# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**CHRISTY J. RHOADES, in her capacity
as the ADMINISTRATRIX and
PERSONAL REPRESENTATIVE of the
ESTATE OF PHILIP JONTZ RHOADES,**

<div style="border:1px solid">
ELECTRONICALLY
FILED
Oct 02 2018
U.S. DISTRICT COURT
Northern District of WV
</div>

**Plaintiff,**

v.

Civil Action No.: __1:18-CV-186__
Judge: __Keeley__

**COUNTY COMMISSION OF MARION COUNTY;
MARION COUNTY SHERIFF'S DEPARTMENT;
DAVID FORSYTH, in his
official and individual capacity; and
JOHN DOE, in his official and individual capacity.**

**Defendants.**

## COMPLAINT

### PRELIMINARY STATEMENT

This is an action brought under 42 U.S.C. §1983 and the laws of the State of West Virginia to hold the Marion County Sheriff's Department and its deputy accountable for their unreasonable use of excessive, deadly force. Between December 2016 and October 2017, the Marion County Sheriff's Department shot at least three citizens in three separate incidents for allegedly "driving their vehicles in aggressive manner."[1] Two of those citizens, including Philip Jontz Rhoades ("Mr. Rhoades"), were pronounced dead on scene. The third, Randall Clay Ford, survived but is now paralyzed. All of these individuals were being sought out by the Marion County Sheriff's Department for non-violent allegations.[2]

---

[1] The Marion County Sheriff's Department is also believed to have been on-scene for a fourth shooting with similar facts.
[2] Philip Jontz Rhoades was charged with one or more felonies after successfully evading the Marion County Sheriff's Department the week prior to his death; however, upon information and belief, the allegations for which he was actually being pursued were in relation to non-violent allegations regarding joy-riding.

As further explained herein, no exigent circumstances or imminent threat existed at the moment Defendant David Forsyth intentionally emptied his firearm into Mr. Rhoades' *parked* vehicle. The Estate of Philip Jontz Rhoades now turns to this Honorable Court, seeking justice under the laws and protections afforded to all citizens of the United States of America for Mr. Rhoades' unnecessary, unreasonable, and unlawful death.

## JURISDICTION AND VENUE

1.      This Complaint seeks remedies pursuant to 42 U.S.C. §§1983 and 1988, alleging violations of the Fourth Amendment of the Constitution of the United States of America, as well as the laws of the State of West Virginia.

2.      Jurisdiction is conferred upon this Honorable Court pursuant to 28 U.S.C. §§1331, 1343, and 1367.

3.      Venue is proper before this Honorable Court pursuant to 28 U.S.C. §1391(b).

## PARTIES

4.      The Plaintiff, Christy J. Rhoades, a resident of Marion County, West Virginia, is the duly qualified Administratrix and Personal Representative of the Estate of her deceased husband and the father of her two sons, Philip Jontz Rhoades. *See* Letter of Administration (attached hereto as "Ex. A").

5.      At the time of his death, Mr. Rhoades was a resident of Marion County, West Virginia.

6.      Defendant County Commission of Marion County is a unit of local government organized under the laws of the State of West Virginia, and, upon information and belief, oversees and operates the Marion County Sheriff's Department, which employs the other Defendants in this case.

7.      At all times relevant herein, Defendant Marion County Sheriff's Department was a governmental entity, duly incorporated and existing under the laws of the State of West Virginia and operated in Marion County, West Virginia, as a law enforcement agency.

8.      At all times relevant herein, Defendant David Forsyth ("Forsyth") was employed by the Marion County Sherriff's Department and, upon information and belief, was a resident of Marion County West Virginia.

9.      At all times relevant herein, Defendant John Doe was an employee, agent, and or other representative of the Marion County Sheriff's Department who acted in concert with the Defendant(s) to unlawfully cause the death of Philip Jontz Rhoades.

10.     At all times relevant herein, the acts and omissions of the Defendants were pursuant to the customs, policies, practices, and procedures of the Marion County Sheriff's Department.

11.     At all times relevant herein, each Defendant acted under the color of the laws, statutes, and regulations of the State of West Virginia.

## FACTS

### The Marion County Sheriff's Department

12.     Marion County, West Virginia, has a population of approximately 55,000 and the lowest *per capita* income of any county in the State of West Virginia according to 2010 U.S. Census Bureau Statistics.

