**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**CHRISTY J. RHOADES, in her capacity
as the ADMINISTRATRIX and
PERSONAL REPRESENTATIVE of the
ESTATE OF PHILIP JONTZ RHOADES,**

**Plaintiff,**

**v.**                                                          **Civil Action No.: 1:18-CV-186
Judge: Hon. Thomas S. Kleeh**

**COUNTY COMMISSION OF MARION COUNTY;
DAVID FORSYTH, in his
official and individual capacity; and
JOHN DOE, in his official and individual capacity.**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, by counsel, J. Bryan Edwards and Ryan J. Umina, and

hereby submits the following Response in Opposition to Defendants' Motion for Summary

Judgment.

## I.    BRIEF STATEMENT OF FACTS

### a.  Defendant Forsyth

Defendant David Forsyth ("Forsyth") is a deputy with the Marion County Sheriff's

Department ("MCSD"). During his pre-employment psychological screening for the

position, Defendant Forsyth was administered a "Personality Assessment Inventory"

("PAI"), which found that "he is prone to deny even relatively minor faults or foibles." *Pre-*

*Employment Psychological Evaluation* at 2, attached as *Ex. A*.

Because of the results of the PAI, Defendant Forsyth was administered a second

personality assessment, the Minnesota Multiphasic Personality Inventory-II ("MMPI").

The MMPI indicated the following about Defendant Forsyth:

> There was a tendency for a defensive response style. His response set on the MMPI items certainly point to a potential for rigidity, as over control of emotions. Again, these would suggest that if a pre-employment interview is completed, then addressing issues of management of aggressive feelings or thoughts, particularly in situations where a law enforcement officer is likely to be placed in when dealing with highly confrontational individuals. He is prone to hyper vigilance. *Id*.

### b. The Shooting Death of Philip Jontz Rhoades

On the afternoon of August 2, 2017, Defendant Forsyth shot and killed 28-year-old Philip Jontz Rhoades ("Philip") within seconds of locating him. (the "Shooting"). *West Virginia State Police Report of Criminal Investigation* at 1, attached as *Ex. B*; *Dkt. No. 22*, at ¶ 45. In the moments leading up to the Shooting, Philip was hiding from the Defendants near a gas well site at the dead end of a small dirt road in rural, northern Marion County, West Virginia, in a 1999 Jeep Wrangler ("Jeep"). *Ex. B* at 1, and *Dkt No. 22* at ¶ 42. Eight days prior, on July 25, 2017, another deputy with the MCSD had shot at Philip, and he had been running and hiding from the Defendants, scared, ever since. *Corey Love Dep*. at 58:4-5, attached as *Ex. C*; *Rick Rhoades Dep.* at 62:4-8*, attached as *Ex. D*; *Kaleb Rhoades Dep.* at 50:14-19, attached as *Ex. E*; *Kayla Rhoades Dep*. at 51:19-21*, attached as *Ex. F*. The Defendants claim that the Shooting was justified; alleging that Philip was aggressively driving the Jeep towards Defendant Forsyth when he employed lethal force—firing seven rounds into the Jeep. *Dkt No. 62* at 5. Defendant Forsyth has since stated that he did not know the man in the Jeep was Philip until after the Shooting. *David Forsyth Dep.* at 46:8-25, attached as *Ex. G*.

When the West Virginia State Police ("WVSP") arrived on scene to investigate approximately thirty minutes later, the Jeep, equipped with a manual transmission, was

still running and in neutral. *Ex. B* at 2; *Samuel Faulkner Dep*. 100:6-8, attached as *Ex. H* ("with a manual transmission, it couldn't have been in gear and still running"). All pertinent witnesses have testified during depositions in this matter that no one touched and/or otherwise manipulated the Jeep's gear shifter at any time after the Shooting. *Ex. G* at 8:2-25, 9:1-13; *Ex. C* at 14:21-23. The only witness to the Shooting was then Deputy Corey Love ("Dep. C. Love")—the MCSD deputy who had shot at Philip eight days prior. As of today, Dep. C. Love is no longer in law enforcement.

### c. Dep. C. Love Shoots at Philip on July 25, 2017

On July 25, 2017, the MCSD visited a vacation home owned by Philip's uncle in Mill Fall, Marion County, West Virginia. Philip's uncle had called in and stated that he believed Philip may be staying at the residence, however, he did not want him to get into any trouble for doing so. *Marion County E911 July 25, 2017 CAD Report* at 2, attached as *Ex. I*. When the MCSD arrived at his uncle's home, Philip immediately fled. *See generally*, *id*.; *Ex. C*.

As Philip was driving away from his uncle's home, Dep. C. Love, a new recruit with the MCSD, was standing in the roadway. *Ex. C* at 58:1-2. As of that day, Dep. C. Love had been with the MCSD for approximately six weeks and had not yet been to the police academy. *Id*. at 50:16-19. Three days earlier, on July 22, 2017, his field training officer noted three of Dep. C. Love's "significant weaknesses:" (1)" communication skills," (2) "cannot comprehend or retain information well (basic instructions)," (3) "gets confused easily." *Dep. C. Love FTO Evaluations*, attached as *Ex. J*. Dep. C. Love's field training officer also indicated that he "is not performing at solo beat officer level." *Id*.  Five days prior, on July 20, 2017, his field training officer noted that Dep. C. Love's "least acceptable

area of performance" was his "aware[ness] of surroundings while outside vehicle." *Id*.

As Dep. C. Love stood in the roadway on July 25, 2017, he saw Philip traveling on the roadway in his direction. *Ex. C* at 57:19-23. In response, Dep. C Love moved, avoiding any perceived threat by Philip's vehicle. *Id.* at 58:4-5. He then drew his weapon and fired at Philip and/or the vehicle Philip was operating as he drove past—still on the roadway. *Id.* at 58:8-10.

