
Litigation SERVICES

CERTIFIED COPY

**In the Matter Of:**

Rhoades vs County Commission of Marion County et al

**SAMUEL DEWITT FAULKNER**

*October 02, 2019*

*Job Number: 565278*



1                    IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
2
                      Civil Action No.: 1:18CV186
3                        Judge: Thomas S. Kleeh

4
      CHRISTY J. RHOADES, in her capacity       )
5     as the ADMINISTRATRIX and PERSONAL        )
      REPRESENTATIVE of the ESTATE OF,          )
6     PHILIP JONTZ RHOADES,                     )
                                                )
7                        Plaintiff,             )
      vs.                                       )
8                                               )
      COUNTY COMMISSION OF MARION COUNTY;       )
9     MARION COUNTY SHERIFF'S DEPARTMENT;       )
      DAVID FORSYTH, in his official and        )
10    individual capacity; and JOHN DOE,        )
      in his official and individual capacity, )
11                                              )
                         Defendants.            )
12    _____ )

13

14               DEPOSITION OF SAMUEL DEWITT FAULKNER

15
      DATE:                October 2, 2019
16
      TIME:                9:55 o'clock a.m.
17
      PLACE:               416 NW 3rd Street
18                         Okeechobee, Florida

19    TAKEN BY:            Plaintiff

20    REPORTER:            KIMBERLY POGUE, Notary Public
                           of State of Florida at Large
21

22    JOB NO.:             565278

23

24

25

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:      CRANSTON & EDWARDS, PLLC
                          1200 Dorsey Avenue, Suite II
 3                        Morgantown, WV  26501
                          (304)296-3500
 4                        BY: J. BRYAN EDWARDS, ESQUIRE

 5

      FOR PLAINTIFF:      UMINA LEGAL, PLLC
 6                        157 Walnut Street
                          Morgantown, WV  26505
 7                        (304)838-8024
                          BY: RYAN J. UMINA, ESQUIRE
 8

 9    FOR DEFENDANT:      PULLIN, FOWLER, FLANAGAN,
                          BROWN & POE, PLLC
10                        2414 Cranberry Square
                          Morgantown, WV  26508
11                        (304)225-2200
                          BY: TIFFANY R. DURST, ESQUIRE
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                           -  -  -

2                     I N D E X

3                           -  -  -

4

5    WITNESS:           DIRECT    CROSS    REDIRECT    RECROSS

6
     SAMUEL DEWITT FAULKNER
7
     BY MR. EDWARDS        4
8

9

10

11                    -  -  -
        N O    E X H I B I T S    M A R K E D
12                    -  -  -

13

14

15

16

17                                              PAGE

18   Certificate of Oath                        113

19   Certificate of Reporter                    114

20

21

22

23

24

25
```

1    AND THEREUPON,

2                    SAMUEL DEWITT FAULKNER

3    called as a witness herein, after having been first duly

4    sworn, was examined and testified as follows:

5                    THE WITNESS:   I do.

6    DIRECT EXAMINATION

7    BY MR. EDWARDS:

8        Q    Mr. Faulkner, will you please state your full

9    name for the record, please?

10       A    Samuel Dewitt Faulkner, F-A-U-L-K-N-E-R.

11       Q    Mr. Faulkner, we're here to take your

12   deposition today.  It's my understanding you've probably

13   been deposed numerous times.  Is that correct?

14       A    Yes, sir.

15       Q    Okay.  So you pretty much know the rules of

16   the game here and I'm not going to waste a whole lot of

17   time going over them.  The only thing that I will tell

18   you, that I'm not sure how long we're going to be here

19   today.  If at any point in time you need to take a

20   break, that is fine, just let me know.  The only caveat

21   to that is if I've asked a question, I would ask that

22   you answer that question prior to taking a break.  Fair

23   enough?

24       A    Yes, sir.

25       Q    Okay.  Is there any reason, as you sit here

1    today, that you don't feel like you're able to give a

2    deposition?

3         A    No, sir.

4         Q    Okay.  No mental or physical ailments of any

5    type?

6         A    No, sir.

7         Q    Okay.  Mr. Faulkner, as part of the

8    deposition, I have served you with a subpoena duces

9    tecum that asked you to bring all the material that you

10   have been provided and/or generated in this case.  And

11   prior to going on the record here today, I reviewed some

12   stuff very briefly.  There's two boxes, say box one of

13   two, over there that it looks like it contains a lot of

14   the discovery material.

15            And in addition, you have a book that's soft,

16   I'll say, well, it's bound with a binder but it's not a

17   hard copy, of the S.T.O.P.S., Strategics (sic) and

18   Tactics of Patrol Stops by Bob Magnuson that you have

19   here.

20            And there is a three-ring binder titled Roads

21   of the Marion County Sheriff's, West Virginia.

22            Is this the complete copy of everything that

23   you have that you've received and reviewed in this case?

24        A    To the best of my knowledge, it is.

25        Q    Okay.  Contained in the three-ring binder are

1   some flash drives that I didn't open up, but you told

2   me, prior to going onto the record, that they -- what do

3   the flash drives contain?

4       A    I believe they're electronic copies of the

5   materials in there.

6       Q    Okay.

7       A    And I did put on them everything I relied on,

8   the articles that I've referenced and sent as exhibits.

9       Q    Okay.

10      A    And the additional material that's been sent

11  other than that -- the box, I've got a lot of

12  depositions that were sent electronically and I put

13  those on the flash drives.

14      Q    Are these flash drives for me to take or are

15  these part of your file?

16      A    They're part of my file.  You're welcome to

17  copy them to your computer if you care to.

18      Q    Okay.  In addition, there is some

19  correspondence between you and Ms. Durst and some

20  billing material or invoices to Ms. Durst.  Is that

21  correct?

22      A    Yes, sir.

23      Q    Are these a complete and total copy of all the

24  invoices that you have sent in this case?

25      A    I believe they are.

1      Q    Okay.  What about any correspondence between

2  you and Ms. Durst, have you provided copies of all

3  those?

4      A    No, I haven't.

5      Q    Okay.  That was one thing that was asked for

6  on the subpoena duces tecum, so I'm going to ask that

7  that be produced.

8           MS. DURST:  Well, and I will note, under the

9  federal rules, to the extent that he did not rely on any

10  information contained in the communications or

11  correspondence, that information is not discoverable,

12  and I would direct him not to produce that.  We can

13  address that, but that's specifically in the federal

14  rules.

15           If there's something, a communication that he

16  relied upon to formulate his opinions, then that would

17  be discoverable; but otherwise, the communications would

18  not be discoverable.

19  BY MR. EDWARDS:

20      Q    Anything in the communications that you've

21  received from Ms. Durst that you relied on in

22  recommending your opinions?

23      A    No, sir.

24      Q    Okay.  Do you have this manual, this

25  S.T.O.P.S. manual, on a flash drive?

1    A   No, sir, I don't.

2    Q   **Okay.**

3    A   I've got the pages that I used but not the

4  whole manual.

5    Q   **All right.  I would ask that that be -- a copy**

6  **of this be produced for me, a complete copy of the**

7  **S.T.O.P.S. manual.**

8         MS. DURST:  Is that -- the only problem, is

9  that a copyrighted material?

10        THE WITNESS:  Yes.

11        MS. DURST:  I can't have him making material

12  that's copyrighted.

13        MR. EDWARDS:  Well, he's relied upon it and I

14  don't have access to it.  I've tried to find it and I'm

15  not able to locate it.

16        MS. DURST:  He didn't rely on the whole

17  manual, he gave you the provisions from the manual.

18        We can figure that out, but I'm not going to

19  have him violate copyright laws by producing a whole

20  copy of a manual for something if it's copyrighted.

21        MR. EDWARDS:  Well, he's already produced

22  copies of it so I don't think you can pick and choose as

23  far as reports.  So I'm going to put on the record that

24  I want a complete copy of this manual.  Okay?

25        MS. DURST:  And I'm noting my objection to

Page 9

```
 1    that.

 2              MR. EDWARDS:   Fine.

 3    BY MR. EDWARDS:

 4        Q    All right.   Mr. Faulkner, if Deputy Forsyth

 5    jumped out of his cruiser on August 2nd, 2017, and

 6    immediately upon seeing the Jeep at the gas well site,

 7    opened fire, that would be objectively unreasonable,

 8    would it not?

 9        A    If the Jeep was just sitting there, yes.

10        Q    Okay.  Meaning that if he was -- I understand

11    that caveat, but if he just pulled up to a gas well

12    site, opened his car door and began firing, do you

13    believe that he would be -- that could be reasonable?

14        A    Yes, it could.

15        Q    Okay.  On what ground would that have been

16    reasonable?

17        A    It would be based on the actions of the Jeep.

18        Q    Okay.  Tell me what actions the Jeep would

19    have to take in order for it to be reasonable that

20    Deputy Forsyth would be able to pull into the gas well

21    site, open up his door and immediately begin firing.

22        A    If the Jeep was driving at or toward Deputy

23    Forsyth.

24        Q    Okay.  Would it have been reasonable for

25    Deputy Forsyth to jump out of his car if that was the
```

1    case?

2        A    That's consistent with training.

3        Q    **Jumping out of a car in front of a moving**

4    **vehicle is consistent with training?**

5        A    I did not say that, sir, and you know I didn't

6    say that.

7        Q    **I believe you did, but go ahead and explain.**

8        A    In training, basically you never let anyone's

9    feet hit the ground before yours, because you don't know

10   what this threat entails.  You don't know if the person

11   inside there is armed.

12            If you are inside your vehicle, you have very

13   limited movement.  In fact, at that point, in training,

14   the vehicle is labeled a kill box, because any round

15   that goes in the vehicle can ricochet all over the

16   vehicle, we now have the rounds coming in, we have

17   limited movement or evasive movement from the officer

18   inside the vehicle.  And you've got glass coming at you,

19   you've got projectiles possibly coming at you.

20            So training is that the law enforcement

21   officer's feet hit the ground first.

22       Q    **Okay.  What training?  What training did**

23   **Deputy Forsyth have that, to your knowledge, that**

24   **indicates that would have been proper?**

25       A    That's training at the West Virginia State

1    Police Academy.

2         Q    Okay.  What specific training at the West

3    Virginia State Police Academy?

4         A    It would have been in subject control and in

5    traffic stops.

6         Q    Okay.  Have you reviewed what specific

7    training Deputy Forsyth had at the West Virginia State

8    Police Academy?

9         A    I haven't.  But West Virginia state troopers

10   have been up to the academy and taken the S.T.O.P.S.

11   course and I'm familiar with what they -- you know,

12   certainly what was taught and taught to them.

13        Q    Okay.  So you don't know what training Deputy

14   Forsyth may or may not have had at the West Virginia

15   State Police Academy.  Is that true?

16        A    I don't know what exact training.  I'm sure it

17   was very good.

18        Q    So it's your testimony that it could be

19   reasonable for him to have pulled into the gas well site

20   on August 2nd, 2017, opened up his door and began firing

21   immediately.

22        A    If he was facing imminent threat or serious

23   bodily harm or death, certainly.

24        Q    Okay.  If the Jeep was not moving toward

25   Deputy Forsyth on August 2nd, 2017 at the gas well site

1    and he opened fire and shot Philip Rhoades, would that

2    have been objectively unreasonable?

3         A    Yes, it would.

4         Q    Would you agree that all the alleged wrongful

5    conduct of Philip Rhoades on both July 25th, 2017, as

6    well as August 2nd, 2017 were a result of police chasing

7    him?

8         A    Yes, sir.

9         Q    In going through your resume that you provided

10   in this case, and let me show you this, I may have this

11   marked Exhibit 1, has any of that information changed or

12   been updated since when it was provided and filed on

13   July 1st, 2019?

14        A    There would have been an additional training

15   at -- I don't know whether it's called West Virginia

16   University or University of West Virginia.  I did

17   training for law enforcement in the state.

18        Q    When was that?

19        A    That would have been probably a month ago,

20   maybe a month, month and a half ago.

21        Q    Okay.  And what exactly training did you

22   perform and where?

23        A    It would have been eight hours of training in

24   response to resistance, the training that I always do.

25             And then there was a -- I was in trial

Page 13

1     probably ten days to two weeks ago in Cleveland.

2          Q     What was the name of that case?

3          A     Wilson versus the State of Ohio.

4          Q     Who were the attorneys involved in that case?

5          A     George Gerken.

6          Q     George Gerken?

7          A     Was the attorney I was working with.

8                And Attorney Generals, I don't know which ones

9     that they were.

10         Q     Was Mr. Gerken representing the State of Ohio?

11         A     Excuse me?

12         Q     Who was Mr. Gerken representing?

13         A     Mr. Wilson.

14         Q     Mr. Wilson.  Okay.

15         A     CO Wilson, yes.  Corrections Officer.

16         Q     What type of case was this?

17         A     A criminal case.

18         Q     And was this in the Circuit Court or --

19         A     Court of Common Pleas.

20         Q     Court of Common Pleas.  In what county?

21         A     Cuyahoga County.

22         Q     The training that you did at West Virginia,

23    was it at West Virginia University?

24         A     It was in Morgantown.  I don't know how many

25    branches they have.

Page 14

```
 1       Q    Okay.  And who provided the seminar, who was

 2   doing this, putting on this training?

 3       A    It was the university.

 4       Q    The university was doing this?

 5       A    Yes.

 6       Q    Okay.  And when was the date of that?

 7       A    I don't know the exact date.  I'd say a month

 8   and a half ago.

 9       Q    Who retained you to come up there and do that?

10       A    University.

11       Q    Was it for the university police department or

12   whom?

13       A    It was -- the university officers were there;

14   law enforcement agencies, sheriff's department, state

15   police were there.  It was opened up to pretty well

16   across the state.

17       Q    Okay.  In looking through your resume, it

18   appears that you received a bachelor's degree from Hiram

19   College in education in June 1971.  Is that correct?

20       A    Yes, sir.

21       Q    Okay.  And thereafter, you received a master's

22   in physical education from Kent State in 1997.

23       A    Yes, sir.

24       Q    Okay.  I don't see any other degrees that you

25   have attained from any other institutions of higher
```

1    education.  Is that correct?

2        A    No, I did post-master's work at Wright State

3    University.  They never did get the Ph.D. program there,

4    they tried with the Board of Regents and they never got

5    it.  So I just took the classes.

6            And then Northwestern University, College of

7    Staff and Command.

8        Q    Okay.  Again, did not receive any type of

9    degree from Northwestern University.  Is that correct?

10       A    It would have been the certificate of

11   completion for that.

12       Q    Okay.  What did that involve?

13       A    There are three basic, we'll call them gold

14   medal programs for law enforcement.  One would be, I'm

15   sure you're familiar with the FBI Academy, and then

16   PELC, Police Leadership College, and then Northwestern

17   University.  I took the one at Northwestern.

18       Q    How long was that program?

19       A    I don't know exactly.  Eight weeks, 12 weeks.

20   There would be -- it would go usually one month out of

21   the year and then you'd have assignments and then, you

22   know, back in class.

23       Q    Okay.  And when did you attend Northwestern

24   University Center for Public Safety and Traffic

25   Institute?

