*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*

```
1
     STATE OF WEST VIRGINIA      IN THE GENERAL COURT OF JUSTICE
2                                NORTHERN DISTRICT COURT DIVISION
     COUNTY OF CLARKSBURG        FILE NO. 1:18-CV-186
3

4


5    CHRISTY J. RHOADES,          )
     In her capacity as the      )
6    Administratix and Personal  )
     Representative of the Estate )
7    of Philip Jontz Rhoades     )
                                  )
8                     Plaintiff,  )        DEPOSITION OF
                                  )
9       vs.                       )     DENNIS ANTHONY ROOT
                                  )
10   COUNTY COMMISSION OF MARION  )
     COUNTY; DAVID FORSYTH, in
11   his official and individual
     capacity and JOHN DOE, in
12   his official and individual
     capacity,
13                     Defendants.

14

15

16

17            DEPOSITION OF DENNIS ROOT, a witness called
     on behalf of defendant's counsel before Lisa
18   Shepherd-Hollar, Court Reporter and Notary Public, in and
     for the State of North Carolina, at Chamber of Commerce,
19   870 W. King Street, Suite A, Boone, North Carolina 28607
     on Tuesday, the 17th day of September, 2019, commencing at
20   9:30 a.m.

21

22

23

24

25
```

```
 1                   A P P E A R A N C E S

 2

 3

 4

 5    TIFFANY DURST, ESQUIRE
      PULLIN, FOWLER, FLANAGAN, BROWN, & POE, LLC
 6    2414 Cranberry Square
      Morgantown, West Virginia 26508
 7    304-255-2200
      tdurst@pffwv.com
 8         On behalf of the defendants

 9

10
      J. BRYAN EDWARDS, ESQUIRE
11    CRANSTON & EDWARDS PLLC
      1200 Dorsey Avenue, Suite 11
12    Morgantown, West Virginia 26501
           On behalf of the plaintiff
13

14    RYAN UMINA, ESQUIRE
      UMINA LEGAL
15    157 Walnut Street
      Morgantown, West Virginia 26505
16         On behalf of the plaintiff

17

18

19

20

21

22

23

24

25
```

```
1                            INDEX

2
    Direct Examination by Mrs. Durst........................4
3

4  Exhibits

5  Exhibit 1...............................................9
   Exhibit 2.............................................120
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                    DENNIS ANTHONY ROOT,

 3    having been first duly sworn, was examined and testified

 4                        as follows:

 5                    DIRECT EXAMINATION

 6    BY MRS. DURST:

 7         Q.   Can you state your full name, please.

 8         A.   Dennis Root.  Last name is spelled R-O-O-T, as

 9    in tango.

10         Q.   Mr. Root, we met briefly before we went on the

11    record.  My name is Tiffany Durst.  And as I indicated I

12    represent the defendants in a lawsuit that is pending in

13    West Virginia where you've been identified as an expert on

14    behalf of the Estate of Philip Rhoades, you understand

15    that?

16         A.   Yes.

17         Q.   I understand from your CV that has been provided

18    as part of the disclosure in this case, that you have

19    testified in depositions before; true?

20         A.   Yes.

21         Q.   I am not going to go over all of the ground

22    rules with you since I assume you are familiar with them

23    generally.  The one that I would ask is, if I ask a

24    question that you don't understand or doesn't make sense

25    for some reason, please let me know.  My question is not
```

 1   designed to trick you.  It may be that maybe I am not

 2   understanding something that we are discussing as part of

 3   your testimony.  So if you will do me a favor and ask me

 4   to repeat or restate my question, I will do my best to

 5   make sure that the question is coherent so you can provide

 6   a response to that question, fair enough?

 7        A.   Yes, ma'am.

 8        Q.   If you answer the question that I've asked you

 9   without asking for any kind of clarification, I am going

10   to assume that you've understood the question and rely on

11   the answer you've given to that question, fair enough?

12        A.   Yes.

13        Q.   The only other thing is, if you need to take a

14   break, I don't know how long we will be here today.  We

15   will be here a little while.  You can ask to take a break

16   at any point in time.  You don't have to tell me why you

17   want to take a break.  And I will be more than happy to

18   accommodate the break.  The only kind of exception is if I

19   have a question that I've asked you and you haven't

20   answered it yet, I would simply ask you to finish

21   answering the question before we take a break, fair

22   enough?

23        A.   Yes.

24        Q.   Did you bring your file with you today?

25        A.   I did.  And I have for you two thumb drives.

```
 1   And also everything that is on there, I have also, to give
 2   to counsel here.  The only thing that is not on those are
 3   the two video files.  There is actually multiple video
 4   files of the depositions of Deputy Forsyth and Deputy
 5   Love.  The size of those files were massive to put on
 6   there and I just thought that we just got those so
 7   everybody has that.  But everything else, every document,
 8   everything I have with me and more is on those.
 9        Q.   With the exception of the videos of the
10   deposition transcripts of Deputy Forsyth and Deputy Love,
11   everything else that you reviewed, relied upon, et cetera
12   would be on the two flash drives you have provided to me?
13        A.   Yes.  The transcripts are on there.  Just the
14   videos themselves are not because of their size.
15        Q.   Fair enough.
16      Do you have -- when you review a transcript, for
17   instance, do you make notes or highlights of things as you
18   are reviewing the transcript?
19        A.   Yes.  I do a highlight.
20        Q.   Are the transcripts that are on the flash drive,
21   do they contain your highlights?
22        A.   No.  Highlights don't copy.  So the highlights,
23   like what I have here, provide you with an example, there
24   is highlight on the page but copying them, I don't make
25   photocopies of it.  So it's just all the documentation
```

 1   there.  As far as like hand written notes and things like

 2   that, no it's usually, it's just generally highlights to

 3   speed my way through a hundred page document to answer

 4   questions that counsel may have.

 5        Q.   Let me make sure I understand.  In all of the

 6   documents that you have reviewed in preparation of any

 7   opinions you've given in this case or intend to give in

 8   this case, you don't actually have hand written notes

 9   where you reviewed those documents; true?

10        A.   Hand written notes?

11        Q.   Yes.

12        A.   No.

13        Q.   Do you have any typed notes as you go through

14   and review a document?

15        A.   No.  Everything consists into the report.

16   Everything is placed into the report.

17        Q.   Now, what you've indicated is, in the binder

18   that you have brought with you.  The deposition

19   transcripts, at least some deposition transcripts may have

20   some highlighting.  I saw the page you flipped you had a

21   red star beside the highlight.

22     What I would like to do also, is to see if we can get a

23   copy, a paper copy of the transcript so I have what you've

24   highlighted, okay?

25        A.   I don't know how you can copy and get the

1   highlight.

2        Q.   You can copy highlight.

3        A.   You can?

4        Q.   You can.

5        A.   I haven't had success with that, I guess.

6        Q.   If you copy it in color the highlight shows.  So

7   we will need to figure out how to do that.  Anything that

8   you've highlighted that you have at least found somewhat

9   important enough to highlight it, I would like to have

10  copies of.  So we will need to figure out how to make

11  arrangements to do that, okay?

12       A.   Sure.

13       Q.   Did you receive any direction from counsel not

14  to bring anything with you?

15       A.   No.  Along that also, I wanted to provide you

16  with my most current CV.

17       Q.   This is updated as of September the 11th.  The

18  one we had was updated May 6th of 2019.  We will go

19  through it.  But are you able to kind of tell me generally

20  what the difference or differences may be between the two

21  copies?

22       A.   I can tell you exactly what they are.  One is

23  new membership with National Sheriff's Association and the

24  other one was the addition of, I presented a forest

25  investigations program for the public defender's office in

1  Florida, so that was added to the CV.

2      Q.    So a new association or new membership and a

3  presentation?

4      A.    Yes, ma'am.

5      Q.    Everything else would be the same on the new CV

6  and the CV that we had of May 6th of '19?

7      A.    Should be identical.

8      Q.    We will go ahead and just mark the new CV that

9  you gave me so I have a copy of it and that way I know the

10  court reporter will have it so I don't lose it.

11    But for my purposes I may refer to the old one because

12  I have some markings on some things, I believe.

13    Let's talk about your current employment.  The report

14  that we received in this case has a company that says,

15  Professional Investigations Training Council, is that your

16  business?

17              (Exhibit 1 marked and identified)

18      A.    Yes.

19      Q.    Are you self employed by that business?

20      A.    Yes.

21      Q.    Does that business also go by another name,

22  Forest Concepts Training Council?

23      A.    Yes.

24      Q.    Now, in reviewing some additional material on

25  you, it looks like in the past you had a business named

1    Dennis Root & Associates?

2         A.   Yes.

3         Q.   Does Dennis Root & Associates still exist?

4         A.   No.

5         Q.   When did it cease to exist?

6         A.   2018 I think it was when I closed that down and

7    opened up my, I guess, it would be considered my part-time

8    business here in Mountain City, Tennessee.

9         Q.   Was Dennis Root & Associates and LLC, a

10   Corporation?

11        A.   Corporation.

12        Q.   Was it a Florida corporation?

13        A.   Yes.

14        Q.   Why did it cease to be in existence?

15        A.   I am trying to retire.  My wife and I moved to

16   Tennessee.  I stopped doing any kind of professional

17   investigations.  I also had a professional investigations

18   agency in Florida through Dennis Root & Associates as well

19   as the consulting in expert witness work.  I am trying to

20   enjoy the later portion of my life in retirement.  So

21   moving up here I continued to stay involved with training.

22   Teaching investigations and doing the consulting work but

23   trying to just do that on a much more limited bases than I

24   was doing when I lived in Florida.

25        Q.   So let's talk about, then, the Professional

```
 1   Investigations Training Council.  That is a limited

 2   liability company?

 3        A.   Yes.

 4        Q.   Is that formed in Tennessee?

 5        A.   Yes.

 6        Q.   It was founded in January of '19?

 7        A.   Yes.  I believe so, yes.

 8        Q.   Is there any member of the LLC other than

 9   yourself?

10        A.   No, it is a single member.

11        Q.   Now, does Professional Investigations Training

12   Council, LLC, does it currently conduct private

13   investigations?

14        A.   No.

15        Q.   Dennis Root & Associates, did conduct -- you did

16   conduct private investigations through that company;

17   correct?

18        A.   Yes.

19        Q.   You also did expert witness work through that

20   company?

21        A.   Yes.

22        Q.   So what you are telling me is, kind of the

23   private investigative work that was part of Dennis Root &

24   Associates, you no longer do through Professional

25   Investigations Training Council?
```

1      A.    Correct.

2      Q.    Dennis Root & Associates was formed in 2013?

3      A.    2012, maybe.  I would have to look.  If you want

4  I can give you the date out of the CV.

5      Q.    Sure.  If you would.

6      A.    2012.

7      Q.    Now, you said it was a Florida Corporation, what

8  position did you hold with the corporation?

9      A.    President.

10     Q.    Were there any other officers?

11     A.    I don't recall if at one time I had my brother

12  running the company for me while I was actually away from

13  the company.  I don't recall if I made him an officer in

14  the corporation.  My wife should be.  My wife is almost

15  always on any business that I've ever had.  So Kathryn

16  Root would have been on there probably as vice president

17  or something to that affect.  I don't know that I ever

18  named my brother.  I don't recall doing that, but it is

19  possible.

20     Q.    So for purposes of the court reporter's benefit,

21  how does your wife spell Kathryn.

22     A.    It's K-A-T-H-R-Y-N.

23     Q.    What was your brother's name?

24     A.    Richard Root.

25     Q.    He did provide at least some assistance in the

1   Dennis Root & Associates but may have not been named as an

2   officer?

3        A.    Correct.

4        Q.    Now, did you also at some point have another

5   business at the same time as Dennis Root & Associates,

6   Tactical Advantage Solutions?

7        A.    Yes.  That was the training company I formed

8   while I was in law enforcement.

9        Q.    Was that business incorporated?

10       A.    LLC, I believe that one was.

11       Q.    Where was it formed?

12       A.    Florida.

13       Q.    Do you how who the members were of that LLC?

14       A.    That, I believe, was myself and my wife Kathryn.

15       Q.    Now, as part of the training that was provided,

16   did you provide training only to law enforcement officers

17   or did you provide training to others outside the law

18   enforcement field?

19       A.    Both.  I provided training a few time with the

20   Army.  I did training with law enforcement.  And I also

21   did training in the private sector for individuals.

22       Q.    As part of that business, where you provided

23   training to law enforcement agencies, at any point in time

24   have you provided training to any law enforcement agency

25   in West Virginia?

1      A.   I did not contract with anybody out of West

2   Virginia, but I can't say specifically if a West Virginia

3   officer ever attended the training.  Because I had

4   officers that would come from across the united states to

5   different classes.  But not specifically like going to a

6   law enforcement agency in West Virginia or holding a class

7   specifically in West Virginia.

8      Q.   Just to be clear then, you can't say because you

9   may not know where a specific officer may have been from

10  who attended your training.  It could have been somebody

11  from West Virginia, maybe, maybe not, but you've never

12  actually went to West Virginia to provide training for any

13  specific law enforcement agency or officers, is that fair?

14     A.   Yes.

15     Q.   Have you ever been requested to go to West

16  Virginia to provide any training?

17     A.   No.

18     Q.   So at the time that you were initially contacted

19  in this case, has all of your work been through

20  Professional Investigations Training Council or was any

21  work done through Dennis Root & Associates?

22     A.   I believe I was originally contacted when I had

23  Dennis Root & Associates.  When I closed the business down

24  and transitioned to Tennessee we transitioned it to

25  Professional Investigations Training Council.  But we

1    honored the original service agreement that was formed

2    with Dennis Root & Associates.

3         Q.   With regard to Dennis Root & Associates, and you

4    said that was a corporation, how were you compensated?

5         A.   For?

6         Q.   For compensation you received for work performed

7    on behalf of Dennis Root & Associates, how were you

8    compensated?  Meaning did you have a set salary?  Did you

9    just take money, like a distribution if there was a

10   profit?  I mean, tell me how you were compensated through

11   Dennis Root & Associates.

12        A.   I received paychecks.  It was based on the type

13   of work being conducted and the time that I put in.  Just

14   like all of my other team members.

15        Q.   Did you have to turn in, like, time sheets?

16        A.   Well, I kept the time sheets, so I maintained my

17   own hours.  So I knew what to pay myself for.

18        Q.   With regard to Professional Investigations

19   Training Council, how were you compensated?

20        A.   With the new LLC as a single member, it's just

21   monies flow in, they take care of the business

22   expenditures.  It was actually formed specifically because

23   I was retiring and reducing my work load so that it will

24   come off my standard income, not have to file any special

25   documentation with the IRS or anything like that for

1   reporting taxes.  It's just, I reserve the taxes that need

2   to be paid on whatever and it comes out of those funds.

3         Q.   With regard so, since kind of, Dennis Root &

4   Associates cease to be in existence in 2018.  And then you

5   transitioned to Professional Investigations Training

6   Council, do you know what your income was for 2018 for

7   expert witness work?

8         A.   The dollar figure?

9         Q.   Yes.

10        A.   Not off the top of my head, I do not.

11        Q.   Do you have any idea?  Are we talking twenty

12   thousand, fifty thousand?

13        A.   I don't want to guess.  I would have to research

14   that.

15        Q.   Were you still doing the training through

16   Tactical Advantage Solutions as well up until Dennis Root

17   & Associate ceased to exist?

18        A.   No.  Tactical Advantage Solutions closed down

19   and the training that I conducted with Dennis Root &

20   Associates was put under Dennis Root & Associates.

21        Q.   When did Tactical Advantage Solutions close?

22        A.   If I can refer to my CV, I can get the exact

23   date.

24        Q.   Sure.

25        A.   I don't recall.  That would have been 2014.

1      Q.   So from 2014 up through 2018, any compensation

2   received for training provided would have been

3   compensation also just through Dennis Root & Associates?

4      A.   Yes.

5      Q.   Do you know in 2019 we are in September, mid

6   September of 2019 and Professional Investigations Training

7   Council has been around since the beginning of the year,

8   do you know how much money you have earned thus far

9   through expert witness work?

10     A.   Through today, I would have to look at the

11  financial.  I am not sure.

12     Q.   I will tell you, excuse me.  So you have no idea

13  as of today, like, whether it's ten thousand, fifteen

14  thousand, no idea what so ever?

15     A.   Well, I could guess, but I don't like to guess.

16     Q.   Can you give me an estimate understanding that

17  it is only an estimate?

18     A.   For this year twenty, twenty-five, maybe.

19     Q.   I understand that is just an estimate.  Is that

20  the only source of income that you currently have?

21     A.   No.

22     Q.   What other source of income do you have?

23     A.   Retirement income.  And then the training income

24  that comes through for the classes that I perform.

25     Q.   Does the twenty to twenty-five estimate that you

1    gave me, that just includes the kind of expert witness

2    work you are doing here in this case, doesn't include

3    income from the training that you provide?

4         A.    Correct.

5         Q.    Did you work at some point in time for a company

6    called Milano Investigations?

7         A.    Yes.

8         Q.    When did you work for Milano Investigations?

9         A.    I want to say 2012.

10        Q.    Where was Milano Investigations located?

11        A.    Stuart, Florida.

12        Q.    What did you do for them?

13        A.    Professional investigations.

14        Q.    Tell me what you are kind of generally referring

15   to when you are talking about professional investigations.

16   What kind of investigative work?

17        A.    For Milano Investigations it was criminal

18   defense work.

19        Q.    How were you providing services through Milano

20   Investigations, meaning, were you an employee, were you an

21   independent contractor?

22        A.    I thought I was an employee but I learned that

23   as I was being compensated I was actually a subcontractor.

24   Which is some of the reasons that I separated from them

25   because that is not legal.  You can't do that.  It's not

 1   permissible for an individual to subcontract work to an

 2   agency.  And unfortunately when I initially researched it

 3   with the State of Florida Department of Agriculture the

 4   representative said, oh they have a work around.  Well,

 5   the more I dug into it, and once I get a wild hair in my

 6   ear I don't stop.  I learned that no, there is no such

 7   work around.  And that led to our separation.

 8        Q.   How long were you with them?

 9        A.   Not very long.  Months.  I don't know the exact

10   amount of time.

11        Q.   So any work you would have performed for them

12   would have only been in the 2012 calendar year?

13        A.   I believe so.  Maybe the end of 2011 to the

14   beginning of 2012, I believe.  But I am not really

15   certain.  I actually forgot all about them.

16        Q.   I noticed they weren't on your CV, is it --

17        A.   Just a personal mistake.  I was there for a very

18   short period of time.  And it wasn't a full-time position.

19   And I actually just completely forgot about them.

20        Q.   Is it, based on your CV, fair to say that you've

21   never worked as a law enforcement officer in West

22   Virginia?

23        A.   Yes.

24        Q.   Now, with regard to your law enforcement

25   employment, you started off with the Riviera Beach Police

1   Department.  It looks like you had two different stints

2   there?

3        A.   Yes.

4        Q.   Tell me what you did at Riviera Beach Police

5   Department.  I mean, just generally what kind of work you

6   were doing?

7        A.   Road patrol duties.  Also, I was the designated

8   shift traffic unit as well in addition to road patrol

9   duties.  I also served as a field training officer for

10  teaching new hired law enforcement personnel and training

11  them in how to do their jobs.  I, in addition to those

12  duties, had duties as a trainer for the agency.  I became

13  the lead defense of tactics instructor and also the impact

14  weapons instructor for the police department.

15    I developed the DUI training program for their road

16  patrol and taught that program as well.

17       Q.   Was the employment with Riviera Beach Police

18  Department your first entry to the law enforcement field?

19       A.   Oh, yes.

20       Q.   One of the things you said you did while with

21  Riviera Beach Police Department was you served as the FTO

22  or the Field Training Officer for new hires?

23       A.   Yes.

24       Q.   Similar to the way that Deputy Parker, in this

25  case, was the FTO for Deputy Love?

1      A.    Yes.  I would imagine they would be comparable.

2      Q.    When you were with Riviera Beach Police

3   Department did the police department hire individuals who

4   may have not been through any kind of academy training

5   yet?

6      A.    As far as putting them on the road?

7      Q.    Yes.

8      A.    No.

9      Q.    Did they hire individuals who had not been

10   through the academy?

11      A.    Yes.  I was hired without going to the academy.

12      Q.    What kind of duties did you do before you went

13   to the academy?

14      A.    Depending on when the academy started.  They

15   would either try to coordinate your hire date for when an

16   academy began or if it was going to be three weeks, a

17   month, whatever, they would bring in new hires and they

18   would be doing some time, like, with criminal

19   investigation division doing file clerk work or mundane

20   tasks.  Helping out in records.  Generally the agency

21   hired and coordinated the academy based on hire dates.

22   Because the academies down there ran on a very specific

23   schedule.

24      Q.    There were a number of academies available to

25   new hires; correct?  I mean, it wasn't only, like, in West

1  Virginia that you had the West Virginia State Police

2  Academy?

3      A.   No, ma'am.  There's academies across the entire

4  state of Florida.

5      Q.   So it may have been easier to get a new hire in

6  for a police department to an academy as opposed to if

7  there is only one choice?

8      A.   I would imagine so.

9      Q.   Why did you leave the Riviera Beach Police

10 Department on the first occasion?

11     A.   I always wanted to work for a sheriff's office

12 and more importantly in Martin County.  That is where I

13 grew up as a kid and where I wanted to return to live as

14 an adult.  I was offered a position for road patrol in

15 Martin County Sheriff's Office so I took that opportunity.

16     Q.   So you were at Riviera Beach Police Department

17 from '89 to '91.  Then Martin County Sheriff's Office from

18 '91 to '92?

19     A.   Yes.

20     Q.   Then went back to the Riviera Beach Police

21 Department from '92 to '93?

22     A.   Yes.

23     Q.   Tell me, you said you had always kind of wanted

24 to work for the sheriff's department, why did you only

25 stay for a year the first time and then leave?

```
1        A.    Boredom.

2        Q.    What do you mean boredom?

3        A.    When you are young in a career and you work for

4   a city like Riviera Beach -- to give you an idea, Riviera

5   Beach at the time that I worked there was rated crime per

6   capita with Miami and New York.  Very active.  Very busy

7   place.  Tremendous training ground for law enforcement

8   officers.  When you work a shift that is 30, 40 calls a

9   shift you develop an energy level that when you go to an

10  agency that is on 12 hour shifts and the maximum calls you

11  get is 10, when you work all night long, it was just

12  fatiguing beyond belief.  And I wanted to go back to where

13  I felt like I was really doing something.

14       Q.    So you didn't feel like it was active enough for

15  you?

16       A.    It wasn't active enough.  I didn't like the 12

17  hour shifts.  They were very long shifts for constant.  I

18  mean, it is not like a 12 hour shift where you pulled

19  something for overtime, it was 12 hours a day all the

20  time.  And under that current administration, it was back

21  under Sheriff Holt, there was no such thing as overtime.

22  If there was an escape prisoner, for example, you stayed

23  out until he was recovered and you didn't get paid for it.

24  That is the way the sheriff's office ran.

25       So looking at the hours and the lack of activity, it
```

1   was just a decision that I made that I preferred to go

2   back to a place that presented law enforcement in a way

3   that I first cut my teeth on.  That is how I envisioned

4   law enforcement to be.

5        Q.   While you were with the Riviera Beach Police

6   Department the first occasion, were you ever disciplined

7   or reprimanded for anything?

8        A.   Not that I can recall.

9        Q.   Your departure from the Riviera Beach Police

10  Department in '91 was a voluntary decision?

11       A.   Yes.

12       Q.   Then you went to Martin County Sheriff's

13  Department, were there for a year, were you reprimanded

14  while you were with the Martin County Sheriff's Department

15  that year?

16       A.   No.

17       Q.   That was a voluntary decision on your part to

18  leave there and to go back to the Riviera Beach Police

19  Department?

20       A.   Yes.

21       Q.   Then you stayed there at Riviera Beach Police

22  Department for another year?

23       A.   Proximately.

24       Q.   Well, at least it's in '92 to '93?

25       A.   Right.

1      Q.    Were you doing the second stint at Riviera Beach

2    Police Department, were you doing the same kind of work?

3      A.    Yes.

4      Q.    Why did you leave if that is where you -- it was

5    more active, you were staying busier, why did you leave

6    there in '93 and go to Jupiter Police Department?

7      A.    Part of the reason that I left, we lost Chief

8    Fitzgerald.  He was our police chief.  He went to become

9    the chief of Palm Beach Gardens Police Department.  A new

10   administration came in who had a very different outlook on

11   the manner in which things were going to be done in the

12   agency.

13      The Jupiter Police Department, at the time I was going

14   to classes and I met a captain from the Jupiter Police

15   Department who recruited me to the agency for the purpose

16   of -- originally it was for road patrol, but then also to

17   act and take a position as the lead defense of tactics

18   instructor for the agency.  Is what he recruited me for.

19      Q.    So part of the change in administration was part

20   of it?

21      A.    It is.  And as a younger officer, if you will, I

22   am not very politically correct.  I am the type of person

23   that is out spoken.  And if I am right I stand firm in

24   what I think.  I just didn't see that as being a positive

25   thing there.  Being offered the opportunity with Jupiter

1   was actually a significant pay raise.  It was a very

2   promising agency.  They had tremendous growth coming in.

3   It really had the potential to be a tremendous

4   opportunity.

5        Q.   Was the type of work you were doing with Jupiter

6   Police Department generally the same type of work you were

7   doing when you were with Riviera Beach Police Department?

8        A.   Yes.  Road patrol duties and teaching defensive

9   tactics.  But I wasn't an FTO in Jupiter.

10        Q.   So you weren't a field training officer in --

11   okay.

12      I had seen and I was looking for it and I couldn't

13   place my finger on it quickly.  I had seen a reference in

14   your CV that there was a reference that you were with Palm

15   Shores Police Department?

16        A.   Palm Beach Shores Police Department.

17        Q.   Palm Beach, okay.  When were you with Palm Beach

18   Shores Police Department?

19        A.   That was the most recent before I left Florida.

20   That would have been 2015 to 2017.

21        Q.   Okay, there it is.

22        A.   As a part-time person, not a full-time officer.

23        Q.   So after you had about four years in between

24   when you left Martin County Sheriff's Department and then

25   kind of rejoined, so to speak, the law enforcement field

1    on a part-time basis?

2         A.   Yes.

3         Q.   Now, you were with Palm Beach Shores, there was

4    a reference to director of internal affairs, did you have

5    involvement in investigating any officer involved

6    shootings while you were with Palm Beach Shores?

7         A.   No.  There were no officer involved shootings

8    there at that time.

9         Q.   Now, Jupiter Police Department, I think you were

10   there even less than a year; is that right?  It wasn't

11   quite a full year?

12        A.   Correct.

13        Q.   You actually kind of left the law enforcement

14   field for a period of time?

15        A.   Yes.

16        Q.   Why did you leave the law enforcement field?

17        A.   My experience with the Jupiter Police

18   Department, the short version, they were an agency that

19   shift bids were based on seniority.  And similar in

20   Riviera Beach, but I never had to do anything other than a

21   three to eleven shift because all the senior guys in the

22   agency they wanted to be on midnights when things slowed

23   down or they wanted to be on day shift.  So I spent the

24   majority of my career working three to eleven.

25        When I went to the Jupiter Police Department I was put

1   on midnights.  I began to have a lot of problems on

2   midnights, emotionally and just high stress.  Very unusual

3   emotional feelings.  So I went to my lieutenant and said,

4   I am having some difficulties.  So through the Ap and

5   everything, long story short, I learned that I have, I

6   can't remember what they call it.  There is a medical

7   condition where I can't reverse my body clock.  I can't

8   get my clock to adjust.  So working midnights meant no

9   sleep at night.  I was fearful that I was going to be

10  terminated because I am on probation and now I can't work

11  midnight shift.  The agency made the decision to move me

12  to the four to twelve shift.  Created a tremendous amount

13  of turmoil, if you will.  Cause now here is the guy that

14  just came in took over defensive tactics and lead

15  instructor and now he is being moved ahead of all the

16  other senior people to a four to twelve shift.  And rather

17  than having a team environment it became very adversarial.

18  Not something that I enjoyed.  And thought, man, this is,

19  at first I had the administration taking bad spots, and

20  then I have -- now I look back, it's kind of unfortunate

21  but a situation had created where I was just not happy.

22  And I thought, well, you know what, I am going to try and

23  just -- maybe this isn't the career for me.  Maybe that is

24  the way it is.

25         Q.    When you were going through those issues with

1  Jupiter Police Department did you apply at any other law

2  enforcement agency to see if maybe it would be better at

3  another agency or was your decision at that point you

4  didn't want to be in law enforcement?

5       A.   My decision at that point was, I believe, it was

6  just to transition away.  I had thought of one of my

7  passions because defensive tactics became physical

8  therapy.  So I wanted to go to school and a credible

9  opportunity had presented itself with Pinkerton to be

10  their human resource person.  And I just thought well,

11  maybe a change of profession would be appropriate.

12       Q.   Up until the point that you left Jupiter and

13  went to Pinkerton Security Services, so while you had your

14  two stints with Riviera Beach Police Department, the one

15  stint at that point with Martin County Sheriff's

16  Department and then Jupiter, had you been disciplined or

17  reprimanded for anything in your law enforcement field?

18       A.   Not that I can recall.  I might have had a

19  traffic crash that I was at fault for.  But not as far as

20  discipline for behavioral actions of activities.

21       Q.   So tell me while you were with Pinkerton

22  Security Services were you doing any kind of investigative

23  work?  You mentioned human resources, so were you kind of

24  the HR person or were you actually doing investigative

25  work?

1    A.   No, I was the HR person.  I did the backgrounds

2   on the applicants.  I ran the psychological exams.  I did

3   the behind the scenes work getting people hired by the

4   agency.

5    Q.   So you did that for two years or so maybe a

6   little bit less because we just have the years and no

7   months.  Why did you leave Pinkerton Security Services and

8   then go back to Martin County Sheriff's Office?

9    A.   I was recruited back to the sheriff's office.

10  They were running a juvenile defender training center.  A

11  boot camp for youth.  And one of my family friends who was

12  working in there at the time contacted me and said that

13  they were looking for law enforcement personnel to come in

14  and participate in the program.  Being intrigued by the

15  opportunity I talked to them.  I went there and toured.

16  Thought, man, what a great opportunity to work with kids.

17  And so I took the offer.  Went through the process and got

18  hired on.  Went back to Martin County Sheriff's Office in

19  law enforcement and was assigned to the juvenile defender

20  training center.

21   Q.   At some point during your second stint with

22  Martin County Sheriff's Department did you kind of leave

23  that juvenile program and then go back to road patrol?

24   A.   Yes.  When I was in the Juvenile Defender

25  Training Center we were under law enforcement.  So it was

```
 1   Major Forchette and my captain.  While I was there I
 2   became one of their instructors for defensive tactics and
 3   open hand control techniques for the agencies personnel.
 4   I also tested for and got promoted to sergeant.  And it
 5   was after Major Forchette left that the agency reorganized
 6   the boot camp and then placed it up underneath
 7   corrections.  I have never been corrections certified.
 8   Wanted an opportunity to go back because I was missing
 9   road patrol and traffic and things like that.  So I
10   requested to be transferred back over to law enforcement
11   to road patrol and they agreed.  The only caveat was you
12   had to give up your stripes if you are going to go back to
13   road patrol.
14        Q.   So while you were on the law enforcement side
15   with Martin County Sheriff's Department your highest rank
16   would have been deputy?
17        A.    No.   Sergeant.  I got promoted to Sergeant while
18   in law enforcement assigned to the juvenile defender
19   training center.  They transitioned it to corrections.
20   That was a bone of contention also because when they were
21   telling me that going back to the road meant giving up
22   stripes, I said no, I tested for and got my stripes here.
23   They said, no you are in corrections.  I said, no I am in
24   law enforcement you guys moved it under corrections.
25   Well, it's corrections position for sergeant.  There
```

1   aren't any sergeant positions in law enforcement so if you

2   want to come back you got to give them up.  At the time I

3   thought I earned them once, I won't have any trouble

4   earning them again.  So I relinquished them and returned

5   to law enforcement.

6       Q.   But when you retired you were only a deputy;

7   correct?

8       A.   That is correct.

9       Q.   After you returned from the juvenile services

10  program back to road patrol and had to give up your

11  sergeant stripes, you applied for promotions throughout

12  the rest of your career; correct?

13      A.   I was always on the list.

14      Q.   But you were never promoted to sergeant at any

15  point in time thereafter?

16      A.   Correct.

17      Q.   Do you know why?

18      A.   Sure.

19      Q.   Why?

20      A.   Because I am not politically correct.

21      Q.   Did you score high enough on the test?

22      A.   I was the first person to make a hundred on the

23  written exam for sergeant.

24      Q.   Was that while you were still with juvenile

25  services or when you were back on road patrol?

1      A.    That was on road patrol.

2      Q.    Even though you had scored that high on the

3  test, you were never given the opportunity for the

4  promotion to sergeant?

5      A.    That is correct.

6      Q.    Why did you leave the law enforcement field in

7  2011?

8      A.    By then I had experienced just about everything

9  there is to do through the sheriff's office and law

10  enforcement.  And the sheriff at the time, Sheriff

11  Crowder, was offering retirement buyouts for anyone with

12  15 years or more in service and who are interested in

13  early retirement.  Seeing that opportunity, and I had

14  already started a training business, and I thought, man,

15  this is the perfect opportunity.  So I thought it was kind

16  of a message from God that here is an opportunity for you

17  to retire and to do what you do as a part-time thing

18  full-time.

19      Q.    Before you left law enforcement in 2011, in any

20  of the law enforcement agencies that you were with,

21  Riviere Beach, Jupiter, Martin County Sheriff's

22  Department, were you the subject of any internal affairs

23  investigation regarding any kind of use of force issues?

24      A.    Not that I can recall.  I am trying to think of

25  Martin County, that's my longest period.  I don't recall.

1   I know I had a traffic crash in Martin County.  And I got

2   a written reprimand for that.  I am trying -- I don't

3   think I was ever the subject -- oh, wait a minute.  Yes I

4   was.  There was a complaint, oh my goodness, what was his

5   name.  There was a complaint filed against me by a young

6   man.  And actually I think there was a civil suit.

7   Mechata.  I think his last name was Mechata.  And he was

8   somebody that I had stopped for possibly being DUI.  And

9   unfortunately other deputies took over my traffic stop,

10  slammed him to the ground, did some very inappropriate

11  things and I immediately reported it to my supervisor.

12  Took the recording of it, provided it to him.  And when

13  the complaint came in I had video showing exactly what

14  happened.  And I was cleared.  The reason I wasn't

15  exonerated is one of the allegations was when I went to

16  put him in the patrol car, he alleged that I tightened his

17  handcuffs down around his wrists.  No such thing ever

18  happened.  But because I couldn't prove I didn't and he

19  couldn't prove I did, it was just unsubstantiated instead

20  of exonerated.  But as far as the other things that

21  happened to him I was, clearly by video, exonerated from

22  those allegations.

23       Q.   So as far as you can recall, that is the only

24  kind of use of force allegation or inappropriate use of

25  force allegation against you during your career as a law

1    enforcement officer?

2         A.   To the best of my recollection.

3         Q.   You mentioned that there may have actually been

4    a civil lawsuit filed by Mr. Mechata as a result of the

5    incident that occurred?

6         A.   Yes.

7         Q.   Were you named as a party?

8         A.   I don't know.  I don't think so.  But I can't

9    recall.  I never saw any of that kind of paperwork that

10   came through.  I know that I never went to any kind of

11   deposition or anything like that for the matter.

12        Q.   Aside from the incident involving Mr. Mechata,

13   are you aware of any other claim or lawsuit brought

14   against you or any department because of your alleged

15   conduct?  Other than the Mr. Mechata claim?

16        A.   No.

17        Q.   I want to make sure, my question sometimes the

18   way I ask it, it may not be the clearest.  No you are not

19   aware or no there are none?  You understand what I am

20   saying?  I just want to make sure you and I are on the

21   same page.

22        A.   I'm not aware of any such issues.

23        Q.   Is it true during your years as a law

24   enforcement officer you never had to discharge your

25   firearm in the course of your duties?

1      A.    Thank God, that is true.  Outside of terminating

2   an animal.

3      Q.    Were there incidents while you were with one of

4   the law enforcement agencies that you were employed by

5   where maybe you weren't the one who had to discharge a

6   weapon but another law enforcement officer was put in a

7   situation where he or she discharged their weapon?

8      A.    Where I was on scene?

9      Q.    Yes.

10      A.    Yes.

11      Q.    Which law enforcement agency were you with?

12      A.    I know for a fact it happened in Riviera Beach.

13      Q.    What happened?

14      A.    We had an armed subject in a bar.  We were

15   making entry into the bar.  We stacked up at the door and

16   the first two officers in the door were confronted and

17   engaged.  I was at the door but I was not a participant in

18   the actual shooting.

19      Q.    So there was an armed subject in the bar?

20      A.    Yes.

21      Q.    Did that subject move towards one or more of

22   those police officers with the weapon in hand?

23      A.    Yes.

24      Q.    Was there any kind of physical contact between

25   the subject and one or more of those officers?

1        A.    Prior to the shooting?

2        Q.    Yes, prior to the shooting?

3        A.    No.  No, he presented the weapon and it was

4    dealt with immediately.

5        Q.    So just the threat of a weapon was presented and

6    the police officer used that -- he used force?

7        A.    Deadly force.

8        Q.    Was there any kind of investigation done by

9    either Riviera Beach Police Department or any other agency

10   to investigate that shooting?

11       A.    Oh, yes.

12       Q.    Were you involved in any manner in the

13   investigation?

14       A.    As conducting it?

15       Q.    Yes.

16       A.    Oh, no.

17       Q.    Were you interviewed?

18       A.    Yes.

19       Q.    Did you actually, I know you weren't directly

20   involved in the incident with the subject, but did you

21   witness what occurred?

22       A.    Yes.

23       Q.    Were you interviewed and asked whether you

24   believed that the police officer who had fired his weapon

25   had acted appropriately?

1        A.    I don't recall being asked that question.

2        Q.    Is there any other incident that you can recall

3    while you were with law enforcement where another officer

4    was in a situation where he or she discharged their

5    weapon?  And again, I am not talking about having to put

6    down a wounded animal or something like that.

7        A.    I understand.

8      I have been involved in a lot of shooting cases and

9    seen examinations.  I am trying to separate my memory from

10   whether I was there post event and putting myself there.

11   Off the top of my head I can't think of another incident

12   in which I was physically on scene at the time the

13   discharge took place.

14       Q.    Now, one of the things you had said was trying

15   to separate out your memories of whether you were present

16   when a shooting occurred or maybe some kind of

17   investigation you were doing.  Did you investigate officer

18   involved shootings at any one of your law enforcement

19   agency positions?

20       A.    Yes.

21       Q.    Tell me, what reason were you investigating?

22   Meaning, were you investigating to determine whether the

23   police officer used reasonable force or were you

24   investigating it for another reason within the agency?

25       A.    With Martin County I was the designated use of

1   force specialist.  I was the resident expert for force

2   related events.

3       I would, for example, in one case there was an officer

4   involved shooting which I was called out to do a scene

5   examination immediately following it.  And my primary job

6   was to evaluate and assess the application of force and

7   answer any questions for the investigators.  Also the

8   weapon systems that were applied, sometimes it was

9   technical questions about the weapon.  Sometimes it was to

10  answer questions about whether or not the individual's use

11  of that particular weapon, given the circumstances, would

12  be considered objectively reasonable.  So my participation

13  was to help the investigators understand the force

14  evolution, the weapon systems and also to say whether or

15  not we had a training issue or if we had a potential

16  policy issue that would then also -- internal affairs

17  would take and run with anything along those lines.

18      Q.   You weren't the one who made the determination

19  as to whether the police officer's use of force was

20  objectively reasonable or not?  Am I understanding you

21  correct?

22      A.   There is command staff that makes that

23  determination.  There is, and generally, usually the

24  document that is signed will only be signed by either the

25  colonel or the sheriff.  The input is sought from the

1  people that let them know, well, here is everything that

2  happened.  And here is why this was this way.  So that

3  they could make the final decision.

4       Q.   Were you ever a member of any kind of police

5  review board that actually made the decision whether a

6  police officer's use of force was objectively reasonable?

7       A.   I have never been on a police review board.

8       Q.   Have you ever been a member, maybe it's not

9  called a police review board, have you ever been a member

10 of any group or organization within a law enforcement

11 agency where you were part of the team, group, whatever,

12 that made the decision as to whether a police officer's

13 use of force was objectively reasonable?

14      A.   Yes.  A shoot team.  That's what I'm saying,

15 it's all the information the team correlates all the

16 information and makes a recommendation or voices the

17 position to the command staff and they make the final

18 determination and they write up the documents and things

19 like that.

20      Q.   Maybe we are kind of having a bit of a

21 disconnect.  I think I understand what you are telling me.

22 That you might be one of the folks that are providing

23 information that is used in the determination.  My

24 question is, have you ever been a member of the group that

25 is actually the one making the decision as to whether the

*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*

1  use of force was objectively reasonable?

2      A.   It's not a group.  In the sheriff's office it

3  was an individual.  It was a command staff individual.

4  Whether it was the designated captain or the colonel, the

5  individual made the final -- it was the group that said

6  here is the information.  You know, I get pulled into a

7  meeting, here is what we've got.  What do you think.  I

8  provide them with the information.  They make the final

9  determination.  There is not a line staff personnel

10  outside of command staff that would articulate whether or

11  not something was within the final decision being

12  objectively reasonable.  That is the sheriff or the

13  colonel's final.

14      Q.   Was that the same kind of make up in all the law

15  enforcement agencies you were with?

16      A.   No.  Each agency has different approaches to how

17  they perform.  Some agencies don't even have shoot teams.

18  They don't, you know, some agencies rely on outside

19  entities to conduct all their officer involved shooting

20  investigations.  And then you also have the comparisons of

21  whether it's a police department or a sheriff's office,

22  because they operate very differently as well.

23      Q.   The investigation where you were interviewed for

24  the shooting that occurred while you were with Riviera

25  Beach, did Riviera Beach Police Department investigate

 1   that shooting themselves or did they have an outside

 2   agency investigate it?

 3        A.   I believe it was the sheriff's office that

 4   actually conducted the investigation.  If I recall

 5   correctly.  That was a long time ago.  But I believe,

 6   especially an officer involved shooting where a subject

 7   was injured they called in the sheriff's office.  Because

 8   we had a very strong working relationship with the

 9   sheriff's office and I believe it was the Palm Beach

10   County Sheriff's Office that did that investigation.

11        Q.   So you retired in 2011.  Did your investigative

12   work, the training work and then you went back to Palm

13   Beach Shores on a part-time basis.  What made you decide

14   to go back into law enforcement even on a part-time basis?

15        A.   I wanted to maintain my law enforcement

16   credential.  Once you are certified you have to maintain

17   educational requirements and then you also have to be

18   connected to a law enforcement agency to renew your

19   certification.  It is not like it used to be a long, long

20   time ago where you got certified and you were just

21   certified for a period and that was it.  Now they added

22   additional criteria to maintain your law enforcement

23   certification.

24        Q.   Since you were out of law enforcement for three

25   to four years, was there a period of time where you were

1   not certified?

2        A.    No.

3        Q.    So you managed to keep the certification.  Is

4   that one of the reasons you went to Palm Beach Shores in

5   2015 then?  Was your certification close to running out,

6   expiring, whatever you want to call it?

7        A.    I'm sure at that point it was close to expiring.

8   And also I was going to be running for sheriff and I

9   wanted to make sure that I was as current as I could be

10  with being up to date on the challenges law enforcement

11  agencies face as a whole.  And I was offered an

12  opportunity with the town of Palm Beach Shores that turned

13  into a tremendous opportunity because I eventually was

14  named as a part-time person.  Cause it is a very small

15  agency.  Very small agency.  Was eventually named the

16  director of training in internal affairs.  And it helped

17  me maintain my credential.  And at the time, I believe it

18  was in 2015, I was also, or '16 I was running for Martin

19  County Sheriff.

20       Q.    I am assuming you lost the election?

21       A.    I did not win.

22       Q.    Have you ran for any kind of elected office

23  other than running for Martin County Sheriff?

24       A.    No.  That was the only experience I really

25  needed to know that ethics are not a part of politics.

1      Q.    There is also a Dennis Root Public Safety

2   Foundation on your CV.  What does this foundation do?  I

3   can read, provides crime prevention and personal safety

4   programs for children.  I mean, are these -- is this a

5   foundation that goes into public schools and provides,

6   kind of, programs or presentations?

7      A.    Well, it was a non profit that I formed.  I was

8   what they title in Florida, prime prevention practitioner,

9   where I had gone through all the attorney general's

10  classes on crime prevention, crime prevented through

11  environmental design, basic, as well as residential and

12  commercial crime prevention.  And through my training

13  company I had personal safety programs that I offered.

14  And I started to realize through training that there was a

15  group of people that was just completely left out.

16  Seniors and children.  And most of the time it was because

17  people couldn't afford to pay for training.  So in seeing

18  that need, I created the Public Safety Foundation as a

19  mechanism for providing crime prevention program for

20  children and seniors was my focus.  And we did -- I

21  developed a program called the CAT Safety Program.  C-A-T

22  Safety Program.  And it was for obduction prevention and

23  awareness.  And I provided it to the community, whether it

24  was through chambers, through the school's, whatever

25  group, church, whoever wanted it.

1    Q.   Senior center?

2    A.   Senior center.  Anything.  It was presented for

3  free.  Also for the seniors I did crime prevention.  I did

4  -- I would go to their homes and help do security surveys

5  to help them identify security risks.  Or sometimes it was

6  health risks, like, trip mechanism and things like that,

7  that could lead to injury.  So I tried to work with our

8  seniors and different groups to get that information to

9  them.  Again, for free.  At no cost to any of them.

10    Q.   It indicates that it was only in existence

11  through 2018.  My assumption is that you are no longer

12  doing that, is because you made the move from Florida to

13  Tennessee?

14    A.   Correct.  It was one of the oars I pulled out of

15  the water.  My wife made it very clear that retirement

16  does not mean having four jobs.

17    Q.   We talked about that you never had to discharge

18  a firearm in the course of your career as a law

19  enforcement officer.  Did you ever have to use deadly

20  means, a deadly force, in some other manner that it wasn't

21  a weapon or something like that?

22    A.   No.  Because deadly force would be, create

23  bodily harm or death.

24    Q.   So in the 20 -- how many years did you actually

25  have with law enforcement including, and I will leave out

1   the Pinkerton, but how many years?

2        A.   Over all, certified 27.

3        Q.   So in the 27 years as a law enforcement officer

4   you never had to fire your weapon and you never had to use

5   deadly force; is that right?

6        A.   Correct.  I've never had to -- and I want to be

7   very clear.  I have had to use force.  And up to causing

8   injury to someone.

9        Q.   But not deadly force?

10       A.   But I've never had to use deadly force, thank

11  God.  Usually the threatened use of deadly force was

12  enough to dissuade them.

13       Q.   As a law enforcement officer did you ever have

14  the authority or, I guess authority is the right word, for

15  final approval of any policies or procedures within any

16  law enforcement agency?  I know you said you've helped

17  develop programs and provide training, but were ever, kind

18  of like, the final approval for any policy or procedure

19  within a law enforcement agency?

20       A.   No.  That only resides with the chief or the

21  sheriff.

22       Q.   Did you ever have any final disciplinary

23  authority over another deputy?  Where you got -- if there

24  was an issue with some kind of discipline, whatever the

25  case may be, were you ever the person that had the final

 1  say on whether a law enforcement officer should be subject

 2  to discipline?

 3      A.   No.  Again, that resides specifically with the

 4  chief or the sheriff.

 5      Q.   On your CV one of the things, it referenced

 6  supervision.  I think it was maybe in your report.  So I

 7  wanted to kind of, I guess, follow up on that.  Is what,

 8  if you didn't have the final, I guess, say, so to speak in

 9  discipline, what kind of supervision did you have?  If

10  that makes sense.  Do you understand what I am asking?

11      A.   No.

12      Q.   You have in your qualifications in your CV, "my

13  duties included detention, road patrol, traffic,

14  detective, K-9 training and supervision."  So what I'm

15  trying to figure out is, where was the supervision aspect

16  of your duties as a law enforcement officer?

17      A.   Well, there is multiple.  Depends on how you are

18  applying it.  For example, as a field training officer you

19  are responsible for the supervision of your trainee.  Also

20  as a sergeant assigned to the juvenile training center I

21  was the day treatment program commander.  I was

22  responsible for all the staff.  Civilian staff and law

23  enforcement staff and correction staff assigned to the

24  program.  So when they made mistakes, I was responsible

25  for documenting the mistake and submitting the written

1  reprimand to the Major for forwarding up through the chain

2  of command.

3      You know, as a leader your job is to coach, guide and

4  mentor.  And at some point when it doesn't work it's to

5  document and refer.  So as a supervisor my responsibility

6  was to make sure my guys did their jobs and if not forward

7  them the opportunity to be educated and to correct the

8  action.  And if not then to document it and make

9  recommendations as to, you know, in an agency that has a

10  union or an agency that's got policies that's accredited

11  certain violations warrant certain types of disciplinary

12  action.  So my job was to, if I wrote somebody up, it is

13  to write them up for a violation and then the command

14  staff makes the final decision as to what the discipline

15  will be.

16      Q.   So let me go back then and kind of break it

17  down.  You told me with Riviera Beach you did serve as an

18  FTO?

19      A.   Yes.

20      Q.   So you would have had some supervisory

21  responsibility over whatever new hire was assigned to you?

22      A.   Correct.

23      Q.   Other than your duty as an FTO at Riviera Beach,

24  did you have any other supervisory responsibilities while

25  you were there?

1        A.    If the sergeant was out I was one of the people

2    named as, you know, a temporary supervisor.  And I ran the

3    shift as a sergeant's position.  That wasn't the rank, it

4    was just you were temporarily the supervisor for the shift

5    in their absence.  Provided you had the schools required

6    by the contract to meet.  If you didn't hold the rank you

7    still had to meet all the education requirements and time

8    requirements for the position in order to be given the

9    opportunity to team leader.

10       Q.    So on occasion if the person in charge was out

11   you would step in and fill in that role?

12       A.    Yes.

13       Q.    And also serve as an FTO?

14       A.    Yes.

15       Q.    Is there any other aspect of your job with

16   Riviera Beach that was in a supervisory capacity?  Other

17   than those two things that we just talked about.

18       A.    Well, for example, in training there is no rank

19   in training.  When you go to training you're under the

20   supervision of the lead instructor.  They are responsible

21   for your day, sending you home, giving you lunch breaks,

22   the whole nine yards.  If there is a problem and somebody

23   attending training it's your job to document it and

24   forward it through.

25       Q.    Now, while you were with Jupiter, I think you

 1   told me you did not serve as an FTO there; is that right?

 2   Did I recall that correctly.

 3        A.   Correct.

 4        Q.   During the short period of time you were with

 5   Jupiter, did you have any kind of supervision over any

 6   other member of the Jupiter Police Department?

 7        A.   Outside of training, no.

 8        Q.   And with Martin County Sheriff's Department,

 9   we've already talked about, like, the juvenile services

10   program.  Aside from that and the supervision you would

11   provide while you were doing training, did you have any

12   other supervision of any other deputies?

13        A.   Outside of field training officer and outside

14   when I was a sergeant in the training or in the juvenile

15   training center?

16        Q.   Yes.  That you can recall.

17        A.   The only other ways that, I mean, again this is

18   kind of splitting hairs but just like as lead detective,

19   you are responsible for what is going on at a scene.  You

20   are responsible for coordinating and organizing and making

21   sure that everything is getting done on your scene for

22   your case.  So I guess that would be a loose level of

23   supervision.  I would deem it as supervision because you

24   are responsible for making sure the jobs get done.  But

25   not a formal position.

1    Q.    When you were referring to, you know, using the

2    term supervision in your qualification section of your

3    report, is there any other aspect that you intended to

4    include in supervision that we've not discussed when you

5    use that term?

6    A.    May I refer to it just so I can read what you

7    are --

8    Q.    It is page 6 of your report.  There is the

9    qualification section.  And it's the first paragraph.

10   A.    Can you restate your question?

11   Q.    Sure.  You included this information in your

12   report; correct?

13   A.    Yes.

14   Q.    When you were preparing this report to include

15   supervision, were you contemplating supervision as

16   anything other than what you've already discussed with me

17   here today?

18   A.    No.

19   Q.    Let's talk about your expert litigation work.

20   Like, the case we are here about today.  Are you able to

21   tell me, and I am focused more on -- I know you have civil

22   and criminal cases on your CV; correct?

23   A.    Yes.

24   Q.    I am focused on civil cases, okay.  Are you able

25   to give me a percentage of your work since you have been

1  doing expert witness work, for the plaintiff versus the

2  defendant in a civil case?

3      A.   I would have to look at the CV.

4      Q.   Well, I will tell you, and you have the CV in

5  front of you.

6      A.   Yes.

7      Q.   In the civil cases it looks to me like in all

8  the civil cases you have been an expert for the plaintiff.

9  But if you can show me a case on here that I missed then I

10 will be more than happy to kind of retract that statement.

11     A.   No.  My CV is a representative of the cases that

12 I have been involved in.

13     Q.   And this listing that is included as part of

14 your CV, these are the cases in which you have either

15 given deposition and or trial testimony; correct?

16     A.   Correct.

17     Q.   Are there other cases, civil cases where you

18 have been retained but you didn't have to give testimony?

19     A.   Oh, yes.

20     Q.   Are you able to give me, of that kind of

21 category of cases, how many, what the percentage is

22 plaintiff versus defendant in cases where you didn't have

23 to give testimony?

24     A.   Not now, no.  I couldn't off the top of my head.

25 May I go back to something that you said earlier?  For

1   some reason it is resonating in my head.

2       Q.   Sure.

3       A.   When we talked about policies and things like

4   that you mentioned that I taught training programs.  And I

5   just wanted to make sure that I was clear when you

6   mentioned Palm Beach Shores.  I was the party responsible

7   for the development and submission of their policies and

8   procedures for the agency as a whole.

9     The way you had phrased it to me earlier has been

10  bouncing off, I know you were in training and developed

11  programs, so I just want to make sure that there is a

12  distinction between policy development and submission

13  versus training program development and submission.

14      Q.   Regarding the testimony that is listed on here,

15  the testimony that was presented at trial, are you aware

16  of any of the occasions, where it's a criminal or a civil

17  case, where your testimony at trial was actually presented

18  by way of video versus you attending the trial in person?

19  Does that make sense?

20      A.   I believe I understand what you -- no.  I

21  believe I've been physically at each trial.  I have done

22  deposition through video.

23      Q.   I understand.  But if you understand that your

24  testimony was being presented at trial, you have been

25  physically in attendance at that trial as opposed to --

1   attorneys sometimes because a witness is not available to

2   attend trial in person and we preserve that witness's

3   testimony by video and then it's played to the jury at

4   trial, you don't recall that ever happening in any of the

5   cases where your testimony was presented?

6       A.   Correct.

7       Q.   I note that there are two cases listed in the

8   State of West Virginia.  It is on page 14 of your updated

9   CV.

10      A.   Okay.

11      Q.   The first one is at the top of the page.  State

12  of West Virginia verses Micah E. LeMaster.  You see that?

13  That was in the Circuit Court of Cabell County?

14      A.   Yes.

15      Q.   Actually I misspoke.  There are three.  Two at

16  the bottom of the page, Xavier Thomas and Martin Thomas v.

17  City of Huntington, that was deposition testimony.  And

18  then Nicholas Evans v. City of Huntington.  I was thinking

19  there was one other criminal case that you had testified

20  in.

21      Yes.  Page 13.  State of West Virginia v. Orville Cobb.

22  So it looks like in looking at your CV you have been, at

23  least, given testimony either by trial or by deposition in

24  four cases in West Virginia.  Does that sound about right?

25      A.   Yes.

1      Q.   The depositions that gave in the two civil case,

2   the Thomas and the Evans case, did you go to West Virginia

3   for those depositions or did the attorneys come to you?

4   If you recall.

5      A.   I don't recall.

6      Q.   The two criminal cases, it looks like you were

7   retained by one attorney in one case and a different

8   attorney in the other case but you testified at trial.  So

9   based on our prior discussion, safe to say you traveled to

10  West Virginia for both of those occasions?

11     A.   Yes.

12     Q.   Have you ever gone to West Virginia to provide

13  testimony that you can recall other than those two

14  criminal trials?

15     A.   In trial?

16     Q.   In trial or deposition.  If you can recall.

17     A.   I can't recall.  The other two cases in West

18  Virginia I can't recall if it was in person there.  I

19  don't remember.

20     Q.   Okay.

21     A.   I believe one of them, they came to Florida.

22     Q.   All of the cases, if we look at the timing with

23  the exception of maybe the criminal case of State of West

24  Virginia v. Orville Cobb, it was August of '18, were you

25  still in Florida in August of '18 or had you moved to

1    Tennessee by that time?

2         A.   August '18 actually we moved to Tennessee in

3    August of 2018.

4         Q.   I wanted to talk to you about those West

5    Virginia cases a bit, if I might.  The State of West

6    Virginia v. Micah E. LeMaster's case, looks like you

7    testified at trial in November of 2016 in the Circuit

8    Court of Cabell County.  It just says case involved use of

9    deadly force-self-defense.  Do you recall details about

10   the case?  What the case was about?  Other than just the

11   use of deadly force-self-defense?

12        A.   Some, yes.

13        Q.   Can you give me a little bit of background about

14   the case?

15        A.   Sure.

16       Micah LeMaster used deadly force to protect himself and

17   his family from an individual trying to force entry into

18   their home.  It was the middle of the night and a naked

19   man was on his front porch pounding on his front door.  He

20   was there with his wife and two or three little children.

21   Gave warnings through the door that, you know, I have a

22   gun.  And the response was, I have a gun too and I am

23   going to burn your place down.  He shot through the door.

24   The man ran across the street.  Tried breaking in, or was

25   pounding on the front door of another residence.  Micah

1    went out to his front yard.  The man ran around and then

2    came running back toward Micah's residence heading

3    straight for his open front door.  Micah LeMaster

4    intervened.  Kept yelling at him to stop.  Once he got

5    close enough he shot him and the gentleman ended up dying

6    on the scene.

7         Q.   Did the person who was shot and killed by Micah

8    LeMaster, did it turn out in fact that he had a weapon?

9         A.   No.  He had no weapon.

10        Q.   So Mr. LeMaster shot and killed an unarmed man?

11        A.   Correct.

12        Q.   And so you were retained on behalf of

13   Mr. LeMaster; correct?

14        A.   Correct.

15        Q.   Is it safe to say that you testified, and you

16   tell me if I am misstating what I assume, maybe, your

17   opinion was, that you believe the shooting was justified

18   based on the fact that Mr. LeMaster feared that there was

19   going to be bodily harm -- great bodily harm or injury to

20   himself or his family members?

21        A.   In a nutshell, yes.

22        Q.   Do you know what the outcome of the case at

23   trial was?

24        A.   I believe he was acquitted on all charges.

25        Q.   So in that situation the person who was knocking

1   on Mr. LeMaster's door in the middle of the night turned

2   out that he was not armed?

3       A.   It was much more significant than knocking on

4   his front door.  It did turn out that he did not possess a

5   weapon.

6       Q.   The case, and you can refer to your CV and I

7   will tell you the page, it's page 14 of 17.  It looks like

8   the LeMaster's case, the Thomas and the Evans you were

9   retained by the same attorney in all three of those cases.

10  A gentleman by the name of Rich Weston.  Do you see that?

11      A.   Yes.

12      Q.   Do you know how Mr. Weston learned about you?

13  For instance, do you advertise on any kind of list serve

14  or expert witness site or anything like that?

15      A.   In the past I have.  I believe that most if not

16  all of my business that I've ever had was based on either

17  word of mouth or, what really started it was, I was the

18  expert in the George Zimmerman case out of Florida and I

19  guess, from what I heard from an attorney is, it was a

20  graphic depiction of my knowledge base and ability to

21  present testimony.  And that's how I got a phone call.

22      Q.   So was the Zimmerman case your first kind of

23  foray in to trial testimony?

24      A.   No.

25      Q.   From an expert witness perspective?

1      A.    I presented it as the expert for officer

2   involved shootings.  I was the go-to expert for the 19th

3   circuit for officer involved shooting for grand juries and

4   providing testimony to the grand jury about what justifies

5   and what doesn't justify a particular event.  So I have

6   that experience.  The George Zimmerman case was the first

7   case in, I want to say, private work where I was not a law

8   enforcement officer talking about law enforcement

9   applications of force.

10     Q.    Fair enough.  I think I understand the

11  distinction.

12     Xavier Martin v. City of Huntington case.  It says,

13  "case involved police practices and law enforcement use of

14  force."  Can you give me any more details about the case

15  other than that description?

16     A.    I believe that was a case where Xavier Thomas

17  was at a gas station and he had observed a traffic stop

18  taking place.  And then was subsequently confronted by law

19  enforcement.  Pulled out of his vehicle.  And there was an

20  application of force by law enforcement.

21     Q.    Not deadly force?  Meaning, it doesn't say the

22  Estate of Xavier Thomas, so I am assuming Mr. Thomas was

23  not killed as a result of any force applied by the police

24  department?

25     A.    Correct.

1    Q.   It indicates that you only testified in
2  deposition.  You never had to testify on trial in that
3  case?
4    A.   That's correct.
5    Q.   The case was pending in federal court in West
6  Virginia.  Did you prepare a written report then like you
7  did in this case and provide to counsel?
8    A.   Oh, I'm sure.
9    Q.   The Nicholas Evans v. City of Huntington case,
10  it was around the same time as the Thomas case against the
11  same city.  It says, "DUI investigation and Law
12  Enforcement Use of Force."  Can you tell me any more
13  details about that?
14    A.   The only thing I remember about that case was
15  that it was a DUI stop and subsequent application of force
16  that resulted in the client in this matter losing his
17  front teeth.  That's the extent of what I can remember on
18  that particular matter.
19    Q.   Do you know, since it doesn't list trial
20  testimony for either of those, did either of those cases
21  proceed to trial?
22    A.   I believe they settled.  But I am not a hundred
23  percent certain.
24    Q.   Are you aware of any case where you were
25  retained as an expert and the case actually proceeded to

1   trial, but for one reason or another you were not called

2   as an expert by the party who retained you?

3        A.   No.

4        Q.   The other case that was in West Virginia is on

5   page 13 of your CV.  It is State of West Virginia v.

6   Orville Cobb the III.  It was in the Circuit Court of

7   Putnam County.  Now, this indicates, case involved

8   investigations and the use of deadly force for

9   self-defense.  Do you have any further recollection about

10  that case?

11       A.   That was a case where, if I remember right, Mr.

12  Cobb stabbed a man.  My review of the case and the

13  investigation that was conducted that I was asked to opine

14  on the investigation itself and also on the application of

15  deadly force.

16       Q.   When you say the investigation, are you talking

17  about the investigation into the use of deadly force?

18       A.   In to the -- yes.  Into that event in its

19  entirety by law enforcement.

20       Q.   Do you recall what law enforcement agency was

21  involved in the use of deadly -- who investigated the use

22  of the deadly force?

23       A.   I don't recall the name of the agency.

24       Q.   So if I understand what you've told me, there

25  was an incident where there was a criminal defendant who

1  stabbed and ultimately killed someone?

2      A.   Yes.

3      Q.   And you kind of gave an opinion on that and

4  whether that use of deadly force was reasonable or not?

5      A.   Yes.

6      Q.   And you also gave an opinion as to the nature of

7  the investigation by the law enforcement agency itself?

8      A.   Correct.

9      Q.   Do you know what the outcome of that trial was?

10     A.   I believe he was found not guilty.  I believe.

11     Q.   Are there other cases that you can recall

12 specifically where you were retained involving a West

13 Virginia claim where maybe you didn't have to give

14 deposition or trial testimony?  So it wouldn't make it on

15 this list.

16     A.   Not in West Virginia, no.

17     Q.   Do you, other than the case we are here about

18 presently, do you have any other cases that are pending in

19 West Virginia?

20     A.   I was just recently retained on a West Virginia

21 case.  A civil case.  As a matter of fact, Rich Weston is

22 the attorney.  And I believe it's, once again, against the

23 Huntington Police Department.  I haven't gotten all --

24 I've just recently been retained.  So, I mean, I am still

25 waiting for discovery and everything to come in for that

1   matter.

2        Q.   So safe to say, since you don't have, like,

3   discovery, et cetera, have you formed any opinions in that

4   case yet?

5        A.   No, ma'am.

6        Q.   Other than that case, were you just recently

7   retained in the cases we are here about today, do you

8   recall any other cases you have pending in West Virginia?

9        A.   No.

10       Q.   How many other active expert witness cases do

11  you have pending right now?  I am not limiting it to West

12  Virginia?

13       A.   Maybe three or four.  It's hard to say because

14  some of them could be a couple of years old.  Sometimes it

15  takes forever for anything to go anywhere.  I think three

16  or four is a safe number.

17       Q.   Are you able to tell me location, meaning state

18  where those cases would be pending?

19       A.   I know there is a couple in Florida.  One in

20  Arizona.  But to be honest with you I don't recall if I

21  have already been retained on that case or if it's just

22  where they were -- cause it's the state or the -- they are

23  doing something with the state to approve expenditures, I

24  think.  So I don't know if I can count that one because I

25  am not sure that will actually come in.  I know I've had

1   the interviews.  And then obviously this matter.  I think

2   that's -- I believe that's it.

3        Q.   In looking at the, generally, the case

4   description where it says case involved and you have a

5   description of the case.  Doing a quick review here.  Most

6   of them, not all, most of them either say use of force or

7   use of deadly force.  If the case does not, for instance,

8   there is one that says State of Florida v. John Robert

9   Forgette.  And it just says, police practices and

10  procedures.  It's on page 15.  If there is no reference to

11  use of force in the description section, am I okay to

12  assume that those cases did not involve some aspect of the

13  use of force?

14       A.   Yes.  Correct.

15       Q.   Any other incident where it says use of force or

16  use of deadly force, some aspect of an opinion you

17  provided touched upon either the use of force or deadly

18  force by a law enforcement officer in the context of a

19  civil case or the use of force or deadly force by a

20  criminal defendant in a criminal case?

21       A.   Correct.

22       Q.   If we look at the timing, like, when it lists --

23  and I'm making the assumption.  You tell me if I am wrong.

24  Like, if it says on the top of page 14, for instance,

25  State of West Virginia v. Micah LeMaster November of 2016,

```
 1   is the November of 2016 that is in parenthesis when you

 2   would have testified at trial?

 3        A.   Yes.

 4        Q.   So if one references a deposition, the month and

 5   the year would be when you actually gave the deposition?

 6        A.   Yes.

 7        Q.   So if we look at the dates that are listed we

 8   would be able to figure out what business you had at the

 9   time you were doing that expert witness work and provided

10   that testimony?  Whether it was Dennis Root & Associates

11   or Professional Investigations Training Council or the

12   like?

13        A.   Yes.

14        Q.   Now, you just provided this as being updated

15   September the 11th, which was last week.  So is it safe to

16   say that last time that you have given any deposition

17   testimony was in January of this year?  Since that is the

18   last occasion listed on your CV?

19        A.   Yes.

20        Q.   Now, you were deposed.  And that's a criminal

21   case, State of Florida v. Abraham Dejesus Canaan?

22        A.   Yes.

23        Q.   The attorney, Mark O'Mara, is that the same

24   attorney that represented Mr. Zimmerman?

25        A.   It is.
```

*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*                                                    Page 66

```
 1        Q.   This says, "use of deadly force by law
 2   enforcement," so is the criminal defendant a law
 3   enforcement officer?
 4        A.   No.  He was shot by law enforcement.
 5        Q.   Okay.  So what is the criminal defendant charged
 6   with?
 7        A.   I believe he was charged with, maybe aggravated
 8   assault.  I don't recall the exact charge for him.  He had
 9   mental health issues.  I don't recall exactly what they
10   charged him with.
11        Q.   I'm just trying to figure out if you were
12   retained by Mr. O'Mara on behalf of the criminal
13   defendant.  Are you giving an opinion about the use of
14   deadly force by law enforcement officer?
15        A.   That was in the case, yes.
16        Q.   Is that what you were retained for?
17        A.   Yes.
18        Q.   What opinion did you have, or what opinions did
19   you give in that case?
20        A.   I couldn't tell you for certain.  I don't recall
21   off the top of my head.  It was a very unique experience.
22        Q.   Was the law enforcement officer who used deadly
23   force charged at all?
24        A.   No.
25        Q.   Was the use of deadly force by law enforcement
```

```
 1    officer involved in an incident involving that criminal

 2    defendant?

 3         A.   Yes.

 4         Q.   Okay.  Do you have any other depositions

 5    currently scheduled in any other case?

 6         A.   No.

 7         Q.   Do you have any upcoming trial testimony that

 8    you know when the date is supposed to be?

 9         A.   There is one in December.

10         Q.   Where is that located?

11         A.   That one is in Florida.  I think that one is

12    Palm Beach County, Florida.

13         Q.   Is that a civil or criminal case?

14         A.   That is a criminal case involving a retired

15    police officer.

16         Q.   Is the defendant a retired police officer?

17         A.   Yes.

18         Q.   You were retained on behalf of the criminal

19    defendant?

20         A.   Yes.

21         Q.   Any other trial testimony that you are aware of

22    that is scheduled?

23         A.   One is scheduled again for March.  But this is

24    the third time that they have changed the scheduled date.

25    So March of next year.  I think either February or March
```

1  was the last e-mail that I got from them.  I don't think

2  that they know when it is going.  So at this stage that's

3  it.  That one, like I said, that's like the third time,

4  oh, we are going to put it here and there is always

5  something that happens.

6        Q.   Is that a civil or criminal case?

7        A.   I believe that one is a criminal case as well.

8        Q.   Do you know where it is pending?

9        A.   I think it was Indian River County, Florida.

10       Q.   Florida, okay.  Are you able to look at your

11  case list and tell me, I guess maybe, the deposition that

12  we just talked about that you had in January of 2019, it

13  says, "use of deadly force by law enforcement."  Are we

14  able to look and see, for instance, if it's a civil case

15  and the defendant in the case is some law enforcement

16  agency, is it safe for me to assume if it says use of

17  force or use of deadly force, that your opinion involved

18  use of force by a law enforcement agency?  Does that make

19  sense?

20       A.   Yes.

21       Q.   I'm just trying to short circuit going through

22  some of the cases on your case list.  So if it's a civil

23  case, would most of the occasions since you were retained

24  by the plaintiff, most of the civil cases you've been

25  retained in, safe to say you've been retained as an expert

1   against law enforcement?

2        A.    Sadly, yes.

3        Q.    The Jordan v. Ohio Department of Public Safety,

4   it says, "use of force law enforcement."  So if you have

5   that description, I can look through the CV and figure out

6   which case involved law enforcement and use of force or

7   use of deadly force?

8        A.    Yes.

9        Q.    You've been involved in some aspect of law

10  enforcement, you said, for 27 years; right?  Give or take.

11       A.    Yes.

12       Q.    Do you have any idea, Mr. Root, about how may

13  law enforcement officers are killed in the line of duty

14  every year by the use of a weapon?

15       A.    The most current statistic?

16       Q.    Yeah.

17       A.    I couldn't give you the exact number right now.

18  I do know it's in the hundreds that are killed each year.

19  As far as weapon designations, open hands, things like

20  that, that's broken down through the FBI's codes.

21       Q.    You said you had maybe three to four current

22  active cases.  Is that safe to say that its other than

23  this one or does that include this one?

24       A.    That includes this one.

25       Q.    So we've got the one that is set for trial in

1    December.  The one that's set for trial in February or

2    March, whenever it goes.  This one.  Is there another one

3    that is active?

4        A.   Potentially that Arizona case.  I don't know if

5    I'm actually on that case or not.  Dealing with the state

6    it's not like a normal case where there is a retainer up

7    front.  There is a lot of things to go through when

8    dealing with the states.

9        Q.   Obviously the one that you were just contacted

10   about more recently by Attorney Rich Weston in West

11   Virginia?

12       A.   Yes.

13       Q.   So the two that are set for trial involve

14   criminal defendants?

15       A.   Yes.

16       Q.   This one is a civil case?

17       A.   Correct.

18       Q.   The one in Arizona was, do you recall civil or

19   criminal?

20       A.   I don't.  No, I don't want to misspeak myself.

21   I'm not really sure.  I think, well no, it's a criminal

22   case.

23       Q.   So of those four we've got one officer involved

24   shooting from a civil case perspective, this case?

25       A.   For a civil case, yes.

1       Q.   The one that you were contacted about by

2    attorney Weston in West Virginia, you said you thought it

3    was also involving the Huntington Police Department.  Does

4    that involve an officer involved shooting?  Do you know

5    the details yet?

6       A.   I couldn't tell you the specifics on everything,

7    the weapons and things yet.

8       Q.   Do know, was there some kind of alleged use of

9    force?  Do you have that basic information?

10      A.   Yes.  I wouldn't be in the case if it wasn't for

11   an application of force.

12      Q.   Was it deadly force?  Or you don't know yet,

13   okay.

14      A.   I know there was somebody injured and

15   everything.  You know, we've had our brief conversation

16   about it.  I am still waiting to get information.

17      Q.   Do you know, in that case, has a lawsuit

18   actually been filed yet or do you know?

19      A.   I have no idea.

20      Q.   Have you ever, in a civil case, so I'm talking

21   specifically about a civil case, have you ever provided an

22   opinion in any civil case that a police officer was

23   justified in the use of deadly force?  For instance in

24   shooting a suspect?

25      A.   I don't think I've gotten a case like that yet.

1   Well, you said a civil case; right?

2        Q.   Yes, a civil case.

3        A.   Not the grand juries and things like that.

4        Q.   Yeah, a civil case.

5        A.   I think there was a case filed.  But I don't

6   know.  I believe there was a case.  You asked if the case

7   had already been filed for Mr. Weston's.

8        Q.   Yeah.

9        A.   I believe that it was, but I am not a hundred

10  percent.

11       Q.   So kind of going back to that question that I

12  just asked you.  Just to kind of follow up on the

13  distinction.  While you were still in law enforcement you

14  testified at grand juries where there was an investigation

15  into an officer involved shooting; right?

16       A.   Correct.

17       Q.   In those occasions you were testifying or

18  offering testimony in your capacity as a law enforcement

19  officer not a retained expert, so to speak?

20       A.   No.  I was offering it as an expert in the use

21  of force by law enforcement.

22       Q.   Was that while you were with Dennis Root &

23  Associates or were you still with law enforcement?

24       A.   I was still with law enforcement.  They make a

25  very big distinction when you testify how you are going to

 1   be presenting the information.

 2       Q.   Fair enough.   The question that I'm asking is in

 3   those cases you did not have an outside business that you

 4   were providing the testimony through?

 5       A.   Correct.   I volunteered my time.

 6       Q.   So you were not, aside from getting your regular

 7   pay from whatever law enforcement office you were working

 8   for at the time, you were not compensated for any

 9   testimony that you gave in those grand jury proceedings?

10       A.   I was paid by the sheriff's office.

11       Q.   Paid but not like in an expert witness case;

12   right?

13       A.   No.   They didn't pay the rates that expert

14   witnesses get.

15       Q.   When is the last time, I mean, is it listed on

16   here that the last time you would have testified before a

17   grand jury as well?

18       A.   Yes.   All of them are on there.

19       Q.   So all of your grand jury testimony is also

20   listed on there?

21       A.   Yes.

22       Q.   Would you agree with me, Mr. Root, that part of

23   their job duties as a law enforcement officer requires law

24   enforcement officers to be involved in tense and dangerous

25   situations?

```
 1        A.    Yes.

 2        Q.    Have you, as far as you know, ever been

 3   disqualified by any court from giving any opinion that you

 4   had offered in a case?

 5        A.    Does that mean excluded?

 6        Q.    Yes.

 7        A.    Yes.

 8        Q.    Are you able to give me any detail or provide

 9   details?  Was it more than one case, one case?

10        A.    It was in West Virginia.  I'm trying to remember

11   the name.  It was a criminal case.

12        Q.    Is it one of the ones that would be listed on

13   here?  We have two criminal cases.

14        A.    No.  I don't think this was on here because it

15   went -- the state attorney made no effort to interview me

16   until a Daubert hearing.

17        Q.    Did you actually testify at a Daubert hearing in

18   West Virginia?

19        A.    Yes.

20        Q.    Do you know who the attorney was who had

21   retained you?

22        A.    Oh, my goodness.  Ashley Lockwood, I think.

23        Q.    Do you recall any details about the case?

24        A.    Oh, yes.  Expensive.

25        Q.    It was a criminal case?
```

1          A.    Yes.

2          Q.    Tell me what it was about.

3          A.    Mr. Hughes was charged with murder because he

4    was involved in a shooting in which he was attacked in a

5    home and he used a firearm to defend himself.

6          Q.    And as a result of him using the firearm to

7    defend himself was somebody killed?

8          A.    Oh, yes.

9          Q.    So you were retained by who you believe was

10   Ashley Lockwood on behalf of the criminal defendant?

11         A.    Yes.

12         Q.    I think what you were kind of indicating to me

13   is, like we are doing here taking your deposition, the

14   prosecuting attorney in that criminal case never asked to

15   take your deposition at any point and time prior to having

16   you testify at a Daubert hearing?

17         A.    That is correct.

18         Q.    Do you know where the case was pending?  And by

19   that I mean in state or federal court?

20         A.    It was -- I'm not familiar with the geography of

21   West Virginia.  But Orville Cobb's case was -- I testified

22   in that matter four days, I think.  Several days before.

23   Or two days before the Daubert hearing on the other side

24   of the state.

25         Q.    You mean on the other side of the state.  Like,

1  how far did you have to drive?

2      A.   Hours to get there.  It's hard to -- driving to

3  the mountains that could be just ten feet.  I don't really

4  know.  It was past -- I was on one side of Huntington.  I

5  remember driving through Huntington.  Then the next time I

6  was well past Huntington heading the opposite direction.

7      Q.   As a result of you providing testimony at that

8  Daubert hearing, did the court preclude you from

9  testifying?

10     A.   That's my understanding.

11     Q.   Were you given any explanation as to what the

12 basis of the court ruling was precluding you from giving

13 your testimony?

14     A.   The summations I got from the attorneys

15 involved, because it was Ashley Lockwood and there was

16 another attorney, I can't think of his name, the judge

17 didn't see how I had anything to offer to any body.

18 Incredible because the state actually told me that they

19 reinvestigated the entire case because of my report.  But

20 apparently the court felt differently.

21     Q.   Were you ever provided a copy of any order that

22 was entered by the court?

23     A.   I was not.

24     Q.   Other than that occasion where you testified at

25 a Daubert hearing in West Virginia, have you ever provided

1   any other testimony at any other Daubert hearings?

2        A.   Oh, yes.

3        Q.   Where, generally?

4        A.   Most of it was in Florida.

5        Q.   Were those --

6        A.   As a matter of fact I think that's the only

7   other state where I have been in Daubert hearings.

8        Q.   Do you recall those occasions where you

9   testified at Daubert hearings in Florida, were they civil,

10  were they criminal, combination of both?

11       A.   I know one was criminal.  I know for a fact one

12  was criminal.

13       Q.   Okay.

14       A.   I don't know.  Maybe they are all criminal I

15  would think.  Because I don't think there was a civil case

16  down there that I can think of.

17       Q.   The occasions where you testified at Daubert

18  hearings in Florida, assuming your recollection is correct

19  that they may have been criminal cases, were you precluded

20  by the courts in any of those cases from giving testimony?

21       A.   At a Daubert hearing?

22       Q.   Yes.

23       A.   No.

24       Q.   Well, as a result of the Daubert hearing?

25       A.   No.

1      Q.   As a result of the Daubert hearing you were not

2    precluded from giving testimony at the trial?

3      A.   No.  Correct.

4      Q.   Aside from actually having to testify at a

5    Daubert hearing, are you aware of any of these cases that

6    are on your list where you have been the subject of a

7    Daubert motion where the opposing counsel has filed a

8    motion challenging your qualifications or your ability to

9    provide testimony?

10      A.   I am trying to think.  There was a recent case

11    in Florida where -- but it wasn't a Daubert hearing, it

12    was a stand your ground hearing.  I guess they call them

13    their immunity hearings.  But they call them a stand your

14    ground hearing.  It was just before the judge and the

15    attorney was trying to present me.  It was a last minute

16    retention.  I didn't have any opinions on the activities

17    of the defendant in the case.  It is not what he had asked

18    me to review.  The state challenged that and the judge

19    basically said, I don't need him for me to better

20    understand how to read the case.  So he didn't have me

21    testify at that hearing.  But it has not gone beyond

22    anything like that as far as trial or depo because I don't

23    have any opinions for their client.

24      Outside of that, the Daubert hearings in Florida that I

25    have been through I have testified at trial following.

1    Q.   Are you aware of, in any civil case where you

2    have been retained as an expert, at least on the list that

3    we have, you were retained on behalf of the plaintiff

4    suing some law enforcement agency, are you aware in any of

5    those cases whether you were the subject of any Daubert

6    motion?

7    A.   No.

8    Q.   And again, no you are not aware --

9    A.   Oh, I'm sorry.

10   Q.   It's the way I asked the question.

11   A.   No, I'm not aware of anything like that.

12   Q.   Based on your experience in doing the expert

13   witness work, if there is a challenge like that do the

14   attorneys usually let you know if there has been some kind

15   of issue raised?

16   A.   Yes.  As a matter of fact, now it's a part of my

17   actual service agreement that they have to tell me.  But

18   prior to -- if there has been a challenge, they've always

19   gotten me because they want to discuss whatever the

20   challenge might be.

21   Q.   How they can kind of rebut the challenge.

22   A.   Right.  If there is anything.

23   Q.   So based on that, you are not aware of any

24   situation in any of the civil cases where the opposing

25   counsel has challenged your ability to testify in the form

1   of a Daubert motion?

2        A.    Correct.

3        Q.    Have you ever been, maybe, permitted to testify

4   at trial but the court has limited the opinions that you

5   intended to give in any manner?

6        A.    Yes.

7        Q.    More than one occasion under that circumstance?

8        A.    I know of -- I can think of one immediately

9   right off the top of my head.

10       Q.    Tell me about that.

11       A.    George Zimmerman case.

12       Q.    How were you limited by the court?

13       A.    Well, I can tell you, that was the very first

14  time I had done anything like that.  So one of my opinions

15  was actually that his actions were objectively reasonable.

16  Well, that and the province of a jury, so that obviously

17  got excluded.  Others were regarding Mr. Zimmerman's

18  training and things.  And the court excluded a lot.  I

19  mean, just about everything.  But I was allowed to testify

20  into training requirements and considerations of force

21  concepts and things like that to help the jury better

22  understand what's involved in the use of force.

23       Q.    Is there any other occasion you could think of

24  like that where you have been permitted to give testimony

25  but the court has limited the nature of the opinions you

1   would give or anything like that?

2        A.    Not that I'm aware of, no.  That one just stood

3   out because it was a very big learning experience.

4                    MR. EDWARDS:  Can we take a short break.

5                    MRS. DURST:  Absolutely.

6                     (Off the record)(11:19 a.m.)

7                     (Back on the record)(11:27 a.m.)

8   BY MRS. DURST:

9        A.    I thought of something.  I think earlier you

10  asked me if I ever had a matter in which I didn't testify

11  by deposition or at trial where, I don't remember the

12  exact wording, but it was justified.  It wasn't a shooting

13  but it was a law enforcement use of force.  I was hired by

14  an attorney to evaluate an officer's use of force.  Never

15  went to deposition or trial because the outcome of it was,

16  I didn't find where the officer had done anything wrong.

17  If fact, it was quite to the contrary.  There was so much

18  more he could have done but didn't.  The name has escaped

19  me, but if you need it I can look it up.  I mean, it's

20  just I was retained and basically the end result was, you

21  tell the attorney it's not going to work that way.

22       Q.    Do you know, was a lawsuit actually filed or

23  were you just being consulted kind of like the claim

24  investigation stage?

25       A.    A law suite was actually filed because he became

 1  very angry with me that -- I have a protocol that I go

 2  through with an interview before I ever take a case.  It's

 3  very in depth.  The information provided after the

 4  interview and discussion was completely contrary to what

 5  was presented during our conversation.  And then he wanted

 6  to be angry with me because he had to have somebody in

 7  court.  Well, that's not my problem.  But I believe it was

 8  filed.

 9       Q.   Was that a civil case?

10       A.   No.  I know it was a civil case because it was

11  not a criminal case.

12       Q.   Do you know where that case was?

13       A.   It was in Florida.

14       Q.   Okay.

15       A.   I don't know where in Florida because it was, if

16  I remember right, it was a fish and wildlife officer.  So

17  it could have been anywhere from Tallahassee down to

18  Miami.

19       Q.   Do you know, did the attorney specifically

20  identify you as an expert in any court filings?

21       A.   Given his level of irritation, it's possible.

22  But it's also possible he identified me before he ever

23  retained me.  That part I don't know.  But I can try to

24  find the name and look through my old case files.

25       Q.   Do you keep a list, I mean, obviously you keep

1  the list where you've testified, either in grand jury,

2  deposition or trial, do you keep a list of cases that

3  you've had over the years where you have been retained

4  whether you provide testimony or not?

5       A.   No.

6       Q.   Has any attorney that has ever retained you made

7  you aware that there was any opinion published by any

8  court, whether it's a state court or, you know, a federal

9  district court or anything like that, that called into

10 question any opinions that you had given in a case?

11      A.   No.

12      Q.   Are you aware of any case that has been

13 published by any court that has addressed your opinions?

14      A.   No.

15      Q.   Have you ever testified as an expert either in

16 trial or deposition on felony traffic stops?

17      A.   No.

18      Q.   With regard to your expert witness work, my

19 understanding is, you are compensated hourly at $250 an

20 hour; is that right?

21      A.   Correct.

22      Q.   Is that for any and all work performed in the

23 case?

24      A.   Yes.

25      Q.   Is there a different rate for trial testimony,

1   or is it still $250 an hour?

2        A.   $250 an hour.

3        Q.   With regard to expenses.  It says your, I think

4   maybe the fee schedule or something says, "the cases that

5   require over night travel are billed at a flat rate.

6   Travel fee of a thousand per day."  So is that just for

7   travel and then if you are doing work, you are still

8   billing at $250 an hour?  Does that question make sense?

9        A.   It does.  It's a travel fee, period.

10       Q.   It doesn't matter how many hours it takes you to

11   get --

12       A.   Correct.

13       Q.   If it's over night travel it's a $1,000?

14       A.   Correct.

15       Q.   If it's like us trying to get back from

16   Jacksonville the other day and your flight is delayed and

17   it's longer, you may lose time.  But if it takes three

18   hours you may actually get a little bit more otherwise?

19       A.   Correct.  When I came back from Miami and I

20   spent all day in the airport it was still the same fee.

21       Q.   Airfare and hotel expenses are separate than the

22   over night travel $1,000?

23       A.   Correct.

24       Q.   If the case that we are here about today

25   actually proceeds to trial and I believe it's also

1   scheduled the first part of March of next year, do you

2   know, do you plan to appear in person at trial?

3        A.   Yes.

4        Q.   Now, I understand you are not really doing --

5   well, you are still doing some training, aren't you?

6        A.   Yes.

7        Q.   Are you able to tell me, you kind of gave me an

8   estimate of the 20 to 25 for expert witness work, what is,

9   like, the percentage of your income now for expert witness

10  work versus training work?  Just on a percentage basis.

11       A.   Just the individual training work?

12       Q.   Yeah.

13       A.   Well, this year with the training that I've

14  done, maybe 40 percent expert.  Because I am actually

15  building an online training course program.  I have taken

16  the last few months off of adding anything to my plate if

17  possible and just building online trainings.  So the

18  training has diminished until it picks back up once I

19  launch the online stuff.

20       Q.   So it's now about maybe 60 training, 40 expert

21  witness work?

22       A.   Yes.  Maybe 55/54.

23       Q.   I understand it can fluctuate depending on

24  whether you are contacted by an attorney to serve as an

25  expert in a case; right?

1    A.    Yes.

2    Q.    You told me that you receive an actual pay check

3  from Professional Investigations Training Council?

4    A.    No.

5    Q.    That was when you were with Dennis Root &

6  Associates?

7    A.    Correct.

8    Q.    Do you receive any kind of, or do you take any

9  kind of bonus out of the Professional Investigations

10  Training Council?

11    A.    No.  It's brand new.  Everything stays in it.

12  Especially with the cost of building something online

13  today.

14    Q.    I had asked you previously when, I think when I

15  was asking you about Rich Weston the attorney in West

16  Virginia, if you knew how he had contacted you.  And I had

17  asked about advertising.  Do you advertise your services

18  as an expert witness in any capacity what so ever?

19    A.    No.

20    Q.    Have you, in the past, advertised your services?

21    A.    I have had a profile on Experts.com and ALM, I

22  think is the name of the periodical that was published.

23  Back when I had Dennis Root & Associates.  Before I

24  retired from full-time duties.

25    Q.    So, pre professional Investigations Training

1   Council?

2       A.   Yes.  The only other things that I have -- well,

3   I don't pay for it or anything, but I have a profile in

4   LinkedIn.  I don't consider it advertising.  Actually I

5   probably don't do anything on there anymore.  But that is

6   it.  I don't do anything other than word of mouth.  If

7   somebody calls me and I evaluate it case by case.

8       Q.   Do you have any kind of other social media site

9   for your business, like a Facebook page or anything?

10      A.   Oh, yes.  Forest Concepts Training Council has a

11  Facebook page and website.

12      Q.   Do you administer that?

13      A.   Yes.  I am the man that wears all the hats.  I

14  also have a social media page called the PI Answer Man.

15      Q.   What social media platform is that through?

16      A.   Facebook.

17      Q.   Is that something, the PI Answer Man, where

18  someone can go on and ask you a question and you will

19  respond?

20      A.   Yes.  It's a free resource for investigators

21  nation wide.  If I try to share information about

22  professional investigations.  I got blessed with success

23  as a business owner and I just try to pay it forward to

24  give advice or information to people educationally about,

25  if you are thinking about it, here are things to consider.

1      Q.    Does your business have a Twitter account?

2      A.    I know I have a Twitter account.  And I think

3   the PI Answer Man does.  I probably shouldn't because I

4   don't think I put much out there because I still don't

5   understand reducing something into a hundred and forty

6   characters.  I can barely get my own -- out of my house

7   without saying it in four hundred words.

8      Q.    Yeah.  I gotcha.

9     Do you know specifically in this case, Mr. Root, how

10  the attorneys representing the Estate of Philip Rhoades

11  located you?

12     A.    I don't.

13     Q.    Have you ever provided any kind of presentation

14  to a group of attorneys?

15     A.    Oh, yes.

16     Q.    What kinds of presentations have you provided to

17  attorneys?

18     A.    I have provided force investigation information.

19  I have provided -- I have done presentations on the

20  decision making process.

21     Q.    What do you mean by the decision making?

22  Decision making in what context?

23     A.    In applications of force.

24     Q.    Okay.

25     A.    The whole picture, if you will, of the decision

1  making process.  Not simply A equals B, but all the

2  variables that go into it.

3     Also, how a force investigation differs from a run of

4  the mill everyday investigation.  And the techniques that

5  should be considered when conducting a force -- well, what

6  variables that should be considered in a force

7  investigation.  I know I have done weapon systems.

8  Explaining especially the conducted electrical weapons,

9  the TASER weapons.  I've done that.

10     Q.   Are these presentations designed or focused on

11  attorney groups or are these presentations that attorneys

12  can attend but are limited to attorney attendance?

13     A.   No, I am speaking specifically to where I have

14  done this.  The only people in the audience are attorneys.

15     Q.   Where have you made those presentations?

16     A.   Across different places in Florida.  I've also

17  presented with national associations, like, there is a

18  professional investigations for defense investigators and

19  they have attorneys that come to those conferences.  And

20  then, obviously, it's through working with bar

21  associations and the circuits of the state attorney's

22  office and the public defender's office.

23     Q.   The presentations, other than you said maybe

24  some national associations, like, presentation for defense

25  investors where attorneys can also attend, have your

 1   presentations primarily been focused at some place in the

 2   state of Florida?

 3        A.   Since that was my home up until last year, that

 4   is pretty much where I focused all my energy.

 5        Q.   Are you aware or do you recall giving any

 6   presentations to any West Virginia attorneys?

 7        A.   Not specifically to an association or group

 8   specifically from West Virginia, no.

 9        Q.   Have you ever taken any kind of class regarding

10   testifying as a witness?

11        A.   Oh, yes.

12        Q.   What kind of classes did you take?  Were these

13   classes, for instance, while you were within law

14   enforcement or have you taken classes that provide

15   guidance to you in how to testify as an expert, a retained

16   expert?

17        A.   It wasn't while in law enforcement.  One course

18   was a program that was presented called Testifying Made

19   Simple.  And then I attended training through -- I'm

20   trying to think of the name of the organization.  They

21   specialize in trainings for expert witnesses providing

22   explanations for federal rules.  What needs to be included

23   in a report and so on and so forth.  And also a

24   presentation --

25        Q.   Where did you do that?  Where it was kind of

1   focused on the federal rules and expert witness?

2       A.   Well, the program was held on the west coast of

3   Florida on a really nice resort.  Which, apparently that

4   is where they go for all those things.

5     I am trying to think of the organization.  They put

6   programs on across the entire country.  But it is, this is

7   going to sound egotistical and I don't mean it to.  But

8   once you hit a certain educational plateau you have to

9   find resources to expand your understandings.  In the

10  expert realm there is not a lot of organizations that

11  focus on expanding the understanding of the expert.  And I

12  will be darn if I can not think of the name of this.  You

13  know, as soon as this is all over I am going to think of

14  it.

15      Q.   Well, maybe it will be like when we take a break

16  or something it will come to you like the other piece of

17  information.

18    The Testifying Made Simple, where was that?

19      A.   That was at a conference I was taking.  I don't

20  recall where it was but it was a very nice lady.  She was

21  a former prosecutor.  She had a full one day class on

22  testimony.  It was also deposition preparation, so on and

23  so forth.  SEAK.

24                  (Court reporter jumped)

25                  THE WITNESS:  I'm sorry.

1          THE REPORTER:  That's okay.

2     A.   S-E-A-K that's the name of the organization.  My

3   brain found it.  That is the organization that provides

4   the training and expert stuff.

5               THE WITNESS:  Sorry.  I get excited when I

6   remember something.  That's sad.

7               MRS. DURST:  I felt like a shooted {sic}

8   squirrel.

9   BY MRS. DURST:

10     Q.   The testifying made simple, was that a one day

11   conference you attended in Florida also?

12     A.   No.  That was a one -- yes, it was a conference

13   over a long period.  You get to pick, I don't remember if

14   it was in Florida, but it was one of those conferences

15   where you have different speakers on different days and

16   they have them in kind of break out kind of sessions.  And

17   I just remember that one because it intrigued me.

18     Q.   You have an associates degree from Indian River

19   Community College in Criminal Justice?

20     A.   Indian River State College, yes.

21     Q.   Indian River, okay.  What did I say?

22     A.   Community college.

23     Q.   So I left out the River.  So it's Indian River

24   Community College?

25     A.   No.  Indian River State College.

*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*                                    Page 93

1      Q.    State college.  I don't know where I got the
2   community from.

3      Q.    When did you obtain that degree?

4      A.    A long time ago.

5      Q.    Well, lets -- was it while you were working at
6   one of the law enforcement agencies?

7      A.    Oh, yes.  Yes.  Yes.

8      Q.    Was it while you were with Martin County?

9      A.    Yes.

10     Q.    Would it have been, like, shortly before you
11  retired or would it have been earlier in your --

12     A.    No.  Earlier in my career.

13     Q.    So probably early 2000, somewhere around in
14  there?

15     A.    Sure.

16     Q.    Do you have any other degrees from any
17  educational institution like a college, junior college, or
18  anything like that?

19     A.    Not other than Indian State College.

20     Q.    Then on your CV you actually also served as an
21  instructor through Indian River State College for a period
22  of time?

23     A.    Oh, yes.

24     Q.    Why did you cease doing that?

25     A.    I wanted to have a life.  That was in addition

```
1   to all my law enforcement work.  It was go to work at the
2   sheriff's office and then teach at the academy.  So it was
3   very long.  And after doing something for so long you
4   just, you want to have something different.  And there
5   were other people that I groomed and, you know, you got to
6   step off the top of the mountain sometimes and let
7   somebody else take it even higher than you did.
8       Q.   I said Indian River State College, is that when
9   you were at Indian River Criminal Justice Institute from
10  2000 to 2008?  Are we talking about the same thing?
11      A.   Yes.  The Indian River State College is the
12  college.  The Criminal Justice Institute is the academy
13  portion that runs both corrections and law enforcement for
14  the college.  So they are in the same entity but they are
15  different sections.
16      Q.   You did that for seven to eight years?
17      A.   Oh, yes.
18      Q.   Have you attended any specialized law
19  enforcement training like the FBI National Academy?
20      A.   I have attended the -- I haven't gone to the
21  national academy because you have to be in the
22  administration and have it signed off by an administrator
23  to do that.  I have attended the Southern Police
24  Institute's Career Training and I also attended the
25  Leadership for Law Enforcement Organization through the
```

1    International Association of Chief of Police.  And that

2    was all after law enforcement.  On my own time.

3         Q.   So after 2011?

4         A.   Yes.

5         Q.   Now, we looked at a number of the cases where

6    you've testified and some of them were police practices,

7    use of force, that kind of thing.  Is it safe to say you

8    were not an expert in the trajectory analysis of a bullet?

9         A.   That is safe to say.

10        Q.   Is it safe to say you are not capable of

11   calculating the angle of impact of a bullet?

12        A.   That would be safe to say also.

13        Q.   Are you able to calculate the path of a bullet?

14        A.   With the proper equipment, yes.

15        Q.   But you would not hold yourself out to be an

16   expert in that field?

17        A.   No.

18        Q.   Do you consider yourself to be a ballistics

19   expert?

20        A.   No.

21        Q.   Do you consider yourself to be an expert in the

22   field of shooting scene reconstruction?

23        A.   No.

24        Q.   Do you consider yourself to be an accident

25   reconstruction expert?

1        A.    No.

2        Q.    Do you consider yourself to be an expert on

3    guns?

4        A.    That's a pretty broad question.

5        Q.    Or did you focus your expertise more on various

6    fighting tactics?  Does that make sense?

7        A.    It does.  I guess my hang up is, I always have a

8    hang up whenever I refer myself as an expert on anything.

9    But the reality is, my education, background and

10   experience would probably qualify me for an expert in

11   firearms because I've been to three different -- two

12   different armorer certifications.  I've got four different

13   firearms instructor certifications on the functioning and

14   application of firearms.  So if you ask if I'm an expert

15   in firearms, in what regard?  I'm not an expert on the

16   manufacture of a weapon, but I would consider myself an

17   expert on its application and the decision making process

18   and how that is associated to firearms.

19       Q.    Have you ever been retained as an expert in that

20   capacity?  Where you just said that you would consider

21   yourself to be an expert on the application of firearms.

22       A.    Which would be in the use of force from them.

23   So it would be -- my instructor -- well, I am sure we will

24   get to all my background training and experience.  But my

25   instructor certification the idea is weapon systems.  For

1   example, K9, I was a K9 officer and then I went and became

2   a K9 team instructor so I could better understand the

3   application of the weapon system.  Because a dog is a

4   weapon system.  So in regards to how a weapon is applied

5   during a force event I am very comfortable with my

6   credentials in that arena.  When you say an expert on

7   firearms, now we are going to have to start talking, what

8   aspect of firearms.

9       Q.   I think I understand your testimony.

10      Regarding your certifications, what current active

11   certifications do you have?

12      A.   What do you mean, certifications?

13      Q.   In your field of law enforcement.  Are you still

14   certified as a law enforcement officer?

15      A.   No.  No, ma'am.  My certification -- well, I

16   guess I should correct that.  My credential in Florida is

17   still valid, active.  If I went back down and took a

18   position with a police department my certificate, I do not

19   believe has expired yet.  Because it was just renewed.  It

20   might be coming up.  We might be entering into that realm.

21   But as far as persuing it and things like that, no, ma'am.

22      Q.   Do you have any other licenses currently other

23   than, like, a drivers license?

24      A.   Notary public.

25      Q.   Anything else?

1      A.   I think I'm coming up on the expiration of my
2   professional licensing from Florida.  Like, my
3   professional investigations license and things like that.
4   Because, again, I've closed all those doors.  I can't
5   think of any other.  Even my firearms instructor's license
6   I haven't sought it up here yet.  So I don't know when
7   that expires out of Florida.  You have to get licensed for
8   everything in Florida.  And there is a concealed weapons
9   permitting.  I think you have to have a state license for
10  being a firearms instructor.  Do all their training and
11  such.  I don't know if that is expired yet or is about to.
12  Outside of that I don't -- I can't think of any.
13     Q.   Are there any certifications that you've held in
14  the past that you no longer hold, for any reason?  Other
15  than you are not sure, you believe your credentials in
16  Florida may still be active, but it may be coming up to
17  the point to where if you don't do something they might no
18  longer be active; right.  Anything else like that you have
19  had in the past that lapsed for any reason?
20     A.   I know that I haven't renewed yet, my instructor
21  credential with TASER Weapons Systems.  Nor do I -- I am
22  not certain that I am going to.  Most other credentials,
23  depending on the entity that you get the certifications
24  from, if you are talking about instructor certification,
25  things like that, some of them there is no expiration.

1  It's based on going to the training, getting the

2  certification, passing the exams and qualifications and

3  moving forward.  But, for example, like with TASER weapons

4  I was a master instructor with TASER International and

5  they require renewals every three years.  I can't think of

6  any other credential that I had that's quote unquote

7  expired.

8       Q.   On your CV there are a couple of boards or

9  things that are listed.  Florida Board Certified

10  Investigator.  Are you still certified in Florida as a

11  Board Certified Investigator?

12       A.   That is yet to be determined.  When I sought the

13  credential and jumped through all the hoops and acquired

14  it I was a licensed professional investigator.  With

15  retiring I am no longer a licensed investigator in

16  Florida.  And the initial response from the accrediting

17  body was, well, if you are not going to be a licensed

18  investigator you can't have this.  I have filed an appeal

19  to ask them, okay, well, what do you do when you retire.

20  I don't, you know, cause the only thing that is listed

21  there is to maintain it you have to maintain educational

22  requirements.  I do that.  But I literally just got it

23  renewed this year before I, or this past year before I

24  moved.  So that one right there, like, on my current

25  updated you won't find that on there because it's in

1    limbo.  I am not certain as to whether it's going to be

2    there or not.

3        Q.   So if that was in the version that we had in May

4    of '19 it might not be on the most recent version?

5        A.   Correct.  I mean, I can look at that right quick

6    and see.

7        Q.   I think it was in the original CV that I had.

8    It was on page 6.

9        A.   Board certifications.

10       Q.   What page are you on?

11       A.   On page 5.

12       Q.   Okay.

13       A.   Yes.  I have removed that one now.

14       Q.   Are all of these --

15       A.   Oh, no, wait.  No, my mistake it is still there.

16   So I am going to update that.  That's -- even though I

17   have the credential and it's not expired I am not

18   comfortable with listing it without having the entity

19   verify that they are going to maintain it since I am no

20   longer licensed.  This particular one is the only one that

21   required that I maintain a state license as an

22   investigator even though their renewal requirements only

23   indicate you must maintain ethical standards and also

24   educational requirements to show that you are continuing

25   to be updated on the material.

1    The Board Certified Forensic Interviewer and the

2    Criminal Defense Investigator I still maintain those.  And

3    also the Board Accredited Investigators Designation.

4         Q.   Other than maybe the Florida Board Certified

5    Investigator that is in limbo, you still have all of these

6    other board certifications?

7         A.   Correct.  Yes, ma'am.

8         Q.   Is there anything that you have to do from a

9    continuing education type perspective to maintain each of

10   these certifications?

11        A.   Each of them have an educational requirement.

12   Some of them are 20 hours or 20 CEUs.  You know, they

13   differ.  And they have designated courses that they will

14   accept.  They can't just be, you know, I went to basket

15   weaving 101 and it qualifies.  You can get those a lot of

16   times through attending professional conferences and as

17   long as they offer credited CEUs they will accept them.

18        Q.   On page 5 under Board Certifications it has

19   licensure.  We talked about the license.  You still list

20   that you have a private investigation private

21   investigative agency license in the state of Florida.

22        A.   That will have to come off.

23        Q.   Okay.

24        A.   It's up to expiring.  I really thought I -- this

25   is the 9/11 one right.

1    Q.   Yeah, it says 9/11.

2    A.   I will have to make that adjustment on the CV.

3  Thank you for pointing that out.  I don't know how that is

4  still on there.

5    Q.   The Private Investigative Agency State of

6  Florida and the Private Investigator State of Florida,

7  both of those may no longer be active?

8    A.   Correct.  I did not renew those.

9    Q.   What about the firearms instructor?  You said

10  that one --

11    A.   I don't know when that one expires.  I have to

12  look at that one.  Because I am still trying to consider

13  whether or not I even what to because I am -- I'd rather

14  pursue one up here where I am versus maintaining a license

15  out of a state that I'm no longer at.

16    Q.   What is Security School Instructor for the State

17  of Florida?  What is that?

18    A.   Another license you have to get if you are going

19  to be providing training of any type to armed and unarmed

20  security professionals in the state of Florida.  You have

21  to become licensed.  You have to do education.  You have

22  to have certain qualifications and certifications and then

23  you apply for licensure in the state.

24    Q.   Is that still an active license?

25    A.   I hope not.  It's coming up on expiration if it

1  is.  Because it is not my intent to renew any of my state

2  licensing in Florida.  So the fact that it's on my updated

3  CV is just an embarrassment.  So I apologize.

4       Q.  We talked a little bit about being on the

5  faculty of what I will call like a generic police academy.

6  That was while you were with the Indian River Criminal

7  Justice Institute?

8       A.  Yes.

9       Q.  When is the last time you served in that role?

10  Do you have the date on there as well for that?  Yeah.  So

11  2000 to 2008 do you know why did you leave that again?

12       A.  Well, as the lead -- I was the lead instructor

13  for both corrections and law enforcement for defensive

14  tactics.  In other words, I coordinated the programs.  I

15  scheduled the instructors.  I worked with administration

16  on the curriculum being presented.  The state gives us a

17  very large menu to choose from and then certain academies

18  may select, for example, one of the biggest techniques

19  removed from most academies was vascular restraints and

20  straps to the side of the neck.  When I became the lead

21  instructor we fought back because it is not a bad

22  technique, it is bad instruction.  So as the lead

23  instructor, the lead instructor for defensive tactics my

24  life was very packed.  I had obtained everything I could.

25  I had taken, the way I saw it, I had taken my role in the

```
 1  academy as far as I could.  And it was time to step down.
 2      Q.   At that same time did you have any of your
 3  consulting businesses?
 4      A.   Yes.
 5      Q.   Aside from the academy what consulting work were
 6  you doing at that time?
 7      A.   I don't remember if that was back -- I think
 8  Tactical Advantage Solutions is one that I had back then.
 9      Q.   While you were with the Indian River Criminal
10  Justice Institute was there ever any issue with you using
11  college resources or facilities for your consulting
12  business?
13      A.   No, that was Mr. Lawson, who was at the time the
14  director, he is not there anymore.  He made the allegation
15  falsely because of another administrator at the sheriff's
16  office that didn't like the fact that I was actually
17  having a successful side business.  The course that he
18  tried to make that issue about was approved through the
19  administrator of the academy and presented, at the
20  academy, marketed through the academy and had nothing to
21  do with me running my company through that.  That is a
22  bunch of crap that some political individual, because of
23  another connection, wanted to start.
24      Q.   Did anybody within the college or the academy
25  raise that with you as an issue?
```

1    A.   We had many a meeting on that.  It was brought

2    to my attention.  First it was Mr. Barry who said that

3    there was an issue and I said, no there's not.  We went

4    through all of the approval processes.  The gentleman who

5    was responsible for it, his name was Kevin Lapham,

6    L-A-P-H-A-M.  He coordinated and organized getting the

7    program there.  Everything was approved through him.  He

8    was the person under Mr. Lawson that was required to

9    organize and coordinate all of that stuff.  As a matter of

10   fact, this brings up a painful memory, so thank you for

11   reminding me.

12       Q.   You're welcome.

13       A.   Mr. Lawson, when I separated, it was actually

14   Lawson had told Mr. Barry that they weren't going to

15   schedule me because I was now not the lead instructor I

16   was the support instructor.  He said they were no longer

17   going to schedule me.  I asked him specifically, are you

18   terminating me and his answer immediately was, no, you are

19   not being terminated we are just not going to schedule you

20   for a while because of this issue.  I am like, there is no

21   issue I met with Mr. Lawson and had an exchange of words

22   with him in the privacy of his office.  That was the end

23   of the relationship with them.

24       Q.   Kind of going back to that, you told me you were

25   the lead instructor for Defensive Tactics and one of the

1  things I think I wrote down was you scheduled the various

2  instructors.  Did you also present as well or were you

3  just lining up the instructors?

4        A.   Oh, no, I presented and taught.

5        Q.   Have you served in any branch of the military?

6        A.   The army for a short period of time.

7        Q.   When did you serve in the army?

8        A.   1986.

9        Q.   Were you discharged?

10       A.   Medical.

11       Q.   What was, just generally, the reason?

12       A.   Flat feet.

13       Q.   Have you authored any peer review paper related

14  to any subject matter that's discussed in your report?

15       A.   No.

16       Q.   What about training materials?

17       A.   Have I authored training?

18       Q.   Authored training materials that are related

19  specifically to any subject matter that is discussed in

20  your report?

21       A.   Sure.

22       Q.   Are these training materials that you have

23  prepared for providing training to various groups and

24  organizations that maybe have retained your Tactical

25  Advantage business?

```
 1        A.    Not for law enforcement.

 2        Q.    I note in your report I think you reference the

 3   US Supreme Court's case in Graham v. Connor.

 4        A.    Graham v. Connor.

 5        Q.    Yes.  It starts off the first part of your

 6   opinion.  My question is, I don't see reference to any

 7   other kind of outside research for material.  So my

 8   question is, did you rely on any research, legal research,

 9   any articles or anything outside of the documents provided

10   to you by counsel to formulate your opinions?

11        A.    Well, the evaluation outside of my background

12   training experience, the decision in Graham v. Connor

13   obviously, Tennessee v. Garner, which I know you are

14   familiar with, Mr. Faulkner mentions in his report, those

15   are the ultimate variables associated with whether

16   something can be determined or deemed to be objectively

17   reasonable.  So those would be the guiding variables that

18   I would have used for forming that particular opinion,

19   which is number one.

20        Q.    Your report doesn't reference Tennessee v.

21   Garner.  Is there a reason it is not referenced in your

22   report?

23        A.    When I didn't reference that, because Tennessee

24   v. Garner is essentially the fleeing felon rule.  In this

25   particular matter I did not consider, based on testimony
```

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

Page 108

1  and documents provided, that Mr. Rhoades was a quote

2  unquote fleeing felon at the time of the use of force.  It

3  was alleged that he was actively involved in a force event

4  against the officer.  Against the deputies.  I felt that

5  the application of Graham v. Connor was more appropriate

6  given the situation and the circumstances.  Tennessee v.

7  Garner just talks about the circumstances surrounding when

8  an officer can justifiably use deadly force in the

9  performance of their duties.  And Graham v. Connor goes

10  much deeper and talks about the objective reasonableness

11  and establishes criteria that needs to be met and

12  considered when evaluating a force event.

13       Q.   So just to kind of make sure I understand.  You

14  didn't mention Tennessee v. Garner.  One of the reasons in

15  your report is, you did not believe at the time of the

16  application of the force that Mr. Rhoades was a fleeing

17  felon?

18       A.   I said I did not view him as that.  He,

19  depending on which statement you are looking at, they

20  either knew or didn't know it was Mr. Rhoades.  They

21  either knew or didn't know he had active warrants.  But in

22  reviewing, and I was asked to evaluate the use of force.

23  In reviewing their statements and the information provided

24  through the course of Mr. Branham's investigation, felt

25  that the Graham v. Connor decision was more appropriate to

Case 1:18-cv-00186-TSK   Document 65-17   Filed 11/18/19   Page 109 of 320   PageID #: 3376

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019                                        Page 109

1   cite.

2       Q.   So we've discussed Graham v. Connor and then

3   Tennessee v. Garner, my question is, was there any other

4   article or research paper by any other expert in the field

5   of use of force that you refer to or relied upon to

6   formulate any opinions in this case?

7       A.   Are we talking about just the first opinion?

8       Q.   No.  With regard to any of the opinions.  I want

9   to know, did you go out and look and do and read any

10  articles or publications from any treatise or anything

11  like that to formulate any of the opinions in the case?

12      A.   As a certified analysis through For Science I

13  utilized the information that I've gained through my

14  background training experience and the certification and

15  the trainings that I have received through For Science.

16  As the underlining references for forming opinions.  It's

17  applicable, I guess, you know, in learning as I go here

18  and after seeing Mr. Faulkner's report, perhaps I should

19  include every singe thing that I have ever read on a

20  particular issue or incident.  And in this particular

21  matter I have all of those behind me.  I do have the

22  certification behind me through For Science where it is a

23  part of my background training experience in evaluating

24  and assessing a force taking into consideration distances,

25  perceptual opportunities.  The process is the ability to

1  see so on and so forth.  And I applied all that

2  information to forming my opinions in this particular

3  matter.  I guess, I would just have to say that it would

4  be my failure not to include each one of those things that

5  are found applicable.

6       Q.   And you mentioned Mr. Faulkner's report.  He

7  does cite materials outside of materials in this cases;

8  right?

9       A.   Yes.

10      Q.   And so my question is, I think I understand what

11 you are saying, is you may have had training and had that

12 knowledge but you didn't actually go and pull any piece of

13 paper or any online source to assist you as you were

14 preparing your report?

15      A.   No.  I'm saying I did.  And I used the

16 materials.  Cause, like for example, the materials that

17 Mr. Faulkner said that he included with his report, even

18 the ones that he didn't include that he said he included,

19 I have the originals and I also have the updated studies.

20 So what I was saying about my failure is, I guess I could

21 have included each of those as I am reviewing and

22 considering what somebody could or could not see and

23 taking into consideration I am using that information in

24 the formulation of my opinion.  I guess I mistook that my

25 background training experience and having those

 1   certifications and being able to explain the concepts and

 2   the reference materials was enough.  I didn't realize that

 3   I needed to, and again, this is completely my fault,

 4   needed to include every one of the studies that may have

 5   influenced my ability.  It's kind of like building a

 6   house.  Once you know how to frame a wall and then you go

 7   on to stucco and things like that, you may not always

 8   remember to go back and tell how you remembered how to

 9   frame a wall.  You know how the wall was framed.

10        Q.   I guess my question is more specific.  If you

11   are building that wall did you look at plans to build that

12   wall as you were building the wall.  That is what I am

13   trying to find out.  I know you were trained on these

14   materials, but as you were preparing the report did you go

15   out, did you pull something, read it as you were preparing

16   your report but maybe not cite it in your report.  Does

17   that make sense?

18        A.   Yes.  That's what I was just trying to say that

19   I did.  And that's my failure if I didn't incorporate each

20   of the -- for example, that first opinion.  The

21   perspective of whether something is considered to be

22   objectively reasonable.  Given the facts and circumstances

23   surrounding the event based on the information provided

24   through the investigation.  Taking in all the training

25   that I've had and the resource and reference material that

1   I have at my immediate disposal.  I formed an opinion and

2   at the time I didn't see how, even though I had this at my

3   disposal and I understand it and I read it, I didn't

4   recognize I needed to now pull that out because my ability

5   to articulate and explain it I felt was what needed to be

6   done.  So I guess in the future, and I would be more than

7   happy to pull out the ones that I did consider and

8   anything that I have done and forward them.

9        Q.   That's going to be one of my questions is, what

10  resource or reference material did you rely upon to

11  formulate the opinion.  So if you can provide that

12  information.

13       A.   Are you speaking on opinion one?  Because I know

14  you identified opinion one.

15       Q.   All of the opinions.  Any opinion set forth in

16  the report that you authored in this case if there is any

17  resource or reference material that you reviewed or relied

18  upon to formulate those opinions, I would like to have

19  that information.

20       A.   No problem whatsoever.

21       Q.   Okay.

22       A.   It will take me -- I will have to look at the

23  opinions or as we go through them I will be able to

24  identify.

25       Q.   Have you discussed any topic that is set forth

1    in your report?  I believe you have an Apple Podcast?

2         A.   I do.

3         Q.   Have you discussed any of the topics set forth

4    in this report specifically on your Apple Podcast?

5         A.   No.  I don't address cases, unless they are

6    closed.

7         Q.   At some point did Dennis Root & Associates

8    subcontract out certain aspects of your expert witness

9    work?

10        A.   Yes.

11        Q.   Does Professional Training Investigations

12   Training Council subcontract any work out?

13        A.   No.

14        Q.   So did you consult with anyone to formulate any

15   of the opinions in this case?

16        A.   No.

17        Q.   Did anyone other than yourself have any

18   involvement in the review of any of the material?

19        A.   No.

20        Q.   When you had Dennis Root & Associates what kind

21   of expert witness work, or aspect of expert witness work

22   would be subcontracted out?

23        A.   Things that aren't in my wheelhouse.  For

24   example, somebody was looking for a fingerprint expert.  I

25   had a gentleman that I worked with, he worked with my

1   company that I would subcontract the work to him.  But

2   only very little actually happened because I got to the

3   point it just wasn't worth the headache of trying to

4   maintain all the files for work that I wasn't performing.

5        Q.   Did anyone have any assistance at all in

6   drafting the report for you?

7        A.   No.

8        Q.   Did you have any peer review of the report

9   before you provided it to counsel?

10       A.   Peer review.

11       Q.   Yeah.  Like another expert in your field --

12       A.   No.

13       Q.   -- do any review of the report?

14       A.   No.

15       Q.   Now, you were first contacted in this case,

16  well, it says date retained of July 13, of 2018.  And

17  later in the report it indicates that, I think it says

18  that is when the -- I don't want to misquote the language.

19  The professional service agreement was executed or

20  something to that effect.  Do you remember that?

21       A.   Yes.

22       Q.   On July 13th I signed fully executed agreement

23  for expert witness services.  And so just to be clear that

24  agreement for expert witness services would have been

25  signed at the time you still had Dennis Root & Associates:

1     A.    Correct.

2     Q.    So if you signed the agreement on July 13th,

3  when were you first contacted about the case?

4     A.    I don't know.  You are talking about the first

5  time they called me just to give me --

6     Q.    Yes.

7     A.    I have no idea.  Before the 13th.

8     Q.    Do you know, was it a significant period of time

9  before you actually signed the agreement?

10    A.    I don't know.

11    Q.    How were you contacted?

12    A.    By phone.

13    Q.    Do you recall who contacted you?

14    A.    I believe it was Bryan that contacted me.

15    Q.    Based on the case list that we've gone over and

16 your recollection of other cases in West Virginia, I

17 assume I know the answer to this question but I have to

18 ask, have you had any other cases with either Mr. Edwards

19 or Mr. Umina?

20    A.    No.

21    Q.    Do you have any other cases pending with either

22 of their firms?

23    A.    No.

24    Q.    When you were first contacted even though you

25 don't recall specifically when, do you recall what

1    information you were provided?

2          A.    No.

3          Q.    When you were first contacted, in between when

4    you were contacted whenever that was, and when you signed

5    the retainer agreement were you provided documentation to

6    review?

7          A.    Before I signed the agreement?

8          Q.    Yeah.   Between when you were contacted and when

9    you signed the agreement.

10         A.    I wouldn't have reviewed it.   So the answer

11   would be no.

12         Q.    Maybe I just misunderstood your answer or you

13   misunderstood my question.   You were contacted at some

14   point and then you signed the retainer agreement?

15         A.    Correct.

16         Q.    Between, in that time, did you receive any

17   information about the case?   Like documents anything like

18   that?

19         A.    No.   Without a retainer and the signed service

20   agreement, I don't perform services.

21         Q.    So other than information that would have been

22   provided to you over the telephone, that is all the

23   information you had when you agreed to serve as an expert?

24         A.    Yes.   And I think, thinking back, I think the

25   information that I had was, there was obviously a use of

1   force by law enforcement and that it was a shooting case.

2   I am certain they gave me an overview because I asked

3   questions about, well, how many people are involved.  You

4   know, what were the essential elements of the case.  But I

5   don't make records of them because one, they are times

6   when people don't call back once they hear that I am very

7   strict on how I do my cases.  And secondly, I have learned

8   now through experience that if you haven't retained me

9   there is nothing I can do for you.  But I make it very

10  clear to everybody that contacts me retaining me doesn't

11  mean you don't have an opinion that you like.

12       Q.   When you were contacted and then had the signed

13  retainer agreement, what specifically were you asked to

14  do?

15       A.   I was asked to review the application of force

16  in this particular matter and also to evaluate it and

17  determine from my perspective whether the actions of those

18  involved were appropriate.  And also relative to the

19  training associated with the application of force.

20       Q.   So you were asked to review, to take a look at

21  the application of force to determine if the actions were

22  appropriate and to review the training in relation to the

23  application of force?

24       A.   Yes.

25       Q.   Prior to the deposition this morning I know you

1  had an opportunity to meet with counsel.  Had you had any

2  consultations with them or conversations over the

3  telephone or in person to prepare for the deposition?

4       A.    We've spoken on the phone.  And we've

5  communicated via e-mail.  As far as preparing for the

6  deposition, I prepare for my depositions.  I don't know

7  what you mean as far as having them prepare me for

8  deposition?

9       Q.    Sit down and have a discussion over the types of

10  questions that you might be expected to be asked in the

11  deposition, anything like that?

12       A.    No.  I don't believe they explained any of that.

13  They were very complimentary about you.  I do recall that.

14       Q.    Don't try to suck up.

15       A.    Worth a shot.

16       Q.    Do you have a process that you go through when

17  you are being asked to give a deposition that you do to

18  prepare for a deposition?

19       A.    Yes.

20       Q.    What is that process?

21       A.    I review the documentation -- well, obviously I

22  review the documentation before I make my reports.  So

23  prior to the deposition I review my report.  I review key

24  elements of the investigation whether it be statements

25  made by witnesses or the officers or whoever.  And I just

1  do a review of my materials.  Because like I said, I

2  highlight stuff in here.  And then when I do my report

3  review if I can't recall who said it or whatever I will go

4  back to my documentation just to look it up and say where

5  did I get that.  Or if I find something that I now see as

6  -- for example, just recently I got Mr. Faulkner's report,

7  I had to scramble to get through stuff and to look at what

8  he had and then spend time trying to go back and look at,

9  wait a minute, because I honestly consider everything and

10  if he had presented something that, that makes sense and

11  made an adjustment, I would make sure that was reflected

12  in what I do.

13      Q.   And when you say, just recently received, that

14  was the supplemental report?

15      A.   Yes, ma'am.  Yes, ma'am.

16      Q.   I'm going to go ahead and mark a copy of your

17  report.  I don't want to mark the one that I have written

18  on.  And I am going to show you, Mr. Root, just to make

19  sure.  Take a look at that if you would.  We will mark

20  that as the next exhibit.  But make sure that I have what

21  is reflected as a complete copy of your report.

22      A.   Yes.

23      Q.   Okay.  So we will go ahead and have the court

24  reporter mark a copy of this.  The next exhibit.  And do

25  you have a copy of the report in front of you?

```
 1          (Deposition Exhibit 2 marked and identified)
 2      A.   Yes.
 3      Q.   Since you have confirmed that is in fact the
 4  report, if you want to refer to the one that is in front
 5  of you.
 6            MRS. DURST:  I will go ahead, madam court
 7  reporter, and lay both of these or you let you have those
 8  so I don't take them.
 9            THE REPORTER:  Okay.
10  BY MRS. DURST:
11      Q.   The report that we have marked then is --
12            MRS. DURST:  What was it, Exhibit 2?
13            THE REPORTER:  Yes.
14  BY MRS. DURST:
15      Q.   My understanding is that is the only written
16  report that you have prepared thus far?
17      A.   Thus far.
18      Q.   Have you been asked to prepare any other
19  reports?
20      A.   Not yet.  No.
21      Q.   And again, safe to say that at this point in
22  time as of September 17, of 2019 you have not prepared any
23  report or document that critiques or criticizes any
24  opinions of Mr. Faulkner?
25      A.   Not at this point.  Whether I will or not,
```

1  especially since I just got his most recent one where he

2  added opinions and such, I reserve the right to do that.

3  It's just there hasn't been enough time permitted for me

4  to be able to complete that review, consider it, find the

5  treatise and information as you have so pointed out that I

6  should really include.  So it's not that I am not going

7  to, it's just that I have not had that opportunity at this

8  point.

9       Q.   With regard to his initial report it was filed

10 with the federal court July 1st, of 2019 and counsel would

11 have had that at that point in time.  So from around the

12 1st of July of 2019 up until the present, you have not

13 prepared or authored any document critiquing the initial

14 report from Mr. Faulkner; correct?

15      A.   The initial report, correct.  Because I figured

16 that the small critiques that I have for his initial

17 report could be cleared up in deposition.

18      Q.   You did mention, actually it is in page 10 of

19 your report, you reserve the right to amend your opinions

20 as needed to rebut the opinions set forth by opposing

21 counsel's expert.  Until you received the supplemental

22 report you had not prepared any written report to rebut

23 any opinions set forth by opposing counsel's expert;

24 correct?

25      A.   That is correct.

1      Q.   Other than I suppose any criticism that you

2    might have of the supplemental report that you received

3    from Mr. Faulkner, are all the opinions that you have

4    formulated in this case set forth in your initial report?

5      A.   As they stand at this moment.

6      Q.   You have not supplemented anything to counsel;

7    is that correct?

8      A.   Not yet.  I am still waiting to receive

9    materials before I can give a final that this is -- they

10   are not going to adjust because I have requested a lot of

11   the documents that I have been provided.

12     Q.   With regard to the preparation of the report,

13   based on the documents you have reviewed at that point in

14   time, you set forth all the opinions in that report that

15   you have formulated at that time?

16     A.   Based on what I have received to this point,

17   yes.

18     Q.   You recognize that the reports in cases like

19   this are produced so other parties like me can know what

20   your expected opinions for trial would be; right?

21     A.   Absolutely.

22     Q.   You understand that the reason you are obligated

23   to provide those opinions is a matter of fairness to all

24   parties in the case?

25     A.   Absolutely.

1      Q.   You would agree that we should be able to look

2   at your report and know what opinions you would provide at

3   trial; correct?

4      A.   Yes.

5      Q.   The report as of May the 15, of 2015.  It listed

6   items that you had --

7                MR. EDWARDS:  I'm sorry.  You said 2015.

8                MRS. DURST:  2019.  I'm sorry.

9   BY MRS. DURTS:

10     Q.   The report listed the material that you had

11  reviewed at that point in time; is that right?

12     A.   Yes.

13     Q.   Page 2 and 3?

14     A.   Yes.

15     Q.   Now, again just to be clear.  All of the

16  documents or audio or any video, you reviewed those

17  materials yourself?

18     A.   Correct.

19     Q.   Since you were contacted, I will represent to

20  you before I believe the actual complaint in this case was

21  filed, did you ever review the complaint before it was

22  actually filed with the court?  I know you have the

23  initial complaint.  My question is, did you review it

24  before it was filed with the court or after?

25     A.   I don't know when it was filed.  I don't think

1   so.  I don't even think anything really started happening

2   until after I was retained.  But that, I would have to

3   look at what I was given versus when it was filed.  I

4   don't know.

5        Q.   You told me that as you are reviewing all these

6   documents you don't take notes.  You may highlight

7   something but you don't actually take notes?

8        A.   That's correct.

9        Q.   Now, I wanted to ask you.  The dashcam video,

10  it's listed as an audio file.

11       A.   The dashcam video?

12       Q.   Yes.  On page 3 of your report there is a

13  section that says audio files and it's numbers 33, 34, and

14  35.  And then there is a video section that says 36 and

15  37.  See number 35, it says dashcam video of 7/25/17?

16       A.   Yes.  That would just be an alignment error.

17       Q.   So it should have been an actual video that you

18  reviewed?

19       A.   Yes.  Of the pursuit, yes.

20       Q.   The week prior?

21       A.   Yes.

22       Q.   I just wanted to make sure that there wasn't

23  something that I was not aware of.

24       A.   It is supposed to be one level lower than it

25  actually is.

1      Q.    Since the preparation of your report you have

2   had to opportunity to review Mr. Faulkner's initial report

3   and the supplemental report?

4      A.    Yes.

5      Q.    You understand or do you have an understanding

6   that Mr. Faulkner's supplemental report was based on

7   documents that he reviewed that were generated after he

8   had prepared his initial report?

9      A.    Yes.

10     Q.    Okay.

11     A.    And I'd like to back up.  When you mentioned I

12  don't take notes, because I don't want to misinform you.

13  My report is my notes.  When I highlight something and I

14  make note I actually take the note and turn them into the

15  report.  So everything that is in the notes is actually in

16  the report.

17     Q.    But for instance you don't write hand written

18  notes as you're highlighting things?

19     A.    No.

20     Q.    Or have a legal tablet like I have in front of

21  me where you are writing notes?

22     A.    No.

23     Q.    I wanted to ask you.  Number 32 just says

24  Exhibit A 791 pages, do you recall what that was?

25     A.    I provide them to the best of my ability with

1    the way that I receive them.  And 791 pages that would

2    have been, there is a lot of duplicates from other

3    sections and I don't take the time to break out each one

4    for a second time and things like that.  So if it is

5    provided to me as Exhibit A and its got 791 pages, I try

6    to identify well, this was provided as Exhibit A and this

7    is how many pages are in it.  For example, if you go to

8    that drive you will find Exhibit A and it will have 791

9    pages on it.

10        Q.   So we should be able to figure out what Exhibit

11   A is referring to?

12        A.   Without question.

13        Q.   The only reason that I am asking is, when I

14   provided responses on behalf of my client we had a number

15   of exhibits.  I think all the way up through, maybe, G or

16   H or something like that.  So I am just trying to figure

17   out if Exhibit A is something that was provided as part of

18   my discovery of Exhibit A or if it was something that was

19   provided to you by plaintiff's counsel.  You don't know as

20   we sit here today?

21        A.   That's why what you see here you will find on

22   those drives.

23        Q.   In addition to both of Mr. Faulkner's reports,

24   what other documents have you reviewed since May the 15th

25   of 2019?

1      A.   Now, there have been the autopsy report.  The

2   videotape and transcript of the deposition on Detective

3   Forsyth.  There is the video recording of the deposition

4   with Deputy, or former Deputy Love.  Also the supplemental

5   report submitted by Mr. Faulkner.  And I believe off the

6   top of my head that's it.  I haven't documented --

7      Q.   Let me ask you this.  You mentioned that you

8   just recently received and reviewed the autopsy report.

9   Do you understand that it was the plaintiff's attorneys

10  that actually produced the autopsy report in discovery in

11  this case?

12     A.   Okay.

13     Q.   Well, I guess my question is, do you know why,

14  if you didn't review it, why you didn't have the autopsy

15  report when you prepared your initial report?

16     A.   Well I would imagine it was because it was an

17  oversight on their part.  But as soon as I requested it,

18  it was provided immediately.

19     Q.   How did you know to request that?  Because you

20  saw reference to it in Mr. Faulkner's report?

21     A.   No.  When I started really evaluating and

22  considering the information and when Mr. Faulkner in his

23  supplement articulated the movement behaviors, potential,

24  he used a possibility for how the vehicle got out of gear.

25  It triggered a thought in my mind that, well, wait a

 1   minute the injury is sustained.  Is it possible.  I want

 2   to know if it is possible because there is information

 3   provided.  And just like the other portion of my report

 4   that you didn't read, which is if new information becomes

 5   available to me not just contrary to their defenses

 6   expert.  But I wanted to know more about the potential

 7   injury.  So that is why I requested the report for the

 8   autopsy.

 9        Q.   I guess the question that I have is, you

10   obviously at the time reviewed the autopsy photographs

11   because they are listed in your report; right?

12        A.   Yes.

13        Q.   Why at that point on May the 15th before you

14   finalized your report, why didn't you ask to see a copy of

15   the autopsy report at that time?

16        A.   At that particular moment it didn't seem like it

17   was an influencing variable to me.  I am not saying that

18   it is not relevant.  It is just not something that was in

19   the forefront of consideration given the information that

20   was provided by the investigation and all the other

21   resources that I received.

22        Q.   Did you review the family members deposition

23   transcripts?

24        A.   Yes.  There was a gentleman -- wait a minute.  I

25   don't, let me look on my list because there were certain

1  transcripts that -- or certain things that I wasn't --

2  didn't apply to what I was investigating -- or not

3  investigating, what I was reviewing.

4       Q.   I will represent to you that the depositions of

5  all the family members were taken after you would have

6  authored your report.  So my question is, after May the

7  15th, 2019 you told me you reviewed the transcript and the

8  video of Deputy Forsyth and former Deputy Love; right?

9       A.   Yes.

10      Q.   There were four family members of the Rhoades

11  family that were deposed, were you provided their

12  deposition transcripts to review?

13      A.   No.

14      Q.   Were you provided the deposition transcript of a

15  gentleman by the name of Carl Straley?

16      A.   The investigator?

17      Q.   Yes.

18      A.   Yes.

19      Q.   You were provided his?

20      A.   Oh, yes.

21      Q.   Is there anything else since May the 15th, 2019

22  that you have been provided to review that we have not

23  discussed?

24      A.   Not that I can recall.  No.

25      Q.   Is there anything that you have reviewed since

1    May the 15th, 2019 that has caused you to change or

2    supplement your opinions?

3         A.    Reinforce them, not change them.

4              MR. EDWARDS:  Definitely just so we are

5    clear.  I believe he has received the troopers deposition.

6         A.    Oh, yes.

7         Q.    McDougal?

8         A.    Yes.  Yes.  McDougal, yes.  I'm sorry.  Yes,

9    that's right.

10        Q.    You do recall receiving and reviewing both

11   members of the West Virginia State Police and Carl

12   Straley?

13        A.    Yes.

14        Q.    But not the family member depositions?

15        A.    No.  Not that I don't remember.  I did not

16   receive them or ask for them.

17        Q.    Fair enough.  On page 3 of your report number 28

18   says, "Professional Investigator work product 14

19   pictures."  Do you see that?

20        A.    Twenty-eight.  Yes.  Yes.

21        Q.    Are those the photographs that were taken by Mr.

22   Straley?

23        A.    Yes.

24        Q.    What if anything do you think that the spent

25   casings added to the West Virginia State Police

1    Investigation?

2        A.   He didn't consider the casings.

3        Q.   But what if any thing -- do you think it would

4    have changed the outcome of the investigation?

5        A.   Well, I think that when you look at how the

6    investigation was conducted, the casings in and of

7    themselves, by themselves don't necessarily represent

8    exactly what took place and where an officer was standing.

9    There's a variable.  The casings and where they were

10   located were never documented.  They could be used in

11   combination with questions.  For example, how were you

12   standing, where were you standing, how were you holding

13   the gun.  Was it a two handed grip.  There is a litany of

14   questions that were never asked.  Was never investigated

15   in this particular matter.  And the casings, depending on

16   the information being presented during that questioning

17   could have either supported or raised additional

18   questions.

19       Q.   So is it fair to say that is more criticism you

20   have about the extent or nature of the investigation

21   conducted by the state police?  That they didn't locate

22   these casings so they didn't have that information to use

23   to question Deputy Love or Deputy Forsyth?

24       A.   No.  I don't want to misinform you.  He didn't

25   document the original casings he did find.

1      Q.    Okay.

2      A.    So the addition of additional casings, you never

3   consider the casings to begin with.  So the addition of

4   additional casings doesn't add to it because you didn't

5   consider it.  So it is a matter of, if you are doing a

6   force investigation and assessing and evaluating a scene

7   in its entirety and you are looking at bullet alignment,

8   trajectories, things like that.  How somebody could be

9   standing.  Where they could be standing.  How the round

10  enters a vehicle.  Direction.  All of these variables that

11  come into conducting the force investigation your location

12  of the casings could help support information derived from

13  other evidence and information.  Like I said, and even Mr.

14  Faulkner mentions in his supplemental report, and as a

15  matter of fact, on there you will find the study that was

16  done for a casing location.  It was actually not just

17  through For Science, but depending on the information you

18  gain from the officer, stance, grip, posture, all these

19  things, those can be supported by casing placement.

20     For example, if an officer is standing in a standard

21  position, two hand grip, fully extended, and discharging

22  his firearm, 97 percent, 96, 97 percent of the casings

23  will eject to the right and rear.  However, the moment

24  that the weapon is being moved, canted, angled, anything

25  like that, that influences where the casings may lead.  If

 1  you have never even thought about the casings even to the

 2  point that you document their placement on a crime scene

 3  diagram you never gave any consideration to it.  So, no,

 4  finding additional casings can't add to the investigation

 5  because they were never a variable investigated to begin

 6  with.

 7      Q.   So you have a criticism of the state police

 8  about the way that was investigated?

 9      A.   No.   I answered your question about whether or

10  not those casings would influence something.

11     If they would have asked the questions, could the

12  casings positions influence the investigator, yes.

13      Q.   And you are saying if they ask the question.  So

14  you take issue with the fact that these questions were

15  never asked because they didn't document where the

16  original casings that they found were located; right?

17      A.    Well, this was not critically evaluated or

18  assessed as an investigation.  This was uncritically

19  accepting versions of an event without actually paying

20  attention to physical evidence present at the scene that

21  would either prove or disprove information being provided.

22     So the fact that he did not investigate the casings or

23  consider them as any part of his force investigation

24  involving an officer involved shooting, the addition of

25  additional casings or the location of additional casings

1   is a mute point.

2        Q.   And my question was broader at that point other

3   than focusing on the additional casings located by

4   Mr. Straley.  My question was, you take issue with the way

5   that the West Virginia State Police conducted the

6   investigation; true?

7        A.   Oh, I have no doubt that the investigation could

8   have been better conducted.

9        Q.   With regard to the location of the additional

10  casings then, what if anything about the location of those

11  additional casings determines anything about the way the

12  shooting occurred?

13       A.   As they stand right now, nothing.

14       Q.   Okay.

15       A.   Because there is not enough information to even

16  use as a reference.

17       Q.   With regard to documents in this case, I believe

18  there was one reference in your report.  Were there

19  documents you asked to review that you were not provided?

20       A.   Yes.

21       Q.   On page, I think it's, I didn't write the page

22  down.  You noted that you requested items for review that

23  were not provided by opposing counsel.  And I am trying to

24  remember --

25       A.   That would have been the last two opinions.

1      Q.   But I am -- that direct quote is what I am

2   trying to figure out, where that came from.

3      A.   I will be happy to help you.  I think it was

4   opinion three.

5      Q.   Actually it is on page 10 of your report in the

6   Professional Opinion the very top of the page.

7      A.   Maybe I iterated it back there too.  Sorry.

8      Q.   It is the third full sentence.  "It is important

9   to note I requested items for review that were not

10  provided by opposing counsel.  Their failure to produce

11  the requested information forced me to form opinions based

12  solely on the information I was given."  Did I read that

13  correctly?

14     A.   Yep.

15     Q.   So specifically what information were you

16  requesting that was not provided?

17     A.   Training related information associated with the

18  training provided related to vehicle pursuits related to

19  performing high risk stops or felony traffic stops.  The

20  training associated with this type of event.

21     Q.   Is there any other item or material that you

22  requested to review that you were not provided?

23     A.   The pursuit policy, I think, was not provided.

24  I did eventually get a complete copy of the use of force.

25  I think predominantly, it was the training.  There was no

1   training materials provided.  There was nothing to show

2   that the officers were even given training or provided any

3   documentation to support that they read or received the

4   policies.  I do know that in the depositions they

5   indicated that they had received them.  And with the new

6   administration I guess took office that year but it was

7   the training related information.  Because that's what it

8   came down to is, without documentation, you know, in the

9   law enforcement world if it is not written down, it didn't

10  happen.  If there is no documentation of training,

11  training didn't occur.

12       Q.   We will talk about that when we talk about the

13  other opinions, then.  But is there any --

14            MR. EDWARDS:  I'm sorry.  I need to take

15  another break when you get a chance.

16            MRS. DURST:  Absolutely.

17            (Off the record)(12:42 p.m.)

18            (Back on the record)(12:44 p.m.)

19  BY MRS. DURST:

20       Q.   So with regard to any other materials, is there

21  anything else you can think of that you would have wanted

22  to review that was not provided other than training

23  materials?

24       A.   Well, I guess it is still training materials.

25  Anything from the West Virginia State Police on how they

1    conduct training for their new officers or for their

2    academy.  As well as I requested a full resource access to

3    the STOPS book that Mr. Faulkner references because it is

4    not readily available in print anywhere.  I like to read

5    the entirety of a section not just pieces taken out if

6    possible.  And you can't find it anywhere.

7         Q.   Who did you make the request to for the STOPS

8    material?  Did you request counsel --

9         A.   Oh, I am sure I submitted -- requested it to

10   them.

11        Q.   Did you ask counsel to see if they could obtain

12   documents from the West Virginia State Police Academy

13   regarding the training that the new cadets are provided?

14        A.   Yeah.

15        Q.   What were you told?

16        A.   They are in the process and they are trying to

17   get it.

18        Q.   Regarding the executive summary that is set

19   forth on page 9 of your report.

20        A.   Yes.

21        Q.   It refers to the fact that Mr. Rhoades was

22   operating a 1999 Jeep Wrangler at the time.  You see that

23   kind of near the beginning of the executive summary?

24        A.   Yes.

25        Q.   And then it is discussed, obviously, later on

1    throughout your report as well.  Your report doesn't

2    mention any place that particular Jeep was stolen.  Is

3    there a reason why?

4         A.   No.

5         Q.   Is there a reason why your report doesn't

6    mention that Jeep was actually that the original color was

7    red and the state police report indicated it had been

8    spray painted black?

9         A.   Because there was no indication as to whether or

10   not it was actually Mr. Rhoades that spray painted it.  It

11   was never asked of the owner if he had changed the color

12   of it.  And the color of the vehicle, when it comes to the

13   use of force, if an officer has to protect them self the

14   color of the car is irrelevant to me.

15        Q.   Is there any reason that you didn't mention that

16   the license plate that was on the Jeep was not the license

17   plate associated with the Jeep?  Meaning it was also

18   stolen.

19        A.   It had no baring on the information that I was

20   provided.

21        Q.   The second sentence in that executive summary,

22   and I am assuming maybe this is a typo.  It says, "persing

23   {sic} deputies.  Is that supposed to be persuing deputies?

24        A.   That would be a much better word in that

25   sentence.  Yes.

1      Q.   That's what I thought.  It says, "persuing

2   deputies lost sight."  Well, it says persing, but it

3   should be persuing deputies.

4      A.   Persuing.  Yes.

5      Q.   "Lost sight on the jeep and saturated the area

6   with personnel."  Did I read that correctly with the

7   insertion of persuing versus persing?

8      A.   Yes.

9      Q.   When you say saturated the area with personnel,

10  how many units?

11     A.   There were multiple units.

12     Q.   So you know the number?

13     A.   No.  I got the impression from the readings that

14  there was many units looking for -- and saturated being

15  relative because some agencies only have three people on

16  an area.  Some people have ten.  It really depends on the

17  number of people available.

18     Q.   You told me most recently that you have reviewed

19  the toxicology report that is part of the autopsy report;

20  right?

21     A.   That's correct.

22     Q.   But you had not reviewed it at any point in time

23  prior?

24     A.   Correct.

25     Q.   Have you ever taught any courses on drugs and

1    alcohol?

2        A.    No.

3        Q.    And I am assuming having the opportunity to

4    review that, you were aware that Mr. Rhoades actually had

5    methamphetamines in his system as well as hydrocodone,

6    Xanax and Ephedrine?

7        A.    Yes.

8        Q.    Now, you do have understanding, do you not, that

9    Deputy Forsyth received training at the West Virginia

10   State Police Academy?

11       A.    Yes.

12       Q.    And we just talked about, as of this point in

13   time you have not reviewed any training materials provided

14   by the academy?

15       A.    Not yet.

16       Q.    And you have asked counsel that retained you to

17   see about getting those materials; correct?

18       A.    Correct.

19       Q.    And at this point in time your opinion is you

20   believe that the training Deputy Forsyth received was not

21   sufficient with regard to traffic stops; correct?

22       A.    Correct.

23       Q.    Yet at this point in time you have no idea what

24   training he might have received, any stint of that

25   training provided by the academy; correct?

 1      A.   Bearing in mind that he went to the academy, I

 2   think it was four years before.  There was many years

 3   between the academy and when the event took place.  And

 4   the agency would have hopefully provided them with

 5   additional training and ongoing training.  But there was

 6   no documented training in that regard from the agency.  So

 7   the extent of his training for an academy, until I can get

 8   those records, I dont' know what he got so many years

 9   before the event took place.

10      Q.   During that four year window was there any

11   significant change in any opinion issued by the U.S.

12   Supreme Court that would change the way a police officer

13   should respond to a traffic stop or a felony traffic stop?

14      A.   I think you have to be very careful about it.

15   It's not just Supreme Court rulings that change the way

16   you respond.  It's about creating a condition of the

17   response in the officer to be able to deal with an event.

18   And if you are not providing adequate training and

19   preparing them for the stress that is associated with

20   various events you are not providing training.  So just

21   because I go and I get the mechanics of how to conduct a

22   high risk traffic stop does not mean, one, that I am going

23   to recall it for the rest of my career.  Two, that the

24   materials in which the academy is training is going to be

25   conducive to every environment in every situation.  And

1    the agency actually has responsibility for providing

2    training that continues to help the personnel perform

3    their duties.  So there is no Supreme Court ruling about

4    traffic stops that is going to alter the training

5    requirement in the way that you preform a traffic stop.

6         Q.   And that was my question.  Was there anything

7    that came down from the Court that said, you guys used to

8    be able to do this and now we don't want you to do that

9    anymore.  Anything like that, that would have occurred

10   during that window when Deputy Forsyth attended the

11   academy versus when this incident occurred?

12        A.   Telling him not to do something?

13        Q.   The way that they should approach a traffic stop

14   or a felony traffic stop.  Anything that you are aware of

15   that you learned that came down from a higher court that

16   would change the way that a police officer should be

17   trained to handle those traffic stops?

18        A.   I don't know of any federal court decision or

19   mandate on how they should handle that, has changed in

20   that period, no.

21        Q.   At the time you authored your May 15th, 2019

22   report, that report contained all the facts and data that

23   you had considered in forming your opinions other than

24   this discussion we had about maybe some reference material

25   that you didn't cite?

1      A.    Correct.

2      Q.    Did you conduct any kind of testing or research

3  in connection with the formulation of the opinions other

4  than the reference materials that we talked about?

5      A.    Testing, no.

6      Q.    Did you ever do any kind of independent research

7  on the Marion County Sheriff's Department?

8      A.    No.  I was provided with articles at some point

9  from a newspaper.  But that wasn't research I conducted.

10 It will be on that.

11     Q.    There wasn't anything that you cite from any

12 newspaper article that you've at least referenced in your

13 report; correct?

14     A.    No.

15     Q.    Did you ever go to the scene of the shooting?

16     A.    Not yet.

17     Q.    You say not yet.  Are you planning to?

18     A.    Oh, I definitely would like to.

19     Q.    Is there a reason you did not do that before you

20 authored your report in this case setting forth your

21 opinions?

22     A.    The photographs taken by the investigator, the

23 sergeant with the West Virginia State Police and his

24 drawing plus the drawing that was created by a

25 professional investigator that the followup.  Was it

1   Sterile?

2        Q.    Straley.

3        A.    Straley.  Gosh, I don't know how I brutalize

4   that every time.

5        They gave me enough information to review and assess

6   and evaluate the fact that this is a very confined small

7   area.  There is enough information to look at the vehicle

8   sizes and offer that, that don't require a scenic

9   examination.  It is always preferable.  I always do one.

10  Especially before trial, but it is not a requirement.

11  Unless it's an unusual scene.

12       This one, the pictures from various angles and the

13  information provided I felt was adequate enough for me to

14  evaluate and assess so that I could create my report.

15       Q.    If the information that was provided through the

16  drawings and the photographs was adequate enough for you

17  to be able to create your report, then what is the reason

18  for you to go to the site after you have already provided

19  the opinions to me in this case?

20       A.    Because I always like to go to the site.

21       Q.    Did you ask counsel if you could go to the site

22  before you authored your report?

23       A.    No.

24       Q.    You mentioned that you had reviewed some news

25  articles and you believe those may have been provided by

1  counsel.  But you didn't do any research of your own and

2  read any online news articles or anything like that;

3  correct?

4       A.   Correct.

5       Q.   Since you didn't go to the scene is it safe to

6  say you have not created any diagram of your own with

7  regard to that actual scene?

8       A.   That's correct.

9       Q.   You told me that you did not receive and review

10 the depositions of the family members.  Have you ever

11 interviewed or spoken with any member of the Rhoades

12 family?

13      A.   No.

14      Q.   Have you spoken with or any witness in this

15 case?

16      A.   No.

17      Q.   Have you ever personally spoken with or

18 interviewed any witness involving this case?

19      A.   No.

20      Q.   Never spoken with Carl Straley; Correct?  The

21 professional investigator.

22      A.   That's correct.  I asked to.

23      Q.   So you asked to speak to Mr. Straley, why?

24      A.   Well, at the time I hadn't gotten his

25 information yet and I thought the quickest most direct

1  route to get information would be to request to speak to

2  him.  But then I got his information, so.

3       Q.   After getting the information did you pursue

4  your request to speak with him?

5       A.   No.  Because he had no firsthand information.

6  And he is the one that located the casings.  And also, he

7  took one photograph that he made an attempt to show

8  directionality of a bullet.  Other than that, what he had

9  to offer was after the event.  And my concern was what

10 took place at the time of the event.

11      Q.   The only folks that were there at the time of

12 the event were Rhoades, Love and Forsyth?

13      A.   That is correct.

14      Q.   Did you prepare any draft report in this case?

15      A.   No.

16      Q.   Did you speak with counsel before you finalized

17 your report?

18      A.   No.  Well, I am sure we had conversations.  But

19 we didn't speak about the report before I finalized it.

20      Q.   And that was the question.

21    Do you know how many hours you have in this case prior

22 to the start of your deposition today?

23      A.   Forty-eight.

24      Q.   Do you know how much -- I know you received,

25 based on the documents provided, you received a five

1    thousand dollar retainer; correct?

2        A.   Yes.

3        Q.   Have you invoiced additional amounts to counsel

4    and received additional payments?

5        A.   Yes.

6        Q.   How much payment have you received thus far?

7        A.   As of right now, including the deposition fee,

8    13,000.

9        Q.   You understand that I pay the deposition fee;

10   correct?

11       A.   Yes.  But I am just trying to be all inclusive.

12   The deposition fee was a $1,000 for the first four hours.

13   And then it will be billed out in addition to that.  So it

14   is $12,000 at this point, from counsel.

15       Q.   With regard to the preparation of the report,

16   that's Exhibit 2, do you kind of have a specific process

17   that you follow in every case where you are preparing an

18   expert report?

19       A.   An internal guide?

20       Q.   Well, not something necessarily in writing but

21   just a process.  Well, in every case here is what I am

22   going to do and here is how I prepare my report.  Do you

23   have a process like that?

24       A.   Of course.

25       Q.   Tell me what that process is.

1        A.    Well, it starts with gaining the information,

2    the initial information, from whoever has retained me so

3    that I can do a thorough review of the documentation to

4    see what's there, what's not there, what I need.   Once I

5    have done my initial review of the materials provided I

6    start asking for additional information so that I -- every

7    event is different.   Ever -- the manner in which people

8    conduct investigations is different.   So I go out of my

9    way to always try to give benefit for law enforcement

10   first because of the type of events that take place in

11   their profession.

12       So when I get the materials I request other documents,

13   things that either substantiate their behaviors or may fly

14   against them.   Things that will help prove that the agency

15   taught them how to do it but they ignored what they were

16   taught, or told them how to do it -- I try to, whatever

17   the case might be, I try to gather that information so

18   that I can review it in it's entirety.   Then my process,

19   also, if there is a deposition, if it is audio recorded

20   and or video recorded, I want the transcript.   I want the

21   audio.   And I want the video.   I want to look at them all.

22   Because for example, in this case there are times where

23   the transcription is wrote inaudible.   You can clearly

24   hear what is being said but it was written inaudible.   Or

25   things -- in one part of the -- the transcript, Mr., I'm

1   sorry, Detective Forsyth said I was in fear.  The
2   transcriptionist wrote, I was in threat.  That is what
3   appears in Mr. Faulkner's, I was in threat.  He didn't say
4   threat.  So I try to get all of these things together
5   because I listen to and read all of them as I go along.
6   And like I said, with a transcript if I see something,
7   plus I also look at behavioral cues and things like that
8   when we are doing the interview.  Transcripts provide
9   content.  That is it.  And I like to hear the way they
10  speak and stuff so that I can take into context what's
11  being said.  Not just what's written on a piece of paper.
12  My favorite example of that is My Cousin Vinny.  You know,
13  there is a scene where he says, I shot the clerk.  And the
14  guy presents it in court as he, you know, admitted that he
15  shot the clerk.  That's just -- you know, when I teach my
16  class I tell people, read all three of them.  So those are
17  my processes.  Then when I get all of the material
18  together and I've gone through them, I then go back
19  through.  And for example, when you get depositions.  Now
20  I go back and I look at the original statements and the
21  depositions, see how they have changed.  There are going
22  to be changes usually, because most people are interviewed
23  immediately following an event.  There's transitions.
24  There's memory issues.  There's memory issues.  There's a
25  lot of things that need to be taken into consideration.

1   Then when you get the deposition, well, where did that

2   come from.  So I go back and I, again, well, why would

3   this happen.  And I take into, my background training

4   experience.  If something is not an issue to me, other

5   people may want to make a big point out of it, you know,

6   and I will give you an example.  In this particular

7   matter, going to the hospital.  I don't care.  I don't

8   need to opine on that because it is a good practice.  It's

9   not part, it's not what I've been asked to review.  So

10  where other people may focus on certain things, I don't.

11  That doesn't come into what's happening during the force

12  event.  So I try to separate those variables.  And then

13  once I get done through this whole process I then start

14  formulating my opinions.  I look at the actions.  I look

15  at policies and procedures.  Training potential issues.

16  Or positives.  Then I create my final report and submit

17  it.

18       Q.   I guess what I am trying to figure out is, you

19  told me that you don't take notes but you highlight

20  things.  And you say when you are taking out of, like,

21  documents you put them into your report.  But as you've

22  described that process for me, you do all those things

23  before you formulate your opinion.  So what I'm trying to

24  figure out is, for instance, you're reviewing the state

25  police report and the statements.  The statements that

1   Deputy Love and Forsyth provided on August the 4th.  As

2   you are initially reviewing those, are you taking things

3   out and plugging them into what ends up being your report

4   or do you review them and then go back later and review

5   them again and take things out and put into a report.

6   Does that make sense?

7        A.   Yes.  My process is -- I've been blessed with a

8   very good memory.  When I go through things I highlight.

9   I've always had the ability when I hear something, for

10  example, when somebody makes a statement in an interview

11  and then I listen to a subsequent interview and it's

12  different, I can't explain why I have the ability.  Wait a

13  minute, and I will go back to the interview that is not

14  what they said.  It's just a strength that I have.  I -- I

15  don't have a photographic memory.  I wish I had that where

16  I could just look at something and know.  But for some

17  reason I have an ability to recall and pull things out.

18  And my process has always been that, you know, for

19  example, if I -- if I write something down that's a

20  deviation --

21       Q.   Uh-huh.

22       A.    -- it will be into the opinion.  If I am

23  creating my report it will be into the opinion.  When I

24  get the next -- if that's not applicable I just delete it.

25  Cause if I am wrong, if I find out, wait a minute that

1   didn't, no that's not right, I delete it.  And that is --

2   my report is literally that culmination of all that

3   information.

4        Q.   It's an ongoing process.  So as you just

5   described.  If you put something in your report that you

6   initially think might be pertinent and then as you review

7   other documents you think it's not, you go back and delete

8   that out.  But there's no version of the report that

9   exists that has that initial information you put into the

10  report; is that correct?

11       A.   That -- that's correct.  Because I wouldn't want

12  to mislead somebody with inaccurate information.

13       Q.   Were you provided any kind of summaries of

14  documents that were provided to you by counsel?

15       A.   Summary?

16       Q.   Yeah.  Like attorneys sometimes will summarize a

17  deposition transcript and send a summary.

18       A.   Oh, no.  No.

19       Q.   No summaries of any documents whatsoever?

20       A.   No.  They've given me the full enchilada.

21       Q.   On page 8 of your report in the Statement of

22  Purpose section.  It says you were asked by the plaintiffs

23  in this case to apply your background training and

24  experience as to what was seen on video footage.  Do you

25  see that?

```
 1        A.   Yes.

 2        Q.   You would agree with me with regard to

 3   Mr.  Rhoades the only video footage is the July 25th, 2017

 4   dashcam where Mr. Rhoades led police on a chase throughout

 5   Marion County; right?

 6        A.   Yes.

 7        Q.   You watched that video; right?

 8        A.   Yes.

 9        Q.   You would agree with me that, that was a

10   dangerous chase?

11        A.   No question.

12        Q.   And that Mr. Rhoades was placing citizens of

13   Marion County at risk by driving as fast as he was through

14   those residential areas?

15        A.   Yes.

16        Q.   And in fact, at that point Marion County

17   Sheriff's Department called off the pursuit because of how

18   dangerous the nature was?

19        A.   Excellent choice.

20        Q.   Is there any reason that your report doesn't

21   discuss this prior incident in detail as to the dangerous

22   nature of the conduct that Mr. Rhoades was engaging in,

23   exposing citizens of Marion County to harm?

24        A.   Well, I was asked to evaluate the application of

25   force and the decision making process.  And one has to
```

1   remember that in a pursuit the catalyst of negative

2   driving behaviors is the law enforcement pursuing them.

3   Thereby remove the police, no more pursuit.  For example,

4   I didn't see any documentation or reference by anybody,

5   the investigator or anything else that there is an

6   extensive bad reckless complaints and history of Mr.

7   Rhoades outside of the pursuit.  So, when I look at a

8   force event his running from police, welcome to law

9   enforcement.  They -- they run.  You pursue them or if it

10  becomes too dangerous you cancel the pursuit, whatever the

11  case might be.  Good decision.  Look, we know where he is.

12  We know who he is.  We will get him later.  So in looking

13  at that and trying to say well, because -- well, I'm sure

14  we will get to it.  The assertion that he is an ongoing

15  risk to public safety because of this one pursuit, that

16  implies that is his driving practice all the time 24/7.

17  Where as that's not been substantiated by anything else.

18  It is a variable officers should take into consideration

19  when trying to apprehend someone.  But it is not something

20  that I need to include in a report that, on this day he

21  was driving like a jerk.  It doesn't take anybody outside

22  of the normal realm to look at a video and say, wow that

23  is really horrible driving.

24       Q.   What eventually led to the use of force at the

25  gas site, at the gas well site started off as a pursuit;

1   correct?

2        A.   Well, it was a pursuit initiated by another

3   officer.  And they lost sight.  They were no longer in

4   pursuit.  The fact that you are searching for them means

5   the pursuit is ended.  Pursuing means they are running,

6   you're chasing.  They constant assertion well, I was

7   continuing -- and everything is written in the pursuit --

8   you weren't.  You were looking for him.  So just like with

9   every event there are start and stop points.  He was being

10  pursued by another deputy.  He was even being -- attempted

11  to be in pursuit by Deputy Forsyth who almost immediately

12  lost sight of him with the exception of dust trails.  And

13  then they were just trying to find the dust trails.  So

14  the pursuit ended when you no longer have the pursuee.

15       Q.   Would you agree with me that none of us, me,

16  you, the counsel in this case know exactly how the

17  incident with Mr. Rhoades began and ended up where it was?

18       A.   None of us were there.

19       Q.   The perception that's important is, what took

20  place in Deputy Forsyth's mind at the time he discharged

21  the weapon?

22       A.   That is very important.

23       Q.   And as long as he perceived that he was in

24  imminent peril of great bodily harm or death, he would be

25  justified in discharging his firearm?

1      A.   If that's his honest perception.  And what I

2   would like to add to that is, fear justifies force.  Facts

3   make fear reasonable.  There is an element that, yes, I

4   can say I was in fear for my life.  And I should be able

5   to substantiate that with information.  So the

6   articulation of fear, fear is what justifies the

7   application of force.  If you were not in fear, you cannot

8   use force.

9      Q.   I think the supreme court, wasn't it in Graham

10  v. Connor.  Graham v. Connor said that you don't look at

11  it in 20/20 hindsight, you look at it based on what was

12  perceived by the police officer.

13     A.   Okay.  But it also says in that decision that he

14  has the obligation of providing information to support

15  that fear.

16     Q.   Okay.

17     A.   So, yes.  I am not looking at it with 20/20

18  hindsight.

19     Q.   Okay.

20     A.   I am looking at it from the perspective of the

21  officer at the moment he discharged the firearm given all

22  of the information provided to me through the investigated

23  efforts of Sergeant, he was Sergeant at the time.  At

24  least he is Sergeant now.  Sergeant Branham.  Did I say

25  his name right?

1      Q.    Uh-huh.  Yes.

2      A.    So the totality of the event is really

3  important.  And that influences the perspective of the

4  officer.

5      Q.    And so I think, just following up on what you

6  said, is you agree that you take into consideration

7  everything that you learn about an incident?

8      A.    At the -- yes.  To a point.  I -- I am not sure,

9  when you say everything to an incident.  For example, the

10 pursuit that happened before, that is not the influencing

11 variable on him making the decision to pull the trigger.

12 The decision to pull the trigger was based on what was

13 happening right there.  Not what happened on the 25th.

14 That can be an element that's used later to help

15 substantiate an ongoing fear of whatever.  But it's not

16 what caused him to pull the trigger at that moment.

17     Q.    The fact that at least it was asserted by the

18 Marion County Sheriff's Deputies, or Sheriff's Department

19 that in the prior incident that Mr. Rhoades tried to run

20 over Deputy Love.  You recall that; right?

21     A.    Do I recall that being said?

22     Q.    Yes.

23     A.    I recall it being said but there is some very

24 big questions on that as well.

25     Q.    Well, there was an arrest warrant issued;

1   correct?

2        A.   One in which that the victim of the crime didn't

3   have any information on or know about, yes.

4        Q.   With regard to what occurred then, if there was

5   a prior incident that was alleged that Mr. Rhoades had

6   tried to run over another deputy a week prior, is it your

7   testimony in this case that information would not be

8   relevant as to what was in the state of mind of Deputy

9   Forsyth as he made the decision to pull the trigger?

10       A.   Well, no, because, again, now we are going back

11  to which statements we are going to be looking at.  If

12  there was, for example, they said that there was multiple

13  felony warrants.  One for attempted murder on a police

14  officer.  According to statements he didn't know that one,

15  he wasn't sure this was Rhoades and two, he didn't know

16  that it was Deputy Love that had been involved in this

17  event.

18     If you are going to take information, yes, you have to

19  take it at face value.  If I tell you, for example, if

20  suddenly somebody says -- what was the other statement

21  that they made.  Oh, he's not going back to jail.  Or

22  something to that effect.  Who said it.  The fact that

23  it's said could be an influencing variable.  But now we

24  have the obligation to verify what was said, how it was

25  said, what was done.  When we look back at the initial

1   event on the 25th, I believe it was, there's not even a

2   document -- documentation of the shooting that took place

3   on that day.  The only document that I could find was

4   relative to Deputy Love having to jump out of the way of a

5   vehicle that was spinning tires, kicking up mud and grass

6   and all these other variables.  Yet he was able to get out

7   of the way of the vehicle, draw up and then hit a moving

8   tire as it passes him.  So there is a lot of things that

9   come into this.  At face value the average person who

10  hears, he has an attempted murder warrant on a police

11  officer, of course that would be a variable that goes

12  involved in it.

13      Q.   Well, you said one of the things, and you said a

14  lot there, but one of the things I believe you said was

15  that it might be at least worth considering if Deputy

16  Forsyth knew that Deputy Love was the one that was

17  involved in the attempted murder on a police officer.

18      A.   Let me correct myself.  He knew, according to

19  him, there was -- well, based on statements.  Because the

20  statements have changed.  But based on statements, the

21  original statement was that he knew that he had active

22  warrants and one was a -- or felony warrants and one was a

23  warrant for attempted murder of a police officer.

24      Q.   Uh-huh.

25      A.   Forgetting Deputy Love for the moment.  At face

1    value he knew Mr. Rhoades to be a violent felon.  He knew

2    that.  If we are going on this path where his statements

3    are he knew this information, he knew he was trying to

4    pursue a violent felon.  He knew that the person he was

5    confronting in the gas well site was a violent felon.

6    Attempted murder on a police officer.  It didn't seem to

7    influence his behavior as far as tactical decisions and

8    other things.  So I guess it comes down to, at face value

9    what we know is very important.  But we still have to be

10   able to articulate how that's influencing our behaviors

11   and decision making process.  In and of itself, saying

12   somebody did or said something.  We need more than that.

13        Q.   Would you agree with me that the moment an

14   individual feels that they are in a situation that places

15   them in danger of great bodily harm or death that it is

16   objectively reasonable for them to use force that will

17   also result in great bodily harm or death?

18        A.   Absolutely.

19        Q.   Would you agree with the statement that we all

20   know that fear justifies force?

21        A.   Yes.

22        Q.   Would you agree with me that what you consider a

23   reasonable fear and what I consider to be a reasonable

24   fear is different because everyone is different based on

25   background training, experiences and information available

1   regarding a particular threat?

2        A.   One hundred percent.

3        Q.   Would you agree with me that a situation such as

4   an individual facing threat from a weapon is a very fluid

5   event?

6        A.   Yes.

7        Q.   And that you have to consider all the

8   information to see if it is reasonable for the person

9   facing the threat to come to the conclusion that they need

10  to use force and maybe deadly force?

11       A.   Yes.

12       Q.   Would you agree with me that when dealing with a

13  suspect armed with a deadly weapon, fractions of a second

14  can make the difference between going home at the end of a

15  police officer's shift and having a law enforcement

16  officer's funeral?

17       A.   A hundred percent.

18       Q.   You would agree with me also in terms of a

19  deadly weapon, that a vehicle can be a deadly weapon?

20       A.   Yes.

21       Q.   In fact, it is not unusual for officers to be

22  struck by vehicles of people who are trying to get away?

23       A.   It has happened a lot.  Sure.

24       Q.   Would you agree with me that there are a number

25  of factors that you would consider with respect to what is

1  or is not considered a threat when evaluating the use of

2  deadly force?

3       A.   Yes.

4       Q.   For instance the relative positions of the

5  police officer in the threat?

6       A.   Yes.

7       Q.   The distance from the police officer to that

8  threat?

9       A.   Yes.

10      Q.   Would you agree that the closer the officer is

11  to the threat the greater the threat is?

12      A.   Oh, sure.

13      Q.   You would also look at whether the threat is

14  actually armed?

15      A.   Yes.  But it can be a threat without a weapon.

16      Q.   But armed could include armed with a vehicle?

17      A.   Sure.

18      Q.   Do you recall there was a case in Florida I

19  think maybe that you were involved in where two law

20  enforcement officers actually shot two individuals and the

21  suspects were not armed but the suspects were in a vehicle

22  and were using that vehicle as a weapon?

23      A.   Oh, yes.

24      Q.   You actually found in that case there was no

25  violation of any policy or procedure involved in that

1    shooting; correct?

2        A.    If it is the one I am thinking of with, I think

3    it was Skowronski and Munsey.

4        Q.    Munsey.

5        A.    Yes, ma'am.

6        Q.    When you made that finding that there was no

7    violation of any policy or procedure involved in that

8    shooting, were you doing that -- were you involved still

9    with the Martin County Sheriff's Department?

10       A.    At that time, yes.

11       Q.    So at that time when you were still a law

12   enforcement officer of your own you found that the actions

13   of those suspects, they didn't have an actual gun or a

14   knife or anything, they were armed with a vehicle, but you

15   found that their actions were objectively reasonable?

16       A.    Based on the information provided throughout a

17   comprehensive investigation.  I wasn't there at the time.

18   I had to do the same kind of review and assessment that I

19   would do here.

20       Q.    Would you also agree that one of the factors

21   that you consider in determining whether to evaluate a

22   threat or non, and to use deadly force is the demeanor of

23   the suspect?

24       A.    Of course.

25       Q.    And prior aspects of the suspect?

1      A.    Could be inclusive, yes.

2      Q.    As a law enforcement officer you were taught to

3  take all of those things into consideration in to

4  determining whether to actually fire your weapon or not;

5  right?

6      A.    Yes.

7      Q.    That is part of what you would consider the

8  totality of the circumstances; right?

9      A.    Yes.

10     Q.    Would you agree with me that you would point

11 your weapon at an individual who is harmed {sic} as the

12 threat becomes more imminent?  That if the threat becomes

13 more imminent to you as a law enforcement officer that you

14 are going to point your weapon at that individual?

15     A.    You are saying -- imminent is basically defined

16 as, without a fixed moment in time it's a possibility.

17 Where as immediate is happening at a guaranteed moment in

18 time without -- so I'm --

19     Q.    Let's talk about this.  Are there factors that

20 would cause a threat to become more imminent to a law

21 enforcement officer?  I mean, you see a threat.  Certain

22 things occur that cause that threat then to become more

23 imminent to that particular law enforcement officer; is

24 that true?

25     A.    Yes.  If I am following what you are saying

1    correctly.  Yes.

2         Q.   Factors that would cause the threat to become

3    more imminent would be the distance or proximity to the

4    threat?

5         A.   Sure.  Spacial relations.

6         Q.   Another factor that would cause the threat to

7    become more imminent to the police officer would be the

8    lack of communication with the suspect?

9         A.   What do you mean by that, the lack of

10   communication?  A threat does not -- you're saying that

11   because I can't talk to you, the threat is more --

12        Q.   Yes.

13        A.   -- increasing?  I think it would be more along

14   the lines of your disposition.  Do so much that I can't

15   talk to you as what your behaviors are in response to my

16   talking to you.

17        Q.   Would you agree that another factor that would

18   cause a threat to become more imminent to a law

19   enforcement officer would be if a suspect is failing to

20   follow that law enforcements orders?

21        A.   Oh, it definitely should increase your awareness

22   if nothing else.

23        Q.   Another factor you would consider a threat to

24   become more imminent would be if you have a fear for your

25   own safety?

1      A.    Based on?

2      Q.    Based on what is being presented to you by that

3   threat.  That the threat is not responding to your orders.

4   The threat is becoming closer.  Those kinds of things.

5      A.    I'm sorry, can you restate your question?

6      Q.    Sure.  That -- the initial question was, another

7   factor that you would consider whether a threat is

8   becoming more imminent to a law enforcement officer, is it

9   that law enforcement officer has a fear for his or her

10  safety; right?

11     A.    I think that -- guess I just don't agree with

12  the manner in which you are phrasing that.

13     The feeling that you get -- the fear for your safety is

14  the culmination of everything else you talked about.  The

15  fact that you are afraid doesn't mean that the threat is

16  getting stronger.  Your fear is based on the threat.  So

17  whether it's an immediate threat which is taking place

18  right then and there, which would be what we would look at

19  in this particular matter versus the imminent threat or

20  the potential threat, which is what they were talking

21  about as a possibility with his pursuit driving.  Imminent

22  verses immediate.  Mr. -- or I'm sorry.  Detective

23  Forsyth, in this particular matter was dealing with the

24  immediate threat being presented to him not an imminent

25  threat.  So I guess that's where we are having a

1   disconnect.  But your fear is developed out of the other

2   things that you've talked about.

3        Q.   Would you agree with me as these other things

4   develop and if you have this fear, based on these other

5   things as they are progressing that it's just a matter of

6   what you as the individual view as option presented to you

7   as that threat is presented?

8                MR. EDWARDS:  Object to the form.  I didn't

9   follow that.

10               MRS. DURST:  Sure.

11  BY MRS. DURST:

12       Q.   We've discussed all these factors that you take

13  into consideration as to whether the person is developing

14  this fear of the threat; right?

15       A.   Yes.

16       Q.   And that if I'm the person that is experiencing

17  this fear, based on all of these things that we have

18  discussed, that it's a matter of what I as the person that

19  is facing that fear view as my option for the action to

20  take.  Not what you from the outside are seeing, what I'm

21  seeing as the person that is facing the fear.  Does that

22  make sense?

23       A.   I think it does.  You have to make the decision.

24       Q.   So I have to decide on what options I have

25  available to me?

1    A.   Yes.  And I, you know, in a particular matter

2  such as this, it's based on background training and

3  experience.  But you are the one experiencing the fear.

4  You're the one that has to decide what the best response

5  would be to whatever threat is being presented.

6    Q.   Would you agree that after recognizing a deadly

7  threat you have to take some type of appropriate action to

8  neutralize that deadly threat?

9    A.   Yes.  If it's a deadly threat to you or someone

10  else you have to do something or the threat is going to

11  fulfill itself potentially.

12    Q.   And in neutralizing the thereat could include

13  firing a round?

14    A.   Oh, yes.

15    Q.   Is an important component of recognizing the

16  threat and taking the action the reaction time between

17  when you see the threat and when your mind tells your body

18  what you should do?

19    A.   Well, that's -- absolutely.  But reaction time

20  is a component involved in the force decision making

21  process.

22    Q.   So that's just one important component of it?

23    A.   It's a variable that influences the outcome.

24    Q.   During the time that you are recognizing the

25  threat and your brain is telling your body what do to, you

1  could have a situation where the threat could be moving;

2  right?

3       A.   Oh, of course.

4       Q.   The threat could actually be moving towards you?

5       A.   Sure.

6       Q.   Now, you've talked about the various training

7  that you've provided, you know, with the academy.  Have

8  you provided training with respect to shooting at a

9  target?

10      A.   Yes.

11      Q.   Would you agree with me there would be times

12  when you would want your officer that you are training to

13  turn around and fire a round at a target in as little as

14  two seconds?

15      A.   Not turn around.  But be able -- if you want to

16  be proficient with your holsters, for example, SAFARILAND

17  has a two second requirement that you are not considered

18  proficient with that holster system unless you can get the

19  weapon out of the holster on target and one round on

20  target in under two seconds.

21      Q.   And so whether you have to turn around or not,

22  you would, during those two seconds you would expect your

23  officer to see the target, perceive the target and react

24  to the target and make a decision whether or not to shoot,

25  all in the matter of two seconds?

1      A.   No.  See, that's where you're confusing it.

2      Q.   Okay.

3      A.   When you initiate motor action, response and

4   reaction time have just taken place.  The last step in the

5   reaction time principle is initiating motor action.  Well,

6   if the fact you are going for your holster means you have

7   already seen, perceived and are responding to the threat.

8   Within two seconds you have to have that weapon out of the

9   holster and on target to engage it.  Anything over that

10  means you need more training, you can't get your gun out

11  of the -- it might as well be super glued to your hip.

12  But the variables involved in the observational process

13  that the response time to a recognizing a threat, there

14  are -- and again, we go back to training and stuff for the

15  individual.  Everybody is different.  But there are -- you

16  can look at simple traffic studies to determine actual

17  response times.  You can look at For Science and what they

18  have done with them.  But when you are looking at the

19  amount of time it takes to see and comprehend a threat,

20  then once that has been collected, now your brain has two

21  choices immediately deploy a strategy that is already been

22  put in place through training and experience or cultivate

23  or develop a strategy.  Which, that's a little too late

24  because you are already in the middle of it.

25      Q.   So as the question as I phrased it, which said,

```
 1   during the two seconds you would expect them to see the
 2   target, perceive the target, react to the target and make
 3   a decision whether to shoot or not, you disagree with that
 4   statement; is that right?
 5        A.   Well, because you are -- that is a very large
 6   generalization.  You need to be -- what caused you to draw
 7   the weapon out of the holster.  So if you have a two
 8   second window to get the weapon out of the holster, if
 9   that drawing, and I want to make sure we are on the same
10   playing field here, if you're removing the weapon from the
11   holster that means you've already observed something.
12   You've already gone through some of the processes that
13   stimulated the muscle response.  So it could take longer
14   than -- the ultimate goal is have a condition response.
15   For example, I've had deputies that I've trained and
16   people that I've trained where they can turn a target,
17   perceive it, whether it's a shoot don't shoot target, and
18   be on target in under two seconds.  Others have taken
19   longer because they don't understand that there is a
20   window that they need to perceive the target -- whether --
21   it's not just, hey, look shoot a silhouette.  It's make a
22   decision as to whether or not that's a threat or not.
23   Optimal responses, if you can get somebody to have a
24   conditioned response that it initiates the action as soon
25   as the threat is perceived, then we now can transition it.
```

1   I want it effectively dealt with within that two seconds.

2   Did I -- I hope I didn't confuse you with that.  I'm

3   trying to --

4        Q.   You didn't.  And my question was much -- and you

5   can provide any explanation you want.  My question was,

6   you disagree with the statement that I read to you that,

7   during the two seconds you would expect them to see the

8   target, perceive the target, react to the target and make

9   a decision whether or not to shoot.  You disagree with

10  that statement?

11       A.   No.  I am not saying I disagree.  Who, are we

12  talking about law enforcement?

13       Q.   Yes.

14       A.   Then I would expect a law enforcement officer to

15  be able to begin to do those processes in that given

16  period of time.

17       Q.   And do that within the two seconds?

18       A.   Within the two seconds.  But I've also learned

19  through experience that getting a weapon out of a holster

20  in two seconds is enough of an issue for many in law

21  enforcement because of lack of training.  So there ability

22  to see and perceive a threat -- which is why we go through

23  condition response training.  Stress inoculation.  Things

24  like that is, we are trying to expedite their ability to

25  make a use of force decision based off good information

1   that they have available to them at the time, formulate a

2   strategy that is automatically, so now they have created

3   neuro pathways in their mind that says X equals -- easy

4   example, if I go into any group of cops and I pull out a

5   knife, they are pulling guns.  That's a conditioned

6   response.  Nobody had to say, hey, it's a good idea if you

7   pull a gun on this one.  So when we look at the

8   conditioning if we could achieve a two seconds where they

9   can get the -- sometimes it's three quarters of a second.

10  No, it's at least a third of a second for them to be able

11  to perceive and recognize and there's the processing.

12  Creating the forms that say A equals B to expedite the

13  time between the two points.  So I would love it to be two

14  seconds.  I would love it to be 1.5 seconds.

15      Q.   In the training that you provided that's what

16  you tried to train your --

17      A.   That's the goal of it.  Yes, ma'am.

18      Q.   And you would train any officer you were

19  providing training for, that hesitation will get them

20  killed?

21      A.   Without question.

22      Q.   Would you agree with me that if an individual is

23  armed with a weapon, you've given him or her commands, he

24  ignores your commands and then that individual keeps

25  moving in your direction with a weapon, you are going to

1   put a bullet in him; aren't you?

2        A.   Yes.

3        Q.   Fair to say you are not going to wait to see

4   whether or not that individual actually intends on

5   shooting you or anything like that; correct?

6        A.   That's correct.

7        Q.   And so if under that scenario that I gave you,

8   if the individual is armed with a weapon such as a vehicle

9   you've given the suspect commands, he is not following

10  those commands, he ignores them and begins moving in your

11  direction with the weapon, in that case a vehicle, you

12  would put a bullet in him; right?

13       A.   I wouldn't be in front of the vehicle.  Cause

14  you are ignoring another variable and you are adding into

15  hypothetical and I recognize the materials that you are

16  pulling them from.

17     You're taking into account the, well, the vehicle is a

18  weapon.  You're in front of the vehicle.  Here is a really

19  important thing about shooting at a motor vehicle, killing

20  the driver doesn't stop the car.  It doesn't.

21       Q.   In this case it did; didn't it?

22       A.   I don't believe it did.  I don't believe it did.

23  Based on my understanding of vehicle dynamics, based on my

24  understanding of how these things transpired and based on

25  the investigation that was provided, I don't see how it

1   was possible for this vehicle to be running in neutral

2   after the driver was shot.  If the catalyst for the

3   vehicle stopping was the termination of a life behind the

4   wheel, what was the catalyst to stop the vehicle in a

5   standard transmission?

6        Q.   You have no idea whether Mr. Rhoades was in the

7   process of shifting gears at the time he was shot; do you?

8        A.   So let me -- in a hypothetical that's been

9   presented you have 30 feet, if the vehicle is 13 to 15

10  feet long you have two to maybe three car lengths and he

11  is going to accelerate so fast that he is in between first

12  and second gear and yet the vehicle stops before it ever

13  exits the gas well site.  And is in the position in which

14  one of the deputies identify it being in when they

15  arrived.  So unless it's a magical vehicle, just because

16  one hypothesizes that this took place in between this,

17  they are not accounting for vehicle dynamics, they are not

18  accounting for what is the drag coefficient on the ground.

19  How much force does it take to get the vehicle moving

20  through the ground.  How could it be going from first to

21  second gear already.  These variables and they said the

22  engine was revving.  And I know in the hypothetical that

23  Mr. Faulkner put in there that it could have been his foot

24  is on the clutch.  He's already disengaged the clutch.

25  He's on the accelerator.  He's hearing the revving.  And

 1   the bullet hits him.  And what caused him to take his foot

 2   off both the clutch and the gas and to stop the vehicle in

 3   less than ten feet.  So all of these things, though they

 4   sound good when we talk about them individually, when we

 5   put them together in a sequence of events and actually

 6   investigate them and consider them in their totality they

 7   don't make sense.

 8        Q.   You mentioned a lot of terms.  You've already

 9   told me that you are not a shooting scene

10   reconstructionist; correct?

11        A.   That is correct.

12        Q.   And you are not an accident reconstructionist;

13   are you?

14        A.   Not an accident reconstructionist.  I've been

15   through traffic homicide investigations.  I've seen

16   traffic homicide investigations.  I have worked countless

17   wrecks.  I have had to investigate wrecks involving

18   pedestrians as well as commercial motor vehicles.  Vehicle

19   dynamics don't require reconstructionist to understand the

20   basic operating function of a vehicle and the amount of

21   time it takes to go from point A to point B.  That is not

22   required for a reconstructionist.

23        Q.   You weren't identified as an expert with regard

24   to vehicle dynamics, were you?  You were identified as a

25   use of force expert; correct?

1      A.   That is correct.

2      Q.   Would you agree with me that whether or not an

3  individual is in fear for -- oh, let me back up.  One of

4  the things when I asked you the question you started off

5  your answer, you said, I know what materials you are

6  taking this from.  What materials were you referring to

7  when you started responding to my question?

8      A.   My impression, my feeling is that these were

9  materials that could have possibly -- for example, I wrote

10  programs and things for the Martin County Sheriff's Office

11  and training and they just sound very familiar.  They

12  could either be from my training that you got from the

13  Sheriff's office materials, which at the time they were

14  written, depending on when they were written it could have

15  been ten years ago, things do change and evolve and get

16  better.  Or there is certain materials that I recognize

17  from some of the readings that I do with other periodicals

18  or manuals such as, not just For Science, but Caliber

19  Press and other groups that have put together materials.

20  Which also helps us in creating the materials that we

21  present to law enforcement.  So that is what I meant by

22  that.  Because some of the material I felt like, well,

23  that was true, but there has been evolutions.  So it's not

24  that, that wasn't accurate but there is more information

25  now.

1       Q.   So when you said you knew what materials that I

2    was referring to you don't know specifics, you just think

3    that it sounds familiar.

4       A.   That's what I said.  I feel I know the materials

5    you are referring to.

6       Q.   Would you agree with me that whether or not an

7    individual is in fear for his life is a significant factor

8    in determining whether or not they have a right to use

9    deadly force?

10      A.   Absolutely.

11      Q.   You mentioned kind of early in the deposition

12   when I asked you about how I think attorney Weston had

13   contacted you and you mentioned that you had testified in

14   the George Zimmerman case; correct?

15      A.   Yes.

16      Q.   In the Zimmerman case your opinion was that

17   based on the fear that Mr. Zimmerman experienced that he

18   had a right to defend himself; correct?

19      A.   Yes.

20      Q.   And because he was in fear for his life, whether

21   or not Trayvon Martin actually was reaching for

22   MR. Zimmerman's gun was a mute point?

23      A.   That is correct.

24      Q.   Mr. Zimmerman resorted to the defensive measure

25   he thought most appropriate given the fact that he was in

1   fear for great bodily harm or death; correct?

2       A.    Correct.

3       Q.    Would you agree that in a situation involving an

4   imminent threat you used the highest level of force you

5   have available to you.  So you don't really get behind the

6   curve.

7       A.    Say that one more time?

8       Q.    Yeah.  In a situation involving an imminent

9   threat, you use the highest level of force you have

10  available to you, so you are not put behind the eight

11  ball?

12      A.    I would state that you use the highest level of

13  force reasonable for the threat that is being presented.

14  Because a threat could be a punch and shooting them absent

15  other variables and information that's not the appropriate

16  connection.  So you don't get behind the curve, yes, but I

17  would put the caveat that you use the highest level of

18  force reasonable to deal with the threat that is being

19  presented.

20      Q.    So the statement as I phrased it, you don't

21  necessarily agree with because it did not include the use

22  of the term reasonable?

23      A.    Well, you said an imminent threat you use the

24  highest level of force available to you.

25      Q.    Yes.

1        A.   My answer to that would be adding the highest

2    level available to you that is reasonable to deal with the

3    threat that is being presented.

4        Q.   Okay.

5        A.   Because what is the threat.  You know, we have

6    to -- what playing field are we talking on.

7        Q.   So going back to my question then.  You disagree

8    with the statement because I didn't use the description of

9    the use of reasonable force?

10       A.    In this particular setting, yes.

11       Q.   The use of the highest level force could include

12   knowing whether or not -- I can't read my own writing,

13   sorry.

14      That situation involving an imminent threat, if you

15   make the decision to use the highest level of force, that

16   could include not knowing whether or not the threat was

17   actually armed; right?

18                   MR. EDWARDS:  Object to form.

19   BY MRS. DURST:

20       Q.   For instance, let's go back to the situation --

21   I can't remember the name of the case.  LeMasters.

22   Mr. LeMasters.  We talked about you testified, it was your

23   opinion and he had the right to use the deadly force;

24   right?

25       A.   Correct.

1    Q.   Based on the threat that was presented to him he

2   used the highest level of force available to him, which

3   was shooting Mr. Martin, I believe was his name, Josh

4   Martin.  The suspect?

5    A.   Yes.

6    Q.   So based on what the information presented to

7   him was he used that highest level of force.

8    A.   Based on the threats being presented by

9   Mr. Martin.  He perceived it to be, yes.

10    Q.   What was presented to him he did not know for

11   sure whether Mr. Martin was armed or not?

12    A.   No.  He took him at his word at the doorway.  He

13   knew the second engagement he could clearly see him.

14    Q.   So under that scenario in that situation

15   involving that imminent threat Mr. LeMasters used the

16   highest level of force regardless of whether or not it

17   turned out that the person that was the threat was armed?

18    A.   Taking in to the information that he available

19   to him, that was the decision that he made, yes.

20    Q.   So would you agree with me that pointing a gun

21   at an occupant of a vehicle, even without any idea of

22   whether that person is armed or not, you don't have any

23   issue with that?

24    A.   Well, I would like there to be some kind of

25   basis for doing it.  Just walking up and pointing a gun at

 1  somebody, I have an issue with that.  The way you phrased

 2  that was just pointing a gun at somebody is okay.  Why are

 3  you pointing a gun at them.

 4      Q.   If the person in the vehicle was presenting a

 5  threat to you, whether you know that they are armed or

 6  not, if they are in this vehicle, whether you see a gun or

 7  not you don't have any problem with someone pointing a gun

 8  at the occupant of that vehicle; is that right?

 9      A.   Depending on the situation.  Yes.

10      Q.   Other than Graham v. Connor and Tennessee v.

11  Garner are there any other legal decisions that you've

12  relied upon to formulate any of your opinions?

13      A.   No.

14      Q.   Did you make a determination as to any

15  constitutional standard you believed that governed Deputy

16  Forsyth's conduct in this case?  Like a constitutional

17  standard.  Like, your report doesn't reference any

18  amendment to the constitution or anything like that.  Did

19  you make a determination as part of the formulation of

20  your opinions in this case as to whether there was any

21  violation of any constitutional --

22      A.   Well, I guess because I used the Graham v.

23  Connor when that decision was about the forth, eighth,

24  fourteenth amendments, I think, of the constitution.  So I

25  guess including that was my, clearly, the ultimate --

1    taking somebody's life is the ultimate seizer.

2        Q.   So without the further discussion, if that

3    question is asked you would just refer to the

4    constitutional standards that are cited in Graham?

5        A.   Yes.

6        Q.   Were there any other constitutional standards

7    that you believed governed Deputy Forsyth's conduct that

8    were specific to this incident?

9        A.   Outside of the decisions the, standards that are

10   articulated in both Tennessee v. Garner and Graham v.

11   Connor cases, no.

12       Q.   Opinion one.  It's the lengthiest discussion.

13   It starts on page 10 of your report.  Do you see that?

14       A.   Yes.

15       Q.   And I'm paraphrasing, but it's essentially that

16   Deputy Forsyth use of deadly force was not objectively

17   reasonable; is that correct?

18       A.   Correct.

19       Q.   You start off, and I've got to find -- it starts

20   near the bottom of that page.  The paragraph that says,

21   "below I have outlined," do you see that?

22       A.   Yes.

23       Q.   It's the third full paragraph.  It says, "Below

24   I have outlined the facts beyond change in this matter."

25   I am trying to -- what do you mean by, beyond change?

1      A.   When I refer to facts beyond change, those are

2   the facts that the state presented in the course of their

3   investigation.

4      Q.   Okay.

5      A.   Those are directly attributed to the

6   investigation.  These were the facts that were presented

7   and in support of whatever the case might be.

8      Q.   I'd just never heard that phrase.

9      A.   I can't alter it.  Those are things that are not

10  open to somebody else's interpretation.  These are what

11  was said.

12     Q.   With regard to opinion number one, based on the

13  information that you have set forth as the basis for your

14  opinions, is it your opinion essentially that the incident

15  could not have occurred the way that it was described by

16  Deputy Forsyth?

17     A.   Well, it did occur with him in front of the

18  vehicle.

19     Q.   Well, you gave a long answer a few minutes ago

20  when I asked about the vehicle stopping after it was shot.

21  And you talked about the drag coefficient and all kinds of

22  things.  Is it your testimony that this incident as

23  described by Deputy Forsyth did not or could not have

24  occurred in that manner with the jeep moving toward him,

25  is that your opinion?

1      A.    That is my opinion that -- yes.  I am just going

2   to leave it at that.  Yeah it did not occur in that way.

3      Q.    So kind of part of, or basis for your opinion

4   that the use of force was not objectively reasonable is

5   that you don't believe that the situation that was

6   presented to him occurred the way he described it?

7      A.    No.  I came to that opinion based on the

8   information provided through an investigation.  Through

9   variables involved in the investigation.  Vehicle

10  placement.  Photographs that were taken.  The statements

11  that were made.  And then actually, looking at the

12  statement made and comparing it with the scene and the

13  information available to you at the scene.  So it wasn't

14  just, I didn't think it had happened that way, it's based

15  on the investigation that was presented to me it did not

16  appear that the manner in which he described it could have

17  taken place that way.

18     Q.    That was my question.  Based on what you

19  reviewed in this case, which sets forth the basis for your

20  opinions, and you talk about the conflicting statements

21  that you believe exist and the conflicts between

22  statements and physical evidence, all of those basis you

23  believe lead you to the conclusion that this incident

24  could not have occurred the way Deputy Forsyth described

25  it?

1     A.   Yes.

2     Q.   That seems to be somewhat of a common opinion

3  for you.  Do you recall in the Orr case that one of the

4  opinions you have was that the event could not have

5  unfolded as described by the parties in that cases?

6     A.   Yes.  And it is very common that when people are

7  providing this information or information that's

8  inaccurate that things do not unfold.  And it has been my

9  experience in the cases that I have reviewed that to be

10 the case.  The opinion in this case is that the use of

11 force was not objectively reasonable based on the totality

12 of the investigation.  Not just isolated down to what

13 you're trying to make it.  Oh, it's just because you don't

14 think it couldn't have happened.  The evidence and the

15 statements conflict with each other.  No one else wanted

16 to pay attention to the conflicts, but as a neutral party

17 with no skin in the game I look at it and say this should

18 have been evaluated.  These should have been checked out.

19 These should have been researched, this information.  But

20 it wasn't.  Oh, well, so now you are faced with the event

21 as it's presented in the investigation.  And they don't

22 match up with the statements made.

23    Q.   Well, you just referred to yourself as a neutral

24 party.  You understand you are retained and you are being

25 paid by the attorney representing the Estate of

1   Mr. Rhoades; correct?

2       A.   I understand that I am being compensated for my

3   time.  My opinion is not for sale.

4       Q.   But you wouldn't classify yourself as neutral

5   when you are being paid by the party that you're

6   testifying for, would you?

7       A.   I would.  Because if they were wrong or if I

8   didn't feel that they had a case I would have told them

9   that and we wouldn't be sitting here.

10      Q.   In the Noble v. Vero Beach case you also

11  testified that the event couldn't have unfolded as

12  described by Officer Gasbarrini; correct?

13      A.   That is absolutely correct.

14      Q.   Were you ever made aware that the plaintiff in

15  that case voluntarily dismissed the case against Vera

16  (Phonetic) Beach?

17      A.   Nope.

18      Q.   Do you also recall in a case of Torres v.

19  Sheriff Bonetti your opinion was that the timeline of

20  events that was testified to by Deputy Bonetti did not

21  make sense considering the events that he described?

22      A.   That is correct.  And based on the weapons

23  systems and everything, I believe, that was the TASER

24  case.

25      Q.   You have repeatedly referred to and discussing

1   what we have discussed so far of your first opinion is

2   that the part of the basis is you believe that there were

3   explicit conflicts between the version of events offered

4   by Deputy Forsyth and Deputy Love; right?

5        A.   Yes.

6        Q.   So is it true that you are relying on the

7   timeline of events as described by Forsyth and Love in

8   saying that there timelines don't match up?

9        A.   No.  I didn't mention the timelines in that.

10       Q.   Well, you mentioned something about the vehicle

11  being in the same place described by one of the officers

12  as in when they pulled in, is that not considered part of

13  the timeline as to how things occurred?  About the vehicle

14  in the same place as pulled in part of the time?

15       A.   No.  Well, it's position at the time, yes.

16  There is a timeline throughout the entire event.  However,

17  when you mention that particular matter I am talking about

18  the fact that without question Deputy Love puts the

19  vehicle in the same place all the time.  Before shooting

20  and after.  He puts it in the same position the entire

21  time.  That conflicts greatly with the information

22  provided by Deputy Forsyth, which put the vehicle almost

23  striking them, then backing up for a three point turn,

24  then coming forward, then revving the engine, spinning the

25  tires and accelerating to him in what he defined as an

1  aggressive manner.  Those two variables in and of

2  themselves, significantly different.  Minusing the

3  perspective observations and things like that, they are

4  different.  Never investigated.  But it's an imperative

5  part of getting the information to insure the right answer

6  is arrived at.

7      Q.   Which is another criticism you have with regard

8  to the totality of the state police investigation?

9      A.   Sure.

10     Q.   Is it true that if you were investigating a

11 shooting that you wouldn't really ever ask about the

12 timeline because every event, especially in a high stress

13 event, time seems to really exist in the way each person

14 is considering it?

15     A.   Well, you're conflating two different topics.

16 Discussing a timeline versus asking something for time

17 variables.  When you look at somebody and say, well, how

18 long did that take you.  Time ceases to exist for somebody

19 under stress.  Which is why, even in all the stuff I read

20 where people are trying to log people into times, I don't

21 care because in that particular matter if you are talking

22 about a matter of a quarter of a second or two seconds,

23 trying to lock them into a time, you have to focus on the

24 issue at hand.  They may or may not be able to provide

25 time.  That is very different than establishing a timeline

1    and sequence of events based on the information provided.

2    Those -- you have to take, for example, if you ask

3    somebody how long it took to do something with a grain of

4    salt.  They may or may not be accurate.  It's not the

5    crutch to say, well, you're lying to me or anything like

6    that.  But it is a part of developing a timeline.  But it

7    is not the timeline.

8        Q.   You reviewed the statements of Deputy Forsyth

9    and Deputy Love in this case, the interview that was

10   conducted by them of Sergeant Branham; correct?

11       A.   Yes.

12       Q.   When you review an interview, is it fair to say

13   that you take into consideration everything from lay

14   witness to the suspects to the defendant to whoever the

15   case might involve, that there could be variations between

16   what each person recalls?

17       A.   Without question.

18       Q.   And what each person saw?

19       A.   Without question.

20       Q.   Because everybody's perception is different;

21   correct?

22       A.   That is correct.

23       Q.   You can have people testifying to different

24   things who actually witnessed the same event?

25       A.   Absolutely.

1    Q.   Would you agree that a conflict in how an

2  individual describes an event versus how another

3  individual describes an event can depend upon the position

4  of each person in relation to that particular incident?

5    A.   Sure.

6    Q.   It can also depend upon the memory of each

7  individual; right?

8    A.   Yes.

9    Q.   Would you agree with me that feeling a high

10 stress traumatic event like a shooting, that a person's

11 body is going to undergo psychological and physiological

12 responses that could impact their memory?

13    A.   For a period of time or forever.

14    Q.   In fact there are situations where it's not

15 uncommon for an individual not to remember certain things

16 occurring at all; correct?

17    A.   Correct.

18    Q.   I wanted to ask you, one of the things you

19 mentioned about was going to the hospital.  We will talk

20 about that in a second.  You've seen in the questioning of

21 Deputy Forsyth and Former Deputy Love by Mr. Edwards that

22 there were a number of questions asked of those

23 individuals about Sergeant Branham asking them to give a

24 statement on August the 2nd when the shooting occurred and

25 they didn't actually provide statements until two days

1   later.  Do you recall those questions?

2        A.   Yes.

3        Q.   Would you agree with me that was not the time

4   for those individuals to actually be answering questions?

5        A.   I do.

6        Q.   The truth is that if you're asked by a police

7   officer, even if you are a law enforcement officer who is

8   involved in a shooting, if you are asked to give a

9   statement immediately following the use of deadly force

10  you should say no?

11       A.   Absolutely.

12       Q.   In fact, you would recommend that an individual

13  not discuss the incident again until they were medically

14  cleared?

15       A.   Correct.

16       Q.   And until they've had an opportunity to speak

17  with a reputable attorney; right?

18       A.   Correct.  For -- you are talking about a

19  civilian cases?

20       Q.   Yeah.

21       A.   Because there is more with law enforcement.

22       Q.   Yes.  So even though it seems like there were a

23  lot of questions asked of Deputy Love and Forsyth as to

24  the timing of the statements and there were questions

25  asked of Sergeant Branham about the timing as well.  Is it

1  fair to say that you do not take any issue with the fact

2  that they did not provide statements until two days later?

3       A.   I take no issue with that at all.

4       Q.   Is it fair to say also that you do not take any

5  issue with the fact that they were taken to Fairmont

6  General Hospital to be evaluated?

7       A.   I have no issue with that either.

8       Q.   In fact you strongly recommend that any

9  individual involved in a high stress event, whether a

10  police officer or not, that they have a complete -- they

11  have an examination; correct?

12       A.   Absolutely.

13       Q.   To make it easier for me I kind of put little

14  letters beside each paragraph.  But I will try to tell you

15  if I am asking you about the paragraph.

16     The first paragraph says, about Deputy Forsyth losing

17  sight of the jeep.  Do you see that?

18       A.   Are you talking about opinion one?

19       Q.   Yes.  Opinion one.  The first paragraph that has

20  the little dash.  The first dash at the bottom of the

21  page.

22       A.   Oh, okay.  Yes.

23       Q.   I think you talked about this a little bit

24  before.  Because he didn't have sight of the jeep, it's

25  your opinion and testimony that he actually wasn't in

1    pursuit of the jeep; is that right?

2         A.   That is correct.

3         Q.   You also mention about conflicting statements

4    about the location of the access road.  Do you see that?

5    Kind of starting at the bottom of that page and continuing

6    over to the next page?

7         A.   Yes.

8         Q.   You only reference page 2 of Deputy Forsyth's

9    interview transcript.  Do you know where the conflict is

10   between his transcript, or his statement and Deputy Love's

11   statement as about the access road?  And I will tell you

12   the page that you referenced.  And if you have Deputy

13   Forsyth's transcript, page 2 is what you referenced.  His

14   quote was, "There was an access road in the area where we

15   lost the vehicle."  My question was, that's what you've

16   referenced, I want you to tell me where he says who

17   actually located the access road in that particular

18   statement.

19        A.   In his original statement?

20        Q.   Yes.  You reference page 2.

21        A.   Can you restate your question for me?

22        Q.   Yeah.  What I found on page 2 in Deputy

23   Forsyth's statement, he references, he said, "There was an

24   access road in the area where we lost the vehicle."  What

25   I am trying to figure out is where in that statement did

1  Deputy Forsyth say who actually located the access road.

2  Because my understanding is, you're saying there is a

3  conflict between what Forsyth and Love said about who knew

4  where the access road was located.

5      A.   My inference from him saying that he waited to

6  make a U-turn because he went to the access road in that

7  area where we had lost the vehicle.  He said that he had

8  located it and it was Deputy Love that said, well, no

9  there is an access road back here and that he just -- he

10 reversed.  There was no passing vehicle.  There was no --

11 it was just he backed up and he told him that there was

12 the access road off to the side.  So it was Deputy Love

13 that located the access road or identified it as they

14 drove by it.

15     Q.   Do you know if they are referring to the same

16 road.  There was Parrish Run.  There was East Run.  Do you

17 know which road they are referring to?

18     A.   They were on Parrish Run.  So the access road

19 would have been the road that they took and then that they

20 identified in their statements as being the road that led

21 to the gas well site.

22     Q.   Well, let me ask this.  You've agreed with me

23 earlier that the moment an individual feels in a situation

24 where they are facing the danger of great bodily harm or

25 death that it's objectively reasonable for them to use

 1   force that would result in great bodily harm or death,

 2   okay.  So my question is, if that's kind of the premise

 3   that we are using to determine whether the force used was

 4   objectively reasonable, how does whether Forsyth, number

 5   one, was in pursuit of the vehicle or lost sight of it or

 6   not, have anything at all to do with whether he perceived

 7   or felt that he was facing serious harm or death at the

 8   gas well site?

 9        A.   It was my observation to show the conflicts in

10   their statements and as they continued to grow throughout

11   the encounter.

12        Q.   But whether he lost sight of the jeep or was

13   still in pursuit of it doesn't tell us what his state of

14   mind was at the site when he fired the shots; right?

15        A.   No.  But if you were going to utilize the stress

16   involved in being involved in a pursuit as part of the

17   articulable variables involved in making a force decision

18   because of the elevated stress and everything that comes

19   from a pursuit.  If you are no longer in a pursuit and you

20   are just looking, that stress is diminishing.  So their

21   assertion of the pursuit, I think it is very important to

22   consider the fact that you are not actively pursuing the

23   vehicle.  So the things that are happening to somebody

24   during a pursuit, as the pursuit ends and you -- you start

25   to relax, you start coming down.  There are fluctuations.

1   So if the assertion is that the pursuit is one of these

2   variables that led up, and based on my reviewing of their

3   statements, the pursuit was a very important variable in

4   his decision making process.  Then I thought it important

5   to prove -- or to show they are not.  You are looking.

6   You are actively searching.  Once you find the vehicle,

7   how the event unfolds from there, you now have another

8   event.  But the pursuit has ended.  You are no longer in

9   pursuit of the vehicle.

10        Q.   How does any conflict in who located the access

11   road have a single thing to do with whether or not Deputy

12   Forsyth thought his life was in danger?

13        A.   I thought that it went to showing that they

14   weren't in pursuit and that if the pursuit is part of the

15   catalyst for the decision making process that, that's a

16   variable that is not impacting this process.

17        Q.   If you assume what Deputy Forsyth described as

18   occurring, that this jeep was moving toward him in an

19   aggressive manner, okay, for purposes of this question.

20   It wouldn't matter if it was Philip Rhoades driving that

21   jeep or not, would it?

22        A.   No, it wouldn't.

23        Q.   So whether he knew whether it was Rhoades or

24   not, if it occurred they way that Deputy Forsyth

25   described, it wouldn't matter whether he was still

1  pursuing the jeep or not; right?  If the jeep is driving

2  at him; right?

3       A.   It wouldn't matter if he is --

4       Q.   If he had lost pursuit of the jeep and then saw

5  the jeep in this clearing and it occurred the way Forsyth

6  said, right, we look at what he was perceiving at the time

7  that jeep was driving toward him; right?

8       A.   Hypothetically if you are saying it occurred the

9  way Forsyth said, then, yes.

10      Q.   Then it wouldn't matter whether he lost sight of

11 the jeep initially or not; right?

12      A.   That's correct.  Because it wouldn't be a

13 variable in the event.

14      Q.   And it wouldn't matter whether Forsyth located

15 the access road or Corey Love located the access road,

16 would it?

17      A.   It would not.

18      Q.   You also then have -- it's in the first full

19 paragraph on the top of page 11.  You talk about there

20 being no ground disturbance.  Do documented evidence of

21 ground disturbance in support of the described vehicle

22 movement.

23      A.   Correct.

24      Q.   Tell me what evidence you would see in a grassy

25 area of a three point turn.

1        A.    At the speed -- with tires spinning or the three

2   point turn?

3        Q.    The three point turn.

4        A.    Well, that particular portion I wouldn't --

5   matted grasses.  Depending on the grass height, vehicle

6   weights.  Things like that.  Crush to the vegetation.

7        Q.    You told me that you have reviewed Sergeant

8   Branham's deposition transcript.

9        A.    Correct.

10       Q.    And did you recall or see in his transcript

11  where he was specifically asked by counsel for Mr. Rhoades

12  estate to review photographs to see whether there was any

13  evidence of tires spinning, do you recall that?

14       A.    Yes.

15       Q.    And he actually identified a photo, didn't he?

16  Do you recall that?

17       A.    No.  I don't recall that.

18       Q.    Okay.

19       A.    Of tires spinning?

20       Q.    Yes.

21       A.    I'd have to see -- I don't recall that.

22       Q.    The next paragraph talks about?  "The vehicle

23  movement was disputed by Deputy Love but the investigator

24  did not follow up on this conflict."  Would you agree with

25  me that, and numerous places throughout, you say the

1  investigator did not seek clarification.  The investigator

2  did not follow up on certain things.  Those would be

3  criticisms you would have of the West Virginia State

4  Police's investigation; correct?

5      A.   Correct.  He made no actual effort to verify or

6  substantiate information to research information to

7  actively -- he didn't -- and I don't fault Sergeant

8  Branham.  It became very clear he didn't understand what a

9  force investigation should entail.  He didn't even know

10 why they were set in separate vehicles and -- because he

11 didn't understand the variables that need to be looked at

12 and investigated in a use of force.  Especially a force

13 event involving law enforcement.

14     Q.   Let's talk about, you say that there was a

15 conflict between the description of the vehicle movement;

16 right?  Essentially.

17     A.   Which page are we on?  I'm sorry.

18     Q.   Page 11.  It's the paragraph that starts the

19 second full paragraph on the page.

20     A.   Okay.

21     Q.   Your testimony in this case is that you believe

22 that there has been a conflict between the vehicle

23 movement as described by Deputy Forsyth and his statement

24 to the state police and Deputy Love and his statement;

25 right?

1      A.   Well, I see a conflict in even Deputy Forsyth's

2  because one minute it's sitting or parked to the left and

3  then it's moving.  But that's a minor issue in and of

4  itself.  Then there is the obvious conflicts between

5  vehicle positioning and movement according to the

6  statements provided by Deputy Forsyth and Deputy Love.

7      Q.   You would agree that two individuals, as we

8  said, witnessing the same incident can see different

9  things; right?

10     A.   It's possible, yes.

11     Q.   Because Deputy Forsyth, when he would have been

12 operating a cruiser and entered the site where the jeep

13 was located, he would have been on the driver's side

14 obviously of the vehicle on the left hand side; right?

15     A.   Yes.

16     Q.   And he would have exited the vehicle on that

17 side?

18     A.   Correct.

19     Q.   And Deputy Love would have been on the right

20 hand side of the vehicle with a different perspective;

21 right?

22     A.   Yes.

23     Q.   So you already agreed with me also, I believe,

24 that individuals can forget things from a high stress

25 event like a shooting; right?

1    A.    Yes.

2    Q.    So the fact that you claim Deputy Forsyth

3  described the movement of the jeep -- I think what part of

4  your -- the conflict you say exists is that, Deputy

5  Forsyth described the movement of the jeep before he

6  exited the cruiser and Deputy Love does not describe that,

7  is that part of it?

8    A.    Conflict -- Deputy Forsyth clearly sees the jeep

9  almost striking their patrol car.  It never existed to

10  Deputy Love.  Deputy Forsyth sees the jeep making a three

11  point turn.  Doesn't exist for Deputy Love.  Now, neither

12  of them, the stress that they have to this point is a past

13  pursuit.  Neither of them describe the vehicle placement

14  or movement the same.

15    Q.    But they have different perspectives; right?

16    A.    Different perspectives -- there are limits to

17  what people can and can't see.  And perspectives do

18  change.  But when you look at the size of the vehicle and

19  you look at the field of performance for observation it is

20  something that is curious and should be recognized and

21  acknowledged that these are variations that are not

22  explained.

23    Q.    Let me ask you.  You have access to Deputy

24  Love's statement?

25    A.    Oh, yes.

1    Q.   And I've got to find it in your report.  Your

2  report indicates that Deputy Love said that the jeep was

3  stopped to the left?

4    A.   Yes.

5    Q.   Find for me in Deputy Love's statement where he

6  actually used the word, stopped, when he is describing the

7  jeep to the left.  The actual -- and let me ask this.  You

8  are referring to the transcription of the recorded

9  interview of Love; right?

10   A.   Yes.

11   Q.   You are referring to the Love interview.  I

12  think it's page 7 and 8.  I didn't write that down.  But

13  your report says 7 and 8.  And you specifically use the

14  word, stop.  What I want you to find for me is where

15  Deputy Love, when he is describing the jeep being to the

16  left.  Where he describes it as being stopped.

17   A.    It was he said that it was off to the left and

18  when he was asked by the trooper if the vehicle was moving

19  and he said no, then that's where he said it was stopped

20  it was off to the left.  He never deviated from the

21  placement.  Deputy Love has consistently said the vehicle

22  was off to the left 10 to 15 feet from the entry point to

23  the gas well site.

24   Q.   You say, Love said the jeep only came forward

25  after Forsyth exited the vehicle; is that right?  So

1  meaning, Deputy Love did not see the jeep moving before

2  Forsyth exited the vehicle; is that right?

3       A.    Are we talking about his original statement?

4       Q.    The statement that he gave to Trooper Branham?

5       A.    Yes.  You're correct.  Correct.

6       Q.    Which is what you would have had at the time you

7  prepared the report.

8       A.    That is correct.

9       Q.    So your opinion is, that Deputy Forsyth says the

10 jeep was moving before he got out of the vehicle that it

11 started to come at the cruiser.  And Deputy Love said the

12 jeep only came forward after Forsyth exited the vehicle;

13 is that right?

14      A.    No.  No, ma'am.  It is very clear in their

15 statements that Deputy Love said that when they entered

16 the jeep pulled forward almost striking the patrol car.

17 Then backed up and tried to do a three point turn.  Almost

18 through the driver's door.

19      Q.    Forsyth or Love?

20      A.    I thought I said Deputy Forsyth.

21      Q.    Okay, I think?

22      A.    I'm sorry, it's Deputy Forsyth.  I'm sorry.  If

23 I said Love I apologize.  Deputy Forsyth is the one that

24 said the vehicle came forward almost striking the patrol

25 car but didn't hit it.  And then backed up and did a three

1    point turn.

2        Q.   So my question to you was, part of what you

3    claim is a conflict between their statements is that

4    Deputy Love did not describe that movement toward the

5    vehicle when they first pulled into the well site; right?

6        A.   He never indicated that movement, any of the

7    movements for the vehicle's three point turn or almost

8    pulling forward almost striking the patrol car.  None of

9    those at all.

10       Q.   Do me a favor and look on page 12 of your

11   report.  It is the one, two, the third full paragraph down

12   that says, "Deputy Love described the jeep's location."

13       A.   Yes.

14       Q.   It goes on the say, "Deputy Love described the

15   jeep's location as bing about 10 to 15 feet off to the

16   left side and as soon as we pulled in he started coming

17   out."  So how did Deputy Love not describe that jeep

18   moving before Deputy Forsyth got out of the car?

19       A.   Well, I think what's really important, as you

20   pull the paragraphs apart individually is, I'm providing

21   the information provided by the statements.  So there are

22   conflicts in their statements that the investigator did

23   not question or critically analyze to just try to find out

24   even it was a memory issue.  What ever the catalyst was

25   for the conflicts, nothing was ever tried to be explained

*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*                                      Page 206

1   or anything or investigated in that way.  I am relating

2   the information that's related from the statements and

3   where the conflicts come in.

4        Q.   But you told me was, part of the reason you

5   believe there is a conflict is because Deputy Love had not

6   described the vehicle as moving at any point in time

7   before Deputy Forsyth exited the vehicle.  And clearly in

8   his statement he says, "and as soon as we pulled in he

9   started coming out."  Correct?

10       A.   That would be where he is based by the corner.

11  Yes.  That is correct.  That's -- that's what he said.

12       Q.   So Deputy Love did describe the jeep as moving

13  before Deputy Forsyth exited the vehicle.  If he says, "as

14  soon as we pulled in he started coming out."

15       A.   Later in his interview, past that point where he

16  made this statement, and I am relating the statements as a

17  neutral party reads through the documents and they review

18  and evaluate, these conflicts and statements would have

19  been wonderful to have clarification on.  There wasn't

20  any.  So in articulating this, it is pointing out the

21  conflicts in the statements.  The things that lead one to

22  believe based on all these conflicts and nobody looking

23  into it.  Nobody investigating it.  Nobody verifying

24  information.  It leaves you with one outcome.  Because if

25  the physical evidence doesn't represent what's being

 1  explained, and again, you know, you go back to, this

 2  person's perception is the most important part.  And it

 3  is.  But that perception has to be based on facts.  On

 4  information.  Even if that information later turns out to

 5  be not what you expected it to be or not what you thought

 6  it was at the time of that moment in time, you still have

 7  to have the basis for forming the initial perception.  And

 8  that's what justifies the application of force.

 9       Q.   Well, as I've understood your report, your

10  report focuses on conflicts between Forsyth and Love's

11  statements?

12       A.   Correct.

13       Q.   I don't, unless I missed it, and I read through

14  this over the weekend again, I don't see any specific

15  place where you say there was any conflict within Deputy

16  Love's statement.  Which is the answer you just gave me

17  when I asked about him saying the vehicle moved forward as

18  soon as we started pulling in.

19       A.   I was focused -- am focused on Deputy Forsyth.

20  Deputy Forsyth is the individual who discharged his

21  firearm.  In looking at all of the statements, I

22  articulate in my report what I read in the statements.

23  And how that influences the opinions that I'm presenting.

24       Q.   And that's fair enough.  But part of the basis

25  of your opinion that the use of force was not objectively

```
 1   reasonable is because there are, what you say are
 2   conflicts between what Forsyth and what Love said; right?
 3        A.   Correct.
 4        Q.   If you believe there are conflicts between what
 5   Love said in his own statement why would you not include
 6   that in the report.  Even if he's not the one that did the
 7   shooting?
 8        A.   If the focus of my opinions was on Deputy Love's
 9   violations of policies, his potential violations of not
10   being forthcoming with information, whatever the case
11   might be for an internal investigation, that would be
12   different.  My -- I'm focused on the use of force and the
13   things that are taking place in that car.  The
14   misinformation as it turns out later that has been
15   provided.  So, I mean, even these statements now, you
16   know, now that I have gotten the -- just received the
17   deposition from Mr. Love, there hasn't been any time to
18   formulate a supplemental report and to provide one.  And
19   that's why when you ask me, I said at this time I am not.
20   There is still more information coming in.  I would be
21   happy to provide a supplemental once I know, okay, well,
22   if we are going to provide a supplemental for every single
23   time if that's what the client wants then that's what I
24   will do.  Be we are still trying to gather information.
25   So these are the statements made initially.  And I might
```

 1   add, these are the statements made initially by two

 2   individuals that took the time needed to decompress, to

 3   gather their thoughts and formulate the information to

 4   written statements they read during an interview.

 5       So I am just relaying the information as it is

 6   presented in their statements.  And I didn't need to focus

 7   on just Deputy Love's discrepancies.  Because Deputy Love

 8   didn't use force in this event.

 9       Q.   But you are focusing on what he said to address

10   what you assert or perceive conflicts between what he and

11   Forsyth said; right?

12       A.   That is correct.

13       Q.   In that answer that you provided you also said

14   something about, we now know that there has been

15   misinformation that's been provided.  What misinformation

16   has been provided?

17       A.   For example, the fact that whether the catalyst

18   for the application of force was based on knowledge -- one

19   of the variables involved in making a force decision is

20   your knowledge of the individual.  And whether or not he

21   had active warrants, whether or not he did certain things,

22   now we are finding out as we go through in deposition

23   that, no, at least Deputy Love, for example, didn't know.

24   And then there was what Deputy Forsyth -- you know what, I

25   am going to pause right here because as I do my reviews,

1  and this is not my process, I will be happy to submit a

2  supplemental report articulating them because one, I don't

3  want to misstate one of the variables that I have observed

4  in the supplements that I've received since.  So I will

5  leave it with, I will supplement this to articulate the

6  ongoing information that either supports or doesn't

7  support my opinions presented or creates new ones.

8      Q.   And to the extent that you do, I may reserve the

9  right to re-depose you.

10     A.   Absolutely.

11     Q.   With regard to that part of the statement, you

12 said you have reviewed Deputy Loves deposition.  You said

13 apparently he didn't know what the warrants were.  Does it

14 matter?  He wasn't the one that did the shooting was it;

15 right?

16     A.   For him?

17     Q.   Yeah.

18     A.   No.

19     Q.   So it doesn't matter whether Deputy Love knew

20 that there were outstanding warrants and what those

21 warrants were, does it?

22     A.   It actually does.  Because if you are looking at

23 a case based solely on statements.  Solely on statements.

24 For example, if this event had taken place in the middle

25 of a concrete parking lot in the middle of nowhere, you

1  would only have the version of events presented by the

2  officers.  Because you would have a potential for none of

3  the roadway evidence that you would see in this particular

4  event.  But there was a very large amount of information

5  that could be acquired from the scene that should

6  substantiate the statements that are being made.  So if

7  there was nothing to substantiate the physical evidence,

8  the statements being made become important because you

9  have to make a determination as to whether or not you're

10  -- you're getting the information relative to what

11  actually took place.

12       Q.   So going back to the discussion that you and I

13  just had.  You believe that whether Forsyth -- or whether

14  Love know whether there were warrants or not is important,

15  but whether there was a conflict in his own statement

16  wasn't something that you needed to include in your

17  report; is that right?

18       A.   No.  That's not what I'm trying to say.  And

19  apparently I am failing at explaining it to you.

20       Q.   The next, it is the third full paragraph on page

21  11 of your report.  It talks about Deputy Forsyth stating

22  at that point, "the engine did begin revving, tires spun

23  and the vehicle started moving towards me in an aggressive

24  manner."  Do you see that?

25       A.   Yes.

1    Q.   Your opinion is that there was no documented

2    evidence of any ground disturbance, which we have kind of

3    talked about; right?

4    A.   That is correct.  At the time that this is

5    written that is correct.

6    Q.   Now, and I want to clarify a question that I

7    asked you, cause I may have misstated.  Deputy Branham was

8    specifically asked -- Sergeant Branham was specifically

9    asked in his deposition about photos that were taken of

10   the scene and he was asked by counsel for the Estate as to

11   whether there was any photo that he thought actually

12   showed aggressive driving by the jeep, okay.  And at page

13   115 and 116 of his deposition he identified a photo that

14   he thought possibly could show aggressive driving.  So

15   you're saying that there is no documented evidence of any

16   ground disturbance and the Sergeant who investigated it

17   was asked specifically in his deposition under oath and he

18   found a picture and pointed it out to counsel.  You don't

19   recall that in his deposition?

20   A.   I missed that in his deposition.  And I would

21   like to know what photograph it is that he's asserting now

22   that shows that.  Because I would like to see the

23   photograph that shows the aggressive driving of this

24   individual.  And I'm praying it's not the assertion that

25   the photograph toward the entry way in which the vehicle

1   was in it's final resting position was proof of

2   acceleration as described by them.  Because in that

3   particular photograph there is a lot of information that

4   could have been looked at but given the location in which

5   they articulated the tires spinning and all that took

6   place, it wasn't at its point of rest.  So I would need to

7   look at what photograph.  And I'm sorry, I have absolutely

8   no idea how I missed that.  But I would say that I will be

9   sure -- and you said it was page --

10       Q.   115, 116.

11       A.   115, 116.  I will look at that because I would

12  like to know what picture that is so that I would better

13  review it from his perspective to consider it in my

14  opinions.

15       Q.   You also in this paragraph state that the

16  investigator did not follow up on this conflict and seek

17  clarification of what "aggressive manner" meant.  Do you

18  see that in your report?

19       A.   Absolutely.

20       Q.   Again, that is a criticism of the West Virginia

21  State Police Investigation, who you understand is not a

22  party to this case; right?

23       A.   I do.  And I don't doubt that at all.

24       Q.   So if Deputy Forsyth described the vehicle as

25  the engine revving, the tires spinning and the vehicle

1  started moving towards me, you don't think that's enough

2  of a description of what he meant by aggressive manor?

3       A.   It sounds like a checklist.

4       Q.   What do you mean, sounds like a checklist?

5       A.    Well, when I read on the 25th how they clearly

6  articulated the vehicle accelerating, tires spinning, mud

7  flying and all that, and through thirty years of

8  experience, there are certain variables that people

9  articulate.  Law enforcement is very well trained that,

10  what is an aggressive manner.  That is not an articulation

11  of something.  It is an aggressive manner.  It's a car

12  coming toward me.  Tires spinning.  The coming toward me

13  in an aggressive manner.  Engine revving.  Okay, engine

14  revving, checklist.  Tires spinning, because it's rapidly

15  accelerating.  These are all flying into a narrative.

16  Fine, as long as the physical evidence at the scene

17  supports the narrative.  Zero issue with that.  But when

18  those descriptors are provided and there isn't physical

19  evidence that shows it, one must question the validity of

20  the information being provided.  Or investigate why it's

21  possible that, that didn't happen.

22       Q.   Is it your testimony in this case that you

23  believe before Deputy Forsyth provided the statement to

24  Sergeant Branham on August the 4th that he reviewed

25  documents from the July 25th chase to make sure that he

1   had those points from the checklist in there in his

2   description?

3        A.    No.

4        Q.    Would you agree with me that someone can drive a

5   vehicle aggressively toward another individual without

6   spinning the tires?

7        A.    I agree somebody can drive it toward them.

8   Again, you're putting in the word aggressively.

9        Q.    Well, I mean, you said that the police officer

10  didn't follow up as to the description of aggressive

11  manner in that there is no ground disturbance that you

12  believe is evidence by the photographs; right?

13       A.    Yes.

14       Q.    My question is, do you believe that someone can

15  drive a vehicle towards you in an aggressive manner and

16  they don't have to be spinning the tires to cause ground

17  disturbance?

18       A.    You have not defined what aggressive manner

19  means.  Can somebody drive towards you without spinning

20  the tires, yes.  You are asking me to agree to aggressive

21  manner.  And I want to know how you define aggressive

22  manner.

23       Q.    How do you define it?

24       A.    It's not up to me to define that.  That's an

25  individuals perception.  I don't define motor vehicles

 1  moving in an aggressive manner.  Vehicles move.  If you

 2  are being targeted by a vehicle, the vehicle is coming at

 3  you trying to kill you.  Trying to run you over.  An

 4  aggressive manner, what does that mean.  That was the

 5  reason that he didn't -- he didn't ask that question.

 6  What do you mean by aggressive manner?

 7      Q.   Well, Deputy Forsyth said the vehicle was moving

 8  toward him, didn't he?

 9      A.   He did.

10      Q.   The next paragraph you also say -- you talk

11  about Deputy Forsyth said he again ordered the vehicle to

12  stop and allowed audible voice.  The vehicle did not stop,

13  slow, veer or slow down.  And you said the investigator

14  did not question Deputy Forsyth's perception of the

15  vehicles' movement.  That is also a criticism you have of

16  the West Virginia State Police's investigation; correct?

17      A.   Sure.

18      Q.   The next paragraph at the bottom of page 11 that

19  continues over the top of page 12.  And this is a conflict

20  as to whether Forsyth knew it was Rhoades or not.  My

21  question to you is, how does whether Forsyth knew it was

22  Rhoades or not equal the fact that he was not in fear of

23  his life if the jeep was driving toward him?  You've

24  already told me it's doesn't matter who was driving the

25  jeep; right?

```
 1        A.    That's correct.  Did you want me to answer the
 2   first question?  Cause you posed two questions there.  You
 3   had one and the followed up by a second one.
 4        Q.    If you can remember the question because I
 5   cannot.
 6        A.    How does it impact whether he knew or not.
 7        Q.    Yeah, okay.
 8        A.    Well, first of all the most basic impact, he is
 9   a police officer pursuing what he articulates as being a
10   wanted felon for attempted murder of a police officer.
11   And he chose to get out in front of, and stand in front of
12   the man with the weapon.  Horrible tactical decision
13   placing himself into a position that forced him to use
14   deadly force to protect himself for a failure to take an
15   kind of real position of advantage or even try to maintain
16   a position of advantage with his motor vehicle.  So
17   whether or not he knew it was Rhoades leading up to it, if
18   he knew that it was Rhoades and he had all this
19   information about how violent and everything else he is,
20   his tactical decisions were terrible given that knowledge.
21   If he didn't know that it was Rhoades, he still made
22   horrible tactical decisions that placed him in a position
23   that opened himself up.  That opened himself up.
24        Q.    If he knew it was Rhoades, and as you said you
25   believe he made a horrible tactical decision, that still
```

1    doesn't mean that he was not in fear for his life; right?

2         A.   One cannot interject -- and we can find a

3    plethora of articles.  Nobody studies this because it

4    would cost too much, probably.  But you do not place

5    yourself in the position to be the subject of deadly force

6    knowing that openly, here, I am using myself as a

7    barricade against a vehicle, and then use deadly force to

8    defend yourself because now you are saying this person is

9    tying to kill me.

10        Q.   So the situation we talked about, the shooting

11   that you had where the police officers went into the bar

12   where there was an armed suspect, they were placing

13   themselves in harms way, were they not?

14        A.   See now you are comparing two different animals.

15   You're talking about making entry into a building where

16   there's a known armed individual.  You have to go in.  You

17   don't have a choice.  There is no other options.  In order

18   to get inside the -- the building to stop somebody from

19   using force against others you must enter.  You don't have

20   a choice.  In traffic stops you have control.  You have a

21   choice.  You can make a choice.  You can dictate the stop.

22   If the bad dictates the stop you can utilize your vehicle

23   for tactical advantages.  There are a lot of things that

24   could have been done.  And the fact that he knew he was

25   dealing with this armed felon that who allegedly attempted

1   to kill another police officer, that did not appear to

2   play any role in his tactical decision making.  He placed

3   himself in a position that he opened himself up to be

4   seriously hurt or killed by someone.  Not because it was

5   something that was mandated by the job or in the

6   protection of the community because of the potential

7   pursuit that followed but that was a decision he made.

8   Opening himself and stepping in front of that vehicle.

9       Q.   You saw in his statement where he stated that

10  the vehicle, when he saw the jeep, the vehicle was

11  traveling in the opposite direction, swerved into the

12  oncoming lane of traffic and almost hit another vehicle;

13  right?

14      A.   Did I see that written in his statement?

15      Q.   Yes.  Yes.

16      A.   I did.

17      Q.   Are you saying that -- you kind of made a face.

18  Are you saying that you don't believe that occurred?

19      A.   Well, lets say I question it based on the fact

20  -- well, let me -- Mr. Faulkner was nice enough to point

21  out a study on vision acuity and things think that, that

22  he acquired through For Science, and the fact frophobia

23  (Phonetic) which is the focal point.  If you go a maximum

24  of three degrees of vision accuracy.  So in the statement

25  being made, in the time it takes to monitor traffic around

 1  you, get yourself turned around and get caught up to a

 2  vehicle, you are still able to see a vehicle doing all of

 3  the other things while focusing on on-coming traffic for

 4  you.  Two opposite directions.

 5      Is it suspect, yes it is.  It is.  And given the amount

 6  of times that we've seen this transition with information,

 7  his turning around at that point, the additional elements,

 8  I question.

 9      Q.   So are you saying he's lying?

10      A.   I am saying that these were elements that are

11  unique and should be looked at.

12      Q.   Are you saying that you do not believe Deputy

13  Forsyth was truthful in his description in his statement

14  to Sergeant Branham?  Simple question.

15      A.   I'm saying that I don't believe every element

16  that he put into his statement.  No.

17      Q.   So when I asked you the question whether or not

18  Forsyth knew it was Rhoades, let me ask you, how does that

19  equal the fact, again, that he was not in fear for his

20  life when he fired the shots to stop the jeep?  If you

21  believe his version of events.

22      A.   If you believe his version of events minus all

23  the other information, minus the physical evidence and

24  everything -- if you ignore everything but the statement

25  made by the officer, the articulation of that, I wouldn't

```
 1   say it was not possible.
 2       Q.   So It wouldn't matter who was operating the jeep
 3   at that point whether it was Rhoades or not; right?
 4       A.   At that stage of the encounter, given the
 5   information minus everything else, it would not matter.
 6       Q.   Then we've also discussed, it's the top of page
 7   12 the first full paragraph about the statement that
 8   Mr. Rhoades was not going back to jail.  And you had that
 9   the investigator made no effort to determine who that
10   source was or where that information came from.  Again,
11   that's a criticism in the state police investigation;
12   correct?
13       A.   It is because it goes to the information being
14   presented about justifying concerns over an individual.
15       Q.   At this point you have no information that
16   contradicts what Deputy Forsyth claimed he knew, right?
17       A.   I'm not -- I don't have anything that
18   contradicts what he said, no.
19       Q.   And if he believed that Rhoades, who had tried
20   to run over a police officer the week before --
21                 MR. EDWARDS:  Objection to form.
22       Q.   -- stated that he was not going back to jail,
23   wouldn't that be a factor that you would consider in
24   whether a threat was becoming imminent to make the
25   decision whether you needed to use force or not?
```

1      A.    If I had it from a credible resource, yes.

2      Q.    So you're saying Deputy Forsyth is not credible?

3      A.    I didn't say that.  I said if I had the

4  information -- you asked me if I would take that and

5  interpret it.  I said, if I have it from a credible

6  resource, yes, it would play into that.  I didn't say he's

7  not credible.  I said it was never examined or checked

8  into or investigated.  That's what I said.

9      Q.    Are you taking that statement about Deputy

10 Forsyth saying Rhoades was not going back to jail into

11 consideration in formulating your opinions in this case?

12     A.    Of course.  You have to look and consider

13 everything.

14     Q.    You've also, and you mentioned this in part of

15 your discussion when you were talking about Deputy

16 Forsyth's tactical decisions, you say that, "his actions

17 placed him in a dangerous situation and at a tactical

18 disadvantage."  Right?

19     A.    On the next opinion, yes.

20     Q.    But you've agreed with me earlier that part of

21 the duties of a law enforcement officer actually requires

22 them to place their selves in tense and dangerous

23 situations; right?

24     A.    I agreed that the job requires that.  But your

25 decision should prevent it from happening unless it's

1   necessitate by a specific event.  The decision to do it on

2   your own, I don't agree with that.  And the fact that the

3   job does require law enforcement to take tremendous risks,

4   which is why we harp so hard on training and making sure

5   that we are aware of how we can mitigate those risks to

6   the best of our ability.  Or I guess I should say to the

7   best of their ability.

8        Q.   I think it's the one, two, three.  The third

9   full paragraph says, "Deputy Love described the jeep's

10  location."  And then about the investigator asked Deputy

11  Love if the jeep was, "trying to get, like, back out of

12  the road that you all came in."  Do you see that?

13       A.   Yes.

14       Q.   Tell me what that particular piece of

15  information has anything to do with whether Deputy Forsyth

16  feared for his life at the time he fired the shots into

17  the jeep.

18       A.   To me in reading that, unfortunately it wasn't

19  investigated further.  But in reading that he indicated

20  that the vehicle was close to the exit, exactly where it

21  was at the time that it was found post-shooting.  Which if

22  his perception was the vehicle was trying to get away.

23  Trying to get back out on to the road and that was his

24  perception inside the vehicle, that means that he knew or

25  his perception was the vehicle wasn't trying to run over

 1   Deputy Forsyth.  From his perception.  For example, if you
 2   look at the photographs provided by Sergeant Branham, the
 3   jeep's front left tire is turned toward the roadway.  Not
 4   toward straight where the patrol car came in but angled
 5   left.  So that would also be supportive of trying to go --
 6   and it would put him more into the bushes.  Not more into
 7   the opening, which would be the apparent, possible
 8   location since nobody ever bothered to ask, actually try
 9   to put Deputy Forsyth at a location, unfortunately, to
10   know whether or not that vehicle was actually angled in a
11   position that it would have missed him.  That was never
12   looked at.  But in this particular element, I was just
13   articulating that it appeared from his perception that,
14   yes, he was going to leave.
15        Q.   And the statement again that we talked about,
16   you quoted from Deputy Love's statement to the state
17   police, that actually supports Forsyth's statement that
18   the vehicle was moving before he got out of the cruiser;
19   right?
20        A.   If you want to say that the vehicle was moving
21   at its point of rest.  Then what you're saying is correct.
22   But if you are trying to say that the vehicle was moving
23   in all the other directions that Forsyth -- I don't see
24   how those two verify one another.
25        Q.   Well, one of the things as we've talked about,

1   you say in your report is that Love says the vehicle

2   didn't move until Forsyth actually got out of it, okay.

3   This statement seems to indicate that the vehicle was

4   moving before Forsyth ever exited the vehicle.  If he

5   says, "as soon as we pulled in he started coming out."  He

6   doesn't say Forsyth has exited the cruiser yet, does he?

7        A.   Correct.

8        Q.   The bottom paragraph on page 12 you talk about

9   Deputy Forsyth would have begun discharging his firearm

10  within seconds of exiting the police vehicle, you see

11  that?  And then you talk about that the investigator did

12  not follow up on the conflict in the evidence.  Even at

13  the very end you say this is another conflict not

14  investigated by --

15       A.   Yes.

16       Q.   -- by the investigator.

17      Pages 13 and 14 of your report, I am not going to go

18  through each paragraph.  But it starts at 13.

19      The first full paragraph that starts, "despite."  And

20  then there are a number of instances down throughout all

21  the way to the bottom of the page.  "The investigator made

22  no documented effort to explore the information.  The

23  investigator never asked deputy Forsyth.  The investigator

24  did not question".  All of those things, those all appear

25  to be criticisms, again, you have of the West Virginia

1   State Police Investigation; right?

2       A.    Those are, yes.

3       Q.    But simply because you belive that the

4   investigation conducted by the state police is not

5   sufficient, that doesn't mean that Deputy Forsyth did not

6   have an objectively reasonable fear for his life.  The

7   simple fact that you disagree with the way they conducted

8   the investigation doesn't mean that Deputy Forsyth didn't

9   have an objectively reasonable fear for his life; right?

10              MR. EDWARDS:  Object to the form.  You can

11  answer.

12      A.    My statements of inadequacies for the

13  investigation to try to verify that information doesn't

14  change what he has said in his statements.

15      Q.    So it doesn't mean that if he says that he had

16  this objectively reasonable fear just because you

17  disagreed with the state police conducted it, doesn't mean

18  that he wasn't in fear and that fear was objectively

19  reasonable; right?

20      A.    Well, I'm not going to say that, no.  Because he

21  has said he is in fear.  And again, fear justifies force.

22  Facts make fear reasonable.  Just because he has said it

23  doesn't make it so absent supporting information.  My

24  interpretation of their investigation identifying the

25  things that would have gone a long way to support a

1  narrative were never even looked at.  That is my pointing

2  out why based on the totality of this that I don't feel it

3  was objectively reasonable.  So I am not going to sit

4  there and say that absent my evaluation he was doing the

5  right thing.  I am going to say that based on what he has

6  written, that is what he has said.

7       Q.   One of the things that we talked about early on

8  about the Daubert hearing you had to testify to, I think

9  it was in West Virginia, where you said the judge wouldn't

10 let you testify about whether the persons fears were

11 objectively reasonable; right?  Isn't that what you told

12 me?

13      A.   In a criminal case.

14      Q.   Do you have a belief that you can testify in

15 this case as to whether that Deputy Forsyth's fears were

16 objectively reasonable?

17      A.   I believe so.

18      Q.   You don't think that's the ultimate issue for a

19 jury to decide?

20      A.   I believe that counsel has representation.  Both

21 sides present their case to the jury.  Both sides are

22 responsible for educating the jury about the variables to

23 be considered.  And the jury has the final say.

24      Q.   It's your opinion based on your review and

25 criticisms of the state police that you don't believe that

1   the fear was objectively reasonable; right?

2          MR. EDWARDS:  Object to form.

3      A.   I'm saying that based on the information

4   provided in the investigation I don't believe it was

5   objectively reasonable to shoot and kill Mr. Rhoades.

6      Q.   And you understand that the state police looked

7   at this and determined it was.  And there is another

8   individual, Mr. Faulkner, who's looked at it that believes

9   that there was an objectively reasonable fear; right?

10     A.   If people would like to look at the information

11  and review it in a noncritical way and just accept it at

12  face value from statements and ignore all the physical

13  evidence, they can come to whatever opinion they would

14  like to.  I chose to look at the totality of the event and

15  all the information presented to me and I form my opinions

16  based off the case information I receive.

17     Q.   Would you agree with me that, like, if a police

18  officer is investigating the incident, that each officer

19  may investigate a incident somewhat differently than you

20  would.  Just like an attorney may defend a case

21  differently than another attorney would?

22     A.   Sure there is going to be differences.

23     Q.   Just because they are criticisms and things that

24  you think that the state police should have done, again,

25  doesn't negate the fear that Mr. -- or that Deputy Forsyth

1  claimed?

2      A.   He can claim whatever he would like to claim.

3  It's -- just because they didn't do something -- they

4  didn't look at physical evidence.  They didn't scrutinize

5  statements.  They didn't look at things that weren't

6  lining up with each other so that the basic investigator

7  could understand, let alone an investigator that's

8  investigating the application of deadly force by a law

9  enforcement professional.  But Deputy Forsyth can

10  articulate whatever he believes.

11      Q.   Is it your testimony that Deputy Forsyth is or

12  was lying when he says the jeep was moving toward him and

13  he had to fire to stop that jeep from hitting him?

14      A.   It is not possible to stop the vehicle --

15      Q.   My question --

16      A.   Can you restate your question.

17      Q.   My question was, do you believe that Deputy

18  Forsyth is lying when he says that he was in fear for his

19  life and he fired into the jeep to stop the jeep from

20  hitting him.  My question is do you believe he's lying

21  about that?

22      A.   Based on the information revealed to me through

23  the course of this investigation that was conducted by the

24  West Virginia State Police, I do not believe that the

25  description provided by Deputy Forsyth actually took place

1   that way.  And for that to be the case, there is

2   misinformation somewhere.  But because nothing was tried

3   to be verified, nothing was looked at, nothing was

4   actually investigated to look at the case in an

5   investigative way, whether he's lying or not is my

6   perception right now, that his use of force was not

7   objectively reasonable given what I have reviewed.

8       Q.   My question is, do you believe he's lying?

9            MR. EDWARDS:  Asked and answered.

10           MRS. DURST:  No, he hasn't answered it.  He

11  said whether he's lying or not.

12  BY MRS. DURTS:

13      Q.   Do you believe he's lying?  That's my question.

14      A.   I don't believe that he is relating the event as

15  it happened.  So, yes, I believe that if -- if he is

16  providing us with this information that is clearly

17  contradicted by scene evidence, then he has to be

18  misinforming us.

19      Q.   Do you agree that there was no question that

20  Sergeant Branham asked Forsyth or Love that they refused

21  to answer?

22      A.   That Sergeant Branham asked them question --

23  they did not refuse any of his questions.

24      Q.   You refer in your report, it's on page 13, to

25  the prepared written statements read by the deputies in

1  their interviews.  I don't see where they read the

2  statements in the interviews.  I see a question and answer

3  by Sergeant Branham in the interviews.  So was your

4  opinion -- was your report -- was that an incorrect

5  statement that they provided statements to Branham and

6  then he asked them questions, or do you believe they

7  actually read the written statement that's part of that

8  transcript?

9      A.   I believe that they read that statement and

10  there were intermittent questions but they focused back in

11  on the statement and statements.

12      Q.   So you disagree that the transcripts that you

13  had were actually just only a question and interview

14  session?  Meaning that they read an entire prepared

15  statement and then he asked them questions, is that what

16  you are saying?

17      A.   I didn't say that.

18      Q.   So you believe they were reading from the

19  statement and then he would ask a followup question, and

20  then they would go back to reading the statement?

21      A.    Correct.  And there is information if you look

22  at, for example, Deputy Love, when he provided his

23  statement, in the middle of the statement when he was

24  interrupted by the Sergeant, the next thing you read was

25  the exact same sentence he already read and then continued

1    on.  So that is how I come to that conclusion.

2         Q.   You also have on page 13 that the state police

3    did not document any effort being made to consider the

4    viability of the information presented by Forsyth in

5    contrast with what was clearly seen at the crime scene.

6    That's on page 13.  Other than your opinion that there was

7    no ground disturbance, tell me what was clearly visible at

8    the crime scene that was in contrast with the information

9    that Forsyth provided.

10        A.   When you start looking at the gas well site and

11   the fact that there was a small pipe that comes up to the

12   left of it, he is making a three point turn.  There was no

13   attempt to -- if it's happening directly in front of the

14   well site that doesn't make any sense.  Because he was

15   already forward facing.  And then if he is backing the

16   jeep up and he's going, where is he backing it to.

17   Because there is a pipe.  Not just the big pipes that come

18   out, but there is a small pipe sticking up out of the

19   ground that doesn't appear to have made contact with the

20   jeep in any way.  Unless it was not documented and

21   pictures don't demonstrate that the pipe nor the jeep are

22   damaged at those levels.  So looking at that, looking at

23   the fact that where the jeep's final place of rest was

24   versus where they said that he accelerated from or implied

25   that he accelerated from to be able to get to that point,

1   there was nothing on the ground in that area that

2   represented an acceleration.  Ground disturbance,

3   something.  Because when a jeep -- especially in that high

4   of grass in order to get moving you are going to have to

5   give it gas.  You are going to have to stand on it.  For a

6   lack of a better term.  I don't know how else -- you're

7   going to have to use more accelerator to get it moving.

8   So if there is the rapid acceleration that they described

9   in their statements and the spinning of tire -- that was

10  not represented there.

11       Q.   We already talked about Deputy, or Sergeant

12  Branham identifying the photograph in his deposition that

13  he identified as possibly showing aggressive driving, but

14  you didn't notice that in his deposition?

15       A.   I did not notice that in his deposition.  And I

16  don't know how I missed that.  But, again, I will look at

17  that and consider it.

18       Q.   You also have on page 13 about Sergeant Branham

19  not questioning about the standard transmission jeep being

20  in gear and running.  If my recollection is correct,

21  Branham never said the jeep -- and I wanted to make sure

22  and I thought maybe it was in his statement.  You said,

23  "The investigator did not question or consider how the

24  standard transmission jeep could be in gear and running

25  when he arrived on the scene."  I don't recall Sergeant

1   Branham saying the jeep was in gear.  Do you recall that

2   from the state police report?

3        A.   No.  That was taken from the statements from the

4   fact that the vehicle was accelerating toward him.  And if

5   it was a standard transmission and at the time that the

6   Sergeant arrived the vehicle was running and not in gear,

7   how did it get out of gear and still be running.

8        Q.   Well, again, if my recollection of the state

9   police report is correct, Sergeant Branham's report says

10  it appears the jeep is running.  The cruiser, he says, was

11  in fact running.  He says the jeep appears to be running.

12  Do you recall that distinction in his report?

13       A.   We are splitting hairs now.  If an investigator

14  goes there and he doesn't know whether a vehicle is

15  running or not and he puts in there that it appears to be

16  running, it's not a very difficult thing to verify and to

17  know.  So I'd have to look and see.  I don't know if he

18  says appears to be running.  I don't recall that

19  specifically.

20       Q.   Did you see in Sergeant Branham's investigation,

21  or his deposition, I'm sorry, that he's never driven a

22  standard transmission, has no idea really how one works?

23  Did you see that?

24       A.   In Branham?

25       Q.   In Branham's, yes.

1      A.    Okay.

2      Q.    Did you see that?

3      A.    In his deposition?

4      Q.    Yes.   In his deposition transcript.

5      A.    I don't recall if I read that or not.  Well, I

6   had to have read it.

7      Q.    Would you agree with me that there is no

8   evidence in this case that Deputy Forsyth did not issue

9   the verbal command that he claims that he issued?

10     A.    No.

11     Q.    In fact, Deputy Love confirmed that Forsyth

12  actually was giving verbal commands to the driver of the

13  jeep; right?

14     A.    During his initial statement in his second

15  interview he has to be reminded of it and then he recalled

16  something was said but he didn't know what.

17     Q.    In the initial statement he gave to the state

18  police two days after he confirmed that he heard Forsyth

19  issuing commands; right?

20     A.    In that statement he did.

21     Q.    One of the factors when we talked whether, you

22  know, we were looking to determine whether a threat was

23  imminent that would cause you to make a decision to use

24  force is, a suspect refusing to obey commands; do you

25  recall that?

1    A.   Yes.

2    Q.   If the suspect is refusing to obey commands to

3  exit a vehicle by a law enforcement officer, is that a

4  crime?

5    A.   If a suspect?

6    Q.   Yeah.  If someone who has active warrants and

7  the police officer is ordering him to exit the vehicle and

8  they refuse to follow those commands, is there any kind of

9  crime committed by that?

10    A.   Oh, sure.  Absolutely.

11    Q.   On page 14 of your report you are talking about

12  Sergeant Branham, I think it's in the -- I am trying to

13  remember if it's in the summary part at the bottom.  It's

14  talking about Sergeant Branham was unaware that Deputy

15  Love was actually the victim or the alleged victim of the

16  incident that occurred that resulted in the warrant for

17  the attempted murder of the police officer; do you recall

18  that?

19    A.   Yes.

20    Q.   Whether Branham was made aware of that or not

21  doesn't mean that Forsyth wasn't in fear; right?  Whether

22  Branham knew it after the fact or not has nothing to do

23  with that; right?

24    A.   That's correct.

25    Q.   Because it's not what Branham knew, it's what

1    Forsyth believed?

2         A.   Correct.

3         Q.   If the incident occurred the week prior the way

4    that we see it on video and the way it was described, that

5    would seem to support Forsyth's fear for his own life;

6    right?

7         A.   I'm sorry.  There is video of the -- of the shot

8    being fired and the attempted homicide?

9         Q.   No.  The chase.  The vehicle.

10        A.   Oh.  Well, you said the incident on that date

11   and then said that it unfolded.  There was a pursuit.

12        Q.   Yes.

13        A.   But that has nothing to do with an attempted

14   murder.  I thought you were telling me there was video of

15   that.  I am like, oh well, I have not seen that video.

16        Q.   Well, I haven't seen it either, so.

17        A.   Okay.

18        Q.   I am trying to read my notes, so just bare with

19   me.  I might have to get my glasses out too.

20        A.   My eyes have already told me, you are too old to

21   keep doing this without me.

22                  THE WITNESS:  It's getting warm in here.

23                  MRS. DURST:  It's hot.  It's hot.

24                  MR. EDWARDS:  That's what happens when you

25   make a complaint.

1    BY MRS. DURST:

2        Q.   Would you agree with me that the incident that

3    was described in the warrant that was issued for

4    Mr. Rhoades for the July 25th incident would be consistent

5    with the way Forsyth and Love described the August 2nd

6    incident of Rhoades driving the vehicle at them?

7        A.   Well, they are similar in the fact that they

8    both allegedly used a vehicle to assault, potentially.

9        Q.   Well, in fact, the charge was actually attempted

10   murder of a police officer from the July 25th incident

11   right?

12       A.   That's what they charged him with.

13       Q.   Page 14 of your report also says that there was

14   no weapon seen in Mr. Rhoades possession.  That's not

15   exactly true; right?  Because a vehicle can be a weapon;

16   right?

17       A.   We are splitting hairs.  A vehicle can be a

18   weapon.  But when asked if you see a weapon in somebody's

19   possession the inference from that is, in my hand.  But,

20   yes, being behind the wheel of a vehicle you can utilize

21   that vehicle as a weapon.

22       Q.   Just with regard to your report, Mr. -- or

23   Deputy Forsyth said he did not see -- he saw Rhoades kind

24   of leaning down but he never saw a gun or any kind of

25   weapon in his possession; right?

1     A.    That's correct.

2     Q.    And the fact of whether he saw a gun or not, if

3  the vehicle was driving at him it wouldn't matter whether

4  Rhoades had a gun; right?

5     A.    If he was using the vehicle as a weapon --

6     Q.    Yes.

7     A.    -- it would have not.

8     Q.    Because if we believe the incident as described

9  from July 25th, 2017 that was the very same weapon that he

10 used in that incident for the attempted murder on a police

11 officer; right?

12    A.    No.  They were different vehicles.

13    Q.    It was a vehicle?

14    A.    Oh, I'm sorry, I thought you were saying that he

15 had used the same car.

16    Q.    No.  It was the very same weapon.  Not the same

17 vehicle.  It was a vehicle that was being used as a

18 weapon.

19    A.    That's what was documented, yes.

20    Q.    If you look at, kind of like the last two

21 paragraphs on page 14.  It talks about case documentation

22 on supporting spinning tires.  "The investigator made no

23 additional investigative efforts to substantiate or

24 disprove the information."  Again, those are things that

25 you believe that the police officer investigating this

1   should have done or followed up on; right?

2       A.   Absolutely.

3       Q.   Page 15, I believe, of the report.  The last

4   paragraph, it says, "In this matter the physical evidence

5   conflicts with the statements made by Deputy Forsyth and

6   Deputy Love and their statements conflict with one

7   another.  Therefore it's clear that Deputy David Forsyth's

8   application of deadly force was not objectively

9   reasonable.  May be described as unauthorized and

10  excessive."  Did I read that correctly?

11      A.   You did.

12      Q.   Is it your testimony that there is a conflict

13  between statements that deadly force can never be

14  objectively reasonable?

15      A.   Nope.

16      Q.   Again here, you talk about conflicts with

17  statements between Forsyth and Love but you don't talk

18  about conflicts between their own statements, is there a

19  reason?

20      A.   Just, I was being brief.

21      Q.   In this whole discussion that we've talked

22  about, the actions that occurred at this gas well site,

23  again, you never once mentioned any discussion about the

24  dangerous nature of the pursuit that Rhoades led the

25  police officers on the week prior, right?  We have -- and

 1   I mean you can look at your report.  I will tell you there

 2   is no discussion about that in there.

 3        A.   I don't have to look.  I know there isn't.

 4        Q.   It never mentions that there were actually any

 5   drugs found in Mr. Rhoades system, does it?  Because you

 6   weren't aware of that at the time were you?

 7        A.   No.

 8        Q.   You don't mention the criminal history of

 9   Mr. Rhoades; right?

10        A.   No.

11        Q.   Never mentions about the jeep being stolen or

12   anything like that; right?

13        A.   Correct.

14        Q.   Fair to say if this case goes to trial you want

15   to come in and tell the finder of fact that Deputy

16   Forsyth's actions were not objectively reasonable and his

17   use of force was excessive and unauthorized; right?

18        A.   My opinion is that his use of force was not

19   objectively reasonable.

20        Q.   And that is what you want to come in and tell

21   the finder of fact if the case proceeds to trial?

22        A.   That opinion, yes.

23        Q.   But in all your years as a law enforcement

24   officer you were never placed in the same situation that

25   Deputy Forsyth was, were you?

 1       A.    I have been in life and death situations, yes.

 2   And I have the scars to prove it.

 3       Q.    Were you in a situation where you were forced to

 4   fire your weapon at suspect?

 5       A.    I have never placed myself directly in front of

 6   a motor vehicle.  And I've been blessed enough that the

 7   threatened use of deadly force was enough to dissuade the

 8   individual from continuing their actions.

 9       Q.    In fact you told us that you never had to fire

10   your weapon other than to put down a wounded animal;

11   correct?

12       A.    That is correct.

13       Q.    We talked about a number of factors that you

14   agree that you would consider with respect to what is and

15   is not considered a threat when you were making the

16   evaluation of the use of deadly force.  And we talked

17   about that the positions of the officer, the distance of

18   the officer from the threat, whether the threat's armed,

19   the demeanor of the suspect, et cetera.  You remember all

20   those we talked about?

21       A.    Yes.

22       Q.    Your report doesn't contain any analysis

23   specifically of those facts -- those factors, is there a

24   reason why?

25       A.    I guess I presume them to be the basic elements

1   of every force decision.

2       Q.   Other than mentioning the outstanding warrant

3   for the July 25th, 2017 incident.  Your report doesn't

4   provide any discussion of that prior pursuit or in

5   incident involving Deputy Love at all, does it?

6       A.   The pursuit was not included because it is not

7   relevant to this particular incident.  And the information

8   on Deputy Love, no.

9       Q.   Can you tell me, with regard to the opinion

10  number one that we talked about, what principles or

11  methodologies you've used to rely upon and formulate the

12  opinion number one.

13      A.   Outside of my, almost three decades of law

14  enforcement experience, teaching law enforcement tactics

15  and weapon systems to professionals from across the United

16  States, also considering the laws that govern the actions

17  of law enforcement and what guide the decision making

18  process in the use of force event, I apply all of that to

19  forming this opinion from Graham v. Connor, primarily,

20  Tennessee v. Garner decision, the experience that I've had

21  training law enforcement and knowing tactics that are

22  recognized nation wide, I have got certifications in

23  teaching these tactics, techniques, interpretation traffic

24  stops, dynamic events and so forth.  And I bring all that

25  and I form my opinion in this particular matter based on

1    all of that.

2         Q.   You saw in Mr. Faulkner's initial report where

3    over the past 30 years he's conducted a series of national

4    research projects that involved law enforcement,

5    corrections officers, and civilians with the purpose to

6    consider what a reasonable response to certain types of

7    resistance and aggression would be; right?  You saw that?

8         A.   I saw his CV, yes.

9         Q.   Have you ever conducted any type of research

10   projects like that to determine what a reasonable response

11   would be to a particular situation?

12        A.   No.  I can't say that I've done that kind of

13   project.  I've been more the teacher and the experienced

14   operator.

15        Q.   Are you familiar with Mr. Faulkner at all?

16        A.   No.

17        Q.   Never heard of him prior to this case?

18        A.   Never.

19        Q.   Did you do any independent research on him after

20   you learned that he was the expert in this case?

21        A.   No.

22        Q.   You didn't conduct any kind of tests or anything

23   with regard to the reasonableness or lack of

24   reasonableness of Deputy Forsyth's response?

25        A.   There are no such tests to be conducted.

 1      Q.    Is there any peer review literature that you

 2   relied upon?

 3      A.    As far as conducting traffic stops?  I mean, the

 4   only thing that is Peer -- I guess --

 5      Q.    With regard to the use of force.

 6      A.    Let's see, the national guidelines, I guess

 7   should be peer reviewed.  I am not -- I guess --

 8      Q.    What national guidelines?

 9      A.    Well, there is national guidelines for law

10   enforcement that you can get through the Department of

11   Justice, the NIJ.  You can look at studies that have been

12   conducted by various entities associated with force.

13   Nobody actually has, that I am aware of, peer review --

14   I'm trying to -- peer review just means was it published

15   in like police magazine where it was read by other people?

16   Is that what peer review is?

17      Q.    Well, it's reviewed by others and approved by

18   others in your field.

19      A.    Oh, I don't know of anything that exists like

20   that outside of the academic levels just doing research

21   that feeds the rest of us.

22      Q.    You have not, in your years, have not been

23   involved in any kind of research study like Mr. Faulkner

24   was to question law enforcement corrections and citizens,

25   present them with specific scenario and determine what a

1  reasonable response would be, you've not done anything

2  like that in your years; is that right?

3       A.   No.

4       Q.   I wanted to talk about then, the opinion number

5  two.  It starts on page 16.

6            THE WITNESS:  Can we do something about the

7  temperature, because it's getting ridiculous.

8            MRS. DURST:  Can we take a break and see if

9  we can.

10           (Off the record)(3:01 p.m.)

11           (Back on the record)(3:04 p.m.)

12  BY MRS. DURST:

13       Q.   I wanted to talk with you then about the second

14  opinion in your report, Mr. Root.  That is, I think it's

15  like 16 and 17, primarily, of your report.  And it's about

16  the tactics used to execute a felony traffic stop or poor

17  -- or did not meet accepted standards for officer safety

18  and directly contributed to the unreasonable application

19  of deadly force.

20      What I wanted to ask you about first is, did you --

21  you've reviewed Mr. Faulkner's report with regard to the

22  STOPS training?

23       A.   Yes.

24       Q.   Do you agree that a felony traffic stop requires

25  at least two law enforcement officers operating two

1    separate vehicles?

2          A.    I do not.

3          Q.    You do not agree with that, why not?

4          A.    Requires multiple officers.  Two vehicles is

5    ideal but as long as you have at least two officers it can

6    be conducted.  It would preferably be two vehicle because

7    you could create channels to funnel people through and so

8    forth.  But you need a minimum of two officers.  Not

9    necessarily two vehicles.

10          Q.    So you disagree then with Mr. Faulkner's

11    statement that a felony traffic requires at least two

12    officers operating two separate vehicles?

13          A.    Yes.  I disagree with that.

14          Q.    Before the inclusion of this STOPS training,

15    which is Strategies and Tactics Of Patrol Stops included

16    with his expert opinion, were you familiar with that?

17          A.    I had never seen that ever.

18          Q.    Are you aware that the test in training for that

19    program has been used nationwide by local, state and

20    federal law enforcement agencies?

21          A.    I read that in his.  I haven't seen what agency.

22    I did attempt to find that material.  I did learn about, I

23    think, it was Magnuson, or something like that.  And

24    tragically he died in 2006.

25          Q.    Bob Magnuson.

1    A.   Yes.  I tried to locate it.  Any entity that was

2   using it or anything.  And it is not in print.  There is

3   no resource outside of what he wrote in his report.  I

4   couldn't find a reference.  It has been included, for

5   example, I do a lot of reading from law enforcement

6   periodicals, like PoliceOne and Police Alert (Phonetic)

7   and things like that.  And I have seen that referenced.

8   As a matter of fact one of the articles I saw was not

9   shooting at cars.  And they referenced that material in it

10  because conducting a traffic stop is pretty much the same

11  across the country on how it's performed.  There are

12  variations and there are policy influences, significant

13  policy influences.  But I couldn't, and the reason I say

14  this I just want you to know, I tried to find that

15  material because I wanted to read the whole text around

16  what he was writing, or including, excuse me.

17    Q.   Prior to receipt of his report, you were not

18  familiar with that particular training?

19    A.   Not particularly that particular text.  The

20  training is the same--

21    Q.   The STOPS --

22    A.   Yes, that text.  The training he articulated is

23  not different from the training that's being facilitated

24  across the country.

25    Q.   Do you agree that Mr. Rhoades was wanted on

1  felony charges at the time of August the 2nd?

2       A.   Yes.

3       Q.   Do you agree that Mr. Rhoades committed

4  additional multiple felonies in the presence of the

5  deputies that were responding to the chase?  I.e. Deputy

6  Forsyth and Love?

7       A.   If I consider only Deputy Forsyth's version and

8  absent everything else.  I don't know if fleeing and

9  alluding is a felony in West Virginia.

10      Q.   Regardless of whether he committed an additional

11  felony in the presence of Forsyth and Love, would you

12  agree that Rhoades on August the 2nd could have

13  been -- could be considered a fleeing felon because he had

14  the felony charges pending against him from the prior

15  incident?

16      A.   Absolutely.

17      Q.   Do you agree that the reasonableness of a

18  particular use of force must be judged from the

19  perspective of a reasonable officer on the scene rather

20  than the 20/20 vision or hindsight?

21      A.   Yes, I do.

22      Q.   Would you agree that the situation that Deputy

23  Forsyth and Love were actually facing on August the 2nd

24  was making a high risk stop of an individual who had

25  committed numerous felonies as opposed to a felony traffic

1   stop?

2          A.    Could you say that one more time, please?

3          Q.    Sure.

4          A.    Thank you.

5          Q.    Would you agree that the situation that Deputies

6   Forsyth and Love actually were facing on August the 2nd

7   was making a high risk stop of an individual who had

8   committed numerous felonies as opposed to a felony traffic

9   stop?

10                  MR. EDWARDS:   Object to from.

11         A.    I think the concept of felony traffic stop

12  includes the idea that you're stopping somebody with

13  felonies.  It was not a classic vehicle stop.  As far as

14  like, you know, with vehicle positioning and trying to

15  initiate the stop, determining where the stop should be,

16  having multiple vehicles present, forming your vehicles

17  and angles and stuff like that.  This should have been a

18  high risk stop conducted in felony stop fashion.  There is

19  a very -- the distinction of saying they're just stopping

20  a high risk felon and not conducting a felony stop.

21  That's playing semantics.

22         Q.    Well, is there -- is there a difference?  If

23  there is not a difference, why would you use high risk

24  traffic stop versus a felony traffic stop?  Why is there a

25  distinction?

1        A.    There isn't.

2        Q.    So you could believe that those descriptive

3    terms are the same?

4        A.    Across this country, originally they were called

5    felony stops.  The problem with that was people would take

6    things to court and it wasn't a felony.  They were doing

7    something that was inappropriate because they weren't

8    stopping a felon.  It was a high risk event.  Felony stop

9    got pushed to the side and we now have unknown risk

10   traffic stops and high risk traffic stops.  Which is why I

11   was very clear in my report in articulating, high risk --

12   a felony stop is a high risk traffic stop.  And whoever

13   might try to say well, they're very different, needs to

14   catch up in time.  Because they haven't been different for

15   decades.

16       Q.    Well, in your opinion number 2 the actual

17   substance of the opinion is, the tactics used by Deputy

18   Forsyth executed and you have "felony traffic stop" it

19   doesn't say high risk traffic stop.  Is there a reason

20   that you used the term felony traffic stop in the Opinion

21   2?

22       A.    That's what they used in their report.  Which is

23   why I surrounded it with quotes.

24       Q.    Would you agree that Mr. Rhoades made it

25   impossible to execute a felony stop because he did not

```
 1   relinquish control of the vehicle or follow commands of

 2   the law enforcement officers?

 3        A.    No.

 4        Q.    Why not?

 5        A.    Because they didn't initiate a high risk stop.

 6   They made -- he made no effort to utilize his vehicle in

 7   any form or fashion for cover concealment.  Even when you

 8   look at the STOPS material that was provided by

 9   Mr. Faulkner.  Using the vehicle, not exposing yourself.

10   Those things -- the misapplication of -- well, the first

11   one to have their feet on the ground -- that's just a

12   misapplication of what was meant.  The meant behind that

13   text and when you look at it nationwide is, when you are

14   dealing with a suspect that you have actually stopped in a

15   high risk stop, you don't want to be trapped inside the

16   vehicle.  You want to be outside the vehicle in a covered

17   position behind the door at least giving commands.  So

18   just getting your feet onto the ground isn't the goal.

19   Cause that means that I can just run out and run in front

20   of a vehicle.  That's not what that man -- no one should

21   interpret the safety tactics deployed by law enforcement

22   to be the first one out of the car wins.  That's not what

23   was meant by that.  So in this particular issue, I don't

24   agree.

25        Q.    You have no information to dispute that Mr.
```

1    Rhoades was given commands to exit the vehicle, and

2    according to Forsyth and Love he did not follow those

3    commands?

4         A.   Correct.  But you asked me about the felony

5    stop.  They didn't conduct a felony stop.  He got out in

6    front of a vehicle, pointed a gun at it, and was calling

7    for stuff.  He may have issued commands.  He may not.

8    There are statements that indicate that they have -- that

9    he did issue commands.  But they were not conducting a

10   traffic stop.  Even a high risk stop, an unknown risk

11   stop, they were not.

12        Q.   Because of the fact that you said they didn't

13   use the vehicle, they didn't position the vehicle, he got

14   out and placed his self in front of the vehicle, is that

15   why?

16        A.   They may -- well, if you're going to say, as

17   a professional, that I conducted this kind of stop.  Then

18   it falls in line that you've monitored safety and security

19   of yourself and your partner to ensure the high

20   probability of your surviving an event.  Not exposing

21   yourself and then claiming this was that kind of stop.  So

22   I draw distinction between the two it's not the same.

23   Which is why he exposed himself.  He had bad tactics and

24   he made decisions that directly contributed to this event.

25        Q.   In your opinion?

1      A.   Of course.  I bet ya as a national look you'll

2    find that.

3      Q.   Have you done any national look?

4      A.   I've looked at the materials and every guidance

5    from every -- I'm still waiting on West Virginia.  Maybe

6    West Virginia tells people, jump out and stand there.  But

7    according to the West Virginia Sergeant, according to the

8    officer that went to after -- when he was deposed, when he

9    finally went to the academy none of that is even

10   recommended by West Virginia.  So once I have the

11   materials specific to this matter from West Virginia I can

12   articulate what he was trained in.  But based on the

13   information in this case, he violated every safety

14   standard known to law enforcement when it comes to

15   conducting a stop on somebody who is expected to be a high

16   risk known felon that's wanted for attempted murder of a

17   police officer.

18     Q.   And so you assume when he said he was -- that he

19   had that information, you believe him when he said he knew

20   that.  But you don't believe him when says other things;

21   is that right?

22     A.   I didn't say I believe him when he said that and

23   when he said other things.  I look at the case

24   information.  And based on fluctuations in statements,

25   based on changing in statements, I take it at face value

1   and give it the consideration it's due.

2        Q.   We talked a little bit -- well, let me ask this.

3   With regard to Opinion number 2 you talked about trying to

4   find the full text of the STOPS that Mr. Faulkner

5   referenced and you've not been able to locate it; is that

6   right?  Or find it so it's available to you?

7        A.   That is correct.

8        Q.   There's no other reference material referred to

9   for Opinion number 2 and the basis for it.  Is that one of

10  those things that we talked about early on, that you refer

11  to things to formulate this opinion you just didn't

12  include reference to it in this report?

13       A.   I didn't include it.  It's my background

14  training and experience teaching these things to law

15  enforcement across this -- I mean, I've taught everybody

16  from California to Florida.  And conducting traffic stops,

17  high risk encounters, dynamic encounters and this

18  information comes from all of that experience.  And I

19  didn't print out one of the hundreds, if not thousands, of

20  articles for law enforcement that's been presented and I

21  would prefer to use the information directly from the West

22  Virginia State Police because I have no doubt that the

23  information I'm relying on through my training experience,

24  my certifications, that this is accurate and is in

25  compliance even with what West Virginia does.

1      Q.   My question was not what you relied upon based

2   on your training, education experience my question was,

3   was there a specific reference material that you

4   referred to or relied upon to formulate the basis of

5   Opinion number 2?

6      A.   I guess I have to go back --

7      Q.   Like a particular manual or something like that,

8   that you pulled out --

9      A.   I relied on my background as an instructor,

10  going through as a state certified instructor and tactics

11  and teaching at the academy and teaching the force

12  considerations and patrol procedures and things like that.

13  So I would have to -- I know it's in a book.  But I did

14  not cite a book in this.

15     Q.   Did you refer to a book for a specific purpose

16  of formulating this opinion, is my question.  Not did you

17  read it in a book at some point in time during the years

18  of training that you provided.  My question is did you

19  refer to any book before you prepared this opinion?

20     A.   I have referenced material.  To be honest with

21  you I cannot recall.  I drew this out of background

22  training in experience that comes from the manuals that

23  are cited.  I didn't cite the manual or book or articles

24  because it's -- outside of academy training, which I've

25  requested the training documentation not only from the

1   sheriff's office but also from the state.  And no training

2   documentation has been provided.  Absent that you have to

3   go through national standards of things that are accepted

4   across the country.  And nobody has created a manual

5   that's just specifically traffic stops across the country

6   so you have to derive your information from what you've

7   done, the courses that you take, the certifications you

8   pursue.  That is where I derived this information from.  I

9   would really love the opportunity to review the material

10  requested from both the sheriff's office about how they

11  teach their people to do it.  As well as the standards for

12  the state of West Virginia.  But as of right now, this

13  opinion is based on my background training and experience,

14  the certifications that I hold the, courses that I have

15  taken and the manuals that came along with those.

16       Q.   And my question -- and I'm not trying to be

17  difficult, Mr. Root.  And you can answer the question

18  however you want.  I need an answer to my question, and

19  it's specific.  When you sat down to prepare Opinion

20  number 2 did you say, oh, let me look at that manual that

21  I used for this?  Let me look at that handbook that I got

22  from this.  That's what I'm wanting to know.  Did

23  you pull out something to refer to as you're preparing

24  this opinion?  That's my question.

25       A.   I did not pull out a book on that opinion.  No.

1    Q.   Okay.  And then we've kind of touched upon

2   Opinions number 2, 3, excuse me, and number 4 about the

3   training records.  And you've kind of provided that and

4   said that you've requested to review and consider training

5   records; right?

6    A.   That is correct.

7    Q.   You've told me, I think, earlier if -- well let

8   me ask this if you believe that this was not a felony

9   traffic stop, why do you want training records with regard

10   to the training for felony traffic stops?

11    A.   First and foremost is, does the agency provide

12   training to the personnel to help educate them and make

13   them prepared for the job that they have to do.  They're

14   saying it's a traffic stop.  I don't know of a single

15   agency that would agree.  So in an effort to be thorough

16   and to get information to say whether somebody was or was

17   not trained to do it this way, I requested the training

18   documentation.

19    Absent that, all I got was some generalized -- I got

20   personnel files and generalized training things.  None of

21   which addressed traffic stops.  None of which addressed

22   the use of force.  There is nothing that I was provided to

23   show the agency in any way, as an agency, not outside

24   training resources that may or may not teach things the

25   agency will accept, the agency in any way has provided

 1   training on the topic or material regarding traffic stops,

 2   high risk stops, pursuits.  There was nothing.  Absent

 3   that I have -- if there is no training, knowing that these

 4   are high risk environments, this is high risk events and

 5   that this is something that not only cost lives but the

 6   bean counters know it cost large sums of money to people,

 7   you have to train on this.  People have to be prepared.

 8   That's why I'm requesting the training documentation.

 9        Q.   And again, you don't know what training they did

10   or did not receive at the academy because you don't have

11   those documents; right?

12        A.   That is absolutely correct.

13        Q.   When did you make that request to counsel for

14   the state police documents?

15        A.   The first request.  I'd have to look back in the

16   e-mails.  That was a while ago.  And then recently

17   as we got through more of the material and everything in

18   recent interviews pointed back to West Virginia, I made

19   the request again saying, can we get it.  Cause now it's

20   like the agency's not involved in training.  It's all

21   going to go back to West Virginia.  Which is just mind

22   boggling.  But if that's what it is then obviously we need

23   to know what West Virginia said.

24        Q.   What have you been told about the status of the

25   request for those documents to the state police?

1      A.    It's been submitted.

2      Q.    Do you know when the request was made?

3      A.    That I don't know.  Counsel said it was

4  submitted, it was submitted.

5      Q.    Is there anything in your review -- well, let me

6  ask this.  This is a use of force case; correct?

7      A.    Yes.

8      Q.    And tell me why your report contains absolutely

9  no discussion whatsoever with regard to the Marion County

10 Sheriff's department's use of force policy?

11     A.    Well I guess it's primarily because the force

12 policy articulates very clearly what every force policy

13 does and the statements that were made by Deputy Forsyth

14 don't deviate from the policy in anyway.

15     Q.    So is the reason you did not refer to the use of

16 force policy is because Deputy Forsyth was actually in

17 compliance with that policy on August the 2nd?

18     A.    No.  That should never be interpreted from what

19 I just said.  I'm saying his statements were.  Absent

20 additional information, one, knowing if he was ever

21 trained on the policy but if -- there is no investigative

22 effort to verify the information to substantiate the

23 statements which goes back to my original opinion.  So the

24 policy is articulated like every policy is.  If you look

25 at the IACP models and things like that.  That reminds me,

1  traffic stops, I looked at IACP's model for conducting

2  traffic stops.

3       Q.   That's the International Association of --

4       A.   Chiefs of Police.

5       Q.   Chief of Police.

6       A.   And I believe that copy is on that disc.  Cause

7  what I looked at the was other model things to look at and

8  apparently I failed to include them here, but --

9       Q.   And I guess what I'm still trying to figure out

10 is, you said that Deputy Forsyth, your opinion is that,

11 his use of force -- use of deadly force was not

12 objectively reasonable; right?

13      A.   That is correct.

14      Q.   And the Marion County Sheriff's Department

15  did in fact have a use of force policy in place.  But no

16 where in your report do you discuss when under that policy

17 the use of force -- use of deadly force is or isn't

18 permitted.  And no where in your report do you say, oh

19 well, since my opinion is that his use of deadly

20 force was not objectively reasonable, did he violate the

21 Marion County Sheriff's department use of force policy;

22 why not?

23      A.   I didn't say he violated the policy.

24      Q.   Do you believe that he was in compliance with

25 the policy?

1      A.   If I don't believe that it was objectively

2   reasonable, then it comes down to, was he taught.  Did he

3   do what was expected.  Was he actually provided with the

4   policy.  Did he sign off -- I have no answers to that

5   because none of their personnel information has that.  So

6   in looking at it I submitted the opinions based off the

7   information that I have.  I have provided my opinions.

8      Q.   And you see now in Deputy Forsyth's transcript

9   that he was in fact provided the use of force policy and

10  was trained on it; right?

11     A.   I see that he has said that in his deposition,

12  just like I saw that Deputy Love said he was trained on it

13  and everything else.  But it's interesting because even

14  with Deputy Love, for example, because he's the newest

15  hire, he said that as part of the FTO (Phonetic) program

16  and there was a packet and things he had to sign.  Haven't

17  seen those either.  Which would substantiate education.

18  But none of that has been provided.

19     Q.   You have had the opportunity to review --

20  initially you had reviewed Mr. Faulkner's report that was

21  from July 1 or somewhere around in there.  And I know you

22  just recently saw his supplemental report.  What, with

23  regard to the initial report, what specific criticism or

24  criticisms do you have of the opinion set forth by

25  Mr. Faulkner in his initial report?

1       A.   I just want to remind myself what his opinions

2   were so I can speak to them directly.

3       His first Opinion is, "Deputy Forsyth did his duty and

4   placed himself in harms way when he responded to a high

5   risk pursuit of a dangerous felon."

6       The articulation that he had, felon, warrants.  I have

7   no disagreement with that.  The primary thing is just, and

8   most of the things that come with it, are his application

9   of perception or perspective.  But the fact that he's

10  showing that it was a high risk stop not a high risk

11  traffic stop, or it was a -- no, I'm sorry.  It was a stop

12  of a high risk felon.  Not a high risk stop.  That's -- I

13  don't agree with that.  Because that's just somebody

14  splitting hairs to try to separate reality from a

15  perspective.  You know, as far as when he cites a study, I

16  have zero issue.  I really appreciated him citing all the

17  For Science stuff.  Even though he doesn't necessarily

18  apply it in its totality to everybody, he applies it in

19  pieces that benefit the narrative that he's put forth.

20      Q.   Other than your attempt to locate the full text

21  of the STOPS training did you review any on the other

22  material that he cited, reference material in either one

23  of his reports?

24      A.   Everything that I could get my hands on.

25  Luckily, for example, he cited that he provided the

1  studies for the casing ejecting thing.  He did not.  He

2  cited them.  But he didn't provide either of them.  But

3  they are available somewhere on the internet.  When you

4  find them on the internet you can't actually get a

5  downloadable thing.  It's very difficult to get that.  So

6  I provided a copy of the actual cite that was done and

7  published.

8       Q.   That's the one on the flash drive?

9       A.   That's on there also.  Yes, ma'am.

10     And when he spoke about the eye and it's ability, he

11  said two degrees.  We were trained it's up to a maximum of

12  three degrees of focus that everything else peripheral.

13  He applied that to how Deputy Forsyth wasn't aware of what

14  was going on around him.  Which is absolutely correct.

15  But he failed to take into consideration how that would

16  also effect and impact Deputy Love and how that

17  transition, the fact that -- I believe it was you that

18  pointed out in deposition how high the vehicle was.  And

19  the fact that when Deputy Love was transitioning forward,

20  moving forward and trying to look over in the direction of

21  the jeep and he only caught the rear end of it, that his

22  perception was the jeep was moving.  But it's also

23  possible, based on his field of focus, the movement and

24  everything going on around him, the vehicle that he is

25  trying up with moving could have looked like the jeep was

1   moving.  It's kind of like when you are sitting at a

2   traffic light and a car next to you suddenly starts to

3   roll back.  People will push harder on the break thinking

4   they are moving.  They are not moving.  Something else is.

5   So I am a firm believer that when I apply research and

6   information, I apply it to everybody in the equation.  I

7   don't just apply it to a piece.

8        Q.   You believe Mr. Faulkner only applied it to a

9   piece?

10       A.   No.  I believe that Mr. Faulkner looked at an

11  event from the perspective that he wanted to see it from,

12  which was, Deputy Forsyth.  And then he applied pieces --

13  he took out -- I mean, it sounds great.  You know, you

14  cite -- you pull the studies.  But let's talk about the

15  studies in their entirety.  The fact that, when he cites

16  in his report that, you know, the casings won't mean

17  anything.  Well, the reality is, the casings alone don't

18  mean anything.  But the casings have value.  There is

19  investigative value in the casings.  But you would need to

20  know more information.  So when he cited that, you know,

21  his position, his hands position and all, he started

22  articulating the things that are in the study that --

23  going to actually forming the study's outcome.  There is a

24  complete ignoring of the fact that none of that

25  information was even sought during the investigation.

1      Q.   One of the things that you just said was, when I

2   asked you, you said he wanted to look at the information

3   from the perspective of Deputy Forsyth.  Isn't that the

4   way you are supposed to do it under Graham v. Connor and

5   Tennessee v. Garner?

6      A.   Yes.  But you -- if you are going to site other

7   people's information as being why that information is

8   accurate, you still have to look at it from their

9   perspective as well.  You have to look at it from the

10  perspective of the person who is being shot.  What do you

11  know about them.  How do you get in their -- we can't get

12  inside his head.  He's dead.  There is no way to get

13  information.  But we can get information from Deputy

14  Forsyth and from Deputy Love.  They were there.  But if we

15  are going to apply studies, we apply them to everybody

16  equally to see how that impacts the information that's

17  being provided to us in an event.

18     Q.   Your testimony is, he only applied the studies

19  to Deputy Forsyth?

20     A.   I am saying that the information he provided in

21  his report cites the study accurately, but it doesn't

22  appear to apply the same information across the board.

23  When you are looking at a use of force event -- let me

24  rephrase that.  When I look at a use of force event, I

25  look at it -- I have a problem with the fact that the jeep

1   doesn't appear to have moved.  According to statements

2   from Deputy Love, according to its position and what we

3   see as far as ground disturbance and everything else.  But

4   then I have a Deputy that is saying, I saw the vehicle --

5   but I only saw half of the vehicle and it was moving.  Is

6   it possible he saw that.  Well, it's possible.  But it's

7   also possible, given his transitions and movements that it

8   appeared to be moving because of his field of focus and

9   what was going on next to him.  That's a possibility.  So

10  then you look at the physical -- so it's a matter of

11  taking these studies and applying them in a way that, if

12  there is a 50/50 nobody knows for sure what's going on,

13  credit will always go to law enforcement.  Because it's

14  certain.  It's tense.  A rapidly evolving events.  But

15  when it comes to looking at the studies, it's also

16  applying it to everybody across the board and using them

17  in that way.  The case study that he did on the casings.

18  It's not inaccurate, but there is more to it.  There is

19  more information.  And that goes to what I was saying is,

20  you have an individual that is saying the casings won't

21  mean anything.  You're right.  Since you never concerned

22  yourself with any of the information that should have been

23  inquired about the shooting in and of itself, these do not

24  mean anything by themselves.  He is a 100 percent right on

25  that.  I don't know the man from Adam.  He is very

1   articulate and he cited studies, you know.  And all I'm

2   doing is going in and saying okay, yep, based on that

3   study.  But however, there is more to it than just that.

4       Q.   You cited absolutely study in your report;

5   right?

6       A.   It's an error that I made.  Yes, ma'am.  But not

7   one that I can't produce.

8      Oh, you wanted to go back to his Opinions.

9       Q.   Yeah.

10      A.   I'm sorry, I told you, very long winded.

11          (Witness reading Opinions softly to himself)

12     Second Opinion, "David Forsyth's response placing

13   members of the general public at risk of serious bodily

14   harm or death.  After attempting to run over a deputy he

15   complied with guidelines and national law enforcement

16   practices."

17     That's ignoring the variable that it requires the

18   pursuit.  And law enforcement is in pursuit and he drives

19   bad.  Again, when I got this, the reason I didn't do a

20   supplemental report to it was, it was just -- these are

21   his opinions.

22     "Deputy Forsyth's response was in compliance with his

23   training and his department policy."  I dont' know how he

24   got that one.  Unless somehow he ws provided with training

25   documentation I never received.  How did you get that he's

1  in compliance with his training.  I do have an issue with

2  that.  Because -- you're telling me, okay, department

3  policy and training -- I don't even know if he was trained

4  on the policy.  I haven't seen any training to show that

5  he was even taught this.  And did you get the West

6  Virginia State Police, cause I haven't gotten that yet.

7  So that opinion I -- I -- I take odd with.

8          (Witness reading opinions softly to himself)

9     The first aide things and after that -- no issue with

10  that at all.

11     "The investigation of this incident by the Marion

12  County Sheriff's Department followed national law

13  enforcement guidelines and practices."  Well, and it's on

14  there too.  I've included it.  It's reference material,

15  but it's not in my report but you will see that IACP puts

16  out a procedure for leadership on how to conduct

17  investigations.  How incisive there is specific

18  information -- I'm sorry, specific training an

19  investigator should have.  It is a good idea to have an

20  experienced homicide investigator and a team.  But there

21  is IACP's rules, there is IACP's policy on conducting

22  force investigations.  And I have provided all of that.

23     Q.   What page are you referring to of his report

24  there?

25     A.   Oh, what page?

1     Q.    Yeah.   What page.

2     A.    Let me find the --

3     Q.    The one where you are talking about the Marion

4   County Sheriff's Department conducting investigations.

5   The reason that I'm asking that is, my understanding is,

6   the Marion County Sheriff's Department did not conduct an

7   investigation.   They referred it to an outside agency for

8   an investigation.

9     A.    "The investigation of this incident by the

10  Marion County Sheriff's Department followed national law

11  enforcement --

12    Q.    Are you aware of any investigation in any of the

13  materials you've received by the Marion County Sheriff's

14  Department?

15    A.    Sadly, no.   Not even an internal.   For either

16  shooting.

17    Q.    So are you aware -- did you review the entirety

18  of Mr. Faulkner's report where he is talking about, it was

19  appropriate for the Sheriff's Department to refer to the

20  State Police for investigation?

21    A.    Yes.   But if you are going to say their

22  investigation was -- I don't want to misquote him now.

23  That's the wrong one.   "The investigation of this incident

24  by the Marion County Sheriff's Department followed

25  national standard."   So if all you are going to say is

1   referring it out is consistent with standards, I have zero

2   issue with that.

3        Q.   Okay.

4        A.   Zero issue with that.

5        Q.   Okay.

6        A.   It is always best, and my recommendation to

7   anybody I have ever taught when it comes to force

8   investigations, another agency should conduct the

9   investigation.  For transparency.  Hopefully, to reduce

10  the possibility of good 'ol boy networks.  For lack of --

11  I don't know the politically correct way to put that.  But

12  that would be -- so that's the other thing, is they didn't

13  do an investigation.  They didn't do an internal that I'm

14  aware of.  Never seen anything on it.  For either -- as a

15  matter of fact, the shooting incident that led to the

16  attempted murder charge, there is no use of force report.

17  There is no documentation of a -- now I did learn in the

18  most recent Deputy Love deposition that he filled out

19  paperwork.  Okay.  I have not seen any of that.  That was

20  the first report.

21        Q.   Okay.

22        A.   Well, sorry.  These are a lot of studies.  Let

23  me jump past that.

24       His second report's opinions -- his first opinion on

25  the second report I don't have any --

1    Q.    What was that?

2    A.    That was the one about Corporal McDougal did not

3    make an appropriate statement to -- that had nothing to do

4    with force.  Maybe he was retained for other things.  I

5    don't know.

6       "The additional .40 caliber spent casings were located

7    at the scene.  Mr. Rhoades was shot.  No additional

8    information.  And do not in any way alter the conclusion

9    of the police investigation."  I think we've covered that.

10   I dont' have to redo that one.

11      His third one, "Sending Deputy Forsyth, Deputy Love to

12   the hospital for evaluation after the shooting and not

13   immediately interviewing the deputies is consistent with

14   best practices."  Zero issue with that at all.

15      He cited the wrong pages in his report.  "There is

16   nothing unusual or suspect about Deputy Forsyth and Deputy

17   Love recollection not being identical."  The only thing

18   that I have, even on his first report and his second one,

19   I am not seeking identical statements.  I know he stated

20   in here that I was critical of the deviation -- I expect

21   deviations.  It's deviations that are not supported by

22   physical evidence.  The deviations from each other's

23   statements and then those deviate from physical evidence.

24   That I have an issue with.  The fact that two people have

25   different perspectives and have different observations, I

1    don't have an issue with that at all.  It's the totality

2    of everything.

3        And that was his last -- oh, and then I starred his

4    hypothetical.  It wasn't listed as a hypothetical.  But he

5    presented one in his report.

6        Q.   Why did you star that?

7        A.   Because I think it's ridiculous.  I think that

8    somebody -- let me rephrase that.  I think that it's

9    something where you're not taking into consideration how

10   an event actually happens.  But when you look at it in

11   little pictures, well, I can imagine that he was in the

12   middle of shifting gears and the shooting took place right

13   at this -- just happened to be right at that second, so he

14   fell off and the vehicle automatically stopped.  It was

15   accelerating.  There was no break application.  What was

16   the catalyst for it going from moving rapidly to suddenly

17   stopping.  We are going to say, because it was out of gear

18   at the time of the shooting.

19       Plus, it doesn't take into consideration with, what was

20   the actual damage done to Mr. Rhoades by the bullet that

21   caused a half inch laceration to his spinal cord at C1.

22   Not to mention fracturing the spinal -- fracturing C1 and

23   also causing trauma to under lobe of the brain.  Was he

24   conscious.  Was he already dead.  That's medical -- that's

25   outside -- but as an investigator and as a force person

1   who looks at it, those are things that we are taught, you

2   have to -- when you look at an event, you have to look at

3   all of these pieces.  So that's why I had starred that.  I

4   just -- I think it's reaching to say that he was in the

5   middle of shifting gears that -- in 20 feet he got it up

6   so fast that he was able to go into second gear.  And

7   there's not significant ground disturbance that would be

8   supportive of it.

9     I know that you mentioned the picture, and I will be

10  looking for that.

11     Q.   Do you believe that in order to be able to shift

12  from first to second gear you have to be going 20 miles an

13  hour?

14     A.   No.  But you do have to have your engine to a

15  specific RPM and movement.  Otherwise when you drop into

16  second, if you are not moving fast enough and all you have

17  is RPMs, you will stall out.

18     Q.   I have a standard, so I know.

19     A.   Okay.  So you know first hand.

20     Q.   I know how to drive one.

21     A.   Yeah.  Okay.  So to look at it -- you know,

22  again, so you bring a perspective cause you have an

23  experience in a standard transmission.  Okay, then I have

24  -- I mean, I wanted to drive in a semi, that's when I was

25  a little kid, my first driving lesson was in, literally a

1    tractor trailer without the trailer.  So my experience

2    with standard transmissions -- my whole life.  When you

3    read something like that -- I starred it just because it

4    didn't make sense.

5         Q.   But it is something that is a possibility that

6    could have occurred.

7         A.   It is somebody who is identifying a possibility.

8    Ignoring physical evidence, ignoring everything else, but

9    raising a possibility that this could have been done.  I

10   can raise a lot of possibilities.  But I should hope that

11   the possibilities are supported by other evidence or

12   testimony.

13        Q.   And the physical evidence you are saying was

14   ignored was this ground disturbance that -- the lack of

15   ground disturbance you say you didn't see?

16        A.   The vehicle location.  The deviation --

17   everything that I've discussed here with you today.  Not

18   just lack of ground disturbance, but distance.  You know,

19   looking at how far the vehicle could have traveled.  Well,

20   where is it placed.  Is it traveling from this point to

21   this point -- and people are putting it at very specific

22   locations, none of that makes -- they don't match up with

23   anything.  And I chose not to ignore things that don't

24   match up.  I want to know why don't they match up.

25        Q.   You chose to formulate an opinion that the

 1   police officer who shot the decedent of your client used

 2   inappropriate and unreasonable force; fair?

 3        A.   I don't want to form any opinions.  I form

 4   opinions based on the information that is provided to me.

 5        Q.   Nowhere in your report do you discuss any other

 6   incidents involving any other officer of the Marion County

 7   Sheriff's Department or any other shooting.  Did you

 8   review any of those materials?

 9        A.   I saw materials for the 25th incident, but

10   I'm --

11        Q.   Not involving Mr. Rhoades.  Involving

12   individuals other than Mr. Rhoades.

13        A.   Oh, no.

14        Q.   You have not formulated any opinions and would

15   not intend to give any about any other incidents involving

16   the Sheriff's Department?

17        A.   I don't know of any other incidents involving

18   the Sheriff's Office outside of what was in this case.

19        Q.   Okay.  Did you -- you said you reviewed the

20   Complaint; right?

21        A.   Yes.

22        Q.   Did you see in the Complaint that there are

23   references to other individuals being shot by members,

24   allegedly members of the Sheriff's Department?

25        A.   I read that in the Complaint.  I am looking at

1   this force event.

2       Q.   Okay.  So you, if this case proceeds to trial,

3   you will not be giving any opinions on any conduct of the

4   Sheriff's Department in relation to those other incidents?

5       A.   No, ma'am.  I have not seen a stitch of

6   information on any of those things.  Other -- well, let me

7   correct myself.  Other than the original Complaint, I have

8   not been asked to look at anything nor have I considered

9   anything in any other matter.

10      Q.   Subject, obviously, to if you issue any

11  supplemental report, I reserve the right to request to

12  depose you further only with regard to any supplemental

13  opinions.  And I do also want to make arrangements to get

14  a copy of what is -- to make it easy, I just want to copy

15  what is in your binder that is colored so I have what

16  you've highlighted and what you've starred.  Whether it's

17  in the deposition transcripts or Mr. Faulkner's report.

18  So I am not sure how we -- if there is like a copy place

19  that is close to you that you can take it and get it

20  copied and the, you know, send me the bill or if I -- I

21  don't know, but I would like --

22      A.   I live in Mountain City.  I will try to find

23  something, I mean, there's got to be a Kinko's somewhere

24  -- Johnson City.

25      Q.   Well, that's one of the reasons I want the file.

1    And I appreciate you putting it on the flash drive.  But

2    me looking at the deposition transcript without your

3    highlighting doesn't tell me what you may have found

4    pertinent or important as you were reviewing it.

5         A.   Sure.

6         Q.   So that's why I want the -- the highlighting

7    documents.

8         A.   No problem.

9         Q.   And to the extent that you have -- that early in

10   our discussion where you talked about any materials that

11   you referred to specifically as you were preparing your

12   report that are not on the flash drive, I would like

13   copies of those as well.

14        A.   Yes ma'am.

15             MR. EDWARDS:  Done?

16             MRS. DURST:  Yep.

17             MR. EDWARDS:  We will read.

18              (Off the record)(3:46 p.m.)

19              (Read and sign requested)

20               (DEPOSITION CONCLUDED)

21

22

23

24

25

*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*                                            *Page 279*

```
 1

 2                        CERTIFICATE

 3  STATE OF NORTH CAROLINA

 4  COUNTY OF WATAUGA

 5

 6          I, Lisa Shepherd-Hollar, a Notary Public in and

 7  for the State of North Carolina, do hereby certify the

 8  testimony of Dennis Anthony Root in the above mentioned

 9  matter was reported by me and reduced to typewriting under

10  my direction; that the foregoing is a true and correct

11  transcript of the said testimony to the best of my ability

12  and understanding.

13          I further certify that I am neither attorney or

14  counsel for, nor related to or employed by, any attorney

15  or counsel employed by the parties hereto or financially

16  interested in the action.

17          IN WITNESS WHEREOF, I have hereto set my hand,

18  this the 30th day of September 30, 2019

19

20                    Lisa S. Hollar
                      _____
                      Lisa S. Hollar
21                    Notary: 201532000037

22

23

24

25
```

**Exhibits**

**Exhibit 1** 3:5 9:17

**Exhibit 2** 3:5 120:1,12 147:16

**$**

**$1,000** 84:13,22 147:12

**$12,000** 147:14

**$250** 83:19 84:1,2,8

**1**

**1** 9:17 262:21

**1.5** 173:14

**10** 23:11 121:18 135:5 183:13 203:22 205:15

**100** 267:24

**101** 101:15

**11** 198:19 200:18 211:21 216:18

**115** 212:13 213:10,11

**116** 212:13 213:10,11

**11th** 8:17 65:15

**12** 23:10,16,18,19 205:10 216:19 221:7 225:8

**13** 54:21 61:5 114:16 175:9 225:17,18 230:24 232:2,6 233:18

**13,000** 147:8

**13th** 114:22 115:2,7

**14** 54:8 58:7 64:24 130:18 225:17 236:11 238:13 239:21

**15** 33:12 64:10 123:5 175:9 203:22 205:15 240:3

**15th** 126:24 128:13 129:7,21 130:1 142:21

**16** 43:18 246:5,15

**17** 58:7 120:22 246:15

**18** 55:24,25 56:2

**19** 9:6 11:6 100:4

**1986** 106:8

**1999** 137:22

**19th** 59:2

**1st** 121:10,12

**2**

**2** 120:1,12 123:13 147:16 194:8, 13,20,22 251:16,21 255:3,9 256:5 257:20 258:2

**20** 45:24 85:8 101:12 274:5,12

**20/20** 156:11,17 249:20

**2000** 93:13 94:10 103:11

**2006** 247:24

**2008** 94:10 103:11

**2011** 19:13 33:7,19 42:11 95:3

**2012** 12:3,6 18:9 19:12,14

**2013** 12:2

**2014** 16:25 17:1

**2015** 26:20 43:5,18 123:5,7

**2016** 56:7 64:25 65:1

**2017** 26:20 153:3 239:9 243:3

**2018** 10:6 16:4,6 17:1 45:11 56:3 114:16

**2019** 8:18 17:5,6 68:12 120:22 121:10,12 123:8 126:25 129:7,21 130:1 142:21

**24/7** 154:16

**25** 85:8

**25th** 153:3 157:13 159:1 214:5,25 238:4,10 239:9 243:3 276:9

**27** 46:2,3 69:10

**28** 130:17

**2nd** 191:24 238:5 249:1,12,23 250:6 260:17

**3**

**3** 123:13 124:12 130:17 258:2

**30** 23:8 175:9 244:3

**32** 125:23

**33** 124:13

**34** 124:13

**35** 124:14,15

**36** 124:14

**37** 124:15

**4**

**4** 258:2

**40** 23:8 85:14,20 272:6

**4th** 151:1 214:24

**5**

**5** 100:11 101:18

**50/50** 267:12

**55/54** 85:22

**6**

**6** 51:8 100:8

**60** 85:20

**6th** 8:18 9:6

**7**

**7** 203:12,13

**7/25/17** 124:15

**791** 125:24 126:1,5,8

**8**

**8** 152:21 203:12,13

**89** 22:17

**9**

**9** 137:19

**9/11** 101:25 102:1

**91** 22:17,18 24:10

**92** 22:18,21 24:24

**93** 22:21 24:24 25:6

**96** 132:22

www.NCDepo.com
info@NCDepo.com
*Depositions, Inc.*
Serving all of North Carolina
(919) 557-4640

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

Index: 97..agree

**97** 132:22

---

**A**

---

**a.m.** 81:6,7

**ability** 58:20 78:8 79:25 109:25 111:5 112:4 125:25 151:9,12,17 172:21,24 223:6,7 264:10

**Abraham** 65:21

**absence** 49:5

**absent** 179:14 226:23 227:4 249:8 257:2 258:19 259:2 260:19

**absolutely** 81:5 122:21,25 136:16 160:18 168:19 178:10 187:13 190:25 192:11 193:12 210:10 213:7,19 236:10 240:2 249:16 259:12 260:8 264:14 268:4

**academic** 245:20

**academies** 21:22,24 22:3 103:17,19

**academy** 21:4,10,11,13,14,16,21 22:2,6 94:2,12,19,21 103:5 104:1, 5,19,20,24 137:2,12 140:10,14,25 141:1,3,7,24 142:11 169:7 254:9 256:11,24 259:10

**accelerate** 175:11

**accelerated** 232:24,25

**accelerating** 188:25 214:6,15 234:4 273:15

**acceleration** 213:2 233:2,8

**accelerator** 175:25 233:7

**accept** 101:14,17 228:11 258:25

**accepted** 246:17 257:3

**accepting** 133:19

**access** 137:2 194:4,11,14,17,24 195:1,4,6,9,12,13,18 197:10 198:15 202:23

**accident** 95:24 176:12,14

**accommodate** 5:18

**account** 88:1,2 174:17

**accounting** 175:17,18

**accredited** 48:10 101:3

**accrediting** 99:16

**accuracy** 219:24

**accurate** 177:24 190:4 255:24 266:8

**accurately** 266:21

**achieve** 173:8

**acknowledged** 202:21

**acquired** 99:13 211:5 219:22

**acquitted** 57:24

**act** 25:17

**acted** 37:25

**action** 48:8,12 167:19 168:7,16 170:3,5 171:24

**actions** 29:20 80:15 117:17,21 150:14 163:12,15 222:16 240:22 241:16 242:8 243:16

**active** 23:6,14,16 25:5 63:10 69:22 70:3 97:10,17 98:16,18 102:7,24 108:21 159:21 209:21 236:6

**actively** 108:3 196:22 197:6 200:7

**activities** 29:20 78:16

**activity** 23:25

**actual** 36:18 79:17 86:2 123:20 124:17 145:7 163:13 170:16 200:5 203:7 251:16 264:6 273:20

**acuity** 219:21

**Adam** 267:25

**add** 132:4 133:4 156:2 209:1

**added** 9:1 42:21 121:2 130:25

**adding** 85:16 174:14 180:1

**addition** 8:24 20:8,11 93:25 126:23 132:2,3 133:24 147:13

**additional** 9:24 42:22 131:17 132:2,4 133:4,25 134:3,9,11 141:5 147:3,4 148:6 220:7 239:23 249:4,10 260:20 272:6,7

**address** 113:5 209:9

**addressed** 83:13 258:21

**adequate** 141:18 144:13,16

**adjust** 28:8 122:10

**adjustment** 102:2 119:11

**administer** 87:12

**administration** 23:20 25:10,19 28:19 94:22 103:15 136:6

**administrator** 94:22 104:15,19

**admitted** 149:14

**adult** 22:14

**advantage** 13:6 16:16,18,21 104:8 106:25 217:15,16

**advantages** 218:23

**adversarial** 28:17

**advertise** 58:13 86:17

**advertised** 86:20

**advertising** 86:17 87:4

**advice** 87:24

**affairs** 27:4 33:22 39:16 43:16

**affect** 12:17

**afford** 44:17

**afraid** 166:15

**agencies** 13:23 31:3 33:20 36:4 41:15,17,18 43:11 93:6 139:15 247:20

**agency** 10:18 13:24 14:6,13 19:2 20:12 21:20 23:10 25:12,15,18 26:2 27:18,22 28:11 29:2,3 30:4 31:5 36:11 37:9 38:19,24 40:11 41:16 42:2,18 43:15 46:16,19 48:9,10 53:8 61:20,23 62:7 68:16, 18 79:4 101:21 102:5 141:4,6 142:1 148:14 247:21 258:11,15, 23,25 270:7 271:8

**agency's** 259:20

**aggravated** 66:7

**aggression** 244:7

**aggressive** 189:1 197:19 211:23 212:12,14,23 213:17 214:2,10,11, 13 215:10,15,18,20,21 216:1,4,6 233:13

**aggressively** 215:5,8

**agree** 73:22 123:1 153:2,9 155:15 157:6 160:13,19,22 161:3, 12,18,24 162:10 163:20 164:10

165:17 166:11 167:3 168:6 169:11 173:22 177:2 178:6 179:3, 21 181:20 191:1,9 192:3 199:24 201:7 215:4,7,20 223:2 228:17 230:19 235:7 238:2 242:14 246:24 247:3 248:25 249:3,12,17, 22 250:5 251:24 252:24 258:15 263:13

**agreed** 31:11 116:23 195:22 201:23 222:20,24

**agreement** 15:1 79:17 114:19, 22,24 115:2,9 116:5,7,9,14,20 117:13

**Agriculture** 19:3

**ahead** 9:8 28:15 119:16,23 120:6

**aide** 269:9

**Airfare** 84:21

**airport** 84:20

**alcohol** 140:1

**Alert** 248:6

**alignment** 124:16

**allegation** 34:24,25 104:14

**allegations** 34:15,22

**alleged** 34:16 35:14 71:8 108:3 158:5 236:15

**allegedly** 218:25 238:8 276:24

**allowed** 80:19 216:12

**alluding** 249:9

**ALM** 86:21

**alter** 142:4 184:9 272:8

**amend** 121:19

**amendment** 182:18

**amendments** 182:24

**amount** 19:10 28:12 170:19 176:20 211:4 220:5

**amounts** 147:3

**analysis** 95:8 109:12 242:22

**analyze** 205:23

**angle** 95:11

**angled** 132:24 224:4,10

**angles** 144:12 250:17

**angry** 82:1,6

**animal** 36:2 38:6 242:10

**animals** 218:14

**answering** 5:21 192:4

**answers** 262:4

**ANTHONY** 4:2

**anymore** 87:5 104:14 142:9

**Ap** 28:4

**apologize** 103:3 204:23

**apparent** 224:7

**apparently** 76:20 91:3 210:13 211:19 261:8

**appeal** 99:18

**appeared** 224:13 267:8

**appears** 149:3 234:10,11,15,18

**Apple** 113:1,4

**applicable** 109:17 110:5 151:24

**applicants** 30:2

**application** 39:6 59:20 60:15 61:14 71:11 96:14,17,21 97:3 108:5,16 117:15,19,21,23 153:24 156:7 207:8 209:18 229:8 240:8 246:18 263:8 273:15

**applications** 59:9 88:23

**applied** 32:11 39:8 59:23 97:4 110:1 264:13 265:8,12 266:18

**applies** 263:18

**apply** 29:1 102:23 129:2 152:23 243:18 263:18 265:5,6,7 266:15, 22

**applying** 47:18 267:11,16

**appreciated** 263:16

**apprehend** 154:19

**approach** 142:13

**approaches** 41:16

**appropriately** 37:25

**approval** 46:15,18 105:4

**approve** 63:23

**approved** 104:18 105:7 245:17

**area** 139:5,9,16 144:7 194:14,24 195:7 198:25 233:1

**areas** 153:14

**arena** 97:6

**Arizona** 63:20 70:4,18

**armed** 36:14,19 58:2 102:19 161:13 162:14,16,21 163:14 173:23 174:8 180:17 181:11,17, 22 182:5 218:12,16,25 242:18

**armorer** 96:12

**army** 13:20 106:6,7

**arrangements** 8:11 277:13

**arrest** 157:25

**arrived** 175:15 189:6 233:25 234:6

**article** 109:4 143:12

**articles** 107:9 109:10 143:8 144:25 145:2 218:3 248:8 255:20 256:23

**articulable** 196:17

**articulate** 41:10 112:5 160:10 207:22 210:5 214:9 229:10 254:12 268:1

**articulated** 127:23 183:10 213:5 214:6 248:22 260:24

**articulates** 217:9 260:12

**articulating** 206:20 210:2 224:13 251:11 265:22

**articulation** 156:6 214:10 220:25 263:6

**Ashley** 74:22 75:10 76:15

**aspect** 47:15 49:15 51:3 64:12, 16 69:9 97:8 113:21

**aspects** 113:8 163:25

**assault** 66:8 238:8

**assert** 209:10

**asserted** 157:17

**asserting** 212:21

**assertion** 154:14 155:6 196:21 197:1 212:24

**assess** 39:6 144:5,14

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019                                        Index: assessed..begins

**assessed** 133:18

**assessing** 109:24 132:6

**assessment** 163:18

**assigned** 30:19 31:18 47:20,23 48:21

**assist** 110:13

**assistance** 12:25 114:5

**Associate** 16:17

**associates** 10:1,3,9,18 11:15,24 12:2 13:1,5 14:21,23 15:2,3,7,11 16:4,20 17:3 65:10 72:23 86:6,23 92:18 113:7,20 114:25

**association** 8:23 9:2 90:7 95:1 261:3

**associations** 89:17,21,24

**assume** 4:22 5:10 57:16 64:12 68:16 115:17 197:17 254:18

**assuming** 43:20 59:22 77:18 138:22 140:3

**assumption** 45:11 64:23

**attacked** 75:4

**attempt** 146:7 232:13 247:22 263:20

**attempted** 155:10 158:13 159:10,17,23 160:6 217:10 218:25 236:17 237:8,13 238:9 239:10 254:16 271:16

**attempting** 268:14

**attend** 54:2 89:12,25

**attendance** 53:25 89:12

**attended** 14:3,10 90:19 92:11 94:18,20,23,24 142:10

**attending** 49:23 53:18 101:16

**attention** 105:2 133:20 186:16

**attorney** 44:9 55:7,8 58:9,19 62:22 65:23,24 70:10 71:2 74:15, 20 75:14 76:16 78:15 81:14,21 82:19 83:6 85:24 86:15 89:11,12 178:12 186:25 192:17 228:20,21

**attorney's** 89:21

**attorneys** 54:1 55:3 76:14 79:14 88:10,14,17 89:11,14,19,25 90:6 127:9 152:16

**attributed** 184:5

**audible** 216:12

**audience** 89:14

**audio** 123:16 124:10,13 148:19, 21

**August** 55:24,25 56:2,3 151:1 191:24 214:24 238:5 249:1,12,23 250:6 260:17

**authored** 106:13,17,18 112:16 121:13 129:6 142:21 143:20 144:22

**authority** 46:14,23

**automatically** 173:2 273:14

**autopsy** 127:1,8,10,14 128:8,10, 15 139:19

**average** 159:9

**aware** 35:13,19,22 53:15 60:24 67:21 78:5 79:1,4,8,11,23 81:2 83:7,12 90:5 124:23 140:4 142:14 187:14 223:5 236:20 241:6 245:13 247:18 264:13 270:12,17 271:14

**awareness** 44:23 165:21

---

**B**

**back** 22:20 23:12,20 24:2,18 28:20 30:8,9,18,23 31:8,10,12,21 32:2,10,25 42:12,14 48:16 52:25 57:2 72:11 81:7 84:15,19 85:18 86:23 97:17 103:21 104:7,8 105:24 111:8 116:24 117:6 119:4, 8 125:11 135:7 136:18 149:18,20 150:2 151:4,13 152:7 158:10,21, 25 170:14 177:3 180:7,20 195:9 207:1 211:12 221:8,22 222:10 223:11,23 231:10,20 246:11 256:6 259:15,18,21 260:23 265:3 268:8

**backed** 195:11 204:17,25

**background** 56:13 96:9,24 107:11 109:14,23 110:25 150:3 152:23 160:25 168:2 255:13 256:9,21 257:13

**backgrounds** 30:1

**backing** 188:23 232:15,16

**bad** 28:19 103:21,22 154:6 218:22 253:23 268:19

**ball** 179:11

**ballistics** 95:18

**bar** 36:14,15,19 89:20 218:11

**bare** 237:18

**barely** 88:6

**baring** 138:19

**barricade** 218:7

**Barry** 105:2,14

**base** 58:20

**based** 15:12 19:20 21:21 27:19 55:9 57:18 58:16 79:12,23 99:1 107:25 111:23 115:15 122:13,16 125:6 135:11 146:25 156:11 157:12 159:19,20 160:24 163:16 166:1,2,16 167:4,17 168:2 172:25 174:23,24 178:17 181:1,6,8 184:12 185:7,14,18 186:11 187:22 190:1 197:2 206:10,22 207:3 209:18 210:23 219:19 227:2,5,24 228:3,16 229:22 243:25 254:12,24,25 256:1 257:13 262:6 264:23 268:2 276:4

**bases** 10:23

**basic** 44:11 71:9 176:20 217:8 229:6 242:25

**basically** 78:19 81:20 164:15

**basis** 27:1 42:13,14 76:12 85:10 181:25 184:13 185:3,19,22 188:2 207:7,24 255:9 256:4

**basket** 101:14

**Beach** 19:25 20:4,17,21 21:2 22:9,16,20 23:4,5 24:5,9,18,21 25:1,9 26:7,16,17 27:3,6,20 29:14 33:21 36:12 37:9 41:25 42:9,13 43:4,12 48:17,23 49:16 53:6 67:12 187:10,16

**bean** 259:6

**Bearing** 141:1

**began** 21:16 28:1 155:17

**begin** 132:3 133:5 172:15 211:22

**beginning** 17:7 19:14 137:23

**begins** 174:10

*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*                                    *Index: begun..capacity*

**begun** 225:9

**behalf** 4:14 15:7 57:12 66:12
67:18 75:10 79:3 126:14

**behavior** 160:7

**behavioral** 29:20 149:7

**behaviors** 127:23 148:13 154:2
160:10 165:15

**belief** 23:12 227:14

**believed** 37:24 182:15 183:7
221:19 237:1

**believer** 265:5

**believes** 228:8 229:10

**belive** 226:3

**benefit** 12:20 148:9 263:19

**bet** 254:1

**bids** 27:19

**big** 72:25 81:3 150:5 157:24
232:17

**biggest** 103:18

**bill** 277:20

**billed** 84:5 147:13

**billing** 84:8

**binder** 7:17 277:15

**bing** 205:15

**bit** 30:6 40:20 56:5,13 84:18
103:4 193:23 255:2

**black** 138:8

**blessed** 87:22 151:7 242:6

**board** 40:5,7,9 99:9,11 100:9
101:1,3,4,6,18 266:22 267:16

**boards** 99:8

**Bob** 247:25

**bodily** 45:23 57:19 155:24
160:15,17 179:1 195:24 196:1
268:13

**body** 28:7 76:17 99:17 168:17,25
191:11

**boggling** 259:22

**bone** 31:20

**Bonetti** 187:19,20

**bonus** 86:9

**book** 137:3 256:13,14,15,17,19,
23 257:25

**boot** 30:11 31:6

**boredom** 23:1,2

**bothered** 224:8

**bottom** 54:16 183:20 193:20
194:5 216:18 225:8,21 236:13

**bouncing** 53:10

**boy** 271:10

**brain** 92:3 168:25 170:20 273:23

**branch** 106:5

**brand** 86:11

**Branham** 156:24 190:10 191:23
192:25 200:8 204:4 212:7,8
214:24 220:14 224:2 230:20,22
231:3,5 233:12,18,21 234:1,24
236:12,14,20,22,25

**Branham's** 108:24 199:8 234:9,
20,25

**break** 5:14,15,17,18,21 48:16
81:4 91:15 92:16 126:3 136:15
246:8 265:3 273:15

**breaking** 56:24

**breaks** 49:21

**briefly** 4:10

**bring** 5:24 8:14 21:17 243:24
274:22

**brings** 105:10

**broad** 96:4

**broader** 134:2

**broken** 69:20

**brother** 12:11,18

**brother's** 12:23

**brought** 7:18 35:13 105:1

**brutalize** 144:3

**Bryan** 115:14

**build** 111:11

**building** 85:15,17 86:12 111:5,
11,12 218:15,18

**bullet** 95:8,11,13 146:8 174:1,12
176:1 273:20

**bullet alignment** 132:7

**bunch** 104:22

**burn** 56:23

**bushes** 224:6

**busier** 25:5

**business** 9:16,19,21,25 10:8
12:15 13:5,9,22 14:23 15:21
33:14 58:16 65:8 73:3 87:9,23
88:1 104:12,17 106:25

**businesses** 104:3

**busy** 23:6

**buyouts** 33:11

**C**

**C-A-T** 44:21

**C1** 273:21,22

**Cabell** 54:13 56:8

**cadets** 137:13

**calculate** 95:13

**calculating** 95:11

**calendar** 19:12

**caliber** 177:18 272:6

**California** 255:16

**call** 28:6 43:6 58:21 78:12,13
103:5 117:6

**called** 18:6 39:4 40:9 42:7 44:21
61:1 83:9 87:14 90:18 115:5
153:17 251:4

**calling** 253:6

**calls** 23:8,10 87:7

**camp** 30:11 31:6

**Canaan** 65:21

**cancel** 154:10

**canted** 132:24

**capable** 95:10

**capacity** 49:16 72:18 86:18
96:20

www.NCDepo.com
info@NCDepo.com                    *Depositions, Inc.*
*Serving all of North Carolina*                    *(919) 557-4640*

*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*

**capita** 23:6

**captain** 25:14 31:1 41:4

**car** 34:16 138:14 174:20 175:10 202:9 204:16,25 205:8,18 208:13 214:11 224:4 239:15 252:22 265:2

**care** 15:21 150:7 189:21

**career** 23:3 27:24 28:23 32:12 34:25 45:18 93:12 94:24 141:23

**careful** 141:14

**Carl** 129:15 130:11 145:20

**cars** 248:9

**case** 4:18 7:7,8 9:14 14:19 18:2 20:25 39:3 46:25 50:22 51:20 52:2,9 53:17 54:19 55:1,2,7,8,23 56:6,8,10,14 57:22 58:6,8,18,22 59:6,7,12,13,14,16 60:3,5,7,9,10, 14,24,25 61:4,7,10,11,12 62:17, 21 63:4,6,21 64:3,4,5,7,19,20 65:21 66:15,19 67:5,13,14 68:6,7, 11,14,15,22,23 69:6 70:4,5,6,16, 22,24,25 71:10,17,20,21,22,25 72:1,2,4,5,6 73:11 74:4,9,11,23, 25 75:14,18,21 76:19 77:15 78:10,17,20 79:1 80:11 82:2,9,10, 11,12,24 83:10,12,23 84:24 85:25 87:7 88:9 107:3 109:6,11 112:16 113:15 114:15 115:3,15 116:17 117:1,4 122:4,24 123:20 127:11 134:17 143:20 144:19 145:15,18 146:14,21 147:17,21 148:17,22 152:23 154:11 155:16 158:7 162:18,24 174:11,21 178:14,16 180:21 182:16,20 184:7 185:19 186:3,10 187:8,10,15,18,24 190:9,15 200:21 208:10 210:23 213:22 214:22 222:11 227:13,15, 21 228:16,20 230:1,4 235:8 239:21 241:14,21 244:17,20 254:13,23 260:6 267:17 276:18 277:2

**cases** 38:8 51:22,24 52:7,8,11, 14,17,21,22 54:5,7,24 55:6,17,22 56:5 58:9 60:20 62:11,18 63:7,8, 10,18 64:12 68:22,24 69:22 73:3 74:13 77:19,20 78:5 79:5,24 83:2 84:4 95:5 110:7 113:5 115:16,18, 21 117:7 122:18 183:11 186:5,9 192:19

**casing** 132:16,19 264:1

**casings** 130:25 131:2,6,9,15,22, 25 132:2,3,4,12,22,25 133:1,4,10, 12,16,22,25 134:3,10,11 146:6 265:16,17,18,19 267:17,20 272:6

**CAT** 44:21

**catalyst** 154:1 175:2,4 197:15 205:24 209:17 273:16

**catch** 251:14

**category** 52:21

**caught** 220:1 264:21

**caused** 130:1 157:16 171:6 176:1 273:21

**causing** 46:7 273:23

**caveat** 31:11 179:17

**cease** 10:5,14 16:4 93:24

**ceased** 16:17

**ceases** 189:18

**center** 30:10,20,25 31:19 45:1,2 47:20 50:15

**certificate** 97:18

**certification** 42:19,23 43:3,5 96:25 97:15 98:24 99:2 109:14,22

**certifications** 96:12,13 97:10, 11,12 98:13,23 100:9 101:6,10,18 102:22 111:1 243:22 255:24 257:7,14

**certified** 31:7 42:16,20,21 43:1 46:2 97:14 99:9,10,11 101:1,4 109:12 256:10

**cetera** 6:11 63:3 242:19

**CEUS** 101:12,17

**chain** 48:1

**challenge** 79:13,18,20,21

**challenged** 78:18 79:25

**challenges** 43:10

**challenging** 78:8

**chambers** 44:24

**chance** 136:15

**change** 25:19 29:11 130:1,3 141:11,12,15 142:16 177:15 183:24,25 184:1 202:18 226:14

**changed** 67:24 131:4 138:11 142:19 149:21 159:20

**changing** 254:25

**channels** 247:7

**characters** 88:6

**charge** 49:10 66:8 238:9 271:16

**charged** 66:5,7,10,23 75:3 238:12

**charges** 57:24 249:1,14

**chase** 153:4,10 214:25 237:9 249:5

**chasing** 155:6

**check** 86:2

**checked** 186:18 222:7

**checklist** 214:3,4,14 215:1

**chief** 25:7,8,9 46:20 47:4 95:1 261:5

**Chiefs** 261:4

**children** 44:4,16,20 56:20

**choice** 22:7 153:19 218:17,20,21

**choices** 170:21

**choose** 103:17

**chose** 217:11 228:14 275:23,25

**church** 44:25

**circuit** 54:13 56:7 59:3 61:6 68:21

**circuits** 89:21

**circumstance** 80:7

**circumstances** 39:11 108:6,7 111:22 164:8

**cite** 109:1 110:7 111:16 142:25 143:11 256:14,23 264:6 265:14

**cited** 183:4 256:23 263:22,25 264:2 265:20 268:1,4 272:15

**cites** 263:15 265:15 266:21

**citing** 263:16

**citizens** 153:12,23 245:24

**city** 10:8 23:4 54:17,18 59:12 60:9,11 277:22,24

**civil** 34:6 35:4 51:21,24 52:2,7,8,

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019
Index: civilian..confirmed

17 53:16 55:1 62:21 64:19 67:13
68:6,14,22,24 70:16,18,24,25
71:20,21,22 72:1,2,4 77:9,15
79:1,24 82:9,10

**civilian** 47:22 192:19

**civilians** 244:5

**claim** 35:13,15 62:13 81:23 202:2
205:3 229:2

**claimed** 221:16 229:1

**claiming** 253:21

**claims** 235:9

**clarification** 5:9 200:1 206:19
213:17

**clarify** 212:6

**class** 14:6 90:9 91:21 149:16

**classes** 14:5 17:24 25:14 44:10
90:12,13,14

**classic** 250:13

**classify** 187:4

**clear** 14:8 45:15 46:7 53:5 114:23
117:10 123:15 130:5 200:8
204:14 240:7 251:11

**cleared** 34:14 121:17 192:14

**clearest** 35:18

**clearing** 198:5

**clerk** 21:19 149:13,15

**client** 60:16 78:23 126:14 208:23
276:1

**clock** 28:7,8

**close** 16:21 43:5,7 57:5 223:20
277:19

**closed** 10:6 14:23 16:18 98:4
113:6

**closer** 162:10 166:4

**clutch** 175:24 176:2

**coach** 48:3

**coast** 91:2

**Cobb** 54:21 55:24 61:6,12

**Cobb's** 75:21

**codes** 69:20

**coefficient** 175:18 184:21

**coherent** 5:5

**collected** 170:20

**college** 92:19,20,22,24,25 93:1,
17,19,21 94:8,11,12,14 104:11,24

**colonel** 39:25 41:4

**colonel's** 41:13

**color** 8:6 138:6,11,12,14

**colored** 277:15

**combination** 77:10 131:11

**comfortable** 97:5 100:18

**command** 39:22 40:17 41:3,10
48:2,13 235:9

**commander** 47:21

**commands** 173:23,24 174:9,10
235:12,19,24 236:2,8 252:1,17
253:1,3,7,9

**commercial** 44:12 176:18

**committed** 236:9 249:3,10,25
250:8

**common** 186:2,6

**communicated** 118:5

**communication** 165:8,10

**community** 44:23 92:19,22,24
93:2 219:6

**company** 9:14 11:2,16,20 12:12,
13 13:7 18:5 44:13 104:21 114:1

**comparable** 21:1

**comparing** 185:12 218:14

**comparisons** 41:20

**compensated** 15:4,8,10,19
18:23 73:8 83:19 187:2

**compensation** 15:6 17:1,3

**complaint** 34:4,5,13 123:20,21,
23 237:25 276:20,22,25 277:7

**complaints** 154:6

**complete** 119:21 121:4 135:24
193:10 265:24

**completely** 19:19 44:15 82:4
111:3

**compliance** 255:25 260:17
261:24 268:22 269:1

**complied** 268:15

**complimentary** 118:13

**component** 168:15,20,22

**comprehend** 170:19

**comprehensive** 163:17

**concealed** 98:8

**concealment** 252:7

**concept** 250:11

**concepts** 9:22 80:21 87:10
111:1

**concern** 146:9

**concerned** 267:21

**concerns** 221:14

**CONCLUDED** 278:20

**conclusion** 161:9 185:23 232:1
272:8

**concrete** 210:25

**condition** 28:7 141:16 171:14
172:23

**conditioned** 171:24 173:5

**conditioning** 173:8

**conducive** 141:25

**conduct** 11:12,15,16 35:15
41:19 137:1 141:21 143:2 148:8
153:22 182:16 183:7 244:22
253:5 269:16 270:6 271:8 277:3

**conducted** 15:13 16:19 42:4
61:13 89:8 131:6,21 134:5,8
143:9 190:10 226:4,7,17 229:23
244:3,9,25 245:12 247:6 250:18
253:17

**conducting** 37:14 89:5 132:11
245:3 248:10 250:20 253:9
254:15 255:16 261:1 269:21
270:4

**conference** 91:19 92:11,12

**conferences** 89:19 92:14
101:16

**confined** 144:6

**confirmed** 120:3 235:11,18

www.NCDepo.com
info@NCDepo.com
Depositions, Inc.
Serving all of North Carolina
(919) 557-4640

**conflating** 189:15

**conflict** 186:15 191:1 194:9 195:3 197:10 199:24 200:15,22 201:1 202:4,8 205:3 206:5 207:15 211:15 213:16 216:19 225:12,13 240:6,12

**conflicting** 185:20 194:3

**conflicts** 185:21 186:16 188:3,21 196:9 201:4 205:22,25 206:3,18, 21,22 207:10 208:2,4 209:10 240:5,16,18

**confronted** 36:16 59:18

**confronting** 160:5

**confuse** 172:2

**confusing** 170:1

**connected** 42:18

**connection** 104:23 143:3 179:16

**Connor** 107:3,4,12 108:5,9,25 109:2 156:10 182:10,23 183:11 243:19 266:4

**conscious** 273:24

**consideration** 109:24 110:23 128:19 133:3 149:25 154:18 157:6 164:3 167:13 190:13 222:11 255:1 264:15 273:9,19

**considerations** 80:20 256:12

**considered** 10:7 39:12 89:5,6 108:12 111:21 142:23 162:1 169:17 188:12 227:23 242:15 249:13 277:8

**consistent** 238:4 271:1 272:13

**consistently** 203:21

**consists** 7:15

**constant** 23:17 155:6

**constitution** 182:18,24

**constitutional** 182:15,16,21 183:4,6

**consult** 113:14

**consultations** 118:2

**consulted** 81:23

**consulting** 10:19,22 104:3,5,11

**contact** 36:24 232:19

**contacted** 14:18,22 30:12 70:9 71:1 85:24 86:16 114:15 115:3, 11,13,14,24 116:3,4,8,13 117:12 123:19 178:13

**contacts** 117:10

**contained** 142:22

**contemplating** 51:15

**content** 149:9

**contention** 31:20

**context** 64:18 88:22 149:10

**continued** 10:21 196:10 231:25

**continues** 142:2 216:19

**continuing** 100:24 101:9 155:7 194:5 242:8

**contract** 14:1 49:6

**contractor** 18:21

**contradicted** 230:17

**contradicts** 221:16,18

**contrary** 81:17 82:4 128:5

**contrast** 232:5,8

**contributed** 246:18 253:24

**control** 31:3 218:20 252:1

**conversation** 71:15 82:5

**conversations** 118:2 146:18

**coordinate** 21:15 105:9

**coordinated** 21:21 103:14 105:6

**coordinating** 50:20

**copied** 277:20

**copies** 8:10,21 278:13

**cops** 173:4

**copy** 6:22 7:23,25 8:2,6 9:9 76:21 119:16,21,24,25 128:14 135:24 261:6 264:6 277:14,18

**copying** 6:24

**cord** 273:21

**Corey** 198:15

**corner** 206:10

**Corporal** 272:2

**corporation** 10:10,11,12 12:7,8,

14 15:4

**correct** 11:17 12:1 13:3 18:4 21:25 25:22 27:12 32:7,8,12,16, 20 33:5 39:21 45:14 46:6 48:7,22 50:3 51:12,22 52:15,16 54:6 57:11,13,14 59:25 60:4 62:8 64:14,21 70:17 72:16 73:5 75:17 77:18 78:3 80:2 83:21 84:12,14, 19,23 86:7 97:16 100:5 101:7 102:8 115:1 116:15 121:14,15,24, 25 122:7 123:3,18 124:8 139:21, 24 140:17,18,21,22,25 143:1,13 145:3,4,8,20,22 146:13 147:1,10 152:10,11 155:1 158:1 159:18 163:1 174:5,6 176:10,11,25 177:1 178:14,18,23 179:1,2 180:25 183:17,18 187:1,12,13,22 190:10, 21,22 191:16,17 192:15,18 193:11 194:2 198:12,23 199:9 200:4,5 201:18 204:5,8 206:9,11 207:12 208:3 209:12 212:4,5 216:16 217:1 221:12 224:21 225:7 231:21 233:20 234:9 236:24 237:2 239:1 241:13 242:11,12 253:4 255:7 258:6 259:12 260:6 261:13 264:14 271:11 277:7

**correction** 47:23

**corrections** 31:7,19,23,24,25 94:13 103:13 244:5 245:24

**correctly** 42:5 50:2 135:13 139:6 165:1 240:10

**correlates** 40:15

**cost** 45:9 86:12 218:4 259:5,6

**Council** 9:15,22 11:1,12,25 14:20,25 15:19 16:6 17:7 65:11 86:3,10 87:1,10 113:12

**counsel** 6:2 7:4 8:13 60:7 78:7 79:25 107:10 114:9 118:1 121:10 122:6 126:19 134:23 135:10 137:8,11 140:16 144:21 145:1 146:16 147:3,14 152:14 155:16 199:11 212:10,18 227:20 259:13 260:3

**counsel's** 121:21,23

**count** 63:24

**counters** 259:6

**countless** 176:16

**country** 91:6 248:11,24 251:4

www.NCDepo.com
info@NCDepo.com                    Depositions, Inc.
                          Serving all of North Carolina           (919) 557-4640

257:4,5

**County** 22:12,15,17 24:12,14
26:24 29:15 30:8,18,22 31:15
33:21,25 34:1 38:25 42:10 43:19,
23 50:8 54:13 56:8 61:7 67:12
68:9 93:8 143:7 153:5,13,16,23
157:18 163:9 177:10 260:9
261:14,21 269:12 270:4,6,10,13,
24 276:6

**couple** 63:14,19 99:8

**courses** 101:13 139:25 257:7,14

**court** 9:10 12:20 54:13 56:8 60:5
61:6 74:3 75:19 76:8,12,20,22
80:4,12,18,25 82:7,20 83:8,9,13
91:24 119:23 120:6 121:10
123:22,24 141:12,15 142:3,7,15,
18 149:14 156:9 251:6

**Court's** 107:3

**courts** 77:20

**Cousin** 149:12

**cover** 252:7

**covered** 252:16 272:9

**crap** 104:22

**crash** 29:19 34:1

**create** 45:22 144:14,17 150:16
247:7

**created** 28:12,21 44:18 143:24
145:6 173:2 257:4

**creates** 210:7

**creating** 141:16 151:23 173:12
177:20

**credential** 42:16 43:17 97:16
98:21 99:6,13 100:17

**credentials** 97:6 98:15,22

**credible** 29:8 222:1,2,5,7

**credit** 267:13

**credited** 101:17

**crime** 23:5 44:3,10,12,19 45:3
133:2 158:2 232:5,8 236:4,9

**criminal** 18:17 21:18 51:22 53:16
54:19 55:6,14,23 61:25 64:20
65:20 66:2,5,12 67:1,13,14,18
68:6,7 70:14,19,21 74:11,13,25
75:10,14 77:10,11,12,14,19 82:11

92:19 94:9,12 101:2 103:6 104:9
227:13 241:8

**criteria** 42:22 108:11

**critical** 272:20

**critically** 133:17 205:23

**criticism** 122:1 131:19 133:7
189:7 213:20 216:15 221:11
262:23

**criticisms** 200:3 225:25 227:25
228:23 262:24

**criticizes** 120:23

**critiques** 120:23 121:16

**critiquing** 121:13

**Crowder** 33:11

**cruiser** 201:12 202:6 204:11
224:18 225:6 234:10

**Crush** 199:6

**crutch** 190:5

**cues** 149:7

**culmination** 152:2 166:14

**cultivate** 170:22

**curious** 202:20

**current** 8:16 9:13 23:20 43:9
69:15,21 97:10 99:24

**curriculum** 103:16

**curve** 179:6,16

**cut** 24:3

**CV** 4:17 8:16 9:1,5,6,8 12:4 16:22
19:16,20 26:14 44:2 47:5,12
51:22 52:3,4,11,14 54:9,22 58:6
61:5 65:18 69:5 93:20 99:8 100:7
102:2 103:3 244:8

---

**D**

**damage** 273:20

**damaged** 232:22

**danger** 160:15 195:24 197:12

**dangerous** 73:24 153:10,18,21
154:10 222:17,22 240:24 263:5

**darn** 91:12

**dash** 193:20

**dashcam** 124:9,11,15 153:4

**data** 142:22

**date** 12:4 16:23 21:15 43:10 67:8,
24 103:10 114:16 237:10

**dates** 21:21 65:7

**Daubert** 74:16,17 75:16,23 76:8,
25 77:1,7,9,17,21,24 78:1,5,7,11,
24 79:5 80:1 227:8

**David** 240:7 268:12

**day** 23:19 27:23 47:21 49:21
84:6,16,20 91:21 92:10 154:20
159:3

**days** 75:22,23 92:15 191:25
193:2 235:18

**dead** 266:12 273:24

**deadly** 37:7 45:19,20,22 46:5,9,
10,11 56:9,11,16 59:21 61:8,15,
17,21,22 62:4 64:7,16,17,19 66:1,
14,22,25 68:13,17 69:7 71:12,23
108:8 161:10,13,19 162:2 163:22
168:6,8,9 178:9 180:23 183:16
192:9 217:14 218:5,7 229:8
240:8,13 242:7,16 246:19 261:11,
17,19

**deal** 141:17 179:18 180:2

**dealing** 70:5,8 161:12 166:23
218:25 252:14

**dealt** 37:4 172:1

**death** 45:23 155:24 160:15,17
179:1 195:25 196:1,7 242:1
268:14

**decades** 243:13 251:15

**decedent** 276:1

**December** 67:9 70:1

**decide** 42:13 167:24 168:4
227:19

**decision** 24:1,10,17 28:11 29:3,5
40:3,5,12,25 41:11 48:14 88:20,
21,22,25 96:17 107:12 108:25
142:18 153:25 154:11 156:13
157:11,12 158:9 160:11 167:23
168:20 169:24 171:3,22 172:9,25
180:15 181:19 182:23 196:17
197:4,15 209:19 217:12,25 219:2,
7 221:25 222:25 223:1 235:23

243:1,17,20

**decisions** 160:7 182:11 183:9 217:20,22 222:16 253:24

**decompress** 209:2

**deem** 50:23

**deemed** 107:16

**deeper** 108:10

**defend** 75:5,7 178:18 218:8 228:20

**defendant** 52:2,22 61:25 64:20 66:2,5,13 67:2,16,19 68:15 75:10 78:17 190:14

**defendants** 4:12 70:14

**defender** 30:10,19,24 31:18

**defender's** 8:25 89:22

**defense** 18:18 20:13 25:17 89:18,24 101:2

**defenses** 128:5

**defensive** 26:8 28:14 29:7 31:2 103:13,23 105:25 178:24

**define** 215:21,23,24,25

**defined** 164:15 188:25 215:18

**degree** 92:18 93:3

**degrees** 93:16 219:24 264:11,12

**Dejesus** 65:21

**delayed** 84:16

**delete** 151:24 152:1,7

**demeanor** 163:22 242:19

**demonstrate** 232:21

**Dennis** 4:2,8 10:1,3,9,18 11:15, 23 12:2 13:1,5 14:21,23 15:2,3,7, 11 16:3,16,19,20 17:3 44:1 65:10 72:22 86:5,23 113:7,20 114:25

**department** 19:3 20:1,5,14,18, 21 21:3 22:6,10,16,21,24 24:6,10, 13,14,19,22 25:2,6,9,13,15 26:6, 7,15,16,18,24 27:9,18,25 29:1,14, 16 30:22 31:15 33:22 35:14 37:9 41:21,25 50:6,8 59:24 62:23 69:3 71:3 97:18 143:7 153:17 157:18 163:9 245:10 261:14,21 268:23 269:2,12 270:4,6,10,14,19,24 276:7,16,24 277:4

**department's** 260:10

**departure** 24:9

**depend** 191:3,6

**depending** 21:14 85:23 98:23 108:19 131:15 132:17 177:14 182:9 199:5

**depends** 47:17 139:16

**depiction** 58:20

**deploy** 170:21

**deployed** 252:21

**depo** 78:22

**depose** 277:12

**deposed** 65:20 129:11 254:8

**deposition** 6:10 7:18,19 35:11 52:15 53:22 54:17,23 55:16 60:2 62:14 65:4,5,16 68:11 75:13,15 81:11,15 83:2,16 91:22 117:25 118:3,6,8,11,17,18,23 120:1 121:17 127:2,3 128:22 129:12,14 130:5 146:22 147:7,9,12 148:19 150:1 152:17 178:11 199:8 208:17 209:22 210:12 212:9,13, 17,19,20 233:12,14,15 234:21 235:3,4 262:11 264:18 271:18 277:17 278:2,20

**depositions** 4:19 6:4 55:1,3 67:4 118:6 129:4 130:14 136:4 145:10 149:19,21

**depth** 82:3

**deputies** 34:9 50:12 108:4 138:23 139:2,3 157:18 171:15 175:14 230:25 249:5 250:5 272:13

**deputy** 6:4,10 20:24,25 31:16 32:6 46:23 127:4 129:8 131:23 140:9,20 142:10 151:1 155:10,11, 20 157:20 158:6,8,16 159:4,15, 16,25 182:15 183:7,16 184:16,23 185:24 187:20 188:4,18,22 190:8, 9 191:21 192:23 193:16 194:8,10, 12,22 195:1,8,12 197:11,17,24 199:23 200:23,24 201:1,6,11,19 202:2,4,6,8,10,11,23 203:2,5,15, 21 204:1,9,11,15,20,22,23 205:4, 12,14,17,18 206:5,7,12,13 207:15,19,20 208:8 209:7,23,24 210:12,19 211:21 212:7 213:24 214:23 216:7,11,14 220:12

221:16 222:2,9,15 223:9,10,15 224:1,9,16 225:9,23 226:5,8 227:15 228:25 229:9,11,17,25 231:22 233:11 235:8,11 236:14 238:23 240:5,6,7 241:15,25 243:5,8 244:24 249:5,7,22 251:17 260:13,16 261:10 262:8,12,14 263:3 264:13,16,19 265:12 266:3, 13,14,19 267:2,4 268:14,22 271:18 272:11,16

**derive** 257:6

**derived** 132:12 257:8

**describe** 202:6,13 205:4,17 206:12

**describes** 191:2,3 203:16

**describing** 203:6,15

**description** 59:15 64:4,5,11 69:5 180:8 200:15 214:2 215:2,10 220:13 229:25

**descriptive** 251:2

**descriptors** 214:18

**design** 44:11

**designated** 20:7 38:25 41:4 101:13

**Designation** 101:3

**designations** 69:19

**designed** 5:1 89:10

**detail** 74:8 153:21

**details** 56:9 59:14 60:13 71:5 74:9,23

**detective** 47:14 50:18 127:2 149:1 166:22

**detention** 47:13

**determination** 39:18,23 40:18, 23 41:9 182:14,19 211:9

**determine** 38:22 117:17,21 170:16 196:3 221:9 235:22 244:10 245:25

**determined** 99:12 107:16 228:7

**determines** 134:11

**determining** 163:21 164:4 178:8 250:15

**develop** 23:9 46:17 167:4 170:23

*Rhoades vs County Commission of Marion County, et al.*
ROOT, DENNIS on 09/17/2019

**developed** 20:15 44:21 53:10 167:1

**developing** 167:13 190:6

**development** 53:7,12,13

**deviate** 260:14 272:23

**deviated** 203:20

**deviation** 151:20 272:20 275:16

**deviations** 272:21,22

**diagram** 133:3 145:6

**dictate** 218:21

**dictates** 218:22

**died** 247:24

**differ** 101:13

**difference** 8:20 161:14 250:22, 23

**differences** 8:20 228:22

**differently** 41:22 76:20 228:19, 21

**differs** 89:3

**difficult** 234:16 257:17 264:5

**difficulties** 28:4

**diminished** 85:18

**diminishing** 196:20

**direct** 4:5 135:1 145:25

**direction** 8:13 76:6 132:10 173:25 174:11 219:11 264:20

**directionality** 146:8

**directions** 220:4 224:23

**directly** 37:19 184:5 232:13 242:5 246:18 253:24 255:21 263:2

**director** 27:4 43:16 104:14

**disadvantage** 222:18

**disagree** 171:3 172:6,9,11 180:7 226:7 231:12 247:10,13

**disagreed** 226:17

**disagreement** 263:7

**disc** 261:6

**discharge** 35:24 36:5 38:13 45:17

**discharged** 36:7 38:4 106:9 155:20 156:21 207:20

**discharging** 132:21 155:25 225:9

**disciplinary** 46:22 48:11

**discipline** 29:20 46:24 47:2,9 48:14

**disciplined** 24:6 29:16

**disclosure** 4:18

**disconnect** 40:21 167:1

**discovery** 62:25 63:3 126:18 127:10

**discrepancies** 209:7

**discuss** 79:19 153:21 192:13 261:16 276:5

**discussed** 51:4,16 106:14,19 109:2 112:25 113:3 129:23 137:25 167:12,18 188:1 221:6 275:17

**discussing** 5:2 187:25 189:16

**discussion** 55:9 82:4 118:9 142:24 183:2,12 211:12 222:15 240:21,23 241:2 243:4 260:9 278:10

**disengaged** 175:24

**dismissed** 187:15

**disposal** 112:1,3

**disposition** 165:14

**disprove** 133:21 239:24

**dispute** 252:25

**disputed** 199:23

**disqualified** 74:3

**dissuade** 46:12 242:7

**distance** 162:7 165:3 242:17 275:18

**distances** 109:24

**distinction** 53:12 59:11 72:13,25 234:12 250:19,25 253:22

**distribution** 15:9

**district** 83:9

**disturbance** 198:20,21 212:2,16 215:11,17 232:7 233:2 267:3

274:7 275:14,15,18

**division** 21:19

**document** 6:7 7:3,14 39:24 48:5, 8 49:23 120:23 121:13 131:25 133:2,15 159:2,3 232:3

**documentation** 6:25 15:25 116:5 118:21,22 119:4 136:3,8,10 148:3 154:4 159:2 239:21 256:25 257:2 258:18 259:8 268:25 271:17

**documented** 127:6 131:10 141:6 198:20 212:1,15 225:22 232:20 239:19

**documenting** 47:25

**documents** 7:6,9 40:18 107:9 108:1 116:17 122:11,13 123:16 124:6 125:7 126:24 134:17,19 137:12 146:25 148:12 150:21 152:7,14,19 206:17 214:25 259:11,14,25 278:7

**dog** 97:3

**dollar** 16:8 147:1

**dont'** 141:8 268:23 272:10

**door** 36:15,16,17 56:19,21,23,25 57:3 58:1,4 204:18 252:17

**doors** 98:4

**doorway** 181:12

**doubt** 134:7 213:23 255:22

**downloadable** 264:5

**draft** 146:14

**drafting** 114:6

**drag** 175:18 184:21

**draw** 159:7 171:6 253:22

**drawing** 143:24 171:9

**drawings** 144:16

**drew** 256:21

**drive** 6:20 76:1 126:8 215:4,7,15, 19 264:8 274:20,24 278:1,12

**driven** 234:21

**driver** 174:20 175:2 235:12

**driver's** 201:13 204:18

**drivers** 97:23

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019
Index: drives..entire

**drives** 5:25 6:12 126:22 268:18

**driving** 76:2,5 153:13 154:2,16, 21,23 166:21 197:20 198:1,7 212:12,14,23 216:23,24 233:13 238:6 239:3 274:25

**drop** 274:15

**drove** 195:14

**drugs** 139:25 241:5

**due** 255:1

**dug** 19:5

**DUI** 20:15 34:8 60:11,15

**duly** 4:3

**duplicates** 126:2

**Durst** 4:6,11 81:5,8 92:7,9 120:6, 10,12,14 123:8 136:16,19 167:10, 11 180:19 230:10 237:23 238:1 246:8,12 278:16

**DURTS** 123:9 230:12

**dust** 155:12,13

**duties** 20:7,9,12 21:12 26:8 35:25 47:13,16 73:23 86:24 108:9 142:3 222:21

**duty** 48:23 69:13 263:3

**dying** 57:5

**dynamic** 243:24 255:17

**dynamics** 174:23 175:17 176:19, 24

**E**

**e-mail** 68:1 118:5

**e-mails** 259:16

**ear** 19:6

**earlier** 52:25 53:9 81:9 93:11,12 195:23 222:20 258:7

**early** 33:13 93:13 178:11 227:7 255:10 278:9

**earned** 17:8 32:3

**earning** 32:4

**easier** 22:5 193:13

**East** 195:16

**easy** 173:3 277:14

**educate** 258:12

**educated** 48:7

**educating** 227:22

**education** 49:7 96:9 101:9 102:21 256:2 262:17

**educational** 42:17 91:8 93:17 99:21 100:24 101:11

**educationally** 87:24

**Edwards** 81:4 115:18 123:7 130:4 136:14 167:8 180:18 191:21 221:21 226:10 228:2 230:9 237:24 250:10 278:15,17

**effect** 114:20 158:22 264:16

**effectively** 172:1

**effort** 74:15 200:5 221:9 225:22 232:3 252:6 258:15 260:22

**efforts** 156:23 239:23

**egotistical** 91:7

**eighth** 182:23

**eject** 132:23

**ejecting** 264:1

**elected** 43:22

**election** 43:20

**electrical** 89:8

**element** 156:3 157:14 220:15 224:12

**elements** 117:4 118:24 220:7,10 242:25

**elevated** 196:18

**eleven** 27:21,24

**else's** 184:10

**embarrassment** 103:3

**emotional** 28:3

**emotionally** 28:2

**employed** 9:19 36:4

**employee** 18:20,22

**employment** 9:13 19:25 20:17

**enchilada** 152:20

**encounter** 196:11 221:4

**encounters** 255:17

**end** 19:13 81:20 105:22 161:14 225:13 264:21

**ended** 57:5 155:5,14,17 197:8

**ends** 151:3 196:24

**energy** 23:9 90:4

**enforcement** 13:8,16,18,20,23, 24 14:6,13 19:21,24 20:10,18 23:7 24:2,4 26:25 27:13,16 29:2, 4,17 30:13,19,25 31:10,14,18,24 32:1,5 33:6,10,19,20 35:1,24 36:4,6,11 38:3,18 40:10 41:15 42:14,15,18,22,24 43:10 45:19,25 46:3,13,16,19 47:1,16,23 59:8,13, 19,20 60:12 61:19,20 62:7 64:18 66:2,3,4,14,22,25 68:13,15,18 69:1,4,6,10,13 72:13,18,21,23,24 73:7,23,24 79:4 81:13 90:14,17 93:6 94:1,13,19,25 95:2 97:13,14 103:13 107:1 117:1 136:9 148:9 154:2,9 161:15 162:20 163:12 164:2,13,21,23 165:19 166:8,9 172:12,14,21 177:21 192:7,21 200:13 214:9 222:21 223:3 229:9 236:3 241:23 243:14,17,21 244:4 245:10,24 246:25 247:20 248:5 252:2,21 254:14 255:15,20 267:13 268:15,18 269:13 270:11

**enforcements** 165:20

**engage** 170:9

**engaged** 36:17

**engagement** 181:13

**engaging** 153:22

**engine** 175:22 188:24 211:22 213:25 214:13 274:14

**enjoy** 10:20

**enjoyed** 28:18

**ensure** 253:19

**entail** 200:9

**enter** 218:19

**entered** 76:22 201:12 204:15

**entering** 97:20

**enters** 132:10

**entire** 22:3 76:19 91:6 188:16,20

www.NCDepo.com
info@NCDepo.com
Depositions, Inc.
Serving all of North Carolina
(919) 557-4640

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

231:14

**entirety**  61:19 132:7 137:5
148:18 265:15 270:17

**entities**  41:19 245:12

**entity**  94:14 98:23 100:18 248:1

**entry**  20:18 36:15 56:17 203:22
212:25 218:15

**environment**  28:17 141:25

**environmental**  44:11

**environments**  259:4

**envisioned**  24:3

**Ephedrine**  140:6

**equal**  216:22 220:19

**equally**  266:16

**equals**  89:1 173:3,12

**equation**  265:6

**equipment**  95:14

**error**  124:16 268:6

**escape**  23:22

**escaped**  81:18

**essential**  117:4

**essentially**  107:24 183:15
184:14 200:16

**establishes**  108:11

**establishing**  189:25

**estate**  4:14 59:22 88:10 186:25
199:12 212:10

**estimate**  17:16,17,19,25 85:8

**ethical**  100:23

**ethics**  43:25

**evaluate**  39:6 81:14 87:7 108:22
117:16 144:6,14 153:24 163:21
206:18

**evaluated**  133:17 186:18 193:6

**evaluating**  108:12 109:23
127:21 132:6 162:1

**evaluation**  107:11 227:4 242:16
272:12

**Evans**  54:18 55:2 58:8 60:9

**event**  38:10 59:5 61:18 97:5
108:3,12 111:23 133:19 135:20
141:3,9,17 146:9,10,12 148:7
149:23 150:12 154:8 155:9 157:2
158:17 159:1 161:5 186:4,20
187:11 188:16 189:12,13 190:24
191:2,3,10 193:9 197:7,8 198:13
200:13 201:25 209:8 210:24
211:4 223:1 228:14 230:14
243:18 251:8 253:20,24 265:11
266:17,23,24 273:10 274:2 277:1

**events**  39:2 141:20 148:10 176:5
187:20,21 188:3,7 190:1 211:1
220:21,22 243:24 259:4 267:14

**eventually**  43:13,15 135:24
154:24

**everybody's**  190:20

**everyday**  89:4

**evidence**  132:13 133:20 185:22
186:14 198:20,24 199:13 206:25
211:3,7 212:2,15 214:16,19
215:12 220:23 225:12 228:13
229:4 230:17 235:8 240:4 272:22,
23 275:8,11,13

**evolution**  39:14

**evolutions**  177:23

**evolve**  177:15

**evolving**  267:14

**exact**  16:22 19:9 66:8 69:17
81:12 231:25

**exam**  32:23

**examination**  4:5 39:5 144:9
193:11

**examinations**  38:9

**examined**  4:3 222:7

**exams**  30:2 99:2

**Excellent**  153:19

**exception**  5:18 6:9 55:23 155:12

**excessive**  240:10 241:17

**exchange**  105:21

**excited**  92:5

**excluded**  74:5 80:17,18

**excuse**  17:12 248:16 258:2

**execute**  246:16 251:25

**executed**  114:19,22 251:18

**executive**  137:18,23 138:21

**exhibit**  9:17 119:20,24 120:1,12
125:24 126:5,6,8,10,17,18 147:16

**exhibits**  126:15

**exist**  10:3,5 16:17 185:21 189:13,
18 202:11

**existed**  202:9

**existence**  10:14 16:4 45:10

**exists**  152:9 202:4 245:19

**exit**  223:20 236:3,7 253:1

**exited**  201:16 202:6 203:25
204:2,12 206:7,13 225:4,6

**exiting**  225:10

**exits**  175:13

**exonerated**  34:15,20,21

**expand**  91:9

**expanding**  91:11

**expect**  169:22 171:1 172:7,14
272:20

**expected**  118:10 122:20 207:5
254:15 262:3

**expedite**  172:24 173:12

**expenditures**  15:22 63:23

**expenses**  84:3,21

**Expensive**  74:24

**experience**  27:17 43:24 59:6
66:21 79:12 81:3 96:10,24 107:12
109:14,23 110:25 117:8 150:4
152:24 168:3 170:22 172:19
186:9 214:8 243:14,20 255:14,18,
23 256:2,22 257:13 274:23 275:1

**experienced**  33:8 178:17 244:13
269:20

**experiences**  160:25

**experiencing**  167:16 168:3

**expert**  4:13 10:19 11:19 16:7
17:9 18:1 39:1 51:19 52:1,8
58:14,18,25 59:1,2 60:25 61:2
63:10 65:9 68:25 72:19,20 73:11,
13 79:2,12 82:20 83:15,18 85:8,9,

14,20,25 86:18 90:15,16,21 91:1,
10,11 92:4 95:8,16,19,21,25 96:2,
8,10,14,15,17,19,21 97:6 109:4
113:8,21,24 114:11,23,24 116:23
121:21,23 128:6 147:18 176:23,
25 244:20 247:16

**expertise** 96:5

**Experts.com** 86:21

**expiration** 98:1,25 102:25

**expired** 97:19 98:11 99:7 100:17

**expires** 98:7 102:11

**expiring** 43:6,7 101:24

**explain** 111:1 112:5 151:12

**explained** 118:12 202:22 205:25
207:1

**explaining** 89:8 211:19

**explanation** 76:11 172:5

**explanations** 90:22

**explicit** 188:3

**explore** 225:22

**exposed** 253:23

**exposing** 153:23 252:9 253:20

**extended** 132:21

**extensive** 154:6

**extent** 60:17 131:20 141:7 210:8
278:9

**eye** 264:10

**eyes** 237:20

---

**F**

---

**face** 43:11 158:19 159:9,25 160:8
219:17 228:12 254:25

**Facebook** 87:9,11,16

**faced** 186:20

**facilitated** 248:23

**facilities** 104:11

**facing** 161:4,9 167:19,21 195:24
196:7 232:15 249:23 250:6

**fact** 36:12 57:8,18 62:21 77:6,11
79:16 81:17 103:2 104:16 105:10
120:3 132:15 133:14,22 137:21

144:6 153:16 155:4 157:17
158:22 161:21 166:15 170:6
178:25 188:18 191:14 192:12
193:1,5,8 196:22 202:2 209:17
216:22 218:24 219:19,22 220:19
223:2 226:7 232:11,23 234:4,11
235:11 236:22 238:7,9 239:2
241:15,21 242:9 248:8 253:12
261:15 262:9 263:9 264:17,19
265:15,24 266:25 271:15 272:24

**factor** 165:6,17,23 166:7 178:7
221:23

**factors** 161:25 163:20 164:19
165:2 167:12 235:21 242:13,23

**facts** 111:22 142:22 156:2 183:24
184:1,2,6 207:3 226:22 242:23

**faculty** 103:5

**failed** 261:8 264:15

**failing** 165:19 211:19

**failure** 110:4,20 111:19 135:10
217:14

**fair** 5:6,11,21 6:15 14:13 19:20
59:10 73:2 130:17 131:19 174:3
190:12 193:1,4 207:24 241:14
276:2

**Fairmont** 193:5

**fairness** 122:23

**falls** 253:18

**falsely** 104:15

**familiar** 4:22 75:20 107:14
177:11 178:3 244:15 247:16
248:18

**family** 30:11 56:17 57:20 128:22
129:5,10,11 130:14 145:10,12

**fashion** 250:18 252:7

**fast** 153:13 175:11 274:6,16

**fatiguing** 23:12

**Faulkner** 107:14 110:17 120:24
121:14 122:3 127:5,22 132:14
137:3 175:23 219:20 228:8
244:15 245:23 252:9 255:4
262:25 265:8,10

**Faulkner's** 109:18 110:6 119:6
125:2,6 126:23 127:20 149:3
244:2 246:21 247:10 262:20
270:18 277:17

**fault** 29:19 111:3 200:7

**favor** 5:3 205:10

**favorite** 149:12

**FBI** 94:19

**FBI's** 69:20

**fear** 149:1 156:2,3,4,6,7,15
157:15 160:20,23,24 165:24
166:9,13,16 167:1,4,14,17,19,21
168:3 177:3 178:7,17,20 179:1
216:22 218:1 220:19 226:6,9,16,
18,21,22 228:1,9,25 229:18
236:21 237:5

**feared** 57:18 223:16

**fearful** 28:9

**fears** 227:10,15

**February** 67:25 70:1

**federal** 60:5 75:19 83:8 90:22
91:1 121:10 142:18 247:20

**fee** 84:4,6,9,20 147:7,9,12

**feeds** 245:21

**feel** 23:14 178:4 187:8 227:2

**feeling** 166:13 177:8 191:9

**feelings** 28:3

**feels** 160:14 195:23

**feet** 76:3 106:12 175:9,10 176:3
203:22 205:15 252:11,18 274:5

**fell** 273:14

**felon** 107:24 108:2,17 160:1,4,5
217:10 218:25 249:13 250:20
251:8 254:16 263:5,6,12

**felonies** 249:4,25 250:8,13

**felony** 83:16 135:19 141:13
142:14 158:13 159:22 246:16,24
247:11 249:1,9,11,14,25 250:8,
11,18,20,24 251:5,6,8,12,18,20,
25 253:4,5 258:8,10

**felt** 23:13 76:20 92:7 108:4,24
112:5 144:13 177:22 196:7

**field** 13:18 20:9,18,22 26:10,25
27:14,16 29:17 33:6 47:18 50:13
95:16,22 97:13 109:4 114:11
171:10 180:6 202:19 245:18
264:23 267:8

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019
Index: fifteen..formed

**fifteen** 17:13

**fifty** 16:12

**fighting** 96:6

**figure** 8:7,10 16:8 47:15 65:8 66:11 69:5 126:10,16 135:2 150:18,24 194:25 261:9

**figured** 121:15

**file** 5:24 15:24 21:19 124:10 277:25

**filed** 34:5 35:4 71:18 72:5,7 78:7 81:22,25 82:8 99:18 121:9 123:21,22,24,25 124:3

**files** 6:3,4,5 82:24 114:4 124:13 258:20

**filings** 82:20

**fill** 49:11

**filled** 271:18

**final** 40:3,17 41:5,8,11,13 46:15, 18,22,25 47:8 48:14 122:9 150:16 213:1 227:23 232:23

**finalized** 128:14 146:16,19

**finally** 254:9

**financial** 17:11

**find** 81:16 82:24 91:9 99:25 111:13 119:5 121:4 126:8,21 131:25 132:15 137:6 151:25 155:13 159:3 183:19 197:6 203:1, 5,14 205:23 218:2 247:22 248:4, 14 254:2 255:4,6 264:4 270:2 277:22

**finder** 241:15,21

**finding** 133:4 163:6 209:22

**Fine** 214:16

**finger** 26:13

**fingerprint** 113:24

**finish** 5:20

**fire** 46:4 164:4 169:13 229:13 242:4,9

**firearm** 35:25 45:18 75:5,6 132:22 155:25 156:21 207:21 225:9

**firearms** 96:11,13,14,15,18,21 97:7,8 98:5,10 102:9

**fired** 37:24 196:14 220:20 223:16 229:19 237:8

**firing** 168:13

**firm** 25:23 265:5

**firms** 115:22

**firsthand** 146:5

**fish** 82:16

**Fitzgerald** 25:8

**fixed** 164:16

**flash** 6:12,20 264:8 278:1,12

**flat** 84:5 106:12

**fleeing** 107:24 108:2,16 249:8,13

**flight** 84:16

**flipped** 7:20

**Florida** 9:1 10:12,18,24 12:7 13:12 18:11 19:3 22:4 26:19 44:8 45:12 55:21,25 58:18 63:19 64:8 65:21 67:11,12 68:9,10 77:4,9,18 78:11,24 82:13,15 89:16 90:2 91:3 92:11,14 97:16 98:2,7,8,16 99:9,10,16 101:4,21 102:6,17,20 103:2 162:18 255:16

**flow** 15:21

**fluctuate** 85:23

**fluctuations** 196:25 254:24

**fluid** 161:4

**fly** 148:13

**flying** 214:7,15

**focal** 219:23

**focus** 44:20 91:11 96:5 150:10 189:23 208:8 209:6 264:12,23 267:8

**focused** 51:21,24 89:10 90:1,4 91:1 207:19 208:12 231:10

**focuses** 207:10

**focusing** 134:3 209:9 220:3

**folks** 40:22 146:11

**follow** 47:7 72:12 147:17 165:20 167:9 199:24 200:2 213:16 215:10 225:12 236:8 252:1 253:2

**followup** 143:25 231:19

**foot** 175:23 176:1

**footage** 152:24 153:3

**foray** 58:23

**force** 33:23 34:24,25 37:6,7 38:23 39:1,6,13,19 40:6,13 41:1 45:20,22 46:5,7,9,10,11 56:16,17 59:9,14,20,21,23 60:12,15 61:8, 15,17,22 62:4 64:6,7,11,13,15,16, 17,18,19 66:1,14,23,25 68:13,17, 18 69:4,6,7 71:9,11,12,23 72:21 80:20,22 81:13,14 88:18,23 89:3, 5,6 95:7 96:22 97:5 108:2,3,8,12, 16,22 109:5,24 117:1,15,19,21,23 132:6,11 133:23 135:24 138:13 150:11 153:25 154:8,24 156:2,7,8 160:16,20 161:10 162:2 163:22 168:20 172:25 175:19 176:25 178:9 179:4,9,13,18,24 180:9,11, 15,23 181:2,7,16 183:16 185:4 186:11 192:9 196:1,3,17 200:9,12 207:8,25 208:12 209:8,18,19 217:14 218:5,7,19 221:25 226:21 229:8 230:6 235:24 240:8,13 241:17,18 242:7,16 243:1,18 245:5,12 246:19 249:18 256:11 258:22 260:6,10,11,12,16 261:11, 15,17,20,21 262:9 266:23,24 269:22 271:7,16 272:4 273:25 276:2 277:1

**force-self-defense** 56:9,11

**forced** 135:11 217:13 242:3

**Forchette** 31:1,5

**forefront** 128:19

**foremost** 258:11

**Forensic** 101:1

**forest** 8:24 9:22 87:10

**forever** 63:15 191:13

**forget** 201:24

**Forgette** 64:9

**Forgetting** 159:25

**forgot** 19:15,19

**form** 79:25 135:11 167:8 180:18 221:21 226:10 228:2,15 243:25 252:7 276:3

**formal** 50:25

**formed** 11:4 12:2 13:7,11 15:1, 22 44:7 63:3 112:1

*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*                                    Index: forming..God

**forming** 107:18 109:16 110:2 142:23 207:7 243:19 250:16 265:23

**forms** 173:12

**formulate** 107:10 109:6,11 112:11,18 113:14 150:23 173:1 182:12 208:18 209:3 243:11 255:11 256:4 275:25

**formulated** 122:4,15 276:14

**formulating** 150:14 222:11 256:16

**formulation** 110:24 143:3 182:19

**Forsyth** 6:4,10 127:3 129:8 131:23 140:9,20 142:10 146:12 149:1 151:1 155:11 158:9 159:16 166:23 183:16 184:16,23 185:24 188:4,7,22 190:8 191:21 192:23 193:16 195:1,3 196:4 197:12,17, 24 198:5,9,14 200:23 201:6,11 202:2,5,8,10 203:25 204:2,9,12, 19,20,22,23 205:18 206:7,13 207:10,19,20 208:2 209:11,24 211:13,21 213:24 214:23 216:7, 11,20,21 220:13,18 221:16 222:2, 10 223:15 224:1,9,23 225:2,4,6,9, 23 226:5,8 228:25 229:9,11,18,25 230:20 232:4,9 235:8,11,18 236:21 237:1 238:5,23 240:5,17 241:25 249:6,11,23 250:6 251:18 253:2 260:13,16 261:10 263:3 264:13 265:12 266:3,14,19 272:11,16

**Forsyth's** 155:20 182:16 183:7 194:8,13,23 201:1 216:14 222:16 224:17 227:15 237:5 240:7 241:16 244:24 262:8 268:12,22

**Forsyth's** 249:7

**forthcoming** 208:10

**forty** 88:5

**Forty-eight** 146:23

**forward** 48:6 49:24 87:23 99:3 112:8 188:24 203:24 204:12,16, 24 205:8 207:17 232:15 264:19, 20

**forwarding** 48:1

**fought** 103:21

**found** 8:8 62:10 92:3 110:5

133:16 162:24 163:12,15 194:22 212:18 223:21 241:5 278:3

**foundation** 44:2,5,18

**founded** 11:6

**fourteenth** 182:24

**fractions** 161:13

**fracturing** 273:22

**frame** 111:6,9

**framed** 111:9

**free** 45:3,9 87:20

**friends** 30:11

**front** 52:5 56:19,25 57:1,3 58:4 60:17 70:7 119:25 120:4 125:20 174:13,18 184:17 217:11 219:8 224:3 232:13 242:5 252:19 253:6, 14

**frophobia** 219:22

**FTO** 20:21,25 26:9 48:18,23 49:13 50:1 262:15

**fulfill** 168:11

**full** 4:7 27:11 91:21 135:8 137:2 152:20 183:23 198:18 200:19 205:11 211:20 221:7 223:9 225:19 255:4 263:20

**full-time** 19:18 26:22 33:18 86:24

**fully** 114:22 132:21

**function** 176:20

**functioning** 96:13

**funds** 16:2

**funeral** 161:16

**funnel** 247:7

**future** 112:6

---

**G**

**gain** 132:18

**gained** 109:13

**gaining** 148:1

**game** 186:17

**Gardens** 25:9

**Garner** 107:13,21,24 108:7,14 109:3 182:11 183:10 243:20 266:5

**gas** 59:17 154:25 160:5 175:13 176:2 195:21 196:8 203:23 232:10 233:5 240:22

**Gasbarrini** 187:12

**gather** 148:17 208:24 209:3

**gave** 9:9 18:1 55:1 56:21 62:3,6 65:5 73:9 85:7 117:2 133:3 144:5 174:7 184:19 204:4 207:16 235:17

**gear** 127:24 175:12,21 233:20,24 234:1,6,7 273:17 274:6,12

**gears** 175:7 273:12 274:5

**general** 193:6 268:13

**general's** 44:9

**generalization** 171:6

**generalized** 258:19,20

**generally** 4:23 7:2 8:19 18:14 20:5 21:20 26:6 39:23 64:3 77:3 106:11

**generated** 125:7

**generic** 103:5

**gentleman** 57:5 58:10 105:4 113:25 128:24 129:15

**geography** 75:20

**George** 58:18 59:6 80:11 178:14

**get all** 149:4,17

**give** 6:1 7:7 12:4 17:16 23:4 31:12 32:2,10 51:25 52:18,20,23 56:13 59:14 62:13 66:19 69:10,17 74:8 80:5,24 81:1 87:24 115:5 118:17 122:9 148:9 150:6 191:23 192:8 233:5 255:1 276:15

**giving** 31:21 49:21 66:13 74:3 76:12 77:20 78:2 90:5 235:12 252:17 277:3

**glasses** 237:19

**glued** 170:11

**go-to** 59:2

**goal** 171:14 173:17 252:18

**God** 33:16 36:1 46:11

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

**good** 150:8 151:8 154:11 172:25 173:6 176:4 269:19 271:10

**goodness** 34:4 74:22

**Gosh** 144:3

**gotcha** 88:8

**govern** 243:16

**governed** 182:15 183:7

**Graham** 107:3,4,12 108:5,9,25 109:2 156:9,10 182:10,22 183:4, 10 243:19 266:4

**grain** 190:3

**grand** 59:3,4 72:3,14 73:9,17,19 83:1

**graphic** 58:20

**grass** 159:5 199:5 233:4

**grasses** 199:5

**grassy** 198:24

**great** 30:16 57:19 155:24 160:15, 17 179:1 195:24 196:1 265:13

**greater** 162:11

**greatly** 188:21

**grew** 22:13

**grip** 131:13 132:18,21

**groomed** 94:5

**ground** 4:21 23:7 34:10 78:12,14 175:18,20 198:20,21 212:2,16 215:11,16 232:7,19 233:1,2 252:11,18 267:3 274:7 275:14,15, 18

**group** 40:10,11,24 41:2,5 44:15, 25 88:14 90:7 173:4

**groups** 45:8 89:11 106:23 177:19

**grow** 196:10

**growth** 26:2

**guaranteed** 164:17

**guess** 8:5 10:7 16:13 17:15 46:14 47:7,8 50:22 58:19 68:11 78:12 96:7 97:16 109:17 110:3, 20,24 111:10 112:6 127:13 128:9 136:6,24 150:18 160:8 166:11,25 182:22,25 223:6 242:25 245:4,6,7 256:6 260:11 261:9

**guidance** 90:15 254:4

**guide** 48:3 147:19 243:17

**guidelines** 245:6,8,9 268:15 269:13

**guiding** 107:17

**guilty** 62:10

**gun** 56:22 131:13 163:13 170:10 173:7 178:22 181:20,25 182:2,3, 6,7 238:24 239:2,4 253:6

**guns** 96:3 173:5

**guy** 28:13 149:14

**guys** 27:21 31:24 48:6 142:7

---

**H**

**hair** 19:5

**hairs** 50:18 234:13 238:17 263:14

**half** 267:5 273:21

**hand** 7:1,8,10 31:3 36:22 125:17 132:21 189:24 201:14,20 238:19 274:19

**handbook** 257:21

**handcuffs** 34:17

**handed** 131:13

**handle** 142:17,19

**hands** 69:19 263:24 265:21

**hang** 96:7,8

**happen** 136:10 150:3 214:21

**happened** 34:14,18,21 36:12,13 40:2 114:2 157:10,13 161:23 185:14 186:14 230:15 273:13

**happening** 54:4 124:1 150:11 157:13 164:17 196:23 222:25 232:13

**happy** 5:17 28:21 52:10 112:7 135:3 208:21 210:1

**hard** 63:13 76:2 223:4

**harder** 265:3

**harm** 45:23 57:19 153:23 155:24 160:15,17 179:1 195:24 196:1,7 268:14

**harmed** 164:11

**harms** 218:13 263:4

**harp** 223:4

**hats** 87:13

**head** 16:10 38:11 52:24 53:1 66:21 80:9 127:6 266:12

**headache** 114:3

**heading** 57:2 76:6

**health** 45:6 66:9

**hear** 117:6 148:24 149:9 151:9

**heard** 58:19 184:8 235:18 244:17

**hearing** 74:16,17 75:16,23 76:8, 25 77:21,24 78:1,5,11,12,14,21 175:25 227:8

**hearings** 77:1,7,9,18 78:13,24

**hears** 159:10

**height** 199:5

**held** 91:2 98:13

**helped** 43:16 46:16

**Helping** 21:20

**helps** 177:20

**hesitation** 173:19

**hey** 171:21 173:6

**high** 28:2 32:21 33:2 135:19 141:22 189:12 191:9 193:9 201:24 233:3 249:24 250:7,18,20, 23 251:8,10,11,12,19 252:5,15 253:10,19 254:15 255:17 259:2,4 263:4,10,12 264:18

**higher** 94:7 142:15

**highest** 31:15 179:4,9,12,17,24 180:1,11,15 181:2,7,16

**highlight** 6:19,24 7:21 8:1,2,6,9 119:2 124:6 125:13 150:19 151:8

**highlighted** 7:24 8:8 277:16

**highlighting** 7:20 125:18 278:3, 6

**highlights** 6:17,21,22 7:2

**hindsight** 156:11,18 249:20

**hip** 170:11

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019
Index: hire..including

**hire** 21:3,9,15,21 22:5 48:21
262:15

**hired** 20:10 21:11,21 30:3,18
81:13

**hires** 20:22 21:17,25

**history** 154:6 241:8

**hit** 91:8 159:7 204:25 219:12

**hits** 176:1

**hitting** 229:13,20

**hold** 12:8 49:6 95:15 98:14
257:14

**holding** 14:6 131:12

**holster** 169:18,19 170:6,9 171:7,
8,11 172:19

**holsters** 169:16

**Holt** 23:21

**home** 49:21 56:18 75:5 90:3
161:14

**homes** 45:4

**homicide** 176:15,16 237:8
269:20

**honest** 63:20 156:1 256:20

**honestly** 119:9

**honored** 15:1

**hoops** 99:13

**hope** 102:25 172:2 275:10

**horrible** 154:23 217:12,22,25

**hospital** 150:7 191:19 193:6
272:12

**hot** 237:23

**hotel** 84:21

**hour** 23:10,17,18 83:20 84:1,2,8
274:13

**hourly** 83:19

**hours** 15:17 23:19,25 76:2 84:10,
18 101:12 146:21 147:12

**house** 88:6 111:6

**HR** 29:24 30:1

**Hughes** 75:3

**human** 29:10,23

**hundred** 7:3 32:22 60:22 72:9
88:5,7 161:2,17

**hundreds** 69:18 255:19

**Huntington** 54:17,18 59:12 60:9
62:23 71:3 76:4,5,6

**hurt** 219:4

**hydrocodone** 140:5

**hypothesizes** 175:16

**hypothetical** 174:15 175:8,22
273:4

**Hypothetically** 198:8

_____

**I**

**I.e.** 249:5

**IACP** 260:25 269:15

**IACP's** 269:21

**IACP'S** 261:1

**idea** 16:11 17:12,14 23:4 69:12
71:19 96:25 115:7 140:23 173:6
175:6 181:21 213:8 234:22
250:12 269:19

**ideal** 247:5

**identical** 9:7 272:17,19

**identified** 4:13 9:17 82:22
112:14 120:1 176:23,24 195:13,
20 199:15 212:13 233:13

**identify** 45:5 82:20 112:24 126:6
175:14

**identifying** 226:24 233:12 275:7

**ignore** 220:24 228:12 275:23

**ignores** 173:24 174:10

**ignoring** 174:14 265:24 268:17
275:8

**Ill** 61:6

**imagine** 21:1 22:8 127:16 273:11

**immediately** 34:11 37:4 39:5
80:8 105:18 127:18 149:23
155:11 170:21 192:9 272:13

**imminent** 155:24 164:12,13,15,
20,23 165:3,7,18,24 166:8,19,21,
24 179:4,8,23 180:14 181:15
221:24 235:23

**immunity** 78:13

**impact** 20:13 95:11 191:12
217:6,8 264:16

**impacting** 197:16

**impacts** 266:16

**imperative** 189:4

**implied** 232:24

**implies** 154:16

**important** 8:9 135:8 155:19,22
157:3 160:9 168:15,22 174:19
196:21 197:3,4 205:19 207:2
211:8,14 278:4

**importantly** 22:12

**impossible** 251:25

**impression** 139:13 177:8

**inaccurate** 152:12 186:8 267:18

**inadequacies** 226:12

**inappropriate** 34:10,24 251:7
276:2

**inaudible** 148:23,24

**inch** 273:21

**incident** 35:5,12 37:20 38:2,11
61:25 64:15 67:1 109:20 142:11
153:21 155:17 157:7,9,19 158:5
183:8 184:14,22 185:23 191:4
192:13 201:8 228:18,19 236:16
237:3,10 238:2,4,6,10 239:8,10
243:3,5,7 249:15 269:11 270:9,23
271:15 276:9

**incidents** 36:3 276:6,15,17
277:4

**incisive** 269:17

**include** 18:2 51:4,14 69:23
109:19 110:4,18 111:4 121:6
154:20 162:16 168:12 179:21
180:11,16 208:5 211:16 255:12,
13 261:8

**included** 47:13 51:11 52:13
90:22 110:17,18,21 243:6 247:15
248:4 269:14

**includes** 18:1 69:24 250:12

**including** 45:25 147:7 182:25
248:16

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

**inclusion** 247:14

**inclusive** 147:11 164:1

**income** 15:24 16:6 17:20,22,23
18:3 85:9

**incorporate** 111:19

**incorporated** 13:9

**incorrect** 231:4

**increase** 165:21

**increasing** 165:13

**Incredible** 76:18

**independent** 18:21 143:6
244:19

**Indian** 68:9 92:18,20,21,23,25
93:19,21 94:8,9,11 103:6 104:9

**indicating** 75:12

**indication** 138:9

**individual** 19:1 41:3,5 56:17
85:11 104:22 160:14 161:4
164:11,14 167:6 170:15 173:22,
24 174:4,8 177:3 178:7 191:2,3,7,
15 192:12 193:9 195:23 207:20
209:20 212:24 215:5 218:16
221:14 228:8 242:8 249:24 250:7
267:20

**individual's** 39:10

**individually** 176:4 205:20

**individuals** 13:21 21:3,9 162:20
191:23 192:4 201:7,24 209:2
215:25 276:12,23

**inference** 195:5 238:19

**influence** 133:10,12 160:7

**influenced** 111:5

**influences** 132:25 157:3 168:23
207:23 248:12,13

**influencing** 128:17 157:10
158:23 160:10

**information** 40:15,16,23 41:6,8
45:8 51:11 71:9,16 73:1 82:3
87:21,24 88:18 91:17 108:23
109:13 110:2,23 111:23 112:12,
19 116:1,17,21,23,25 121:5
127:22 128:2,4,19 131:16,22
132:12,13,17 133:21 134:15
135:11,12,15,17 136:7 138:19

144:5,7,13,15 145:25 146:1,2,3,5
148:1,2,6,17 152:3,9,12 156:5,14,
22 158:3,7,18 160:3,25 161:8
163:16 172:25 177:24 179:15
181:6,18 184:13 185:8,13 186:7,
19 188:21 189:5 190:1 200:6
205:21 206:2,24 207:4 208:10,20,
24 209:3,5 210:6 211:4,10 213:3
214:20 217:19 220:6,23 221:5,10,
13,15 222:4 223:15 225:22
226:13,23 228:3,10,15,16 229:22
230:16 231:21 232:4,8 239:24
243:7 252:25 254:13,19,24
255:18,21,23 257:6,8 258:16
260:20,22 262:5,7 265:6,20,25
266:2,7,13,16,20,22 267:19,22
269:18 272:8 276:4 277:6

**initial** 99:16 121:9,13,15,16 122:4
123:23 125:2,8 127:15 148:2,5
152:9 158:25 166:6 207:7 235:14,
17 244:2 262:23,25

**initially** 14:18 19:2 151:2 152:6
198:11 208:25 209:1 262:20

**initiate** 170:3 250:15 252:5

**initiated** 155:2

**initiates** 171:24

**initiating** 170:5

**injured** 42:7 71:14

**injury** 45:7 46:8 57:19 128:1,7

**inoculation** 172:23

**input** 39:25

**inquired** 267:23

**insertion** 139:7

**inside** 218:18 223:24 252:15
266:12

**instance** 6:17 58:13 64:7,24
68:14 71:23 90:13 125:17 150:24
162:4 180:20

**instances** 225:20

**Institute** 94:9,12 103:7 104:10

**Institute's** 94:24

**institution** 93:17

**instruction** 103:22

**instructor** 20:13,14 25:18 28:15
49:20 93:21 96:13,23,25 97:2
98:10,20,24 99:4 102:9,16

103:12,21,23 105:15,16,25 256:9,
10

**instructor's** 98:5

**instructors** 31:2 103:15 106:2,3

**insure** 189:5

**intend** 7:7 276:15

**intended** 51:3 80:5

**intends** 174:4

**intent** 103:1

**interested** 33:12

**interesting** 262:13

**interject** 218:2

**intermittent** 231:10

**internal** 27:4 33:22 39:16 43:16
147:19 208:11 270:15 271:13

**International** 95:1 99:4 261:3

**internet** 264:3,4

**interpret** 222:5 252:21

**interpretation** 184:10 226:24
243:23

**interpreted** 260:18

**interrupted** 231:24

**intervened** 57:4

**interview** 74:15 82:2,4 149:8
151:10,11,13 190:9,12 194:9
203:9,11 206:15 209:4 231:13
235:15

**interviewed** 37:17,23 41:23
145:11,18 149:22

**Interviewer** 101:1

**interviewing** 272:13

**interviews** 64:1 231:1,2,3
259:18

**intrigued** 30:14 92:17

**investigate** 37:10 38:17 41:25
42:2 133:22 176:6,17 214:20
228:19

**investigated** 61:21 131:14
133:5,8 156:22 189:4 200:12
206:1 212:16 222:8 223:19
225:14 230:4

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

**investigating** 27:5 38:21,22,24 129:2,3 189:10 206:23 228:18 229:8 239:25

**investigation** 21:19 33:23 37:8, 13 38:17 41:23 42:4,10 60:11 61:13,14,16,17 62:7 72:14 81:24 88:18 89:3,4,7 101:20 108:24 111:24 118:24 128:20 131:1,4,6, 20 132:6,11 133:4,18,23 134:6,7 163:17 174:25 184:3,6 185:8,9,15 186:12,21 189:8 200:4,9 208:11 213:21 216:16 221:11 226:1,4,8, 13,24 228:4 229:23 234:20 265:25 269:11 270:7,8,9,12,20, 22,23 271:9,13 272:9

**investigations** 8:25 9:15 10:17, 22 11:1,11,13,16,25 14:20,25 15:18 16:5 17:6 18:6,8,10,13,15, 17,20 41:20 61:8 65:11 86:3,9,25 87:22 89:18 98:3 113:11 148:8 176:15,16 269:17,22 270:4 271:8

**investigative** 11:23 18:16 29:22, 24 42:11 101:21 102:5 230:5 239:23 260:21 265:19

**investigator** 99:10,11,14,15,18 100:22 101:2,5 102:6 129:16 130:18 133:12 143:22,25 145:21 154:5 199:23 200:1 205:22 213:16 216:13 221:9 223:10 225:11,16,21,23 229:6,7 233:23 234:13 239:22 269:19,20 273:25

**investigators** 39:7,13 87:20 89:18 101:3

**investors** 89:25

**invoiced** 147:3

**involve** 64:12 70:13 71:4 190:15

**involved** 10:21 27:5,7 37:12,20 38:8,18 39:4 41:19 42:6 52:12 56:8 59:2,3,13 61:7,21 64:4 67:1 68:17 69:6,9 70:23 71:4 72:15 73:24 75:4 76:15 80:22 108:3 117:3,18 133:24 158:16 159:12, 17 162:19,25 163:7,8 168:20 170:12 185:9 192:8 193:9 196:16, 17 209:19 244:4 245:23 259:20

**involvement** 27:5 113:18

**involving** 35:12 62:12 67:1,14 71:3 133:24 145:18 176:17 179:3, 8 180:14 181:15 200:13 243:5 276:6,11,15,17

**irrelevant** 138:14

**irritation** 82:21

**IRS** 15:25

**isolated** 186:12

**issue** 39:15,16 46:24 79:15 104:10,18,25 105:3,20,21 109:20 133:14 134:4 150:4 172:20 181:23 182:1 189:24 193:1,3,5,7 201:3 205:24 214:17 227:18 235:8 252:23 253:9 263:16 269:1, 9 271:2,4 272:14,24 273:1 277:10

**issued** 141:11 157:25 235:9 238:3 253:7

**issues** 28:25 33:23 35:22 66:9 149:24 150:15

**issuing** 235:19

**item** 135:21

**items** 123:6 134:22 135:9

**iterated** 135:7

**it's** 253:22 255:6

**J**

**Jacksonville** 84:16

**jail** 158:21 221:8,22 222:10

**January** 11:6 65:17 68:12

**jeep** 137:22 138:2,6,16,17 139:5 184:24 193:17,24 194:1 196:12 197:18,21 198:1,4,5,7,11 201:12 202:3,5,8,10 203:2,7,15,24 204:1, 10,12,16 205:17 206:12 212:12 216:23,25 219:10 220:20 221:2 223:11,17 229:12,13,19 232:16, 20,21 233:3,19,21,24 234:1,10,11 235:13 241:11 264:21,22,25 266:25

**jeep's** 205:12,15 223:9 224:3 232:23

**jerk** 154:21

**job** 39:5 48:3,12 49:15,23 73:23 219:5 222:24 223:3 258:13

**jobs** 20:11 45:16 48:6 50:24

**John** 64:8

**Johnson** 277:24

**Jordan** 69:3

**Josh** 181:3

**judge** 76:16 78:14,18 227:9

**judged** 249:18

**July** 114:16,22 115:2 121:10,12 153:3 214:25 238:4,10 239:9 243:3 262:21

**jump** 159:4 254:6 271:23

**jumped** 91:24 99:13

**junior** 93:17

**Jupiter** 25:6,13,14,25 26:5,9 27:9,17,25 29:1,12,16 33:21 49:25 50:5,6

**juries** 59:3 72:3,14

**jury** 54:3 59:4 73:9,17,19 80:16, 21 83:1 227:19,21,22,23

**Justice** 92:19 94:9,12 103:7 104:10 245:11

**justifiably** 108:8

**justified** 57:17 71:23 81:12 155:25

**justifies** 59:4 156:2,6 160:20 207:8 226:21

**justify** 59:5

**justifying** 221:14

**juvenile** 30:10,19,23,24 31:18 32:9,24 47:20 50:9,14

**K**

**K-9** 47:14

**K-A-T-H-R-Y-N** 12:22

**K9** 97:1,2

**Kathryn** 12:15,21 13:14

**Kevin** 105:5

**key** 118:23

**kicking** 159:5

**kid** 22:13 274:25

**kids** 30:16

**kill** 216:3 218:9 219:1 228:5

**killed** 57:7,10 59:23 62:1 69:13,

Case 1:18-cv-00186-TSK   Document 65-17   Filed 11/18/19   Page 300 of 320   PageID #: 3567

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019                                    Index: killing..list

18 75:7 173:20 219:4

**killing** 174:19

**kind** 5:9,18 8:19 10:16 11:22 16:3
18:1,14,16 20:5 21:4,12 22:23
25:2 26:25 27:13 28:20 29:22,23
30:22 33:15,23 34:24 35:9,10
36:24 37:8 38:16 40:4,20 41:14
43:22 44:6 46:17,24 47:7,9 48:16
50:5,18 52:10,20 58:13,22 62:3
71:8 72:11,12 75:12 79:14,21
81:23 85:7 86:8,9 87:8 88:13
90:9,12,25 92:16 95:7 105:24
107:7 108:13 111:5 113:20
137:23 143:2,6 147:16 152:13
163:18 178:11 181:24 185:3
193:13 194:5 196:2 212:2 217:15
219:17 236:8 238:23,24 239:20
244:12,22 245:23 253:17,21
258:1,3 265:1

**kinds** 88:16 166:4 184:21

**Kinko's** 277:23

**knew** 15:17 86:16 108:20,21
159:16,18,21 160:1,3,4 178:1
181:13 195:3 197:23 210:19
216:20,21 217:6,17,18,24 218:24
220:18 221:16 223:24 236:22,25
254:19

**knife** 163:14 173:5

**knocking** 57:25 58:3

**knowing** 180:12,16 218:6 243:21
259:3 260:20

**knowledge** 58:20 110:12
209:18,20 217:20

---

**L**

---

**L-A-P-H-A-M** 105:6

**laceration** 273:21

**lack** 23:25 165:8,9 172:21 233:6
244:23 271:10 275:14,18

**lady** 91:20

**lane** 219:12

**language** 114:18

**Lapham** 105:5

**lapsed** 98:19

**large** 103:17 171:5 211:4 259:6

**late** 170:23

**launch** 85:19

**law** 13:8,16,17,20,23,24 14:6,13
19:21,24 20:10,18 23:7 24:2,4
26:25 27:13,16 29:1,4,17 30:13,
19,25 31:10,14,18,24 32:1,5 33:6,
9,19,20 34:25 35:23 36:4,6,11
38:3,18 40:10 41:14 42:14,15,18,
22,24 43:10 45:18,25 46:3,13,16,
19 47:1,16,22 59:7,8,13,18,20
60:11 61:19,20 62:7 64:18 66:1,2,
4,14,22,25 68:13,15,18 69:1,4,6,
9,13 72:13,18,21,23,24 73:7,23
79:4 81:13,25 90:13,17 93:6 94:1,
13,18,25 95:2 97:13,14 103:13
107:1 117:1 136:9 148:9 154:2,8
161:15 162:19 163:11 164:2,13,
20,23 165:18,20 166:8,9 172:12,
14,20 177:21 192:7,21 200:13
214:9 222:21 223:3 229:8 236:3
241:23 243:13,14,17,21 244:4
245:9,24 246:25 247:20 248:5
252:2,21 254:14 255:14,20
267:13 268:15,18 269:12 270:10

**laws** 243:16

**Lawson** 104:13 105:8,13,14,21

**lawsuit** 4:12 35:4,13 71:17 81:22

**lay** 120:7 190:13

**lead** 20:13 25:17 28:14 45:7
49:20 50:18 103:12,20,22,23
105:15,25 132:25 185:23 206:21

**leader** 48:3 49:9

**leadership** 94:25 269:16

**leading** 217:17

**leaning** 238:24

**learn** 157:7 247:22 271:17

**learned** 18:22 19:6 28:5 58:12
117:7 142:15 172:18 244:20

**learning** 81:3 109:17

**leave** 22:9,25 24:18 25:4,5 27:16
30:7,22 33:6 45:25 103:11 185:2
210:5 224:14

**leaves** 206:24

**led** 19:7 153:4 154:24 195:20
197:2 240:24 271:15

**left** 25:7 26:19,24 27:13 29:12
31:5 33:19 44:15 92:23 201:2,14

203:3,7,16,17,20,22 205:16
224:3,5 232:12

**legal** 18:25 107:8 125:20 182:11

**Lemaster** 54:12 56:16 57:3,8,10,
13,18 64:25

**Lemaster's** 56:6 58:1,8

**Lemasters** 180:21,22 181:15

**lengthiest** 183:12

**lengths** 175:10

**lesson** 274:25

**let alone** 229:7

**lets** 93:5 219:19

**letters** 193:14

**level** 23:9 50:22 82:21 124:24
179:4,9,12,17,24 180:2,11,15
181:2,7,16

**levels** 232:22 245:20

**liability** 11:2

**license** 97:23 98:3,5,9 100:21
101:19,21 102:14,18,24 138:16

**licensed** 98:7 99:14,15,17
100:20 102:21

**licenses** 97:22

**licensing** 98:2 103:2

**licensure** 101:19 102:23

**lieutenant** 28:3

**life** 10:20 93:25 103:24 156:4
175:3 178:7,20 183:1 197:12
216:23 218:1 220:20 223:16
226:6,9 229:19 237:5 242:1 275:2

**light** 265:2

**limbo** 100:1 101:5

**limited** 10:23 11:1 80:4,12,25
89:12

**limiting** 63:11

**limits** 202:16

**lines** 39:17 165:14

**lining** 106:3 229:6

**Linkedin** 87:4

**list** 32:13 58:13 60:19 62:15
68:11,22 78:6 79:2 82:25 83:1,2

*Rhoades vs County Commission of Marion County, et al.*
ROOT, DENNIS on 09/17/2019

101:19 115:15 128:25

**listed** 53:14 54:7 65:7,18 73:15, 20 74:12 99:9,20 123:5,10 124:10 128:11 273:4

**listen** 149:5 151:11

**listing** 52:13 100:18

**lists** 64:22

**litany** 131:13

**literally** 99:22 152:2 274:25

**literature** 245:1

**litigation** 51:19

**live** 22:13 277:22

**lived** 10:24

**lives** 259:5

**LLC** 10:9 11:8,12 13:10,13 15:20

**load** 15:23

**lobe** 273:23

**local** 247:19

**locate** 131:21 248:1 255:5 263:20

**located** 18:10 67:10 88:11 131:10 133:16 134:3 146:6 194:17 195:1,4,8,13 197:10 198:14,15 201:13 272:6

**location** 63:17 132:11,16 133:25 134:9,10 194:4 205:12,15 213:4 223:10 224:8,9 275:16

**locations** 275:22

**lock** 189:23

**Lockwood** 74:22 75:10 76:15

**log** 189:20

**long** 5:14 19:8,9 23:11,17 28:5 42:5,19 92:13 93:4 94:3 101:17 155:23 175:10 184:19 189:18 190:3 214:16 226:25 247:5 268:10

**longer** 11:24 45:11 84:17 98:14, 18 99:15 100:20 102:7,15 105:16 155:3,14 171:13,19 196:19 197:8

**longest** 33:25

**looked** 95:5 200:11 213:4 220:11 224:12 227:1 228:6,8 230:3 254:4

261:1,7 264:25 265:10

**loose** 50:22

**lose** 9:10 84:17

**losing** 60:16 193:16

**lost** 25:7 43:20 139:2,5 155:3,12 194:15,24 195:7 196:5,12 198:4, 10

**lot** 28:1 38:8 70:7 80:18 91:10 101:15 122:10 126:2 149:25 159:8,14 161:23 176:8 192:23 210:25 213:3 218:23 248:5 271:22 275:10

**love** 6:5,10 20:25 127:4 129:8 131:23 146:12 151:1 157:20 158:16 159:4,16,25 173:13,14 188:4,7,18 190:9 191:21 192:23 195:3,8,12 198:15 199:23 200:24 201:6,19 202:6,10,11 203:2,9,11, 15,21,24 204:1,11,15,19,23 205:4,12,14,17 206:5,12 208:2,5, 17 209:7,23 210:19 211:14 223:9, 11 225:1 230:20 231:22 235:11 236:15 238:5 240:6,17 243:5,8 249:6,11,23 250:6 253:2 257:9 262:12,14 264:16,19 266:14 267:2 271:18 272:11,17

**Love's** 194:10 202:24 203:5 207:10,16 208:8 209:7 224:16

**Loves** 210:12

**lower** 124:24

**Luckily** 263:25

**lunch** 49:21

**lying** 190:5 220:9 229:12,18,20 230:5,8,11,13

---

**M**

**madam** 120:6

**made** 12:13 24:1 28:11 39:18 40:5,12 41:5 42:13 45:12,15 47:24 74:15 83:6 89:15 90:18 91:18 92:10 104:14 118:25 119:11 146:7 158:9,21 163:6 181:19 185:11,12 186:22 187:14 200:5 206:16 208:25 209:1 211:6, 8 217:21,25 219:7,17,25 220:25 221:9 225:21 232:3,19 236:20 239:22 240:5 251:24 252:6

253:24 259:18 260:2,13 268:6

**magazine** 245:15

**magical** 175:15

**Magnuson** 247:23,25

**maintain** 42:15,16,22 43:17 99:21 100:19,21,23 101:2,9 114:4 217:15

**maintained** 15:16

**maintaining** 102:14

**Major** 31:1,5 48:1

**majority** 27:24

**make** 4:24 5:5 6:17,24 7:5 8:10 32:22 35:17,20 40:3,17 41:8,14 43:9 48:6,8 53:5,11,19 62:14 68:18 72:24 84:8 96:6 102:2 104:18 108:13 111:17 117:5,9 118:22 119:11,18,20 124:22 125:14 137:7 150:5 151:6 156:3 161:14 167:22,23 169:24 171:2,9, 21 172:8,25 176:7 180:15 182:14, 19 186:13 187:21 193:13 195:6 211:9 214:25 218:21 221:24 226:22,23 232:14 233:21 235:23 237:25 258:12 259:13 272:3 275:4 277:13,14

**makes** 39:22 40:16 47:10 48:14 119:10 151:10 275:22

**making** 36:15 40:25 50:20,24 64:23 88:20,21,22 89:1 96:17 153:25 157:11 160:11 168:20 196:17 197:4,15 202:10 209:19 218:15 219:2 223:4 232:12 242:15 243:17 249:24 250:7

**man** 28:18 30:16 33:14 34:6 56:19,24 57:1,10 61:12 87:13,14, 17 88:3 217:12 252:20 267:25

**managed** 43:3

**mandate** 142:19

**mandated** 219:5

**manner** 25:11 37:12 45:20 80:5 148:7 166:12 184:24 185:16 189:1 197:19 211:24 213:17 214:10,11,13 215:11,15,18,21,22 216:1,4,6

**manor** 214:2

**manual** 256:7,23 257:4,20

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

**manuals** 177:18 256:22 257:15

**manufacture** 96:16

**March** 67:23,25 70:2 85:1

**Marion** 143:7 153:5,13,16,23 157:18 260:9 261:14,21 269:11 270:3,6,10,13,24 276:6

**mark** 9:8 65:23 119:16,17,19,24

**marked** 9:17 120:1,11

**marketed** 104:20

**markings** 9:12

**Martin** 22:12,15,17 24:12,14 26:24 29:15 30:8,18,22 31:15 33:21,25 34:1 38:25 43:18,23 50:8 54:16 59:12 93:8 163:9 177:10 178:21 181:3,4,9,11

**massive** 6:5

**master** 99:4

**match** 186:22 188:8 275:22,24

**material** 9:24 100:25 107:7 111:25 112:10,17 113:18 123:10 135:21 137:8 142:24 149:17 177:22 247:22 248:9,15 252:8 255:8 256:3,20 257:9 259:1,17 263:22 269:14

**materials** 106:16,18,22 110:7,16 111:2,14 119:1 122:9 123:17 136:1,20,23,24 140:13,17 141:24 143:4 148:5,12 174:15 177:5,6,9, 13,16,19,20 178:1,4 254:4,11 270:13 276:8,9 278:10

**matted** 199:5

**matter** 35:11 60:16,18 62:21 63:1 64:1 75:22 77:6 79:16 81:10 84:10 105:9 106:14,19 107:25 109:21 110:3 117:16 122:23 131:15 132:5,15 150:7 166:19,23 167:5,18 168:1 169:25 183:24 188:17 189:21,22 197:20,25 198:3,10,14 210:14,19 216:24 221:2,5 239:3 240:4 243:25 248:8 254:11 267:10 271:15 277:9

**maximum** 23:10 219:23 264:11

**Mcdougal** 130:7,8 272:2

**meaning** 15:8 18:20 38:22 59:21 63:17 138:17 204:1 231:14

**means** 45:20 155:4,5 170:6,10

**meant** 28:8 31:21 177:21 213:17 214:2 252:12,23

**measure** 178:24

**mechanics** 141:21

**mechanism** 44:19 45:6

**Mechata** 34:7 35:4,12,15

**media** 87:8,14,15

**medical** 28:6 106:10 273:24

**medically** 192:13

**meet** 49:6 118:1 246:17

**meet all** 49:7

**meeting** 41:7 105:1

**member** 11:8,10 15:20 40:4,8,9, 24 50:6 130:14 145:11

**members** 13:13 15:14 57:20 128:22 129:5,10 130:11 145:10 268:13 276:23,24

**membership** 8:23 9:2

**memories** 38:15

**memory** 38:9 105:10 149:24 151:8,15 191:6,12 205:24

**mental** 66:9

**mention** 108:14 121:18 138:2,6, 15 188:9,17 194:3 241:8 273:22

**mentioned** 29:23 35:3 53:4,6 110:6 125:11 127:7 144:24 176:8 178:11,13 188:10 191:19 222:14 240:23 274:9

**mentioning** 243:2

**mentions** 107:14 132:14 241:4, 11

**mentor** 48:4

**menu** 103:17

**message** 33:16

**met** 4:10 25:14 105:21 108:11

**methamphetamines** 140:5

**methodologies** 243:11

**Miami** 23:6 82:18 84:19

**Micah** 54:12 56:6,16,25 57:3,7 64:25

**Micah's** 57:2

**mid** 17:5

**middle** 56:18 58:1 170:24 210:24,25 231:23 273:12 274:5

**midnight** 28:11

**midnights** 27:22 28:1,2,8

**Milano** 18:6,8,10,17,19

**miles** 274:12

**military** 106:5

**mill** 89:4

**mind** 127:25 141:1 155:20 158:8 168:17 173:3 196:14 259:21

**minimum** 247:8

**minor** 201:3

**minus** 220:22,23 221:5

**Minusing** 189:2

**minute** 34:3 78:15 119:9 128:1, 24 151:13,25 201:2

**minutes** 184:19

**misapplication** 252:10,12

**misinform** 125:12 131:24

**misinformation** 208:14 209:15 230:2

**misinforming** 230:18

**mislead** 152:12

**misquote** 114:18 270:22

**missed** 52:9 207:13 212:20 213:8 224:11 233:16

**missing** 31:8

**misspeak** 70:20

**misspoke** 54:15

**misstate** 210:3

**misstated** 212:7

**misstating** 57:16

**mistake** 19:17 47:25 100:15

**mistakes** 47:24

**mistook** 110:24

**misunderstood** 116:12,13

**mitigate** 223:5

**model** 261:1,7

**models** 260:25

**moment** 122:5 128:16 132:23
156:21 157:16 159:25 160:13
164:16,17 195:23 207:6

**money** 15:9 17:8 259:6

**monies** 15:21

**monitor** 219:25

**monitored** 253:18

**month** 21:17 65:4

**months** 19:9 30:7 85:16

**morning** 117:25

**motion** 78:7,8 79:6 80:1

**motor** 170:3,5 174:19 176:18
215:25 217:16 242:6

**mountain** 10:8 94:6 277:22

**mountains** 76:3

**mouth** 58:17 87:6

**move** 28:11 36:21 45:12 216:1
225:2

**moved** 10:15 28:15 31:24 55:25
56:2 99:24 132:24 207:17 267:1

**movement** 127:23 198:22
199:23 200:15,23 201:5 202:3,5,
14 205:4,6 216:15 264:23 274:15

**movements** 205:7 267:7

**moving** 10:21 99:3 159:7 169:1,4
173:25 174:10 175:19 184:24
197:18 201:3 203:18 204:1,10
205:18 206:6,12 211:23 214:1
216:1,7 224:18,20,22 225:4
229:12 233:4,7 264:20,22,25
265:1,4 267:5,8 273:16 274:16

**mud** 159:5 214:6

**multiple** 6:3 47:17 139:11 158:12
247:4 249:4 250:16

**mundane** 21:19

**Munsey** 163:3,4

**murder** 75:3 158:13 159:10,17,
23 160:6 217:10 236:17 237:14

238:10 239:10 254:16 271:16

**muscle** 171:13

**mute** 134:1 178:22

---

**N**

**naked** 56:18

**named** 9:25 12:18 13:1 35:7
43:14,15 49:2

**narrative** 214:15,17 227:1
263:19

**nation** 87:21 243:22

**national** 8:23 89:17,24 94:19,21
244:3 245:6,8,9 254:1,3 257:3
268:15 269:12 270:10,25

**nationwide** 247:19 252:13

**nature** 62:6 80:25 131:20 153:18,
22 240:24

**necessarily** 131:7 147:20
179:21 247:9 263:17

**necessitate** 223:1

**neck** 103:20

**needed** 43:25 111:3,4 112:4,5
121:20 209:2 211:16 221:25

**negate** 228:25

**negative** 154:1

**networks** 271:10

**neuro** 173:3

**neutral** 175:1 186:16,23 187:4
206:17

**neutralize** 168:8

**neutralizing** 168:12

**newest** 262:14

**news** 144:24 145:2

**newspaper** 143:9,12

**nice** 91:3,20 219:20

**Nicholas** 54:18 60:9

**night** 23:11 28:9 56:18 58:1 84:5,
13,22

**NIJ** 245:11

**Noble** 187:10

**noncritical** 228:11

**normal** 70:6 154:22

**Notary** 97:24

**note** 54:7 107:2 125:14 135:9

**noted** 134:22

**notes** 6:17 7:1,8,10,13 124:6,7
125:12,13,15,18,21 150:19
237:18

**notice** 233:14,15

**noticed** 19:16

**November** 56:7 64:25 65:1

**number** 21:24 63:16 69:17 95:5
107:19 124:15 125:23 126:14
130:17 139:12,17 161:24 184:12
191:22 196:4 225:20 242:13
243:10,12 246:4 251:16 255:3,9
256:5 257:20 258:2

**numbers** 124:13

**numerous** 199:25 249:25 250:8

**nutshell** 57:21

---

**O**

**O'MARA** 65:23 66:12

**oars** 45:14

**oath** 212:17

**obduction** 44:22

**obey** 235:24 236:2

**Object** 167:8 180:18 226:10
228:2 250:10

**Objection** 221:21

**objective** 108:10

**objectively** 39:12,20 40:6,13
41:1,12 80:15 107:16 111:22
160:16 163:15 183:16 185:4
186:11 195:25 196:4 207:25
226:6,9,16,18 227:3,11,16 228:1,
5,9 230:7 240:8,14 241:16,19
261:12,20 262:1

**obligated** 122:22

**obligation** 156:14 158:24

**observation** 196:9 202:19

**observational** 170:12

**observations** 189:3 272:25

**observed** 59:17 171:11 210:3

**obtain** 93:3 137:11

**obtained** 103:24

**obvious** 201:4

**occasion** 22:10 24:6 49:10 65:18 76:24 80:7,23

**occasions** 53:16 55:10 68:23 72:17 77:8,17

**occupant** 181:21 182:8

**occur** 136:11 164:22 184:17 185:2

**occurred** 35:5 37:21 38:16 41:24 134:12 142:9,11 158:4 184:15,24 185:6,24 188:13 191:24 197:24 198:5,8 219:18 236:16 237:3 240:22 275:6

**occurring** 191:16 197:18

**odd** 269:7

**offer** 30:17 76:17 101:17 144:8 146:9

**offered** 22:14 25:25 43:11 44:13 74:4 188:3

**offering** 33:11 72:18,20

**office** 8:25 22:11,15,17 23:24 30:8,9,18 33:9 41:2,21 42:3,7,9, 10 43:22 73:7,10 89:22 94:2 104:16 105:22 136:6 177:10,13 257:1,10 276:18

**officer** 12:13 13:2 14:3,9 19:21 20:9,22 25:21 26:10,22 27:5,7 35:1,24 36:6 37:6,24 38:3,17,23 39:3 41:19 42:6 45:19 46:3,13 47:1,16,18 50:13 59:1,3,8 64:18 66:3,14,22 67:1,15,16 70:23 71:4, 22 72:15,19 73:23 81:16 82:16 97:1,14 108:4,8 131:8 132:18,20 133:24 138:13 141:12,17 142:16 155:3 156:12,21 157:4 158:14 159:11,17,23 160:6 162:5,7,10 163:12 164:2,13,21,23 165:7,19 166:8,9 169:12,23 172:14 173:18 187:12 192:7 193:10 215:9 217:9, 10 219:1 220:25 221:20 222:21 228:18 236:3,7,17 238:10 239:11, 25 241:24 242:17,18 246:17

249:19 254:8,17 276:1,6

**officer's** 39:19 40:6,12 81:14 161:15,16

**officers** 12:10 13:16 14:4,13 23:8 36:16,22,25 69:13 73:24 118:25 136:2 137:1 154:18 161:21 162:20 188:11 211:2 218:11 240:25 244:5 246:25 247:4,5,8,12 252:2

**Ohio** 69:3

**ol** 271:10

**on-coming** 220:3

**oncoming** 219:12

**ongoing** 141:5 152:4 154:14 157:15 210:6

**online** 85:15,17,19 86:12 110:13 145:2

**open** 31:3 57:3 69:19 184:10

**opened** 10:7 217:23 219:3

**opening** 219:8 224:7

**openly** 218:6

**operate** 41:22

**operating** 137:22 176:20 201:12 221:2 246:25 247:12

**operator** 244:14

**opine** 61:13 150:8

**opinion** 57:17 62:3,6 64:16 66:13,18 68:17 71:22 74:3 83:7 107:6,18 109:7 110:24 111:20 112:1,11,13,14,15 117:11 135:4,6 140:19 141:11 150:23 151:22,23 178:16 180:23 183:12 184:12,14, 25 185:1,3,7 186:2,10 187:3,19 188:1 193:18,19,25 204:9 207:25 212:1 222:19 227:24 228:13 231:4 232:6 241:18,22 243:9,12, 19,25 246:4,14 247:16 251:16,17, 20 253:25 255:3,9,11 256:5,16,19 257:13,19,24,25 260:23 261:10, 19 262:24 263:3 268:12 269:7 271:24 275:25

**opinions** 7:7 63:3 66:18 78:16, 23 80:4,14,25 83:10,13 107:10 109:6,8,11,16 110:2 112:15,18,23 113:15 120:24 121:2,19,20,23 122:3,14,20,23 123:2 130:2 134:25 135:11 136:13 142:23

143:3,21 144:19 150:14 182:12, 20 184:14 185:20 186:4 207:23 208:8 210:7 213:14 222:11 228:15 258:2 262:6,7 263:1 268:8,11,21 269:8 271:24 276:3, 4,14 277:3,13

**opportunities** 109:25

**opportunity** 22:15 25:25 26:4 29:9 30:15,16 31:8 33:3,13,15,16 43:12,13 48:7 49:9 118:1 121:7 125:2 140:3 192:16 257:9 262:19

**opposed** 22:6 53:25 249:25 250:8

**opposing** 78:7 79:24 121:20,23 134:23 135:10

**opposite** 76:6 219:11 220:4

**Optimal** 171:23

**option** 167:6,19

**options** 167:24 218:17

**order** 49:8 76:21 218:17 233:4 274:11

**ordered** 216:11

**ordering** 236:7

**orders** 165:20 166:3

**organization** 40:10 90:20 91:5 92:2,3 94:25

**organizations** 91:10 106:24

**organize** 105:9

**organized** 105:6

**organizing** 50:20

**original** 15:1 100:7 131:25 133:16 138:6 149:20 159:21 194:19 204:3 260:23 277:7

**originally** 14:22 25:16 251:4

**originals** 110:19

**Orr** 186:3

**Orville** 54:21 55:24 61:6 75:21

**other's** 272:22

**outcome** 57:22 62:9 81:15 131:4 168:23 206:24 265:23

**outlined** 183:21,24

**outlook** 25:10

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

**outstanding** 210:20 243:2

**oversight** 127:17

**overtime** 23:19,21

**overview** 117:2

**owner** 87:23 138:11

---

**P**

**p.m.** 136:17,18 246:10,11 278:18

**packed** 103:24

**packet** 262:16

**pages** 125:24 126:1,5,7,9 225:17 272:15

**paid** 16:2 23:23 73:10,11 186:25 187:5

**painful** 105:10

**painted** 138:8,10

**Palm** 25:9 26:14,16,17 27:3,6 42:9,12 43:4,12 53:6 67:12

**paper** 7:23 106:13 109:4 110:13 149:11

**paperwork** 35:9 271:19

**paragraph** 51:9 183:20,23 193:14,15,16,19 198:19 199:22 200:18,19 205:11 211:20 213:15 216:10,18 221:7 223:9 225:8,18, 19 240:4

**paragraphs** 205:20 239:21

**paraphrasing** 183:15

**parenthesis** 65:1

**parked** 201:2

**Parker** 20:24

**parking** 210:25

**Parrish** 195:16,18

**part** 4:18 5:2 11:23 13:15,22 24:17 25:7,19 40:11 43:25 52:13 73:22 79:16 82:23 85:1 107:5 109:23 126:17 127:17 133:23 139:19 148:25 150:9 164:7 182:19 185:3 188:2,12,14 189:5 190:6 196:16 197:14 202:3,7 205:2 206:4 207:2,24 210:11 222:14,20 231:7 236:13 262:15

**part-time** 10:7 26:22 27:1 33:17 42:13,14 43:14

**participant** 36:17

**participate** 30:14

**participation** 39:12

**parties** 122:19,24 186:5

**partner** 253:19

**party** 35:7 53:6 61:2 186:16,24 187:5 206:17 213:22

**passes** 159:8

**passing** 99:2 195:10

**passions** 29:7

**past** 9:25 58:15 76:4,6 86:20 98:14,19 99:23 202:12 206:15 244:3 271:23

**path** 95:13 160:2

**pathways** 173:3

**patrol** 20:7,8,16 22:14 25:16 26:8 30:23 31:9,11,13 32:10,25 33:1 34:16 47:13 202:9 204:16,24 205:8 224:4 247:15 256:12

**pause** 209:25

**pay** 15:17 26:1 44:17 73:7,13 86:2 87:3,23 147:9 186:16

**paychecks** 15:12

**paying** 133:19

**payment** 147:6

**payments** 147:4

**pedestrians** 176:18

**peer** 106:13 114:8,10 245:1,4,7, 13,14,16

**pending** 4:12 60:5 62:18 63:8, 11,18 68:8 75:18 115:21 249:14

**people** 28:16 30:3 40:1 44:15,17 49:1 87:24 89:14 94:5 117:3,6 139:15,16,17 148:7 149:16,22 150:5,10 161:22 171:16 186:6 189:20 190:23 202:17 214:8 228:10 245:15 247:7 251:5 254:6 257:11 259:6,7 265:3 272:24 275:21

**people's** 266:7

**perceive** 169:23 171:2,17,20 172:8,22 173:11 209:10

**perceived** 155:23 156:12 170:7 171:25 181:9 196:6

**perceiving** 198:6

**percent** 60:23 72:10 85:14 132:22 161:2,17 267:24

**percentage** 51:25 52:21 85:9,10

**perception** 155:19 156:1 190:20 207:2,3,7 215:25 216:14 223:22, 24,25 224:1,13 230:6 263:9 264:22

**perceptual** 109:25

**perfect** 33:15

**perform** 17:24 41:17 116:20 142:2

**performance** 108:9 202:19

**performed** 15:6 19:11 83:22 248:11

**performing** 114:4 135:19

**peril** 155:24

**period** 19:18 27:14 33:25 42:21, 25 50:4 84:9 92:13 93:21 106:6 115:8 142:20 172:16 191:13

**periodical** 86:22

**periodicals** 177:17 248:6

**peripheral** 264:12

**permissible** 19:1

**permitted** 80:3,24 121:3 261:18

**permitting** 98:9

**persing** 138:22 139:2,7

**person** 25:22 26:22 29:10,24 30:1 32:22 43:14 46:25 49:10 53:18 54:2 55:18 57:7,25 85:2 105:8 118:3 159:9 160:4 161:8 167:13,16,18,21 181:17,22 182:4 189:13 190:16,18 191:4 218:8 266:10 273:25

**person's** 191:10 207:2

**personal** 19:17 44:3,13

**personally** 145:17

**personnel** 20:10 30:13 31:3 41:9 139:6,9 142:2 258:12,20 262:5

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

**persons** 227:10

**perspective** 58:25 70:24 101:9 111:21 117:17 156:20 157:3 189:3 201:20 213:13 249:19 263:9,15 265:11 266:3,9,10 274:22

**perspectives** 202:15,16,17 272:25

**persuing** 97:21 138:23 139:1,3, 4,7

**pertinent** 152:6 278:4

**Philip** 4:14 88:10 197:20

**phone** 58:21 115:12 118:4

**Phonetic** 187:16 219:23 248:6 262:15

**photo** 199:15 212:11,13

**photocopies** 6:25

**photograph** 146:7 212:21,23,25 213:3,7 233:12

**photographic** 151:15

**photographs** 128:10 130:21 143:22 144:16 185:10 199:12 215:12 224:2

**photos** 212:9

**phrase** 184:8

**phrased** 53:9 170:25 179:20 182:1

**phrasing** 166:12

**physical** 29:7 36:24 133:20 185:22 206:25 211:7 214:16,18 220:23 228:12 229:4 240:4 267:10 272:22,23 275:8,13

**physically** 38:12 53:21,25

**physiological** 191:11

**PI** 87:14,17 88:3

**pick** 92:13

**picks** 85:18

**picture** 88:25 212:18 213:12 274:9

**pictures** 130:19 144:12 232:21 273:11

**piece** 91:16 110:12 149:11 223:14 265:7,9

**pieces** 137:5 263:19 265:12 274:3

**Pinkerton** 29:9,13,21 30:7 46:1

**pipe** 232:11,17,18,21

**pipes** 232:17

**place** 23:7 24:2 26:13 38:13 56:23 59:18 90:1 131:8 138:2 141:3,9 146:10 148:10 155:20 159:2 166:17 170:4,22 175:16 185:17 188:11,14,19 207:15 208:13 210:24 211:11 213:6 218:4 222:22 229:25 232:23 261:15 273:12 277:18

**placement** 132:19 133:2 185:10 202:13 203:21

**places** 89:16 160:14 199:25

**placing** 153:12 217:13 218:12 268:12

**plaintiff** 52:1,8,22 68:24 79:3 187:14

**plaintiff's** 126:19 127:9

**plaintiffs** 152:22

**plan** 85:2

**planning** 143:17

**plans** 111:11

**plate** 85:16 138:16,17

**plateau** 91:8

**platform** 87:15

**play** 219:2 222:6

**played** 54:3

**playing** 171:10 180:6 250:21

**plethora** 218:3

**plugging** 151:3

**Podcast** 113:1,4

**point** 5:16 13:4,23 18:5 29:3,5, 12,15 30:21 32:15 43:7 48:4 75:15 98:17 113:7 114:3 116:14 120:21,25 121:8,11 122:13,16 123:11 128:13 133:2 134:1,2 139:22 140:12,19,23 143:8 147:14 150:5 153:16 157:8 164:10,14 176:21 178:22 188:23 198:25 199:2,3 202:11,12 203:22 204:17 205:1,7 206:6,15 211:22

213:6 219:20,23 220:7 221:3,15 224:21 232:12,25 256:17 275:20, 21

**pointed** 121:5 212:18 253:6 259:18 264:18

**pointing** 102:3 181:20,25 182:2, 3,7 206:20 227:1

**points** 155:9 173:13 215:1

**police** 19:25 20:4,14,17,21 21:2, 3 22:1,6,9,16,20 24:5,9,18,21 25:2,6,8,9,13,14 26:6,7,15,16,18 27:9,17,25 29:1,14 36:22 37:6,9, 24 38:23 39:19 40:4,6,7,9,12 41:21,25 50:6 59:13,23 62:23 64:9 67:15,16 71:3,22 94:23 95:1, 6 97:18 103:5 130:11,25 131:21 133:7 134:5 136:25 137:12 138:7 140:10 141:12 142:16 143:23 150:25 153:4 154:3,8 156:12 158:13 159:10,17,23 160:6 161:15 162:5,7 165:7 189:8 192:6 193:10 200:24 213:21 215:9 217:9,10 218:11 219:1 221:11,20 224:17 225:10 226:1,4,17 227:25 228:6,17,24 229:24 232:2 234:2,9 235:18 236:7,17 238:10 239:10, 25 240:25 245:15 248:6 254:17 255:22 259:14,25 261:4,5 269:6 270:20 272:9 276:1

**Police's** 200:4 216:16

**Policeone** 248:6

**policies** 46:15 48:10 53:3,7 136:4 150:15 208:9

**policy** 39:16 46:18 53:12 135:23 162:25 163:7 248:12,13 260:10, 12,14,16,17,21,24 261:15,16,21, 23,25 262:4,9 268:23 269:3,4,21

**political** 104:22

**politically** 25:22 32:20 271:11

**politics** 43:25

**poor** 246:16

**porch** 56:19

**portion** 10:20 94:13 128:3 199:4

**posed** 217:2

**position** 12:8 19:18 22:14 25:17 31:25 40:17 49:3,8 50:25 97:18 132:21 175:13 188:15,20 191:3 213:1 217:13,15,16,22 218:5

*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*

219:3 224:11 252:17 253:13
265:21 267:2

**positioning** 201:5 250:14

**positions** 32:1 38:19 133:12
162:4 242:17

**positive** 25:24

**positives** 150:16

**possess** 58:4

**possession** 238:14,19,25

**possibilities** 275:10,11

**possibility** 127:24 164:16
166:21 267:9 271:10 275:5,7,9

**possibly** 34:8 177:9 212:14
233:13

**post** 38:10

**post-shooting** 223:21

**posture** 132:18

**potential** 26:3 39:15 127:23
128:6 150:15 166:20 208:9 211:2
219:6

**potentially** 70:4 168:11 238:8

**pounding** 56:19,25

**practice** 150:8 154:16

**practices** 59:13 64:9 95:6
268:16 269:13 272:14

**practitioner** 44:8

**praying** 212:24

**pre** 86:25

**preclude** 76:8

**precluded** 77:19 78:2

**precluding** 76:12

**predominantly** 135:25

**prefer** 255:21

**preferable** 144:9

**preferably** 247:6

**preferred** 24:1

**preform** 142:5

**premise** 196:2

**preparation** 7:6 91:22 122:12
125:1 147:15

**prepare** 60:6 118:3,6,7,18
120:18 146:14 147:22 257:19

**prepared** 106:23 120:16,22
121:13,22 125:8 127:15 204:7
230:25 231:14 256:19 258:13
259:7

**preparing** 51:14 110:14 111:14,
15 118:5 141:19 147:17 257:23
278:11

**presence** 249:4,11

**present** 38:15 58:21 78:15 106:2
121:12 133:20 177:21 227:21
245:25 250:16

**presentation** 9:3 88:13 89:24
90:24

**presentations** 44:6 88:16,19
89:10,11,15,23 90:1,6

**presented** 8:24 24:2 29:9 37:3,5
45:2 53:15,17,24 54:5 59:1 82:5
89:17 90:18 103:16 104:19 106:4
119:10 131:16 166:2,24 167:6,7
168:5 175:9 179:13,19 180:3
181:1,6,8,10 184:2,6 185:6,15
186:21 209:6 210:7 211:1 221:14
228:15 232:4 255:20 273:5

**presenting** 73:1 182:4 207:23

**presently** 62:18

**presents** 149:14

**preserve** 54:2

**president** 12:9,16

**Press** 177:19

**presume** 242:25

**pretty** 90:4 96:4 248:10

**prevent** 222:25

**prevented** 44:10

**prevention** 44:3,8,10,12,19,22
45:3

**previously** 86:14

**primarily** 90:1 243:19 246:15
260:11

**primary** 39:5 263:7

**prime** 44:8

**principle** 170:5

**principles** 243:10

**print** 137:4 248:2 255:19

**prior** 37:1,2 55:9 75:15 79:18
117:25 118:23 124:20 139:23
146:21 153:21 157:19 158:5,6
163:25 237:3 240:25 243:4
244:17 248:17 249:14

**prisoner** 23:22

**privacy** 105:22

**private** 11:12,16,23 13:21 59:7
101:20 102:5,6

**probability** 253:20

**probation** 28:10

**problem** 49:22 82:7 112:20
182:7 251:5 266:25 278:8

**problems** 28:1

**procedure** 46:18 162:25 163:7
269:16

**procedures** 46:15 53:8 64:10
150:15 256:12

**proceed** 60:21

**proceeded** 60:25

**proceedings** 73:9

**proceeds** 84:25 241:21 277:2

**process** 30:17 88:20 89:1 96:17
109:25 118:16,20 137:16 147:16,
21,23,25 148:18 150:13,22 151:7,
18 152:4 153:25 160:11 168:21
170:12 175:7 197:4,15,16 210:1
243:18

**processes** 105:4 149:17 171:12
172:15

**processing** 173:11

**produce** 135:10 268:7

**produced** 122:19 127:10

**product** 130:18

**profession** 29:11 148:11

**professional** 9:15 10:16,17,25
11:11,24 14:20,25 15:18 16:5
17:6 18:13,15 65:11 86:3,9,25
87:22 89:18 98:2,3 99:14 101:16
113:11 114:19 130:18 135:6
143:25 145:21 229:9 253:17

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

Index: professionals..quickest

**professionals** 102:20 243:15

**proficient** 169:16,18

**profile** 86:21 87:3

**profit** 15:10 44:7

**program** 8:25 20:15,16 30:14,23 32:10 44:19,21,22 47:21,24 50:10 53:13 85:15 90:18 91:2 105:7 247:19 262:15

**programs** 44:4,6,13 46:17 53:4, 11 91:6 103:14 177:10

**progressing** 167:5

**project** 244:13

**projects** 244:4,10

**promising** 26:2

**promoted** 31:4,17 32:14

**promotion** 33:4

**promotions** 32:11

**proof** 213:1

**proper** 95:14

**prosecuting** 75:14

**prosecutor** 91:21

**protect** 56:16 138:13 217:14

**protection** 219:6

**protocol** 82:1

**prove** 34:18,19 133:21 148:14 197:5 242:2

**provide** 5:5 6:23 8:15 12:25 13:16,17 14:12,16 18:3 41:8 46:17 50:11 55:12 60:7 74:8 78:9 83:4 90:14 112:11 122:23 123:2 125:25 149:8 172:5 189:24 191:25 193:2 208:18,21,22 243:4 258:11 264:2

**provided** 4:17 6:12 13:15,19,22, 24 17:2 34:12 44:23 49:5 64:17 65:9,14 71:21 76:21,25 82:3 88:13,16,18,19 107:9 108:1,23 111:23 114:9 116:1,5,22 122:11 126:5,6,14,17,19 127:18 128:3,20 129:11,14,19,22 133:21 134:19, 23 135:10,16,18,22,23 136:1,2,22 137:13 138:20 140:13,25 141:4 143:8 144:13,15,18,25 146:25 148:5 151:1 152:13,14 156:22

163:16 169:7,8 173:15 174:25 185:8 188:22 190:1 201:6 205:21 208:15 209:13,15,16 214:18,20, 23 224:2 228:4 229:25 231:5,22 232:9 252:8 256:18 257:2 258:3, 22,25 262:3,7,9,18 263:25 264:6 266:17,20 268:24 269:22 276:4

**providing** 18:19 40:22 44:19 59:4 73:4 76:7 90:21 102:19 106:23 141:18,20 142:1 156:14 173:19 186:7 205:20 230:16

**province** 80:16

**Proximately** 24:23

**proximity** 165:3

**psychological** 30:2 191:11

**public** 8:25 44:1,5,18 69:3 89:22 97:24 154:15 268:13

**publications** 109:10

**published** 83:7,13 86:22 245:14 264:7

**pull** 110:12 111:15 112:4,7 151:17 157:11,12,16 158:9 173:4, 7 205:20 257:23,25 265:14

**pulled** 23:18 41:6 45:14 59:19 188:12,14 204:16 205:5,16 206:8, 14 225:5 256:8

**pulling** 173:5 174:16 205:8 207:18

**punch** 179:14

**purpose** 25:15 152:22 244:5 256:15

**purposes** 9:11 12:20 197:19

**pursue** 102:14 146:3 154:9 160:4 257:8

**pursued** 155:10

**pursuee** 155:14

**pursuing** 154:2 155:5 196:22 198:1 217:9

**pursuit** 124:19 135:23 153:17 154:1,3,7,10,15,25 155:2,4,5,7, 11,14 157:10 166:21 194:1 196:5, 13,16,19,21,24 197:1,3,8,9,14 198:4 202:13 219:7 237:11 240:24 243:4,6 263:5 268:18

**pursuits** 135:18 259:2

**push** 265:3

**pushed** 251:9

**put** 6:5 15:13 16:20 27:25 34:16 36:6 38:5 68:4 88:4 91:5 150:21 151:5 152:5,9 170:22 174:1,12 175:23 176:5 177:19 179:10,17 188:22 193:13 220:16 224:6,9 242:10 263:19 271:11

**Putnam** 61:7

**puts** 188:18,20 234:15 269:15

**putting** 21:6 38:10 215:8 275:21 278:1

### Q

**qualification** 51:2,9

**qualifications** 47:12 78:8 99:2 102:22

**qualifies** 101:15

**qualify** 96:10

**quarter** 189:22

**quarters** 173:9

**question** 4:24,25 5:4,5,6,8,10, 11,19,21 35:17 38:1 40:24 51:10 72:11 73:2 79:10 83:10 84:8 87:18 96:4 107:6,8 109:3 110:10 111:10 115:17 116:13 123:23 126:12 127:13 128:9 129:6 131:23 133:9,13 134:2,4 142:6 146:20 153:11 166:5,6 170:25 172:4,5 173:21 177:4,7 180:7 183:3 185:18 188:18 190:17,19 194:15,21 196:2 197:19 205:2,23 212:6 214:19 215:14 216:5,14,21 217:2,4 219:19 220:8,14,17 225:24 229:15,16,17,20 230:8,13, 19,22 231:2,13,19 233:23 245:24 256:1,2,16,18 257:16,17,18,24

**questioning** 131:16 191:20 233:19

**questions** 7:4 39:7,9,10 112:9 117:3 118:10 131:11,14,18 133:11,14 157:24 191:22 192:1,4, 23,24 217:2 230:23 231:6,10,15

**quick** 64:5 100:5

**quickest** 145:25

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019
Index: quickly..referring

**quickly** 26:13

**quote** 99:6 108:1 135:1 194:14

**quoted** 224:16

**quotes** 251:23

---

**R**

**R-O-O-T** 4:8

**raise** 26:1 104:25 275:10

**raised** 79:15 131:17

**raising** 275:9

**ran** 21:22 23:24 30:2 43:22 49:2 56:24 57:1

**rank** 31:15 49:3,6,18

**rapid** 233:8

**rapidly** 214:14 267:14 273:16

**rate** 83:25 84:5

**rated** 23:5

**rates** 73:13

**re-depose** 210:9

**reaching** 178:21 274:4

**react** 169:23 171:2 172:8

**reaction** 168:16,19 170:4,5

**read** 44:3 51:6 78:20 109:9,19 111:15 112:3 128:4 135:12 136:3 137:4 139:6 145:2 149:5,16 172:6 180:12 189:19 207:13,22 209:4 214:5 230:25 231:1,7,9,14,24,25 235:5,6 237:18 240:10 245:15 247:21 248:15 256:17 275:3 276:25 278:17,19

**readily** 137:4

**reading** 223:18,19 231:18,20 248:5 268:11 269:8

**readings** 139:13 177:17

**reads** 206:17

**real** 217:15

**reality** 96:9 263:14 265:17

**realize** 44:14 111:2

**realm** 91:10 97:20 154:22

**rear** 132:23 264:21

**reason** 4:25 25:7 34:14 38:21,24 53:1 61:1 98:14,19 106:11 107:21 122:22 126:13 138:3,5,15 143:19 144:17 151:17 153:20 206:4 216:5 240:19 242:24 248:13 251:19 260:15 268:19 270:5

**reasonable** 38:23 39:12,20 40:6, 13 41:1,12 62:4 80:15 107:17 111:22 156:3 160:16,23 161:8 163:15 179:13,18,22 180:2,9 183:17 185:4 186:11 195:25 196:4 208:1 226:6,9,16,19,22 227:3,11,16 228:1,5,9 230:7 240:9,14 241:16,19 244:6,10 246:1 249:19 261:12,20 262:2

**reasonableness** 108:10 244:23, 24 249:17

**reasons** 18:24 43:4 108:14 277:25

**rebut** 79:21 121:20,22

**recall** 12:11,13,18 16:25 24:8 29:18 33:24,25 34:23 35:9 38:1,2 42:4 50:2,16 54:4 55:4,5,13,16, 17,18 56:9 61:20,23 62:11 63:8, 20 66:8,9,20 70:18 74:23 77:8 90:5 91:20 115:13,25 118:13 119:3 125:24 129:24 130:10 141:23 151:17 157:20,21,23 162:18 186:3 187:18 192:1 199:10,13,16,17,21 212:19 233:25 234:1,12,18 235:5,25 236:17 256:21

**recalled** 235:15

**recalls** 190:16

**receipt** 248:17

**receive** 8:13 86:2,8 116:16 122:8 126:1 130:16 145:9 228:16 259:10

**received** 9:14 15:6,12 17:2 109:15 119:13 121:21 122:2,16 127:8 128:21 130:5 136:3,5 140:9,20,24 146:24,25 147:4,6 208:16 210:4 268:25 270:13

**receiving** 130:10

**recent** 26:19 78:10 100:4 121:1 259:18 271:18

**recently** 62:20,24 63:6 70:10 119:6,13 127:8 139:18 259:16 262:22

**reckless** 154:6

**recognize** 112:4 122:18 173:11 174:15 177:16

**recognized** 202:20 243:22

**recognizing** 168:6,15,24 170:13

**recollection** 35:2 61:9 77:18 115:16 233:20 234:8 272:17

**recommend** 192:12 193:8

**recommendation** 40:16 271:6

**recommendations** 48:9

**recommended** 254:10

**reconstruction** 95:22,25

**reconstructionist** 176:10,12, 14,19,22

**record** 4:11

**recorded** 148:19,20 203:8

**recording** 34:12 127:3

**records** 21:20 117:5 141:8 258:3,5,9

**recovered** 23:23

**recruited** 25:15,18 30:9

**red** 7:21 138:7

**redo** 272:10

**reduce** 271:9

**reducing** 15:23 88:5

**refer** 9:11 16:22 48:5 51:6 58:6 96:8 109:5 120:4 183:3 184:1 230:24 255:10 256:15,19 257:23 260:15 270:19

**reference** 26:13,14 27:4 64:10 107:2,6,20,23 111:2,25 112:10,17 127:20 134:16,18 142:24 143:4 154:4 182:17 194:8,20 248:4 255:8,12 256:3 263:22 269:14

**referenced** 47:5 107:21 143:12 194:12,13,16 248:7,9 255:5 256:20

**references** 65:4 109:16 137:3 194:23 276:23

**referred** 186:23 187:25 255:8 256:4 270:7 278:11

**referring** 18:14 51:1 126:11

177:6 178:2,5 195:15,17 203:8,11
269:23 271:1

**refers** 137:21

**reflected** 119:11,21

**refuse** 230:23 236:8

**refused** 230:20

**refusing** 235:24 236:2

**regard** 15:3,18 16:3 19:24 83:18
84:3 96:15 109:8 121:9 122:12
134:9,17 136:20 140:21 141:6
145:7 147:15 153:2 158:4 176:23
184:12 189:7 210:11 238:22
243:9 244:23 245:5 246:21 255:3
258:9 260:9 262:23 277:12

**regular** 73:6

**Reinforce** 130:3

**reinvestigated** 76:19

**rejoined** 26:25

**related** 39:2 106:13,18 135:17,18
136:7 206:2

**relating** 206:1,16 230:14

**relation** 117:22 191:4 277:4

**relations** 165:5

**relationship** 42:8 105:23

**relative** 117:18 139:15 159:4
162:4 211:10

**relax** 196:25

**relaying** 209:5

**relevant** 128:18 158:8 243:7

**relied** 6:11 109:5 112:17 182:12
245:2 256:1,4,9

**relinquish** 252:1

**relinquished** 32:4

**rely** 5:10 41:18 107:8 112:10
243:11

**relying** 188:6 255:23

**remember** 28:6 55:19 60:14,17
61:11 74:10 76:5 81:11 82:16
92:6,13,17 104:7 111:8 114:20
130:15 134:24 154:1 180:21
191:15 217:4 236:13 242:19

**remembered** 111:8

**remind** 263:1

**reminded** 235:15

**reminding** 105:11

**reminds** 260:25

**remove** 154:3

**removed** 100:13 103:19

**removing** 171:10

**renew** 42:18 102:8 103:1

**renewal** 100:22

**renewals** 99:5

**renewed** 97:19 98:20 99:23

**reorganized** 31:5

**repeat** 5:4

**repeatedly** 187:25

**rephrase** 266:24 273:8

**report** 7:15,16 9:13 47:6 51:3,8,
12,14 60:6 76:19 90:23 106:14,20
107:2,14,20,22 108:15 109:18
110:6,14,17 111:14,16 112:16
113:1,4 114:6,8,13,17 118:23
119:2,6,14,17,21,25 120:4,11,16,
23 121:9,14,15,17,19,22 122:2,4,
12,14 123:2,5,10 124:12 125:1,2,
3,6,8,13,15,16 127:1,5,8,10,15,20
128:3,7,11,14,15 129:6 130:17
132:14 134:18 135:5 137:19
138:1,5,7 139:19 142:22 143:13,
20 144:14,17,22 146:14,17,19
147:15,18,22 150:16,21,25 151:3,
5,23 152:2,5,8,10,21 153:20
154:20 182:17 183:13 203:1,2,13
204:7 205:11 207:9,10,22 208:6,
18 210:2 211:17,21 213:18 225:1,
17 230:24 231:4 234:2,9,12
236:11 238:13,22 240:3 241:1
242:22 243:3 244:2 246:14,15,21
248:3,17 251:11,22 255:12 260:8
261:16,18 262:20,22,23,25
265:16 266:21 268:4,20 269:15,
23 270:18 271:16,20,25 272:15,
18 273:5 276:5 277:11,17 278:12

**report's** 271:24

**reported** 34:11

**reporter** 9:10 91:24 92:1 119:24
120:7,9,13

**reporter's** 12:20

**reporting** 16:1

**reports** 118:22 120:19 122:18
126:23 263:23

**represent** 4:12 123:19 129:4
131:7 206:25

**representation** 227:20

**representative** 19:4 52:11

**represented** 65:24 233:2,10

**representing** 88:10 186:25

**reprimand** 34:2 48:1

**reprimanded** 24:7,13 29:17

**reputable** 192:17

**request** 127:19 137:7,8 146:1,4
148:12 259:13,15,19,25 260:2
277:11

**requested** 14:15 31:10 122:10
127:17 128:7 134:22 135:9,11,22
137:2,9 256:25 257:10 258:4,17
278:19

**requesting** 135:16 259:8

**require** 84:5 99:5 144:8 176:19
223:3

**required** 49:5 100:21 105:8
176:22

**requirement** 101:11 142:5
144:10 169:17

**requirements** 42:17 49:7,8
80:20 99:22 100:22,24

**requires** 73:23 222:21,24 246:24
247:4,11 268:17

**research** 16:13 107:7,8 109:4
143:2,6,9 145:1 200:6 244:4,9,19
245:20,23 265:5

**researched** 19:2 186:19

**reserve** 16:1 121:2,19 210:8
277:11

**residence** 56:25 57:2

**resident** 39:1

**residential** 44:11 153:14

**resides** 46:20 47:3

**resistance** 244:7

**resonating** 53:1

www.NCDepo.com
info@NCDepo.com                        Depositions, Inc.
                              Serving all of North Carolina         (919) 557-4640

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019
Index: resort..runs

**resort** 91:3

**resorted** 178:24

**resource** 29:10 87:20 111:25 112:10,17 137:2 222:1,6 248:3

**resources** 29:23 91:9 104:11 128:21 258:24

**respect** 161:25 169:8 242:14

**respond** 87:19 141:13,16

**responded** 263:4

**responding** 166:3 170:7 177:7 249:5

**response** 5:6 56:22 99:16 141:17 165:15 168:4 170:3,13,17 171:13,14,24 172:23 173:6 244:6, 10,24 246:1 268:12,22

**responses** 126:14 171:23 191:12

**responsibilities** 48:24

**responsibility** 48:5,21 142:1

**responsible** 47:19,22,24 49:20 50:19,20,24 53:6 105:5 227:22

**rest** 32:12 141:23 213:6 224:21 232:23 245:21

**restate** 5:4 51:10 166:5 194:21 229:16

**resting** 213:1

**restraints** 103:19

**result** 35:4 59:23 75:6 76:7 77:24 78:1 81:20 160:17 196:1

**resulted** 60:16 236:16

**retained** 52:18 55:7 57:12 58:9 60:25 61:2 62:12,20,24 63:7,21 66:12,16 67:18 68:23,25 72:19 74:21 75:9 79:2,3 81:20 82:23 83:3,6 90:15 96:19 106:24 114:16 117:8 124:2 140:16 148:2 186:24 272:4

**retainer** 70:6 116:5,14,19 117:13 147:1

**retaining** 117:10

**retention** 78:16

**retire** 10:15 33:17 99:19

**retired** 32:6 42:11 67:14,16 86:24

93:11

**retirement** 10:20 17:23 33:11,13 45:15

**retiring** 15:23 99:15

**retract** 52:10

**return** 22:13

**returned** 32:4,9

**revealed** 229:22

**reverse** 28:7

**reversed** 195:10

**review** 6:16 7:14 40:5,7,9 61:12 64:5 78:18 106:13 113:18 114:8, 10,13 116:6 117:15,20,22 118:21, 22,23 119:1,3 121:4 123:21,23 125:2 127:14 128:22 129:12,22 134:19,22 135:9,22 136:22 140:4 144:5 145:9 148:3,5,18 150:9 151:4 152:6 163:18 190:12 199:12 206:17 213:13 227:24 228:11 245:1,13,14,16 257:9 258:4 260:5 262:19 263:21 270:17 276:8

**reviewed** 6:11 7:6,9 112:17 116:10 122:13 123:11,16 124:18 125:7 126:24 127:8 128:10 129:7, 25 139:18,22 140:13 144:24 185:19 186:9 190:8 199:7 210:12 214:24 230:7 245:7,17 246:21 262:20 276:19

**reviewing** 6:18 9:24 108:22,23 110:21 124:5 129:3 130:10 150:24 151:2 197:2 278:4

**reviews** 209:25

**revving** 175:22,25 188:24 211:22 213:25 214:13,14

**Rhoades** 4:14 88:10 108:1,16,20 129:10 137:21 138:10 140:4 145:11 146:12 153:3,4,12,22 154:7 155:17 157:19 158:5,15 160:1 175:6 187:1 197:20,23 199:11 216:20,22 217:17,18,21, 24 220:18 221:3,8,19 222:10 228:5 238:4,6,14,23 239:4 240:24 241:5,9 248:25 249:3,12 251:24 253:1 272:7 273:20 276:11,12

**Rich** 58:10 62:21 70:10 86:15

**Richard** 12:24

**ridiculous** 246:7 273:7

**risk** 135:19 141:22 153:13 154:15 249:24 250:7,18,20,23 251:8,9, 10,11,12,19 252:5,15 253:10 254:16 255:17 259:2,4 263:5,10, 12 268:13

**risks** 45:5,6 223:3,5

**River** 68:9 92:18,20,21,23,25 93:21 94:8,9,11 103:6 104:9

**Riviera** 19:25 20:4,17,21 21:2 22:9,16,20 23:4 24:5,9,18,21 25:1 26:7 27:20 29:14 36:12 37:9 41:24,25 48:17,23 49:16

**Riviere** 33:21

**road** 20:7,8,15 21:6 22:14 25:16 26:8 30:23 31:9,11,13,21 32:10, 25 33:1 47:13 194:4,11,14,17,24 195:1,4,6,9,12,13,16,17,18,19,20 197:11 198:15 223:12,23

**roadway** 211:3 224:3

**Robert** 64:8

**role** 49:11 103:9,25 219:2

**roll** 265:3

**Root** 4:2,8,10 10:1,3,9,18 11:15, 23 12:2,16,24 13:1,5 14:21,23 15:2,3,7,11 16:3,16,19,20 17:3 44:1 65:10 69:12 72:22 73:22 86:5,23 88:9 113:7,20 114:25 119:18 246:14 257:17

**round** 132:9 168:13 169:13,19

**route** 146:1

**RPM** 274:15

**RPMS** 274:17

**rule** 107:24

**rules** 4:22 90:22 91:1 269:21

**ruling** 76:12 142:3

**rulings** 141:15

**run** 39:17 89:3 154:9 157:19 158:6 195:16,18 216:3 221:20 223:25 252:19 268:14

**running** 12:12 30:10 43:5,8,18, 23 57:2 104:21 154:8 155:5 175:1 233:20,24 234:6,7,10,11,15,16,18

**runs** 94:13

www.NCDepo.com
info@NCDepo.com
Depositions, Inc.
Serving all of North Carolina
(919) 557-4640

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

*Index: S-E-A-K..shooting*

## S

**S-E-A-K** 92:2

**sad** 92:6

**Sadly** 69:2 270:15

**SAFARILAND** 169:16

**safe** 55:9 57:15 63:2,16 65:15 68:16,25 69:22 95:7,9,10,12 120:21 145:5

**safety** 44:1,3,13,18,21,22 69:3 154:15 165:25 166:10,13 246:17 252:21 253:18 254:13

**salary** 15:8

**sale** 187:3

**salt** 190:4

**same--** 248:20

**sat** 257:19

**saturated** 139:5,9,14

**scars** 242:2

**scenario** 174:7 181:14 245:25

**scene** 36:8 38:12 39:4 50:19,21 57:6 95:22 132:6 133:2,20 143:15 144:11 145:5,7 149:13 176:9 185:12,13 211:5 212:10 214:16 230:17 232:5,8 233:25 249:19 272:7

**scenes** 30:3

**scenic** 144:8

**schedule** 21:23 84:4 105:15,17, 19

**scheduled** 67:5,22,23,24 85:1 103:15 106:1

**school** 29:8 102:16

**school's** 44:24

**schools** 44:5 49:5

**Science** 109:12,15,22 132:17 170:17 177:18 219:22 263:17

**score** 32:21

**scored** 33:2

**scramble** 119:7

**scrutinize** 229:4

**SEAK** 91:23

**searching** 155:4 197:6

**seconds** 169:14,20,22,25 170:8 171:1,18 172:1,7,17,18,20 173:8, 14 189:22 225:10

**section** 51:2,9 64:11 124:13,14 137:5 152:22

**sections** 94:15 126:3

**sector** 13:21

**security** 29:13,22 30:7 45:4,5 102:16,20 253:18

**seek** 200:1 213:16

**seeking** 272:19

**sees** 202:8,10

**seizer** 183:1

**select** 103:18

**self-defense** 61:9

**semantics** 250:21

**semi** 274:24

**send** 152:17 277:20

**sending** 49:21 272:11

**senior** 27:21 28:16 45:1,2

**seniority** 27:19

**seniors** 44:16,20 45:3,8

**sense** 4:24 47:10 53:19 68:19 84:8 96:6 111:17 119:10 151:6 167:22 176:7 187:21 232:14 275:4

**sentence** 135:8 138:21,25 231:25

**separate** 38:9,15 84:21 150:12 200:10 247:1,12 263:14

**separated** 18:24 105:13

**separation** 19:7

**September** 8:17 17:5,6 65:15 120:22

**sequence** 176:5 190:1

**sergeant** 31:4,17,25 32:1,11,14, 23 33:4 47:20 49:1 50:14 143:23 156:23,24 190:10 191:23 192:25 199:7 200:7 212:8,16 214:24 220:14 224:2 230:20,22 231:3,24

233:11,18,25 234:6,9,20 236:12, 14 254:7

**sergeant's** 49:3

**series** 244:3

**serve** 48:17 49:13 50:1 58:13 85:24 106:7 116:23

**served** 20:9,21 93:20 103:9 106:5

**service** 15:1 33:12 79:17 114:19 116:19

**services** 18:19 29:13,22 30:7 32:9,25 50:9 86:17,20 114:23,24 116:20

**session** 231:14

**sessions** 92:16

**set** 15:8 69:25 70:1,13 112:15,25 113:3 121:20,23 122:4,14 137:18 184:13 200:10 262:24

**sets** 185:19

**setting** 143:20 180:10

**settled** 60:22

**share** 87:21

**sheets** 15:15,16

**sheriff** 23:21 33:10 39:25 41:12 43:8,19,23 46:21 47:4 187:19

**sheriff's** 8:23 22:11,15,17,24 23:24 24:12,14 26:24 29:15 30:8, 9,18,22 31:15 33:9,21 41:2,21 42:3,7,9,10 50:8 73:10 94:2 104:15 143:7 153:17 157:18 163:9 177:10,13 269:12 270:4,6, 10,13,19,24 276:7,16,18,24 277:4

**sheriff's** 257:1,10 260:10 261:14,21

**shift** 20:8 23:8,9,18 27:19,21,23 28:11,12,16 49:3,4 161:15 274:11

**shifting** 175:7 273:12 274:5

**shifts** 23:10,17

**shoot** 40:14 41:17 169:24 171:3, 17,21 172:9 228:5

**shooted** 92:7

**shooting** 36:18 37:1,2,10 38:8, 16 39:4 41:19,24 42:1,6 57:17 59:3 70:24 71:4,24 72:15 75:4

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

Index: shootings..stall

81:12 95:22 117:1 133:24 134:12
143:15 159:2 163:1,8 169:8
174:5,19 176:9 179:14 181:3
188:19 189:11 191:10,24 192:8
201:25 208:7 210:14 218:10
248:9 267:23 270:16 271:15
272:12 273:12,18 276:7

**shootings** 27:6,7 38:18 59:2

**Shores** 26:15,16,18 27:3,6 42:13
43:4,12 53:6

**short** 19:18 27:18 28:5 50:4
68:21 81:4 106:6

**shortly** 93:10

**shot** 56:23 57:5,7,10 66:4 118:15
149:13,15 162:20 175:2,7 184:20
237:7 266:10 272:7 276:1,23

**shots** 196:14 220:20 223:16

**show** 52:9 100:24 119:18 136:1
146:9 196:9 197:5 212:14 258:23
269:4

**showed** 212:12

**showing** 34:13 197:13 233:13
263:10

**shows** 8:6 212:22,23 214:19

**sic** 92:7 138:23 164:11

**side** 31:14 75:23,25 76:4 103:20
104:17 195:12 201:13,14,17,20
205:16 251:9

**sides** 227:21

**sight** 139:2,5 155:3,12 193:17,24
196:5,12 198:10

**sign** 262:4,16 278:19

**signed** 39:24 94:22 114:22,25
115:2,9 116:4,7,9,14,19 117:12

**significant** 26:1 58:3 115:8
141:11 178:7 248:12 274:7

**significantly** 189:2

**silhouette** 171:21

**similar** 20:24 27:19 238:7

**simple** 90:19 91:18 92:10 170:16
220:14 226:7

**simply** 5:20 89:1 226:3

**singe** 109:19

**single** 11:10 15:20 197:11
208:22 258:14

**sit** 118:9 126:20 227:3

**site** 58:14 87:8 144:18,20,21
154:25 160:5 175:13 195:21
196:8,14 201:12 203:23 205:5
232:10,14 240:22 266:6

**sitting** 187:9 201:2 265:1

**situation** 28:21 36:7 38:4 57:25
79:24 108:6 141:25 160:14 161:3
169:1 179:3,8 180:14,20 181:14
182:9 185:5 195:23 218:10
222:17 241:24 242:3 244:11
249:22 250:5

**situations** 73:25 191:14 222:23
242:1

**size** 6:5,14 202:18

**sizes** 144:8

**skin** 186:17

**Skowronski** 163:3

**slammed** 34:10

**sleep** 28:9

**slow** 216:13

**slowed** 27:22

**small** 43:14,15 121:16 144:6
232:11,18

**social** 87:8,14,15

**softly** 268:11 269:8

**solely** 135:12 210:23

**Solutions** 13:6 16:16,18,21
104:8

**somebody's** 183:1 238:18

**sought** 39:25 98:6 99:12 265:25

**sound** 54:24 91:7 176:4 177:11

**sounds** 178:3 214:3,4 265:13

**source** 17:20,22 110:13 221:10

**Southern** 94:23

**Spacial** 165:5

**speak** 26:25 47:8 72:19 145:23
146:1,4,16,19 149:10 192:16
263:2

**speakers** 92:15

**speaking** 89:13 112:13

**special** 15:24

**specialist** 39:1

**specialize** 90:21

**specialized** 94:18

**specific** 14:9,13 21:22 111:10
147:16 183:8 207:14 223:1
245:25 254:11 256:3,15 257:19
262:23 269:17,18 274:15 275:21

**specifically** 14:2,5,7 15:22 47:3
62:12 71:21 82:19 88:9 89:13
90:7,8 105:17 106:19 113:4
115:25 117:13 135:15 199:11
203:13 212:8,17 234:19 242:23
257:5 278:11

**specifics** 71:6 178:2

**speed** 7:3 199:1

**spell** 12:21

**spelled** 4:8

**spend** 119:8

**spent** 27:23 84:20 130:24 272:6

**spinal** 273:21,22

**spinning** 159:5 188:24 199:1,13,
19 213:5,25 214:6,12,14 215:6,
16,19 233:9 239:22

**splitting** 50:18 234:13 238:17
263:14

**spoke** 264:10

**spoken** 25:23 118:4 145:11,14,
17,20

**spots** 28:19

**spray** 138:8,10

**spun** 211:22

**squirrel** 92:8

**stabbed** 61:12 62:1

**stacked** 36:15

**staff** 39:22 40:17 41:3,9,10 47:22,
23 48:14

**stage** 68:2 81:24 221:4

**stall** 274:17

**stance** 132:18

**stand** 25:23 78:12,13 122:5 134:13 217:11 233:5 254:6

**standard** 15:24 132:20 175:5 182:15,17 233:19,24 234:5,22 254:14 270:25 274:18,23 275:2

**standards** 100:23 183:4,6,9 246:17 257:3,11 271:1

**standing** 131:8,12 132:9,20

**star** 7:21 273:6

**starred** 273:3 274:3 275:3 277:16

**start** 97:7 104:23 146:22 148:6 150:13 155:9 183:19 196:24,25 232:10

**started** 19:25 21:14 33:14 44:14 58:17 124:1 127:21 154:25 177:4, 7 204:11 205:16 206:9,14 207:18 211:23 214:1 225:5 265:21

**starting** 194:5

**starts** 107:5 148:1 183:13,19 200:18 225:18,19 246:5 265:2

**state** 4:7 19:3 22:1,4 54:8,11,21 55:23 56:5 61:5 63:17,22,23 64:8, 25 65:21 70:5 74:15 75:19,24,25 76:18 77:7 78:18 83:8 89:21 90:2 92:20,25 93:1,19,21 94:8,11 98:9 100:21 101:21 102:5,6,15,16,20, 23 103:1,16 130:11,25 131:21 133:7 134:5 136:25 137:12 138:7 140:10 143:23 150:24 158:8 179:12 184:2 189:8 196:13 200:3, 24 213:15,21 216:16 221:11 224:16 226:1,4,17 227:25 228:6, 24 229:24 232:2 234:2,8 235:17 247:19 255:22 256:10 257:1,12 259:14,25 269:6 270:20

**stated** 219:9 221:22 272:19

**statement** 52:10 108:19 151:10 152:21 158:20 159:21 160:19 171:4 172:6,10 179:20 180:8 185:12 191:24 192:9 194:10,11, 18,19,23,25 200:23,24 202:24 203:5 204:3,4 206:8,16 207:16 208:5 210:11 211:15 214:23 219:9,14,24 220:13,16,24 221:7 222:9 224:15,16,17 225:3 231:5, 7,9,11,15,19,20,23 233:22 235:14,17,20 247:11 272:3

**statements** 108:23 118:24 149:20 150:25 158:11,14 159:19, 20 160:2 185:10,20,22 186:15,22 190:8 191:25 192:24 193:2 194:3 195:20 196:10 197:3 201:6 204:15 205:3,21,22 206:2,16,18, 21 207:11,21,22 208:15,25 209:1, 4,6 210:23 211:6,8 226:12,14 228:12 229:5 230:25 231:2,5,11 233:9 234:3 240:5,6,13,17,18 253:8 254:24,25 260:13,19,23 267:1 272:19,23

**states** 14:4 70:8 243:16

**stating** 211:21

**station** 59:17

**statistic** 69:15

**status** 259:24

**stay** 10:21 22:25

**stayed** 23:22 24:21

**staying** 25:5

**stays** 86:11

**step** 49:11 94:6 104:1 170:4

**stepping** 219:8

**Sterile** 144:1

**sticking** 232:18

**stimulated** 171:13

**stint** 25:1 29:15 30:21 140:24

**stints** 20:1 29:14

**stitch** 277:5

**stolen** 138:2,18 241:11

**stood** 81:2

**stop** 19:6 34:9 57:4 59:17 60:15 141:13,22 142:5,13,14 155:9 174:20 175:4 176:2 203:14 216:12 218:18,21,22 220:20 229:13,14,19 246:16,24 248:10 249:24 250:1,7,9,11,13,15,18,20, 24 251:8,12,18,19,20,25 252:5,15 253:5,10,11,17,21 254:15 258:9, 14 263:10,11,12

**stopped** 10:16 34:8 203:3,6,16, 19 252:14 273:14

**stopping** 175:3 184:20 250:12, 19 251:8 273:17

**stops** 83:16 135:19 137:3,7 140:21 142:4,17 175:12 218:20 243:24 245:3 246:22 247:14,15 248:21 251:5,10 252:8 255:4,16 257:5 258:10,21 259:1,2 261:1,2 263:21

**story** 28:5

**straight** 57:3 224:4

**Straley** 129:15 130:12,22 134:4 144:2,3 145:20,23

**straps** 103:20

**Strategies** 247:15

**strategy** 170:21,23 173:2

**street** 56:24

**strength** 151:14

**stress** 28:2 141:19 172:23 189:12,19 191:10 193:9 196:15, 18,20 201:24 202:12

**strict** 117:7

**striking** 188:23 202:9 204:16,24 205:8

**stripes** 31:12,22 32:11

**strong** 42:8

**stronger** 166:16

**strongly** 193:8

**struck** 161:22

**Stuart** 18:11

**stucco** 111:7

**studies** 110:19 111:4 170:16 218:3 245:11 264:1 265:14,15 266:15,18 267:11,15 268:1 271:22

**study** 132:15 219:21 245:23 263:15 265:22 266:21 267:17 268:3,4

**study's** 265:23

**stuff** 85:19 92:4 105:9 119:2,7 149:10 170:14 189:19 250:17 253:7 263:17

**subcontract** 19:1 113:8,12 114:1

**subcontracted** 113:22

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019
Index: subcontractor..technical

**subcontractor** 18:23

**subject** 33:22 34:3 36:14,19,21, 25 37:20 42:6 47:1 78:6 79:5 106:14,19 218:5 277:10

**submission** 53:7,12,13

**submit** 150:16 210:1

**submitted** 127:5 137:9 260:1,4 262:6

**submitting** 47:25

**subsequent** 60:15 151:11

**subsequently** 59:18

**substance** 251:17

**substantiate** 148:13 156:5 157:15 200:6 211:6,7 239:23 260:22 262:17

**substantiated** 154:17

**success** 8:5 87:22

**successful** 104:17

**suck** 118:14

**suddenly** 158:20 265:2 273:16

**sufficient** 140:21 226:5

**suing** 79:4

**suit** 34:6

**suite** 81:25

**summaries** 152:13,19

**summarize** 152:16

**summary** 137:18,23 138:21 152:15,17 236:13

**summations** 76:14

**sums** 259:6

**super** 170:11

**supervision** 47:6,9,14,15,19 49:20 50:5,10,12,23 51:2,4,15

**supervisor** 34:11 48:5 49:2,4

**supervisory** 48:20,24 49:16

**supplement** 127:23 130:2 210:5

**supplemental** 119:14 121:21 122:2 125:3,6 127:4 132:14 208:18,21,22 210:2 262:22 268:20 277:11,12

**supplemented** 122:6

**supplements** 210:4

**support** 105:16 132:12 136:3 156:14 184:7 198:21 210:7 226:25 237:5

**supported** 131:17 132:19 272:21 275:11

**supporting** 226:23 239:22

**supportive** 224:5 274:8

**supports** 210:6 214:17 224:17

**suppose** 122:1

**supposed** 67:8 124:24 138:23 266:4

**supreme** 107:3 141:12,15 142:3 156:9

**surrounded** 251:23

**surrounding** 108:7 111:23

**surveys** 45:4

**surviving** 253:20

**suspect** 71:24 161:13 163:23,25 165:8,19 174:9 181:4 218:12 220:5 235:24 236:2,5 242:4,19 252:14 272:16

**suspects** 162:21 163:13 190:14

**sustained** 128:1

**swerved** 219:11

**sworn** 4:3

**system** 97:3,4 140:5 169:18 241:5

**systems** 39:8,14 89:7 96:25 98:21 187:23 243:15

---

**T**

**tablet** 125:20

**tactical** 13:6 16:16,18,21 104:8 106:24 160:7 217:12,20,22,25 218:23 219:2 222:16,17

**tactics** 20:13 25:17 26:9 28:14 29:7 31:2 96:6 103:14,23 105:25 243:14,21,23 246:16 247:15 251:17 252:21 253:23 256:10

**takes** 63:15 84:10,17 170:19

176:21 219:25

**taking** 28:19 59:18 75:13 91:19 109:24 110:23 111:24 150:20 151:2 166:17 168:16 174:17 177:6 181:18 183:1 208:13 222:9 267:11 273:9

**talk** 9:13 10:25 51:19 56:4 136:12 164:19 165:11,15 176:4 185:20 191:19 198:19 200:14 216:10 225:8,11 240:16,17 246:4,13 265:14

**talked** 30:15 45:17 49:17 50:9 53:3 68:12 101:19 103:4 140:12 143:4 166:14 167:2 169:6 180:22 184:21 193:23 212:3 218:10 224:15,25 227:7 233:11 235:21 240:21 242:13,16,20 243:10 255:2,3,10 278:10

**talking** 16:11 18:15 38:5 59:8 61:16 71:20 94:10 97:7 98:24 109:7 115:4 165:16 166:20 172:12 180:6 188:17 189:21 192:18 193:18 204:3 218:15 222:15 236:11,14 270:3,18

**talks** 108:7,10 199:22 211:21 239:21

**Tallahassee** 82:17

**tango** 4:9

**target** 169:9,13,19,20,23,24 170:9 171:2,16,17,18,20 172:8

**targeted** 216:2

**TASER** 89:9 98:21 99:3,4 187:23

**tasks** 21:20

**taught** 20:16 53:4 106:4 139:25 148:15,16 164:2 255:15 262:2 269:5 271:7 274:1

**taxes** 16:1

**teach** 94:2 149:15 257:11 258:24

**teacher** 244:13

**teaching** 10:22 20:10 26:8 243:14,23 255:14 256:11

**team** 15:14 28:17 40:11,14,15 49:9 97:2 269:20

**teams** 41:17

**technical** 39:9

www.NCDepo.com
info@NCDepo.com
Depositions, Inc.
Serving all of North Carolina
(919) 557-4640

**technique** 103:22

**techniques** 31:3 89:4 103:18 243:23

**teeth** 24:3 60:17

**telephone** 116:22 118:3

**telling** 11:22 31:21 40:21 142:12 168:25 237:14 269:2

**tells** 168:17 254:6

**temperature** 246:7

**temporarily** 49:4

**temporary** 49:2

**ten** 17:13 76:3 139:16 176:3 177:15

**Tennessee** 10:8,16 11:4 14:24 45:13 56:1,2 107:13,20,23 108:6,14 109:3 182:10 183:10 243:20 266:5

**tense** 73:24 222:22 267:14

**term** 51:2,5 179:22 233:6 251:20

**terminated** 28:10 105:19

**terminating** 36:1 105:18

**termination** 175:3

**terms** 161:18 176:8 251:3

**terrible** 217:20

**test** 32:21 33:3 247:18

**tested** 31:4,22

**testified** 4:3,19 54:19 55:8 56:7 57:15 60:1 65:2 72:14 73:16 75:21 76:24 77:9,17 78:25 83:1,15 95:6 178:13 180:22 187:11,20

**testify** 60:2 72:25 74:17 75:16 78:4,21 79:25 80:3,19 81:10 90:15 227:8,10,14

**testifying** 72:17 76:9 90:10,18 91:18 92:10 187:6 190:23

**testimony** 5:3 52:15,18,23 53:14,15,17,24 54:3,5,17,23 55:13 58:21,23 59:4 60:20 62:14 65:10,17 67:7,21 72:18 73:4,9,19 76:7,13 77:1,20 78:2,9 80:24 83:4,25 91:22 97:9 107:25 158:7 184:22 193:25 200:21 214:22 229:11 240:12 266:18 275:12

**testing** 143:2,5

**tests** 244:22,25

**text** 248:15,19,22 252:13 255:4 263:20

**That's** 252:20,22

**therapy** 29:8

**thereat** 168:12

**thing** 5:13 6:2 23:21 25:25 33:17 34:17 60:14 94:10 95:7 99:20 109:19 131:3 174:19 197:11 227:5 231:24 234:16 245:4 263:7 264:1,5 271:12 272:17

**things** 6:17 7:1 9:12 20:20 25:11 27:22 31:9 34:11,20 38:14 40:18 45:6 47:5 49:17 53:3 69:19 70:7 71:7 72:3 80:18,21 87:2,25 91:4 97:21 98:3,25 99:9 106:1 110:4 111:7 113:23 125:18 126:4 129:1 132:8,19 148:13,14,25 149:4,7,25 150:10,20,22 151:2,5,8,17 159:8,13,14 160:8 164:3,22 166:4 167:2,3,5,17 172:23 174:24 176:3 177:4,10,15 184:9,22 186:8 188:13 189:3 190:24 191:15,18 196:23 199:6 200:2 201:9,24 206:21 208:13 209:21 218:23 219:21 220:3 224:25 225:24 226:25 227:7 228:23 229:5 239:24 248:7 251:6 252:10 254:20,23 255:10,11,14 256:12 257:3 258:20,24 260:25 261:7 262:16 263:8 265:22 266:1 269:9 272:4 274:1 275:23 277:6

**thinking** 54:18 87:25 116:24 163:2 265:3

**thirty** 214:7

**Thomas** 54:16 55:2 58:8 59:16, 22 60:10

**thought** 6:6 18:22 28:18,22 29:6, 10 30:16 32:3 33:14,15 71:2 81:9 101:24 127:25 133:1 139:1 145:25 178:25 197:4,12,13 204:20 207:5 212:11,14 233:22 237:14 239:14

**thoughts** 209:3

**thousand** 16:12 17:13,14 84:6 147:1

**thousands** 255:19

**threat** 37:5 149:2,3,4 161:1,4,9 162:1,5,8,11,13,15 163:22 164:12,20,21,22 165:2,4,6,10,11, 18,23 166:3,4,7,15,16,17,19,20, 24,25 167:7,14 168:5,7,8,9,10,16, 17,25 169:1,4 170:7,13,19 171:22,25 172:22 179:4,9,13,14, 18,23 180:3,5,14,16 181:1,15,17 182:5 221:24 235:22 242:15,18

**threat's** 242:18

**threatened** 46:11 242:7

**threats** 181:8

**thumb** 5:25

**Tiffany** 4:11

**tightened** 34:16

**time** 5:16 12:11 13:5,19,23 14:18 15:13,15,16 18:5 19:10,18 21:18 22:25 23:5,20 25:13 27:8,14 30:12 32:2,15 33:10 38:12 42:5, 20,25 43:17 44:16 49:7 50:4 56:1 60:10 65:9,16 67:24 68:3 73:5,8, 15,16 75:15 76:5 80:14 84:17 93:4,22 95:2 103:9 104:1,2,6,13 106:6 108:2,15 112:2 114:25 115:5,8 116:16 119:8 120:22 121:3,11 122:14,15 123:11 126:3, 4 128:10,15 137:22 139:22 140:13,19,23 142:21 144:4 145:24 146:10,11 154:16 155:20 156:23 163:10,11,17 164:16,18 168:16,19,24 170:4,5,13,19 172:16 173:1,13 175:7 176:21 177:13 179:7 187:3 188:14,15,19, 21 189:13,16,18,23,25 191:13 192:3 198:6 204:6 206:6 207:6 208:17,19,23 209:2 212:4 219:25 223:16,21 234:5 241:6 249:1 250:2 251:14 256:17 273:18

**timeline** 187:19 188:7,13,16 189:12,16,25 190:6,7

**timelines** 188:8,9

**times** 101:16 117:5 148:22 169:11 170:17 189:20 220:6

**timing** 55:22 64:22 192:24,25

**tire** 159:8 224:3 233:9

**tires** 159:5 188:25 199:1,13,19 211:22 213:5,25 214:6,12,14 215:6,16,20 239:22

www.NCDepo.com
info@NCDepo.com                    Depositions, Inc.
                    Serving all of North Carolina          (919) 557-4640

Case 1:18-cv-00186-TSK   Document 65-17   Filed 11/18/19   Page 317 of 320   PageID #: 3584

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019                                    Index: title..Twenty-eight

**title** 44:8

**today** 5:14,24 17:10,13 51:17,20 63:7 84:24 86:13 126:20 146:22 275:17

**told** 48:17 50:1 61:24 76:18 86:2 105:14,24 124:5 129:7 137:15 139:18 145:9 148:16 150:19 176:9 187:8 195:11 199:7 206:4 216:24 227:11 237:20 242:9 258:7 259:24 268:10

**top** 16:10 38:11 52:24 54:11 64:24 66:21 80:9 94:6 127:6 135:6 198:19 216:19 221:6

**topic** 112:25 259:1

**topics** 113:3 189:15

**Torres** 187:18

**totality** 157:2 164:8 176:6 186:11 189:8 227:2 228:14 263:18 273:1

**touched** 64:17 258:1

**toured** 30:15

**town** 43:12

**toxicology** 139:19

**tractor** 275:1

**traffic** 20:8 29:19 31:9 34:1,9 47:13 59:17 83:16 135:19 140:21 141:13,22 142:4,5,13,14,17 170:16 176:15,16 218:20 219:12, 25 220:3 243:23 245:3 246:16,24 247:11 248:10 249:25 250:8,11, 24 251:10,12,18,19,20 253:10 255:16 257:5 258:9,10,14,21 259:1 261:1,2 263:11 265:2

**tragically** 247:24

**trailer** 275:1

**trails** 155:12,13

**train** 173:16,18 259:7

**trained** 111:13 142:17 171:15,16 214:9 254:12 258:17 260:21 262:10,12 264:11 269:3

**trainee** 47:19

**trainer** 20:12

**training** 9:15,22 10:21 11:1,11, 25 13:7,15,16,17,19,20,21,23,24 14:3,10,12,16,20,25 15:19 16:5, 15,19 17:2,6,23 18:3 20:9,10,15,
22 21:4 23:7 26:10 30:10,20,25 31:19 33:14 39:15 42:12 43:16 44:12,14,17 46:17 47:14,18,20 49:18,19,23 50:7,11,13,14,15 53:4,10,13 65:11 80:18,20 85:5, 10,11,13,15,18,20 86:3,10,25 87:10 90:19 92:4 94:19,24 96:24 98:10 99:1 102:19 106:16,17,18, 22,23 107:12 109:14,23 110:11, 25 111:24 113:11,12 117:19,22 135:17,18,20,25 136:1,2,7,10,11, 22,24 137:1,13 140:9,13,20,24,25 141:5,6,7,18,20,24 142:2,4 150:3, 15 152:23 160:25 168:2 169:6,8, 12 170:10,14,22 172:21,23 173:15,19 177:11,12 223:4 243:21 246:22 247:14,18 248:18, 20,22,23 255:14,23 256:2,18,22, 24,25 257:1,13 258:3,4,9,10,12, 17,20,24 259:1,3,8,9,20 263:21 268:23,24 269:1,3,4,18

**trainings** 85:17 90:21 109:15

**trajectories** 132:8

**trajectory** 95:8

**transcript** 6:16,18 7:23 127:2 129:7,14 148:20,25 149:6 152:17 194:9,10,13 199:8,10 231:8 235:4 262:8 278:2

**transcription** 148:23 203:8

**transcriptionist** 149:2

**transcripts** 6:10,13,20 7:19 128:23 129:1,12 149:8 231:12 277:17

**transferred** 31:10

**transition** 29:6 171:25 220:6 264:17

**transitioned** 14:24 16:5 31:19

**transitioning** 264:19

**transitions** 149:23 267:7

**transmission** 175:5 233:19,24 234:5,22 274:23

**transmissions** 275:2

**transparency** 271:9

**transpired** 174:24

**trapped** 252:15

**trauma** 273:23

**traumatic** 191:10

**travel** 84:5,6,7,9,13,22

**traveled** 55:9 275:19

**traveling** 219:11 275:20

**Trayvon** 178:21

**treatise** 109:10 121:5

**treatment** 47:21

**tremendous** 23:7 26:2,3 28:12 43:13 223:3

**trial** 52:15 53:15,17,18,21,24,25 54:2,4,23 55:8,15,16 56:7 57:23 58:23 60:2,19,21 61:1 62:9,14 65:2 67:7,21 69:25 70:1,13 78:2, 22,25 80:4 81:11,15 83:2,16,25 84:25 85:2 122:20 123:3 144:10 241:14,21 277:2

**trials** 55:14

**trick** 5:1

**trigger** 157:11,12,16 158:9

**triggered** 127:25

**trip** 45:6

**trooper** 203:18 204:4

**troopers** 130:5

**trouble** 32:3

**true** 4:19 7:9 35:23 36:1 134:6 164:24 177:23 188:6 189:10 238:15

**truth** 192:6

**truthful** 220:13

**turmoil** 28:13

**turn** 15:15 57:8 58:4 125:14 169:13,15,21 171:16 188:23 198:25 199:2,3 202:11 204:17 205:1,7 232:12

**turned** 43:12 58:1 181:17 220:1 224:3

**turning** 220:7

**turns** 207:4 208:14

**twelve** 28:12,16

**twenty** 16:11 17:18,25

**Twenty-eight** 130:20

Rhoades vs County Commission of Marion County, et al.
ROOT, DENNIS on 09/17/2019

**twenty-five** 17:18,25

**Twitter** 88:1,2

**tying** 218:9

**type** 15:12 25:22 26:5,6 101:9 102:19 135:20 148:10 168:7 244:9

**typed** 7:13

**types** 48:11 118:9 244:6

**typo** 138:22

**U**

**U-TURN** 195:6

**U.S.** 141:11

**Uh-huh** 151:21 157:1 159:24

**ultimate** 107:15 171:14 182:25 183:1 227:18

**ultimately** 62:1

**Umina** 115:19

**unarmed** 57:10 102:19

**unauthorized** 240:9 241:17

**unaware** 236:14

**uncommon** 191:15

**uncritically** 133:18

**undergo** 191:11

**underlining** 109:16

**underneath** 31:6

**understand** 4:14,17,24 7:5 17:19 35:19 38:7 39:13 40:21 47:10 53:20,23 59:10 61:24 78:20 80:22 85:4,23 88:5 97:2,9 108:13 110:10 112:3 122:22 125:5 127:9 147:9 171:19 176:19 186:24 187:2 200:8,11 213:21 228:6 229:7

**understanding** 5:2 17:16 39:20 76:10 83:19 91:11 120:15 125:5 140:8 174:23,24 195:2 270:5

**understandings** 91:9

**understood** 5:10 207:9

**unfold** 186:8

**unfolded** 186:5 187:11 237:11

**unfolds** 197:7

**unfortunate** 28:20

**union** 48:10

**unique** 66:21 220:11

**unit** 20:8

**united** 14:4 243:15

**units** 139:10,11,14

**unknown** 251:9 253:10

**unquote** 99:6 108:2

**unreasonable** 246:18 276:2

**unsubstantiated** 34:19

**unusual** 28:2 144:11 161:21 272:16

**upcoming** 67:7

**update** 100:16

**updated** 8:17,18 54:8 65:14 99:25 100:25 103:2 110:19

**utilize** 196:15 218:22 238:20 252:6

**utilized** 109:13

**V**

**valid** 97:17

**validity** 214:19

**variable** 128:17 131:9 133:5 154:18 157:11 158:23 159:11 168:23 174:14 197:3,16 198:13 268:17

**variables** 89:2,6 107:15,17 132:10 150:12 159:6 170:12 175:21 179:15 185:9 189:1,17 196:17 197:2 200:11 209:19 210:3 214:8 227:22

**variations** 190:15 202:21 248:12

**vascular** 103:19

**veer** 216:13

**vegetation** 199:6

**vehicle** 59:19 127:24 132:10 135:18 138:12 144:7 159:5,7 161:19 162:16,21,22 163:14 174:8,11,13,17,18,19,23 175:1,3, 4,9,12,15,17,19 176:2,18,20,24

181:21 182:4,6,8 184:18,20 185:9 188:10,13,19,22 194:15,24 195:7, 10 196:5,23 197:6,9 198:21 199:5,22 200:15,22 201:5,14,16, 20 202:13,18 203:18,21,25 204:2, 10,12,24 205:5 206:6,7,13 207:17 211:23 212:25 213:24,25 214:6 215:5,15 216:2,7,11,12 217:16 218:7,22 219:8,10,12 220:2 223:20,22,24,25 224:10,18,20,22 225:1,3,4,10 229:14 234:4,6,14 236:3,7 237:9 238:6,8,15,17,20, 21 239:3,5,13,17 242:6 247:6 250:13,14 252:1,6,9,16,20 253:1, 6,13,14 264:18,24 267:4,5 273:14 275:16,19

**vehicle's** 205:7

**vehicles** 161:22 176:18 200:10 215:25 216:1 239:12 247:1,4,9,12 250:16

**vehicles'** 216:15

**Vera** 187:15

**verbal** 235:9,12

**verified** 230:3

**verify** 100:19 158:24 200:5 224:24 226:13 234:16 260:22

**verifying** 206:23

**Vero** 187:10

**verses** 54:12 166:22

**version** 27:18 100:3,4 152:8 188:3 211:1 220:21,22 249:7

**versions** 133:19

**versus** 52:1,22 53:13,18 85:10 102:14 124:3 139:7 142:11 166:19 189:16 191:2 232:24 250:24

**viability** 232:4

**vice** 12:16

**victim** 158:2 236:15

**video** 6:3 34:13,21 53:18,22 54:3 123:16 124:9,11,14,15,17 127:3 129:8 148:20,21 152:24 153:3,7 154:22 237:4,7,14,15

**videos** 6:9,14

**videotape** 127:2

Case 1:18-cv-00186-TSK   Document 65-17   Filed 11/18/19   Page 319 of 320   PageID #: 3586

*Rhoades vs County Commission of Marion County, et al.*
*ROOT, DENNIS on 09/17/2019*
*Index: view..wrists*

**view** 108:18 167:6,19

**Vinny** 149:12

**violate** 261:20

**violated** 254:13 261:23

**violation** 48:13 162:25 163:7 182:21

**violations** 48:11 208:9

**violent** 160:1,4,5 217:19

**Virginia** 4:13 13:25 14:2,6,7,11, 12,16 19:22 22:1 54:8,12,21,24 55:2,10,12,18,24 56:5,6 60:6 61:4,5 62:13,16,19,20 63:8,12 64:25 70:11 71:2 74:10,18 75:21 76:25 86:16 90:6,8 115:16 130:11,25 134:5 136:25 137:12 140:9 143:23 200:3 213:20 216:16 225:25 227:9 229:24 249:9 254:5,6,7,10,11 255:22,25 257:12 259:18,21,23 269:6

**visible** 232:7

**vision** 219:21,24 249:20

**voice** 216:12

**voices** 40:16

**voluntarily** 187:15

**voluntary** 24:10,17

**volunteered** 73:5

---

**W**

---

**wait** 34:3 100:15 119:9 127:25 128:24 151:12,25 174:3

**waited** 195:5

**waiting** 62:25 71:16 122:8 254:5

**walking** 181:25

**wall** 111:6,9,11,12

**wanted** 8:15 22:11,13,23 23:12 27:22,23 29:8 31:8 42:15 43:9 44:25 47:7 53:5 56:4 82:5 93:25 104:23 124:9,22 125:23 128:6 136:21 186:15 191:18 217:10 233:21 246:4,13,20 248:15,25 254:16 265:11 266:2 268:8 274:24

**wanting** 257:22

**warm** 237:22

**warnings** 56:21

**warrant** 48:11 157:25 159:10,23 236:16 238:3 243:2

**warrants** 108:21 158:13 159:22 209:21 210:13,20,21 211:14 236:6 263:6

**watched** 153:7

**water** 45:15

**ways** 50:17

**weapon** 36:6,7,22 37:3,5,24 38:5 39:8,9,11,14 45:21 46:4 57:8,9 58:5 69:14,19 89:7 96:16,25 97:3, 4 132:24 155:21 161:4,13,19 162:15,22 164:4,11,14 169:19 170:8 171:7,8,10 172:19 173:23, 25 174:8,11,18 217:12 238:14,15, 18,21,25 239:5,9,16,18 242:4,10 243:15

**weapons** 20:14 71:7 89:8,9 98:8, 21 99:3 187:22

**wears** 87:13

**weaving** 101:15

**website** 87:11

**week** 65:15 124:20 158:6 221:20 237:3 240:25

**weekend** 207:14

**weeks** 21:16

**weights** 199:6

**west** 4:13 13:25 14:1,2,6,7,11,12, 15 19:21 21:25 22:1 54:8,12,21, 24 55:2,10,12,17,23 56:4,5 60:5 61:4,5 62:12,16,19,20 63:8,11 64:25 70:10 71:2 74:10,18 75:21 76:25 86:15 90:6,8 91:2 115:16 130:11,25 134:5 136:25 137:12 140:9 143:23 200:3 213:20 216:16 225:25 227:9 229:24 249:9 254:5,6,7,10,11 255:21,25 257:12 259:18,21,23 269:5

**Weston** 58:10,12 62:21 70:10 71:2 86:15 178:12

**Weston's** 72:7

**whatsoever** 112:20 152:19 260:9

**wheel** 175:4 238:20

**wheelhouse** 113:23

**wide** 87:21 243:22

**wife** 10:15 12:14,21 13:14 45:15 56:20

**wild** 19:5

**wildlife** 82:16

**win** 43:21

**winded** 268:10

**window** 141:10 142:10 171:8,20

**wins** 252:22

**witness's** 54:2

**witnessed** 190:24

**witnesses** 73:14 90:21 118:25

**witnessing** 201:8

**wonderful** 206:19

**word** 46:14 58:17 87:6 138:24 181:12 203:6,14 215:8

**wording** 81:12

**words** 88:7 103:14 105:21

**work** 10:19,22 11:19,23 14:19,21 15:6,13,23 16:7 17:9 18:2,5,8,16, 18 19:1,4,7,11 20:5 21:19 22:11, 24 23:3,8,11 25:2 26:5,6 28:10 29:23,25 30:3,16 42:12 45:7 48:4 51:19,25 52:1 59:7 65:9 79:13 81:21 83:18,22 84:7 85:8,10,11, 21 94:1 104:5 113:9,12,21 114:1, 4 130:18

**worked** 19:21 23:5 103:15 113:25 176:16

**working** 27:24 28:8 30:12 42:8 73:7 89:20 93:5

**works** 234:22

**world** 136:9

**worth** 114:3 118:15 159:15

**wounded** 38:6 242:10

**wow** 154:22

**Wrangler** 137:22

**wrecks** 176:17

**wrists** 34:17

**write**  40:18 48:13 125:17 134:21
151:19 203:12

**writing**  125:21 147:20 180:12
248:16

**written**  7:1,8,10 32:23 34:2 47:25
60:6 119:17 120:15 121:22
125:17 136:9 148:24 149:11
155:7 177:14 209:4 212:5 219:14
227:6 230:25 231:7

**wrong**  64:23 81:16 151:25 187:7
270:23 272:15

**wrote**  48:12 106:1 148:23 149:2
177:9 248:3

**ws**  268:24

---

**X**

---

**Xanax**  140:6

**Xavier**  54:16 59:12,16,22

---

**Y**

---

**ya**  254:1

**yard**  57:1

**yards**  49:22

**year**  17:7,18 19:12 22:25 24:13,
15,22 27:10,11 65:5,17 67:25
69:14,18 85:1,13 90:3 99:23
136:6 141:10

**years**  26:23 30:5,6 33:12 35:23
42:25 45:24 46:1,3 63:14 69:10
83:3 94:16 99:5 141:2,8 177:15
214:7 241:23 244:3 245:22 246:2
256:17

**yelling**  57:4

**York**  23:6

**young**  23:3 34:5

**younger**  25:21

**youth**  30:11

---

**Z**

---

**Zimmerman**  58:18,22 59:6
65:24 80:11 178:14,16,17,24

**Zimmerman's**  80:17 178:22