UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG
- - -

CHRISTY J. RHOADES, in her            CIVIL ACTION NO. 1:18-CV-186
capacity as the Administratrix
and Personal Representative of
the estate of Philip Jontz
Rhoades,

                    Plaintiff,

V.

DAVID FORSYTH, in his official
and individual capacity,

                    Defendant.

                    - - -
     Proceedings had in the Jury Trial, of the above-styled
action on Wednesday, April 7, 2021, before the Honorable Judge
Thomas S. Kleeh, District Judge, at Clarksburg, West Virginia.
                    - - -

APPEARANCES:
For the Plaintiff:            Ryan J. Umina
                             Umina Legal, PLLC
                             125 Greenbag Road
                             Morgantown, WV 26501

                             Travis Austin Prince
                             Benjamin J. Hogan
                             Bailey & Glasser, LLP - Morgantown
                             6 Canyon Rd., Suite 200
                             Morgantown, WV 26508

For the Defendant:           Tiffany R. Durst
                             Nathan A. Carroll
                             Pullin Fowler Flanagan Brown & Poe
                             PLLC - Morgantown
                             2414 Cranberry Sq.
                             Morgantown, WV 26508

     Proceedings recorded utilizing realtime translation.
Transcript produced by computer-aided transcription.

1                        INDEX

2          SEALED PROCEEDINGS (Filed separately.).....249

3                        - - -

4          WITNESS:  JP BRANHAM

5          Direct Examination by Mr. Umina.............249

6          Cross-Examination by Ms. Durst..............287

7          Redirect Examination by Mr. Umina...........309

8          Recross-Examination by Ms. Durst............316

9

10         WITNESS:  CAN METIN SAVASMAN, M.D.

11         Direct Examination by Mr. Prince............322

12         Cross-Examination by Mr. Carroll............327

13         Redirect Examination by Mr. Prince..........330

14         Recross-Examination by Mr. Carroll..........331

15

16         WITNESS:  DAVID CHRISTOPHER FORSYTH

17         Cross-Examination by Mr. Prince.............333

18         Direct Examination by Ms. Durst.............352

19

20

21

22

23

24

25

1          (Proceedings commenced at 9:08 a.m.)

09:08:31   2          THE COURT:  All right.  Good morning everyone.  We

09:08:54   3    are here on day two of trial in the matter of Rhoades versus

09:08:59   4    Forsyth, 18-CV-186.  We are here initially this morning for

09:09:06   5    the jury to be here at 10:00.  We're here presently to address

09:09:10   6    the issue yesterday where we didn't seem to have any

09:09:13   7    witnesses.  So is Sergeant Branham here this morning?

09:09:18   8          MR. UMINA:  He is in the hall, Your Honor.

09:09:19   9          THE COURT:  All right.  Is Mr. Crum available?

09:09:21   10         MR. UMINA:  Yes, Your Honor.  I have the phone number

09:09:23   11   for him as well.

09:09:24   12         THE COURT:  All right.  Seems to me that -- well, let

09:09:29   13   me ask, are there any preliminary matters we need to take up?

09:09:32   14         MR. UMINA:  Not prior to these, Your Honor.

09:09:35   15         THE COURT:  Ms. Durst?

09:09:36   16         MS. DURST:  No, I don't believe so, Your Honor.

09:09:39   17         THE COURT:  Mr. Umina, if I could trouble you for

09:09:39   18   that number so Madam Clerk can call Mr. Crum.

09:09:42   19         MR. UMINA:  Yes, Your Honor.  304-534-9633.

09:10:04   20       (Calling Nathan Crum via telephone call.)

09:10:17   21         THE COURT:  Mr. Crum, can you hear me, sir?

09:10:21   22         THE WITNESS:  Yes, sir, I can.

09:10:22   23         THE COURT:  All right.  This is Judge Kleeh down in

09:10:23   24   Clarksburg.  I will give you fair warning, you are on our

09:10:26   25   version of speakerphone here in court this morning.  Do you

09:10:29   1   have a few moments, sir?

09:10:31   2        THE WITNESS:  I do.  Absolutely, sir.

09:10:33   3        THE COURT:  Outstanding.  I'm going to ask you -- I

09:10:36   4   know we have you just by telephone -- but I'm going to ask you

09:10:38   5   to raise your right hand so Madam Clerk can swear you in,

09:10:42   6   please.

09:10:43   7        THE WITNESS:  Okay.

09:10:44   8        THE CLERK:  Can you please state your full name for

09:10:46   9   the record.

09:10:47   10       THE WITNESS:  Nathan Edward Crum.

09:10:49   11       THE CLERK:  Thank you.

09:10:54   12            NATHAN EDWARD CRUM, WITNESS, SWORN

09:10:56   13       THE COURT:  All right.  Thank you, Mr. Crum.  And I

09:11:00   14   know you did this for Madam Clerk, can I ask you to just state

09:11:03   15   your full name for the record, sir?

09:11:05   16       THE WITNESS:  Sure.  Nathan Edward Crum.

09:11:08   17       THE COURT:  Sir, what do you do for a living, Mr.

09:11:11   18   Crum?

09:11:11   19       THE WITNESS:  I own and also perform process service

09:11:15   20   as well as investigation (inaudible) and Blue Eagle

09:11:21   21   Investigation.

09:11:21   22       COURT REPORTER:  I'm sorry, I didn't hear you.

09:11:21   23       THE COURT:  All right.  Mr. Crum, one thing, if I

09:11:24   24   could ask you to speak just a little slower for us so Madam

09:11:28   25   Court Reporter can have the benefit of being able to clearly

09:11:34  1    understand you.

09:11:34  2         Again, can you tell me the nature of your work, sir.

09:11:37  3         THE WITNESS:  Sure.  I own two companies, one is

09:11:42  4    called Docuserve, D-O-C-U-S-E-R-V-E, and the other one is

09:11:49  5    called Blue Eagle Investigation, and it's a private

09:11:54  6    investigation company.  So the nature of our work is obviously

09:11:58  7    private investigation and process service.

09:12:01  8         THE COURT:  Okay.  And how long -- I really just have

09:12:05  9    a few questions with respect to your work as a process server,

09:12:08  10   sir.

09:12:09  11        How long you have worked in that field?

09:12:10  12        THE WITNESS:  In process service, we have been doing

09:12:14  13   it for over 13 years; and private investigations, this is year

09:12:18  14   number six.

09:12:18  15        THE COURT:  And we are here this morning, we're

09:12:25  16   midstream in a trial in the matter of Christy Rhoades versus

09:12:30  17   David Forsyth.

09:12:31  18        It's my understanding, sir, based on some affidavits of

09:12:36  19   service that were filed in this case, that you may have been

09:12:39  20   retained by plaintiff's counsel, in particular Mr. Umina, to

09:12:43  21   serve some subpoenas in this case; is that correct?

09:12:47  22        THE WITNESS:  Yes, sir.  That is correct.

09:12:49  23        THE COURT:  All right.  And there are two subpoenas

09:12:51  24   in particular.  Again, sir, I've got the returns and

09:12:55  25   affidavits.  So honestly, imposing on your time this morning

09:12:59  1    might be a little bit of overkill, but I wanted to make sure

09:13:02  2    that I understood the lay of the land before we deal with some

09:13:06  3    other issues today.

09:13:07  4         There is an affidavit of service that was signed by you

09:13:13  5    on April 5, 2021, related to the service of a trial subpoena

09:13:19  6    upon a Sergeant JP Branham with the West Virginia State

09:13:24  7    Police.  Do you recall your firm's efforts to serve that

09:13:27  8    subpoena?

09:13:28  9         THE WITNESS:  I do, yes, sir.

09:13:30  10        THE COURT:  Could you walk me through that, please?

09:13:33  11        THE WITNESS:  Yes, sir.  So one of our first attempts

09:13:37  12   was on March 16.  We had gone to the residence and the office

09:13:41  13   was closed.  There was -- the lady that was in the office

09:13:46  14   asked us to return the following day and there would be

09:13:50  15   someone there.  The officer that we were looking for would be

09:13:53  16   there after four.  So we left.  And that was performed by

09:13:57  17   Andrew Hess, who was one of the employees at the time, an

09:14:01  18   employee here.

09:14:01  19        The following day, on the 17th, around 3:30, I believe --

09:14:06  20   I apologize I am pulling this from my memory -- we went back

09:14:09  21   and the woman at the front desk refused to accept papers for

09:14:16  22   that officer; said that she wouldn't accept papers for him

09:14:21  23   specifically.

09:14:22  24        So we went back, we spoke with the attorney's office and

09:14:28  25   we explained to them what was said and they provided a

09:14:32  1   different affidavit that -- or excuse me, a different summons

09:14:36  2   that said the state police department, care of that particular

09:14:42  3   officer, Sergeant JP Branham.

09:14:45  4       So we went back again on the 23rd which was -- I believe

09:14:48  5   the 17th was near a weekend, so we went back the following

09:14:52  6   week.  And the process server, again, Andrew Hess, this is his

09:14:58  7   third attempt there, third time going, he said that when he

09:15:04  8   went to the office, that the lady behind the counter brought

09:15:08  9   in three or four other officers and informed him that he had

09:15:13  10  this -- that this document had to be submitted to the office

09:15:16  11  in Charleston, that they would not accept this document to

09:15:21  12  that office.

09:15:22  13      So he -- after he left, he called me on the phone, and

09:15:28  14  him and I spoke.  And he said, you know, like, he was very

09:15:33  15  intimidated by it because there was several, you know, badged

09:15:35  16  armed officers and --

09:15:35  17          COURT REPORTER:  I'm sorry.

09:15:35  18          THE WITNESS:  -- (indiscernible) that they were not

09:15:38  19  going to accept it.  So I called, I made a phone call to that

09:15:41  20  office --

09:15:41  21          THE COURT:  Mr. Crum, if I could interrupt you for a

09:15:44  22  second.  Again, if you wouldn't mind speaking a little bit

09:15:48  23  more slowly for us.  I believe you were recounting the events

09:15:53  24  between or among the third or fourth attempts to serve the

09:15:56  25  subpoena.

09:15:57   1        THE WITNESS:  Yes.  So I am not sure where we missed.

09:16:01   2   I apologize, I will try to speak slower, sir.

09:16:01   3        THE COURT:  Thank you.

09:16:04   4        THE WITNESS:  On the 23rd, we made another attempt

09:16:10   5   and the process server, Andrew Hess, who went to the state

09:16:15   6   police department, was met by a lady at the front desk and

09:16:21   7   several officers who were there.  They refused to accept the

09:16:25   8   documents, stating that the documents had to be sent to their

09:16:30   9   office that was located in Charleston, West Virginia, for

09:16:35  10   acceptance of that -- of those documents.

09:16:38  11    So the process server left the office and called me on

09:16:43  12   the phone, and explained to me what had happened at his

09:16:50  13   attempt.  I informed him that I would call and I did.  So I

09:16:54  14   called the office, probably within 20 minutes of him leaving

09:16:58  15   on the 23rd, and I spoke with the lady at the front desk.

09:17:01  16        THE COURT:  And Mr. Crum, again, I apologize for

09:17:05  17   interrupting, but when you say you called the office, I assume

09:17:07  18   you called the state police detachment, the office of the

09:17:11  19   state police; is that correct?

09:17:12  20        THE WITNESS:  That is correct.  I called the office

09:17:14  21   that the process server had just left.  Yes, sir, that is

09:17:16  22   accurate.

09:17:17  23        THE COURT:  All right.  Understood.  Thank you.

09:17:18  24        THE WITNESS:  So I spoke with the lady that Mr. Hess

09:17:22  25   spoke with, and she began to inform me that their policy was

09:17:26    1   that they do not accept documents at that office.  They do not

09:17:31    2   accept subpoenas or summons at that office.  And I informed

09:17:36    3   her that the documents being served to you were addressed to

09:17:40    4   that address, they were addressed to the state police

09:17:43    5   department.  As a process server that is where we are required

09:17:47    6   to do that.  If you -- we are required to provide the

09:17:51    7   documents.  If you have a company policy, that does not

09:17:54    8   supercede the letter of the law when we are here, supposed to

09:17:59    9   provide documents, and that I would be returning the following

09:18:03    10  day with the documents that I was going to leave there whether

09:18:10    11  they accepted them or not, and if they chose to not agree to

09:18:13    12  take them, that I would put that in my affidavit that you were

09:18:17    13  refusing the documents and I left them.  And she said that's

09:18:21    14  fine and hung the phone up on me.  She didn't say anything

09:18:21    15  other than that, just hung up.

09:18:24    16      So I was anticipating the following day when I went there

09:18:28    17  to be in confrontation.  I was expecting that.  So on the

09:18:33    18  24th, I went there with another process server other than

09:18:36    19  myself; Andrew and I went there.  I walked into the room.  I

09:18:42    20  said, this is who I am, and she said, that's fine, leave them

09:18:46    21  there.  And I laid the documents down and walked out.  There

09:18:49    22  was no confrontation, nothing.  They took the documents and we

09:18:52    23  left.

09:18:55    24              THE COURT:  Okay.  Do you know the identity of the

09:18:58    25  individual at the front desk with whom you spoke on that day?

09:19:02  1          THE WITNESS:  I don't know her name, but it was a

09:19:08  2    Caucasian female.  I would say around the age of 45.

09:19:12  3          THE COURT:  And do you know if the person you spoke

09:19:15  4    to on the telephone was the same person with whom you left the

09:19:17  5    subpoena in this case?

09:19:18  6          THE WITNESS:  No, Your Honor, I do not.  I would

09:19:24  7    assume, but I don't know that.  I don't know the identity of

09:19:27  8    that person.  And the original process server that had gone,

09:19:31  9    did not go to the attempt that was on the 24th.

09:19:35  10         THE COURT:  Do you know on March 24th, when you left

09:19:40  11   the subpoena with the front desk at the state police

09:19:45  12   detachment, if Sergeant Branham was present in that

09:19:50  13   detachment?

09:19:50  14         THE WITNESS:  No, Your Honor, I wouldn't be able to

09:19:52  15   identify him even at this day.  I've not met him.

09:19:56  16         THE COURT:  But there was not any indication to you

09:19:59  17   from anyone you spoke on the phone or anyone you interacted

09:20:03  18   with physically, was physically present at the detachment, as

09:20:07  19   to whether or not he was present that day?

09:20:09  20         THE WITNESS:  That is correct, Your Honor.  No one

09:20:12  21   informed me of that in any way, no.

09:20:14  22         THE COURT:  Did you have any other interaction,

09:20:17  23   Mr. Crum, with anyone affiliated with either Sergeant Branham

09:20:20  24   or the West Virginia State Police with respect to the subpoena

09:20:24  25   that was issued to Sergeant Branham for appearance at this

09:20:28  1   trial?

09:20:28  2              THE WITNESS:  No, Your Honor.  I have no relationship

09:20:31  3   with any of the individuals.

09:20:33  4              THE COURT:  But you weren't asked to do any follow-up

09:20:36  5   work or anything like that by counsel or otherwise?

09:20:39  6              THE WITNESS:  No, Your Honor.  I was not.

09:20:41  7              THE COURT:  And then you completed the affidavit of

09:20:42  8   service, again, it appears to be signed by you on April 5th,

09:20:49  9   2021, it's notarized by a Kambria Romanko, and I apologize if

09:20:53  10  I am mispronouncing her name, on the same day; is that

09:20:56  11  correct?

09:20:57  12             THE WITNESS:  Yes.  I want to kind of put a little

09:21:01  13  asterisk beside that, sir.  We have to complete the affidavit

09:21:03  14  the day after, it just hadn't made it to that attorney's

09:21:06  15  office in the mail, so we actually went over and recreated the

09:21:10  16  affidavit.  So the one that you're seeing is the one that we

09:21:12  17  had gone and recreated, but we originally created it the day

09:21:16  18  right after that.

09:21:17  19             THE COURT:  Okay.  Madam Court Reporter, I apologize,

09:21:20  20  it's K-A-M-B-R-I-A, R-O-M-A-N-K-O.

09:21:20  21             COURT REPORTER:  Thank you.

09:21:32  22             THE COURT:  And then I assume, Mr. Crum, that once

09:21:35  23  you signed that affidavit on the 5th of April, that basically

09:21:41  24  until your phone was darkened at my request yesterday, had no

09:21:46  25  further involvement or interaction with respect to the

09:21:49  1  subpoena to Sergeant Branham; is that correct?

09:21:52  2  THE WITNESS:  That's correct, sir, yes.

09:21:54  3  THE COURT:  Were you also retained to serve a

09:21:56  4  subpoena on a Dr. Savasman?

09:22:00  5  THE WITNESS:  Yes, Your Honor.

09:22:01  6  THE COURT:  Okay.  Can you tell me about your firm's

09:22:07  7  efforts to serve that subpoena?

09:22:08  8  THE WITNESS:  I will attempt, sir.  If you could give

09:22:12  9  me just one moment, I would like to bring it up on my iPad

09:22:16 10  here, so I can speak intelligently to it.

09:22:17 11  THE COURT:  Please, I'm doing the same.

09:22:31 12  THE WITNESS:  You're referencing Dr. Savasman; is

09:22:36 13  that correct?

09:22:37 14  THE COURT:  That is correct.

09:22:38 15  THE WITNESS:  Okay.  Yes, sir.

09:22:39 16  THE COURT:  All right.  Can you tell me about your

09:22:41 17  firm's efforts to serve that trial subpoena upon Dr. Metin

09:22:51 18  Savasman.

09:22:52 19  THE WITNESS:  Yes, sir.  That was on March 15th at

09:22:55 20  11:35 a.m.  It was in Charleston, West Virginia.  I was in

09:23:01 21  that location.  That was myself who performed that service of

09:23:05 22  process.  I went down to Charleston for a different meeting at

09:23:12 23  the State Capitol Building; and after that meeting, I had gone

09:23:16 24  over to the office; and I don't know how to explain it but I

09:23:21 25  guess the office is kind of connected to -- I don't know if

09:23:28  1   it's like a public health building-type situation.

09:23:31  2       When I walked into the door, they asked me to -- they

09:23:35  3   took my temperature.  I walked into the room.  The officer

09:23:38  4   behind the door said, let me go get the person that will

09:23:41  5   actually accept the document, so he called her on the phone

09:23:44  6   while I sat down and I believe her name was Millicent Moran, I

09:23:55  7   apologize if I am chopping that up, excuse me.

09:23:58  8       So she came out, she was a female about 5'7", brown hair,

09:24:03  9   Caucasian, around the age of 40.  She came out.  She very

09:24:06  10  happily accepted it, and I went back about my business.

09:24:11  11          THE COURT:  Do you know who Ms. Moran is?

09:24:14  12          THE WITNESS:  I do not.  I do know that in that

09:24:17  13  particular office, they required me to sign in, and she signed

09:24:21  14  off that I -- she had accepted papers on that same document.

09:24:25  15  So they have a log file in their office that shows the time

09:24:28  16  you are there -- the time I was there, excuse me, the time I

09:24:32  17  was there, and that she signed off on accepting it.

09:24:35  18          THE COURT:  And you were at the state medical

09:24:38  19  examiner's office; is that correct?

09:24:39  20          THE WITNESS:  Yes, sir.  That is correct.

09:24:41  21          THE COURT:  Okay.  And when you first arrived, I'm

09:24:43  22  sure you were -- other than having your temperature taken,

09:24:46  23  were met by someone in the reception area.  Would that be a

09:24:51  24  fair assumption?

09:24:52  25          THE WITNESS:  Yeah.  I would like to -- I am trying

09:24:55  1    to be polite about it, sir.  It was kind of like an office

09:24:58  2    corner/building.  It wasn't really a -- it wasn't a place for

09:25:02  3    public access.  It was more of like a place that the medical

09:25:08  4    examiners would come in and sit in cubes, and it was a really

09:25:13  5    tight-quartered area.  But there was an officer there who did

09:25:16  6    meet me at the door.  He asked me what my business was and I

09:25:19  7    told him what I was there for.  And he said, no problem, I

09:25:20  8    will get someone to come down for you, have a seat, and then

09:25:23  9    he brought out a piece of paper -- or a little pad that had a

09:25:27  10   log-in file that had my name and what company I was with, and

09:25:31  11   what time I got there, and the reason.

09:25:33  12       And when the lady came out, she signed that document and

09:25:38  13   took the documents from me and said thank you.  They were very

09:25:42  14   polite and very receptive.  No problems.

09:25:45  15            THE COURT:  Was it your impression, Mr. Crum, that

09:25:48  16   Ms. Moran worked in the medical examiner's office?

09:25:53  17            THE WITNESS:  Yes.  According to that officer, she

09:25:56  18   was the one that would accept for that office.

09:25:59  19            THE COURT:  And were you able to hear the call from

09:26:04  20   security that summoned Ms. Moran to the lobby area?

09:26:10  21            THE WITNESS:  I was, yeah.

09:26:13  22            THE COURT:  Can you tell me what -- at least the end

09:26:16  23   of the conversation that you heard?

09:26:17  24            THE WITNESS:  The part of the conversation, sir, that

09:26:19  25   I heard was basically, I have a process server here that has

09:26:25  1    documents for the doctor.  And she said, no problem, I will be

09:26:28  2    right there, and it was a very brief conversation.

09:26:32  3        THE COURT:  So you were certainly left with the

09:26:35  4    impression, though, that the reason for your presence, the

09:26:40  5    envelope that you had when you handed it to Ms. Moran, there

09:26:44  6    were no secrets, everybody knew why you were there and what

09:26:47  7    your purpose was?

09:26:48  8        THE WITNESS:  Absolutely.  I have no reason to

09:26:51  9    believe that they didn't have a hundred percent understanding

09:26:55  10   of why I was there.

09:26:56  11       THE COURT:  Did you have any verbal interaction or

09:26:59  12   conversation with Ms. Moran?

09:27:00  13       THE WITNESS:  Yes, sir.  She came out and said hello,

09:27:06  14   and again, didn't seem stressed or upset or put out by it at

09:27:12  15   all, like it was something that was very common for her to

09:27:15  16   receive those types of documents.

09:27:17  17       THE COURT:  But you told her why you were there and

09:27:19  18   what you were handing her, correct?

09:27:20  19       THE WITNESS:  I did.  I apologize, sir.  I didn't

09:27:23  20   explain this.  We put all of our documents in a manila folder

09:27:28  21   that is sealed.  And we write on the front of it who this

09:27:33  22   document is for very clearly, so she knew exactly who the

09:27:37  23   document was for because it was written in four-inch sized

09:27:42  24   letters across the entire front of the page.  It was very

09:27:43  25   simple to see it.

09:27:46  1        THE COURT:  Did Ms. Moran say anything to you or give

09:27:49  2   you any impression that she did not know Dr. Savasman, who he

09:27:56  3   was?

09:27:56  4        THE WITNESS:  Not at all.  They immediately knew who

09:27:59  5   he was.

09:27:59  6        THE COURT:  Were you given any impression by anything

09:28:01  7   Ms. Moran said or otherwise that Dr. Savasman did not work at

09:28:06  8   the office in which you were located to serve this trial

09:28:10  9   subpoena?

09:28:11  10        THE WITNESS:  Not at all, not even a little bit.

09:28:13  11        THE COURT:  Anything that Ms. Moran said or indicated

09:28:19  12   that gave you the impression that there was a risk that this

09:28:22  13   subpoena would not ultimately reach Dr. Savasman's hands?

09:28:27  14        THE WITNESS:  None that was given to me, sir, none at

09:28:31  15   all.

09:28:32  16        THE COURT:  Did you leave with the impression, sir,

09:28:34  17   that this manner of service, leaving or handing Ms. Moran the

09:28:39  18   trial subpoena was how things normally operated at the medical

09:28:45  19   examiner's office?

09:28:45  20        THE WITNESS:  Very much so, sir.  And I appreciate

09:28:47  21   the way that you worded that because that is very typical of

09:28:51  22   how most physicians or even, for that case, executives or

09:28:58  23   attorneys and some larger organizations are served.  You very

09:29:02  24   rarely get to see them because they have such, what I use in

09:29:06  25   my company, is barriers between them to keep people that

09:29:10   1   prevent you from actually seeing them.  So quite often,

09:29:13   2   administrative assistants or legal assistants or even

09:29:16   3   attorneys for that matter will -- other attorneys will come

09:29:19   4   out and accept on behalf of them.  So it was very routine.  It

09:29:25   5   was extraordinarily routine.  Almost as if they -- it was

09:29:29   6   common for them as well.  Like, they had no reservations, no

09:29:32   7   pushback from that office at all.

09:29:35   8              THE COURT:  Understood.  Thank you, Mr. Crum.  Let

09:29:38   9   me -- I hate to flash sideways and forward on you, but going

09:29:43   10   back to the service of the subpoena on Sergeant Branham at the

09:29:47   11   state police detachment, on the fourth and final attempt as it

09:29:57   12   was the successful attempt to serve that subpoena, were you

09:29:59   13   given any indication from anyone there that those documents

09:30:02   14   would not ultimately be placed in Sergeant Branham's hands?

09:30:07   15              THE WITNESS:  Not at all, sir.  Not at all.  I would

09:30:11   16   like to say, sir, since I am being asked that question,

09:30:14   17   walking into the office that day, I was expecting

09:30:17   18   confrontation, because they had intentionally refused service

09:30:25   19   two times prior to that.  So the reason that I went as opposed

09:30:28   20   to the assigned process server was because I was expecting

09:30:33   21   confrontation, and I have been doing this for a while, and I

09:30:38   22   do know what the requirements are for a successful service in

09:30:42   23   the State of West Virginia.  But I did not receive any of

09:30:45   24   that.  When I was in, I explained who I was, and why I was

09:30:48   25   there, and they very simply said, place it right here on the

09:30:52  1    desk in front of them, which was two inches from them, and I

09:30:55  2    did, and I turned around and walked away.

09:30:58  3           THE COURT:  Okay.  Mr. Umina, anything you believe we

09:31:03  4    need to know from Mr. Crum at this point, sir?

09:31:05  5           MR. UMINA:  No, Your Honor.  I believe he stated

09:31:07  6    everything.

09:31:07  7           THE COURT:  Thank you.  Ms. Durst?

09:31:08  8           MS. DURST:  Oh, no, Your Honor.  I don't have

09:31:10  9    anything.  Thank you.

09:31:11  10          THE COURT:  All right.  Mr. Crum, sir, I certainly

09:31:13  11   appreciate you making yourself available for us this morning.

09:31:18  12   But I believe that's all the imposition on your schedule that

09:31:22  13   we need to make as far as I know, so far today.  Again, thank

09:31:26  14   you very much for your time, sir.

09:31:27  15          THE WITNESS:  All right.  Thank you, sir.  I

09:31:28  16   apologize for not being able to be there in person.

09:31:31  17          THE COURT:  Not at all.  We appreciate your time.

09:31:31  18          (Conclusion of telephone call.)

09:31:40  19          THE COURT:  All right.  I asked about Sergeant

09:31:43  20   Branham.  Is Dr. Savasman here?

09:31:48  21      Sir, I am going to ask you to wait out in the hallway for

09:31:51  22   a few moments if I could.

09:32:02  23      All right.  Will someone fetch Sergeant Branham for us,

09:32:07  24   please?

09:32:07  25          (Sergeant Branham entered the courtroom.)

09:32:22   1              THE COURT:  If I could ask to you step forward, sir,

09:32:25   2    before Madam Clerk so she can swear you in.

09:32:29   3                   JP BRANHAM, WITNESS, SWORN.

09:32:39   4              THE COURT:  Sergeant, you can have a seat here on the

09:32:41   5    witness stand, sir.  Thank you.

09:32:48   6         Sergeant -- is it sergeant?  I'm sorry.

09:32:50   7              THE WITNESS:  I'm a lieutenant.

09:32:53   8              THE COURT:  Lieutenant, I'm sorry.  I apologize.

09:32:53   9    Lieutenant Branham, once you're seated, sir, if I could ask

09:32:55   10   you to adjust that microphone so we can hear you.  And you are

09:32:58   11   free to take your mask off while on the stand given our

09:33:01   12   Plexiglass and the rest.

09:33:03   13        Lieutenant, can I ask you to tell us your full name,

09:33:06   14   please?

09:33:06   15             THE WITNESS:  James P. Branham, III.

09:33:09   16             THE COURT:  Good morning, sir.  Thank you for being

09:33:10   17   here.  I know you have been subpoenaed by both parties in this

09:33:13   18   case to testify at trial that started yesterday, but there are

09:33:18   19   a couple issues we need to talk about before, you know, your

09:33:22   20   trial testimony commences.

09:33:26   21        How many subpoenas have you received with respect to the

09:33:28   22   trial of this case, sir?

09:33:30   23             THE WITNESS:  One, sir.

09:33:31   24             THE COURT:  All right.  And when did you receive

09:33:33   25   that?

233

09:33:33  1          THE WITNESS:  I received that I believe it was

09:33:35  2  March 12th.  It would have been March 12th of this year, sir.

09:33:42  3          THE COURT:  And who issued that subpoena?  Who signed

09:33:44  4  it?

09:33:45  5          THE WITNESS:  It was signed by Tiffany Durst.

09:33:48  6          THE COURT:  Okay.  Do you recall when you were served

09:33:50  7  with that subpoena?

09:33:52  8          THE WITNESS:  I don't recall exactly what day I was

09:33:54  9  served with it, no, sir.

09:33:54  10          THE COURT:  How were you served with that subpoena?

09:33:56  11          THE WITNESS:  I don't remember if it was sent by mail

09:33:59  12  or by email, but I definitely received it.

09:34:02  13          THE COURT:  All right.  But you believe you received

09:34:03  14  it either by mail or by email?

09:34:06  15          THE WITNESS:  Yes, sir.

09:34:06  16          THE COURT:  No one handed it to you personally; is

09:34:08  17  that correct?

09:34:09  18          THE WITNESS:  I don't recall, that's possible.

09:34:11  19          THE COURT:  All right.  And what date does that

09:34:16  20  subpoena command your appearance in this Court?

09:34:19  21          THE WITNESS:  For April 7th thru the 8th at 9:00 a.m.

09:34:25  22          THE COURT:  There has been, Lieutenant, an affidavit

09:34:27  23  of service with respect to a subpoena that was issued by

09:34:32  24  plaintiff's counsel in this case that a Nathan Crum indicates

09:34:37  25  that he served at your detachment on March 24, 2021, about

09:34:44   1   1:45 in the afternoon.  Have you have ever seen or received

09:34:47   2   that subpoena?

09:34:48   3              THE WITNESS:  No, sir, I have not.

09:34:50   4              THE COURT:  Where is your office located at,

09:34:50   5   Lieutenant?

09:34:53   6              THE WITNESS:  My office is located within the Troop 1

09:34:57   7   Facility.  It's actually split offices.  There is the

09:34:59   8   detachment on one side and the troop headquarters on the

09:35:02   9   opposite end of the building, and I'm in the troop

09:35:02   10  headquarters.

09:35:04   11             THE COURT:  And that's in Fairmont; is that correct?

09:35:06   12             THE WITNESS:  That's correct, sir.

09:35:06   13             THE COURT:  And is that where you were -- you are

09:35:07   14  based out of?

09:35:08   15             THE WITNESS:  That's where my office is based, yes,

09:35:08   16  sir.

09:35:10   17             THE COURT:  Do you have any other offices anywhere in

09:35:12   18  the State of West Virginia?

09:35:13   19             THE WITNESS:  No, sir.

09:35:18   20             THE COURT:  How long have you been with the state

09:35:20   21  police, sir?

09:35:21   22             THE WITNESS:  A little over -- right at about 23

09:35:24   23  years, sir.

09:35:25   24             THE COURT:  Thank you very much for your service.  I

09:35:27   25  assume that this subpoena that you received by email or by

09:35:30  1    mail from defense counsel in this case, is not the first

09:35:32  2    subpoena you've ever received?

09:35:33  3            THE WITNESS:  No, sir, not at all.

09:35:39  4            THE COURT:  If someone wanted to serve a subpoena

09:35:41  5    upon you at your office in Fairmont, how does that work?

09:35:45  6            THE WITNESS:  Well, whoever would be serving the

09:35:48  7    subpoena would come in the entrance of the office.  That is

09:35:51  8    all locked down.  There is a glass reception area where there

09:35:55  9    is an office assistant located.  They would -- depending on

09:35:59  10   the subpoena, magistrate court subpoena, the process server

09:36:02  11   drops them off, or some of those get faxed.

09:36:05  12      For a civil subpoena, the normal protocol is they ask who

09:36:10  13   the subpoena is for.  If that subject is there, they are

09:36:14  14   served personally.

09:36:17  15           THE COURT:  Are there ever any situations where

09:36:18  16   subpoenas are left with folks at the front desk, reception, or

09:36:22  17   whatever you all may call it or refer to it as?

09:36:25  18           THE WITNESS:  No, sir.  They will not accept it if we

09:36:26  19   are not there.

09:36:27  20           THE COURT:  Who is at the front reception desk or

09:36:29  21   area?

09:36:31  22           THE WITNESS:  Our office assistant.

09:36:32  23           THE COURT:  Who is that?

09:36:32  24           THE WITNESS:  Tracy Tichnell.

09:36:34  25           THE COURT:  How long has Miss -- can you spell that

09:36:34  1    last name?

09:36:34  2          THE WITNESS:  T-I-C-H-N-E-L-L.

09:36:40  3          THE COURT:  And how long has Ms. Tichnell worked

09:36:42  4    there for -- at that detachment?

09:36:44  5          THE WITNESS:  That particular office is only

09:36:47  6    approximately three years.  She has probably a total of 20 or

09:36:51  7    21 years with our department.

09:36:53  8          THE COURT:  All right.  But at this physical office,

09:36:56  9    she has been there the entire three years?

09:36:57  10         THE WITNESS:  That's correct, sir.

09:36:57  11         THE COURT:  Is there anyone else -- if Ms. Tichnell

09:37:00  12    is on break or gone for the day, anything like that, is there

09:37:03  13    anyone else who is designated to fill in that spot?

09:37:06  14         THE WITNESS:  No, sir.  Once her shift is up, those

09:37:09  15    front doors are locked.  There is a sign to call the main

09:37:12  16    office number.  If she is not in, that would ring into our

09:37:17  17    dispatch center.

09:37:19  18         THE COURT:  Do you know if Ms. Tichnell was working

09:37:20  19    at the detachment on March 24, 2021, at about 1:43 p.m.?

09:37:26  20         THE WITNESS:  I don't know what her schedule was that

09:37:28  21    day.

09:37:29  22         THE COURT:  Do you recall what you were doing on

09:37:31  23    March 24th?

09:37:32  24         THE WITNESS:  No, sir.  But I could look it up in my

09:37:35  25    records.

09:37:36   1          THE COURT:  I assume that you would not know

09:37:40   2     Ms. Tichnell's schedule on March 16th, 17th, or 23rd either;

09:37:44   3     is that correct?

09:37:45   4          THE WITNESS:  I know she has taken some leave days

09:37:47   5     here and there.  They are in a separate office, so no, sir.

09:37:52   6          THE COURT:  You said that the practice of the state

09:37:54   7     police with respect to civil case subpoenas is that the front

09:37:58   8     desk doesn't take those, that they are personally served; is

09:38:01   9     that correct?

09:38:02   10          THE WITNESS:  Their protocol is to ask who the

09:38:04   11     subpoena is issued for.  If that officer is there, that

09:38:08   12     officer, of course, will come out and be served in person with

09:38:10   13     the subpoena.

09:38:11   14          THE COURT:  So, Ms. Tichnell will buzz in the back or

09:38:13   15     call in the back to say Trooper X, someone is here for you?

09:38:17   16          THE WITNESS:  Yes, she would make a phone call.

09:38:19   17          THE COURT:  Have you been served in that manner with

09:38:21   18     a civil subpoena at this Fairmont detachment before?

09:38:24   19          THE WITNESS:  Yes, sir, I have.

09:38:25   20          THE COURT:  How many times?

09:38:26   21          THE WITNESS:  Approximately -- several subpoenas,

09:38:29   22     probably two or three.

09:38:31   23          THE COURT:  And how does it work in non-civil

09:38:35   24     subpoenas, for example, a criminal case?

09:38:39   25          THE WITNESS:  A criminal case, the local prosecutor's

09:38:40   1    office in Marion County will often fax those.  Sometimes they

09:38:43   2    will actually have the process server drop those off at the

09:38:48   3    front desk.

09:38:48   4              THE COURT:  What if it's a subpoena from defense

09:38:50   5    counsel in a criminal case, does that work the same way?

09:38:52   6              THE WITNESS:  It should work the same way, yes, sir.

09:38:52   7              THE COURT:  And it's your testimony here, Lieutenant

09:38:59   8    Branham that you have never seen this subpoena that was served

09:39:05   9    on March 24, 2021, to your detachment; is that correct?

09:39:09   10             THE WITNESS:  That's correct, sir.  I have not.

09:39:11   11             THE COURT:  Were you deposed in this case, sir?

09:39:12   12             THE WITNESS:  Yes, sir.

09:39:13   13             THE COURT:  When was that, do you remember?

09:39:14   14             THE WITNESS:  It was --

09:39:15   15             THE COURT:  That's an unfair question for you, I'm

09:39:15   16    sure.

09:39:18   17       Mr. Umina, when was the Lieutenant deposed in this case?

09:39:21   18             MR. UMINA:  July 11, 2019, Your Honor.

09:39:32   19             THE COURT:  All right.  It's been a couple years.

09:39:35   20    Have you had any communication, Lieutenant, with Mr. Umina

09:39:38   21    standing there, or anyone with his office since you were

09:39:42   22    deposed back in July of 2019?

09:39:45   23             THE WITNESS:  No, sir.

09:39:46   24             THE COURT:  And when I say communication, I mean any

09:39:48   25    kind, written, email, text, telephone, in person, or anything.

09:39:51   1            THE WITNESS:  Not to my knowledge, no, sir.

09:39:53   2            THE COURT:  Okay.  Ms. Durst, is here, and

09:39:55   3    Mr. Carroll is here.  Do you know them?

09:39:58   4            THE WITNESS:  From the previous deposition, yes, sir.

09:40:00   5            THE COURT:  Sure, back in July.  Have you had any

09:40:01   6    communication of any kind with Ms. Durst, Mr. Carroll, or

09:40:05   7    anyone from their office, since your deposition back in July

09:40:09   8    of 2019?

09:40:11   9            THE WITNESS:  No, sir.

09:40:13   10           THE COURT:  Did you have any communication with them

09:40:14   11   after you received the subpoena that they issued to you?

09:40:17   12           THE WITNESS:  Yes.  There was a letter to contact

09:40:18   13   them at that time.

09:40:19   14           THE COURT:  Did you do that?

09:40:20   15           THE WITNESS:  Yes, I did.

09:40:21   16           THE COURT:  When did you do that?

09:40:23   17           THE WITNESS:  I believe it was yesterday because I

09:40:28   18   remember at some point I left a message at their office.

09:40:31   19   Nobody contacted me back.  So I made a phone call yesterday to

09:40:34   20   try to determine what time I was supposed to be here.

09:40:38   21           THE COURT:  Before I delve any further, Ms. Durst,

09:40:41   22   Mr. Carroll, do you represent the Lieutenant in this case or

09:40:43   23   any other capacity?

09:40:45   24           MS. DURST:  No, Your Honor.  We do not represent

09:40:48   25   Lieutenant Branham.

240

09:40:49  1          THE COURT:  All right.  Understood.  Thank you.

09:40:50  2      So you spoke with Ms. Durst yesterday afternoon; is that

09:40:52  3  correct?

09:40:53  4          THE WITNESS:  That's correct, sir.

09:40:54  5          THE COURT:  Tell me about that conversation, please.

09:40:57  6          THE WITNESS:  I called with regards to this subpoena

09:40:57  7  to try to determine what time, I know it was 9:00, what time

09:41:02  8  my expected testimony was to be.

09:41:04  9          THE COURT:  Do you recall what point of day yesterday

09:41:05  10 you had that conversation?

09:41:06  11         THE WITNESS:  That was earlier.  I then received a

09:41:11  12 phone call from her advising me to proceed down here to the

09:41:17  13 court, that there was another subpoena which I wasn't aware

09:41:21  14 of.  So I was out actually doing physical training at the

09:41:25  15 time, jogging, so I went to the office, got changed, and drove

09:41:28  16 down here.

09:41:32  17         THE COURT:  Mr. Umina, on this specific limited

09:41:35  18 issue, is there anything further you believe we need to hear

09:41:38  19 from the Lieutenant?

09:41:39  20         MR. UMINA:  No, Your Honor.

09:41:40  21         THE COURT:  Ms. Durst?

09:41:41  22         MS. DURST:  No, Your Honor.

09:41:42  23         THE COURT:  All right.  Lieutenant, thank you very

09:41:43  24 much.  You can step down.  If you wouldn't mind just having a

09:41:46  25 seat in the gallery for a moment, please.  Thank you.

09:41:50   1          (Witness steps down).

09:42:00   2              THE COURT:  Can someone holler at Dr. Savasman,

09:42:03   3     please?

09:42:21   4              MR. UMINA:  Your Honor, I will wait for the Madam

09:42:24   5     Clerk.

09:42:25   6              THE COURT:  Doctor, if you wouldn't mind taking a

09:42:27   7     seat for a second.  We are wiping down the witness stand.

09:42:30   8     We're going to ask you a couple questions here in a moment.

09:42:57   9              THE COURT:  Thank you.  Yes, Mr. Umina.

09:43:00   10             MR. UMINA:  As to your previous question, that Docket

09:43:04   11    Number 195 is where we filed the subject -- the most recent

09:43:10   12    subpoena.  I think it should be noted that we were

09:43:12   13    specifically told by Mr. Crum to -- and I included an

09:43:16   14    attachment to that.  On the first attempted subpoena, we were

09:43:21   15    specifically instructed by their office to change it from his

09:43:25   16    name to in care of him in those instructions, to which they

09:43:30   17    said they would then accept service.  So that is why you see

09:43:34   18    the difference there.

09:43:35   19         As to the next -- as to Dr. Savasman at ECF200, we have

09:43:42   20    attached the fax receipt by that office, the signed fee

09:43:48   21    agreement, a copy of the check that was provided as instructed

09:43:52   22    in the fee agreement, as well as the certified mail return

09:43:56   23    receipt for that check on ECF200.

09:44:00   24             THE COURT:  I think that is 197.

09:44:03   25             MR. UMINA:  Oh.

09:44:06  1          THE COURT:  200, I believe was the subpoena that

09:44:08  2    Ms. Durst filed.

09:44:09  3          MR. UMINA:  Oh, I'm sorry.

09:44:10  4          THE COURT:  Based on this Court's instructions.  No

09:44:13  5    problem.  I think all of the attachments you're referencing

09:44:15  6    are attached to 197, and same on the subpoena to Lieutenant

09:44:20  7    Branham, which is at 196.  But I think everybody was just

09:44:26  8    filing subpoenas after the Court requested that yesterday.

09:44:29  9       Dr. Savasman, sir, if you wouldn't mind stepping forward

09:44:33  10   and pausing here before Madam Clerk so she can swear you in.

09:44:38  11   Thank you.

09:44:50  12          DR. CAN SAVASMAN, GOVERNMENT'S WITNESS, SWORN

09:44:50  13          THE COURT:  Thank you very much, Doctor.  If you

09:44:52  14   wouldn't mind having a seat here, sir.  Once you are seated,

09:44:55  15   adjust that microphone so we can hear you.

09:44:58  16          THE WITNESS:  Thank you, Your Honor.

09:45:02  17          THE COURT:  And yes, please, remove your mask on the

09:45:04  18   witness stand.  We have enough barriers and the rest around

09:45:06  19   us, but again, thank you very much.

09:45:10  20       Could I ask you to state your full name for the record,

09:45:12  21   sir?

09:45:13  22          THE WITNESS:  My name is Can Miten Savasman.

09:45:18  23          THE COURT:  All right.  And I apologize for

09:45:20  24   mispronouncing your name, Dr. Savasman.

09:45:23  25          THE WITNESS:  It's spelled C-A-N.  It's very

09:45:26  1    different.

09:45:27  2         THE COURT:  Got you.  Could you tell me what you do

09:45:28  3    for a living, Doctor?

09:45:30  4         THE WITNESS:  I am a forensic pathologist and deputy

09:45:34  5    chief in the only medical examiner office in the state of West

09:45:43  6    Virginia, and it's in Charleston.  I have been working there

09:45:47  7    for six, seven years.

09:45:49  8         THE COURT:  You have been with that office for six or

09:45:51  9    seven years?

09:45:52  10        THE WITNESS:  Yeah.  I am double board-certified in

09:45:56  11   surgical pathology and also in forensic pathology.  My

09:45:59  12   background --

09:46:00  13        THE COURT:  And, Doctor, I don't mean to interrupt, I

09:46:04  14   just have a few questions this morning about a subpoena that

09:46:06  15   was delivered to your office.

09:46:07  16        THE WITNESS:  Okay.

09:46:07  17        THE COURT:  The jury will be here momentarily, and I

09:46:12  18   am sure we will all hear at great length about your

09:46:14  19   qualifications and the rest at that point, but I just have a

09:46:17  20   couple questions for you.

09:46:19  21        You mentioned you work in the only medical examiner's

09:46:24  22   office we have in the State of West Virginia, and that's in

09:46:26  23   Charleston, correct, sir?

09:46:27  24        THE WITNESS:  Correct.

09:46:28  25        THE COURT:  And you have been there for six or seven

09:46:30   1    years?

09:46:31   2              THE WITNESS:  Yes.

09:46:31   3              THE COURT:  I assume in addition to the work you do

09:46:34   4    as an actual physician in connection with your employment at

09:46:38   5    the medical examiner's office, that testifying either at trial

09:46:44   6    or in deposition is something you do on a regular basis; is

09:46:49   7    that correct, sir?

09:46:50   8              THE WITNESS:  Yes.

09:46:50   9              THE COURT:  Are you regularly served with subpoenas

09:46:54   10   requiring you to attend either depositions or trials?

09:46:57   11             THE WITNESS:  Well, we are working as forensic

09:47:05   12   pathologists and our office is much, much, much busier than

09:47:10   13   other states, so that is the reason that paperwork kind of

09:47:15   14   things are handled by the administration office as much as

09:47:21   15   possible.  Unless they have questions, we would not be

09:47:26   16   interfering with their jobs.  And whenever the Court orders us

09:47:30   17   to come over, we would come and -- back as a doctor rather

09:47:35   18   than administration.  That doesn't mean that my boss who is my

09:47:40   19   supervisor, Dr. Allen Mock, he is the main person who orders

09:47:46   20   everybody for this, including the administration office.

09:47:55   21             Basically we are not very into it, but any questions that

09:47:58   22   you have, the person's name is Matt Izzo, about 140 people

09:48:06   23   working under him.  I am sure he will be answering your

09:48:10   24   questions.

09:48:11   25             THE COURT:  Sure.  Do you know Millicent Moran, if I

09:48:15  1    am pronouncing her name correctly.

09:48:17  2            THE WITNESS:  Yes.  She is working as a case manager

09:48:19  3    in our office.

09:48:20  4            THE COURT:  How long has she worked there, do you

09:48:20  5    know?

09:48:24  6            THE WITNESS:  About three or four years, let's say,

09:48:26  7    if not five.

09:48:27  8            THE COURT:  Okay.  Did you receive a subpoena in

09:48:32  9    connection with this trial, Doctor?

09:48:36  10           THE WITNESS:  I have been given yesterday by

09:48:39  11   administration office that I should be here and I should

09:48:43  12   testify.  And usually, as I told you, I don't need to repeat

09:48:48  13   again and again, but we have a very busy office, and -- for

09:48:54  14   example, last year I did 450 autopsies, so that's the reason

09:48:59  15   that, you know, we be given usually one or two days before and

09:49:05  16   we have to do our job.

09:49:07  17           THE COURT:  All right.  When was the first time,

09:49:09  18   Doctor, you were made aware that a subpoena had been issued

09:49:12  19   requiring your attendance to testify at this trial?

09:49:16  20           THE WITNESS:  Usually, they put in the beginning of

09:49:18  21   the month.  But my secretary would know that.  And she would

09:49:25  22   say to me about one or two months before, whenever they

09:49:30  23   receive, and then I would recognize when they make the doctor

09:49:35  24   schedule for cutting the autopsies -- the cutting the

09:49:41  25   schedule, and then we would just keep on doing our job.  And

09:49:44  1    then the last one or two days we would be really -- because

09:49:48  2    you would tell us that we are really coming or you postponed

09:49:52  3    the court; that kind of issue.

09:49:55  4            THE COURT:  Okay.  Subpoenas requiring your

09:49:59  5    attendance at a trial, are those typically accepted by

09:50:03  6    Ms. Moran in your office?

09:50:08  7            THE WITNESS:  I don't recall the name of Moran,

09:50:10  8    sorry.

09:50:11  9            THE COURT:  Millicent Moran.

09:50:13  10           THE WITNESS:  Okay.  Okay.  Millicent, I'm sorry.

09:50:15  11           THE COURT:  No.  That's all right.

09:50:16  12           THE WITNESS:  Millicent, well Millicent is one of the

09:50:20  13   persons receiving that, I believe.

09:50:23  14           THE COURT:  Receiving subpoenas?

09:50:24  15           THE WITNESS:  I believe most of them, let's say like

09:50:26  16   that.  And her boss is, as I told you that person

09:50:32  17   administration, Matt Izzo.

09:50:38  18           THE COURT:  Do you recall when your appearance at

09:50:40  19   this trial here in Clarksburg, and I know it's a haul up the

09:50:45  20   interstate to get here, do you know when that was put on your

09:50:50  21   calendar?

09:50:50  22           THE WITNESS:  Yeah.  I mean, I don't recall right

09:50:53  23   now, but I am sure they put it and what is the court informed

09:50:58  24   me, Your Honor, they would tell me that, you know, I have been

09:51:02  25   doing this job as you appreciate for a while.  So they would

09:51:05   1    tell me that, doc, one of your autopsies are going, you know,

09:51:10   2    tomorrow or the next day, would you please get prepared and I

09:51:14   3    would sit down and study my final report.  And it wouldn't

09:51:22   4    take that much long time to remember and to be into it.  And I

09:51:25   5    didn't have any problem for this case also.

09:51:29   6            THE COURT:  Sure.  Well, I guess --

09:51:32   7            THE WITNESS:  I don't recall exactly when did they --

09:51:34   8    if I say something, I may be lying.  I don't want to do that.

09:51:38   9            THE COURT:  I'm not -- certainly not insinuating

09:51:40   10   that.  I am just trying to get a grasp here.  Here's sort of

09:51:43   11   the issue.  We were here yesterday for trial and reached a

09:51:48   12   point where we didn't have any witnesses, and the subpoena

09:51:51   13   that was delivered to your office back in March --

09:51:57   14           THE WITNESS:  I'm sure they did.

09:51:59   15           THE COURT:  -- it indicated the trial, that the

09:52:01   16   subpoena, at least, to you indicated yesterday morning at

09:52:05   17   9:00 a.m.  And I know how this works, and it's certainly

09:52:09   18   always with the Court's encouragement that the parties

09:52:12   19   communicate with witnesses to minimize the inconvenience and

09:52:15   20   the rest, but I guess, you mentioned you got a phone call

09:52:18   21   yesterday from someone telling you you had to be here today?

09:52:21   22           THE WITNESS:  No.  Millicent supervisor came near me,

09:52:26   23   her name is Jessica, and she told me that, Doc, you have court

09:52:31   24   tomorrow.  And just would you please do that and it was

09:52:35   25   something almost routine for me.

09:52:38  1          THE COURT:  Okay.  Doctor, thank you very much.
09:52:41  2   That's all the questions I have at this point, because we have
09:52:46  3   got to bring our jury in here in a few moments.  You can step
09:52:51  4   down, sir.  Thank you very much.
09:52:52  5          THE WITNESS:  Thank you, Your Honor.
09:52:52  6      (Witness steps down.)
09:52:56  7          THE COURT:  We will get to the real reason you are
09:52:58  8   here later today I am sure.
09:53:01  9          THE WITNESS:  I apologize that I asked this question,
09:53:04  10  because I am not clear, not about any questions, am I leaving?
09:53:13  11         THE COURT:  No, you are not.
09:53:15  12         THE WITNESS:  Sorry for asking that question.
09:53:16  13         THE COURT:  That's all right, sir.  But you can have
09:53:18  14  a seat here in the courtroom for a moment.  Given the time and
09:53:22  15  that our jury was to return at 10:00, it's 9:55, we are going
09:53:30  16  to take a break for a few moments, let counsel collect their
09:53:35  17  thoughts before we begin.
09:53:37  18      We will confirm that all of our jurors are here to begin
09:53:40  19  at 10:00.  The Court is going to take under advisement the
09:53:45  20  issues with respect to the subpoenas served upon -- I'm
09:53:50  21  sorry -- Lieutenant Branham, Dr. Savasman, and the fact that
09:53:55  22  we had no witnesses here yesterday, including this Court's
09:53:59  23  further inquiry into Rule 45 as to if anyone is in contempt of
09:54:02  24  this Court for disobeying properly served subpoenas.  We are
09:54:06  25  going to take that up at another time.

09:54:08   1        Because, again, as I made clear yesterday, we will

09:54:11   2   efficiently use our jurors' time while we are here.  So with

09:54:14   3   that said, Lieutenant and Doctor, we have an order

09:54:19   4   sequestering our witnesses during this trial, so we are going

09:54:23   5   to have both of you to step out, but someone will summons you

09:54:26   6   when it's your turn to take the stand.  We are going to take a

09:54:30   7   five-minute recess.

09:54:31   8        Mr. Umina be prepared to call your first witness at 10:00

09:54:34   9   promptly.  Thank you.

09:54:35  10        MR. UMINA:  Yes, Your Honor.

09:54:37  11        (Break taken at this time 9:54 a.m. - 10:05 a.m.)

10:05:15  12        (At this time, a sealed hearing took place from 10:05

10:05:15  13   a.m. - 10:29 a.m.  Transcript filed separately under seal.)

10:29:01  14        THE COURT:  Thank you.  Anything we need to take up

10:29:02  15   before we have our jurors?

10:29:06  16        Ms. Durst.

10:29:06  17        MS. DURST:  No, Your Honor.

10:29:07  18        THE COURT:  All right.  Sir, can we have our jury

10:29:10  19   please?  Thank you.

10:29:15  20        (The jury entered the courtroom at 10:29 a.m.)

10:30:03  21        THE COURT:  Good morning, ladies and gentlemen.

10:30:05  22   Thank you all for being here again.  My apologies for being

10:30:08  23   behind the promised schedule.  You will probably start

10:30:13  24   becoming familiar with the reference I like to call "judge

10:30:17  25   time."  That's what I operate on.  So my apologies that we are

10:30:22  1    behind schedule, we are actually on time based on my normal

10:30:25  2    schedule.

10:30:26  3         But with that said, Mr. Umina, you may call your first

10:30:29  4    witness.

10:30:29  5              MR. UMINA:  Your Honor, the plaintiff calls

10:30:30  6    Lieutenant JP Branham.

10:30:55  7              JP BRANHAM, PLAINTIFF'S WITNESS, SWORN

10:31:04  8              THE COURT:  Thank you very much, Lieutenant.  Once

10:31:13  9    you are seated and comfortable, if you wouldn't mind adjusting

10:31:15  10   that microphone.  And please feel free to remove your mask

10:31:19  11   while you are testifying.

10:31:25  12        Mr. Umina, you may proceed, sir.

10:31:27  13                      DIRECT EXAMINATION

10:31:27  14   BY MR. UMINA:

10:31:28  15   Q.  Lieutenant Branham, my name is Rodney Umina.  We met back

10:31:30  16   in July of 2019 when we took your deposition.  Thank you for

10:31:34  17   being here.

10:31:35  18   A.  Yes, sir.

10:31:35  19   Q.  Can you please introduce yourself to the jury?

10:31:38  20   A.  My name is Lieutenant James Branham, III.

10:31:40  21   Q.  And Lieutenant Branham, you have been a police officer

10:31:43  22   for some time, correct?

10:31:44  23   A.  Yes, sir.

10:31:44  24   Q.  How long?

10:31:45  25   A.  Approximately 23 years at this point.

| | | |
|---|---|---|
| 10:31:49 | 1 | Q.   Okay.   And what is your current position? |
| 10:31:51 | 2 | A.   My current position is Troop 1 Logistics Officer. |
| 10:31:55 | 3 | Q.   Can you tell the jury what that means in -- |
| 10:31:58 | 4 | A.   My responsibilities now are with all of our vehicles, |
| 10:32:01 | 5 | fleet, office maintenance, any repairs need done to the |
| 10:32:05 | 6 | offices, supplies for every detachment in our troop which |
| 10:32:12 | 7 | encompasses 13 counties from Hancock to Doddridge County. |
| 10:32:14 | 8 | Q.   What was your position on August 2, 2017? |
| 10:32:16 | 9 | A.   At that time I was the detachment commander of Fairmont |
| 10:32:20 | 10 | office. |
| 10:32:21 | 11 | Q.   And on that date, you investigated the defendant shooting |
| 10:32:28 | 12 | and killing Philip Rhoades, correct? |
| 10:32:30 | 13 | A.   Yes, sir. |
| 10:32:30 | 14 | Q.   And you were the lead investigator, correct? |
| 10:32:35 | 15 | A.   I was the primary, yes, sir. |
| 10:32:38 | 16 | Q.   Okay.   How did you come to be the primary investigator in |
| 10:32:40 | 17 | that shooting? |
| 10:32:41 | 18 | A.   I believe at the time I was contacted by the 911 center |
| 10:32:44 | 19 | at the direction of the sheriff of Marion County.   I was |
| 10:32:48 | 20 | advised that there was an officer-involved shooting. |
| 10:32:52 | 21 | Q.   Lieutenant Branham, prior to investigating this shooting, |
| 10:33:01 | 22 | what additional training had you received in your career |
| 10:33:06 | 23 | regarding instances of where a police officer potentially |
| 10:33:10 | 24 | violated a member of the communities' constitutional rights |
| 10:33:14 | 25 | through the unlawful use of deadly force? |

10:33:15  1   A.   I have no extra training, but other than what I was

10:33:21  2   trained at the academy.

10:33:22  3   Q.   Somewhat similar question, a little different.  Prior to

10:33:28  4   investigating this shooting, what additional training had you

10:33:31  5   received in your career regarding investigating instances

10:33:35  6   where a police officer potentially violated their own

10:33:40  7   departmental policies through the unlawful use of deadly force

10:33:44  8   against the member of this community?

10:33:45  9   A.   I have none.

10:33:46  10  Q.   Now, let's talk about some specific facts that you

10:33:50  11  observed during your investigation, and if at any time you

10:33:54  12  don't recall, I have a copy of that here for you to refer to

10:33:58  13  if you need to refresh your recollection.

10:34:00  14  A.   Yes, sir.

10:34:00  15  Q.   When you arrived on scene, approximately how much time

10:34:06  16  had passed since the shooting?

10:34:08  17  A.   I received a call, I believe, it was a little after

10:34:11  18  3:00 p.m. I think I arrived on scene within a half-hour time

10:34:15  19  span.

10:34:15  20  Q.   About 30, 40 minutes?

10:34:17  21  A.   Yes, sir.

10:34:17  22  Q.   Okay.  And to assist the jury, can you explain where this

10:34:25  23  shooting occurred?

10:34:26  24  A.   This shooting occurred in Marion County off of an area

10:34:31  25  what's called Parrish Run Road.  There is actually what looks

253

| | | |
|---|---|---|
| 10:34:36 | 1 | like a gas well site that actually kind of spurs off to the |
| 10:34:40 | 2 | right off of Parrish Run Road. |
| 10:34:43 | 3 | Q.   Parrish Run is a gravel road, correct? |
| 10:34:45 | 4 | A.   Yes, sir. |
| 10:34:46 | 5 | Q.   Pretty far out into the rural area of Marion County, |
| 10:34:51 | 6 | that's fair, correct? |
| 10:34:52 | 7 | A.   Yes, that's correct. |
| 10:34:53 | 8 | Q.   Okay.  Approximately what time of day was it? |
| 10:34:58 | 9 | A.   This was early afternoon. |
| 10:34:59 | 10 | Q.   So it was broad daylight, right? |
| 10:35:01 | 11 | A.   Yes, sir. |
| 10:35:02 | 12 | Q.   Okay.  And the conditions that day, it wasn't raining, |
| 10:35:06 | 13 | correct? |
| 10:35:07 | 14 | A.   No, I don't believe it was raining. |
| 10:35:09 | 15 | Q.   Sun was out? |
| 10:35:10 | 16 | A.   Yes, sir. |
| 10:35:10 | 17 | Q.   Was anyone at the gas well site during the shooting other |
| 10:35:19 | 18 | than the defendant? |
| 10:35:20 | 19 | A.   During the course of the investigation, I determined that |
| 10:35:26 | 20 | there was another officer on scene at the time. |
| 10:35:28 | 21 | Q.   What was his name? |
| 10:35:29 | 22 | A.   Deputy Love. |
| 10:35:32 | 23 | Q.   So when you arrived 30 to 40 minutes later after the |
| 10:35:36 | 24 | defendant shot and killed Philip Rhoades, the defendant had |
| 10:35:39 | 25 | already left the scene, correct? |

| | | |
|---|---|---|
| 10:35:40 | 1 | A.   That's correct. |
| 10:35:40 | 2 | Q.   And Deputy Love had already left the scene, correct? |
| 10:35:43 | 3 | A.   That's correct. |
| 10:35:44 | 4 | Q.   And Sergeant Branham, while you're up there, as best that |
| 10:35:50 | 5 | we possibly can, I'm guilty of it to, I'll try and let you |
| 10:35:53 | 6 | finish your answer, and you let me try and finish my question |
| 10:35:56 | 7 | just for Madam Court Reporter's sake here. |
| 10:35:59 | 8 | A.   Yes, sir. |
| 10:36:00 | 9 | Q.   So, again, within 30 to 40 minutes, both the shooter and |
| 10:36:08 | 10 | the only witness to that shooting had left the scene, correct? |
| 10:36:10 | 11 | A.   That's correct. |
| 10:36:11 | 12 | Q.   During your investigation, you never had either the |
| 10:36:18 | 13 | defendant or Corey Love come back to the gas well site and |
| 10:36:23 | 14 | explain to you what happened, did you? |
| 10:36:25 | 15 | A.   No, sir. |
| 10:36:25 | 16 | Q.   And that's within the county in which they both work, |
| 10:36:29 | 17 | right? |
| 10:36:29 | 18 | A.   That's correct. |
| 10:36:30 | 19 | Q.   Now, I am going to hand you what -- |
| 10:36:41 | 20 | MR. UMINA:   Your Honor, may I approach the witness? |
| 10:36:42 | 21 | THE COURT:   You may. |
| 10:36:43 | 22 | BY MR. UMINA: |
| 10:36:44 | 23 | Q.   Sergeant Branham, I'm going to hand you what's been |
| 10:36:47 | 24 | premarked for identification purposes as Plaintiff's Exhibits |
| 10:36:49 | 25 | 2 through 20 in this binder. |

| 10:36:54 | 1 | Could you please look through those for a moment for me? |
| 10:37:01 | 2 | THE COURT:  Which tabs were those again? |
| 10:37:03 | 3 | MR. UMINA:  Your Honor, those are premarked Exhibits |
| 10:37:05 | 4 | 2 through 20. |
| 10:37:06 | 5 | THE COURT:  Thank you. |
| 10:37:06 | 6 | MR. UMINA:  You're welcome, Your Honor. |
| 10:37:14 | 7 | BY MR. UMINA: |
| 10:37:15 | 8 | Q.   Lieutenant Branham, please, just let me know when you |
| 10:37:16 | 9 | finish looking through those. |
| 10:37:51 | 10 | A.   Okay. |
| 10:37:52 | 11 | Q.   Those photos, they were part of your investigation? |
| 10:37:56 | 12 | A.   Yes, sir. |
| 10:37:57 | 13 | Q.   Do those appear to be in the same or substantially the |
| 10:38:00 | 14 | same condition as when you filed them with your report? |
| 10:38:03 | 15 | A.   It was filed in a CD digital copy with my report, but |
| 10:38:08 | 16 | yes, these appear to be photographs. |
| 10:38:11 | 17 | MR. UMINA:  Your Honor, I ask at this time that |
| 10:38:14 | 18 | Plaintiff's Exhibits 2 through 20 be admitted into evidence as |
| 10:38:18 | 19 | Plaintiff's Exhibits 2 through 20. |
| 10:38:20 | 20 | THE COURT:  Any objection? |
| 10:38:22 | 21 | MS. DURST:  No objection, Your Honor. |
| 10:38:23 | 22 | THE COURT:  Without objection, so admitted and you |
| 10:38:25 | 23 | may publish as you see fit, Mr. Umina. |
| 10:38:28 | 24 | MR. UMINA:  Thank you, Your Honor. |
| 10:38:29 | 25 | BY MR. UMINA: |

| | | |
|---|---|---|
| 10:38:30 | 1 | Q.   Now, let's walk through some of these photographs.  I'm |
| 10:38:36 | 2 | going to ask my co-counsel here to bring these up. |
| 10:38:46 | 3 | Let's start with Exhibit No. 2 which is marked.  For the |
| 10:38:51 | 4 | jury's reference, this shows the road as you come off of |
| 10:38:57 | 5 | Parrish Run Road, that gravel road, to the gas well site, |
| 10:39:02 | 6 | correct? |
| 10:39:02 | 7 | A.   That is correct. |
| 10:39:03 | 8 | Q.   And the road that we're talking about is not the gated |
| 10:39:08 | 9 | road, it's the lower road on the bottom right here? |
| 10:39:12 | 10 | A.   Yes, what appears to the road to the right of the gate, |
| 10:39:16 | 11 | yes, sir. |
| 10:39:16 | 12 | Q.   Okay.  And you would agree with me that as you enter that |
| 10:39:22 | 13 | road, where the Jeep was ultimately sitting, you're unable to |
| 10:39:26 | 14 | see that, correct? |
| 10:39:28 | 15 | A.   From this picture, no, sir, you can't. |
| 10:39:31 | 16 | Q.   Yes.  And that individual standing there, that was |
| 10:39:34 | 17 | someone assisting in the investigation or someone on scene? |
| 10:39:36 | 18 | A.   I believe it was -- it appears to be possibly a sheriff |
| 10:39:40 | 19 | deputy maybe on scene still prior to me -- if I can remember |
| 10:39:44 | 20 | correctly, I took the picture whenever I first arrived on |
| 10:39:47 | 21 | scene is one of the first things. |
| 10:39:48 | 22 | Q.   Yeah, that was my next question.  And so the jury is |
| 10:39:53 | 23 | clear.  These were about the same conditions, what we see in |
| 10:39:56 | 24 | the photograph, as when the defendant shot and killed Philip |
| 10:39:56 | 25 | Rhoades. |

| | | |
|---|---|---|
| 10:40:00 | 1 | This is 40 minutes later.  You didn't come back days |
| 10:40:04 | 2 | later and take these? |
| 10:40:05 | 3 | A.   No, sir. |
| 10:40:06 | 4 | Q.   Okay.  Now, I'd like to refer to you Plaintiff's |
| 10:40:14 | 5 | Exhibit 3.  So what we're seeing here in the travel that the |
| 10:40:21 | 6 | defendant would have -- that the route of travel the defendant |
| 10:40:25 | 7 | would have taken -- you would have -- based on his account to |
| 10:40:28 | 8 | you, he would have come up the road in the same manner that |
| 10:40:32 | 9 | that Ford Explorer is right now, when entering the site, |
| 10:40:36 | 10 | correct? |
| 10:40:37 | 11 | A.   Yes, sir. |
| 10:40:38 | 12 | Q.   Now, I will refer you to Plaintiff's Exhibit 4.  This is |
| 10:40:45 | 13 | when you are actually on that access road.  And further |
| 10:40:49 | 14 | reference, you would agree with me, that road is a little over |
| 10:40:52 | 15 | 200 feet long right, about 213 feet? |
| 10:40:54 | 16 | A.   That sounds approximate, yes, sir. |
| 10:40:58 | 17 | Q.   Okay.  And again, sir, this is a photograph as you're, |
| 10:41:02 | 18 | again, you're off of Parrish Run Road still entering the gas |
| 10:41:06 | 19 | well site, so there is a little bit of length of this road |
| 10:41:10 | 20 | before you get to the clearing? |
| 10:41:12 | 21 | A.   Yes, sir. |
| 10:41:12 | 22 | Q.   I'd like to refer to you Plaintiff's Exhibit 5.  Now, you |
| 10:41:18 | 23 | took this photo of tire tracks on the road? |
| 10:41:23 | 24 | A.   Yes, sir. |
| 10:41:24 | 25 | Q.   And so based on this photo, you would agree with me that |

| | | |
|---|---|---|
| 10:41:29 | 1 | the ground that day was soft.  The ground was still wet? |
| 10:41:34 | 2 | A.   In the area that this was taken, yes, sir. |
| 10:41:36 | 3 | Q.   Yeah.  It was muddy out? |
| 10:41:38 | 4 | A.   It's muddy in this area, you can tell in this photograph. |
| 10:41:42 | 5 | Q.   And this area is about maybe 150 feet from where the Jeep |
| 10:41:47 | 6 | ultimately was, correct? |
| 10:41:48 | 7 | A.   That sounds approximate. |
| 10:41:49 | 8 | Q.   I'd like to refer to you Plaintiff's Exhibit No. 6.  So |
| 10:42:00 | 9 | this photograph is being taken just back from where the |
| 10:42:07 | 10 | clearing begins, correct? |
| 10:42:08 | 11 | A.   Yes, sir. |
| 10:42:09 | 12 | Q.   And although you cannot see it in the photograph, the |
| 10:42:16 | 13 | Jeep is to the left behind that brush, correct? |
| 10:42:21 | 14 | A.   Yes, sir. |
| 10:42:21 | 15 | Q.   So as the defendant entered this clearing here, okay, |
| 10:42:29 | 16 | right where that brush line is, to the left, before the bull |
| 10:42:37 | 17 | starts, approximately that area is where he tells you that he |
| 10:42:38 | 18 | jumped out of his vehicle, correct? |
| 10:42:41 | 19 | A.   That sounds correct, yes, sir. |
| 10:42:42 | 20 | Q.   Okay.  And just to be clear, he did not put his vehicle |
| 10:42:46 | 21 | into park before exiting his vehicle, correct? |
| 10:42:49 | 22 | A.   It did not appear to be, no, sir. |
| 10:42:52 | 23 | Q.   I'd like to refer to you Plaintiff's Exhibit Number 7. |
| 10:43:02 | 24 | So in Plaintiff's Exhibit No. 7, that green equipment back |
| 10:43:09 | 25 | there, that is oil and gas equipment, correct? |

10:43:13   1        MS. DURST:  Your Honor, I'm going to object.

10:43:14   2   Mr. Umina is leading the witness throughout the entirety of

10:43:18   3   his questioning thus far.

10:43:20   4        MR. UMINA:  May we approach, Your Honor?

10:43:22   5        THE COURT:  No.  Objection is sustained.  Rephrase

10:43:25   6   your question.

10:43:27   7   BY MR. UMINA:

10:43:32   8   Q.   Where is the Jeep in this photo?

10:43:37   9   A.   You cannot see the Jeep in this photo.  It would be to

10:43:40   10  the left around the brush, to the left of the cruiser.

10:43:44   11  Q.   Did the defendant's vehicle make contact with the oil and

10:43:57   12  gas equipment in front of him?

10:43:58   13  A.   I don't believe so.

10:44:00   14  Q.   So it was in drive, right?

10:44:04   15  A.   That's correct.

10:44:05   16  Q.   And where approximately did it stop in front of that oil

10:44:09   17  and gas equipment?

10:44:10   18  A.   It's sitting at its final resting place upon my arrival,

10:44:15   19  as shown in the photograph.

10:44:16   20  Q.   I'd like to refer to you Plaintiff's Exhibit No. 8 now.

10:44:23   21  Where is the Jeep in this photo?

10:44:25   22  A.   You can see the top of the -- what appears to be the Jeep

10:44:29   23  to the left of the cruiser and the side-view mirror just to

10:44:33   24  the left of the cruiser in the photograph.

10:44:36   25  Q.   I'd like to refer to you Plaintiff's Exhibit No. 9.  When

10:44:50  1    we look at this photograph, okay, you already stated that the

10:44:57  2    defendant exited his vehicle before the clearing, correct?

10:45:02  3    A.   At some point in that area, yes, sir.

10:45:04  4    Q.   Okay.  What did Corey Love tell you that he did at the

10:45:11  5    same time as the defendant when they entered that clearing?

10:45:14  6    A.   If I'm not mistaken, he had also exited the vehicle at

10:45:18  7    some point and went -- I believe he went to the front of the

10:45:22  8    vehicle to try to provide coverage, was his statement.

10:45:24  9    Q.   Okay.  Do you know if he was aware at the time when he

10:45:29  10   attempted to go to the front of the vehicle, did he tell you

10:45:33  11   whether or not he knew the vehicle was moving as he attempted

10:45:37  12   to work his way to the front of the moving vehicle?

10:45:40  13   A.   I don't recall that.  I do recall something to the effect

10:45:43  14   that he realized the vehicle was moving.  I don't know whether

10:45:47  15   that was -- whether he was already out of the vehicle at that

10:45:51  16   point.

10:45:51  17   Q.   Do you know the approximate distance from the front of

10:45:56  18   that clearing, meaning where the defendant and Corey Love

10:46:03  19   exited their vehicle, to where the Jeep ultimately -- or

10:46:08  20   excuse me, the cruiser ultimately rested?  Do you know the

10:46:11  21   approximate distance in feet?

10:46:12  22   A.   Not without looking.  I completed a diagram also that

10:46:16  23   day, I'm not sure if I took that exact measurement.

10:46:29  24   Q.   Would you like to refer to your -- the diagram that you

10:46:34  25   prepared to verify whether or not you took a measurement?

10:46:37  1    A.   Yes, sir.

10:46:38  2              MR. UMINA:   May I approach, Your Honor?

10:46:38  3              THE COURT:   You may.

10:46:39  4    BY MR. UMINA:

10:46:40  5    Q.   I am handing you the diagram that you completed as part

10:46:43  6    of your investigation in order to assist you in refreshing

10:46:50  7    your recollection.

10:46:52  8         Please let me know when you have had a moment to look at

10:46:54  9    that diagram.

10:46:55  10   A.   I have looked at it.  It's a little dark, I can't read

10:47:00  11   the measurements, I can somewhat see the measurements they are

10:47:01  12   labeled, but it's kind of hard to read.

10:47:03  13   Q.   You agree with me you didn't measure from the front of

10:47:06  14   that clearing to where that truck is, did you?

10:47:08  15   A.   No, it does not appear that I measured from the end of

10:47:14  16   the road to the end of the clearing where the cruiser is.  No,

10:47:17  17   sir.

10:47:17  18   Q.   Why not?

10:47:18  19   A.   I took measurements from a reference point, at the point

10:47:22  20   of the intersected roadway which would have been Parrish Run

10:47:25  21   and the entrance to the gas well site, and also to the wheels

10:47:30  22   of the vehicles.

10:47:33  23   Q.   But you did not take any measurements from where the

10:47:38  24   defendant and Corey Love exited their vehicle to where the

10:47:42  25   vehicle ultimately rested?

| | | |
|---|---|---|
| 10:47:44 | 1 | A.   I did not take an overall width at that point, no, sir. |
| 10:47:48 | 2 | Q.   And you didn't take an overall length either, did you? |
| 10:47:51 | 3 | A.   No, sir, I did not. |
| 10:47:53 | 4 | Q.   I'd like to refer you to Plaintiff's Exhibits No. 10. |
| 10:48:12 | 5 | Okay.   Where, in relation to that Jeep, based on this |
| 10:48:22 | 6 | photograph -- okay? -- did the defendant tell you he was |
| 10:48:27 | 7 | standing when he fired seven shots to the front? |
| 10:48:32 | 8 | A.   I believe he stated it was towards the front of the |
| 10:48:35 | 9 | vehicle. |
| 10:48:38 | 10 | Q.   Did he state that he was standing in this thick brush |
| 10:48:42 | 11 | right here? |
| 10:48:43 | 12 | A.   No, sir, he did not say anything about standing in the |
| 10:48:46 | 13 | thick brush. |
| 10:48:47 | 14 | Q.   But that's what's in front of the vehicle? |
| 10:48:49 | 15 | A.   With this photograph, yes, sir, it is. |
| 10:48:52 | 16 | Q.   And, again, this was taken 45 minutes after the shooting? |
| 10:48:56 | 17 | A.   That was taken upon my arrival at the scene, yes, sir. |
| 10:48:59 | 18 | Q.   I'd like to refer you to Exhibit No. 11. |
| 10:49:10 | 19 | When we look at this photograph -- okay? -- what is in |
| 10:49:18 | 20 | this photo just to the right of the Jeep, behind it?  And you |
| 10:49:27 | 21 | can look at the photograph in the binder as well if you can't |
| 10:49:30 | 22 | see clearly there. |
| 10:49:37 | 23 | A.   Are you referring to the one on the ground, sir? |
| 10:49:39 | 24 | Q.   Yes. |
| 10:49:40 | 25 | A.   It looks -- looks something blue.  I'm not sure what that |

10:49:44  1    is at this point.

10:49:46  2    Q.   Okay.  Are you aware that Defendant Forsyth claims that

10:49:52  3    the Jeep revved its engine, tires began spinning and then

10:50:00  4    rapidly accelerated at him?

10:50:03  5    A.   I know that he had stated that the vehicle had moved

10:50:05  6    toward him in an aggressive manner, I'm not sure exactly what

10:50:08  7    the exact wording was.

10:50:09  8    Q.   Okay.  Did you take photographs of any obstructions

10:50:14  9    behind the Jeep to show how far back the Jeep could have

10:50:20  10   possibly been or could have been?

10:50:23  11   A.   I'm sure I took some photographs from behind the Jeep at

10:50:26  12   some point, yes, sir.

10:50:27  13   Q.   Okay.  That thing sticking out, out of the ground to the

10:50:32  14   right of the Jeep -- okay? -- are you aware that that is a

10:50:36  15   pipe?

10:50:39  16   A.   That appears to be a pipe, yes, sir.

10:50:40  17   Q.   Okay.  And this area to the left of the gas well site, do

10:50:47  18   you recall what the terrain was like?

10:50:50  19   A.   Very brushy.

10:50:51  20   Q.   And what about any changes in elevation, is that --

10:50:56  21   A.   I believe there is an upslope.

10:50:58  22   Q.   Would you agree it's a pretty big upslope over to the

10:51:02  23   left?

10:51:02  24   A.   I didn't measure it but, yes, it appears to be from the

10:51:05  25   photograph as well that there is a slope there.

| | |
|---|---|
| 10:51:07 | 1 |
| 10:51:12 | 2 |
| 10:51:15 | 3 |
| 10:51:19 | 4 |
| 10:51:21 | 5 |
| 10:51:25 | 6 |
| 10:51:27 | 7 |
| 10:51:28 | 8 |
| 10:51:31 | 9 |
| 10:51:34 | 10 |
| 10:51:37 | 11 |
| 10:51:39 | 12 |
| 10:51:46 | 13 |
| 10:51:52 | 14 |
| 10:51:56 | 15 |
| 10:51:57 | 16 |
| 10:51:58 | 17 |
| 10:52:10 | 18 |
| 10:52:18 | 19 |
| 10:52:21 | 20 |
| 10:52:24 | 21 |
| 10:52:27 | 22 |
| 10:52:30 | 23 |
| 10:52:32 | 24 |
| 10:52:36 | 25 |

Q.   Okay.  So the top of your photograph, does that -- the
top left -- does that capture how high of a change in
elevation that you have on the left-hand side of that, or does
that hill continue to go upward?

A.   I don't recall exactly how far it goes up.  I mean, from
the photograph, I mean, you can see that there is an
embankment.

Q.   There is an embankment.  And at the bottom of that
embankment do you recall what the terrain was like?

A.   I believe there is some -- it appears to be some sort of
a ditch almost.

Q.   So just to be clear, within feet behind that, no more
than a couple of car lengths, there is a ditch and then a
large hillside that goes up in elevation covered with thick
brush?

A.   That would be fair to say, yes, sir.

Q.   I'd like to refer to you Plaintiff's Exhibit No. 12.
Where in relation to this vehicle -- okay? -- are you able to
state that the defendant was standing based on his statements
to you when he shot and killed Philip Rhoades?

A.   I'm not sure exactly where he was standing at this point
in time.  I don't know if the vehicles had moved prior to me
arriving on scene.  The photographs depict the vehicles as
they were shown as I arrived on scene, so I'm not sure exactly
where he was out or positioned at the vehicle.

10:52:39  1    Q.   So in the course of your investigation into the shooting

10:52:43  2    death of a citizen, you did not determine where the shooter

10:52:46  3    was standing?

10:52:48  4    A.   He advised he was in front of the vehicle.

10:52:52  5    Q.   But my question to you is:  Can you state, based on your

10:52:57  6    investigation, where in front of the vehicle he was standing?

10:53:02  7    A.   No, sir, I cannot.

10:53:03  8    Q.   I'd like to refer to you Plaintiff's Exhibit 13.

10:53:22  9         Now, as we look at this photograph here -- okay? -- the

10:53:27 10    defendant has claimed that the vehicle came directly at him.

10:53:33 11    It didn't turn, it didn't veer, tires spinning, and in an

10:53:38 12    aggressive acceleration at him.

10:53:41 13         As you look at this photograph, is there anything other

10:53:46 14    than brush and hillside and a ditch behind that Jeep?

10:53:49 15    A.   Behind the Jeep appears to be some vegetation and appears

10:53:55 16    there is an embankment.

10:54:01 17    Q.   I'd like to refer you now to Plaintiff's Exhibit No. 14.

10:54:06 18         Why did you take this photograph?

10:54:08 19    A.   This photograph shows bullet holes within the vehicle.

10:54:15 20    Q.   This photograph, does it depict all of the bullet holes

10:54:19 21    in the vehicle?

10:54:20 22    A.   These were entry holes, they appear to be.

10:54:26 23    Q.   Are you aware of an additional bullet hole below the

10:54:33 24    lowermost bullet hole that is clearly depicted in this

10:54:38 25    photograph?

| | | |
|---|---|---|
| 10:54:38 | 1 | A.   Are you talking toward, if you're looking at the |
| 10:54:43 | 2 | photograph, to the left of the windshield wiper? |
| 10:54:47 | 3 | Q.   So if we look at left windshield wiper blade, yeah, just |
| 10:54:51 | 4 | to the right of it.  You have a -- that's the lowermost that's |
| 10:54:55 | 5 | apparent by this photo.  Are you aware of another bullet hole |
| 10:54:57 | 6 | that is a little bit lower than that? |
| 10:54:59 | 7 | A.   It's kind of hard to tell from the photo. |
| 10:55:02 | 8 | Q.   Okay.  What's your understanding of how many times the |
| 10:55:05 | 9 | defendant fired into the Jeep? |
| 10:55:07 | 10 | A.   I believe it was seven, sir. |
| 10:55:09 | 11 | Q.   Okay.  I'd like to refer to you Plaintiff's Exhibit |
| 10:55:14 | 12 | No. 15. |
| 10:55:19 | 13 | Why did you take this photograph? |
| 10:55:20 | 14 | A.   It shows the front of the vehicle.  It shows the entry |
| 10:55:24 | 15 | points of the bullet holes.  It also shows some area behind |
| 10:55:28 | 16 | the vehicle. |
| 10:55:29 | 17 | Q.   And then that, to the right of the Jeep, is that that |
| 10:55:39 | 18 | pipe that we just talked about, at the gas well site behind |
| 10:55:45 | 19 | the Jeep on the ground? |
| 10:55:46 | 20 | A.   There appears to be what appears to be a pipe in the |
| 10:55:49 | 21 | photograph to the right of the Jeep, yes, sir. |
| 10:55:51 | 22 | Q.   Okay.  I would like to refer you to Plaintiff's Exhibit |
| 10:55:57 | 23 | No. 16.  The two main bullet holes in the front windshield, |
| 10:56:07 | 24 | did those exit the back of the Jeep? |
| 10:56:11 | 25 | A.   There were some exit holes.  I don't recall exactly how |

| | |
|---|---|
| 10:56:16 | 1 |
| 10:56:19 | 2 |
| 10:56:21 | 3 |
| 10:56:25 | 4 |
| 10:56:31 | 5 |
| 10:56:33 | 6 |
| 10:56:37 | 7 |
| 10:56:41 | 8 |
| 10:56:42 | 9 |
| 10:56:46 | 10 |
| 10:56:47 | 11 |
| 10:56:52 | 12 |
| 10:56:58 | 13 |
| 10:57:01 | 14 |
| 10:57:06 | 15 |
| 10:57:08 | 16 |
| 10:57:11 | 17 |
| 10:57:14 | 18 |
| 10:57:14 | 19 |
| 10:57:19 | 20 |
| 10:57:22 | 21 |
| 10:57:22 | 22 |
| 10:57:24 | 23 |
| 10:57:28 | 24 |
| 10:57:33 | 25 |

many exit holes.  I believe there was approximately two, two
or three to the rear of the Jeep.
Q.   Okay.  And at least two of the exit holes in the rear of
the Jeep coordinate with the two in the very front windshield
there, would you say that's a fair statement?
A.   I would say the exit holes came from bullets that had
entered this vehicle.  I'm not a ballistics expert, I don't
want to sit here and tell you what the trajectory would be.  I
would say it came from any of these bullet holes that entered
it.
Q.   So, Sergeant Branham, you investigated a shooting death
of a citizen, and are you -- is it your claim then though, you
don't know -- you are not a ballistics expert, so you don't
know where bullets go when they are shot?
A.   It probably would depend on the circumstances.  Like I
said, there were a couple exit holes out of this vehicle.  I'm
sure they probably came from a few of the bullets that entered
this vehicle.
Q.   Did you have a ballistics expert ever look into this
vehicle to verify what the defendant said or did not say?
A.   No, sir.
Q.   Why not?
A.   I didn't have one on hand.  The only person that had some
sort of training was a crime scene team that we had when I
executed the search warrant on this vehicle.

268

| | | |
|---|---|---|
| 10:57:35 | 1 | Q.   Are you supposed to treat this shooting death like a |
| 10:57:37 | 2 | homicide, like any other homicide? |
| 10:57:39 | 3 | A.   Yes, sir. |
| 10:57:39 | 4 | Q.   And you didn't hire a ballistics expert to verify |
| 10:57:42 | 5 | trajectory of the bullets that killed a man? |
| 10:57:44 | 6 | A.   No, sir, I did not hire a ballistics expert. |
| 10:57:47 | 7 | Q.   Does the West Virginia State Police Office have |
| 10:57:50 | 8 | ballistics experts available? |
| 10:57:52 | 9 | A.   No, sir, not to my knowledge. |
| 10:57:55 | 10 | Q.   Does the West Virginia State Police when investigating |
| 10:58:00 | 11 | homicides ever use ballistics experts? |
| 10:58:04 | 12 | A.   Would say yes, sir. |
| 10:58:05 | 13 | Q.   I'd like to refer you to Plaintiff's Exhibit No. 17. |
| 10:58:11 | 14 | What does this show? |
| 10:58:13 | 15 | A.   This shows the windshield and the front cowl of the |
| 10:58:23 | 16 | vehicle. |
| 10:58:26 | 17 | Q.   Lieutenant Branham, can you tell the jury what a cowl is? |
| 10:58:30 | 18 | A.   A cowl would be the area where you can see the vents at |
| 10:58:35 | 19 | the bottom of the windshield, the area -- a lot of newer |
| 10:58:38 | 20 | vehicles are plastic. |
| 10:58:41 | 21 | Q.   I think there were several people who didn't know what |
| 10:58:44 | 22 | that meant, including myself, so thank you. |
| 10:58:46 | 23 | THE COURT:  Thank you for clarifying. |
| 10:58:46 | 24 | BY MR. UMINA: |
| 10:58:50 | 25 | Q.   I'd like to refer you now to Plaintiff's Exhibit |

10:58:53  1    Number 18.

10:58:55  2         What does this photograph depict?

10:58:57  3    A.   This depicts from standing in the open area toward the

10:59:02  4    entrance to that site.

10:59:03  5    Q.   Okay.  And, again, just so we're clear, you don't have

10:59:09  6    any accurate measurements, at least in the course of your

10:59:12  7    investigation, as to the width of the gas well site or the

10:59:17  8    length of the gas well site; is that fair?

10:59:20  9    A.   I do not have overall measurements of that.  I do have

10:59:24  10   measurements where the vehicles had come to rest.

10:59:28  11   Q.   But you measured that from the beginning of the access

10:59:32  12   point which was about 213 feet away on a windy road.

10:59:38  13   A.   It was 213 approximately to the opening of that site

10:59:43  14   through the entrance of that road, yes, sir.

10:59:45  15   Q.   I'd like to refer you now to Plaintiff's Exhibit 19.

10:59:55  16        Why didn't you use a reference point that's fixed in the

10:59:58  17   gas well site like this piece of equipment here?

11:00:01  18   A.   Because I didn't know if that equipment could change at a

11:00:04  19   later time.  I'm not familiar with how to operate these gas

11:00:08  20   well sites is the reason why I didn't use that.

11:00:11  21   Q.   Did you ever contact the gas company and ask them if they

11:00:14  22   have any plans to move the oil and gas equipment?

11:00:17  23   A.   No, sir, I had not.

11:00:18  24   Q.   Would you agree with me, it looked like that equipment

11:00:20  25   had been there for quite some time?

11:00:23  1    A.   It looks like there's a new fitting on the equipment.  It

11:00:25  2    looks like it had been there for a while, but like I said, I'm

11:00:27  3    not an expert in the oil and gas industry, and I'm not sure

11:00:32  4    whether that equipment would stay on that site.

11:00:33  5    Q.   Okay.  Can we go to Plaintiff's Exhibit No. 20, please?

11:00:39  6         This shows the equipment, correct?

11:00:41  7    A.   Yes, sir.

11:00:41  8    Q.   And your testimony is that you don't believe that that

11:00:44  9    equipment looks dated?

11:00:47  10   A.   No, sir, I did not say that.  That does look dated.

11:00:51  11   Q.   You didn't just say that the equipment didn't look dated

11:00:54  12   to the jury?

11:00:55  13   A.   No, I said there was a new fitting on it at some point.

11:00:58  14   That equipment does look dated.  I believe I stated I'm not

11:01:02  15   sure whether that equipment, at a later time, would be moved.

11:01:05  16   That's why I didn't use that as a reference point.

11:01:07  17   Q.   Okay.  But when you went to the site, you had this dated

11:01:11  18   looking equipment with fixed reference points, and you chose

11:01:13  19   not to use those, correct?

11:01:15  20   A.   No, sir, I did not use those.

11:01:17  21   Q.   You took a measurement 213 feet down a windy road that

11:01:23  22   you can't see around as a reference point?

11:01:24  23   A.   I used the reference point as the point of intersect of

11:01:28  24   Parrish Run Road and the other berm of the access road.

11:01:32  25   Q.   Hundreds of feet away?

| | | |
|---|---|---|
| 11:01:34 | 1 | A.   It was approximately 200 some feet, yes, sir. |
| 11:01:36 | 2 | Q.   And from the entrance of the gas well site to that |
| 11:01:41 | 3 | equipment is less than 50 feet; is that fair? |
| 11:01:45 | 4 | A.   That would be fair to say, yes, sir. |
| 11:01:49 | 5 | Q.   And then in width it's only about 33 feet? |
| 11:01:55 | 6 | A.   I didn't measure the overall width, but that would appear |
| 11:01:58 | 7 | correct, yes. |
| 11:01:59 | 8 | Q.   So, again, just so the jury understands this because, you |
| 11:02:03 | 9 | know, you observed a lot of the facts here.  The facts that we |
| 11:02:07 | 10 | have to bring to them. |
| 11:02:09 | 11 |    You were investigating a homicide and you did not take a |
| 11:02:13 | 12 | measurement of the area in which the homicide occurred? |
| 11:02:18 | 13 | A.   I did take measurements.  I did not take an overall |
| 11:02:21 | 14 | measurement of the width of the gas well site. |
| 11:02:24 | 15 | Q.   I want to talk to you about some things that you |
| 11:02:35 | 16 | observed.  Let me switch to this for just a moment.  Okay. |
| 11:03:14 | 17 |      MR. UMINA:  Your Honor, can you ask if everyone on |
| 11:03:16 | 18 | the jury can see that? |
| 11:03:19 | 19 |      THE COURT:  Can you try to zoom in on that? |
| 11:03:23 | 20 |      MR. UMINA:  No, Your Honor, I want this to -- |
| 11:03:25 | 21 |      THE COURT:  You may need to slide -- just slide that |
| 11:03:29 | 22 | down. |
| 11:03:30 | 23 |      MR. UMINA:  Okay.  I'm trying to make it as big -- |
| 11:03:35 | 24 | okay.  Are you able to see this now? |
| 11:03:37 | 25 |      THE COURT:  I think so.  Can everybody see it okay? |

272

| | | |
|---|---|---|
| 11:03:39 | 1 | All right.  Seeing no indication of the contrary. |
| 11:03:41 | 2 | Thank you, Mr. Umina, you may proceed, sir. |
| 11:03:43 | 3 | MR. UMINA:  Thank you, Your Honor. |
| 11:03:44 | 4 | BY MR. UMINA: |
| 11:03:45 | 5 | Q.   You observed -- okay? -- this is a statement from your |
| 11:03:50 | 6 | report, okay?  You observed that the police cruiser was |
| 11:03:58 | 7 | running and in drive, correct? |
| 11:04:02 | 8 | A.   Yes, sir. |
| 11:04:03 | 9 | Q.   You did not qualify that language at all, did you? |
| 11:04:07 | 10 | A.   I don't understand your question, sir. |
| 11:04:11 | 11 | Q.   Okay.  I'm going to show you another statement, this is |
| 11:04:22 | 12 | regarding the Jeep.  You wrote, "The undersigned officer |
| 11:04:28 | 13 | observed that the Jeep was running and appeared to be in |
| 11:04:35 | 14 | gear." |
| 11:04:37 | 15 | A.   Yes, sir. |
| 11:04:37 | 16 | Q.   So you qualified your language about it being in gear, |
| 11:04:44 | 17 | right?  You said it appeared to be in gear? |
| 11:04:46 | 18 | A.   Yes, sir, I said it appeared to be. |
| 11:04:48 | 19 | Q.   When you looked at the police officer's cruiser, you |
| 11:04:53 | 20 | didn't qualify that language.  You knew definitively that it |
| 11:04:58 | 21 | was running; is that fair? |
| 11:05:00 | 22 | A.   Yes, sir, I did put it was running. |
| 11:05:02 | 23 | Q.   And in drive? |
| 11:05:04 | 24 | A.   Yes, sir, that's what that states. |
| 11:05:06 | 25 | Q.   So you had no question about whether or not the officer's |

11:05:10   1    vehicle was in drive; is that fair?

11:05:12   2    A.   It says, "The vehicle appeared to be open and the vehicle

11:05:15   3    was running and in drive."  Yes, sir.

11:05:17   4    Q.   Okay.  But you wrote that it appeared to be in gear as it

11:05:21   5    relates to the Jeep.  You didn't say that it was in gear?

11:05:25   6    A.   No, sir, it says, "it appeared to be."

11:05:27   7    Q.   What kind of transmission did the police cruiser have?

11:05:43   8    A.   It's automatic transmission.

11:05:45   9    Q.   What kind of transmission did the Jeep have?

11:05:49   10   A.   That would have been a standard.

11:05:52   11   Q.   On that day, were you aware of how to drive a manual

11:05:56   12   transmission vehicle?

11:05:57   13   A.   No, sir.

11:05:58   14   Q.   So, again, you're the investigating state trooper into

11:06:06   15   the shooting death of a citizen that involved allegations that

11:06:10   16   a manual transmission vehicle was used as a weapon against an

11:06:17   17   officer causing him to shoot and kill that person.  And is it

11:06:20   18   your testimony that you did not know how the vehicle, in which

11:06:24   19   he claimed to be a weapon, operated?

11:06:28   20   A.   I have never operated a standard, no, sir.

11:06:31   21   Q.   Did you ever ask anyone or anyone who assisted you how a

11:06:43   22   manual transmission vehicle operates?

11:06:45   23   A.   No, sir, I don't believe I did.

11:06:47   24   Q.   How long after arriving on scene did you make the

11:06:57   25   observation about what the police cruiser was doing and what

11:07:03  1    the Jeep was doing in terms of what we just spoke about?

11:07:07  2    A.   At some point, I don't know exactly when during that

11:07:12  3    on-scene time that that was discovered where I noted that.

11:07:15  4    Q.   If I told you that you noted that 52 minutes after the

11:07:19  5    shooting, would you have any reason to disagree?

11:07:22  6    A.   I don't know exactly how long I was on scene, no, sir.

11:07:25  7    Q.   Does that sound about right?

11:07:27  8    A.   Like I said, without referring to my report, I'm not sure

11:07:31  9    exactly when I left the scene, no.

11:07:32  10   Q.   Okay.  I will refer you.  If you open your report, when

11:07:40  11   you get into the narrative of your report, if you turn to

11:07:53  12   page 1, the bottom paragraph on that page.  Do you know now

11:08:12  13   what time you made an observation about the Ford Explorer?

11:08:19  14   A.   I put that I started beginning to take photographs at

11:08:23  15   1545, which is at 3:45 p.m.  I don't believe I noted in my

11:08:28  16   report an exact time when I noted that with the vehicles.

11:08:31  17   Q.   Would it have been after 3:45 p.m.?  Your report is in

11:08:39  18   chronological order.

11:08:40  19   A.   That's correct.  It is.

11:08:41  20   Q.   So would that observation have occurred after 3:45 p.m?

11:08:46  21   A.   That's possible.

11:08:47  22   Q.   Is it likely?

11:08:49  23   A.   Looks like I was on scene until approximately 4:15 p.m.

11:08:57  24   so somewhere between 3:45 and 4:15.

11:09:03  25   Q.   How long did your total investigation at the scene last?

11:09:07  1    A.   From -- I arrived on scene at 1532, looks like I departed

11:09:17  2    the scene at 4:15.

11:09:22  3    Q.   I'd like to refer you to page 2, next page, top

11:09:31  4    paragraph.  So by that same logic, when was the observation of

11:09:37  5    the Jeep made approximately?

11:09:38  6    A.   Observation of the Jeep with regards to what it appeared

11:09:44  7    would have been anywhere between, I would say, 3:45 to 4:15.

11:09:55  8    I put it in that paragraph during the time that I was taking

11:10:00  9    digital photographs.

11:10:01  10   Q.   Okay.  When you observed the Jeep to still be running,

11:10:06  11   approximately 52 minutes after the shooting, was there anyone

11:10:10  12   in it pushing the gas or the clutch?

11:10:14  13   A.   No, sir.

11:10:14  14   Q.   Was the Jeep sitting on flat ground?

11:10:28  15   A.   It was in an area near a ditch.  It was fairly level.

11:10:44  16   Q.   And what time did you leave the scene?

11:10:49  17   A.   Looks like I departed the scene at 4:15 p.m.

11:10:53  18   Q.   So, well, how long was your investigation there about 40,

11:10:58  19   50 minutes maybe?

11:11:00  20   A.   Approximately, yes, sir.

11:11:04  21   Q.   And you never went back?

11:11:08  22   A.   To that scene, I don't recall if I did on that date.

11:11:13  23   Q.   What did you do after you left the scene of the shooting

11:11:18  24   on August 2nd, 2017?

11:11:22  25   A.   I believe I traveled to the hospital in Fairmont.

11:11:25   1    Q.   Why did you travel to the hospital in Fairmont?

11:11:28   2    A.   To attempt to meet with the officers that were involved.

11:11:31   3    Q.   During your investigation, did any other officer assist

11:11:36   4    in investigating at the hospital?

11:11:37   5    A.   Yes, sir.

11:11:38   6    Q.   Is it -- is Corporal McDugal the officer who performed

11:11:47   7    the gunshot residue test on the defendant?

11:11:48   8    A.   Yes, sir.

11:11:49   9    Q.   Was Corporal McDugal able to successfully perform a

11:11:54  10    gunshot residue test on the defendant?

11:11:57  11    A.   Yes.  He performed a gunshot residue test on the

11:12:01  12    defendant and the two officers that were involved.

11:12:02  13    Q.   Okay.  Had the defendant washed his hands before that

11:12:07  14    gunshot residue test?

11:12:09  15    A.   Yes, sir.

11:12:10  16    Q.   Had Corey Love washed his hands before the gunshot

11:12:13  17    residue test?

11:12:14  18    A.   Yes, sir.

11:12:14  19    Q.   Did you speak to the defendant at the hospital?

11:12:22  20    A.   Yes, sir.

11:12:23  21    Q.   What did he tell you?

11:12:24  22    A.   He stated he wanted to speak to me at a later time.

11:12:28  23    Q.   So he did not give you a statement at the hospital?

11:12:31  24    A.   Not at that time, no, sir.

11:12:32  25    Q.   But you went there to speak to him?

11:12:36   1    A.   I went there to speak to him and secure other evidence

11:12:39   2    such as their duty weapon.

11:12:41   3    Q.   Did you speak with Corey Love at the hospital?

11:12:43   4    A.   I believe I did, yes, sir.

11:12:45   5    Q.   What did he tell you?

11:12:49   6    A.   Pretty much the same thing, he wanted to speak to me at a

11:12:52   7    later time.

11:12:53   8    Q.   If you're investigating a homicide, why did you not

11:12:57   9    insist that the defendant and Corey Love come to the state

11:13:03   10   police barracks for questioning immediately after the

11:13:06   11   shooting?

11:13:07   12   A.   They were involved in a critical incident.  I was just

11:13:10   13   affording them time to meet with me.  I did not interview them

11:13:15   14   on that day, so they wanted to talk to me at a later date.

11:13:19   15   Q.   Do you do that with other homicide suspects?

11:13:22   16   A.   Not usually, no, sir.

11:13:23   17   Q.   So you wouldn't generally just allow someone who you knew

11:13:30   18   just shot and killed someone to come talk to you at a later

11:13:33   19   date, right?

11:13:33   20   A.   No, sir, I wouldn't think I would.

11:13:36   21   Q.   When did you speak to Corey Love?  Let me rephrase that.

11:13:50   22   When did you next speak with Corey Love after leaving the

11:13:53   23   hospital?

11:13:54   24   A.   I believe that was by phone, it would have been on August

11:13:59   25   3.

11:14:12  1        MR. UMINA:  Is the overhead still on?

11:14:14  2        THE CLERK:  Yes.

11:14:14  3  BY MR. UMINA:

11:14:35  4  Q.   So this is on August 3rd, the day after the shooting, you

11:14:43  5  wrote at approximately 1546 hours that you contacted Deputy

11:14:49  6  Love in order to schedule an interview.

11:14:52  7        Now, in your report, he advised you that the -- that he

11:14:57  8  and the defendant wished to meet with you together; is that

11:15:03  9  fair?

11:15:04  10  A.   Yes, sir, that's what he stated.

11:15:07  11  Q.   Okay.  Now, Corey Love's deposition testimony is going to

11:15:15  12  be heard by the jury in just a little bit.  So if he said the

11:15:28  13  next time I talked to him -- excuse me.

11:15:35  14        If he says, they called -- you called and told him to

11:15:42  15  show up, and he believes that Forsyth contacted you to set up

11:15:53  16  the call -- okay? -- and he claims to have not talked to you.

11:15:56  17        Down here at the bottom, "Did Trooper Branham ever

11:16:08  18  contact you?"  "Not that I can remember."  Right?

11:16:11  19        He says -- we asked him in his deposition.  "So it's your

11:16:13  20  understanding that Trooper Branham told Deputy Forsyth to come

11:16:16  21  in?"  "Yes, sir."  "Did Trooper Branham ever contact you?"

11:16:21  22  "Not that I can remember."

11:16:22  23        That's not a true statement, right?  You contacted him?

11:16:24  24  A.   I contacted him, yes, sir.

11:16:26  25  Q.   And he told you that he wanted to come and talk to you

11:16:30  1   with Forsyth?

11:16:31  2   A.   That's correct.

11:16:32  3   Q.   And, in fact, you didn't speak to Forsyth until after you

11:16:46  4   talked to Love, right?

11:16:48  5   A.   That's correct.

11:16:49  6   Q.   So if Love said that you talked to Forsyth first, and

11:16:54  7   then called him and told him when to come in, that would be

11:16:58  8   untrue, wouldn't it?

11:16:59  9   A.   That's untrue.  I spoke with Deputy Love before I spoke

11:17:02  10  with Deputy Forsyth.

11:17:03  11  Q.   Okay.  And again, if deputy -- if Deputy Forsyth said

11:17:13  12  that he never talked to Deputy Love about coming to give a

11:17:17  13  statement to you, based on this, that wouldn't be true either,

11:17:20  14  would it?  Because at 1600 hours you were contacted by

11:17:27  15  Deputy Forsyth and he told you that he wanted to meet you with

11:17:31  16  Deputy Love?

11:17:32  17  A.   That's correct.

11:17:32  18  Q.   You wouldn't put false information here, would you?

11:17:35  19  A.   No, sir.

11:17:36  20  Q.   So if they made statements to the contrary, those are

11:17:40  21  lies, would you agree with me?

11:17:42  22  A.   According to my report, I contacted Deputy Love prior to

11:17:47  23  speaking with Deputy Forsyth; that's correct.

11:17:49  24  Q.   And if he said that you just called him after you talked

11:17:53  25  to Forsyth and told him when to come in, that's not true,

| 11:17:56 | 1 | correct? |
| 11:17:56 | 2 | A.   That is not true, no, sir. |
| 11:17:58 | 3 | Q.   Just to be clear, the defendant told you he wanted to |
| 11:18:13 | 4 | give a statement with Corey Love, correct? |
| 11:18:17 | 5 | A.   That's correct. |
| 11:18:18 | 6 | Q.   When did you actually speak with the defendant and Corey |
| 11:18:32 | 7 | Love?  On what day? |
| 11:18:33 | 8 | A.   That would have been on August 4th. |
| 11:18:38 | 9 | MR. UMINA:  May I have the overhead again, please? |
| 11:18:50 | 10 | BY MR. UMINA: |
| 11:18:53 | 11 | Q.   Did they arrive at the detachment together? |
| 11:18:57 | 12 | A.   I'm not sure if they came in the same vehicle, I don't |
| 11:19:00 | 13 | recall, but they were there at the same time, yes, sir. |
| 11:19:02 | 14 | Q.   Okay.  And this says you advised them that they had to be |
| 11:19:06 | 15 | interviewed separately? |
| 11:19:08 | 16 | A.   That's correct. |
| 11:19:09 | 17 | Q.   So if we asked him, "Did you all attempt to give your |
| 11:19:22 | 18 | statements or speak to Trooper Branham at the same time |
| 11:19:25 | 19 | instead of separately?"  And he said, "No, sir."  And we |
| 11:19:28 | 20 | asked, "Has that never occurred?"  And he said, "Uh-Huh." |
| 11:19:31 | 21 | That's a lie too -- right? -- because you told them they had |
| 11:19:34 | 22 | to give their statements separately? |
| 11:19:36 | 23 | MS. DURST:  Your Honor, could I have Mr. Umina tell |
| 11:19:39 | 24 | me what page that testimony is from? |
| 11:19:40 | 25 | MR. UMINA:  It is page 36, line 14 through 23. |

11:19:44  1            THE COURT:  Request granted, Ms. Durst.

11:19:47  2            MS. DURST:  Thank you, Your Honor.

11:19:48  3            MR. UMINA:  And for Madam Court Reporter's reference

11:19:53  4   and Ms. Durst, the previous testimony that was put up there

11:19:56  5   was page 34, lines 1 through 21.

11:20:07  6   BY MR. UMINA:

11:20:07  7   Q.   I want to ask you another question about that gunshot

11:20:10  8   residue test.  So you stated in here that Deputy Love had

11:20:23  9   advised that he also washed his hands?

11:20:25  10  A.   That's correct.

11:20:27  11  Q.   Okay.  So if we look at page 20, lines 21 through 23 of

11:20:36  12  his deposition, and we asked him under oath, "Had you washed

11:20:41  13  your hands prior to doing that test?"  And he said, "No, sir."

11:20:45  14  That would be a lie; is that fair?

11:20:48  15  A.   Yes, sir.

11:20:48  16  Q.   Whose statement did you take first?

11:21:11  17  A.   I believe I took a statement from Deputy Forsyth first.

11:21:17  18  Q.   Did he have any written materials with him during that

11:21:20  19  interview?

11:21:21  20  A.   I don't recall if he brought any, I know that he had, I

11:21:26  21  believe he had prepared a typed or written statement that he

11:21:30  22  possibly could have brought that to the interview.

11:21:32  23  Q.   Do you recall him reading from that statement?

11:21:35  24  A.   Yes, sir, somewhat, I think I do at this point.

11:21:40  25  Q.   Would you agree that the majority of his statement to you

| 11:21:43 | 1 | was from a written prepared statement? |
| 11:21:47 | 2 | A.   That would be fair to say, yes, sir. |
| 11:21:49 | 3 | Q.   Who did you speak with next? |
| 11:21:51 | 4 | A.   It would have been Deputy Love. |
| 11:21:53 | 5 | Q.   Did he come there to meet with you with a written |
| 11:21:57 | 6 | statement prepared? |
| 11:21:59 | 7 | A.   Yes, sir. |
| 11:22:02 | 8 | Q.   Was the majority of his interview simply read from a |
| 11:22:07 | 9 | written statement? |
| 11:22:08 | 10 | A.   He did read from a written statement during the |
| 11:22:10 | 11 | interview, yes. |
| 11:22:11 | 12 | Q.   Do you recall how long your interview into the shooting |
| 11:22:16 | 13 | death of Philip Rhoades with the defendant lasted? |
| 11:22:20 | 14 | A.   Approximately 35 to 40 minutes. |
| 11:22:28 | 15 | Q.   The actual recorded interview of the defendant, are you |
| 11:22:33 | 16 | saying that you interviewed him for longer than what you |
| 11:22:37 | 17 | recorded? |
| 11:22:38 | 18 | A.   No, sir. |
| 11:22:38 | 19 | Q.   So if that recording was only 11 minutes, and not |
| 11:22:44 | 20 | 35 minutes, that would be different than your testimony right |
| 11:22:47 | 21 | now, correct? |
| 11:22:48 | 22 | A.   I don't have a record of how long the actual interview |
| 11:22:52 | 23 | lasted, so I'm not really sure exactly what the total time |
| 11:22:56 | 24 | was. |
| 11:22:56 | 25 | Q.   Okay.  And if I told you that you only talked to Corey |

11:23:05  1  Love for nine minutes, do you have any reason to disagree with

11:23:07  2  me?

11:23:08  3  A.   I can't agree or disagree as I just previously stated, I

11:23:11  4  do not know exactly what the total time was.  I don't have any

11:23:15  5  recollection of that.

11:23:15  6  Q.   Okay.  Typically when you're investigating a homicide, do

11:23:22  7  you normally only speak to the shooter for 11 minutes?

11:23:25  8  A.   I would say no, sir.

11:23:26  9  Q.   And typically when you're interviewing the only other

11:23:29  10  person on scene to a homicide, do you only interview them for

11:23:34  11  nine minutes?

11:23:34  12  A.   I would say no.

11:23:36  13  Q.   And you testified earlier you're supposed to investigate

11:23:39  14  this as a homicide, correct?

11:23:40  15  A.   Investigating a crime, yes, sir, a shooting.

11:23:43  16  Q.   I want to talk to you a little bit about the statements

11:23:48  17  that they made to you.

11:23:53  18       MR. UMINA:  May we go back to the PowerPoint, please?

11:23:56  19  Q.   Sergeant Branham, I'd like to refer to Plaintiff's

11:24:26  20  Exhibit No. 9.  Would you agree with me that this is the

11:24:37  21  approximate location that Corey Love told you that the vehicle

11:24:43  22  was in when he entered the gas well site.  Do you recall that?

11:24:47  23  A.   I don't recall the exact location.  That is an accurate

11:24:51  24  depiction of what it looked like when I arrived on scene from

11:25:00  25  the photograph.

11:25:02  1    Q.   Do you recall Corey Love telling you when they pulled in

11:25:10  2    the gas well site that the Jeep was sitting a few feet back

11:25:15  3    from the left?

11:25:16  4    A.   I don't recall exact wording what was stated, no, sir.

11:25:18  5    Q.   Would you state that is accurate based on your

11:25:21  6    recollection, that they told you it was sitting off to the

11:25:24  7    left?

11:25:25  8    A.   That could be accurate, yes, sir.

11:25:26  9    Q.   Okay.  I'd like to speak with you now about what the

11:25:36  10   defendant told you as opposed to what Corey Love told you

11:25:40  11   during their interviews, the differences.  And I'd also like

11:25:46  12   to speak with you about some of the questions that you asked

11:25:50  13   or didn't ask to the defendant.

11:25:54  14        Turning onto gas well road, did you ever ask the

11:25:56  15   defendant how fast he traveled up the road to the clearing?

11:26:00  16   A.   I don't recall that, sir.

11:26:02  17   Q.   Did you ever ask him how long it took him after he got to

11:26:08  18   the clearing, to get out of the cruiser?

11:26:10  19   A.   I don't recall what was said.

11:26:13  20   Q.   If the defendant told you that when he first got to the

11:26:16  21   clearing, the Jeep Wrangler was marked and then pulled towards

11:26:21  22   him, almost hitting the cruiser, before backing up, did you

11:26:23  23   ever question him as to why there were no tire tracks in the

11:26:27  24   grass indicating that occurred?

11:26:28  25   A.   I don't recall anything to that extent, sir.

11:26:31   1   Q.   If the defendant indicated that he got out of his cruiser

11:26:35   2   and the Jeep Wrangler was attempting to do a three-point turn,

11:26:40   3   did the defendant ever tell you how the Jeep was performing

11:26:44   4   this three-point turn, or the details of that?

11:26:46   5   A.   I don't recall that, no, sir.

11:26:47   6   Q.   Did the defendant ever tell you where exactly the Jeep

11:26:51   7   was performing this supposed three-point turn at?

11:26:53   8   A.   I don't recall that.

11:26:55   9   Q.   Okay.  Do you recall Corey Love giving you a completely

11:26:58   10  different statement about what the Jeep was doing when you

11:27:00   11  pulled into the -- when they pulled into the gas well site and

11:27:03   12  made no mention of the three-point turn?

11:27:05   13  A.   No, sir, not to my recollection, without referencing the

11:27:08   14  statements.

11:27:09   15  Q.   I'd like to -- let me reference the PowerPoint.  I'd like

11:27:27   16  to refer ** to you Exhibit No. 19.  The defendant told you

11:27:41   17  that after attempting a three-point turn and after the

11:27:44   18  defendant supposedly repeatedly made commands telling him to

11:27:50   19  stop, show his hands, several times, that the engine started

11:27:54   20  revving, tires spun, and the Jeep came at him in an aggressive

11:27:59   21  manner.  But when we look at this photograph, there is no

11:28:03   22  evidence of tires spinning in this photograph, is there?

11:28:07   23  A.   On this photograph I cannot see any, no, sir.

11:28:10   24  Q.   Okay.  And do you recall from the previous photographs

11:28:16   25  that the conditions were wet and muddy that day?

| | | |
|---|---|---|
| 11:28:18 | 1 | A.   It was wet and muddy in the area where I took those tire |
| 11:28:22 | 2 | impressions that was on the entrance road, there was a puddle |
| 11:28:25 | 3 | there, yes, sir. |
| 11:28:25 | 4 | Q.   Which was just feet from where this Jeep was, that's |
| 11:28:28 | 5 | fair, right? |
| 11:28:29 | 6 | A.   I don't recall the exact measurement, but it was off the |
| 11:28:32 | 7 | entrance to the site. |
| 11:28:34 | 8 | Q.   You didn't take that measurement, did you? |
| 11:28:36 | 9 | A.   No, I did not take measurement of that. |
| 11:28:38 | 10 | Q.   Again, what kind of transmission did that Jeep Wrangler |
| 11:28:38 | 11 | have? |
| 11:28:47 | 12 | A.   It was a standard. |
| 11:28:49 | 13 | Q.   As the investigator, were you aware that the shot that |
| 11:28:54 | 14 | struck Philip essentially instantly paralyzed him from his |
| 11:28:59 | 15 | neck down, so that he couldn't hit the brake or the clutch or |
| 11:29:05 | 16 | do anything with his arms? |
| 11:29:06 | 17 | A.   No, sir, I did not know that at the time. |
| 11:29:09 | 18 | Q.   You did attend the autopsy though, correct? |
| 11:29:12 | 19 | A.   That's correct. |
| 11:29:12 | 20 | Q.   Okay.  And you know that his C1 was shattered by the |
| 11:29:17 | 21 | bullet? |
| 11:29:17 | 22 | A.   That sounds correct, yes, sir. |
| 11:29:19 | 23 | Q.   Okay.  We know that shooting a rapidly moving vehicle |
| 11:29:36 | 24 | doesn't stop the vehicle, is that a safe statement? |
| 11:29:40 | 25 | A.   Like I said, depends on what type of vehicle and where |

11:29:44  1    it's being hit at.  I would say that is a fairly safe

11:29:47  2    statement, yes, sir.

11:29:47  3    Q.   And shooting the windshield doesn't stop a rapidly

11:29:53  4    accelerating vehicle?

11:29:53  5    A.   No, sir.

11:29:54  6    Q.   And if a vehicle is in gear rapidly accelerating, does

11:30:00  7    shooting the driver somehow magically cause it to stop in its

11:30:05  8    tracks?

11:30:06  9    A.   I would not say that it would magically cause it to stop.

11:30:10  10   Q.   Question for you:  Can you please explain to the jury how

11:30:27  11   a Jeep with a manual transmission could be in gear and running

11:30:36  12   for approximately 52 minutes with no one in it to push on the

11:30:44  13   gas or on the clutch?

11:30:47  14   A.   No, sir, I can't.  I've never driven a standard.

11:30:53  15   Q.   So, again, you're not aware how the supposed weapon in a

11:31:05  16   homicide actually operates?

11:31:08  17   A.   I've never operated standard, like I said, sir.

11:31:11  18   Q.   Okay.  Have you since learned that it is impossible for a

11:31:17  19   standard transmission vehicle to be running and in gear for 52

11:31:24  20   minutes with no one to push on the gas or clutch?

11:31:27  21   A.   Yes, sir.

11:31:28  22   Q.   Thank you, Sergeant Branham.

11:31:29  23        MR. UMINA:  I have no further questions, Your Honor.

11:31:31  24        THE COURT:  Thank you very much, Mr. Umina.  Ms.

11:31:35  25   Durst.

11:31:35  1          MS. DURST:  Thank you, Your Honor.

11:31:38  2          THE COURT:  I will give everybody fair warning, we

11:31:42  3   will stop probably at some point during your examination for

11:31:46  4   lunch, but we might as well get started.

11:31:48  5          MS. DURST:  That's fine Your Honor.

11:31:51  6                        CROSS-EXAMINATION

11:31:51  7   BY MS. DURST:

11:32:15  8   Q.  Good morning, Lieutenant Branham.

11:32:17  9   A.  Good morning.

11:32:17  10  Q.  Just to follow up on a couple of things that Mr. Umina

11:32:21  11  had started off with you.  He asked you about any training you

11:32:25  12  had received specifically with regard to investigating a

11:32:29  13  shooting like this.  Do you recall that?

11:32:31  14  A.  Yes.

11:32:31  15  Q.  Okay.  He's also asked you questions about whether you

11:32:35  16  treated this as a homicide; is that right?

11:32:37  17  A.  That's correct.

11:32:38  18  Q.  Would there have been any additional training that you

11:32:40  19  would have needed or received aside from the training received

11:32:43  20  at the state police academy to investigate this incident?

11:32:47  21  A.  No, ma'am.  I mean, there are some specialized trainings,

11:32:51  22  different places, I've never went to any of them.

11:32:54  23  Q.  Was this -- this was not the first incident you had

11:32:58  24  investigated involving an officer-involved shooting, was it?

11:33:01  25  A.  No.

11:33:01   1    Q.   We've talked a little bit about and I think the
11:33:10   2    assumption is there, but as a result of your investigation
11:33:14   3    into the August 2, 2017, incident, did you complete a written
11:33:19   4    report?
11:33:20   5    A.   Yes, ma'am.
11:33:20   6    Q.   Okay.  And did that report reflect the information that
11:33:27   7    you obtained as part of your investigation?
11:33:30   8    A.   Yes, ma'am.
11:33:30   9    Q.   Did the report reflect information you obtained from the
11:33:37  10    witness statements that were taken?
11:33:39  11    A.   Yes.
11:33:39  12    Q.   That report, did it also include the photographs that you
11:33:45  13    took at the scene?
11:33:46  14    A.   Yes, it did.
11:33:47  15    Q.   And we've seen some of those.  We'll talk a little bit
11:33:50  16    more about some other photos in a minute.
11:33:52  17         Do you still have a copy of your report there in front of
11:33:55  18    you, Lieutenant Branham?
11:33:56  19    A.   Yes, ma'am.
11:33:56  20    Q.   Okay.  Are you able to tell the jury the date that your
11:34:01  21    report was finalized?
11:34:04  22    A.   It appears that the date of -- my date of report was
11:34:08  23    August 14, 2017.
11:34:10  24    Q.   By the time you had completed your report on August the
11:34:14  25    14th of 2017, did you believe that you had obtained -- had

11:34:19   1   obtained the evidence that you needed, contacted all the folks

11:34:24   2   that you needed to speak with in order to complete your

11:34:27   3   report?

11:34:28   4   A.   Yes.  At that time when I submitted this initial report,

11:34:32   5   yes, I believe I did.

11:34:33   6   Q.   And as a result of your investigation, did you find any

11:34:38   7   evidence that Mr. Rhoades was not driving the Jeep at Deputy

11:34:44   8   Forsyth the way he had recounted it to you?

11:34:46   9   A.   No.

11:34:47  10   Q.   If you would have, would you have noted that in your

11:34:52  11   report?

11:34:52  12   A.   Yes.

11:34:53  13   Q.   Now, you have your report there, you said, in front of

11:34:57  14   you, correct?

11:34:58  15   A.   Yes, ma'am.

11:34:58  16   Q.   Can you explain to the jury, I think you told us at that

11:35:02  17   time you were the detachment commander?

11:35:07  18   A.   That's correct.

11:35:07  19   Q.   Did you have a supervisor?

11:35:10  20   A.   At that time my supervisor would have been a district

11:35:13  21   commander.

11:35:14  22   Q.   When you complete a report such as the one you completed

11:35:17  23   as a result of this investigation, do you have to submit your

11:35:23  24   report to your district commander?

11:35:26  25   A.   Yes.  Any major incidents or reports they review the

11:35:30   1   report.

11:35:30   2   Q.   If you submit your report to the district commander, who

11:35:36   3   is your supervisor, and that commander determines there's

11:35:42   4   something else that you needed to do as part of your

11:35:44   5   investigation, is that conveyed to you?

11:35:47   6   A.   Yes, it is.

11:35:48   7   Q.   How is that conveyed to you?

11:35:51   8   A.   That is conveyed with, it could be a sit-down talk and

11:35:55   9   notes, and then report back saying this, whatever follow-up

11:35:58  10   needs conducted and then we would actually either do a whole

11:36:03  11   report or actually a supplemental report to supplement that

11:36:06  12   information.

11:36:07  13   Q.   In this case, did your district commander advise you of

11:36:13  14   any follow-up needed for this investigation?

11:36:16  15   A.   No.

11:36:17  16   Q.   There is a section in your report -- excuse me,

11:36:33  17   Lieutenant Branham, that says additional victim information

11:36:36  18   and lists assault on LEO.  Can you tell the jury what LEO

11:36:41  19   means?

11:36:42  20   A.   LEO stands for law enforcement officer.

11:36:44  21   Q.   Okay.  Where did the information come from for assault on

11:36:48  22   a law enforcement officer?

11:36:50  23   A.   Based upon what I had in the investigation.

11:36:53  24   Q.   What would that have included?

11:36:55  25   A.   The vehicle travelling towards an officer.

11:36:58  1   Q.   And where did you get that information?

11:37:01  2   A.   That information came from statements from the officers

11:37:06  3   involved.

11:37:06  4   Q.   Now, is there a section in the report also then that says

11:37:08  5   type of weapon used?

11:37:09  6   A.   Yes.

11:37:10  7   Q.   And in this case what does your report indicate?

11:37:13  8   A.   I'm not sure exactly what section you're referring to.

11:37:21  9   Q.   I believe it's on -- let me ask it this way.  Do you

11:37:27  10  recall noting in your report that motor vehicle was listed as

11:37:30  11  the potential weapon?

11:37:32  12  A.   That is correct.  I actually see that section now.

11:37:34  13  Q.   Okay.  Where did the reference come from to a motor

11:37:40  14  vehicle as being the weapon used?

11:37:43  15  A.   Based upon the statements of the officers.

11:37:45  16  Q.   Are you able to tell the jury, either from your

11:37:49  17  recollection or from refreshing your recollection from your

11:37:53  18  report, what facts you were actually able to determine from

11:37:59  19  your investigation?

11:38:00  20  A.   That there was a pursuit, the pursuit had continued into

11:38:05  21  this gas well site.  The two officers involved entered the gas

11:38:10  22  well site.  Deputy Forsyth had exited his vehicle, gave

11:38:16  23  commands to the driver of this Jeep.  The driver failed to

11:38:21  24  obey by his commands, started driving towards him in an

11:38:25  25  aggressive manner, and traveling towards him in an aggressive

11:38:27  1    manner and shots were fired.

11:38:28  2    Q.   And where did that information, again, come from?

11:38:32  3    A.   That information came from evidence I saw at the scene

11:38:37  4    and statements.

11:38:38  5    Q.   And we talked a little bit about the statements that

11:38:44  6    Deputy Forsyth and Deputy Love provided to you.  Did you

11:38:50  7    permit them to provide statements together?

11:38:54  8    A.   No.

11:38:54  9    Q.   I wanted to ask you something as well.  Mr. Umina had

11:39:01  10   asked you about gunshot residue tests.

11:39:04  11        Do you recall those questions?

11:39:05  12   A.   Yes.

11:39:05  13   Q.   As a result of your investigation, was there any dispute,

11:39:13  14   question, or any concern in your mind that Deputy Forsyth was

11:39:17  15   the one that actually discharged his weapon?

11:39:20  16   A.   No, there was not.

11:39:21  17   Q.   Your report also indicates that Deputy Love told you that

11:39:41  18   he had exited the vehicle and remained close by as a covering

11:39:45  19   unit.

11:39:45  20        Do you recall that generally?

11:39:47  21   A.   Yes.

11:39:48  22   Q.   Where did you get that information?

11:39:51  23   A.   That was based off the statements.

11:39:54  24   Q.   And if I can probably direct you to, I think it's page 1

11:40:00  25   of your report, that -- in the narrative section, Lieutenant

11:40:05  1    Branham.  And at the top where it says "mode of operation" in
11:40:11  2    the very first paragraph, do you see that?
11:40:14  3    A.   Yes, ma'am.
11:40:14  4    Q.   Okay.  So we just looked at around the bottom where it
11:40:17  5    says, "Deputy Love had also exited the vehicle and remained
11:40:21  6    close by as a covering unit."
11:40:23  7         Do you see that?
11:40:24  8    A.   Yes.
11:40:24  9    Q.   Okay.  And then the report continues on.  Can you read
11:40:30  10   the last two sentences from that mode of operation to the
11:40:34  11   jury, please?
11:40:35  12   A.   The report states:  "Philip Rhoades failed to comply with
11:40:38  13   the orders given by Deputy Forsyth, and the vehicle began to
11:40:42  14   move in an aggressive manner towards Deputy Forsyth.  At that
11:40:46  15   time Deputy Forsyth fired his service weapon striking and
11:40:51  16   killing Philip Rhoades."
11:40:52  17   Q.   And, again, that information you prepared in your report
11:40:57  18   that was completed August the 14th; is that right?
11:41:00  19   A.   That's correct.
11:41:00  20   Q.   Where did that information come from?
11:41:04  21   A.   That information came from the totality of the evidence
11:41:06  22   that I had including the statements.
11:41:10  23   Q.   Just to be clear, what time, and if you can for my
11:41:16  24   benefit, not tell me in military time, tell me what time you
11:41:21  25   were actually contacted and what time you arrived on scene?

11:41:25  1    A.   I was called at 3:02 p.m., I arrived on scene at

11:41:30  2    3:32 p.m.

11:41:32  3    Q.   Okay.  And how were you contacted again?

11:41:36  4    A.   I was contacted by the 911 center in Marion County by the

11:41:40  5    request of the sheriff.

11:41:41  6    Q.   Of the sheriff for?

11:41:44  7    A.   Sheriff of Marion County.

11:41:45  8    Q.   Okay.  After you were contacted through the 911 center to

11:41:49  9    conduct the investigation, did anyone from the Marion County

11:41:55  10   Sheriff's Department attempt to interfere or impede your

11:41:58  11   investigation in any manner?

11:41:59  12   A.   No, ma'am.

11:42:00  13   Q.   I don't know that we've -- we've talked about some of the

11:42:06  14   photographs.  But can you tell the jury what you saw when you

11:42:11  15   arrived on scene?

11:42:12  16   A.   Now, when I arrived on scene to the gas well site, I

11:42:18  17   started taking the photographs.  I observed the cruiser that I

11:42:21  18   could see first.  I entered the gas well site, I observed the

11:42:25  19   Jeep with some bullet hole damage.  I observed some blood on

11:42:29  20   the ground in-between both of the vehicles.  There appeared

11:42:32  21   there was some medical assistance provided.

11:42:38  22   Q.   In one of the photos I think you had looked at, you

11:42:42  23   indicated that there might have been maybe a sheriff's deputy

11:42:44  24   or some deputies still from the sheriff's department on scene?

11:42:47  25   A.   That's correct.

11:42:48   1   Q.   Okay.   When you arrived, had EMS left or were they still

11:42:53   2   there?

11:42:53   3   A.   I believe EMS had already departed from the scene.

11:42:57   4   Q.   Okay.   So if -- when you got on scene, do you have any

11:43:00   5   recollection of how many members from the sheriff's department

11:43:03   6   may have been there?

11:43:05   7   A.   Approximately two to three.

11:43:06   8   Q.   Okay.   Did any of those officers do anything to interfere

11:43:10   9   with your investigation?

11:43:12   10   A.   No.

11:43:12   11   Q.   And safe to say, we know when you got on scene the

11:43:19   12   cruiser was still there and the Jeep was still there?

11:43:21   13   A.   That's correct.

11:43:22   14   Q.   Okay.   And we talked about the photographs that you took

11:43:25   15   and I think -- how did you take those photographs?

11:43:28   16   A.   With a digital camera.

11:43:30   17   Q.   Okay.   Now, Mr. Umina had gone over some photographs with

11:43:39   18   you from your report.   I want to go over some additional ones

11:43:44   19   with you.   Some of these may be some of the same, but they

11:43:49   20   look so close.

11:43:50   21          MS. DURST:   Your Honor, may I approach?

11:43:51   22          THE COURT:   You may.

11:43:59   23          MR. UMINA:   I will stipulate to the admission of

11:44:01   24   these.

11:44:02   25          THE COURT:   Okay.   Understood.   Mark first so we can

11:44:07    1   keep our record as clean as possible.

11:44:09    2          MS. DURST:  And, Your Honor, if I might, these were

11:44:12    3   part of under defendant's tab number 7 in our exhibit

11:44:17    4   notebook, but obviously that entirety of the document will not

11:44:30    5   be admitted.  We are going to use select photos.

11:44:31    6          THE COURT:  Understood.

11:44:46    7          MS. DURST:  Your Honor, may I approach?

11:44:47    8          THE COURT:  You may.  If you wound mind telling me

11:44:49    9   what you have marked that as, please.

11:44:51   10          MS. DURST:  Defendant's Exhibit No. 1, Your Honor.

11:44:53   11   And for the record, there are 30 photographs that are

11:44:57   12   comprised of Number 1.

11:44:59   13          THE COURT:  Understood.  Thank you.

11:45:08   14          MS. DURST:  Your Honor, with the stipulation to the

11:45:14   15   admissibility, can we publish these to the jury?

11:45:17   16          THE COURT:  Mr. Umina, you have had a chance to

11:45:18   17   review all the photographs?

11:45:20   18          MR. UMINA:  Yes, Your Honor.

11:45:20   19          THE COURT:  And no objection?

11:45:21   20          MR. UMINA:  None, Your Honor.

11:45:22   21          THE COURT:  Defendant's Exhibit 1, which consists of

11:45:24   22   30 -- a collection of 30 photographs is hereby admitted and

11:45:27   23   you may publish as you deem appropriate.

11:45:29   24          MS. DURST:  Thank you, Your Honor.

11:45:29   25   BY MS. DURST:

11:45:30   1    Q.   Lieutenant Branham we are going to go ahead and walk
11:45:32   2    through some of the photographs.  If you would do me just a
11:45:33   3    favor, first, and just confirm for me that these
11:45:38   4    photographs -- there is 30 of them there -- they were
11:45:41   5    photographs that you took at the scene.
11:45:45   6    A.   Yes, ma'am, they appear to be ones I took at the scene.
11:45:48   7    Q.   And some of these photographs are some of the same ones
11:45:51   8    that you had gone over with Mr. Umina, correct?
11:45:53   9    A.   That's correct.
11:45:54  10    Q.   Do you see some photographs near the end that are ones
11:45:59  11    that were not discussed with Mr. Umina?
11:46:01  12    A.   Yes.
11:46:02  13    Q.   Okay.  And for the record, Lieutenant Branham, I have, to
11:46:07  14    make it easier for reference, I have written a little number
11:46:11  15    on the bottom right-hand corner that says 1 through 30, okay?
11:46:15  16    So if we're referring to a photograph for my co-counsel here,
11:46:19  17    if you could just tell me which number you're referring to
11:46:22  18    that he can pull that up on the screen, okay?
11:46:25  19    A.   Yes, ma'am.
11:46:25  20    Q.   Okay.  Now, you went over with Mr. Umina some of the
11:46:30  21    photographs that you were discussing.  Remember the pipe that
11:46:36  22    was sticking up in the ground?
11:46:37  23    A.   Yes.
11:46:38  24    Q.   Can you flip to number 27?  Do you see that photograph,
11:46:49  25    Lieutenant Branham?

11:46:49    1    A.   Yes, ma'am.

11:47:07    2         MS. DURST:   Your Honor, the resolution on that screen

11:47:09    3    is a little bit bright, can we inquire of the jurors if they

11:47:13    4    can see?  My view on the screen is much different than that.

11:47:17    5         THE COURT:   We can dim the lights a little bit.

11:47:20    6         MS. DURST:   Okay.

11:47:21    7         THE COURT:   See if that helps.

11:47:23    8         MS. DURST:   It helps a bit, Your Honor.

11:47:25    9         THE COURT:   Can everyone see that exhibit okay on

11:47:27   10    monitors in the box?  I'm seeing unanimous head shakes, so you

11:47:32   11    may proceed, Ms. Durst.

11:47:32   12         MS. DURST:   Thank you, Your Honor.

11:47:33   13    BY MS. DURST:

11:47:34   14    Q.   Lieutenant Branham, are you able to see the pipe that you

11:47:36   15    were discussing with Mr. Umina on photograph number 27 of

11:47:39   16    Defendant's Exhibit No. 1?

11:47:40   17    A.   Yes.

11:47:41   18    Q.   Okay.  Would you agree that that pipe is not directly

11:47:45   19    behind the Jeep?

11:47:47   20    A.   No, it's to the left of the Jeep if you're looking at the

11:47:49   21    rear of the Jeep.

11:47:50   22    Q.   Okay.  And Mr. Umina had shown you a photograph, and it

11:47:58   23    was Exhibit -- Plaintiff's Exhibit No. 19, and asked you if

11:48:01   24    you had seen any evidence of tire spinning or anything like

11:48:04   25    that.  You said not in that photograph, you couldn't see any

| | | |
|---|---|---|
| 11:48:08 | 1 | tracks.  Do you recall that? |
| 11:48:09 | 2 | A.  Yes, ma'am. |
| 11:48:09 | 3 | Q.  Are you able to look through these photographs, for |
| 11:48:12 | 4 | instance if you look at Plaintiff's Number -- or excuse me, |
| 11:48:14 | 5 | Defendant's Number 25.  Are you able to see any evidence that |
| 11:48:23 | 6 | appears that the Jeep may have been in a location different |
| 11:48:27 | 7 | than where it was when you arrived? |
| 11:48:30 | 8 | A.  It's kind of hard to tell from this photograph.  It |
| 11:48:33 | 9 | appears that there's some tire tracks that correspond with |
| 11:48:37 | 10 | that vehicle in that photograph. |
| 11:48:39 | 11 | Q.  Can you describe for the jury where those tire tracks |
| 11:48:43 | 12 | appear to be? |
| 11:48:44 | 13 | A.  To the rear of the Jeep. |
| 11:48:46 | 14 | Q.  If there were tire tracks from the rear of the Jeep when |
| 11:48:53 | 15 | you arrived, would you have any information as to any other |
| 11:48:57 | 16 | vehicle making those tire tracks? |
| 11:49:00 | 17 | A.  No, ma'am. |
| 11:49:00 | 18 | Q.  Are you able to look at, if you would -- let me get the |
| 11:49:06 | 19 | number -- Defendant's 26.  Are you able to see generally the |
| 11:49:13 | 20 | same tire tracks in that photograph? |
| 11:49:17 | 21 | A.  Somewhat, yes, ma'am.  There are disturbances within the |
| 11:49:21 | 22 | brush there. |
| 11:49:22 | 23 | Q.  Okay.  Do me a favor, if you would, and just to be clear |
| 11:49:26 | 24 | for Lieutenant Branham, these are not photographs that |
| 11:49:27 | 25 | Mr. Umina had gone over with you, correct? |

301

| | |
|---|---|
| 11:49:30 | 1 |

A.   I don't recall these, no, ma'am.

Q.   Would you look at photograph number 30?  Do you have photograph number 30, Lieutenant Branham?

A.   Yes, ma'am.

Q.   What do you believe number 30 shows?

A.   Number 30, if you look towards the left portion of that photograph, there is a disturbance in what appears to be dirt in the vegetation area.

Q.   And was this in the area that would have been behind the Jeep?

A.   Yes, ma'am.

Q.   So do you believe, Lieutenant Branham, based on the photographs that you documented on the day of your investigation that there was evidence of the Jeep being in a position different than it was when you arrived?

A.   That's correct.

Q.   And evidence of what has been referred to, to some extent, ground surface?

A.   Yes, that's why I took a photo of that.

Q.   Now, let's talk about the --

        MS. DURST:  Your Honor, if we -- if you would like, we can bring the lights back up at this point.

        THE COURT:  We'll do that.

        MS. DURST:  Thank you.

BY MS. DURST:

11:50:48  1    Q.   Lieutenant Branham, you talked a bit about the cruiser

11:50:51  2    and the Jeep, okay?  Mr. Umina had shown you some portions

11:50:57  3    from your report that indicated that the cruiser was running

11:51:03  4    and in drive?

11:51:04  5    A.   That's correct.

11:51:05  6    Q.   Did you learn or come to obtain any information as to how

11:51:10  7    when you arrived on the scene the cruiser may have still been

11:51:14  8    in drive?

11:51:15  9    A.   Based off statements, I believe Deputy Forsyth advised

11:51:18  10   that he jumped out of the vehicle, I would say in the spur of

11:51:24  11   the moment, he might not have realized that it was not in

11:51:28  12   park.

11:51:29  13   Q.   So would you -- is it safe to say that the photograph

11:51:33  14   that you have of the cruiser is not the photograph that would

11:51:38  15   show where Deputy Forsyth actually exited?

11:51:42  16   A.   No, that's where the vehicles came to rest in that area.

11:51:45  17   Q.   Okay.  You also testified about the Jeep, and I think you

11:51:51  18   have admitted you've never operated a manual transmission?

11:51:55  19   A.   No, ma'am.

11:51:55  20   Q.   Okay.  And so have you come to learn, Lieutenant Branham,

11:52:01  21   that a manual transmission cannot set idle in gear if no one

11:52:07  22   is in it depressing the clutch?

11:52:10  23   A.   Yes, ma'am.

11:52:11  24   Q.   Okay.  Do you know if the Jeep was in gear or not when

11:52:15  25   you got there?

11:52:16   1   A.   No, ma'am, it's just what it appeared to be as.

11:52:22   2   Q.   Okay.  The photographs that we looked at, the cruiser

11:52:26   3   door, when Deputy Forsyth's cruiser is open, do you recall

11:52:29   4   those photos?

11:52:30   5   A.   Yes, ma'am.

11:52:30   6   Q.   Okay.  Is that the way it was when you got there?

11:52:35   7   A.   Yes.

11:52:35   8   Q.   The Jeep, the door was closed; is that right?

11:52:41   9   A.   I believe the Jeep, yes, the Jeep door was closed.

11:52:46   10   Q.   Would you agree with me that in order for Mr. Rhoades to

11:52:50   11   have been removed from the Jeep, the door would have had to

11:52:54   12   have been open at some point?

11:52:56   13   A.   Yes, ma'am.

11:52:56   14   Q.   Do you know how the door was closed?

11:52:59   15   A.   No, I do not.

11:52:59   16   Q.   Do you know who closed it?

11:53:01   17   A.   No, I do not.

11:53:02   18   Q.   Do you know when it was closed?

11:53:03   19   A.   I would say it was at some point after this incident,

11:53:06   20   after Mr. Rhoades was removed from the vehicle.

11:53:09   21   Q.   But don't know at what point in time between when he was

11:53:12   22   removed and when you arrived on scene?

11:53:14   23   A.   No, ma'am, I do not.

11:53:15   24   Q.   Okay.  Are you aware, Lieutenant Branham, if there was

11:53:22   25   ever any determination made as to which bullet that was fired

11:53:26  1    by Deputy Forsyth was actually the one that killed

11:53:30  2    Mr. Rhoades?

11:53:31  3    A.   No, ma'am.

11:53:32  4    Q.   And I think you said you thought that maybe he had fired

11:53:35  5    seven rounds?

11:53:36  6    A.   I believe so, yes.

11:53:37  7    Q.   Did you ever make any determination as to whether that

11:53:42  8    Deputy Forsyth may have started firing as the Jeep came at

11:53:46  9    him, the Jeep continues to move and then the last bullet is

11:53:50  10   the one that struck and killed Mr. Rhoades?

11:53:53  11   A.   There was seven rounds fired, I was advised the vehicle

11:53:56  12   was traveling towards him, I can't -- I could not tell you

11:53:59  13   which one actually struck Mr. Rhoades.

11:54:01  14   Q.   And you would agree that there is evidence in these

11:54:04  15   photographs that you and I have just gone over, that the Jeep

11:54:06  16   had moved forward at some point in time before you took the

11:54:10  17   photographs?

11:54:11  18   A.   Yes, it appears that way.

11:54:13  19   Q.   Now, we've talked about the statements that you took from

11:54:29  20   Deputy Forsyth and Deputy Love, and you indicated that you had

11:54:32  21   gone to the hospital and to see about taking a statement; is

11:54:36  22   that right?

11:54:37  23   A.   That's correct.

11:54:38  24   Q.   Okay.  And you think you told the jury that Deputy

11:54:41  25   Forsyth had indicated to you that he wished to speak with you

11:54:44   1   at a later time?

11:54:45   2   A.   Yes.

11:54:46   3   Q.   Did Deputy Forsyth indicate to you that he was going to

11:54:49   4   refuse to provide any statement to you?

11:54:52   5   A.   No, he did not.

11:54:53   6   Q.   With regard to Deputy Forsyth's statement, I think you

11:55:01   7   had discussed with Mr. Umina you thought he may have come with

11:55:05   8   a, like a written or typed statement?

11:55:08   9   A.   Yes.

11:55:08  10   Q.   Did the fact that Deputy Forsyth may have come with a

11:55:14  11   typed statement stop you or impair you in any way from asking

11:55:19  12   any follow-up questions that you thought you needed to

11:55:22  13   question him about?

11:55:24  14   A.   No.

11:55:24  15   Q.   Did you actually ask follow-up questions of Deputy

11:55:28  16   Forsyth?

11:55:28  17   A.   I believe I did, yes.

11:55:29  18   Q.   Was there anything that Deputy Forsyth was asked by you

11:55:36  19   that he refused to answer?

11:55:38  20   A.   No, ma'am.

11:55:39  21   Q.   And you were also asked questions about treating this as

11:55:44  22   a homicide investigation, right?

11:55:46  23   A.   Yes.

11:55:47  24   Q.   Is it frequently -- or are there times where you might be

11:55:50  25   interviewing someone as part of a homicide investigation, they

11:55:54   1   come with an attorney?

11:55:55   2   A.   Yes.

11:55:56   3   Q.   Did Deputy Forsyth come and voluntarily give a statement

11:55:59   4   to you without an attorney?

11:56:01   5   A.   Yes, he came voluntarily.

11:56:03   6   Q.   How many investigations would you say you've conducted

11:56:12   7   over your 23 years?

11:56:13   8   A.   Hundreds.

11:56:14   9   Q.   Do you frequently take statements?

11:56:16   10   A.   Yes.

11:56:17   11   Q.   As an officer I think probably around -- well, let me ask

11:56:23   12   this way.  In 2017, when you took this statement from

11:56:26   13   Deputy Forsyth and Deputy Love, how long had you been with the

11:56:30   14   state police?

11:56:30   15   A.   At that time that was --

11:56:30   16   Q.   '17?

11:56:35   17   A.   '17.  I would have been with the state police

11:56:38   18   approximately 20, 21 years.

11:56:40   19   Q.   As an investigating officer with 20 or 21 years of

11:56:46   20   experience, taking hundreds of statements from witnesses, did

11:56:49   21   you have any sense that Deputy Forsyth was being less than

11:56:53   22   truthful or withholding any information from you?

11:56:55   23   A.   No.

11:56:55   24   Q.   Do you believe deputy -- excuse me, Lieutenant Branham,

11:57:06   25   that you conducted a thorough interview of Deputy Forsyth to

11:57:11  1   get the information you needed to complete your investigation?

11:57:14  2   A.   At the time, yes, or I would have probably had a longer

11:57:19  3   interview with him.

11:57:20  4   Q.   Would you have stopped your interview with him if there

11:57:23  5   were questions that still remained in your mind?

11:57:25  6   A.   No.

11:57:26  7   Q.   The same questions with regard to Deputy Love.  Did

11:57:33  8   Deputy Love refuse to answer any questions that you asked of

11:57:37  9   him?

11:57:37  10  A.   No, he did not.

11:57:38  11  Q.   I think you said he may have come with a written

11:57:42  12  statement as well?

11:57:43  13  A.   Yes.

11:57:43  14  Q.   Did the fact that he came with a written statement

11:57:47  15  interfere or impair your ability to question him?

11:57:51  16  A.   No.

11:57:51  17  Q.   Did you ask follow-up questions of Deputy Love as well?

11:57:56  18  A.   I believe I did.

11:57:57  19  Q.   Did Deputy Love come with or without an attorney?

11:58:04  20  A.   He did not have an attorney.

11:58:05  21  Q.   In conducting the interviews that you conducted of

11:58:12  22  Deputy Forsyth and Deputy Love, as the investigating officer,

11:58:17  23  did you find what you thought to be any inconsistencies in

11:58:21  24  their statements?

11:58:22  25  A.   No.

11:58:23  1    Q.   I wanted to ask you a question.  We talked about in the

11:58:43  2    report, you had listed the weapon as a vehicle.

11:58:46  3         Do you recall that?

11:58:46  4    A.   Yes.

11:58:47  5    Q.   Okay.  Did you ask or did Deputy Forsyth tell you whether

11:58:52  6    he saw Mr. Rhoades with any weapon?

11:58:56  7    A.   I believe he stated he did not observe any weapons.

11:58:59  8    Q.   Do you recall Deputy Forsyth telling you that he saw

11:59:03  9    Mr. Rhoades leaning toward the floorboard or the console?

11:59:10  10   A.   Leaning towards the console area I believe.

11:59:12  11   Q.   You listened -- let me ask this.  As part of the

11:59:21  12   investigation we talked about you took statements, that you

11:59:24  13   also took photographs.  Were there other aspects of your

11:59:28  14   investigation, such as, did you obtain the radio traffic from

11:59:32  15   the 911 center?

11:59:34  16   A.   Yes, I did.

11:59:34  17   Q.   Did you listen to that radio traffic?

11:59:37  18   A.   Yes, at some point.

11:59:38  19   Q.   Do you recall, Lieutenant Branham, that part of that

11:59:44  20   radio traffic indicated that Mr. Rhoades may have been armed?

11:59:48  21   A.   Yes.

11:59:57  22        THE COURT:  Ms. Durst, while you're pausing, not to

12:00:03  23   interrupt your train of thought, let me ask how much longer

12:00:06  24   you may have?

12:00:06  25        MS. DURST:  Probably not even more than two minutes,

12:00:08  1   Your Honor.

12:00:09  2          THE COURT:  All right.  Thank you.

12:00:10  3          MS. DURST:  No problem, Your Honor.  Just kind of

12:00:12  4   weeding through some of the things that have already been

12:00:14  5   asked.

12:00:15  6   BY MS. DURST:

12:00:17  7   Q.   Leaving aside the issue then we just talked about,

12:00:19  8   Lieutenant Branham, that Deputy Forsyth told you, "I didn't

12:00:23  9   see him have a weapon, I saw him reaching toward the console,

12:00:26  10  but I didn't see a weapon."

12:00:29  11         Okay.  Leave aside that information.  Was the information

12:00:30  12  that you obtained during your investigation that the Jeep that

12:00:36  13  we have seen on these photographs, was moving toward

12:00:40  14  Deputy Forsyth at the time he fired his weapon?

12:00:43  15  A.   Yes, I believe it was moving.

12:00:45  16  Q.   Did you obtain any information through your investigation

12:00:49  17  that Philip Rhoades was stopped in the Jeep at the time

12:00:53  18  Deputy Forsyth fired his weapon?

12:00:56  19  A.   No.

12:00:58  20         MS. DURST:  Your Honor, those are all of the

12:01:00  21  questions I have for Lieutenant Branham.

12:01:03  22         THE COURT:  Thank you.  Mr. Umina, I assume you have

12:01:05  23  some redirect, sir?

12:01:06  24         MR. UMINA:  I do, Your Honor.  I'd actually like to

12:01:07  25  start with this photograph.  Could we please leave this up for

| | | |
|---|---|---|
| 12:01:10 | 1 | a moment? |
| 12:01:11 | 2 | THE COURT:  Well, actually what I was planning on |
| 12:01:13 | 3 | doing was taking a break so the jurors and everyone else can |
| 12:01:15 | 4 | go to lunch and then pick back up. |
| 12:01:15 | 5 | MR. UMINA:  Oh, that's great. |
| 12:01:19 | 6 | THE COURT:  How long do you anticipate having, I just |
| 12:01:21 | 7 | assumed it was -- |
| 12:01:22 | 8 | MR. UMINA:  Less than ten minutes. |
| 12:01:23 | 9 | THE COURT:  I will hold you to that, sir. |
| 12:01:25 | 10 | Ladies and gentlemen, I will police our lunchtime |
| 12:01:29 | 11 | vigorously.  Mr. Umina, you may proceed, thank you. |
| 12:01:31 | 12 | MR. UMINA:  I take lunchtime very seriously. |
| 12:01:35 | 13 | THE COURT:  I understand. |
| 12:01:36 | 14 | REDIRECT EXAMINATION |
| 12:01:36 | 15 | BY MR. UMINA: |
| 12:01:39 | 16 | Q.   Sergeant Branham, the insinuation that was just made is |
| 12:01:42 | 17 | effectively these are evidence of tires spinning behind the |
| 12:01:47 | 18 | Jeep prior to it rapidly accelerating at the defendant as he |
| 12:01:56 | 19 | alleges. |
| 12:01:57 | 20 | A.   That's correct. |
| 12:01:58 | 21 | MR. UMINA:  Okay.  My copy is not numbered. |
| 12:02:04 | 22 | MS. DURST:  Oh, I'm sorry. |
| 12:02:05 | 23 | MR. UMINA:  Can we have this photograph?  I think |
| 12:02:08 | 24 | it's -- or I can use the other one. |
| 12:02:15 | 25 | (Off the record discussion.) |

12:02:37  1        MR. UMINA:  Can we go to 25 really quickly, please.

12:02:37  2    BY MR. UMINA:

12:02:41  3    Q.   Okay.  So when we look at this photo, that to the right

12:02:50  4    of the Jeep and all back through there, that's a ditch, right,

12:02:54  5    and then a big hillside starts?

12:02:56  6    A.   I would classify it as a ditch, yes.

12:02:58  7        MR. UMINA:  And can we go back to number 30, please?

12:03:06  8    Q.   Okay.  So ** these tire marks to have occurred, the Jeep

12:03:12  9    would have been having to come out of the ditch facing

12:03:16  10   outward, right?  The way -- with the direction that those

12:03:20  11   tires marks are facing because behind it is a ditch?

12:03:24  12   A.   Or to the side of it and maybe steering, I guess it would

12:03:27  13   be to the left.

12:03:28  14   Q.   So he would have had to have turned, you're saying.

12:03:33  15   You're saying he would have had to spun the tires and then

12:03:36  16   turned out of the ditch to get into the position of the Jeep's

12:03:39  17   final resting place?

12:03:39  18   A.   This -- this photograph shows what appears to be a

12:03:42  19   disturbance there.  It's kind of hard to tell from this

12:03:46  20   photograph since it's so close up on where the tire marks

12:03:49  21   would have went or where this is in relation to the Jeep --

12:03:52  22   Q.   My point is that -- not to interrupt you.

12:03:55  23        Back behind here, is a ditch to the right of the ** bowl.

12:04:02  24   So these tire marks are coming in this direction out of the

12:04:07  25   ditch.  And we know over here, this is all brush.  This is the

12:04:11  1   point I'm making.

12:04:13  2        So for these tire marks to have been made by the Jeep --

12:04:17  3            MR. UMINA:  Can we go back to 25, please?

12:04:23  4   Q.   It would have had to have been coming in this direction,

12:04:27  5   not in this direction, because there is a ditch right here.

12:04:33  6   A.   There is a small ditch there, yes, sir.

12:04:36  7   Q.   Yes.  And from the direction from the tire -- the alleged

12:04:39  8   tire marks in that photo, that Jeep, if it went straight at

12:04:43  9   the defendant as he claimed, couldn't have been coming from

12:04:46  10  there with the direction of those tires, could it?

12:04:49  11  A.   I'm not sure if I'm following you on that question.  I'm

12:04:53  12  looking at another -- the actual tire marks coming out, I

12:04:57  13  don't know if the vehicle -- that mark was made by a vehicle

12:05:01  14  maybe coming, I guess, parallel with the ditch and turning.

12:05:05  15  Q.   Yeah.  But it wasn't made -- if that Jeep was back a car

12:05:11  16  length, it could have been in a ditch, and with the direction

12:05:14  17  of those facing out from the ditch, those are opposite

12:05:17  18  directions.  The direction of the tire marks are this way, the

12:05:21  19  Jeep is facing this way.

12:05:22  20  A.   Yes.

12:05:23  21  Q.   Thank you, Sergeant Branham.

12:05:27  22       Now, you never called, like, the gas well company and

12:05:30  23  confirmed that they hadn't, like, recently serviced that or

12:05:33  24  anything, have you?

12:05:33  25  A.   No, sir, I did not.

| 12:05:34 | 1 | Q.   Okay.  And I mean, we're looking at what's more likely |

12:05:34   1   Q.   Okay.  And I mean, we're looking at what's more likely

12:05:37   2   than not.  The tire marks are coming this way, and that oil

12:05:42   3   and gas equipment is there, that could have likely just been

12:05:45   4   an oil and gas truck servicing this or anything?

12:05:49   5   A.   I'm not sure if it was serviced.  That looked like a

12:05:52   6   fresh disturbance is why I took a picture of it.

12:05:54   7   Q.   But in any event, they were coming in this direction, not

12:05:58   8   in that direction?

12:05:58   9   A.   I can't tell you which direction it looks like they're

12:06:03   10   going from that photo.  It looks like it's along with a ditch

12:06:05   11   almost, parallel with it.

12:06:08   12          MR. UMINA:  Can you we go back to 30?

12:06:10   13   Q.   The ditch runs this way.  The tire, if it is, is coming

12:06:20   14   this way.

12:06:22   15   A.   Okay.

12:06:22   16   Q.   In this direction?

12:06:23   17   A.   Yes.

12:06:24   18   Q.   That's perpendicular to the ditch.

12:06:26   19   A.   Yes.

12:06:27   20   Q.   Thank you.  About four questions for you.  She mentioned

12:06:33   21   assault on a law enforcement officer, okay?  That was solely

12:06:39   22   based upon the statements the pre-prepared written statements

12:06:43   23   by the defendant and Corey Love, correct?

12:06:47   24   A.   It's not solely based on that, and evidence that was at

12:06:50   25   the scene and with a vehicle involved, yes.

12:06:51  1    Q.   Are you familiar with the concept of confirmation bias?

12:06:55  2    A.   No, sir.

12:06:56  3    Q.   As an investigator you're not aware of what confirmation

12:06:59  4    bias is?

12:07:00  5    A.   No, sir.

12:07:01  6    Q.   If I tell you that it is the tendency to see evidence as

12:07:04  7    a preconceived theory and you attempt to make that evidence

12:07:07  8    fit that theory, would you have any reason to disagree with

12:07:09  9    me?

12:07:09  10   A.   I couldn't tell you what the definition of that is.

12:07:11  11   Q.   Okay.  So when you went there and viewed this evidence,

12:07:14  12   you viewed this evidence through the lens of the story the

12:07:17  13   defendant told you?

12:07:19  14   A.   When I viewed this evidence at the scene, I hadn't talked

12:07:23  15   to the defendant.

12:07:23  16   Q.   When you determined it was assault on an officer?

12:07:25  17   A.   When I completed the report, yes, sir.

12:07:27  18   Q.   Okay.  And that was, again, based on the theory that the

12:07:30  19   defendant gave you?

12:07:31  20   A.   Based on statement.

12:07:32  21   Q.   Okay.  Now, we just addressed the issue of a weapon and I

12:07:40  22   really want to address this issue here.  It is your

12:07:45  23   understanding the defendant did not -- he was not armed?

12:07:47  24   A.   No, sir, he was not.

12:07:48  25   Q.   And the defendant never claimed him being armed as a

| | | |
|---|---|---|
| 12:07:53 | 1 | reason for shooting him.  He claimed solely that the Jeep was |
| 12:07:57 | 2 | moving to you.  That's fair, right? |
| 12:07:59 | 3 | A.   Yes, sir. |
| 12:07:59 | 4 | Q.   It's not anything having to do with him allegedly being |
| 12:08:03 | 5 | armed? |
| 12:08:03 | 6 | A.   No, sir, it is not. |
| 12:08:05 | 7 | Q.   Okay.  So, again, his sole reason for using force in this |
| 12:08:10 | 8 | shooting was his claim that the Jeep was rapidly accelerating |
| 12:08:18 | 9 | towards him? |
| 12:08:18 | 10 | A.   The vehicle was traveling towards him, yes, sir. |
| 12:08:21 | 11 | Q.   Okay.  Now you just said there is no evidence that the |
| 12:08:25 | 12 | Jeep wasn't doing what the defendant claims, at least when you |
| 12:08:29 | 13 | looked at it. |
| 12:08:30 | 14 | A.   It appeared to be that way, yes, sir. |
| 12:08:32 | 15 | Q.   Okay.  But we now know it's impossible that the vehicle |
| 12:08:39 | 16 | was in gear when you arrived. |
| 12:08:43 | 17 | A.   Yes, sir, I have learned that after the fact since I |
| 12:08:46 | 18 | wasn't familiar with the standard, that's what it appeared to |
| 12:08:49 | 19 | me at that time. |
| 12:08:50 | 20 | Q.   So the fact that we have someone who was killed and |
| 12:08:54 | 21 | immediately when the shot hit them, paralyzed them from the |
| 12:08:58 | 22 | neck down, couldn't touch anything, meaning he couldn't have |
| 12:09:02 | 23 | shifted it out of gear, and the fact that we know now that the |
| 12:09:05 | 24 | Jeep was in neutral, when you arrived, that evidence would |
| 12:09:10 | 25 | contradict the defendant's story, wouldn't it?  The story that |

316

| | | |
|---|---|---|
| 12:09:14 | 1 | it was in gear? |
| 12:09:15 | 2 | A.   The story that it was in gear after he was shot? |
| 12:09:18 | 3 | Q.   Yes.  When he was shot, because he couldn't touch it |
| 12:09:21 | 4 | after he was shot, and he testified that he didn't touch it |
| 12:09:24 | 5 | and Corey didn't touch it, and everyone has testified they |
| 12:09:28 | 6 | didn't touch that gear shift.  So no one touched the gear |
| 12:09:30 | 7 | shift.  The person who was killed couldn't have done anything |
| 12:09:33 | 8 | to the gear shifter and it wasn't in gear when you arrived |
| 12:09:36 | 9 | 45 minutes later, that would contradict the fact that the Jeep |
| 12:09:41 | 10 | was in gear, which is what he claims.  That's fair, right? |
| 12:09:44 | 11 | A.   Yes, sir. |
| 12:09:44 | 12 | Q.   Okay.  And you would agree if the Jeep wasn't in gear |
| 12:09:48 | 13 | then he's liable for the death. |
| 12:09:54 | 14 | A.   If the Jeep wasn't -- I can't -- if the Jeep, if it was |
| 12:09:56 | 15 | not in gear afterwards, I can't tell whether the Jeep was in |
| 12:09:59 | 16 | gear during this incident. |
| 12:10:01 | 17 | Q.   If it wasn't in gear when he shot him, he's lying, |
| 12:10:04 | 18 | though, isn't it? |
| 12:10:05 | 19 | A.   If it was not in gear? |
| 12:10:06 | 20 | Q.   Yes. |
| 12:10:07 | 21 | A.   I'm not going to make a legal determination of whether he |
| 12:10:10 | 22 | is liable or not.  I would say that the vehicle wouldn't be |
| 12:10:12 | 23 | traveling if it wasn't in gear, it wouldn't have traveled |
| 12:10:15 | 24 | towards ** in. |
| 12:10:15 | 25 | Q.   And so his justification would be false? |

| | | |
|---|---|---|
| 12:10:17 | 1 | A.   I would say so. |
| 12:10:19 | 2 | Q.   Thank you, Sergeant Branham -- I mean, Lieutenant, I |
| 12:10:21 | 3 | apologize, no further questions. |
| 12:10:24 | 4 | THE COURT:  Thank you, Mr. Umina. |
| 12:10:25 | 5 | Ms. Durst, any recross? |
| 12:10:27 | 6 | MS. DURST:  I think just a couple, Your Honor, I'll |
| 12:10:28 | 7 | make it brief. |
| 12:10:30 | 8 | RECROSS-EXAMINATION |
| 12:10:30 | 9 | BY MS. DURST: |
| 12:10:31 | 10 | Q.   Lieutenant Branham, Mr. Umina asked you about |
| 12:10:34 | 11 | confirmation bias and asked you some questions about how you |
| 12:10:38 | 12 | decide when you go in and do an investigation.  Did you |
| 12:10:40 | 13 | conduct a biased investigation? |
| 12:10:42 | 14 | A.   No, ma'am. |
| 12:10:42 | 15 | Q.   Do you believe you conducted a thorough investigation |
| 12:10:46 | 16 | into this incident? |
| 12:10:47 | 17 | A.   Yes. |
| 12:10:48 | 18 | Q.   We talked about that you submit your report to the |
| 12:10:53 | 19 | district commander, and then the commander signs off on it, |
| 12:10:56 | 20 | right? |
| 12:10:57 | 21 | A.   That's correct. |
| 12:10:57 | 22 | Q.   Okay.  After you complete your report, and at some point |
| 12:11:03 | 23 | in this case, I believe -- we took your deposition in this |
| 12:11:10 | 24 | case July 11 of 2019, does that sound about right? |
| 12:11:13 | 25 | A.   That's correct. |

12:11:14    1    Q.   And around that time there were questions asked of you

12:11:18    2    during that deposition about the Jeep being in gear versus

12:11:20    3    being in neutral.  Do you remember those questions generally

12:11:23    4    during your deposition?

12:11:23    5    A.   Yes, ma'am.

12:11:23    6    Q.   Since that time, have you made any revisions or changes

12:11:27    7    to the August 14th, 2017, report that you prepared?

12:11:32    8    A.   No, I have not.

12:11:33    9    Q.   Mr. Umina was also asking you questions about whether if

12:11:37   10    the Jeep was in gear or if it was in neutral, if it was in

12:11:41   11    neutral then Deputy Forsyth couldn't have -- it couldn't have

12:11:45   12    happened the way Deputy Forsyth said.

12:11:47   13         Do you recall that just generally?

12:11:48   14    A.   Yes.

12:11:49   15    Q.   Okay.  Do you know what may have happened inside the Jeep

12:11:54   16    with Mr. Rhoades before a bullet lacerated his neck?

12:11:59   17    A.   No, I do not.

12:12:00   18    Q.   Don't know whether he was in the middle of shifting gears

12:12:03   19    as he was revving the engine toward Deputy Forsyth?

12:12:07   20    A.   I do not.

12:12:10   21         MS. DURST:  Those are all the questions I have,

12:12:12   22    Lieutenant Branham.

12:12:13   23         THE COURT:  Thank you, Ms. Durst.

12:12:16   24    Mr. Umina, anything further from Lieutenant Branham, sir?

12:12:21   25         MR. UMINA:  No, Your Honor, nothing further.

12:12:23   1          THE COURT:  Understood.  Ladies and gentlemen, we've

12:12:25   2   reached a point in our proceedings today where we are going to

12:12:28   3   take a lunch break, sneaking up on 12:15.  If I could ask you

12:12:33   4   to be back here at 1:15 ready to proceed.  We'll be ready to

12:12:38   5   hear from our next witness at that point in time.

12:12:41   6          Of course, my prior instructions still stand.  Please

12:12:44   7   refrain from discussing this case with anyone including any of

12:12:47   8   your fellow jurors at this point in time, and any non-jurors

12:12:53   9   of course.  Also, please continue to refrain from any

12:12:56  10   independent investigation efforts about this case or about any

12:12:59  11   issues we've discussed so far in this case.

12:13:01  12          At this point, we thank you for your time and attention

12:13:05  13   this morning and we'll see you back here at 1:15.  Thank you

12:13:09  14   all very much.

12:13:10  15          (Jury excused.)

12:13:35  16          THE COURT:  You called Lieutenant Branham.  May he be

12:13:38  17   excused?  I'll throw that question to everybody.

12:13:40  18          MR. UMINA:  He may be excused.

12:13:42  19          MS. DURST:  Your Honor, we had him subpoenaed for

12:13:43  20   today and tomorrow, not knowing, he can be released from our

12:13:46  21   subpoena.

12:13:46  22          THE COURT:  All right.  So he's not subject to

12:13:48  23   recall.  Thank you for being here today, you're free to go,

12:13:50  24   sir.

12:13:52  25          THE WITNESS:  Yes, sir.  Thank you.

12:13:54    1              THE COURT:  Thank you.  Anything we need to take up

12:13:55    2    at this point in time, Counsel?

12:13:57    3              MR. UMINA:  Just lunch, Your Honor.

12:13:59    4              MS. DURST:  No, Your Honor.

12:14:00    5              THE COURT:  All right.  Who will be our next witness,

12:14:02    6    Mr. Umina?

12:14:03    7              MR. UMINA:  It will be Dr. Savasman.

12:14:05    8              THE COURT:  All right.  If I could ask you to let him

12:14:07    9    know of that fact and we'll start at 1:15.  Thank you all very

12:14:11   10    much.

01:17:53   11         (Lunch break taken at 12:14 p.m. until 1:17 p.m.)

01:17:53   12              THE COURT:  Mr. Umina, anything we need to take up

01:17:55   13    before we call jury back?

01:17:57   14              MR. UMINA:  Your Honor, just briefly before they come

01:18:00   15    back.  We are stipulating to the use of certain radio

01:18:10   16    transmissions.

01:18:10   17              THE COURT:  Yes.

01:18:12   18              MR. UMINA:  Defendant Forsyth will be the witness

01:18:15   19    after the medical examiner who we're about to call.  So we're

01:18:20   20    not going to require them to lay a foundation or anything,

01:18:22   21    they can utilize that during their cross-examination.

01:18:25   22              THE COURT:  All right.  Thank you for the heads up.

01:18:27   23              MS. DURST:  Yes, Your Honor, and we discussed subject

01:18:29   24    to the objection that the Court ruled on with regard to that

01:18:31   25    one clip, everything else would revert to anyway, we wanted to

01:18:36   1   bringing that to the Court's attention.

01:18:38   2        MR. UMINA:  I'm sorry.  And this just came up, but

01:18:42   3   one of our witnesses, Rick Rhoades, he normally wears a

01:18:46   4   hearing aid, well, we just found out that he's now having an

01:18:49   5   issue with one of those hearing aids.  He will -- we have a

01:18:52   6   few things to do before that, and I'm guessing we'll certainly

01:18:56   7   get that afternoon break, so we may need a moment to test

01:19:00   8   out -- I'm assuming the Court has something for audio?

01:19:00   9        THE COURT:  We do.  We absolutely do.

01:19:05  10        MR. UMINA:  And to try and test that, because he

01:19:07  11   literally just had an issue with one of his hearing aids.

01:19:09  12        THE COURT:  That's fine.  We'll use our afternoon

01:19:11  13   break to test that regardless of where we are in terms of

01:19:14  14   witness order.

01:19:18  15      Ms. Durst, what exhibit number is the stipulated to audio

01:19:21  16   recording?

01:19:21  17        MS. DURST:  It will be Defendant's Exhibit No. 2,

01:19:25  18   Your Honor.  And if you give me one second I can tell you.  It

01:19:29  19   would have been included in our exhibit binder on the disk

01:19:34  20   that we had provided that -- I think it's from Exhibit

01:19:38  21   Number -- it would have been under tab 6, but we would have

01:19:42  22   provided a disk.  So obviously it's only portions now of the

01:19:47  23   August 2nd radio traffic.

01:19:50  24        THE COURT:  Understood.  But for our record here,

01:19:52  25   it's Defendant's 2.

01:19:53    1        MS. DURST:  Yes, Your Honor.  And Madam Clerk had

01:19:56    2   advised me, we have it saved on Mr. Carroll's computer, but

01:19:59    3   she said as long as we get her a flash drive that we can mark

01:20:02    4   as Exhibit No. 2 before we conclude the trial.  We will make

01:20:06    5   sure that we do that.

01:20:07    6        THE COURT:  Understood, and I thank you very much.

01:20:10    7   Thank you.

01:20:10    8      Anything else, Mr. Umina?

01:20:13    9        MR. UMINA:  Not at this time.

01:20:14   10        THE COURT:  Okay.  Ms. Durst, anything further?

01:20:16   11        MS. DURST:  No, Your Honor.

01:20:16   12        THE COURT:  Can we have our jury then please?  Thank

01:20:19   13   you.

01:21:13   14      (The jury entered the courtroom at 1:21 p.m.)

01:21:13   15        THE COURT:  With no further issues, Mr. Umina, you

01:21:17   16   may call your next witness.

01:21:18   17        MR. UMINA:  Your Honor, plaintiff calls Dr. Metin

01:21:24   18   Savasman.

01:21:26   19        THE COURT:  Thank you very much.

01:21:46   20      Doctor, if I can ask you to pause here so you can be

01:21:50   21   sworn in.

01:21:55   22      METIN SAVASMAN, M.D., PLAINTIFF'S WITNESS, SWORN

01:22:10   23        THE COURT:  Good afternoon, Doctor, thank you very

01:22:12   24   much.  If I could ask you to adjust that microphone once

01:22:15   25   you're comfortable.  Please remove your mask while you're

323

01:22:18    1    testifying.  Thank you so much.

01:22:20    2        Mr. Prince, you may proceed, sir.

01:22:24    3            MR. PRINCE:  Thank you, Your Honor.

01:22:24    4                        DIRECT EXAMINATION

01:22:24    5    BY MR. PRINCE:

01:22:25    6    Q.   Dr. Savasman, will you please state your full name?

01:22:29    7    A.   Can Metin Savasman.  C-A-N.  M-E-T-I-N.  S-A-V-A-S-M-A-N.

01:22:40    8    Q.   Where are you currently employed?

01:22:42    9    A.   In Charleston, medical examiner office, West Virginia

01:22:48   10    State Medical Examiner Office.

01:22:50   11    Q.   And are you a deputy chief medical examiner in that

01:22:55   12    office?

01:22:55   13    A.   Correct.  Also I'm forensic pathologist.

01:22:59   14    Q.   And as part of that position, do you perform autopsies?

01:23:03   15    A.   Correct, sir.

01:23:05   16    Q.   Were you working as a deputy chief medical examiner for

01:23:10   17    the State of West Virginia, on August 3, 2017?

01:23:13   18    A.   Correct, sir.

01:23:13   19    Q.   Did you perform an autopsy on Philip Rhoades on

01:23:20   20    August 3rd, 2017?

01:23:21   21    A.   Correct, sir.

01:23:22   22    Q.   What was the cause of death for Philip Rhoades?

01:23:25   23    A.   At this point, can I find the report that I signed?

01:23:29   24    Q.   Yes.

01:23:30   25            MR. PRINCE:  May I approach, Your Honor?

01:23:31   1          THE COURT:  You may.

01:23:33   2   BY MR. PRINCE:

01:23:37   3   Q.   Dr. Savasman, I am handing you the autopsy report that

01:23:40   4   you just referenced.

01:23:42   5   A.   Thank you.  Can you repeat the question, please?

01:23:53   6   Q.   Yes, sir.  Please take a moment and review what I've just

01:23:56   7   handed you, if you don't mind.

01:24:13   8   A.   I did it.

01:24:14   9   Q.   Does that document look familiar to you?

01:24:17  10   A.   Yes.

01:24:17  11   Q.   Okay.  So my question was, what was your finding as to

01:24:22  12   the cause of Philip Rhoades's death?

01:24:25  13   A.   Gunshot wound of the head.  Lacerating to cervical

01:24:33  14   spine -- cervical spine cord.

01:24:36  15   Q.   Dr. Savasman, when was Philip Rhoades pronounced

01:24:56  16   deceased?  The date and time, please.  Should be on the first

01:25:02  17   page.

01:25:02  18   A.   August, 2nd, 2017 at 03:26 p.m.

01:25:10  19   Q.   How many times was Philip shot?

01:25:14  20   A.   Single.

01:25:19  21   Q.   Where did the bullet enter his body?

01:25:23  22   A.   Right cheek.

01:25:24  23   Q.   And where did it travel from there?

01:25:26  24   A.   From right side of the head to the right side of the

01:25:34  25   neck, towards the right side of the spine -- I mean, the bone,

01:25:43  1    and bounced it after fracture and stopped there very close to

01:25:51  2    spine wall.

01:25:52  3    Q.   You'd mentioned that the bullet lacerated Philip's spinal

01:25:57  4    column; is that right?

01:25:58  5    A.   Correct.

01:25:58  6    Q.   Upon the bullet lacerating Philip's spinal column, was

01:26:04  7    Philip able to move from the neck down with that type of

01:26:12  8    injury?

01:26:12  9    A.   Was, you said?  Was Philip.

01:26:14  10   Q.   Would he have been able to move from the neck down with a

01:26:18  11   lacerated --

01:26:20  12   A.   Very unlikely.  Very unlikely.

01:26:48  13        MR. PRINCE:  Just one moment, Your Honor.

01:26:50  14        THE COURT:  Certainly.

01:27:24  15   BY MR. PRINCE:

01:27:25  16   Q.   Doctor, I want to clarify one point.  Is your testimony

01:27:27  17   today that there is a possibility that Philip could move his

01:27:33  18   lower extremities with a severed --

01:27:36  19   A.   Very unlikely.

01:27:37  20   Q.   What does -- are you testifying that you think it's

01:27:40  21   possible or --

01:27:43  22   A.   No.

01:27:43  23   Q.   -- with a severed cervical spine?

01:27:46  24   A.   I can't give you the percent because it's not a question,

01:27:56  25   like, in 100 people in the same position has been researched

01:28:01  1    how many of them were moving or not.  But if you are saying

01:28:07  2    how much unlikely, very, very, very, unlikely.  I mean, if you

01:28:11  3    close your eyes and shoot to the sky you may hit a bird.  That

01:28:18  4    means very unlikely.

01:28:20  5    Q.  Dr. Savasman, you gave a deposition in this matter; is

01:28:47  6    that correct?

01:28:47  7    A.  Yes.

01:28:48  8    Q.  Do you recall?  Okay.  And there were attorneys present

01:28:52  9    that asked you questions?  At the deposition, do you recall

01:28:57  10   that?

01:29:00  11   A.  I don't recall right now.

01:29:02  12   Q.  You don't -- well --

01:29:05  13   A.  I don't recall right now.  If you have another question I

01:29:09  14   can answer.

01:29:10  15   Q.  Okay.  You don't know if you gave a deposition?

01:29:13  16   A.  This case was five years ago.  And I am doing 450

01:29:18  17   autopsies and if you ask the question like that, I don't want

01:29:21  18   to answer you wrong.

01:29:23  19   Q.  I understand.  Would your deposition transcript refresh

01:29:26  20   your recollection?

01:29:26  21   A.  Sure.

01:29:28  22        MR. PRINCE:  May I approach, Your Honor?

01:29:29  23        THE COURT:  You may.

01:29:59  24   BY MR. PRINCE:

01:30:02  25   Q.  Dr. Savasman, I am handing you your deposition transcript

| | | |
|---|---|---|
| 01:30:09 | 1 | and I would ask for you to read on the bottom of page 20. |
| 01:30:14 | 2 | A.   Okay. |
| 01:30:15 | 3 | Q.   Line 24, is where it starts.  There is a question. |
| 01:30:19 | 4 | A.   Okay. |
| 01:30:20 | 5 | Q.   And then there is an answer that you gave in response to |
| 01:30:25 | 6 | that question, okay? |
| 01:30:26 | 7 | A.   Okay. |
| 01:30:27 | 8 | Q.   Let me know once you have read that? |
| 01:30:29 | 9 | A.   You said 24? |
| 01:30:31 | 10 | Q.   Yeah.  Let me know once you've read that question and |
| 01:30:33 | 11 | that answer. |
| 01:30:34 | 12 | A.   Okay.  24 is -- |
| 01:30:36 | 13 | Q.   Just take a moment and read that to yourself, if you |
| 01:30:40 | 14 | don't mind. |
| 01:30:41 | 15 | A.   Oh, okay.  My answer was -- |
| 01:30:58 | 16 | THE COURT:  One second, Doctor.  One second, please. |
| 01:31:01 | 17 | If you would let counsel know what page you're on? |
| 01:31:04 | 18 | MR. PRINCE:  Yes.  For the record we are at the |
| 01:31:07 | 19 | bottom of page 20 at line 24, and the top of page 21, lines 1 |
| 01:31:14 | 20 | through 4. |
| 01:31:14 | 21 | BY MR. PRINCE: |
| 01:31:15 | 22 | Q.   So I asked you, Dr. Savasman, you mentioned you didn't |
| 01:31:20 | 23 | recall.  Does this transcript refresh your recollection of |
| 01:31:23 | 24 | your testimony? |
| 01:31:23 | 25 | A.   Yes.  Yes. |

01:31:24    1    Q.   Okay.  So would it be fair then that you previously

01:31:28    2    testified that --

01:31:31    3    A.   I previously testify that he wouldn't be able to --

01:31:36    4         THE COURT:  Doctor, hold on, let Mr. Prince ask his

01:31:39    5    question.

01:31:40    6    A.   I apologize.

01:31:41    7    Q.   That's okay, I appreciate that.  So would it be fair then

01:31:47    8    now that your recollection is refreshed that you have

01:31:50    9    previously testified that once Mr. Rhoades' spinal cord was

01:31:56   10    severed, he would not have any movement of his lower

01:31:58   11    extremities and your response to that, you said, "Absolutely,

01:32:01   12    yeah."  Is that correct?

01:32:02   13    A.   Correct.

01:32:03   14    Q.   Thank you.

01:32:04   15         MR. PRINCE:  I have no further questions at this

01:32:05   16    time, Your Honor.

01:32:06   17         THE COURT:  Thank you, Mr. Prince.

01:32:08   18      Mr. Carroll, Ms. Durst.

01:32:11   19         MR. CARROLL:  Thank you, Your Honor.

01:32:17   20                         CROSS-EXAMINATION

01:32:17   21    BY MR. CARROLL:

01:32:37   22    Q.   Good afternoon, Dr. Savasman.

01:32:38   23    A.   Good afternoon, sir.

01:32:39   24    Q.   Your only direct knowledge of Philip Rhoades is with

01:32:43   25    regards to the autopsy that you performed; is that correct?

01:32:46  1    A.   Correct.

01:32:47  2    Q.   And you can't tell us from your autopsy what

01:32:50  3    Philip Rhoades was doing immediately prior to the time he was

01:32:54  4    struck by a bullet?

01:32:55  5    A.   I cannot.

01:32:56  6    Q.   You have no knowledge of the position of Philip Rhoades'

01:32:59  7    body at the time he was struck with the bullet?

01:33:02  8    A.   I cannot.

01:33:03  9    Q.   You do not know where Philip Rhoades' hands were at the

01:33:06  10   time he was struck with the bullet?

01:33:08  11   A.   I don't.

01:33:09  12   Q.   You were asked questions just now about functions of

01:33:15  13   Philip Rhoades' body after he was shot.  Do you recall

01:33:18  14   answering those questions?

01:33:19  15   A.   I recall.

01:33:20  16   Q.   Okay.  To the extent that Philip Rhoades would have lost

01:33:24  17   control of his arms or his body, would that have included his

01:33:29  18   vital functions as well?

01:33:30  19   A.   If not immediately, almost immediately.  I mean, there is

01:33:34  20   so much less difference between two expression.  We can say

01:33:40  21   immediately, I think.

01:33:42  22   Q.   You were asked questions about when Philip Rhoades was

01:33:49  23   pronounced dead.  Can you tell me is there a difference

01:33:52  24   between being pronounced dead and when actual death occurs?

01:33:56  25   A.   Pronouncement of death it's a legal issue and somebody is

01:34:01  1  coming and saying that after checking, this person is dead.

01:34:08  2  And other thing that you said, if you repeat it.  Actual death

01:34:12  3  I think you said, am I right?

01:34:14  4  Q.   That's correct.

01:34:15  5  A.   Well, whenever the person died, he leaves, which if they

01:34:21  6  check before, who knows maybe he was dead also.  Not at the

01:34:25  7  pronouncement moment, at that second.

01:34:28  8  Q.   Okay.  So do I understand correctly that actual death

01:34:31  9  occurs before someone is pronounced dead?

01:34:34  10  A.   Yeah.  Almost all the time.

01:34:36  11  Q.   Okay.

01:34:43  12         MR. CARROLL:  One moment, Your Honor.

01:34:45  13         THE COURT:  Certainly.

01:34:48  14  A.   Actually there is some exceptions for that.

01:34:56  15  Q.   I'm sorry, could you repeat that?

01:34:59  16  A.   There are exceptions for that.  For example, the person,

01:35:02  17  you know, vital functions can stop, those vital functions can

01:35:08  18  be continued artificially.

01:35:11  19  Q.   Okay.

01:35:11  20  A.   So the pronouncement can be right now before and that is

01:35:16  21  considered afterwards.

01:35:19  22  Q.   Counsel also asked you a question a moment ago about

01:35:25  23  Philip Rhoades would be, if I recall correctly, unable to use

01:35:28  24  his arms after his spinal cord was severed.  Is that

01:35:31  25  consistent with your testimony earlier?

01:35:33  1    A.   Yes.

01:35:33  2    Q.   Okay.   And if Philip Rhoades had his arms extended or his

01:35:39  3    arms were under tension, he would not be able to maintain that

01:35:42  4    tension in his arms after the bullet struck his spinal cord?

01:35:46  5    A.   I don't think so.

01:35:48  6         MR. CARROLL:   Your Honor, I have no further

01:35:50  7    questions.   Thank you, Dr. Savasman.

01:35:52  8         THE COURT:   Thank you.   Mr. Prince, anything further

01:35:52  9    for the Doctor?

01:35:54  10        MR. PRINCE:   Yes, Your Honor, briefly.

01:35:59  11                     REDIRECT EXAMINATION

01:35:59  12   BY MR. PRINCE:

01:36:11  13   Q.   Dr. Savasman, you still have your report in front of you;

01:36:14  14   is that correct?

01:36:15  15   A.   Yes.

01:36:16  16   Q.   On page 4 of the report, it describes the direction of

01:36:27  17   the wound path; is that correct?

01:36:29  18   A.   Correct.

01:36:29  19   Q.   What does that say?

01:36:31  20   A.   The direction of the wound path with respect to position

01:36:36  21   is right to left, downward and front to back.

01:36:44  22   Q.   And thank you for that, Doctor.   And on page 7, you also

01:37:01  23   made note of the trajectory of the bullet that killed

01:37:05  24   Philip Rhoades.   Am I right?

01:37:09  25   A.   Seven, I'm looking.

01:37:10  1    Q.   Yes, sir.  Page 7, letter F.

01:37:13  2    A.   Let me check.  Correct, direction and trajectory are used

01:37:24  3    in the same meaning.

01:37:26  4    Q.   Right.  Okay.  So when you say trajectory right to left,

01:37:30  5    downward and slightly front to back, that's the same as the

01:37:32  6    direction description you provided?

01:37:34  7    A.   Correct, sir.

01:37:36  8    Q.   Thank you.

01:37:36  9         MR. PRINCE:  I have no further questions, Your Honor.

01:37:38  10        THE COURT:  Thank you, Mr. Prince.

01:37:38  11   Mr. Carroll, anything further for the doctor?

01:37:41  12        MR. CARROLL:  Just a few brief questions, Your Honor.

01:37:44  13                    RECROSS-EXAMINATION

01:37:44  14   BY MR. CARROLL:

01:37:47  15   Q.   Dr. Savasman, you did not perform any ballistics report

01:37:52  16   or ballistics analysis for this incident; is that correct?

01:37:55  17   A.   No, sir.

01:37:56  18   Q.   Okay.  So you can't tell exactly what position the body

01:37:58  19   was in at what time that Philip Rhoades was shot with the

01:38:02  20   bullet?

01:38:02  21   A.   What time you said?

01:38:03  22   Q.   At the time Philip Rhoades was struck with the bullet?

01:38:07  23   A.   Uh-huh.

01:38:07  24   Q.   Is it fair to say that you can't tell us what position

01:38:09  25   his body was in at that point?

01:38:11   1   A.   No, I can't.

01:38:12   2         MR. CARROLL:  Thank you, Your Honor.  I have no

01:38:14   3   further questions.

01:38:14   4         THE COURT:  Mr. Prince, anything further?

01:38:17   5         MR. PRINCE:  No, Your Honor.

01:38:17   6         THE COURT:  All right.  May the doctor be excused?

01:38:20   7         MR. PRINCE:  Yes, Your Honor.

01:38:22   8         MR. CARROLL:  Yes, Your Honor.  And I would also note

01:38:24   9   that we had the doctor under subpoena for later in the week

01:38:26  10   and I would like him excused from that subpoena as well.

01:38:28  11         THE COURT:  Will do.  Doctor, thank you for being

01:38:28  12   here, you may step down.  You are excused from any further

01:38:31  13   subpoena obligations in this matter.

01:38:35  14         MR. PRINCE:  May I approach, Your Honor?

01:38:37  15         THE COURT:  Yes, you can leave that there, Doctor,

01:38:39  16   we'll clean up.  Thank you.

01:38:46  17         THE COURT:  Madam Clerk, if I could impose on you.

01:39:01  18         MR. UMINA:  Can we have one minute?

01:39:03  19         THE COURT:  Absolutely.  Yes.  Absolutely.

01:39:53  20         THE COURT:  Mr. Umina, are you ready to call your

01:39:55  21   next witness, sir?

01:39:56  22         MR. UMINA:  Yes, Your Honor.  The plaintiff calls

01:39:58  23   David Forsyth.

01:39:58  24         THE COURT:  Thank you.  Mr. Forsyth, sir, if I could

01:40:00  25   ask you to step forward and pause before Madam Clerk so she

01:40:04    1    can swear you in.  Thank you.

01:40:23    2                DAVID CHRISTOPHER FORSYTH, DEFENDANT, SWORN

01:40:23    3                THE COURT:  Thank you very much, sir.  As soon as

01:40:25    4    you're seated and comfortable I'll ask you to adjust that

01:40:27    5    microphone so everyone can hear you.

01:40:27    6                THE WITNESS:  Yes, Your Honor.

01:40:29    7                THE COURT:  You may be asked by Madam Court Reporter

01:40:35    8    to slide a smidge to the right.  All right.  Thank you very

01:40:35    9    much, sir.

01:40:36   10        Mr. Prince, you may proceed whenever you are ready.

01:40:38   11                MR. PRINCE:  Thank you, Your Honor.  I may at some

01:40:43   12    point use the projector.  I don't know if it's ready to rock

01:40:46   13    and roll or not.

01:40:46   14                          CROSS-EXAMINATION

01:40:46   15    BY MR. PRINCE:

01:41:33   16    Q.   Officer Forsyth, will you please state your full name for

01:41:35   17    the record.

01:41:35   18    A.   David Christopher Forsyth.

01:41:37   19    Q.   Where are you currently employed?

01:41:39   20    A.   The Marion County Sheriff's Department.

01:41:41   21    Q.   Now, Officer Forsyth, you would agree, wouldn't you, that

01:41:47   22    a police officer is not permitted to knowingly violate

01:41:52   23    someone's constitutional rights?

01:41:54   24    A.   Absent exigent circumstances, correct.

01:41:56   25    Q.   Okay.  So, in your opinion, constitutional rights aren't

01:42:03  1    absolute, is that fair?  Is that your testimony?

01:42:10  2    A.   No, sir.  What I'm stating is that --

01:42:14  3    Q.   Well, you just testified --

01:42:16  4         THE COURT:  Hold on a second, Mr. Prince, let him

01:42:17  5    finish his answer.  Go ahead, Mr. Forsyth.

01:42:20  6    A.   They are absolute.  I think what you're referring to here

01:42:26  7    is that I violated his rights by killing him.

01:42:31  8    Q.   I just asked a simple question.

01:42:34  9    A.   Okay, sir.  That's fine.

01:42:35 10    Q.   You would agree, wouldn't you, Officer Forsyth, that if a

01:42:41 11    police officer violates someone's constitutional rights, he or

01:42:44 12    she should be held accountable?

01:42:49 13    A.   Within reason, yes, sir.

01:42:51 14    Q.   So there are circumstances, in your opinion, where an

01:42:58 15    officer is allowed to violate someone's constitutional rights

01:43:01 16    and they not be held accountable.  That's okay for you?

01:43:05 17    A.   I believe your name is Mr. Prince.  Mr. Prince, what I'm

01:43:08 18    saying is that I also have constitutional rights.

01:43:15 19    Q.   My question wasn't about your constitutional rights,

01:43:19 20    Officer.  My question was whether you would agree that if a

01:43:25 21    police officer violates someone's constitutional rights, he or

01:43:29 22    she should be held accountable.

01:43:31 23         You can't agree to that, can you?

01:43:34 24    A.   Sir, it's not that I can't agree to that.  What you're

01:43:39 25    trying to get me to say is that I was not justified in the

01:43:43  1   situation where Mr. Rhoades attempted to run me over with a

01:43:47  2   vehicle.

01:43:48  3   Q.   I'm not asking you about that at all.  I'm asking you

01:43:52  4   about constitutional rights of citizens.  Will you or will you

01:43:59  5   not answer this question?

01:44:02  6   A.   Could you ask the question again, sir?

01:44:03  7   Q.   I will.  You would agree, wouldn't you, Officer, that if

01:44:09  8   a police officer violates someone's constitutional rights, he

01:44:14  9   or she should be held accountable?

01:44:18  10  A.   Okay.  There should be a review as to what happened, yes.

01:44:23  11  Q.   And if that review finds someone's constitutional rights

01:44:28  12  were violated, that officer should be held accountable, right?

01:44:34  13  A.   Yes.  If I violated some sort of policy and procedure,

01:44:38  14  yes.

01:44:38  15  Q.   And you knew that on August 2nd, 2017, right?  You knew

01:44:44  16  that?

01:44:44  17  A.   Yes, sir.

01:44:44  18  Q.   You would agree that a police officer is required to

01:44:49  19  follow and comply with police department policies?

01:44:53  20  A.   Yes.

01:44:53  21  Q.   And certainly you would agree, Officer, that if a police

01:44:59  22  officer violates police department policies and someone is

01:45:05  23  killed, that police officer should be held accountable?

01:45:09  24  A.   That's fair.

01:45:10  25  Q.   Now, you were the officer that shot and killed

01:45:14   1   Philip Rhoades, correct?

01:45:15   2   A.   Yes, sir.

01:45:16   3   Q.   On August 2nd, 2017, you were on patrol with

01:45:20   4   Officer Love?

01:45:23   5   A.   Yes.

01:45:24   6   Q.   You were driving the police cruiser and Officer Love was

01:45:28   7   in the front passenger seat?

01:45:30   8   A.   Yes.

01:45:31   9   Q.   You were on vehicle patrol when you noticed a black Jeep

01:45:37   10   Wrangler drive past you, correct?

01:45:38   11   A.   I wasn't just on regular patrol.

01:45:43   12   Q.   You were driving a police cruiser and you saw a black

01:45:47   13   Jeep Wrangler drive past you; is that correct?

01:45:54   14      Can we not agree that you were driving --

01:45:56   15   A.   Yes, I was driving the car.

01:45:57   16   Q.   Okay.   You were driving the car.   You saw a black Jeep,

01:46:01   17   right?

01:46:01   18   A.   Yes, sir.

01:46:01   19   Q.   Okay.   All right.   Officer Love is in the passenger's

01:46:06   20   seat, right?

01:46:06   21   A.   Yes, sir.

01:46:07   22   Q.   Okay.   I think these will be easy questions.   So when you

01:46:11   23   saw the black Jeep Wrangler drive past you, you decided to

01:46:16   24   turn your police cruiser around and engage the black Jeep in a

01:46:21   25   pursuit, fair?

01:46:22   1    A.   Yes.

01:46:23   2    Q.   The pursuit we've heard about led to a wooded area in

01:46:29   3    Marion County, right?

01:46:30   4    A.   That's correct.

01:46:32   5    Q.   And that's where -- oh, and the wooded area in Marion

01:46:39   6    County led to a dirt road, right?

01:46:45   7    A.   The gravel road led to an access road which led to a well

01:46:54   8    pad.

01:46:54   9           COURT REPORTER:  Led toward --

01:46:54   10          THE WITNESS:  A well pad, oil and gas area, yes,

01:46:54   11   ma'am.

01:46:54   12          COURT REPORTER:  Thank you.

01:46:57   13   BY MR. PRINCE:

01:46:57   14   Q.   And that well pad is where you located the black Jeep

01:47:03   15   Wrangler operated by Philip Rhoades, correct?

01:47:06   16   A.   Yes, sir.

01:47:07   17   Q.   You pull into that small clearing and exit your police

01:47:13   18   cruiser, correct?

01:47:13   19   A.   There was a little more to it than that, but yes.

01:47:16   20   Q.   A little more to it than that?

01:47:18   21   A.   Yes, sir.  As I entered the area, the Jeep wasn't

01:47:21   22   setting, I think I used the word adjacent, but a better word

01:47:26   23   may be perpendicular to my vehicle and drove towards my

01:47:31   24   vehicle and almost stuck me.  And then the vehicle began to

01:47:35   25   back up and make a three-point turn.  At that point I did exit

01:47:38  1    my vehicle.

01:47:39  2    Q.   And your police cruiser was still moving when you exited,

01:47:49  3    correct?

01:47:50  4    A.   That's correct, it was.  Unfortunately I didn't get it

01:47:54  5    into park, but I can explain that.

01:47:56  6    Q.   Okay.  You pull into the small clearing.  You didn't put

01:47:59  7    your vehicle in park.  You get out of your car, correct?

01:48:02  8    A.   Could you restate the question?

01:48:07  9    Q.   You approached the small clearing.  You fail to put your

01:48:12  10   vehicle in park.  You get out of the car, right?

01:48:14  11   A.   Yes.

01:48:15  12   Q.   And your vehicle was still moving because it was not in

01:48:19  13   park.  You failed to put it in park?

01:48:21  14   A.   That's correct.  I didn't realize that at the time, but

01:48:23  15   in the heat of the moment, I did not get it into park.

01:48:27  16   Q.   And when you exited your police cruiser you were standing

01:48:31  17   in front of the Jeep, right?

01:48:33  18   A.   When I exited my vehicle, I was attempting to get to the

01:48:38  19   rear of it.  The vehicle continued to move forward, therefore,

01:48:43  20   that placed me in an open area, yes, in front of the Jeep.

01:48:48  21   Q.   This photograph represents where you were standing,

01:48:54  22   doesn't it?

01:48:56  23   A.   In that general area, yes, sir.

01:48:57  24   Q.   Okay.  At no point during the killing of Philip did you

01:49:04  25   see him with a handgun, right?

340

01:49:09   1    A.   No, sir, although we did have information that he could

01:49:12   2    possibly be armed.

01:49:13   3    Q.   Well, we're going to talk about that.

01:49:15   4    A.   Yes, sir.

01:49:15   5    Q.   At no point did you see him with a rifle, right?

01:49:20   6    A.   No, sir.

01:49:20   7    Q.   Didn't see him with a shotgun, right?

01:49:22   8    A.   No, sir.

01:49:23   9    Q.   Didn't see him with a knife, right?

01:49:26   10   A.   No, sir.

01:49:27   11   Q.   Didn't see him with any weapons whatsoever?

01:49:30   12   A.   Other than the vehicle, no, sir.

01:49:32   13   Q.   We're going to talk about that, too.  Other than the Jeep

01:49:37   14   that you claim was a weapon, you did not see him with any

01:49:42   15   weapons at any point during this entire exchange, did you?

01:49:46   16   A.   Other than vehicle that was driving at me, I saw him with

01:49:49   17   no other weapons.

01:49:50   18   Q.   From the time you exited your police cruiser to the time

01:49:55   19   you shot and killed Philip, you would estimate approximately a

01:49:58   20   couple seconds elapsed?

01:50:01   21   A.   I believe during my deposition I approximated ten.  I

01:50:05   22   couldn't give a definite answer then and I couldn't give you a

01:50:07   23   definite answer now.

01:50:08   24   Q.   Two to 10 seconds, approximately?

01:50:12   25   A.   It could have been more than that.

01:50:19  1    Q.   Now you claim you shouted instructions at Phillip,
01:50:24  2    correct?
01:50:24  3    A.   That's correct.
01:50:25  4    Q.   And in response, you only gave Philip seconds to respond
01:50:32  5    to your instructions, right?
01:50:34  6         This all happened in seconds, didn't it?
01:50:37  7    A.   Again, I can't give you an exact time frame of when it
01:50:41  8    all happened.
01:50:42  9    Q.   Right.  That's why my question was seconds.  We're not
01:50:45  10   talking about 30 minutes here, are we?
01:50:47  11   A.   No, sir, it wasn't 30 minutes.
01:50:49  12   Q.   We're talking about seconds, right?  This whole ordeal
01:50:52  13   lasted seconds.
01:50:53  14   A.   That's correct.
01:50:53  15   Q.   Okay.  So you get out of police cruiser, you give
01:50:56  16   instructions to Philip, you gave him seconds to comply,
01:51:00  17   correct?
01:51:00  18   A.   That's all the time that the --
01:51:04  19   Q.   Is that correct?
01:51:05  20   A.   That's all the time that the incident took.
01:51:08  21   Q.   Right.  I wasn't asking about the incident.  I'm asking
01:51:11  22   about the time you got out of your police cruiser, removed
01:51:14  23   your holster, removed your firearm from its holster, and gave
01:51:18  24   instructions to Philip.  You had seconds.  You gave him
01:51:22  25   seconds to comply before you opened fire, right?

01:51:25  1    A.   Sir, I gave as much time as I had.  The vehicle was

01:51:29  2    driving at me.

01:51:30  3    Q.   I understand that.  My question was about seconds.  You

01:51:35  4    gave Philip seconds to comply, right?

01:51:38  5    A.   Yes, sir.  And when I started giving my statement, when I

01:51:42  6    started telling him to show me his hands, stop the vehicle, he

01:51:45  7    was still in the vehicle and backing up.

01:51:51  8    Q.   At this time the Jeep -- his Jeep was still running?

01:51:55  9    A.   Yes.

01:51:56  10   Q.   Right.  Your car is running?

01:51:58  11   A.   Yes.

01:52:00  12   Q.   Right?  And we know, Officer, based on the evidence in

01:52:30  13   this case, that in a matter of seconds from you exiting your

01:52:35  14   police cruiser you determined and you decided that Philip

01:52:38  15   needed to die, right?

01:52:41  16   A.   No, sir.  That's not correct.

01:52:44  17   Q.   Were you shooting to wound him?

01:52:48  18   A.   I was shooting to stop the threat which was the vehicle

01:52:53  19   driving at me.

01:52:54  20   Q.   So you weren't shooting at Philip, you were shooting at

01:52:59  21   the vehicle; is that your testimony?

01:53:00  22   A.   The threat is a vehicle that was coming at me, sir, he

01:53:03  23   was driving the vehicle.

01:53:05  24   Q.   And you believed that your bullets could stop a vehicle;

01:53:23  25   is that fair?

01:53:23   1    A.   I believed that it could stop him from driving at me.

01:53:26   2    Q.   But you were shooting at him, you just testified, you

01:53:29   3    were shooting at the Jeep?

01:53:30   4    A.   He was operating the vehicle, so he was inside of the

01:53:33   5    Jeep.

01:53:33   6    Q.   So you were shooting at Philip, right?

01:53:37   7    A.   Who was operating the vehicle that was driving at me,

01:53:40   8    yes.

01:53:40   9    Q.   So it's your testimony that your killing Philip was

01:53:46   10   justified because he was driving the Jeep towards you, fair?

01:53:51   11   A.   That's my testimony.   That Mr. Rhoades drove that Jeep at

01:53:55   12   me, yes.

01:53:56   13   Q.   That's not what I am asking you.   It's your testimony

01:54:00   14   that your killing Philip was justified because he was driving

01:54:06   15   the Jeep towards you, fair?

01:54:08   16   A.   That's correct, it was justified because he was

01:54:10   17   attempting to kill me with that Jeep.

01:54:12   18   Q.   Now, you agree that the investigating West Virginia State

01:54:17   19   Trooper observed the Jeep to be running when he arrived on

01:54:20   20   scene, fair?

01:54:21   21   A.   Could you restate the question, sir?

01:54:23   22   Q.   You agree that the investigating West Virginia State

01:54:28   23   Trooper observed the Jeep to still be running when he arrived

01:54:32   24   on scene, right?

01:54:33   25   A.   I believe that's what he testified to, yes, sir.

01:54:35  1    Q.   No reason to dispute Trooper Branham's finding that the

01:54:40  2    Jeep was running when he arrived, right?

01:54:42  3    A.   No, sir.

01:54:43  4    Q.   You didn't turn off the Jeep when you dragged his body

01:54:47  5    out of it, did you?

01:54:48  6    A.   Excuse me.  No, sir.

01:54:49  7    Q.   You didn't instruct Deputy Love to turn off the Jeep,

01:54:53  8    right?

01:54:53  9    A.   No, sir.

01:54:54  10   Q.   You would agree that in order for a stationary five-speed

01:54:57  11   vehicle to be running without an occupant, it must be in

01:55:01  12   neutral, right?

01:55:02  13   A.   That's correct.

01:55:03  14   Q.   And if not in neutral, that vehicle, that five-speed

01:55:08  15   vehicle would stall and shut off if no one is holding the

01:55:12  16   clutch, right?

01:55:13  17   A.   That's correct.

01:55:13  18   Q.   And since a five-speed vehicle must be in neutral to be

01:55:17  19   running without an occupant, you would agree that if the Jeep

01:55:19  20   was running after Philip was removed, it was in neutral at

01:55:23  21   that time?

01:55:24  22   A.   Yes, sir.

01:55:25  23   Q.   Let me get this straight, Officer.  You agree that an

01:55:33  24   unoccupied five-speed vehicle will stall out if running and in

01:55:39  25   gear, and you agree that this five speed was running without

01:55:43  1  an occupant, and are still not willing to admit that it was in

01:55:48  2  neutral when you opened fire on Philip Rhoades?

01:55:53  3  A.   Mr. Prince, I don't know what happened inside that

01:55:55  4  vehicle between the time I started firing and the time I

01:55:58  5  stopped firing, but I know without a shadow of a doubt that

01:56:02  6  that vehicle was coming at me.  That's what I perceived that

01:56:05  7  vehicle coming at me which is why I started firing.

01:56:08  8  Q.   But you can't explain to the jury how the Jeep could be

01:56:12  9  in neutral and also somehow moving towards you so

01:56:16  10  aggressively, can you?

01:56:22  11  A.   Could you repeat your question, please?

01:56:25  12  Q.   Sure.  You can't explain to the jury, how the Jeep could

01:56:33  13  be in neutral and also somehow be coming towards you

01:56:37  14  aggressively?

01:56:39  15  A.   I don't know how the vehicle ended up in neutral.  I

01:56:43  16  could speculate it could be that he was trying to change

01:56:46  17  gears, it could be --

01:56:49  18       MR. PRINCE:  Objection, Your Honor.  This witness is

01:56:52  19  speculating.

01:56:53  20       THE COURT:  You asked the question, he can answer it,

01:56:56  21  sir.

01:56:56  22  A.   It could be that he was trying to change gears, it could

01:57:00  23  be that after I struck Mr. Rhoades he fell over the center

01:57:05  24  console and knocked it out of gear, I don't know.  But what I

01:57:09  25  do know is that vehicle was coming at me when I was shooting.

01:57:11   1   Q.   And you would agree that one such possible explanation is
01:57:14   2   that the vehicle was in neutral?
01:57:18   3   A.   No, sir.  I will not agree with that.
01:57:19   4   Q.   That's one explanation you will not accept, right?
01:57:22   5   Because that explanation is inconsistent with your argument,
01:57:26   6   isn't it?
01:57:26   7   A.   It's because I know what happened that day.
01:57:29   8   Q.   It's not consistent with your --
01:57:31   9           MS. DURST:  Your Honor, would he let the witness --
01:57:32   10          THE COURT:  I've got it.  Mr. Forsyth, if you will
01:57:36   11   let counsel finish his question first, and Counsel, you need
01:57:39   12   to let the witness finish their answer first.
01:57:40   13       Is there another objection, Ms. Durst?
01:57:43   14          MS. DURST:  Not at this time, Your Honor.
01:57:45   15          THE COURT:  Understood.  You may proceed, Counsel,
01:57:47   16   ask your question again.
01:57:48   17       I will ask both of you to please refrain from speaking
01:57:50   18   overtop of one another.
01:57:54   19   BY MR. CARROLL:
01:57:54   20   Q.   Officer Forsyth, the only explanation you're not willing
01:57:57   21   to accept is the one that is inconsistent with your defense,
01:58:00   22   correct?
01:58:02   23   A.   I know what was true, sir.  I know what I saw.
01:58:08   24   Q.   Now, this -- excuse me.  This area was flat, right?  So
01:58:16   25   this is not a situation where the vehicle would be moving

01:58:19   1   forward unless it were in gear, correct?

01:58:22   2   A.   That's fair.

01:58:23   3   Q.   Now, after you killed Philip, multiple police officers

01:58:30   4   and first -- and emergency responders were at the scene,

01:58:33   5   right?

01:58:33   6   A.   There were a lot of people showing up afterwards, yes,

01:58:36   7   sir.

01:58:36   8   Q.   Sir, and you have no reason to believe that anyone

01:58:38   9   tampered with the gear position of the Jeep after you killed

01:58:42   10   Philip, right?

01:58:42   11   A.   I don't believe that anybody tampered with anything in

01:58:45   12   the vehicle or the scene, no, sir.

01:58:47   13   Q.   Do you wear glasses, Officer Forsyth?

01:58:58   14   A.   I do now.

01:59:00   15   Q.   At the time of the killing, did you wear corrective

01:59:03   16   lenses or glasses?

01:59:04   17   A.   I don't recall if I did or didn't.  I know I have

01:59:06   18   recently within the last couple of years been given glasses.

01:59:11   19   Q.   Hearing aids?  Do you wear hearing aids?

01:59:14   20   A.   No, sir.

01:59:15   21   Q.   You weren't wearing glasses when you shot and killed

01:59:22   22   Philip, were you?

01:59:23   23   A.   No, sir, I don't believe I was.

01:59:25   24   Q.   Let's talk about the seven shots that you fired at

01:59:46   25   Philip Rhoades.  You fired the first shot and you didn't stop

| | | |
|---|---|---|
| 01:59:53 | 1 | repeating verbal commands then, did you? |
| 01:59:57 | 2 | A.   Sir, everything was happening pretty quickly.  I don't |
| 02:00:00 | 3 | recall if I was giving verbal commands while I was shooting or |
| 02:00:03 | 4 | not. |
| 02:00:03 | 5 | Q.   You don't know, fair? |
| 02:00:05 | 6 | A.   I don't recall if I gave verbal commands while I was |
| 02:00:10 | 7 | shooting.  It's possible, but it's also not possible. |
| 02:00:13 | 8 | Q.   And that would be the same for all seven shots, right? |
| 02:00:20 | 9 | You just don't know, fair? |
| 02:00:25 | 10 | A.   I gave verbal commands to Mr. Rhoades multiple times |
| 02:00:30 | 11 | prior to him driving at me.  And continued to give verbal |
| 02:00:36 | 12 | commands until I started firing.  Again, while I was firing, I |
| 02:00:39 | 13 | don't recall if I was doing both things at the same time. |
| 02:00:44 | 14 | Q.   Just to be clear, Officer, the Jeep accelerating towards |
| 02:00:56 | 15 | you, that was the sole basis for your use of lethal force, |
| 02:01:01 | 16 | right? |
| 02:01:01 | 17 | A.   The vehicle was about to strike me.  It was coming at me, |
| 02:01:05 | 18 | it was going to hit me, it was going to kill me, which is why |
| 02:01:08 | 19 | I used lethal force. |
| 02:01:11 | 20 | Q.   That's the only reason, right? |
| 02:01:14 | 21 | A.   In that instance, yes. |
| 02:01:22 | 22 | Q.   You understand that one of your shots struck Philip in |
| 02:01:29 | 23 | the face, correct? |
| 02:01:31 | 24 | A.   Yes, sir, I do. |
| 02:01:32 | 25 | Q.   You were just here for the medical examiner's testimony, |

02:01:37   1   right?

02:01:37   2   A.   Yes, sir.

02:01:38   3   Q.   You understand that that bullet lodged in Phillip's neck,

02:01:41   4   right?

02:01:41   5   A.   That's what I heard the medical examiner say, yes, sir.

02:01:45   6   Q.   And that it severed his spinal column, right?

02:01:48   7   A.   Yes, sir.

02:01:49   8   Q.   And the impact that that would have had on Phillip's

02:01:51   9   ability to move his arms and legs, right?  You heard that

02:01:54   10   testimony as well?

02:01:55   11   A.   Yes.

02:01:55   12   Q.   Is it fair to say, Officer, that you're not able to

02:02:06   13   explain how a Jeep with a manual transmission that was

02:02:12   14   allegedly coming towards you in an aggressive manner, came to

02:02:17   15   a stop while continuing to run when the operator of the Jeep

02:02:20   16   was paralyzed from the neck down, and thus unable to hit the

02:02:25   17   brake, push in the clutch or take it out of gear; is that

02:02:28   18   fair?

02:02:28   19   A.   Again, without speculating, no.

02:02:32   20   Q.   Let's just take a step back, Officer Forsyth.  Your

02:02:39   21   killing Philip on August 2nd, 2017, that wasn't the first time

02:02:43   22   you fired your gun that day, was it?

02:02:45   23   A.   No, sir, it was not.

02:02:46   24   Q.   You were asked to assist with a wounded deer on the side

02:02:53   25   of the road -- right? -- in Marion County?

02:02:54  1    A.   It was at headquarters in Marion County, yes, sir.

02:02:59  2    Q.   It took you five shots to kill that deer, didn't it?

02:03:04  3    A.   It probably wouldn't have taken five shots, sir, but I

02:03:09  4    used five shots because I didn't want the deer to get up and

02:03:12  5    run away.  And I didn't want to use a shotgun because we were

02:03:16  6    in an urban area, and just more likely chance for a ricochet,

02:03:19  7    or something of that nature, so...

02:03:20  8    Q.   Yeah, you shot five times at the deer, right?

02:03:22  9    A.   Yes.

02:03:23  10   Q.   Now, you weren't wearing glasses when you shot the deer

02:03:26  11   either, were you?

02:03:28  12   A.   No, sir, not that I recall.

02:03:30  13   Q.   Now, you indicated a moment ago that you were standing

02:03:37  14   directly in front of the Jeep when you opened fire on Philip.

02:03:41  15        Do you recall that?

02:03:44  16   A.   Yes, sir.

02:03:44  17   Q.   Now, you agree -- right? -- that you didn't take any

02:03:49  18   steps to get out of the way of this Jeep, did you?

02:03:55  19   A.   I don't recall ever taking any evasive action, no, sir.

02:03:58  20   Q.   Are you telling me that you did or that you didn't?

02:04:02  21   A.   I don't recall ever taking any evasive action.

02:04:09  22   Q.   Evasive action, you mean, taking a step to get out of the

02:04:13  23   way of a moving Jeep?

02:04:15  24        Is that what you're referring to by evasive?

02:04:17  25   A.   I didn't try to get out of the way of the vehicle while

02:04:20  1    it was driving at me, if that's what you're asking.

02:04:22  2    Q.   That's exactly what I'm asking, thank you.  You did not

02:04:23  3    try to get out of the way of this Jeep, right?

02:04:26  4    A.   I didn't really have a lot of time when it was coming

02:04:29  5    towards me, sir.

02:04:30  6    Q.   You didn't take -- in fact, you didn't take one single

02:04:35  7    step to get out of the way of this Jeep, did you?

02:04:38  8    A.   Sir, again, I have testified here that I exited my

02:04:41  9    vehicle, tried to get to the back of it and I ended up in an

02:04:45  10   open area.

02:04:46  11   Q.   Officer, you didn't take a single step to get out of the

02:04:49  12   way of that Jeep because it wasn't moving, was it?

02:04:53  13   A.   That's incorrect.

02:04:54  14   Q.   You didn't take a single step to get out of the way of

02:04:57  15   that vehicle because it was in neutral, just as it was when

02:05:01  16   you killed Philip?

02:05:01  17   A.   No, sir, that's incorrect.

02:05:03  18   Q.   Now, the state trooper investigating this shooting came

02:05:10  19   to get your statement on August 2nd, didn't he?

02:05:13  20   A.   Yes, sir, he did.

02:05:14  21   Q.   You didn't give him one, did you?

02:05:16  22   A.   No, sir.

02:05:17  23   Q.   Didn't give him on August 3rd either, did you?

02:05:20  24   A.   No, sir, I didn't.

02:05:20  25   Q.   Waited a couple days before you made your official

02:05:23   1   statement, right?

02:05:24   2   A.   Yes, sir.

02:05:24   3   Q.   And when you gave your official statement, you didn't

02:05:28   4   realize that the Jeep Philip died in was a five speed, did

02:05:30   5   you?

02:05:30   6   A.   No, sir.

02:05:31   7   Q.   When you gave your written statement, it didn't occur to

02:05:33   8   you that since the vehicle was still running after you killed

02:05:36   9   Philip that it must be in neutral, not in gear.  You didn't

02:05:41   10   know that at the time?

02:05:42   11   A.   I didn't know what was inside the vehicle.

02:05:46   12   Q.   And that's why, Officer Forsyth, that's why when you

02:05:52   13   prepared your written statement to Trooper Branham you thought

02:05:55   14   it would be safe to claim the Jeep drove at you before you

02:06:00   15   killed him, isn't it?

02:06:01   16   A.   No, sir, that's not the reason why I did that.  I did

02:06:04   17   that because that's what happened.

02:06:08   18   Q.   Regardless, Officer Forsyth, we know -- right? -- that

02:06:14   19   vehicles in neutral don't accelerate, do they?

02:06:19   20   A.   That's correct.  Not without some other type of stimulus.

02:06:26   21   MR. PRINCE:  One moment, Your Honor.

02:06:27   22   THE COURT:  Certainly.

02:06:52   23   MR. PRINCE:  No further questions at this time, Your

02:06:53   24   Honor.

02:06:53   25   THE COURT:  Understood.  Thank you very much, Mr.

02:06:53    1    Prince.

02:06:57    2         Ms. Durst.

02:06:57    3              MS. DURST:  Yes, Your Honor.

02:07:01    4              MR. PRINCE:  Just one moment to get this picked up.

02:07:05    5              THE COURT:  Sure.

02:07:44    6              MS. DURST:  Your Honor, with the Court's permission,

02:07:46    7    I will just conduct my questioning of Deputy Forsyth at this

02:07:51    8    moment in time.  I will not be calling him in our case in

02:07:55    9    chief.

02:07:55   10              THE COURT:  Any objection to that?

02:07:56   11              MR. PRINCE:  No, Your Honor.

02:07:57   12              THE COURT:  Understood.  You may proceed.

02:07:59   13              MS. DURST:  Thank you, Your Honor.

02:08:00   14                        DIRECT EXAMINATION

02:08:00   15    BY MS. DURST:

02:08:01   16    Q.   Deputy Forsyth, let's go back.  Sorry.  Let me take my

02:08:05   17    mask off.  Let's go ahead and back up a little bit.

02:08:07   18         Can you -- we know that you're with the sheriff's

02:08:11   19    department.  But can you tell the jury just a little bit about

02:08:13   20    yourself?

02:08:13   21    A.   Yes, ma'am.  Born in Southwest Pennsylvania, lived down

02:08:21   22    there up there until I was around 12 or 13.  I had moved here

02:08:25   23    around 13 years old.  I lived a lot of different places,

02:08:30   24    Clarksburg, Morgantown, Daybrook, like I said, I bounced

02:08:35   25    around a lot.  I graduated from a private school called Act

02:08:38   1   Academy.  It was a religious school, and then went on to work

02:08:44   2   my way through college at Fairmont State.

02:08:47   3       I received my degree in criminal justice.  I've lived

02:08:51   4   here in Marion County while going to school and then since

02:08:57   5   then I've lived here -- I lived in Harrison County, I

02:09:00   6   apologize.  I've lived in Marion County from then on until

02:09:05   7   currently where I still live there.

02:09:07   8   Q.   Okay.  You've told the jury already that you're employed

02:09:14   9   with the sheriff's department, and we know you were employed

02:09:17  10   in August of 2017.  How long had you been -- well, let's ask

02:09:21  11   it this way.  In August of 2017, how long had you been with

02:09:25  12   the Marion County Sheriff's Department?

02:09:27  13   A.   So I was hired March 3rd of 2010.  So that would have

02:09:38  14   been 16 some odd change years -- right? -- or close to -- no,

02:09:42  15   sorry, that could have been seven and some change.

02:09:45  16   Q.   So you said you started in 2010?

02:09:47  17   A.   Yes, ma'am.

02:09:47  18   Q.   Okay.  And this incident occurred in 2017, so about seven

02:09:51  19   years?

02:09:51  20   A.   Correct.

02:09:52  21   Q.   Okay.  Are you married?  Do you have kids?

02:09:55  22   A.   Yes.  I am married to my wife, Kaitlin.  And -- excuse

02:10:02  23   me.  I have three young children.

02:10:05  24   Q.   Okay.  On August 2nd, of 2017, Mr. Prince just asked you

02:10:12  25   questions with regard to pursuing the Jeep, okay?

02:10:15  1      Can you tell the jury how it is that you became involved

02:10:24  2  in a pursuit of the Jeep Mr. Rhoades was driving?

02:10:29  3  A.    Yes, ma'am.  So I was at the office and we had heard over

02:10:34  4  the radio, Deputy Wesley Wheeler had called in pursuit of a

02:10:39  5  black in color Jeep Wrangler.  He had given out the license

02:10:44  6  plate number and then he had stated that he was in pursuit of

02:10:46  7  Mr. Rhoades.  He had known him, known who it was.  So he

02:10:51  8  identified him as Philip Rhoades.

02:10:56  9      MS. DURST:  Your Honor, at this moment in time, as

02:10:59  10  previously discussed, these are individual clips of radio

02:11:03  11  traffic we would like to go ahead and play each of those

02:11:07  12  clips.

02:11:07  13      THE COURT:  Understood.  That exhibit has been

02:11:09  14  stipulated to as admissible.  You may publish as you deem

02:11:14  15  appropriate, Ms. Durst, and again, that's Defendant's Exhibit

02:11:17  16  No. 2, correct?

02:11:17  17      MS. DURST:  Yes, Your Honor.  Thank you.

02:11:19  18      THE COURT:  Let's play the first clip just to make

02:11:21  19  sure everyone can hear it appropriately.

02:11:28  20      MR. CARROLL:  That's correct, Your Honor, I will be

02:11:29  21  turning up the volume on my end to the max as I believe that's

02:11:32  22  required.

02:11:34  23      (Playing radio clip.)

02:11:40  24      MS. DURST:  Your Honor, can we ask if the jury can

02:11:42  25  hear that?

| | | |
|---|---|---|
| 02:11:42 | 1 | THE COURT:  Can everybody hear that okay?  Can you |
| 02:11:46 | 2 | crank that up at all any further, Madam Clerk?  Try again, |
| 02:11:50 | 3 | Mr. Carroll.  I realize that's quick and a short snippet.  Can |
| 02:11:58 | 4 | everybody hear?  All right. |
| 02:12:00 | 5 | MS. DURST:  Okay. |
| 02:12:02 | 6 | BY MS. DURST: |
| 02:12:02 | 7 | Q.  Deputy Forsyth, before we play some more of the clips, on |
| 02:12:07 | 8 | the screen that you see, did you see that there are times |
| 02:12:12 | 9 | associated with each of these clips? |
| 02:12:14 | 10 | A.  Yes, ma'am. |
| 02:12:15 | 11 | Q.  Okay.  Are those times set forth in military time? |
| 02:12:25 | 12 | A.  Yes, ma'am, it appears they are.  So that would have been |
| 02:12:29 | 13 | 144304, which would have been roughly 2:43. |
| 02:12:33 | 14 | Q.  So 2:43:04? |
| 02:12:37 | 15 | A.  Correct, ma'am. |
| 02:12:37 | 16 | Q.  Okay.  All right.  Let's go ahead.  Let me ask you there. |
| 02:12:44 | 17 | Let's play that clip. |
| 02:12:45 | 18 | MS. DURST:  Play it again, if you could, Mr. Carroll. |
| 02:12:47 | 19 | (Playing radio clip.) |
| 02:12:52 | 20 | Q.  And that clip cuts off.  Are you able to tell the jury |
| 02:12:54 | 21 | who that deputy is that radioed that? |
| 02:12:56 | 22 | A.  That is Deputy Wesley Wheeler. |
| 02:12:58 | 23 | Q.  Okay.  Let's -- what is the time of the next clip? |
| 02:13:01 | 24 | A.  Looks like it is 144308. |
| 02:13:06 | 25 | Q.  So about four seconds later? |

02:13:09   1    A.   Yes, ma'am.

02:13:10   2    Q.   Okay.  Let's play that, please.

02:13:12   3         (Playing radio clip.)

02:13:15   4    Q.   Is that the continuation of Deputy Wheeler reporting that

02:13:20   5    it was a black Wrangler, soft top?

02:13:23   6    A.   Yes, ma'am.

02:13:24   7    Q.   Okay.  Let's play the -- what is time of the next clip?

02:13:27   8    A.   Looks like it's 144343.

02:13:32   9    Q.   Okay.  So this is still 2:43, but almost about 39 seconds

02:13:37  10    after the first clip that we listened to?

02:13:40  11    A.   Correct.

02:13:41  12         MS. DURST:  Let's play that one, Mr. Carroll.

02:13:46  13         (Playing radio clip.)

02:13:46  14    Q.   Do you know who that was?

02:13:48  15    A.   That was Deputy Mundell.

02:13:50  16    Q.   Mundell, okay.  Let's play the next clip.  Well, what is

02:13:54  17    the time of the next clip?

02:13:56  18    A.   1444, excuse me while I get my glasses out.

02:14:03  19         THE COURT:  Take your time, sir.

02:14:19  20    Ms. Durst, if you wouldn't mind repeating your question,

02:14:20  21    ma'am, please.

02:14:20  22         MS. DURST:  Yes, Your Honor.

02:14:20  23    BY MS. DURST:

02:14:20  24    Q.   The third clip I believe where we're getting ready to

02:14:23  25    listen to, can you tell the jury what time that clip was?

02:14:27   1            MS. DURST:  Fourth, Your Honor, I apologize.

02:14:27   2   A.   It's going to be 144432.

02:14:31   3   Q.   Okay.  So this is now 2:44 and 32 seconds?

02:14:36   4   A.   That's my understanding, yes.

02:14:37   5   Q.   Okay.  Let's play that clip.

02:14:37   6        (Playing radio clip.)

02:14:43   7   Q.   Who was that?

02:14:43   8   A.   That would have been then corporal, now Sergeant Russell

02:14:49   9   Garrett.

02:14:50   10  Q.   Okay.  You told me that you were at the station and heard

02:14:58   11  over the radio Deputy Wheeler indicate that he was in pursuit

02:15:01   12  of Mr. Rhoades?

02:15:02   13  A.   Yes.

02:15:03   14  Q.   Are you able to hear these reports over the radio as you

02:15:12   15  are getting to your cruiser, or in your cruiser?

02:15:15   16  A.   Yes, ma'am.  So I carry my portable radio even in the

02:15:18   17  office and then we have a radio station in the office, and you

02:15:23   18  can hear that coming over the radio.  I mean, everyone can

02:15:26   19  hear it.  Anyone with a scanner or whatever.

02:15:30   20  Q.   The clip that we listened to previously that you said was

02:15:34   21  Deputy Mundell, that said "Last I heard may be armed."  Had

02:15:37   22  you heard that before you got in your cruiser or after you got

02:15:40   23  into your cruiser?

02:15:41   24  A.   I don't recall if I was in my cruiser already or not,

02:15:44   25  ma'am.

02:15:45   1   Q.   Okay.  Let's go to the next clip, which would be clip

02:15:48   2   number five.  Could you tell the jury what time that clip --

02:15:51   3   A.   Looks like it's going to be 145132.

02:15:56   4   Q.   And is it your understanding, Deputy Forsyth, that that

02:16:00   5   time is the time that the transmission was made?

02:16:03   6   A.   That's my understanding, yes.

02:16:05   7        MS. DURST:  Let's play that clip.

02:16:09   8        (Playing radio clip.)

02:16:09   9   Q.   Who is that?

02:16:10  10   A.   That sounded like me, ma'am.

02:16:13  11   Q.   Okay.  And you're asking who, what?

02:16:17  12   A.   Could you play the traffic again?

02:16:24  13        (Playing radio clip.)

02:16:24  14   A.   It sounded like I asked Donny if he had passed a black

02:16:30  15   Jeep.

02:16:30  16   Q.   And who would be Donny?

02:16:32  17   A.   With there being snippets, you know, I don't recall if it

02:16:37  18   was Donny Wheeler or Donny Mundell.  Unfortunately we have two

02:16:42  19   Donnys.  It could have been either of them, both were

02:16:44  20   assisting.

02:16:45  21   Q.   Okay.  What is time of the next clip, please?

02:16:48  22   A.   145138.

02:16:51  23   Q.   2:51 and 38 seconds?

02:16:54  24   A.   Yes, ma'am.

02:16:55  25   Q.   And so this is now about nine minutes or so after the

02:17:00   1    first clip we listened to, if I have done my math right?

02:17:03   2    A.   Give or take, yes.

02:17:04   3    Q.   Let's play that.

02:17:08   4         (Playing radio clip)

02:17:08   5    A.   That was Donny Mundell saying negative.

02:17:11   6    Q.   Okay.  So in listening to that clip are you able to tell

02:17:14   7    the jury whether you were asking Donny Wheeler or Donny

02:17:18   8    Mundell?

02:17:19   9    A.   Yes.  I must have been asking Donny Mundell who was

02:17:24  10    behind me, he was in car .

02:17:27  11    Q.   Where is this area in Marion County?  Is there anything

02:17:31  12    like a landmark or a location that you can describe?

02:17:36  13    A.   Yes.  So there used to be an auction barn there if you

02:17:41  14    are heading north from Fairmont to Mannington, it would have

02:17:46  15    been on the right-hand side before you get to North Marion

02:17:49  16    High School, which I guess that's a pretty big landmark, but

02:17:52  17    it would have been that stretch just south of North Marion

02:17:57  18    High School.

02:17:57  19    Q.   Okay.  At this point in time, are you able to tell the

02:18:01  20    jury if you had made it to your cruiser or not, when you're

02:18:07  21    asking Deputy Mundell if the Jeep had passed him?

02:18:09  22    A.   Yes, I believe that I asked that because I had passed the

02:18:14  23    Jeep at that point that matched the description.

02:18:17  24    Q.   Let's go -- what is the time of the next clip, please?

02:18:21  25    A.   145142.

02:18:24   1              MS. DURST:  Okay.  Can you play that, please,
02:18:26   2      Mr. Carroll.
02:18:31   3          (Playing radio clip.)
02:18:31   4      Q.  You had just asked Deputy Mundell if he had passed a
02:18:36   5      black Jeep and he said negative.  Why did you ask that
02:18:39   6      question again?
02:18:40   7      A.  I had asked it again because I didn't hear his initial
02:18:42   8      radio traffic that he had said negative, and I didn't hear it,
02:18:46   9      I was excited, and I got louder than I probably should have.
02:18:52   10     It happens from time to time when we talk to each other on the
02:18:54   11     radio.
02:18:54   12     Q.  What is the time on the next clip?
02:18:58   13     A.  145146.
02:19:00   14     Q.  So just about four seconds after your radio transmission
02:19:04   15     to Deputy Mundell asking again if he had seen the black Jeep?
02:19:08   16     A.  Yes.
02:19:09   17              MS. DURST:  Mr. Carroll, please.
02:19:12   18          (Playing radio clip.)
02:19:12   19     Q.  Who was that?
02:19:13   20     A.  That was Deputy Mundell again.
02:19:15   21     Q.  Okay.  What's the time of the next clip?
02:19:18   22     A.  145148.
02:19:23   23     Q.  Okay.  So two seconds after that clip we just listened
02:19:28   24     to?
02:19:28   25     A.  Yes, ma'am.

| | | |
|---|---|---|
| 02:19:29 | 1 | MS. DURST:  Okay.  Let's play that, Mr. Carroll. |
| 02:19:29 | 2 | (Playing radio clip.) |
| 02:19:33 | 3 | Q.   Who is that? |
| 02:19:33 | 4 | A.   That was me. |
| 02:19:34 | 5 | Q.   Okay.  And when you say, "He cut up East Run."  What are |
| 02:19:41 | 6 | you referring to? |
| 02:19:42 | 7 | A.   Mr. Rhoades, in the black Jeep. |
| 02:19:44 | 8 | Q.   So the black Jeep that you were involved in a pursuit |
| 02:19:47 | 9 | had -- what you had seen, cut up East Run? |
| 02:19:49 | 10 | A.   Yes, ma'am.  So previously Deputy Mundell had stated that |
| 02:19:54 | 11 | he was in that car anything area, so I knew based on where I |
| 02:19:57 | 12 | was and where Deputy Mundell was, the only road that he could |
| 02:20:01 | 13 | have cut up between me and Deputy Mundell was East Run. |
| 02:20:04 | 14 | Q.   Had you seen the black Jeep at that point? |
| 02:20:07 | 15 | A.   Yes. |
| 02:20:08 | 16 | Q.   Where had you seen the black Jeep? |
| 02:20:10 | 17 | A.   It was on the straight stretch where that old auction |
| 02:20:13 | 18 | barn used to be, that hilltop swap shop, or maybe chance, I |
| 02:20:18 | 19 | forget what it was called.  It was in that straight stretch I |
| 02:20:22 | 20 | passed the black Jeep matching the suspect description with a |
| 02:20:25 | 21 | male subject, who I believed to be Mr. Rhoades inside the |
| 02:20:27 | 22 | vehicle. |
| 02:20:27 | 23 | Q.   When you say you passed it, could you describe to the |
| 02:20:30 | 24 | jury what you mean?  Did you pull out and pass it, or did you |
| 02:20:33 | 25 | pass it as it was coming at your direction? |

02:20:36  1    A.   So I was traveling north on Route 250 and the black Jeep

02:20:41  2    was traveling in the southbound lane on Route 250.  When I

02:20:46  3    witnessed the vehicle, that's where I -- when I witnessed it I

02:20:49  4    attempted to start turning around, I turned my lights on

02:20:52  5    because I didn't want to pull into oncoming traffic, and as I

02:20:55  6    did so, I witnessed the vehicle swerve into my lane of traffic

02:21:01  7    or the northbound lane, almost striking a vehicle to go around

02:21:04  8    another vehicle that was in front of him in the southbound

02:21:09  9    lane.

02:21:09  10   Q.   What did you do after the Jeep, just as you described,

02:21:13  11   swerved into oncoming traffic?

02:21:14  12   A.   That's when I actually started to radio back and forth

02:21:18  13   with Deputy Mundell.

02:21:19  14   Q.   Okay.  Let's -- what's the time of the next clip then?

02:21:25  15   A.   Next clip is going to be 145159.

02:21:31  16        MS. DURST:  Mr. Carroll, could we play that, please?

02:21:32  17        (Playing radio clip.)

02:21:36  18   Q.   Who was that?

02:21:36  19   A.   That was me.

02:21:37  20   Q.   When you say, "I believe I jumped him up."  What were you

02:21:40  21   meaning?

02:21:41  22   A.   Deputy Wheeler had previously lost sight of Mr. Rhoades

02:21:47  23   during his pursuit, which is why we were still searching that

02:21:50  24   area for him.  When I said I jumped him back, I had located

02:21:54  25   Mr. Rhoades, or he was attempting to flee from us again.

364

| | | |
|---|---|---|
| 02:21:58 | 1 | Q.   Where had you located him at that point?  When you say |
| 02:22:03 | 2 | jumped him up, is that when you saw -- |
| 02:22:04 | 3 | A.   That was -- that was when I saw him on the road and all |
| 02:22:07 | 4 | of that. |
| 02:22:07 | 5 | Q.   Okay.  Okay.  Let's go to the next clip.  What is the |
| 02:22:10 | 6 | time of that clip? |
| 02:22:11 | 7 | A.   Next clip is going to be 145210. |
| 02:22:11 | 8 | MS. DURST:  Let's play that, Mr. Carroll. |
| 02:22:21 | 9 | (Playing radio clip.) |
| 02:22:21 | 10 | A.   Sounded like Deputy Wheeler saying "copy." |
| 02:22:24 | 11 | Q.   To your transmission that you had just jumped him up? |
| 02:22:28 | 12 | A.   Yeah. |
| 02:22:28 | 13 | Q.   Okay.  What is time of the next clip? |
| 02:22:31 | 14 | A.   145226. |
| 02:22:37 | 15 | MS. DURST:  Let's play that, Mr. Carroll. |
| 02:22:43 | 16 | (Playing radio clip.) |
| 02:22:43 | 17 | A.   Could you play that one again?  I didn't get a good -- |
| 02:22:43 | 18 | (Playing radio clip.) |
| 02:22:51 | 19 | A.   That sounds like Deputy Minnick. |
| 02:22:58 | 20 | Q.   And were you able to tell what Deputy Minnick was saying? |
| 02:23:02 | 21 | A.   Could you play that one more time? |
| 02:23:07 | 22 | (Playing radio clip.) |
| 02:23:07 | 23 | A.   "How far up are you, Dave?" |
| 02:23:09 | 24 | Q.   Okay.  And did you believe that transmission was directed |
| 02:23:14 | 25 | to you or someone else? |

02:23:15   1    A.   Yes.

02:23:15   2    Q.   Okay.  What's time of the next clip?

02:23:18   3    A.   145241.

02:23:23   4         MS. DURST:  Mr. Carroll, please.

02:23:23   5         (Playing radio clip.)

02:23:27   6    Q.   Who is that?

02:23:27   7    A.   That was me.

02:23:28   8    Q.   And when you say you got to the first turn, what were you

02:23:31   9    meaning as you were saying over the radio?

02:23:34   10   A.   So what had happened was we had begun pursuing him down

02:23:38   11   East Run Road, we were following that road -- it's part hard

02:23:42   12   top and it's also part gravel, so it left a dust trail and we

02:23:45   13   were following the dust trail out East Run and just if you go

02:23:49   14   down the hill when you turn on East Run from the 250 side,

02:23:52   15   there is a church and then there is a road to the left that

02:23:55   16   cuts up the hill called Parrish Run.  It's all gravel.

02:23:59   17        We had followed the trail up there and the first turn,

02:24:02   18   it's a very sharp turn.  It's like a switchback is where we

02:24:08   19   got to whenever dust trail stopped.

02:24:10   20   Q.   Okay.  And so that's what you were just referring to in

02:24:15   21   that radio transmission?

02:24:16   22   A.   Yes.

02:24:17   23   Q.   Got to the first turn?

02:24:20   24   A.   Yes, ma'am.

02:24:20   25   Q.   Okay.  What is the time of the next clip?

02:24:21  1    A.   145246.

02:24:25  2         MS. DURST:  Okay.  Mr. Carroll, please.

02:24:30  3         (Playing radio clip.)

02:24:30  4    Q.   Who is that?

02:24:31  5    A.   That was me.

02:24:32  6    Q.   What are you referring to over this transmission?

02:24:35  7    A.   I was stating -- I was relaying that I wasn't sure if he

02:24:40  8    continued up Parrish Run or if he cut off on one of the roads

02:24:43  9    that was there in that turn.

02:24:45  10   Q.   Okay.  Let's go to the time of the next clip, please.

02:24:48  11   A.   145304.

02:24:53  12        MS. DURST:  Okay, Mr. Carroll.

02:24:53  13        (Playing radio clip.)

02:24:59  14   Q.   And we've seen some of the photographs.  What trail are

02:25:06  15   you referring to when you say it looks like he cut off the

02:25:09  16   trail on East Run?

02:25:10  17   A.   I misspoke that day, it's actually Parrish Run that we

02:25:18  18   have established today, but it would have the access road to

02:25:20  19   the well site that we have seen in the pictures today.

02:25:23  20   Q.   And what time is that clip again?

02:25:25  21   A.   It appears that that was 145304.

02:25:31  22   Q.   Okay.  So that's 2:53 and 4 seconds?

02:25:34  23   A.   Yes, ma'am.

02:25:35  24   Q.   Okay.  And let's play next clip.  What is the time of the

02:25:43  25   next clip?  Sorry.  What's the time of the next clip?

02:25:44  1    A.    145315.

02:25:46  2          MS. DURST:  Okay.  Let's go ahead and play that,

02:25:48  3    Mr. Carroll.

02:25:55  4          (Playing radio clip.)

02:25:55  5    Q.    Who was that?

02:25:56  6    A.    That was Deputy Mundell.

02:25:59  7    Q.    Do you know what he's referring to when he's saying

02:26:04  8    "Where at on the split?"

02:26:06  9    A.    I'm not positive.  He may be talking about the split for

02:26:10 10    East Run, Parrish Run.

02:26:12 11    Q.    Okay.  What's the time of the next clip?

02:26:15 12    A.    145320.

02:26:19 13          MS. DURST:  All right.  Let's go ahead and play that,

02:26:22 14    please.

02:26:22 15          (Playing radio clip.)

02:26:26 16    Q.    And what is this clip?

02:26:27 17    A.    That was me.

02:26:29 18    Q.    And what are you reporting over the radio?

02:26:32 19    A.    That shots had been fired.

02:26:36 20    Q.    And by this time, had you fired seven rounds?

02:26:42 21    A.    Yes, ma'am, I just finished using my weapon and then had

02:26:47 22    reported over the radio.

02:26:48 23    Q.    Okay.  And then let's play the last -- what's the time of

02:26:52 24    the last clip, please?

02:26:55 25    A.    145327.

| | | |
|---|---|---|
| 02:26:58 | 1 | MS. DURST:  Okay.  Mr. Carroll. |
| 02:27:05 | 2 | (Playing radio clip.) |
| 02:27:05 | 3 | Q.   And who is that? |
| 02:27:06 | 4 | A.   That was -- that was me. |
| 02:27:07 | 5 | Q.   And what were you asking over the radio there? |
| 02:27:09 | 6 | A.   I was asking for dispatch to send an ambulance. |
| 02:27:16 | 7 | Q.   Okay.  Generally, Deputy Forsyth, these transmissions, |
| 02:27:22 | 8 | were you reporting some of these things simultaneously as they |
| 02:27:29 | 9 | were occurring? |
| 02:27:29 | 10 | A.   Some of them, yes. |
| 02:27:30 | 11 | Q.   Okay.  So let's back up again.  When you located -- when |
| 02:27:38 | 12 | you first saw the Jeep, were you on 250? |
| 02:27:42 | 13 | A.   Yes, ma'am. |
| 02:27:43 | 14 | Q.   Okay.  Can you describe what happened -- let me back up. |
| 02:27:50 | 15 | Which direction were you traveling on 250? |
| 02:27:53 | 16 | A.   I was traveling northbound, so I was traveling from the |
| 02:27:56 | 17 | Fairmont to Mannington. |
| 02:27:57 | 18 | Q.   Okay.  In which direction was the Jeep traveling? |
| 02:28:00 | 19 | A.   The Jeep was traveling southbound, so from Mannington |
| 02:28:04 | 20 | back towards Fairmont. |
| 02:28:05 | 21 | Q.   When you saw the Jeep, did you take any action at that |
| 02:28:09 | 22 | time? |
| 02:28:10 | 23 | A.   Yes, I kicked my lights on and then attempted to turn |
| 02:28:16 | 24 | around to get behind the vehicle, I was going to try to |
| 02:28:19 | 25 | identify driver. |

02:28:20  1   Q.   Did the Jeep -- did you see the Jeep take any action in

02:28:24  2   response?

02:28:24  3   A.   Yes.   That's when I saw it swerve into oncoming traffic

02:28:28  4   almost striking another vehicle to go around the vehicle that

02:28:31  5   was in front of it.

02:28:33  6   Q.   Okay.   So just, I guess, to make sure that I understand,

02:28:43  7   Parrish Run is where the access road to the gas well site cuts

02:28:48  8   off of, am I understanding that correctly?

02:28:50  9   A.   Yes.   The access road is off of Parrish Run.

02:28:53  10  Q.   Okay.   So let's talk about when you pull into the access

02:28:59  11  road.

02:28:59  12  A.   Yes, ma'am.

02:29:00  13  Q.   Okay.   When you pull into the access road, do you see the

02:29:06  14  Jeep?

02:29:07  15  A.   Yes.   As I -- well, the initial access road you could not

02:29:11  16  see the Jeep.   As I pulled out into the opening where the gas

02:29:15  17  well was is when I witnessed the Jeep off to my left.

02:29:20  18  Q.   Did you come across any other vehicles in between when

02:29:24  19  you were pulling onto Parrish Run and when you got into the

02:29:29  20  access road?

02:29:30  21  A.   Yes, ma'am.   So in that turn at Parrish Run in that sharp

02:29:35  22  switchback, there was actually a little girl in a -- it was

02:29:38  23  like a champagne colored Ford Focus, one of the real little

02:29:45  24  subcompact Fords.   So I had to let her get down -- you know,

02:29:49  25  get out of the turn before I actually turned around.

02:29:51   1    Q.   And so then what did you do after her car was out of the

02:29:54   2    way?

02:29:54   3    A.   After her car was out of the way is when I got turned

02:29:58   4    around and went into the access road.

02:30:00   5    Q.   Okay.  When you entered the access road can you tell the

02:30:03   6    jury what you recall seeing?

02:30:06   7    A.   It was a grown up area.  As I pulled into the access road

02:30:11   8    where it opened up, the Jeep was setting perpendicular to my

02:30:19   9    car off to the left and drove towards my car almost striking

02:30:23   10   it, and that's when I, in haste, I was trying to get out of

02:30:29   11   the vehicle, you know, because I was responding to assisted

02:30:32   12   pursuit, I'm sure that my engine and transmission, everything

02:30:35   13   was hot, I don't know -- you know, I don't know if I just

02:30:37   14   didn't get it up into gear or didn't want to go into park or

02:30:41   15   what, whenever I was doing that, but it didn't go into park,

02:30:44   16   so I exited my vehicle and went to get to the rear of my

02:30:47   17   cruiser to use it as cover, and the vehicle kept moving

02:30:51   18   forward so it left me exposed in the middle of the road.

02:30:54   19   Q.   When you pulled into the access road, did you immediately

02:30:58   20   exit your vehicle?

02:30:59   21   A.   It wasn't immediate.

02:31:01   22   Q.   If it wasn't immediate, can you tell the jury what was

02:31:06   23   happening in that time between when you pulled into the access

02:31:09   24   road and when you actually exited your vehicle?

02:31:12   25   A.   Yes, ma'am.  So that's -- as I said when I got into where

02:31:16   1   the clearing opened up, the vehicle was setting perpendicular
02:31:19   2   to me, and it came -- like came forward and almost struck my
02:31:24   3   vehicle.  So as that happened, the vehicle, the black Jeep was
02:31:28   4   attempting to do like a quasi three-point turn and get angled
02:31:32   5   and that's when I had taken the chance to get out of my
02:31:35   6   vehicle and get to the rear of it.
02:31:37   7   Q.   The photo -- some of the photos that we have seen here
02:31:42   8   today, Deputy Forsyth, do any of those show the position of
02:31:46   9   the vehicle where it was when you first saw it?
02:31:51  10   A.   It's possible there is some that show, like, the ground
02:31:56  11   where the vehicle was at.
02:31:57  12   Q.   The final resting place of the Jeep in those photographs,
02:32:02  13   was that the position of the Jeep when you first pulled into
02:32:05  14   the access road?
02:32:06  15   A.   No, ma'am, it was not.
02:32:10  16        MS. DURST:  Your Honor, may I approach and get
02:32:12  17   Defendant's Exhibit No. 1?
02:32:14  18        THE COURT:  You may.
02:32:19  19        MS. DURST:  Your Honor, may I hand these to
02:32:20  20   Deputy Forsyth, please?
02:32:22  21        THE COURT:  Please.
02:32:23  22        MS. DURST:  Thank you.
02:32:24  23   BY MS. DURST:
02:32:28  24   Q.   Deputy Forsyth, I have handed you what has been
02:32:32  25   previously admitted as Defendants No. 1.  And there are 30

02:32:37  1    photographs there.  What I would like to you do, if you could,

02:32:40  2    Deputy Forsyth, is look through those photographs, and see if

02:32:44  3    you can locate any that you would be able to point to the jury

02:32:48  4    where the positioning of the Jeep would have been when you

02:32:52  5    first pulled into the access road.

02:32:55  6         And if you can find a photo to that effect, there is a

02:32:58  7    number in the bottom right-hand corner, if you can identify

02:33:02  8    that number, then we can have Mr. Carroll pull the photo up

02:33:07  9    onto the screen.

02:33:08  10   A.   Yes, ma'am.  Okay.  If you can go to number 22.

02:33:55  11   Q.   Is that photograph on the screen, Deputy Forsyth, is that

02:33:57  12   the one you're looking at?

02:33:58  13   A.   Yes, ma'am.

02:33:59  14   Q.   Okay.  And what about photograph number 22, can you show

02:34:04  15   the jury where the Jeep would have been when you initially

02:34:09  16   pulled into the access road?

02:34:10  17   A.   Okay.  So if you see where the tire on the actual Jeep

02:34:18  18   is, at that --

02:34:18  19   Q.   Let me stop you there.  Which tire?

02:34:20  20   A.   I'm sorry, the fifth tire, the spare.

02:34:23  21   Q.   Okay.

02:34:24  22   A.   There is ground disturbance or a clearing right there, I

02:34:29  23   believe that that would be roughly where it was at and it was

02:34:32  24   parked perpendicular to where I was.  So it was like in a T

02:34:37  25   fashion as I was coming in.

02:34:38  1    Q.   Where was the back of the Jeep versus the front of the

02:34:42  2    Jeep when you first pulled into the access?

02:34:43  3    A.   The front would have been pointed towards me and the back

02:34:46  4    of it then backed into the brush.

02:34:48  5    Q.   Okay.  All right.  At that point, then, when you pull

02:34:52  6    into the access road, what does the Jeep do?

02:34:57  7    A.   That is when the Jeep -- when I started in is when the

02:35:01  8    Jeep came forward and almost struck my vehicle.

02:35:04  9    Q.   Struck your vehicle where?

02:35:06  10   A.   It would have been on or around the front driver side

02:35:10  11   quarter panel, front door, like right around the A frame or

02:35:14  12   the A pillar.

02:35:14  13   Q.   Then what happened?

02:35:16  14   A.   That's when he started to back up and do like a quasi

02:35:19  15   three-point turn, and that's when I started to exit my

02:35:22  16   vehicle.

02:35:22  17   Q.   Okay.  When you exited your vehicle, then, what was your,

02:35:29  18   I guess, intention when you were exiting your vehicle, what

02:35:33  19   was your plan?

02:35:34  20   A.   I was trying to get to the rear of my vehicle for cover

02:35:37  21   and attempt to stop this fleeing vehicle.

02:35:40  22   Q.   When you exit your vehicle, did you -- did you realize at

02:35:45  23   that point in time that your cruiser was not in park?

02:35:49  24   A.   No, ma'am, I didn't.  In my haste to get out of the

02:35:53  25   vehicle, again, I don't know if because the transmission was

02:35:56  1    hot that I couldn't get it into park, or I knocked the gear

02:36:02  2    shift up, but it didn't go into -- it didn't go into park, I

02:36:04  3    didn't get it there.

02:36:04  4    Q.   Did you see your cruiser moving forward?

02:36:08  5    A.   In my peripheral, I just remember trying to get to the

02:36:11  6    back of it and it wasn't there.

02:36:14  7    Q.   Let me stop there, and let me ask you something.  Before

02:36:16  8    you became involved in this pursuit of Philip Rhoades, had you

02:36:21  9    had any personal or professional dealings with him yourself?

02:36:26  10   A.   No, ma'am.  None.

02:36:28  11   Q.   Okay.  So you get out of your cruiser, and then what

02:36:36  12   happens?

02:36:36  13   A.   I had gotten out of my vehicle, I drew my weapon, I began

02:36:41  14   to give Mr. Rhoades loud verbal commands, stop the vehicle,

02:36:46  15   show me your hands, things of that nature.

02:36:48  16   Q.   Did Mr. Rhoades comply with those commands?

02:36:51  17   A.   No, ma'am, he did not.  He continued to try to angle the

02:36:55  18   vehicle or to maneuver the vehicle in the clearing there.

02:36:57  19   Q.   Did Mr. Rhoades ever comply with the verbal commands that

02:37:02  20   you gave?

02:37:02  21   A.   No, ma'am, he did not.

02:37:04  22   Q.   At one point in time, Deputy Forsyth, did you begin

02:37:09  23   firing your weapon?

02:37:10  24   A.   The vehicle had -- after the vehicle had started coming

02:37:15  25   towards me and I realized that I was about to be run over, I

02:37:18  1    was going to get hit by the vehicle.

02:37:21  2    Q.   Do you recall how many shots you fired?

02:37:26  3    A.   I believe it was seven rounds.

02:37:29  4    Q.   At that point in time, did you know that you had fired

02:37:32  5    seven rounds?

02:37:32  6    A.   So in my training, we're taught at times to do what is

02:37:40  7    called a tac reload.  I began to do a tac reload after

02:37:44  8    shooting.  But I did not.  I chose not to.  Instead I moved

02:37:49  9    forward and cleared the passenger area of the vehicle to make

02:37:55  10   sure there was no other weapons and then began to render aid.

02:37:58  11   Q.   You've heard Lieutenant Branham's testimony with regard

02:38:08  12   to the information you provided as part of his investigation,

02:38:11  13   true?

02:38:11  14   A.   Yes.

02:38:12  15   Q.   Do you recall telling Sergeant Branham that you had seen

02:38:17  16   the person inside the Jeep doing anything?

02:38:21  17   A.   Yes, ma'am.

02:38:22  18   Q.   What did you -- what did you see or what did you notice

02:38:26  19   and at what point in time did you notice this?

02:38:29  20   A.   So as he -- as he was backing up and right before the

02:38:32  21   vehicle started to come towards me, the subject inside the

02:38:35  22   vehicle was reaching over the, like, the console into either

02:38:41  23   floorboard or the passenger side area of the front of the

02:38:44  24   Jeep.  Almost as if he were, like, trying to hide down behind

02:38:48  25   the dash or reach down into the floorboard to get something.

| | | |
|---|---|---|
| 02:38:51 | 1 | Q.   Is it fair to say, Deputy Forsyth, that you never |
| 02:38:56 | 2 | actually saw Philip Rhoades with any kind of gun, knife, or |
| 02:39:01 | 3 | anything like that.  Is that fair? |
| 02:39:03 | 4 | A.   That's correct.  I didn't see him with a gun or a knife |
| 02:39:06 | 5 | or anything like that. |
| 02:39:08 | 6 | Q.   But had heard over the radio that he may be armed? |
| 02:39:13 | 7 | A.   Yes, ma'am. |
| 02:39:13 | 8 | Q.   Deputy Forsyth, can you tell this jury why you fired your |
| 02:39:20 | 9 | weapon at that Jeep? |
| 02:39:21 | 10 | A.   Because I thought I was going to die.  I thought that I |
| 02:39:27 | 11 | was not going to make it home to my wife and my three |
| 02:39:30 | 12 | children. |
| 02:39:31 | 13 | Q.   I think Mr. Prince -- are you okay, Deputy Forsyth? |
| 02:39:31 | 14 | A.   (No audible answer.) |
| 02:39:54 | 15 | Q.   I think Mr. Prince had asked you and I think it had come |
| 02:39:58 | 16 | up in your deposition about whether you knew how much time had |
| 02:40:00 | 17 | elapsed during your interactions with the Jeep. |
| 02:40:04 | 18 | Do you recall that? |
| 02:40:05 | 19 | A.   Yes, ma'am, I do. |
| 02:40:06 | 20 | Q.   Okay.  Even as we sit here today, even looking at the |
| 02:40:11 | 21 | radio traffic, the time of that, are you still able to tell |
| 02:40:15 | 22 | the jury what you recall versus what is actually on the radio |
| 02:40:19 | 23 | traffic? |
| 02:40:22 | 24 | Does that make sense?  Aside from seeing the timing of |
| 02:40:25 | 25 | when those radio transmissions were made, would you be able to |

02:40:29  1    tell the jury how much time elapsed if you had not seen those

02:40:34  2    times?

02:40:34  3    A.   No, ma'am.

02:40:35  4    Q.   Did you perceive what you believed to be a threat of

02:40:40  5    imminent danger to you when you fired your weapon?

02:40:44  6    A.   Yes, ma'am.

02:40:45  7    Q.   What was that threat?

02:40:47  8    A.   The vehicle driving at me.

02:40:49  9    Q.   When did you actually stop firing your weapon?

02:40:53  10   A.   When the -- when the vehicle stopped.

02:40:56  11   Q.   After the shooting, can you tell the jury, we've heard

02:41:07  12   your transmission where you came over and said, "Man, shots

02:41:10  13   fired, shots fired," and then radioed for an ambulance, can

02:41:14  14   you tell the jury what you did after that?

02:41:16  15   A.   After that, I -- there was some more radio traffic that

02:41:22  16   we didn't play, dispatch had asked me, like, they knew that we

02:41:26  17   needed 1050, they knew we needed an ambulance, and I had

02:41:29  18   checked on Corey to make sure that he was okay.  He was okay.

02:41:32  19        Dispatch asked again if all officers were okay.  We said

02:41:36  20   yes.  At that point, we cleared the passenger area of the

02:41:40  21   vehicle, Mr. -- I moved towards the vehicle and saw

02:41:45  22   Mr. Rhoades inside the vehicle slumped over the center

02:41:50  23   console.  At that point I believe I asked Deputy Love to get

02:41:54  24   gloves so that we could pull him out of the vehicle to render

02:41:58  25   aid.

378

02:41:58   1   Q.   While you were firing your weapon, do you know where

02:42:01   2   Deputy Love actually was?

02:42:05   3   A.   No, ma'am.  I know initially that I had thought that he

02:42:08   4   was behind me, but I later come to find out that he was not

02:42:12   5   because he tried to take care of the vehicle that was still

02:42:15   6   moving.

02:42:16   7   Q.   Okay.  So you said you cleared the passenger side of the

02:42:22   8   Jeep.  What --

02:42:24   9   A.   Passenger, I'm sorry, let me -- the passenger area.  That

02:42:27   10   would be, so I do this from time to time I speak in police

02:42:32   11   officers, so I apologize.  That would be any area where people

02:42:36   12   sit inside their vehicle.  So where Mr. Rhoades was sitting,

02:42:41   13   that area, his immediate area where he sat.

02:42:44   14   Q.   So the area where seats would be inside the Jeep?

02:42:48   15   A.   Yes, ma'am.

02:42:49   16   Q.   Okay.  Okay.  And at some point in time -- well, let me

02:42:54   17   back up.  You said that Mr. Rhoades was slumped over the

02:42:58   18   console?

02:42:58   19   A.   Yes, ma'am.  He was leaning forward and over the console.

02:43:02   20   Q.   Is that the area where the gear shift was as well?

02:43:06   21   A.   Yes, ma'am.

02:43:07   22   Q.   Do you know, did you remove Mr. Rhoades from the Jeep by

02:43:17   23   yourself, did Deputy Love assist you?

02:43:20   24   A.   I couldn't say for certain, I believe Deputy Love

02:43:23   25   assisted me.

02:43:24  1   Q.   Okay.  When you took Mr. Rhoades from the Jeep, did you

02:43:30  2   find any pulse?

02:43:32  3   A.   After taking him out of the Jeep, no, ma'am, I didn't --

02:43:36  4   I didn't find a pulse.

02:43:37  5   Q.   What did you do when you removed him from the Jeep?

02:43:40  6   A.   We removed him from the Jeep and laid him on the ground,

02:43:44  7   didn't find a pulse and then I began to administer CPR.

02:43:48  8   Q.   Let me ask this, what was -- if anything, was Deputy Love

02:43:54  9   doing at that time?

02:43:56  10  A.   I don't really recall because I know I had him get

02:44:00  11  gloves, I was focused on continuing to do CPR, and anyone who

02:44:07  12  has done that, that is a pretty involved process.

02:44:09  13  Q.   While you were performing CPR, did you ever find a pulse?

02:44:13  14  A.   I only checked that first time and then by the time I was

02:44:17  15  relieved from doing that whenever medical personnel got there.

02:44:21  16  Q.   Fair enough.  You heard Lieutenant Branham's testimony

02:44:24  17  with regard to his investigation and when he got there the

02:44:29  18  Jeep, he said, was running and appeared to be in gear.  You've

02:44:32  19  heard that testimony?

02:44:33  20  A.   Yes, ma'am.

02:44:33  21  Q.   Okay.  Do you recall if the Jeep was still running when

02:44:39  22  you removed Mr. Rhoades?

02:44:41  23  A.   I don't recall if it was running or not.

02:44:44  24  Q.   Do you have any reason to dispute Lieutenant Branham's

02:44:47  25  statement that the Jeep was still running?

02:44:51  1    A.   No, ma'am, not that it was still running.

02:44:54  2    Q.   Do you have any reason to dispute that the Jeep was still

02:44:57  3    running and appeared to be in gear?

02:44:59  4    A.   Yes, ma'am.

02:45:00  5    Q.   Why?

02:45:01  6    A.   Because that's -- it's not possible for a Jeep to be in

02:45:08  7    gear and running without someone being in the vehicle.

02:45:14  8    Q.   We heard Lieutenant Branham say he doesn't know how to

02:45:17  9    and has never operated a manual transmission.  Have you ever

02:45:21  10   operated a manual transmission?

02:45:21  11   A.   Yes, ma'am.

02:45:21  12   Q.   Have you ever owned a manual transmission vehicle?

02:45:25  13   A.   Yes, ma'am.

02:45:25  14   Q.   How many over the years have you owned?

02:45:30  15   A.   Personally, I've owned at least one and my parents owned

02:45:33  16   vehicles, you know, my -- that's what I was taught to drive on

02:45:37  17   was a standard.

02:45:39  18   Q.   Do you know then, Deputy Forsyth, if it's possible to

02:45:43  19   take a manual transmission out of gear without the clutch

02:45:47  20   being pushed in?

02:45:49  21   A.   Yes.

02:45:49  22   Q.   Is it possible to put a Jeep -- a manual transmission

02:45:53  23   into gear if the clutch isn't pushed in?

02:45:57  24   A.   Not easily.

02:46:15  25   Q.   We've heard some testimony from Lieutenant Branham.  Mr.

02:46:18   1   Prince actually asked you some questions about the statement

02:46:21   2   that you provided to Sergeant Branham.

02:46:22   3       Do you recall that?

02:46:23   4   A.   Yes, ma'am.

02:46:24   5   Q.   Okay.  Did you -- did anyone tell you not to provide a

02:46:31   6   statement to lieutenant -- he would have then been sergeant,

02:46:37   7   now Lieutenant Branham at the hospital?

02:46:38   8   A.   No, ma'am, I don't recall anyone ever telling me not to

02:46:41   9   give a statement to him.

02:46:42   10  Q.   When you went to give your statement to Sergeant Branham,

02:46:46   11  did you take an attorney?

02:46:48   12  A.   No, ma'am.

02:46:49   13  Q.   Were there any questions you refused to answer?

02:46:53   14  A.   No, ma'am.

02:46:54   15  Q.   Why did you take a written statement with you?

02:46:59   16  A.   So part of my job when I do anything that I do, we

02:47:09   17  document -- right? -- that's what we do.  We document things

02:47:11   18  so that we can recall.  We document things so that we can

02:47:15   19  remember later.

02:47:16   20      I wanted to have something to clearly understand the

02:47:22   21  facts that I remembered from that day in front of me whenever

02:47:26   22  I gave my statement.

02:47:28   23  Q.   Did anyone help you prepare that statement?

02:47:33   24  A.   No, ma'am.

02:47:33   25  Q.   Deputy Forsyth, I want to ask you a couple questions.

02:47:42  1    You heard questioning of Lieutenant Branham about you washing

02:47:47  2    your hands and --

02:47:48  3    A.   That's correct.

02:47:49  4    Q.   -- with regard to the gunshot residue test, right?

02:47:52  5    A.   Yes.

02:47:53  6    Q.   Did you ever dispute or deny that you were the one that

02:47:59  7    had fired your weapon into the Jeep?

02:48:02  8    A.   No, ma'am.

02:48:02  9    Q.   Starting off his questions, Mr. Prince asked you about a

02:48:09  10   police officer violating a citizen's constitutional rights.

02:48:13  11        Do you recall his questions initially?

02:48:15  12   A.   Yes, ma'am.

02:48:16  13   Q.   And your actions on August 2nd, 2017, Deputy Forsyth, do

02:48:21  14   you believe that you violated Philip Rhoades' constitutional

02:48:26  15   rights?

02:48:26  16   A.   No, ma'am.

02:48:26  17   Q.   He also asked you -- well, let me back up.  Why?

02:48:31  18   A.   He was attempting to kill me.

02:48:34  19   Q.   You were also asked questions about a police officer

02:48:37  20   being required to comply with the policies and procedures of

02:48:41  21   its department.

02:48:42  22        You agree with that, right?

02:48:43  23   A.   Yes.

02:48:44  24   Q.   Do you believe that you violated any policy or procedure

02:48:48  25   of the Marion County Sheriff's Department in your actions on

02:48:52   1    August 2nd, 2017?

02:48:53   2    A.   No, ma'am.  I do not.

02:48:55   3            MS. DURST:  Your Honor one moment, please.

02:48:57   4            THE COURT:  Certainly.

02:49:07   5            MS. DURST:  Your Honor, I have no further questions

02:49:09   6    of Defendant Forsyth.

02:49:10   7            THE COURT:  Thank you.  Mr. Prince, if you'll give

02:49:12   8    Ms. Durst a moment.  Thank you.

02:49:39   9                    FURTHER CROSS-EXAMINATION

02:49:39   10   BY MR. PRINCE:

02:49:39   11   Q.   Officer Forsyth, you testified that you saw Philip

02:49:45   12   reaching towards the center console; is that right?

02:49:48   13   A.   He was reaching into, like, passenger side floorboard or

02:49:52   14   down in the center console area, yes.

02:49:55   15   Q.   You heard the medical examiner testify, didn't you?  He

02:49:58   16   was shot on the right side of his face?

02:50:01   17   A.   Yes, sir.

02:50:02   18   Q.   Isn't that -- wouldn't that be more consistent with him

02:50:07   19   leaning away from the console perhaps to take cover from your

02:50:10   20   fire?

02:50:10   21   A.   Sir, so when the vehicle started coming at me he was down

02:50:16   22   -- he was down underneath the dashboard.  As I was firing, I

02:50:21   23   did witness the silhouette pop up.  Again, I don't know what

02:50:24   24   he was doing inside the vehicle.  I don't know if he was

02:50:28   25   struck by glass.  I don't know if he was trying to change

02:50:32  1    gears.  I don't know.

02:50:33  2         But yes, when the vehicle -- I testified that when the

02:50:35  3    vehicle started coming towards me he was down in behind the

02:50:38  4    dash or reaching into the floorboard.

02:50:40  5    Q.   Right.  I think the point is that you don't know, right?

02:50:44  6    A.   Excuse me?

02:50:46  7    Q.   I think the point is you don't know, right?

02:50:49  8    A.   I don't know what, sir?

02:50:51  9    Q.   You just testified you don't know what Philip was doing

02:50:54  10   inside the vehicle and you don't know, do you?

02:50:56  11   A.   I don't know what he was doing inside the vehicle.

02:50:58  12   Q.   Now, let me ask you this.  Do you shoot every occupant of

02:51:03  13   a vehicle that reaches towards the console?

02:51:06  14   A.   No, sir.

02:51:07  15   Q.   Now, you couldn't read the screen in front of you without

02:51:13  16   your glasses, could you?  I notice you put your glasses on?

02:51:16  17   A.   Not today, sir, I have a problem with computer screens

02:51:19  18   sometimes, that's why I have glasses.  I set behind a desk a

02:51:23  19   lot now.

02:51:23  20   Q.   You couldn't read the screen without your glasses on,

02:51:27  21   right?

02:51:27  22   A.   Yes, sir, I had a hard time reading the computer screen.

02:51:29  23   Q.   Corey Love's dad -- you know Corey Love, right?

02:51:32  24   A.   Yes, sir.

02:51:32  25   Q.   Corey Love's dad was your boss on August 2nd, 2017,

02:51:39  1   wasn't he?

02:51:41  2   A.   I mean, if you're asking was he -- I mean, he is over me

02:51:45  3   in the department, yes.

02:51:46  4   Q.   Right.  And Corey Love's dad is still your boss today,

02:51:52  5   isn't he?

02:51:53  6   A.   Yes, sir.  He is still employed with the sheriff's

02:51:56  7   department.

02:52:02  8   Q.   Now, you testified that you had enough time to think

02:52:10  9   about doing a tac reload, that's short for tactical reload,

02:52:16  10   isn't it?

02:52:16  11   A.   I believe that it is.

02:52:16  12   Q.   Yeah.  So you're shooting at this Jeep and you have

02:52:19  13   enough time to think about reloading so you can shoot some

02:52:25  14   more, but not enough time to take a step to get out of the way

02:52:29  15   of this Jeep that's coming towards you?

02:52:32  16   A.   That was after -- after the incident and I've trained to

02:52:37  17   do tac reloads a lot.  I don't particularly train to dive out

02:52:41  18   of the way of a vehicle on a regular basis, sir.

02:52:43  19   Q.   Not trained to take a step, is that your testimony?

02:52:48  20   A.   No, sir.  I just testified that I train often to do tac

02:52:54  21   reloads, I don't train basic maneuvers in front of vehicles on

02:52:58  22   a regular basis.

02:52:59  23   Q.   Trained to shoot, not trained to step out of the way of a

02:53:02  24   running vehicle, in your opinion, right?

02:53:04  25   A.   No, sir, I've explained myself.

| | | |
|---|---|---|
| 02:53:06 | 1 | Q.   You testified that you wanted to go home to your |
| 02:53:22 | 2 | children, but you would agree, wouldn't you, Officer, that |
| 02:53:27 | 3 | officers with children aren't allowed to just shoot their |
| 02:53:31 | 4 | firearms with reckless abandon, are they? |
| 02:53:34 | 5 | A.   Sir, I didn't shoot with reckless abandon. |
| 02:53:36 | 6 | Q.   You would agree with me, wouldn't you, Officer, that |
| 02:53:39 | 7 | officers with children are not allowed to shoot their firearms |
| 02:53:43 | 8 | with reckless abandon, wouldn't you? |
| 02:53:46 | 9 | A.   I didn't shoot with reckless abandon. |
| 02:53:49 | 10 | Q.   You would agree with me, wouldn't you, Officer Forsyth, |
| 02:53:53 | 11 | that police officers that have children still are not allowed |
| 02:53:57 | 12 | to shoot their firearms with reckless abandon, are they? |
| 02:54:02 | 13 | A.   While I do agree with you, that's not what I did. |
| 02:54:04 | 14 | Q.   And you agree with me, Officer, that the use of force |
| 02:54:09 | 15 | policy in Marion County does not say officers with children |
| 02:54:15 | 16 | are allowed to shoot first and ask questions later, does it? |
| 02:54:19 | 17 | Not in there? |
| 02:54:20 | 18 | A.   That's not in there.  That's also not what I did, sir. |
| 02:54:22 | 19 | Q.   And you would agree with me, Officer, that the United |
| 02:54:28 | 20 | States Constitution does not say that the rights contained |
| 02:54:32 | 21 | herein do not apply if the officer has children at home, |
| 02:54:37 | 22 | right? |
| 02:54:38 | 23 | A.   I don't believe that is in the Constitution, sir. |
| 02:54:41 | 24 | Q.   And you don't have any explanation for this jury as to |
| 02:54:45 | 25 | how this Jeep moved in neutral, so you come in court to |

02:54:49   1   testify and you use your children as a justification for

02:54:55   2   killing Philip Rhoades, don't you?

02:54:58   3           MS. DURST:  Objection, Your Honor, badgering the

02:55:00   4   witness.

02:55:01   5           THE COURT:  Overruled.  You may answer the question,

02:55:03   6   Mr. Forsyth.

02:55:04   7           THE WITNESS:  Could you restate the question, sir.

02:55:06   8   BY MR. PRINCE:

02:55:06   9   Q.   You don't have any explanation as to how this Jeep moved

02:55:10   10  while it was in neutral, so instead you come to court today

02:55:17   11  and you resort to using your own children as an excuse, as

02:55:22   12  some sick justification for killing Philip Rhoades?

02:55:26   13  A.   No, Mr. Prince, I'm not using my children for anything,

02:55:28   14  I'm explaining to you what was going on that day.  And I've

02:55:33   15  attempted to give you what you asked for in speculation of how

02:55:36   16  that Jeep may have ended up in neutral.  I don't know how it

02:55:39   17  ended up in neutral, but what I do know is that that vehicle

02:55:42   18  was driving at me that day.  I know that.

02:55:46   19          MR. PRINCE:  We're finished with this witness, Your

02:55:48   20  Honor?

02:55:48   21          THE COURT:  Understood.  Anything further, Ms. Durst?

02:55:50   22          MS. DURST:  I don't have anything further, Your

02:55:52   23  Honor.

02:55:52   24          THE COURT:  Mr. Forsyth, you may step down.  You can

02:55:54   25  leave those exhibits there, sir, we will take care of tidying

02:55:58   1    up.

02:55:58   2              MS. DURST:  Do you want him to leave the exhibits,

02:55:58   3    Your Honor?

02:56:01   4              THE COURT:  We'll take care of the exhibits.  Leave

02:56:03   5    those there, thank you, sir.

02:56:15   6         Ladies and gentlemen, it strikes me we are at the

02:56:18   7    appropriate time this afternoon to take our afternoon break so

02:56:20   8    we'll do that now.  We'll be ready to go again at ten after

02:56:25   9    3:00.  My usual instructions still apply.

02:56:28   10        Please continue to refrain from discussing this case with

02:56:30   11   anyone, that includes amongst yourselves or with any of your

02:56:33   12   fellow jurors, and also please continue to refrain from any

02:56:36   13   independent investigations.  Not only with respect to this

02:56:38   14   case, any of the issues we've discussed so far.

02:56:40   15        With that, we'll see you again here in 15 minutes.  Thank

02:56:43   16   you all very much.

02:57:13   17        (The jury exited the courtroom at 2:57 p.m.)

02:57:13   18             THE COURT:  Please be seated.  Who will be the next

02:57:15   19   witness?

02:57:16   20             MR. UMINA:  Your Honor, we are actually going to

02:57:19   21   play -- we just got the designations between the two of us

02:57:24   22   from Corey Love.  That will be --

02:57:27   23             THE COURT:  Well, do we need to take up the

02:57:30   24   objections?

02:57:31   25             MR. UMINA:  We worked it out.  We have been

02:57:33    1    conferring.

02:57:34    2         THE COURT:  What a pleasant, welcome and heartwarming

02:57:37    3    surprise.  I withdraw my inquiry then.  Thank you all for

02:57:41    4    doing that.  Genuine appreciation from the bench.

02:57:46    5         MS. DURST:  Your Honor, just for the record.

02:57:46    6         THE COURT:  Yes.

02:57:47    7         MS. DURST:  I think the video is about an hour after

02:57:49    8    it was edited, just to give the Court a heads up.

02:57:52    9         THE COURT:  Thank you.  That was going to be my next

02:57:55   10    point.  I anticipate a hard stop at 4:30, 4:45 today so if we

02:58:01   11    play that video, that will probably get us there.

02:58:03   12         MR. UMINA:  I was just going to say after that I

02:58:08   13    believe Deputy Parker is here, or at least on his way.  Really

02:58:14   14    his testimony will be very short, specifically about Corey

02:58:18   15    Love.  So and then after that, Rick Rhoades.  So in the event

02:58:25   16    we still have, you know, 30, 45 minutes, we can likely get

02:58:29   17    through both Parker and Mr. Rhoades.

02:58:31   18         THE COURT:  Okay.  All right.  We'll play it by ear.

02:58:34   19    Yes, Mr. Carroll?

02:58:34   20         MR. CARROLL:  I do anticipate offering an objection

02:58:37   21    to Eric Parker's testimony.  I can appreciate that the

02:58:41   22    plaintiff may want to play the deposition first, but I just

02:58:43   23    wanted to make -- the trial testimony first, but I just wanted

02:58:47   24    to make the Court aware we plan to object to Eric Parker.

02:58:50   25         Based on the Court's ruling -- ruling on the motions in

| | | |
|---|---|---|
| 02:58:54 | 1 | limine. |
| 02:58:55 | 2 | THE COURT:  Okay.  All right.  Well, we can address |
| 02:58:57 | 3 | that after we play the video of Mr. Love. |
| 02:59:00 | 4 | Anything else we need to take up at this point? |
| 02:59:03 | 5 | MR. UMINA:  No, Your Honor.  Only thing we just need |
| 02:59:04 | 6 | to, in the event just test that hearing. |
| 02:59:08 | 7 | THE COURT:  Okay.  Yeah, Madam Clerk, can I impose on |
| 02:59:11 | 8 | you to do that?  Thank you. |
| 02:59:12 | 9 | Ms. Durst, Mr. Carroll, anything further we need to take |
| 02:59:15 | 10 | up at this point? |
| 02:59:15 | 11 | MS. DURST:  I don't think so, Your Honor, thank you. |
| 02:59:16 | 12 | THE COURT:  Outstanding.  We'll stand at ease until |
| 02:59:19 | 13 | ten after.  Thank you. |
| 03:11:22 | 14 | (A recess was taken from 2:59 p.m. until 3:11 p.m.) |
| 03:11:22 | 15 | THE COURT:  Thank you.  Anything else we need to take |
| 03:11:23 | 16 | up at this point, Ms. Durst? |
| 03:11:26 | 17 | MS. DURST:  No, Your Honor. |
| 03:11:26 | 18 | THE COURT:  Okay.  The plaintiffs are going to play |
| 03:11:28 | 19 | Mr. Love's deposition next.  Okay.  All right.  We can bring |
| 03:11:32 | 20 | in our jury then, thank you. |
| 03:13:25 | 21 | THE COURT:  Thank you.  I owe everyone an apology for |
| 03:13:29 | 22 | a number of reasons, but I neglected to prioritize this |
| 03:13:34 | 23 | morning, make a more temperate climate in the courtroom, but |
| 03:13:37 | 24 | we've put that request in so it's comfortable this afternoon, |
| 03:13:41 | 25 | and you have my strongest promise that that will be taken care |

03:13:47  1    of before we reconvene in the morning with my apologies.

03:13:52  2        It's my understanding, Mr. Umina, our next witness is

03:13:55  3    Corey Love and he's going to appear by videotaped deposition?

03:13:58  4        MR. UMINA:  Yes, Your Honor, this is joint

03:14:00  5    designation between myself and Ms. Durst.

03:14:03  6        THE COURT:  All right.  Understood.  Ladies and

03:14:04  7    gentlemen of the jury, our next witness will testify by

03:14:07  8    previously recorded videotaped deposition.  It will be

03:14:11  9    displayed on the monitors in the jury box as well as our big

03:14:15  10   screen here.  Madam Clerk is going to dim the lights slightly

03:14:19  11   so you can see that a little bit better.  But whenever counsel

03:14:19  12   is ready to play, you may.

03:14:19  13       (Videotaped deposition of Corey Love played for the

04:12:45  14   jury.)

04:12:45  15       THE COURT:  Can I ask counsel to approach for one

04:12:55  16   second?

04:12:55  17       (Bench conference outside the hearing of the jury.)

04:16:07  18       THE COURT:  You wanted to call Mr. Parker next; is

04:16:10  19   that correct?

04:16:10  20       MR. UMINA:  Your Honor, I have about three questions

04:16:12  21   for him.  Specifically, as Mr. Love just testified, Parker was

04:16:17  22   his training officer.  This is from end of phase one, his

04:16:21  23   evaluation on 7-22-2017.  It was twelve days before the

04:16:27  24   shooting and specifically what he had observed about him, his

04:16:30  25   weaknesses as an officer.  That is it --

| | | |
|---|---|---|
| 04:16:33 | 1 | THE COURT:  Is this Mr. Love? |
| 04:16:34 | 2 | MR. UMINA:  About Mr. Love specifically, so what I -- |
| 04:16:36 | 3 | this is evidence of Mr. Love -- he says he gets confused |
| 04:16:43 | 4 | easily, can't follow basic instructions, and I don't recall |
| 04:16:46 | 5 | the third one, but I believe that him getting confused easily, |
| 04:16:51 | 6 | unable to follow basic instructions, and the third critique, |
| 04:16:57 | 7 | those go directly to his credibility as a witness and him as a |
| 04:17:02 | 8 | police officer, and specifically his ability to recall facts, |
| 04:17:06 | 9 | and to even understand what is happening at the scene as |
| 04:17:09 | 10 | described.  And I think that the jury is entitled to hear |
| 04:17:13 | 11 | that. |
| 04:17:14 | 12 | MR. CARROLL:  Your Honor, I think we're talking about |
| 04:17:16 | 13 | him in a position of a witness now.  I mean, I know he is a |
| 04:17:18 | 14 | police officer, but we are just going off of him and what he |
| 04:17:21 | 15 | saw.  This would be the same thing as pulling someone who |
| 04:17:23 | 16 | works as a cashier or something else, and pull their |
| 04:17:26 | 17 | employment file and going over their specific reviews.  I |
| 04:17:30 | 18 | don't think that there is anything of relevance here and |
| 04:17:32 | 19 | especially now that the prior incidents are out. |
| 04:17:34 | 20 | I mean, there is no basis to talk about Corey Love's |
| 04:17:37 | 21 | training.  It is simply not relevant, and is not helpful to |
| 04:17:41 | 22 | the jury with the issue before the Court. |
| 04:17:42 | 23 | MR. UMINA:  Your Honor, I believe -- |
| 04:17:45 | 24 | THE COURT:  You believe it's relevant? |
| 04:17:47 | 25 | MR. UMINA:  No, Your Honor.  It's simply his |

04:17:47   1   credibility, and it's character, as well.  It's not specific.

04:17:57   2           THE COURT:  All right.  Non-party witness?

04:17:59   3           MR. UMINA:  Yes.

04:18:01   4           THE COURT:  Officer Parker?  And I apologize, I don't

04:18:04   5   remember his --

04:18:07   6           MR. UMINA:  He was his FTO training officer and he

04:18:09   7   had just talked about that, so he was assigned to Parker in

04:18:14   8   the days leading up to this.  And again, specifically this

04:18:17   9   review was his end-of-phase one review, which occurred 12 days

04:18:21  10   prior to the shooting.

04:18:22  11           THE COURT:  And phases are what level you are within

04:18:29  12   the sheriff's department; is that correct?

04:18:30  13           MR. UMINA:  Within the FTO program.  So my

04:18:33  14   understanding is it is a field training officer program.  It

04:18:35  15   is a three-phase program and I think they are six-week

04:18:40  16   increments.  He had been on the job six weeks at the time.

04:18:42  17   And again, it's simply his observations about Deputy Love as a

04:18:48  18   person, and his ability to process information, see things.

04:18:53  19   And again, it says he gets confused easily.  We are talking

04:18:58  20   about him being a witness to someone being shot to death here

04:19:01  21   and he is a critical fact witness.

04:19:07  22           MR. CARROLL:  Your Honor, we're not in a position

04:19:08  23   where they are reviewing some psychologist's review or

04:19:09  24   reviewing some specific purpose of telling whether or not he

04:19:11  25   is confused or has a good memory.  Those are employment

04:19:15  1    records.  They are designed for the training in an FTO

04:19:18  2    program, and are designed to keep track of his progress

04:19:20  3    through the program and not to test his ability to recall.

04:19:23  4         THE COURT:  Do we have this evaluation document?

04:19:26  5         MR. UMINA:  I have it right here.  I will grab it,

04:19:30  6    Your Honor.  Your Honor, I don't intend to offer this as

04:19:49  7    evidence, simply that I will refresh his recollection if

04:19:51  8    necessary.

04:19:51  9         THE COURT:  What basis are you going --

04:19:55  10        MR. UMINA:  I'm going to say, you know, you made some

04:19:57  11   observations about Mr. Love 12 days prior to this.  And his

04:20:02  12   performance as a police officer, and him as a person, and his

04:20:06  13   significant weaknesses.  Twelve days prior were his

04:20:11  14   communication skills, that he cannot comprehend, retain

04:20:14  15   information well, including basic instructions and that he

04:20:17  16   gets confused easily.

04:20:20  17        THE COURT:  And you will have to tell me Mr. Parker's

04:20:24  18   background.

04:20:25  19        MR. UMINA:  When I deposed him, I believe he had been

04:20:28  20   at the department for 12 years, so he has probably been there

04:20:31  21   about 15 years now.  And at the time the field training

04:20:37  22   program was relatively new, but he was Mr. Love's assigned

04:20:43  23   field training officer during this phase.  And so that is who,

04:20:47  24   you know, did his reviews.  That's who he rode with.  That's

04:20:51  25   who was training him at the time.

04:20:53   1          THE COURT:  So you don't intend to call Mr. Parker to

04:20:58   2   (inaudible) credibility of Mr. Love, based on Mr. Parker's

04:21:02   3   observations, again, contemporaneous -- almost

04:21:07   4   contemporaneous, or close in time anyway, with this based on

04:21:10   5   his observations or Mr. Love?

04:21:12   6          MR. UMINA:  Mr. Love, yes, specifically as an officer

04:21:16   7   and as a person.

04:21:17   8          THE COURT:  All right.  Anything further, Mr.

04:21:20   9   Carroll?

04:21:20  10          MR. CARROLL:  I reiterate what I said, and want to

04:21:23  11   point out that Deputy Parker is not a psychologist.  He does

04:21:25  12   not have any training or a basis to make any opinions as to

04:21:27  13   recall or his ability to understand (inaudible), Your Honor.

04:21:30  14   I simply believe it's an employment record that can't be used

04:21:33  15   to impeach.

04:21:35  16          THE COURT:  I am inclined to sustain that objection.

04:21:39  17   I am giving you a chance to find a case that says you can call

04:21:43  18   a witness who (inaudible) credibility of a non-party witness.

04:21:47  19   I certainly understand Mr. Love is a critical witness here.

04:21:50  20   But I need something that tells me you can call an outside

04:21:55  21   witness.

04:21:56  22          MR. UMINA:  We will look into that tonight.

04:21:58  23          THE COURT:  Let's do that.  But given that, we are

04:22:00  24   going to hold that in abeyance.  I will give you that chance

04:22:02  25   and we will decide that the very first thing in the morning.

04:22:12   1   So why don't we do this:  You guys can get started on that.  I

04:22:16   2   will dismiss the jury for the day, and tomorrow we will start

04:22:24   3   with Mr. Parker.

04:22:28   4          MR. UMINA:  Yes.  And if the Court -- if it pleases

04:22:30   5   the Court, I mean, if you wish to go any further, we can call

04:22:34   6   Rick Rhoades today.  We don't anticipate him being that long

04:22:36   7   of testimony.  If you want to start tomorrow, that's fine.

04:22:38   8          THE COURT:  With all due respect, it's not personal,

04:22:44   9   why don't we do that, start him tomorrow.  That will be the

04:22:47  10   plan.  I will give you another swing with respect to Officer

04:22:51  11   Parker tomorrow.  I understand your standing objection based

04:22:54  12   on your proffer.  I understand.  Is there any other testimony

04:22:58  13   from Officer Parker that you anticipate eliciting?

04:22:58  14          MR. UMINA:  No, there is not other relevant testimony

04:23:04  15   to this.

04:23:04  16          THE COURT:  I understand.  Mr. Carroll?

04:23:07  17          MR. CARROLL:  No, Your Honor.

04:23:08  18          THE COURT:  All right.  We will break for the day.

04:23:13  19   We will revisit this in the morning.  We will start with Mr.

04:23:20  20   Rhoades in the morning.

04:23:22  21          MS. DURST:  The only thing I wanted to put on the

04:23:25  22   record was, I don't want to have the situation that we had

04:23:29  23   yesterday.  I don't believe Deputy Parker -- when I talked to

04:23:35  24   him at lunch, when he was here, he indicated he didn't have a

04:23:38  25   subpoena for today, but we got him here.  I don't think he is

04:23:42  1    under subpoena for tomorrow.  I just want Mr. Umina to be able

04:23:45  2    to let Deputy Parker know because he is also Judge Wilson's

04:23:50  3    and Marion County's bailiff.  So I don't want to have a

04:23:54  4    situation where you make a ruling Deputy Parker is permitted

04:23:57  5    to testify, and then he not be here.  So I just wanted to

04:24:00  6    bring that to the Court's attention because I don't believe he

04:24:03  7    was under subpoena for tomorrow.

04:24:05  8         MR. UMINA:  Your Honor, I believe that he was.  I

04:24:06  9    believe I put him and Forsyth under subpoena, but I had --

04:24:10  10   actually Parker and I, we have good communication, so I

04:24:13  11   will -- he told me he could be up here tomorrow.  I will get

04:24:17  12   his number, and we will do some research --

04:24:24  13        THE COURT:  Okay.  Does anyone have a problem with

04:24:32  14   starting at nine tomorrow?

04:24:32  15        MR. UMINA:  No.

04:24:33  16        MS. DURST:  No.

04:24:34  17        THE COURT:  I will ask the jury to start at nine and

04:24:36  18   so we can get started on that.  Please check with Officer

04:24:41  19   Parker or Deputy Parker.

04:24:41  20        (Bench conference concluded, and the following

04:24:41  21   transpired in open court.)

04:26:01  22        THE COURT:  Ladies and gentlemen of the jury, we have

04:26:01  23   actually reached a good spot in our witness lineup to break

04:26:04  24   for the day, so we are going to do that.  Before I get to my

04:26:09  25   repeated instructions, let me pose this question:  Our normal

04:26:14  1   schedule, or what we try to make a normal schedule during

04:26:18  2   trial when we are receiving evidence, is to start at 9:00 a.m.

04:26:21  3   Would that pose a problem if we started at 9:00 tomorrow

04:26:26  4   morning?

04:26:27  5        JUROR:  Well, I have to get my girl and take my

04:26:30  6   little girl into school in the morning.  About an hour and a

04:26:33  7   half drive for me.

04:26:34  8        THE COURT:  Does 9:30 work better?

04:26:37  9        JUROR:  Yes.

04:26:37  10       THE COURT:  Understood.  I too make a morning school

04:26:41  11  drop-off route, but I have a shorter commute.  We will stick

04:26:45  12  with 9:30 then, but we will be ready to hear from our next

04:26:51  13  witness at 9:30 tomorrow morning.

04:26:52  14       Please continue to refrain from discussing the case with

04:26:55  15  anyone, that includes amongst yourselves, with any fellow

04:26:58  16  jurors.  I am to be blamed if any of your family members, if

04:27:04  17  they ask you what you have been doing all day.  There will be

04:27:05  18  a time when you can talk to them.  It's just not yet.  Also

04:27:09  19  please continue to refrain from undertaking any independent

04:27:14  20  investigation efforts, not only with respect to this case, in

04:27:16  21  particular, the issues that have come up so far.

04:27:18  22       But with that, we thank you again for your time and

04:27:21  23  attention today.  We will see you at 9:30 in the morning with

04:27:24  24  my promise that it will be temperate all day here tomorrow.

04:27:29  25  Thank you all very much.  Have a pleasant evening.

04:27:56   1        (Jury excused, and the following transpired in open

04:27:56   2   court.)

04:27:57   3            THE COURT:  Is there something else we need to take

04:27:59   4   up?  Anything we need to address at this point?

04:28:02   5            MR. UMINA:  No, Your Honor.

04:28:02   6            MS. DURST:  No, Your Honor.  Thank you.

04:28:04   7            THE COURT:  All right.  Thank you all very much.  I

04:28:07   8   will see everybody here at 9:30.  Thank you all very much.

           9        (Proceedings concluded at 4:25 p.m.)

          10                    C E R T I F I C A T E

          11        I, Jill M. Cutter, Registered Professional Reporter and

          12   Official Reporter for the United States District Court for the

          13   Northern District of West Virginia, so hereby certify that the

          14   foregoing is a correct transcript to the best of my ability of

          15   the taped proceedings in the above-styled action on April 7,

          16   2021, as reported by me in stenotypy.

          17        I certify that the transcript fees and format comply with

          18   those prescribed by the Court and Judicial conference of the

          19   United States.

          20            Given under by hand this day, April 26, 2021.

          21

          22            /s/ Jill M. Cutter, RPR

          23             Official Reporter, United States
                         US District Court for the Northern
          24             US District of West Virginia

          25

1

**'**

**'17** [2] - 306:16, 306:17

**/**

**/s** [1] - 399:22

**0**

**03:26** [1] - 324:18

**1**

**1** [13] - 234:6, 251:2, 274:12, 281:5, 293:24, 297:10, 297:12, 297:21, 298:15, 299:16, 327:19, 371:17, 371:25
**10** [2] - 262:4, 340:24
**100** [1] - 325:25
**1050** [1] - 377:17
**10:00** [4] - 216:5, 248:15, 248:19, 249:8
**10:05** [2] - 249:11, 249:12
**10:29** [2] - 249:13, 249:20
**11** [5] - 238:18, 262:18, 282:19, 283:7, 317:24
**11:35** [1] - 225:20
**12** [5] - 264:17, 353:22, 393:9, 394:11, 394:20
**125** [1] - 214:15
**12:14** [1] - 320:11
**12:15** [1] - 319:3
**12th** [2] - 233:2
**13** [5] - 218:13, 251:7, 265:8, 353:22, 353:23
**14** [3] - 265:17, 280:25, 289:23
**140** [1] - 244:22
**144304** [1] - 356:13
**144308** [1] - 356:24
**144343** [1] - 357:8
**1444** [1] - 357:18
**144432** [1] - 358:2
**145132** [1] - 359:3
**145138** [1] - 359:22
**145142** [1] - 360:25
**145146** [1] - 361:13
**145148** [1] - 361:22
**145159** [1] - 363:15

**145210** [1] - 364:7
**145226** [1] - 364:14
**145241** [1] - 365:3
**145246** [1] - 366:1
**145304** [2] - 366:11, 366:21
**145315** [1] - 367:1
**145320** [1] - 367:12
**145327** [1] - 367:25
**14th** [1] - 289:25, 294:18, 318:7
**15** [3] - 266:12, 388:15, 394:21
**150** [1] - 258:5
**1532** [1] - 275:1
**1545** [1] - 274:15
**1546** [1] - 278:5
**15th** [1] - 225:19
**16** [3] - 219:12, 266:23, 354:14
**1600** [1] - 279:14
**16th** [1] - 237:2
**17** [1] - 268:13
**17th** [3] - 219:19, 220:5, 237:2
**18** [1] - 269:1
**18-CV-186** [1] - 216:4
**19** [3] - 269:15, 285:16, 299:23
**195** [1] - 241:11
**196** [1] - 242:7
**197** [2] - 241:24, 242:6
**1:15** [3] - 319:4, 319:13, 320:9
**1:17** [1] - 320:11
**1:18-CV-186** [1] - 214:3
**1:21** [1] - 322:14
**1:43** [1] - 236:19
**1:45** [1] - 234:1

**2**

**2** [12] - 251:8, 254:25, 255:4, 255:18, 255:19, 256:3, 275:3, 289:3, 321:17, 321:25, 322:4, 355:16
**20** [12] - 221:14, 236:6, 254:25, 255:4, 255:18, 255:19, 270:5, 281:11, 306:18, 306:19, 327:1, 327:19
**200** [4] - 214:18, 242:1, 257:15, 271:1
**2010** [2] - 354:13, 354:16
**2017** [20] - 251:8,

275:24, 289:3, 289:23, 289:25, 306:12, 318:7, 323:17, 323:20, 324:18, 336:15, 337:3, 349:21, 354:10, 354:11, 354:18, 354:24, 382:13, 383:1, 384:25
**2019** [5] - 238:18, 238:22, 239:8, 250:16, 317:24
**2021** [8] - 214:12, 219:5, 224:9, 233:25, 236:19, 238:9, 399:16, 399:20
**21** [6] - 236:7, 281:5, 281:11, 306:18, 306:19, 327:19
**213** [4] - 257:15, 269:12, 269:13, 270:21
**22** [2] - 372:10, 372:14
**23** [5] - 234:22, 250:25, 280:25, 281:11, 306:7
**23rd** [4] - 220:4, 221:4, 221:15, 237:2
**24** [7] - 233:25, 236:19, 238:9, 327:3, 327:9, 327:12, 327:19
**2414** [1] - 214:22
**24th** [4] - 222:18, 223:9, 223:10, 236:23
**25** [3] - 300:5, 311:1, 312:3
**250** [5] - 363:1, 363:2, 365:14, 368:12, 368:15
**26** [2] - 300:19, 399:20
**26501** [1] - 214:16
**26508** [2] - 214:19, 214:23
**27** [2] - 289:24, 299:15
**2:43** [2] - 356:13, 357:9
**2:43:04** [1] - 356:14
**2:44** [1] - 358:3
**2:51** [1] - 359:23
**2:53** [1] - 366:22
**2:57** [1] - 388:17
**2:59** [1] - 390:14
**2nd** [11] - 275:24, 321:23, 324:18, 336:15, 337:3, 349:21, 351:19,

354:24, 382:13, 383:1, 384:25

**3**

**3** [3] - 257:5, 277:25, 323:17
**30** [18] - 252:20, 253:23, 254:9, 297:11, 297:22, 298:4, 298:15, 301:2, 301:3, 301:5, 301:6, 311:7, 313:12, 341:10, 341:11, 371:25, 389:16
**304-534-9633** [1] - 216:19
**32** [1] - 358:3
**33** [1] - 271:5
**34** [1] - 281:5
**35** [2] - 282:14, 282:20
**36** [1] - 280:25
**38** [1] - 359:23
**39** [1] - 357:9
**3:00** [2] - 252:18, 388:9
**3:02** [1] - 295:1
**3:11** [1] - 390:14
**3:30** [1] - 219:19
**3:32** [1] - 295:2
**3:45** [5] - 274:15, 274:17, 274:20, 274:24, 275:7
**3rd** [4] - 278:4, 323:20, 351:23, 354:13

**4**

**4** [4] - 257:12, 327:20, 331:16, 366:22
**40** [7] - 226:9, 252:20, 253:23, 254:9, 257:1, 275:18, 282:14
**45** [5] - 223:2, 248:23, 262:16, 316:9, 389:16
**450** [2] - 245:14, 326:16
**4:15** [5] - 274:23, 274:24, 275:2, 275:7, 275:17
**4:25** [1] - 399:9
**4:30** [1] - 389:10
**4:45** [1] - 389:10
**4th** [1] - 280:8

354:24, 382:13, 383:1, 384:25

**5**

**5** [2] - 219:5, 257:22
**5'7** [1] - 226:8
**50** [2] - 271:3, 275:19
**52** [4] - 274:4, 275:11, 287:12, 287:19
**5th** [2] - 224:8, 224:23

**6**

**6** [3] - 214:18, 258:8, 321:21

**7**

**7** [7] - 214:12, 258:23, 258:24, 297:3, 331:22, 332:1, 399:15
**7-22-2017** [1] - 391:23
**7th** [1] - 233:21

**8**

**8** [1] - 259:20
**8th** [1] - 233:21

**9**

**9** [2] - 259:25, 283:20
**911** [4] - 251:18, 295:4, 295:8, 308:15
**9:00** [5] - 233:21, 240:7, 247:17, 398:2, 398:3
**9:08** [1] - 216:1
**9:30** [5] - 398:8, 398:12, 398:13, 398:23, 399:8
**9:54** [1] - 249:11
**9:55** [1] - 248:15

**A**

**a.m** [10] - 216:1, 225:20, 233:21, 247:17, 249:11, 249:13, 249:20, 398:2
**abandon** [5] - 386:4, 386:5, 386:8, 386:9, 386:12
**abeyance** [1] - 395:24
**ability** [7] - 307:15, 349:9, 392:8, 393:18, 394:3, 395:13, 399:14
**able** [29] - 217:25, 223:14, 227:19,

231:16, 264:18,
271:24, 276:9,
289:20, 292:16,
292:18, 299:14,
300:3, 300:5,
300:18, 300:19,
325:7, 325:10,
328:3, 331:3,
349:12, 356:20,
358:14, 360:6,
360:19, 364:20,
372:3, 376:21,
376:25, 397:1
**above-styled** [2] -
214:11, 399:15
**absent** [1] - 334:24
**absolute** [2] - 335:1,
335:6
**Absolutely** [1] -
328:11
**absolutely** [5] - 217:2,
228:8, 321:9, 333:19
**academy** [2] - 252:2,
288:20
**Academy** [1] - 354:1
**accelerate** [1] - 352:19
**accelerated** [1] -
263:4
**accelerating** [5] -
287:4, 287:6,
310:18, 315:8,
348:14
**acceleration** [1] -
265:12
**accept** [14] - 219:21,
219:22, 220:11,
220:19, 221:7,
222:1, 222:2, 226:5,
227:18, 230:4,
235:18, 241:17,
346:4, 346:21
**acceptance** [1] -
221:10
**accepted** [4] - 222:11,
226:10, 226:14,
246:5
**accepting** [1] - 226:17
**access** [22] - 227:3,
257:13, 269:11,
270:24, 338:7,
366:18, 369:7,
369:9, 369:10,
369:13, 369:15,
369:20, 370:4,
370:5, 370:7,
370:19, 370:23,
371:14, 372:5,
372:16, 373:2, 373:6
**according** [2] -
227:17, 279:22

**account** [1] - 257:7
**accountable** [6] -
335:12, 335:16,
335:22, 336:9,
336:12, 336:23
**accurate** [5] - 221:22,
269:6, 283:23,
284:5, 284:8
**Act** [1] - 353:25
**ACTION** [1] - 214:3
**action** [7] - 214:12,
350:19, 350:21,
350:22, 368:21,
369:1, 399:15
**actions** [2] - 382:13,
382:25
**actual** [8] - 244:4,
282:15, 282:22,
312:12, 329:24,
330:2, 330:8, 372:17
**addition** [1] - 244:3
**additional** [6] -
251:22, 252:4,
265:23, 288:18,
291:17, 296:18
**address** [5] - 216:5,
222:4, 314:22,
390:2, 399:4
**addressed** [3] - 222:3,
222:4, 314:21
**adjacent** [1] - 338:22
**adjust** [4] - 232:10,
242:15, 322:24,
334:4
**adjusting** [1] - 250:9
**administer** [1] - 379:7
**administration** [5] -
244:14, 244:18,
244:20, 245:11,
246:17
**administrative** [1] -
230:2
**Administratrix** [1] -
214:4
**admissibility** [1] -
297:15
**admissible** [1] -
355:14
**admission** [1] -
296:23
**admit** [1] - 345:1
**admitted** [6] - 255:18,
255:22, 297:5,
297:22, 302:18,
371:25
**advise** [1] - 291:13
**advised** [8] - 251:20,
265:4, 278:7,
280:14, 281:9,
302:9, 304:11, 322:2

**advisement** [1] -
248:19
**advising** [1] - 240:12
**affidavit** [8] - 219:4,
220:1, 222:12,
224:7, 224:13,
224:16, 224:23,
233:22
**affidavits** [2] - 218:18,
218:25
**affiliated** [1] - 223:23
**affording** [1] - 277:13
**afternoon** [11] - 234:1,
240:2, 253:9, 321:7,
321:12, 322:23,
328:22, 328:23,
388:7, 390:24
**afterwards** [3] -
316:15, 330:21,
347:6
**age** [2] - 223:2, 226:9
**aggressive** [7] -
263:6, 265:12,
285:20, 292:25,
294:14, 349:14
**aggressively** [2] -
345:10, 345:14
**ago** [3] - 326:16,
330:22, 350:13
**agree** [40] - 222:11,
256:12, 257:14,
257:25, 261:13,
263:22, 269:24,
279:21, 281:25,
283:3, 283:20,
299:18, 303:10,
304:14, 316:12,
334:21, 335:10,
335:20, 335:23,
335:24, 336:7,
336:18, 336:21,
337:14, 343:18,
343:22, 344:10,
344:19, 344:23,
344:25, 346:1,
346:3, 350:17,
382:22, 386:2,
386:6, 386:10,
386:13, 386:14,
386:19
**agreement** [2] -
241:21, 241:22
**ahead** [7] - 298:1,
335:5, 353:17,
355:11, 356:16,
367:2, 367:13
**aid** [3] - 321:4, 375:10,
377:25
**aided** [1] - 214:25
**aids** [4] - 321:5,

321:11, 347:19
**allegations** [1] -
273:15
**alleged** [1] - 312:7
**allegedly** [2] - 315:4,
349:14
**alleges** [1] - 310:19
**Allen** [1] - 244:19
**allow** [1] - 277:17
**allowed** [5] - 335:15,
386:3, 386:7,
386:11, 386:16
**almost** [16] - 230:5,
247:25, 264:11,
284:22, 313:11,
329:19, 330:10,
338:24, 357:9,
363:7, 369:4, 370:9,
371:2, 373:8,
375:24, 395:3
**ambulance** [3] -
368:6, 377:13,
377:17
**analysis** [1] - 332:16
**Andrew** [4] - 219:17,
220:6, 221:5, 222:19
**angle** [1] - 374:17
**angled** [1] - 371:4
**answer** [17] - 254:6,
305:19, 307:8,
326:14, 326:18,
327:5, 327:11,
327:15, 335:5,
336:5, 340:22,
340:23, 345:20,
346:12, 376:14,
381:13, 387:5
**answering** [2] -
244:23, 329:14
**anticipate** [5] - 310:6,
389:10, 389:20,
396:6, 396:13
**anticipating** [1] -
222:16
**anyway** [2] - 320:25,
395:4
**apologies** [3] -
249:22, 249:25,
391:1
**apologize** [17] -
219:20, 221:2,
221:16, 224:9,
224:19, 226:7,
228:19, 231:16,
232:8, 242:23,
248:9, 317:3, 328:6,
354:6, 358:1,
378:11, 393:4
**apology** [1] - 390:21
**apparent** [1] - 266:5

**appear** [9] - 255:13,
255:16, 258:22,
261:15, 265:22,
271:6, 298:6,
300:12, 391:3
**appearance** [2] -
223:25, 233:20,
246:18
**APPEARANCES** [1] -
214:14
**appeared** [13] -
272:13, 272:17,
272:18, 273:2,
273:4, 273:6, 275:6,
295:20, 303:1,
315:14, 315:18,
379:18, 380:3
**apply** [2] - 386:21,
388:9
**appreciate** [6] -
229:20, 231:11,
231:17, 246:25,
328:7, 389:21
**appreciation** [1] -
389:4
**approach** [10] -
254:20, 259:4,
261:2, 296:21,
297:7, 323:25,
326:22, 333:14,
371:16, 391:15
**approached** [1] -
339:9
**appropriate** [3] -
297:23, 355:15,
388:7
**appropriately** [1] -
355:19
**approximate** [5] -
257:16, 258:7,
260:17, 260:21,
283:21
**approximated** [1] -
340:21
**April** [7] - 214:12,
219:5, 224:8,
224:23, 233:21,
399:15, 399:20
**area** [47] - 226:23,
227:5, 227:20,
235:8, 235:21,
252:24, 253:5,
258:2, 258:4, 258:5,
258:17, 260:3,
263:17, 266:15,
268:18, 268:19,
269:3, 271:12,
275:15, 286:1,
301:8, 301:9,
302:16, 308:10,

338:2, 338:5,
338:10, 338:21,
339:20, 339:23,
346:24, 350:6,
351:10, 360:11,
362:11, 363:24,
370:7, 375:9,
375:23, 377:20,
378:9, 378:11,
378:13, 378:14,
378:20, 383:14
**argument** [1] - 346:5
**armed** [8] - 220:16,
308:20, 314:23,
314:25, 315:5,
340:2, 358:21, 376:6
**arms** [7] - 286:16,
329:17, 330:24,
331:2, 331:3, 331:4,
349:9
**arrival** [2] - 259:18,
262:17
**arrive** [1] - 280:11
**arrived** [24] - 226:21,
252:15, 252:18,
253:23, 256:20,
264:24, 275:1,
283:24, 294:25,
295:1, 295:15,
295:16, 296:1,
300:7, 300:15,
301:15, 302:7,
303:22, 315:16,
315:24, 316:8,
343:19, 343:23,
344:2
**arriving** [2] - 264:23,
273:24
**artificially** [1] - 330:18
**aside** [4] - 288:19,
309:7, 309:11,
376:24
**aspects** [1] - 308:13
**assault** [4] - 291:18,
291:21, 313:21,
314:16
**assigned** [3] - 230:20,
393:7, 394:22
**assist** [5] - 252:22,
261:6, 276:3,
349:24, 378:23
**assistance** [1] -
295:21
**assistant** [2] - 235:9,
235:22
**assistants** [2] - 230:2
**assisted** [3] - 273:21,
370:11, 378:25
**assisting** [2] - 256:17,
359:20

associated [1] - 356:9
**assume** [7] - 221:17,
223:7, 224:22,
234:25, 237:1,
244:3, 309:22
**assumed** [1] - 310:7
**assuming** [1] - 321:8
**assumption** [2] -
226:24, 289:2
**asterisk** [1] - 224:13
**AT** [1] - 214:2
**attached** [2] - 241:20,
242:6
**attachment** [1] -
241:14
**attachments** [1] -
242:5
**attempt** [12] - 220:7,
221:4, 221:13,
223:9, 225:8,
230:11, 230:12,
276:2, 280:17,
295:10, 314:7,
373:21
**attempted** [7] -
241:14, 260:10,
260:11, 336:1,
363:4, 368:23,
387:15
**attempting** [7] - 285:2,
285:17, 339:18,
343:17, 363:25,
371:4, 382:18
**attempts** [2] - 219:11,
220:24
**attend** [2] - 244:10,
286:18
**attendance** [2] -
245:19, 246:5
**attention** [4] - 319:12,
321:1, 397:6, 398:23
**attorney** [5] - 306:1,
306:4, 307:19,
307:20, 381:11
**attorney's** [2] -
219:24, 224:14
**attorneys** [4] - 229:23,
230:3, 326:8
**auction** [2] - 360:13,
362:17
**audible** [1] - 376:14
**audio** [2] - 321:8,
321:15
**August** [25] - 251:8,
275:24, 277:24,
278:4, 280:8, 289:3,
289:23, 289:24,
294:18, 318:7,
321:23, 323:17,
323:20, 324:18,

336:15, 337:3,
349:21, 351:19,
351:23, 354:10,
354:11, 354:24,
382:13, 383:1,
384:25
**Austin** [1] - 214:17
**automatic** [1] - 273:8
**autopsies** [5] -
245:14, 245:24,
247:1, 323:14,
326:17
**autopsy** [5] - 286:18,
323:19, 324:3,
328:25, 329:2
**available** [3] - 216:9,
231:11, 268:8
**aware** [13] - 240:13,
245:18, 260:9,
263:2, 263:14,
265:23, 266:5,
273:11, 286:13,
287:15, 303:24,
314:3, 389:24

## B

**backed** [1] - 373:4
**background** [2] -
243:12, 394:18
**backing** [3] - 284:22,
342:7, 375:20
**badged** [1] - 220:15
**badgering** [1] - 387:3
**Bailey** [1] - 214:18
**bailiff** [1] - 397:3
**ballistics** [9] - 267:7,
267:13, 267:19,
268:4, 268:6, 268:8,
268:11, 332:15,
332:16
**barn** [2] - 360:13,
362:18
**barracks** [1] - 277:10
**barriers** [2] - 229:25,
242:18
**based** [27] - 218:18,
234:14, 234:15,
242:4, 250:1, 257:7,
257:25, 262:5,
264:19, 265:5,
279:13, 284:5,
291:23, 292:15,
293:23, 301:12,
302:9, 313:22,
313:24, 314:18,
314:20, 342:12,
362:11, 389:25,
395:2, 395:4, 396:11
**basic** [4] - 385:21,

392:4, 392:6, 394:15
**basis** [7] - 244:6,
348:15, 385:18,
385:22, 392:20,
394:9, 395:12
**became** [2] - 355:1,
374:8
**becoming** [1] - 249:24
**began** [8] - 221:25,
263:3, 294:13,
338:24, 374:13,
375:7, 375:10, 379:7
**begin** [3] - 248:17,
248:18, 374:22
**beginning** [3] -
245:20, 269:11,
274:14
**begins** [1] - 258:10
**begun** [1] - 365:10
**behalf** [1] - 230:4
**behind** [24] - 220:8,
226:4, 249:23,
250:1, 258:13,
262:20, 263:9,
263:11, 264:12,
265:14, 265:15,
266:15, 266:18,
299:19, 301:9,
310:17, 311:11,
311:23, 360:10,
368:24, 375:24,
378:4, 384:3, 384:18
**believes** [1] - 278:15
**below** [1] - 265:23
**bench** [1] - 389:4
**Bench** [2] - 391:17,
397:20
**benefit** [2] - 217:25,
294:24
**Benjamin** [1] - 214:17
**berm** [1] - 270:24
**beside** [1] - 224:13
**best** [2] - 254:4,
399:14
**better** [3] - 338:22,
391:11, 398:8
**between** [14] - 220:24,
229:25, 274:24,
275:7, 295:20,
303:21, 329:20,
329:24, 345:4,
362:13, 369:18,
370:23, 388:21,
391:5
**bias** [3] - 314:1, 314:4,
317:11
**biased** [1] - 317:13
**big** [5] - 263:22,
271:23, 311:5,
360:16, 391:9

**binder** [3] - 254:25,
262:21, 321:19
**bird** [1] - 326:3
**bit** [17] - 219:1,
220:22, 229:10,
257:19, 266:6,
278:12, 283:16,
289:1, 289:15,
293:5, 299:3, 299:5,
299:8, 302:1,
353:17, 353:19,
391:11
**black** [18] - 337:9,
337:12, 337:16,
337:23, 337:24,
338:14, 355:5,
357:5, 359:14,
361:5, 361:15,
362:7, 362:8,
362:14, 362:16,
362:20, 363:1, 371:3
**blade** [1] - 266:3
**blamed** [1] - 398:16
**blood** [1] - 295:19
**blue** [1] - 262:25
**Blue** [2] - 217:20,
218:5
**board** [1] - 243:10
**board-certified** [1] -
243:10
**body** [7] - 324:21,
329:7, 329:13,
329:17, 332:18,
332:25, 344:4
**bone** [1] - 324:25
**born** [1] - 353:21
**boss** [4] - 244:18,
246:16, 384:25,
385:4
**bottom** [10] - 256:9,
264:8, 268:19,
274:12, 278:17,
294:4, 298:15,
327:1, 327:19, 372:7
**bounced** [2] - 325:1,
353:24
**bowl** [1] - 311:23
**box** [2] - 299:10, 391:9
**brake** [2] - 286:15,
349:17
**BRANHAM** [3] - 215:4,
232:3, 250:7
**Branham** [66] - 216:7,
219:6, 220:3,
223:12, 223:23,
223:25, 225:1,
230:10, 231:20,
231:23, 231:25,
232:9, 232:15,
238:8, 239:25,

242:7, 248:21,
250:6, 250:15,
250:20, 250:21,
251:21, 254:4,
254:23, 255:8,
267:11, 268:17,
278:17, 278:20,
278:21, 280:18,
283:19, 287:22,
288:8, 289:18,
291:17, 294:1,
298:1, 298:13,
298:25, 299:14,
300:24, 301:3,
301:12, 302:1,
302:20, 303:24,
306:24, 308:19,
309:8, 309:21,
310:16, 312:21,
317:2, 317:10,
318:22, 318:24,
319:16, 352:13,
375:15, 380:8,
380:25, 381:2,
381:7, 381:10, 382:1
**Branham's** [5] -
230:14, 344:1,
375:11, 379:16,
379:24
**break** [11] - 236:12,
248:16, 249:11,
310:3, 319:3,
320:11, 321:7,
321:13, 388:7,
396:18, 397:23
**brief** [3] - 228:2,
317:7, 332:12
**briefly** [2] - 320:14,
331:10
**bright** [1] - 299:3
**bring** [7] - 225:9,
248:3, 256:2,
271:10, 301:22,
390:19, 397:6
**bringing** [1] - 321:1
**broad** [1] - 253:10
**brought** [4] - 220:8,
227:9, 281:20,
281:22
**brown** [1] - 226:8
**Brown** [1] - 214:21
**brush** [10] - 258:13,
258:16, 259:10,
262:10, 262:13,
264:15, 265:14,
300:22, 311:25,
373:4
**brushy** [1] - 263:19
**Building** [1] - 225:23
**building** [2] - 226:1,

234:9
**building-type** [1] -
226:1
**bull** [1] - 258:16
**bullet** [24] - 265:19,
265:20, 265:23,
265:24, 266:5,
266:15, 266:23,
267:9, 286:21,
295:19, 303:25,
304:9, 318:16,
324:21, 325:3,
325:6, 329:4, 329:7,
329:10, 331:4,
331:23, 332:20,
332:22, 349:3
**bullets** [5] - 267:6,
267:14, 267:17,
268:5, 342:24
**busier** [1] - 244:12
**business** [2] - 226:10,
227:6
**busy** [1] - 245:13
**buzz** [1] - 237:14
**BY** [36] - 250:14,
254:22, 255:7,
255:25, 259:7,
261:4, 268:24,
272:4, 278:3,
280:10, 281:6,
288:7, 297:25,
299:13, 301:25,
309:6, 310:15,
311:2, 317:9, 323:5,
324:2, 325:15,
326:24, 327:21,
328:21, 331:12,
332:14, 334:15,
338:13, 346:19,
353:15, 356:6,
357:23, 371:23,
383:10, 387:8

---

## C

**C-A-N** [2] - 242:25,
323:7
**C1** [1] - 286:20
**calendar** [1] - 246:21
**camera** [1] - 296:16
**CAN** [2] - 215:10,
242:12
**Canyon** [1] - 214:18
**capacity** [3] - 214:4,
214:9, 239:23
**Capitol** [1] - 225:23

**capture** [1] - 264:2
**car** [13] - 264:13,
312:15, 337:15,
337:16, 339:7,
339:10, 342:10,
360:10, 362:11,
370:1, 370:3, 370:9
**care** [6] - 220:2,
241:16, 378:5,
387:25, 388:4,
390:25
**career** [2] - 251:22,
252:5
**CARROLL** [15] -
328:19, 328:21,
330:12, 331:6,
332:12, 332:14,
333:2, 333:8,
346:19, 355:20,
389:20, 392:12,
393:22, 395:10,
396:17
**Carroll** [25] - 214:21,
239:3, 239:6,
239:22, 328:18,
332:11, 356:3,
356:18, 357:12,
361:2, 361:17,
362:1, 363:16,
364:8, 364:15,
365:4, 366:2,
366:12, 367:3,
368:1, 372:8,
389:19, 390:9,
395:9, 396:16
**Carroll's** [1] - 322:2
**Carroll............327** [1]
- 215:12
**Carroll..........331** [1] -
215:14
**carry** [1] - 358:16
**case** [32] - 218:19,
218:21, 223:5,
229:22, 232:18,
232:22, 233:24,
235:1, 237:7,
237:24, 237:25,
238:5, 238:11,
238:17, 239:22,
245:2, 247:5,
291:13, 292:7,
317:23, 317:24,
319:7, 319:10,
319:11, 326:16,
342:13, 353:8,
388:10, 388:14,
395:17, 398:14,
398:20
**cashier** [1] - 392:16
**Caucasian** [2] - 223:2,

226:9
**causing** [1] - 273:17
**CD** [1] - 255:15
**center** [9] - 236:17,
251:18, 295:4,
295:8, 308:15,
345:23, 377:22,
383:12, 383:14
**certain** [2] - 320:15,
378:24
**certainly** [11] - 228:3,
231:10, 247:9,
247:17, 321:6,
325:14, 330:13,
336:21, 352:22,
383:4, 395:19
**certified** [2] - 241:22,
243:10
**certify** [2] - 399:13,
399:17
**cervical** [3] - 324:13,
324:14, 325:23
**champagne** [1] -
369:23
**chance** [6] - 297:16,
350:6, 362:18,
371:5, 395:17,
395:24
**change** [8] - 241:15,
264:2, 269:18,
345:16, 345:22,
354:14, 354:15,
383:25
**changed** [1] - 240:15
**changes** [2] - 263:20,
318:6
**character** [1] - 393:1
**Charleston** [7] -
220:11, 221:9,
225:20, 225:22,
243:6, 243:23, 323:9
**check** [5] - 241:21,
241:23, 330:6,
332:2, 397:18
**checked** [2] - 377:18,
379:14
**checking** [1] - 330:1
**cheek** [1] - 324:22
**chief** [4] - 243:5,
323:11, 323:16,
353:9
**children** [11] - 354:23,
376:12, 386:2,
386:3, 386:7,
386:11, 386:15,
386:21, 387:1,
387:11, 387:13
**chopping** [1] - 226:7
**chose** [3] - 222:11,
270:18, 375:8

**CHRISTOPHER** [2] -
215:16, 334:2
**Christopher** [1] -
334:18
**Christy** [1] - 218:16
**CHRISTY** [1] - 214:3
**chronological** [1] -
274:18
**church** [1] - 365:15
**circumstances** [3] -
267:15, 334:24,
335:14
**citizen** [3] - 265:2,
267:12, 273:15
**citizen's** [1] - 382:10
**citizens** [1] - 336:4
**civil** [4] - 235:12,
237:7, 237:18,
237:23
**CIVIL** [1] - 214:3
**claim** [5] - 267:12,
315:8, 340:14,
341:1, 352:14
**claimed** [5] - 265:10,
273:19, 312:9,
314:25, 315:1
**claims** [4] - 263:2,
278:16, 315:12,
316:10
**clarify** [1] - 325:16
**clarifying** [1] - 268:23
**CLARKSBURG** [1] -
214:2
**Clarksburg** [4] -
214:12, 216:24,
246:19, 353:24
**classify** [1] - 311:6
**clean** [2] - 297:1,
333:16
**clear** [10] - 248:10,
249:1, 256:23,
258:20, 264:12,
269:5, 280:3,
294:23, 300:23,
348:14
**cleared** [3] - 375:9,
377:20, 378:7
**clearing** [17] - 257:20,
258:10, 258:15,
260:2, 260:5,
260:18, 261:14,
261:16, 284:15,
284:18, 284:21,
338:17, 339:6,
339:9, 371:1,
372:22, 374:18
**clearly** [5] - 217:25,
228:22, 262:22,
265:24, 381:20
**Clerk** [12] - 216:18,

217:5, 217:14,
232:2, 241:5,
242:10, 322:1,
333:17, 333:25,
356:2, 390:7, 391:10
**CLERK** [3] - 217:8,
217:11, 278:2
**climate** [1] - 390:23
**clip** [62] - 320:25,
355:18, 355:23,
356:17, 356:19,
356:20, 356:23,
357:3, 357:7,
357:10, 357:13,
357:16, 357:17,
357:24, 357:25,
358:5, 358:6,
358:20, 359:1,
359:2, 359:7, 359:8,
359:13, 359:21,
360:1, 360:4, 360:6,
360:24, 361:3,
361:12, 361:18,
361:21, 361:23,
362:2, 363:14,
363:15, 363:17,
364:5, 364:6, 364:7,
364:9, 364:13,
364:16, 364:18,
364:22, 365:2,
365:5, 365:25,
366:3, 366:10,
366:13, 366:20,
366:24, 366:25,
367:4, 367:11,
367:15, 367:16,
367:24, 368:2
**clips** [4] - 355:10,
355:12, 356:7, 356:9
**close** [8] - 293:18,
294:6, 296:20,
311:20, 325:1,
326:3, 354:14, 395:4
**closed** [6] - 219:13,
303:8, 303:9,
303:14, 303:16,
303:18
**clutch** [9] - 275:12,
286:15, 287:13,
287:20, 302:22,
344:16, 349:17,
380:19, 380:23
**co** [2] - 256:2, 298:16
**co-counsel** [2] -
256:2, 298:16
**collect** [1] - 248:16
**collection** [1] - 297:22
**college** [1] - 354:2
**color** [1] - 355:5
**colored** [1] - 369:23

**column** [3] - 325:4,
325:6, 349:6
**comfortable** [4] -
250:9, 322:25,
334:4, 390:24
**coming** [26] - 246:2,
279:12, 311:24,
312:4, 312:9,
312:12, 312:14,
313:2, 313:7,
313:13, 330:1,
342:22, 345:6,
345:7, 345:13,
345:25, 348:17,
349:14, 351:4,
358:18, 362:25,
372:25, 374:24,
383:21, 384:3,
385:15
**command** [1] - 233:20
**commander** [9] -
251:9, 290:17,
290:21, 290:24,
291:2, 291:3,
291:13, 317:19
**commands** [11] -
285:18, 292:23,
294:24, 348:1,
348:3, 348:6,
348:10, 348:12,
374:14, 374:16,
374:19
**commenced** [1] -
216:1
**commences** [1] -
232:20
**common** [2] - 228:15,
230:6
**communicate** [1] -
247:19
**communication** [6] -
238:20, 238:24,
239:6, 239:10,
394:14, 397:10
**communities'** [1] -
251:24
**community** [1] - 252:8
**commute** [1] - 398:11
**companies** [1] - 218:3
**company** [8] - 218:6,
222:7, 227:10,
229:25, 269:21,
312:22
**complete** [6] - 224:13,
289:3, 290:2,
290:22, 307:1,
317:22
**completed** [7] - 224:7,
260:22, 261:5,
289:24, 290:22,

294:18, 314:17
**completely** [1] - 285:9
**comply** [9] - 294:12,
336:19, 341:16,
341:25, 342:4,
374:16, 374:19,
382:20, 399:17
**comprehend** [1] -
394:14
**comprised** [1] -
297:12
**computer** [4] - 214:25,
322:2, 384:17,
384:22
**computer-aided** [1] -
214:25
**concept** [1] - 314:1
**concern** [1] - 293:14
**conclude** [1] - 322:4
**concluded** [2] -
397:20, 399:9
**Conclusion** [1] -
231:18
**condition** [1] - 255:14
**conditions** [3] -
253:12, 256:23,
285:25
**conduct** [3] - 295:9,
317:13, 353:7
**conducted** [5] -
291:10, 306:6,
306:25, 307:21,
317:15
**conducting** [1] -
307:21
**conference** [3] -
391:17, 397:20,
399:18
**conferring** [1] - 389:1
**confirm** [2] - 248:18,
298:3
**confirmation** [3] -
314:1, 314:3, 317:11
**confirmed** [1] - 312:23
**confrontation** [4] -
222:17, 222:22,
230:18, 230:21
**confused** [5] - 392:3,
392:5, 393:19,
393:25, 394:16
**connected** [1] -
225:25
**connection** [2] -
244:4, 245:9
**considered** [1] -
330:21
**consistent** [3] -
330:25, 346:8,
383:18
**consists** [1] - 297:21

**console** [12] - 308:9,
308:10, 309:9,
345:24, 375:22,
377:23, 378:18,
378:19, 383:12,
383:14, 383:19,
384:13
**Constitution** [2] -
386:20, 386:23
**constitutional** [13] -
251:24, 334:23,
334:25, 335:11,
335:15, 335:18,
335:19, 335:21,
336:4, 336:8,
336:11, 382:10,
382:14
**contact** [5] - 239:12,
259:11, 269:21,
278:18, 278:21
**contacted** [13] -
239:19, 251:18,
278:5, 278:15,
278:23, 278:24,
279:14, 279:22,
290:1, 294:25,
295:3, 295:4, 295:8
**contained** [1] - 386:20
**contemporaneous** [2]
- 395:3, 395:4
**contempt** [1] - 248:23
**continuation** [1] -
357:4
**continue** [6] - 264:4,
319:9, 388:10,
388:12, 398:14,
398:19
**continued** [6] -
292:20, 330:18,
339:19, 348:11,
366:8, 374:17
**continues** [2] - 294:9,
304:9
**continuing** [2] -
349:15, 379:11
**contradict** [2] -
315:25, 316:9
**contrary** [2] - 272:1,
279:20
**control** [1] - 329:17
**conversation** [6] -
227:23, 227:24,
228:2, 228:12,
240:5, 240:10
**conveyed** [2] - 291:5,
291:7, 291:8
**coordinate** [1] - 267:4
**copy** [6] - 241:21,
252:12, 255:15,
289:17, 310:21,

364:10
**cord** [4] - 324:14,
328:9, 330:24, 331:4
**Corey** [29] - 254:13,
260:4, 260:18,
261:24, 276:16,
277:3, 277:9,
277:21, 277:22,
278:11, 280:4,
280:6, 282:25,
283:21, 284:1,
284:10, 285:9,
313:23, 316:5,
377:18, 384:23,
384:25, 385:4,
388:22, 389:14,
391:3, 391:13,
392:20
**corner** [2] - 298:15,
372:7
**corner/building** [1] -
227:2
**Corporal** [2] - 276:6,
276:9
**corporal** [1] - 358:8
**correct** [140] - 218:21,
218:22, 221:19,
221:20, 223:20,
224:11, 225:1,
225:2, 225:13,
225:14, 226:19,
226:20, 228:18,
233:17, 234:11,
234:12, 236:10,
237:3, 237:9, 238:9,
238:10, 240:3,
240:4, 243:23,
243:24, 244:7,
250:22, 251:12,
251:14, 253:3,
253:6, 253:7,
253:13, 253:25,
254:1, 254:2, 254:3,
254:10, 254:11,
254:18, 256:6,
256:7, 256:14,
257:10, 258:6,
258:10, 258:13,
258:18, 258:19,
258:21, 258:25,
259:15, 260:2,
270:6, 270:19,
271:7, 272:7,
274:19, 279:2,
279:5, 279:17,
279:23, 280:1,
280:4, 280:5,
280:16, 281:10,
282:21, 283:14,
286:18, 286:19,

286:22, 288:17,
290:14, 290:18,
292:12, 294:19,
295:25, 296:13,
298:8, 298:9,
300:25, 301:16,
302:5, 304:23,
310:20, 313:23,
317:21, 317:25,
323:13, 323:15,
323:18, 323:21,
325:5, 326:6,
328:12, 328:13,
328:25, 329:1,
330:4, 331:14,
331:17, 331:18,
332:2, 332:7,
332:16, 334:24,
337:1, 337:10,
337:13, 338:4,
338:15, 338:18,
339:3, 339:4, 339:7,
339:14, 341:2,
341:3, 341:14,
341:17, 341:19,
342:16, 343:16,
344:13, 344:17,
346:22, 347:1,
348:23, 352:20,
354:20, 355:16,
355:20, 356:15,
357:11, 376:4,
382:3, 391:19,
393:12, 399:14
**corrective** [1] - 347:15
**correctly** [5] - 245:1,
256:20, 330:8,
330:23, 369:8
**correspond** [1] -
300:9
**Counsel** [3] - 320:2,
346:11, 346:15
**counsel** [13] - 218:20,
224:5, 233:24,
235:1, 238:5,
248:16, 256:2,
298:16, 327:17,
330:22, 346:11,
391:11, 391:15
**counter** [1] - 220:8
**counties** [1] - 251:7
**County** [20] - 238:1,
251:7, 251:19,
252:24, 253:5,
295:4, 295:7, 295:9,
334:20, 338:3,
338:6, 349:25,
350:1, 354:4, 354:5,
354:6, 354:12,
360:11, 382:25,

386:15
**county** [1] - 254:16
**County's** [1] - 397:3
**couple** [12] - 232:19,
238:19, 241:8,
243:20, 264:13,
267:16, 288:10,
317:6, 340:20,
347:18, 351:25,
381:25
**course** [6] - 237:12,
253:19, 265:1,
269:6, 319:6, 319:9
**Court** [20] - 217:25,
224:19, 233:20,
242:8, 244:16,
248:19, 248:24,
254:7, 281:3,
320:24, 321:8,
334:7, 389:8,
389:24, 392:22,
396:4, 396:5,
399:12, 399:18,
399:23
**court** [10] - 216:25,
235:10, 240:13,
246:3, 246:23,
247:23, 386:25,
387:10, 397:21,
399:2
**COURT** [277] - 214:1,
216:2, 216:9,
216:12, 216:15,
216:17, 216:21,
216:23, 217:3,
217:13, 217:17,
217:22, 217:23,
218:8, 218:15,
218:23, 219:10,
220:17, 220:21,
221:3, 221:16,
221:23, 222:24,
223:3, 223:10,
223:16, 223:22,
224:4, 224:7,
224:19, 224:21,
224:22, 225:3,
225:6, 225:11,
225:14, 225:16,
226:11, 226:18,
226:21, 227:15,
227:19, 227:22,
228:3, 228:11,
228:17, 229:1,
229:6, 229:11,
229:16, 230:8,
231:3, 231:7,
231:10, 231:17,
231:19, 232:1,
232:4, 232:8,

232:16, 232:24,
233:3, 233:6,
233:10, 233:13,
233:16, 233:19,
233:22, 234:4,
234:11, 234:13,
234:17, 234:20,
234:24, 235:4,
235:15, 235:20,
235:23, 235:25,
236:3, 236:8,
236:11, 236:18,
236:22, 237:1,
237:6, 237:14,
237:17, 237:20,
237:23, 238:4,
238:7, 238:11,
238:13, 238:15,
238:19, 238:24,
239:2, 239:5,
239:10, 239:14,
239:16, 239:21,
240:1, 240:5, 240:9,
240:17, 240:21,
240:23, 241:2,
241:6, 241:9,
241:24, 242:1,
242:4, 242:13,
242:17, 242:23,
243:2, 243:8,
243:13, 243:17,
243:25, 244:3,
244:9, 244:25,
245:4, 245:8,
245:17, 246:4,
246:9, 246:11,
246:14, 246:18,
247:6, 247:9,
247:15, 248:1,
248:7, 248:11,
248:13, 249:14,
249:18, 249:21,
250:8, 254:21,
255:2, 255:5,
255:20, 255:22,
259:5, 261:3,
268:23, 271:19,
271:21, 271:25,
281:1, 287:24,
288:2, 296:22,
296:25, 297:6,
297:8, 297:13,
297:16, 297:19,
297:21, 299:5,
299:7, 299:9,
301:23, 308:22,
309:2, 309:22,
310:2, 310:6, 310:9,
310:13, 317:4,
318:23, 319:1,
319:16, 319:22,

320:1, 320:5, 320:8,
320:12, 320:17,
320:22, 321:9,
321:12, 321:24,
322:6, 322:10,
322:12, 322:15,
322:19, 322:23,
324:1, 325:14,
326:23, 327:16,
328:4, 328:17,
330:13, 331:8,
332:10, 333:4,
333:6, 333:11,
333:15, 333:17,
333:19, 333:20,
333:24, 334:3,
334:7, 335:4, 338:9,
338:12, 345:20,
346:10, 346:15,
352:22, 352:25,
353:5, 353:10,
353:12, 355:13,
355:18, 356:1,
357:19, 371:18,
371:21, 383:4,
383:7, 387:5,
387:21, 387:24,
388:4, 388:18,
388:23, 389:2,
389:6, 389:9,
389:18, 390:2,
390:7, 390:12,
390:15, 390:18,
390:21, 391:6,
391:15, 391:18,
392:1, 392:24,
393:2, 393:4,
393:11, 394:4,
394:9, 394:17,
395:1, 395:8,
395:16, 395:23,
396:8, 396:16,
396:18, 397:13,
397:17, 397:22,
398:8, 398:10,
399:3, 399:7
**Court's** [7] - 242:4,
247:18, 248:22,
321:1, 353:6,
389:25, 397:6
**courtroom** [6] -
231:25, 248:14,
249:20, 322:14,
388:17, 390:23
**cover** [3] - 370:17,
373:20, 383:19
**coverage** [1] - 260:8
**covered** [1] - 264:14
**covering** [2] - 293:18,
294:6

**cowl** [3] - 268:15,
268:17, 268:18
**CPR** [3] - 379:7,
379:11, 379:13
**Cranberry** [1] - 214:22
**crank** [1] - 356:2
**created** [1] - 224:17
**credibility** [4] - 392:7,
393:1, 395:2, 395:18
**crime** [2] - 267:24,
283:15
**criminal** [4] - 237:24,
237:25, 238:5, 354:3
**critical** [3] - 277:12,
393:21, 395:19
**critique** [1] - 392:6
**CROSS** [4] - 288:6,
328:20, 334:14,
383:9
**Cross** [2] - 215:6,
215:12
**cross** [2] - 215:17,
320:21
**CROSS-
EXAMINATION** [4] -
288:6, 328:20,
334:14, 383:9
**Cross-Examination**
[2] - 215:6, 215:12
**cross-examination** [2]
- 215:17, 320:21
**cruiser** [40] - 259:10,
259:23, 259:24,
260:20, 261:16,
272:6, 272:19,
273:7, 273:25,
284:18, 284:22,
285:1, 295:17,
296:12, 302:1,
302:3, 302:7,
302:14, 303:2,
303:3, 337:6,
337:12, 337:24,
338:18, 339:2,
339:16, 340:18,
341:15, 341:22,
342:14, 358:15,
358:22, 358:23,
358:24, 360:20,
370:17, 373:23,
374:4, 374:11
**Crum** [19] - 216:9,
216:18, 216:20,
216:21, 217:10,
217:13, 217:16,
217:18, 217:23,
220:21, 221:16,
223:23, 224:22,
227:15, 230:8,
231:4, 231:10,

233:24, 241:13
**CRUM** [1] - 217:12
**cubes** [1] - 227:4
**current** [2] - 251:1, 251:2
**cut** [5] - 362:5, 362:9, 362:13, 366:8, 366:15
**cuts** [3] - 356:20, 365:16, 369:7
**Cutter** [2] - 399:11, 399:22
**cutting** [2] - 245:24

**D**

**dad** [3] - 384:23, 384:25, 385:4
**damage** [1] - 295:19
**danger** [1] - 377:5
**dark** [1] - 261:10
**darkened** [1] - 224:24
**dash** [2] - 375:25, 384:4
**dashboard** [1] - 383:22
**date** [9] - 233:19, 251:11, 275:22, 277:14, 277:19, 289:20, 289:22, 324:16
**dated** [5] - 270:9, 270:10, 270:11, 270:14, 270:17
**Dave** [1] - 364:23
**DAVID** [3] - 214:8, 215:16, 334:2
**David** [2] - 218:17, 333:23, 334:18
**Daybrook** [1] - 353:24
**daylight** [1] - 253:10
**days** [10] - 237:4, 245:15, 246:1, 257:1, 351:25, 391:23, 393:8, 393:9, 394:11, 394:13
**dead** [5] - 329:23, 329:24, 330:1, 330:6, 330:9
**deadly** [2] - 251:25, 252:7
**deal** [1] - 219:2
**dealings** [1] - 374:9
**death** [13] - 265:2, 267:11, 268:1, 273:15, 282:13, 316:13, 323:22, 324:12, 329:24, 329:25, 330:2,

330:8, 393:20
**deceased** [1] - 324:16
**decide** [2] - 317:12, 395:25
**decided** [2] - 337:23, 342:14
**deem** [2] - 297:23, 355:14
**deer** [5] - 349:24, 350:2, 350:4, 350:8, 350:10
**defendant** [47] - 251:11, 253:18, 253:24, 254:13, 256:24, 257:6, 258:15, 260:2, 260:5, 260:18, 261:24, 262:6, 264:19, 265:10, 266:9, 267:20, 276:7, 276:10, 276:12, 276:13, 276:19, 277:9, 278:8, 280:3, 280:6, 282:13, 282:15, 284:10, 284:13, 284:15, 284:20, 285:1, 285:3, 285:6, 285:16, 285:18, 310:18, 312:9, 313:23, 314:13, 314:15, 314:19, 314:23, 314:25, 315:12
**Defendant** [5] - 214:10, 214:20, 263:2, 320:18, 383:6
**DEFENDANT** [1] - 334:2
**defendant's** [4] - 259:11, 297:3, 297:21, 315:25
**Defendant's** [8] - 297:10, 299:16, 300:5, 300:19, 321:17, 321:25, 355:15, 371:17
**Defendants** [1] - 371:25
**defense** [3] - 235:1, 238:4, 346:21
**definite** [2] - 340:22, 340:23
**definitely** [1] - 233:12
**definition** [1] - 314:10
**definitively** [1] - 272:20
**degree** [1] - 354:3
**delivered** [2] - 243:15, 247:13

**delve** [1] - 239:21
**deny** [1] - 382:6
**departed** [3] - 275:1, 275:17, 296:3
**Department** [4] - 295:10, 334:20, 354:12, 382:25
**department** [15] - 220:2, 221:6, 222:5, 236:7, 295:24, 296:5, 336:19, 336:22, 353:19, 354:9, 382:21, 385:3, 385:7, 393:12, 394:20
**departmental** [1] - 252:7
**depict** [3] - 264:23, 265:20, 269:2
**depicted** [1] - 265:24
**depiction** [1] - 283:24
**depicts** [1] - 269:3
**deposed** [4] - 238:11, 238:17, 238:22, 394:19
**deposition** [22] - 239:4, 239:7, 244:6, 250:16, 278:11, 278:19, 281:12, 317:23, 318:2, 318:4, 326:5, 326:9, 326:15, 326:19, 326:25, 340:21, 376:16, 389:22, 390:19, 391:3, 391:8, 391:13
**depositions** [1] - 244:10
**depressing** [1] - 302:22
**deputies** [1] - 295:24
**deputy** [8] - 243:4, 256:19, 279:11, 295:23, 306:24, 323:11, 323:16, 356:21
**Deputy** [106] - 253:22, 254:2, 278:5, 278:20, 279:9, 279:10, 279:11, 279:12, 279:15, 279:16, 279:22, 279:23, 281:8, 281:17, 282:4, 290:7, 292:22, 293:6, 293:14, 293:17, 294:5, 294:13, 294:14, 294:15, 302:9, 302:15, 303:3,

304:1, 304:8, 304:20, 304:24, 305:3, 305:6, 305:10, 305:15, 305:18, 306:3, 306:13, 306:21, 306:25, 307:7, 307:8, 307:17, 307:19, 307:22, 308:5, 308:8, 309:8, 309:14, 309:18, 318:11, 318:12, 318:19, 344:7, 353:7, 353:16, 355:4, 356:7, 356:22, 357:4, 357:15, 358:11, 358:21, 359:4, 360:21, 361:4, 361:15, 361:20, 362:10, 362:12, 362:13, 363:13, 363:22, 364:10, 364:19, 364:20, 367:6, 368:7, 371:8, 371:20, 371:24, 372:2, 372:11, 374:22, 376:1, 376:8, 376:13, 377:23, 378:2, 378:23, 378:24, 379:8, 380:18, 381:25, 382:13, 389:13, 393:17, 395:11, 396:23, 397:2, 397:4, 397:19
**describe** [4] - 300:11, 360:12, 362:23, 368:14
**described** [2] - 363:10, 392:10
**describes** [1] - 331:16
**description** [3] - 332:6, 360:23, 362:20
**designated** [1] - 236:13
**designation** [1] - 391:5
**designations** [1] - 388:21
**designed** [2] - 394:1, 394:2
**desk** [11] - 219:21, 221:6, 221:15, 222:25, 223:11, 231:1, 235:16, 235:20, 237:8, 238:3, 384:18
**detachment** [15] -

221:18, 223:12, 223:13, 223:18, 230:11, 233:25, 234:8, 236:4, 236:19, 237:18, 238:9, 251:6, 251:9, 280:11, 290:17
**details** [1] - 285:4
**determination** [3] - 303:25, 304:7, 316:21
**determine** [4] - 239:20, 240:7, 265:2, 292:18
**determined** [3] - 253:19, 314:16, 342:14
**determines** [1] - 291:3
**diagram** [4] - 260:22, 260:24, 261:5, 261:9
**die** [2] - 342:15, 376:10
**died** [2] - 330:5, 352:4
**difference** [3] - 241:18, 329:20, 329:23
**differences** [1] - 284:11
**different** [12] - 220:1, 225:22, 243:1, 252:3, 282:20, 285:10, 288:22, 299:4, 300:6, 301:15, 353:23
**digital** [3] - 255:15, 275:9, 296:16
**dim** [2] - 299:5, 391:10
**Direct** [3] - 215:5, 215:11, 215:18
**direct** [2] - 293:24, 328:24
**DIRECT** [3] - 250:13, 323:4, 353:14
**directed** [1] - 364:24
**direction** [20] - 251:19, 311:10, 311:24, 312:4, 312:5, 312:7, 312:10, 312:16, 312:18, 313:7, 313:8, 313:9, 313:16, 331:16, 331:20, 332:2, 332:6, 362:25, 368:15, 368:18
**directions** [1] - 312:18
**directly** [4] - 265:10, 299:18, 350:14, 392:7
**dirt** [2] - 301:7, 338:6

**disagree** [4] - 274:5, 283:1, 283:3, 314:8
**discharged** [1] - 293:15
**discovered** [1] - 274:3
**discussed** [6] - 298:11, 305:7, 319:11, 320:23, 355:10, 388:14
**discussing** [5] - 298:21, 299:15, 319:7, 388:10, 398:14
**discussion** [1] - 310:25
**disk** [2] - 321:19, 321:22
**dismiss** [1] - 396:2
**disobeying** [1] - 248:24
**dispatch** [4] - 236:17, 368:6, 377:16, 377:19
**displayed** [1] - 391:9
**dispute** [5] - 293:13, 344:1, 379:24, 380:2, 382:6
**distance** [2] - 260:17, 260:21
**district** [5] - 290:20, 290:24, 291:2, 291:13, 317:19
**DISTRICT** [2] - 214:1, 214:1
**District** [5] - 214:12, 399:12, 399:13, 399:23, 399:24
**disturbance** [4] - 301:7, 311:19, 313:6, 372:22
**disturbances** [1] - 300:21
**ditch** [19] - 264:11, 264:13, 265:14, 275:15, 311:4, 311:6, 311:9, 311:11, 311:16, 311:23, 311:25, 312:5, 312:6, 312:14, 312:16, 312:17, 313:10, 313:13, 313:18
**dive** [1] - 385:17
**doc** [1] - 247:1
**Doc** [1] - 247:23
**Docket** [1] - 241:10
**doctor** [8] - 228:1, 241:6, 244:17, 245:23, 248:1, 332:11, 333:6, 333:9

**Doctor** [15] - 242:13, 243:3, 243:13, 245:9, 245:18, 249:3, 322:20, 322:23, 325:16, 327:16, 328:4, 331:9, 331:22, 333:11, 333:15
**document** [13] - 220:10, 220:11, 226:5, 226:14, 227:12, 228:22, 228:23, 297:4, 324:9, 381:17, 381:18, 394:4
**documented** [1] - 301:13
**documents** [16] - 221:8, 221:10, 222:1, 222:3, 222:7, 222:9, 222:10, 222:13, 222:21, 222:22, 227:13, 228:1, 228:16, 228:20, 230:13
**Docuserve** [1] - 218:4
**DOCUSERVE** [1] - 218:4
**Doddridge** [1] - 251:7
**done** [4] - 251:5, 316:7, 360:1, 379:12
**Donny** [8] - 359:14, 359:16, 359:18, 360:5, 360:7, 360:9
**Donnys** [1] - 359:19
**door** [9] - 226:2, 226:4, 227:6, 303:3, 303:8, 303:9, 303:11, 303:14, 373:11
**doors** [1] - 236:15
**double** [1] - 243:10
**doubt** [1] - 345:5
**down** [34] - 216:23, 222:21, 225:22, 226:6, 227:8, 235:8, 240:12, 240:16, 240:24, 241:7, 247:3, 248:4, 248:6, 270:21, 271:22, 278:17, 286:15, 291:8, 315:22, 325:7, 325:10, 333:12, 349:16, 353:21, 365:10, 365:14, 369:24, 375:24, 375:25, 383:14, 383:21, 383:22, 384:3, 387:24

**down)** [1] - 241:1
**downward** [2] - 331:21, 332:5
**Dr** [25] - 225:4, 225:12, 225:17, 229:2, 229:7, 229:13, 231:20, 241:2, 241:19, 242:9, 242:24, 244:19, 248:21, 320:7, 322:17, 323:6, 324:3, 324:15, 326:5, 326:25, 327:22, 328:22, 331:7, 331:13, 332:15
**DR** [1] - 242:12
**dragged** [1] - 344:4
**drew** [1] - 374:13
**drive** [14] - 259:14, 272:7, 272:23, 273:1, 273:3, 273:11, 302:4, 302:8, 322:3, 337:10, 337:13, 337:23, 380:16, 398:7
**driven** [1] - 287:14
**driver** [5] - 287:7, 292:23, 368:25, 373:10
**driving** [20] - 290:7, 292:24, 337:6, 337:12, 337:14, 337:15, 337:16, 340:16, 342:2, 342:19, 342:23, 343:1, 343:7, 343:10, 343:14, 348:11, 351:1, 355:2, 377:8, 387:18
**drop** [2] - 238:2, 398:11
**drop-off** [1] - 398:11
**drops** [1] - 235:11
**drove** [5] - 240:15, 338:23, 343:11, 352:14, 370:9
**due** [1] - 396:8
**during** [24] - 249:4, 252:11, 253:17, 253:19, 254:12, 274:2, 275:8, 276:3, 281:18, 282:10, 284:11, 288:3, 309:12, 316:16, 318:2, 318:4, 320:21, 339:24, 340:15, 340:21, 363:23, 376:17,

394:23, 398:1
**DURST** [86] - 216:16, 231:8, 239:24, 240:22, 249:17, 255:21, 259:1, 280:23, 281:2, 288:1, 288:5, 288:7, 296:21, 297:2, 297:7, 297:10, 297:14, 297:24, 297:25, 299:2, 299:6, 299:8, 299:12, 299:13, 301:21, 301:24, 301:25, 308:25, 309:3, 309:6, 309:20, 310:22, 317:6, 317:9, 318:21, 319:19, 320:4, 320:23, 321:17, 322:1, 322:11, 346:9, 346:14, 353:3, 353:6, 353:13, 353:15, 355:9, 355:17, 355:24, 356:5, 356:6, 356:18, 357:12, 357:22, 357:23, 358:1, 359:7, 361:1, 361:17, 362:1, 363:16, 364:8, 364:15, 365:4, 366:2, 366:12, 367:2, 367:13, 368:1, 371:16, 371:19, 371:22, 371:23, 383:3, 383:5, 387:3, 387:22, 388:2, 389:5, 389:7, 390:11, 390:17, 396:21, 397:16, 399:6
**Durst** [30] - 214:20, 216:15, 231:7, 233:5, 239:2, 239:6, 239:21, 240:2, 240:21, 242:2, 249:16, 281:1, 281:4, 287:25, 299:11, 308:22, 317:5, 318:23, 321:15, 322:10, 328:18, 346:13, 353:2, 355:15, 357:20, 383:8, 387:21, 390:9, 390:16, 391:5
**Durst.............287** [1] - 215:6

**Durst.............352** [1] - 215:18
**Durst............316** [1] - 215:8
**dust** [3] - 365:12, 365:13, 365:19
**duty** [1] - 277:2

## E

**Eagle** [2] - 217:20, 218:5
**ear** [1] - 389:18
**early** [1] - 253:9
**ease** [1] - 390:12
**easier** [1] - 298:14
**easily** [5] - 380:24, 392:4, 392:5, 393:19, 394:16
**East** [8] - 362:5, 362:9, 362:13, 365:11, 365:13, 365:14, 366:16, 367:10
**easy** [1] - 337:22
**ECF200** [2] - 241:19, 241:23
**edited** [1] - 389:8
**Edward** [2] - 217:10, 217:16
**EDWARD** [1] - 217:12
**effect** [2] - 260:13, 372:6
**effectively** [1] - 310:17
**efficiently** [1] - 249:2
**efforts** [5] - 219:7, 225:7, 225:17, 319:10, 398:20
**either** [14] - 223:23, 233:14, 237:2, 244:5, 244:10, 254:12, 262:2, 279:13, 291:10, 292:16, 350:11, 351:23, 359:19, 375:22
**elapsed** [3] - 340:20, 376:17, 377:1
**elevation** [3] - 263:20, 264:3, 264:14
**eliciting** [1] - 396:13
**email** [4] - 233:12, 233:14, 234:25, 238:25
**embankment** [4] - 264:7, 264:8, 264:9, 265:16
**emergency** [1] - 347:4
**employed** [5] - 323:8, 334:19, 354:8,

354:9, 385:6
**employee** [1] - 219:18
**employees** [1] - 219:17
**employment** [4] - 244:4, 392:17, 393:25, 395:14
**EMS** [2] - 296:1, 296:3
**encompasses** [1] - 251:7
**encouragement** [1] - 247:18
**end** [8] - 227:22, 234:9, 261:15, 261:16, 298:10, 355:21, 391:22, 393:9
**end-of-phase** [1] - 393:9
**ended** [4] - 345:15, 351:9, 387:16, 387:17
**enforcement** [3] - 291:20, 291:22, 313:21
**engage** [1] - 337:24
**engine** [4] - 263:3, 285:19, 318:19, 370:12
**enter** [2] - 256:12, 324:21
**entered** [13] - 231:25, 249:20, 258:15, 260:5, 267:7, 267:9, 267:17, 283:22, 292:21, 295:18, 322:14, 338:21, 370:5
**entering** [2] - 257:9, 257:18
**entire** [3] - 228:24, 236:9, 340:15
**entirety** [2] - 259:2, 297:4
**entitled** [1] - 392:10
**entrance** [7] - 235:7, 261:21, 269:4, 269:14, 271:2, 286:2, 286:7
**entry** [2] - 265:22, 266:14
**envelope** [1] - 228:5
**equipment** [18] - 258:24, 258:25, 259:12, 259:17, 269:17, 269:18, 269:22, 269:24, 270:1, 270:4, 270:6, 270:9, 270:11, 270:14, 270:15,

270:18, 271:3, 313:3
**Eric** [2] - 389:21, 389:24
**especially** [1] - 392:19
**essentially** [1] - 286:14
**established** [1] - 366:18
**estate** [1] - 214:5
**estimate** [1] - 340:19
**evaluation** [2] - 391:23, 394:4
**evasive** [4] - 350:19, 350:21, 350:22, 350:24
**evening** [1] - 398:25
**event** [3] - 313:7, 389:15, 390:6
**events** [1] - 220:23
**evidence** [25] - 255:18, 277:1, 285:22, 290:1, 290:7, 293:3, 294:21, 299:24, 300:5, 301:14, 301:17, 304:14, 310:17, 313:24, 314:6, 314:7, 314:11, 314:12, 314:14, 315:11, 315:24, 342:12, 392:3, 394:7, 398:2
**exact** [7] - 260:23, 263:7, 274:16, 283:23, 284:4, 286:6, 341:7
**exactly** [17] - 228:22, 233:8, 247:7, 263:6, 264:5, 264:21, 264:24, 266:25, 274:2, 274:6, 274:9, 282:23, 283:4, 285:6, 292:8, 332:18, 351:2
**EXAMINATION** [11] - 250:13, 288:6, 310:14, 317:8, 323:4, 328:20, 331:11, 332:13, 334:14, 353:14, 383:9
**Examination** [10] - 215:5, 215:6, 215:7, 215:8, 215:11, 215:12, 215:13, 215:14, 215:17, 215:18
**examination** [2] - 288:3, 320:21
**examiner** [7] - 243:5,

320:19, 323:9, 323:11, 323:16, 349:5, 383:15
**Examiner** [1] - 323:10
**examiner's** [6] - 226:19, 227:16, 229:19, 243:21, 244:5, 348:25
**examiners** [1] - 227:4
**example** [3] - 237:24, 245:14, 330:16
**exceptions** [2] - 330:14, 330:16
**exchange** [1] - 340:15
**excited** [1] - 361:9
**excuse** [14] - 220:1, 226:7, 226:16, 260:20, 278:13, 291:16, 300:4, 306:24, 344:6, 346:24, 354:22, 357:18, 384:6, 387:11
**excused** [7] - 319:15, 319:17, 319:18, 333:6, 333:10, 333:12, 399:1
**executed** [1] - 267:25
**executives** [1] - 229:22
**exhibit** [5] - 297:3, 299:9, 321:15, 321:19, 355:13
**Exhibit** [31] - 256:3, 257:5, 257:12, 257:22, 258:8, 258:23, 258:24, 259:20, 259:25, 262:18, 264:17, 265:8, 265:17, 266:11, 266:22, 268:13, 268:25, 269:15, 270:5, 283:20, 285:16, 297:10, 297:21, 299:16, 299:23, 321:17, 321:20, 322:4, 355:15, 371:17
**Exhibits** [5] - 284:24, 255:3, 255:18, 255:19, 262:4
**exhibits** [3] - 387:25, 388:2, 388:4
**exigent** [1] - 334:24
**exit** [11] - 266:24, 266:25, 267:1, 267:3, 267:6, 267:16, 338:17, 338:25, 370:20,

373:15, 373:22
**exited** [17] - 260:2, 260:6, 260:19, 261:24, 292:22, 293:18, 294:5, 302:15, 339:2, 339:16, 339:18, 340:18, 351:8, 370:16, 370:24, 373:17, 388:17
**exiting** [3] - 258:21, 342:13, 373:18
**expected** [1] - 240:8
**expecting** [3] - 222:17, 230:17, 230:20
**experience** [1] - 306:20
**expert** [6] - 267:7, 267:13, 267:19, 268:4, 268:6, 270:3
**experts** [2] - 268:8, 268:11
**explain** [10] - 225:24, 228:20, 252:22, 254:14, 287:10, 290:16, 339:5, 345:8, 345:12, 349:13
**explained** [4] - 219:25, 221:12, 230:24, 385:25
**explaining** [1] - 387:14
**explanation** [6] - 346:1, 346:4, 346:5, 346:20, 386:24, 387:9
**Explorer** [2] - 257:9, 274:13
**exposed** [1] - 370:18
**expression** [1] - 329:20
**extended** [1] - 331:2
**extent** [3] - 284:25, 301:18, 329:16
**extra** [1] - 252:1
**extraordinarily** [1] - 230:5
**extremities** [2] - 325:18, 328:11
**eyes** [1] - 326:3

---

# F

**face** [2] - 348:23, 383:16
**Facility** [1] - 234:7
**facing** [4] - 311:9, 311:11, 312:17,

312:19
**fact** [11] - 248:21, 279:3, 305:10, 307:14, 315:17, 315:20, 315:23, 316:9, 320:9, 351:6, 393:21
**facts** [6] - 252:10, 271:9, 292:18, 381:21, 392:8
**fail** [1] - 339:9
**failed** [3] - 292:23, 294:12, 339:13
**fair** [35] - 216:24, 226:24, 253:6, 264:16, 267:5, 269:8, 271:3, 271:4, 272:21, 273:1, 278:9, 281:14, 282:2, 286:5, 288:2, 315:2, 316:10, 328:1, 328:7, 332:24, 335:1, 336:24, 337:25, 342:25, 343:10, 343:15, 343:20, 347:2, 348:5, 348:9, 349:12, 349:18, 376:1, 376:3, 379:16
**fairly** [2] - 275:15, 287:1
**Fairmont** [10] - 234:11, 235:5, 237:18, 251:9, 275:25, 276:1, 354:2, 360:14, 368:17, 368:20
**false** [2] - 279:18, 316:25
**familiar** [5] - 249:24, 269:19, 314:1, 315:18, 324:9
**family** [1] - 398:16
**far** [10] - 231:13, 253:5, 259:3, 263:9, 264:5, 319:11, 364:23, 388:14, 398:21
**fashion** [1] - 372:25
**fast** [1] - 234:15
**favor** [2] - 298:3, 300:23
**fax** [2] - 238:1, 241:20
**faxed** [1] - 235:11
**fee** [2] - 241:20, 241:22
**fees** [1] - 399:17
**feet** [13] - 257:15, 258:5, 260:21, 264:12, 269:12,

270:21, 270:25,
271:1, 271:3, 271:5,
284:2, 286:4
**fell** [1] - 345:23
**fellow** [3] - 319:8,
388:12, 398:15
**female** [2] - 223:2,
226:8
**fetch** [1] - 231:23
**few** [10] - 217:1, 218:9,
231:22, 243:14,
248:3, 248:16,
267:17, 284:2,
321:6, 332:12
**field** [4] - 218:11,
393:14, 394:21,
394:23
**fifth** [1] - 372:20
**file** [3] - 226:15,
227:10, 392:17
**Filed** [1] - 215:2
**filed** [6] - 218:19,
241:11, 242:2,
249:13, 255:14,
255:15
**filing** [1] - 242:8
**fill** [1] - 236:13
**final** [5] - 230:11,
247:3, 259:18,
311:17, 371:12
**finalized** [1] - 289:21
**fine** [6] - 222:14,
222:20, 288:5,
321:12, 335:9, 396:7
**finish** [6] - 254:6,
255:9, 335:5,
346:11, 346:12
**finished** [2] - 367:21,
387:19
**fire** [4] - 341:25,
345:2, 350:14,
383:20
**firearm** [1] - 341:23
**firearms** [3] - 386:4,
386:7, 386:12
**fired** [21] - 262:7,
266:9, 293:1,
294:15, 303:25,
304:4, 304:11,
309:14, 309:18,
347:24, 347:25,
349:22, 367:19,
367:20, 375:2,
375:4, 376:8, 377:5,
377:13, 382:7
**firing** [10] - 304:8,
345:4, 345:5, 345:7,
348:12, 374:23,
377:9, 378:1, 383:22
**firm's** [3] - 219:7,

225:6, 225:17
**first** [40] - 219:11,
226:21, 235:1,
241:14, 245:17,
249:8, 250:3,
256:20, 256:21,
279:6, 281:16,
281:17, 284:20,
288:23, 294:2,
295:18, 296:25,
298:3, 324:16,
346:11, 346:12,
347:4, 347:25,
349:21, 355:18,
357:10, 360:1,
365:8, 365:17,
365:23, 368:12,
371:9, 371:13,
372:5, 373:2,
379:14, 386:16,
389:22, 389:23,
395:25
**fit** [2] - 255:23, 314:8
**fitting** [2] - 270:1,
270:13
**five** [14] - 245:7,
249:7, 326:16,
344:10, 344:14,
344:18, 344:24,
344:25, 350:2,
350:3, 350:4, 350:8,
352:4, 359:2
**five-minute** [1] - 249:7
**five-speed** [4] -
344:10, 344:14,
344:18, 344:24
**fixed** [2] - 269:16,
270:18
**Flanagan** [1] - 214:21
**flash** [2] - 230:9, 322:3
**flat** [2] - 275:14,
346:24
**flee** [1] - 363:25
**fleeing** [1] - 373:21
**fleet** [1] - 251:5
**flip** [1] - 298:24
**floorboard** [5] - 308:9,
375:23, 375:25,
383:13, 384:4
**Focus** [1] - 369:23
**focused** [1] - 379:11
**folder** [1] - 228:20
**folks** [2] - 235:16,
290:1
**follow** [10] - 224:4,
288:10, 291:9,
291:14, 305:12,
305:15, 307:17,
336:19, 392:4, 392:6
**follow-up** [6] - 224:4,

291:9, 291:14,
305:12, 305:15,
307:17
**followed** [1] - 365:17
**following** [10] -
219:14, 219:19,
220:5, 222:9,
222:16, 312:11,
365:11, 365:13,
397:20, 399:1
**force** [6] - 251:25,
252:7, 315:7,
348:15, 348:19,
386:14
**Ford** [3] - 257:9,
274:13, 369:23
**Fords** [1] - 369:24
**foregoing** [1] - 399:14
**forensic** [4] - 243:4,
243:11, 244:11,
323:13
**forget** [2] - 362:19
**format** [1] - 399:17
**Forsyth** [81] - 216:4,
218:17, 263:2,
278:15, 278:20,
279:1, 279:3, 279:6,
279:10, 279:11,
279:15, 279:23,
279:25, 281:17,
290:8, 292:22,
293:6, 293:14,
294:13, 294:14,
294:15, 302:9,
302:15, 304:1,
304:8, 304:20,
304:25, 305:3,
305:10, 305:16,
305:18, 306:3,
306:13, 306:21,
306:25, 307:22,
308:5, 308:8, 309:8,
309:14, 309:18,
318:11, 318:12,
318:19, 320:18,
333:23, 333:24,
334:16, 334:18,
334:21, 335:5,
335:10, 346:10,
346:20, 347:13,
349:20, 352:12,
352:18, 353:7,
353:16, 356:7,
359:4, 368:7, 371:8,
371:20, 371:24,
372:2, 372:11,
374:22, 376:1,
376:8, 376:13,
380:18, 381:25,
382:13, 383:6,

291:9, 291:14,
305:12, 305:15,
307:17
**followed** [1] - 365:17
383:11, 386:10,
387:6, 387:24, 397:9
**FORSYTH** [3] - 214:8,
215:16, 334:2
**Forsyth's** [2] - 303:3,
305:6
**forth** [2] - 356:11,
363:12
**forward** [13] - 230:9,
232:1, 242:9,
304:16, 333:25,
339:19, 347:1,
370:18, 371:2,
373:8, 374:4, 375:9,
378:19
**foundation** [1] -
320:20
**four** [7] - 219:16,
220:9, 228:23,
245:6, 313:20,
356:25, 361:14
**four-inch** [1] - 228:23
**fourth** [3] - 220:24,
230:11, 358:1
**Fowler** [1] - 214:21
**fracture** [1] - 325:1
**frame** [2] - 341:7,
373:11
**free** [3] - 232:11,
250:10, 319:23
**frequently** [2] -
305:24, 306:9
**fresh** [1] - 313:6
**front** [48] - 219:21,
221:6, 221:15,
222:25, 223:11,
228:21, 228:24,
231:1, 235:16,
235:20, 236:15,
237:7, 238:3,
259:12, 259:16,
260:7, 260:10,
260:12, 260:17,
261:13, 262:7,
262:8, 262:14,
265:4, 265:6,
266:14, 266:23,
267:4, 268:15,
289:17, 290:13,
331:13, 331:21,
332:5, 337:7,
339:17, 339:20,
350:14, 363:8,
369:5, 373:1, 373:3,
373:10, 373:11,
375:23, 381:21,
384:15, 385:21
**FTO** [3] - 393:6,
393:13, 394:1
**full** [6] - 217:8, 217:15,

232:13, 242:20,
323:6, 334:16
**functions** [4] - 329:12,
329:18, 330:17
**FURTHER** [1] - 383:9

## G

**gallery** [1] - 240:25
**Garrett** [1] - 358:9
**gas** [37] - 253:1,
253:17, 254:13,
256:5, 257:18,
258:25, 259:12,
259:17, 261:21,
263:17, 266:18,
269:7, 269:8,
269:17, 269:19,
269:21, 269:22,
270:3, 271:2,
271:14, 275:12,
283:22, 284:2,
284:14, 285:11,
287:13, 287:20,
292:21, 295:16,
295:18, 312:22,
313:3, 313:4,
338:10, 369:7,
369:16
**gate** [1] - 256:10
**gated** [1] - 256:8
**gear** [41] - 272:14,
272:16, 272:17,
273:4, 273:5, 287:6,
287:11, 287:19,
302:21, 302:24,
315:16, 315:23,
316:1, 316:2, 316:6,
316:8, 316:10,
316:12, 316:15,
316:16, 316:17,
316:19, 316:23,
318:2, 318:10,
344:25, 345:24,
347:1, 347:9,
349:17, 352:9,
370:14, 374:1,
378:20, 379:18,
380:3, 380:7,
380:19, 380:23
**gears** [4] - 318:18,
345:17, 345:22,
384:1
**general** [1] - 339:23
**generally** [6] - 277:17,
293:20, 300:19,
318:3, 318:13, 368:7
**gentlemen** [6] -
249:21, 310:10,
319:1, 388:6, 391:7,

11

397:22
**genuine** [1] - 389:4
**girl** [3] - 369:22, 398:5, 398:6
**given** [11] - 229:6, 229:14, 230:13, 232:11, 245:10, 245:15, 248:14, 294:13, 347:18, 355:5, 395:23
**Given** [1] - 399:20
**glass** [2] - 235:8, 383:25
**Glasser** [1] - 214:18
**glasses** [10] - 347:13, 347:16, 347:18, 347:21, 350:10, 357:18, 384:16, 384:18, 384:20
**gloves** [2] - 377:24, 379:11
**GOVERNMENT'S** [1] - 242:12
**grab** [1] - 394:5
**graduated** [1] - 353:25
**granted** [1] - 281:1
**grasp** [1] - 247:10
**grass** [1] - 284:24
**gravel** [5] - 253:3, 256:5, 338:7, 365:12, 365:16
**great** [2] - 243:18, 310:5
**green** [1] - 258:24
**Greenbag** [1] - 214:15
**ground** [12] - 258:1, 262:23, 263:13, 266:19, 275:14, 295:20, 298:22, 301:18, 371:10, 372:22, 379:6
**grown** [1] - 370:7
**guess** [8] - 225:25, 247:6, 247:20, 311:12, 312:14, 360:16, 369:6, 373:18
**guessing** [1] - 321:6
**guilty** [1] - 254:5
**gun** [3] - 349:22, 376:2, 376:4
**gunshot** [9] - 276:7, 276:10, 276:11, 276:14, 276:16, 281:7, 293:10, 324:13, 382:4
**guys** [1] - 396:1

# H

**hair** [1] - 226:8
**half** [2] - 252:18, 398:7
**half-hour** [1] - 252:18
**hall** [1] - 216:8
**hallway** [1] - 231:21
**Hancock** [1] - 251:7
**hand** [10] - 217:5, 254:19, 254:23, 264:3, 267:23, 298:15, 360:15, 371:19, 372:7, 399:20
**handed** [4] - 228:5, 233:16, 324:7, 371:24
**handgun** [1] - 339:25
**handing** [5] - 228:18, 229:17, 261:5, 324:3, 326:25
**handled** [1] - 244:14
**hands** [11] - 229:13, 230:14, 276:13, 276:16, 281:9, 281:13, 285:19, 329:9, 342:6, 374:15, 382:2
**happily** [1] - 226:10
**hard** [7] - 261:12, 266:7, 300:8, 311:19, 365:11, 384:22, 389:10
**Harrison** [1] - 354:5
**haste** [2] - 370:10, 373:24
**hate** [1] - 230:9
**haul** [1] - 246:19
**head** [3] - 299:10, 324:13, 324:24
**heading** [1] - 360:14
**headquarters** [3] - 234:8, 234:10, 350:1
**heads** [2] - 320:22, 389:8
**health** [1] - 226:1
**hear** [20] - 216:21, 217:22, 227:19, 232:10, 240:18, 242:15, 243:18, 319:5, 334:5, 355:19, 355:25, 356:1, 356:4, 358:14, 358:18, 358:19, 361:7, 361:8, 392:10, 398:12
**heard** [19] - 227:23, 227:25, 278:12, 338:2, 349:5, 349:9,

355:3, 358:10, 358:21, 358:22, 375:11, 376:6, 377:11, 379:16, 379:19, 380:8, 380:25, 382:1, 383:15
**hearing** [8] - 249:12, 321:4, 321:5, 321:11, 347:19, 390:6, 391:17
**heartwarming** [1] - 389:2
**heat** [1] - 339:15
**held** [6] - 335:12, 335:16, 335:22, 336:9, 336:12, 336:23
**hello** [1] - 228:13
**help** [1] - 381:23
**helpful** [1] - 392:21
**helps** [2] - 299:7, 299:8
**hereby** [2] - 297:22, 399:13
**herein** [1] - 386:21
**Hess** [4] - 219:17, 220:6, 221:5, 221:24
**hide** [1] - 375:24
**high** [1] - 264:2
**High** [2] - 360:16, 360:18
**hill** [3] - 264:4, 365:14, 365:16
**hillside** [3] - 264:14, 265:14, 311:5
**hilltop** [1] - 362:18
**hire** [2] - 268:4, 268:6
**hired** [1] - 354:13
**hit** [7] - 286:15, 287:1, 315:21, 326:3, 348:18, 349:16, 375:1
**hitting** [1] - 284:22
**Hogan** [1] - 214:17
**hold** [4] - 310:9, 328:4, 335:4, 395:24
**holding** [1] - 344:15
**hole** [4] - 265:23, 265:24, 266:5, 295:19
**holes** [11] - 265:19, 265:20, 265:22, 266:15, 266:23, 266:25, 267:1, 267:3, 267:6, 267:9, 267:16
**holler** [1] - 241:2
**holster** [2] - 341:23
**home** [3] - 376:11,

386:1, 386:21
**homicide** [13] - 268:2, 271:11, 271:12, 277:8, 277:15, 283:6, 283:10, 283:14, 287:16, 288:16, 305:22, 305:25
**homicides** [1] - 268:11
**honestly** [1] - 218:25
**Honor** [128] - 216:8, 216:10, 216:14, 216:16, 216:19, 223:6, 223:14, 223:20, 224:2, 224:6, 225:5, 231:5, 231:8, 238:18, 239:24, 240:20, 240:22, 241:4, 242:16, 246:24, 248:5, 249:10, 249:17, 250:5, 254:20, 255:3, 255:6, 255:17, 255:21, 255:24, 259:1, 259:4, 261:2, 271:17, 271:20, 272:3, 280:23, 281:2, 287:23, 288:1, 288:5, 296:21, 297:2, 297:7, 297:10, 297:14, 297:18, 297:20, 297:24, 299:2, 299:8, 299:12, 301:21, 309:1, 309:3, 309:20, 309:24, 317:6, 318:25, 319:19, 320:3, 320:4, 320:14, 320:23, 321:18, 322:1, 322:11, 322:17, 323:3, 323:25, 325:13, 326:22, 328:16, 328:19, 330:12, 331:6, 331:10, 332:9, 332:12, 333:2, 333:5, 333:7, 333:8, 333:14, 333:22, 334:6, 334:11, 345:18, 346:9, 346:14, 352:21, 352:24, 353:3, 353:6, 353:11, 353:13, 355:9, 355:17, 355:20, 355:24, 357:22, 358:1,

371:16, 371:19, 383:3, 383:5, 387:3, 387:20, 387:23, 388:3, 388:20, 389:5, 390:5, 390:11, 390:17, 391:4, 391:20, 392:12, 392:23, 392:25, 393:22, 394:6, 395:13, 396:17, 397:8, 399:5, 399:6
**Honorable** [1] - 214:12
**hospital** [9] - 275:25, 276:1, 276:4, 276:19, 276:23, 277:3, 277:23, 304:21, 381:7
**hot** [2] - 370:13, 374:1
**hour** [2] - 252:18, 389:7, 398:6
**hours** [2] - 278:5, 279:14
**hundred** [1] - 228:9
**hundreds** [3] - 270:25, 306:8, 306:20
**hung** [2] - 222:14, 222:15

# I

**identification** [1] - 254:24
**identified** [1] - 355:8
**identify** [3] - 223:15, 368:25, 372:7
**identity** [1] - 222:24, 223:7
**idle** [1] - 302:21
**III** [2] - 232:15, 250:20
**immediate** [3] - 370:21, 370:22, 378:13
**immediately** [8] - 229:4, 277:10, 315:21, 329:3, 329:19, 329:21, 370:19
**imminent** [1] - 377:5
**impact** [1] - 349:8
**impair** [2] - 305:11, 307:15
**impeach** [1] - 395:15
**impede** [1] - 295:10
**impose** [2] - 333:17, 390:7
**imposing** [1] - 218:25
**imposition** [1] - 231:12

**impossible** [2] - 287:18, 315:15
**impression** [6] - 227:15, 228:4, 229:2, 229:6, 229:12, 229:16
**impressions** [1] - 286:2
**in-between** [1] - 295:20
**inaudible** [4] - 217:20, 395:2, 395:13, 395:18
**inch** [1] - 228:23
**inches** [1] - 231:1
**incident** [12] - 277:12, 288:20, 288:23, 289:3, 303:19, 316:16, 317:16, 332:16, 341:20, 341:21, 354:18, 385:16
**incidents** [2] - 290:25, 392:19
**inclined** [1] - 395:16
**include** [1] - 289:12
**included** [4] - 241:13, 291:24, 321:19, 329:17
**includes** [2] - 388:11, 398:15
**including** [6] - 244:20, 248:22, 268:22, 294:22, 319:7, 394:15
**inconsistencies** [1] - 307:23
**inconsistent** [2] - 346:5, 346:21
**inconvenience** [1] - 247:19
**incorrect** [2] - 351:13, 351:17
**increments** [1] - 393:16
**independent** [3] - 319:10, 388:13, 398:19
**INDEX** [1] - 215:14
**indicate** [3] - 292:7, 305:3, 358:11
**indicated** [11] - 229:11, 247:15, 247:16, 285:1, 295:23, 302:3, 304:20, 304:25, 308:20, 350:13, 396:24
**indicates** [2] - 233:24, 293:17

**indicating** [1] - 284:24
**indication** [3] - 223:16, 230:13, 272:1
**indiscernible** [1] - 220:18
**individual** [4] - 214:9, 222:25, 256:16, 355:10
**individuals** [1] - 224:3
**industry** [1] - 270:3
**inform** [1] - 221:25
**information** [25] - 279:18, 289:6, 289:9, 291:12, 291:17, 291:21, 292:1, 292:2, 293:2, 293:3, 293:22, 294:17, 294:20, 294:21, 300:15, 302:6, 306:22, 307:1, 309:11, 309:16, 340:1, 375:12, 393:18, 394:15
**informed** [5] - 220:9, 221:13, 222:2, 223:21, 246:23
**initial** [3] - 290:4, 361:7, 369:15
**injury** [1] - 325:8
**inquire** [1] - 299:3
**inquiry** [2] - 248:23, 389:3
**inside** [13] - 318:15, 343:4, 345:3, 352:11, 362:21, 375:16, 375:21, 377:22, 378:12, 378:14, 383:24, 384:10, 384:11
**insinuating** [1] - 247:9
**insinuation** [1] - 310:16
**insist** [1] - 277:9
**instance** [2] - 300:4, 348:21
**instances** [2] - 251:23, 252:5
**instantly** [1] - 286:14
**instead** [3] - 280:19, 375:8, 387:10
**instruct** [1] - 344:7
**instructed** [2] - 241:15, 241:21
**instructions** [12] - 241:16, 242:4, 319:6, 341:1, 341:5, 341:16, 341:24, 388:9, 392:4, 392:6,

394:15, 397:25
**intelligently** [1] - 225:10
**intend** [2] - 394:6, 395:1
**intention** [1] - 373:18
**intentionally** [1] - 230:18
**interacted** [1] - 223:17
**interaction** [3] - 223:22, 224:25, 228:11
**interactions** [1] - 376:17
**interfere** [3] - 295:10, 296:8, 307:15
**interfering** [1] - 244:16
**interrupt** [4] - 220:21, 243:13, 308:23, 311:22
**interrupting** [1] - 221:17
**intersect** [1] - 270:23
**intersected** [1] - 261:20
**interstate** [1] - 246:20
**interview** [13] - 277:13, 278:6, 281:19, 281:22, 282:8, 282:11, 282:12, 282:15, 282:22, 283:10, 306:25, 307:3, 307:4
**interviewed** [2] - 280:15, 282:16
**interviewing** [2] - 283:9, 305:25
**interviews** [2] - 284:11, 307:21
**intimidated** [1] - 220:15
**introduce** [1] - 250:19
**investigate** [2] - 283:13, 288:20
**investigated** [3] - 251:11, 267:11, 288:24
**investigating** [16] - 251:21, 252:4, 252:5, 268:10, 271:11, 273:14, 276:4, 277:8, 283:6, 283:15, 288:12, 306:19, 307:22, 343:18, 343:22, 351:18
**investigation** [42] - 217:20, 218:6, 218:7, 252:11,

253:19, 254:12, 255:11, 256:17, 261:6, 265:1, 265:6, 269:7, 274:25, 275:18, 276:3, 289:2, 289:7, 290:6, 290:23, 291:5, 291:14, 291:23, 292:19, 293:13, 295:9, 295:11, 296:9, 301:14, 305:22, 305:25, 307:1, 308:12, 308:14, 309:12, 309:16, 317:12, 317:13, 317:15, 319:10, 375:12, 379:17, 398:20
**Investigation** [2] - 217:21, 218:5
**investigations** [3] - 218:13, 306:6, 388:13
**investigator** [4] - 251:14, 251:16, 286:13, 314:3
**involved** [13] - 251:20, 273:15, 276:2, 276:12, 277:12, 288:24, 292:3, 292:21, 313:25, 355:1, 362:8, 374:8, 379:12
**involvement** [1] - 224:25
**involving** [1] - 288:24
**iPad** [1] - 225:9
**issue** [11] - 216:6, 240:18, 246:3, 247:11, 309:7, 314:21, 314:22, 321:5, 321:11, 329:25, 392:22
**issued** [6] - 223:25, 233:3, 233:23, 237:11, 239:11, 245:18
**issues** [7] - 219:3, 232:19, 248:20, 319:11, 322:15, 388:14, 398:21
**Izzo** [2] - 244:22, 246:17

**J**

**James** [2] - 232:15, 250:20
**Jeep** [184] - 256:13, 258:5, 258:13,

259:8, 259:9, 259:21, 259:22, 260:19, 262:5, 262:20, 263:3, 263:9, 263:11, 263:14, 265:14, 265:15, 266:9, 266:17, 266:19, 266:21, 266:24, 267:2, 267:4, 272:12, 272:13, 273:5, 273:9, 274:1, 275:5, 275:6, 275:10, 275:14, 284:2, 284:21, 285:2, 285:3, 285:6, 285:10, 285:20, 286:4, 286:10, 287:11, 290:7, 292:23, 295:19, 296:12, 299:19, 299:20, 299:21, 300:6, 300:13, 300:14, 301:10, 301:14, 302:2, 302:17, 302:24, 303:8, 303:9, 303:11, 304:8, 304:9, 304:15, 309:12, 309:17, 310:18, 311:4, 311:8, 311:21, 312:2, 312:8, 312:15, 312:19, 315:1, 315:8, 315:12, 315:24, 316:9, 316:12, 316:14, 316:15, 318:2, 318:10, 318:15, 337:9, 337:13, 337:16, 337:23, 337:24, 338:14, 338:21, 339:17, 339:20, 340:13, 342:8, 343:3, 343:5, 343:10, 343:11, 343:15, 343:17, 343:19, 343:23, 344:2, 344:4, 344:7, 344:19, 345:8, 345:12, 347:9, 348:14, 349:13, 349:15, 350:14, 350:18, 350:23, 351:3, 351:7, 351:12, 352:4, 352:14, 354:25, 355:2, 355:5, 359:15, 360:21, 360:23, 361:5,

361:15, 362:7,
362:8, 362:14,
362:16, 362:20,
363:1, 363:10,
368:12, 368:18,
368:19, 368:21,
369:1, 369:14,
369:16, 369:17,
370:8, 371:3,
371:12, 371:13,
372:4, 372:15,
372:17, 373:1,
373:2, 373:6, 373:7,
373:8, 375:16,
375:24, 376:9,
376:17, 378:8,
378:14, 378:22,
379:1, 379:3, 379:5,
379:6, 379:18,
379:21, 379:25,
380:2, 380:6,
380:22, 382:7,
385:12, 385:15,
386:25, 387:9,
387:16
**Jeep's** [1] - 311:16
**Jessica** [1] - 247:23
**Jill** [2] - 399:11,
399:22
**job** [5] - 245:16,
245:25, 246:25,
381:16, 393:16
**jobs** [1] - 244:16
**jogging** [1] - 240:15
**joint** [1] - 391:4
**Jontz** [1] - 214:5
**JP** [6] - 215:4, 219:6,
220:3, 232:3, 250:6,
250:7
**judge** [1] - 249:24
**Judge** [4] - 214:12,
214:12, 216:23,
397:2
**Judicial** [1] - 399:18
**July** [6] - 238:18,
238:22, 239:5,
239:7, 250:16,
317:24
**jumped** [6] - 258:18,
302:10, 363:20,
363:24, 364:2,
364:11
**JUROR** [2] - 398:5,
398:9
**jurors** [8] - 248:18,
249:15, 299:3,
310:3, 319:8,
388:12, 398:16
**jurors'** [1] - 249:2
**Jury** [2] - 214:11,

399:1
**jury** [62] - 216:5,
243:17, 248:3,
248:15, 249:18,
249:20, 250:19,
251:3, 252:22,
256:22, 268:17,
270:12, 271:8,
271:18, 278:12,
287:10, 289:20,
290:16, 291:18,
292:16, 294:11,
295:14, 297:15,
300:11, 304:24,
319:15, 320:13,
322:12, 322:14,
345:8, 345:12,
353:19, 354:8,
355:1, 355:24,
356:20, 357:25,
359:2, 360:7,
360:20, 362:24,
370:6, 370:22,
372:3, 372:15,
376:8, 376:22,
377:1, 377:11,
377:14, 386:24,
388:17, 390:20,
391:7, 391:9,
391:14, 391:17,
392:10, 392:22,
396:2, 397:17,
397:22
**jury's** [1] - 256:4
**justice** [1] - 354:3
**justification** [3] -
316:25, 387:1,
387:12
**justified** [4] - 335:25,
343:10, 343:14,
343:16

## K

**Kaitlin** [1] - 354:22
**Kambria** [1] - 224:9
**KAMBRIA** [1] - 224:20
**keep** [4] - 229:25,
245:25, 297:1, 394:2
**kept** [1] - 370:17
**kicked** [1] - 368:23
**kids** [1] - 354:21
**kill** [5] - 273:17,
343:17, 348:18,
350:2, 382:18
**killed** [19] - 253:24,
256:24, 264:20,
268:5, 277:18,
304:1, 304:10,
315:20, 316:7,

331:23, 336:23,
336:25, 340:19,
347:3, 347:9,
347:21, 351:16,
352:8, 352:15
**killing** [10] - 251:12,
294:16, 335:7,
339:24, 343:9,
343:14, 347:15,
349:21, 387:2,
387:12
**kind** [17] - 224:12,
225:25, 227:1,
238:25, 239:6,
244:13, 246:3,
253:1, 261:12,
266:7, 273:7, 273:9,
286:10, 300:8,
309:3, 311:19, 376:2
**Kleeh** [2] - 214:12,
216:23
**knife** [3] - 340:9,
376:2, 376:4
**knocked** [2] - 345:24,
374:1
**knowing** [1] - 319:20
**knowingly** [1] -
334:22
**knowledge** [4] -
239:1, 268:9,
328:24, 329:6
**known** [2] - 355:7
**knows** [1] - 330:6

## L

**labeled** [1] - 261:12
**lacerated** [3] - 318:16,
325:3, 325:11
**lacerating** [2] -
324:13, 325:6
**Ladies** [1] - 397:22
**ladies** [5] - 249:21,
310:10, 319:1,
388:6, 391:6
**lady** [6] - 219:13,
220:8, 221:6,
221:15, 221:24,
227:12
**laid** [2] - 222:21, 379:6
**land** [1] - 219:2
**landmark** [2] - 360:12,
360:16
**lane** [4] - 363:2, 363:6,
363:7, 363:9
**language** [3] - 272:9,
272:16, 272:20
**large** [1] - 264:14
**larger** [1] - 229:23
**last** [9] - 236:1,

245:14, 246:1,
274:25, 294:10,
304:9, 347:18,
367:23, 367:24
**Last** [1] - 358:21
**lasted** [3] - 282:13,
282:23, 341:13
**law** [4] - 222:8,
291:20, 291:22,
313:21
**lay** [2] - 219:2, 320:20
**lead** [1] - 251:14
**leading** [2] - 259:2,
393:8
**leaning** [4] - 308:9,
308:10, 378:19,
383:19
**learn** [2] - 302:6,
302:20
**learned** [2] - 287:18,
315:17
**least** [7] - 227:22,
247:16, 267:3,
269:6, 315:12,
380:15, 389:13
**leave** [11] - 222:10,
222:20, 229:16,
237:4, 275:16,
309:11, 309:25,
333:15, 387:25,
388:2, 388:4
**leaves** [1] - 330:5
**leaving** [5] - 221:14,
229:17, 248:10,
277:22, 309:7
**led** [5] - 338:2, 338:6,
338:7, 338:9
**left** [41] - 219:16,
220:13, 221:11,
221:21, 222:13,
222:23, 223:4,
223:10, 228:3,
235:16, 239:18,
253:25, 254:2,
254:10, 258:13,
258:16, 259:10,
259:23, 259:24,
263:17, 263:23,
264:2, 264:3, 266:2,
266:3, 274:9,
275:23, 284:3,
284:7, 296:1,
299:20, 301:6,
311:13, 331:21,
332:4, 365:12,
365:15, 369:17,
370:9, 370:18
**left-hand** [1] - 264:3
**legal** [3] - 230:2,
316:21, 329:25

**Legal** [1] - 214:15
**legs** [1] - 349:9
**length** [5] - 243:18,
257:19, 262:2,
269:8, 312:16
**lengths** [1] - 264:13
**lens** [1] - 314:12
**lenses** [1] - 347:16
**LEO** [3] - 291:18,
291:20
**less** [4] - 271:3,
306:21, 310:8,
329:20
**lethal** [2] - 348:15,
348:19
**letter** [3] - 222:8,
239:12, 332:1
**letters** [1] - 228:24
**level** [2] - 275:15,
393:11
**liable** [2] - 316:13,
316:22
**license** [1] - 355:5
**lie** [2] - 280:21, 281:14
**lies** [1] - 279:21
**lieutenant** [2] - 232:7,
381:6
**Lieutenant** [53] -
232:8, 232:9,
232:13, 233:22,
234:5, 238:7,
238:17, 238:20,
239:22, 239:25,
240:19, 240:23,
242:6, 248:21,
249:3, 250:6, 250:8,
250:15, 250:20,
250:21, 251:21,
255:8, 268:17,
288:8, 289:18,
291:17, 293:25,
298:1, 298:13,
298:25, 299:14,
300:24, 301:3,
301:12, 302:1,
302:20, 303:24,
306:24, 308:19,
309:8, 309:21,
317:2, 317:10,
318:22, 318:24,
319:16, 375:11,
379:16, 379:24,
380:8, 380:25,
381:7, 382:1
**lights** [5] - 299:5,
301:22, 363:4,
368:23, 391:10
**likely** [5] - 274:22,
313:1, 313:3, 350:6,
389:16

**limine** [1] - 390:1
**limited** [1] - 240:17
**line** [4] - 258:16, 280:25, 327:3, 327:19
**lines** [3] - 281:5, 281:11, 327:19
**lineup** [1] - 397:23
**listed** [2] - 292:10, 308:2
**listen** [2] - 308:17, 357:25
**listened** [5] - 308:11, 357:10, 358:20, 360:1, 361:23
**listening** [1] - 360:6
**lists** [1] - 291:18
**literally** [1] - 321:11
**live** [1] - 354:7
**lived** [6] - 353:21, 353:23, 354:3, 354:5, 354:6
**living** [2] - 217:17, 243:3
**LLP** [1] - 214:18
**lobby** [1] - 227:20
**local** [1] - 237:25
**locate** [1] - 372:3
**located** [9] - 221:9, 229:8, 234:4, 234:6, 235:9, 338:14, 363:24, 364:1, 368:11
**location** [5] - 225:21, 283:21, 283:23, 300:6, 360:12
**locked** [2] - 235:8, 236:15
**lodged** [1] - 349:3
**log** [2] - 226:15, 227:10
**log-in** [1] - 227:10
**logic** [1] - 275:4
**Logistics** [1] - 251:2
**look** [25] - 236:24, 255:1, 260:1, 261:8, 262:19, 262:21, 265:9, 265:13, 266:3, 267:19, 270:10, 270:11, 270:14, 281:11, 285:21, 296:20, 300:3, 300:4, 300:18, 301:2, 301:6, 311:3, 324:9, 372:2, 395:22
**looked** [9] - 261:10, 269:24, 272:19, 283:24, 294:4, 295:22, 303:2,

313:5, 315:13
**looking** [11] - 219:15, 255:9, 260:22, 266:1, 270:18, 299:20, 312:12, 313:1, 331:25, 372:12, 376:20
**looks** [15] - 252:25, 262:25, 270:1, 270:2, 270:9, 274:23, 275:1, 275:17, 313:9, 313:10, 356:24, 357:8, 359:3, 366:15
**lost** [2] - 329:16, 363:22
**loud** [1] - 374:14
**louder** [1] - 361:9
**love** [2] - 390:3, 392:1
**Love** [61] - 253:22, 254:2, 254:13, 260:4, 260:18, 261:24, 276:16, 277:3, 277:9, 277:21, 277:22, 278:6, 279:4, 279:6, 279:9, 279:12, 279:16, 279:22, 280:4, 280:7, 281:8, 282:4, 283:1, 283:21, 284:1, 284:10, 285:9, 293:6, 293:17, 294:5, 304:20, 306:13, 307:7, 307:8, 307:17, 307:19, 307:22, 313:23, 337:4, 337:6, 337:19, 344:7, 377:23, 378:2, 378:23, 378:24, 379:8, 384:23, 388:22, 389:15, 391:3, 391:13, 391:21, 392:2, 392:3, 393:17, 394:11, 395:2, 395:5, 395:6, 395:19
**Love's** [6] - 278:11, 384:23, 384:25, 385:4, 392:20, 394:22
**love's** [1] - 390:19
**lower** [4] - 256:9, 266:6, 325:18, 328:10
**lowermost** [2] - 265:24, 266:4
**Lunch** [1] - 320:11

**lunch** [5] - 288:4, 310:4, 319:3, 320:3, 396:24
**lunchtime** [2] - 310:10, 310:12
**lying** [2] - 247:8, 316:17

## M

**M-E-T-I-N** [1] - 323:7
**M.D** [2] - 215:10, 322:22
**ma'am** [80] - 288:21, 289:5, 289:8, 289:19, 290:15, 294:3, 295:12, 298:6, 298:19, 299:1, 300:2, 300:17, 300:21, 301:1, 301:4, 301:11, 302:19, 302:23, 303:1, 303:5, 303:13, 303:23, 304:3, 305:20, 317:14, 318:5, 338:11, 353:21, 354:17, 355:3, 356:10, 356:12, 356:15, 357:1, 357:6, 357:21, 358:16, 358:25, 359:10, 359:24, 361:25, 362:10, 365:24, 366:23, 367:21, 368:13, 369:12, 369:21, 370:25, 371:15, 372:10, 372:13, 373:24, 374:10, 374:17, 374:21, 375:17, 376:7, 376:19, 377:3, 377:6, 378:3, 378:15, 378:19, 378:21, 379:3, 379:20, 380:1, 380:4, 380:11, 380:13, 381:4, 381:8, 381:12, 381:14, 381:24, 382:8, 382:12, 382:16, 383:2
**Madam** [16] - 216:18, 217:5, 217:14, 217:24, 232:2, 241:4, 242:10, 254:7, 281:3, 322:1, 333:17, 333:25, 334:7, 356:2, 390:7, 391:10

**madam** [1] - 224:19
**magically** [2] - 287:7, 287:9
**magistrate** [1] - 235:10
**mail** [5] - 224:15, 233:11, 233:14, 235:1, 241:22
**main** [3] - 236:15, 244:19, 266:23
**maintain** [1] - 331:3
**maintenance** [1] - 251:5
**major** [1] - 290:25
**majority** [2] - 281:25, 282:8
**male** [1] - 362:21
**Man** [1] - 377:12
**man** [1] - 268:5
**manager** [1] - 245:2
**maneuver** [1] - 374:18
**maneuvers** [1] - 385:21
**manila** [1] - 228:20
**manner** [10] - 229:17, 237:17, 257:8, 263:6, 285:21, 292:25, 293:1, 294:14, 295:11, 349:14
**Mannington** [3] - 360:14, 368:17, 368:19
**manual** [12] - 273:11, 273:16, 273:22, 287:11, 302:18, 302:21, 349:13, 380:9, 380:10, 380:12, 380:19, 380:22
**March** [12] - 219:12, 223:10, 225:19, 233:2, 233:25, 236:19, 236:23, 237:2, 238:9, 247:13, 354:13
**Marion** [21] - 238:1, 251:19, 252:24, 253:5, 295:4, 295:7, 295:9, 334:20, 338:3, 338:5, 349:25, 350:1, 354:4, 354:6, 354:12, 360:11, 360:15, 360:17, 382:25, 386:15, 397:3
**mark** [3] - 296:25, 312:13, 322:3
**marked** [3] - 256:3,

284:21, 297:9
**marks** [9] - 311:8, 311:11, 311:20, 311:24, 312:2, 312:8, 312:12, 312:18, 313:2
**married** [2] - 354:21, 354:22
**mask** [5] - 232:11, 242:17, 250:10, 322:25, 353:17
**matched** [1] - 360:23
**matching** [1] - 362:20
**materials** [1] - 281:18
**math** [1] - 360:1
**Matt** [2] - 244:22, 246:17
**matter** [6] - 216:3, 218:16, 230:3, 326:5, 333:13, 342:13
**matters** [1] - 216:13
**max** [1] - 355:21
**McDugal** [2] - 276:6, 276:9
**mean** [20] - 238:24, 243:13, 244:18, 246:22, 264:5, 264:6, 288:21, 313:1, 317:2, 324:25, 326:2, 329:19, 350:22, 358:18, 362:24, 385:2, 392:13, 392:20, 396:5
**meaning** [5] - 260:18, 315:22, 332:3, 363:21, 365:9
**means** [3] - 251:3, 291:19, 326:4
**meant** [1] - 268:22
**measure** [3] - 261:13, 263:24, 271:6
**measured** [2] - 261:15, 269:11
**measurement** [8] - 260:23, 260:25, 270:21, 271:12, 271:14, 286:6, 286:8, 286:9
**measurements** [8] - 261:11, 261:19, 261:23, 269:6, 269:9, 269:10, 271:13
**medical** [16] - 226:18, 227:3, 227:16, 229:18, 243:5, 243:21, 244:5, 295:21, 320:19,

323:9, 323:11, 323:16, 348:25, 349:5, 379:15, 383:15
**Medical** [1] - 323:10
**meet** [6] - 227:6, 276:2, 277:13, 278:8, 279:15, 282:5
**meeting** [2] - 225:22, 225:23
**member** [2] - 251:24, 252:8
**members** [2] - 296:5, 398:16
**memory** [2] - 219:20, 393:25
**mention** [1] - 285:12
**mentioned** [5] - 243:21, 247:20, 313:20, 325:3, 327:22
**message** [1] - 239:18
**met** [4] - 221:6, 223:15, 226:23, 250:15
**METIN** [2] - 215:10, 322:22
**Metin** [3] - 225:17, 322:17, 323:7
**microphone** [5] - 232:10, 242:15, 250:10, 322:24, 334:5
**middle** [2] - 318:18, 370:18
**midstream** [1] - 218:16
**might** [6] - 219:1, 288:4, 295:23, 297:2, 302:11, 305:24
**military** [2] - 294:24, 356:11
**Millicent** [7] - 226:6, 244:25, 246:9, 246:10, 246:12, 247:22
**mind** [12] - 220:22, 240:24, 241:6, 242:9, 242:14, 250:9, 293:14, 297:8, 307:5, 324:7, 327:14, 357:20
**minimize** [1] - 247:19
**Minnick** [2] - 364:19, 364:20
**minute** [3] - 249:7, 289:16, 333:18
**minutes** [25] - 221:14, 252:20, 253:23,

254:9, 257:1, 262:16, 274:4, 275:11, 275:19, 282:14, 282:19, 282:20, 283:1, 283:7, 283:11, 287:12, 287:20, 308:25, 310:8, 316:9, 341:10, 341:11, 359:25, 388:15, 389:16
**mirror** [1] - 259:23
**mispronouncing** [2] - 224:10, 242:24
**Miss** [1] - 235:25
**missed** [1] - 221:1
**misspoke** [1] - 366:17
**mistaken** [1] - 260:6
**Miten** [1] - 242:22
**Mock** [1] - 244:19
**mode** [2] - 294:1, 294:10
**moment** [24] - 225:9, 240:25, 241:8, 248:14, 255:1, 261:8, 271:16, 302:11, 310:1, 321:7, 324:6, 325:13, 327:13, 330:7, 330:12, 330:22, 339:15, 350:13, 352:21, 353:4, 353:8, 355:9, 383:3, 383:8
**momentarily** [1] - 243:17
**moments** [4] - 217:1, 231:22, 248:3, 248:16
**monitors** [2] - 299:10, 391:9
**month** [1] - 245:21
**months** [1] - 245:22
**Moran** [14] - 226:6, 226:11, 227:16, 227:20, 228:5, 228:12, 229:1, 229:7, 229:11, 229:17, 244:25, 246:6, 246:7, 246:9
**Morgantown** [6] - 214:16, 214:18, 214:19, 214:22, 214:23, 353:24
**morning** [4] - 216:2, 216:4, 216:7, 216:25, 218:15, 218:25, 231:11, 232:16, 243:14, 247:16, 249:21,

288:8, 288:9, 319:13, 390:23, 391:1, 395:25, 396:19, 396:20, 398:4, 398:6, 398:10, 398:13, 398:23
**most** [3] - 229:22, 241:11, 246:15
**motions** [1] - 389:25
**motor** [2] - 292:10, 292:13
**move** [8] - 269:22, 294:14, 304:9, 325:7, 325:10, 325:17, 339:19, 349:9
**moved** [9] - 263:5, 264:22, 270:15, 304:16, 353:22, 375:8, 377:21, 386:25, 387:9
**movement** [1] - 328:10
**moving** [17] - 260:11, 260:12, 260:14, 286:23, 309:13, 309:15, 315:2, 326:1, 339:2, 339:12, 345:9, 346:25, 350:23, 351:12, 370:17, 374:4, 378:6
**MR** [133] - 216:8, 216:10, 216:14, 216:19, 231:5, 238:18, 240:20, 241:4, 241:10, 241:25, 242:3, 249:10, 250:5, 250:14, 254:20, 254:22, 255:3, 255:6, 255:7, 255:17, 255:24, 255:25, 259:4, 259:7, 261:2, 261:4, 268:24, 271:17, 271:20, 271:23, 272:3, 272:4, 278:1, 278:3, 280:9, 280:10, 280:25, 281:3, 281:6, 283:18, 287:23, 296:23, 297:18, 297:20, 309:24, 310:5, 310:8, 310:12, 310:15, 310:21, 310:23, 311:1, 311:2, 311:7, 312:3, 313:12,

318:25, 319:18, 320:3, 320:7, 320:14, 320:18, 321:2, 321:10, 322:9, 322:17, 323:3, 323:5, 323:25, 324:2, 325:13, 325:15, 326:22, 326:24, 327:18, 327:21, 328:15, 328:19, 328:21, 330:12, 331:6, 331:10, 331:12, 332:9, 332:12, 332:14, 333:2, 333:5, 333:7, 333:8, 333:14, 333:18, 333:22, 334:11, 334:15, 338:13, 345:18, 346:19, 352:21, 352:23, 353:4, 353:11, 355:20, 383:10, 387:8, 387:19, 388:20, 388:25, 389:12, 389:20, 390:5, 391:4, 391:20, 392:2, 392:12, 392:23, 392:25, 393:3, 393:6, 393:13, 393:22, 394:5, 394:10, 394:19, 395:6, 395:10, 395:22, 396:4, 396:14, 396:17, 397:8, 397:15, 399:5
**MS** [86] - 216:16, 231:8, 239:24, 240:22, 249:17, 255:21, 259:1, 280:23, 281:2, 288:1, 288:5, 288:7, 296:21, 297:2, 297:7, 297:10, 297:14, 297:24, 297:25, 299:2, 299:6, 299:8, 299:12, 299:13, 301:21, 301:24, 301:25, 308:25, 309:3, 309:6, 309:20, 310:22, 317:6, 317:9, 318:21, 319:19, 320:4, 320:23, 321:17, 322:1, 322:11, 346:9, 346:14, 353:3, 353:6, 353:13,

353:15, 355:9, 355:17, 355:24, 356:5, 356:6, 356:18, 357:12, 357:22, 357:23, 358:1, 359:7, 361:1, 361:17, 362:1, 363:16, 364:8, 364:15, 365:4, 366:2, 366:12, 367:2, 367:13, 368:1, 371:16, 371:19, 371:22, 371:23, 383:3, 383:5, 387:3, 387:22, 388:2, 389:5, 389:7, 390:11, 390:17, 396:21, 397:16, 399:6
**muddy** [4] - 258:3, 258:4, 285:25, 286:1
**multiple** [2] - 347:3, 348:10
**Mundell** [16] - 357:15, 357:16, 358:21, 359:18, 360:5, 360:8, 360:9, 360:21, 361:4, 361:15, 361:20, 362:10, 362:12, 362:13, 363:13, 367:6
**must** [4] - 344:11, 344:18, 352:9, 360:9

## N

**name** [22] - 217:8, 217:15, 223:1, 224:10, 226:6, 227:10, 232:13, 236:1, 241:16, 242:20, 242:22, 242:24, 244:22, 245:1, 246:7, 247:23, 250:15, 250:20, 253:21, 323:6, 334:16, 335:17
**narrative** [2] - 274:11, 293:25
**NATHAN** [1] - 217:12
**Nathan** [5] - 214:21, 216:20, 217:10, 217:16, 233:24
**nature** [4] - 218:2, 218:6, 350:7, 374:15
**near** [4] - 220:5, 247:22, 275:15,

298:10
**necessary** [1] - 394:8
**neck** [8] - 286:15,
315:22, 318:16,
324:25, 325:7,
325:10, 349:3,
349:16
**need** [22] - 216:13,
231:4, 231:13,
232:19, 240:18,
245:12, 249:14,
251:5, 252:13,
271:21, 320:1,
320:12, 321:7,
346:11, 388:23,
390:4, 390:5, 390:9,
390:15, 395:20,
399:3, 399:4
**needed** [10] - 288:19,
290:1, 290:2, 291:4,
291:14, 305:12,
307:1, 342:15,
377:17
**needs** [1] - 291:10
**negative** [3] - 360:5,
361:5, 361:8
**neglected** [1] - 390:22
**neutral** [20] - 315:24,
318:3, 318:10,
318:11, 344:12,
344:14, 344:18,
344:20, 345:2,
345:9, 345:13,
345:15, 346:2,
351:15, 352:9,
352:19, 386:25,
387:10, 387:16,
387:17
**never** [14] - 238:8,
254:12, 273:20,
275:21, 279:12,
280:20, 287:14,
287:17, 288:22,
302:18, 312:22,
314:25, 376:1, 380:9
**new** [3] - 270:1,
270:13, 394:22
**newer** [1] - 268:19
**next** [39] - 241:19,
247:2, 256:22,
275:3, 277:22,
278:13, 282:3,
319:5, 320:5,
322:16, 333:21,
356:23, 357:7,
357:16, 357:17,
359:1, 359:21,
360:24, 361:12,
361:21, 363:14,
363:15, 364:5,

364:7, 364:13,
365:2, 365:25,
366:10, 366:24,
366:25, 367:11,
388:18, 389:9,
390:19, 391:2,
391:7, 391:18,
398:12
**nine** [5] - 283:1,
283:11, 359:25,
397:14, 397:17
**NO** [1] - 214:3
**nobody** [1] - 239:19
**non** [4] - 237:23,
319:8, 393:2, 395:18
**non-civil** [1] - 237:23
**non-jurors** [1] - 319:8
**non-party** [2] - 393:2,
395:18
**none** [5] - 229:14,
252:9, 297:20,
374:10
**normal** [4] - 235:12,
250:1, 397:25, 398:1
**normally** [3] - 229:18,
283:7, 321:3
**north** [2] - 360:14,
360:16
**North** [2] - 360:15,
360:17
**northbound** [2] -
363:7, 368:16
**Northern** [2] - 399:13,
399:23
**NORTHERN** [1] -
214:1
**notarized** [1] - 224:9
**note** [2] - 331:23,
333:8
**notebook** [1] - 297:4
**noted** [6] - 241:12,
274:3, 274:4,
274:15, 274:16,
290:10
**notes** [1] - 291:9
**nothing** [2] - 222:22,
318:25
**notice** [3] - 375:18,
375:19, 384:16
**noticed** [1] - 337:9
**noting** [1] - 292:10
**Number** [7] - 241:11,
258:23, 269:1,
297:12, 300:4,
300:5, 321:21
**number** [24] - 216:10,
216:18, 218:14,
236:16, 297:3,
298:14, 298:17,
298:24, 299:15,

300:19, 301:2,
301:3, 301:5, 301:6,
311:7, 321:15,
355:6, 359:2, 372:7,
372:8, 372:10,
372:14, 390:22,
397:12
**numbered** [1] - 310:21

## O

**oath** [1] - 281:12
**obey** [1] - 292:24
**object** [2] - 259:1,
389:24
**objection** [13] -
255:20, 255:21,
255:22, 259:5,
297:19, 320:24,
345:18, 346:13,
353:10, 387:3,
389:20, 395:16,
396:11
**objections** [1] -
388:24
**obligations** [1] -
333:13
**observation** [5] -
273:25, 274:13,
274:20, 275:4, 275:6
**observations** [4] -
393:17, 394:11,
395:3, 395:5
**observe** [1] - 308:7
**observed** [13] -
252:11, 271:9,
271:16, 272:5,
272:6, 272:13,
275:10, 295:17,
295:18, 295:19,
343:19, 343:23,
391:24
**obstructions** [1] -
263:8
**obtain** [3] - 302:6,
308:14, 309:16
**obtained** [5] - 289:7,
289:9, 289:25,
290:1, 309:12
**obviously** [3] - 218:6,
297:4, 321:22
**occupant** [4] - 344:11,
344:19, 345:1,
384:12
**occur** [1] - 352:7
**occurred** [9] - 252:23,
252:24, 271:12,
274:20, 280:20,
284:24, 311:8,
354:18, 393:9

**occurring** [1] - 368:9
**occurs** [2] - 329:24,
330:9
**odd** [1] - 354:14
**OF** [1] - 214:1
**offer** [1] - 394:6
**offering** [1] - 389:20
**office** [66] - 219:12,
219:13, 219:24,
220:8, 220:10,
220:12, 220:20,
221:9, 221:11,
221:14, 221:17,
221:18, 221:20,
222:1, 222:2,
224:15, 225:24,
225:25, 226:13,
226:15, 226:19,
227:1, 227:16,
227:18, 229:8,
229:19, 230:7,
230:17, 234:4,
234:6, 234:15,
235:5, 235:7, 235:9,
235:22, 236:5,
236:8, 236:16,
237:5, 238:1,
238:21, 239:7,
239:18, 240:15,
241:15, 241:20,
243:5, 243:8,
243:15, 243:22,
244:5, 244:12,
244:14, 244:20,
245:3, 245:11,
245:13, 246:6,
247:13, 251:5,
251:10, 323:9,
323:12, 355:3,
358:17
**Office** [2] - 268:7,
323:10
**Officer** [27] - 251:2,
334:21, 335:10,
335:20, 336:7,
336:21, 337:4,
337:6, 337:19,
342:12, 344:23,
346:20, 347:13,
348:14, 349:12,
349:20, 352:12,
352:18, 383:11,
386:2, 386:6,
386:10, 386:14,
386:19, 396:10,
396:13, 397:18
**officer** [51] - 219:15,
219:22, 220:3,
226:3, 227:5,
227:17, 237:11,

237:12, 250:21,
251:20, 251:23,
252:6, 253:20,
272:12, 273:17,
276:3, 276:6,
288:24, 291:20,
291:22, 291:25,
306:11, 306:19,
307:22, 313:21,
314:16, 334:16,
334:22, 335:11,
335:15, 335:21,
336:8, 336:12,
336:18, 336:22,
336:23, 336:25,
351:11, 382:10,
382:19, 386:21,
391:22, 391:25,
392:8, 392:14,
393:4, 393:6,
393:14, 394:12,
394:23, 395:6
**officer's** [2] - 272:19,
272:25
**officer-involved** [2] -
251:20, 288:24
**officers** [16] - 220:9,
220:16, 221:7,
276:2, 276:12,
292:2, 292:15,
292:21, 296:8,
347:3, 377:19,
378:11, 386:3,
386:7, 386:11,
386:15
**offices** [3] - 234:7,
234:17, 251:6
**official** [3] - 214:8,
351:25, 352:3
**Official** [2] - 399:12,
399:23
**often** [3] - 230:1,
238:1, 385:20
**oil** [8] - 258:25,
259:11, 259:16,
269:22, 270:3,
313:2, 313:4, 338:10
**old** [2] - 353:23,
362:17
**on-scene** [1] - 274:3
**once** [8] - 224:22,
232:9, 236:14,
242:14, 250:8,
322:24, 327:8,
327:10, 328:9
**oncoming** [3] - 363:5,
363:11, 369:3
**one** [67] - 217:23,
218:3, 218:4,
219:11, 219:17,

223:20, 224:16, 225:9, 227:18, 232:23, 233:16, 234:8, 245:15, 245:22, 246:1, 246:12, 247:1, 256:21, 262:23, 267:23, 287:12, 287:20, 290:22, 293:15, 295:22, 302:21, 304:1, 304:10, 304:13, 310:24, 316:6, 320:25, 321:3, 321:5, 321:11, 321:18, 325:13, 325:16, 327:16, 330:12, 333:18, 344:15, 346:1, 346:4, 346:18, 346:21, 348:22, 351:6, 351:21, 352:21, 353:4, 357:12, 364:17, 364:21, 366:8, 369:23, 372:12, 374:22, 380:15, 382:6, 383:3, 391:15, 391:22, 392:5, 393:9

**ones** [4] - 296:18, 298:6, 298:7, 298:10

**open** [9] - 269:3, 273:2, 274:10, 303:3, 303:12, 339:20, 351:10, 397:21, 399:1

**opened** [5] - 341:25, 345:2, 350:14, 370:8, 371:1

**opening** [2] - 269:13, 369:16

**operate** [2] - 249:25, 269:19

**operated** [8] - 229:18, 273:19, 273:20, 287:17, 302:18, 338:15, 380:9, 380:10

**operates** [2] - 273:22, 287:16

**operating** [2] - 343:4, 343:7

**operation** [2] - 294:1, 294:10

**operator** [1] - 349:15

**opinion** [3] - 334:25, 335:14, 385:24

**opinions** [1] - 395:12

**opposed** [2] - 230:19,

284:10

**opposite** [2] - 234:9, 312:17

**ordeal** [1] - 341:12

**order** [8] - 249:3, 261:6, 274:18, 278:6, 290:2, 303:10, 321:14, 344:10

**orders** [3] - 244:16, 244:19, 294:13

**organizations** [1] - 229:23

**original** [1] - 223:8

**originally** [1] - 224:17

**otherwise** [2] - 224:5, 229:7

**outside** [2] - 391:17, 395:20

**outstanding** [2] - 217:3, 390:12

**outward** [1] - 311:10

**overall** [5] - 262:1, 262:2, 269:9, 271:6, 271:13

**overhead** [2] - 278:1, 280:9

**overkill** [1] - 219:1

**overruled** [1] - 387:5

**overtop** [1] - 346:18

**owe** [1] - 390:21

**own** [4] - 217:19, 218:3, 252:6, 387:11

**owned** [4] - 380:12, 380:14, 380:15

---

## P

**p.m** [17] - 236:19, 252:18, 274:15, 274:17, 274:20, 274:23, 275:17, 295:1, 295:2, 320:11, 322:14, 324:18, 388:17, 390:14, 399:9

**pad** [4] - 227:9, 338:8, 338:10, 338:14

**page** [18] - 228:24, 274:12, 275:3, 280:24, 280:25, 281:5, 281:11, 293:24, 324:17, 327:1, 327:17, 327:19, 331:16, 331:22, 332:1

**panel** [1] - 373:11

**paper** [1] - 227:9

**papers** [3] - 219:21, 219:22, 226:14

**paperwork** [1] - 244:13

**paragraph** [4] - 274:12, 275:4, 275:8, 294:2

**parallel** [2] - 312:14, 313:11

**paralyzed** [3] - 286:14, 315:21, 349:16

**parents** [1] - 380:15

**park** [13] - 258:21, 302:12, 339:5, 339:7, 339:10, 339:13, 339:15, 370:14, 370:15, 373:23, 374:1, 374:2

**parked** [1] - 372:24

**Parker** [18] - 389:13, 389:17, 389:24, 391:18, 391:21, 393:4, 393:7, 395:1, 395:11, 396:3, 396:11, 396:13, 396:23, 397:2, 397:4, 397:10, 397:19

**Parker's** [3] - 389:21, 394:17, 395:2

**Parrish** [15] - 252:25, 253:2, 253:3, 256:5, 257:18, 261:20, 270:24, 365:16, 366:8, 366:17, 367:10, 369:7, 369:9, 369:19, 369:21

**part** [14] - 227:24, 255:11, 261:5, 289:7, 291:4, 297:3, 305:25, 308:11, 308:19, 323:14, 365:11, 365:12, 375:12, 381:16

**particular** [6] - 218:20, 218:24, 220:2, 226:13, 236:5, 398:21

**particularly** [1] - 385:17

**parties** [2] - 232:17, 247:18

**party** [2] - 393:2, 395:18

**pass** [2] - 362:24, 362:25

**passed** [7] - 252:16, 359:14, 360:21, 360:22, 361:4, 362:20, 362:23

**passenger** [8] - 337:7,

375:9, 375:23, 377:20, 378:7, 378:9, 383:13

**passenger's** [1] - 337:19

**past** [3] - 337:10, 337:13, 337:23

**path** [2] - 331:17, 331:20

**pathologist** [2] - 243:4, 323:13

**pathologists** [1] - 244:12

**pathology** [2] - 243:11

**patrol** [3] - 337:3, 337:9, 337:11

**pause** [2] - 322:20, 333:25

**pausing** [2] - 242:10, 308:22

**Pennsylvania** [1] - 353:21

**people** [6] - 229:25, 244:22, 268:21, 325:25, 347:6, 378:11

**perceive** [1] - 377:4

**perceived** [1] - 345:6

**percent** [2] - 228:9, 325:24

**perform** [5] - 217:19, 276:9, 323:14, 323:19, 332:15

**performance** [1] - 394:12

**performed** [5] - 219:16, 225:21, 276:6, 276:11, 328:25

**performing** [3] - 285:3, 285:7, 379:13

**perhaps** [1] - 383:19

**peripheral** [1] - 374:5

**permission** [1] - 353:6

**permit** [1] - 293:7

**permitted** [2] - 334:22, 397:4

**perpendicular** [5] - 313:18, 338:23, 370:8, 371:1, 372:24

**person** [20] - 223:3, 223:4, 223:8, 226:4, 231:16, 237:12, 238:25, 244:19, 246:16, 267:23, 273:17, 283:10, 316:7, 330:1, 330:5, 330:16, 375:16, 393:18, 394:12, 395:7

**person's** [1] - 244:22

**personal** [2] - 374:9, 396:8

**Personal** [1] - 214:4

**personally** [4] - 233:16, 235:14, 237:8, 380:15

**personnel** [1] - 379:15

**persons** [1] - 246:13

**phase** [4] - 391:22, 393:9, 393:15, 394:23

**phases** [1] - 393:11

**Philip** [63] - 214:5, 251:12, 253:24, 256:24, 264:20, 282:13, 286:14, 294:12, 294:16, 309:17, 323:19, 323:22, 324:12, 324:15, 324:19, 325:7, 325:9, 325:17, 328:24, 329:3, 329:6, 329:9, 329:13, 329:16, 329:22, 330:23, 331:2, 331:24, 332:19, 332:22, 337:1, 338:15, 339:24, 340:19, 341:4, 341:16, 341:24, 342:4, 342:14, 342:20, 343:6, 343:9, 343:14, 344:20, 345:2, 347:3, 347:10, 347:22, 347:25, 348:22, 349:21, 350:14, 351:16, 352:4, 352:9, 355:8, 374:8, 376:2, 382:14, 383:11, 384:9, 387:2, 387:12

**Philip's** [2] - 325:3, 325:6

**Phillip** [1] - 341:1

**Phillip's** [2] - 349:3, 349:8

**phone** [13] - 216:10, 220:13, 220:19, 221:12, 222:14, 223:17, 224:24, 226:5, 237:16, 239:19, 240:12, 247:20, 277:24

**photo** [15] - 257:23, 257:25, 259:8, 259:9, 259:21, 262:20, 266:5,

266:7, 301:19,
311:3, 312:8,
313:10, 371:7,
372:6, 372:8
**photograph** [49] -
256:24, 257:17,
258:4, 258:9,
258:12, 259:19,
259:24, 260:1,
262:6, 262:15,
262:19, 262:21,
263:25, 264:1,
264:6, 265:9,
265:13, 265:18,
265:19, 265:20,
265:25, 266:2,
266:13, 266:21,
269:2, 283:25,
285:21, 285:22,
285:23, 298:16,
298:24, 299:15,
299:22, 299:25,
300:8, 300:10,
300:20, 301:2,
301:3, 301:7,
302:13, 302:14,
309:25, 310:23,
311:18, 311:20,
339:21, 372:11,
372:14
**photographs** [35] -
255:16, 256:1,
263:8, 263:11,
264:23, 274:14,
275:9, 285:24,
289:12, 295:14,
295:17, 296:14,
296:15, 296:17,
297:11, 297:17,
297:22, 298:2,
298:4, 298:5, 298:7,
298:10, 298:21,
300:3, 300:24,
301:13, 303:2,
304:15, 304:17,
308:13, 309:13,
366:14, 371:12,
372:1, 372:2
**photos** [6] - 255:11,
289:16, 295:22,
297:5, 303:4, 371:7
**physical** [2] - 236:8,
240:14
**physically** [2] - 223:18
**physician** [1] - 244:4
**physicians** [1] -
229:22
**pick** [1] - 310:4
**picked** [1] - 353:4
**picture** [3] - 256:15,

256:20, 313:6
**pictures** [1] - 366:19
**piece** [2] - 227:9,
269:17
**pillar** [1] - 373:12
**pipe** [7] - 263:15,
263:16, 266:18,
266:20, 298:21,
299:14, 299:18
**place** [7] - 227:2,
227:3, 230:25,
249:12, 259:18,
311:17, 371:12
**placed** [2] - 230:14,
339:20
**places** [2] - 288:22,
353:23
**Plaintiff** [2] - 214:6,
214:14
**plaintiff** [4] - 250:5,
322:17, 333:22,
389:22
**plaintiff's** [2] - 218:20,
233:24
**PLAINTIFF'S** [2] -
250:7, 322:22
**Plaintiff's** [24] -
254:24, 255:18,
255:19, 257:4,
257:12, 257:22,
258:8, 258:23,
258:24, 259:20,
259:25, 262:4,
264:17, 265:8,
265:17, 266:11,
266:22, 268:13,
268:25, 269:15,
270:5, 283:19,
299:23, 300:4
**plaintiffs** [1] - 390:18
**plan** [3] - 373:19,
389:24, 396:10
**planning** [1] - 310:2
**plans** [1] - 269:22
**plastic** [1] - 268:20
**plate** [1] - 355:6
**play** [32] - 355:11,
355:18, 356:7,
356:17, 356:18,
357:2, 357:7,
357:12, 357:16,
358:5, 359:7,
359:12, 360:3,
361:1, 362:1,
363:16, 364:8,
364:15, 364:17,
364:21, 366:24,
367:2, 367:13,
367:23, 377:16,
388:21, 389:11,

389:18, 389:22,
390:3, 390:18,
391:12
**played** [1] - 391:13
**playing** [3] - 355:23,
356:19, 357:13
**Playing** [19] - 357:13,
358:6, 359:8,
359:13, 360:4,
361:3, 361:18,
362:2, 363:17,
364:9, 364:16,
364:18, 364:22,
365:5, 366:3,
366:13, 367:4,
367:15, 368:2
**pleasant** [2] - 389:2,
398:25
**pleases** [1] - 396:4
**Plexiglass** [1] -
232:12
**PLLC** [2] - 214:15,
214:22
**Poe** [1] - 214:21
**point** [77] - 231:4,
239:18, 240:9,
243:19, 247:12,
248:2, 250:25,
260:3, 260:7,
260:16, 261:19,
262:1, 263:1,
263:12, 264:21,
269:12, 269:16,
270:13, 270:16,
270:22, 270:23,
274:2, 281:24,
285:2, 285:4, 285:7,
285:12, 285:17,
288:3, 301:22,
303:12, 303:19,
303:21, 304:16,
308:18, 311:22,
312:1, 317:22,
319:2, 319:5, 319:8,
319:12, 320:2,
323:23, 325:16,
332:25, 334:12,
338:25, 339:24,
340:5, 340:15,
360:19, 360:23,
362:14, 364:1,
371:4, 372:3, 373:5,
373:15, 373:23,
374:22, 375:4,
375:19, 377:20,
377:23, 378:16,
384:5, 384:7,
389:10, 390:4,
390:10, 390:16,
395:11, 399:4

pointed [1] - 373:3
**points** [2] - 266:15,
270:18
**Police** [4] - 219:7,
223:24, 268:7,
268:10
**police** [48] - 220:2,
221:6, 221:18,
221:19, 222:4,
223:11, 230:11,
234:21, 237:7,
250:21, 251:23,
252:6, 272:6,
272:19, 273:7,
273:25, 277:10,
288:20, 306:14,
306:17, 310:10,
334:22, 335:11,
335:21, 336:8,
336:18, 336:19,
336:21, 336:22,
336:23, 337:6,
337:12, 337:24,
338:17, 339:2,
339:16, 340:18,
341:15, 341:22,
342:14, 347:3,
378:10, 382:10,
382:19, 386:11,
392:8, 392:14,
394:12
**policies** [4] - 252:7,
336:19, 336:22,
382:20
**policy** [5] - 221:25,
222:7, 336:13,
382:24, 386:15
**polite** [2] - 227:1,
227:14
**pop** [1] - 383:23
**portable** [1] - 358:16
**portion** [1] - 301:6
**portions** [2] - 302:2,
321:22
**pose** [2] - 397:25,
398:3
**position** [16] - 251:1,
251:2, 251:8,
301:15, 311:16,
323:14, 325:25,
329:6, 331:20,
332:18, 332:24,
347:9, 371:8,
371:13, 392:13,
393:22
**positioned** [1] -
264:25
**positioning** [1] - 372:4
**positive** [1] - 367:9
**possibility** [1] -

325:17
**possible** [12] - 233:18,
244:15, 274:21,
297:1, 325:21,
346:1, 348:7,
371:10, 380:6,
380:18, 380:22
**possibly** [5] - 254:5,
256:18, 263:10,
281:22, 340:2
**postponed** [1] - 246:2
**potential** [1] - 292:11
**potentially** [2] -
251:23, 252:6
**PowerPoint** [2] -
283:18, 285:15
**practice** [1] - 237:6
**pre** [1] - 313:22
**pre-prepared** [1] -
313:22
**preconceived** [1] -
314:7
**preliminary** [1] -
216:13
**premarked** [2] -
254:24, 255:3
**prepare** [1] - 381:23
**prepared** [10] - 247:2,
249:8, 260:25,
281:21, 282:1,
282:6, 294:17,
313:22, 318:7,
352:13
**prescribed** [1] -
399:18
**presence** [1] - 228:4
**present** [4] - 223:12,
223:18, 223:19,
326:8
**presently** [1] - 216:5
**pretty** [6] - 253:5,
263:22, 277:6,
348:2, 360:16,
379:12
**prevent** [1] - 230:1
**previous** [4] - 239:4,
241:10, 281:4,
285:24
**previously** [10] -
283:3, 328:1, 328:3,
328:9, 355:10,
358:20, 362:10,
363:22, 371:25,
391:8
**primary** [2] - 251:15,
251:16
**Prince** [20] - 214:17,
323:2, 328:4,
328:17, 331:8,
332:10, 333:4,

334:10, 335:4,
335:17, 345:3,
353:1, 354:24,
376:13, 376:15,
381:1, 382:9, 383:7,
387:13
**PRINCE** [28] - 323:3,
323:5, 323:25,
324:2, 325:13,
325:15, 326:22,
326:24, 327:18,
327:21, 328:15,
331:10, 331:12,
332:9, 333:5, 333:7,
333:14, 334:11,
334:15, 338:13,
345:18, 352:21,
352:23, 353:4,
353:11, 383:10,
387:8, 387:19
**Prince..............333** [1] - 215:17
**Prince............322** [1] - 215:11
**Prince..........330** [1] - 215:13
**prioritize** [1] - 390:22
**private** [4] - 218:5, 218:7, 218:13, 353:25
**problem** [8] - 227:7, 228:1, 242:5, 247:5, 309:3, 384:17, 397:13, 398:3
**problems** [1] - 227:14
**procedure** [2] - 336:13, 382:24
**procedures** [1] - 382:20
**proceed** [10] - 240:12, 250:12, 272:2, 299:11, 310:11, 319:4, 323:2, 334:10, 346:15, 353:12
**proceedings** [2] - 319:2, 399:15
**PROCEEDINGS** [1] - 215:2
**Proceedings** [4] - 214:11, 214:24, 216:1, 399:9
**process** [18] - 217:19, 218:7, 218:9, 218:12, 220:6, 221:5, 221:11, 221:21, 222:5, 222:18, 223:8, 225:22, 227:25, 230:20, 235:10,

238:2, 379:12, 393:18
**produced** [1] - 214:25
**professional** [1] - 374:9
**Professional** [1] - 399:11
**proffer** [1] - 396:12
**program** [6] - 393:13, 393:14, 393:15, 394:2, 394:3, 394:22
**progress** [1] - 394:2
**projector** [1] - 334:12
**promise** [2] - 390:25, 398:24
**promised** [1] - 249:23
**promptly** [1] - 249:9
**pronounced** [4] - 324:15, 329:23, 329:24, 330:9
**pronouncement** [3] - 329:25, 330:7, 330:20
**pronouncing** [1] - 245:1
**properly** [1] - 248:24
**prosecutor's** [1] - 237:25
**protocol** [2] - 235:12, 237:10
**provide** [6] - 222:6, 222:9, 260:8, 293:7, 305:4, 381:5
**provided** [9] - 219:25, 241:21, 293:6, 295:21, 321:20, 321:22, 332:6, 375:12, 381:2
**psychologist** [1] - 395:11
**psychologist's** [1] - 393:23
**public** [2] - 226:1, 227:3
**publish** [4] - 255:23, 297:15, 297:23, 355:14
**puddle** [1] - 286:2
**pull** [11] - 298:18, 338:17, 339:6, 362:24, 363:5, 369:10, 369:13, 372:8, 373:5, 377:24, 392:16
**pulled** [12] - 284:1, 284:21, 285:11, 369:16, 370:7, 370:19, 370:23, 371:13, 372:5, 372:16, 373:2

**Pullin** [1] - 214:21
**pulling** [3] - 219:20, 369:19, 392:15
**pulse** [4] - 379:2, 379:4, 379:7, 379:13
**purpose** [2] - 228:7, 393:24
**purposes** [1] - 254:24
**pursuing** [2] - 354:25, 365:10
**pursuit** [12] - 292:20, 337:25, 338:2, 355:2, 355:4, 355:6, 358:11, 362:8, 363:23, 370:12, 374:8
**push** [3] - 287:12, 287:20, 349:17
**pushback** [1] - 230:7
**pushed** [2] - 380:20, 380:23
**pushing** [1] - 275:12
**put** [21] - 222:12, 224:12, 228:14, 228:20, 245:20, 246:20, 246:23, 258:20, 272:22, 274:14, 275:8, 279:18, 281:4, 339:6, 339:9, 339:13, 380:22, 384:16, 390:24, 396:21, 397:9

**Q**

**qualifications** [1] - 243:19
**qualified** [1] - 272:16
**qualify** [2] - 272:9, 272:20
**quarter** [1] - 373:11
**quartered** [1] - 227:5
**quasi** [2] - 371:4, 373:14
**questioning** [4] - 259:3, 277:10, 353:7, 382:1
**questions** [49] - 218:9, 241:8, 243:14, 243:20, 244:15, 244:21, 244:24, 248:2, 248:10, 284:12, 287:23, 288:15, 293:11, 305:12, 305:15, 305:21, 307:5, 307:7, 307:8, 307:17, 309:21, 313:20, 317:3,

317:11, 318:1, 318:3, 318:9, 318:21, 326:9, 328:15, 329:12, 329:14, 329:22, 331:7, 332:9, 332:12, 333:3, 337:22, 352:23, 354:25, 381:1, 381:13, 381:25, 382:9, 382:11, 382:19, 383:5, 386:16, 391:20
**quick** [1] - 356:3
**quickly** [2] - 311:1, 348:2
**quite** [2] - 230:1, 269:25

**R**

**R-O-M-A-N-K-O** [1] - 224:20
**radio** [48] - 308:14, 308:17, 308:20, 320:15, 321:23, 355:4, 355:10, 355:23, 356:19, 357:3, 357:13, 358:6, 358:11, 358:14, 358:16, 358:17, 358:18, 359:8, 359:13, 360:4, 361:3, 361:8, 361:11, 361:14, 361:18, 362:2, 363:12, 363:17, 364:9, 364:16, 364:18, 364:22, 365:5, 365:9, 365:21, 366:3, 366:13, 367:4, 367:15, 367:18, 367:22, 368:2, 368:5, 376:6, 376:21, 376:22, 376:25, 377:15
**radioed** [2] - 356:21, 377:13
**raining** [2] - 253:12, 253:14
**raise** [1] - 217:5
**rapidly** [6] - 263:4, 286:23, 287:3, 287:6, 310:18, 315:8
**rarely** [1] - 229:24
**rather** [1] - 244:17
**Rd** [1] - 214:18
**reach** [2] - 229:13, 375:25

**reached** [3] - 247:11, 319:2, 397:23
**reaches** [1] - 384:13
**reaching** [5] - 309:9, 375:22, 383:12, 383:13, 384:4
**read** [11] - 261:10, 261:12, 282:8, 282:10, 294:9, 327:1, 327:8, 327:10, 327:13, 384:15, 384:20
**reading** [2] - 281:23, 384:22
**ready** [9] - 319:4, 333:20, 334:10, 334:12, 357:24, 388:8, 391:12, 398:12
**real** [2] - 248:7, 369:23
**realize** [4] - 339:14, 352:4, 356:3, 373:22
**realized** [3] - 260:14, 302:11, 374:25
**really** [11] - 218:8, 227:2, 227:4, 246:1, 246:2, 282:23, 311:1, 314:22, 351:4, 379:10, 389:13
**realtime** [1] - 214:24
**rear** [9] - 267:2, 267:3, 299:21, 300:13, 300:14, 339:19, 370:16, 371:6, 373:20
**reason** [20] - 227:11, 228:4, 228:8, 230:19, 244:13, 245:14, 248:7, 269:20, 274:5, 283:1, 314:8, 315:1, 315:7, 335:13, 344:1, 347:8, 348:20, 352:16, 379:24, 380:2
**reasons** [1] - 390:22
**receipt** [2] - 241:20, 241:23
**receive** [5] - 228:16, 230:23, 232:24, 245:8, 245:23
**received** [16] - 232:21, 233:1, 233:12, 233:13, 234:1, 234:25, 235:2, 239:11, 240:11, 251:22, 252:5, 252:17, 288:12, 288:19, 354:3

**receiving** [3] - 246:13, 246:14, 398:2
**recent** [1] - 241:11
**recently** [2] - 312:23, 347:18
**reception** [4] - 226:23, 235:8, 235:16, 235:20
**receptive** [1] - 227:14
**recess** [2] - 249:7, 390:14
**reckless** [5] - 386:4, 386:5, 386:8, 386:9, 386:12
**recognize** [1] - 245:23
**recollection** [12] - 252:13, 261:7, 283:5, 284:6, 285:13, 292:17, 296:5, 326:20, 327:23, 328:8, 394:7
**reconvene** [1] - 391:1
**record** [14] - 217:9, 217:15, 242:20, 282:22, 297:1, 297:11, 298:13, 310:25, 321:24, 327:18, 334:17, 389:5, 395:14, 396:22
**recorded** [4] - 214:24, 282:15, 282:17, 391:8
**recording** [2] - 282:19, 321:16
**records** [2] - 236:25, 394:1
**recounted** [1] - 290:8
**recounting** [1] - 220:23
**recreated** [2] - 224:15, 224:17
**Recross** [2] - 215:8, 215:14
**recross** [1] - 317:5
**RECROSS** [2] - 317:8, 332:13
**Recross-Examination** [2] - 215:8, 215:14
**RECROSS-EXAMINATION** [2] - 317:8, 332:13
**redirect** [1] - 309:23
**Redirect** [2] - 215:7, 215:13
**REDIRECT** [2] - 310:14, 331:11
**refer** [24] - 235:17, 252:12, 257:4,

257:12, 257:22, 258:8, 258:23, 259:20, 259:25, 260:24, 262:4, 262:18, 264:17, 265:8, 265:17, 266:11, 266:22, 268:13, 268:25, 269:15, 274:10, 275:3, 283:19, 285:16
**reference** [13] - 249:24, 256:4, 257:14, 261:19, 269:16, 270:16, 270:18, 270:22, 270:23, 281:3, 285:15, 292:13, 298:14
**referenced** [1] - 324:4
**referencing** [3] - 225:12, 242:5, 285:13
**referred** [1] - 301:17
**referring** [12] - 262:23, 274:8, 292:8, 298:16, 298:17, 335:6, 350:24, 362:6, 365:20, 366:6, 366:15, 367:7
**reflect** [2] - 289:6, 289:9
**refrain** [7] - 319:7, 319:9, 346:17, 388:10, 388:12, 398:14, 398:19
**refresh** [4] - 252:13, 326:19, 327:23, 394:7
**refreshed** [1] - 328:8
**refreshing** [2] - 261:6, 292:17
**refuse** [2] - 305:4, 307:8
**refused** [5] - 219:21, 221:7, 230:18, 305:19, 381:13
**refusing** [1] - 222:13
**regard** [8] - 288:12, 305:6, 307:7, 320:24, 354:25, 375:11, 379:17, 382:4
**regarding** [3] - 251:23, 252:5, 272:12
**regardless** [2] - 321:13, 352:18
**regards** [3] - 240:6, 275:6, 328:25

**Registered** [1] - 399:11
**regular** [4] - 244:6, 337:11, 385:18, 385:22
**regularly** [1] - 244:9
**reiterate** [1] - 395:10
**related** [1] - 219:5
**relates** [1] - 273:5
**relation** [3] - 262:5, 264:18, 311:21
**relationship** [1] - 224:2
**relatively** [1] - 394:22
**relaying** [1] - 366:7
**released** [1] - 319:20
**relevance** [1] - 392:18
**relevant** [3] - 392:21, 392:24, 396:14
**relieved** [1] - 379:15
**religious** [1] - 354:1
**reload** [4] - 375:7, 385:9
**reloading** [1] - 385:13
**reloads** [2] - 385:17, 385:21
**remained** [3] - 293:18, 294:5, 307:5
**remember** [12] - 233:11, 238:13, 239:18, 247:4, 256:19, 278:18, 278:22, 298:21, 318:3, 374:5, 381:19, 393:5
**remembered** [1] - 381:21
**remove** [4] - 242:17, 250:10, 322:25, 378:22
**removed** [9] - 303:11, 303:20, 303:22, 341:22, 341:23, 344:20, 379:5, 379:6, 379:22
**render** [2] - 375:10, 377:24
**repairs** [1] - 251:5
**repeat** [5] - 245:12, 324:5, 330:2, 330:15, 345:11
**repeated** [1] - 397:25
**repeatedly** [1] - 285:18
**repeating** [2] - 348:1, 357:20
**rephrase** [2] - 259:5, 277:21
**report** [52] - 247:3, 255:14, 255:15,

272:6, 274:8, 274:10, 274:11, 274:16, 274:17, 278:7, 279:22, 289:4, 289:6, 289:9, 289:12, 289:17, 289:21, 289:22, 289:24, 290:3, 290:4, 290:11, 290:13, 290:22, 290:24, 291:1, 291:2, 291:9, 291:11, 291:16, 292:4, 292:7, 292:10, 292:18, 293:17, 293:25, 294:9, 294:12, 294:17, 296:18, 302:3, 308:2, 314:17, 317:18, 317:22, 318:7, 323:23, 324:3, 331:13, 331:16, 332:15
**reported** [2] - 367:22, 399:16
**REPORTER** [5] - 217:22, 220:17, 224:21, 338:9, 338:12
**Reporter** [6] - 217:25, 224:19, 334:7, 399:11, 399:12, 399:23
**Reporter's** [2] - 254:7, 281:3
**reporting** [3] - 357:4, 367:18, 368:8
**reports** [2] - 290:25, 358:14
**represent** [2] - 239:22, 239:24
**Representative** [1] - 214:4
**represents** [1] - 339:21
**request** [4] - 224:24, 281:1, 295:5, 390:24
**requested** [1] - 242:8
**require** [1] - 320:20
**required** [6] - 222:5, 222:6, 226:13, 336:18, 355:22, 382:20
**requirements** [1] - 230:22
**requiring** [3] - 244:10, 245:19, 246:4
**research** [1] - 397:12
**researched** [1] -

325:25
**reservations** [1] - 230:6
**residence** [1] - 219:12
**residue** [8] - 276:7, 276:10, 276:11, 276:14, 276:17, 281:8, 293:10, 382:4
**resolution** [1] - 299:2
**resort** [1] - 387:11
**respect** [12] - 218:9, 223:24, 224:25, 232:21, 233:23, 237:7, 248:20, 331:20, 388:13, 396:8, 396:10, 398:20
**respond** [1] - 341:4
**responders** [1] - 347:4
**responding** [1] - 370:11
**response** [4] - 327:5, 328:11, 341:4, 369:2
**responsibilities** [1] - 251:4
**rest** [6] - 232:12, 242:18, 243:19, 247:20, 269:10, 302:16
**restate** [3] - 339:8, 343:21, 387:7
**rested** [2] - 260:20, 261:25
**resting** [3] - 259:18, 311:17, 371:12
**result** [4] - 289:2, 290:6, 290:23, 293:13
**retain** [1] - 394:14
**retained** [2] - 218:20, 225:3
**return** [3] - 219:14, 241:22, 248:15
**returning** [1] - 222:9
**returns** [1] - 218:24
**revert** [1] - 320:25
**review** [8] - 290:25, 297:17, 324:6, 336:10, 336:11, 393:9, 393:23
**reviewing** [2] - 393:23, 393:24
**reviews** [2] - 392:17, 394:24
**revisions** [1] - 318:6
**revisit** [1] - 396:19
**revved** [1] - 263:3
**revving** [2] - 285:20, 318:19
**RHOADES** [1] - 214:3

**Rhoades** [67] - 214:5, 216:3, 218:16, 251:12, 253:24, 256:25, 264:20, 282:13, 290:7, 294:12, 294:16, 303:10, 303:20, 304:2, 304:10, 304:13, 308:6, 308:9, 308:20, 309:17, 318:16, 321:3, 323:19, 323:22, 324:15, 328:24, 329:3, 329:16, 329:22, 330:23, 331:2, 331:24, 332:19, 332:22, 336:1, 337:1, 338:15, 343:11, 345:2, 345:23, 347:25, 348:10, 355:2, 355:7, 355:8, 358:12, 362:7, 362:21, 363:22, 363:25, 374:8, 374:14, 374:16, 374:19, 376:2, 377:22, 378:12, 378:17, 378:22, 379:1, 379:22, 389:15, 389:17, 396:6, 396:20

**Rhoades'** [5] - 328:9, 329:6, 329:9, 329:13, 382:14

**Rhoades's** [1] - 324:12

**Rick** [3] - 321:3, 389:15, 396:6

**ricochet** [1] - 350:6

**rifle** [1] - 340:5

**right-hand** [3] - 298:15, 360:15, 372:7

**rights** [15] - 251:24, 334:23, 334:25, 335:7, 335:11, 335:15, 335:18, 335:19, 335:21, 336:4, 336:8, 336:11, 382:10, 382:15, 386:20

**ring** [1] - 236:16

**risk** [1] - 229:12

**Road** [7] - 214:15, 252:25, 253:2, 256:5, 257:18, 270:24, 365:11

**road** [46] - 253:3, 256:4, 256:5, 256:8, 256:9, 256:10, 256:13, 257:8, 257:13, 257:14, 257:19, 257:23, 261:16, 269:12, 269:14, 270:21, 270:24, 284:14, 284:15, 286:2, 338:6, 338:7, 349:25, 362:12, 364:3, 365:11, 365:15, 366:18, 369:7, 369:9, 369:11, 369:13, 369:15, 369:20, 370:4, 370:5, 370:7, 370:18, 370:19, 370:24, 371:14, 372:5, 372:16, 373:6

**roads** [1] - 366:8

**roadway** [1] - 261:20

**rock** [1] - 334:12

**rode** [1] - 394:24

**Rodney** [1] - 250:15

**roll** [1] - 334:13

**Romanko** [1] - 224:9

**room** [2] - 222:19, 226:3

**roughly** [2] - 356:13, 372:23

**rounds** [5] - 304:5, 304:11, 367:20, 375:3, 375:5

**route** [2] - 257:6, 398:11

**Route** [2] - 363:1, 363:2

**routine** [3] - 230:4, 230:5, 247:25

**RPR** [1] - 399:22

**Rule** [1] - 248:23

**ruled** [1] - 320:24

**ruling** [3] - 389:25, 397:4

**Run** [23] - 252:25, 253:2, 253:3, 256:5, 257:18, 261:20, 270:24, 362:5, 362:9, 362:13, 365:11, 365:13, 365:14, 365:16, 366:8, 366:16, 366:17, 367:10, 369:7, 369:9, 369:19, 369:21

**run** [4] - 336:1, 349:15, 350:5, 374:25

**running** [28] - 272:7, 272:13, 272:21, 272:22, 273:3, 275:10, 287:11, 287:19, 302:3, 342:8, 342:10, 343:19, 343:23, 344:2, 344:11, 344:19, 344:20, 344:24, 344:25, 352:8, 379:18, 379:21, 379:23, 379:25, 380:1, 380:3, 380:7, 385:24

**runs** [1] - 313:13

**rural** [1] - 253:5

**Russell** [1] - 358:8

**Ryan** [1] - 214:14

## S

**S-A-V-A-S-M-A-N** [1] - 323:7

**safe** [5] - 286:24, 287:1, 296:11, 302:13, 352:14

**sake** [1] - 254:7

**sat** [2] - 226:6, 378:13

**SAVASMAN** [3] - 215:10, 242:12, 322:22

**Savasman** [25] - 225:4, 225:12, 225:18, 229:2, 229:7, 231:20, 241:2, 241:19, 242:9, 242:22, 242:24, 248:21, 320:7, 322:18, 323:6, 323:7, 324:3, 324:15, 326:5, 326:25, 327:22, 328:22, 331:7, 331:13, 332:15

**Savasman's** [1] - 229:13

**saved** [1] - 322:2

**saw** [20] - 293:3, 295:14, 308:6, 308:8, 309:9, 337:12, 337:16, 337:23, 340:16, 346:23, 364:2, 364:3, 368:12, 368:21, 369:3, 371:9, 376:2, 377:21, 383:11, 392:15

**scanner** [1] - 358:19

**scene** [48] - 252:15,

252:18, 253:20, 253:25, 254:2, 254:10, 256:17, 256:19, 256:21, 262:17, 264:23, 264:24, 267:24, 273:24, 274:3, 274:6, 274:9, 274:23, 274:25, 275:1, 275:2, 275:16, 275:17, 275:22, 275:23, 283:10, 283:24, 289:13, 293:3, 294:25, 295:1, 295:15, 295:16, 295:24, 296:3, 296:4, 296:11, 298:5, 298:6, 302:7, 303:22, 313:25, 314:14, 343:20, 343:24, 347:4, 347:12, 392:9

**schedule** [11] - 231:12, 236:20, 237:2, 245:24, 245:25, 249:23, 250:1, 250:2, 278:6, 398:1

**school** [5] - 353:25, 354:1, 354:4, 398:6, 398:10

**School** [2] - 360:16, 360:18

**screen** [10] - 298:18, 299:2, 299:4, 356:8, 372:9, 372:11, 384:15, 384:20, 384:22, 391:10

**screens** [1] - 384:17

**seal** [1] - 249:13

**SEALED** [1] - 215:2

**sealed** [2] - 228:21, 249:12

**search** [1] - 267:25

**searching** [1] - 363:23

**seat** [8] - 227:8, 232:4, 240:25, 241:7, 242:14, 248:14, 337:7, 337:20

**seated** [5] - 232:9, 242:14, 250:9, 334:4, 388:18

**seats** [1] - 378:14

**second** [8] - 220:22, 241:7, 321:18, 327:16, 330:7, 335:4, 391:16

**seconds** [20] - 340:20, 340:24, 341:4,

341:6, 341:9, 341:12, 341:13, 341:16, 341:24, 341:25, 342:3, 342:4, 342:13, 356:25, 357:9, 358:3, 359:23, 361:14, 361:23, 366:22

**secretary** [1] - 245:21

**secrets** [1] - 228:6

**section** [5] - 291:16, 292:4, 292:8, 292:12, 293:25

**secure** [1] - 277:1

**security** [1] - 227:20

**see** [57] - 228:25, 229:24, 241:17, 255:23, 256:14, 256:23, 258:12, 259:9, 259:22, 261:11, 262:22, 264:6, 268:18, 270:22, 271:18, 271:24, 271:25, 285:23, 292:12, 294:2, 294:7, 295:18, 298:10, 298:24, 299:4, 299:7, 299:9, 299:14, 299:25, 300:5, 300:19, 304:21, 309:9, 309:10, 314:6, 319:13, 339:25, 340:5, 340:7, 340:9, 340:11, 340:14, 356:8, 369:1, 369:13, 369:16, 372:2, 372:17, 374:4, 375:18, 376:4, 388:15, 391:11, 393:18, 398:23, 399:8

**seeing** [7] - 224:16, 230:1, 257:5, 272:1, 299:10, 370:6, 376:24

**seem** [2] - 216:6, 228:14

**select** [1] - 297:5

**send** [1] - 368:6

**sense** [2] - 306:21, 376:24

**sent** [2] - 221:8, 233:11

**sentences** [1] - 294:10

**separate** [1] - 237:5

**separately** [4] - 249:13, 280:15,

280:19, 280:22
**separately.).....249** [1]
- 215:2
**sequestering** [1] -
249:4
**Sergeant** [23] - 216:7,
219:6, 220:3,
223:12, 223:23,
223:25, 225:1,
230:10, 230:14,
231:19, 231:23,
231:25, 232:4,
254:4, 254:23,
267:11, 287:22,
312:21, 317:2,
358:8, 375:15,
381:2, 381:10
**sergeant** [5] - 232:6,
283:19, 310:16,
381:6
**seriously** [1] - 310:12
**serve** [9] - 218:21,
219:7, 220:24,
225:3, 225:7,
225:17, 229:8,
230:12, 235:4
**served** [14] - 222:3,
229:23, 233:6,
233:9, 233:10,
233:25, 235:14,
237:8, 237:12,
237:17, 238:8,
244:9, 248:20,
248:24
**server** [12] - 218:9,
220:6, 221:5,
221:11, 221:21,
222:5, 222:18,
223:8, 227:25,
230:20, 235:10,
238:2
**service** [16] - 217:19,
218:7, 218:12,
218:19, 219:4,
219:5, 224:8,
225:21, 229:17,
230:10, 230:18,
230:22, 233:23,
234:24, 241:17,
294:15
**serviced** [2] - 312:23,
313:5
**servicing** [1] - 313:4
**serving** [1] - 235:6
**set** [4] - 278:15,
302:21, 356:11,
384:18
**setting** [3] - 338:22,
370:8, 371:1
**seven** [15] - 243:7,

243:9, 243:25,
262:7, 266:10,
304:5, 304:11,
331:25, 347:24,
348:8, 354:15,
354:18, 367:20,
375:3, 375:5
**several** [5] - 220:15,
221:7, 237:21,
268:21, 285:19
**severed** [5] - 325:18,
325:23, 328:10,
330:24, 349:6
**shadow** [1] - 345:5
**shakes** [1] - 299:10
**sharp** [2] - 365:18,
369:21
**shattered** [1] - 286:20
**sheriff** [5] - 251:19,
256:18, 295:5,
295:6, 295:7
**Sheriff's** [4] - 295:10,
334:20, 354:12,
382:25
**sheriff's** [7] - 295:23,
295:24, 296:5,
353:18, 354:9,
385:6, 393:12
**shift** [5] - 236:14,
316:6, 316:7, 374:2,
378:20
**shifted** [1] - 315:23
**shifter** [1] - 316:8
**shifting** [1] - 318:18
**shoot** [11] - 273:17,
326:3, 384:12,
385:13, 385:23,
386:3, 386:5, 386:7,
386:9, 386:12,
386:16
**shooter** [3] - 254:9,
265:2, 283:7
**shooting** [45] -
251:11, 251:17,
251:20, 251:21,
252:4, 252:16,
252:23, 252:24,
253:17, 254:10,
262:16, 265:1,
267:11, 268:1,
273:15, 274:5,
275:11, 275:23,
277:11, 278:4,
282:12, 283:15,
286:23, 287:3,
287:7, 288:13,
288:24, 315:1,
315:8, 342:17,
342:18, 342:20,
343:2, 343:3, 343:6,

345:25, 348:3,
348:7, 351:18,
375:8, 377:11,
385:12, 391:24,
393:10
**shop** [1] - 362:18
**short** [3] - 356:3,
385:9, 389:14
**shorter** [1] - 398:11
**shot** [22] - 253:24,
256:24, 264:20,
267:14, 277:18,
286:13, 315:21,
316:2, 316:3, 316:4,
316:17, 324:19,
329:13, 332:19,
336:25, 340:19,
347:21, 347:25,
350:8, 350:10,
383:16, 393:20
**shotgun** [2] - 340:7,
350:5
**shots** [12] - 262:7,
293:1, 347:24,
348:8, 348:22,
350:2, 350:3, 350:4,
367:19, 375:2,
377:12, 377:13
**shouted** [1] - 341:1
**show** [11] - 263:9,
268:14, 272:11,
278:15, 285:19,
302:15, 342:6,
371:8, 371:10,
372:14, 374:15
**showing** [1] - 347:6
**shown** [4] - 259:19,
264:24, 299:22,
302:2
**shows** [10] - 226:15,
256:4, 265:19,
266:14, 266:15,
268:15, 270:6,
301:5, 311:18
**shut** [1] - 344:15
**sick** [1] - 387:12
**side** [15] - 234:8,
259:23, 264:3,
311:12, 324:24,
324:25, 349:24,
360:15, 365:14,
373:10, 375:23,
378:7, 383:13,
383:16
**side-view** [1] - 259:23
**sideways** [1] - 230:9
**sight** [1] - 363:22
**sign** [2] - 226:13,
236:15
**signed** [10] - 219:4,

224:8, 224:23,
226:13, 226:17,
227:12, 233:3,
233:5, 241:20,
323:23
**significant** [1] -
394:13
**signs** [1] - 317:19
**silhouette** [1] - 383:23
**similar** [1] - 252:3
**simple** [2] - 228:25,
335:8
**simply** [7] - 230:25,
282:8, 392:21,
392:25, 393:17,
394:7, 395:14
**simultaneously** [1] -
368:8
**single** [4] - 324:20,
351:6, 351:11,
351:14
**sit** [6] - 227:4, 247:3,
267:8, 291:8,
376:20, 378:12
**sit-down** [1] - 291:8
**site** [28] - 253:1,
253:17, 254:13,
256:5, 257:9,
257:19, 261:21,
263:17, 266:18,
269:4, 269:7, 269:8,
269:13, 269:17,
270:4, 270:17,
271:2, 271:14,
283:22, 284:2,
285:11, 286:7,
292:21, 292:22,
295:16, 295:18,
366:19, 369:7
**sites** [1] - 269:20
**sitting** [6] - 256:13,
259:18, 275:14,
284:2, 284:6, 378:12
**situation** [5] - 226:1,
336:1, 346:25,
396:22, 397:4
**situations** [1] - 235:15
**six** [6] - 218:14, 243:7,
243:8, 243:25,
393:15, 393:16
**six-week** [1] - 393:15
**sized** [1] - 228:23
**skills** [1] - 394:14
**sky** [1] - 326:3
**slide** [3] - 271:21,
334:8
**slightly** [2] - 332:5,
391:10
**slope** [1] - 263:25
**slower** [2] - 217:24,

221:2
**slowly** [1] - 220:23
**slumped** [2] - 377:22,
378:17
**small** [4] - 312:6,
338:17, 339:6, 339:9
**smidge** [1] - 334:8
**sneaking** [1] - 319:3
**snippet** [1] - 356:3
**snippets** [1] - 359:17
**so..** [1] - 350:7
**soft** [2] - 258:1, 357:5
**sole** [2] - 315:7,
348:15
**solely** [3] - 313:21,
313:24, 315:1
**someone** [21] -
219:15, 226:23,
227:8, 231:23,
235:4, 237:15,
241:2, 247:21,
249:5, 256:17,
277:17, 277:18,
305:25, 315:20,
330:9, 336:22,
364:25, 380:7,
392:15, 393:20
**sometimes** [2] -
238:1, 384:18
**somewhat** [4] - 252:3,
261:11, 281:24,
300:21
**somewhere** [1] -
274:24
**soon** [1] - 334:3
**sorry** [17] - 217:22,
220:17, 232:6,
232:8, 242:3, 246:8,
246:10, 248:12,
248:21, 310:22,
321:2, 330:15,
353:16, 354:15,
366:25, 372:20,
378:9
**sort** [4] - 247:10,
264:10, 267:24,
336:13
**sound** [2] - 274:7,
317:24
**sounded** [3] - 359:10,
359:14, 364:10
**sounds** [5] - 257:16,
258:7, 258:19,
286:22, 364:19
**south** [1] - 360:17
**southbound** [3] -
363:2, 363:8, 368:19
**Southwest** [1] -
353:21
**span** [1] - 252:19

**spare** [1] - 372:20
**speakerphone** [1] - 216:25
**speaking** [3] - 220:22, 279:23, 346:17
**specialized** [1] - 288:21
**specific** [5] - 240:17, 252:10, 392:17, 393:1, 393:24
**specifically** [11] - 219:23, 241:13, 241:15, 288:12, 389:14, 391:21, 391:24, 392:2, 392:8, 393:8, 395:6
**speculate** [1] - 345:16
**speculating** [2] - 345:19, 349:19
**speculation** [1] - 387:15
**speed** [6] - 344:10, 344:14, 344:18, 344:24, 344:25, 352:4
**spell** [1] - 235:25
**spelled** [1] - 242:25
**spinal** [6] - 325:3, 325:6, 328:9, 330:24, 331:4, 349:6
**spine** [5] - 324:14, 324:25, 325:2, 325:23
**spinning** [5] - 263:3, 265:11, 285:22, 299:24, 310:17
**split** [3] - 234:7, 367:8, 367:9
**spot** [2] - 236:13, 397:23
**spun** [2] - 285:20, 311:15
**spur** [1] - 302:10
**spurs** [1] - 253:1
**Sq** [1] - 214:22
**stall** [2] - 344:15, 344:24
**stand** [7] - 232:5, 232:11, 241:7, 242:18, 249:6, 319:6, 390:12
**standard** [8] - 273:10, 273:20, 286:12, 287:14, 287:17, 287:19, 315:18, 380:17
**standing** [14] - 238:21, 256:16, 262:7, 262:10, 262:12, 264:19, 264:21,

265:3, 265:6, 269:3, 339:16, 339:21, 350:13, 396:11
**stands** [1] - 291:20
**start** [11] - 249:23, 256:3, 309:25, 320:9, 363:4, 396:2, 396:7, 396:9, 396:19, 397:17, 398:2
**started** [25] - 232:18, 274:14, 285:19, 288:4, 288:11, 292:24, 295:17, 304:8, 342:5, 342:6, 345:4, 345:7, 348:12, 354:16, 363:12, 373:7, 373:14, 373:15, 374:24, 375:21, 383:21, 384:3, 396:1, 397:18, 398:3
**starting** [2] - 382:9, 397:14
**starts** [3] - 258:17, 311:5, 327:3
**state** [26] - 217:8, 217:14, 220:2, 221:5, 221:18, 221:19, 222:4, 223:11, 226:18, 230:11, 234:20, 237:6, 242:20, 243:5, 262:10, 264:19, 265:5, 273:14, 277:9, 284:5, 288:20, 306:14, 306:17, 323:6, 334:16, 351:18
**State** [13] - 219:6, 223:24, 225:23, 230:23, 234:18, 243:22, 268:7, 268:10, 323:10, 323:17, 343:18, 343:22, 354:2
**statement** [44] - 260:8, 267:5, 272:5, 272:11, 276:23, 278:23, 279:13, 280:4, 281:16, 281:17, 281:21, 281:23, 281:25, 282:1, 282:6, 282:9, 282:10, 285:10, 286:24, 287:2, 304:21, 305:4, 305:6, 305:8, 305:11, 306:3,

306:12, 307:12, 307:14, 314:20, 342:5, 351:19, 352:1, 352:3, 352:7, 352:13, 379:25, 381:1, 381:6, 381:9, 381:10, 381:15, 381:22, 381:23
**statements** [22] - 264:19, 279:20, 280:18, 280:22, 283:16, 285:14, 289:10, 292:2, 292:15, 293:4, 293:5, 293:7, 293:23, 294:22, 302:9, 304:19, 306:9, 306:20, 307:24, 308:12, 313:22
**States** [4] - 386:20, 399:12, 399:19, 399:23
**states** [3] - 244:13, 272:24, 294:12
**STATES** [1] - 214:1
**stating** [3] - 221:8, 335:2, 366:7
**station** [2] - 358:10, 358:17
**stationary** [1] - 344:10
**stay** [1] - 270:4
**steering** [1] - 311:12
**stenotypy** [1] - 399:16
**step** [15] - 232:1, 240:24, 248:3, 249:5, 333:12, 333:25, 349:20, 350:22, 351:7, 351:11, 351:14, 385:14, 385:19, 385:23, 387:24
**stepping** [1] - 242:9
**steps** [3] - 241:1, 248:6, 350:18
**stick** [1] - 398:11
**sticking** [2] - 263:13, 298:22
**still** [35] - 256:19, 257:18, 258:1, 275:10, 278:1, 289:17, 295:24, 296:1, 296:12, 302:7, 307:5, 319:6, 331:13, 339:2, 339:12, 342:7, 342:8, 343:23, 345:1, 352:8, 354:7, 357:9, 363:23, 376:21, 378:5,

379:21, 379:25, 380:1, 380:2, 385:4, 385:6, 386:11, 388:9, 389:16
**stimulus** [1] - 352:20
**stipulate** [1] - 296:23
**stipulated** [2] - 321:15, 355:14
**stipulating** [1] - 320:15
**stipulation** [1] - 297:14
**stop** [21] - 259:16, 285:19, 286:24, 287:3, 287:7, 287:9, 288:3, 305:11, 330:17, 342:6, 342:18, 342:24, 343:1, 347:25, 349:15, 372:19, 373:21, 374:7, 374:14, 377:9, 389:10
**stopped** [6] - 307:4, 309:17, 325:1, 345:5, 365:19, 377:10
**story** [4] - 314:12, 315:25, 316:2
**straight** [4] - 312:8, 344:23, 362:17, 362:19
**stressed** [1] - 228:14
**stretch** [3] - 360:17, 362:17, 362:19
**strike** [1] - 348:17
**strikes** [1] - 388:6
**striking** [4] - 294:15, 363:7, 369:4, 370:9
**strongest** [1] - 390:25
**struck** [14] - 286:14, 304:10, 304:13, 329:4, 329:7, 329:10, 331:4, 332:22, 345:23, 348:22, 371:2, 373:8, 373:9, 383:25
**stuck** [1] - 338:24
**study** [1] - 247:3
**styled** [2] - 214:11, 399:15
**subcompact** [1] - 369:24
**subject** [6] - 235:13, 241:11, 319:22, 320:23, 362:21, 375:21
**submit** [3] - 290:23, 291:2, 317:18
**submitted** [2] -

220:10, 290:4
**subpoena** [54] - 219:5, 219:8, 220:25, 223:5, 223:11, 223:24, 225:1, 225:4, 225:7, 225:17, 229:9, 229:13, 229:18, 230:10, 230:12, 233:3, 233:7, 233:10, 233:20, 233:23, 234:2, 234:25, 235:2, 235:4, 235:7, 235:10, 235:12, 235:13, 237:11, 237:13, 237:18, 238:4, 238:8, 239:11, 240:6, 240:13, 241:12, 241:14, 242:1, 242:6, 243:14, 245:8, 245:18, 247:12, 247:16, 319:21, 333:9, 333:10, 333:13, 396:25, 397:1, 397:7, 397:9
**subpoenaed** [2] - 232:17, 319:19
**subpoenas** [14] - 218:21, 218:23, 222:2, 232:21, 235:16, 237:7, 237:21, 237:24, 242:8, 244:9, 246:4, 246:14, 248:20, 248:24
**substantially** [1] - 255:13
**successful** [2] - 230:12, 230:22
**successfully** [1] - 276:9
**Suite** [1] - 214:18
**summoned** [1] - 227:20
**summons** [3] - 220:1, 222:2, 249:5
**sun** [1] - 253:15
**supercede** [1] - 222:8
**supervisor** [5] - 244:19, 247:22, 290:19, 290:20, 291:3
**supplement** [1] - 291:11
**supplemental** [1] - 291:11
**supplies** [1] - 251:6

**supposed** [6] - 222:8, 239:20, 268:1, 283:13, 285:7, 287:15
**supposedly** [1] - 285:18
**surface** [1] - 301:18
**surgical** [1] - 243:11
**surprise** [1] - 389:3
**suspect** [1] - 362:20
**suspects** [1] - 277:15
**sustain** [1] - 395:16
**sustained** [1] - 259:5
**swap** [1] - 362:18
**swear** [4] - 217:5, 232:2, 242:10, 334:1
**swerve** [2] - 363:6, 369:3
**swerved** [1] - 363:11
**swing** [1] - 396:10
**switch** [1] - 271:16
**switchback** [2] - 365:18, 369:22
**sworn** [1] - 322:21
**SWORN** [6] - 217:12, 232:3, 242:12, 250:7, 322:22, 334:2

**T**

**T-I-C-H-N-E-L-L** [1] - 236:2
**tab** [2] - 297:3, 321:21
**tabs** [1] - 255:2
**tac** [5] - 375:7, 385:9, 385:17, 385:20
**tactical** [1] - 385:9
**tampered** [2] - 347:9, 347:11
**taped** [1] - 399:15
**taught** [2] - 375:6, 380:16
**team** [1] - 267:24
**telephone** [5] - 216:20, 217:4, 223:4, 231:18, 238:25
**temperate** [2] - 390:23, 398:24
**temperature** [2] - 226:3, 226:22
**ten** [4] - 310:8, 340:21, 388:8, 390:13
**tendency** [1] - 314:6
**tension** [2] - 331:3, 331:4
**terms** [2] - 274:1, 321:13
**terrain** [2] - 263:18, 264:9

**test** [13] - 276:7, 276:10, 276:11, 276:14, 276:17, 281:8, 281:13, 321:7, 321:10, 321:13, 382:4, 390:6, 394:3
**testified** [17] - 283:13, 302:17, 316:4, 316:5, 328:2, 328:9, 335:3, 343:2, 343:25, 351:8, 383:11, 384:2, 384:9, 385:8, 385:20, 386:1, 391:21
**testify** [8] - 232:18, 245:12, 245:19, 328:3, 383:15, 387:1, 391:7, 397:5
**testifying** [4] - 244:5, 250:11, 323:1, 325:20
**testimony** [30] - 232:20, 238:7, 240:8, 270:8, 273:18, 278:11, 280:24, 281:4, 282:20, 325:16, 327:24, 330:25, 335:1, 342:21, 343:9, 343:11, 343:13, 348:25, 349:10, 375:11, 379:16, 379:19, 380:25, 385:19, 389:14, 389:21, 389:23, 396:7, 396:12, 396:14
**tests** [1] - 293:10
**text** [1] - 238:25
**THE** [394] - 216:2, 216:9, 216:12, 216:15, 216:17, 216:21, 216:22, 216:23, 217:2, 217:3, 217:7, 217:8, 217:10, 217:11, 217:13, 217:16, 217:17, 217:19, 217:23, 218:3, 218:8, 218:12, 218:15, 218:22, 218:23, 219:9, 219:10, 219:11, 220:18, 220:21, 221:1, 221:3, 221:4, 221:16, 221:20, 221:23, 221:24, 222:24, 223:1,

223:3, 223:6, 223:10, 223:14, 223:16, 223:20, 223:22, 224:2, 224:4, 224:6, 224:7, 224:12, 224:19, 224:22, 225:2, 225:3, 225:5, 225:6, 225:8, 225:11, 225:12, 225:14, 225:15, 225:16, 225:19, 226:11, 226:12, 226:18, 226:20, 226:21, 226:25, 227:15, 227:17, 227:19, 227:21, 227:22, 227:24, 228:3, 228:8, 228:11, 228:13, 228:17, 228:19, 229:1, 229:4, 229:6, 229:10, 229:11, 229:14, 229:16, 229:20, 230:8, 230:15, 231:3, 231:7, 231:10, 231:15, 231:17, 231:19, 232:1, 232:4, 232:7, 232:8, 232:15, 232:16, 232:23, 232:24, 233:1, 233:3, 233:5, 233:6, 233:8, 233:10, 233:11, 233:13, 233:15, 233:16, 233:18, 233:19, 233:21, 233:22, 234:3, 234:4, 234:6, 234:11, 234:12, 234:13, 234:15, 234:17, 234:19, 234:20, 234:22, 234:24, 235:3, 235:4, 235:6, 235:15, 235:18, 235:20, 235:22, 235:23, 235:24, 235:25, 236:2, 236:3, 236:5, 236:8, 236:10, 236:11, 236:14, 236:18, 236:20, 236:22, 236:24, 237:1, 237:4, 237:6, 237:10, 237:14, 237:16, 237:17, 237:19, 237:20, 237:21, 237:23, 237:25, 238:4,

238:6, 238:7, 238:10, 238:11, 238:12, 238:13, 238:14, 238:15, 238:19, 238:23, 238:24, 239:1, 239:2, 239:4, 239:5, 239:9, 239:10, 239:12, 239:14, 239:15, 239:16, 239:17, 239:21, 240:1, 240:4, 240:5, 240:6, 240:9, 240:11, 240:17, 240:21, 240:23, 241:2, 241:6, 241:9, 241:24, 242:1, 242:4, 242:13, 242:16, 242:17, 242:22, 242:23, 242:25, 243:2, 243:4, 243:8, 243:10, 243:13, 243:16, 243:17, 243:24, 243:25, 244:2, 244:3, 244:8, 244:9, 244:11, 244:25, 245:2, 245:4, 245:6, 245:8, 245:10, 245:17, 245:20, 246:4, 246:7, 246:9, 246:10, 246:11, 246:12, 246:14, 246:15, 246:18, 246:22, 247:6, 247:7, 247:9, 247:14, 247:15, 247:22, 248:1, 248:5, 248:7, 248:9, 248:11, 248:12, 248:13, 249:14, 249:18, 249:21, 250:8, 254:21, 255:2, 255:5, 255:20, 255:22, 259:5, 261:3, 268:23, 271:19, 271:21, 271:25, 278:2, 281:1, 287:24, 288:2, 296:22, 296:25, 297:6, 297:8, 297:13, 297:16, 297:19, 297:21, 299:5, 299:7, 299:9, 301:23, 308:22, 309:2, 309:22, 310:2, 310:6, 310:9, 310:13, 317:4, 318:23, 319:1,

319:16, 319:22, 319:25, 320:1, 320:5, 320:8, 320:12, 320:17, 320:22, 321:9, 321:12, 321:24, 322:6, 322:10, 322:12, 322:15, 322:19, 322:23, 324:1, 325:14, 326:23, 327:16, 328:4, 328:17, 330:13, 331:8, 332:10, 333:4, 333:6, 333:11, 333:15, 333:17, 333:19, 333:20, 333:24, 334:3, 334:6, 334:7, 335:4, 338:10, 345:20, 346:10, 346:15, 352:22, 352:25, 353:5, 353:10, 353:12, 355:13, 355:18, 356:1, 357:19, 371:18, 371:21, 383:4, 383:7, 385:7, 387:7, 387:21, 387:24, 388:4, 388:18, 388:23, 389:2, 389:6, 389:9, 389:18, 390:2, 390:7, 390:12, 390:15, 390:18, 390:21, 391:6, 391:15, 391:18, 392:1, 392:24, 393:2, 393:4, 393:11, 394:4, 394:9, 394:17, 395:1, 395:8, 395:16, 395:23, 396:8, 396:16, 396:18, 397:13, 397:17, 397:22, 398:8, 398:10, 399:3, 399:7
**theory** [3] - 314:7, 314:8, 314:18
**therefore** [1] - 339:19
**thick** [3] - 262:10, 262:13, 264:14
**third** [6] - 220:7, 220:24, 357:24, 392:5, 392:6
**Thomas** [1] - 214:12
**thorough** [2] - 306:25, 317:15
**thoughts** [1] - 248:17

**threat** [4] - 342:18, 342:22, 377:4, 377:7
**three** [19] - 220:9, 236:6, 236:9, 237:22, 245:6, 267:2, 285:2, 285:4, 285:7, 285:12, 285:17, 296:7, 338:25, 354:23, 371:4, 373:15, 376:11, 391:20, 393:15
**three-phase** [1] - 393:15
**three-point** [8] - 285:2, 285:4, 285:7, 285:12, 285:17, 338:25, 371:4, 373:15
**throughout** [1] - 259:2
**throw** [1] - 319:17
**Tichnell** [5] - 235:24, 236:3, 236:11, 236:18, 237:14
**Tichnell's** [1] - 237:2
**tidying** [1] - 387:25
**Tiffany** [2] - 214:20, 233:5
**tight** [1] - 227:5
**tight-quartered** [1] - 227:5
**timing** [1] - 376:24
**tire** [22] - 257:23, 284:23, 286:1, 299:24, 300:9, 300:11, 300:14, 300:16, 300:20, 311:8, 311:20, 311:24, 312:2, 312:7, 312:8, 312:12, 312:18, 313:2, 313:13, 372:17, 372:19, 372:20
**tires** [8] - 263:3, 265:11, 285:20, 285:22, 310:17, 311:11, 311:15, 312:10
**today** [19] - 219:3, 231:13, 247:21, 248:8, 319:2, 319:20, 319:23, 325:17, 366:18, 366:19, 371:8, 376:20, 384:17, 385:4, 387:10, 389:10, 396:6, 396:25, 398:23
**together** [3] - 278:8,

280:11, 293:7
**tomorrow** [14] - 247:2, 247:24, 319:20, 396:2, 396:7, 396:9, 396:11, 397:1, 397:7, 397:11, 397:14, 398:3, 398:13, 398:24
**tonight** [1] - 395:22
**took** [30] - 222:22, 226:3, 227:13, 249:12, 250:16, 256:20, 257:23, 260:23, 260:25, 261:19, 263:11, 270:21, 281:17, 284:17, 286:1, 289:13, 296:14, 298:5, 298:6, 301:19, 304:16, 304:19, 306:12, 308:12, 308:13, 313:6, 317:23, 341:20, 350:2, 379:1
**top** [8] - 259:22, 264:1, 264:2, 275:3, 294:1, 327:19, 357:5, 365:12
**total** [4] - 236:6, 274:25, 282:23, 283:4
**totality** [1] - 294:21
**touch** [5] - 315:22, 316:3, 316:4, 316:5, 316:6
**touched** [1] - 316:6
**toward** [8] - 263:6, 266:1, 269:3, 308:9, 309:9, 309:13, 318:19, 338:9
**towards** [31] - 262:8, 284:21, 291:25, 292:24, 292:25, 294:14, 301:6, 304:12, 308:10, 315:9, 315:10, 316:24, 324:25, 338:23, 343:10, 343:15, 345:9, 345:13, 348:14, 349:14, 351:5, 368:20, 370:9, 373:3, 374:25, 375:21, 377:21, 383:12, 384:3, 384:13, 385:15
**track** [1] - 394:2
**tracks** [9] - 257:23, 284:23, 287:8, 300:1, 300:9,

300:11, 300:14, 300:16, 300:20
**Tracy** [1] - 235:24
**traffic** [14] - 308:14, 308:17, 308:20, 321:23, 355:11, 359:12, 361:8, 363:5, 363:6, 363:11, 369:3, 376:21, 376:23, 377:15
**trail** [6] - 365:12, 365:13, 365:17, 365:19, 366:14, 366:16
**train** [4] - 308:23, 385:17, 385:20, 385:21
**trained** [5] - 252:2, 385:16, 385:19, 385:23
**training** [18] - 240:14, 251:22, 252:1, 252:4, 267:24, 288:11, 288:18, 288:19, 375:6, 391:22, 392:21, 393:6, 393:14, 394:1, 394:21, 394:23, 394:25, 395:12
**trainings** [1] - 288:21
**trajectory** [5] - 267:8, 268:5, 331:23, 332:2, 332:4
**transcript** [5] - 326:19, 326:25, 327:23, 399:14, 399:17
**Transcript** [2] - 214:25, 249:13
**transcription** [1] - 214:25
**translation** [1] - 214:24
**transmission** [26] - 273:7, 273:8, 273:9, 273:12, 273:16, 273:22, 286:10, 287:11, 287:19, 302:18, 302:21, 349:13, 359:5, 361:14, 364:11, 364:24, 365:21, 366:6, 370:12, 373:25, 377:12, 380:9, 380:10, 380:12, 380:19, 380:22
**transmissions** [3] - 320:16, 368:7,

376:25
**transpired** [2] - 397:21, 399:1
**travel** [4] - 257:5, 257:6, 276:1, 324:23
**traveled** [3] - 275:25, 284:15, 316:23
**traveling** [11] - 292:25, 304:12, 315:10, 316:23, 363:1, 363:2, 368:15, 368:16, 368:18, 368:19
**travelling** [1] - 291:25
**Travis** [1] - 214:17
**treat** [1] - 268:1
**treated** [1] - 288:16
**treating** [1] - 305:21
**trial** [21] - 216:3, 218:16, 219:5, 224:1, 225:17, 229:8, 229:18, 232:18, 232:20, 232:22, 244:5, 245:9, 245:19, 246:5, 246:19, 247:11, 247:15, 249:4, 322:4, 389:23, 398:2
**Trial** [1] - 214:11
**trials** [1] - 244:10
**tried** [2] - 351:9, 378:5
**Troop** [2] - 234:6, 251:2
**troop** [3] - 234:8, 234:9, 251:6
**Trooper** [9] - 237:15, 278:17, 278:20, 278:21, 280:18, 343:19, 343:23, 344:1, 352:13
**trooper** [2] - 273:14, 351:18
**trouble** [1] - 216:17
**truck** [2] - 261:14, 313:4
**true** [6] - 278:23, 279:13, 279:25, 280:2, 346:23, 375:13
**truthful** [1] - 306:22
**try** [14] - 221:2, 239:20, 240:7, 254:5, 254:6, 260:8, 271:19, 321:10, 350:25, 351:3, 356:2, 368:24, 374:17, 398:1
**trying** [11] - 226:25, 247:10, 271:23,

335:25, 345:16, 345:22, 370:10, 373:20, 374:5, 375:24, 383:25
**turn** [23] - 249:6, 265:11, 274:11, 285:2, 285:4, 285:7, 285:12, 285:17, 337:24, 338:25, 344:4, 344:7, 365:8, 365:14, 365:17, 365:18, 365:23, 366:9, 368:23, 369:21, 369:25, 371:4, 373:15
**turned** [6] - 231:2, 311:14, 311:16, 363:4, 369:25, 370:3
**turning** [4] - 284:14, 312:14, 355:21, 363:4
**twelve** [2] - 391:23, 394:13
**two** [24] - 216:3, 218:3, 218:23, 230:19, 231:1, 237:22, 245:15, 245:22, 246:1, 266:23, 267:1, 267:3, 267:4, 276:12, 292:21, 294:10, 296:7, 308:25, 329:20, 340:24, 359:18, 361:23, 388:21
**type** [5] - 226:1, 286:25, 292:5, 325:7, 352:20
**typed** [3] - 281:21, 305:8, 305:11
**types** [1] - 228:16
**typical** [1] - 229:21
**typically** [3] - 246:5, 283:6, 283:9

**U**

**ultimately** [7] - 229:13, 230:14, 256:13, 258:6, 260:19, 260:20, 261:25
**UMINA** [90] - 216:8, 216:10, 216:14, 216:19, 231:5, 238:18, 240:20, 241:4, 241:10, 241:25, 242:3, 249:10, 250:5, 250:14, 254:20,

254:22, 255:3,
255:6, 255:7,
255:17, 255:24,
255:25, 259:4,
259:7, 261:2, 261:4,
268:24, 271:17,
271:20, 271:23,
272:3, 272:4, 278:1,
278:3, 280:9,
280:10, 280:25,
281:3, 281:6,
283:18, 287:23,
296:23, 297:18,
297:20, 309:24,
310:5, 310:8,
310:12, 310:15,
310:21, 310:23,
311:1, 311:2, 311:7,
312:3, 313:12,
318:25, 319:18,
320:3, 320:7,
320:14, 320:18,
321:2, 321:10,
322:9, 322:17,
333:18, 333:22,
388:20, 388:25,
389:12, 390:5,
391:4, 391:20,
392:2, 392:23,
392:25, 393:3,
393:6, 393:13,
394:5, 394:10,
394:19, 395:6,
395:22, 396:4,
396:14, 397:8,
397:15, 399:5
**Umina** [43] - 214:14,
214:15, 216:17,
218:20, 231:3,
238:17, 238:20,
240:17, 241:9,
249:8, 250:3,
250:12, 250:15,
255:23, 259:2,
272:2, 280:23,
287:24, 288:10,
293:9, 296:17,
297:16, 298:8,
298:11, 298:20,
299:15, 299:22,
300:25, 302:2,
305:7, 309:22,
310:11, 317:4,
317:10, 318:9,
318:24, 320:6,
320:12, 322:8,
322:15, 333:20,
391:2, 397:1
**Umina**.............**249** [1]
- 215:5
**Umina**...........**309** [1] -

215:7
**unable** [4] - 256:13,
330:23, 349:16,
392:6
**unanimous** [1] -
299:10
**under** [12] - 244:23,
248:19, 249:13,
281:12, 297:3,
321:21, 331:3,
333:9, 397:1, 397:7,
397:9, 399:20
**underneath** [1] -
383:22
**undersigned** [1] -
272:12
**understood** [17] -
219:2, 221:23,
230:8, 240:1,
296:25, 297:6,
297:13, 319:1,
321:24, 322:6,
346:15, 352:25,
353:12, 355:13,
387:21, 391:6,
398:10
**undertaking** [1] -
398:19
**unfair** [1] - 238:15
**unfortunately** [2] -
339:4, 359:18
**unit** [2] - 293:19,
294:6
**UNITED** [1] - 214:1
**United** [4] - 386:19,
399:12, 399:19,
399:23
**unlawful** [2] - 251:25,
252:7
**unless** [2] - 244:15,
347:1
**unlikely** [6] - 325:12,
325:19, 326:2, 326:4
**unoccupied** [1] -
344:24
**untrue** [2] - 279:8,
279:9
**up** [86] - 216:13,
222:14, 222:15,
224:4, 225:9, 226:7,
236:14, 236:24,
246:19, 248:25,
249:14, 254:4,
256:2, 257:8, 264:5,
264:14, 278:15,
281:4, 284:15,
284:22, 288:10,
291:9, 291:14,
298:18, 298:22,
301:22, 305:12,

305:15, 307:17,
309:25, 310:4,
311:20, 319:3,
320:1, 320:12,
320:22, 321:2,
333:16, 338:25,
342:7, 345:15,
347:6, 350:4, 351:9,
353:4, 353:17,
353:22, 355:21,
356:2, 362:5, 362:9,
362:13, 363:20,
364:2, 364:11,
364:23, 365:16,
365:17, 366:8,
368:11, 368:14,
370:7, 370:8,
370:14, 371:1,
372:8, 373:14,
374:2, 375:20,
376:16, 378:17,
382:17, 383:23,
387:16, 387:17,
388:1, 388:23,
389:8, 390:4,
390:10, 390:16,
393:8, 397:11,
398:21, 399:4
**upset** [1] - 228:14
**upslope** [2] - 263:21,
263:22
**upward** [1] - 264:4
**urban** [1] - 350:6
**usual** [1] - 388:9
**utilize** [1] - 320:21
**utilizing** [1] - 214:24

## V

**veer** [1] - 265:11
**vegetation** [2] -
265:15, 301:8
**vehicle** [167] - 258:18,
258:20, 258:21,
259:11, 260:2,
260:6, 260:8,
260:10, 260:11,
260:12, 260:14,
260:15, 260:19,
261:24, 261:25,
262:9, 262:14,
263:5, 264:18,
264:25, 265:4,
265:6, 265:10,
265:19, 265:21,
266:14, 266:16,
267:7, 267:16,
267:18, 267:20,
267:25, 268:16,
273:1, 273:2,

273:12, 273:16,
273:18, 273:22,
280:12, 283:21,
286:23, 286:24,
286:25, 287:4,
287:6, 287:19,
291:25, 292:10,
292:14, 292:22,
293:18, 294:5,
294:13, 300:10,
300:16, 302:10,
303:20, 304:11,
308:2, 312:13,
313:25, 315:10,
315:15, 316:22,
336:2, 337:9,
338:23, 338:24,
339:1, 339:7,
339:10, 339:12,
339:18, 339:19,
340:12, 340:16,
342:1, 342:6, 342:7,
342:18, 342:21,
342:22, 342:23,
342:24, 343:4,
343:7, 344:11,
344:14, 344:15,
344:18, 344:24,
345:4, 345:6, 345:7,
345:15, 345:25,
346:2, 346:25,
347:12, 348:17,
350:25, 351:9,
351:15, 352:8,
352:11, 362:22,
363:3, 363:6, 363:7,
363:8, 368:24,
369:4, 370:11,
370:16, 370:17,
370:20, 370:24,
371:1, 371:3, 371:6,
371:9, 371:11,
373:8, 373:9,
373:16, 373:17,
373:18, 373:20,
373:21, 373:22,
373:25, 374:13,
374:14, 374:18,
374:24, 375:1,
375:9, 375:21,
375:22, 377:8,
377:10, 377:21,
377:22, 377:24,
378:5, 378:12,
380:7, 380:12,
383:21, 383:24,
384:2, 384:3,
384:10, 384:11,
384:13, 385:18,
385:24, 387:17
**vehicles** [13] - 251:4,

261:22, 264:22,
264:23, 268:20,
269:10, 274:16,
295:20, 302:16,
352:19, 369:18,
380:16, 385:21
**vents** [1] - 268:18
**verbal** [8] - 228:11,
348:1, 348:3, 348:6,
348:10, 348:11,
374:14, 374:19
**verify** [3] - 260:25,
267:20, 268:4
**version** [1] - 216:25
**versus** [5] - 216:3,
218:16, 318:2,
373:1, 376:22
**via** [1] - 216:20
**victim** [1] - 291:17
**video** [3] - 389:7,
389:11, 390:3
**videotaped** [2] -
391:3, 391:8
**Videotaped** [1] -
391:13
**view** [2] - 259:23,
299:4
**viewed** [3] - 314:11,
314:12, 314:14
**vigorously** [1] -
310:11
**violate** [2] - 334:22,
335:15
**violated** [7] - 251:24,
252:6, 335:7,
336:12, 336:13,
382:14, 382:24
**violates** [4] - 335:11,
335:21, 336:8,
336:22
**violating** [1] - 382:10
**VIRGINIA** [1] - 214:1
**Virginia** [17] - 214:12,
219:6, 221:9,
223:24, 225:20,
230:23, 234:18,
243:6, 243:22,
268:7, 268:10,
323:9, 323:17,
343:18, 343:22,
399:13, 399:24
**vital** [3] - 329:18,
330:17
**volume** [1] - 355:21
**voluntarily** [2] - 306:3,
306:5

## W

**wait** [2] - 231:21,

241:4
**waited** [1] - 351:25
**walk** [3] - 219:10,
256:1, 298:1
**walked** [5] - 222:19,
222:21, 226:2,
226:3, 231:2
**walking** [1] - 230:17
**wall** [1] - 325:2
**warning** [2] - 216:24,
288:2
**warrant** [1] - 267:25
**washed** [4] - 276:13,
276:16, 281:9,
281:12
**washing** [1] - 382:1
**weaknesses** [2] -
391:25, 394:13
**weapon** [25] - 273:16,
273:19, 277:2,
287:15, 292:5,
292:11, 292:14,
293:15, 294:15,
308:2, 308:6, 309:9,
309:10, 309:14,
309:18, 314:21,
340:14, 367:21,
374:13, 374:23,
376:9, 377:5, 377:9,
378:1, 382:7
**weapons** [5] - 308:7,
340:11, 340:15,
340:17, 375:10
**wear** [3] - 347:13,
347:15, 347:19
**wearing** [2] - 347:21,
350:10
**wears** [1] - 321:3
**Wednesday** [1] -
214:12
**weeding** [1] - 309:4
**week** [3] - 220:6,
333:9, 393:15
**weekend** [1] - 220:5
**weeks** [1] - 393:16
**welcome** [2] - 255:6,
389:2
**Wesley** [2] - 355:4,
356:22
**WEST** [1] - 214:1
**West** [17] - 214:12,
219:6, 221:9,
223:24, 225:20,
230:23, 234:18,
243:5, 243:22,
268:7, 268:10,
323:9, 323:17,
343:18, 343:22,
399:13, 399:24
**wet** [3] - 258:1,

285:25, 286:1
**whatsoever** [1] -
340:11
**Wheeler** [8] - 355:4,
356:22, 357:4,
358:11, 359:18,
360:7, 363:22,
364:10
**wheels** [1] - 261:21
**whole** [2] - 291:10,
341:12
**width** [5] - 262:1,
269:7, 271:5, 271:6,
271:14
**wife** [2] - 354:22,
376:11
**willing** [2] - 345:1,
346:20
**Wilson's** [1] - 397:2
**windshield** [7] -
266:2, 266:3,
266:23, 267:4,
268:15, 268:19,
287:3
**windy** [2] - 269:12,
270:21
**wiper** [2] - 266:2,
266:3
**wiping** [1] - 241:7
**wish** [1] - 396:5
**wished** [2] - 278:8,
304:25
**withdraw** [1] - 389:3
**withholding** [1] -
306:22
**WITNESS** [128] -
215:4, 215:10,
215:16, 216:22,
217:2, 217:7,
217:10, 217:12,
217:16, 217:19,
218:3, 218:12,
218:22, 219:9,
219:11, 220:18,
221:1, 221:4,
221:20, 221:24,
223:1, 223:6,
223:14, 223:20,
224:2, 224:6,
224:12, 225:2,
225:5, 225:8,
225:12, 225:15,
225:19, 226:12,
226:20, 226:25,
227:17, 227:21,
227:24, 228:8,
228:13, 228:19,
229:4, 229:10,
229:14, 229:20,
230:15, 231:15,

232:3, 232:7,
232:15, 232:23,
233:1, 233:5, 233:8,
233:11, 233:15,
233:18, 233:21,
234:3, 234:6,
234:12, 234:15,
234:19, 234:22,
235:3, 235:6,
235:18, 235:22,
235:24, 236:2,
236:5, 236:10,
236:14, 236:20,
236:24, 237:4,
237:10, 237:16,
237:19, 237:21,
237:25, 238:6,
238:10, 238:12,
238:14, 238:23,
239:1, 239:4, 239:9,
239:12, 239:15,
239:17, 240:4,
240:6, 240:11,
242:12, 242:16,
242:22, 242:25,
243:4, 243:10,
243:16, 243:24,
244:2, 244:8,
244:11, 245:2,
245:6, 245:10,
245:20, 246:7,
246:10, 246:12,
246:15, 246:22,
247:7, 247:14,
247:22, 248:5,
248:9, 248:12,
250:7, 319:25,
322:22, 334:6,
338:10, 387:7
**witness** [37] - 232:5,
241:1, 241:7,
242:18, 248:6,
249:8, 250:4,
254:10, 254:20,
259:2, 289:10,
319:5, 320:5,
320:18, 321:14,
322:16, 333:21,
345:18, 346:9,
346:12, 383:23,
387:4, 387:19,
388:19, 391:2,
391:7, 392:7,
392:13, 393:2,
393:20, 393:21,
395:18, 395:19,
395:21, 397:23,
398:13
**witnessed** [4] - 363:3,
363:6, 369:17
**witnesses** [7] - 216:7,

247:12, 247:19,
248:22, 249:4,
306:20, 321:3
**woman** [1] - 219:21
**wooded** [2] - 338:2,
338:5
**word** [2] - 338:22
**worded** [1] - 229:21
**wording** [2] - 263:7,
284:4
**works** [2] - 247:17,
392:16
**wound** [5] - 297:8,
324:13, 331:17,
331:20, 342:17
**wounded** [1] - 349:24
**Wrangler** [9] - 284:21,
285:2, 286:10,
337:10, 337:13,
337:23, 338:15,
355:5, 357:5
**write** [1] - 228:21
**written** [17] - 228:23,
238:25, 281:18,
281:21, 282:1,
282:5, 282:9,
282:10, 289:3,
298:14, 305:8,
307:11, 307:14,
313:22, 352:7,
352:13, 381:15
**wrote** [3] - 272:12,
273:4, 278:5
**WV** [3] - 214:16,
214:19, 214:23

**Y**

**year** [3] - 218:13,
233:2, 245:14
**years** [22] - 218:13,
234:23, 236:6,
236:7, 236:9,
238:19, 243:7,
243:9, 244:1, 245:6,
250:25, 306:7,
306:18, 306:19,
326:16, 347:18,
353:23, 354:14,
354:19, 380:14,
394:20, 394:21
**yesterday** [15] - 216:6,
224:24, 232:18,
239:17, 239:19,
240:2, 240:9, 242:8,
245:10, 247:11,
247:16, 247:21,
248:22, 249:1,
396:23
**young** [1] - 354:23

**yourself** [6] - 231:11,
250:19, 327:13,
353:20, 374:9,
378:23
**yourselves** [2] -
388:11, 398:15

**Z**

**zoom** [1] - 271:19