13.     At all times relevant herein, upon information and belief, the Marion County Sheriff Department owned hundreds of thousands of dollars in military grade vehicles and/or equipment. *See, e.g.,* Emily Gallager, Marion County Sheriff's Department Purchases $260,000 Armored Vehicle, Times West Virginian (August 24, 2015), http://www.timeswv.com/news/marion-county-sheriff-s-department-purchases-armored-vehicle/article_b68052ac-4a11-11e5-9742-3fa434b760dc.html (attached hereto as "Ex. B").

14.     Despite the money spent in recent years on military grade vehicles and/or equipment, at all times relevant to this action, the Marion County Sheriff's Department's deputies did not wear body cameras and the department claimed to own only three operable "in-car dash cameras." *See* August 12, 2017 FOIA Request and Response Provided by the Marion County Sheriff's Department (attached hereto as "Ex. C").

15.     Based on a Freedom of Information Act ("FOIA") Request to the Marion County Sheriff's Department, in the ten years prior the Marion County Sheriff Department's shooting of Mr. Rhoades, members of the Marion County Sheriff's Department discharged their firearms over 800 times—or an average of approximately once every 4.5 days.[3] *See* August 11, 2017 FOIA Request and Response Provided by the Marion County Sheriff's Department (attached hereto as "Ex. D").

16.     Between December 2016 and October 2017, the Marion County Sheriff's Department shot three individuals in three separate incidents for allegedly "driving their vehicle in aggressive manner," and were on-scene during a fourth shooting with similar facts involving the City of Fairmont Police Department.

17.     As a result of said shootings, the Marion County Sheriff's Department killed two individuals, including Mr. Rhoades, and the third individual, Randall Clay Ford, is now paralyzed.

18.     The individual shot during the fourth shooting involving the City of Fairmont Police Department is also now paralyzed.

**The Marion County Sheriff's Department's Use of Force Policy**

19.     The Marion County Sheriff's Department Use of Force Policy "is designed to give deputies of the Marion County Sheriff's Department a set of guidelines" regarding the use of less-

---

[3] The August 11, 2017 FOIA Request asked the Marion County Sheriff's Department to provide "[a]ny and all information relating to any Marion County Sheriff's Department's employee discharging their weapon while on duty at any time during the past ten (10) years. In response, the Marion County Prosecuting Attorney's Office, on behalf of the Marion County Sheriff's Department, provided Plaintiff's counsel with a 21-page list from Marion County Department of Homeland Security & Emergency Management & E911, which shows 882 entries spanning from July 25, 2007, through August 28, 2017. No other responsive information has ever been provided. *See* Ex. D.

lethal or lethal force ("MCSD Use of Force Policy"). *See* MCSD Use of Force Policy at 1 (attached

hereto as "Ex. E").

20.     The MCSD Use of Force Policy defines an "Imminent Threat" as "[t]hat threat which

is *about to happen, immediate, and perceived to be unavoidable.*" *Id.* (emphasis added).

21.     Pursuant to the MCSD Use of Force Policy, "a deputy *shall not* discharge a firearm

under" certain circumstances, including, but not limited to, the following:

   a.   Solely to protect property interests;
   b.   When lethal force is not authorized in accordance with the MCSD Use
        of Force Police or the MCSD Firearms Policy;
   c.   To stop an individual on mere suspicion of a crime simply because the
        individual runs away; or
   d.   At or from a moving vehicle, absent exigent circumstances.

*Id.* at 7.

22.     The MCSD Use of Force Policy defines "Excessive Force" as "that force used greater

than that which is reasonably necessary to compel compliance given the circumstances or

inappropriate to the circumstances to accomplish a legal purpose. When any degree of force is utilized

as summary punishment or for vengeance. Excessive force is NEVER authorized." *Id* at 1.

23.     At all times relevant to this action, the Marion County Sheriff's Department has had a

custom, pattern, practice, and procedure of using Excessive Force when, at the time of using deadly

force, no reasonable police officer would believe that an Imminent Threat existed.

24.     At all times relevant to this action, after utilizing Excessive Force, as described in the

above paragraph, the Marion County Sheriff's Department has had a custom, pattern, practice, and

procedure of claiming that they believed an Imminent Threat existed in order to justify their wrongful

actions.

**Philip Jontz Rhoades**

25.     At the time of his death, Mr. Rhoades was legally married to the Administratrix of his Estate, Christy J. Rhoades, and they had two sons, ages six and eight.