Immediately after being shot at by Dep. C. Love, Philip desperately ran from and successfully evaded the MCSD in a highly publicized failed pursuit ("Failed Pursuit"). *See Dkt. No.* 62 at 2-3. During the Failed Pursuit, Philip was able to change cars three times, never using force or the threat of force in doing so. *See generally*, Record.

Following the Failed Pursuit, the MCSD charged Philip with the "attempted murder" of Dep. C. Love "by willful, deliberate, premeditated killing;" with Deputy Eric Parker ("Dep. Parker") obtaining the arrest warrant ("Parker Warrant"). *Parker Warrant Criminal Complaint*, attached as *Ex. K*. Dep. C. Love's father, Sgt. Matthew Love ("Sgt. M. Love"), a high-ranking member of the MCSD, provided the only known narrative relating the Failed Pursuit. *July 25, 2017 Narrative*, attached as *Ex. L*.

The facts alleged against Philip in the Parker Warrant are as follows,

> While investigating a call of Trespassing/squatting at the residence of 280 Mill Fall Run Rd., Marion County, WV information had been received of Philip Jontz Rhoades and Amanda Powell having broke into the same residence, cut luck off water utility and are living at the same without owner consent. [ . . . ] Deputies observed a white pick up truck to the right side of the residence, and a green pick up truck at rear of residence with Amanda Powell near back porch and Philip Rhoades now running towards the white truck from the green truck. Deputies ordered Rhoades to stop several times. Rhoades stopped for a brief second making eye contact with this Deputy, turned and ran across back porch over bannister. Deputy units #71/#23 pursued [ . . . ] Rhoades to rear of residence. Philip Jontz Rhoades jumped

into the white truck and recklessly drove at Deputy Love spinning tires, throwing mud and grass. To avoid being struck by the truck Deputy Love was able to jump out of its path as it narrowly missed running him down.

*Ex. K.* at 1-2.

Dep. Parker was asked by Plaintiff's counsel during his deposition, "why would you obtain the warrant if other deputies had actually saw the shooting or were involved with it?;" to which he responded, "[Dep. C. Love] was the only one who saw it. I just did it. I did it. I did it for him." *Eric Parker Dep.* at 23:6-10, attached as *Ex. M.* Dep. C. Love stated during his deposition that he was unaware of the existence of the Parker Warrant until after Defendant Forsyth killed Philip on August 2, 2017. *Ex. C* at 113:9-18.

During Dep. C. Love's Deposition, he provided the following account of shooting at Philip,

Q.   Okay. So you went chasing after the male. What occurred then?
A.   "He jumped over the banister on the porch, and I jumped over following him. And he ran around the corner, and I was following him, but I lost sight of him and I ran up on the road looking for him. And I turned around and his truck was coming at me."
Q.   Was he driving on the road?
A.   The little gravel road that led up int here.
Q.   Okay. And you were standing in the road?
A.   Yes, sir.
Q.   Okay. What happened then?
A.   When it – when he came to hit me, I moved off to the side and I drew my pistol and shot the tire.
Q.   Okay. So you were able to move to the side?
A.   Yes, sir.
Q.   Okay. And you were able to pull out your gun and fire at it as the truck went past?
A.   Yes, sir.
Q.   Okay. Did you hit the truck?
A.   I hit the tire.
Q.   Okay. Did you blow out the tire?
A.   Yes, sir.
Q.   Okay. So you were able to get off the roadway, pull your weapon, aim and hit a tire of a moving vehicle; is that correct?

A.    Yes, sir.

*Ex. C* at 57:17-58:18.

Regarding Dep. C. Love's use of lethal force on July 25, 2017, Deputy Parker

stated the following during his deposition,

Q.    So can we agree then, once Corey moved out of the way, he avoided
      that threat, correct?
A.    Yes.
Q.    So, once he avoided that threat, under the Marion County Sheriff's
      Department's use-of-force policy, that would then be a violation for
      him to shoot at the vehicle.
            MS. DURST: Object to the form.
A.    Yes.
Q.    Just to be clear, your answer to that question was yes?
A.    Yes.

*Ex. M* at 31:13-24.

After being shot at by Dep. C. Love on July 25, 2017, Philip and his family feared

that the MCSD was going to kill him *Ex. D* at 62:4-8; *Ex. E* at 50:14-19; *Ex. F* at 51:19-

21. Eight days later, on August 2, 2017, Defendant Forsyth shot Philip in the face within

seconds of he and Dep. C. Love locating him. *Ex. H* at 86:5-10.

### d.  Use of Force Policy

The MCSD's Use of Force Policy ("Use of Force Policy") defines "Excessive Force"

as "that force used greater than that which is reasonably necessary to compel compliance

given the circumstances or inappropriate to the circumstances to accomplish a legal

purpose. When any degree of force is utilized as summary punishment or for vengeance.

Excessive force is NEVER authorized." *MCSD Use of Force Policy* at 1, attached as *Ex.*

*N.*

Deputies with MCSD are prohibited from utilizing lethal force unless he or she

reasonably believes there to be an "imminent threat" of "serious bodily injury or death" to

themselves or others, as defined by the Use of Force Policy. *Ex. N* at 6. The Use of Force Policy defines an "Imminent Threat" as "[t]hat threat which is *about* to happen, immediate, and perceived to be unavoidable." *Id*. at 1. "Serious Bodily Injury" is defined as "[b]odily injury which creates substantial risk of death or which is likely to cause severe injury, permanent disfigurement, loss of or extended impairment of the function of any body member or organ." *Id*. Thus, pursuant to the Use of Force Policy, a deputy may only discharge his or her weapon in an attempt to avoid what they reasonably believe to be an immediate and otherwise unavoidable threat of "Serious Bodily Injury" to themselves or others.