```
 1      A    I don't know.  I don't recall the date if it's
 2  not on here.
 3      Q    Your work experience looks like from 1983 to
 4  '84, you worked as a probation officer in Portage
 5  County.  Is that correct?
 6      A    That's correct.
 7      Q    And how long total, was it less than a year or
 8  more than a year?
 9      A    Right around a year.  I mean, just pretty well
10  exactly a year.
11           During that time, I took my law enforcement
12  training and then was -- I was commissioned through
13  Portage County Sheriff's Office.  Then I took a position
14  at Robinson Memorial Hospital with the county hospital,
15  uniform patrol at the county hospital, did that for
16  four, four and a half years, then was hired by Kent
17  State City.
18      Q    Okay.
19      A    The City of Kent.
20      Q    If you can just hold off, I'm going to go
21  through and have some specific questions with each of
22  these.
23      A    Okay.
24      Q    So just to keep us from backtracking.
25      A    All right, that's fine.
```

Page 17

1       Q     All right.  As a probation officer, did you do

2   anything other than supervise people on probation for

3   Portage County?

4       A     No.  It was a state program, intensive

5   supervision of adult felons.

6       Q     Okay.  You weren't doing any type of arresting

7   or anything like that.  Is that correct?

8       A     Not for probation but I did as a deputy.

9       Q     Okay.  And you worked part-time there at

10  Portage County from '84 to '87.  Is that correct?

11      A     Yes, sir.

12      Q     Okay.  And your resume says working on drugs.

13  What exactly does that mean?

14      A     In the sheriff's department, I did the

15  undercover drug work and surveillance, that type of

16  stuff.

17      Q     Okay.  Then warrant service meaning just serve

18  warrants on people?

19      A     Yes.

20      Q     Okay.  And extradition of prisoners?

21      A     Yes.

22      Q     Does that mean basically going to pick up

23  people and bringing them back or transporting them?

24      A     They would fly me around the country and I'd

25  transport prisoners.

Page 18

1      Q     Okay.  Did you actively act as a sheriff's

2  deputy, meaning did you do patrols at that point in

3  time?

4      A     No, I did not.

5      Q     Okay.  So no patrol work from '84 to '87.  Is

6  that correct?

7      A     That's correct.

8      Q     Okay.  In '87, you also did some work for the

9  City of Kent Police Department.  Is that correct?

10      A     Yes, sir.

11      Q     It says you were there from '87 to '87.  How

12  long were you actually there?

13      A     Probably about eight months.

14      Q     Okay.  And what exactly did you do for the

15  City of Kent Police Department?

16      A     Uniform patrol.

17      Q     Okay.  Is that the first time you ever did any

18  type of uniform patrol?

19      A     Yeah.  Well, other than the hospital.

20      Q     Okay.  It looks like the hospital was from

21  2000 to 2004.

22      A     I believe so.

23      Q     I'm sorry.  No, that was the airport.  I

24  didn't mean to misspeak.

25      A     Oh, okay.  You're right.

1      Q      All right.  So you were also hired as an

2   officer for the hospital.  Is that correct?

3      A      Yes, sir.

4      Q      Okay.  I'm assuming that you didn't -- well,

5   maybe I shouldn't assume.  How many felony stops did you

6   do for the hospital?

7      A      Classic felony stops, none.

8      Q      Okay.

9      A      High-risk, some.

10     Q      Okay.  What high-risk stops did you do for the

11  hospital?

12     A      Well, one was a person bringing a shotgun to

13  the hospital, then we had an individual with knives, and

14  those type of things.

15     Q      Okay.  City of Kent, did you do any type of --

16  any traffic felony stops?

17     A      I don't think I had felony stops there.

18     Q      Okay.  It looks like you held a commission as

19  a deputy sheriff with the Madison County Sheriff's

20  Office from '87 to 2000.  Is that correct?

21     A      Yes, sir.

22     Q      Were you an active deputy sheriff with Madison

23  County Sheriff's Office?

24     A      I did some training for them.

25     Q      Okay.  You didn't do any type of felony stops

Page 20

1    for them?

2         A    No.  Training but no --

3         Q    Okay.

4         A    -- no road.

5         Q    And then you went to the Port of Columbus.  Is

6    that correct?

7         A    That was just voluntary, yes.

8         Q    All right.  So that was a voluntary position?

9         A    Yes.  It was not paid.  I was after 911, I

10   went there to assist.

11        Q    Okay.  Did you do any type of felony stops

12   there at the Columbus airport?

13        A    Again, not classic felony stops as we would

14   talk about, but high-risk, yes.

15        Q    Okay.  Again, what was the high-risk stops

16   that you did there?

17        A    People running on warrants, you know, weapons

18   found and that type of stuff.

19        Q    Okay.  Did you operate a patrol vehicle?

20        A    Yes.

21        Q    Any type of felony stops involving vehicles?

22        A    Not classic felony stops, no.

23        Q    Okay.  When you say not classic, what are you

24   referring to?

25        A    That would be outlined in a training manual,

1    you know, multiple vehicles involved, multiple law

2    enforcement vehicles involved, the stopping of the

3    vehicle, the positioning of the vehicle, ordering people

4    out, that type of stuff.

5         Q    Okay.  Your next job, it appears to be from

6    2004 to 2008 in Mechanicsburg PD.

7         A    Yes, sir.

8         Q    You were a part-time uniformed patrol.  Is

9    that correct?

10        A    Yes, sir.

11        Q    Okay.  How often did you work there?

12        A    Usually multiple times a week.

13        Q    Okay.  How many full-time officers are there

14   in -- at that time were there in Mechanicsburg PD?

15        A    I believe there were four full-time.

16        Q    That include the chief?

17        A    Yes, sir.

18        Q    Okay.  With regard to that, how many felony

19   stops -- classic felony stops did you perform from 2004

20   to 2008?

21        A    Classic, none.

22        Q    Okay.

23        A    High-risk, a number.

24        Q    Okay.  From '87 to January 2009, it states you

25   were a full-time Ohio Peace Training Academy.  Your

1    title was law enforcement training specialist.   Is that

2    correct?

3         A    It is, sir.

4         Q    What exactly did that entail?

5         A    I did, basically, train the trainers classes

6    for -- very different in Ohio than in West Virginia.

7    Everybody in West Virginia is trained at the West

8    Virginia State Police Academy; in Ohio, you'll have as

9    many as 110 basic training sites.

10              I would have trained any trainer that trained

11   at any one of those sites, and also the trainers in

12   private security, corrections and bailiffs.

13        Q    And what did you train them on?

14        A    Anything in the force spectrum.  Anything from

15   officer presence, verbalization, through pressure

16   points, joint locks, takedowns, handcuffing, ground

17   stabilization, ground tactics, aerosol agents,

18   conductive energy devices, refers to tasers, batons and

19   combative firearms; force-on-force training.

20        Q    Did you train them at all with regard to

21   traffic stops?

22        A    Yes, sir.

23        Q    And what exactly did you train them on it?

24   What training did you provide to them for traffic stops?

25        A    It would have been the S.T.O.P.S. training.

1  That was the manual we used.

2      Q      Everything in this manual here?  I say this

3  manual here, it's the manual that we've referred to

4  earlier at deposition, the Strategics and Tactics Of

5  Patrol Stops.

6      A      That would be the basis for the training, yes,

7  sir.

8      Q      Okay.  Did you train everything that's

9  included in this, that's included in this manual?

10     A      That's the instructor's manual.  The basic

11  manual wouldn't be quite as entailed as that.

12     Q      Okay.  So I guess my question is, what

13  portions of this manual did you teach?

14     A      It would be every portion of it.

15     Q      Okay.

16     A      Usually for traffic, you've got a one-week

17  course, you know, a 40-hour course.  And so you're going

18  to get as much as you can and you'll cover every topic,

19  but you may not be able to do actual field training

20  walk-throughs with every type of stop, you know, a

21  3-foot offset, a 20-foot offset, left or right, a corner

22  stop, you wouldn't be able to get to all of those.  You

23  would discuss them and maybe walk through them, but you

24  wouldn't do role playing on every single -- there

25  wouldn't be enough time.

1    Q    Okay.  In regard to that, what in your

2   background or qualifications gave you the qualifications

3   to teach that manual, to teach the traffic stops?

4    A    Just my total law enforcement background and

5   the training in the area.

6    Q    Okay.  And have we missed anything to date

7   with regards to what your law enforcement background and

8   training was?

9    A    No, sir.

10    Q    Okay.  So we've covered all that?

11    A    Yes, sir.

12    Q    Okay.  Why did you leave as a law enforcement

13   training specialist at the Ohio Peace Officer's Training

14   Academy?

15    A    I retired.

16    Q    You retired.

17    A    Yeah, I took a -- I just kind of made a

18   commitment with myself that when I turned 60, I was

19   going to stop wrestling around with kids that were three

20   times my size and at one-third my age; five surgeries.

21   I mean, if you're going to do force-on-force training,

22   you know, it's tough on the body.

23        So I, at age 60, I had my time in and retired.

24    Q    Okay.  It also appears that in December of

25   2008 through December 2013, you served as the chief of

Page 25

1    police for Mechanicsburg.  Is that correct?

2        A    Yes, sir.

3        Q    Okay.  Any felony traffic stops that you

4    performed in that role?

5        A    Not felony traffic stops, we didn't have

6    enough cruisers or officers to do classic stops, but

7    certainly high-risk stops and stops with assisting

8    agencies.

9        Q    How many full-time officers did you have

10   during that time period?

11       A    Four.

12       Q    Four?  Okay.

13            And you indicated you never participated in

14   any traffic felony -- classic felony stops.  Is that

15   correct?

16       A    No, we didn't, not with positioning of the

17   vehicles and all that, no.

18       Q    Did you ever have a situation where you had to

19   use your firearm?

20       A    Only for animals.

21       Q    Okay.  Is that true throughout your entire

22   career?

23       A    Yes, sir.

24       Q    Okay.  Why did you leave Mechanicsburg in

25   December of 2013?

```
 1        A    I had given the mayor a five-year commitment,

 2   that was up, and I retired from that.

 3        Q    Okay.  Were you ever asked to leave?

 4        A    Oh, no, sir.

 5        Q    Okay.  In your initial expert disclosure, you

 6   state that you've been retained in over 450

 7   police-related cases.  Is that correct?

 8        A    Yes, sir.

 9        Q    Okay.  How many of those cases have been civil

10   cases?

11        A    Probably maybe 95 percent.  90, 95 percent I

12   would think.

13        Q    And how many times have you actually testified

14   at trial in those cases?

15        A    I would say, I'm just going to guess, maybe

16   100, 120, something like that.

17        Q    Have you ever been retained as an expert for a

18   plaintiff against a police officer or a police

19   department?

20        A    Not in a civil case, no, sir.

21        Q    Have you ever testified against a police

22   officer?

23        A    Yes, sir.

24        Q    When was that?

25        A    A number of times in criminal cases.
```

Page 27

```
 1              If a law enforcement officer has done
 2      something wrong, we need to get him out of the
 3      profession.
 4              And so I've done a number of cases where they
 5      were wrong, and one was convicted of -- not murder but a
 6      lesser charge.
 7              I had assaults, things like that.
 8      Q       If you look at your resume, and this is under
 9      the last four years.
10      A       Yes, sir.
11      Q       In any of the cases listed there, are those
12      cases where you testified against a police officer in a
13      criminal case?
14      A       Some of them would be.
15              I believe State of Ohio V James Truckey.
16      Q       That's number 13?
17      A       Yes, sir.
18      Q       And you believe you testified against the --
19      was Mr. Truckey a police officer?
20      A       I believe.
21      Q       Okay.  Do you recall any of the facts and
22      circumstances around that case?
23      A       On that one, no, I don't.
24      Q       Okay.
25      A       Number 17, Marquel Ali was a police officer
```

1   when the alleged wrongdoing happened, and so I testified

2   against him.

3       Q    What was the facts and circumstances of that

4   case?

5       A    He had been -- he was the driver, another

6   person in the car.  There was a substantial quantity of

7   drugs found in the trunk of the car, in his bag, and so

8   it was a drug-related case.

9       Q    Okay.  He was suing the City of Beckley?

10      A    Yes.

11      Q    I'm assuming -- well, again, I shouldn't

12   assume.  Were you there on behalf of the City of

13   Beckley?

14      A    Yes, sir.

15      Q    What was the nature of the charges?  I mean,

16   what was the nature of the lawsuit then?  He was a

17   police officer.  Did it have anything to do with the

18   fact that he was -- I mean, did that really have

19   anything to do with the case?

20      A    I don't know how to answer that.

21            I'm sure it had something to do with the case,

22   yeah.

23      Q    Okay.  Well, what were you called to testify

24   about?

25      A    Police practices, yeah.

Page 29

1    Q    Okay.  Was he indicating that the City of

2  Beckley Police Department did something wrong in his

3  arrest?

4    A    Yes.

5    Q    Okay.  So I guess my question goes, again, the

6  fact that he was a police officer really wasn't germane

7  to what you were doing, he was basically making the

8  claim they did something improper in his arrest.

9    A    Yes.  He was not involved in a police function

10  when that happened.

11    Q    Okay.  So when you state that you testified

12  against a police officer, it's just who he happened

13  maybe to be, but it wasn't involved in his duties as a

14  police officer.  Is that correct?

15    A    Right.  Right.  He was a police officer doing

16  wrongdoings.

17    Q    Okay.  With regard to any other criminal cases

18  that you've testified against a police officer for

19  wrongdoings, can you point out any of those?

20    A    It would have been 11.

21    Q    Okay.

22    A    Bolton.

23    Q    You testified for the prosecutor?  What was

24  Mr. Bolton accused of doing?

25    A    I may get the two -- there were two cases, I

1    can't remember which name was which.  One of them, there

2    was an officer called to a bar fight.  When he

3    arrived -- they had body cams so we could use that.

4         The person was down on the ground being held

5    down by a friend.  Officer ordered the friend off.

6         The individual, I guess, grabbed the officer's

7    leg.  The officer punched him a number of times and

8    sprayed with an aerosol agent.

9         He was handcuffed, got him up, walked him to a

10   cruiser, started to put him in the cruiser.  The kid

11   didn't want to go in.  It's, you know, pretty common.

12   He went around and pulled the kid in the cruiser.

13        All of that was -- I mean, at that point, I

14   wasn't crazy about it but, you know, at least there was

15   an argument that could be made.

16        And then, you know, when the kid was in the

17   cruiser, it's over.  Instead of closing the door, he

18   pulled the kid backwards, hit him in the head three or

19   four times with the door, sat him up and punched him in

20   the back of the head.  That's wrong.  You just don't do

21   that.

22        Q    Okay.

23        A    And then after that, when he found out there

24   was a video, he went to the other agency that had backed

25   up and said, I need the video for evidence, never turned

Page 31

```
 1    the video in.  It was just all kinds of things that were
 2    wrong.  So we had to get him out of the profession.
 3         Q    Okay.  So he was having criminal charges
 4    brought against him.
 5         A    Yes, sir.
 6         Q    Okay.
 7         A    The other was an officer was --
 8         Q    And when you say the other, is this
 9    Mr. Truckey or is this something else?
10         A    It would be -- I may have Bolton and Truckey's
11    name, I may have the cases backwards.
12         Q    Fair enough.
13         A    I'm just saying I can't remember the names.
14         Q    Okay.
15         A    I can give you the fact patterns.
16         Q    Sure.
17         A    Officer called to an audible alarm at a
18    building.  He checked the building, no damage, no open
19    doors or anything like that.
20              He heard, a street over, a quadrunner start up
21    and, you know, just went and checked it out, tried to
22    stop the quadrunner.  It was a guy who left the bar.  He
23    happened to be intoxicated and had a person on the back
24    of the bike as a passenger that was just looking for a
25    ride.  It turned out to be a pursuit against the
```

```
                                                    Page 32
 1    quadrunner.