26.     Mr. Rhoades had no history of being dangerous or violent (other than getting into a siblings' quarrel with his adult brother at their father's residence and subsequently being charged with "domestic violence" in relation to said quarrel by Defendant Marion County Sheriff's Department).

27.     Unfortunately, like many of West Virginia's citizens, Mr. Rhoades battled addiction issues during his adult life.

28.     As a result of legal troubles relating to his battle with addiction, Mr. Rhoades, as a twenty-eight-year old, was left without a driver's license.

29.     As a resident of northern Marion County, Mr. Rhoades had extremely limited means of transportation, and in the weeks prior to his death, he had been accused of driving vehicles in or around Marion County that had the keys left inside, but without the owner's permission—in other words, he had been joy-riding.

30.     A review of every 911 call regarding Mr. Rhoades' joy-riding activities reveals that he never once used force or the threat of force towards a single person and no caller ever reported seeing Mr. Rhoades with a weapon of any kind.

**The Marion County Sheriff's Department's Failed Pursuit of Mr. Rhoades**

31.     On or about July 25, 2017, Mr. Rhoades successfully evaded the Marion County Sheriff's Department in a publicized failed pursuit (the "July 25th Failed Pursuit").

32.     During the July 25th Failed Pursuit, Mr. Rhoades was able to change vehicles three times—never using force or the threat of force to do so—and ultimately successfully evaded the Marion County Sheriff's Department.

33.     At all times relevant herein, The Marion County Sheriff's Department has had a custom, pattern, practice, and procedure of using Excessive Force against individuals who are allegedly fleeing without anyone being in Imminent Danger.

34.     As indicated above, pursuant to the MCSD Use of Force Policy, "a deputy *shall not* discharge a firearm under" certain circumstances, including, but not limited to, the following:

   a.   Solely to protect property interests;
   b.   When lethal force is not authorized in accordance with the MCSD Use of Force Policy or the MCSD Firearms Policy;
   c.   To stop an individual on mere suspicion of a crime simply because the individual runs away; or
   d.   At or from a moving vehicle, absent exigent circumstances.

*Id.* at 7 (emphasis added).

35.     Consistent with its custom, pattern, practice, and procedure, during the July 25th Failed Pursuit, the Marion County Sheriff's Department discharged one or more firearms at Mr. Rhoades, violating the MSCD Use of Force Policy in multiple ways, including, but not limited to: (a) discharging a firearm solely protect property interests; (b) discharging a firearm to stop an individual on mere suspicion of a crime simply because the individual runs away; and (c) discharging a firearm at a moving vehicle, absent exigent circumstances.

36.     Consistent with its custom, pattern, practice, and procedure, the Marion County Sheriff's Department accused Mr. Rhoades of attempting to use his vehicle in an aggressive manner towards a police officer to justify using deadly force when deputies shot at Mr. Rhoades during the July 25th Failed Pursuit.

37.     Importantly, when reviewing the radio traffic and 911 call records from the July 25th Failed Pursuit, there does not appear to be any mention of Mr. Rhoades attempting to harm anyone— only that shots had been fired by the police and that residents in the area heard the gunshots.

38.     Upon information and belief, the Marion County Sheriff's Department was embarrassed by the fact that Mr. Rhoades was able to successfully change vehicles three times and ultimately avoided being arrested during the July 25th Failed Pursuit.

39.     Following the July 25th Failed Pursuit, a member or members of the West Virginia State Police informed Mr. Rhoades' family that they should tell them where Mr. Rhoades was before the Marion County Sheriff's Department found him because the Marion County Sheriff's Department was going to "take him out."

### August 2, 2017 – The Marion County Sheriff's Department "Takes Out" Mr. Rhoades

40.     On or about August 2, 2017, just prior to being shot and killed by the Marion County Police Department, Mr. Rhoades assisted two individuals who had just wrecked their vehicle into a ditch in in the northern area of Marion County.

41.     According to one of the individuals Mr. Rhoades assisted after the wreck referenced in the above paragraph, when Mr. Rhoades heard the emergency sirens in response to the vehicle accident, he left to hide from the Marion County Sheriff's Department.

42.     According to radio traffic, members of the Marion County Sheriff's Department saw Mr. Rhoades driving in the northern area of Marion County shortly after the above-referenced wreck.