The Use of Force Policy expressly prohibits deputies from discharging their firearms in the following situations:

    a. Solely to protect property interests;
    b. When lethal force **is not** authorized in accordance with the Use of Force Policy or the MCSD Firearms Policy;
    c. To stop an individual on mere suspicion of a crime simply because the individual runs away; or
    d. At or from a moving vehicle, absent exigent circumstances.

*Ex. N* at 7 (emphasis in original).

The MCSD's primary policy maker, Sheriff Jimmy Riffle ("Sheriff Riffle"), agreed during his deposition in this matter that it "has a duty to ensure that the deputies ha[ve] an understanding of what's contained in the use-of force policy." *Sheriff Riffle Dep.* at 25:10-14, attached as *Ex. O*. In this regard, he indicated that it is okay for a member who is unable to articulate the Use of Force Policy to act as a deputy, so long as that deputy signs a piece of paper stating that they have received and understand it upon being hired. *See id*. at 25:10-31:5. Sheriff Riffle disagreed that a deputy would be acting unreasonably if he or she violated the [Use of Force Policy]. *Id.* at 21:8-22:23.

### e. Nature of the Action

This is an action brought under 42 U.S.C. §1983 and the laws of the State of West Virginia to hold the Marion County Sheriff's Department and its deputy accountable for their unreasonable use of excessive, deadly force. Between December 2016 and October 2017, the Marion County Sheriff's Department shot at no less than three citizens in four separate incidents for allegedly driving their vehicles in an aggressive manner. Two of those citizens, including Philip, were ultimately killed. The third, Randall Clay Ford, survived but is now paralyzed. All of these individuals were being sought out by the MCSD for allegations of non-violent offenses.[1]

In her Amended Complaint, the Plaintiff alleges Defendant Forsyth violated the Use of Force Policy in multiple ways, including, but not limited to, (1) utilizing deadly force as summary punishment and/or for vengeance in response the Failed Pursuit; (2) discharging a firearm solely to protect property interests; (3) using deadly force when it is not authorized in accordance with the Use of Force Policy; (4) using deadly force to stop Philip on mere suspicion of a crime simply because he had ran in the past; and/or (5) assuming, *arguendo*, that Defendant Forsyth perceived Philip's vehicle to be moving, by

---

[1] As described herein, the MCSD accused Philip of the "attempted murder" of Dep. C. Love on July 25, 2017. However, this accusation, and the MCSD's motivations for making it, is a critical question of fact for the jury. Since the initiation of litigation in this matter, Plaintiff has alleged that the MCSD has a custom, pattern, practice, and/or procedure of using Excessive Force against individuals who are allegedly fleeing without anyone being in Imminent Danger, as defined by the Use of Force Policy, and without the existence of exigent circumstances, and then falsely claiming that Imminent Danger or exigent circumstances existed at the time of the shooting to justify their unlawful actions. *Dkt. No.* 22 at ¶ 87.

8

discharging a firearm at a moving vehicle without the existence of exigent circumstances. *Dkt. No.* 22 at ¶ 80.

It is the Plaintiff's position that all evidence in this case, with the exception of statements made by members of the MCSD, supports the allegations set forth herein. Accordingly, at the trial for this matter, the Plaintiff will argue that Defendant Forsyth's use of deadly force was not a reaction to any perceived immediate and unavoidable threat to himself or another, but rather, a knowing and intentional unlawful shooting into a stationary vehicle. Further, because the Jeep was in neutral and all pertinent witnesses have testified that its gear shifter was not touched and/or otherwise manipulated at any time after the Shooting, the Plaintiff will argue at trial that Defendant Forsyth could not have reasonably perceived the Jeep to be moving when he utilized deadly force. *Ex. G* at 7:3-7; *Ex. C* at 14:21-23.

## B. <u>STANDARD OF LAW</u>

"Summary judgment is appropriate only when there are no material facts in dispute, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Betton v. Belue*, 2019 U.S. App. LEXIS 33034, *9, __ F.3d __, 2019 WL 5700353 (citing *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218, 2018 U.S. App. LEXIS 16292, *7, 2018 WL 3015045).  Evidence presented during summary judgment proceedings must be viewed in the light most favorable to the non-moving party. *Id*.

## C. <u>ARGUMENT</u>

Each issue raised in the Defendants' Motion for Summary Judgment ("Defendants' Motion") requires a consideration of conflicting material facts that may only be resolved by a jury, and therefore, the Defendants' Motion must be summarily denied. Prior to

addressing the specific arguments raised therein, the Plaintiff provides the following regarding certain disputed material facts in this case.

Stated succinctly, the Plaintiff alleges that Defendant Forsyth knowingly and intentionally violated Philip's Fourth Amendment Rights on August 2, 2017, when he jumped out of his moving cruiser, a Ford Explorer, and immediately began firing into the parked Jeep. Relying solely upon Defendant Forsyth and Dep. C. Love's statements, the Defendants allege that Philip was aggressively driving at Defendant Forsyth while actively attempting to flee at the moment he was shot. However, the objective evidence in this case tells a different story.

   a.  **Material Questions of Fact That Must be Resolved by the Jury**.

Material questions of fact that must be resolved by the jury, include, but are not limited to, the following:

> i.  **Given that the Jeep was still running and in neutral following the Shooting, was Philip actually driving at Defendant Forsyth as he and Dep. C. Love have claimed as justification for the subject use of lethal force at issue herein?**

If the jury decides that the Jeep was not accelerating towards Defendant Forsyth when he discharged his weapon, then the Plaintiff must prevail on the issue of liability as a matter of law. The Defendants' "use of force" expert agreed with this premise during his deposition, as did the investigating WVSP trooper. *Ex. H* at 9:4-9, 11:24-12:3; *Sgt. Branham Dep*. at 117:14-118:21, attached as *Ex. P*. With the exception of Defendant Forsyth and Dep. C. Love's statements, all relevant and admissible evidence in this case indicates that the Jeep was in neutral when Defendant Forsyth shot Philip.