 2              He wound up, while the quadrunner was running,

 3    pulling up and firing a taser at the driver.  Luckily

 4    that missed.  And then it went on for a while.

 5              The quadrunner gets bogged down then in some

 6    mud.  Another officer had the guy down and handcuffed.

 7              This guy ran up, got down in his face, yelled

 8    at him, punched him in the face, busted his head open,

 9    went up and ran up, did it to the other guy.  We just

10    don't do that, that's wrong.

11       Q    Okay.  And criminal charges were brought

12    against that officer?

13       A    Yes.  Found guilty.  Yes.

14       Q    Okay.  Any other?

15       A    I think that's it in this group.

16       Q    Okay.  Do you have any names that you can

17    recall beyond this that's listed here?

18       A    Let me think.  Talley.  Talley was --

19       Q    What's that?

20       A    -- in Cleveland.

21       Q    Is that the State of Ohio versus Talley?

22       A    Versus Talley.  Yeah.  He was -- well, that

23    one.

24       Q    What was that about?

25       A    That was an officer that had not -- done a
```

1    questionable act at a police department, was allowed to

2    resign instead of being terminated, which I'm not in

3    favor of, went to another department and got an off-duty

4    gig at Dillard's Department Store, which was, you know,

5    you go in your uniform, it was all authorized through

6    the PD.

7            He went the first day just to meet the people,

8    wasn't in uniform or anything, and was in the control

9    room where they've got all the cameras.  And an

10   individual was looking at leather coats.  And the kid

11   did steal a coat.  You know, there's no question about

12   that, he stole one of the coats.

13           And Talley, although not on duty or anything,

14   went out, intercepted the kid, grabbed him by the scruff

15   of the neck, and it was defined as -- it looked like a

16   principal taking a middle-schooler to the office, walked

17   him off camera.

18           Now I can only rely on the testimony of the

19   individuals, of the employees there.  I had three

20   supervisors in a break room.

21           He took him to the holding room.  And they had

22   already called the police.  And the kid didn't want to

23   go in the holding room so he took him down to the

24   ground.  I have no problem with that.  Handcuffed him,

25   no problem with that.

1        But then when he was handcuffed, he scooped

2   him up.  One of the witnesses said he was on his knee,

3   two of the other witnesses say he picked him up to a

4   standing position and dropped him on his head, knocked

5   him unconscious.  Squad called, broken collarbone.

6        There were a lot of problems in this case,

7   police problems and medical problems.  Because they

8   thought he was just a crackhead, they didn't do adequate

9   medical treatment, they sent him back to the PD.

10        The problem was this was a black sheep

11   family -- black sheep of a black family that owned --

12   very prominent, owned a number of funeral homes in the

13   Cleveland area.

14        And the mother had been through this,

15   unfortunately, a number of times before, was coming to

16   pick him up at the police department.  When she walked

17   in the door, he leaned over and started throwing up.

18        The officer looked at her and said, ma'am, you

19   need to take him to the hospital, that's a sign of

20   possible head injury.

21        By the time they got him to the hospital, he

22   died.  They had fractured his skull from above his orbit

23   all the way down, basilar fracture around the skull, up

24   to the other side.

25        The prosecutor from Cleveland, Bowral

Page 35

1   (phonetic), who's kind of a god to the cops up there,

2   testified that was a force equivalent to handcuffing a

3   person, having them fall unimpeded two stories and

4   landing on solid concrete.

5          That is totally against what law enforcement

6   is trained to do.  Had to get him out of the profession.

7      Q    **Any other cases that you can recall?**

8      A    There are but I can't -- I can't think of them

9   right offhand.

10     Q    **Okay.**

11     A    There have been a number.

12     Q    **Okay.  Have you ever testified against a**

13  **police department?**

14     A    Yes.  If I believe an officer is right, if the

15  officer is follow their training, I'll testify for the

16  officer.  If they didn't follow their training, I'll

17  testify for the police department.

18     Q    **Okay.  But my question is, have you ever been**

19  **involved in a case, retained in a case, where you've**

20  **testified against a police department?**

21     A    Not in a civil case, a plaintiff, no.

22     Q    **Okay.**

23     A    But in law enforcement profession, yes.

24     Q    **When you say law enforcement profession --**

25     A    The way I explained it to you.  Was the

1    officer right or was the police department right?

2        Q    I understand.   Okay.   So that would have been

3    in a criminal aspect, but never in a civil case have you

4    ever testified against a police department.

5        A    It would be in criminal, arbitration, and I

6    believe some civil cases.

7        Q    Okay.   I'm somewhat confused by your answer

8    now.

9             All right.   In what context would you have

10   testified against a police department in a civil case?

11   And I'm going to exclude employment matters.

12       A    If they were, say, suing to get their job back

13   or that type of stuff.

14       Q    Okay.

15       A    Yeah.

16       Q    So it would be -- that would only involve

17   employment matters.   Correct?

18       A    I believe in that case, yes.

19       Q    Okay.   Well, has there been any cases that

20   you --

21       A    In the case -- not that case, but in the type

22   of case you're outlining, I believe so.

23       Q    Okay.   All right.   So you've never been

24   retained to testify against a police department in a

25   civil aspect that didn't involve some type of employment

Page 37

1    matter.

2        A    That's correct.

3             I mean, I'm often called by plaintiff's

4    attorney, I will listen to anybody, I'll tell them -- I

5    believe I have an ethical responsibility to tell them

6    exactly what we train police to do.

7             And if they give me a fact pattern, you know,

8    and it's not favorable, I'll say, Counselor, if you can

9    prove that, you don't need me.  I'll give them some

10   names who will take the case.  It's just right now, at

11   70, I have -- I have all the work I need.

12       Q    Okay.

13       A    I mean, and my whole career was law

14   enforcement.  I won't say we'll always do it right.  If

15   they don't do it right, I'll work to get them out of the

16   profession.  But I just don't take cases against --

17   civil cases against law enforcement.

18       Q    Okay.  You indicate that you've been qualified

19   in state and federal courts in defense tactics --

20       A    Yes, sir.

21       Q    -- subject control --

22       A    Yes, sir.

23       Q    -- and police procedures.

24       A    Yes, sir.  Policies, procedures, practices.

25       Q    Okay.  And that's what I was going to ask you.

1   What police procedures have you been qualified as an

2   expert in?

3        A    I don't know how to answer that.  Could you

4   explain?

5        Q    Well, I don't know.  You list it as police

6   procedures so I don't know what police procedures you're

7   referring to in your report.

8             So what exactly -- are these police procedures

9   as relates to defense tactics and subject control?

10        A    It could be anything around a stop; how the

11   stop was initiated, the probable cause issues,

12   reasonable suspicion issues, search issues, follow-up

13   procedures.

14        Q    And again, I want to make sure these are

15   things that you've been qualified as an expert to

16   testify in courts.  Are you telling me you've been

17   qualified as an expert to testify in court regarding

18   those matters?

19        A    Yes, sir.

20        Q    Okay.

21        A    Yes, sir.

22             After force was used through whatnot, was a

23   medical follow-up appropriate, consistent with law

24   enforcement best practices, the investigation that

25   followed.  Anything, you know, related to issues like

Page 39

1    that.

2           And it's even, a very strange case, I taught a

3    class in law enforcement, developing a winning attitude.

4    And in one case, a judge said, you know, I was an expert

5    in attitude, so.  I mean, I don't know, I just work

6    here.

7       Q    Okay.  Have you ever been not qualified to

8    give an expert opinion by a court?

9       A    Not on qualifications.

10      Q    Okay.  What were you not qualified to do then?

11      A    I think one or two was in like summary

12   judgment, it was limited only to -- in a summary

13   judgment issue, limited only to an area related to the

14   loss.  I don't understand exactly what the finding was

15   there but it was in a summary judgment issue.

16          And there was a period of time in West

17   Virginia, and I can't remember the judge's name, but one

18   of the districts, the judge made the decision that

19   experts aren't needed in empty-hand issues.

20          In other words, if it was incorrect

21   handcuffing, that's fine; if it was a taser aerosol.

22          But if it was an empty-hand control issue, he

23   said that the jury would be able to understand that by

24   themselves.  No experts were needed.

25          Now since then, that's changed and I've

1    testified in that district then, but that happened I

2    believe on two occasions.

3        Q    When you said the district, you think those

4    were federal courts?

5        A    Yes, federal court.

6        Q    Do you know if those were the Southern or

7    Northern District?

8        A    I don't remember.

9        Q    Okay.  Do you know how long ago that would

10   have been?

11       A    Probably.  Time goes so fast.  Eight, ten, 12,

12   maybe 14 years.  I don't remember.

13       Q    Any recollection of the attorneys involved in

14   those cases?

15       A    I can't say specifically, but there's a good

16   chance it was Pullin, Fowler, Flanagan, Brown & Poe or

17   Steptoe & Johnson.

18            THE COURT REPORTER:  I'm sorry.  Pullin,

19   Fowler --

20            MS. DURST:  Pullin.  My firm name.

21            THE WITNESS:  I'll try to slow down.

22            THE COURT REPORTER:  Or the other firm?

23            THE WITNESS:  Steptoe & Johnson.

24   BY MR. EDWARDS:

25       Q    So you indicated there was a period of time

Page 41

1    where open-hand or empty-hands, you were not allowed to

2    testify as an expert?

3        A    Yes, sir.

4        Q    And there was a time on summary judgment where

5    your expert testimony was not allowed.  Is that your

6    understanding?

7        A    It was -- it was only to one of the issues.  I

8    don't understand.  I mean --

9        Q    Okay.  Do you know where that court was or --

10       A    I don't, sir.

11       Q    Okay.  Any other time where you were giving

12   testimony at trial where a court excluded your testimony

13   or a portion thereof?

14       A    I don't recall.

15       Q    Is there anything today that's prohibiting you

16   from recalling other than time?

17       A    No, I just -- I believe there was an issue in

18   magistrates court, now we're looking probably 20 years

19   ago.  I believe it was the City of Dayton might have

20   been involved.  But, again, it was a strange one.

21           An individual kidnapped a lady.  There was a

22   high-speed pursuit.  The car crashed.  An officer broke

23   the window, took the lady out of the window, and then

24   they arrested that guy.  She sued the law enforcement

25   officers.

1          And I was asked, had I ever broken a window

2    and pulled somebody out of a window, and I said, no, I

3    had never done that in my career.

4          And then he said, okay, we're not going to

5    testify on that then.

6          Q    Okay.

7          A    He said I was eminently qualified in training,

8    but the issue is taking the person out of a window, and

9    so --

10         Q    Okay.  Any other times with regard to where

11   your testimony was excluded that you can recall here

12   today?

13         A    No.

14         Q    Okay.  It appears from your resume that you've

15   only been qualified as an expert in the topics of

16   defense tactics, subject control and police procedures.

17   Is that correct?

18         A    Practice, procedures, policies.  Yes, sir.

19         Q    And you're not attempting to provide expert

20   opinions in any other subjects as it relates to this

21   case.  Is that correct?

22         A    No.

23         Q    In formulating your opinion from the initial

24   disclosure, you list 24 different things that you

25   reviewed.  Did you review any other documents or

Page 43

1    materials other than those listed in that disclosure in

2    formulating the opinions in that initial disclosure?

3         A    In the initial -- in the first paper?

4         Q    Yes.

5         A    Yes.  In the supplement, I believe there's

6    additional things that were reviewed.

7         Q    No, no, no.  I understand and I appreciate it,

8    but you didn't understand my question, I don't believe.

9         A    I don't believe.

10        Q    With regard to the initial disclosure, your

11   first disclosure that you made in this case, you listed

12   24 things that you reviewed.

13        A    Okay.

14        Q    As it relates to the opinions in that

15   disclosure, did you review any other material?

16        A    I don't believe so.

17        Q    Okay.  Are you sure about that or do you know

18   for certain?

19        A    I don't believe so.

20        Q    Okay.

21        A    If I would have reviewed it, I would have

22   listed it.

23        Q    All right.  And in that list, I do not see any

24   listing of any training material used to train either

25   Deputy Forsyth or Deputy Love.  Is that correct?

1     A     Correct.

2     Q     Okay.  So as it relates to this, you're not

3  going to provide an opinion as to the adequacy of either

4  Deputy Love or Deputy Forsyth's training.  Is that

5  correct?

6     A     Oh, I could if I'm asked.  I'm very familiar

7  with West Virginia State Police Academy, I've been

8  there.

9     Q     Okay.  I understand that.

10    A     I've trained there.

11          And their trainers, they were constantly

12  coming up to the academy.  I've trained every trainer

13  there since probably 1990; Eddie Sinclair (phonetic);

14  and then it was Jess Gundy who went on to run the

15  academy; and then it was Bob -- Trooper Petry, who's now

16  Lieutenant Petry, in charge of the certification in

17  standards; and then most recently, it's now Corporal

18  Barker, I just had him in training.  So I've trained all

19  those people.

20    Q     Okay.  In this regard, I think I asked you

21  this question early on, you do not know specifically

22  what training Deputy Forsyth may or may not have had

23  prior to August 2nd, 2017.  Is that correct?

24    A     Other than his basic training at the academy,

25  correct, sir.

Page 45

```
 1        Q     And you haven't reviewed any documents as that

 2   relates to when he went through the academy, what he may

 3   have been trained on or wasn't trained on.  Is that

 4   correct?