43.     Mr. Rhoades attempted to hide down a dead-end road dirt road leading to a gas-well site in the Parish Run Road/East Run Road area of northern Marion County.

44.     When Defendant Forsyth and his partner that day, Deputy Corey Love[4] ("Deputy Love"), learned where Mr. Rhoades was hiding, they pursued him.

45.     Notably, Defendant Forsyth and Deputy Love provided substantially different accounts of the moments leading up to Defendant Forsyth shooting and killing Mr. Rhoades. *See*

---

[4] Upon information and belief, at the time of the shooting, Deputy Love had only been employed by the Marion County Sheriff's Department for one month and two weeks and had not yet been to the police academy. Thus, Deputy Love was untrained at all times relevant herein.

Transcribed Statement of Deputy Forsyth (attached hereto as "Ex. F"); Transcribed Statement of Deputy Love (attached hereto as "Ex G").

46.     When the Marion County Sheriff's Department cruiser being operated by Defendant Forsyth entered the clearing and made visual contact with the vehicle Mr. Rhoades was in, Defendant Forsyth jumped out of his moving cruiser, positioned himself directly in front of Mr. Rhoades, and discharged his firearm seven times—killing Mr. Rhoades.



W.Va. State Police photo of the entrance to the gas-well site.



W.Va. State Police photo of the site. The Rhoades' vehicle is behind the bushes on the left.



W.Va. State Police photo of the location of the vehicles after the shooting.



W.Va. State Police photo of the location of the vehicles after the shooting.

47.     Deputy Love did not even make it around the front of the Marion County Sheriff's Department's cruiser before Defendant Forsyth began shooting Mr. Rhoades. *See* "Ex. G" at 3:13-15.

48.     Defendant Forsyth stated that he pulled Mr. Rhoades' body from the vehicle after shooting him. *See* "Ex. F" at 4:9-13.

49.     When reading their pre-written accounts of the shooting during the West Virginia State Police's investigation—two days after the shooting occurred—Defendant Forsyth and Deputy Love stated that Mr. Rhoades' vehicle was moving towards Defendant Forsyth and that, stated succinctly, they believed Defendant Forsyth's death was unavoidable short of shooting Mr. Rhoades. *See generally* "Ex. F;" "Ex. G."

50.     The photographs of the scene following the shooting show that any allegedly perceived threat of being hit by Mr. Rhoades' vehicle as being "unavoidable" short of using deadly force is unreasonable under any circumstances.

51.     Assuming, *arguendo*, that Defendant Forsyth actually believed—after jumping out of his moving cruiser and directly in front of Mr. Rhoades—that the vehicle was moving towards him, Defendant Forsyth could have simply stepped out of the way to avoid any perceived threat, as any reasonable officer would recognize under the circumstances.

52.     At the moment Defendant Forsyth began shooting Mr. Rhoades, he could not have reasonably believed himself to be in Imminent Danger, as defined in the MCSD Use of Force Policy, or that any exigent circumstance existed.

53.     As explained immediately below, Mr. Rhoades' vehicle could *not* have been moving at the time of the shooting.

54.     The West Virginia State Police's Report of Criminal Investigation states that the vehicle Mr. Rhoades was driving was "running and *appeared* to be in gear" approximately 39 minutes after the shooting occurred.  *See* Redacted Report of Criminal Investigation at 2 (attached hereto as "Ex. H") (emphasis added).

55.     Mr. Rhoades was in a "standard" or "stick-shift" Jeep Wrangler when he was shot and killed by Defendant Forsyth.

56.     The Jeep Wrangler would have had to have been in gear to be moving towards Defendant Forsyth.

57.     Had the Jeep Wrangler been in gear when Defendant Forsyth shot and killed Mr. Rhoades, the engine would have stopped running, at the latest, when Mr. Rhoades' foot was taken off of the clutch when his body was pulled from the vehicle immediately after being shot—as with *any* standard/stick-shift vehicle.

58.     The fact that the subject Jeep Wrangler was still running when the West Virginia State Police arrived on scene approximately 39 minutes later can only lead to one conclusion—the vehicle was in neutral and parked the entire time.

59.     Thus, the subject Jeep Wrangler was not moving towards Defendant Forsyth as he and Deputy Love have falsely claimed as justification for Defendant Forsyth's unreasonable and unlawful use of Excessive Force when he intentionally shot and killed Mr. Rhoades.