Approximately thirty-four (34) minutes after Defendant Forsyth killed Philip, the WVSP arrived on scene to investigate. *Ex. B*. WVSP Sgt. Branham observed that Deputy

Forsyth's cruiser "was running" and "in drive." *Id*. As for the Jeep, Sgt. Branham observed that it "was running" and "appeared to be in gear." *Ex. B* at 2. Sgt. Branham, however, does not have knowledge of how standard transmissions operate. *Ex. P* at 78:11-12 ("I am not a mechanic or an operator of a Standard, so I couldn't"). As the Defendants' expert in this case correctly observed, "with a manual transmission, it couldn't have been in gear and still running." *Ex. H* at 100:6-8.

All pertinent witnesses have testified during depositions in this matter that no one touched and/or otherwise manipulated the Jeep's gear shifter at any time after the Shooting. *Ex. G* at 8:2-25, 9:1-13; *Ex. C* at 14:21-23. Further, there is no evidence which would support any theory set forth by the Defendants as to how the Jeep would have otherwise been in neutral if it had not been prior to the Shooting. Thus, any argument set forth by the Defendants at trial in an attempt to reconcile this undisputed fact with their version of events would be based on mere speculation. However, as in all cases in controversy, "pure speculation [ . . . ] cannot substitute for hard facts." *See Higgs v. United States*, 711 F. Supp. 2d 479, 508, 2010 U.S. Dist. LEXIS 48535, *65 (internal citations omitted).

### ii. If Philip was aggressively driving at Deputy Forsyth at the time he was shot, how did the Jeep come to an immediate stop?

When describing the moments leading up to the Shooting to the WVSP two days later, Defendant Forsyth stated "[at that point, the engine did begin revving, tires spun and the vehicle started moving towards me in an aggressive manner. I again ordered the vehicle to stop in a loud, audible voice. It did not stop, veer or slow down at that point." Both Defendant Forsyth and Dep. C. Love testified during their depositions in this matter

that shooting Philip is what caused the allegedly aggressively accelerating Jeep to stop. *Ex. C* at 80:22-24; Ex. *G* at 7:10-11.

However, both experts in this case are in agreement that shooting Philip would not have stopped the allegedly moving Jeep, as the Defendants have claimed. *Ex. H* at 100:6-8, *Dennis Root Dep*. at 174:17-20, attached as *Ex. Q*. Further, based upon photographs taken at the scene by the WVSP shortly after the Shooting, it does not appear to be possible for Defendant Forsyth and Dep. C. Love's accounts to be true when considering the Jeep's location and the limited size of the clearing at the scene. *Dkt. No.* 22 at 9-11.

### iii. Given Defendant Forsyth's account of the Jeep's "tires spinning" just prior to accelerating towards him, why was there no evidence of "ground disturbance" by spinning tires on scene following the Shooting?

In his statement to the WVSP following the Shooting, Deputy Forsyth stated "[at that point, the engine did begin revving, tires spun and the vehicle started moving towards me in an aggressive manner. I again ordered the vehicle to stop in a loud, audible voice. It did not stop, veer or slow down at that point."[2]  Defendants expert, on the other hand, noted that there was no evidence of ground disturbance in the area where Deputy Forsyth claims these events occurred. *Faulkner Supp. Report* at 9, attached as *Ex. R*.

### b. Plaintiff's Claim for Excessive Force Under 42 USC § 1983 Survives the Defendants' Motion for Summary Judgment Because Questions of Material Fact Exist As to Whether Defendant Forsyth Used Excessive Force When He Shot and Killed Philip.

#### i. Plaintiff's § 1983 claim must not be dismissed because Defendant Forsyth is not entitled to qualified immunity.

---

[2] Similarly, following the July 25, 2017 shooting, the MCSD claimed that Philip's vehicle's tires were "spinning, throwing mud and grass" just before allegedly aggressively advancing towards Dep. C. Love. *See Ex. K.* However, Dep. C Love has stated that Philip's vehicle was on the roadway at all times during the subject encounter. *Ex. C* at 57:17-58:18.

The doctrine of qualified immunity "balances two important interests," namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform duties responsibly from "harassment, distraction, and liability." *Betton v. Belue*, 2019 U.S. App. LEXIS 33034, *9, __ F.3d __, 2019 WL 5700353 *Id.* at 219 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)). The burden of establishing the affirmative defense of qualified immunity rests on the party seeking to invoke it. *Id.* Here, Defendants' use of force expert has admitted that "if Deputy Forsyth failed to act in accordance with the [Use of Force Policy] on August 2, 2017, when he shot and killed Philip [],"  he would "opine that [Deputy Forsyth] acted objectively unreasonable if he didn't follow that policy." *Ex. H.* at 101:14-102-21. Thus, as a reasonable jury could conclude that Defendant Forsyth violated the Use of Force Policy and therefore, acted unreasonably, the Defendants' Motion must be denied.

### ii. The record indicates that Defendant Forsyth's actions were unreasonable under a totality of the circumstances, and that he violated Philip's constitutional rights.