 5        A     Correct, sir.

 6        Q     Okay.  With regard to Deputy Forsyth -- I'm

 7   sorry -- Deputy Love's training, he hadn't been through

 8   the academy at that point in time.  Is that correct?

 9        A     Correct, sir.

10        Q     When I say that point in time, I meant August

11   2nd, 2017.

12        A     Correct, sir.

13        Q     And you did not review any material that he

14   may have been trained on as it relates from the Marion

15   County Sheriff's Department.  Is that correct?

16        A     That's correct, sir.

17        Q     Okay.  So other than what you believe may --

18   they may have been trained on, when I say they, Deputy

19   Forsyth may have been trained, you don't -- you aren't

20   able to give an opinion as to the adequacy of either of

21   their training as of August 2nd, 2017.  Is that correct?

22        A     Correct.

23        Q     Okay.  I was trying to do some math in my head

24   but probably not all that well.  How much have you been

25   paid to date for your expert -- for your retained expert
```

1    in this case?

2        A    I believe it's about $7,000.

3        Q    Okay.  And how much did you bill total last

4    year as an expert in cases?

5        A    Each year, it's usually between 60 to $80,000.

6        Q    As you sit here, do you know an exact number

7    or a closer number than that for last year?

8        A    No, sir, I don't.

9        Q    Okay.  What about this year, how much have you

10   billed to date?

11       A    This year, probably about $80,000 at this

12   point.

13       Q    Okay.  So we're right at the beginning of

14   October and you're right around $80,000.

15       A    Correct, sir.

16       Q    Okay.  How many times have you been retained

17   in cases by defendant's counsel, Pullin, Fowler,

18   Flanagan, Brown & Poe?

19       A    Oh, I couldn't render a guess.  There's been a

20   number.

21       Q    I'm sorry, I'm not laughing, but I'm sure

22   there has been a number.  Is that number high, is it --

23   you know, you said you've been retained over 450 times

24   in civil cases -- I'm sorry, that's an unfair

25   question -- in cases you've acted as an expert over 450

Page 47

```
 1    times.  You indicated 95 percent of those have been for

 2    civil cases.  So my question is, is that number over

 3    200?

 4        A    Oh, no, sir.

 5        Q    Is it over 100?

 6        A    I don't believe so.

 7        Q    Okay.  Do you believe it's between 50 and 100?

 8        A    Very possibly, yes, sir.

 9        Q    Okay.  So you believe that in the cases you've

10    been retained for in civil matters, you've been retained

11    by Ms. Durst's firm, Pullin, Fowler, Flanagan, Brown &

12    Poe, between 50 and 100 times?

13        A    I would guess that.  I would think probably

14    more in the 50, 60, 70 range, but it's just, it's a

15    guess.  I mean, it's been a lot of years.

16        Q    Okay.  So you've had a long relationship with

17    that firm.

18        A    Since it was Pullin, Fowler & Flanagan.

19        Q    Okay.  And so 20 years?  Longer?

20        A    Probably -- probably longer.

21        Q    Okay.  And along with Ms. Durst, you've acted

22    as an expert for Chip Williams?

23        A    Yes, sir.

24        Q    Keith Gamble?

25        A    Yes, sir.
```

Page 48

1       Q      Theresa Kirk?

2       A      Yes, sir.

3       Q      Who else with the firm have you been retained

4    in cases with at that firm?

5       A      Jimmy Brown.

6              MS. DURST:  Johnnie.

7              THE WITNESS:  Johnnie Brown.  I'm sorry.

8              Duane Ruggier, Mr. Pullin, Vic Flanagan.

9              Those are the ones I can just come up with off

10   the top of my head.

11   BY MR. EDWARDS:

12      Q      It may have been an easier question to ask you

13   which ones you haven't been retained by at this point.

14      A      No, it's a lot of attorneys.

15      Q      And in looking, it looks like in fact you,

16   along with Keith Gamble and Chip Williams, presented and

17   authored a seminar called, "How to avoid the pitfalls of

18   police liability:  What you know could hurt you," in

19   2012.  Does that sound familiar?

20      A      Probably a Lorman seminar, I think.

21      Q      Okay.

22      A      Yes, sir.

23      Q      Have you done more than one of those with that

24   firm?

25      A      Yes, sir.

Page 49

```
1              Oh.  Well, some with them and some with other
2    firms.
3         Q    Okay.  I want to ask you about some statements
4    here, I'm just going to read some things and ask you
5    whether you agree with them or not.  Okay?
6         A    Okay.
7         Q    Do you agree that it would be a severe officer
8    safety violation for an officer just to pull up to a
9    potential shooting scene, announcing that they were an
10   officer, illuminating themselves, and making an easy and
11   convenient target?
12        A    That would -- tactically, it wouldn't be the
13   best thing to do.
14        Q    Okay.  Well, do you have any problems with
15   that statement?
16        A    If the officer puts himself at risk.
17        Q    Okay.  So you don't think that's a reasonable
18   thing for an officer to do.
19        A    See, we have two different things.
20             Is he violating any constitutional right?  No.
21        Q    Correct.
22        A    Has he put him or herself at risk?  Yes.
23        Q    Okay.  Do you agree that ultimately, it's the
24   job of the jury or the court to decide the question of
25   whether or not the responses of law enforcement officers
```

Page 50

1    used were reasonable?

2         A    Yes, sir.

3         Q    Would you agree that the inadequacy of police

4    training may serve as a basis for a municipal liability

5    where absence of training amounts to deliberate

6    indifference for the rights of persons whom the police

7    come into contact?

8         A    Yes, sir.

9         Q    For high-risk stops, do you agree that you

10   should stay in a low-profile position behind an open

11   cruiser door while conducting a high-risk stop?

12        A    You'd have to give me a lot more than that.

13        Q    Okay.  Well, just as a general training for

14   high-risk stops, do you agree that that's one of the

15   things you should do?

16        A    Again, what type of stop?

17        Q    A high-risk felony stop.

18        A    Understand my confusion, if I -- if I respond

19   to a bank alarm, that's a high-risk stop.

20             I mean, what are we -- you've got to give me

21   more.  I don't understand, you know --

22        Q    If someone is pursuing another vehicle --

23        A    Okay.

24        Q    -- and you believe it to be a high-risk or a

25   felony stop --

1      A     Okay.

2      Q     -- do you think that you stay in a low-profile

3   position behind an open cruiser door while conducting a

4   high-risk stop?

5      A     That's part of training, but we have to have a

6   lot of things fall in place before that happens.

7      Q     Okay.  Do you approach the vehicle?

8      A     It depends.  Again, it depends on what's

9   happening.

10     Q     Okay.  Well I'm asking you, as part of

11  training for high-risk stops, is that part of your

12  training?

13     A     The confusion -- and I see it with Mr. Root,

14  it's the same thing.  When you have high-risk stops,

15  that's a plethora of stuff.  I mean, there are times

16  when you have -- that you will put yourself at risk to

17  keep risk from somebody else.

18           If we're talking about classic training of a

19  classic felony stop, where the person has complied with

20  your commands and either is pulled over, has wrecked

21  their vehicle, or the vehicle has just run out of gas or

22  something, and we are allowed to position our cruisers,

23  and we are -- and we can then open the doors and get

24  adequate people, and we can get him to follow our

25  commands like, sir, turn off your vehicle, put your keys

Page 52

1    on the hood, if they'll do all that, then it is

2    training, it is correct, you stay behind your door and

3    you bring them out one at a time, you bring them back to

4    a secure area, you secure them one at a time.  And once

5    everybody's out of the vehicle, then you'll do a

6    distraction and drive a vehicle up and keep the noise of

7    the motor going to check the trunk and -- but we have so

8    many things that have to happen for that to take place.

9         Q    Okay.  I understand.

10             But you train -- you indicated you train

11   people or you use this S.T.O.P.S. manual for doing

12   high-risk felony stops.  Correct?

13        A    For classic high-risk felony stops, and then

14   they'll also be -- we do in there, try to do some of the

15   variables because, you know, no plan survives initial

16   contact with the individual, and if it's going well,

17   it's probably an ambush.  I mean --

18        Q    Well, that's one of the reasons why you are

19   trained to stay behind a door, to have some type of

20   defense.  Is that correct?

21        A    If you can.

22        Q    Okay.  If you can.

23        A    But again --

24        Q    I'm sorry, I didn't mean to interrupt.  Go

25   ahead.

Page 53

```
 1        A     If we look at a specific case, if I have a

 2  vehicle coming at me, standing behind a door is probably

 3  the worst place I could possibly be.

 4        Q     Standing in front of it would be even worse,

 5  wouldn't it?

 6        A     It would give me at least an option to move.

 7        Q     Okay.  All right.  So let's go through this

 8  again.  With regard to your training that you're

 9  familiar with, is it proper to stay in a low-profile

10  position behind an open cruiser door when conducting a

11  high-risk stop?

12        A     It could be.

13        Q     Okay.  Would it be appropriate not to approach

14  the vehicle?

15        A     It could be.

16        Q     Okay.  And that's something, how a reasonable

17  officer or someone would conduct themselves during a

18  high-risk stop.

19        A     If all the variables call for that, yes.

20        Q     Okay.  Prior to doing this stop, should you

21  radio your intention that you're going to stop someone?