60.     During his interview with the West Virginia State Police, Defendant Forsyth admitted that when he entered the clearing, Mr. Rhoades was "parked," but then quickly attempted to change his story once he realized what he had said. *See* "Ex F" at 6:11.

61.     According to radio traffic from the Marion County Sheriff's Department, only sixteen seconds elapsed between the time that it was reported that Mr. Rhoades had "cut off on a trail" to the time that Defendant Forsyth reported "shots fired" after unloading his firearm into Mr. Rhoades' vehicle.

62.     According to radio traffic from the Marion County Sheriff's Department, immediately following the shooting, the Marion County Sheriff's Department instructed that Defendant Forsyth be put in a cruiser and "don't have him talk to anybody."

### The West Virginia State Police's Investigation

63.     Upon information and belief, all shootings are required to be investigated as a homicide and then proven as such or ruled otherwise (i.e. suicide, self-defense, an otherwise justified shooting, etc…).

64.     Defendant Forsyth violated the MCSD Use of Force Policy in multiple ways when he unreasonably shot and killed Mr. Rhoades, including, but not limited to, (1) utilizing deadly force as summary punishment and/or for vengeance in response the July 25th Failed Pursuit; (2) discharging a firearm solely to protect property interests; (3) using deadly force when it is not authorized in accordance with the MCSD Use of Force Policy; (4) using deadly force to stop Mr. Rhoades on mere suspicion of a crime simply because he had ran in the past; and (5) assuming, *arguendo*, that Defendant

Forsyth perceived Mr. Rhoades' vehicle to be moving, by discharging a firearm at a moving vehicle without the existence of exigent circumstances.

65.     The West Virginia State Police did not investigate the subject shooting as a homicide.

66.     Defendant Forsyth did not give a statement following the shooting until August 4, 2017—two days later—when he met with the West Virginia State Police and read from a pre-written statement. *See* Statement of Deputy Forsyth.

67.     The West Virginia State Police's interview of Defendant Forsyth lasted a total of twelve (12) minutes. *Id.*

68.     Likewise, Deputy Love did not give a statement following the shooting until August 4, 2017—two days later—when he met with the West Virginia State Police and read from a pre-written statement. *See* "Ex. G."

69.     The West Virginia State Police's interview of Deputy Love lasted a total of nine (9) minutes. *Id.*

70.     During both interviews, the investigating West Virginia State Trooper, asked leading questions that were crafted with the intent of ruling the shooting as "justified." *See generally, id.*; "Ex F."

71.     Plaintiff's counsel was initially contacted by the Rhoades family to learn the details of what had occurred, including whether or not Mr. Rhoades was dead or alive, because no one would give the family any information beyond what had been provided to media outlets.

72.     Plaintiff's counsel had to inform the Rhoades family that Mr. Rhoades had been killed by the Marion County Sheriff's Department.

73.     In an effort to find answers for the Rhoades family, Plaintiff's counsel enlisted the services of a private investigator and former West Virginia State Trooper, Karl Streyle ("Mr. Streyle").

74.     During Mr. Streyle's first visit to the location of the subject shooting, he located three shell casings from Defendant Forsyth's firearm that were missed by the West Virginia State Police. *See* "Ex. H" at 7.

75.     The West Virginia State Police claim to have only recovered two shell casings from Defendant Forsyth's firearm during their investigation.

76.     Two shell casings from Deputy Forsyth's firearm have never been recovered.

77.     Despite countless attempts to obtain Mr. Rhoades' autopsy, the Office of the Chief Medical Examiner of the State of West Virginia has refused to provide their report to the Rhoades family or Plaintiff's counsel.

### The Marion County Prosecuting Attorney's Determination that the Shooting was "Justified"

78.     On Monday, August 7, 2017—five days after the shooting occurred and several weeks prior to the West Virginia State Police concluding their investigation—the Marion County Prosecuting Attorney's Office advised the West Virginia State Police that it was not going to present the matter to the Grand Jury because the incident "appeared to be justifiable." *Id.* at 6.

### COUNT I
### 42 U.S.C. §1983 – Excessive Use of Force

79.     The Plaintiff hereby incorporates by reference the allegations contained in the paragraphs 1-78, as if fully set forth herein.

80.     Defendant Forsyth, while acting under the color of the law, violated Mr. Rhoades' constitutional rights by unreasonably using Excessive Force, as described herein throughout, on or about August 2, 2017, which resulted in Mr. Rhoades' death.