Defendants' Motion argues that "[t]he undisputed record demonstrates Deputy Forsyth's alleged actions were reasonable under a totality of circumstances, and there was no violation of any of Rhoades' constitutional rights." *Dkt. No.* 62 at 10. However, the Defendants' entire legal analysis, spanning nine and a half pages, is void of the slightest acknowledgment of any evidence in this case other than their own statements. *Id.* at 9-17. In all likelihood, Defendants do not attempt to rely on the objective evidence in this case due to the fact that it overwhelmingly supports the Plaintiff's version of events. *See infra*.

The objective evidence in this case paints a fearful picture. In a matter of "mere

seconds" after making visual contact with the Jeep on August 2, 2017, Defendant Forsyth: (1) jumped out of his moving cruiser; (2) drew his firearm; (3) aimed it; (4) fired seven rounds at Philip, fatally shooting him in the face; (5) began performing a tactical reload but decided against it; and finally (6) radioed that shots had been fired. *Ex. H* at 86:5-10. Dep. C. Love, who jumped out of the moving cruiser immediately after Defendant Forsyth, was still attempting to make his way around the front of the cruiser at the end of the encounter. *Ex. C* at 73:15-24. Meanwhile, the "aggressively moving" Jeep alleged to be the Imminent Threat necessitating and justifying Defendant Forsyth's use of lethal force, was in neutral. *Ex. H* at 99: 16-17.

Based upon the undisputed timeline of the Shooting, Defendant Forsyth's version of events seems impossible. Moreover, because the Jeep was in neutral and all pertinent witnesses have testified that its shifter was not touched and/or otherwise manipulated at any time after the Shooting, Defendant Forsyth could not have perceived the Jeep to be moving when he utilized lethal force. *Ex. G* at 8:2-25, 9:1-13; *Ex. C* at 14:21-23.

Considering the facts in a light most favorable to the Plaintiff, no reasonable police officer would have jumped out of their moving cruiser and immediately fired seven rounds into a stationary vehicle in a matter of "mere seconds;" especially when that officer claims not to have known who was inside. *See Ex. G* at 46:8-25. Likewise, no reasonable police officer would have attempted to justify their unlawful actions by making false accusations against the individual that they had just killed. However, this is the MCSD's pattern and practice. Therefore, pursuant to any pertinent legal analysis, Defendant Forsyth is not entitled to qualified immunity.[3]

---

[3] When analyzing the three factors set forth in *Graham v. Connor*, 490 U.S. 386 (1989), the 4th Circuit has held that when the first element – (1) the severity of the crime at issue – is "insignificant"

### iii. Defendant Forsyth violated a clearly established right of Philip because no reasonable officer would have believed that lethal force was lawful.

Defendants' Motion argues that "there is no basis for Plaintiff to argue Deputy Forsyth would have been on notice that using lethal force against a fleeing felon where a Deputy is in [sic] path of the fleeing felon's moving vehicle was in contravention of any constitutional right." *Dkt. No.* 62 at 18. However, Philip was not a "fleeing felon" and Defendant Forsyth was not "in the path of [any] fleeing felon's moving vehicle" when he utilized lethal force—as the Jeep was in neutral. *Ex. H* at 99:16-17. Any reasonable police officer clearly understands that jumping out of their moving cruiser and immediately firing seven rounds into a stationary vehicle violates the occupant of that vehicle's constitutional rights. Therefore, the Defendants' argument fails.

### iv. Reasonable jurors could find in Plaintiff's favor.

The Defendants' argument to the contrary once again hinges upon the assumption that Philip was aggressively driving the Jeep towards Defendant Forsyth at the time of

---

or if the plaintiff has committed no crime at all, then the plaintiff has stated a claim for violation of his or her constitutional right to be free from excessive police force. *See Clem v Courbeau*, 284 F.3d 543, 545-47 (4th Cir. 2002); *Park v. Shiftlett*, 250 F. 3d 843, 848, 853 (4th Cir. 2001). Here, there is a material question of fact as to whether Philip was committing any non-property related crimes and thus, if he had a constitutional right to be free from excessive police force. Regarding the second *Graham* factor – (2) whether a "reasonable officer" could have perceived the plaintiff as posing "an immediate threat to the safety of the officers or others" – the 4th Circuit has held that where the plaintiff is neither armed nor suspected by the officer of being armed, there is a genuine issue of material fact. *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Here, the Jeep was in neutral and thus, stationary. As such, no reasonable officer would have perceived a stationary vehicle as posing "an immediate threat to the safety of the officers or others." Lastly, (3) where a suspect actively stops resisting arrest prior to the allegation of excessive force, there is also a genuine issue of material fact to be determined. *See Valladares v. Cordero*, 01 1209 Fed4, 07-1995 (Jan 12, 2009). In the case at bar, all objective physical evidence indicates that Philip was not resisting arrest at the moment he was shot. Defendant Forsyth's fatal shot entered Philip's right cheek, with the bullet becoming lodged in his neck; indicating that he was ducking for cover at the moment he was shot while sitting in the stationary Jeep. Based on the foregoing, material issues of fact exist regarding each of the *Graham* factors and thus, the Defendants' arguments fail.

the Shooting. *See* Dkt. 62 at 19. For the reasons stated herein throughout, the Defendants' argument necessarily fails.

### c.   <u>The Evidence in the Record Supports the Plaintiff's *Monell* Claim.</u>

#### i.   *Monell* Liability may attach to this action against the County because Philip was subjected to excessive force.

As discussed at length herein throughout, Philip was subjected to excessive force. Therefore, the Defendants' argument here fails.

#### ii.   Plaintiff has identified a satisfactory custom, pattern, policy, and/or practice which violated Plaintiff's constitutional right to be free from excessive force.