22        A     You could, yes.

23        Q     Well, you could or you should?

24        A     Probably should.

25        Q     Okay.  Should you try to coordinate the stop
```

1    with other officers?

2         A     If there's other officers available, yes.

3         Q     Okay.  Should you position your cruiser at

4    least 20 to 25 feet away from the other vehicle?

5         A     Again, that just totally depends on the stop,

6    the area, the location.

7         Q     Okay.  If it allows for it.

8         A     Well, again, I don't want to get too technical

9    with you.

10              20 feet doesn't give you much reaction time

11   and we try to show that to officers in our training.

12   More like 25 or 30 feet, if you're going to stay back.

13        Q     Okay.

14        A     With a 25 or 30-foot left or right offset.

15              Or you go a 3-foot left or right offset so

16   that if they put it in reverse, it's probably enough --

17   not enough kinetic energy to deploy your airbag and, you

18   know, to take your cruiser out of the situation.  So

19   there are so many variables we're looking at.

20        Q     Okay.  So you basically tell them to stay 25

21   to 30 feet behind the vehicle, so if they put it in

22   reverse, there's not enough kinetic energy for them --

23        A     No.  That the would be the 3-foot left or

24   right offset.

25        Q     Thank you, I just wanted to make sure I was

Page 55

1    right.

2        A    That's a 3-foot.

3        Q    All right.  You don't approach the suspect or

4    the suspect vehicle.

5        A    It depends on the situation.

6        Q    Okay.  Wait for back-up prior to making

7    contact with the suspect.

8        A    If the person is cooperating, allows you to do

9    that, yes.

10       Q    Stay behind the wall.

11       A    If there's a wall.

12       Q    Okay.  Well, your cruiser can be the wall.

13   Correct?

14       A    I don't usually refer to it as that, no,

15   but --

16       Q    Okay.  Well, is it best not to stay behind

17   your cruiser for a felony stop?

18       A    It depends on the situation.

19       Q    Okay.  Well, you keep on saying it depends on

20   the situation.

21            You train officers.  Correct?

22       A    As I outlined, sir, in classic felony stops,

23   you can't -- you can't go back and forth in between

24   these things.  You can't -- you're talking about

25   something classic on paper that you can set up and you

Page 56

1   can put together.

2       Q    Sure.

3       A    Or you're looking at a situation where you

4   pull in, and we've got from -- it seems like the radio

5   traffic, we've got about six seconds from when we first

6   see a vehicle until the vehicle's coming at an

7   individual.  And you want -- you're expecting them to

8   stop the vehicle, call in, wait for back-up, get behind

9   the cruiser, you are just so unrealistic in what you're

10  trying to allege in here.

11      Q    I'm not alleging anything, I'm just asking you

12  simple questions with regard to the training for a

13  high-risk felony stop.  Are these the proper protocol

14  that you do in that training?

15      A    And that's why I said, if the tactics will

16  allow it, yes, it is.

17      Q    Okay.  That's all I'm asking for.

18           All right.  So you stay behind cover and

19  things of that nature.  Is that correct?

20      A    If they'll allow it, yes, sir.

21      Q    Okay.  And that is what you do for a

22  reasonable stop if it allows for it.  I'll give you that

23  caveat.  Correct?

24      A    And if things may change.

25      Q    Okay.  Would you agree that the use of deadly

1    force to prevent the escape of all felony suspects,

2    whatever the circumstances, is constitutionally

3    unreasonable?

4         A    No, sir.

5         Q    You don't agree with that.

6         A    No.

7         Q    Okay.  You agree that where the suspect poses

8    no immediate threat to the officer and no threat to

9    others, the harm resulting from failing to apprehend him

10   does not justify the use of deadly force to that extent?

11        A    That's correct.  That's one of the sections.

12        Q    Okay.  Do you agree that an officer's evil

13   intentions will not make a Fourth Amendment violation

14   out of an objectively reasonable use of force, nor will

15   an officer's good intentions make an objectively

16   unreasonable use of force constitutional?

17        A    Yes, sir.

18        Q    Okay.  Would you agree that coercive actions

19   taken by officers that deprive any person of liberty or

20   cause some type of duress more than necessary is

21   unreasonable, and by default, excessive?

22        A    I'm not crazy about the way you worded that.

23        Q    You want me to reread it?

24        A    Well, the word I'm having a problem with is

25   necessary.  I would rather, you know, more than

Page 58

1    reasonable.

2            Because you can only -- the courts have never

3    said we have to be perfect or even correct, we just have

4    to be reasonable.

5            The only way you can find out if it was

6    necessary or not is actually after the fact.

7            And so that's -- I guess that's the one word I

8    had a problem with in your statement.

9    Q    Okay.  So let me reread it to make sure we're

10   on the same page here.

11           Coercive actions taken by officers that

12   deprive any person of liberty or cause some type of

13   duress more than necessary is unreasonable, and by

14   default, excessive.

15           You don't agree with that because of the word

16   necessary.  Is that correct?

17   A    Yeah.  More than necessary.

18           I believe -- well, that seems restrictive.  It

19   seems to fall into that second-guess, you know, aspect

20   of it.

21   Q    Okay.  What about:  An individual must possess

22   a weapon and show signs that he is willing to use it.

23   The mere possession of a weapon with no perceived intent

24   to cause injury will not meet the standard for the use

25   of deadly force?

Page 59

1     A     Yes, sir.

2     Q     You agree with that statement?

3     A     Yes, sir.

4     Q     Do you agree with:  Reasonableness depends on

5  not only when the seizure was made but also on how it

6  was made?

7     A     Yes, sir.

8     Q     Okay.  It is not constitutionally reasonable

9  to use deadly force to prevent the escape of a felon who

10  is unarmed and possesses no threat to others.

11     A     Yes, sir.

12     Q     And when you say, yes, sir, meaning you agree

13  with that statement?

14     A     Yes, sir.

15     Q     Okay.  The statement:  An officer's good

16  intentions will not make -- I'm sorry, let me rephrase

17  that.

18           An officer's good intentions will not make an

19  objectively unreasonable use of force constitutional.

20     A     Correct.

21     Q     Okay.  An officer must act as other reasonable

22  officers would have acted in a like or similar

23  situation.

24     A     Yes, sir.

25     Q     Officers should attempt to cause the least

1    amount of injury or trauma to the subject while still

2    limiting the exposure of risk to themselves.

3         A    Yes, sir.

4         Q    Do you agree with that?

5         A    Well, yeah, it's -- I'm just -- I agree with

6    it.  It doesn't always work out that way, it's hard to

7    do.

8         Q    Okay.  You agree that it's possible that an

9    officer may have misjudged the situation, the speed of

10   the incident, the stress level, fear, injury,

11   exhaustion, et cetera, may have forced an error in

12   judgment.  This will certainly increase civil liability,

13   but that is the civil process in all -- that is what the

14   civil process is all about, to right unintentional

15   wrongs.  A major problem is when an officer realizes a

16   mistake after the fact and is reluctant to admit it.

17        A    Yes, sir.

18        Q    You agree with that statement?

19        A    Yes, sir.

20        Q    Okay.  In part of the material that you

21   reviewed, you reviewed Deputy Forsyth's psychological

22   profile.  Is that correct?

23        A    If I did, I -- if it was part of his hiring

24   packet, I did.  I can't say I paid much attention to it.

25        Q    So you don't recall it stating in his profile

1    that he was prone to deny even relatively minor faults

2    or foibles?

3        A    No.

4        Q    Okay.  You don't recall seeing that in

5    addressing issues of management, aggressive feelings or

6    thoughts, particularly in situations where a law

7    enforcement officer is likely to be placed in dealing

8    with highly confrontational individuals, he is prone to

9    hypervigilance?

10       A    I -- I don't recall it.

11       Q    Okay.  So that didn't play a part in making

12   any of your opinions in this case.

13       A    No, sir.  I wouldn't -- I wouldn't try to

14   second-guess a psychological.

15       Q    Okay.  You did review the Marion County

16   Sheriff's Department use of force policy.  Is that

17   correct?

18       A    I did, sir.

19       Q    Okay.  And you believe that the Marion County

20   use of force policy is a reasonable --

21       A    Yes, sir.

22       Q    -- policy.  Is that correct?

23       A    Yes, sir.  It is actually pretty standard.

24       Q    Okay.  And it's reasonable to apply that use

25   of force policy to the facts and circumstances of this

Page 62

1   case.

2        A    Yes, sir.

3        Q    Okay.  The use of force policy of Marion

4   County defines several terms, one of which is

5   reasonable, defined as those actions that a prudent

6   person would believe are fair and sensible given the

7   totality of the circumstances.

8        A    Yes, sir.

9        Q    Proper?

10       A    Yes, sir.

11       Q    Okay.  Imminent threat defined as that threat

12  which is about to happen, immediate, and perceived to be

13  unavoidable.

14       A    Yes, sir.

15       Q    Proper?

16       A    Yes, sir.

17       Q    Okay.  So if a threat can be avoided, it's no

18  longer an imminent threat.  Is that correct?

19       A    We have to qualify that.  Because if we're

20  dealing with possible -- is it possible it could be

21  avoided?  Again, that goes back to the difference

22  between what is possible and what is reasonable.

23       Q    I understand that.

24            And the definition which you agree was

25  reasonable, that a threat that is about to happen,

1    immediate and perceived to be unavoidable --

2        A    Yes, sir.

3        Q    -- you said that was proper.

4        A    It is.

5        Q    And my question was, if a threat can be

6    avoided, then it's not an immediate threat.  So if you

7    can avoid the threat, it's not an immediate threat.

8    Correct?

9             MR. UMINA:  Imminent Bryan.

10   BY MR. EDWARDS:

11       Q    Imminent threat.  I'm sorry, I'm saying it

12   wrong.  Imminent threat.

13       A    It's hard, as I just said in my answer before,

14   one and two are not -- the first statement you read and

15   the second statement you read aren't totally consistent

16   with each other.

17       Q    Okay.  And how are they inconsistent?

18       A    Because the term is reasonable.  All right?

19   In other words, if -- I'll keep it in context of what

20   we're dealing with.

21            If I have a car coming at me and after the

22   fact, well, it's possible you could have, you could have

23   done this or done that which may then have -- we

24   don't -- it's not looked at that way.

25            Is it reasonable from the perception of that

```
                                                    Page 64
 1    officer at that time that he was going to be hit by that
 2    car, not is it possible that if you would have done X, Y
 3    or Z, you may not have.
 4         Q    You made a statement there and I want to make
 5    sure that I heard that correctly.  You said if it's
 6    reasonable from what that officer thought.  Is that what
 7    you believe to be the standard?
 8         A    From the perception of an officer in a tense,
 9    rapidly evolving situation.
10         Q    But of a particular officer or just a
11    reasonable officer?
12         A    A reasonable officer.  And then it's a jury's
13    task to decide, was that officer's perception in that
14    situation reasonable.
15         Q    Okay.  So, again, you may have answered but I
16    don't think you have so I'm going to ask the question
17    again.
18              Imminent threat is defined as that threat
19    which is about to happen, immediate and perceived to be
20    unavoidable.  My question to you was:  If a threat can
21    be avoided, it is not imminent.  Is that correct?
22              MS. DURST:  I think he --
23              MR. EDWARDS:  I'm sorry, I did it again.  I
24    think I did it again.
25              MS. DURST:  Well, I'm going to object to the
```

Page 65

```
 1    form, and I think he's answered it.
 2              THE WITNESS:  I believe I've -- I've answered
 3    that I believe the best I can.
 4    BY MR. EDWARDS:
 5        Q    Well, would you agree that if a threat can be
 6    avoided, it's certainly not imminent?
 7        A    No, sir.
 8              Let me try to explain it another way.  You
 9    point a firearm at me, I move and I use my firearm
10    against you.  After the fact, it's found out that your
11    firearm was empty.  Well, it could have been avoided
12    because it was an empty firearm.  I had no way of
13    knowing that at the time.
14              That's why when you're using the term that
15    you're using, I have a problem with it, unless you put
16    in what our standard is, reasonably perceived.
17              That's why the first statement you did, I
18    agree with that completely, a reasonable perception,
19    that's what we are.
20              But the fact that it could have been avoided
21    where after the fact, you prove this or prove that of
22    things I couldn't have known -- the officer couldn't
23    have known at that time, I disagree with that.
24        Q    Okay.  And I think I may have misworded my
25    question.  Let me word it like this.
```