81.     The actions of Defendant Forsyth violated the constitutional rights guaranteed to Mr. Rhoades by the Fourth Amendment of the United States Constitution.

82.     The actions of Defendant Forsyth were not taken in good-faith and were in violation of clearly established law.

83.     Defendant Forsyth violated the MCSD Use of Force Policy in multiple ways when he used Excessive Force at the time he unreasonably shot and killed Mr. Rhoades, including, but not limited to, (1) utilizing deadly force as summary punishment and/or for vengeance in response the July 25th Failed Pursuit; (2) discharging a firearm solely to protect property interests; (3) using deadly force when it is not authorized in accordance with the MCSD Use of Force Policy; (4) using deadly force to stop Mr. Rhoades on mere suspicion of a crime simply because he had ran in the past; and/or (5) assuming, *arguendo*, that Defendant Forsyth perceived Mr. Rhoades' vehicle to be moving, by discharging a firearm at a moving vehicle without the existence of exigent circumstances.

84.     Defendant Forsyth's actions were unnecessary, unreasonable, unlawful, and unjustified.

85.     As stated herein throughout, the Marion County Sheriff's Department has a custom, pattern, practice, and procedure of using Excessive Force against individuals who are allegedly fleeing without anyone being in Imminent Danger, as defined by the MCSD Use of Force Policy.

86.     Consistent with its custom, pattern, practice, and procedure, the Marion County Sheriff's Department unjustifiably shot and killed Mr. Rhoades in violation of the MSCD Use of Force Policy.

87.     Consistent with its custom, pattern, practice, and procedure, the Marion County Sheriff's Department accused Mr. Rhoades of attempting to use his vehicle in an aggressive manner to justify using deadly force.

88.     The Marion County Sheriff's Department has attempted to justify shooting three citizens between December 2016 and October 2017 using this same excuse, and was on scene during

a fourth shooting involving the City of Fairmont Police Department, which attempted to be justified in the same manner.

89.     As a direct and proximate result of the Marion County Sheriff's Department's custom, pattern, practice, and procedure, as stated herein above, Mr. Rhoades' rights guaranteed to him by the Fourth Amendment of the United States Constitution were violated.

90.     As a direct and proximate result of Defendants' unreasonable and unlawful actions, Mr. Rhoades died and suffered substantial damages, both compensatory and general, including, but not limited to, severe emotional distress, mental anguish, pain, and suffering.

91.     The actions of Defendant Forsyth against Mr. Rhoades were reprehensible, willful, and wanton, malicious, and in blatant and intentional disregard for the rights owed to Mr. Rhoades, thereby justifying an award of punitive damages to the fullest extent permitted by law.

## COUNT II
### State Constitutional Violations

92.     The Plaintiff hereby incorporates by reference the allegations contained in the paragraphs 1-91, as if fully set forth herein.

93.     Defendant Forsyth, while acting under the color of the law, violated Mr. Rhoades' constitutional rights by using excessive and unlawful force, as described herein, on or about August 2, 2017, which resulted in Mr. Rhoades' death.

94.     Count II alleges a constitutional tort action under the West Virginia Constitution, pursuant to the common law of West Virginia, and specifically is not filed pursuant to 42 U.S.C. § 1983 or any other related federal statute.

95.     The actions of Defendant Forsyth were not taken in good-faith and were in violation of clearly established law.

96.     Defendant Forsyth violated the MCSD Use of Force Policy in multiple ways when he unreasonably shot and killed Mr. Rhoades, including, but not limited to, (1) utilizing deadly force as

summary punishment and/or for vengeance in response the July 25th Failed Pursuit; (2) discharging a firearm solely to protect property interests; (3) using deadly force when it is not authorized in accordance with the MCSD Use of Force Policy; (4) using deadly force to stop an Mr. Rhoades on mere suspicion of a crime simply because Mr. Rhoades had ran in the past; and/or (5) assuming, *arguendo*, that Defendant Forsyth perceived Mr. Rhoades' vehicle to be moving, by discharging a firearm at a moving vehicle without the existence of exigent circumstances.

97.     Defendant Forsyth's actions were unnecessary, unreasonable, unlawful, and unjustified.

98.     As a direct and proximate result of the Marion County Sheriff's Department's custom, pattern, practice, and procedure, as stated herein above, Mr. Rhoades' rights guaranteed to him by the Constitution of the State of West Virginia were violated.