A municipality is liable under "§ 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Monell*, 436 U.S. at 694. Liability against municipalities may be based upon a single incident and the requirements of "policy" and "custom" do not necessitate proof of a long-standing practice. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *Owen v. City of Independence, Mo..,* 445 U.S. 622 (1980). Further, when a plaintiff can demonstrate "persistent and widespread practice[] of municipal officials," alongside the "duration and frequency" of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their "deliberate indifference," liability may attach. *Spell v. McDaniel*, 824 F.2d 1380, 1386–91 (4th Cir. 1987).

In her Amended Complaint, the Plaintiff alleges,

Defendant County Commission of Marion County, through its law enforcement agency, the Marion County Sheriff's Department and its policymaker(s), as stated herein throughout, has a custom, pattern, practice, and/or procedure of using Excessive Force against individuals who are allegedly fleeing without anyone being in Imminent Danger, as defined by the Use of Force Policy, and without the existence of exigent circumstances, and then falsely claiming that Imminent Danger or exigent

circumstances existed at the time of the shooting to justify their unlawful actions.

*Dkt. No.* 22 at ¶ 87.

Here, within an eleven-week period in 2017, in the same general geographic area—rural northern Marion County, West Virginia—there were three known shootings in which the MCSD exhibited the pattern and practice set forth immediately above at a time when the MCSD employed twenty-one (21) deputies. *Dkt. No.* 22 at ¶ 88; *Ex. O* at 35:20-21) Thus, during this *eleven-week period*, 14.29% of deputies within the MCSD acted in accordance with the pattern and practice alleged by the Plaintiff, evincing a high rate of frequency. *See Spell*, 824 F.2d 1380, 1386–91. The requirements of holding municipalities accountable for a "policy" and/or "custom" do not necessitate proof of a long-standing practice, as liability may be based upon a single incident. *Pembaur*, 475 U.S. 469; *Owen,* 445 U.S. 622. Each incident is addressed briefly below.

### **Dep. C. Love – July 25, 2017**

Dep. C. Love's use of lethal force against Philip on July 25, 2017, was in violation of the Use of Force Policy, which has been confirmed by his field training officer. *Ex. M* at 31:13-24. Rather than using Dep. C. Love's violation of the Use of Force Policy as a teaching moment for their new, untrained recruit and perhaps others in the department, the MCSD obtained a warrant under false pretenses for his "attempted murder," thereby falsely justifying Dep. C. Love's unlawful actions.

Three primary pieces of evidence indicate that the Parker Warrant was obtained under false pretenses. First, Dep. Parker admits that Dep. C. Love violated the Use of Force Policy, but nevertheless accused Philip of attempted murder. Second, the Parker Warrant states that Philip "recklessly drove at Deputy Love spinning tires, throwing mud

and grass," and "[t]o avoid being struck by the truck Deputy Love was able to jump out of its path as it narrowly missed running him down." *Ex. K* at 1-2. However, Dep. C. Love stated that he was standing on the roadway when he saw Philip traveling in his direction. *Ex. C* at 58:1-2.

Finally, and most importantly, Deputy Parker stated that he obtained the Parker Warrant for Dep. C. Love. *Ex. K* at 23:6-10. However, as stated during his deposition, Dep. C. Love was unaware of the existence of the Parker Warrant until after Defendant Forsyth killed Philip on August 2, 2017. *Ex. C* at 113:9-18. This misconduct represents the exact custom, policy, pattern, and/or practice alleged by the Plaintiff since initiating this litigation. *Dkt. No.* 22 at ¶ 87.

### Defendant Forsyth – August 2, 2017

Eight days after shooting at Philip in violation of the Use of Force Policy and obtaining a fraudulent warrant for his attempted murder of the very deputy who had unlawfully shot at him (who also happened to be the son one the MCSD's highest ranking officers, Sgt. Matthew Love), the MCSD shot and killed Philip within seconds of locating him at the dead end of a dirt road in rural, northern Marion County. Once again, the MCSD claimed that Philip was attempting to run over the deputy who shot at him. However, the Jeep, alleged to be the threat necessitating Defendant Forsyth's use of lethal force against Philip, was in neutral.

### Deputy John Billie – October 17, 2017

On October 17, 2017, Deputy John Billie ("Dep. Billie") stood on the roadway during a "staggered roadblock" in rural northern Marion County within roughly five miles of where Philip was killed (the "Roadblock"). The Roadblock was not necessarily intended

to stop the fleeing vehicle, but rather, to slow it down long enough to identify the driver. *Sgt. M. Love Narrative of Oct. 17, 2017*, attached as *Ex. U.* Paths of egress were intentionally left through the Roadblock. *Id.* As the fleeing vehicle approached, another deputy on scene radioed to Dep. Billie, "move, move, move!" Dep. Billie then jumped out of the path of egress on the roadway, pulled out his service weapon, and fired three shots at the driver of the vehicle, Randall Clay Ford ("Randall"), through his drivers-side window. No one was in front of Randall's vehicle or on the other side of the Roadblock at the time of the shooting. *Ex. V* at 10:15-11:1. Randall was struck twice in the back, causing instant paralysis.

Randall's vehicle slowly rolled through the path of egress. *Id.* Without the ability to use his legs, he had to intentionally wreck his vehicle into a hillside to stop. *Id.* Deputy Wesley Wheeler, who had been pursuing Randall, continued to follow him through the same path of egress. *Id.* at 9:23-10:1. At the time he fled, he was alleged to have had an improper vehicle registration while driving ten miles per hour over the posted speed limit. *See generally*, *id.* Eight months later, after Randall had obtained the undersigned counsel, the Defendants charged him with "assault on an officer." *Ford Indictment*, attached as *Ex. S.*

During Dep. Billie's deposition in this matter, the following exchange took place:

Q.     So can we just agree then that, in that situation, officer believes the vehicle to be fleeing, officer places themself in front of it, the appropriate charge then is not assault on an officer; its fleeing with reckless indifference because, in that situation, the officer placed themself in front of the vehicle they already believed to be fleeing?
            MS. DURST: Object to the form. You can answer if you can.
            MR. UMINA: I can repeat that if you'd like.
A.     Sir, I'm still going with reckless indifference. That's where I'm at with it.