```
1              If a threat has been avoided, it's certainly
2    not an imminent threat.
3         A    Oh, I disagree with that, too.
4              If I was lucky enough to jump out of the way
5    when you were shooting at me and I didn't get hit, it
6    doesn't mean that wasn't an imminent threat.  Does that
7    make sense to you?
8         Q    I understand the shooting aspect.  But if I'm
9    standing -- if a car passes me by, I'm no longer in
10   imminent threat of that car.
11        A    Not at that point.
12             But we still have to worry, what if the car --
13   and I've had this in other cases -- backs up again,
14   tries to hit the officer.
15        Q    Hold on.  But that's a whole different issue.
16   I'm talking about the immediate threat.  If a car passes
17   me by, that immediate threat has passed.  If he backs
18   up, that's a whole different situation.  Correct?
19        A    Yes.
20        Q    Okay.
21        A    That immediate threat to the officer.
22             But by Tennessee versus Garner, if that -- I
23   have an individual at a county fair and he decides he
24   wants to kill everybody, he drives up on the sidewalk
25   and runs over a bunch of people, he comes in my
```

Page 67

1  direction, I dive out of the way, well, no imminent

2  threat to me, but how about all these other people on

3  the sidewalk?

4      Q    I understand that, sir.  That's not the

5  question I asked.  You're adding additional facts.

6          My question is:  If a single threat has been

7  avoided, it's certainly no longer an imminent.  Correct?

8      A    To that officer.

9      Q    To that officer.

10     A    It doesn't mean it's not an imminent threat to

11  other people.

12     Q    Okay.  Fair enough.  That goes to the fact and

13  circumstances.

14          But if it's still an ongoing threat, then it

15  would be an imminent threat to someone else.  Correct?

16  It has to be an imminent threat to someone else.

17     A    Yes, sir.

18     Q    Okay.  So, again, if a threat has been

19  avoided, it's certainly no longer imminent.  Correct?

20          MS. DURST:  And I'm going to object to the

21  form.  Avoided by whom?

22  BY MR. EDWARDS:

23     Q    By the person that it was directed to.  As it

24  relates to that person, it's no longer imminent.

25     A    Yes, sir.  To that person.

Page 68

1      Q      Okay.

2      A      I'll agree with that.

3      Q      All right.

4      A      With, again, the caveat that you have to

5   give -- give adequate reaction time.

6             In other words, well, the bumper was two feet

7   past.  If the vehicle is traveling at 10 miles per hour,

8   it's going 14.67 feet per second, it takes time -- both

9   Mr. Root and I have taken the first science instructors

10  course.  It takes time to do everything.  It takes time

11  to start the shoot, it takes time to stop the shoot.

12            That's why, again, we go into the

13  reasonableness of it.  Because it is very possible that

14  if a vehicle is coming at me and I start pulling the

15  trigger, it is physically and humanly possible to stop

16  shooting, in the amount of time that vehicle could then

17  drive 14.67 feet, so technically it's past me, but

18  that's why the term is reasonable.

19     Q      Okay.  I understand.

20            Okay.  Are you familiar with what a staggered

21  roadblock is?

22     A      Yes, sir.

23     Q      Okay.  Can you just tell me what that is?

24     A      If you're going to do a roadblock, you have to

25  allow an escape route.  So that's why -- in other words,

Page 69

1    you can't -- you're told -- trained not to completely

2    block off the road.  So you'll either stack here where

3    they can go either left or right or you'll stagger it so

4    there is an escape route if the person is -- decides

5    that they're willing to either take their life or take

6    the life of anybody around the cars.

7        Q    So the purpose of a staggered roadblock, my

8    understanding, is to slow the car down, not necessarily

9    to stop it.

10       A    Yes, sir.

11       Q    Okay.

12       A    Encourage him to stop.

13       Q    Sure.

14            And as I think you already indicated, there

15   are points or openings in a staggered roadblock that

16   allow for a vehicle to pass through slowing down.

17       A    Escape routes, yes, sir.

18       Q    Okay.  And if there is a point in the

19   staggered roadblock, if the point of the staggered

20   roadblock is basically to slow a vehicle down, allow it

21   to pass through, it wouldn't be reasonable for an

22   officer to stand in that opening where the car is to go

23   through, would it?

24       A    Right.  No.

25       Q    Is that correct, it would not be reasonable?

Page 70

1      A      That would certainly be against your training.

2      Q      Okay.  All right.  Now, with the -- and we've

3  gone through some of this already.  The use of force,

4  lethal force use under the use of force policy of the

5  Marion County Sheriff's Department, you're familiar with

6  that.  Is that correct?

7      A      Yes, sir.

8      Q      Okay.  And it states that deputies of the

9  Marion County Sheriff's Department are permitted to use

10  lethal force when the deputy reasonably believes that

11  it's necessary to, A, protect themselves or others from

12  what they believe to be an imminent threat of serious

13  bodily injury or death to include, but not limited to,

14  one, attempts to render the deputy unconscious; two,

15  grabbing the deputy's firearm; three, blows or attempted

16  blows to the deputy's vital organs or head; four,

17  stabbing, shooting or any other action which would

18  create a likelihood of causing the deputy or other

19  serious injury or death.

20          B, to prevent the escape of a suspect or

21  prisoner whose freedom is reasonably believed to

22  represent an imminent threat of serious bodily injury or

23  death to the deputy or other law enforcement officers or

24  others.

25          So did I read that correctly as to what your

Page 71

1    understanding of that is?

2        A    Yes, sir.

3        Q    Okay.  Would you agree that if an individual

4    is fleeing the police and has already passed the police

5    by, the police can no longer consider themselves to be

6    in imminent threat of serious bodily injury?

7        A    The police officer can't based on the

8    explanation I just gave you previously.

9        Q    Okay.  Cannot.  The police officer cannot.

10       A    Cannot.

11       Q    Okay.

12       A    Right.  For him or herself.

13       Q    All right.  And if I ask a follow-up

14   question this time, maybe it'll help this out a little

15   bit.

16            And likewise, if there are no members of the

17   public in the immediate area, then under the definition

18   of imminent threat, there would be no justification for

19   use of deadly force.  Is that correct?

20       A    How are you defining immediate?

21       Q    Well, immediate means there.

22            MR. UMINA:  Imminent is the term.

23            MS. DURST:  No, he said immediate area.

24            MR. EDWARDS:  I said immediate area.

25            MR. UMINA:  Got you.

1    BY MR. EDWARDS:

2        Q    So immediate area meaning there within

3    where -- I guess within the sight of the police

4    officers.

5        A    I -- I don't know how to answer that.  That

6    would have to be -- it depends on what happened before,

7    it depends on the area we're in and, you know --

8        Q    I'm sorry, so tell me why.  Why can't you

9    answer the question?

10       A    You limit it, you said in the sight of the

11   officer.

12            If it happened on one block and I know there's

13   a parade on the next block over --

14       Q    Well, let me go back and maybe help you out a

15   little bit.

16            The use of force policy defines imminent

17   threat, that threat which is about to happen, immediate

18   or perceived to be unavoidable.

19            My question was, if there are no members of

20   the public in the immediate area, then under the

21   definition of imminent threat, there would be no

22   justification to use deadly force.

23       A    Unless it was, again, the perceived what?  The

24   thing you read first.  In imminent.

25       Q    I'm not sure.  I'm going back and forth here.

Page 73

1  So let me go -- you agreed with this statement.  You

2  would agree that if an individual is fleeing the police

3  and has already passed the police by, the police can no

4  longer consider themselves to be in imminent -- be in

5  imminent threat of serious bodily injury, and you agreed

6  with that statement.

7       A    Yes.

8       Q    Okay.  And my follow-up was likewise, if there

9  are no members of the public in the immediate area, then

10  under the definition of imminent threat, there would be

11  no justification for use of deadly force.

12      A    Okay.  And what I'm asking you is read --

13  would you turn back the page and read imminent?

14      Q    Yes.  Imminent:  That threat which is about to

15  happen, immediate, and perceived to be unavoidable.

16      A    Okay.  The perceived to be unavoidable.

17      Q    Okay.

18      A    We have to put that part in there.

19           In other words, exactly what I said, if I know

20  that the end of this road, I've got a busy thoroughfare,

21  and this person has already demonstrated total disregard

22  for themselves, disregard for the life of others, this

23  is where it makes it very hard for that officer to say,

24  I'm going to let him go ahead and get on this road, and

25  if he kills somebody, that's just a factor.

Page 74

1    Q    Do you agree that the use of force policy

2  strictly prohibits a deputy from discharging his firearm

3  solely to protect property interest?

4    A    Yes, sir.

5    Q    And just so we're fair, you have no problem

6  whatsoever with the defined terms of the use of force

7  policy.  Is that correct?  You believe those are proper.

8    A    Yes, sir.

9    Q    Okay.

10    A    Pretty standard.

11    Q    If Deputy Forsyth knew, on August 2nd, 2017,

12  that Philip Rhoades was just wanting to escape from the

13  gas well site, would it have been objectively

14  unreasonable for him to have stepped in front of the

15  Jeep and shoot him?

16    A    I don't know how -- I don't know how to answer

17  that.

18    Q    Okay.

19    A    Because, again, we've got so many factors

20  involved in here.

21    Q    Okay.  Well, my question, just as I asked it

22  to you, that's the only factors I'm asking, if Deputy

23  Forsyth knew, on August 2nd, 2017, that Philip Rhoades

24  was just wanting to escape from the gas well site, it

25  would have been objectively unreasonable for him to step

Page 75

1    in front of the Jeep and to shoot him.  Is that correct?

2         A    No.  If all he knew was this person was trying

3    to escape and we didn't have all these other factors

4    we've talked about, then, yeah, he shouldn't have shot

5    him.

6         Q    Okay.  That would have been unreasonable, that

7    would have been objectively unreasonable.  Correct?

8         A    If we didn't have all these other factors we

9    talked about.

10        Q    Okay.  All right.  In going through your

11   initial disclosure, the first thing that you bring up is

12   a July 9th, 2017 counterfeit incident.

13        A    Yes, sir.

14        Q    What relevance does that have to this case

15   whatsoever?

16        A    I believe that was part of the first getting

17   the warrants for his arrest.

18        Q    Okay.  Did you review anything in the material

19   that indicated that Deputy Forsyth was even aware that

20   there was a warrant for a counterfeit?

21        A    I don't know whether he knew that or not.  I

22   believe he knew there were warrants but --

23        Q    Okay.  So you don't know whether he knew

24   anything about the counterfeit incident one way or the

25   other, the alleged counterfeit incident, one way or the

Page 76

1    other.

2        A    No.   And it wouldn't surprise me because, I

3    mean, as an officer, all any -- they don't even tell

4    you.   Dispatch will say there's a warrant on this

5    individual or there are warrants out.   They're not going

6    to tell you what type of warrant.

7        Q    Okay.   When you go down to the July 25th

8    series of incidents, as you -- I think that's how you

9    put it, series of incidents.

10       A    Yes, sir.

11       Q    You stated that the deputies received

12   information that Mr. Rhoades and Amanda Powell had

13   broken into the residence, cut the lock off the water

14   utility, were living in the residence without the

15   owner's permission.   That's a quote from your report.

16            In your review of the material, do you know

17   who filed that report with the police?

18       A    I don't.

19       Q    Okay.   You don't know that it was actually a

20   family member who owned the house, and when I say family

21   member, someone who's related to Mr. Rhoades, and

22   indicated that he didn't want to get him into any type

23   of trouble or anything like that?

24       A    No, I --

25       Q    Okay.   You don't recall seeing that in your

1    review?

2         A    I think when I read the -- I don't think it

3    was in relation to that, but when I read the family

4    depositions, I think there was something about that in

5    there.

6         Q    Okay.

7         A    Again, that's something, as an officer, I

8    wouldn't know until I was -- if I'm dispatched to a

9    call, I'm gonna go.

10        Q    Okay.  You didn't mention in your series of

11   events that it was Deputy Love, that Deputy Love shot at

12   Philip Rhoades when Philip Rhoades passed him by in the

13   truck.  Why not?

14        A    I don't know.  I thought I did.  To me, I

15   mean, I don't think there's any question about that.

16        Q    Okay.  But you didn't mention it at all in

17   your disclosure.  Were you aware of that when you made

18   that disclosure?

19        A    Oh, sure.

20        Q    Okay.

21        A    Sure.  I mean, there's nobody saying that

22   didn't happen.

23        Q    Okay.  But when were you made aware that it

24   was actually Deputy Love who shot at Philip Rhoades on

25   July 25th?

Page 78

1      A    I'm sorry, what was that?

2      Q    In the July 25th, 2017 series of incidents,

3   you don't mention that Deputy Love shot at Philip

4   Rhoades.

5      A    Oh, at.  Okay.  Okay.  At.

6      Q    Yeah.  That's not mentioned in your report.

7   And my question is, why not?

8      A    I knew that right from the beginning.  I mean,

9   to me, that was something that just -- who he shot at or

10  who shot at him, I didn't really care.  I didn't think

11  that had anything to do with -- other than the fact that

12  a law enforcement officer had shot, been put in this

13  situation, I don't really care who it was.

14     Q    All right.  So I just want to make sure I

15  understand.  It's your testimony that the fact a Marion

16  County Sheriff's deputy had shot at Philip Rhoades a

17  week before they shot and killed Philip Rhoades was not

18  relevant.

19     A    No, sir.  No.  The person who did it wasn't

20  relevant.

21          Now, maybe if it had been that same person who

22  was involved the second time but, I mean, even that,

23  it's --

24     Q    Okay.

25     A    I don't know what that has to do with what

Page 79

1   happened.

2        Q      You indicate in the report on the July 25th,

3   2017 series of incidents that Mr. Rhoades -- let's see.

4              Well, let me ask you the question.  Do you

5   ever see any statements from any of the pedestrians on

6   the rail trail that said that Philip Rhoades passed them

7   without regards to their presence or safety?

8        A      I didn't see that in statements.  I saw the

9   video of the pursuit.

10       Q      Okay.  Is it your testimony that a video

11  pursuit shows something of Mr. Rhoades on a rail trail?

12       A      It didn't, but it certainly showed horrendous

13  driving.

14       Q      Okay.  With regard to the August 2nd, 2017

15  incident, you indicate that the information you rely on

16  in your report is taken from the statements of Deputy

17  Forsyth and Love.  Is that correct?

18       A      Yes, sir.

19       Q      Okay.  Do you believe that you would change

20  any of the information or your opinions after reviewing

21  Deputy Forsyth's and Love's deposition testimony?

22       A      No, sir.

23       Q      Okay.  You indicate that the drug screen was

24  performed by the Offices of the Medical Examiner.  Is

25  that correct?

Page 80

1      A     I'm sorry?

2      Q     In your report, you indicated that a drug

3   screen was performed on Philip Rhoades's body.

4      A     Yes, sir.

5      Q     Okay.

6      A     Yes, sir.

7      Q     You're not a toxicologist.  Is that correct?

8      A     No, I'm not.

9      Q     Okay.  You're not qualified to give an opinion

10   regarding any substance allegedly in Philip Rhoades's

11   system.  Is that correct?

12     A     Correct.

13     Q     Okay.  And you have no evidence if either

14   Deputy Forsyth or Deputy Love were even aware that

15   Philip Rhoades may have been under the influence of any

16   substance on August 2nd, 2017.

17     A     Oh, they couldn't have known.

18     Q     Okay.  In your statement of opinions, you

19   indicated, one, Deputy Forsyth did his duty and placed

20   himself in harm's way when he responded to a high-risk

21   pursuit of a dangerous fleeing felon.

22     A     Yes, sir.

23     Q     That's your opinion.

24           Okay.  You acknowledge, on page eight of that

25   opinion, that it was the pursuit of Philip Rhoades that

1    created the risk.  Is that correct?

2           You answered this question before, and maybe

3    it's the wording of it.  You indicated, when we first

4    started, that the alleged incidents that -- the alleged

5    harmful conduct of Philip Rhoades were a result of him

6    being chased by police.  Is that correct?

7        A    The alleged harmful conduct was due to

8    Mr. Rhoades felony fleeing from police officers that

9    were lawfully trying to stop him.

10       Q    Okay.  I understand.  But that was my

11   question, now I'll follow-up.

12          We don't have any -- you all don't have any

13   evidence or have reviewed any material that alleges that

14   Philip Rhoades acted violently or dangerously at any

15   other time other than when he was being chased by

16   police.  Is that fair?

17       A    That would be both in vehicles and on foot?

18       Q    Yes.

19       A    Okay.  Yes.

20       Q    Okay.

21       A    It was all during the course of trying to

22   apprehend him.

23       Q    Okay.  And you also agree that the alleged

24   dangerous actions attributed to Philip Rhoades was his

25   driving while attempting to escape.  Correct?

Page 82

1      A    Yes, sir.

2      Q    Okay.  Page seven and eight, you state:

3    Deputy Love had to jump out of the path of the truck

4    driven -- I'm sorry, seven and eight of your disclosure.

5    Detective Love had to jump out of the path of the truck

6    driven by Mr. Rhoades.  Mr. Rhoades's truck narrowly

7    missed Deputy Love.  Is that your statement?

8      A    Yes, sir.

9      Q    Okay.  How do you know how close the truck

10   came to Corey Love?

11     A    Just from his statements.

12     Q    Okay.  And that's his statements -- what

13   statements?  Because we're going back to one through 24.

14   What statements did he give that indicate how close the

15   truck was to him on July 25th, 2017?

16     A    I don't believe he said it was one foot, two

17   foot.  I don't think there was any distances taken.

18     Q    Okay.  You would agree that shooting a moving

19   target with a pistol is pretty difficult.

20     A    It could be, yes.

21     Q    Okay.  Are you aware that on this July 25th,

22   2017 incident, Corey Love testified that he was able to

23   get out of the way of the truck being driven by Philip

24   Rhoades, pull out his pistol, aim and then shoot and hit

25   the rear tire of the truck as it passed by him?

Page 83

1      A     Yes, sir.

2      Q     Okay.  If Corey Love was out of the path of

3  the truck and had time to pull his weapon, aim and fire

4  it and hit the rear tire, he was no longer in imminent

5  danger, was he?

6      A     Probably not.

7      Q     Okay.  Was there any evidence, from what you

8  reviewed or what anyone told you, that there was anyone

9  in Philip Rhoades's path in front of him at the time

10  Corey Love shot his tires and passed by him on

11  July 25th, 2017?

12      A     No.

13      Q     And you believe, of course, if there was

14  someone in front of him, that would have been

15  documented?

16      A     Well, I believe the outcome would have been

17  very different then.

18      Q     Okay.  Your statement was:  Deputy Forsyth and

19  Love knew that Mr. Rhoades had fled from the police with

20  reckless disregard.  Mr. Rhoades had multiple felony

21  warrants for his arrest -- for his arrest including

22  murder of a police officer.

23            I think you had a typo but I wanted to type it

24  as your quote, as it states.

25            Is the fact that Forsyth knew who he was

Page 84

```
 1    chasing on August 2nd, 2017 important?

 2         A    No.

 3         Q    Okay.  Why not?

 4         A    He still had a report of a potential stolen

 5    vehicle.

 6         Q    Okay.

 7         A    And so then when he sees the vehicle, and as

 8    soon as that vehicle then swerves into -- and puts

 9    oncoming traffic at risk, I mean, that's a whole 'nother

10    chain of events in there.

11              So at that point, ultimately who was the

12    driver didn't matter.  And at that point, when the

13    vehicle came at Deputy Forsyth, who the driver was

14    didn't really matter.

15         Q    Okay.  If Forsyth didn't know who was in the

16    Jeep, so that wouldn't have changed your opinions in

17    that matter at all?

18         A    No.

19         Q    Okay.  You state in your opinion that

20    according to sources, he, meaning Philip Rhoades, stated

21    he was not going back to jail.

22         A    (Nodding head.)

23         Q    In the material that you reviewed, did you

24    identify the source of that alleged quote?

25         A    I didn't.  The only thing I did see was in a
```

Page 85

1    Facebook post that he made, he had a gun to his head,

2    and I don't know.

3         Q    Okay.  Can you say, with any degree of

4    certainty, if that quote was ever made by Philip

5    Rhoades?

6         A    I don't know and it --

7         Q    Okay.

8         A    I didn't --

9         Q    I'm sorry, go ahead.

10        A    I didn't try to say in here anything about

11   police-assisted suicide or something like that.  Those

12   factors I don't believe were known to Deputy Forsyth at

13   the time so I didn't take that path.

14        Q    You're doing a great job, you're already

15   answering my next question before I ask it.

16             To your knowledge, you don't know whether

17   Forsyth or Love were even aware of that quote.

18        A    Don't know.

19        Q    Okay.  You stated Mr. Rhoades made it

20   impossible to conduct a felony traffic stop.  He had not

21   voluntarily stopped his vehicle.

22        A    Correct.

23        Q    Okay.  If that statement is true, then wasn't

24   it against all police training and procedure for Forsyth

25   to jump out of his cruiser and place himself in front of

1    a moving car?

2         A    I don't think he placed himself in front of a

3    moving car, sir.

4         Q    Okay.

5         A    He got out of his vehicle.  He said his

6    intention was to go to the back of the vehicle.

7              But if you look at the timeframe, which I

8    believe is like six seconds from his last transmission

9    until shots fired, you've got to give a human being time

10   to do something.

11        Q    Okay.

12        A    He didn't even get his cruiser stopped.

13        Q    Can you tell me -- can you cite for me where

14   it states that Forsyth, in jumping out of -- I'm sorry.

15             Can you cite to me where it states that what

16   Forsyth did in jumping out of his cruiser when a

17   suspect's vehicle had not stopped is proper?

18        A    I don't believe it was intentional.

19        Q    What do you mean, you don't believe it was

20   intentional?

21        A    I believe he tried to put it in park while

22   he's starting to get out of the vehicle.  I don't

23   believe he intentionally kept the vehicle rolling.

24        Q    No, I understand that, and my question is:

25   Why was it proper for him to jump out of his cruiser

1    when the suspect's vehicle hadn't stopped is proper?

2         A    Oh.  You don't know what this vehicle's going

3    to do.

4              He says when he pulled in, the vehicle came

5    toward him.  He thought he was going to hit him.

6              Then the vehicle backed up, that's when he got

7    out of the cruiser.

8              So, I mean, I can't fault him at all for doing

9    that.  I think the last thing you want to do is stay

10   inside that vehicle at that point.  What are you going

11   to do from there?

12        Q    Okay.  So my question to you is that can you

13   cite to me what material you rely on in making that

14   statement, that it was proper for him to jump out of his

15   vehicle, meaning Forsyth to jump out of his cruiser,

16   when the suspect's vehicle hadn't come to a stop?

17        A    I just think common sense.

18        Q    Okay.  You think that's common sense.

19        A    Yes.

20        Q    Okay.  Opinion number two:  Deputy Forsyth's

21   response to Mr. Rhoades placing members of the general

22   public at risk of death or serious bodily harm, and

23   after attempting to run over the deputy, complied with

24   Supreme Court guidelines and National Law Enforcement

25   operational practices.