99.     As a direct and proximate result of Defendant Forsyth's actions, Mr. Rhoades died and suffered substantial damages, both compensatory and general, including, but not limited to, severe emotional distress, mental anguish, pain, and suffering.

100.    The actions of Defendant Forsyth against Mr. Rhoades were carried out with (a) actual malice and/or (b) a conscious, reckless, and outrageous indifference to the health, safety, and welfare of others, thereby justifying an award of punitive damages to the fullest extent permitted by law.

## COUNT III
### Intentional Infliction of Emotional Distress

101.    The Plaintiff hereby incorporates by reference the allegations contained paragraphs 1-101, as if fully set forth herein.

102.    Defendant Forsyth shooting and killing Mr. Rhoades was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency.

103.    Defendant Forsyth acted with the intent to inflict emotional distress or acted recklessly when it was certain or substantially certain that emotional distress would result from his outrageous conduct.

104.    Defendant Forsyth's actions caused Mr. Rhoades to suffer severe emotional distress as he was being shot and killed.

105.    The emotional distress Mr. Rhoades experienced was so severe, no reasonable person could be expected to endure it.

106.    As a direct and proximate result of Defendant Forsyth's action actions, Mr. Rhoades died and suffered substantial damages, both compensatory and general, including, but not limited to, severe emotional distress, mental anguish, pain, and suffering.

107.    The actions of Defendant Forsyth against Mr. Rhoades were carried out with (a) actual malice and/or (b) a conscious, reckless, and outrageous indifference to the health, safety, and welfare of others, thereby justifying an award of punitive damages to the fullest extent permitted by law.

## COUNT IV
### Wrongful Death - W.Va. Code § 55-7-6

108.    The Plaintiff hereby incorporates the allegations contained in paragraphs 1-108, as if fully set forth herein.

109.    As a direct and proximate result of the misconduct described herein, the Defendants are responsible for Mr. Rhoades' wrongful death.

110.    As a direct and proximate result of Mr. Rhoades' wrongful death, the Estate of Philip Jontz Rhoades and Mr. Rhoades' family members are entitled to damages pursuant to West Virginia's Wrongful Death Statute, W.Va. Code § 55-7-6.

111.    The actions of Defendant Forsyth against Mr. Rhoades were carried out with (a) actual malice and/or (b) a conscious, reckless, and outrageous indifference to the health, safety, and welfare of others, thereby justifying an award of punitive damages to the fullest extent permitted by law.

**WHEREFORE**, the Plaintiff, Christy J. Rhoades, in her capacity as the Administratrix and Personal Representative of the Estate of Philip Jontz Rhoades, demands judgment against the Defendants for:

a.  Compensatory damages for all economic losses and expenses incurred a result of the death of Philip Jontz Rhoades;

b.  General damages for all physical pain, mental suffering, and emotional distress suffered by Philip Jontz Rhoades from the time of being shot until his death;

c.  Damages permitted to be recovered by the West Virginia Wrongful Death Act, including:

    A.  Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the Decedent;

    B.  Compensation for reasonable expected loss of (i) income of the Decedent, and (ii) services, protection, care and assistance provided by the Decedent; and

    C.  Reasonable funeral expenses and any other expenses incurred as a result of the death of Philip Jontz Rhoades;

d.  Punitive damages to the fullest extent permitted by law;

e.  Pre-judgment and post-judgment interest;

f.  Costs incurred in this action and reasonable attorney fees under 42 U.S.C. § 1988; and

g.  Such other further specific and general relief as may become apparent from discovery as this matter matures for trial.


**THE PLAINTIFF DEMANDS A TRIAL BY JURY.**

**CHRISTY J. RHOADES, in her capacity
as the ADMINISTRATRIX and
PERSONAL REPRESENTATIVE of the
ESTATE OF PHILIP JONTZ RHOADES,**

By Counsel

J. Bryan Edwards (W.Va. Bar No. 6886)
Ryan J. Umina (W.Va. Bar No. 13056)
**CRANSTON & EDWARDS, PLLC**
1200 Dorsey Avenue, Suite II
Morgantown, WV 26501
Phone: (304) 296-3500
Fax: (304) 296-3600
bedwards@cranstonedwards.com
rumina@cranstonedwards.com