*John Billie Dep.* at 36:4-15, attached as *Ex. V*.

Like Dep. C. Love on June 25, 2017, Dep. Billie was standing in the roadway when he realized that a vehicle was traveling towards him, and in response to any perceived threat created thereby, avoided it by moving off of the roadway. Like Dep. C. Love, Dep. Billie, once out of the way, pulled out his service weapon and discharged it at a moving vehicle in the absence of exigent circumstances—in direct violation of the Use of Force Policy.  Like on both July 25, 2017 and August 2, 2017, a deputy with the MCSD shot at an individual in violation of the Use of Force Policy and then falsely accused that individual of creating an Imminent Threat or exigent circumstance by attempting to intentionally run them over.

The Defendants argue that because this event occurred after the Shooting, "it cannot support a *Monell* claim of pattern and practice existing before August 2, 2017," but cite no legal authority for the same. *Dkt. No.* 62 at 22. However, Federal Circuit Courts across the United States have routinely found "post-event evidence" to be admissible. *See, e.g., Beck v. City of Pittsburgh*, 89 F.3d 966,973 (3d Cir. 1996) (recognizing that post-event incident "may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force"); *Foley v. City of Lowell*, 948 F.2d 10, 13-15 (1st Cir. 1991); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985), cert. denied, 480 U.S. 916 (1987); *see also Henry v. County of Shasta*, 132 F.3d 512, 518-20 (9th Cir. 1997), *amended on denial of rehearing*, 137 F.3d 1372 (9th Cir. 1998) ("we reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry").

Further, Dep. Billie himself has acknowledged the similarities between the case at bar and his shooting of Randall just ten weeks later. The following exchange took place during Dep. Billie's deposition in this matter:

> Q.    Let me ask you a this: If an officer knows a vehicle is fleeing or at least believes the vehicle is fleeing, they don't believe the vehicle is stopped, they believe the vehicle is in the process of fleeing and they stand in front of that vehicle, is the person fleeing guilty of assault or recklessly fleeing?
>
> > MS. DURST: I'm going to object to the form. You can answer if you can.
>
> A.    I don't know.
> Q.    Why don't you know?
> A.    The situation that you're presenting is present in both atmospheres. A normal person will stop if somebody turns on their emergency lights. That's a normal person and given the opportunity to stop lots of times so, whenever you fail to do so, the vehicle can be perceived as a lot of things but, to me, I don't know how else to explain it. Again, I wasn't there with Deputy Forsyth.
>
> > MS. DURST: His question is more –
> > MR. UMINA: It's more general.
> > THE WITNESS: It's kind of a loaded question.

*Ex. V* at 31:25-32:20. The fact that Dep. Billie, unprompted, acknowledged the similarities between the two cases, is one that the Defendants cannot escape. Therefore, this incident is both relevant and admissible.

As stated above, within an eleven-week period, 14.29% of the MCSD's deputies shot at a civilian in violation of the Use of Force Policy, which the MCSD subsequently falsely justified, demonstrating a deliberate indifference to the clearly established constitutional rights of these individuals. Because the MCSD acted in accordance with the custom, policy, pattern, and/or practice alleged by the Plaintiff on August 2, 2017, which was an actual and proximate cause of the violation of Philip's Fourth Amendment

Rights leading to his death, the Defendants' argument here fails.[4]

**d.** **Deputy Forsyth is not entitled to qualified immunity of Plaintiff's state law intentional infliction of emotional distress claim contained in Count III.**

The Defendants' Motion argues that "Deputy Forsyth is entitled to qualified immunity because a reasonable officer, under the same circumstances, would have believed he had to use lethal force to defend himself and protect potential injuries to third parties when Rhoades fled from the police, revved his engine and conducted his Jeep towards Defendant Forsyth." *Dkt No. 62* at 25. The Defendants are correct in stating, [t]he Supreme Court of Appeals of West Virginia has stated, "[g]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Syl. pt. 3, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009). However, as discussed at length herein throughout, there exists substantial evidence in the record indicating that Defendant Forsyth's conduct violated Philip's clearly established constitutional rights of which a reasonable person would have known. Thus, the Defendants' argument here fails.

**e.** **Plaintiff's wrongful death claim should not be dismissed.**

Because of the existence of numerous material facts in dispute in this case, as

---

[4] Moreover, the MCSD was involved in a fourth shooting approximately eight months before these three incidents involving similar facts and circumstances outside of the Fairmont, Marion County, West Virginia, Wal-Mart, which resulted in the death of Randy Lee Cumberledge ("Cumberledge"). *See generally, Brandon Clyde Dep.*, attached as *Ex. W*. During that incident a deputy with the MCSD, Chris Erdie ("Dep. Erdie"), and a member of the White Hall, West Virginia, Police Department, fired upon the occupant of a vehicle who they allege was attempting to flee. *Id*. Mr. Cumberledge's death was attributed to the shots fired by the officer with the White Hall Police Department, Brandon Clyde, who has claimed that his use of lethal force was justified because he believed Mr. Cumberledge's vehicle represented an Imminent Threat of serious bodily injury to Dep. Erdie while allegedly attempting to flee. *Id*. Brandon Clyde is now a deputy with the MCSD. *Id*.

described herein throughout, the Plaintiff's substantive federal and state law claims must not be dismissed. Therefore, the Defendants' argument based upon this premise fails.