```
                                                        Page 88
1       A    Yes, sir.

2       Q    That's your opinion.

3            What members of the general public were

4  present and at imminent risk of death or serious bodily

5  harm on August 2nd, 2017 when Deputy Forsyth shot and

6  killed Philip Rhoades?

7       A    Anybody in the roads that he -- when he almost

8  hit a vehicle before going up the gas well and anybody

9  that would have been on the roads if he had successfully

10 got back to the roadway.

11      Q    So it's your testimony that the general

12 public, that was to be considered -- they would be

13 considered present and at imminent risk of death and

14 serious bodily harm at the time Deputy Forsyth shot and

15 killed Philip Rhoades.

16      A    I don't believe that's why he -- Deputy

17 Forsyth shot, but that's still a factor that needed to

18 be at least considered.

19      Q    What specific Supreme Court guidelines was

20 Forsyth complying with when he stood in front of the

21 Jeep on August 2nd, 2017 and shot and killed Philip

22 Rhoades?

23      A    Again, sir, I don't believe he stood in front

24 of the Jeep.

25      Q    So it's your testimony you don't believe he
```

Page 89

1    stood in front of the Jeep?

2        A    I believe the Jeep drove at him.

3        Q    **What exactly had to have been occurring in**

4    **order for the Supreme Court guidelines, for an**

5    **objectively reasonable shooting to have occurred on**

6    **August 2nd, 2017?**

7        A    I outline them in the paper in terms of

8    Tennessee versus Garner.

9        Q    **Okay.  Tell me today.**

10       A    It was the danger to the officer or others.

11   It says it's not reasonable to shoot an unarmed, fleeing

12   felon who poses no danger to others.

13            And after that case, law enforcement training

14   around the United States changed.

15            When I first got into law enforcement, if

16   somebody ran from you, you were allowed to shoot.

17            So that changed training.  And so we have to

18   look, was he fleeing at the time, and at the time, he

19   wasn't fleeing.  He was driving at an officer.

20            And so those are the factors that would be

21   present at that time.

22       Q    **Is that all?**

23       A    I mean, how much do you need?

24       Q    **Well, I just want to make sure that your**

25   **answer is complete.**

1      A    I believe that's why he shot, because his life

2  was in imminent danger.

3      Q    Okay.  What National Law Enforcement

4  operational practices was Deputy Forsyth complying with

5  when he jumped out of his cruiser on August 2nd, 2017

6  and placed himself in front of the Jeep that was

7  allegedly moving towards him?

8      A    I do not -- again, you keep on saying it and I

9  will keep on saying, I do not believe he placed himself

10  in front.

11          The Jeep was backing up when he got out of his

12  vehicle, then the Jeep drove toward him.  And anything

13  else is maybe something you want to -- a fact pattern

14  you want to put forward as a hypothetical.  No one says

15  that.

16      Q    Okay.  So let me back up.  Fair enough.

17          Hypothetically, if he placed himself in front

18  of the Jeep, would that have been proper?

19      A    It would have been -- it would have been

20  tactically unsound to do that.

21      Q    At the time the shooting took place,

22  Mr. Rhoades was not fleeing but was actively engaged in

23  committing felonious assault against Deputy Forsyth.

24  That's a quote from your disclosure.

25      A    Yes, sir.

Page 91

```
 1      Q     And this is a pretty important statement by

 2   you because if Forsyth knew that Philip Rhoades was

 3   simply trying to escape on August 2nd, 2017, he wouldn't

 4   have been justified in shooting him, would he?

 5      A     We've been through that but we'll go through

 6   it again.

 7            If it's just escape, without all the other

 8   factors we talked about, it would have been incorrect to

 9   shoot.

10      Q     Okay.  And you agree that Deputy Forsyth had

11   time to draw his weapon and fire seven times and begin a

12   tactical reloading his weapon, if he knew that Philip

13   Rhoades was simply wanting to flee, he should have been

14   able to get out of the way.  Correct?

15      A     I don't know how -- I don't know how to answer

16   that.

17      Q     Okay.  Well, my question is, you know that he

18   drew his weapon, fired seven times and started a

19   tactical reloading.  Is that correct?

20      A     He did that after the Jeep stopped.  He

21   started a tactical reload after the threat had passed.

22   He said he stopped firing, then he thought about doing a

23   tactical reload but then realized -- then said he

24   probably shouldn't and did not, you know, put the

25   magazine back in the weapon.
```

1       Q       Okay.  But if he knew -- I'm sorry, go ahead.

2       A       So I don't even understand what you're asking

3    there.

4       Q       Well, my question is, if he had time to shoot

5    and to reload his weapon, wouldn't he have time to get

6    out of the way if he knew that Philip Rhoades was just

7    trying to escape?

8               MS. DURST:  Object to the form.

9               THE WITNESS:  Are you saying that the vehicle

10   is not driving at Deputy Forsyth?  If it's just trying

11   to escape over there, he shouldn't have shot.

12              But I don't even know what you're asking.

13   BY MR. EDWARDS:

14      Q       Well, my question is, if he knows he's just

15   trying to escape, he shouldn't have shot him.  Is that

16   correct?

17      A       If you try to escape by running over me, I'm

18   going to shoot.

19      Q       Sure.

20      A       If there is trying to escape and trying to run

21   over Deputy Forsyth as part of that escape, it was

22   completely reasonable for him to shoot to save his life.

23      Q       Okay.  You indicate it's impossible to get in

24   Mr. Rhoades's mind to ascertain what his true intentions

25   were toward Deputy Forsyth.

Page 93

1         In Deputy Forsyth and Deputy Love's

2    statements, there was no question that they perceived

3    Mr. Rhoades's action posed a threat of serious physical

4    harm or death to Deputy Forsyth.  Both deputies perceive

5    that Mr. Forsyth (sic) was using his weapon -- his

6    vehicle as a weapon aimed at Deputy Forsyth.  Is that

7    correct?

8         A     Yes, sir.

9         Q     Okay.  And this goes towards your objectively

10   reasonable analysis.  Correct?

11        A     Yes, sir.

12        Q     Okay.  And I understand what you said before,

13   but if Deputy Forsyth knew that Philip Rhoades's

14   intentions were always just trying to escape, it would

15   have been improper for him to shoot him.  Is that

16   correct?

17             MS. DURST:  Object to the form.

18             THE WITNESS:  No, sir.

19             We've been over that so many times and --

20   BY MR. EDWARDS:

21        Q     Okay.

22        A     I've answered that the best I can.

23        Q     Okay.  So you believe that Deputy Forsyth, it

24   would have been improper for him to step in front of the

25   Jeep to shoot if he knew he was just trying to escape.

Page 94

1    Is that correct?

2         A    You should not put yourself in front of a

3    moving vehicle, yeah.

4         Q    Okay.  And that would be objectively

5    unreasonable for him to have done that.

6         A    It would be tactically, it's certainly

7    tactically unsound to do.

8         Q    Okay.  Well, why wouldn't it be objectively

9    unreasonable to do as well?  If someone's in a car and

10   trying to escape and you step in front of them, you're

11   not allowed to step in front of them and shoot them, are

12   you?

13        A    No.

14        Q    Okay.  That would be objectively unreasonable.

15        A    Yes, if that's what he did, that would be

16   unreasonable.

17        Q    Okay.  You quote:  The suspect posed a serious

18   threat of physical harm to others.

19             And again, at the time that Deputy Forsyth

20   shot and killed Philip Rhoades, what members of the

21   public were in imminent danger of sustaining serious

22   physical harm?

23             MS. DURST:  Objection, asked and answered.

24             THE WITNESS:  I --

25             MS. DURST:  You can answer it again if you

Page 95

1   can.

2          THE WITNESS:  He shot because he was in

3   imminent danger of his own life.  That's why he shot.

4   BY MR. EDWARDS:

5      Q    Okay.

6      A    The point I made and will continue to make, if

7   he would have made it to the roadway, anybody on the

8   roadway would have been at risk of serious bodily harm

9   or death.

10     Q    If there were people there.  Correct?

11     A    Yes, sir.

12     Q    Okay.

13     A    And I think you've -- I've been on the road

14  and I believe you've been on the road, and it's

15  certainly a valid assumption to assume that there is

16  going to be a significant amount of traffic on that

17  roadway.

18     Q    You cite research regarding a March 2017

19  Memphis police officer.  It states that a subject does

20  not have a weapon but is trying to beat an officer to

21  death with their hands or feet, subject is trying to

22  take an officer's firearm away or subject is using a

23  weapon such as a knife, gun or club or other against the

24  officer.  How are these facts and circumstances any way

25  related to this case?

1    A    It's part of what I relate to as objective

2  reasonableness.

3         In other words, when -- I explained everything

4  in the paper.  Being the lead trainer for the state and

5  training Kentucky and West Virginia and all these other

6  states, you've got to put things in context.  Anything

7  done at the right time is right, anything done at the

8  wrong time is wrong.

9         And so that's when I started the national

10 research projects, because it's our job to protect and

11 serve the general public.  And so I wanted to know what

12 I'm training my officers was objectively reasonable.

13        And that's been confirmed in every study I've

14 ever done.  And it's done with the National Institute of

15 Justice, confirmed with their study, with a study in

16 conjunction with them.  It's just, it's what I base

17 my -- the training I do on.

18    Q    Okay.  And in order for it to be related to

19 this -- these facts and circumstances, it's premised on

20 the prefix that Philip Rhoades was driving towards

21 Deputy Forsyth with the intent to harm him rather than

22 was trying to escape.  Correct?

23    A    Yes, sir.

24    Q    Okay.  Page 14 of your disclosure states:

25 Additionally, the deputies had reason to believe that

Page 97

1   Philip Rhoades may be armed -- or might be armed.

2   Sorry.

3           You would agree that both deputies stated --

4   affirmatively stated that they never saw Philip Rhoades

5   with a weapon.  Correct?

6       A    Correct, sir.

7       Q    Okay.  Neither deputy made a statement that

8   either of their actions were based on the thought that

9   Philip Rhoades had a weapon.  Is that correct?

10      A    That's correct, sir.

11      Q    Okay.  And in fact, if either of the deputies

12  had believed that Philip Rhoades was armed, it would

13  have made their actions of jumping out of the cruiser

14  into the open even more unreasonable.  Is that correct?

15      A    No, sir.

16      Q    You believe that if they knew he was armed or

17  thought he was armed, it was proper for them to jump out

18  of the car in front of -- or where he would have an open

19  view of them?

20      A    Yes, sir.  You do not want to try to get into

21  gun battle in the vehicle.  The vehicle at that point is

22  considered a kill box.

23      Q    Sure.

24           But at that point in time, Philip Rhoades,

25  according to both of the testimony, neither one of them

1    had stated Philip Rhoades attempted to get out of his

2    vehicle.   Correct?

3         A    Correct.

4         Q    In fact, it was still moving, the vehicle.   Is

5    that correct?

6         A    Yes, sir.   When he got out, that vehicle was

7    backing up.

8         Q    So I want to ask you this.   If I'm a police

9    officer going up to a scene where I believe that someone

10   has a weapon and that vehicle is still moving, do you

11   think it's proper for me to get out of my vehicle and

12   not take any cover, just to be out in the open in front

13   of that vehicle where I believe that vehicle -- that

14   other individual may be armed?

15        A    Tactically, it's not sound.   That's why Deputy

16   Forsyth said he got out of the vehicle and intended on

17   going to the back of the vehicle.

18        Q    Okay.

19        A    You've got to give him time to do it.

20        Q    All right.   You touched on this before

21   regarding the radio traffic by Deputy Forsyth.   And you

22   indicated that at 9 point 08, radio traffic says:   I got

23   up to -- this is Deputy Forsyth:   I got up to the first

24   turn, I'm not sure if he cut off or continued up the

25   hill.

1            At 9:10, and this is nine minutes, ten

2   seconds:  Looks like he cut off on a trail.

3            And at nine minutes, 16 seconds:  Shots fired.

4            Is it your opinion that the actions of Deputy

5   Forsyth, from the time he decided to turn on the gas

6   well trail until he shot Philip Rhoades, took place in

7   six seconds?

8       A    That's what it seems like.

9       Q    Okay.

10      A    From the radio traffic.

11      Q    Okay.  Do you have an opinion as to how Deputy

12   Forsyth's shooting Philip Rhoades caused the Jeep to

13   stop moving?

14      A    I don't know.  I mean, again, people are

15   debating this, and I don't think you can know.

16           It had to be, in a manual transmission, it had

17   to be out of gear.

18           Now, I don't know whether he was in the

19   process -- he hit the gear shift, I don't know.  It

20   could have been he was shifting.  It could have been he

21   was thinking -- he saw the weapon and he was doing what

22   he did before, he went and he drove to the vehicle and

23   then backed up, he could have been driving toward the

24   deputy and in the process of thinking about backing up,

25   I don't know.  But it's just --

1      Q     It would be speculation on your part.

2      A     Sure.  You wouldn't know how it got there.

3            But it couldn't be -- with a manual

4    transmission, it couldn't have been in gear and still

5    running.

6      Q     Okay.  You would agree with me that Deputy

7    Forsyth shooting Philip Rhoades didn't stop the vehicle.

8      A     Correct.

9      Q     Okay.  You may have already stated this

10   before.  You know how to determine how many feet a car

11   will travel per second at a given speed.  Correct?

12     A     Yes, sir.

13     Q     Okay.  My understanding is basically you

14   multiply the speed by 5,280 and divide it by 360.

15     A     Right.

16     Q     And that will give you the feet per second.

17     A     Or you go on your computer, which I did, you

18   know, after I calculated it, I went on the computer in

19   the foot per second calculator and confirmed it.

20     Q     With regard to your opinion number three,

21   Deputy Forsyth's firearm response was in compliance with

22   his training and department policy.

23     A     Yes, sir.

24     Q     Okay.  What did you review, other than the

25   Marion County Sheriff's Department use of force policy,

1   regarding Deputy Forsyth's training prior to August 2nd,

2   2017?

3       A    I didn't review the training, but I will

4   guarantee that West Virginia State Police Academy, like

5   all police -- because they did their firearms training

6   at our academy.  They will be trained in Tennessee

7   versus Garner, they will be trained in Graham versus

8   Connor, they will.  There's just no question about it.

9       Q    You've already stated this but I want to make

10   sure you agree that the Marion County Sheriff's

11   Department use of force policy is a reasonable policy

12   and correct?

13       A    Yes, sir.  Yes, sir, it is.

14       Q    Okay.  And you would agree that if, if Deputy

15   Forsyth failed to act in accordance with the Marion

16   County Sheriff's Department use of force policy on

17   August 2nd, 2017, when he shot and killed Philip

18   Rhoades, you would opine that he acted objectively

19   unreasonable if he didn't follow that policy.

20       A    I won't go that far, no.

21       Q    Why not?

22       A    Because I reviewed some policies, forgive me,

23   that are just absolutely stupid.

24           A shooting in Dayton, their policy says the

25   officer will exhaust all -- every available alternative

Page 102