Regarding damages under W.Va. Code § 55-7-6(c)(1)(B), the Defendant is correct in that the Plaintiff is not pursuing this category of damages under West Virginia's Wrongful Death Statute.  As for Christy J. Rhoades' ability to obtain damages under W.Va. Code § 55-7-6(c)(1)(A), the measure of grief, bereavement and anguish of the soul experienced by a separated spouse is a question for the jury to resolve.

### f.  Plaintiff's punitive damages claim must not be dismissed.

The Defendants set forth two arguments in support of their assertion that Plaintiff's punitive damages claim must be dismissed; with neither acknowledging the glaring objective physical evidence in direct conflict with the facts upon which they rely. *Dkt No.* 62 at 27-29. First, the Defendants argue that "Plaintiff's punitive damages claim must be dismissed as the claim does not survive the dismissal of Plaintiff's substantive claims." *Id*. at 27-28. For the reasons stated herein throughout, the Defendants are not entitled to the dismissal of Plaintiff's substantive claims, and thus, this argument is fatally flawed.

Second, the Defendants argue that "the undisputed record fails to present any evidence to support punitive damages," relying upon W.Va. Code § 55-7-2(c) in support thereof, while ignoring well-settled federal law.[5] *Id*. at 28. Like in their previous Motion to

---

[5] Even if W.Va. Code § 55-7-29(a) (2015) were controlling in this matter, as the Defendants wrongfully argue, the Plaintiff would still be entitled to a consideration of punitive damages. W.Va. Code § 55-7-29(a) (2015) states,

[a]n award of punitive damages may only occur in a civil action against a defendant if a plaintiff establishes by clear and convincing evidence that the damages suffered were the result of the conduct that was carried out by the defendant with

Dismiss, Defendants inappropriately rely upon West Virginia state law to support their argument. *See Dkt. No.* 9 at 8-9.

Federal Courts around the country, including the United States Supreme Court, have held that "[p]unitive damages are allowed in an action under § 1983 when the defendant's conduct is shown to be 'motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Morning v. Dillon Cty.*, 2018 U.S. Dist. LEXIS 163072, at *12 (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)). In this regard, the Fourth Circuit has held, "[t]he callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on the § 1983 claim." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (citing Smith, 461 U.S. 30, 56, 103 S. Ct. 1625; Cook & Sobieski, 2 Civil Rights Actions, "Punitive Damages," para. 4.08 (1986)). In recent years, District Courts in the Fourth Circuit have continually held that punitive damages are available in § 1983 actions. *See, e.g., Oliver v. Daniels*, 2018 U.S. Dist. LEXIS 48881, at *15, 2018 WL 1474935; *Lagana v. Health*, 2018 U.S. Dist. LEXIS 140477, at *30, 2018 WL 3970472; *Painter v. Blue Ridge Reg'l Jail Auth.*, 2018 U.S. Dist. LEXIS 127882, at

---

actual malice toward the plaintiff or a conscious, reckless and outrageous indifference to the health, safety and welfare of others.

Evidence of the Defendants acting with actual malice towards the Plaintiff, include, but are not limited to, falsely accusing Philip of attempted murder to cover up Dep. C. Love's unlawful actions on July 25, 2017; the objective timeline of August 2, 2017, which supports the Plaintiff's version of events as described herein; and the objective physical evidence relating to the Shooting, which is in direct conflict with the Defendants' version of events. Moreover, jumping out of a moving police cruiser and immediately or almost immediately firing seven rounds into a stationary, occupied vehicle that was in neutral—thereby necessarily posing no Imminent Threat of serious bodily injury to a reasonable police officer—evinces a "conscious, reckless and outrageous indifference" to Philip's "health, safety, and welfare." Therefore, even if West Virginia state law did apply to the issue of punitive damages in this case, the Defendants' argument fails.

*11, 2018 WL 3631895; *Diggs v. Balogun*, 2018 U.S. Dist. LEXIS 112368, at *11, 2018 WL 3329585; *Cox v. Keller*, 2015 U.S. Dist. LEXIS 71657, at *33, 2015 WL 3505640.

Because well-settled federal law clearly permits punitive damages in § 1983 actions, and sufficient evidence exists for a reasonable jury to conclude that Defendant Forsyth's conduct was either: (1) motivated by evil motive or intent, or (2) involved reckless or callous indifference to Philip's federally protected rights, the Defendants' Motion for Summary Judgment as to Plaintiff's claims for punitive damages must be denied.

### IV. **CONCLUSION**

**WHEREFORE**, for the reasons stated herein throughout, the Plaintiff respectfully requests that the Defendants' Motion for Summary Judgment be summarily denied.

Respectfully submitted,
Plaintiff,
By Counsel

/s/ J. Bryan Edwards, Esq.
J. Bryan Edwards, Esq. (W.Va. Bar #6886)
**CRANSTON & EDWARDS, PLLC**
1200 Dorsey Avenue, Suite II
Morgantown, WV 26501
Phone: (304) 296-3500
Fax: (304) 296-3600
bedwards@cranstonedwards.com

/s/ Ryan J. Umina, Esq.
Ryan J. Umina, Esq. (W.Va. Bar #13056)
**UMINA LEGAL, PLLC**
157 Walnut Street
Morgantown, WV 26505
Phone: (304) 838-8024
Fax: (304) 506-4929
ryan@uminalegal.com

## **CERTIFICATE OF SERVICE**

I, Ryan J. Umina, hereby certify that on the 18xf[th] day of November 2019, I electronically filed **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system.

Tiffany R. Durst
Nathan A. Carroll
**Pullin, Fowler, Flanagan, Brown & Poe, PLLC**
2414 Cranberry Square
Morgantown, WV  26508
*Counsel for Defendants*

/s/ Ryan J. Umina, Esq.
Ryan J. Umina, Esq. (W.Va. Bar #13056)