```
 1   before resorting to use of deadly force.  That is
 2   stupid.  Because you can't exhaust all available
 3   alternatives.
 4           I'm asked at that deposition, well, he could
 5   have jumped in the car with the individual, couldn't he
 6   have?  He could have thrown his gun at him.
 7           So, no, just because you're not in policy, it
 8   doesn't mean your actions are objectively unreasonable.
 9      Q    All right.  Well, you cited there but I've
10   already asked you, that you said that the Marion County
11   Sheriff's Department use of force policy is reasonable.
12      A    Yes, sir.
13      Q    And is correct.
14      A    Yes, sir.
15      Q    So my question was, if he failed to act in
16   accordance --
17      A    With his policy.
18      Q    -- with his policy when he shot and killed
19   Philip Rhoades, would you opine that he acted
20   objectively unreasonable?
21      A    In this policy, yes.
22      Q    Okay.  Opinion number four:  The Marion County
23   deputies' procedures after Mr. Rhoades was shot complied
24   with National Law Enforcement guidelines, training and
25   best practice.
```

1       A     Yes, sir.

2       Q     Okay.  Basically Deputy Forsyth and/or Love

3    radioed EMS after shooting Philip Rhoades and you

4    believe they complied with the requirements.  Is that

5    correct?

6       A     Sir, you know more than that -- you know more

7    happened than that.

8             They immediately called shots fired, that they

9    needed an ambulance, that the deputies were okay.

10            Deputy Forsyth then ran back to his cruiser,

11   got his gloves, removed Mr. Rhoades from the car.

12   Deputy Love went back to get his gloves.  They started

13   CPR and they continued CPR until other officers arrived

14   on the scene to take it over.  That's what happened.

15      Q     Okay.  And I wasn't trying to -- but, I mean,

16   basically they were required to call EMS, they did that,

17   and they tried to take what actions they could at that

18   point in time.  Correct?

19      A     Yes, sir.  Yes, sir.  Yes.

20      Q     What does that have to do with any basis of

21   the claims in this case?  Does that have anything to do

22   with what the claims that were made?

23      A     To me, it just shows that they did correct

24   follow-up procedures.

25      Q     Okay.  But the claims made in this case regard

1    with a shooting, not of what occurred after the

2    shooting.  Is that a fair statement?

3             MS. DURST:  I object to that, to the

4    characterization of the complaint.

5    BY MR. EDWARDS:

6        Q    Okay.  Your best practices, what's the best

7    practice?  Is there something you can cite to me as

8    what's required or where you get that information of

9    what they're to do?

10       A    Training throughout the United States and in

11   virtually every policy in the United States, if a

12   subject is injured, appears to be injured or alleges to

13   be injured, they should receive medical evaluation and,

14   if necessary, a medical treatment.

15       Q    Okay.  And actually, I think you already

16   testified before, as you sit here today, you don't know

17   what they may have been trained on or not because you

18   didn't review any of their actual training materials.

19   Is that correct?  Other than the use of force policy.

20       A    And they would have had first aid -- standard

21   first aid training and CPR as part of basic training, as

22   part of all basic training guidelines.

23       Q    You believe them to, but as you sit here

24   today, you don't know that for certain.  Is that

25   correct?

Page 105

1      A    I would be amazed if they didn't.

2      Q    Okay.  Opinion number five:  The investigation

3  of this incident by the Marion County Sheriff's

4  Department followed National Law Enforcement guidelines

5  and best practices.

6         What investigation into the August 2nd, 2017

7  shooting of Philip Rhoades did the Marion County

8  Sheriff's Department perform?

9      A    They did what they needed to.  They arrived on

10  the scene, separated the individuals, we had firearms

11  that were taken into evidence, and then they were sent

12  to the hospital.  That's what they should have done.

13        And at that point, the best thing to do is --

14  the best thing I believe they could have done is turned

15  it over to the state police.

16        In Ohio, immediately what they do is call

17  what's called BCI, or Bureau of Criminal Identification

18  and Investigation, they called BCI to get them out, or

19  the state police, Ohio State Highway Patrol, to turn it

20  over to them.  I would always prefer them to do that.

21        Now, some departments do their own

22  investigation, I would prefer it turned over.

23      Q    To your knowledge, Marion County, other than

24  what you indicated where they had the officers

25  separated, took their firearms and sent them to the

1   hospital, that was the extent of their investigation in

2   this.

3       A    Yes.  They turned it over, then they sent

4   their deputies for psychologicals.  I mean, I think they

5   did it just like they should.

6       Q    Okay.  All right.  Let's go to the

7   supplemental disclosure.

8            MS. DURST:  Can we take a bathroom break?

9            MR. EDWARDS:  Sure.  Yeah.

10           (A recess was taken.)

11  BY MR. EDWARDS:

12      Q    Mr. Faulkner, we took a break there, and right

13  before we took the break, I think we started on what I

14  was going to, your supplemental disclosure.

15      A    Yes, sir.

16      Q    All right.  So on page two of your

17  supplemental disclosure, opinion number one, you state

18  that Corporal McDougal did not make inappropriate

19  statements to Rick Rhoades (phonetic).

20           All right.  You would agree with me that as to

21  the credibility of a witness, that's solely for the jury

22  to determine.

23      A    Yes, sir.

24      Q    Okay.  And you're not qualified to give expert

25  opinion as to the credibility of a witness.  Is that

1    correct.

2         A    Correct, sir.

3         Q    Okay.  And if Corporal McDougal had told Rick

4    Rhoades that Marion County deputies were going to take

5    down Philip Rhoades, that would be inappropriate.  Is

6    that correct?

7         A    It would have been, yes.

8         Q    All right.  Your supplemental opinion number

9    two states:  The additional .40 caliber spent shell

10   casings located at the scene where Mr. Rhoades was shot

11   offer no additional information and do not in any way

12   alter the conclusions of the West Virginia State Police

13   investigation.

14        Okay.  Now, the reason that the location of

15   the spent shell casings didn't help is because the West

16   Virginia State Police failed to properly investigate and

17   document where Deputy Forsyth was standing or his

18   position of the weapon when he was shooting at Philip

19   Rhoades.  Is that correct?

20        A    You couldn't have known it.

21        Q    Okay.  Well, why couldn't they?  Couldn't they

22   ask him where exactly he was standing?  They could have

23   questioned Deputy Forsyth about that, couldn't they?

24        A    You could've.

25        Q    Okay.

1        A    But, I mean, you wouldn't have any reliability

2   with that.

3        Q    Okay.  Well, to the best of his ability, he

4   could have said, this is where I was standing, this is

5   how I held my weapon, things of that nature.  That could

6   have been done.  Correct?

7        A    It could have, but it would have been

8   unreliable at best and I don't think it would have --

9        Q    Okay.

10       A    I mean, it's basically the same thing, when I

11  made the site visit, I just said, you know, talk me

12  through it and watched, you know.

13       Q    Okay.  Well, you did the site visit how long

14  after the incident?

15       A    I don't -- I don't know.

16       Q    Okay.  Do you recall the date when you went up

17  there?

18       A    I don't.

19       Q    Okay.  You would agree with -- would you agree

20  with the statement that all killings should be

21  investigated as homicides until proven otherwise?

22       A    Yes, sir.

23       Q    Okay.  Your opinion number four, supplemental

24  number four, is:  There is nothing unusual or suspect

25  about Deputy Forsyth and Deputy Love's recollection of

1     the events not being identical.

2          A     Correct.

3          Q     Again, you can't invade the province of the

4     jury regarding a witness's credibility.  Is that

5     correct?

6          A     Correct.

7          Q     Okay.  You're not an expert on memory.

8          A     No, sir.

9          Q     Okay.  You're not an expert on how the brain

10    reacts to stress.

11         A     I've had training in it but --

12         Q     You don't consider yourself to be an expert in

13    that.

14         A     I'm not a psychologist or psychiatrist, no.

15         Q     Okay.  And you're not an expert on how the

16    brain tracks moving objects.  Is that correct?

17         A     Correct.

18         Q     You're not a crime scene reconstructionist.

19         A     No.

20         Q     You're not an accident reconstructionist.

21         A     No, sir.

22         Q     Okay.  You state:  What is known is that the

23    gears of the vehicle with a manual transmission would

24    have had -- it's bad when you can't read your own

25    typing, let alone handwriting.

1          This is your quote:  What is known is that the

2    gears of a vehicle with a manual transmission would have

3    to be disengaged if it was stationary and running.

4         A    Yes, sir.

5         Q    True statement?

6         A    Yes, sir.

7         Q    Okay.  Would you consider physical evidence to

8    be more reliable than subjective recollections of

9    independent individuals?

10        A    It could be.

11        Q    Okay.  Well, why wouldn't it be?

12        A    It depends on what the physical evidence is.

13        Q    Okay.  Well, you would agree that physical

14   evidence, it is what it is.  You can see it, measure it,

15   take pictures of it or whatever.  There's no questions

16   in that regard.  Is that correct?

17        A    Well, let's do it this way.  If there were

18   seven casings found and the officer said, I don't know,

19   I think I shot five times, the casings will tell the

20   number of times it was shot.

21             But if the officer said, you know, I was

22   moving here, the casings don't do anything in terms of

23   disproving or proving where the officer was or wasn't at

24   the time that, you know, he pulled the trigger for that

25   specific casing.

Page 111

```
 1        Q    It could or could not be.  I mean, if he says,

 2   I was here, and they found casings in front of him 50

 3   yards away, it would probably disprove that he actually

 4   stood in that area where he believed him to be.  Then

 5   the physical evidence would say, wait a minute, it may

 6   not tell you exactly where you are but we know you're

 7   not where you're stating you're at.  Correct?

 8        A    That could be.

 9             Or, again, it could be due to foot traffic,

10   something was kicked or carried or, you know, there's

11   all kind of possibilities there.

12        Q    Okay.  But as a matter of principle, physical

13   evidence is more reliable than subjective evidence --

14        A    Yeah.

15        Q    -- or recollections.  Correct?

16        A    I would say so.

17        Q    Okay.  All right.  Let me go through some

18   stuff here, I may be about done.

19        A    Okay.

20             (Discussion held off the record.)

21             MR. EDWARDS:  Mr. Faulkner, that's all the

22   questions I have for you.

23             THE WITNESS:  Okay.  If I can find that,

24   because his partner used to be Mark Durkin (phonetic)

25   and I'll -- if I can find Mark somewhere, I'll let you
```

Page 112

1    know.

2              MS. DURST:  Okay.

3              THE WITNESS:  And pass that along.

4              MS. DURST:  Okay.  And we can wait while he

5    burns a copy of those flash drives.

6              You know you have the right to read and sign

7    your transcript or you can waive that right.  Do you

8    want to review and sign?

9              THE WITNESS:  I'll read it.

10             (Deposition was concluded at 12:15 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                        Page 113
 1    STATE OF FLORIDA   )
                         :  SS
 2    COUNTY OF MARTIN   )

 3                    CERTIFICATE OF OATH

 4           I, KIMBERLY POGUE, in my capacity as a Notary

 5    Public of the State of Florida at Large authorized to

 6    administer oaths on this 2nd day of October, 2019, at

 7    9:55 o'clock a.m., SAMUEL DEWITT FAULKNER personally

 8    appeared before me and took an oath or affirmation for

 9    the purpose of giving testimony in the matter of:

10    CHRISTY J. RHOADES, ETC, VS. COUNTY COMMISSION OF MARION

11    COUNTY, ET AL.

12

13    PERSONALLY KNOWN___
      OR PRODUCED IDENTIFICATION-XX
14    TYPE OF IDENTIFICATION PRODUCED-Driver's License

15

16

17    _____
      KIMBERLY POGUE
18    My Commission Expires:
      March 18, 2022
19    Commission Number GG168230
      THIS TRANSCRIPT IS DIGITALLY SIGNED.
20    SHOULD THERE BE ANY CHANGE MADE,
      THE SIGNATURE AND SEAL WILL DISAPPEAR.
21

22

23

24

25
```

```
                                                         Page 114
 1    STATE OF FLORIDA  )
                        :  SS
 2    COUNTY OF MARTIN  )

 3                         CERTIFICATE

 4              I, Kimberly Pogue, a Shorthand Reporter and

 5    Notary Public of the State of Florida at Large, certify

 6    that the foregoing deposition of SAMUEL DEWITT FAULKNER

 7    was stenographically reported by me and is a true and

 8    accurate transcription of said deposition of SAMUEL

 9    DEWITT FAULKNER; that a review of the transcript was

10    requested.

11              I further certify I am neither attorney nor

12    counsel for, nor related to, nor employed by any of the

13    parties to the action in which the deposition is taken

14    and, further, that I am not a relative or an employee of

15    any attorney or counsel employed in this case, nor am I

16    financially interested in the outcome of this action.

17              DATED this 11th day of October, 2019.

18

19

20

21    _____
      KIMBERLY POGUE
22    THIS TRANSCRIPT IS DIGITALLY SIGNED.
      SHOULD THERE BE ANY CHANGE MADE,
23    THE SIGNATURE WILL DISAPPEAR.

24

25
```