09:09:11

1

UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG
3                        - - -

4  CHRISTY J. RHOADES, in her        CIVIL ACTION NO. 1:18-CV-186
   capacity as the Administratrix
5  and Personal Representative of
   the estate of Philip Jontz
6  Rhoades,

7                    Plaintiff,

8  V.

9  DAVID FORSYTH, in his official
   and individual capacity,
10
                    Defendant.
11
                        - - -
12        Proceedings had in the Jury Trial of the above-styled
   action on Thursday, April 8, 2021, before the Honorable Judge
13 Thomas S. Kleeh, District Judge, at Clarksburg, West Virginia.
                        - - -
14
   APPEARANCES:
15 For the Plaintiff:         Ryan J. Umina
                              Umina Legal, PLLC
16                            125 Greenbag Road
                              Morgantown, WV 26501
17
                              Travis Austin Prince
18                            Benjamin J. Hogan
                              Bailey & Glasser, LLP - Morgantown
19                            6 Canyon Rd., Suite 200
                              Morgantown, WV 26508
20

21 For the Defendant:         Tiffany R. Durst
                              Nathan A. Carroll
22                            Pullin Fowler Flanagan Brown & Poe
                              PLLC - Morgantown
23                            2414 Cranberry Sq.
                              Morgantown, WV 26508
24

25        Proceedings recorded utilizing realtime translation.
   Transcript produced by computer-aided transcription.

1      INDEX.

2      WITNESS:  RICK RHOADES

3      Direct Examination by Mr. Umina.................404

4      Cross-Examination by Mr. Carroll...............414

5      Redirect Examination by Mr. Umina..............416

6

7      WITNESS:  CHRISTY J. RHOADS

8      Direct Examination by Mr. Umina.................418

9      Cross-Examination by Mr. Carroll...............423

10     Redirect Examination by Mr. Umina..............435

11

12     WITNESS:  DENNIS ROOT

13     Direct Examination by Mr. Umina.................439

14     Cross-Examination by Mr. Durst.................513

15     Redirect Examination by Mr. Umina..............589

16     Recross-Examination by Ms. Durst...............594

17     Further Redirect Examination by Mr. Umina.......596

18     Further Recross-Examination by Ms. Durst........597

19

20

21

22

23

24

25

1      (Proceedings commenced at 9:32 a.m., in open court.)

09:37:01   2          THE COURT:  Good morning, everyone.  Good to see you.

09:37:04   3   All right.  We are reconvened on day three of trial in the

09:37:06   4   matter of Rhoades vs. Forsyth, 1:18-CV-186.  I know the plan

09:37:14   5   we discussed, counsel, at the end of the day yesterday, was

09:37:18   6   that Mr. Parker, pending the Court's ruling on the objection

09:37:22   7   to his testimony, and then Mr. Rhoades.

09:37:25   8      Is that where we are at still?

09:37:26   9          MR. UMINA:  Your Honor, we tend to agree with the

09:37:31  10   Court based on the law that we found, so we are not going to

09:37:34  11   call Mr. Parker.

09:37:36  12          THE COURT:  All right.  Well, we will skip Mr.

09:37:38  13   Parker.  It's always nice to be validated here on the bench.

09:37:42  14   Okay.  He is not here; is that correct?

09:37:44  15          MR. UMINA:  He is.  I told him he didn't have to be,

09:37:46  16   but he came up anyway.  We will let him know.

09:37:48  17          THE COURT:  Okay.  If we could let him know that his

09:37:51  18   presence here is not necessary.  So the next witness we are

09:38:13  19   going to hear from is Mr. Rhoades; is that correct?

09:38:16  20          MR. UMINA:  Yes, Your Honor.

09:38:16  21          THE COURT:  Before we have the jury come in and do

09:38:19  22   that, anything we need to take up from plaintiff's

09:38:21  23   perspective?

09:38:23  24          MR. UMINA:  Your Honor, in terms of our second

09:38:28  25   witness today, I just wanted to address again, kind of a topic

09:38:33   1    area to make sure we don't go down that road or defense

09:38:38   2    counsel doesn't.  And there was some talk about him when he

09:38:42   3    was younger --

09:38:44   4              THE COURT:  Who?

09:38:46   5              MR. UMINA:  About Mr. Philip Rhoades, when he was

09:38:48   6    younger and specifically they were talking about high school

09:38:52   7    because, you know, he left school early and went and started

09:38:55   8    work in construction.  And I am not sure if defense counsel

09:38:58   9    intends to go down that road.  We're not making a claim for

09:39:01   10   economic damages, so we don't want it brought up, anything in

09:39:05   11   the subject matter of, you know, him leaving high school early

09:39:08   12   or anything like that.  We think it's totally irrelevant to

09:39:12   13   this.  We are not claiming economic damages.

09:39:16   14       And, you know, there was one specific question in Ms.

09:39:20   15   Rhoades's deposition, "And you now why he quit school?

09:39:22   16       I'm not real sure.  He just didn't like to be told what

09:39:25   17   to do."  We don't want that taken out of context and then try

09:39:28   18   to be used in this and then we have to explain the context of

09:39:31   19   that.  I just want to get out ahead of that and address it

09:39:34   20   here before the jury comes in.

09:39:35   21             THE COURT:  Are we going down that road, Ms. Durst,

09:39:38   22   Mr. Carroll?

09:39:38   23             MS. DURST:  I will be conducting Ms. Rhoades's

09:39:40   24   questions.  I have no intention of asking any questions in

09:39:43   25   that record at all.

| | | |
|---|---|---|
| 09:39:44 | 1 | THE COURT:  Understood.  Sounds like a non-issue. |
| 09:39:45 | 2 | MR. UMINA:  Okay.  Great. |
| 09:39:47 | 3 | THE COURT:  I appreciate you bringing it up. |
| 09:39:47 | 4 | Anything else, Mr. Umina? |
| 09:39:48 | 5 | MR. UMINA:  No, nothing from us, Your Honor. |
| 09:39:50 | 6 | THE COURT:  Ms. Durst, anything else before we bring |
| 09:39:53 | 7 | our jury back in? |
| 09:39:54 | 8 | MR. CARROLL:  Nothing, Your Honor. |
| 09:39:56 | 9 | THE COURT:  Thank you.  Sir, can we have our jury |
| 09:39:57 | 10 | then, please? |
| 09:39:58 | 11 | (Jury entered the courtroom, and the following transpired |
| 09:40:00 | 12 | in open court.) |
| 09:40:59 | 13 | THE COURT:  Thank you, ladies and gentlemen.  Good |
| 09:41:01 | 14 | morning everyone.  Thank you again for being here.  We |
| 09:41:04 | 15 | appreciate, again, your patience with us and your continued |
| 09:41:08 | 16 | service.  We are ready to proceed at this point. |
| 09:41:11 | 17 | Mr. Umina, you may call your next witness. |
| 09:41:13 | 18 | MR. UMINA:  Plaintiff calls Mr. Rick Rhoades. |
| 09:41:22 | 19 | RICK RHOADES, PLAINTIFF'S WITNESS, SWORN |
| 09:42:10 | 20 | THE COURT:  Mr. Rhoades, if you wouldn't mind |
| 09:42:13 | 21 | stepping forward. |
| 09:42:33 | 22 | Mr. Rhoades, sir, if you wouldn't mind stepping |
| 09:42:35 | 23 | forward and pausing here before Madam Clerk so she can swear |
| 09:42:40 | 24 | you in.  Thank you. |
| 09:44:48 | 25 | Mr. Rhoades, can you hear me okay, sir?  Mr. Rhoades, |

09:44:59  1   can you hear me?

09:44:59  2        (Off the record due to technical issues with

09:44:59  3   hearing-assist device.)

09:46:03  4                     DIRECT EXAMINATION

09:46:03  5   BY MR. UMINA

09:46:03  6   Q.   Mr. Rhoades, can you please introduce yourself to the

09:46:05  7   jury.

09:46:06  8   A.   My name is Rick Rhoades.  I live in Wyatt, West Virginia.

09:46:12  9   Q.   And Rick, are you still working, retired?  What do you do

09:46:18  10  for a living?

09:46:20  11  A.   They aren't working again.

09:46:23  12  Q.   How is that?  How is that?  How about now?

09:46:41  13  A.   Now they are working again.

09:46:43  14  Q.   Can you hear that?

09:46:52  15             THE COURT:  I assume we have run through all of our

09:46:56  16  headsets at this point?

09:46:58  17             Try again, Mr. Umina.

09:47:02  18  A.   It will quit in a minute.

09:47:03  19  Q.   Okay.  Well, we will do the best that we can.  And if you

09:47:07  20  can't hear my question, just raise your hand.

09:47:16  21  A.   Now I can hear again.

09:47:17  22  Q.   All right.  Rick, why don't we just start off, you know,

09:47:23  23  with you raising your son.  Rick, where were you at 32 years

09:47:27  24  ago yesterday?

09:47:29  25  A.   It's not working again.  It's got a short in it.

09:47:37  1    Q.   How about now?

09:47:38  2    A.   I can hear right at this moment, yeah.

09:47:40  3    Q.   Okay.  Rick, can you tell the jury where you were

09:47:45  4    32 years ago yesterday?

09:47:47  5    A.   I was in Stuart, Florida.  It was the day my son Jontz

09:47:57  6    was born.

09:47:57  7    Q.   So Philip, it was the day he was born?

09:48:01  8    A.   Yeah, Philip Jontz.

09:48:03  9    Q.   Rick, you know, you understand why we are here.  And what

09:48:10  10   we are going to explain to the jury is about you raising your

09:48:16  11   son, and Jontz's life.  Can you tell the jury just your

09:48:20  12   experience in raising that little boy and watching him grow

09:48:24  13   up.

09:48:25  14   A.   Yeah, he was my little buddy.  And when he was little, he

09:48:37  15   was scared to death of the hootin' hen and said it was a

09:48:44  16   nootin' nanny.  He was scared to death of the nootin' nanny.

09:48:50  17   Then he was scared of the wampus cat, but he was basically a

09:48:55  18   good boy, and I loved him very much.  He was comical.  He

09:49:00  19   liked to make people laugh.

09:49:04  20        And he and Kaleb, they were just about inseparable when

09:49:13  21   they were little.  They played together all the time.  We had

09:49:16  22   a big tree in our yard and it was really shady under and it

09:49:20  23   was nice and cool.  And him and his brother played with cars

09:49:24  24   under that every day.  And before Kaleb started school, he

09:49:30  25   would prepare everything, make roads and everything, and he

09:49:33   1   would run out the end of our driveway and look and see if
09:49:37   2   Jontz was coming.  And finally when Jontz came, he would run
09:49:41   3   out to meet him, and when they come in there, no matter what
09:49:44   4   car Jontz picked up, he picked up the wrong one and Kaleb
09:49:49   5   messed it all up, and it would start all over again,
09:49:51   6   rebuilding the whole thing.
09:49:55   7   Q.   How far apart in age are Kaleb and Jontz?
09:50:00   8   A.   Repeat the question.
09:50:02   9   Q.   How much age difference is there between Kaleb and
09:50:07   10  Philip?
09:50:08   11  A.   A little over two years.
09:50:09   12  Q.   So can you describe their relationship, you know, growing
09:50:12   13  up as kids, as brothers?
09:50:14   14  A.   Oh, I tell you, they loved each other.  I mean, they
09:50:18   15  fought with each other, but what brothers -- all brothers do
09:50:21   16  that.  But, yeah, they were always together.  When I -- we had
09:50:28   17  a construction company down there.  When I take the boys to
09:50:31   18  work with me -- but I wouldn't take them at the same time,
09:50:34   19  because they were scared to death one of them was going to do
09:50:38   20  more work than the other, so I would take them one at a time.
09:50:41   21  They each got a turn.  And we had our own company so I paid
09:50:47   22  them good money.  I give them 40 dollars per day's work.  But
09:50:52   23  they earned it, because they learned to work.  They were hard
09:50:55   24  workers.
09:50:58   25  Q.   And as, you know, Philip grew up, did he continue to do

09:51:05   1   that kind of work, or work with you in that regard?

09:51:08   2   A.   He sure did.  He helped me remodel my house.  And he was

09:51:14   3   one of the few people that I know that got a job.  He was

09:51:19   4   hired on.  Before he got his paycheck on Friday, he got three

09:51:23   5   raises because the guy did not want -- he did not want to lose

09:51:28   6   him because he was such a good worker.

09:51:31   7   Q.   What kind of talents did Philip have that you saw as his

09:51:37   8   father when he was growing up and as he became an adult?

09:51:39   9   A.   He was an artist.  And he just adapted to construction

09:51:46   10  work on his own.  He loved to do it, and also he was an

09:51:49   11  excellent roofer, and he liked to do that, too, and he was not

09:51:54   12  lazy whatsoever.

09:51:59   13  Q.   Now, did your son grow up and get married?

09:52:06   14  A.   Pardon?

09:52:07   15  Q.   Did your son have the opportunity to grow up and get

09:52:10   16  married?

09:52:10   17  A.   Oh, yes.  He married Christy, and they had two beautiful

09:52:17   18  boys.

09:52:19   19  Q.   Rick, in this case, the jury's not going to have the

09:52:27   20  opportunity to hear from the boys, and we have talked about

09:52:30   21  that.  But can you talk to the jury, please, about Philip's

09:52:39   22  relationship as a father with his sons?

09:52:43   23  A.   Well, his sons especially the oldest one, Levi, adored

09:52:49   24  his daddy.  I mean, his daddy was his hero.  And he loved to

09:52:55   25  play chess with his daddy, and we shot guns.  We had a place

409

| | |
|---|---|
| 09:53:00 | 1 |
| 09:53:03 | 2 |
| 09:53:11 | 3 |
| 09:53:17 | 4 |
| 09:53:19 | 5 |
| 09:53:22 | 6 |
| 09:53:27 | 7 |
| 09:53:27 | 8 |
| 09:53:34 | 9 |
| 09:53:37 | 10 |
| 09:53:42 | 11 |
| 09:53:51 | 12 |
| 09:53:56 | 13 |
| 09:53:58 | 14 |
| 09:54:02 | 15 |
| 09:54:05 | 16 |
| 09:54:14 | 17 |
| 09:54:23 | 18 |
| 09:54:27 | 19 |
| 09:54:32 | 20 |
| 09:54:36 | 21 |
| 09:54:42 | 22 |
| 09:54:47 | 23 |
| 09:54:52 | 24 |
| 09:54:57 | 25 |

where we shot guns, and he loved to shoot 22s with his daddy
and with all of us.  And he is left-handed and he was a real
good shot.  And Philip shoots, too, but he is not into it like
Levi is, but he is younger.

Q.   Can you talk -- you mentioned playing chess.  Can you
tell the jury a little bit about Philip playing chess with his
son?

A.   Oh, yeah.  We taught Levi how to play chess at a young
age.  He wanted to learn how to play at five years old.  And
by the time he was eight years old he was beating adults.  And
when his dad got out of jail the last time, if we -- Levi and
Kaleb and Jontz would always play chess, and boy, if Levi got
the chance when his daddy was going to play and he would
tremble he would be so excited about it, because he loved
playing with his daddy.

Q.   Can you talk a little bit about, you know, if the boys
would come to your house, what they would do with Philip and,
you know, what kind of activities they would do together?

A.   Well, they all -- every one of them got motorcycles or
four wheelers, they are the small ones, and they would come to
the house, we got a big yard and they spent hours out there in
the yard riding them things.

Q.   Do the boys visit your house often now?

A.   Oh, yeah.  They are there all the time.

Q.   What can you tell the jury about the effect that Philip's

09:55:02  1    death has had on those boys?

09:55:05  2    A.   Well, it didn't -- Philip, the youngest one, was real

09:55:12  3    young when it happened, but Levi -- I was trying to get Levi's

09:55:18  4    mind off it one day and we was playing chess, and all of the

09:55:23  5    sudden, he looked up and he started crying and he said, I will

09:55:29  6    never see my daddy again.  And he was just a little -- he was

09:55:38  7    nine years old when his daddy was killed.

09:55:42  8    Q.   Have you seen this death have an effect on those boys in

09:55:48  9    their day-to-day life?

09:55:50  10   A.   Yeah.  It's affected their lives.  Levi, well, like

09:55:56  11   yesterday, every year on his birthday, we let off balloons

09:56:01  12   and, of course, we weren't able to do that this time but we

09:56:04  13   are going to do it later, you know.  Like this year would have

09:56:09  14   been 32 balloons, and we fill them up with helium gas and tie

09:56:15  15   strings around them and the boys all write messages on them

09:56:20  16   like, daddy, I miss you; daddy, I love you.  And I got four

09:56:25  17   grandsons, so all of them do it.  And then we take them up on

09:56:29  18   the hill besides where Jontz's and Christy's trailer was and

09:56:33  19   we let them loose.

09:56:39  20   Q.   Rick, can you explain to the jury how this death has

09:56:48  21   affected you as Philip's father?

09:56:53  22   A.   Well, when it happened, I was literally in shock for two

09:56:58  23   days.  I couldn't sleep.  I couldn't eat.  And I know Kaleb

09:57:04  24   would come in my room, and we would sit on the bed with our

09:57:14  25   arms around each other and just cry and cry.  And Kaleb asked

09:57:22  1    me, "Why, dad?  Why did this have to happen?"

09:57:29  2    Q.  I hate to ask you this question.  I think it's something

09:57:39  3    that the jury needs to understand.  Can you explain to them

09:57:46  4    what it was like to have to be a father burying your son?

09:57:51  5    A.  Well, it's something that parents do not expect to do,

09:57:56  6    believe me.  And we got a memorial set up inside our house for

09:58:05  7    Jontz.  And I think that's when it first hit little Philip

09:58:08  8    that his daddy was gone, when we set that memorial up.  And he

09:58:12  9    started crying and he said, "My daddy is gone, ain't he?"

09:58:18  10   Yeah, it's hard.

09:58:22  11   Q.  What was the funeral like for you?

09:58:26  12   A.  Believe it or not, the funeral home was full of people.

09:58:31  13   My relatives, Christy's relatives, friends and neighbors from

09:58:36  14   where we -- up around where we live at.  And then after the

09:58:42  15   funeral, we had a little get-together at Danny Wallace's house

09:58:49  16   where Danny and his wife, they prepared a feast for everybody,

09:58:51  17   I mean, all kind of food for everybody.  And we all went down

09:58:56  18   there.  And then after we left there we went to where Christy

09:59:00  19   was staying at the time.

09:59:03  20   Q.  Rick, have you visited the scene where your son was

09:59:10  21   killed?

09:59:10  22   A.  We go regularly over there.  We have three crosses set up

09:59:15  23   there, and we put flowers in every year, and we -- usually all

09:59:21  24   of us go; Christy, Kaleb, and the boys.

09:59:29  25   Q.  What are those visits like for his children, and his

| | | |
|---|---|---|
| 09:59:34 | 1 | brother, and for you and the family? |
| 09:59:36 | 2 | A.   Well, we all think about, you know, what it was like for |
| 09:59:41 | 3 | Jontz there.  That was the last time he was on this earth and |
| 09:59:46 | 4 | we went over there when he was killed, and I told the boys, I |
| 09:59:51 | 5 | said, "This here is the last thing your daddy seen before he |
| 09:59:55 | 6 | was killed." |
| 09:59:57 | 7 | Q.   Is it hard for you all? |
| 09:59:59 | 8 | A.   Pardon. |
| 10:00:00 | 9 | Q.   Is it difficult to be there? |
| 10:00:02 | 10 | A.   Yes, it is. |
| 10:00:10 | 11 | Q.   Rick, I want you to talk to the jury just a little bit |
| 10:00:20 | 12 | about the things that his sons will miss out on knowing who |
| 10:00:29 | 13 | Philip was growing up, knowing what his talents were, what his |
| 10:00:34 | 14 | children won't get to experience as they grow up. |
| 10:00:37 | 15 | A.   Well, he won't have his sons there to teach them how to |
| 10:00:43 | 16 | do carpentry work.  And myself, I am getting a little bit too |
| 10:00:47 | 17 | old to do it.  But I taught Jontz and I taught Kaleb. |
| 10:00:51 | 18 | Actually, I taught all of my sons except for my youngest son, |
| 10:00:55 | 19 | Seth.  He was taken away from me when he was five, and really |
| 10:01:01 | 20 | I haven't had much time with him because we just get him for a |
| 10:01:05 | 21 | few weeks in the summer time.  But I taught every one of my |
| 10:01:09 | 22 | boys.  And I am sure Jontz was looking forward to doing that |
| 10:01:12 | 23 | to his kids. |
| 10:01:14 | 24 | Q.   You said Seth is Jontz's brother.  Is that his youngest |
| 10:01:19 | 25 | brother? |

| | |
|---|---|
| 10:01:19 | 1 |
| 10:01:21 | 2 |
| 10:01:24 | 3 |
| 10:01:24 | 4 |
| 10:01:30 | 5 |
| 10:01:34 | 6 |
| 10:01:38 | 7 |
| 10:01:45 | 8 |
| 10:01:48 | 9 |
| 10:01:51 | 10 |
| 10:01:55 | 11 |
| 10:01:56 | 12 |
| 10:02:01 | 13 |
| 10:02:06 | 14 |
| 10:02:13 | 15 |
| 10:02:20 | 16 |
| 10:02:25 | 17 |
| 10:02:26 | 18 |
| 10:02:33 | 19 |
| 10:02:37 | 20 |
| 10:02:43 | 21 |
| 10:02:48 | 22 |
| 10:02:52 | 23 |
| 10:02:55 | 24 |
| 10:02:59 | 25 |

A.    Seth is the youngest brother, yes.

Q.    When you said, "taken away from," he went to live with who?

A.    His mother.  His mother took him, and she left me a note in our house and said I could have custody of Jontz and Kaleb. She did not want them.  She just wanted Seth.  And there was another time me, Jontz, and Kaleb stood in the room with our arms around each other crying.  And I told them, I said, "Boys, your dad will never leave you."

Q.    Did you ever expect Philip to have to leave you in this way?

A.    No.  I thought about that many times, though.

Q.    It's okay, Rick, you can tell the jury exactly how you feel about this.  Don't hold back.  Rick, is there anything else that you would like to say to the jury about the loss to you, and his sons, and his brother, and the rest of the family?

A.    Well, I know Jontz was -- he was a big help to my parents.  He built a porch.  He loved my dad, and he built a great big porch for my dad.  And I think it was 2010, and he was only 20 years old and he built that porch all by hisself because my dad because was too old to help him at the time, and I had to work.  I mean, it was -- big beams and everything, he had to put up by hisself, and he was just -- Jontz just knew how to do stuff like that.  And my dad wanted

10:03:04  1   hardwood floors put in his house and Jontz went in, pulled all
10:03:09  2   the carpet up, and moved all the furniture by hisself, and put
10:03:13  3   the hardwood floors in there.  And he did the hardwood floors
10:03:20  4   in our house, too.  He was only 17 years old when he did them.
10:03:28  5   Q.  Rick, anything else about the emotional toll that you
10:03:32  6   have seen the children go through, or that you, yourself, or
10:03:37  7   any other members of the family, are experiencing?
10:03:39  8   A.  Well, something that I know, I talk about him all the
10:03:49  9   time.  One of my friends, she lost her daughter, and she lost
10:03:55  10  her daughter about the time that I lost Jontz.  And I know me
10:03:59  11  and her have a lot in common because of that.  And she told me
10:04:03  12  that she knows how I feel.  And, of course, I know how she
10:04:07  13  feels because we both went through losing a child.
10:04:13  14  Q.  Thank you, Rick.
10:04:14  15         MR. UMINA:  I have no further questions.
10:04:16  16         THE COURT:  Thank you, Mr. Umina.
10:04:18  17     Mr. Carroll, sir.
10:04:19  18         MR. CARROLL:  Your Honor, may we approach?
10:04:21  19         THE COURT:  You may.
10:05:48  20     (Bench conference outside the hearing of the jury.)
10:05:48  21         MR. CARROLL:  Your Honor, the Court made prior
10:05:48  22  rulings about past criminal history.  We just heard clear
10:05:48  23  testimony from Mr. Rhoades about, quote, when he got out of
10:05:48  24  jail the last time.  I clearly believe that opened the door.
10:05:48  25         THE COURT:  It wasn't a question that opened the

| 10:05:48 | 1 | door.  It was an utterance from a witness, so no.  That is -- |
| 10:05:48 | 2 | the Court's full-effect order remains. |
| 10:05:48 | 3 | MR. CARROLL:  Out of jail two and a half years, and |
| 10:05:48 | 4 | did go to jail prior to that.  Thank you, Your Honor. |
| 10:05:48 | 5 | (Bench conference concluded, and the following transpired |
| 10:05:56 | 6 | in open court.) |
| 10:05:56 | 7 | THE COURT:  You may proceed whenever you are ready. |
| 10:05:58 | 8 | I encourage you to use the microphone. |
| 10:06:13 | 9 | CROSS-EXAMINATION |
| 10:06:13 | 10 | BY MR. CARROLL: |
| 10:06:13 | 11 | Q.  Mr. Rhoades, can you hear me okay at this time? |
| 10:06:15 | 12 | A.  Yes. |
| 10:06:16 | 13 | Q.  Mr. Rhoades, you provided some testimony a moment ago |
| 10:06:21 | 14 | that you took your sons with you to work in construction work; |
| 10:06:24 | 15 | is that correct? |
| 10:06:25 | 16 | A.  Yes. |
| 10:06:26 | 17 | Q.  And was that while you were living in Florida? |
| 10:06:29 | 18 | A.  Yes. |
| 10:06:30 | 19 | Q.  Okay.  And the last time that you lived in Florida with |
| 10:06:33 | 20 | your sons, was that around 2010, 2011? |
| 10:06:37 | 21 | A.  2005. |
| 10:06:38 | 22 | Q.  2005.  Thank you.  And was Philip Rhoades employed at the |
| 10:06:45 | 23 | time of his death? |
| 10:06:46 | 24 | A.  No. |
| 10:06:48 | 25 | Q.  And do I understand correctly that Philip Rhoades was |

10:06:54  1    separated from his wife, Christy, at the time of his death?

10:06:57  2    A.   Yes.

10:06:58  3    Q.   Okay.   What time did they separate?

10:07:01  4    A.   I think it was around 2013, somewhere around there.

10:07:06  5    Q.   And is it fair to say that Christy Rhoades had primary

10:07:10  6    custody over Philip Rhoades' children at that time?

10:07:15  7    A.   Yes, I am sure she did.

10:07:19  8    Q.   Is it fair to say that Philip Rhoades' children did not

10:07:26  9    stay overnight with him at his residence any time after

10:07:29  10   Christy and Philip Rhoades separated?

10:07:33  11   A.   No, that's not correct.   In the last few weeks, he

10:07:36  12   didn't.

10:07:37  13   Q.   And then I want to make sure you understand my question.

10:07:40  14   Is it a fair statement that Philip Rhoades' and Christy

10:07:46  15   Rhoades' two boys did not stay at Philip Rhoades' trailer

10:07:51  16   after they separated?

10:07:53  17   A.   No, they didn't stay there, but they have spent the night

10:07:56  18   there.   But they stayed at our house most of the time because

10:08:01  19   I have cable TV and they could watch cartoons.

10:08:07  20        MR. CARROLL:   Thank you, Your Honor.   I've no further

10:08:08  21   questions for this witness.

10:08:09  22        THE COURT:   Thank you very much.

10:08:11  23      Mr. Umina, anything further for Mr. Rhoades?

10:08:13  24        MR. UMINA:   Just a couple questions.

          25

| | |
|---|---|
| 10:08:14 | 1 |
| 10:08:16 | 2 |
| 10:08:16 | 3 |
| 10:08:19 | 4 |
| 10:08:22 | 5 |
| 10:08:23 | 6 |
| 10:08:27 | 7 |
| 10:08:34 | 8 |
| 10:08:35 | 9 |
| 10:08:37 | 10 |
| 10:08:42 | 11 |
| 10:08:45 | 12 |
| 10:08:49 | 13 |
| 10:08:56 | 14 |
| 10:09:00 | 15 |
| 10:09:04 | 16 |
| 10:09:09 | 17 |
| 10:09:13 | 18 |
| 10:09:17 | 19 |
| 10:09:21 | 20 |
| 10:09:26 | 21 |
| 10:09:30 | 22 |
| 10:09:37 | 23 |
| 10:09:40 | 24 |
| 10:09:48 | 25 |

THE COURT:  Sure.

REDIRECT EXAMINATION

BY MR. UMINA:

Q.   Rick, you were just asked -- can you hear me?

A.   Yeah.

Q.   You were just asked if Philip was working at the time of his death.  And you said no.  Why wasn't Philip working at the time of his death?

A.   He didn't have transportation, and he didn't have a driver's license, and we live in a remote area of West Virginia.

Q.   Was he working in the months leading up to that?

A.   When he first got out of jail, he worked for John Hamrick, a friend of ours, and they worked in Morgantown.  And John Hamrick would come and get him every morning.  But John Hamrick, after he got off work, he liked to go to bars.  And Jontz didn't want to go to bars.  He wanted to come home.  And John Hamrick would stay at the bars 'til -- they, before he come home, and Jontz just didn't want to do that, so Jontz quit.  But Jontz started working at Enterprise for a while with a guy named Dave.  But I think Dave's truck broke down or something, and they had to quit working until Dave could get his truck fixed.  He just never heard from Dave again.

Q.   Rick, how far is your house from where Jontz's house was?

A.   I don't know, maybe -- probably not even a hundred feet.

| | | |
|---|---|---|
| 10:09:56 | 1 | Q.   Is it located on the same property? |
| 10:09:58 | 2 | A.   Oh, yes. |
| 10:09:59 | 3 | Q.   Thank you, Rick.  Those are all the questions I have. |
| 10:10:02 | 4 | THE COURT:  Thank you. |
| 10:10:02 | 5 | Mr. Carroll, anything further of Mr. Rhoades? |
| 10:10:05 | 6 | MR. CARROLL:  Nothing, Your Honor. |
| 10:10:06 | 7 | THE COURT:  May Mr. Rhoades be excused, Mr. Umina? |
| 10:10:09 | 8 | MR. UMINA:  Yes, Your Honor. |
| 10:10:10 | 9 | THE COURT:  Mr. Carroll. |
| 10:10:11 | 10 | MR. CARROLL:  Yes, Your Honor. |
| 10:10:12 | 11 | THE COURT:  Mr. Rhoades, sir, thank you very much. |
| 10:10:13 | 12 | You can step down. |
| 10:10:37 | 13 | Madam Clerk, can I trouble you to sanitize our witness |
| 10:10:39 | 14 | stand, please? |
| 10:10:48 | 15 | Mr. Umina, you may advise your next witness they will |
| 10:10:50 | 16 | be ready to testify here in a second. |
| 10:10:53 | 17 | MR. UMINA:  Next witness will be Christy Rhoades. |
| 10:10:56 | 18 | THE COURT:  Thank you very much.  Ms. Rhoades, we |
| 10:10:57 | 19 | will be right with you. |
| 10:11:36 | 20 | THE COURT:  Thank you, Madam Clerk. |
| 10:11:40 | 21 | Mr. Umina, you may call your next witness. |
| 10:11:43 | 22 | MR. UMINA:  The plaintiff calls Christy Rhoades, Your |
| 10:11:43 | 23 | Honor. |
| 10:11:46 | 24 | THE COURT:  Ms. Rhoades, you can step forward and |
| 10:11:46 | 25 | pause here before Madam Clerk, so she can swear you in, |

10:11:48  1    please.

10:11:49  2              CHRISTY J. RHOADES, PLAINTIFF'S WITNESS, SWORN

10:12:09  3              THE COURT:  Thank you very much.  As soon as you are

10:12:12  4    comfortable, if I may trouble you to adjust that microphone.

10:12:14  5    You can remove your mask whenever you are ready.

10:12:16  6         Mr. Umina, you may proceed whenever you are ready, sir.

10:12:19  7                        DIRECT EXAMINATION

10:12:19  8    BY MR. UMINA:

10:12:20  9    Q.   Christy, can you please state your name for the jury?

10:12:23  10   A.   Christy Jeannette Rhoades.

10:12:25  11   Q.   Christy, I want to discuss with you at the outset how you

10:12:29  12   became the administratrix of this estate.  So we know that you

10:12:36  13   and Philip had separated before his death, correct?

10:12:42  14   A.   Yes.

10:12:42  15   Q.   Okay.  And at the time of his death, were the two of you

10:12:48  16   still lawfully married?

10:12:49  17   A.   Yes, we were.

10:12:51  18   Q.   They asked a question about a custody arrangement.  Was

10:12:56  19   there ever a custody agreement between the two of you?

10:12:59  20   A.   No.  We didn't have a custody agreement.

10:13:02  21   Q.   Because you two were still married, correct?

10:13:04  22   A.   Right.

10:13:05  23   Q.   Okay.  Christy, do you recall why it w-as you who was

10:13:16  24   required to serve as the administratrix of Philip's estate?

10:13:21  25   A.   Well, I tried to let my brother-in-law do that, which

10:13:28  1   they acted like they never heard of that before.  But they

10:13:32  2   told me that I would have to wait so long before I could give

10:13:37  3   it to my brother-in-law, so I did it so we could, you know --

10:13:45  4   Q.   Can you talk to -- tell the jury how these -- this

10:13:58  5   investigation into and ultimately a lawsuit came to be after

10:14:05  6   -- start at the moment everyone found out he was killed.

10:14:09  7   A.   I don't understand what you are asking me.

10:14:11  8   Q.   In terms of the family reaching out to me in this regard.

10:14:20  9   A.   Why did we?

10:14:22 10   Q.   Exactly.  Yes.

10:14:23 11   A.   Well, I found out on Facebook that Jontz had been shot.

10:14:35 12   My father-in-law couldn't even find out whether or not he was

10:14:38 13   dead.  I called the state police, and they told me there is no

10:14:44 14   obligation to tell me anything.  And Marion County wouldn't

10:14:49 15   even talk to me.  We knew absolutely nothing.  And then the

10:14:55 16   coroner called my father-in-law at 6:00 that evening, and told

10:15:00 17   him that he had his son.  And Rick said that he didn't get to

10:15:08 18   identify him or anything.  And he said, "I promise it's

10:15:13 19   Philip."  And that's just all we were given.  We knew nothing.

10:15:19 20   No reason behind it.  Nothing.  So Rick went and met Ryan.

10:15:29 21   Q.   Do you recall what happened after that, Christy?

10:15:41 22   A.   We had to meet at the funeral home where I had to go sign

10:15:47 23   papers and stuff with my uncle.  I had to cremate Jontz after

10:15:55 24   making a promise to our boys that they would get to say

10:15:58 25   good-bye to him.

| | | |
|---|---|---|
| 10:16:03 | 1 | Q.   It's okay if you need a minute, Christy. |
| 10:16:14 | 2 | A.   That was the first time that we met Ryan, was at the |
| 10:16:17 | 3 | funeral home.  We waited almost two weeks for them to send |
| 10:16:34 | 4 | back Jontz's ashes before we could have a memorial.  And that |
| 10:16:40 | 5 | happened back in-between my sons' birthdays and August. |
| 10:16:53 | 6 | Q.   I know it's tough, Christy.  How old were Philip and Levi |
| 10:17:02 | 7 | when their father was killed? |
| 10:17:14 | 8 | A.   They were nine and six when he was killed.  Philip turned |
| 10:17:23 | 9 | seven.  I had Jontz's memorial service and Levi turned ten. |
| 10:17:34 | 10 | Q.   How far between the children's birthdays was the funeral? |
| 10:17:38 | 11 | A.   Philip's birthday is the 18th.  We had the service on the |
| 10:17:43 | 12 | 20th or the 21st, I don't remember, and my birthday is the |
| 10:17:48 | 13 | 26th, and then they (indiscernible) is the 28th. |
| 10:17:53 | 14 | Q.   Of August? |
| 10:17:54 | 15 | A.   Yes. |
| 10:17:54 | 16 | Q.   I know it's hard for Rick to talk about it, but can you |
| 10:18:08 | 17 | tell the jury the effect you have seen since the funeral and |
| 10:18:19 | 18 | through now that this death has had on Rick Rhoades? |
| 10:18:39 | 19 | A.   Even though most people say they don't have favorites, |
| 10:18:43 | 20 | and Rick has six kids, so he says that as well.  Jontz was his |
| 10:18:48 | 21 | favorite and everybody knew it.  He didn't hide it from |
| 10:18:51 | 22 | anybody.  I honestly thought we were going to lose him, too. |
| 10:19:04 | 23 | Q.   Christy, do you still see Rick often? |
| 10:19:09 | 24 | A.   Every day. |
| 10:19:16 | 25 | Q.   Christy, what effect have you seen this have on Kaleb and |

10:19:21  1    the rest of the family?

10:19:28  2    A.   Kaleb has probably taken it the hardest.  Him and Jontz

10:19:33  3    were really close.  And they had an argument just days before,

10:19:39  4    and KK never got to tell him he was sorry.  And he had a

10:19:46  5    really hard time with it, especially yesterday on his

10:19:49  6    birthday.  He's always real distant and stays away from

10:19:54  7    everybody.  Kind of surprises me that he was here.

10:20:07  8    Q.   Christy, we talked about how you became, you know,

10:20:10  9    administratrix of this estate.  Who did you bring this lawsuit

10:20:19  10   on behalf of?

10:20:21  11   A.   For my boys, for Jontz, because he wouldn't turn his back

10:20:28  12   on me.

10:20:33  13   Q.   I know this is very difficult to talk about, Christy.

10:20:41  14   Can you tell the jury, and just talk to them and tell them how

10:20:49  15   you have seen Philip's death affect your children and what

10:20:54  16   they have gone through.

10:21:04  17   A.   Levi knew something was wrong as soon as he got home.  I

10:21:08  18   sat down and put him and Philip on the couch, and he just

10:21:12  19   started saying, "No, mommy."  And I couldn't even choke out

10:21:18  20   the words to tell him.  And my mom tried to and she said that

10:21:34  21   daddy wasn't coming home, and Levi jumped up away from me and

10:21:41  22   he said, "You are lying mommy.  You are lying," and he started

10:21:44  23   screaming at me.  And I tried to hug him and he said, "No, I

10:21:49  24   just want to tell my daddy I love him.  Please mommy, please

10:21:55  25   let me tell daddy I love him," and that's when I made the

| | |
|---|---|
| 10:21:59 | 1 |
| 10:22:02 | 2 |
| 10:22:07 | 3 |
| 10:22:15 | 4 |
| 10:22:20 | 5 |
| 10:22:24 | 6 |
| 10:22:36 | 7 |
| 10:22:40 | 8 |
| 10:22:46 | 9 |
| 10:22:53 | 10 |
| 10:22:56 | 11 |
| 10:23:05 | 12 |
| 10:23:15 | 13 |
| 10:23:20 | 14 |
| 10:23:23 | 15 |
| 10:23:30 | 16 |
| 10:23:39 | 17 |
| 10:23:41 | 18 |
| 10:23:46 | 19 |
| 10:23:50 | 20 |
| 10:23:55 | 21 |
| 10:23:59 | 22 |
| 10:24:03 | 23 |
| 10:24:07 | 24 |
| 10:24:16 | 25 |

promise that he could get to, at least, say good-bye; that it wouldn't be the same, but he would get to tell daddy good-bye. I didn't realize that I was going to have to cremate him.

My son is 13 now, and he still won't mention his dad. There is very, very few times that he does, and when he does, it's not with me. And Philip was so little, that he remembers Jontz, he has a hard time, but there is just certain times that it really bothers him. But Levi is all the time. And he used to be such a sweet little boy, and now he is mean. He is even mean to me. And I know he doesn't mean it towards me and stuff, but I couldn't imagine.

Q. Do you think that, you know, the change in Levi that you have seen is a result of his father's death?

A. Absolutely.

Q. When he does talk about it, what is that -- like, how -- I mean, how does he emotionally appear?

A. If I am around he cries. He leaves the room. He doesn't talk about Jontz in front of me ever. I think he is scared of making me cry.

Q. Do you ever go with the family and the kids and do things to memorialize Philip's death?

A. Oh, yeah. I am the one that started the balloon release and stuff, and I had the crosses made that we put up there, where he died at. I go out there almost every day by myself. One of my biggest regrets is leaving him. I just always

424

| | |
|---|---|
| 10:24:29 | 1 |
| 10:24:37 | 2 |

10:24:29  1   figured that we would get back together.  Who knew he wasn't
10:24:37  2   going to be here.
10:24:46  3   Q.   Christy, you know, at the time of his death, you know,
10:24:52  4   you two, you know, you were separated; is that right?
10:24:55  5   A.   Yes, we were.
10:24:56  6   Q.   And you two were both in, you know, other relationships?
10:25:01  7   A.   Yes.
10:25:03  8   Q.   Did you ever stop caring about Philip?
10:25:06  9   A.   No.  I still love him more than anything.
10:25:22 10   Q.   Christy, I'm going to just stop there.  I know this is
10:25:25 11   very difficult for you.  Thank you.
10:25:25 12        THE COURT:  Thank you, Mr. Umina.
10:25:32 13        Ms. Durst.
10:25:33 14        MS. DURST:  Thank you, Your Honor.
10:25:33 15                    CROSS-EXAMINATION
10:25:33 16   BY MS. DURST:
10:25:56 17   Q.   Good morning, ma'am.
10:25:56 18   A.   Good morning.
10:25:57 19   Q.   Are you okay to proceed?
10:25:59 20   A.   Yeah.
10:25:59 21   Q.   Sorry.
10:26:01 22        THE COURT:  Thank you, Ms. Durst.  The Clerk was
10:26:02 23   advising me, Your Honor.
10:26:04 24   BY MS. DURST:
10:26:05 25   Q.   Ms. Rhoades, you just testified on the questions from

10:26:09   1   Mr. Umina, that you and Mr. Rhoades were still legally married

10:26:13   2   on August 2nd of 2017; is that correct?

10:26:15   3   A.   Yes, ma'am.

10:26:16   4   Q.   Okay.  Even though you were still legally married to

10:26:20   5   Mr. Rhoades, you were in a relationship with another gentlemen

10:26:24   6   by the name of Todd Stevens; is that correct?

10:26:26   7   A.   Yes.

10:26:27   8   Q.   And you were actually living with Mr. Stevens, on

10:26:31   9   August 2nd of 2017, at a place in Joetown in Marion County; is

10:26:36  10   that correct?

10:26:38  11   A.   Yes.

10:26:39  12   Q.   And your two boys, Levi and Philip, were actually living

10:26:43  13   there with you and Mr. Stevens; is that right?

10:26:46  14   A.   Yes.

10:26:47  15   Q.   And during this time that you were in a relationship with

10:26:54  16   Mr. Stevens, you actually had a child by him, correct,

10:26:58  17   another -- a young daughter, Gabriella?

10:27:02  18   A.   Yes, I did.  And he told me if I wanted to come home, I

10:27:06  19   could still come home and he would be her dad.

10:27:08  20   Q.   Well, we will talk about that in a second.  So you would

10:27:12  21   have still had Gabriella Stevens by Todd Stevens while you

10:27:17  22   were still legally married to Philip Rhoades, right?

10:27:20  23   A.   Yes.

10:27:20  24   Q.   Okay.  And you and Mr. Rhoades stopped living together as

10:27:26  25   husband and wife around 2013 or 2014; is that correct?

| | | |
|---|---|---|
| 10:27:31 | 1 | A.   Yes. |
| 10:27:32 | 2 | Q.   And, in fact, you actually left Mr. Rhoades; is that |
| 10:27:37 | 3 | right? |
| 10:27:37 | 4 | A.   Yes. |
| 10:27:38 | 5 | Q.   And after you left Mr. Rhoades, you never moved back in |
| 10:27:44 | 6 | with him at any point in time from either 2013 or 2014 up |
| 10:27:48 | 7 | until the time of his death; is that right? |
| 10:27:51 | 8 | A.   Yes. |
| 10:27:54 | 9 | Q.   And you just testified, I think you said one of your |
| 10:27:57 | 10 | biggest regrets was leaving Mr. Rhoades; is that right? |
| 10:28:01 | 11 | A.   Yes.  I will regret it 'til the day I die. |
| 10:28:04 | 12 | Q.   But not only did you not move back in with Mr. Rhoades |
| 10:28:07 | 13 | after the two of you separated, you never got back with him at |
| 10:28:11 | 14 | any point in time from the point in time you separated up |
| 10:28:15 | 15 | until his death; is that right? |
| 10:28:22 | 16 | A.   Yes, that's right, but not because I didn't love Jontz. |
| 10:28:26 | 17 | Q.   Well, in fact, isn't it true, Ms. Rhoades, that you |
| 10:28:31 | 18 | hadn't even spoken to Mr. Rhoades in over a year prior to his |
| 10:28:34 | 19 | death? |
| 10:28:37 | 20 |       Isn't that right? |
| 10:28:39 | 21 | A.   Yes, but I saw him.  Yes, that's right. |
| 10:28:48 | 22 | Q.   And you hadn't had any form of communications with him in |
| 10:28:51 | 23 | that year's time, even text communications, up to his death, |
| 10:28:55 | 24 | had you? |
| 10:28:58 | 25 | A.   Jontz never really had a cell phone to text. |

| | | |
|---|---|---|
| 10:29:04 | 1 | Q.   So during the year's time leading up to Mr. Rhoades's |
| 10:29:09 | 2 | passing, you didn't have any communications with him at all; |
| 10:29:12 | 3 | is that right? |
| 10:29:13 | 4 | A.   Right. |
| 10:29:13 | 5 | Q.   And at no point in time after the two of you had |
| 10:29:23 | 6 | separated in either 2013 or 2014, did your boys, Philip and |
| 10:29:29 | 7 | Levi, ever live with their father, did they? |
| 10:29:32 | 8 | A.   They spent half their time up there.  They lived between |
| 10:29:40 | 9 | both houses. |
| 10:29:41 | 10 | Q.   Did they actually live with their father at any point in |
| 10:29:46 | 11 | time after the two of you separated? |
| 10:29:50 | 12 | A.   I guess not, no. |
| 10:29:52 | 13 | Q.   During the period of time from the time you separated in |
| 10:29:58 | 14 | 2013 or 2014, up until August of 2017, you were the one |
| 10:30:05 | 15 | responsible for taking care of the boys; isn't that right? |
| 10:30:08 | 16 | A.   I don't understand what you are asking. |
| 10:30:11 | 17 | Q.   You took care of them, you got them ready for school, you |
| 10:30:15 | 18 | fed them, you clothed them, those kinds of things, didn't you? |
| 10:30:19 | 19 | A.   Yes, I did. |
| 10:30:20 | 20 | Q.   And -- |
| 10:30:21 | 21 | A.   Because I wanted to. |
| 10:30:22 | 22 | Q.   Okay.  And so you were the one, then, during the period |
| 10:30:26 | 23 | of time you separated, up until the point in time that |
| 10:30:30 | 24 | Mr. Rhoades died, you were the one responsible for taking care |
| 10:30:35 | 25 | of the boys, right? |

| | | |
|---|---|---|
| 10:30:36 | 1 | A.   Yes. |
| 10:30:41 | 2 | Q.   And from 2013 or 2014 up through 2017 at the time of his |
| 10:30:49 | 3 | death, Mr. Rhoades was not providing any financial support for |
| 10:30:53 | 4 | the boys, was he? |
| 10:30:54 | 5 | A.   No.  Respectfully, ma'am, I didn't ask Jontz for |
| 10:31:02 | 6 | anything.  Had I, he would have helped me. |
| 10:31:05 | 7 | Q.   Okay.  But even -- these were his boys, right?  They were |
| 10:31:09 | 8 | his two biological sons, correct? |
| 10:31:12 | 9 | A.   Yes. |
| 10:31:12 | 10 | Q.   And because you never asked him, he never provided |
| 10:31:16 | 11 | anything, did he? |
| 10:31:18 | 12 | A.   I wouldn't take it. |
| 10:31:23 | 13 | Q.   You never asked him? |
| 10:31:24 | 14 | A.   I never asked him.  He offered.  I didn't take it. |
| 10:31:27 | 15 | Q.   He never provided any financial support from 2013 or 2014 |
| 10:31:32 | 16 | up until -- |
| 10:31:33 | 17 | A.   No, ma'am, he didn't. |
| 10:31:36 | 18 | Q.   And in 2017, at the time of Mr. Rhoades' death, you were |
| 10:31:40 | 19 | not employed, were you? |
| 10:31:42 | 20 | A.   No, I wasn't. |
| 10:31:44 | 21 | Q.   And we heard -- |
| 10:31:46 | 22 | A.   Oh, yeah.  I was employed.  In 2014 to 2015 I worked at |
| 10:31:56 | 23 | 7-Eleven. |
| 10:31:57 | 24 | Q.   Let me rephrase my question.  Maybe it wasn't clear. |
| 10:32:00 | 25 | That's okay.  At the time of his death, in August of 2017, you |

| | |
|---|---|
| 10:32:04 | 1 |

were not employed, right?

A.   No.

Q.   Okay.  And we have heard Rick Rhoades testify that at
that time as well, Mr. Rhoades, Philip Rhoades, was not
employed either, right?

A.   Right.

Q.   Okay.  And so you actually relied on Todd Stevens, who
you were living with, to help financially take care of your
boys, didn't you, because Mr. Stevens was employed?

A.   No.

Q.   That's not true?

A.   He didn't take care of my kids.

Q.   Did you rely on him financially to help take care of your
boys?

A.   No.  He couldn't take care of my kids.  He paid the rent
at the trailer we lived in, and sometimes he would pay some of
the bills.  I received welfare that bought their clothing, and
I received food stamps to buy their food.  And my mom helped
me with whatever else I needed.

Q.   Ms. Rhoades, do you remember giving a deposition in this
case where I asked you some questions under oath similar to
what we are doing here today?

A.   Yes.

Q.   And you had your attorney present with you, correct?

A.   Yes.

430

| 10:33:08 | 1 | Q.   Okay.  And you were under oath like you are here today, |
| 10:33:12 | 2 | correct? |
| 10:33:12 | 3 | A.   Yes. |
| 10:33:13 | 4 | MS. DURST:  Your Honor, may I approach? |
| 10:33:14 | 5 | THE COURT:  You may. |
| 10:33:20 | 6 | A.   I am unaware of what this is. |
| 10:33:22 | 7 | Q.   I will hand it to you, Ms. Rhoades. |
| 10:33:24 | 8 | THE COURT:  Ms. Rhoades, you will have to wait until |
| 10:33:25 | 9 | there is a question pending.  Okay?  Thank you. |
| 10:33:28 | 10 | BY MS. DURST: |
| 10:33:30 | 11 | Q.   Ms. Rhoades, I have handed you your deposition |
| 10:33:34 | 12 | transcript.  Will you please take a look at it? |
| 10:33:37 | 13 | A.   I did. |
| 10:33:39 | 14 | THE COURT:  Let us know what page and line number you |
| 10:33:42 | 15 | will be referring to. |
| 10:33:44 | 16 | MS. DURST:  Page 39 of the deposition, lines 4 |
| 10:33:48 | 17 | through 6. |
| 10:33:48 | 18 | BY MS. RHOADES: |
| 10:33:50 | 19 | Q.   Do you see that, Ms. Rhoades? |
| 10:33:51 | 20 | A.   Yes. |
| 10:33:54 | 21 | Q.   Okay.  The question:  "Okay.  So Todd was helping take |
| 10:33:56 | 22 | care of you financially?" |
| 10:33:57 | 23 | What was your answer? |
| 10:33:59 | 24 | A.   That says, "Todd's helping me."  You said, Todd took care |
| 10:34:09 | 25 | of my boys. |

10:34:10  1    Q.   I asked if you were relying on Todd financially to help

10:34:14  2    take care of your boys.  Is it your testimony under oath here

10:34:18  3    today that Todd was only helping you financially but not your

10:34:21  4    boys; is that your testimony?

10:34:22  5    A.   No.  That's not how I meant that.

10:34:25  6    Q.   Now, we talked about the fact that you were the one that

10:34:33  7    took care of the boys; clothed them, fed them, got them ready

10:34:38  8    for school, right?

10:34:39  9    A.   Right.

10:34:40  10   Q.   And over the years your boys would have had medical

10:34:44  11   appointments, well child visits, those kinds of things,

10:34:47  12   correct?

10:34:48  13   A.   Correct.

10:34:49  14   Q.   You are the one that took the boys to all of their

10:34:52  15   medical appointments, aren't you?

10:34:54  16   A.   Yes, because I wanted to.

10:34:55  17   Q.   Mr. Rhoades never went to any of their doctors'

10:35:00  18   appointments with them until the time you separated up until

10:35:03  19   his death, did he?

10:35:04  20   A.   No, he didn't.  He didn't before either.  I am their

10:35:06  21   mother.  I took them to doctor and dentist appointments.

10:35:08  22   Q.   Okay.  But after you separated, he never assisted with

10:35:11  23   that at all, did he?

10:35:13  24   A.   No, but he never did prior either.

10:35:16  25   Q.   Okay.  Well, let's talk about aside from regularly

10:35:20  1   scheduled appointments.  Boys have -- they're kids.  They have

10:35:25  2   incidents where they might need urgent care visits.  Your son

10:35:29  3   Philip had to get staples at some point, didn't he?

10:35:33  4   A.   Yes.

10:35:33  5   Q.   And this would have been after you and Mr. Rhoades

10:35:36  6   separated, and before Mr. Rhoades died, right?

10:35:39  7   A.   Yes.

10:35:39  8   Q.   And you were the one that took your son Philip for that

10:35:43  9   medical care, correct?

10:35:44  10  A.   Yes.

10:35:45  11  Q.   You didn't even tell Mr. Rhoades about that at that time,

10:35:49  12  did you?

10:35:50  13  A.   No, I didn't.

10:35:51  14  Q.   From 2013 or 2014 up until 2017, when Mr. Rhoades died,

10:36:00  15  he never went to any parent teacher conferences for the boys

10:36:03  16  at school, did he?

10:36:05  17  A.   No, but I don't go to parent teacher conferences.

10:36:10  18  Q.   Did he go to anything for the boys at the school?

10:36:12  19  A.   I don't recall.

10:36:13  20  Q.   He never -- when -- he may not have been over at -- the

10:36:19  21  boys may not have been over at their grandfather's house --

10:36:23  22  Philip Rhoades never called the boys to talk with them on the

10:36:27  23  phone either, did he?

10:36:29  24  A.   I'm not sure.

10:36:37  25  Q.   So as we sit here today, you're not sure if he called the

| | | |
|---|---|---|
| 10:36:42 | 1 | boys or not?  Is that your testimony? |
| 10:36:43 | 2 | A.  Yes, ma'am, because he didn't call my house.  I didn't |
| 10:36:47 | 3 | have a phone.  My boys stayed with my mother a lot, so I am |
| 10:36:52 | 4 | not sure if they -- he would have called there for them or |
| 10:36:56 | 5 | not. |
| 10:36:57 | 6 | Q.  You have your transcript still there in front of you, Ms. |
| 10:36:59 | 7 | Rhoades.  If you will flip to page 32, line 11.  Do you see |
| 10:37:08 | 8 | the numbered lines on the side again?  Do you see that, |
| 10:37:14 | 9 | Ms. Rhoades? |
| 10:37:14 | 10 | A.  Yes, I saw it. |
| 10:37:16 | 11 | Q.  The question was, "Did he call the boys?"  And what was |
| 10:37:19 | 12 | your answer? |
| 10:37:19 | 13 | A.  "No," that he did not call my home. |
| 10:37:23 | 14 | Q.  Your answer did not say that in your sworn testimony |
| 10:37:26 | 15 | under oath, did it? |
| 10:37:27 | 16 | A.  No, it didn't. |
| 10:37:34 | 17 | Q.  Okay.  During the last couple -- well, let me back up. |
| 10:37:41 | 18 | Mr. Umina asked you a question that at the time of his death, |
| 10:37:44 | 19 | Mr. Rhoades was in a relationship, and you were in a |
| 10:37:47 | 20 | relationship, we know, with Todd Stevens, right? |
| 10:37:49 | 21 | A.  Right. |
| 10:37:50 | 22 | Q.  Okay.  And Mr. Rhoades was in a relationship with a woman |
| 10:37:53 | 23 | by the name of Amanda Powell; is that right? |
| 10:37:56 | 24 | A.  Yes, I guess. |
| 10:37:58 | 25 | Q.  You would not let your boys go around Amanda Powell, |

10:38:01  1    would you?

10:38:03  2    A.   I didn't really stop them.  I didn't want them around

10:38:08  3    her, no.  I didn't know her.

10:38:15  4    Q.   Take a look at your deposition testimony, Ms. Rhoades,

10:38:19  5    page 29, line 20.  Do you see the question:  "Okay.  With the

10:38:34  6    things you heard about her, did you let the boys go around

10:38:37  7    her?"

10:38:37  8         What was your answer?

10:38:39  9    A.   "No."

10:38:41  10   Q.   So if Mr. Rhoades was living with Amanda Powell at that

10:38:44  11   point, and you wouldn't let the boys go around Amanda Powell,

10:38:49  12   safe to assume that if the boys were with Amanda Powell -- if

10:38:54  13   Mr. Rhoades was with Amanda Powell, they wouldn't have seen

10:38:55  14   their dad at that time?

10:38:56  15   A.   No, that's not correct.

10:39:00  16   Q.   Your sons would not actually stay with their father at

10:39:06  17   his trailer.  They would stay either at your sister's or Rick

10:39:11  18   Rhoades' house; is that right?

10:39:12  19   A.   My sister lives at Rick Rhoades' house.  And my

10:39:15  20   father-in-law lives steps away from Jontz.  And they stayed

10:39:22  21   the night with my father-in-law and my sister, yes.

10:39:26  22   Q.   And they actually went to their grandfather's house with

10:39:28  23   the intent of staying there, not staying with their father; is

10:39:31  24   that right?

10:39:32  25   A.   Not necessarily.  I mean, I wasn't there.  I don't really

| | | |
|---|---|---|
| 10:39:37 | 1 | know.  But they went and stayed with my sister. |
| 10:39:41 | 2 | Q.   Would you take a look at your deposition testimony, |
| 10:39:44 | 3 | page 30, please, lines 9 through 11. |
| 10:39:56 | 4 | A.   At their grandfather's house. |
| 10:40:00 | 5 | Q.   I'm sorry? |
| 10:40:01 | 6 | A.   Yes. |
| 10:40:01 | 7 | Q.   Okay.  So the question was:  "Okay.  And they went there |
| 10:40:05 | 8 | with the intent that they were going to stay at their |
| 10:40:07 | 9 | grandfather's house?"  And your answer was -- |
| 10:40:09 | 10 | A.   "At his home." |
| 10:40:13 | 11 | Q.   Would you agree with me, Ms. Rhoades, that during the |
| 10:40:20 | 12 | time you were in the relationship with Todd Stevens from |
| 10:40:23 | 13 | around 2013 or 2014, up until the point of Mr. Rhoades' death, |
| 10:40:29 | 14 | that your son Philip actually spent more time with |
| 10:40:33 | 15 | Todd Stevens than he did his own father? |
| 10:40:45 | 16 | A.   That was my fault.  Yes. |
| 10:40:49 | 17 | Q.   Okay.  Is it safe to say, Ms. Rhoades, that neither you |
| 10:40:57 | 18 | or the boys had sought any counseling following Mr. Rhoades' |
| 10:41:01 | 19 | death? |
| 10:41:02 | 20 | A.   I have since meeting with you at the office. |
| 10:41:16 | 21 | Q.   So at the time I took your deposition -- |
| 10:41:18 | 22 | A.   No, I hadn't, and my boys have. |
| 10:41:21 | 23 | Q.   Just to be fair, your deposition was taken July 10 of |
| 10:41:23 | 24 | 2019, which was almost two years after Mr. Rhoades' death. |
| 10:41:28 | 25 | And up until that point, you had not gone to any counseling; |

436

| | | |
|---|---|---|
| 10:41:32 | 1 | is that right? |
| 10:41:32 | 2 | A.   Right. |
| 10:41:40 | 3 | MS. DURST:  Your Honor, I believe those are the |
| 10:41:42 | 4 | questions I have.  Can I approach and retrieve the transcript? |
| 10:41:45 | 5 | THE COURT:  You may. |
| 10:41:46 | 6 | MS. DURST:  Thank you. |
| 10:41:57 | 7 | THE COURT:  Mr. Umina. |
| 10:41:58 | 8 | MR. UMINA:  Just brief follow-up, Judge. |
| 10:42:02 | 9 | THE COURT:  Certainly. |
| 10:42:02 | 10 | REDIRECT EXAMINATION |
| 10:42:02 | 11 | BY MR. UMINA: |
| 10:42:08 | 12 | Q.   Christy, do you have a sister? |
| 10:42:09 | 13 | A.   Yes, I do. |
| 10:42:10 | 14 | Q.   Who is she married to? |
| 10:42:12 | 15 | A.   Jontz's brother. |
| 10:42:15 | 16 | Q.   So you sisters married a pair of brothers? |
| 10:42:18 | 17 | A.   Yes, we did. |
| 10:42:19 | 18 | Q.   About how old were they when you met them? |
| 10:42:22 | 19 | A.   Jontz and I were 16.  Kaleb was 13, 14. |
| 10:42:33 | 20 | Q.   You said KK.  That is Kaleb? |
| 10:42:37 | 21 | A.   Yes, I'm sorry. |
| 10:42:38 | 22 | Q.   That's okay.  Do you know about how big Rick Rhoades' |
| 10:42:42 | 23 | property is?  Is it multiple acres? |
| 10:42:45 | 24 | A.   Yes. |
| 10:42:45 | 25 | Q.   Okay.  And did the whole family live on the same |

10:42:50   1   property?

10:42:51   2   A.   Always.

10:42:52   3   Q.   So when Ms. Durst, you know, was talking about staying at

10:42:58   4   their grandfather's house and this time spent there, were they

10:43:02   5   on the same property as their father?

10:43:04   6   A.   Yes.

10:43:05   7   Q.   Okay.  And about how much time did they spend over there

10:43:08   8   after you separated?

10:43:10   9   A.   All of it, if I let them.

10:43:12   10   Q.   But I mean, I know it's if you let them, but

10:43:16   11   realistically how often were they over at --

10:43:19   12   A.   Every weekend for sure, and any time they had a day off

10:43:23   13   school.

10:43:23   14   Q.   And what about summertime?

10:43:26   15   A.   All summer.  I had to force them to come home for a

10:43:29   16   couple days.

10:43:30   17   Q.   And so to be clear, on that property it was their father,

10:43:34   18   their aunt, who is also your sister, their uncle, Philip's

10:43:39   19   brother, and their grandfather?

10:43:42   20   A.   Yes.  And during the summer, Jontz's youngest brother

10:43:46   21   Seth would be here, too.  So he was there as well.

10:43:49   22   Q.   From Florida?

10:43:50   23   A.   Yes.

10:43:51   24   Q.   Do your boys have any cousins?

10:43:56   25   A.   Yes.

10:43:57   1   Q.   How many?  About their age that is?

10:44:01   2   A.   My sister and KK have two boys.  And they live with Rick

10:44:08   3   as well.  And then my brother just recently married my best

10:44:12   4   friend, and she has two boys.  So they live in the trailer

10:44:17   5   where Jontz and I lived.  So now there is six boys when we go

10:44:23   6   over.

10:44:24   7   Q.   When they would stay over on that property, would they

10:44:27   8   have sleepovers with their cousins?

10:44:30   9   A.   Yes.

10:44:31   10   Q.   Did they want to have sleepovers with their cousins?

10:44:32   11   A.   Yes.

10:44:33   12        MR. UMINA:  No further questions, Your Honor.

10:44:35   13        THE COURT:  Thank you, Mr. Umina.

10:44:36   14   Ms. Durst, anything further?

10:44:37   15        MS. DURST:  I don't have anything further.  Thank

10:44:40   16   you.

10:44:40   17        THE COURT:  Ms. Rhoades, you may step down, ma'am.

10:44:43   18   Thank you very much.

10:44:58   19        This is a good time to take our morning break.  We

10:45:01   20   will go ahead and do that.  Is the air temperature in here

10:45:07   21   more acceptable?  I see nods.  Great.  I am glad we finally

10:45:13   22   achieved that.  Sorry.

10:45:14   23        We are going to take our midmorning break.  We will take

10:45:18   24   15 minutes and resume back at 11.  Again, my standing

10:45:20   25   instructions remain:  Please continue to refrain from

10:45:23   1   discussing the case with anyone, including amongst yourselves

10:45:26   2   or with any of your fellow jurors or anyone else.  Also please

10:45:30   3   continue to refrain from conducting any type of independent

10:45:32   4   investigation not only into this case, but any of the issues

10:45:35   5   that have been discussed so far.  Thank you very much.  We

10:45:37   6   will see you in 15 minutes.  Thank you.

10:45:37   7        (Jury was excused, and the following transpired in open

10:45:37   8   court.)

10:46:01   9             THE COURT:  Please be seated.

10:46:02  10        Mr. Umina, who will be our next witness, sir?

10:46:06  11             MR. UMINA:  Expert witness, Dennis Root, Your Honor.

10:46:08  12             THE COURT:  Okay.  Is Mr. Root here and ready to go?

10:46:12  13             MR. UMINA:  He is.  It's 11.  I am sure we are going

10:46:18  14   to run into lunchtime.

10:46:20  15             THE COURT:  That's fine.  Okay.  Any issues we need

10:46:22  16   to take up before we hear from Mr. Root?

10:46:25  17             MR. UMINA:  If we can have a few minutes to set up.

10:46:28  18             THE COURT:  Absolutely.

10:46:30  19        Ms. Durst, anything we need to take up at this point?

10:46:33  20             MS. DURST:  Nothing, Your Honor.  Thank you.

10:46:34  21             THE COURT:  See you all in 15 minutes.  Thank you.

11:05:08  22        (A recess was taken at this time 10:46 a.m. - 11:05 a.m.)

11:05:08  23             THE COURT:  Anything we need to take up before we

11:07:50  24   bring the jury back in?

11:07:51  25             MR. UMINA:  No, Your Honor.

11:07:52  1          MS. DURST:  No, Your Honor.

11:07:52  2          THE COURT:  Again, please feel free to move

11:07:56  3   anywhere --

11:07:56  4          MS. DURST:  I will go over in the corner, Your Honor.

11:08:37  5          THE COURT:  I believe we are ready to call our jurors

11:08:40  6   in, sir.  Thank you.

11:08:42  7       (Jurors entered the courtroom, and the following

11:08:45  8   transpired in open court.)

11:09:33  9          THE COURT:  Thank you, ladies and gentlemen.  You may

11:09:35  10  be seated everyone.

11:09:36  11      Mr. Umina, you may call your next witness, sir.

11:09:39  12         MR. UMINA:  Plaintiff calls Dennis Root.

11:09:44  13         THE COURT:  Mr. Root, sir, if you wouldn't mind

11:09:50  14  coming up here and pausing so Madam Clerk can swear you in.

11:10:10  15          DENNIS ROOT, PLAINTIFF'S WITNESS, SWORN

11:10:10  16         THE COURT:  Good morning, Mr. Root.  Sir, as soon as

11:10:14  17  you are seated, if you can adjustment that microphone, so we

11:10:17  18  all can hear you clearly.

11:10:33  19      Mr. Umina, you may proceed whenever are you ready, sir.

11:10:38  20                  DIRECT EXAMINATION

11:10:38  21  BY MR. UMINA:

11:10:39  22  Q.  Good morning, Mr. Root.

11:10:39  23  A.  Good morning.

11:10:40  24  Q.  Can you please introduce yourself to the jury.

11:10:42  25  A.  My name is Dennis Root.  Last name is spelled, R-o-o-t,

| 11:10:47 | 1 | like the bottom of a tree. |
|---|---|---|

11:10:47  1    like the bottom of a tree.

11:10:48  2    Q.   And, Mr. Root, what is your profession?

11:10:50  3    A.   I'd like to say I am retired.  My wife would disagree.

11:10:56  4    My current profession is, primarily I do training for a

11:11:01  5    variety of self-defense and use of force type topics for law

11:11:05  6    enforcement, use of force, and also individual self-defense.

11:11:08  7    I also provide use of force expert consultant and expert

11:11:14  8    witness work.

11:11:15  9    Q.   Are you paid for that work, Dennis?

11:11:17  10    A.   I am.

11:11:18  11    Q.   And what are your fees for that?

11:11:23  12    A.   I'm compensated for my time at a $5,000 retainer and I

11:11:28  13    make $250 per hour, both in half hour increments for the time

11:11:32  14    that I invest in reviewing any materials and/or testifying at

11:11:37  15    deposition or trial.

11:11:38  16    Q.   And to your knowledge, is that pretty standard in this

11:11:41  17    field?

11:11:42  18    A.   Some charge more.  I think I'm on the lower end, but I

11:11:46  19    think it's pretty average I guess.

11:11:48  20    Q.   In your work as an expert witness, Mr. Root, have you

11:11:54  21    ever turned down cases or provided an opinion to the person

11:11:57  22    who retained you, that they didn't -- that the person that

11:12:00  23    retained you didn't like?

11:12:03  24    A.   Well, I would say most experts can turn down cases.  I

11:12:08  25    most certainly have.  I mean, my process is simple.  I get a

11:12:12   1   phone call and I give a free consultation for whoever is

11:12:15   2   seeking the type of expert that I -- or expert in the field

11:12:19   3   that I do.  We do a consultation, and based on the case facts

11:12:23   4   that they present to me at that time, I can tell them whether

11:12:26   5   or not I can be of any assistance.  If it's not within my

11:12:29   6   wheelhouse, maybe I might know somebody who could be -- they

11:12:33   7   could be referred to.

11:12:33   8        And, yes, I've had cases where I was retained in a case,

11:12:40   9   based on the premise of the facts presented, later I was

11:12:43   10  provided with all of the discovery in the case, and all of the

11:12:46   11  information and the facts in the case didn't turn out the way

11:12:50   12  that the individual that retained me presented them, so they

11:12:53   13  get the opinion based on the facts, not what they want.  And

11:12:56   14  that's a really big distinction that needs to be made.  I am

11:13:01   15  compensated for my time.  My opinion is not for sale.  So

11:13:05   16  whenever I have a case, it's based -- I take it based on the

11:13:09   17  information given to me.  And then the opinion is rendered

11:13:12   18  based off the facts that come through discovery.

11:13:15   19  Q.   Would the cases that you turn down, or provide an opinion

11:13:21   20  that the person who retained you didn't like, would those

11:13:22   21  appear on your CV?

11:13:23   22  A.   No.  No.  The only cases that are listed on the CV for a

11:13:28   23  professional expert witness, are the cases at which they've

11:13:32   24  testified either by trial or at deposition.  And if you render

11:13:37   25  an opinion that is contrary to what the client wanted, that

11:13:41    1    opinion won't -- if they don't put you through to a deposition

11:13:45    2    or to trial testimony, it won't appear on a CV.

11:13:49    3    Q.   Mr. Root, when you take a case, what is important to you?

11:13:57    4    A.   When I take a case -- well, open and honesty.  I mean,

11:14:01    5    when I take a case, especially a force related case, what is

11:14:05    6    important to me are the facts that are presented to the

11:14:07    7    individual at the time we have the consultation.

11:14:11    8         I don't take a case just because it's there.  Somebody

11:14:14    9    contacts me, and I ask them a variety of questions, and I make

11:14:19    10   sure that I understand the premise of their case before I ever

11:14:23    11   tell them that I think I can help.  And then if they decide

11:14:27    12   that I'm the person that fits their legal need, if you will,

11:14:32    13   then they will retain me, we will sign service agreements, and

11:14:35    14   move forward.

11:14:39    15   Q.   Mr. Root, before we get into your opinion, I want the

11:14:42    16   jury to be able to get to know you a little bit better, so can

11:14:43    17   you tell them where you're from?

11:14:44    18   A.   Currently I'm happy to say that I'm from Mountain City,

11:14:50    19   Tennessee.  Originally I'm from Florida, but two years ago my

11:14:54    20   wife and I retired and moved to Mountain City, Tennessee, and

11:14:56    21   bought 25 acres of just a beautiful example of what God

11:15:00    22   created.  And we live right off of, I think it's the Blue

11:15:03    23   Ridge Mountains.  And I live there with my wife, my three fur

11:15:08    24   babies, my dogs, and hope my kids will come see me sometime.

11:15:13    25   Q.   All right.  Now, for what we are here for, Mr. Root.

11:15:17  1   Have you come to court prepared to state your opinion as to

11:15:21  2   whether or not the defendant's use of deadly force when he

11:15:25  3   shot and killed Philip Rhoades was or was not objectively

11:15:29  4   reasonable?

11:15:29  5   A.   Yes.

11:15:30  6   Q.   Before you render that opinion, let's review your

11:15:34  7   qualifications to give the opinion.

11:15:39  8        Mr. Root, first question:  How long have you been or were

11:15:45  9   you a certified police officer?

11:15:49  10  A.   Total time, just over 27 years as a certified officer in

11:15:54  11  the State of Florida.

11:15:55  12  Q.   Any other certifications that you think the jury should

11:16:01  13  know about, Dennis?

11:16:03  14  A.   Certifications?  Well, as it relates to use of force,

11:16:08  15  what I do as an expert consultant, my certifications, I've

11:16:14  16  conducted -- total number now is 13 -- instructor

11:16:17  17  certifications in force related topics; teaching everything

11:16:19  18  from open hand control tactics, intermediate weapon, things

11:16:25  19  like impact weapons or less than lethal weapons, like OC,

11:16:28  20  pepper spray, conducted electrical weapons.  I also -- my

11:16:34  21  certifications include tactical handgun, law enforcement long

11:16:38  22  gun and handgun, tactical shotgun.

11:16:45  23       Certification -- the reason it's confusing to say is

11:16:47  24  because there's education and certifications, instructor

11:16:50  25  certifications in what we pursue, and I also went through

11:16:56   1   force science -- Force Science Institute is dedicated to

11:16:58   2   providing force related training for law enforcement.  And I

11:17:00   3   had the honor of becoming a force science analyst where I was

11:17:04   4   certified to review and evaluate force events involving law

11:17:08   5   enforcement, and better understand the totality of what took

11:17:10   6   place.

11:17:11   7        So certification-wise, I'm no longer a certified police

11:17:14   8   officer in Florida, but I still hold the instructor

11:17:16   9   certifications that relate to use of force topics.

11:17:22   10   Q.   Can you tell the jury a little bit about your work

11:17:24   11   history, Dennis?

11:17:26   12   A.   Can I give you the shortened version?

11:17:31   13   Q.   Please, yeah.  Just hit the highlights for us.

11:17:34   14   A.   I started my law enforcement career in 1989.  I started

11:17:41   15   my career with the City of Riviera Beach Police Department in

11:17:43   16   Riviera, Florida.  And I had the opportunity while with them

11:17:47   17   to become a lead defensive tactics instructor, to become an

11:17:52   18   impact weapons instructor.  I also -- I was assigned primarily

11:17:56   19   road patrol duties, and I was on our shift traffic unit, and I

11:17:59   20   also served as a field training officer for the Riviera Police

11:18:04   21   Department while I was there.

11:18:06   22        Following that -- did you want me to just go ahead --

11:18:10   23   Q.   Just a little bit more for them.

11:18:13   24   A.   I worked with the Jupiter Police Department for a short

11:18:16   25   time where I also served as a lead defensive tactics

11:18:16  1    instructor for that agency.

11:18:16  2        COURT REPORTER:  I'm sorry, can you slow down,
11:18:23  3    please?

11:18:23  4    A.   Okay.  I'm sorry.  Trying to be brief for you.  Jupiter
11:18:29  5    Police Department where I served as the lead defensive tactics
11:18:33  6    instructor for that agency, and then I also worked with and
11:18:35  7    retired from the Martin County Sheriff's Office where I had a
11:18:40  8    variety of topics, or job duties; everything from detective,
11:18:46  9    canine, traffic, DUI unit, patrol.  I was also the agencies --
11:18:51  10   one of the agencies auxiliary trainers for force related
11:18:55  11   topics, as well as their use of force specialist.  That was
11:18:59  12   the title that was given to me.  I was responsible for
11:19:02  13   reviewing all of the use of force events; creating and
11:19:05  14   implementing force related training, working other trainers.

11:19:08  15       I also had the opportunity of being the supervisor of the
11:19:12  16   sanctions enforcement unit and I, after retiring from
11:19:16  17   full-time law enforcement, I also worked in a part-time
11:19:20  18   capacity with Palm Beach Shores Police Department where, once
11:19:23  19   again, I took care of training.  And I was also named the
11:19:28  20   Director of Internal Affairs and Training for the agency.

11:19:34  21   Q.   Can you tell the jury a little bit about, you know, in
11:19:37  22   your retirement, your current jobs that your wife claims that
11:19:42  23   you have, and the responsibilities?

11:19:44  24   A.   Well, and again, retirement is a euphemism for me.  My
11:19:50  25   wife tells me I work more now than when I was actually in law

11:19:54    1    enforcement.  But what I do now is, my job consists of --

11:19:59    2    originally consisted of face-to-face training, but obviously

11:20:02    3    with Covid over the last year, all the face-to-face training

11:20:06    4    had to stop.

11:20:07    5         So I developed and created online training programs and

11:20:11    6    got those up and running.  I currently provide online training

11:20:14    7    for force investigations, for professional investigators, law

11:20:18    8    enforcement, where they can take a class online to become

11:20:21    9    certified through me, through the force investigations

11:20:24   10    program.  And I have additional training programs.  And I

11:20:27   11    basically converted the school from primarily all in-person to

11:20:30   12    being online.

11:20:33   13         In addition to that, I do the expert consultant work and

11:20:36   14    also testify as an expert witness.

11:20:40   15    Q.   What education have you had in terms of the use of force?

11:20:43   16    A.   Like I said before, now we are getting back to

11:20:51   17    certifications and where education goes through.  I have been

11:20:52   18    through -- my entire career was dedicated to attending schools

11:20:57   19    and training.  I've been through training for use of force, or

11:21:02   20    force science, became an analyst, dynamic encounters where I

11:21:05   21    also became instructor for dynamic encounters.

11:21:08   22         Active shooter, taught our active shooter program.

11:21:15   23    Handgun, long gun, open hand control tactics, tactical

11:21:19   24    communication, which is referred to as verbal judo.  It's

11:21:22   25    interpersonal communication for law enforcement and how to

11:21:26  1    interact with people, and hopefully deescalate events.

11:21:32  2         All the weapons system.  I have also been through

11:21:36  3    investigation training, criminal investigations; most recently

11:21:39  4    I just completed a critical death and serious bodily injury

11:21:45  5    investigations program, as well as investigating video as it

11:21:48  6    relates to force events.

11:21:50  7         And to be honest, my CV, rather than bore you with trying

11:21:54  8    to break it all down, there is a ton of training on there and

11:21:58  9    after almost three decades of going to schools and attending

11:22:02  10   training, I don't think I could possibly list all of them

11:22:05  11   sitting here from memory.

11:22:07  12   Q.   Have you done any writing on the topics of use of force?

11:22:12  13   A.   I've written articles, I've also authored three

11:22:17  14   instruction manuals for the instruction level programs that I

11:22:19  15   have created now for impact weapons, excited delirium

11:22:22  16   instructors, also for OC aerosol instructor, and I've also

11:22:27  17   authored my own book called Force Concepts.  It's a definitive

11:22:30  18   guide for separating self-defense from criminal action.  And

11:22:34  19   that I have published recently.

11:22:36  20   Q.   Have you made any television appearances relating to use

11:22:40  21   of force by officers?

11:22:41  22   A.   I've been sought after and interviewed as an expert

11:22:45  23   witness for force related events on major and national and

11:22:49  24   local news media outlets.  I've had news appearances as well

11:22:54  25   as television show appearances where I was asked to explain

11:22:59    1    weapons systems for local TV programming to hopefully bridging

11:23:03    2    the gap between the community and law enforcement.  And I have

11:23:07    3    also appeared on Cops a few times.  The TV show.  That wasn't

11:23:12    4    by choice, that was actually forced by the agency.

11:23:16    5    Q.   Mr. Root, so any commendations other than being on Cops,

11:23:27    6    that you received as a police officer?

11:23:28    7    A.   Throughout my career I received many letters of

11:23:33    8    recommendation and commendation.  Probably one of the best

11:23:38    9    ones, while I was employed with the Riviera Beach Police

11:23:43   10    Department, I received letter of commendation for apprehending

11:23:47   11    armed -- there was four armed -- they were actually strong arm

11:23:50   12    robbery suspects, and I was just actually finishing field

11:23:53   13    training on my own and apprehended them on my own, and

11:23:57   14    actually took four armed men out of a vehicle with the

11:24:00   15    assistance of the other officers once they arrived, and got a

11:24:03   16    commendation for that.

11:24:04   17        I'm sure there were other accolades that came along for

11:24:09   18    community participation and, you know, just doing whatever I

11:24:10   19    could do to be a part of the community policing efforts.

11:24:14   20    Q.   Any professional organizations that you belong to,

11:24:17   21    Mr. Root?

11:24:18   22    A.   I try to maintain associations with different

11:24:26   23    professional groups.  I know I have a membership with the

11:24:28   24    International Association of Chiefs of Police.

11:24:31   25        Oh, sorry I'll slow down.

11:24:33   1        Also the National Sheriff's Association.  .I'm proud to

11:24:37   2   say now that I'm a Tennessee resident, I'm a member of the

11:24:40   3   Tennessee Sheriff's Association.  I also have associations

11:24:43   4   with Budo Renmei, which is a martial arts organization, and I

11:24:49   5   have associations with other state-level and national-level

11:24:53   6   professional investigator associations.

11:24:57   7        MR. UMINA:  Your Honor, at this time, I move that

11:25:00   8   Dennis Root be qualified as an expert witness in the use of

11:25:03   9   force by law enforcement officers.

11:25:05   10        THE COURT:  Any objection or further voir dire?

11:25:07   11        MS. DURST:  No objection, Your Honor.

11:25:09   12        THE COURT:  All right.  Thank you.  Motion granted

11:25:11   13   without objection, Mr. Umina, and Mr. Root will be considered

11:25:15   14   qualified as an expert witness in this case.

11:25:17   15        Ladies and gentlemen of the jury, Mr. Root, as I

11:25:20   16   mentioned, is now qualified in the fields mentioned to serve

11:25:24   17   as an expert witness.

11:25:25   18        And what that means is he is permitted, under the rules

11:25:28   19   of evidence, to share opinions with you, whereas nonexpert

11:25:33   20   witnesses are not usually permitted to share their opinions

11:25:37   21   with you.

11:25:38   22        With that said, Mr. Umina, you may proceed, sir.

11:25:41   23   BY MR. UMINA:

11:25:43   24   Q.   Mr. Root, you have now been deemed by the Court to be an

11:25:46   25   expert in the field of use of force by law enforcement.  As

11:25:55   1   such, do you have an opinion that you hold to a reasonable

11:26:00   2   degree of certainty customary in your field, as to whether or

11:26:07   3   not the defendant's use of deadly force when he shot and

11:26:12   4   killed Philip Rhoades, was or was not objectively reasonable?

11:26:15   5   A.   I do.

11:26:16   6   Q.   And what is that opinion?

11:26:18   7   A.   My opinion is the use of deadly force by Deputy Forsyth

11:26:22   8   was not objectively reasonable.

11:26:24   9   Q.   Mr. Root, let's talk about the basis for your opinion.

11:26:31   10  Did you utilize your knowledge, training, and experience, as

11:26:34   11  discussed earlier, in forming your opinions?

11:26:36   12  A.   Yes.

11:26:37   13  Q.   What information did you review in forming your opinion?

11:26:42   14  A.   The information I was provided in discovery included

11:26:49   15  written statements, written transcripts of the interviews,

11:26:54   16  audio recorded -- audio recordings of the interviews of both

11:26:57   17  Deputy Love and Deputy Forsyth.  The West Virginia State

11:27:02   18  Police investigation report, as well as all of the attached

11:27:06   19  documents with that.

11:27:07   20       I also reviewed deposition statements from all the

11:27:10   21  parties involved.  I reviewed crime scene photographs.  There

11:27:15   22  was radio traffic that was provided.  There was a tremendous

11:27:19   23  list of information that was provided in case discovery, as

11:27:22   24  well as there was information provided by a professional

11:27:26   25  investigator that you had hired that actually went out to the

11:27:30    1    scene and conducted an independent investigation of the scene
11:27:33    2    itself.
11:27:34    3    Q.   Have you had -- you mention the site.  Have you had an
11:27:39    4    opportunity to visit the scene of the shooting since providing
11:27:42    5    your written opinion and being deposed in this matter?
11:27:45    6    A.   Yes, I have.
11:27:45    7    Q.   Did your visit to the scene of the shooting change any of
11:27:50    8    your opinions?
11:27:51    9    A.   No, not at all.  As a matter of fact, it literally
11:27:56   10    strengthens the positions that I hold with the opinions that
11:27:58   11    I've expressed.
11:27:59   12    Q.   Mr. Root, I'd like to talk to you about the term, "arena
11:28:03   13    of performance."  Can you please explain to the jury what an
11:28:06   14    arena of performance is?
11:28:08   15    A.   The arena of performance is the area in which an event
11:28:13   16    takes place.  So when you -- if you consider a sporting event,
11:28:18   17    the arena of performance would be the football field, the
11:28:21   18    baseball field.  It's the area that the event is going to take
11:28:24   19    place in.
11:28:25   20        So we use that as a term to identify the area in which,
11:28:30   21    for example, a force event, the arena of performance, what was
11:28:34   22    the total area available for the event to have taken place as
11:28:37   23    described by the people who either witnessed or participated
11:28:40   24    in the event?
11:28:43   25    Q.   And in this case, what was the arena of performance?

| | | |
|---|---|---|
| 11:28:47 | 1 | A.   The arena of performance, as you heard from testimony, |
| 11:28:53 | 2 | was the end of a long access road leading to a gas well site. |
| 11:28:57 | 3 | And the gas well site is essentially -- a bowl would be the |
| 11:29:02 | 4 | best way to describe it.  It is roughly -- based on the -- and |
| 11:29:06 | 5 | we'll see these shortly in one of the photos I'll show you -- |
| 11:29:10 | 6 | it has roughly been estimated about 33 -- a little more than |
| 11:29:15 | 7 | 33 feet wide and approximately 46 -- a little more than |
| 11:29:19 | 8 | 46 feet deep.  So that's the total area or arena of |
| 11:29:23 | 9 | performance.  And that also includes some of the obstructions |
| 11:29:26 | 10 | that were present at the time. |
| 11:29:27 | 11 | Q.   Mr. Root, did you prepare any visual aids for the jury to |
| 11:29:30 | 12 | better assist them in understanding this concept? |
| 11:29:34 | 13 | A.   I did as of this morning.  I tried to put some things |
| 11:29:36 | 14 | together for you so that after the testimony, that I would |
| 11:29:39 | 15 | also be able to provide some of the stuff you've already heard |
| 11:29:42 | 16 | and bring it in with the photos that we've received and that |
| 11:29:45 | 17 | you've already seen. |
| 11:29:46 | 18 | Q.   Okay.  Would you like to utilize those visual aids at |
| 11:29:51 | 19 | this time? |
| 11:29:51 | 20 | A.   Yes, that would be great.  If I turn the clicker on it |
| 11:30:22 | 21 | will work better.  Sorry.  My apologies. |
| 11:30:29 | 22 | THE COURT:  Ladies and gentlemen of the jury, are you |
| 11:30:30 | 23 | able to see the screen well enough or do we need to dim the |
| 11:30:34 | 24 | lights? |
| 11:30:34 | 25 | Mr. Umina, you may proceed, sir. |

BY MR. UMINA:

Q.   Dennis, you may discuss your visual aid here.

A.   The first thing -- one of the most important things whenever somebody is going to review, assess, or evaluate a use of force, we take in all of the case information; the discovery, the statements, the videos -- if any videos are present -- and I want to assure you that that is not the case here.  I'm just identifying some of the things that would be included.  And we look at the arena of performance, the area the event could take place in.  And then we also consider the window of time.  In other words, the window of opportunity.  Could everything have taken place within a designated period of time?

     And these are all elements that we obtain through statements made by the witnesses, or individuals who are involved directly with the event, or we get it through documentation that's been conducted later.  For example, crime scene photographs, diagrams, things like that; people that did the investigation or performed the investigation on the event.

     And it's important for us to understand this because in the use of force event, the average person -- we don't really think about how long it takes for us to do just normal, everyday activities, like standing up or walking around.  We take for granted periods of time.  But when you look at a force event and the stress of an officer, that -- the stress

11:31:59   1   that an officer experiences during a force event, time becomes

11:32:03   2   very relative to the people that are reviewing it, but it's

11:32:07   3   not an easy concept for the individual that is actually

11:32:09   4   involved in the event.

11:32:12   5        So what I wanted to try to do was provide the time and

11:32:16   6   distance considerations that I used to evaluate and assess and

11:32:21   7   in forming the opinions that I have, based on what we've seen

11:32:23   8   in discovery, as well as what has been presented

11:32:26   9   with testimony here during the trial.

11:32:33   10       This is one of the first drawings.  This is -- this is

11:32:37   11   the first drawing that I received as related to the case.

11:32:41   12   This is the diagram that was created by Sergeant -- excuse me,

11:32:45   13   Lieutenant Branham at the time that he conducted his force

11:32:51   14   investigation.  And what's really important on this, and I

11:32:54   15   want to point out a few things.

11:33:01   16       Excuse me, Your Honor, I was trying to turn on the light

11:33:03   17   and I realize it's right in front of me.  I apologize.

11:33:06   18            THE COURT:  Hold on one second.  You can -- that

11:33:08   19   monitor that you have there is on, and honestly -- and I

11:33:13   20   believe this to be the case, if he touches the screen it will

11:33:16   21   mark -- yes.  You can use your finger to mark up as well.

11:33:22   22            THE WITNESS:  Thank you.  Technology is great.

11:33:23   23            THE COURT:  Well, we'll keep our fingers crossed that

11:33:26   24   it works.

11:33:27   25            THE WITNESS: I'll stick with the PowerPoint then.

11:33:29  1          THE CLERK:  Judge, it will work.  Well, there is a --
11:33:33  2   I have to find it.
11:33:34  3          THE WITNESS:  I've got it on PowerPoint, thank you
11:33:36  4   though, just in case I went old school on the PowerPoint.
11:33:41  5       So the first thing that I would like to do, you will
11:33:42  6   notice in the very middle of the bowl, if you will, in the top
11:33:47  7   right corner, there is a black smudge, and I'm going to see if
11:33:51  8   I can get this laser to work.  Right there.  Do you see that
11:33:56  9   right there?  That black smudge.  I don't know -- it's not
11:34:05  10  referenced in the narrative.  It's not described.  It wasn't
11:34:08  11  actually referenced at any point, so I'm not sure what it's
11:34:12  12  representative of.
11:34:14  13      You heard testimony that -- and it was included in
11:34:18  14  photographs -- that there was a pipe sticking out of the
11:34:20  15  ground there.  But I don't know that to be the case.  So I
11:34:24  16  wanted to be honest with you, I ignored that in the review of
11:34:27  17  the diagram only because you will notice also, and we'll see
11:34:31  18  pictures here in a minute, the diagram doesn't include any of
11:34:35  19  the gas well -- any of the gas well equipment that was present
11:34:39  20  on the scene within the confines of the diagram that was
11:34:42  21  presented, so I can't say with certainty that that black
11:34:45  22  smudge is a pipe.  So I wanted you to know that it's not
11:34:49  23  relative to what I am reviewing.  But I think it's important
11:34:53  24  for you to know what I also ignored and why I ignored it.
11:34:55  25      So one of the first things you'll see when you look at

11:34:59   1    the diagram, directly behind the vehicle, there are what

11:35:06   2    appear to be linear marks that could be interpreted as being

11:35:12   3    quote unquote, "acceleration marks."

11:35:16   4        Now, why I do say acceleration marks?  Because the

11:35:18   5    statements that were provide by Deputy Forsyth was that the

11:35:21   6    vehicle was moving towards him.  If they were deceleration

11:35:27   7    marks, it would have been because the vehicle was stopping.

11:35:29   8    So the interpretation of the diagram is that those would be

11:35:32   9    acceleration marks.  And the reason that this is important, is

11:35:39  10    if you look at the angle of the diagram, those marks lead

11:35:42  11    right to the back of what would be the Jeep as it was drawn at

11:35:46  12    this location.

11:35:48  13        The problem is -- oh, I guess it's caught up in this

11:35:52  14    circle -- please ignore the red things to the right.  That was

11:35:55  15    my demonstration by Madam Clerk.

11:35:59  16        These lines are not articulated in the narrative of the

11:36:03  17    report nor are they indicated at any point as being ground

11:36:06  18    disturbance; up until recently, you heard testimony that they

11:36:11  19    believed there was ground disturbance.

11:36:15  20        One of the reasons that this is important for us now to

11:36:17  21    review, and the reason I'm bringing this to you, is this is

11:36:20  22    new information that is actually from testimony that I needed

11:36:23  23    to make sure I included when Mr. Umina asked me.

11:36:23  24        Sorry.

11:36:28  25        When Mr. Umina asked me if my scene examination changed

11:36:35  1    anything.  It hadn't, but I also had to take into

11:36:38  2    consideration the statements that I've heard made during the

11:36:39  3    testimony.

11:36:41  4        You'll notice that what we heard testimony on, where

11:36:46  5    Lieutenant Branham was -- it was pointed out that those marks,

11:36:51  6    ground disturbance, they think might be ground disturbance in

11:36:53  7    the images that you saw, were linear and perpendicular.  They

11:36:57  8    weren't in line with the placement of the vehicle.  So that's

11:37:01  9    something that I have to look at, review, and evaluate, and

11:37:04  10   they were never mentioned and I'm going to show you the

11:37:07  11   photographs.  Another key point.  This shows two distinct

11:37:12  12   linear lines.  Even in the photographs that were used

11:37:16  13   yesterday to demonstrate maybe ground disturbance, there was

11:37:22  14   only one.  I'll show you that in a moment.

11:37:25  15       Also, really important, down here, and I know it's very

11:37:30  16   difficult to see, in that black area there are two letters,

11:37:36  17   it's R and P.  RP.  Reference point.  This is where Lieutenant

11:37:42  18   Branham identified that he took the measurements from the berm

11:37:47  19   at the end of the access road to the location of the evidence,

11:37:52  20   being the vehicle, within the scene.  A, B, C, and D, you

11:37:59  21   heard Lieutenant Branham state that those marked the center

11:38:05  22   wheels of -- they marked the wheels of the vehicle.

11:38:08  23       When you do a diagram with a vehicle, you mark the two

11:38:13  24   wheels so that you can put the vehicle back in its place later

11:38:17  25   so you can recreate the scene.  The problem is when you go

11:38:23  1   from RP up to A, and then up to B, you'll notice that it's not

11:38:29  2   a straight line.  It's going to require you to curve around a

11:38:33  3   corner.

11:38:35  4       Well, if I take a measurement on the same area, but I

11:38:40  5   take a different path than you did with a curve, the arc could

11:38:44  6   be different and we could actually literally put the evidence

11:38:47  7   in the wrong spot because we're not taking the right markings.

11:38:50  8   So this became important to me when I reviewed the information

11:38:53  9   because there is not a reliable way to get the vehicles or the

11:38:58  10  information back to its location.

11:39:00  11      Also, you will notice the next two things, and I know

11:39:04  12  it's very difficult to see, these are distance measurements.

11:39:08  13  So let me try to bring it in a little closer for you.  The

11:39:11  14  first one, the lower one, it actually reads 212' 3".  I know

11:39:20  15  yesterday we heard testimony that it was 213 feet.  It's a

11:39:25  16  matter of inches different, but it's really important because

11:39:29  17  when we talk about time and distance, the length of that

11:39:33  18  road -- in a moment you're going to see how important the

11:39:35  19  length of that road truly is.

11:39:37  20      So Lieutenant Branham identified the length of that road

11:39:41  21  being 212' and 3".  He also, the next number up he has 5'9".

11:39:51  22  At first, I thought it was 6'9", but when you actually look --

11:39:55  23  I know it's blurred out and blurred out more here, it's

11:39:58  24  difficult -- but it's actually a 5, I believe he meant 6'9".

11:40:05  25  And the reason I say that is the actual width of a 2011 to

| | |
|---|---|
| 11:40:10 | 1 |
| 11:40:17 | 2 |
| 11:40:20 | 3 |
| 11:40:25 | 4 |
| 11:40:28 | 5 |
| 11:40:30 | 6 |
| 11:40:31 | 7 |

1   2017 Ford Explorer Police Interceptor is six and a half feet

2   wide.  So if it was a 5'9" wide area, the vehicle wouldn't

3   have fit down the roadway.  Or if it did because of

4   over-brush, the speed of the vehicle would have caused

5   different kind of transfer marks to the side of the vehicle

6   that would have been evidence to show whether the vehicle was

7   moving slowly or quickly.

8        For example, anybody that's drove through brush like I

9   have now because I live in Tennessee, the slower you go when a

10  branch is touching your vehicle, the less damage the branch

11  does to your vehicle.  The faster you go, friction, drag and

12  all of that along with it causes more damage.  So those would

13  be very important information for us to have when we review

14  the event.

15       All of that brings me to here for you.  I know it was a

16  long road to get here.  When you look at timing distance as it

17  relates to a use of force event, we know that --

18            MS. DURST:  Your Honor, may we approach?

19            THE COURT:  Sure.

20       (Bench conference outside the hearing of the jury.)

21            THE COURT:  Yes, ma'am.

22            MS. DURST:  Yes, Your Honor, Mr. Root was qualified

23  as a use of force expert.  These are calculations that a

24  reconstruction expert does.  He has testified in his

25  deposition he is not an accident reconstructionist or shoot

11:45:23   1   scene reconstruction expert.

11:45:23   2       I need to slow myself down, too.

11:45:24   3       And these, I don't believe these calculations were

11:45:24   4   provided as part of any expert report in this case either.  So

11:45:24   5   I think for those reasons, this information should be

11:45:24   6   excluded.  He is not -- that wasn't the field he was qualified

11:45:24   7   in.

11:45:24   8       THE COURT:  I understand.  At this point we are

11:45:24   9   dealing with mathematic calculations.  Was any of this

11:45:24   10  disclosed?

11:45:24   11      MR. UMINA:  Your Honor, what he is getting to is

11:45:24   12  based upon the radio traffic that we obtained yesterday, and

11:45:24   13  the timeline of events.  This is basic, simple math.  And what

11:45:24   14  he is attempting to do is to determine how much time, based

11:45:24   15  upon this very simple math, could have elapsed based on radio

11:45:25   16  transmissions and based on the claims that Deputy Forsyth

11:45:25   17  actions that he took.

11:45:25   18      So all of these individual actions that he indicated that

11:45:25   19  he took in this time frame, we're trying to understand the

11:45:25   20  time frame.  I think he just explained that very thoroughly.

11:45:25   21  He is not up here doing trigonometry.  This is, I mean, maybe

11:45:25   22  sixth grade math, fifth grade math.

11:45:25   23      THE COURT:  Careful, you are about to insult the

11:45:25   24  Court.  Was any of this discussed in his reports, supplemental

11:45:25   25  reports?

11:45:25   1           MR. UMINA:  He made a number of mentions about the

11:45:25   2    issues with the time, based on what they stated.  The

11:45:26   3    defendant and Corey Love have given multiple inconsistent

11:45:26   4    statements about what occurred.  So we had to come into trial,

11:45:26   5    hear what the defendant was going to say this time -- take

11:45:26   6    Corey Love's deposition testimony, and then for him to give --

11:45:26   7    and he is going to in this opinion -- give Mr. Forsyth every

11:45:26   8    benefit of the doubt and give him as much time as possible.

11:45:26   9    And that is what we are getting to.  Most certainly he is here

11:45:26   10   to analyze a force event.

11:45:26   11          THE COURT:  Are we getting any further down the road

11:45:26   12   of beyond --

11:45:26   13          MR. UMINA:  Not knowing beyond -- and I -- we

11:45:26   14   discussed this in Mr. Faulkner's testimony and the very same

11:45:26   15   graph, I believe, was presented in front of Mr. Faulkner

11:45:26   16   during his testimony, so -- and so I believe that we have

11:45:26   17   discussed this very concept with Mr. Faulkner, and certainly

11:45:26   18   he reviewed his deposition.

11:45:26   19          THE COURT:  I understand your objection, Ms. Durst.

11:45:26   20   I don't think we are in the realm of reconstruction yet of

11:45:26   21   either of the two mentioned.  You are obviously going to --

11:45:27   22   cross with respect to his level of expertise in this realm.

11:45:27   23   But I do think we are in a mathematical formula, which is not

11:45:27   24   an opinion.  It's math science, but obviously you can cross

11:45:27   25   him on that front.  Objection overruled at this point.

11:45:27   1    (Bench conference concluded, and the following transpired

11:45:30   2    in open court.)

11:45:30   3    BY MR. UMINA:

11:45:31   4    Q.   Mr. Root, you may continue where you left off.

11:45:34   5    A.   Based on the information provided from the investigation

11:45:40   6    into the event that took place, there is an access road, and

11:45:45   7    that access road's distance is approximately 212 -- well, the

11:45:53   8    distance was measured to be 212' 3" by Lieutenant Branham.

11:46:00   9         That is an important element as we move through the

11:46:03   10   assessment and evaluation in forming the opinion that I have.

11:46:08   11   When you look at how long it takes to move down 212 feet --

11:46:12   12   now I rounded this down to the speed computations just to save

11:46:17   13   myself some headaches with math, but if you traveled 200 -- if

11:46:22   14   he traveled the length of that -- from the road to the

11:46:25   15   entryway to the gas well site at five miles an hour, it would

11:46:29   16   take 29 seconds to get down the road.

11:46:32   17        If you did it at ten miles an hour, it would take

11:46:35   18   14 seconds.  The numbers you see to the right are the actual

11:46:39   19   numbers, -- I just rounded them to the nearest whole number --

11:46:42   20   would take 14 seconds.  And as you see, as you progress, the

11:46:46   21   faster you are going, the less time it would take to get down

11:46:51   22   the road.  I know that seems obvious, but what's really

11:46:55   23   important is when you look at the road in and of itself,

11:46:58   24   whether or not a vehicle could move at a given speed without

11:47:03   25   problems, and what those speeds would cause with regard to

11:47:10  1    changes in physical evidence, I know that you saw a picture of

11:47:15  2    tire -- you know what, I think, if you don't mind, I know

11:47:17  3    we're going to show photographs.  I will address that for the

11:47:21  4    convenience of the jury, so they can better understand when

11:47:25  5    they can see the pictures.

11:47:25  6    Q.   Absolutely.

11:47:26  7    A.   So this is an element that the expert has to evaluate and

11:47:31  8    assess when they are forming that opinion; how long will it

11:47:33  9    take for this action to take place for this portion of the

11:47:37  10   event?  I'm -- I'm sorry.  We're going to transition to

11:47:53  11   another picture.

11:47:53  12        Now that we are down the road, I want to go into the

11:47:56  13   evaluation and assessment of the gas well site, in and of

11:47:59  14   itself.

11:48:24  15   Q.   You need a single slide?

11:48:26  16   A.   Yes.  It's one image of the investigator's diagram.

11:48:37  17   Q.   And just to be clear, Dennis, did you review this diagram

11:48:40  18   prior to providing your written opinion and being deposed in

11:48:43  19   this matter?

11:48:44  20   A.   Yes.  This one was prior to also.  So this is a diagram

11:48:49  21   that was done by the professional investigator that went to

11:48:52  22   the scene after the event.  What you'll notice here is in the

11:49:00  23   very bottom of the -- well, again, in the very bottom of the

11:49:08  24   diagram, there is a width that shows the road was about -- it

11:49:13  25   was like eight feet wide.  That's the measurement of the road

11:49:15    1    that the investigator found.

11:49:18    2        He also -- when you look to the right of the roadway,

11:49:21    3    you'll see the long arrows that say 213' 6".  That's how far

11:49:28    4    he measured the road to be, and they are within just a little

11:49:32    5    more than a foot of each other.  But that's why it's so

11:49:35    6    important to have fixed reference points, because you can be

11:49:37    7    measuring the exact same location, but if you are not

11:49:40    8    measuring from the same point you don't get the same

11:49:42    9    information.

11:49:44    10        What this investigator did, was something that wasn't

11:49:48    11    done prior, is he identified the width as being 33 feet, a

11:49:53    12    little over 33 feet wide, and from the entry point, in other

11:49:58    13    words where the bowl begins at the end of the access road, to

11:50:02    14    the embankment or the berm-type thing that you see in the

11:50:07    15    pictures, is only 46 -- a little over 46 feet.  46' 7".

11:50:14    16        The other thing that he's done, he used the actual

11:50:18    17    plumbing or piping that was there at the gas well site as

11:50:21    18    fixed points of reference to measure to other evidence that

11:50:25    19    was on the scene.

11:50:26    20        For example, he found spent casings to the right and he

11:50:31    21    took measurements from those.  Those are the numbers you see

11:50:34    22    up in the upper, right-hand corner, and those become important

11:50:38    23    in the element of, those help us, in a way, to position where

11:50:41    24    an officer may have been at the time they discharged their

11:50:45    25    firearm.  And he also included, if you look to the left side

11:50:49  1    of RP1, which is about the eight o'clock position on the

11:50:57  2    circle, you will see a lone pipe sticking up out of the

11:51:01  3    ground.  So he actually diagramed it and tried to include the

11:51:04  4    locations of things within that arena of performance.

11:51:16  5        Go to the pictures.

11:51:17  6    Q.   Okay.

11:51:19  7    A.   In my opinion, and this is why it is so important, and I

11:51:23  8    know this type of stuff might get tedious, so I apologize, but

11:51:26  9    when you look at a force event, you have to take in the

11:51:29  10   totality of everything that has been presented to you.  It's

11:51:32  11   not about just one piece over another.  It's about looking at

11:51:36  12   everything and assessing it.  Evaluating it.  Part of the

11:51:43  13   force event, in forming the opinion, I had to consider

11:51:46  14   statements made by all parties who had firsthand knowledge of

11:51:50  15   the event.

11:51:52  16        In this particular matter, that would be Deputy Forsyth

11:51:56  17   and Deputy Love.  Their statements are what we must consider

11:52:05  18   when we look at the arena of performance.  They're the ones

11:52:09  19   that are providing us with what they perceived to have taken

11:52:13  20   place.  So you have the arena of performance, you have the

11:52:17  21   window of time, the window of opportunity for the event to

11:52:19  22   take place, now you take the information provided by the

11:52:23  23   individuals, and the information collected through a scene

11:52:27  24   examination, which was the investigation that was done by the

11:52:31  25   responding law enforcement agency, and you put them together.

11:52:36    1    And you want to see how the information that's provided by the

11:52:41    2    witnesses or the people involved in the event match up with

11:52:44    3    the physical evidence that was left at the scene, to create

11:52:48    4    the entire picture and form the opinion that I made.

11:52:52    5         So I'm looking at these pictures.  This is the first

11:52:56    6    picture you've already seen.  I'm going to try to -- I'm going

11:52:57    7    to try not to speak too quickly.  But I'm going to try to move

11:53:01    8    through these so -- more rapidly since you've already seen

11:53:05    9    them.  This is the entry point.  This is the area just outside

11:53:09    10   the access road.  And off to the left somewhere you will see

11:53:14    11   there is a little flower.  I'll try to point it on the screen

11:53:18    12   up here.  In this area somewhere, I believe based on the

11:53:22    13   diagram that the lieutenant created, is the berm or that he

11:53:27    14   used as a reference point.

11:53:34    15        One of the important things in reviewing the opinion or

11:53:37    16   in reviewing the case, was this particular curve as it was

11:53:43    17   described, was a very sharp curve, so when the officers made

11:53:48    18   the curve, the access road would have been behind them.  And

11:53:50    19   that's what the testimony was, was the access road was back

11:53:53    20   there and they had to go back to the access road.  So that's

11:53:56    21   an important element in reviewing the time element.

11:54:01    22        Well, here's one of the pieces of the puzzle.  They had

11:54:02    23   to return back to where they believe the vehicle may have cut

11:54:06    24   off to.

11:54:12    25        What's important about this photograph is when we look at

11:54:17   1   speed, the faster a vehicle goes through an area, different

11:54:22   2   types of ground disturbance.  We obviously see that a vehicle

11:54:25   3   came through here, and very distinct tire impressions.  The

11:54:31   4   lieutenant took a good picture to show that you can see the

11:54:34   5   tread marks in the mud identifying the vehicle had passed

11:54:37   6   through here.

11:54:41   7       Now we're getting to the arena of performance.  And this

11:54:46   8   is an area that really has to be reviewed, assessed, and

11:54:50   9   evaluated in its entirety.  In this photograph, I looked --

11:54:55  10   there is obviously, -- you can't see the Jeep yet, but you do

11:54:58  11   see the patrol vehicle.  We're closer to where the hedge line

11:55:03  12   is now opening up and it's beginning to open to our left-hand

11:55:07  13   side.  Still cannot see the Jeep.

11:55:13  14       This is out of sequence.

11:55:18  15       Now we move just a little bit closer, or it is possible

11:55:21  16   that Lieutenant Branham moved more to the right.  I'm not sure

11:55:26  17   how this image came in, but this is the general position to

11:55:29  18   the opening of the gas well site, and you get to first see the

11:55:33  19   Jeep off to the left-hand side.

11:55:42  20       The distance, 15 feet.  Again, distance and time is

11:55:48  21   relative.  15 feet from where?  If we are in the vehicle

11:55:52  22   sitting in the access road and we say that the Jeep is located

11:55:55  23   10 to 15 feet off to our left, we would expect the vehicle to

11:55:59  24   be 10 to 15 feet, which is similar to where you see it in this

11:56:04  25   position right here.  And that was what was said, but the

11:56:09   1    distance was of the vehicle at the time that they entered the

11:56:12   2    gas well site.

11:56:19   3        When we look at this photograph, to the right side on the

11:56:25   4    ground is the pipe that's sticking up out of the ground.  And

11:56:28   5    that is actually an exceptionally important piece of physical

11:56:32   6    evidence at the scene.  When I say "evidence" it's something

11:56:35   7    that has to be taken into consideration when reviewing and

11:56:38   8    evaluating the arena of performance, because it limits the

11:56:41   9    ability to do certain things.

11:56:49   10       What this image is showing us with the vehicle placement

11:56:53   11   directly behind it, and I want to see if I can get to one

11:56:56   12   that's -- visually we see that the vehicle, from the side, is

11:57:08   13   pressed up against the brush line and it is forward, and we'll

11:57:12   14   see it in another photograph.  It is forward of the brush line

11:57:16   15   behind it.

11:57:26   16       If you look behind the Jeep at this point, directly

11:57:32   17   behind the Jeep where the foliage becomes dark and tall,

11:57:37   18   that's the ditch line.  This is the image that -- I believe

11:57:47   19   these were the two images that were used yesterday during

11:57:53   20   testimony about identifying potential examples of ground

11:57:57   21   disturbance.

11:58:00   22       You may look at -- and I'm going to use the pointer up on

11:58:04   23   the big screen to try to identify the location, and then you

11:58:07   24   can look on your small screen.  This area right through here

11:58:08   25   appears to be a linear line along the edge of -- it's on just

11:58:17  1    the Jeep side of that pipe.  But when you look at that line in

11:58:23  2    alignment with the tires of the Jeep, it doesn't line up.

11:58:26  3    That's one.

11:58:27  4        Two, there is only one of them.  So if the diagram that

11:58:34  5    Lieutenant Branham created was accurate, there's no pairing

11:58:38  6    line.  Not to mention there was testimony across the board

11:58:42  7    that there was -- or there was statements made across the

11:58:44  8    board that there was no evident ground disturbance.  But

11:58:50  9    you'll also notice to the right of the Jeep and behind it

11:58:53  10   where the foliage is tall, that's where the ditch line is.

11:59:00  11       The distance between the Jeep and that ditch line was

11:59:06  12   never measured.  We can only visually estimate it off of the

11:59:10  13   pictures.  So I have to look at it and figure, you know, you

11:59:13  14   look at a Jeep, the Jeep's, I don't know, 13 to 16 feet long,

11:59:18  15   I'd have to look up the specifics on the Jeep, but the Jeep,

11:59:24  16   it's at least, I would say, a Jeep and a half away from the

11:59:29  17   ditch line.  Maybe.  Depending on the angle.

11:59:39  18       This is just a better shot showing that that ground

11:59:42  19   disturbance that's off to the side doesn't line up with the

11:59:46  20   tires -- the rear tires especially, and there's no matching

11:59:49  21   ground distance, nor was there a photograph of any matching

11:59:54  22   ground disturbance in that regard.

11:59:57  23       This image is really important for me to review and

12:00:02  24   evaluate.  When you look at this image of the Jeep, the front

12:00:07  25   tire of the Jeep is canted to the passenger side, meaning the

12:00:15   1      wheel of the Jeep was pointed toward the access road.  If the

12:00:18   2      Jeep was backed straight up and was driving forward at the

12:00:25   3      time of the shooting, the wheel ended up being turned.  Again,

12:00:35   4      that's if the Jeep was backed up.  But this, to me -- we saw

12:00:42   5      in statements from Deputy Love, in his statement, that the

12:00:45   6      Jeep was sitting off 10 to 15 feet.  His statement was that

12:00:50   7      the Jeep did not back up, it just drove forward.

12:01:07   8          Do you have any of questions for me on the pictures?

12:01:11   9      Q.   Does -- in your review, did you find any evidence in

12:01:18   10     those photos that supported the defendant's claim of tires

12:01:24   11     spinning, or aggressive movement, acceleration of the Jeep, to

12:01:31   12     support what the defendant has stated?

12:01:34   13     A.   There was no physical evidence of ground disturbance that

12:01:38   14     was supportive of rapid acceleration.  The statement made was

12:01:43   15     "The vehicle came toward me in an aggressive manner."  What

12:01:47   16     does that mean?  How -- what is an "aggressive manner?"  It

12:01:52   17     would be implied that it was coming toward me in a way that

12:01:56   18     was going to run me over, which implies speed.  Acceleration.

12:02:01   19     Moving toward me.  If the vehicle was just slowly gliding

12:02:05   20     forward, barely moving, it wouldn't really be considered a

12:02:08   21     threat; it would have to be moving or at least attempting to

12:02:11   22     begin to be moving very quickly.

12:02:13   23         You know, and the very graphic description which was

12:02:16   24     presented, the engine was revving, tires spun, came toward me

12:02:21   25     in an aggressive manner, okay, the engine revving, tires spun,

12:02:26  1   there is no ground disturbance in support of tires spinning.

12:02:30  2   Every surface has what they call a "drag coefficient."  What

12:02:36  3   does it take to make a tire -- you know, how much friction is

12:02:39  4   there between a tire and the ground?

12:02:42  5        In a Jeep in a grassy area that's soft or has been

12:02:46  6   recently wet, the tire spinning is going to create ground

12:02:48  7   disturbance.  It's going to create damage in the ground.

12:02:52  8   Another variable was the statement by Deputy Forsyth, was the

12:02:58  9   vehicle did not slow or veer.  There's only two car lengths,

12:03:04  10  three car lengths maximum.  If you're going off at an angle --

12:03:07  11  but unfortunately we don't know what the distance possibility

12:03:10  12  was because it wasn't taken.  We have to go off of what we see

12:03:14  13  in the images and the information that we get from the parties

12:03:17  14  that are witnesses to the event.  But there is no physical

12:03:20  15  evidence to support tires spinning and that rapid

12:03:24  16  acceleration.  Nor does it take into consideration that if you

12:03:27  17  do get your vehicle moving up to a speed that is threatening,

12:03:32  18  even if you take it out of gear, what stops the vehicle from

12:03:35  19  continuing to go?

12:03:37  20       And a great example is Deputy Forsyth's vehicle.

12:03:42  21  Deputy Forsyth got out of his vehicle, and he left it in

12:03:46  22  drive.  Obviously wasn't moving very fast because it coasted

12:03:51  23  forward until it experienced enough resistance from the ground

12:03:55  24  to stop moving.  And it stopped moving, the photographs show

12:04:00  25  it stopped moving a couple feet shy of that, which tells you

12:04:03  1    at a slow speed it doesn't take far for the vehicle to stop

12:04:06  2    most.  Well, it will take that much farther if the vehicle is

12:04:08  3    trying to accelerate to a rapid -- a rapid pace.  But a bullet

12:04:14  4    won't stop a vehicle from moving.  It may terminate the life

12:04:17  5    form in the driver's seat, but it doesn't negate the dynamics

12:04:21  6    of the vehicle in motion until the environment causes the

12:04:29  7    stop.

12:04:29  8    Q.   In your review of the photos, just so the jury is clear,

12:04:34  9    what did the photos tell you, based upon Corey Love's

12:04:39  10   statement, when they pulled into the gas well site?

12:04:41  11   A.   The photos represent exactly where Corey Love stated the

12:04:46  12   vehicle was at the time they entered the gas well site, 10

12:04:50  13   feet -- 10 to 15 feet off to the left.

12:04:53  14   Q.   Was there a difference between the defendant and Corey

12:04:57  15   Love's account of what the vehicle was doing based upon your

12:05:00  16   review in this case when they pulled into the gas well site?

12:05:04  17   A.   Well, there was a completely different review or

12:05:08  18   statements made.  Corey Love stated that upon entering the gas

12:05:13  19   well site that the vehicle was off to the left 10 or 15 feet

12:05:20  20   sitting there.

12:05:22  21        Deputy Forsyth's statement said as they entered the gas

12:05:25  22   well site.  The vehicle came forward almost striking them.

12:05:30  23        Now, that's an important thing because the vehicle is

12:05:32  24   already facing toward the exit road then.  If it's coming

12:05:35  25   forward and almost striking me, the front end of the vehicle

12:05:38   1   is already pointing toward the road.  Then the vehicle backed
12:05:42   2   up and came forward -- or excuse me, the vehicle backed up and
12:05:49   3   began doing its -- attempted a three-point turn, a modified
12:05:53   4   three-point turn, which a three-point turn by definition puts
12:05:56   5   you in a completely different direction.  All of us have done
12:05:59   6   a three-point turn.  The idea is, I need to turn around and be
12:06:02   7   going the other way.
12:06:03   8        The Jeep is already facing forward.  I'm not really
12:06:08   9   certain -- why would he need to make a three-point turn?
12:06:09   10  But -- because if he's making that statement -- we have to
12:06:14   11  remember that small pipe sticking out of the ground also.
12:06:18   12  That's shown in the photograph.  Well, if the vehicle is
12:06:20   13  backing up, its got to back up straight from where it was,
12:06:24   14  because otherwise it's going to hit the pipe unless he's able
12:06:27   15  to negotiate the distance between the pipe and the ditch line.
12:06:30   16  So then he says the vehicle came forward at him.
12:06:36   17       Well, Deputy Love was specifically asked, "Did the
12:06:41   18  vehicle back up?"  And he said, "No.  It did not back up.  It
12:06:46   19  came forward."
12:06:52   20  Q.   In your review of the evidence in this case, and hearing
12:06:58   21  all of the testimony thus far at trial, have you seen any
12:07:03   22  evidence to indicate that the Jeep was not in neutral at the
12:07:09   23  time the defendant utilized lethal force?
12:07:09   24  A.   I can't answer a negative.  What you're asking me is to
12:07:22   25  prove a negative, or look for something that shows a negative.

12:07:24  1    Whether the vehicle -- the evidence supports that the vehicle

12:07:26  2    was not moving at the time of the shooting.  That, to me, the

12:07:30  3    evidence, the physical evidence at the scene, the vehicle

12:07:33  4    placement, the vehicle wasn't moving at the time that rounds

12:07:36  5    were discharged.

12:07:38  6         It's kind of like saying -- and I heard testimony, the

12:07:42  7    question was asked, and I think it was an affirmative

12:07:44  8    response, that there was no evidence the vehicle wasn't going

12:07:48  9    forward.  Well, no, there wasn't.  That's proving a negative.

12:07:54  10   That's not something, just like I won't answer your question

12:07:57  11   on that, that's not something -- you can't prove a negative in

12:08:00  12   that regard.

12:08:01  13   Q.   And that's a great transition to us.  What I would like

12:08:06  14   to ask you about, is your take on Lieutenant Branham's

12:08:15  15   testimony regarding the scene and some of the questions that

12:08:18  16   he was asked by Ms. Durst.

12:08:19  17        First, let me ask you this question:  Did any of

12:08:25  18   Lieutenant Branham's testimony yesterday do anything to alter

12:08:30  19   your opinion in this case?

12:08:32  20   A.   Absolutely not.

12:08:35  21        THE COURT:  Mr. Umina, if I could interject, whenever

12:08:38  22   you think you're at a good point to take a break, if you

12:08:41  23   wouldn't mind letting us know, since we're creeping up on the

12:08:44  24   usual lunch hour.

12:08:46  25        MR. UMINA:  Absolutely.  I'll just work through a

| | | |
|---|---|---|
| 12:08:48 | 1 | couple more questions here, Your Honor, and then we can all |
| 12:08:51 | 2 | get to lunch. |
| 12:08:52 | 3 | THE COURT:  Understood.  Before I pass the mic to |
| 12:08:54 | 4 | you, can we turn our lights back up? |
| 12:08:54 | 5 | MR. UMINA:  Please. |
| 12:09:01 | 6 | THE COURT:  Mr. Umina, you may proceed, sir. |
| 12:09:03 | 7 | BY MR. UMINA: |
| 12:09:03 | 8 | Q.   Mr. Root, yesterday the defendant's counsel asked |
| 12:09:13 | 9 | Lieutenant Branham to effectively prove a negative. |
| 12:09:18 | 10 | Is that a safe statement? |
| 12:09:21 | 11 | A.   Yes.  Well, she asked him if there was any evidence -- I |
| 12:09:25 | 12 | don't want to say that she asked him to prove a negative, she |
| 12:09:28 | 13 | asked him if there was any evidence that the vehicle wasn't |
| 12:09:30 | 14 | moving forward, and he said no. |
| 12:09:32 | 15 | Q.   In your review, Dennis, was there any evidence that you |
| 12:09:38 | 16 | found to support the claim that this Jeep was being used as a |
| 12:09:44 | 17 | weapon, in the manner that the defendant claims, against him |
| 12:09:48 | 18 | at the moment he was using force? |
| 12:09:50 | 19 | A.   No.  None.  That's my point. |
| 12:09:54 | 20 | MR. UMINA:  Your Honor, I think we can take a break |
| 12:09:55 | 21 | here, and then reconvene with Mr. Root. |
| 12:09:59 | 22 | THE COURT:  All right.  Thank you, Mr. Umina. |
| 12:10:01 | 23 | MR. UMINA:  Thank you, Your Honor. |
| 12:10:01 | 24 | THE COURT:  Thank you, Mr. Umina. |
| 12:10:03 | 25 | Ladies and gentlemen, we're at a point where we are going |

12:10:05  1   to take a break so that you can grab something to eat for

12:10:08  2   lunch.  It's about ten after 12.  If I could ask you to be

12:10:13  3   back and ready to reconvene by 1:15.  We'll get started at

12:10:17  4   that point.

12:10:18  5       My standing instructions remain, of course.  Please

12:10:21  6   continue to refrain from discussing the case with anyone

12:10:24  7   including with any of your fellow jurors, amongst yourselves

12:10:28  8   in smaller groups, or anyone at all.  And also please continue

12:10:30  9   to refrain from any independent investigation efforts.

12:10:34  10      Again, not only about this case, any of the issues that

12:10:36  11  may have been raised.  With that said, we'll see you back here

12:10:39  12  at 1:15.  Thank you all very much.

12:11:01  13      (The jury exited the courtroom at 12:11 p.m.)

12:11:01  14         THE COURT:  Thank you all.  Please be seated.

12:11:04  15      Mr. Root, we'll enable you to step down, sir.  I will

12:11:07  16  give counsel a cover because you're still midstream on your

12:11:11  17  testimony, they can't talk to you outside of the courtroom.

12:11:15  18  So you're on your own for lunch, and for the next hour no one

12:11:19  19  is being particularly rude, they're just not allowed to talk

12:11:23  20  to you even though you are an expert witness.

12:11:25  21      With that you can step down.  Feel free to leave

12:11:28  22  everything there.  It will be on the witness stand until you

12:11:31  23  return.  Thank you.

12:11:34  24      With that, Mr. Umina, anything we need to take up at this

12:11:37  25  point?

12:11:37  1          MR. UMINA:  Nothing, Your Honor.

12:11:37  2          THE COURT:  Ms. Durst, anything?

12:11:40  3          MS. DURST:  No, Your Honor.  Thank you.

12:11:41  4          THE COURT:  All right.  Thank you, counsel.  We'll

12:11:41  5  see you back here at 1:15.  We'll stand in recess until then.

12:11:46  6  Thank you.

01:18:51  7      (A recess was taken from 12:11 p.m. until 1:18 p.m.)

01:18:51  8          THE COURT:  Counsel, anything we need to take up

01:18:52  9  before we bring in the jury?

01:18:56  10         MR. UMINA:  No.

01:18:57  11         MS. DURST:  No.

01:18:58  12         THE COURT:  Sir, may we bring the jury in, please?

01:18:58  13     (The jury returned to the courtroom, and the following

01:19:24  14  transpired in open court.)

01:19:37  15         THE COURT:  Thank you all very much.  Please be

01:19:38  16  seated.

01:19:40  17     Mr. Umina, I believe we're ready to continue with

01:19:47  18  Mr. Root's testimony.

01:19:49  19         MR. UMINA:  Yes, Your Honor.

01:19:49  20         THE COURT:  If you would retake the witness stand,

01:20:13  21  sir.  You continue to be under oath, sir.

01:20:15  22     Mr. Umina, you may proceed.

01:20:18  23         MR. UMINA:  Your Honor, may I approach the witness,

01:20:19  24  briefly?

01:20:20  25         THE COURT:  You may.

01:20:21  1   BY MR. UMINA:

01:20:21  2   Q.   Mr. Root, I'm handing you a copy of your demonstrative

01:20:26  3   exhibit that demonstrates time and distance calculations.  I

01:20:34  4   know it's tough to keep in your head.

01:20:37  5        Mr. Root, I would like to next speak with you about the

01:20:43  6   timeline that you have prepared for the jury.  Do you still

01:20:48  7   have the clicker with you?

01:20:50  8   A.   I do.  Did you want me to turn it on?

01:20:57  9   Q.   Yes, sir.

01:21:02  10            THE COURT:  Would it be beneficial to dim the lights

01:21:04  11  a little bit?

01:21:05  12       Ladies and gentlemen, is it easier to see the large

01:21:07  13  screen if we dim the lights?

01:21:10  14       I see a yes or two, so let's do that, Madam Clerk.  Thank

01:21:14  15  you.

01:21:17  16  BY MR. UMINA:

01:21:19  17  Q.   Mr. Root, after hearing the evidence presented at trial,

01:21:24  18  including the radio transmission testimony, what have you

01:21:28  19  learned or been able to discern using your knowledge,

01:21:33  20  training, and experience, and the testimony in evidence that

01:21:36  21  you've heard here at trial?

01:21:37  22  A.   I was able to establish a timeline for a window of

01:21:43  23  opportunity for the entire event to have taken place within.

01:21:49  24  Q.   And did you prepare a visual aid today to assist the

01:21:49  25  jury?

01:21:53  1   A.   I did.

01:21:53  2   Q.   Can you please share with the jury your findings in this

01:21:58  3   regard?

01:21:58  4   A.   Sure.  Based on the testimony that was presented

01:22:05  5   yesterday, and the timeline that was provided, all the radio

01:22:08  6   transmission traffic, the overall event began at 2:43:08 and

01:22:17  7   it was listed as 1443:08, with 14 being 2:00 p.m., 43 and

01:22:23  8   8 seconds.  So the timeline continuum, actually that was

01:22:26  9   presented through radio transmission recordings, gave us to

01:22:30  10  the seconds approximately.

01:22:33  11       So the overall event that drew Officer Forsyth's

01:22:38  12  attention to Mr. Rhoades began at 2:43:08.  Bypassing all of

01:22:46  13  the interior information that was also included, because I

01:22:48  14  went through all radio traffic and just getting directly to

01:22:51  15  the part that preceded and followed the use of force event, at

01:22:57  16  2:53:04 the announcement came over that the vehicle cut off on

01:23:02  17  an access road or a trail.

01:23:04  18       I'm not saying this is exactly the statement that was

01:23:07  19  made by Deputy Forsyth.  I was busy writing down the times and

01:23:12  20  trying to keep up, so those are just kind of like summaries of

01:23:15  21  what they said that transmission was about.

01:23:18  22       From 5304 to 5315, the next radio transmission is a

01:23:28  23  question that is being posed regarding where at a split, left

01:23:32  24  or right -- excuse me -- there was another deputy that was

01:23:35  25  posing a question that they talked about.

01:23:38   1        At 2:53:20, according to the radio transmissions, that's

01:23:44   2   when the announcement was that shots were fired.  So that

01:23:47   3   would have been Deputy Forsyth getting on the radio and

01:23:50   4   announcing shots fired.  So we know the shooting had taken

01:23:54   5   place.

01:23:55   6        Then seven seconds later at 5327, again, there's a radio

01:24:00   7   transmission requesting medical treatment be sent to the -- to

01:24:04   8   the location.

01:24:07   9        The force event, based on radio transmission traffic, had

01:24:12   10   to have taken place between 2:53:04 and then completed by

01:24:19   11   2:53:20.  That's a total -- I'm sorry -- that's a total of

01:24:28   12   16 seconds for the event to unfold.

01:24:32   13        Like I said earlier when you asked me about the opinion,

01:24:35   14   what goes in it, the arena of performance, the window of

01:24:38   15   opportunity, the time involved, the ability of people to

01:24:42   16   complete tasks as identified through statements in comparison

01:24:46   17   with the physical evidence at the scene.

01:24:48   18        This timeline allows the expert to evaluate the event in

01:24:53   19   a realtime manner, to try to assess the probability or

01:24:59   20   possibility of certain things being able to be done or not

01:25:01   21   being able to be done.

01:25:03   22        So when you consider that 16 seconds, the clock started,

01:25:11   23   for lack of a better term, that 16 seconds started at 5304.

01:25:18   24   Following that radio transmission, Deputy Forsyth and Deputy

01:25:25   25   Love would have had to travel 212' 3" according to Lieutenant

01:25:31  1    Branham's diagram information, to get from that berm area
01:25:36  2    which is the corner of where the intersecting road and the
01:25:39  3    access road go to, I think it was Parrish Run -- I get a
01:25:43  4    little confused on the names, but I think it was Parrish
01:25:46  5    Run -- to the entrance of the gas well site. So we have
01:25:50  6    212 -- a little over the 212 feet for that based on the
01:25:53  7    drawing from Lieutenant Branham.
01:25:56  8        Based on testimony, once the vehicle arrived at that
01:26:00  9    location, at the entrance of the well, even though initial
01:26:04  10   statements provided, Deputy Forsyth said he immediately exited
01:26:08  11   the vehicle. He testified that he didn't immediately exit the
01:26:14  12   vehicle. There was a pause. And it was at that time, during
01:26:17  13   that pause, that he observed the Jeep moving, doing its coming
01:26:22  14   forward, which is probably about the same time he is arriving.
01:26:26  15   You have to give him credit, it's not like it's just
01:26:29  16   stopgapped. These are -- some of these things are happening
01:26:31  17   all at the same time.
01:26:32  18       So vehicle is moving forward. We know that the vehicle
01:26:38  19   was moving forward, if we look at the testimony, at the time
01:26:41  20   he got out of the car based on Deputy Forsyth's testimony and
01:26:46  21   Deputy Love.
01:26:48  22       The next thing that happened in that timeline is
01:26:51  23   Deputy Forsyth gets out of the vehicle, moving to the rear of
01:26:54  24   his vehicle. That's followed by giving verbal commands. Now,
01:27:00  25   he could have been giving verbal commands as transitioning

01:27:03   1    back, he could have been pointing his gun as he moved -- you

01:27:05   2    know, in the direction of the Jeep.  He's making his

01:27:08   3    observations also, because remember, he was very clear about

01:27:11   4    seeing what the occupant of the vehicle was doing.

01:27:13   5         Well, if you're -- these are all happening potentially

01:27:16   6    simultaneously, so we want to take into consideration, he's

01:27:18   7    also making observations of what the driver or the occupant of

01:27:22   8    the vehicle was doing.

01:27:25   9         Then he testified, his testimony is that the Jeep began

01:27:29   10   moving forward in an aggressive manner, and he discharged his

01:27:33   11   firearm seven times.

01:27:35   12        Now, based on his background, training, and experience, I

01:27:38   13   want to give him the full benefit of being very proficient

01:27:42   14   with the discharge of the weapon, meaning that he could get a

01:27:45   15   round discharged in about a quarter second per round.  That's

01:27:49   16   pretty quick shooting.  So you're looking at a second and a

01:27:53   17   half just in the discharge timeline of the firearm.

01:27:59   18        Following the discharge of the firearm, he testified that

01:28:02   19   he began to do a tac reload, but changed his mind before

01:28:09   20   transitioning to clearing the passenger compartment of the

01:28:12   21   vehicle.

01:28:14   22        The clock stops at the time he announces over the radio

01:28:20   23   shots have been fired.  What's not included in this

01:28:25   24   timeline -- because, again, benefit needs to go to the deputy

01:28:30   25   when doing the assessment and evaluation.  I was not there.  I

01:28:34   1    have to try to take into consideration what may or may not

01:28:37   2    have been happening.

01:28:38   3        What's not included is, he testified that once -- he had

01:28:44   4    to pause to let a vehicle go by.  If that is included, if he

01:28:50   5    got on the radio and said he turned off and then he paused,

01:28:54   6    which was my impression, but I could be wrong on that, if

01:28:58   7    that's when he paused, and the vehicle went by, then he backed

01:29:02   8    up and went down the road, that's -- that would consume more

01:29:06   9    of that 16 seconds, but giving benefit of the doubt to Deputy

01:29:10   10   Forsyth, we'll say that he never got on the radio to say that

01:29:13   11   it's back here until after that vehicle had gone by.

01:29:16   12       Also, clearing the passenger compartment of the Jeep, I

01:29:21   13   presume that he would have announced "shots fired" before

01:29:25   14   that.  He might not have, but if I include -- if I say, well,

01:29:30   15   he probably didn't, that would be my guessing, and that would

01:29:33   16   be adding something into the elements that need to be

01:29:36   17   considered, in my opinion, improperly.

01:29:42   18       Benefit needs to go to the deputy to make sure that I'm

01:29:44   19   assessing what could have happened in the timeline.

01:29:46   20       So we have 16 seconds for him to -- from the time he says

01:29:51   21   on radio about the cut off, to the time that he's announced

01:29:55   22   "shots fired," 16 seconds from beginning to end for this event

01:29:59   23   to have unfolded.

01:30:03   24       That would be the end of that.

01:30:08   25   Q.  Based on the information you provided earlier, how much

01:30:14  1   of that 16 seconds could have been consumed due to the travel
01:30:21  2   down that 212, 213-foot road?
01:30:27  3   A.   Well, we don't know the exact speed that he went down
01:30:29  4   that road.  I mean, that was never investigated, articulated,
01:30:34  5   or asked.  Excuse me.
01:30:38  6       But the reason I showed you earlier on that one slide
01:30:41  7   where we had time, you know, if the vehicle was moving at five
01:30:44  8   miles an hour to cover that 212 feet, would take 29 seconds.
01:30:52  9   If he was traveling at ten miles an hour, which is a pretty
01:30:56  10  good clip down the dirt road, especially one like that as you
01:31:01  11  saw overgrowth, and there's also where you see the mud
01:31:02  12  sections, if he was traveling at ten miles an hour it would
01:31:07  13  have taken 14 seconds to make it from that point to the
01:31:11  14  entrance of the gas well site.
01:31:13  15      If he was traveling -- excuse me -- at 15 miles an hour,
01:31:18  16  now he's down to ten seconds.  At 20 miles an hour, he can
01:31:22  17  make it down that length of road in seven seconds.
01:31:28  18      It doesn't appear -- when you look at the information
01:31:31  19  that's provided in the photographs from Lieutenant Branham,
01:31:34  20  those are very clear tread marks in the mud.  And anybody
01:31:38  21  that's driven in the mud, when you slide or when you hit mud,
01:31:42  22  it's not always just a straightforward movement, there's a lot
01:31:45  23  of extra things happening to the ground surface below your
01:31:48  24  tire and it doesn't usually leave this perfectly beautiful
01:31:53  25  tread mark.

01:31:54   1      But I feel it's important for us to look at what the

01:31:59   2   consideration is -- I -- I don't believe that his vehicle was

01:32:01   3   doing 20 miles an hour going down that access road because

01:32:04   4   here's why, because when you get down on that type of surface,

01:32:08   5   if you're suddenly stopping, well, what will you have then?

01:32:12   6   You'll have -- you could potentially have some kind of ground

01:32:19   7   disturbance, or not if he's stuttering the brake.

01:32:20   8      Again, all this has to be given credit to the deputy just

01:32:23   9   in case, you know, we're evaluating something incorrectly.

01:32:27  10   What I can tell you is the fastest he could get down there

01:32:31  11   would be in the 25 mile an hour mark, that would be six

01:32:36  12   seconds.  So he would have ten seconds now to get to the end

01:32:41  13   of the road, pause, watch the vehicle moving around, get out

01:32:47  14   of his car and move to the rear, give verbal commands and make

01:32:51  15   observations of what's going on inside the car, and then have

01:32:53  16   the vehicle coming toward him when he discharges his firearm

01:32:57  17   and gets on the radio.

01:32:59  18      So if he was moving at 25 miles an hour down that road,

01:33:05  19   he would have ten seconds for all of those other activities to

01:33:11  20   take place.  Anything less than that negatively impacts the

01:33:14  21   amount of time for the force event to have actually occurred.

01:33:17  22   Q.   And do you recall the defendant stating that he stopped

01:33:21  23   to turn around prior to that?  So he would have had to have

01:33:25  24   been coming from essentially a dead stop to 25 miles an hour

01:33:30  25   to make that possible on the roadway.

01:33:34   1    A.   Correct.  He would have -- he would have had to have

01:33:39   2    accelerated from where -- well, we don't know exactly where he

01:33:42   3    made that radio transmission.  I am trying to give him the

01:33:45   4    benefit of the doubt that he was right at the road curve.  Any

01:33:50   5    movement of his vehicle farther away from that road curve, if

01:33:54   6    the radio transmission takes place from -- heck, if you're

01:34:01   7    talking about 30 feet, 40 feet down the road, those are

01:34:04   8    seconds that will be added and taken away from the window of

01:34:07   9    opportunity within the gas well site.

01:34:10   10        But giving him full -- you know, law enforcement officers

01:34:16   11   have to make very hard decisions in split seconds.  So when we

01:34:21   12   evaluate a force event, we have to give as much benefit of the

01:34:24   13   doubt to the officer as possible.  So I put him as close to

01:34:28   14   the road, right where Lieutenant Branham made his measurement,

01:34:31   15   and did it from there.

01:34:33   16   Q.   In hearing the testimony yesterday at trial, and hearing

01:34:37   17   the radio transmission, what has that done, if anything, to

01:34:43   18   your opinion?  Has that changed your opinion at all?

01:34:47   19   A.   No.  Absolutely not.

01:34:49   20   Q.   Has it --

01:34:50   21   A.   It's strengthened -- it just reinforced what my

01:34:55   22   perception was of the event, and it added additional

01:34:58   23   information in support of that opinion.

01:35:00   24   Q.   I'm going to turn now to the Marion County Sheriff's

01:35:09   25   Department's use of force policy regarding the use of lethal

01:35:09  1    force.

01:35:14  2        Did you review that policy prior to forming your opinion

01:35:18  3    in this matter?

01:35:19  4    A.   Yes.

01:35:20  5    Q.   I'm going to show you the section of that policy relating

01:35:29  6    to the use of lethal force.

01:35:55  7        Based upon this policy, Mr. Root, deputies of the Marion

01:36:03  8    County Sheriff's Department are permitted to use lethal force

01:36:06  9    when the deputy reasonably believes that it is necessary to

01:36:09  10   protect themselves or others from what they believe to be an

01:36:13  11   imminent threat of serious bodily injury or death.

01:36:17  12       Now, in this case, as you know, the defendant claims that

01:36:22  13   he was in imminent threat of serious bodily injury or death

01:36:27  14   due to the Jeep.

01:36:29  15       What is your opinion, based on all of the facts and

01:36:32  16   evidence that you've heard, regarding whether or not the

01:36:36  17   defendant violated this policy?

01:36:39  18   A.   Well, considering -- my opinion is that the use of deadly

01:36:45  19   force in this event was not objectively reasonable.  Which

01:36:50  20   also means it would be a violation of this policy because the

01:36:54  21   statements, the physical evidence, everything at the scene,

01:36:56  22   when looked at from a neutral perspective and evaluated for

01:37:03  23   what they are and how they're presented, do not support that

01:37:06  24   this Jeep was moving at the time of the shooting.

01:37:11  25       Plus, in that matter, the policy specifically prohibits

01:37:17   1   the use of deadly force from or at a moving vehicle absent

01:37:24   2   exigent circumstances.  And exigent circumstances, if someone

01:37:27   3   is trying to run you over with a car, that could be an exigent

01:37:31   4   circumstance.  And it needs to be investigated and evaluated

01:37:36   5   and verified that that is actually what took place.

01:37:39   6   Q.   Did you rely --

01:37:43   7        MR. UMINA:  We can take that down now, Mr. Prince.

01:37:45   8   Thank you very much.

01:37:50   9   Q.   Did you rely on any clearly established case law in

01:37:54   10  determining whether or not the defendant violated

01:38:00   11  Mr. Rhoades's constitutional rights when he utilized lethal

01:38:04   12  force in this matter?

01:38:05   13  A.   Well, it's -- this all falls under the *Graham v.*

01:38:10   14  *Connor* -- the United States Supreme Court decision in *Graham*

01:38:14   15  *v. Connor* which addressed the use of force by law enforcement

01:38:18   16  as a whole.  It wasn't specifically about deadly force.  The

01:38:22   17  Supreme Court decision in *Graham v. Connor* addressed the use

01:38:25   18  of all force by law enforcement.  And that was a guiding

01:38:29   19  variable that I used because it addresses how the use of force

01:38:33   20  is a Fourth Amendment issue and that's what I used in

01:38:37   21  evaluating this case for constitutional reasons.

01:38:40   22  Q.   And how did you apply the facts in this case to *Graham v.*

01:38:48   23  *Connor*?

01:38:48   24  A.   The *Graham v. Connor* decision is very clear.  The court

01:38:55   25  ruled that a use of force for law enforcement, because they're

01:39:00  1    forced to make split-second judgments in events that are
01:39:02  2    rapidly unfolding, very tense, uncertain, because they find
01:39:07  3    themselves within these environments and situations, when you
01:39:12  4    evaluate the use of force by law enforcement, you cannot do it
01:39:17  5    with the benefit of 20/20 hindsight.
01:39:20  6         You have to base that observation or that assessment on
01:39:24  7    what was known to the officer at that moment that they made
01:39:29  8    that horrific decision to have to discharge their firearm.
01:39:34  9         So the facts in this case, that's how I reviewed and
01:39:39  10   evaluated everything in the case.  It's not 20/20 hindsight.
01:39:44  11   What does the case facts, what is the truth presented by the
01:39:47  12   case?
01:39:47  13        One of the other elements that's really important,
01:39:50  14   because in this particular matter, unlike many other force
01:39:56  15   events, the only witnesses to the event are the officers
01:40:02  16   themselves who were involved in the event.  And I want to be
01:40:06  17   very clear.  You have the deputy who actually used the deadly
01:40:10  18   force, and then you had the young officer, the young deputy,
01:40:14  19   Mr. Love, that was a witness, because he didn't physically
01:40:17  20   participate in the gunfire.
01:40:22  21        Since we don't have other witnesses or anything else, one
01:40:26  22   of the key elements in the *Graham v. Connor* decision was
01:40:29  23   officers have the responsibility for being able to articulate
01:40:35  24   what gave rise to that fear that eventually led to the choices
01:40:42  25   they made and the actions that they took.  So it's not just a

01:40:45  1   matter of saying, "I was in fear for my life" and it's over.

01:40:49  2   It doesn't work like that.  What happens is, the personnel

01:40:54  3   involved -- I'm sorry, I'm trying to slow down.  I'm very

01:41:00  4   passionate.

01:41:01  5       The personnel that are involved in the event have the

01:41:04  6   responsibility of being able to articulate what happened.

01:41:09  7   That information then should be critically examined in light

01:41:14  8   of the physical evidence that's presented at the scene.

01:41:20  9       If the statements made and the physical evidence don't

01:41:24  10  line up, there's a problem.  And those considerations and

01:41:29  11  variables are all what led me down the path to forming the

01:41:33  12  first opinion that I did about the shooting not being

01:41:36  13  objectively reasonable.

01:41:37  14      It's based on the totality of everything that was

01:41:41  15  presented through every statement that each individual made,

01:41:44  16  the photographs, the diagrams, everything.  It's not one piece

01:41:47  17  of information.  It's all of it.

01:41:55  18  Q.  Based upon your review of the evidence, did you determine

01:42:00  19  that Mr. Rhoades was in the process of fleeing when the

01:42:11  20  defendant came upon him, or was it something else?

01:42:14  21  A.  Well, if I understand your question correctly, when the

01:42:24  22  deputies found him in the gas well site, he was sitting there.

01:42:28  23  Statements made said he was parked off to the left of the

01:42:31  24  entrance.  And there was adjustments to statements, but they

01:42:36  25  were stopped and to the left of the entrance to the gas well

01:42:39  1  site.  That's not fleeing, at that moment, because you asked,

01:42:44  2  you know, at the moment that they encountered him.  At the

01:42:46  3  moment they encountered him, the Jeep is sitting in the gas

01:42:49  4  well site hiding.

01:42:51  5      If nothing else, maybe hiding.  It's obscured off to the

01:42:54  6  side, that's the way I can describe it.

01:42:57  7  Q.   In law enforcement is there an important distinction

01:43:01  8  between officers actively pursuing a vehicle that they have

01:43:05  9  visual contact with and searching for a vehicle that they lost

01:43:11  10 visual contact with and do not know of its whereabouts?

01:43:16  11 A.   Well, the term "pursuit" means you're actively engaged in

01:43:20  12 following something.  And generally if you say, "I'm in

01:43:22  13 pursuit of this vehicle," you have a visual on the vehicle.

01:43:24  14 The moment you no longer have a visual on the vehicle, and

01:43:29  15 you're trying to find the vehicle, you're actively searching

01:43:34  16 for the vehicle that was being pursued.

01:43:37  17      And based on testimony, the statements made by Deputy

01:43:44  18 Love and Deputy Forsyth, when they made that U-turn to go

01:43:49  19 after the Jeep, they lost site of the Jeep.  I think Deputy

01:43:53  20 Love said within the first quarter mile it was gone, and then

01:43:56  21 they were relying on, did the Jeep pass you?  No.  Okay.

01:43:58  22 Well, this is the road to this way.  And then they got to a

01:44:01  23 road that had gravel that they could follow a dust trail,

01:44:05  24 presumably being the dust trail from the vehicle that they

01:44:08  25 were initially turned around on.

01:44:11  1    So you can't pursue something when you're looking.
01:44:15  2  You're either actively searching or you pursuing them.  And
01:44:18  3  given fact that he wasn't within their visual field, they were
01:44:22  4  trying to locate him, so I would say they were actively
01:44:26  5  searching for him.
01:44:27  6  Q.   It was mentioned during this trial -- just shifting gears
01:44:34  7  a little bit here, Mr. Root.  It was mentioned during this
01:44:38  8  trial that you don't have an issue with the officers taking a
01:44:45  9  bit of time before they give their statements.
01:44:49  10    So my first question to you is:  Why is that, that you
01:44:56  11  don't have an issue with them waiting?
01:44:58  12  A.   Well, I don't have an issue with them waiting to give
01:45:02  13  statements.  I don't have an issue with any citizen waiting to
01:45:08  14  give a statement, whether they're law enforcement or an
01:45:12  15  individual.  And the reason for that is, studies have shown
01:45:15  16  that following high stress events, critical encounters, that
01:45:19  17  are life endangering, people go through a multitude of
01:45:25  18  physiological changes and psychological changes that empower
01:45:31  19  them to survive the event in some way.
01:45:34  20    Immediately following the event the person should be
01:45:38  21  medically cleared, first of all, because of the physiological
01:45:41  22  changes that can happen to someone.  Focusing on the statement
01:45:44  23  time, the studies have revealed that an officer -- an
01:45:49  24  individual, let's just leave it at an individual -- it could
01:45:53  25  be 24, 48 up to 72 hours before you have come down to a point

01:45:58   1   that you can compartmentalize and work your way through,

01:46:03   2   personally, that tragic event that you were just encountered

01:46:07   3   -- that you had just encountered.

01:46:08   4        It's also recommended that in that 72-hour period, that

01:46:11   5   you have at least one full sleep cycle so that you have rest,

01:46:17   6   you have the opportunity to decompress from what is, most

01:46:23   7   likely for people in situations like this, a life-changing

01:46:25   8   event, so any person should wait.  And for law enforcement, I

01:46:33   9   would tell any law enforcement officer, when you do give your

01:46:36   10  statement, have your attorney and your union representative

01:46:40   11  with you.

01:46:41   12       If you're a private citizen, I would tell you when you go

01:46:43   13  and you do give your statement, have your attorney with you.

01:46:47   14  There's nothing wrong with that.  That's our constitutional

01:46:50   15  right.  That's part of being an American.  So I have zero

01:46:53   16  issue with telling anybody that.

01:46:54   17  Q.  What do you take issue with regarding the manner in which

01:46:57   18  the defendant and Corey Love gave their statements in this

01:47:04   19  case?

01:47:04   20  A.  The conflict that I have with it, is the fact that it

01:47:11   21  seems like they were having communications post.  They were

01:47:13   22  seen in the hospital and they said, "I don't want to give a

01:47:16   23  statement right now."  Okay.  No problem.

01:47:20   24       Following that, though, according to the testimony, even

01:47:23   25  though Lieutenant Branham -- it's like they were trying to

01:47:26   1   coordinate the meeting.  It was -- he said that he reached out

01:47:30   2   and they wanted to come in together.  I have a problem with

01:47:33   3   that.

01:47:35   4       Following an event like this, when people speak -- I'll

01:47:39   5   slow down, sorry.

01:47:40   6       When people speak to other people about an event, it gets

01:47:45   7   messed up in their heads sometimes.  And I don't mean that in

01:47:48   8   a negative way, that's why we keep witnesses, following any

01:47:52   9   kind of crime or anything like that, we keep them separated.

01:47:55  10   Because we don't want one person who is really confident in

01:47:59  11   the information, and another person who is not so confident,

01:48:02  12   talking to each other, because it will influence that.

01:48:05  13       And if they were team members, if you will, if you were

01:48:09  14   investigating a crime and you had two bad people, it gives

01:48:12  15   them an opportunity to get their stories straight before they

01:48:15  16   provide a statement.

01:48:17  17       In matters like this, law enforcement -- what I have an

01:48:21  18   issue with is, it appears that they were trying to coordinate

01:48:23  19   the communication and then they showed up with, interestingly

01:48:28  20   enough, written statements that they read into the record.

01:48:33  21   There were some questions that were asked, not great, in-depth

01:48:39  22   questions, or not real good follow-up questions.

01:48:41  23       For example, Lieutenant Branham -- and I want to preface

01:48:46  24   this, I don't fault Lieutenant Branham.  He's never had the

01:48:50  25   training for use of force investigations.  He may have

01:48:52  1    investigated hundreds of crimes, but there's different

01:48:56  2    information that needs to be reviewed, assessed, and evaluated

01:48:59  3    in a force event.   And even though he has investigated

01:49:02  4    hundreds of crimes, I think he testified that this was his

01:49:05  5    second lead force investigation, and maybe total in his

01:49:10  6    career.   At that time he had four, two as a secondary, two as

01:49:14  7    a primary, and that was this event.

01:49:17  8        So with that said, because I don't want to cast

01:49:22  9    negativity on Lieutenant Branham, he didn't ask questions.  He

01:49:25  10   testified yesterday that there was no discrepancies -- I'm

01:49:29  11   speaking too fast again, sorry.

01:49:32  12       He testified yesterday, that there were no discrepancies

01:49:35  13   between the statements.  If you read the two statements, it's

01:49:39  14   clear that's not true.

01:49:41  15       For example, this is what I said earlier.  He was asked

01:49:44  16   specifically if the Jeep backed up or just moved forward

01:49:51  17   toward Deputy Forsyth.  He said, "No, it didn't back up.  It

01:49:57  18   moved forward."

01:49:59  19       Well, there's no three-point turns -- there were a lot of

01:50:02  20   things that the two stories were inconsistent with one

01:50:05  21   another.  So the statement that they were -- there were no

01:50:08  22   inconsistencies isn't true at face value.  But I also want to

01:50:13  23   be clear.  Inconsistencies between witnesses doesn't mean

01:50:17  24   lying, all the time.  You have your perspective.  I have my

01:50:22  25   perspective.  When we see things, we see things differently.

01:50:25  1   I may be looking at something else and you are looking in a

01:50:27  2   different direction.

01:50:28  3        Inconsistencies just mean we need to spend time

01:50:31  4   investigating this because if this doesn't match up, why

01:50:34  5   doesn't it match up?  Could it be just natural human error or

01:50:39  6   could it be deception?  It's just something that, as an

01:50:42  7   investigator, you look at, consider, and either clear it off

01:50:45  8   the roll, or focus in on it as a point of concern.

01:50:52  9   Q.   What effect did the inconsistencies in those two

01:50:55  10  statements have on your opinion and your review of this use of

01:51:00  11  force incident in determining whether it was objectively

01:51:04  12  reasonable, specifically the defendant's actions?

01:51:15  13  A.   I already said law enforcement had a very different job.

01:51:18  14  There are no -- there are no witnesses to this event outside

01:51:21  15  of the personnel that was involved in it.  So we have to take

01:51:26  16  them at their word.  What happened?  Tell us what happened.

01:51:31  17       But then we have the obligation to take that information

01:51:35  18  and look at the physical evidence at the scene and see if it's

01:51:39  19  conceivable, you know?  I mean, when we think about the size

01:51:42  20  of the arena of performance, 33 feet wide by a maximum of

01:51:48  21  46 feet deep, that is not a big area.  I didn't measure this

01:51:54  22  room.  I was thinking about doing it.  But I feel pretty

01:51:57  23  confident that from the jury box to that wall would be within

01:52:00  24  that 30 to 35-foot realm, and I just want you to have a visual

01:52:08  25  reference.

01:52:08  1      You have multiple vehicles' movement, a car making

01:52:10  2   multiple point turns, or trying to, backing up, moving

01:52:13  3   forward, their statements and looking at the arena of

01:52:18  4   performance, it doesn't line up.  They don't match.  The

01:52:23  5   accusations made about what was taking place, there's no

01:52:26  6   physical evidence in support of that.

01:52:28  7      So when looking at the statements and looking at the

01:52:32  8   physical evidence, and then looking at the changes in the

01:52:34  9   statements, you know, the evolutions of the statements over

01:52:37  10  time between the two of them, you know, and then confirming

01:52:41  11  that misinformation was actually being given by one of them,

01:52:46  12  it's just -- they're supposed to be the solid source of

01:52:51  13  information, but it doesn't match up with the physical

01:52:53  14  evidence on scene.

01:52:55  15  Q.   Is the physical evidence and the objective evidence what

01:52:59  16  you focused on in forming your opinion, Mr. Root?

01:53:04  17  A.   I -- yes.  I don't want to discount their statements

01:53:09  18  entirely because it was an element that had to be considered.

01:53:12  19  But you have to do a critical thinking type evaluation of the

01:53:17  20  information that's presented.  Not just a, I did this, okay,

01:53:20  21  that's fine.

01:53:21  22      If there's physical evidence in support of it, that would

01:53:25  23  really solidify what was being said.  If there weren't giant

01:53:29  24  changes in statements you would probably be like, I don't see

01:53:32  25  any problem.  But there were.  And looking at the objective

01:53:36   1   information, things that nobody -- the location of the casings

01:53:40   2   at the scene, you know, there were additional casings found

01:53:43   3   later that weren't found the day of the shooting, the fact

01:53:46   4   that the scene wasn't documented or investigated in a way that

01:53:51   5   would support or disprove the information that was being

01:53:55   6   provided by the only two people that have information relative

01:53:59   7   to the shooting, those are things that I took -- because those

01:54:04   8   are, I believe the key elements in looking at a force in its

01:54:07   9   entirety.

01:54:08   10       You often hear law enforcement say, "the totality of the

01:54:11   11   circumstances," because that's an important thing.  It's about

01:54:14   12   everything that was happening.  But when it comes to

01:54:17   13   investigating use of force, it's also about the totality of

01:54:19   14   the circumstances.  What does all the evidence tell me?  What

01:54:23   15   does all the information provided, what picture does that

01:54:26   16   create?  And that is what led to the forming of my opinions.

01:54:30   17   Q.   Did the objective evidence in this case, the timeline,

01:54:37   18   the hard evidence at the scene, all of the objective physical

01:54:41   19   evidence, did that support the defendant's version of events,

01:54:49   20   or did that disprove the defendant's version of events to you?

01:54:55   21   A.   To me it disproves it.  All the evidence and information

01:54:58   22   that was contained, physical evidence looking at the scene, it

01:55:02   23   did not line up.  It did not support his version of events or

01:55:06   24   any of the versions of events that were told.

01:55:09   25   Q.   Now, in a few moments I believe that the defendant is

01:55:15    1    going to have his expert witness testify.  Now you say that

01:55:25    2    the objective physical evidence did not support his -- the

01:55:30    3    defendant's version of events.  Have you had an opportunity to

01:55:36    4    review the defendant's expert's opinion in this case?

01:55:41    5    A.   Yes.

01:55:42    6    Q.   And the basis for that opinion?

01:55:44    7    A.   Yes.

01:55:44    8    Q.   Did he apply the objective physical evidence to this case

01:55:50    9    in an attempt to prove or disprove the defendant's story or

01:55:55   10    did he merely use the defendant's story?

01:56:02   11    A.   My opinion of his report is he focused 98 percent of

01:56:07   12    his -- I will leave it with he put 98 percent of his focus

01:56:14   13    into the statements.  The explanations being presented by

01:56:17   14    officers, and when there was a deviation there was a reason

01:56:21   15    for it.  There was no -- he did document in his report that

01:56:24   16    there was no ground disturbance.  He conceded that there was

01:56:30   17    no ground disturbance.  That's why during yesterday's

01:56:33   18    testimony, there was now ground disturbance but even -- and I

01:56:37   19    want to be very clear, Mr. Faulkner's report, he conducted a

01:56:42   20    scene examination, he met with Deputy Forsyth.  I believe the

01:56:48   21    record shows that he met with him at the scene.

01:56:50   22         I didn't do my scene examination until I came up here for

01:56:55   23    the, you know, before the trial.  But even though he'd already

01:57:00   24    done the scene examination, he created a report and

01:57:03   25    articulated in the report there was no -- it could account for

01:57:06   1    no ground disturbance.

01:57:08   2        He was using one element to -- and he cited in that, you

01:57:12   3    know, because the person could have been shifting gears or

01:57:15   4    something like that, this could all -- one of the sentences

01:57:17   5    was to the effect, I'm paraphrasing now, that this could

01:57:21   6    account for no ground disturbance.  So even his report says

01:57:25   7    that.

01:57:25   8        So I don't want to say all of his report -- it just

01:57:28   9    seemed like the opinions that he formed were focused solely on

01:57:32   10   the information provided by the deputies without critically

01:57:35   11   considering and evaluating how that applied to the physical

01:57:38   12   evidence of the scene.

01:57:39   13   Q.   Mr. Root, we have talked about the observations you made

01:57:46   14   in forming your opinion in this regard.  Does reconsideration

01:57:48   15   of any of the information we've discussed today of what you

01:57:51   16   have heard during this trial change your opinion as to whether

01:57:56   17   or not the defendant's use of deadly force being not

01:58:03   18   objectively reasonable?

01:58:08   19   A.   I still think the use of force was not objectively

01:58:11   20   reasonable, if that answers -- I got a little confused by your

01:58:14   21   question, but I do not think it is.

01:58:16   22   Q.   Thank you.  Now, Mr. Root, I'd like to turn to your

01:58:20   23   second opinion.  Have you come to court today prepared to

01:58:24   24   state your opinion as to whether or not the tactics used by

01:58:28   25   the defendant to execute this traffic stop were poor, whether

01:58:31  1   they had met the accepted standards for officer safety, and

01:58:35  2   whether his chosen tactics did or did not directly contribute

01:58:40  3   to the unreasonable application of deadly force in this case?

01:58:44  4   A.   Yes.

01:58:44  5   Q.   Mr. Root, what is that opinion?

01:58:47  6   A.   Close to what you just said the opinion -- the second

01:58:51  7   opinion that I hold is that the tactics that Deputy Forsyth

01:58:55  8   deployed during this traffic stop were poor, and there is no

01:59:02  9   question that they did not meet officer safety standards.  And

01:59:06  10  I believe that they directly contributed to his application of

01:59:12  11  deadly force.

01:59:14  12  Q.   Did you utilize your knowledge, training, and experience

01:59:18  13  as you discussed earlier in forming your opinion?

01:59:20  14  A.   Yes.

01:59:21  15  Q.   Did you rely on the same information in forming that

01:59:24  16  opinion?

01:59:24  17  A.   Yes.

01:59:25  18  Q.   I'd like to invite you to step down off the witness stand

01:59:30  19  here and we brought a whiteboard in for you, and I would like

01:59:33  20  you to explain to the jury why you believe that the

01:59:40  21  defendant's tactics for this traffic stop were poor, did not

01:59:44  22  meet the established officer safety standards, and directly

01:59:48  23  contributed to his use of deadly force.

02:00:03  24           THE COURT:  Mr. Prince, if I could impose, I know

02:00:04  25  there's another microphone there on counsel table, if you

02:00:06   1   wouldn't mind turning that --

02:00:06   2           MR. PRINCE:  Yes, Your Honor.

02:00:07   3           THE COURT:   -- so we have some hope of amplifying

02:00:11   4   Mr. Root while he's testifying with the whiteboard.  Thank

02:00:16   5   you, sir.

02:00:19   6           THE WITNESS:  I will dig deep for my voice with the

02:00:21   7   mask.

02:00:21   8           THE COURT:  Not only for our jury, but for Madam

02:00:25   9   Court Reporter's benefit.  Yeah, actually, why don't we go

02:00:28   10  with a little lapel mic.  If that is all right.

02:01:12   11          THE WITNESS:  I'm going to try to do this one handed.

02:01:16   12  I couldn't do it with one hand.

02:01:19   13      Okay.  In looking at the traffic stop -- I'm not an

02:01:25   14  artist, but let's say -- and I'm going to stand in the way

02:01:27   15  when I draw it, then I'll move out of the way to explain it.

02:01:30   16      We have -- we have the bowl, the gas well site.  We have

02:01:42   17  an access road.  And essentially, when you look at the images

02:01:47   18  that were presented or that was captured by Lieutenant

02:01:51   19  Branham, it shows the position of the Jeep, it shows the

02:01:55   20  position of the patrol car, and then when you use that

02:01:58   21  information in relation to what we hear from Deputy Forsyth,

02:02:02   22  and we also consider the information they provided to us about

02:02:06   23  what they heard through radio traffic, and that's another key

02:02:11   24  element.

02:02:11   25      But this is not to scale, this is just a generalization,

02:02:20  1    I'm not that good.  The Jeep, the little triangle in the front

02:02:41  2    indicates that's the front of the vehicle.  The patrol car was

02:02:44  3    set off and more into the gas well site.  And the gas piping

02:02:50  4    ran across here basically, and then there was another pipe

02:02:55  5    that came off this way, but -- that's absolutely terrible.

02:03:03  6         What's important about this when we look at it from

02:03:06  7    tactics, when they entered the gas well site, the statements

02:03:10  8    indicated that the Jeep, upon entering, was parked adjacent

02:03:15  9    to, off to the left side of the entry point to the gas well

02:03:20  10   site.

02:03:23  11        Deputy Love's statement indicated it was 10 to 15 feet

02:03:27  12   off to the side, which is actually approximately where it was

02:03:30  13   after the shooting also.  Luckily it was the -- it was the

02:03:39  14   middle of the day, so lighting was not a concern, it wasn't

02:03:42  15   like it was a poorly lit environment.  But when they pulled up

02:03:46  16   to the entry way of the gas well site -- I guess I should make

02:03:53  17   the car up here, sorry -- when they pulled up to the entry

02:03:57  18   point, the indication was the vehicle was doing a bunch of --

02:04:02  19   suddenly came forward, almost struck the patrol car, and then

02:04:06  20   started backing up and doing all this maneuvering.

02:04:09  21        You saw the diagram that was done by the investigator

02:04:14  22   that identified the width of the road being about eight feet.

02:04:17  23   Then you have the diagram that was done by Lieutenant Branham

02:04:24  24   that puts it less than six feet.  The point is, their patrol

02:04:30  25   car -- and having driven down there in a vehicle myself, your

02:04:33  1    vehicle takes up the access road.  It's not something where

02:04:38  2    somebody is going to squeeze by you unless they're willing to

02:04:41  3    drive into really heavy brush or wooded vegetation around the

02:04:46  4    entry point.

02:04:47  5         So it's kind of like what we would call a bottleneck.

02:04:49  6    There is one way in and out, and they're blocking it.  As a

02:04:54  7    matter of fact, I think it was Lieutenant Branham that asked

02:04:58  8    Deputy Love if he thought the vehicle was just trying to get

02:05:03  9    back out onto the access road, and his answer was yes.

02:05:07  10        But when they get to this point and they see the vehicle,

02:05:12  11   they have essentially cut off all points of egress.  And

02:05:17  12   here's why.  This here, you have a ditch that runs along this

02:05:30  13   area and then a steeper incline, he wasn't going that way.  He

02:05:35  14   couldn't get around the equipment and the berm back there, and

02:05:38  15   on this side of the bowl, is a very steep drop.  He's not

02:05:47  16   going out that way either.

02:05:51  17        This is the control point of entry and exit to the gas

02:05:55  18   well site.  If the vehicle was pulled off to the left side and

02:06:00  19   they put their patrol car right here, and it came forward

02:06:05  20   almost striking the car -- I want you to think about this --

02:06:12  21   you have a vehicle that you blocked in, comes forward and

02:06:15  22   almost strikes your car, but you get out of your car without

02:06:20  23   making any evasive or tactical position of the vehicle, this

02:06:27  24   is not a wide area, but nothing would prevent him from backing

02:06:33  25   up some or depending on when they actually saw -- do you

02:06:36   1    remember the pictures that I showed as you enter the gas well

02:06:40   2    site?  It begins to open the view to the left, which means if

02:06:43   3    you're looking and scanning the area, you start to see the

02:06:46   4    vehicle before your patrol car is in the gas well site.

02:06:56   5        The information known about the car, according to radio

02:06:59   6    traffic, may be armed.  If you knew nothing else about the

02:07:08   7    vehicle, for tactics-wise, the fact that the individual may

02:07:10   8    have a firearm should adjust the manner in which you interact

02:07:14   9    with the vehicle.

02:07:17   10       The tactics deployed by Deputy Forsyth took him -- his

02:07:22   11   initial statement, said he got out of the car directly in

02:07:25   12   front of the Jeep.  That was also supported by Deputy Love.

02:07:29   13   His deposition statement added to that, "Well, I didn't get

02:07:32   14   out immediately" -- which he originally said that -- both he

02:07:35   15   and Love's statements indicated it was immediate.  He didn't

02:07:40   16   get out immediately.  And when he got out, he's now moving to

02:07:43   17   the back of his vehicle because it would be a -- that is a

02:07:46   18   tactical position because it would put the full vehicle length

02:07:51   19   between him and an angled object because the angled object

02:07:55   20   couldn't come through here.

02:07:59   21       So why would you get out of the car?  You could utilize

02:08:03   22   the vehicle, just stop it -- and what I'm explaining right now

02:08:13   23   is basic tactics.  This isn't S.W.A.T. training.  This isn't

02:08:19   24   special vehicle extraction training.  This is just tactical

02:08:22   25   consideration of an environment and a vehicle.  And you have

02:08:24   1    to remember, I believe that Deputy Forsyth is part of the

02:08:30   2    S.W.A.T. team or has been.  I believe that was in his record.

02:08:39   3         But every patrol officer should understand that in your

02:08:43   4    vehicle, you have an engine block.  This is a heavy object

02:08:55   5    that we can use for safety, security, cover, and concealment.

02:09:00   6    The differences between the two.  Cover, hides you.  I'm

02:09:05   7    sorry.  Cover, protection from ballistic fire; concealment

02:09:08   8    hides you.

02:09:09   9         So, for example, if you open up a door, you get minimal

02:09:17   10   cover, you get a lot of concealment.  And if you have ever

02:09:23   11   watched any cop show when they do a high risk -- when they do

02:09:27   12   a high risk takedown or they do a high risk traffic stop, or

02:09:30   13   they're dealing with potentially armed subjects, they will

02:09:33   14   position their vehicles at an angle behind theirs, they'll

02:09:36   15   open their doors, they'll get down behind doors and behind the

02:09:37   16   lights and they'll use all of their equipment to help protect

02:09:41   17   them from the potential threat.

02:09:45   18        Here is your potential threat.  And Deputy Forsyth gets

02:09:49   19   out in front of not only the vehicle that just tried --

02:09:54   20   according to his statement, his testimony -- not only does he

02:09:59   21   get out of his car in front of a vehicle that just allegedly

02:10:04   22   tried to -- like it was almost going to hit him, he gets out

02:10:08   23   in front of a vehicle, that according to radio traffic, may

02:10:12   24   have -- the operator may be armed.

02:10:16   25        That is not sound tactics.  Those elements, in and of

02:10:20  1    themselves, tell -- I hope they would tell the basic officer,

02:10:23  2    if they went through field training, that this will get you

02:10:27  3    killed.

02:10:29  4        Then he identifies that he transitions from the vehicle

02:10:33  5    and he tries to go to the rear, but he hasn't realized that he

02:10:37  6    left the gear in drive.  The reason he went to the rear is a

02:10:46  7    tactical mechanism for safety.  Yet when the safety shield

02:10:50  8    leaves, he remains standing in the open while the vehicle --

02:10:55  9    according to his statement -- backs up.

02:11:03  10       These tactics, getting out -- jumping out of the car -- I

02:11:07  11   know that you are going to hear that there are those that say,

02:11:11  12   well, the key to a high risk situation, be the first person

02:11:14  13   out of the car.  You know, the first person.  For example, in

02:11:19  14   a high risk stop, if you are stopping a vehicle, you don't

02:11:21  15   want to be trapped in your car when they jump out of their car

02:11:25  16   and start shooting at you.  You utilize your vehicle as cover.

02:11:28  17   You use the engine block.  But we don't sacrifice our safety

02:11:34  18   to be the first person out of the car.

02:11:37  19       When you are literally in front of the vehicle, tactics

02:11:42  20   would have been to utilize the vehicle to obstruct the

02:11:45  21   opening.  There is no way you get out of the car if you're

02:11:50  22   half in the gas well site without being directly in front of

02:11:55  23   the Jeep, unless you take the time to turn the wheel and get

02:11:58  24   into the gas well site so that you're using the wheel the best

02:12:02  25   you can to put your engine block -- I don't want to get this

02:12:16  1    too dramatic.

02:12:19  2         Once you see it backing up, and pulling forward or

02:12:24  3    backing up and staying, depending on how much of the view of

02:12:26  4    this vehicle that you have, you're still blocking the exit.

02:12:29  5    They can't get out.  And you positioned your vehicle in a way

02:12:33  6    that the engine block is between you and them if they are

02:12:35  7    armed, you have a very solid object that is providing you with

02:12:39  8    cover.  And when you do exit the vehicle, you can now use your

02:12:42  9    door as additional cover and concealment.  This is not

02:12:47  10   advanced training.  This is not advanced tactics.  This is

02:12:53  11   basic police training.

02:12:56  12        So utilizing your vehicle as a mechanism for safety is

02:13:01  13   about every traffic stop.  It doesn't matter where you are.

02:13:04  14   If you're the person stopping the car, you try to pick the

02:13:08  15   location, you try to pick the time, the whole nine yards, but

02:13:12  16   you don't always get to do that.  So then when you're thrown a

02:13:15  17   curve ball, for example, if you're trying to stop a vehicle,

02:13:18  18   and the lady that's driving the car doesn't feel safe stopping

02:13:21  19   in a dark area, she wants to go to the gas station where it's

02:13:24  20   lit.  You don't know what's going on in the car.  You follow

02:13:27  21   the car.  When the car pulls into the well-lit area, you

02:13:31  22   position your vehicle in a way that it provides you with

02:13:34  23   protection until you verify what's going on with the car.

02:13:37  24        And since it's a stop that didn't go normally, you

02:13:43  25   utilize PA equipment and things like that to give your

02:13:47  1   commands loudly over a loud speaker to the driver to generate

02:13:51  2   compliance to see if there is going to be, you know, driver --

02:13:53  3   if you're in a position of advantage, you got your vehicle as

02:13:57  4   your obstruction, protection.  These tactics allow you to use

02:14:01  5   the equipment in the car to make the announcement, not just

02:14:05  6   your voice.  If they are anything like me, I have a huge mouth

02:14:09  7   and I am very capable of getting a loud command out.  But with

02:14:13  8   a vehicle set up and doing proper tactics, you would be able

02:14:18  9   to use the PA system to effect the same thing without exposing

02:14:22  10  yourself to significant risk.

02:14:27  11      That's proper tactics.  Not getting out in front of the

02:14:31  12  vehicle that is potentially armed, in the open, and then the

02:14:34  13  vehicle that you allegedly use in your tactical block leaves

02:14:38  14  you and you just stand there in the open.

02:14:41  15      And the reason I attribute high marks to Deputy Forsyth

02:14:46  16  about tactical knowledge, if he's been trained in a way that

02:14:51  17  educated him on tactical reloads -- tactical reload means

02:14:55  18  this, you reload when you can, and when you have to.  It's for

02:14:59  19  a gun fight.  You're involved in a gun fight.  You got 15

02:15:02  20  rounds in a magazine.  You pull the trigger eight times.  The

02:15:05  21  shooting stops, and you're in a position of safety.  Make sure

02:15:08  22  before the engagement begins again, or you move from that

02:15:10  23  position of safety, you remove the magazine, put a fresh

02:15:13  24  magazine in so that should another engagement occur, you have

02:15:16  25  a fully-loaded weapon versus a partially-loaded weapon.

02:15:19    1    That's what a tactical reload is for.

02:15:24    2        He was going to engage in one after he shot at a vehicle

02:15:28    3    he alleges was moving toward him, because he wasn't sure what

02:15:32    4    was inside, but then he stopped.  He moved out of the vehicle

02:15:38    5    to put tactics -- according to his deposition -- to move to

02:15:41    6    the rear of the vehicle.  And in his testimony, yet, when the

02:15:44    7    rear of the vehicle wasn't present for his protection, he

02:15:47    8    stood out in the open.  Those are bad tactics.

02:16:23    9            THE COURT:  Mr. Prince, while Mr. Root is resuming

02:16:25   10    the witness stand, can I ask you to move the whiteboard?

02:16:28   11            MR. PRINCE:  Yes, sir.

02:16:29   12            THE COURT:  Thank you.

02:16:45   13    BY MR. UMINA:

02:16:45   14    Q.   Mr. Root, do you recall what Deputy Love indicated that

02:16:52   15    he was doing as all this was going on?

02:16:56   16    A.   In the final statements he indicated that when

02:17:05   17    Deputy Forsyth got out of the vehicle, he also got out of the

02:17:08   18    vehicle.  I am yelling now, sorry.  Takes a while for it to

02:17:15   19    catch up.

02:17:17   20            THE COURT:  Mr. Root, take a breath and slow down as

02:17:20   21    well.

02:17:21   22            THE WITNESS: I apologize, Your Honor, again.  Thank

02:17:23   23    you.

02:17:25   24        When Deputy Forsyth exited the vehicle, Deputy Love also,

02:17:30   25    at the same time, exited the vehicle, and he began moving

02:17:36   1    forward of the patrol car.  He hadn't realized that it wasn't

02:17:41   2    in park, so as he's going forward, so is the patrol car.  But

02:17:46   3    clearly not at a very fast pace.  Because he was able to --

02:17:50   4    not only did the patrol car eventually stop within a few feet

02:17:53   5    of the gas well equipment, but Deputy Love was eventually able

02:17:59   6    to get around the vehicle, but he exited at the same time that

02:18:04   7    Deputy Forsyth did.

02:18:11   8    BY MR. UMINA:

02:18:11   9    Q.   Tactically is it a good idea to attempt to run in front

02:18:17   10   of a vehicle that's moving like Mr. Love claims that he did,

02:18:22   11   his own?

02:18:25   12   A.   I don't think you have to be a tactician to know that it

02:18:29   13   is not a good idea to run in front of a moving vehicle.  But

02:18:35   14   he's very -- and again, giving credit to the officers and

02:18:39   15   trying -- he's very young.  He was in his first month or so of

02:18:45   16   being a police officer, so getting out of the car, not knowing

02:18:49   17   that, oh, he hadn't been to the academy yet, you know,

02:18:52   18   (indiscernible) this way to where your partner was going.  He

02:18:56   19   just made a mistake, and he was going -- it wasn't tactically

02:19:00   20   sound, but I don't think he knew any better.

02:19:02   21   Q.   Do you believe he knew that the vehicle was moving when

02:19:09   22   he attempted to run around the front of it?

02:19:14   23   A.   Well -- he figured it out.  I mean, he had to know it was

02:19:19   24   moving, because you get out of a car -- it probably hit him

02:19:22   25   when he got out of car and the car -- because if the car was

02:19:26  1    moving, you know when you get out.  And I will admit, in all

02:19:29  2    embarrassment, I have bailed out of my patrol car and left it

02:19:33  3    in drive.  I know the feeling that that creates.  I was lucky

02:19:39  4    enough to jump back in.  But for him, I'm sure as he exited he

02:19:44  5    realized, but you're already committed to the action; I've

02:19:47  6    started this, I continue doing it.

02:19:49  7    Q.   Mr. Root, we have now talked about the observations you

02:19:55  8    made in forming your opinion in this matter.  Does

02:19:59  9    reconsideration of any of the information we have discussed

02:20:01  10   today or that you've heard during this trial change your

02:20:05  11   opinion as to whether the defendant's tactics for this traffic

02:20:10  12   stop were poor, failed to meet established officer safety

02:20:14  13   standards, and directly contributed to his unreasonable use of

02:20:18  14   deadly force?

02:20:19  15   A.   Absolutely not.  And I'd like to add something, that when

02:20:23  16   we were talking about timelines that deal with Deputy Love and

02:20:27  17   his exiting the vehicle, Deputy Love also said that the shots

02:20:32  18   being fired took place within seconds of him getting out of

02:20:37  19   the car.

02:20:41  20        That's an important piece of information also.  Because

02:20:43  21   remember, I told you we have a 16-second window, and we know

02:20:47  22   it takes the fastest -- if we have the fastest timeline as far

02:20:52  23   as getting the vehicle down the road and then we only have 10

02:20:56  24   seconds -- if he did it at 25 miles an hour, you have a

02:20:58  25   ten-second window; if it's a second and a half for discharging

514

02:21:02  1    the rounds, now you're down to an eight and a half-window, and

02:21:06  2    you have a deputy that's saying within seconds of getting out

02:21:10  3    of there, that's when the shooting happened.  So it's an

02:21:15  4    interesting concept.

02:21:17  5    Q.   Thank you, Mr. Root.

02:21:18  6                MR. UMINA:  No further questions.

02:21:21  7                THE COURT:  Thank you, Mr. Umina.

02:21:23  8         Ms. Durst.

02:21:23  9                MS. DURST:  Thank you, Your Honor.

02:21:23  10                        CROSS-EXAMINATION

02:21:58  11   BY MS. DURST:

02:21:58  12   Q.   Good afternoon, Mr. Root.

02:21:59  13   A.   Good afternoon.

02:22:00  14   Q.   This is not the first time you've testified at trial, is

02:22:04  15   it?

02:22:05  16   A.   No.

02:22:05  17   Q.   Not the first time you've testified under oath ever,

02:22:08  18   right?

02:22:08  19                MS. DURST:  Sorry, Your Honor.  I usually -- loud

02:22:08  20   voice is not an issue.

02:22:08  21                THE COURT:  That's all right.

02:22:08  22   BY MS. DURST:

02:22:16  23   Q.   Not the first time you've testified under oath, right?

02:22:18  24   A.   Correct.

02:22:18  25   Q.   Probably done that in your career with law enforcement

02:22:22   1   and in your expert witness work hundreds of times, right?

02:22:25   2   A.   That would be fair,

02:22:26   3   Q.   Okay.  And you understand that you're sworn to tell the

02:22:31   4   truth, right?

02:22:31   5   A.   Absolutely.

02:22:32   6   Q.   And you have done that in this case?

02:22:34   7   A.   Correct.

02:22:34   8   Q.   And you've done that when you testified in your

02:22:35   9   deposition in this case, right?

02:22:36   10   A.   Correct.

02:22:36   11   Q.   And all the other times that you've taken the witness

02:22:39   12   stand, either at trial or testifying in deposition, you've

02:22:43   13   testified under oath truthfully, correct?

02:22:45   14   A.   Correct.

02:22:45   15   Q.   Okay.  Now, I wanted to ask you one of the things then --

02:22:52   16   you spent quite a bit of time this morning, and still partly

02:22:57   17   this afternoon, talking about the arena of performance.

02:23:02   18        Do you recall all of that testimony?

02:23:03   19   A.   Yes.

02:23:03   20   Q.   Okay.  Do you recall me taking your deposition in this

02:23:08   21   case back in September of 2019?

02:23:13   22   A.   Yes.

02:23:14   23   Q.   Okay.  You recall that you and I spent quite a bit of

02:23:19   24   time together, did we not?

02:23:21   25   A.   Yeah, absolutely.  Sure.

02:23:22  1   Q.   Your deposition, according to the transcript, lasted from

02:23:26  2   9:30 to 3:46 p.m., and was about 280 pages.  Sound about

02:23:26  3   right?

02:23:33  4   A.   Sure.

02:23:34  5   Q.   Okay.

02:23:34  6          MS. DURST:  Your Honor, may I approach?

02:23:36  7          THE COURT:  You may.

02:23:49  8   BY MS. DURST:

02:23:50  9   Q.   I've handed you a copy of your deposition from

02:23:54  10  September 17, 2019, and there is an index in the back for easy

02:24:02  11  reference.  Find in there for me, in 280 pages, where you ever

02:24:07  12  talked about arena of performance, please.

02:24:10  13  A.   Well, that's a term that I decided to use to educate the

02:24:13  14  jury, not you.

02:24:14  15  Q.   Okay.  You testified, did you not, that you visited the

02:24:21  16  scene when you came up here to West Virginia, right?

02:24:23  17  A.   Correct.

02:24:24  18  Q.   For trial?

02:24:25  19  A.   Correct.

02:24:25  20  Q.   Okay.  But all the other information you told to the

02:24:28  21  jury, the radio traffic, the drawing from the investigator,

02:24:34  22  Lieutenant Branham's information, statements, you had all of

02:24:36  23  that information at the time you prepared your report in this

02:24:39  24  case, right?

02:24:40  25  A.   That's correct.  However, the radio traffic, it was

02:24:44  1    provided to us -- to me -- in segments, reversed order.  So

02:24:52  2    when I was going through that, and I was trying to figure out,

02:24:55  3    okay, how does this go, and I had to figure out that it was

02:24:58  4    all backwards.  I did not have faith in what I was given to be

02:25:03  5    able to create a timeline associated with the radio traffic

02:25:09  6    because I wasn't sure that it would be accurate and give the

02:25:12  7    benefit due to Mr. Forsyth.

02:25:14  8         After hearing yesterday's testimony is when I was assured

02:25:18  9    of what the timeline could be, and that's when I evaluated

02:25:23  10   everything I had read and considered at that point and used

02:25:25  11   that timeline.

02:25:26  12   Q.  Well, again, you and I spent several hours together,

02:25:29  13   about 280 pages.  Show me in that transcript anywhere where

02:25:33  14   you told me that you didn't have enough information about the

02:25:35  15   order of the radio traffic to be able to really finalize your

02:25:40  16   opinions?

02:25:41  17   A.  I never said that I couldn't finalize my opinions.

02:25:43  18   That's not what I just said to you right now.  I said, I

02:25:47  19   didn't create a timeline based on the radio traffic.  Having

02:25:52  20   the opportunity to hear testimony and see the designated

02:25:57  21   timeline presented in the case based off the radio traffic in

02:26:02  22   the proper order, that's when I looked at it and said, "Okay,

02:26:04  23   that's the timeline that I can now use to evaluate the

02:26:08  24   information."

02:26:08  25        And had it been adverse to one of my opinions, I can

02:26:11  1   assure you that I would have told Mr. Umina that this timeline

02:26:15  2   doesn't actually (indiscernible) made me alter my opinion, but

02:26:19  3   that's not the case.

02:26:20  4   Q.   Okay.  You also testified to a chart that had time and

02:26:25  5   distance calculations based on the measurement of the access

02:26:29  6   road of 212 feet, right?

02:26:31  7   A.   Yes.

02:26:31  8   Q.   Okay.  You had that information at the time I took your

02:26:35  9   deposition in September of 2019, correct?

02:26:39  10  A.   The length of the road?

02:26:40  11  Q.   Yes.

02:26:40  12  A.   Oh, yes.

02:26:41  13  Q.   Okay.  Look in the transcript for me and tell me anywhere

02:26:45  14  where you mentioned to me about these times and distance

02:26:48  15  calculations that you have now told this jury.

02:26:51  16  A.   In order to have a time and distance calculation you have

02:26:54  17  to have the established timeline.  Having one piece of an

02:26:58  18  event for a timeline you cannot create a timeline off of the

02:27:01  19  roadway distance.  It is using that information in

02:27:07  20  coordination with the timeline; in other words, the radio

02:27:10  21  traffic, the established time, that's what empowers you to do

02:27:10  22  it.

02:27:14  23       So, again, that variable, that element that you're asking

02:27:15  24  me about is really because now I was able to create a timeline

02:27:19  25  for the radio traffic and what was presented in court.

519

02:27:22   1   Q.   Well, let me ask you this, Mr. Root:  You told the jury
02:27:24   2   you have 27 years experience in law enforcement, right?
02:27:27   3   A.   Correct.
02:27:28   4   Q.   Is it your testimony to this jury that you could not
02:27:30   5   figure out how that radio traffic worked?  Those time
02:27:35   6   increments, that you couldn't look at the time that we showed
02:27:37   7   to this jury and figure out the order of the radio traffic
02:27:39   8   before yesterday?  Is that your testimony?
02:27:41   9   A.   I never said that.
02:27:42   10  Q.   So you had the radio traffic.  You could have figured out
02:27:46   11  exactly the point in time where Deputy Forsyth said, "Cut off
02:27:52   12  the trail," to the time he said, "Shots fired," correct?
02:27:57   13       Is that correct?
02:27:57   14  A.   That is not correct.
02:27:59   15  Q.   Why is that not correct?
02:28:01   16  A.   Ma'am, the timeline was -- I'm sorry, the radio traffic
02:28:07   17  transmissions were given to me chopped apart -- normally when
02:28:12   18  you get radio transmissions you have a beginning and an end.
02:28:15   19  Every one of these transmissions was chopped apart, cut into
02:28:19   20  pieces, and then provided in reverse order.  I had to
02:28:22   21  determine they were in reverse order.
02:28:24   22       So if pieces are missing, or if there's something that's
02:28:29   23  erroneous information that's being provided, it could
02:28:30   24  negatively impact the way I evaluated the case for Mr. Forsyth
02:28:35   25  and could negatively impact his life because I'm forming an

02:28:39  1    opinion off bad information.

02:28:40  2         I made a professional decision that, looking at the

02:28:43  3    information, looking at the investigation, there was plenty of

02:28:47  4    other information.  It wasn't until you published the actual

02:28:50  5    times in court that I was able to say, "I can rely on that

02:28:54  6    information now."  I'm not required to use that as a message,

02:28:58  7    I was just -- it doesn't change the opinion in any way.  It

02:29:02  8    actually strengthened it.

02:29:04  9    Q.   Well, your testimony just now to the jury was, you got it

02:29:07  10   in increments, chopped up, correct?

02:29:10  11   A.   That is correct.

02:29:11  12   Q.   And that is what we played for the jury yesterday,

02:29:14  13   correct?  Chopped up increments?

02:29:16  14   A.   That is true.

02:29:17  15   Q.   One of the other things you had mentioned, Mr. Root, was

02:29:32  16   the photograph that showed the tire marks in the mud.

02:29:40  17        Do you remember that, where you are talking about

02:29:41  18   Lieutenant Branham taking those tire marks in the mud, you

02:29:43  19   indicated because you could clearly see tire tread that -- I'm

02:29:48  20   taking your opinion that that means the vehicle was not

02:29:52  21   traveling quickly through that area since you could discern

02:29:55  22   tire marks.

02:29:56  23        Am I understanding your testimony correctly?

02:29:57  24   A.   As have already been explained, that my experience in

02:30:00  25   life in looking at tire marks and doing crash investigations,

02:30:02  1    it would be supportive of that.

02:30:04  2    Q.   Okay.  Well, let's talk about that photograph.  That's

02:30:06  3    one that Lieutenant Branham took after he got to the scene,

02:30:10  4    correct?

02:30:10  5    A.   That's correct.

02:30:10  6    Q.   And we know, because you were here for his testimony,

02:30:13  7    that he was there 30 minutes, approximately, after he was

02:30:16  8    notified of the shooting, correct?

02:30:18  9    A.   Yes.

02:30:18  10   Q.   And we also know, based on the testimony in this case,

02:30:22  11   that by the time Lieutenant Branham got there to take that

02:30:25  12   photograph, we know Deputy Forsyth had left in a cruiser,

02:30:30  13   right?

02:30:31  14   A.   Okay.  Yes.

02:30:32  15   Q.   We know that Deputy Love had left in a cruiser, right?

02:30:35  16   A.   Sure.

02:30:36  17   Q.   We know that there was a City of Mannington police

02:30:40  18   officer there in a cruiser, right?

02:30:42  19   A.   Yes.  Deputy Love indicated that, yes.

02:30:46  20   Q.   And we also know the ambulance was there to take

02:30:49  21   Mr. Rhoades from the scene, correct?

02:30:51  22   A.   Well, they were all there -- I can't say they were all in

02:30:54  23   the gas well site because that would be an impossibility, I

02:30:56  24   mean, if you look at the size of the gas well site.  They were

02:30:59  25   at the scene in the area.  Whether or not they all traveled

02:31:02   1   down that road or not, that was never indicated.  I have no

02:31:05   2   way of knowing if they did or not.  I -- considering the fact

02:31:08   3   that the vehicles were still in place, I don't know if

02:31:11   4   everybody drove down there or not.  I have no way of knowing.

02:31:13   5   Q.   So the tire marks that you're telling to the jury, you

02:31:18   6   believe evidences that Deputy Forsyth couldn't have traveled

02:31:23   7   down that path based on the time and distance calculations you

02:31:26   8   did, you don't even know which vehicle was the last one to

02:31:30   9   travel through there that left that mark before Lieutenant

02:31:35   10  Branham took the photograph, do you?  Do you?

02:31:37   11  A.   Well, you didn't -- I'm not going to answer the question

02:31:40   12  the way you're characterizing it.  I didn't say he didn't go

02:31:44   13  down the path.  I said that the tire mark indicated slow

02:31:46   14  movement.

02:31:46   15      I gave him the benefit on my timeline of 25 miles an

02:31:51   16  hour, which is the fastest time.  And if you've been down that

02:31:55   17  road, you only have to travel it once to know you're not going

02:32:00   18  down that road at 25 miles an hour, but I gave him the benefit

02:32:02   19  of the fastest possible time.  I was just showing that the

02:32:07   20  tire mark indicates slow movement.

02:32:07   21      If those slow movements were because an ambulance left or

02:32:11   22  a patrol car left, that doesn't change the amount of time it

02:32:13   23  would have taken him to get down that 212 and 3-inch roadway.

02:32:17   24  Q.   You don't know how fast his vehicle was traveling, do

02:32:19   25  you?

02:32:20  1    A.   That's what I just said.

02:32:21  2    Q.   Because you're not an accident reconstructionist, are

02:32:23  3    you?

02:32:23  4    A.   You don't have to be an accident reconstructionist to

02:32:26  5    determine speed.

02:32:27  6    Q.   Are you an accident reconstructionist?

02:32:30  7    A.   No.

02:32:30  8    Q.   You've talked -- when Mr. Umina started off with you,

02:32:38  9    Mr. Root, you talked quite a bit about your training.

02:32:41  10        Do you recall that testimony?

02:32:42  11   A.   I tried to make it abbreviated, but yes.

02:32:44  12   Q.   Okay.  You've never actually come to West Virginia to

02:32:47  13   provide training for any law enforcement agency, have you?

02:32:51  14   A.   No.

02:32:51  15   Q.   And that would include that you have never provided any

02:32:55  16   training to anybody at the West Virginia State Police Academy,

02:32:58  17   correct?

02:32:59  18   A.   Through the academy?

02:33:01  19   Q.   To anyone through the state police academy, actually

02:33:05  20   serve as a trainer or provide training at the West Virginia

02:33:08  21   State Police Academy?

02:33:09  22   A.   Thank you, that's what I was trying to clarify.  No, I've

02:33:11  23   never taught at the West Virginia State Police Academy.

02:33:12  24   Q.   Not only have you never been actually in West Virginia to

02:33:17  25   provide training, you've never even been asked to come to West

02:33:20  1    Virginia to provide training for law enforcement officers,

02:33:22  2    have you?

02:33:23  3    A.   Not that I can recall.

02:33:27  4    Q.   When you left law enforcement, what was your rank?

02:33:34  5    A.   When I left?

02:33:35  6    Q.   Yes.

02:33:36  7    A.   Deputy sheriff.

02:33:37  8    Q.   So after 27 years in law enforcement, the highest rank

02:33:40  9    you had was deputy sheriff?

02:33:42  10   A.   No.  The highest rank I had was sergeant.

02:33:44  11   Q.   But when you retired, you were deputy sheriff?

02:33:46  12   A.   When I retired, yes.

02:33:47  13   Q.   What happened with your sergeant stripe?

02:33:50  14   A.   As I told you in the depo, when I was working with the

02:33:53  15   Martin County Sheriff's Office, I went back under law

02:33:57  16   enforcement.  We had a juvenile offender training center,

02:34:01  17   which is a boot camp for young -- youths that are at risk, and

02:34:04  18   I went to work there.  We were under law enforcement, and I

02:34:07  19   tested for sergeant and I got promoted to sergeant.

02:34:10  20        Sometime after that, the major over that division retired

02:34:17  21   and they reorganized the agency, placing the juvenile offender

02:34:22  22   training center underneath corrections.  And I wanted to go

02:34:26  23   back to road patrol and work over there, but I was told I

02:34:30  24   would have to -- there weren't any positions -- sergeant

02:34:33  25   positions and then they told me my stripes were a correction's

02:34:36   1    promotion, which that was inaccurate.  So they said, "Well, if

02:34:42   2    you want to go back on the road, you would have to give up

02:34:45   3    your stripes."  I wanted to go back to law enforcement because

02:34:48   4    the boot camp -- the sheriff was getting ready -- in the

02:34:50   5    future was going to close it down and I wanted to go back to

02:34:53   6    law enforcement, so I figured I had them once, I will get them

02:34:56   7    again.  So I gave them up and went to the road.  And sadly,

02:35:00   8    because I have a big mouth and not politically correct, I

02:35:03   9    never got promoted again.

02:35:05  10    Q.   Yeah, you actually applied for a promotion throughout the

02:35:07  11    rest of your career and you were never promoted; is that

02:35:09  12    right?

02:35:09  13    A.   You don't apply for promotion.  You actually participate

02:35:12  14    in the testing and evaluation process, you go through the oral

02:35:16  15    boards, you go through the written examination, things like

02:35:17  16    that, and you get on a list.  And then the sheriff has the

02:35:21  17    right to pick anyone on the list that he chooses to pick to

02:35:24  18    promote to the next rank.

02:35:26  19         It's not that I applied for a position, it's just that I

02:35:29  20    was not selected.

02:35:30  21    Q.   So fair enough.  You didn't have to apply, but even if

02:35:33  22    you were on the list, you were never selected by your

02:35:36  23    supervisor or the sheriff for any promotions before you left

02:35:40  24    law enforcement, fair enough?

02:35:40  25    A.   You can choose to say it that way.

02:35:43  1   Q.   Well, when you retired, you did not have any stripes back

02:35:47  2   as a sergeant, true?

02:35:49  3   A.   That is true.

02:35:50  4   Q.   Now, you were testifying here in this lawsuit against

02:35:57  5   Deputy Forsyth, my client, and in 27 years of law enforcement

02:36:03  6   I think you told me you thought you may have been sued once by

02:36:07  7   Mr. Michata (phonetic)?

02:36:09  8   A.   Yes, I think that was correct.  I wasn't sure.

02:36:12  9   Q.   And that's the only time that you can recall being in my

02:36:17  10  client's shoes, correct?

02:36:19  11  A.   That I can recall, yes.

02:36:22  12  Q.   Well, do you happen to recall a case in Florida filed by

02:36:27  13  Johnny Dismuke, D-i-s-m-u-k-e, in the Martin County court?

02:36:38  14  A.   Johnny -- a civil suit against me?  No.  No, I don't

02:36:43  15  recall that.

02:36:45  16          MS. DURST:  Your Honor, may I approach?

02:36:46  17          THE COURT:  You may.

02:36:46  18  BY MS. DURST:

02:37:02  19  Q.   Mr. Root, what I have handed you is a docket sheet from

02:37:06  20  the clerk of the court -- Circuit Court comptroller, Karen

02:37:13  21  Timann, T-i-m-a-n-n, do you see that?

02:37:14  22  A.   I do.

02:37:16  23  Q.   Do you see it has a file date at the top of 10/8 of 2003,

02:37:19  24  correct?

02:37:21  25  A.   Yes.

02:37:22  1   Q.   Okay.  And you see immediately under where the dates are

02:37:26  2   it says "plaintiff" and then there are a number of defendants

02:37:29  3   listed?

02:37:29  4   A.   Yes.

02:37:30  5   Q.   Your name is there, isn't it?

02:37:33  6   A.   Oh, this is -- he sued the Martin County Sheriff's Office

02:37:37  7   and named me.  I've never been to court, and I didn't even

02:37:41  8   know about this until you brought it up.  I just know the name

02:37:43  9   now because I arrested him for felony charges on credit card

02:37:48  10  fraud and he went back to prison.  He must have filed a

02:37:51  11  lawsuit.  But the sheriff's office had it.  I never knew about

02:37:54  12  it.

02:37:54  13  Q.   Well, look down on that first page, Mr. Root.  There are

02:37:57  14  a couple of entries.  I think the one says January 26, 2004.

02:38:04  15       Do you see that?

02:38:06  16  A.   Yes.

02:38:09  17  Q.   Notice of appearance for Defendant Dennis Root, correct?

02:38:13  18  A.   I see it, yes.

02:38:15  19  Q.   And then a couple of entries above that, January 27,

02:38:21  20  2004, you see that?

02:38:24  21  A.   Are you talking about the motion?

02:38:26  22  Q.   Yes.

02:38:26  23  A.   Yes.

02:38:27  24  Q.   So you're telling this jury that you had a lawsuit filed

02:38:32  25  against you where you filed a notice of appearance and a

02:38:35  1    motion to dismiss, but you weren't aware of it?  Is that your

02:38:39  2    testimony?

02:38:40  3    A.   I have never filed a motion in my life.  I have never

02:38:45  4    done any of the things that are listed here.  This would have

02:38:48  5    been handled by the sheriff's office, and I had absolutely no

02:38:52  6    involvement with it.  I have never filed a motion.  That is

02:38:55  7    what I'm saying.

02:38:57  8    Q.   I'm not saying that you filed a motion.  You didn't have

02:39:00  9    an attorney file a motion to dismiss on your behalf in that

02:39:03  10   lawsuit?

02:39:03  11   A.   I did not know anything about this, ma'am.  Our sheriff's

02:39:08  12   office handles the lawsuits.  If there was something that

02:39:11  13   required my attendance, I would have been there.

02:39:13  14          MS. DURST:  Your Honor, may I approach and get the

02:39:15  15   document?

02:39:15  16          THE COURT:  You may.

02:39:15  17   BY MS. DURST:

02:39:30  18   Q.   Now, you've testified previously at a trial here in West

02:39:33  19   Virginia, is that right, a criminal trial?

02:39:36  20   A.   I believe more than one.

02:39:38  21   Q.   Well, *State of West Virginia vs. Micah LeMaster* --

02:39:42  22   A.   Yes.

02:39:43  23   Q.   -- do you recall that?  Now, in that case, Mr. LeMaster

02:39:47  24   who was a criminal defendant, you were retained on behalf of,

02:39:50  25   he actually shot and killed an unarmed man; is that right?

02:39:54  1    A.   He shot and killed a man, yeah.  He was unarmed, yes.

02:39:58  2    Q.   Okay.  And I think the man that was shot and killed, Josh

02:40:01  3    Martin, apparently he had been banging on Mr. LeMaster's door

02:40:06  4    in the middle of the night and made some threats; is that

02:40:08  5    right?

02:40:08  6    A.   That's a minor way of putting it, but yes.

02:40:11  7    Q.   And after Mr. LeMaster shot and killed Josh Martin,

02:40:16  8    turned out Mr. Martin didn't have a weapon at all, did he?

02:40:20  9    A.   At the time that rounds were discharged, he didn't know

02:40:23  10   that, but it turns out later -- well, actually, in the

02:40:28  11   original -- I want to rephrase this.

02:40:30  12        The original shots fired he didn't know if he was armed

02:40:35  13   or not, because in the middle of the night he was trying to

02:40:38  14   break into their home through their front door, and it led to

02:40:42  15   a shooting, not getting off track.  The shot that killed him

02:40:46  16   was when Mr. -- can you repeat his name again?

02:40:52  17   Q.   Josh Martin.

02:40:53  18   A.   -- Mr. Martin was actually running at the house at

02:40:57  19   Mr. LeMaster toward the open front door where his family was.

02:41:01  20   At the time he shot him, at that point he knew he didn't have

02:41:04  21   a weapon, but there was a lot of information in the case that

02:41:08  22   we're not able to get into here.

02:41:11  23   Q.   So just to be clear then, you actually testified on

02:41:14  24   behalf of Mr. LeMaster in that criminal trial that even though

02:41:18  25   at the time he fired the shot that killed Josh Martin, he knew

02:41:23   1    he didn't have a weapon.  At that point your testimony was

02:41:27   2    that his actions were justified under the circumstances,

02:41:30   3    weren't they?

02:41:31   4    A.   Leaving out all of the other information associated with

02:41:34   5    that case and what led to the opinion, yes, the end opinion

02:41:38   6    was that the shooting in that case, given the totality of

02:41:41   7    everything, was objectively reasonable.

02:41:44   8    Q.   Shooting an unarmed man in that circumstance was

02:41:48   9    objectively reasonable based on the facts of the case; is that

02:41:52   10   true?

02:41:52   11   A.   If you want to emphasize the unarmed man, yes, there are

02:41:55   12   situations and times that, based on the case, that could be

02:41:58   13   objectively reasonable.  But it does require a tremendous

02:42:01   14   amount of explaining, investigation, and a comprehensive

02:42:04   15   understanding of the facts.

02:42:06   16   Q.   You would agree with me, would you not, Mr. Root, that

02:42:08   17   law enforcement officers are placed in danger quite

02:42:12   18   frequently, and hundreds of law enforcement officers are

02:42:15   19   killed each year in the line of duty?

02:42:17   20   A.   Sadly, yes.

02:42:18   21   Q.   And you would agree with me that part of their job duties

02:42:20   22   as a law enforcement officer requires law enforcement officers

02:42:24   23   to be involved in tense and dangerous situations?

02:42:29   24   A.   Absolutely.

02:42:29   25   Q.   I think you said rapidly evolving situations?

02:42:33   1   A.   Yes.

02:42:33   2   Q.   Right?

02:42:34   3   A.   Yes.

02:42:34   4   Q.   Now, let me ask you, you have done what you're doing here

02:42:46   5   today; served as an expert in a number of cases over the

02:42:49   6   years, correct?

02:42:50   7   A.   Yes.

02:42:52   8   Q.   Okay.  And in a civil case like this, not a criminal case

02:42:59   9   like for Mr. LeMaster's case, but in a civil case, you were

02:43:02   10   not aware of any civil case where you've been retained on

02:43:06   11   behalf of the plaintiff like in this case, where you were the

02:43:09   12   subject of the motion to exclude your testimony; is that

02:43:12   13   right?

02:43:13   14   A.   No, there was one I told you about.

02:43:16   15   Q.   Okay.  You told me about one?

02:43:19   16   A.   Yeah, in my deposition.  I'm sure you can you find it.

02:43:27   17   Q.   Well, go ahead, you have your transcript in front of you,

02:43:31   18   correct?  Page 79?

02:43:48   19   A.   Okay.

02:43:48   20   Q.   At the top of the page, line one, question:

02:43:50   21        "Are you aware of, in any civil case, where you've been

02:43:54   22   retained as an expert, at least on the list that we have, you

02:43:58   23   were retained on behalf of the plaintiff suing some law

02:44:00   24   enforcement agency, are you aware in any of those cases

02:44:03   25   whether you were the subject any *Daubert* motion."

| | | |
|---|---|---|
| 02:44:05 | 1 | You understand what a *Daubert* motion is, right? |
| 02:44:06 | 2 | A.   That's correct. |
| 02:44:07 | 3 | Q.   To exclude your testimony or limit it in some manner, |
| 02:44:10 | 4 | right? |
| 02:44:10 | 5 | A.   That is correct. |
| 02:44:10 | 6 | Q.   And what is your answer? |
| 02:44:12 | 7 | A.   The answer on this page is "No," but I believe if we look |
| 02:44:15 | 8 | in the transcript, we'll find where I remembered that there |
| 02:44:18 | 9 | was the one in West Virginia.  And I think we even discussed |
| 02:44:21 | 10 | it at great length where I was testifying in one case in West |
| 02:44:25 | 11 | Virginia, and then four days later I was in another court |
| 02:44:28 | 12 | where I testified as an expert in investigations and use of |
| 02:44:32 | 13 | force, and then I went to another court in West Virginia, and |
| 02:44:36 | 14 | the judge -- in a criminal case -- and the judge identified he |
| 02:44:39 | 15 | has nothing to offer me.  He was the person who said I have |
| 02:44:43 | 16 | nothing to offer, and that was case -- I'm pretty sure if you |
| 02:44:46 | 17 | look in the -- I can't find the page without some kind of -- |
| 02:44:48 | 18 | but that is fact. |
| 02:44:50 | 19 | Q.   Okay.  So your recollection is that there was one case |
| 02:44:54 | 20 | where you were the subject of a motion to exclude or limit |
| 02:44:58 | 21 | your testimony in some manner; is that true? |
| 02:45:00 | 22 | A.   I think it was where I was excluded. |
| 02:45:00 | 23 | Q.   Okay. |
| 02:45:05 | 24 | A.   I think when we talked about -- because we also talked |
| 02:45:06 | 25 | about the case in Florida. |

02:45:08   1    Q.   My question is where you were the subject of a motion to
02:45:11   2    exclude your testimony, and so is it your recollection that
02:45:15   3    the one in West Virginia you're referring to resulted in you
02:45:19   4    being excluded as a witness?
02:45:21   5    A.   That was in that one court, yes, that one was.  I was
02:45:25   6    excluded in that case, yes.
02:45:27   7    Q.   Okay.  So aside from that case then, you're not aware of
02:45:31   8    any situation in any of the civil cases where opposing
02:45:36   9    counsel, like me, has challenged your ability to testify in
02:45:40   10   the form of a *Daubert* motion; is that right?
02:45:43   11              THE COURT:  Hold on a second, Ms. Durst.  Can I ask
02:45:45   12   counsel to approach, please?
02:45:45   13        (Bench conference outside the hearing of the jury.)
02:51:08   14              THE COURT:  Why are we --
02:51:08   15              MS. DURST:  Goes to his credibility, Your Honor.  I
02:51:08   16   have motions where he testified he was not the subject of --
02:51:08   17   he testified under oath that he -- that he had not been the
02:51:08   18   subject of any motions to exclude his testimony.  So it goes
02:51:08   19   to his credibility.  I'm not arguing that he was excluded.
02:51:08   20   It's just to his credibility as a witness that he did not
02:51:08   21   truthfully answer those questions.  And I have the motions.
02:51:08   22              THE COURT:  Possible that he didn't know about that
02:51:08   23   motion?
02:51:08   24              MS. DURST:  But based on his testimony in his
02:51:08   25   deposition, Your Honor, I specifically asked him and he said,

02:51:09   1    "I would have been made aware because the attorneys would

02:51:09   2    contact me to discuss the challenge."

02:51:09   3            THE COURT:  He doesn't know that.  How are you going

02:51:09   4    to connect the bridge between question one and question two?

02:51:09   5            MS. DURST:  I'm going to ask him if he was made

02:51:09   6    aware.  And you testimony -- you testified under oath that the

02:51:09   7    attorneys would have made you aware.

02:51:09   8            THE COURT:  What if he says no, he wasn't made aware?

02:51:09   9            MS. DURST:  That's not what he said in his

02:51:09   10   deposition.

02:51:09   11           THE COURT:  What if he was not made aware the motion

02:51:09   12   was filed?

02:51:09   13           MS. DURST:  Then he can testify to that.

02:51:09   14           THE COURT:  If not impeachment, then it's dangled

02:51:09   15   something out there that doesn't reach the conclusion of

02:51:09   16   accuracy.

02:51:09   17           MS. DURST:  Respectfully, I disagree with that, Your

02:51:09   18   Honor, based on the way I asked the questions in the

02:51:09   19   deposition, knowing they had these motions in limine to

02:51:09   20   exclude his testimony.

02:51:09   21           THE COURT:  What is the basis of that motion in

02:51:09   22   limine?

02:51:09   23           MS. DURST:  There are a number of bases; one is that

02:51:09   24   he can't give you the opinion that use of force is objectively

02:51:09   25   similar in this case, that events could have not happened the

02:51:09   1    way he described -- that the suspect or officer described

02:51:09   2    them, which is similar to what he is describing here.  He said

02:51:09   3    it couldn't have happened the way Deputy Forsyth described

02:51:09   4    that happened, so it's just for credibility.  I am not arguing

02:51:10   5    that he was excluded in those cases.

02:51:10   6            MR. UMINA:  Your Honor, I was just about to object to

02:51:10   7    this line of questioning.  There is no way to verify if he

02:51:10   8    wasn't aware and he wasn't made aware, like for example when I

02:51:10   9    have worked him, he actually -- she asked, you know, if there

02:51:10   10   were *Daubert* motions, please let me know.  There is no way of

02:51:10   11   verifying whether he knows if an attorney did or did not tell

02:51:10   12   him about a *Daubert* motion.

02:51:10   13           Additionally, this is, I mean, extremely misleading

02:51:10   14   information to the jury.  I think it has -- I mean, just under

02:51:10   15   403, the jury doesn't understand that lawyers file those

02:51:10   16   motions often as a matter of form, so the variety of those and

02:51:10   17   how much weight those motions actually carried when they were

02:51:10   18   filed, there is no way --

02:51:10   19           THE COURT:  We are not -- is there a motion filed,

02:51:10   20   Ms. Durst?  What are we even talking about?

02:51:10   21           MR. UMINA:  In Florida, Your Honor.

02:51:10   22           MS. DURST:  Where he was an officer.

02:51:10   23           THE COURT:  Is there responses to that motion filed?

02:51:10   24   Was there --

02:51:10   25           MS. DURST:  I don't have that information, Your

02:51:10  1   Honor.  I have the motion that was electronically filed with

02:51:10  2   the federal court that was the subject of the motion.

02:51:10  3          THE COURT:  There is no docket.  You have no ability

02:51:10  4   to access, no response, there is no hearing that was

02:51:11  5   conducted.

02:51:11  6          MS. DURST:  I didn't access that docket, Your Honor.

02:51:11  7   That information came from the attorney who actually

02:51:11  8   electronically filed the motion.

02:51:11  9          THE COURT:  All that you know is that motion was

02:51:11  10  filed.

02:51:11  11         MS. DURST:  I know that a motion was filed, and I

02:51:11  12  know he testified that he did not believe he was the subject

02:51:11  13  of any motion, and the attorneys would have made him aware.

02:51:11  14  That's what he said.

02:51:11  15         THE COURT:  We have all run across bad lawyers.  We

02:51:11  16  are going to excuse the jury for the afternoon break, and we

02:51:11  17  are going to -- you are going to ask him these questions out

02:51:11  18  of the presence of the jury.  I don't think it's an issue --

02:51:11  19  credibility issue, but we are not going to -- we are not going

02:51:11  20  (inaudible) allegation for inference with his credibility that

02:51:11  21  is not supported.  If he doesn't know about this, then it's

02:51:11  22  not coming in.  We are going to excuse the jury.  We will --

02:51:11  23  you can ask those questions outside the presence of the jury.

02:51:11  24         (Bench conference concluded, and the following

02:51:11  25  transpired in open court.)

02:51:11   1        THE COURT:  We are going to let you leave and stretch out

02:51:13   2   here for 15 minutes or so.  It's about ten 'til three right

02:51:16   3   now.  So our aspirational goal will be to resume Mr. Root's

02:51:21   4   testimony -- excuse me, five after three.  We are going to

02:51:25   5   excuse you for an afternoon break.

02:51:28   6        Please continue to refrain from discussing this case with

02:51:31   7   anyone, that includes with any of your fellow jurors or even

02:51:33   8   in small groups and in anyone outside the jury room.  Also

02:51:38   9   please continue to refrain from any independent investigation

02:51:41  10   efforts with respect to this case or issues that have been

02:51:44  11   raised in this case.

02:51:45  12        At this point we will let you stretch your legs for an

02:51:47  13   afternoon break and we will see you in about 15 minutes.

02:51:51  14   Thank you very much.

02:51:51  15        (The jury exited the courtroom at 2:52 p.m., and the

02:52:18  16   following transpired in open court.)

02:52:18  17        THE COURT:  Thank you all.  Please be seated.

02:52:18  18   Mr. Root, just so you are aware of what's going on, Ms. Durst

02:52:18  19   is going to ask you a few more questions outside the presence

02:52:21  20   of the jury.

02:52:21  21        Ms. Durst, you may proceed whenever you're ready.

02:52:24  22        MS. DURST:  Thank you, Your Honor.

02:52:24  23   BY MS. DURST:

02:52:25  24   Q.  Mr. Root, just following up on one of the questions that

02:52:27  25   I was asking you.  Do you recall me asking you specifically in

02:52:29  1   your deposition with regard to *Daubert* motion, or motions to

02:52:33  2   exclude?

02:52:34  3   A.   Yes.

02:52:34  4   Q.   Okay.  And do you recall specifically testifying that if

02:52:38  5   there has been a challenge, quote, "They've always gotten me

02:52:41  6   because they want to discuss whatever the challenge might be."

02:52:45  7   And I can refer you to your deposition, it's page 79, lines 18

02:52:50  8   through 20.

02:53:04  9   A.   What was --

02:53:06  10  Q.   18 through 20.

02:53:25  11  A.   Okay.  You left out the part, "It's now part of my

02:53:28  12  service agreement," that's only been within the last year, but

02:53:33  13  whatever this deposition was I had to change my service

02:53:35  14  agreement because I have learned that things take place

02:53:39  15  outside of my knowledge and I have no way of knowing if

02:53:42  16  someone has filed something unless an attorney tells me.

02:53:45  17       So I actually made it a part of my service agreement.

02:53:48  18  Whether they continue to do that or not, they are obligated by

02:53:51  19  contract now.

02:53:52  20  Q.   Okay.  But then you say, "As a matter of fact, now it's a

02:53:54  21  part of my actual agreement and they have to tell me.  But

02:53:58  22  prior to, if there had been a challenge, they've always gotten

02:54:02  23  me because they want to discuss whatever the challenge might

02:54:05  24  be."

02:54:06  25       So your testimony was -- before you placed it in your

02:54:09  1    service agreement, prior to that -- if there was a challenge,

02:54:11  2    the attorneys always got to you to discuss whatever the

02:54:14  3    challenge might be.  Was that your testimony?

02:54:17  4    A.   That was, from my point of reference which was, if they

02:54:21  5    contact me saying there was a challenge, I knew about it, and

02:54:25  6    they would work with me.  I guess now looking back on the way

02:54:28  7    you interpret it, I would be better served saying, if they

02:54:32  8    tell me, they'll always get me, because at the time I didn't

02:54:36  9    presume it would be used in the manner that you would.

02:54:38  10        But if they told me there was a challenge, I work

02:54:43  11   hand-in-hand as best I can to provide them with whatever they

02:54:47  12   need.  So the manner in which I said in that way and the way

02:54:50  13   you're taking it, I don't think are the same, but those are

02:54:52  14   the words that I said on that day.

02:54:54  15             MS. DURST:  Those are, I mean, that's the testimony I

02:54:56  16   would ask, Your Honor, with regard to his testimony, that

02:54:59  17   prior to adding that into his service agreement, "They would

02:55:01  18   have always gotten to me because they wanted information with

02:55:06  19   regard to challenge."

02:55:07  20             THE COURT:  Well, I think we need to get to --

02:55:10  21             MS. DURST:  Okay.  I didn't know how far you wanted

02:55:10  22   me -- apologies.

02:55:10  23   BY MS. DURST:

02:55:12  24   Q.   So you would agree with me then, would you not, Mr. Root,

02:55:16  25   based on that testimony that we've just gone over that you

02:55:19   1   should have been made aware of a motion in limine or a motion

02:55:22   2   to exclude that was filed in a case in Florida, middle

02:55:27   3   district of Florida in federal court, do you remember the

02:55:32   4   *Torres vs. Bonetti* case?

02:55:32   5   A.   Oh, my goodness that was years and years ago, well before

02:55:35   6   my contract.  So according to my testimony here, that case

02:55:39   7   would not even be a part of it because I don't recall them --

02:55:43   8   I would have to pull that file that there was a challenge to

02:55:47   9   me and I was made aware of it.  I would have documents in my

02:55:52   10  file if I was made aware of it.  That's all I can tell you.

02:55:58   11      If you have another question you want to ask -- I just

02:56:00   12  want to be very clear with the Court, that that particular

02:56:02   13  matter you're talking about is 2000 and -- was it, I don't

02:56:06   14  even know the year, so you have it in your hand, could you

02:56:09   15  tell the Court what the year was?

02:56:09   16  Q.   This motion was filed May 1st of 2013.

02:56:14   17  A.   2013.  So like I said, at the time of this, which was in

02:56:17   18  2019?

02:56:18   19  Q.   The deposition was --

02:56:19   20  A.   So six years before, I can't attest to that, but within

02:56:24   21  the time of our deposition, I made an addition -- that

02:56:28   22  contract -- would be able to pull for the Court the contract,

02:56:31   23  that kind of language and things aren't even in the contract.

02:56:34   24  Q.   Okay.  But going back to your sworn deposition testimony

02:56:37   25  in this case, you said before you put it in your service

02:56:39   1    agreement, before that, the attorneys would have always gotten

02:56:42   2    to you.

02:56:42   3         So is your testimony that the attorneys would not have

02:56:45   4    told you about the motion that was filed in *Torres vs.*

02:56:50   5    *Bonetti*?

02:56:50   6    A.   Ma'am, I can't tell you whether they would or wouldn't,

02:56:52   7    just like the reason I have a contract now is because there

02:56:54   8    were attorneys, when my CV was online without the watermark,

02:56:59   9    that were including me in their case before they ever retained

02:57:02  10    me, thus the reason this progresses.

02:57:04  11         I realize the manner which you're -- the context that

02:57:05  12    you're taking my testimony, and I can understand how would you

02:57:08  13    like to apply it that way, but if an attorney reaches out to

02:57:12  14    me, if there was a *Daubert* hearing and they reached out to me,

02:57:15  15    they would always get me because I will make myself available

02:57:20  16    to them.  I can't speak to that case from 2013 without pulling

02:57:24  17    the file.

02:57:24  18    Q.   So as we sit here today, are you able to tell the Court

02:57:27  19    that you were aware of that motion or not?

02:57:30  20    A.   2013 case, sir, with all the cases -- I can't tell you

02:57:35  21    for certain one way or the other, in all honesty.

02:57:38  22              THE COURT:  Who was Mr. Root retained by in that

02:57:38  23    case?

02:57:45  24              MS. DURST:  He was retained by the plaintiff Carmen

02:57:45  25    Suarez.

02:57:50    1              THE COURT:  Counsel, do you have those?

02:57:50    2              MS. DURST:  Well, there should be a certificate of

02:57:54    3    service.

02:57:55    4              THE COURT:  In theory.

02:57:56    5              MS. DURST:  In theory.  It was sent to David H. Paul

02:58:02    6    and Jason A. Paul of Paul & Perkins in Orlando, Florida and

02:58:09    7    Travis Williams in Orlando, Florida.

02:58:13    8              THE WITNESS:  Travis Williams, I remember the name,

02:58:15    9    Travis Williams, that -- the attorney that --

02:58:16   10              THE COURT:  What is name of that case, Ms. Durst?

02:58:17   11              MS. DURST:  It is Carmen Torres, Your Honor,

02:58:21   12    T-o-r-r-e-s, as personal representative of the estate of

02:58:34   13    Johnny Bolaud, LLC. vs. Frank Bonetti, B-o-n-e-t-t-i

02:58:34   14              THE COURT:  Sir, do you recall these counsel in this

02:58:37   15    case advising you that a motion with respect to your

02:58:41   16    qualifications or opinions was filed?

02:58:45   17              THE WITNESS:  I really don't.  I can't say.

02:58:49   18              THE COURT:  Understood.  I guess I'll call this

02:58:54   19    Mr. Umina's objection, even though the Court prompted the

02:58:58   20    conversation, the objection is sustained.  We're not going to

02:59:00   21    go down that road based on what we've heard here, Ms. Durst.

02:59:05   22      We don't have any other information other than the motion

02:59:09   23    was filed, I think that would make it more appropriate effort

02:59:15   24    for impeachment response to hearing anything that would prove

02:59:18   25    Mr. Root's knowledge of the motion or participation in

02:59:21  1    opposition to the motion.  As I indicated at the bench

02:59:25  2    conference, my concern with this line of testimony is that it

02:59:28  3    is an effort of impeachment.  I understand that.  Credibility

02:59:31  4    is always at issue, but we're dependent upon that impeachment

02:59:38  5    effort from third parties not here; that being the counsel

02:59:41  6    involved in the Torres case, I'm sorry.

02:59:44  7         MS. DURST:  There was another one, Your Honor.  I

02:59:46  8    understand the Court's ruling.  Just for the record, the other

02:59:48  9    matter I would have questioned Mr. Root about would have been

02:59:50  10   *Shawn Noble*, N-o-b-l-e vs. *Michael Gasbarrini*,

02:59:59  11   G-a-s-b-a-r-r-i-n-i, *et al*.  And it was in the Southern

03:00:02  12   District of Florida, Your Honor.

03:00:04  13        THE COURT:  Southern District of Florida?

03:00:06  14        MS. DURST:  Yes, Your Honor.

03:00:07  15        THE COURT:  And do we know anything else about that

03:00:09  16   matter other than a motion was filed?

03:00:09  17        MS. DURST:  The same information, Your Honor.

03:00:10  18        THE COURT:  So we don't know if a response was filed,

03:00:12  19   if it was fully briefed, if there was a motions hearing held,

03:00:15  20   or anything like that?

03:00:16  21        MS. DURST:  I do not, Your Honor.  I cannot tell the

03:00:20  22   Court I just have the electronic filing with the motion and

03:00:22  23   supporting memorandum and then --

03:00:24  24        THE COURT:  Who was plaintiff's counsel in that -- or

03:00:26  25   I'm making an assumption, but who was counsel in that case?

03:00:29  1        MS. DURST:  Yeah, Mr. Root was retained by

03:00:31  2   plaintiff's counsel, and -- bear with me one minute, Your

03:00:41  3   Honor.

03:00:41  4        THE COURT:  Sure.  Sure.

03:00:43  5        MS. DURST:  Plaintiff's counsel was Brett Waronicki,

03:00:48  6   W-a-r-o-n-i-c-k-i.

03:00:52  7        THE COURT:  All right.  Do you recall ever being told

03:00:55  8   about any motions challenging your qualifications or opinions

03:00:58  9   by Mr. Waronicki. -- and what was the name of that case again?

03:01:01  10       MS. DURST:  Oh, I'm sorry, Your Honor.  *Noble vs.*

03:01:01  11  *Gasbarrini, et al.*

03:01:04  12       THE WITNESS: No, sir.

03:01:05  13       THE COURT:  All right.  Same ruling.  I appreciate

03:01:09  14  the record there, Ms. Durst, objection is noted.  Objection is

03:01:13  15  sustained.

03:01:15  16       MS. DURST:  Understood the Court's ruling, Your

03:01:17  17  Honor.

03:01:17  18       THE COURT:  Thank you.  Anything else we need to take

03:01:19  19  up at this point, Mr. Umina?

03:01:20  20       MR. UMINA:  Nothing from us, Your Honor.

03:01:21  21       THE COURT:  Ms. Durst?

03:01:21  22       MS. DURST:  No, Your Honor.

03:01:22  23       THE COURT:  All right.  You guys have five minutes.

03:01:25  24  See you in five.  Thank you.

03:10:16  25       (A recess was taken from 3:01 p.m. until 3:10 p.m.)

545

| | |
|---|---|
| 03:10:16 | 1 |
| 03:10:18 | 2 |
| 03:10:19 | 3 |

THE COURT:  Ms. Durst, are you ready to proceed, ma'am?

MS. DURST:  I am, Your Honor.

THE COURT:  May we have our jury, please, then.

(Jury returned to courtroom at 3:11 p.m., and the following transpired in open court.)

THE COURT:  Thank you.  Ladies and gentlemen, please be seated.

You may proceed whenever you are ready.

MS. DURST:  Thank you, Your Honor.

BY MS. DURST:

Q.   Mr. Root, you would agree that you are not an expert in trajectory -- sorry.

MS. DURST:  Apologies, Your Honor.

THE COURT:  No apologies necessary.

BY MS. DURST:

Q.   You are not an expert in trajectory analysis of a bullet, correct?

A.   Correct.

Q.   You are not capable of -- well, let me ask it this way:  You do not hold yourself out to be an expert in calculating the path of a bullet, correct?

A.   Correct.

Q.   You are not a ballistics expert?

A.   No.

546

03:11:51   1    Q.    You are not an expert in the field of shooting scene

03:11:55   2    reconstruction?

03:11:56   3    A.    Correct.

03:11:56   4    Q.    And you are not an accident reconstruction expert, are

03:12:00   5    you?

03:12:00   6    A.    That's correct.

03:12:01   7    Q.    Now, you've told this jury that you went to the scene

03:12:06   8    after you got here to West Virginia for your trial testimony,

03:12:10   9    but at no point in time when you formulated your opinion or

03:12:14  10    before you gave your deposition in this case, had you ever

03:12:18  11    been at the scene; is that true?

03:12:19  12    A.    That is correct.

03:12:20  13    Q.    Now, one of the things I believed you told Mr. Umina was

03:12:27  14    you don't believe that Deputy Forsyth and Deputy Love were

03:12:34  15    actually in pursuit of Mr. Rhoades at the time because they

03:12:41  16    had lost sight of him; is that true?

03:12:41  17    A.    Deputy Love and Deputy Forsyth?

03:12:43  18    Q.    Yes.

03:12:44  19    A.    Were -- correct, they were actively searching for him.

03:12:46  20    Q.    Because I think you said, "They lost sight.  They were no

03:12:49  21    longer in pursuit, " in your deposition; do you recall that?

03:12:51  22    A.    Sounds about right.

03:12:52  23    Q.    Okay.  One of the things that you reviewed in this case

03:12:56  24    to formulate your opinions, was, then sergeant, now Lieutenant

03:13:02  25    Branham's deposition testimony, correct?

03:13:03   1   A.   That is correct.

03:13:04   2   Q.   Do you recall Sergeant Branham being asked with regard to

03:13:08   3   how the West Virginia State Police defined a pursuit?

03:13:12   4   A.   Off the top of my head, no.

03:13:15   5   Q.   You don't recall if he said somebody initiates a pursuit,

03:13:19   6   even if the vehicle is out of their visual sight, by state

03:13:23   7   police standards they are -- still considered that to be a

03:13:26   8   pursuit; do you recall that?

03:13:27   9   A.   I don't recall that, no.

03:13:29   10   Q.   Okay.  So based on your testimony here today, you

03:13:33   11   disagree if that is, in fact, what Lieutenant Branham

03:13:37   12   testified to, that the West Virginia State Police standards

03:13:40   13   are that they would still consider that to be a pursuit even

03:13:43   14   if they lost visual sight, you wouldn't consider to be a

03:13:47   15   pursuit.

03:13:48   16        Am I understanding your testimony?

03:13:50   17   A.   Well, I don't think Deputy Forsyth works for the West

03:13:54   18   Virginia State Police, but the way I define it and the way I

03:13:58   19   look at it, if you're not actively pursuing a vehicle, you're

03:14:03   20   actually searching for the vehicle.  And, again, probably

03:14:06   21   don't remember it because he was talking about the standards

03:14:08   22   of the West Virginia State Police.

03:14:11   23   Q.   Okay.  Would you agree with me, Mr. Root, that none of

03:14:17   24   us, me, counsel, my co-counsel, none of us know exactly how

03:14:22   25   this incident with Mr. Rhoades began and where it ended up?

03:14:27  1    A.   Correct.  It's only Deputy Love and Deputy Forsyth that
03:14:30  2    can provide us with information.
03:14:32  3    Q.   Because none of us were there, right?
03:14:35  4    A.   And the scene.  But none of us were there.  We can't
03:14:38  5    speak to it firsthand.
03:14:39  6    Q.   Would you agree with me that in the evaluation of the use
03:14:43  7    of force in this case, the perception that's important is what
03:14:48  8    took place in Deputy Forsyth's mind at the time he fired his
03:14:52  9    weapon?
03:14:54  10   A.   Yes, absolutely.  The objectively reasonable perception
03:14:58  11   of the officer.
03:14:59  12   Q.   And as long as Deputy Forsyth had a perception that he
03:15:03  13   was in imminent peril of great bodily injury or death, he
03:15:08  14   would be justified in discharging his firearm, true?
03:15:11  15   A.   It would have to be a well-founded perception.
03:15:15  16   Q.   I think in your deposition you said, "honest perception,"
03:15:18  17   is that what you're telling the jury?
03:15:20  18   A.   Honest perception, well-founded, pretty much the same
03:15:24  19   thing to me; based on what the officer saw, knew, and
03:15:28  20   understood of the totality of the event facing him at that
03:15:32  21   time to form the perception.
03:15:33  22   Q.   So if in Deputy Forsyth's well-founded perception, honest
03:15:40  23   perception -- whatever word want to use -- was that he was in
03:15:42  24   fear that Mr. Rhoades' actions were going to cause great
03:15:46  25   injury to him or death, then he would have been justified in

03:15:51  1   discharging his firearm?

03:15:53  2   A.   Fear justifies the application of force, but facts make

03:15:57  3   fear reasonable.  So merely saying, "I was in fear for my

03:16:01  4   life," is one thing.  Having the facts and information in

03:16:04  5   support of that fear, is another.

03:16:06  6        So if Deputy Forsyth said, "I was in fear for my life,"

03:16:10  7   and facts and the circumstances all support that fear, then,

03:16:15  8   yes, that would be objectively reasonable.

03:16:17  9   Q.   I used your word.  I said, so Deputy Forsyth had a

03:16:20 10   "well-founded or honest perception" that he was about to be

03:16:25 11   struck by that Jeep, he would have been justified in

03:16:27 12   discharging his weapon.  Using your word, "well-founded

03:16:31 13   perception"?

03:16:32 14   A.   Okay.  I was expounding on it.

03:16:36 15   Q.   Now, I wanted to talk with you about the statements at

03:16:41 16   the hospital.  So you concede that there was nothing wrong

03:16:46 17   with Deputy Forsyth or Deputy Love not wanting to give

03:16:51 18   sergeant -- then Sergeant Branham a statement the day of the

03:16:54 19   shooting, right?

03:16:56 20   A.   Did you say I concede?

03:16:57 21   Q.   Yes.

03:16:58 22   A.   Yes, ma'am.  Yes.

03:16:59 23   Q.   And there was nothing wrong with them waiting to the time

03:17:02 24   frame when they actually gave the statements, true?

03:17:05 25   A.   True.

03:17:06   1   Q.   And, in fact, you said that you would have recommended
03:17:09   2   they actually have an attorney with them, right?
03:17:12   3   A.   And a union representative if they have a union.
03:17:15   4   Q.   Okay.  And part of your explanation for the timing of
03:17:20   5   when they give those statements is if someone is in, like, a
03:17:25   6   life threatening situation, they need to be able to decompress
03:17:29   7   and kind of calm down; is that fair?
03:17:33   8   A.   That is all part of it, yes.
03:17:34   9   Q.   Okay.  So based on the fact that you can see that there
03:17:39   10  was nothing wrong with Deputy Forsyth or Deputy Love waiting
03:17:42   11  to give those statements, you concede that they were in a
03:17:46   12  life-threatening situation?
03:17:48   13  A.   No.  If an individual indicates that they were -- I give
03:17:56   14  benefit of the doubt to the officers involved.  If they say
03:17:59   15  they were in a life or death situation, I have no problem with
03:18:04   16  the timing, none of that.  But giving them the time doesn't
03:18:07   17  mean that what they're saying is or is not true.
03:18:11   18       It's just if the -- event we know there were -- a weapon
03:18:15   19  was discharged, we know that.  So take the time that you need
03:18:19   20  to meet that timeline that we discussed earlier, so I don't
03:18:23   21  have to rehash it for the jury, I'm sure they are comfortable
03:18:26   22  with it.
03:18:26   23  Q.   You would agree that a moment an individual, whoever that
03:18:32   24  person is, whether it's a private citizen, law enforcement
03:18:34   25  officer, whomever it is, the moment that individual feels that

03:18:37  1   they are in a situation that places them in danger of great

03:18:41  2   bodily harm or death, that it is objectively reasonable for

03:18:45  3   them to use force that will also result in great bodily harm

03:18:50  4   or death?

03:18:51  5   A.   Yes.

03:18:51  6   Q.   You also agree with the statement, I think you told the

03:18:59  7   jury in one your answers, that fear justifies force?

03:19:02  8   A.   Yes.

03:19:03  9   Q.   And what you consider a reasonable fear, what I consider

03:19:08  10  to be a reasonable fear would be different or could be

03:19:12  11  different because everyone is different based on their

03:19:16  12  background, their education, training, experience, and the

03:19:19  13  information that's available regarding that particular threat;

03:19:23  14  do you agree with that?

03:19:24  15  A.   I agree with the fear -- the way you said I want to make

03:19:29  16  sure I'm clear.  What makes you afraid could be very different

03:19:33  17  from what makes me afraid.  We're all different.  It's based

03:19:35  18  on our experience in life.  So that's -- it is independent of

03:19:38  19  every individual.

03:19:39  20  Q.   Okay.  So what you would consider to be a potential

03:19:42  21  threat facing you might be different than what Deputy Forsyth

03:19:46  22  would consider to be a threat facing him because of your

03:19:49  23  differences, experience in life, right?

03:19:52  24  A.   Well, sure.  I have no problem with that.  Yes, that's

03:19:57  25  fair.

03:19:57   1   Q.   And a situation such as an individual that is facing a

03:20:01   2   threat from a weapon, is a very fluid event?

03:20:07   3   A.   Oh, yes, absolutely.

03:20:09   4   Q.   And that you have to consider all of the information to

03:20:13   5   see if it's reasonable for the person facing that threat to

03:20:18   6   come to the conclusion that he or she needs to use deadly

03:20:21   7   force to protect him or herself?

03:20:24   8   A.   Yes.

03:20:28   9   Q.   And you take into consideration everything you learned

03:20:30   10  about an individual, right?

03:20:31   11  A.   I take into consideration everything that is presented to

03:20:35   12  me, yes.

03:20:36   13  Q.   Okay.  And would you agree that when you are dealing with

03:20:40   14  a suspect armed with a deadly weapon, fractions of a second

03:20:45   15  can make a difference between a law enforcement officer going

03:20:49   16  home at the end of his shift or having a law enforcement

03:20:54   17  officer's funeral?

03:20:55   18  A.   Yes.

03:20:56   19  Q.   And in terms of a deadly weapon, we can agree that a

03:20:59   20  vehicle can be a deadly weapon, right?

03:21:02   21  A.   Yes.

03:21:02   22  Q.   And you would agree that it's not unusual for police

03:21:07   23  officers to be struck by vehicles of people who are trying to

03:21:11   24  flee?

03:21:11   25  A.   It has happened many times.

03:21:13  1    Q.   And you would agree with me that there are a number of

03:21:19  2    factors that you would consider with respect to what is or is

03:21:25  3    not considered to be a threat when you are evaluating the use

03:21:30  4    of deadly force?

03:21:31  5    A.   Yes.

03:21:32  6    Q.   One of those factors would be the position of the officer

03:21:37  7    and the threat?

03:21:39  8    A.   Yes.

03:21:40  9    Q.   The distance from the police officer to that threat?

03:21:43  10   A.   Yes.

03:21:44  11   Q.   And the closer the officer is to the threat, the greater

03:21:48  12   the threat will be?

03:21:52  13   A.   Yes.   Firearms being kind of excluded because there's

03:21:57  14   much greater distance.   It's really a moot point with a

03:22:02  15   weapon, but yes, in general terms, the closer they are to the

03:22:06  16   delivery of that threat, the more risk there is of a

03:22:08  17   successful delivery.

03:22:10  18   Q.   And, in fact, you can actually have a threat where

03:22:13  19   someone is not armed, like in the *LeMasters'* situation, where

03:22:18  20   the individual who ended up being shot actually didn't have a

03:22:22  21   weapon at the time, right?

03:22:23  22   A.   That's correct.

03:22:24  23   Q.   Do you recall a case in Florida, Mr. Root, where two law

03:22:31  24   enforcement officers, Deputy Swaronski (phonetic) and Deputy

03:22:36  25   Muncie (phonetic); do you recall the case?

03:22:37  1    A.   Yes.

03:22:37  2    Q.   They actually -- those law enforcement officers actually

03:22:41  3    shot two individuals, a Mr. Treeman (phonetic) and a Mr. Perry

03:22:44  4    (phonetic), right?  Do you recall that?

03:22:46  5    A.   I don't recall the people's name in the car, but I

03:22:49  6    remember the deputies.

03:22:50  7    Q.   Okay.  So fair enough.  You recall a case in Florida

03:22:52  8    where two deputies, whose name I gave you, shot two suspects

03:22:56  9    in a vehicle?

03:22:57  10   A.   Yes.

03:22:57  11   Q.   Okay.  And those suspects were not armed with a knife, a

03:23:03  12   gun, or anything like that, true?

03:23:05  13   A.   I can't speak -- I don't recall that part.

03:23:11  14   Q.   Would you agree that those suspects were using their

03:23:14  15   vehicle as a weapon toward those law enforcement officers?

03:23:18  16   A.   I believe that was the case, but I don't remember what

03:23:21  17   was found inside the car.

03:23:23  18   Q.   And in that case, you actually found that there were no

03:23:26  19   violations of any policy or procedure in those law enforcement

03:23:31  20   officers shooting those suspects, did you?

03:23:33  21   A.   In that, no.

03:23:34  22   Q.   In that case, though, you were actually with the Martin

03:23:37  23   County Sheriff's Department, you were still on staff with the

03:23:41  24   sheriff's department, not being paid as an expert witness like

03:23:44  25   you are here; is that fair?

03:23:46  1    A.   Correct.  That was limited to the agency for that review.

03:23:49  2    Well -- and I don't know if that went to the grand jury or

03:23:53  3    not, but I served as the force specialist for the agency.

03:23:56  4    Q.   So aside from your regular compensation through the

03:23:59  5    sheriff's department, you didn't receive any further

03:24:02  6    compensation for the time you spent in the preparation of

03:24:05  7    those opinions?

03:24:05  8    A.   Not that I can recall.

03:24:09  9    Q.   One of the other factors that you would look at

03:24:12  10   considering whether to evaluate a threat and to use deadly

03:24:14  11   force is the demeanor of the suspect, right?

03:24:17  12   A.   Yes.

03:24:18  13   Q.   And prior actions of the suspect, right?

03:24:21  14   A.   Prior actions?

03:24:24  15   Q.   Yes.

03:24:25  16   A.   They can be, yes.

03:24:26  17   Q.   These factors -- did you walk through that analysis, like

03:24:31  18   the position of the threat to the officer, the demeanor of the

03:24:35  19   suspect, did you walk through any of that in your analysis in

03:24:39  20   this case?

03:24:39  21   A.   No.  It's not a possibility for an expert that they walk

03:24:47  22   through every option, otherwise the jury would be here for six

03:24:51  23   years.

03:24:51  24   Q.   So the factors that you just agreed that you should take

03:24:55  25   into consideration, in a use of force analysis, you did not go

03:25:00  1   through that specific analysis in that case -- in this case;

03:25:03  2   is that fair?

03:25:03  3   A.   No, it's not.  All those variables were considered they

03:25:08  4   just weren't what we discussed amongst all the other variables

03:25:11  5   we discussed, because there is a lot -- there's even more than

03:25:14  6   that that we could discuss.

03:25:15  7   Q.   Did you note anything in your opinions about

03:25:20  8   Deputy Forsyth and Deputy Love's testimony that Mr. Rhoades

03:25:25  9   was not complying with the commands to, "Show me your hands.

03:25:30  10  Get out of the car?"

03:25:30  11  A.   Based solely on Deputy Forsyth's and Deputy Love's

03:25:34  12  statements?

03:25:35  13  Q.   Yes.

03:25:36  14  A.   Did I say anything about that?

03:25:38  15  Q.   Did you have any discussion in your opinions in this case

03:25:41  16  or the testimony that you provided to this jury about whether

03:25:45  17  you took into consideration Mr. Rhoades' failure to comply

03:25:49  18  with the commands to, "Stop the vehicle.  Show me your hands?"

03:25:53  19  A.   Well, that would have to be if I found that -- if I felt

03:25:55  20  that the use of force was justified, I would be explaining

03:25:59  21  those elements as well, but since the opinion is to the

03:26:01  22  negative, then I don't believe it's justified because I don't

03:26:05  23  believe that, given the totality of this event and all the

03:26:08  24  information available, that those were actually the sequence

03:26:11  25  of events.

03:26:11  1    Q.   So your testimony is you don't believe Deputy Forsyth

03:26:14  2    provided commands to Mr. Rhoades to, "Stop the vehicle.  Show

03:26:18  3    me your hands," and you believe Mr. Rhoades complied?  Is that

03:26:23  4    your testimony?

03:26:25  5    A.   I never said Mr. Rhoades complied.

03:26:25  6    Q.   Okay.

03:26:27  7    A.   That never came out of my mouth.

03:26:29  8    Q.   Okay.

03:26:29  9    A.   I was very clear.  Based on the statements and the

03:26:33  10   information, my opinion was, I don't feel the shooting was

03:26:37  11   objectively reasonable.  The fact that he said he gave

03:26:41  12   commands, that the vehicle was moving, the vehicle stopped,

03:26:43  13   the vehicle -- there were so many conflicts within the

03:26:45  14   statements I'm not going to just cherry-pick one thing and say

03:26:48  15   well, this is okay and this one is not.  I have to consider

03:26:51  16   all of those elements and then try to combine those with the

03:26:55  17   physical evidence at the scene to come to the opinions that I

03:26:55  18   find.

03:26:59  19   Q.   We'll talk about the conflict in the statements here in a

03:27:02  20   minute.  You testified with regard to Mr. Faulkner and the

03:27:06  21   opinions that he's given in this case, correct?

03:27:08  22   A.   I believe there was a question on him, yes.

03:27:12  23   Q.   In fact, Mr. Umina actually asked you about Mr. Faulkner

03:27:16  24   near the end of your direct testimony; do you recall that?

03:27:19  25   A.   Yes.

03:27:19   1    Q.    You have obviously seen Mr. Faulkner's report in this

03:27:22   2    case and his background and education and experience, true?

03:27:25   3    A.    I have seen CV, yes.

03:27:28   4    Q.    And you're aware that Mr. Faulkner has done research

03:27:34   5    studies with subjects, I think about 60,000 research subjects

03:27:38   6    over the years, some for the justice department to determine

03:27:46   7    what level of force is appropriate based on a particular

03:27:50   8    threat; do you recall that?

03:27:52   9    A.    I'm aware of the study.  I never actually seen the

03:27:54   10   outcome or the data that goes with the study or anything, it's

03:27:58   11   just I've done this and I know I personally took his --

03:28:02   12   participated in his survey four times online.

03:28:06   13         So I know he questions a lot of civilians and I know he's

03:28:10   14   indicated he's done studies and things like that.  I'm not

03:28:14   15   going to speak to the studies because I've never actually seen

03:28:16   16   one.

03:28:17   17         Even in the -- he references them in his report but, were

03:28:20   18   not actually provided with the study.  So I can't speak to the

03:28:24   19   validity of the study, but I do speak to the comparison

03:28:28   20   between the average individual, and law enforcement officers

03:28:33   21   identification and assessment of a force event because what

03:28:37   22   some people who have no background, training, or experience in

03:28:40   23   law enforcement and been through the training won't understand

03:28:43   24   when officers are or are not allowed to use force and what

03:28:47   25   certain threats are.

03:28:48  1        The manner in which you pose a question, can influence

03:28:51  2   the outcome of the result.  So as for his studies, I know

03:28:56  3   they're cited in his report.  I know he talks about them,

03:29:00  4   but -- and I did ask for, can we get the studies?  Can we see

03:29:05  5   something?  I went online, I saw a piece that was there --

03:29:07  6   it's not there anymore -- but I can't get the information.

03:29:11  7   Q.   Well, let me ask this:  Have you ever done any similar

03:29:15  8   research studies of your own?

03:29:17  9   A.   The only -- as far as published studies?  I don't think

03:29:19  10  his are published studies, but I don't know for sure.  The

03:29:24  11  only studies or research I've done is actually talking to the

03:29:28  12  officers involved in real life use of force events and what

03:29:31  13  happened to them, and go through their experiences to better

03:29:35  14  understand how they're being influenced, that's the extent of

03:29:39  15  it, because as the force specialist for the agency and also

03:29:43  16  working with the academy, I had the opportunity to meet a lot

03:29:46  17  of the officers that, sadly, were placed in positions to have

03:29:49  18  to use deadly force, but I don't have an online study or

03:29:54  19  anything like that.

03:29:55  20  Q.   And no published material that reflects the compilation

03:29:59  21  of all that information that you just talked about where we

03:30:02  22  could go and find, true?

03:30:03  23  A.   Right, that's what I said.  I don't have a published

03:30:05  24  study.  I've just done real life experience assessments.

03:30:09  25  Q.   And you are aware that Mr. Faulkner has also done real

03:30:13   1   life assessments, true?

03:30:14   2   A.   I can't speak to his real life law enforcement

03:30:18   3   experience.

03:30:18   4   Q.   Okay.  You would agree with me, would you not, Mr. Root,

03:30:23   5   that the factors that you would use or that could cause a

03:30:30   6   threat to become more imminent to a law enforcement officer,

03:30:35   7   again, is the distance or proximity of the threat to the

03:30:39   8   officer?

03:30:39   9   A.   Yes.

03:30:40   10   Q.   Okay.  A lack of communication with the suspect?

03:30:45   11   A.   Sure.

03:30:46   12   Q.   And if the suspect is failing to follow the law

03:30:49   13   enforcement officer's commands or orders, right?

03:30:53   14   A.   Yes.

03:30:54   15   Q.   After a police officer recognizes a deadly threat, or

03:31:03   16   anybody recognizes a deadly threat, that person has to take

03:31:08   17   some kind of action to attempt to neutralize the threat in

03:31:14   18   some manner, right?

03:31:15   19   A.   Yes.

03:31:15   20   Q.   And neutralizing the threat could include firing a round

03:31:21   21   from your weapon at the threat?

03:31:24   22   A.   That's one of the options, yes.

03:31:26   23   Q.   And an important component of recognizing the threat and

03:31:32   24   taking action in response to the threat is the reaction time

03:31:38   25   between when you see the threat, and when your mind tells your

03:31:42  1   body you need to take some kind of action, right?

03:31:46  2   A.   That is a part of it, yes.

03:31:48  3   Q.   And during the time that you are recognizing that threat,

03:31:53  4   and your brain is telling you -- telling your body, I guess,

03:32:00  5   what to do, you can have a situation where that threat is

03:32:03  6   still moving, right?

03:32:06  7   A.   Oh, yes.

03:32:06  8   Q.   And the threat could actually be moving toward you in

03:32:10  9   your direction, right?

03:32:12  10  A.   Yes.

03:32:14  11  Q.   And the training -- you've talked about your training,

03:32:19  12  you've actually provided training to individuals with respect

03:32:22  13  to shooting at targets, have you not?

03:32:25  14  A.   Shooting at targets, shooting at people.

03:32:28  15  Q.   Okay.  So you've provided training, and there would be

03:32:31  16  times that the individuals -- well, let me ask this:  That

03:32:34  17  training, is it specific to law enforcement officers?

03:32:38  18  A.   No.  I've done training for law enforcement, private

03:32:41  19  individuals, I did some training -- not firearms training with

03:32:45  20  the military, it was more control tactics and non-lethals but

03:32:50  21  the firearms training shooting was law enforcement and private

03:32:53  22  individuals.

03:32:54  23  Q.   With regard to the timing of when you expect an

03:32:57  24  individual to be able to take action in response to a threat,

03:33:00  25  is that different if it's an individual citizen or a law

03:33:02  1   enforcement officer?

03:33:04  2   A.   This is a very complex concept.  The reaction time is

03:33:13  3   consistent amongst humans across the board.  In other words,

03:33:16  4   whether you're a police -- a male, female police officer, or

03:33:20  5   male, female individual, reaction times generally -- and I'm

03:33:23  6   generalizing just for presentation, figure a third of a

03:33:27  7   second.  You have reaction time and you have response time.

03:33:32  8        Reaction time is the time it takes for you to see,

03:33:35  9   interpret, and acknowledge a given threat and have your brain

03:33:40  10  decide what weapon, technique, whatever, is appropriate.

03:33:44  11       The response time is the amount of time that it takes to

03:33:47  12  complete the action of whatever it was.  I'm sorry, the

03:33:51  13  movement time.  So reaction time, movement time, equal

03:33:54  14  response time.

03:33:55  15       So when I see a threat, if it takes a third of a second

03:33:58  16  for me to see it, interpret it, and create the movement -- or

03:34:01  17  start the movement, like in your case where you said, I see a

03:34:05  18  threat and I'm going to shoot it, the reaction time is a third

03:34:07  19  of a second, then movement time, how long is it going to take

03:34:10  20  me to get my weapon out of holster and put one round down

03:34:14  21  range is movement time.

03:34:15  22       When that first bullet is fired, the action has been

03:34:20  23  completed, that is the response time.

03:34:22  24  Q.   And you would expect for law enforcement officers that

03:34:26  25  that to occur in about two seconds or ideally less, you would

03:34:30   1   want the officers to see the threat, perceive the threat,

03:34:34   2   react to the threat, and make a decision as to whether to

03:34:38   3   shoot that threat or not, right?

03:34:39   4   A.   If you're talking a target, yes, because that's the

03:34:41   5   established standard by Safari Land for the firearms holsters

03:34:46   6   when you have turning targets, when the target turns towards

03:34:50   7   the officer, the threat is presented, they need to see it,

03:34:53   8   react to it, and have one round down range, be proficient with

03:34:59   9   the holster, it needs to be done in less than two seconds.  If

03:35:01   10  it takes longer than two seconds for that action to be

03:35:01   11  completed, that's not acceptable.  So our goal is always to

03:35:06   12  make it faster than that.  We would like it to be as fast as

03:35:10   13  possible given how quickly a threat can be presented.

03:35:12   14  Q.   So, again, then with a threat being presented in front of

03:35:16   15  you, if it's not a turning target, as you described, but if

03:35:20   16  it's a threat presented to you, you would still expect the law

03:35:24   17  enforcement officer to see the threat, perceive the threat,

03:35:26   18  react to the threat and take action in response to the threat

03:35:28   19  ideally in two seconds or less?

03:35:32   20  A.   In an outdoor environment there's a lot of things that go

03:35:35   21  into it.  It's not as simple as a yes or no.  I'm not trying

03:35:38   22  to avoid your question.  What are you focused on?  What are

03:35:41   23  you looking at?

03:35:43   24       For example, if I'm looking at this bottle right here and

03:35:46   25  a threat suddenly presents itself I have to redirect my

03:35:49  1    attention to that.  Ideal world if we could have law

03:35:52  2    enforcement see, respond, and react the same way in a real

03:35:56  3    world environment that they do on the range, we would be more

03:36:00  4    successful.  It would be great if we could get -- and that

03:36:03  5    would be an ultimate goal of training is to get them to

03:36:07  6    respond to that threat in that period of time.  But it may

03:36:12  7    take longer and it might not be the fault of the officer, but

03:36:15  8    it is the goal and it is the preferred amount of time.  Faster

03:36:19  9    is always better.

03:36:21  10   Q.   Do you recall you testified at the very beginning that

03:36:25  11   when you testified in cases, not just in this case, but you

03:36:29  12   have testified truthfully, correct?

03:36:30  13   A.   Yes.

03:36:31  14   Q.   And you testified in the case of *Noble vs. Gasbarrini* in

03:36:35  15   the United States District before the Seventh District of

03:36:38  16   Florida, correct?

03:36:40  17   A.   Yes.

03:36:42  18         MS. DURST:  Your Honor, may I approach?

03:36:44  19         THE COURT:  You may.

03:36:59  20   BY MS. DURST:

03:37:00  21   Q.   Mr. Root, can you look at the front page and confirm that

03:37:03  22   this is a transcript from your deposition in *Noble vs.*

03:37:07  23   *Gasbarrini*; do you see that?

03:37:09  24   A.   Yes.

03:37:09  25   Q.   And what's the date of the deposition?

03:37:11   1    A.   April 4, 2014.

03:37:17   2    Q.   And if you look at page 70 lines 21 through 25, and you

03:37:24   3    were asked a question very similar to the way that I just

03:37:26   4    asked you.   "And during as little as two seconds you would

03:37:29   5    expect a law enforcement officer to see the target, perceive

03:37:32   6    the target, react to the target and make a decision as to

03:37:34   7    whether to shoot or not, correct?"

03:37:36   8    A.   Yes.

03:37:36   9    Q.   Okay.  And what was your answer there?

03:37:39   10   A.   Well, "Yes, absolutely."  Bearing in mind that that was

03:37:43   11   seven years ago and I've learned a lot more about perception

03:37:47   12   time, reaction time and a lot of things.  That was my

03:37:50   13   perspective on it in its totality then, but I have had a lot

03:37:54   14   of opportunity to be in a lot more education and training in

03:37:58   15   the years past.

03:37:59   16              MS. DURST:  Your Honor, may I approach?

03:38:01   17              THE COURT:  You may.

03:38:02   18              THE WITNESS:  And essentially it actually says the

03:38:04   19   same.

03:38:06   20   BY MS. DURST:

03:38:06   21   Q.   Well, you would agree that's not the way you answered my

03:38:08   22   question in this courtroom, right?  You didn't say, oh, "Yes,

03:38:12   23   absolutely," did you?

03:38:14   24   A.   Well, of course not.  I'm in front of a jury and not at a

03:38:17   25   deposition.  I would want to be educating the jury as to the

03:38:20  1    entirety of the concept and not just locked into two seconds,

03:38:24  2    but have them better understand all the things that have to be

03:38:27  3    done.

03:38:27  4         But, as I said, both there and here, it would be the

03:38:31  5    ultimate goal, we would absolutely want them to be able to do

03:38:35  6    it as quickly as possible.  If we could do it in one second,

03:38:38  7    that would be even better.

03:38:39  8    Q.   And so Deputy Forsyth, you would want him to be able see

03:38:43  9    the Jeep, perceive the Jeep, react to the Jeep, and take

03:38:45  10   action to determine whether he needed to fire or not in two

03:38:48  11   seconds?

03:38:50  12   A.   You're oversimplifying this and it's -- again, all these

03:38:56  13   elements are taking place, you are talking about reaction time

03:38:58  14   principle.  Threat being presented.  I am fairly confident

03:39:02  15   that he knew where the Jeep was.  He understood where its

03:39:06  16   movements were.  He understood he was standing in front of it.

03:39:08  17        You're compartmentalizing it into a period that I'm

03:39:11  18   supposed to have two seconds for all of that.  Which is also

03:39:14  19   why I just explained to the jury that there is reaction time,

03:39:18  20   movement time, make up the response time.  But there are other

03:39:22  21   things.  What are they focused on?  What are they look --

03:39:24  22   those are all things that have to be considered when you look

03:39:27  23   at a use of force.  I didn't say that he gets out of the car

03:39:33  24   and he has under two seconds to see the Jeep, shoot the Jeep.

03:39:35  25   That's not what I said.

| | | |
|---|---|---|
| 03:39:36 | 1 | Q.   Okay.  You would train the officer you were providing |
| 03:39:41 | 2 | training for that hesitation will get them killed, correct? |
| 03:39:44 | 3 | A.   Yes. |
| 03:39:44 | 4 | Q.   And you would agree with me that if an individual was |
| 03:39:47 | 5 | armed with a weapon, you've given that individual commands, |
| 03:39:51 | 6 | that individual ignores your commands, and that individual |
| 03:39:55 | 7 | keeps moving at you, in your direction with a weapon, you're |
| 03:39:59 | 8 | going to put a bullet in that person, are you not? |
| 03:40:02 | 9 | A.   Yes. |
| 03:40:03 | 10 | Q.   And we've agreed that armed can be armed with a vehicle, |
| 03:40:06 | 11 | right? |
| 03:40:07 | 12 | A.   That is correct. |
| 03:40:08 | 13 | Q.   Fair to say that if someone is coming at you in the |
| 03:40:11 | 14 | manner that I just described, that they're armed with a |
| 03:40:17 | 15 | weapon, you've given them commands, they're ignoring the |
| 03:40:19 | 16 | commands, they keep coming at you in that direction, fair to |
| 03:40:21 | 17 | say you're not going to wait and see whether that person |
| 03:40:24 | 18 | actually intends on causing serious bodily injury or death to |
| 03:40:30 | 19 | you, are you? |
| 03:40:31 | 20 | A.   With a weapon.  Let's not confuse -- I understand you're |
| 03:40:34 | 21 | saying and I agree that a car is a weapon, but what you're |
| 03:40:38 | 22 | saying right there, yes.  If it's a weapon, I wouldn't, but I |
| 03:40:42 | 23 | also wouldn't be standing in front of a vehicle in the open if |
| 03:40:46 | 24 | I had the impression that the person could be armed.  So I |
| 03:40:50 | 25 | don't want to mix apples and oranges. |

03:40:53    1    Q.    Well, you heard Deputy Forsyth testify that his intention

03:40:56    2    was to get out of the car and go to the rear of the cruiser so

03:41:00    3    he had cover, right?

03:41:02    4    A.    That is what he testified to, yes.

03:41:03    5    Q.    You would agree with me that whether or not an individual

03:41:09    6    was in fear for his or her life is a significant, probably if

03:41:14    7    not the factor, in determining whether or not they have a

03:41:16    8    right to use deadly force?

03:41:18    9    A.    Yes.

03:41:19   10    Q.    And, for example, you were actually the expert in the

03:41:24   11    George Zimmerman trial, right, where the gentleman shot

03:41:26   12    Trayvon Martin, right?

03:41:27   13    A.    That is correct.

03:41:28   14    Q.    And your opinion was that based on the fear experienced

03:41:31   15    by Mr. Zimmerman that he had a right to defend himself?

03:41:35   16    A.    Based on the fact that the totality of the circumstances,

03:41:38   17    not just the expression of fear, but yes.

03:41:40   18    Q.    Based on his fear, he had a right to defend himself?

03:41:47   19    A.    Yes.

03:41:47   20    Q.    And because he was in fear for his life, whether or not

03:41:51   21    Trayvon Martin actually was reaching for Mr. Zimmerman's gun

03:41:56   22    or not was a moot point in your opinion, right?

03:41:59   23    A.    At the stage of the event with all the information that

03:42:01   24    was presented with regard to what was happening to him on the

03:42:05   25    ground with everything included, that is correct.

03:42:08   1    Q.   Now, your opinion -- correct me if I'm wrong, from your

03:42:15   2    testimony -- your opinion that the discharge of Deputy

03:42:21   3    Forsyth's weapon was not objectively reasonable is based on

03:42:24   4    your further opinion or finding that this incident with

03:42:30   5    Mr. Rhoades could not have happened the way Deputy Forsyth

03:42:33   6    described it; is that right?

03:42:37   7    A.   It could be said that way, yes.

03:42:39   8    Q.   And that is a consistent opinion that you've had in other

03:42:45   9    cases over the years, isn't it?  That the event that was

03:42:49   10   described by law enforcement officer couldn't have happened

03:42:51   11   the way it was described?

03:42:52   12   A.   Given the facts of the cases that I've been presented

03:42:55   13   with, and the information provided, it is the most polite way

03:43:00   14   of saying it, yes.

03:43:02   15   Q.   Well, and there was a case, do you remember the *Orr* case,

03:43:05   16   I think that was in -- O-r-r.  One of your opinions in that

03:43:13   17   case was that the event could not have been described -- or it

03:43:16   18   could not have unfolded as the parties in the case described.

03:43:21   19        Ring a bell at all?

03:43:22   20   A.   You're asking me about the *Orr* case and I'm drawing a

03:43:26   21   blank.  If you're saying that is an opinion that I had if they

03:43:29   22   were describing the event and they were lying, I don't know

03:43:35   23   enough -- off the title of the case I can't remember, I'm

03:43:38   24   sorry.

03:43:38   25   Q.   Well, go ahead, if you would, I can at least refresh your

570

03:43:42   1   recollection with regard to the question.  You have your

03:43:45   2   deposition there in front of you?

03:43:45   3   A.   Sure.

03:43:46   4   Q.   Page 186 in your deposition.

03:44:05   5   A.   Okay.

03:44:06   6   Q.   186 the question starts on line two.

03:44:10   7        Question:  "And we're talking about your opinion that it

03:44:13   8   couldn't have happened the way Deputy Forsyth described on the

03:44:15   9   prior page."

03:44:16   10       My question was:  "That seems to be somewhat of a common

03:44:20   11  opinion for you.  Do you recall in the *Orr* case that one of

03:44:22   12  the opinions you had was that the event could not have

03:44:25   13  unfolded as described by parties in that case?"

03:44:27   14       And your answer was, "Yes."  And then you provided a

03:44:30   15  description that it's not necessarily an element for people

03:44:37   16  that recall things differently.  But my question was, at least

03:44:39   17  in 2019 you answered yes.

03:44:43   18       So you have no recollection of what the *Orr* case is about

03:44:45   19  today?

03:44:46   20  A.   Give me a moment, I'm trying to see if there is some

03:45:03   21  context where we talked about it.  At this moment I'm trying

03:45:07   22  to remember the *Orr* case.

03:45:15   23       Are you saying that this was a police case, a civil

03:45:19   24  police case in the *Orr* case?

03:45:19   25  Q.   If you have no recollection of it today --

03:45:24   1   A.   No, like I said in my deposition, it's common for people

03:45:29   2   not to remember some things, again, go back to the memory

03:45:32   3   issues, but as far as the commonality of my saying it didn't

03:45:36   4   happen the way it unfolded, it's not uncommon either for

03:45:39   5   people not to remember things or to interject things that

03:45:43   6   maybe they heard, or if we have individuals have to have

03:45:47   7   transitions for statements that don't meet physical evidence

03:45:52   8   that is not uncommon in certain types of cases such as these,

03:45:58   9   where the only way you can politely say it is, that it

03:46:04   10  couldn't have unfolded in the way in which it was being

03:46:07   11  described, which leaves the opportunity we have to look at

03:46:10   12  what other ways there are.

03:46:11   13  Q.   Mr. Root, my question simply was, do you recall the *Orr*

03:46:14   14  case?

03:46:14   15  A.   No, your question wasn't just the *Orr* case.   It was about

03:46:18   16  what I testified in the *Orr* case, and I don't recall that

03:46:20   17  particular case in and of itself.

03:46:22   18  Q.   Do you recall giving an opinion in *Noble vs. Gasbarrini*

03:46:27   19  case that the description provided by Officer Gasbarrini

03:46:30   20  regarding the shooting of Mr. Noble, how it took place was not

03:46:34   21  possible.   Do you recall that case?

03:46:36   22  A.   Oh, I do.   I recall that case greatly, ma'am.

03:46:39   23  Q.   Also recall *Torres vs. Bonetti* where your opinion was

03:46:43   24  that the timeline of events that were provided by Deputy

03:46:45   25  Bonetti did not make sense considering the events that he

03:46:49   1   described.

03:46:49   2        Do you recall that case?

03:46:50   3   A.   Yes, because in both cases I found the officers to be

03:46:53   4   lying.

03:46:54   5   Q.   And that's one of the opinions that you have here that

03:46:59   6   Deputy Forsyth, the event couldn't have happened the way he

03:47:03   7   described it, right?

03:47:03   8   A.   I don't think I wrote an opinion that says that.

03:47:07   9   Q.   Well, I just asked you the question, that one reason or a

03:47:13  10   reason for --

03:47:14  11   A.   I'm sorry.

03:47:15  12        THE COURT:   Hold on, Mr. Root, let her finish the

03:47:17  13   question.

03:47:18  14        MS. DURST:   Thank you, Your Honor.

03:47:18  15   BY MS. DURST:

03:47:18  16   Q.   I asked you that one of the reasons you testified that

03:47:23  17   you believe supports your opinion that the shooting was

03:47:29  18   objectively unreasonable, is because the event could not have

03:47:32  19   happened the way Deputy Forsyth described it, true?

03:47:35  20   A.   You said two things there.  My opinion doesn't say that.

03:47:44  21   Supporting information provided by the evidence in this case

03:47:48  22   in the statements, is that essentially, even though it's not

03:47:52  23   written in there, given the statements, the multiple

03:47:54  24   statements, it couldn't have happened when you look at the

03:47:56  25   statements and the events, so it couldn't have unfolded in the

03:47:59  1    manner in which he is describing.

03:48:01  2    Q.   Are you calling Deputy Forsyth a liar like you just

03:48:04  3    called the police officers in those other two cases, the

03:48:08  4    *Bonetti* and the *Noble* case?

03:48:10  5    A.   Well, to be very clear, it's your job, not mine, to

03:48:14  6    determine credibility of any witness, so I don't ever try to

03:48:17  7    invade the province of the jury as far as determining

03:48:19  8    credibility, but I do feel that since the other cases were

03:48:22  9    closed and not relevant here, you were asking me about them,

03:48:26  10   that I was able to share why that information was provided in

03:48:28  11   those particular matters, so that it gives a proper context in

03:48:31  12   which it was delivered.

03:48:33  13   Q.   So you testified that you believed that those events in

03:48:40  14   the Florida case couldn't have occurred the way the officers

03:48:43  15   described, and you said because you found the officers were

03:48:46  16   lying.  Isn't that what you just testified to here?

03:48:49  17   A.   Yes.  The evidence showed that.

03:48:51  18   Q.   Okay.  So then my question is, your testimony in this

03:48:54  19   case is that the events couldn't have occurred the way

03:49:00  20   Deputy Forsyth described and, therefore, you believe the

03:49:03  21   shooting was objectively unreasonable, fair?

03:49:07  22   A.   No.  It's the totality of everything.  It's the fact that

03:49:10  23   statements provided by Deputy Love and Deputy Forsyth conflict

03:49:15  24   with one another, as well as conflict with the physical

03:49:19  25   evidence at the scene.

03:49:20   1     It's not just I'm saying, well, I don't believe him, it's
03:49:24   2   I'm taking the totality of all the physical evidence presented
03:49:30   3   in this case along with the statements and everything, and my
03:49:32   4   opinions are formed based on that, given the totality of
03:49:36   5   everything I had a chance to review, my opinion is that that
03:49:38   6   shooting was not objectively reasonable.
03:49:40   7   Q.   Because based on the statements and the objective
03:49:44   8   evidence that you say that was at the scene, it couldn't have
03:49:48   9   happened the way he described, right?
03:49:50   10  A.   Sure.
03:49:50   11  Q.   Okay.  So if that's the case, are you saying that
03:49:54   12  Deputy Forsyth is lying about what he described occurring in
03:49:58   13  that gas well site?
03:50:00   14  A.   With all due respect, ma'am, and very respectfully, the
03:50:10   15  statements stand for themselves.  I don't want to accuse him
03:50:14   16  of it.  Do I feel it?  I honestly feel backed into a corner
03:50:19   17  because I don't want to speak disparagingly against the
03:50:22   18  officer -- or I'm sorry, the deputy -- but if -- and I know I
03:50:26   19  have to answer your question, but given the facts, the
03:50:28   20  changing statements, the physical evidence and everything
03:50:31   21  else, there is no way that Jeep, in my opinion, was moving at
03:50:36   22  the time Deputy Forsyth shot him, so if those are the case
03:50:39   23  facts that I form my opinion on, then yes, I believe that he
03:50:44   24  is not telling the truth.
03:50:46   25  Q.   He's lying?

03:50:47  1  A.   If you want -- I'm not call him that -- I am going to

03:50:53  2  respect the man and not doing stuff like that to him, ma'am.

03:50:57  3  Q.   Why will you not say that about Deputy Forsyth but you

03:51:01  4  said that about the other law enforcement officers in Florida

03:51:04  5  that you found that they were lying?  Is there a reason?

03:51:06  6  A.   Oh, sure.  First and foremost they are not in the room to

03:51:09  7  be disrespected, and with them here, I would not do that.

03:51:13  8  Secondly, you keep bringing up information and you're taking

03:51:16  9  it out of context.  You're not sharing the totality of the

03:51:19  10  case.  You're just sharing the opinions and a segment of it,

03:51:22  11  and the shortest way to get people to understand that the

03:51:24  12  reason I say what I say is they were lying.

03:51:28  13      Video interviews shows in the *Noble* case, he showed three

03:51:33  14  different shooting positions and the trajectory of the round

03:51:36  15  the pathologist showed the shooting position couldn't have

03:51:38  16  happened that way, which means he wasn't telling the truth,

03:51:40  17  which also means the event could not have unfolded in the

03:51:43  18  manner in which he described.

03:51:44  19      That is a very politically correct and non-offensive way

03:51:48  20  of ensuring people understand it couldn't have happened this

03:51:52  21  way.  And the jury can decide, but I just wasted another chunk

03:51:57  22  of the jury's time trying to explain something to explain to

03:52:00  23  you why I was willing to say it about them on closed cases,

03:52:03  24  but I did not want to say it to this man.

03:52:05  25          THE COURT:  One second, Mr. Root, I understand and

03:52:09  1    appreciate your answer, but please refrain any further

03:52:12  2    editorial comments about the use of the jury's time.

03:52:16  3         Ms. Durst, you can ask your next question.

03:52:17  4         MS. DURST:  Thank you, Your Honor.

03:52:17  5    BY MS. DURST:

03:52:18  6    Q.   You've talked a little bit, Mr. Root, about -- or agreed

03:52:24  7    that everyone's perception of an event is different, right?

03:52:28  8    A.   Yes.

03:52:29  9    Q.   Okay.  That you can have people, two different people

03:52:35  10   witness the same exact event and give statements about that

03:52:40  11   event that are different, true?

03:52:43  12   A.   True.

03:52:44  13   Q.   And a conflict in how a person describes an event that

03:52:50  14   occurred versus how another person may describe that event can

03:52:54  15   depend upon the person's position relative to what he or she

03:53:00  16   is witnessing, correct?

03:53:01  17   A.   Yes.

03:53:02  18   Q.   And if one person is standing in one location, and a

03:53:07  19   second person is standing in a different location, those

03:53:11  20   individuals could see different things and report different

03:53:15  21   things in their statement, true?

03:53:17  22   A.   Yes.

03:53:17  23   Q.   Okay.  And in this case, we have Deputy Forsyth exiting

03:53:23  24   his cruiser on the driver's side, right?

03:53:25  25   A.   Yes.

03:53:25  1    Q.   And Deputy Forsyth would have exited on his cruiser on

03:53:30  2    the passenger side, true?

03:53:31  3    A.   True.

03:53:31  4    Q.   And so each of them would have had a different

03:53:33  5    perspective for what he was seeing as they were exiting the

03:53:38  6    cruiser, right?

03:53:39  7    A.   Yes, and once outside the cruiser.

03:53:41  8    Q.   And what an individual also recalls and provides in a

03:53:50  9    statement can depend upon the memory of each of those

03:53:55  10   individuals, correct?

03:53:57  11   A.   Of course, yes.

03:53:57  12   Q.   And following a high stress -- a stress-inducing event

03:54:03  13   like you've described as a shooting, a person's body, I think

03:54:07  14   you said, will undergo psychological or physiological

03:54:12  15   responses that could impact a person's memory, true?

03:54:14  16   A.   Yes.

03:54:15  17   Q.   It could actually impact a person's memory for a finite

03:54:20  18   period of time or forever?

03:54:21  19   A.   That is correct.

03:54:22  20   Q.   In fact, there are situations where it's not uncommon for

03:54:27  21   a person who has been in a stress-inducing event like a

03:54:32  22   shooting to not remember certain things occurring at all,

03:54:37  23   right?

03:54:37  24   A.   Correct.

03:54:38  25   Q.   So in this case, you have said that Corey Love didn't

03:54:44  1    describe seeing the three-point turn that Mr. Rhoades' Jeep

03:54:49  2    did, that Deputy Forsyth described, right?

03:54:52  3    A.   That is correct.

03:54:55  4    Q.   And that's one of the things that you say you found as a

03:54:59  5    conflict in their statements, true?

03:55:01  6    A.   If they were both seated in the patrol car at the time it

03:55:05  7    was taking place, and they're both looking at the same suspect

03:55:10  8    vehicle because that's what they're looking for, one saw

03:55:14  9    something -- didn't see any movement, didn't see the vehicle

03:55:17  10   backing up or anything like that.  If they're seated in the

03:55:19  11   same position in the car and looking in the same areas, one

03:55:23  12   would expect, especially the size of the motor vehicle in the

03:55:26  13   broad daylight that they would see vehicle movement.

03:55:30  14   Q.   My question wasn't about seeing.  We were just talking

03:55:33  15   about memory.  And you've agreed that an individual that could

03:55:37  16   be in a stress-inducing situation, such as a shooting, it's

03:55:41  17   not uncommon for that person to forget some things ever

03:55:45  18   occurring at all, right?

03:55:46  19   A.   That's correct.  I must have misunderstood your question.

03:55:49  20   Q.   So Deputy Love was in a stress-induced situation,

03:55:56  21   possible he forgot that the three-point turn occurred; isn't

03:56:02  22   that fair?

03:56:02  23   A.   If that was the singular -- it is possible.  And if it

03:56:06  24   was singular by itself, that would be fair.

03:56:10  25   Q.   You were here for opening statements, I guess two days

03:56:14    1    ago now, right?

03:56:16    2    A.   Yes.

03:56:17    3    Q.   And you heard the statements of deputy -- let me rephrase

03:56:26    4    this because I think I already covered this.  I don't want to

03:56:29    5    go down a road that we have already gone down.

03:56:36    6        We've already covered that.

03:56:38    7        Okay.  So let's kind of dovetail into the conflicts that

03:56:43    8    you believe exist in Deputy Forsyth's and Deputy Love's

03:56:47    9    statements.

03:56:47   10        One part of what you have indicated is you believe that

03:56:51   11    there is a conflict between Deputy Forsyth and Deputy Love --

03:56:54   12    or at least, I don't think you told the jury this, but you

03:56:57   13    mentioned this in your report and in your deposition, is that

03:57:00   14    you believe there's a conflict between who located the access

03:57:04   15    road to the gas well site.

03:57:06   16        Do you remember that in your deposition?

03:57:08   17    A.   It was in the report.  I didn't testify to it here.

03:57:12   18    Q.   I said, do you remember that from your deposition?

03:57:14   19    A.   Yes.  Yes.

03:57:16   20    Q.   Okay.  And for that conflict, you would actually refer to

03:57:20   21    Deputy Forsyth's interview with Sergeant Branham; do you

03:57:23   22    recall that?

03:57:25   23    A.   Yes.

03:57:26   24    Q.   Okay.  Let me ask this:  If the issue is was

03:57:31   25    Deputy Forsyth experiencing fear for his life as the Jeep was

| 03:57:39 | 1 | coming at him, what makes a difference who located the access |
| 03:57:44 | 2 | road? |
| 03:57:44 | 3 | A.   At that moment in time?  Nothing. |
| 03:57:46 | 4 | Q.   Okay.  Do you have Deputy Forsyth's statement that he |
| 03:57:56 | 5 | gave to Sergeant Branham? |
| 03:58:05 | 6 | A.   I believe I do. |
| 03:58:06 | 7 | Q.   I can probably get a copy. |
| 03:58:08 | 8 | A.   Faster? |
| 03:58:25 | 9 | Q.   Probably. |
| 03:58:36 | 10 | MS. DURST:  Your Honor, may I approach? |
| 03:58:37 | 11 | THE COURT:  You may. |
| 03:58:38 | 12 | BY MS. DURST: |
| 03:58:54 | 13 | Q.   Mr. Root, what I have handed you is a transcription of |
| 03:58:58 | 14 | the statement that Deputy Forsyth gave to Lieutenant Branham |
| 03:59:03 | 15 | on August 4 of 2017. |
| 03:59:06 | 16 | You've seen this document, right? |
| 03:59:07 | 17 | A.   Yes. |
| 03:59:08 | 18 | Q.   And part of what we were just talking about is you |
| 03:59:11 | 19 | believe that a conflict existed between what Deputy Forsyth |
| 03:59:15 | 20 | said about who located the access road and what Deputy Love |
| 03:59:19 | 21 | said about who located the access road, right, from their |
| 03:59:24 | 22 | statements? |
| 03:59:24 | 23 | A.   Yes. |
| 03:59:24 | 24 | Q.   Okay.  And I think in recalling from your testimony, you |
| 03:59:27 | 25 | believe that Deputy Love said he located the access road, |

03:59:30  1    right?

03:59:31  2    A.   He pointed it out, yes.

03:59:32  3    Q.   Can you show me anywhere in Deputy Forsyth's statement to

03:59:37  4    Lieutenant Branham where he says who actually located the

03:59:41  5    access road?

04:00:22  6    A.   On page 2 he referenced it and I took that to be his

04:00:28  7    identifying the access road.

04:00:30  8    Q.   What did he say on page 2?

04:00:32  9    A.   He said, "I allowed them to get by and there was an

04:00:36  10   access road in that area where we lost sight of the vehicle."

04:00:40  11   Identifying -- he identified the access -- I took that to mean

04:00:42  12   he had identified the access road.

04:00:44  13   Q.   But in his actual statement he never said he located the

04:00:48  14   access road versus Deputy Love located the access road; is

04:00:53  15   that fair?

04:00:53  16   A.   That is fair.

04:00:54  17   Q.   Okay.

04:00:54  18        MS. DURST:   Your Honor, may I approach?

04:00:55  19        THE COURT:   You may.

04:01:20  20   BY MS. DURST:

04:01:20  21   Q.   Let me ask this, Mr. Root, if you assume that

04:01:26  22   Deputy Forsyth's description of how the event occurred is

04:01:30  23   correct, okay, the Jeep is driving at him, moving in an

04:01:34  24   aggressive manner, we would look at what Deputy Forsyth is

04:01:38  25   perceiving at the time the Jeep is moving at him, it wouldn't

04:01:43  1    matter who located the access road or not, right?

04:01:46  2    A.   That is correct.

04:01:47  3    Q.   Okay.  Another, as I understand it from your testimony, a

04:01:54  4    conflict you believe exists between what Deputy Forsyth said

04:01:57  5    and Deputy Love said, is the, I guess what I'll call the

04:02:04  6    movement of the vehicle.  And I believe what you told me in

04:02:08  7    your deposition in this case is the reason you believe there's

04:02:11  8    a conflict is because Deputy Love had not described the Jeep

04:02:15  9    as moving at any point in time before Deputy Forsyth actually

04:02:21  10   exited the cruiser; do you recall that?

04:02:24  11   A.   Yes.

04:02:25  12   Q.   Okay.  You have the report up there?

04:02:29  13   A.   Yes.

04:02:30  14   Q.   Can you look at page 12 of your report, please?

04:02:48  15   A.   I have it.

04:02:50  16   Q.   I don't, so bear with me one minute.  I think it's in the

04:03:10  17   third full paragraph, I believe.  Give me a minute, I don't

04:03:19  18   want you in the wrong paragraph, I don't want to mislead you.

04:03:25  19        Yeah, it's the third full bullet-point paragraph.  You

04:03:29  20   see it says, "Deputy Love described the Jeep's location"?

04:03:36  21   A.   Yes.

04:03:37  22   Q.   Okay.  So that says, "Deputy Love described the Jeep's

04:03:41  23   location as being about 10 to 15 feet off to the left inside

04:03:45  24   and as soon as we pulled in, he started coming out."

04:03:49  25        So Deputy Love actually described movement of the Jeep

04:03:55  1   before Deputy Forsyth exited the cruiser, correct?

04:03:59  2   A.   But not movement of the Jeep that was being described by

04:04:03  3   Deputy Forsyth.   Deputy Forsyth said the vehicle came forward

04:04:07  4   and almost struck the patrol car.   Deputy Love never said

04:04:11  5   that.

04:04:11  6   Q.   Well, let me go back and ask you the question again, and

04:04:13  7   part of the reason you believe that there is a conflict

04:04:16  8   between Deputy Forsyth and Deputy Love's statements is because

04:04:20  9   you claim Deputy Love had not described the Jeep as moving at

04:04:24  10  any point in time before Deputy Forsyth exited the vehicle.

04:04:32  11       And you would agree with me that that is not correct if

04:04:36  12  Deputy Love described the Jeep as moving as soon as they

04:04:40  13  entered the -- "as soon as we pulled in he started coming

04:04:46  14  out," right?

04:04:48  15  A.   That is what's here, and if I may, it says that that was

04:04:52  16  from the interview transcript.   So I wanted to make sure that

04:04:58  17  I'm looking at the same document.

04:05:00  18  Q.   Fair enough.   We read that directly from the report you

04:05:03  19  prepared in the case, right?

04:05:04  20  A.   Right.

04:05:19  21  Q.   Okay.

04:05:19  22  A.   That is in the report, yes, ma'am.

04:05:20  23  Q.   Okay.   So based on what you just determined that is in

04:05:27  24  your report that you noted that Deputy Love specifically

04:05:30  25  described the Jeep, "As soon as we pulled in, he started

04:05:35  1    coming out," right?

04:05:36  2    A.   That's what he said.

04:05:38  3    Q.   Which would have been before Deputy Forsyth actually

04:05:41  4    exited the cruiser based on his testimony, right?

04:05:44  5    A.   Well, depends on the statement.  If you look at the

04:05:47  6    original statement, he got out immediately.  If you look at

04:05:50  7    his testimony and following statements, there was a delay

04:05:54  8    developed and then there was a transition developed, so it

04:05:57  9    really depends on which statement we're going to apply it to.

04:06:00  10         I was going with the statement after they had the time to

04:06:03  11   collect themselves and present their information to them in

04:06:06  12   this report, I articulated that, and these are the things

04:06:09  13   relating to what they had said, and then my overall opinions

04:06:14  14   were based off of everything.  So I probably just muddied all

04:06:17  15   that up.

04:06:18  16   Q.   Well, let me ask you --

04:06:19  17   A.   Sure.

04:06:20  18   Q.   -- going back to what we just said about Deputy Love's

04:06:23  19   statement, "About 10 to 15 feet off the left side," and, "As

04:06:26  20   soon as we pulled in, he started coming out."

04:06:28  21        We've agreed that is in your report?

04:06:30  22   A.   Yes, ma'am.

04:06:30  23   Q.   Okay.  You testified on direct examination by Mr. Umina

04:06:34  24   that the statements say he was parked and stopped to the left?

04:06:39  25   A.   Deputy Forsyth's.

585

04:06:41   1    Q.   Where does Deputy Love indicate that he said he was

04:06:48   2    stopped?

04:06:48   3         You said in your deposition in this case that Deputy Love

04:06:52   4    said that the Jeep was stopped.  So can you show me anywhere

04:06:56   5    in Deputy Love's statement he indicated the Jeep was stopped?

04:06:59   6    A.   Will you share with me the page of the deposition so I

04:07:04   7    could reference it in context to make sure that I'm -- when I

04:07:06   8    was questioned by Mr. Umina, my testimony earlier was about

04:07:10   9    what Deputy Forsyth had indicated and we're now talking about

04:07:14  10    Deputy Love and I want to make sure that -- in the deposition

04:07:17  11    you said that I --

04:07:17  12    Q.   I was referring to your trial testimony here.  You said,

04:07:21  13    quote, "The statements say he was parked and to the left and

04:07:24  14    was stopped."  That's what I wrote down what you said.

04:07:27  15         So my question is:  What statements, plural, said that

04:07:33  16    the Jeep was stopped when they entered the clearing?

04:07:36  17    A.   Deputy Forsyth provided multiple statements and he said

04:07:39  18    parked, and then he changed it to something else.  So there

04:07:42  19    were statements that indicated -- there were more than one.

04:07:46  20    It's not just one statement.

04:07:50  21    Q.   So your testimony is that Deputy Forsyth described it as

04:07:54  22    being stopped, not Deputy Love; is that right?

04:07:57  23    A.   No.  He also describes it as being stopped.

04:08:00  24    Q.   Where does Deputy Love in his statement to Sergeant

04:08:04  25    Branham say that the Jeep was stopped?  That's my question.

04:08:07  1   The statement to Sergeant Branham.

04:08:10  2   A.   That's where I am getting confused, is in my report I did

04:08:18  3   write that he told Sergeant Branham he was stopped in his

04:08:22  4   interview.  I'm sorry.  I'm having a disconnect with what --

04:08:26  5   Q.   Well, we are.  What I'm basing this on is your testimony

04:08:30  6   here on direct examination when you were talking about the

04:08:32  7   process of the fleeing, you said, "The statements say that he

04:08:36  8   was parked and stopped to the left."

04:08:39  9   A.   What was the question that that was a response to?

04:08:43  10  Q.   The question was with regard to your description of the

04:08:45  11  vehicle not being pursued, it lost sight, and you said:   "The

04:08:49  12  statement said that it was stopped.  They were actively

04:08:53  13  looking for it, but the Jeep was stopped, based on the

04:08:56  14  statement."

04:08:56  15      I'm just trying to figure out whose statement says it was

04:08:59  16  stopped.  Do you know?

04:09:01  17  A.   Ma'am, I shared with you the information -- I wish I

04:09:06  18  could go back and recall exactly everything around what you've

04:09:10  19  picked out as far as a question.  Give me a generalized

04:09:13  20  question, they were actively searching, you can combine the

04:09:18  21  pursuit and that -- I'm just trying to make sure that I'm not

04:09:22  22  misinforming anybody.  You started with the report saying I --

04:09:26  23  I'm just trying to figure out where we are.  I'm sorry.

04:09:29  24  Q.   My question at that point is not about the report.  My

04:09:32  25  question was about your testimony here on direct examination

04:09:37   1    when you said:  "The statements say the Jeep was parked and

04:09:44   2    stopped to the left."

04:09:46   3        What statement, is what I'm asking you.  What statement?

04:09:49   4    A.   There are statements from Deputy Forsyth, I know that

04:09:52   5    there are statements from Deputy Love also, a variety of

04:09:56   6    statements.  And they indicated the vehicle was off to the

04:09:59   7    left and -- now I'm combining the statements.  I'm

04:10:03   8    generalizing the statement.  If you would like me to go into

04:10:06   9    each individual statement, but the statements were, the

04:10:08   10   vehicle was off to the left and it was stopped.

04:10:12   11       The word used by Deputy Forsyth was originally parked,

04:10:15   12   and adjacent to, and then there was, I believe, he said that

04:10:19   13   in his deposition as well.

04:10:21   14   Q.   And maybe you and I are having a disconnect with the use

04:10:25   15   of the term "statement" when you testified on direct.  Are you

04:10:28   16   using the term "statement" and "deposition" interchangeably or

04:10:32   17   are you talking about the statements that they gave to

04:10:36   18   Sergeant Branham?  It's your testimony I'm asking --

04:10:39   19   A.   I understand.  And I guess, because I can't recall the

04:10:44   20   exact question, statements, it could have been, maybe it was

04:10:48   21   off the depositions, so I apologize if I used an improper way

04:10:54   22   of referring to it.

04:10:55   23   Q.   Let me ask you this:  We don't have your drawing up on

04:10:59   24   the whiteboard anymore, but you were talking about the bowl

04:11:01   25   and you were showing where the gas well tank and everything

04:11:09  1   was, and you said to the right, kind of -- or to the left of

04:11:12  2   the bowl there was a steep embankment, and you said, "You know

04:11:15  3   he wasn't going to go take that Jeep up that embankment."

04:11:18  4       How do you know that Rhoades wouldn't have taken that

04:11:21  5   Jeep up that embankment?

04:11:22  6   A.   I don't think that's the exact words I used, but the

04:11:25  7   embankment is extraordinary steep, and had he tried to go up

04:11:29  8   that way, there would have been -- you wouldn't even had to

04:11:32  9   ask if there was ground disturbance, he would have been in

04:11:36  10  four-wheel drive and climbing.  I was using it as an example

04:11:39  11  that there is an obstruction that way, and then there is a

04:11:41  12  drop off on the other side that contains the bowl.

04:11:44  13  Q.   Well, and I understand that.  But you were providing a

04:11:46  14  description with your drawing that the access road was really

04:11:50  15  the only exit point for Mr. Rhoades because of the area around

04:11:55  16  the bowl, right?

04:11:55  17  A.   That is correct.

04:11:56  18  Q.   And what you said was, that's the only access point -- or

04:12:01  19  the access point is the only way to exit because you got the

04:12:04  20  gas pipe materials behind, you have the steep embankment to

04:12:09  21  the left, and I forget how you described the area to the

04:12:12  22  right.

04:12:13  23      But my question is:  This was a Jeep, how do you know

04:12:17  24  that Mr. Rhoades would not take that Jeep up over the

04:12:22  25  embankment?  You can't say that, can you?

04:12:24   1   A.   Well, given the amount of brush, trees, and overgrowth in

04:12:28   2   that area, whether he is in the Jeep or not, and the steep

04:12:31   3   incline that I witnessed when I did my scene examination, it

04:12:33   4   would -- I cannot say definitely whether or not a Jeep could

04:12:37   5   climb, but it would be relatively -- I can't say definitely.

04:12:42   6   I will leave it there.

04:12:43   7   Q.   You would agree with me, would you not, Mr. Root, you

04:12:49   8   talked about the conflict that you perceived with

04:12:51   9   Deputy Forsyth and Deputy Love's statements.  The simple fact

04:12:54   10  that conflicts in statement exists in and of themselves

04:12:58   11  doesn't mean that the use of force was not objectively

04:13:01   12  reasonable, does it?

04:13:02   13  A.   Not necessarily, no.

04:13:07   14  Q.   You talked about the *Graham vs. Connor* case, and you said

04:13:24   15  that you would agree with me, I guess in light of *Connor* that

04:13:31   16  Deputy Forsyth's use of force on August 2nd has to be judged

04:13:34   17  from the perspective of a reasonable police officer on the

04:13:39   18  scene facing those same or similar circumstances that he was

04:13:42   19  facing and not with some 20/20 hindsight or Monday morning

04:13:47   20  quarter backing, right?

04:13:48   21  A.   That is correct.

04:13:53   22         MS. DURST:  Your Honor, may I have a moment?

04:13:55   23         THE COURT:  You may.

04:14:10   24         MS. DURST:  Your Honor, at this point I don't believe

04:14:12   25  I have any further questions for Mr. Root.

590

04:14:15    1              THE COURT:  All right.  Thank you very much, Ms.

04:14:18    2    Durst.

04:14:19    3        Mr. Umina.

04:14:24    4              MS. DURST:  Your Honor, may I obtain my transcript

04:14:27    5    back?

04:14:28    6              THE COURT:  You may we will give you a moment to --

04:14:31    7    Mr. Umina for planning purposes, how long do you anticipate

04:14:35    8    your redirect being of our witness?

04:14:39    9              MR. UMINA:  I can't imagine more than 20 to

04:14:44   10    30 minutes, if that.

04:14:45   11              THE COURT:  Okay.  Understood.  You may proceed, sir.

04:14:51   12                        REDIRECT EXAMINATION

04:14:51   13    BY MR. UMINA:

04:15:08   14    Q.   Mr. Root, we talked a lot about witness statements and

04:15:13   15    the conflicts between them.  Do you recall in Mr. Forsyth --

04:15:21   16    the defendant's testimony where he stated that he saw a black

04:15:26   17    Jeep, and I quote, "Parked adjacent to where I was entering

04:15:31   18    that clearing?"

04:15:31   19    A.   Yes.

04:15:32   20    Q.   And do you recall him also saying that it was pulled in

04:15:38   21    directly to the left of the entrance to the gas well site when

04:15:40   22    he entered the clearing?

04:15:41   23    A.   Yes.

04:15:42   24    Q.   And then in the same recorded statement he gave a second

04:15:49   25    version when he first said that it was pulled in and then he

04:15:54   1    went on to give this version about it pulling out almost

04:15:58   2    hitting him and attempting to do a three-point turn?

04:16:00   3    A.    Yes.

04:16:01   4    Q.    So you recall the defendant giving two separate versions

04:16:06   5    of what happened when he pulled into the gas well site in the

04:16:11   6    same statement?

04:16:11   7    A.    Yes.

04:16:12   8    Q.    Do you recall him giving two statements in his deposition

04:16:22   9    testimony where he said that he witnessed the black Jeep

04:16:26   10   parked and then he goes on to say the Jeep actually drove

04:16:30   11   towards my vehicle almost striking it?

04:16:32   12   A.    Yes.

04:16:32   13   Q.    Do you recall in Corey Love's statement, he stated, "As

04:16:40   14   we came into the opening off to the left in the bushes I saw a

04:16:45   15   black Jeep."

04:16:46   16   A.    Yes.

04:16:47   17   Q.    And do you remember Corey Love's deposition testimony

04:16:55   18   where the defendant told him that it would be a good idea for

04:16:59   19   him to have his written statement and then made Corey Love

04:17:06   20   exchange statements with him?

04:17:08   21   A.    Yes.

04:17:08   22   Q.    And ensured that he had his version of events?

04:17:11   23   A.    Yes.

04:17:12   24   Q.    And then after he received those instructions from the

04:17:18   25   defendant, in his deposition it was at that point that he said

04:17:24    1    that the vehicle was moving as they entered the gas well site?

04:17:28    2    A.   Yes.

04:17:29    3    Q.   But prior to receiving the defendant's written statement,

04:17:33    4    on August 4th, he didn't say anything about the vehicle

04:17:37    5    moving.   He said, "As we came into the opening, off to the

04:17:41    6    left in the bushes, I saw a black Jeep."   Do you recall that?

04:17:42    7    A.   I do.

04:17:43    8    Q.   And was that the basis that you based your opinion of

04:17:51    9    conflicting statements on?

04:17:53   10    A.   Yes.

04:17:54   11    Q.   Now, one of the things that Ms. Durst just spent a lot of

04:18:05   12    time, a lot of time discussing with you are people's

04:18:10   13    subjective beliefs about fear and other things.   Do you recall

04:18:14   14    that?

04:18:14   15    A.   Yes.

04:18:15   16    Q.   Do you recall her actually getting into subject matters

04:18:21   17    that don't even involve police officers and their fears?

04:18:26   18    A.   Yes.

04:18:27   19    Q.   When the question that the jury is asked to answer here

04:18:36   20    is what an objectively reasonable officer would do, that's

04:18:41   21    what you testified to earlier, wasn't it?

04:18:43   22    A.   Yes.

04:18:44   23    Q.   Okay.   So what does subjective thoughts on the standard

04:18:52   24    objectively reasonable officer have to do with anything?

04:18:55   25    A.   Well, the only element is fear is subjective to the

04:19:00   1    individual which is why *Graham v. Connor* puts responsibility

04:19:05   2    on officers to be able to explain what gave rise to their fear

04:19:08   3    because it is subjective.  It's each individuals'

04:19:11   4    interpretation of an event.  And like Ms. Durst pointed out,

04:19:15   5    what may make me afraid, may not make you afraid so that

04:19:19   6    that's the element -- there is a subjective element in it

04:19:21   7    because we are human beings, and that's why the decision was

04:19:24   8    we have the responsibility of explaining it as to why we were

04:19:28   9    in fear.

04:19:28   10   Q.   And we can all agree, though, if the Jeep wasn't in gear

04:19:34   11   and the Jeep wasn't aggressively accelerating towards the

04:19:38   12   defendant, no matter what -- no matter what else is brought

04:19:42   13   up, this shooting was objectively unreasonable, wasn't it?

04:19:45   14   A.   That is correct.

04:19:46   15   Q.   Okay.  Other than the drawing provided by the

04:19:56   16   investigator Mr. Straley who he himself is a former state

04:20:04   17   trooper, but other than that, do you know if a single piece of

04:20:07   18   evidence in this case came from anywhere other than law

04:20:12   19   enforcement officers?

04:20:16   20   A.   No.

04:20:16   21   Q.   So we're talking about a police shooting here and every

04:20:22   22   single piece of evidence that you recall -- I mean, I want you

04:20:25   23   to tell me, did one thing come from anywhere other than the

04:20:28   24   police in a police shooting?

04:20:30   25   A.   Excluding the investigator's information, no.  It was all

04:20:35  1    from the source.

04:20:36  2    Q.   Just one moment, Mr. Root, we may actually be done right

04:20:47  3    now.  If any of the other cases that were brought up you

04:21:18  4    believed that the officer was telling the truth and wasn't

04:21:23  5    lying, would you have given a different opinion?

04:21:27  6    A.   Absolutely.  My opinions are based on case facts, end of

04:21:31  7    story, end of day.  And I always give the benefit of the doubt

04:21:34  8    to the law enforcement officer because of the types of events

04:21:38  9    they find themselves in.

04:21:39  10   Q.   And similarly in all of those cases, did pretty much all

04:21:43  11   of the evidence come from the police?

04:21:47  12   A.   That, I couldn't honestly answer without looking at the

04:21:53  13   cases.  I do know in the *Noble* shooting he was actually

04:21:56  14   interviewed from the police department that showed the

04:21:59  15   discrepancies.  He was giving a statement in the police

04:22:03  16   department interview room and it had a recording on it.

04:22:06  17   Q.   I mean, if the police give you all of the evidence of a

04:22:09  18   police shooting, is there any way other than to prove that

04:22:14  19   they were wrong than prove that they were lying or show that

04:22:19  20   they were lying?

04:22:20  21        Is there another way to do that if they are giving you

04:22:22  22   all of the evidence?

04:22:22  23   A.   Well, law enforcement is entrusted with conducting the

04:22:25  24   investigations and that's why, you know, that's your source of

04:22:28  25   information, especially in events that are isolated.  It's not

04:22:32   1   like it happened in a mall or a grocery store where there's a

04:22:35   2   bunch of people around.  It happened in a rural isolated area.

04:22:39   3   So the only witnesses -- unfortunately, you know, if

04:22:42   4   Mr. Rhoades survived, there would be another witness, but

04:22:46   5   since he didn't, the only witnesses are the officers that were

04:22:48   6   actually present at the time.

04:22:49   7   Q.   Thank you, Mr. Root.

04:22:51   8           MR. UMINA:  No further questions, Your Honor.

04:22:52   9           THE COURT:  Thank you, Mr. Umina.

04:22:54   10       Ms. Durst, any recross, ma'am?

04:22:57   11          MS. DURST:  Yeah, just one brief inquiry.  Thank you,

04:22:57   12  Your Honor.

04:22:57   13                      RECROSS-EXAMINATION

04:22:57   14  BY MS. DURST:

04:23:02   15  Q.   Mr. Root, Mr. Umina just asked you about the statements

04:23:05   16  that Deputy Forsyth and Deputy Love gave and asked if you

04:23:09   17  remembered Deputy Love testifying in his deposition that

04:23:13   18  Deputy Forsyth told him it would be a good idea to exchange

04:23:17   19  those statements before he gave his statement to state police;

04:23:19   20  do you remember that?

04:23:20   21  A.   Yes.

04:23:20   22  Q.   That's not true, is it?  Deputy Forsyth --

04:23:23   23          MR. UMINA:  I object, Your Honor.  That's not what I

04:23:24   24  stated.  Counsel is mischaracterizing evidence.

04:23:27   25          THE COURT:  Well, the questions aren't evidence.

04:23:29  1    Overruled.

04:23:29  2        Ask your question again, Ms. Durst.

04:23:31  3    BY MS. DURST:

04:23:32  4    Q.  My understanding -- let me rephrase.  My understanding of

04:23:34  5    what Mr. Umina asked, was Deputy Love testified in his

04:23:39  6    deposition that Deputy Forsyth told him it would be a good

04:23:45  7    idea to exchange their statements and they did it before they

04:23:47  8    gave their statements to Sergeant Branham.  That didn't

04:23:49  9    happen, did it?

04:23:49  10   A.  Before their statements to Branham?

04:23:51  11   Q.  Yes.

04:23:51  12   A.  No, not before the statement to Branham.

04:23:53  13   Q.  So when Deputy Love gave his statement, he didn't have

04:23:56  14   Deputy Forsyth's statement and the vice-versa, right?

04:23:59  15   A.  No.

04:24:00  16   Q.  No, I'm not right?

04:24:02  17   A.  No, I'm saying that didn't happen before that.

04:24:06  18        MS. DURST:  All right.  That's the only thing I

04:24:07  19   wanted to clarify, Your Honor.

04:24:08  20        THE COURT:  All right.  Any re-redirect?

04:24:11  21        MR. UMINA:  Your Honor, if I may just address what

04:24:12  22   was just said.

04:24:14  23        THE COURT:  Certainly.

04:24:15  24             FURTHER REDIRECT EXAMINATION

04:24:15  25   BY MR. UMINA:

04:24:16   1   Q.   Mr. Root, the question that I asked you was, "Do you

04:24:23   2   recall him exchanging statements prior to Love giving his

04:24:29   3   deposition testimony."

04:24:30   4   A.   That's the way I remembered it and that was the question,

04:24:32   5   and that is affirmative.

04:24:33   6   Q.   So I didn't ask you, "Did they exchange written

04:24:37   7   statements prior to talking to Branham?"

04:24:38   8   A.   You did not.

04:24:40   9   Q.   What I asked you was, prior to talking to Branham, Love

04:24:46   10   makes no mention of the Jeep moving.  He says, "As we came

04:24:52   11   into the opening, off to the left in the bushes, I saw a black

04:24:57   12   Jeep."  That's what he said to Branham.

04:24:59   13        And then after giving that statement he was asked by the

04:25:06   14   defendant to exchange statements, which they did, and it was

04:25:11   15   not only until that time when his deposition was taken after

04:25:16   16   giving that statement that omitted any movement, and after

04:25:20   17   being directed by the defendant to exchange statements, did he

04:25:24   18   then claim there was movement during his deposition.

04:25:28   19        That was my question, wasn't it, Mr. Root?

04:25:30   20   A.   That was.

04:25:31   21              MR. UMINA:  Thank you.

04:25:33   22              THE COURT:  Ms. Durst, anything further.

04:25:35   23              MS. DURST:  Yes, Your Honor.

04:25:35   24                     FURTHER RECROSS-EXAMINATION

04:25:35   25   BY MS. DURST:

598

| | | |
|---|---|---|
| 04:25:40 | 1 | Q.   Mr. Root, you still have your report up there? |
| 04:25:42 | 2 | A.   I do. |
| 04:25:43 | 3 | Q.   And you have Deputy Love's interview transcript up there? |
| 04:25:47 | 4 | A.   I have to look.  I'm sure I do. |
| 04:25:53 | 5 | Q.   That I can't find quickly for you. |
| 04:25:56 | 6 | A.   No, that's okay.  Did you want me to look at the |
| 04:26:27 | 7 | transcript from the interview? |
| 04:26:32 | 8 | Q.   Yes, sir. |
| 04:26:34 | 9 | A.   Okay.  I found the statement, so the transcript would be |
| 04:26:50 | 10 | right in front of it, should be.  Yes, ma'am. |
| 04:26:50 | 11 | Q.   Do you have it? |
| 04:26:51 | 12 | A.   Yes.  I was trying to differentiate between the look of a |
| 04:26:55 | 13 | deposition and the look of a transcribed statement. |
| 04:26:57 | 14 | Q.   You have the transcript of Deputy Love's statement from |
| 04:27:01 | 15 | August 4, 2017? |
| 04:27:02 | 16 | A.   Yes. |
| 04:27:02 | 17 | Q.   Okay.  And Mr. Umina just asked you that Deputy Love did |
| 04:27:07 | 18 | not describe initially in that statement any movement of the |
| 04:27:11 | 19 | Jeep, it was after he got Deputy Forsyth's statement that he |
| 04:27:18 | 20 | then described the movement of the Jeep in his deposition.  Do |
| 04:27:22 | 21 | you recall that question? |
| 04:27:22 | 22 | A.   Yeah, I thought he qualified it with the almost striking |
| 04:27:26 | 23 | the vehicle. |
| 04:27:26 | 24 | Q.   Well, do you have page 4 of Deputy Love's statement |
| 04:27:30 | 25 | there? |

04:27:31   1   A.   I do.

04:27:32   2   Q.   And I'm just looking at your report without having the

04:27:38   3   transcript in front of me.  Your report refers to Deputy

04:27:41   4   Love's transcript at page 4.  "Deputy Love described the

04:27:44   5   Jeep's location" and it's even in quotes, "About ten to 15

04:27:47   6   feet off to the left side, and as soon as we pulled in, he

04:27:51   7   started coming out."  Is that what's on page 4?

04:27:54   8   A.   Correct.  That's what we discussed earlier.

04:27:56   9   Q.   Okay.  So this statement was before he had

04:28:00   10  Deputy Forsyth's statement, right?

04:28:01   11  A.   This statement, yes, ma'am.

04:28:02   12  Q.   Okay.  And so in this statement, Deputy Love actually

04:28:06   13  described movement of the Jeep before he ever had

04:28:10   14  Deputy Forsyth's written statement, right?

04:28:13   15  A.   Yes, ma'am.

04:28:14   16  Q.   Okay.  Because he said, "As soon as we pulled in, he

04:28:17   17  started coming out."

04:28:18   18  A.   Yes, ma'am.

04:28:19   19        MS. DURST:  Okay.  All the questions I have, Your

04:28:22   20  Honor.  Thank you.

04:28:23   21        THE COURT:  Mr. Umina?

04:28:24   22        MR. UMINA:  Nothing further, Your Honor.

04:28:26   23        THE COURT:  Mr. Root, step down.

04:28:28   24        THE WITNESS:   Yes.

04:28:29   25        THE COURT:  Sir, thank you very much, you may step

04:28:32   1      down.  Thank you, sir.

04:29:09   2           Ladies and gentlemen of the jury, it strikes me that we

04:29:11   3      are at a good spot to stop for the day, so we are going to do

04:29:14   4      that.  We'll excuse you at this point.

04:29:18   5           Again, my instructions remain the same as they have been.

04:29:21   6      Please continue to refrain from discussing this case with

04:29:25   7      anyone, this includes any of your fellow jurors, or small

04:29:27   8      groups of your fellow jurors.  You have my permission, as

04:29:29   9      usual, to blame me when you get home, and your family members

04:29:32   10     or whomever may ask you what you've been doing all day, you

04:29:36   11     can't talk about it yet.  Please also continue to refrain from

04:29:41   12     any independent investigation efforts, not only about this

04:29:42   13     case but any of the issues that may have been discussed in

04:29:46   14     connection with that case.

04:29:47   15          We thank you for your time and patience today.  We'll see

04:29:52   16     you back here tomorrow morning at 9:00.  Thank you very much.

04:29:52   17     Have a pleasant evening.

12:45:18   18          (The jury exited the courtroom at 4:29 p.m.  and the

12:46:13   19     following transpired in open court.)

04:30:16   20          THE COURT:  Let's have a brief planning conversation.

04:30:18   21     Mr. Umina, do you anticipate any additional witnesses, sir?

04:30:21   22          MR. UMINA:  No, we do not, Your Honor.

04:30:22   23          THE COURT:  All right then.  Not knowing the answer

04:30:30   24     to that question and remembering I'm not supposed to ask

04:30:35   25     questions I don't know the answer to in the courtroom in front

04:30:36  1    of the jury, do you feel compelled or need to rest in the

04:30:43  2    presence of the jury?

04:30:46  3             MR. UMINA:  No, Your Honor, I don't believe that we

04:30:49  4    do.

04:30:50  5             THE COURT:  Okay.  So we will take up any motions

04:30:57  6    first thing tomorrow morning.  I'll ask counsel to be here at

04:30:59  7    9:00 so that we can discuss whatever motions may be

04:31:05  8    forthcoming.  And then we'll advise the jurors the plaintiff

04:31:09  9    has rested and anything else we need to based on those

04:31:15  10   motions.

04:31:16  11        Ms. Durst, let me ask you, who do you anticipate calling,

04:31:19  12   one overall and two tomorrow.

04:31:21  13            MS. DURST:  Your Honor, the only witness, since we

04:31:23  14   have called Deputy Forsyth, questioned him in the plaintiff's

04:31:25  15   case, would be Mr. Faulkner, because everybody else we've --

04:31:29  16   Deputy Love was questioned as part of that, so the only

04:31:31  17   witness we would have would be Mr. Faulkner.

04:31:34  18        There was one issue, Your Honor, I wanted to bring to the

04:31:36  19   Court's attention.  Deputy Forsyth is scheduled for his COVID

04:31:40  20   vaccine tomorrow at 10:00, obviously, you know, he wouldn't be

04:31:44  21   here for that at the start of Mr. Faulkner's testimony.  I

04:31:48  22   wouldn't want the jury to take any -- have any negative

04:31:52  23   perception if he's not here.  So I obviously don't want him to

04:31:57  24   miss his vaccine, so I don't know if we could just advise the

04:31:59  25   jury that that's why he's not here at the start of the trial

04:32:02   1   since he's getting his vaccine and just come in.

04:32:04   2         THE COURT:  Yeah, that's fine.  Mr. Forsyth, assuming

04:32:07   3   you don't have a problem with me disclosing your personal

04:32:10   4   health information to the jury, I most certainly will tell

04:32:14   5   them why you're not present at the start tomorrow.

04:32:19   6         DEPUTY FORSYTH:  No, Your Honor, that's fine.

04:32:19   7         THE COURT:  Thank you.  I will certainly do that and

04:32:22   8   convey that to the jury.  I certainly wouldn't expect you to

04:32:26   9   miss that appointment.  I'm sure the jury wouldn't either.

04:32:30   10   I'll address that with them first thing when we're here

04:32:31   11   tomorrow.  Okay.  Thank you for that heads up.  We'll deal

04:32:34   12   with that in the morning.

04:32:36   13      One thing I wanted to mention before we officially

04:32:39   14   consider the plaintiff rested, I think we just may have missed

04:32:42   15   it, it was Defendant's Exhibit Number 1, the collection of 30

04:32:47   16   photographs.  I don't believe there was an objection to those,

04:32:50   17   but for our official record, I want to make sure there wasn't

04:32:53   18   so we could have those admitted; is that correct, Mr. Umina?

04:32:57   19         MR. UMINA:  Yes, Your Honor.  There's no objection.

04:32:57   20         THE COURT:  All right.  They are hereby deemed

04:33:00   21   admitted and are so considered as part of plaintiff's case in

04:33:05   22   chief, but were introduced and admitted without objection

04:33:09   23   during the plaintiff's case in chief.  So if counsel can be

04:33:12   24   here at 9:00 tomorrow, we'll take up any motions, then we'll

04:33:16   25   have the jury come in.  I'll advise them first that Mr.

04:33:20  1    Forsyth can't be here because of a vaccine appointment, and

04:33:23  2    that the plaintiff has rested, and then we'll proceed with Mr.

04:33:28  3    Faulkner's testimony.

04:33:30  4        We are, just for counsel's planning purposes, we are

04:33:33  5    about finished with our proposed jury charge.  Counsel will

04:33:38  6    receive that first thing in the morning.  And we'll have our

04:33:42  7    jury charge whenever we are finished with Mr. Faulkner's

04:33:47  8    testimony, obviously.  We'll see how long that ultimately

04:33:49  9    takes and we'll probably have conversation outside the

04:33:52  10   presence of the jury with respect to planning our day moving

04:33:55  11   forward tomorrow.

04:33:58  12       The charge itself is not very long.  I won't ask again

04:34:01  13   how long folks want to close, but we'll see where we are

04:34:07  14   tomorrow, and how long we have left in the day once we are

04:34:11  15   finished with the evidence.

04:34:13  16            MR. UMINA:  Your Honor, can we address the verdict

04:34:15  17   form?

04:34:15  18            THE COURT:  Yes, we'll do that in the charge

04:34:16  19   conference, yes, sir.

04:34:18  20       Okay.  Anything else we need to take up at this point,

04:34:21  21   Mr. Umina?

04:34:21  22            MR. UMINA:  No.

04:34:24  23            THE COURT:  All right.  Ms. Durst?

04:34:24  24            MS. DURST:  The only thing I would note, Your Honor,

04:34:26  25   I think we still need to get the flash drive of the radio

04:34:30 1    traffic to the court clerk.  And Mr. Carroll has the flash

04:34:34 2    drive.  We will get that downloaded and get it to the Court

04:34:35 3    tomorrow so it can be admitted.

04:34:37 4         THE COURT:  That's fine, yes.  That would be great.

04:34:39 5    We already dealt with that, just the actual -- that's

04:34:44 6    Defendant's 2, correct?

04:34:46 7         MS. DURST:  Yes, it was admitted, I guess I didn't

04:34:48 8    use the correct term, provided to the clerk so it can be made

04:34:50 9    part of the record.

04:34:51 10        THE COURT:  I realize that I admitted a nonexistent

04:34:55 11   exhibit this morning, but we'll cure that error tomorrow

04:34:59 12   morning.

04:35:00 13        If nothing further, have a pleasant evening.  We'll see

04:35:03 14   everyone in the morning.

15            (Proceedings adjourned at 4:35 p.m.)

16                        C E R T I F I C A T E

17            I, Jill M. Cutter, Registered Professional Reporter and

18   Official Reporter for the United States District Court for the

19   Northern District of West Virginia, so hereby certify that the

20   foregoing is a correct transcript to the best of my ability of

21   the taped proceedings in the above-styled action on April 8,

22   2021, as reported by me in stenotypy.

23            I certify that the transcript fees and format comply with

24   those prescribed by the Court and Judicial conference of the

25   United States.

1

2          Given under by hand this day, April 26, 2021.

3

4               /s/ Jill M. Cutter, RPR

5            Official Reporter, United States
            US District Court for the Northern
6            US District of West Virginia

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**$**

$250 [1] - 441:13
$5,000 [1] - 441:12

**/**

/s [1] - 605:7

**1**

1 [1] - 602:18
10 [11] - 435:23,
468:23, 468:24,
471:6, 473:12,
473:13, 473:19,
504:11, 513:23,
582:24, 584:20
10/8 [1] - 526:23
10:00 [1] - 601:23
10:46 [1] - 439:22
11 [4] - 433:7, 435:3,
438:24, 439:13
11:05 [1] - 439:22
12 [2] - 477:2, 582:15
125 [1] - 400:16
12:11 [2] - 477:13,
478:7
13 [4] - 423:4, 436:19,
444:16, 470:14
14 [5] - 436:19,
463:18, 463:20,
480:7, 485:13
1443:08 [1] - 480:7
15 [18] - 438:24, 439:6,
439:21, 468:20,
468:21, 468:23,
468:24, 471:6,
473:13, 473:19,
485:15, 504:11,
510:19, 537:3,
537:14, 582:24,
584:20, 599:8
16 [9] - 436:19,
470:14, 481:12,
481:22, 481:23,
484:9, 484:20,
484:22, 485:1
16-second [1] -
513:21
17 [2] - 414:4, 516:10
18 [2] - 538:8, 538:11
186 [2] - 570:5, 570:7
18th [1] - 421:11
1989 [1] - 445:14
1:15 [3] - 477:3,
477:12, 478:5
1:18 [1] - 478:7
1:18-CV-186 [2] -
400:4, 402:4

**1st** [1] - 540:17

**2**

2 [3] - 581:7, 581:9,
604:9
20 [7] - 413:21, 434:5,
485:16, 486:3,
538:9, 538:11,
590:10
20/20 [3] - 490:5,
490:10, 589:20
200 [2] - 400:19,
463:13
2000 [1] - 540:14
2003 [1] - 526:23
2004 [2] - 527:14,
527:20
2005 [2] - 415:21,
415:22
2010 [2] - 413:20,
415:20
2011 [2] - 415:20,
459:25
2013 [13] - 416:4,
425:25, 426:6,
427:6, 427:14,
428:2, 428:15,
432:14, 435:13,
540:17, 540:18,
541:17, 541:21
2014 [10] - 425:25,
426:6, 427:6,
427:14, 428:2,
428:15, 428:22,
432:14, 435:13,
565:2
2015 [1] - 428:22
2017 [10] - 425:2,
425:9, 427:14,
428:2, 428:18,
428:25, 432:14,
460:1, 580:16,
598:18
2019 [6] - 435:24,
515:21, 516:10,
518:9, 540:19,
570:18
2021 [3] - 400:12,
604:25, 605:5
20th [1] - 421:12
21 [1] - 565:3
212 [12] - 459:14,
459:21, 463:7,
463:8, 463:11,
481:25, 482:6,
485:2, 485:8, 518:6,
522:23
213 [2] - 459:15, 465:3
213-foot [1] - 485:2

21st [1] - 421:12
22s [1] - 409:1
24 [1] - 493:25
2414 [1] - 400:23
25 [8] - 443:21,
486:11, 486:18,
486:24, 513:24,
522:15, 522:18,
565:3
26 [2] - 527:14, 605:5
26501 [1] - 400:16
26508 [2] - 400:19,
400:23
26th [1] - 421:13
27 [5] - 444:10, 519:2,
524:8, 526:5, 527:19
280 [3] - 516:2,
516:11, 517:13
28th [1] - 421:13
29 [3] - 434:5, 463:16,
485:8
2:00 [1] - 480:7
2:43:08 [2] - 480:6,
480:12
2:52 [1] - 537:16
2:53:04 [2] - 480:16,
481:10
2:53:20 [2] - 481:1,
481:11
2nd [3] - 425:2, 425:9,
589:17

**3**

3 [2] - 463:8, 481:25
3" [2] - 459:14, 459:21
3-inch [1] - 522:23
30 [6] - 435:3, 487:7,
497:24, 521:7,
590:11, 602:18
32 [4] - 405:23, 406:4,
410:14, 433:7
33 [5] - 453:6, 453:7,
465:11, 465:12,
497:20
35-foot [1] - 497:24
39 [1] - 430:16
3:01 [1] - 545:1
3:10 [1] - 545:1
3:11 [1] - 545:6
3:46 [1] - 516:2

**4**

4 [7] - 430:16, 565:2,
580:16, 598:18,
599:2, 599:7, 599:10
40 [2] - 407:22, 487:7
403 [1] - 535:16
43 [1] - 480:7

46 [6] - 453:7, 453:8,
465:15, 497:21
48 [1] - 493:25
4:29 [1] - 600:21
4:35 [1] - 604:18
4th [1] - 592:5

**5**

5 [1] - 459:24
5'9 [1] - 460:2
5'9" [1] - 459:21
5304 [2] - 480:22,
481:23
5315 [1] - 480:22
5327 [1] - 481:6

**6**

6 [2] - 400:19, 430:17
6" [1] - 465:3
6'9 [1] - 459:22
6'9" [1] - 459:24
60,000 [1] - 558:6
6:00 [1] - 420:16

**7**

7" [1] - 465:15
7-Eleven [1] - 428:23
70 [1] - 565:3
72 [1] - 493:25
72-hour [1] - 494:4
79 [2] - 531:19, 538:8

**8**

8 [3] - 400:12, 480:8,
604:24

**9**

9 [1] - 435:3
98 [2] - 500:11, 500:12
9:00 [3] - 600:19,
601:10, 603:2
9:30 [1] - 516:2
9:32 [1] - 402:1

**A**

a.m [2] - 402:1, 439:22
abbreviated [1] -
523:11
ability [5] - 469:9,
481:15, 533:10,
536:4, 604:23
able [27] - 410:12,
443:16, 453:15,
453:23, 474:14,

479:19, 479:22,
481:20, 481:21,
490:23, 491:6,
510:8, 512:3, 512:5,
517:5, 517:15,
518:24, 520:5,
529:23, 540:23,
541:19, 550:7,
561:25, 566:6,
566:9, 573:11, 593:3
above-styled [2] -
400:12, 604:24
absent [1] - 489:1
absolutely [19] -
420:15, 423:14,
439:18, 464:6,
475:20, 475:25,
487:19, 504:5,
513:15, 515:5,
515:25, 528:5,
530:25, 548:11,
552:4, 565:11,
565:24, 566:6, 594:7
academy [4] - 512:17,
523:18, 523:19,
559:17
Academy [3] - 523:16,
523:21, 523:23
accelerate [1] - 473:3
accelerated [1] -
487:2
accelerating [1] -
593:12
acceleration [7] -
457:3, 457:4, 457:9,
471:11, 471:14,
471:18, 472:16
acceptable [2] -
438:21, 563:12
accepted [1] - 502:1
access [36] - 453:2,
458:19, 463:6,
463:7, 465:13,
467:10, 467:18,
467:19, 467:20,
468:22, 471:1,
480:17, 482:3,
486:3, 503:17,
505:1, 505:9, 518:5,
536:5, 536:7,
579:15, 580:2,
580:21, 580:22,
581:1, 581:6, 581:8,
581:11, 581:12,
581:13, 581:15,
582:2, 588:15,
588:19, 588:20
accident [5] - 460:25,
523:2, 523:4, 523:6,
546:5

**accolades** [1] - 449:17
**according** [10] - 481:1, 481:25, 494:24, 506:5, 507:20, 507:23, 508:9, 511:5, 516:1, 540:7
**account** [3] - 473:15, 500:25, 501:6
**accuracy** [1] - 534:17
**accurate** [2] - 470:5, 517:6
**accusations** [1] - 498:5
**accuse** [1] - 574:16
**achieved** [1] - 438:22
**acknowledge** [1] - 562:10
**acres** [2] - 436:23, 443:21
**acted** [1] - 420:1
**ACTION** [1] - 400:4
**action** [14] - 400:12, 448:18, 464:9, 513:5, 560:18, 560:25, 561:2, 561:25, 562:13, 562:23, 563:11, 563:19, 566:11, 604:24
**actions** [8] - 461:17, 461:18, 490:25, 497:12, 530:3, 548:25, 555:14, 555:15
**active** [2] - 447:22
**actively** [9] - 492:8, 492:11, 492:15, 493:2, 493:4, 546:20, 547:20, 586:13, 586:21
**activities** [3] - 409:18, 454:23, 486:19
**actual** [7] - 459:25, 463:18, 465:16, 520:4, 538:22, 581:14, 604:8
**adapted** [1] - 408:9
**add** [1] - 513:15
**added** [3] - 487:8, 487:22, 506:13
**adding** [2] - 484:16, 539:18
**addition** [2] - 447:13, 540:22
**additional** [5] - 447:10, 487:22, 499:2, 509:9, 600:24
**additionally** [1] - 535:14

**address** [6] - 402:25, 403:19, 464:3, 596:22, 602:13, 603:19
**addressed** [2] - 489:15, 489:17
**addresses** [1] - 489:19
**adjacent** [3] - 504:8, 587:13, 590:18
**adjourned** [1] - 604:18
**adjust** [2] - 419:4, 506:8
**adjustment** [1] - 440:17
**adjustments** [1] - 491:24
**Administratrix** [1] - 400:4
**administratrix** [3] - 419:12, 419:24, 422:9
**admit** [1] - 513:1
**admitted** [6] - 602:21, 602:24, 602:25, 604:6, 604:10, 604:13
**adored** [1] - 408:23
**adult** [1] - 408:8
**adults** [1] - 409:10
**advanced** [2] - 509:10
**advantage** [1] - 510:3
**adverse** [1] - 517:25
**advise** [4] - 418:15, 601:11, 602:2, 603:3
**advising** [2] - 424:23, 542:16
**aerosol** [1] - 448:16
**Affairs** [1] - 446:20
**affect** [1] - 422:15
**affected** [2] - 410:10, 410:21
**afraid** [4] - 551:17, 551:18, 593:6
**afternoon** [6] - 514:12, 514:13, 515:17, 536:17, 537:6, 537:14
**age** [4] - 407:7, 407:9, 409:9, 438:1
**agencies** [2] - 446:9, 446:10
**agency** [11] - 446:1, 446:6, 446:20, 449:4, 466:25, 523:13, 524:21, 531:25, 555:2, 554:4, 559:16
**aggressive** [6] - 471:11, 471:15,

471:16, 471:25, 483:10, 581:25
**aggressively** [1] - 593:12
**ago** [7] - 405:24, 406:4, 415:13, 443:19, 540:6, 565:12, 579:2
**agree** [26] - 402:9, 435:11, 530:17, 530:22, 539:25, 545:13, 547:24, 548:7, 550:24, 551:7, 551:15, 551:16, 552:14, 552:20, 552:23, 553:2, 554:15, 560:5, 565:22, 567:5, 567:22, 568:6, 583:12, 589:8, 589:16, 593:11
**agreed** [5] - 555:25, 567:11, 576:7, 578:16, 584:22
**agreement** [9] - 419:19, 419:20, 538:13, 538:15, 538:18, 538:22, 539:2, 539:18, 541:2
**agreements** [1] - 443:13
**ahead** [5] - 403:19, 438:20, 445:22, 531:18, 570:1
**aid** [2] - 454:2, 479:24
**aided** [1] - 400:25
**aids** [2] - 453:11, 453:18
**ain't** [1] - 411:9
**air** [1] - 438:20
**al** [2] - 543:12, 544:12
**alignment** [1] - 470:2
**allegation** [1] - 536:21
**allegedly** [2] - 507:21, 510:13
**alleges** [1] - 511:3
**allow** [1] - 510:4
**allowed** [3] - 477:19, 558:25, 581:10
**allows** [1] - 481:18
**almost** [14] - 421:3, 423:24, 435:24, 448:9, 473:22, 473:25, 504:19, 505:20, 505:22, 507:22, 583:5, 591:2, 591:12, 598:25
**alter** [2] - 475:18,

518:2
**Amanda** [6] - 433:23, 433:25, 434:10, 434:11, 434:12, 434:13
**ambulance** [2] - 521:20, 522:21
**Amendment** [1] - 489:20
**American** [1] - 494:15
**amount** [6] - 486:21, 522:22, 530:15, 562:12, 564:9, 589:2
**amplifying** [1] - 503:3
**analysis** [5] - 545:18, 555:18, 555:20, 556:1, 556:2
**analyst** [2] - 445:3, 447:20
**analyze** [1] - 462:10
**angle** [4] - 457:10, 470:17, 472:10, 507:14
**angled** [2] - 506:19
**announced** [2] - 484:13, 484:21
**announcement** [3] - 480:16, 481:2, 510:5
**announces** [1] - 483:22
**announcing** [1] - 481:4
**answer** [20] - 430:23, 433:12, 433:14, 434:8, 435:9, 474:24, 475:10, 505:9, 522:11, 532:7, 532:8, 533:22, 565:10, 570:15, 574:20, 576:2, 592:20, 594:13, 601:1, 601:3
**answered** [2] - 565:22, 570:18
**answers** [2] - 501:20, 551:8
**anticipate** [3] - 590:8, 600:24, 601:14
**anyway** [1] - 402:16
**apart** [3] - 407:7, 519:17, 519:19
**apologies** [4] - 453:21, 539:23, 545:15, 545:16
**apologize** [4] - 455:17, 466:8, 511:22, 587:22
**appear** [5] - 423:16, 442:21, 443:2, 457:2, 485:18

**appearance** [2] - 527:17, 527:25
**appearances** [3] - 448:20, 448:24, 448:25
**APPEARANCES** [1] - 400:14
**appeared** [1] - 449:3
**apples** [1] - 568:1
**application** [3] - 502:3, 502:10, 549:3
**applied** [3] - 501:11, 525:10, 525:19
**apply** [6] - 489:22, 500:8, 525:13, 525:21, 541:14, 584:10
**appointment** [2] - 602:12, 603:4
**appointments** [5] - 431:11, 431:15, 431:18, 431:21, 432:1
**appreciate** [4] - 404:3, 404:15, 544:14, 576:2
**apprehended** [1] - 449:13
**apprehending** [1] - 449:10
**approach** [13] - 414:18, 430:4, 436:4, 460:18, 478:23, 516:6, 526:16, 528:14, 533:13, 564:19, 565:17, 580:11, 581:19
**appropriate** [3] - 542:24, 558:8, 562:11
**April** [4] - 400:12, 565:2, 604:24, 605:5
**arc** [1] - 459:5
**area** [31] - 403:1, 417:10, 452:15, 452:18, 452:20, 452:22, 453:8, 454:9, 458:16, 459:4, 460:2, 467:9, 467:12, 468:1, 468:8, 469:24, 472:5, 482:1, 497:21, 505:13, 505:24, 506:3, 509:19, 509:21, 520:21, 521:25, 581:11, 588:16, 588:22, 589:3, 595:3
**areas** [1] - 578:12

**arena** [19] - 452:12, 452:14, 452:15, 452:17, 452:21, 452:25, 453:1, 453:8, 454:9, 466:4, 466:18, 466:20, 468:7, 469:8, 481:14, 497:20, 498:3, 515:17, 516:12
**arguing** [2] - 533:20, 535:5
**argument** [1] - 422:3
**arm** [1] - 449:11
**armed** [17] - 449:11, 449:14, 506:6, 507:13, 507:24, 509:7, 510:12, 529:13, 552:15, 553:20, 554:12, 567:6, 567:11, 567:15, 567:25
**arms** [2] - 410:25, 413:8
**arrangement** [1] - 419:18
**arrested** [1] - 527:9
**arrived** [2] - 449:15, 482:8
**arriving** - 482:14
**arrows** [1] - 465:3
**articles** [1] - 448:13
**articulate** [2] - 490:23, 491:6
**articulated** [4] - 457:16, 485:4, 500:25, 584:13
**artist** [2] - 408:9, 503:14
**arts** [1] - 450:4
**ashes** [1] - 421:4
**aside** [3] - 431:25, 533:8, 555:5
**aspirational** [1] - 537:4
**assess** [4] - 454:4, 455:6, 464:8, 481:19
**assessed** [2] - 468:8, 496:2
**assessing** [2] - 466:12, 484:19
**assessment** [5] - 463:10, 464:13, 483:25, 490:6, 558:22
**assessments** [2] - 559:25, 560:2
**assigned** [1] - 445:18
**assist** [3] - 405:3, 453:12, 479:24

**assistance** [2] - 442:5, 449:15
**assisted** [1] - 431:22
**associated** [2] - 517:5, 530:5
**Association** [3] - 449:24, 450:1, 450:3
**associations** [4] - 449:22, 450:3, 450:5, 450:6
**assume** [3] - 405:15, 434:12, 581:22
**assuming** [1] - 602:5
**assumption** [1] - 544:1
**assure** [2] - 454:7, 518:1
**assured** [1] - 517:8
**AT** [1] - 400:2
**attached** [1] - 451:18
**attempt** [3] - 500:9, 512:9, 560:18
**attempted** [2] - 474:3, 512:22
**attempting** [3] - 461:14, 471:21, 591:3
**attendance** [1] - 528:13
**attending** [2] - 447:18, 448:9
**attention** [3] - 480:12, 564:2, 601:22
**attest** [1] - 540:21
**attorney** [10] - 429:24, 494:10, 494:13, 528:9, 535:12, 536:8, 538:17, 541:14, 542:10, 550:3
**attorneys** [7] - 534:2, 534:8, 536:14, 539:3, 541:2, 541:4, 541:9
**attribute** [1] - 510:15
**audio** [2] - 451:16
**August** [10] - 421:5, 421:14, 425:2, 425:9, 427:14, 428:25, 580:16, 589:17, 592:5, 598:18
**aunt** [1] - 437:18
**Austin** [1] - 400:17
**authored** [2] - 448:13, 448:17
**auxiliary** [1] - 446:10
**available** [4] - 452:22, 541:16, 551:14, 556:25

**average** [3] - 441:19, 454:21, 558:21
**avoid** [1] - 563:23
**aware** [21] - 528:1, 531:11, 531:22, 531:25, 533:8, 534:2, 534:7, 534:8, 534:9, 534:12, 535:9, 536:14, 537:19, 540:2, 540:10, 540:11, 541:20, 558:5, 558:10, 560:1

## B

**babies** [1] - 443:24
**backed** [7] - 471:2, 471:4, 474:1, 474:2, 484:7, 496:16, 574:17
**background** [4] - 483:12, 551:13, 558:3, 558:23
**backing** [8] - 474:13, 498:2, 504:20, 505:24, 509:2, 509:3, 578:11, 589:21
**backs** [1] - 508:9
**backwards** [1] - 517:4
**bad** [4] - 495:14, 511:8, 520:1, 536:16
**bailed** [1] - 513:2
**Bailey** [1] - 400:18
**ball** [1] - 509:17
**ballistic** [1] - 507:7
**ballistics** [1] - 545:25
**balloon** [1] - 423:22
**balloons** [2] - 410:11, 410:14
**banging** [1] - 529:4
**barely** [1] - 471:20
**bars** [3] - 417:16, 417:17, 417:18
**base** [1] - 490:6
**baseball** [1] - 452:18
**based** [62] - 402:10, 442:3, 442:9, 442:13, 442:16, 442:18, 453:4, 455:7, 461:12, 461:14, 461:15, 461:16, 462:2, 463:5, 467:12, 473:9, 473:15, 480:4, 481:9, 482:6, 482:8, 482:20, 483:12, 484:25, 488:7, 488:15,

491:14, 491:18, 492:17, 517:19, 517:21, 518:5, 521:10, 522:7, 530:10, 530:13, 533:25, 534:19, 540:1, 542:22, 547:11, 548:20, 550:10, 551:12, 551:18, 556:12, 557:10, 558:8, 568:15, 568:17, 568:19, 569:4, 574:5, 574:8, 583:24, 584:5, 584:15, 586:14, 592:9, 594:7, 601:12
**bases** [1] - 534:24
**basic** [4] - 461:13, 506:23, 508:1, 509:11
**basing** [1] - 586:6
**basis** [4] - 419:9, 500:6, 534:22, 592:9
**Beach** [3] - 445:15, 446:18, 449:9
**beams** [1] - 413:23
**bear** [2] - 544:3, 582:17
**bearing** [1] - 565:11
**beating** [1] - 409:10
**beautiful** [3] - 408:17, 443:21, 485:24
**became** [6] - 408:8, 419:12, 422:8, 447:20, 447:21, 459:8
**become** [5] - 445:17, 447:8, 465:22, 560:7
**becomes** [2] - 455:1, 469:17
**becoming** [1] - 445:3
**bed** [1] - 410:24
**began** [7] - 474:3, 480:6, 480:12, 483:9, 483:19, 511:25, 548:1
**begin** [1] - 471:22
**beginning** [4] - 468:12, 484:22, 519:18, 564:11
**begins** [3] - 465:13, 506:2, 510:22
**behalf** [6] - 422:10, 528:9, 528:25, 529:25, 531:12, 531:24
**behind** [12] - 420:20, 457:1, 467:18, 469:11, 469:15,

469:16, 469:17, 470:9, 507:14, 507:15, 588:21
**beings** [1] - 593:8
**beliefs** [1] - 592:14
**believes** [1] - 488:9
**bell** [1] - 569:20
**belong** [1] - 449:20
**below** [1] - 485:23
**Bench** [6] - 414:20, 415:5, 460:20, 463:1, 533:14, 536:25
**bench** [2] - 402:13, 543:2
**beneficial** [1] - 479:10
**benefit** [14] - 462:8, 483:13, 483:24, 484:9, 484:18, 487:4, 487:12, 490:5, 503:9, 517:7, 522:15, 522:18, 550:15, 594:8
**Benjamin** [1] - 400:18
**berm** [5] - 458:18, 465:14, 467:13, 482:1, 505:14
**berm-type** [1] - 465:14
**best** [7] - 405:19, 438:3, 449:8, 453:4, 508:24, 539:12, 604:23
**better** [13] - 443:16, 445:5, 453:12, 453:21, 464:4, 470:18, 481:23, 512:20, 539:8, 559:14, 564:10, 566:3, 566:8
**between** [29] - 407:9, 419:19, 421:5, 421:10, 427:8, 449:2, 470:11, 472:4, 473:14, 474:15, 481:10, 492:8, 496:13, 496:23, 498:10, 506:19, 507:6, 509:6, 534:5, 552:16, 558:21, 561:1, 579:12, 579:15, 580:20, 582:5, 583:9, 590:16, 598:15
**beyond** [2] - 462:12, 462:13
**big** [10] - 406:22, 409:21, 413:18, 413:20, 413:23, 436:22, 442:14,

4

469:23, 497:21, 525:8

**biggest** [2] - 423:25, 426:10

**bills** [1] - 429:17

**biological** [1] - 428:8

**birthday** [4] - 410:11, 421:11, 421:12, 422:6

**birthdays** [2] - 421:5, 421:10

**bit** [16] - 409:6, 409:16, 412:11, 412:16, 443:16, 445:10, 445:23, 446:21, 468:15, 479:11, 493:7, 493:9, 515:16, 515:23, 523:9, 576:7

**black** [9] - 456:7, 456:9, 456:21, 458:16, 590:17, 591:10, 591:16, 592:7, 597:14

**blame** [1] - 600:12

**blank** [1] - 569:22

**block** [5] - 507:4, 508:17, 508:25, 509:6, 510:13

**blocked** [1] - 505:21

**blocking** [2] - 505:6, 509:4

**Blue** [1] - 443:22

**blurred** [2] - 459:23

**board** [3] - 470:6, 470:8, 562:4

**boards** [1] - 525:15

**bodily** [7] - 448:4, 488:11, 488:13, 548:14, 551:3, 551:4, 567:19

**body** [3] - 561:2, 561:5, 577:14

**Bolaud** [1] - 542:14

**Bonetti** [6] - 540:5, 541:6, 542:14, 571:24, 572:1, 573:5

**BONETTI** [1] - 542:14

**book** [1] - 448:17

**boot** [2] - 524:17, 525:4

**bore** [1] - 448:7

**born** [2] - 406:6, 406:7

**bothers** [1] - 423:8

**bottle** [1] - 563:25

**bottleneck** [1] - 505:5

**bottom** [3] - 441:1, 464:23

**bought** [2] - 429:17, 443:21

**bowl** [9] - 453:3, 456:6, 465:13, 503:16, 505:15, 587:25, 588:3, 588:13, 588:17

**box** [1] - 497:23

**boy** [4] - 406:12, 406:18, 409:12, 423:9

**boys** [46] - 407:17, 408:18, 408:20, 409:16, 409:23, 410:1, 410:8, 410:15, 411:24, 412:4, 412:22, 416:15, 420:24, 422:11, 425:12, 427:6, 427:15, 427:25, 428:4, 428:7, 429:9, 429:14, 430:25, 431:2, 431:4, 431:7, 431:10, 431:14, 432:1, 432:15, 432:18, 432:21, 432:22, 433:1, 433:3, 433:11, 433:25, 434:6, 434:11, 434:12, 435:18, 435:22, 437:24, 438:2, 438:4, 438:5

**Boys** [1] - 413:9

**brain** [2] - 561:5, 562:10

**brake** [1] - 486:7

**branch** [2] - 460:10

**Branham** [40] - 455:13, 458:5, 458:18, 458:21, 459:20, 463:8, 468:16, 470:5, 476:9, 482:7, 485:19, 487:14, 494:25, 495:23, 495:24, 496:9, 503:19, 504:23, 505:7, 520:18, 521:3, 521:11, 522:10, 547:3, 547:12, 549:19, 579:22, 580:6, 580:15, 581:5, 586:1, 586:2, 586:4, 587:19, 596:9, 596:11, 596:13, 597:10, 597:12, 597:15

**Branham's** [5] - 475:14, 475:18,

482:1, 516:22, 547:1

**break** [10] - 438:19, 438:23, 448:8, 475:22, 476:20, 477:1, 529:15, 536:17, 537:6, 537:14

**breath** [1] - 511:20

**Brett** [1] - 544:6

**bridge** [1] - 534:5

**bridging** [1] - 449:1

**brief** [4] - 436:8, 446:4, 595:12, 600:23

**briefed** [1] - 543:20

**briefly** [1] - 478:24

**bring** [8] - 404:6, 422:9, 439:24, 453:16, 459:13, 478:9, 478:12, 601:21

**bringing** [3] - 404:3, 457:21, 575:9

**brings** [1] - 460:15

**broad** [1] - 578:14

**broke** [1] - 417:21

**brother** [12] - 406:23, 412:1, 412:24, 412:25, 413:1, 413:16, 419:25, 420:3, 436:15, 437:19, 437:20, 438:3

**brother-in-law** [2] - 419:25, 420:3

**brothers** [4] - 407:13, 407:15, 436:16

**brought** [5] - 403:10, 502:19, 527:8, 593:13, 594:4

**Brown** [1] - 400:22

**brush** [6] - 460:4, 460:8, 469:13, 469:14, 505:3, 589:2

**buddy** [1] - 406:14

**Budo** [1] - 450:4

**built** [3] - 413:19, 413:21

**bullet** [6] - 473:3, 545:18, 545:23, 562:23, 567:9, 582:20

**bullet-point** [1] - 582:20

**bunch** [2] - 504:18, 595:3

**burying** [1] - 411:4

**bushes** [3] - 591:15, 592:7, 597:14

**busy** [1] - 480:19

**buy** [1] - 429:18

**BY** [38] - 405:5, 415:10, 417:3, 419:8, 424:16, 424:24, 430:10, 430:18, 436:11, 440:21, 450:23, 454:1, 463:3, 476:7, 479:1, 479:16, 511:13, 512:8, 514:11, 514:22, 516:8, 526:18, 528:17, 537:24, 539:24, 545:12, 545:17, 564:21, 565:21, 572:16, 576:6, 580:13, 581:21, 590:14, 595:15, 596:4, 597:3, 598:3

**bye** [3] - 420:25, 423:1, 423:2

**bypassing** [1] - 480:12

---

# C

**cable** [1] - 416:19

**calculating** [1] - 545:22

**calculation** [1] - 518:16

**calculations** [7] - 460:23, 461:3, 461:9, 479:3, 518:5, 518:15, 522:7

**calm** [1] - 550:8

**camp** [2] - 524:17, 525:4

**canine** [1] - 446:9

**cannot** [5] - 468:13, 490:4, 518:18, 543:22, 589:5

**canted** [1] - 470:25

**Canyon** [1] - 400:19

**capable** [2] - 510:7, 545:21

**capacity** [3] - 400:4, 400:9, 446:18

**captured** [1] - 503:18

**car** [55] - 407:4, 472:9, 472:10, 482:20, 486:14, 486:15, 489:3, 498:1, 503:20, 504:2, 504:17, 504:19, 504:25, 505:19, 505:20, 505:22, 506:4, 506:5, 506:11, 506:21,

507:21, 508:10, 508:13, 508:15, 508:18, 508:21, 509:14, 509:18, 509:20, 509:21, 509:23, 510:5, 512:1, 512:2, 512:4, 512:16, 512:24, 512:25, 513:2, 513:19, 522:22, 554:6, 554:18, 556:11, 566:24, 567:22, 568:3, 578:7, 578:12, 583:5

**card** [1] - 527:9

**care** [14] - 427:15, 427:17, 427:24, 429:8, 429:12, 429:13, 429:15, 430:22, 430:24, 431:2, 431:7, 432:2, 432:9, 446:19

**career** [7] - 445:14, 445:15, 447:18, 449:7, 496:6, 514:25, 525:11

**careful** [1] - 461:23

**caring** [1] - 424:8

**Carmen** [2] - 541:25, 542:12

**carpentry** [1] - 412:16

**carpet** [1] - 414:2

**carried** [1] - 535:18

**CARROLL** [8] - 404:8, 414:18, 414:21, 415:3, 415:10, 416:20, 418:6, 418:10

**Carroll** [6] - 400:21, 403:22, 414:17, 418:5, 418:9, 604:4

**Carroll**................**414** [1] - 401:4

**Carroll**................**423** [1] - 401:9

**cars** [1] - 406:23

**cartoons** [1] - 416:19

**case** [153] - 408:19, 429:21, 439:1, 439:4, 442:3, 442:8, 442:10, 442:11, 442:16, 443:3, 443:4, 443:5, 443:8, 443:10, 450:14, 451:23, 452:25, 454:5, 454:7, 455:11, 455:20, 456:4, 456:15, 461:4, 467:16, 473:16, 474:20,

475:19, 477:6,
477:10, 486:9,
488:12, 489:9,
489:21, 489:22,
490:9, 490:10,
490:11, 490:12,
494:19, 499:17,
500:4, 500:8, 502:3,
515:6, 515:9,
515:21, 516:24,
517:21, 518:3,
519:24, 521:10,
526:12, 528:24,
529:22, 530:6,
530:7, 530:10,
530:13, 531:9,
531:10, 531:11,
531:12, 531:22,
532:11, 532:15,
532:17, 532:20,
533:1, 533:7, 533:8,
535:1, 537:7,
537:11, 537:12,
540:3, 540:5, 540:7,
541:1, 541:10,
541:17, 541:21,
541:24, 542:11,
542:16, 543:7,
544:1, 544:10,
546:11, 546:24,
548:8, 553:24,
554:1, 554:8,
554:17, 554:19,
554:23, 555:21,
556:2, 556:16,
557:22, 558:3,
562:18, 564:12,
564:15, 569:16,
569:18, 569:19,
569:21, 569:24,
570:12, 570:14,
570:19, 570:23,
570:24, 570:25,
571:15, 571:16,
571:17, 571:18,
571:20, 571:22,
571:23, 572:3,
572:22, 573:5,
573:15, 573:20,
574:4, 574:12,
574:23, 575:11,
575:14, 576:24,
578:1, 582:8,
583:20, 585:4,
589:15, 593:19,
594:7, 600:9,
600:16, 600:17,
601:18, 602:24,
603:1
**cases** [22] - 441:21,
441:24, 442:8,

442:19, 442:22,
442:23, 531:6,
531:25, 533:9,
535:6, 541:21,
564:12, 569:10,
569:13, 571:9,
572:4, 573:4, 573:9,
575:24, 594:4,
594:11, 594:14
**casings** [3] - 465:20,
499:1, 499:2
**cast** [1] - 496:8
**cat** [1] - 406:17
**catch** [1] - 511:19
**caught** [1] - 457:13
**caused** [1] - 460:4
**causes** [2] - 460:12,
473:6
**causing** [1] - 567:19
**cell** [1] - 426:25
**center** [3] - 458:21,
524:16, 524:22
**certain** [8] - 423:7,
469:9, 474:9,
481:20, 541:22,
559:1, 571:9, 577:23
**certainly** [8] - 436:9,
441:25, 462:9,
462:17, 597:1,
602:7, 602:10,
602:11
**certainty** [2] - 451:2,
456:21
**certificate** [1] - 542:3
**certification** [2] -
444:23, 445:7
**certification-wise** [1] -
445:7
**certifications** [9] -
444:12, 444:14,
444:15, 444:17,
444:21, 444:24,
444:25, 445:9,
447:17
**certified** [5] - 444:9,
444:10, 445:4,
445:7, 447:9
**certify** [2] - 604:22,
605:1
**challenge** [11] - 534:3,
538:6, 538:7,
538:23, 538:24,
539:2, 539:4, 539:6,
539:11, 539:20,
540:9
**challenged** [1] -
533:10
**challenging** [1] -
544:9
**chance** [2] - 409:13,

574:6
**change** [7] - 423:12,
452:7, 501:16,
513:10, 520:7,
522:22, 538:14
**changed** [4] - 457:25,
483:19, 487:18,
585:19
**changes** [6] - 464:1,
493:18, 493:22,
498:8, 498:24
**changing** [2] - 494:7,
574:21
**characterizing** [1] -
522:12
**charge** [5] - 441:18,
603:8, 603:10,
603:15, 603:21
**charges** [1] - 527:9
**chart** [1] - 518:4
**cherry** [1] - 557:15
**cherry-pick** [1] -
557:15
**chess** [6] - 408:25,
409:5, 409:6, 409:8,
409:12, 410:4
**chief** [2] - 602:25,
603:1
**Chiefs** [1] - 449:24
**child** [3] - 414:13,
425:16, 431:11
**children** [6] - 411:25,
412:14, 414:6,
416:6, 416:8, 422:15
**children's** [1] - 421:10
**choice** [1] - 449:4
**choices** [1] - 490:24
**choke** [1] - 422:19
**choose** [1] - 525:25
**chooses** [1] - 525:17
**chopped** [4] - 519:17,
519:19, 520:10,
520:13
**chosen** [1] - 502:2
**christy** [1] - 436:12
**Christy** [22] - 408:17,
411:18, 411:24,
416:1, 416:5,
416:10, 416:14,
418:17, 418:22,
419:9, 419:10,
419:11, 419:23,
420:21, 421:1,
421:6, 421:23,
421:25, 422:8,
422:13, 424:3,
424:10
**CHRISTY** [3] - 400:4,
401:7, 419:2
**Christy's** [2] - 410:18,

411:13
**chunk** [1] - 575:22
**circle** [2] - 457:14,
466:2
**Circuit** [1] - 526:20
**circumstance** [2] -
489:4, 530:9
**circumstances** [8] -
489:2, 499:11,
499:14, 530:3,
549:8, 568:17,
589:19
**cited** [2] - 501:2, 559:4
**citizen** [4] - 493:13,
494:12, 550:25,
562:1
**City** [4] - 443:18,
443:20, 445:15,
521:17
**CIVIL** [1] - 400:4
**civil** [7] - 526:14,
531:9, 531:10,
531:11, 531:22,
533:9, 570:24
**civilians** [1] - 558:14
**claim** [5] - 403:9,
471:10, 476:16,
583:10, 597:21
**claiming** [1] - 403:13
**claims** [5] - 446:22,
461:16, 476:17,
488:12, 512:10
**clarify** [2] - 523:22,
596:20
**CLARKSBURG** [1] -
400:2
**Clarksburg** [1] -
400:13
**class** [1] - 447:8
**clear** [18] - 414:22,
428:24, 437:17,
464:17, 473:8,
483:3, 485:20,
489:24, 490:17,
496:14, 496:23,
497:7, 500:19,
529:24, 540:13,
551:17, 557:10,
573:6
**cleared** [1] - 493:21
**clearing** [5] - 483:20,
484:12, 585:17,
590:19, 590:23
**clearly** [5] - 414:24,
440:18, 489:9,
512:3, 520:19
**Clerk** [8] - 404:23,
418:13, 418:20,
418:25, 424:22,
440:14, 457:15,

479:14
**CLERK** [1] - 456:1
**clerk** [3] - 526:20,
604:4, 604:11
**clicker** [2] - 453:20,
479:7
**client** [2] - 442:25,
526:5
**client's** [1] - 526:10
**climb** [1] - 589:6
**climbing** [1] - 588:11
**clip** [1] - 485:10
**clock** [2] - 481:22,
483:22
**close** [5] - 422:3,
487:13, 502:6,
525:5, 603:16
**closed** [2] - 573:10,
575:24
**closer** [5] - 459:13,
468:11, 468:15,
553:12, 553:16
**clothed** [2] - 427:18,
431:7
**clothing** [1] - 429:17
**co** [1] - 547:25
**co-counsel** [1] -
547:25
**coasted** [1] - 472:22
**coefficient** [1] - 472:2
**collect** [1] - 584:12
**collected** [1] - 466:23
**collection** [2] - 602:18
**combine** [2] - 557:17,
586:21
**combining** [1] - 587:8
**comfortable** [2] -
419:4, 550:22
**comical** [1] - 406:18
**coming** [18] - 407:2,
422:21, 440:14,
471:17, 473:24,
482:13, 486:16,
486:24, 536:23,
567:14, 567:17,
580:2, 582:25,
583:14, 584:2,
584:21, 599:10,
599:20
**command** [1] - 510:7
**commands** [13] -
482:24, 482:25,
486:14, 510:1,
556:10, 556:19,
557:3, 557:13,
560:14, 567:6,
567:7, 567:16,
567:17
**commenced** [1] -
402:1

**commendation** [3] - 449:8, 449:10, 449:16

**commendations** [1] - 449:5

**comments** [1] - 576:3

**committed** [1] - 513:5

**common** [3] - 414:11, 570:11, 571:2

**commonality** [1] - 571:4

**communication** [4] - 447:24, 447:25, 495:19, 560:11

**communications** [4] - 426:22, 426:23, 427:2, 494:21

**community** [3] - 449:2, 449:18, 449:19

**company** [2] - 407:17, 407:21

**comparison** [2] - 481:16, 558:20

**compartment** [2] - 483:20, 484:12

**compartmentalize** [1] - 494:1

**compartmentalizing** [1] - 566:18

**compelled** [1] - 601:4

**compensated** [2] - 441:12, 442:15

**compensation** [2] - 555:5, 555:7

**compilation** [1] - 559:21

**complete** [2] - 481:16, 562:13

**completed** [4] - 448:4, 481:10, 562:24, 563:12

**completely** [2] - 473:17, 474:5

**complex** [1] - 562:3

**compliance** [1] - 510:2

**complied** [2] - 557:4, 557:6

**comply** [2] - 556:18, 605:1

**complying** [1] - 556:10

**component** [1] - 560:24

**comprehensive** [1] - 530:15

**comptroller** [1] - 526:20

**computations** [1] -

463:12

**computer** [1] - 400:25

**computer-aided** [1] - 400:25

**concealment** [4] - 507:5, 507:7, 507:10, 509:9

**concede** [3] - 549:17, 549:21, 550:12

**conceded** [1] - 500:16

**conceivable** [1] - 497:19

**concept** [2] - 453:12, 455:3, 462:17, 514:4, 562:3, 566:2

**Concepts** [1] - 448:17

**concern** [3] - 497:8, 504:14, 543:3

**concluded** [3] - 415:5, 463:1, 536:25

**conclusion** [2] - 534:16, 552:7

**conducted** [7] - 444:16, 444:20, 452:1, 454:17, 455:13, 500:19, 536:6

**conducting** [3] - 403:23, 439:3, 594:24

**conference** [9] - 414:20, 415:5, 460:20, 463:1, 533:14, 536:25, 543:3, 603:22, 605:2

**conferences** [2] - 432:15, 432:17

**confident** [4] - 495:10, 495:11, 497:23, 566:15

**confines** [1] - 456:20

**confirm** [1] - 564:22

**confirming** [1] - 498:10

**conflict** [14] - 494:20, 557:20, 573:24, 573:25, 576:14, 578:6, 579:12, 579:15, 579:21, 580:20, 582:5, 582:9, 583:8, 589:9

**conflicting** [1] - 592:10

**conflicts** [4] - 557:14, 579:8, 589:11, 590:16

**confuse** [1] - 567:21

**confused** [3] - 482:4, 501:20, 586:3

**confusing** [1] - 444:23

**connect** [1] - 534:5

**connection** [1] - 600:17

**Connor** [9] - 489:14, 489:15, 489:17, 489:23, 489:24, 490:22, 589:15, 589:16, 593:2

**consider** [17] - 452:16, 454:10, 466:13, 466:17, 481:22, 497:7, 503:22, 547:14, 547:15, 551:10, 551:21, 551:23, 552:5, 553:3, 557:16, 602:17

**consideration** [11] - 458:2, 469:7, 472:16, 483:6, 484:1, 486:2, 506:25, 552:10, 552:12, 556:1, 556:18

**considerations** [2] - 455:6, 491:10

**considered** [10] - 450:13, 471:20, 484:17, 498:18, 517:10, 547:8, 553:4, 556:4, 566:23, 602:24

**considering** [5] - 488:18, 501:11, 522:2, 555:11, 572:1

**consisted** [1] - 447:2

**consistent** [2] - 562:4, 569:9

**consists** [1] - 447:1

**constitutional** [3] - 489:11, 489:21, 494:14

**construction** [4] - 403:8, 407:17, 408:9, 415:14

**consultant** [3] - 441:7, 444:15, 447:13

**consultation** [3] - 442:1, 442:3, 443:7

**consume** [1] - 484:8

**consumed** [1] - 485:1

**contact** [4] - 492:9, 492:10, 534:3, 539:6

**contacts** [1] - 443:9

**contained** [1] - 499:22

**contains** [1] - 588:13

**context** [7] - 403:17, 403:18, 541:12, 570:22, 573:12, 575:10, 585:8

**continue** [14] - 407:25, 438:25, 439:3, 463:4, 477:6, 477:8, 478:17, 478:21, 513:6, 537:7, 537:10, 538:19, 600:9, 600:14

**continued** [1] - 404:15

**continuing** [1] - 472:19

**continuum** [1] - 480:8

**contract** [6] - 538:20, 540:7, 540:23, 540:24, 541:8

**contrary** [1] - 442:25

**contribute** [1] - 502:2

**contributed** [3] - 502:10, 502:23, 513:13

**control** [4] - 444:18, 447:23, 505:17, 561:21

**convenience** [1] - 464:4

**conversation** [3] - 542:21, 600:23, 603:12

**converted** [1] - 447:11

**convey** [1] - 602:11

**cool** [1] - 406:23

**coordinate** [2] - 495:1, 495:18

**coordination** [1] - 518:20

**cop** [1] - 507:11

**Cops** [2] - 449:3, 449:5

**copy** [3] - 479:2, 516:9, 580:8

**Corey** [11] - 462:3, 462:6, 473:9, 473:11, 473:14, 473:18, 494:18, 578:1, 591:14, 591:18, 591:20

**corner** [6] - 440:4, 456:7, 459:3, 465:22, 482:2, 574:17

**coroner** [1] - 420:16

**correct** [91] - 402:14, 402:19, 415:15, 416:11, 419:13, 419:21, 425:2, 425:6, 425:10, 425:16, 425:25, 428:8, 429:24, 430:2, 431:12, 431:13, 432:9, 434:15, 487:1,

514:24, 515:7, 515:10, 515:13, 515:14, 516:17, 516:19, 516:25, 518:9, 519:3, 519:12, 519:13, 519:14, 519:15, 520:10, 520:11, 520:13, 521:4, 521:5, 521:8, 521:21, 523:17, 525:8, 526:8, 526:10, 526:24, 527:17, 531:7, 531:19, 532:3, 532:6, 545:19, 545:20, 545:23, 545:24, 546:4, 546:7, 546:13, 546:20, 547:1, 547:2, 548:2, 553:23, 555:2, 557:22, 564:13, 564:17, 565:8, 567:3, 567:13, 568:14, 569:1, 569:2, 575:20, 576:17, 577:11, 577:20, 577:25, 578:4, 578:20, 581:24, 582:3, 583:2, 583:12, 588:18, 589:22, 593:15, 599:11, 602:21, 604:9, 604:11, 604:23

**correction's** [1] - 524:25

**corrections** [1] - 524:22

**correctly** [3] - 415:25, 491:21, 520:23

**couch** [1] - 422:18

**Counsel** [1] - 595:25

**counsel** [22] - 402:5, 403:2, 403:8, 476:8, 477:16, 478:4, 478:8, 502:25, 533:10, 533:13, 542:2, 542:15, 543:6, 543:25, 544:1, 544:3, 544:6, 547:25, 601:9, 603:1, 603:8

**counsel's** [1] - 603:7

**counseling** [2] - 435:18, 435:25

**County** [9] - 420:14, 425:9, 446:7, 487:24, 488:8,

524:15, 526:13,
527:6, 554:24
**couple** [7] - 416:24,
433:17, 437:16,
472:25, 476:1,
527:14, 527:19
**course** [5] - 410:12,
414:12, 477:5,
565:25, 577:12
**COURT** [150] - 400:1,
402:2, 402:12,
402:17, 402:21,
403:4, 403:21,
404:1, 404:3, 404:6,
404:9, 404:13,
404:20, 405:15,
414:16, 414:19,
414:25, 415:7,
416:22, 417:1,
418:4, 418:7, 418:9,
418:11, 418:18,
418:20, 418:24,
419:3, 424:12,
424:22, 430:5,
430:8, 430:14,
436:5, 436:7, 436:9,
438:13, 438:17,
439:9, 439:12,
439:15, 439:18,
439:21, 439:23,
440:2, 440:5, 440:9,
440:13, 440:16,
446:2, 450:10,
450:12, 453:22,
455:18, 455:23,
460:19, 460:21,
461:8, 461:23,
462:11, 462:19,
475:21, 476:3,
476:6, 476:22,
476:24, 477:14,
478:2, 478:4, 478:8,
478:12, 478:15,
478:20, 478:25,
479:10, 502:24,
503:3, 503:8, 511:9,
511:12, 511:20,
514:7, 514:21,
516:7, 526:17,
528:16, 533:12,
533:15, 533:23,
534:4, 534:9,
534:12, 534:15,
534:22, 535:20,
535:24, 536:4,
536:10, 536:16,
537:2, 537:18,
539:21, 541:23,
542:2, 542:5,
542:11, 542:15,
542:19, 543:14,
543:16, 543:19,
543:25, 544:5,
544:8, 544:14,
544:19, 544:22,
544:24, 545:2,
545:5, 545:8,
545:16, 564:20,
565:18, 572:13,
576:1, 580:12,
581:20, 589:24,
590:2, 590:7,
590:12, 595:10,
596:1, 596:21,
597:1, 597:25,
599:24, 600:1,
600:3, 600:23,
601:1, 601:8, 602:5,
602:10, 602:23,
603:21, 604:1,
604:7, 604:13
**court** [25] - 402:1,
404:12, 415:6,
439:8, 440:8, 444:1,
463:2, 478:14,
489:24, 501:23,
518:25, 520:5,
526:13, 526:20,
527:7, 532:12,
532:14, 533:6,
536:3, 537:1,
537:17, 540:4,
545:7, 600:22, 604:4
**Court** [18] - 402:10,
414:21, 450:24,
461:24, 489:14,
489:17, 503:9,
526:20, 540:13,
540:16, 540:23,
541:19, 542:20,
543:23, 604:5,
604:21, 605:2, 605:8
**Court's** [5] - 402:6,
415:2, 543:9,
544:17, 601:22
**courtroom** [10] -
404:11, 440:7,
477:13, 477:17,
478:13, 537:16,
545:6, 565:23,
600:21, 601:13
**cousins** [3] - 437:24,
438:8, 438:10
**cover** [10] - 477:16,
485:8, 507:5, 507:6,
507:7, 507:10,
508:16, 509:8,
509:9, 568:4
**covered** [2] - 579:5,
579:7
**Covid** [1] - 447:3

**COVID** [1] - 601:22
**Cranberry** [1] - 400:23
**crash** [1] - 520:25
**create** [9] - 467:3,
472:6, 472:7,
499:16, 517:5,
517:19, 518:18,
518:24, 562:17
**created** [7] - 443:22,
447:5, 448:15,
455:12, 467:13,
470:5, 500:24
**creates** [1] - 513:3
**creating** [1] - 446:13
**credibility** [9] -
533:16, 533:20,
533:21, 535:5,
536:20, 536:21,
543:4, 573:7, 573:9
**credit** [4] - 482:15,
486:8, 512:14, 527:9
**creeping** [1] - 475:23
**cremate** [2] - 420:23,
423:3
**cries** [1] - 423:17
**crime** [4] - 451:21,
454:17, 495:9,
495:14
**crimes** [2] - 496:1,
496:4
**criminal** [8] - 414:22,
448:3, 448:18,
528:19, 528:25,
529:25, 531:9,
532:15
**critical** [3] - 448:4,
493:16, 498:19
**critically** [2] - 491:7,
501:10
**Cross** [3] - 401:4,
401:9, 401:14
**CROSS** [3] - 415:9,
424:15, 514:10
**cross** [2] - 462:22,
462:24
**Cross-Examination**
[3] - 401:4, 401:9,
401:14
**CROSS-
EXAMINATION** [3] -
415:9, 424:15,
514:10
**crossed** [1] - 455:23
**crosses** [2] - 411:22,
423:23
**cruiser** [11] - 521:12,
521:15, 521:18,
568:3, 576:25,
577:2, 577:7, 577:8,
582:11, 583:2, 584:5

**cry** [3] - 410:25,
423:19
**crying** [3] - 410:5,
411:9, 413:8
**cure** [1] - 604:14
**current** [2] - 441:4,
446:22
**curve** [8] - 459:2,
459:5, 467:16,
467:17, 467:18,
487:4, 487:5, 509:17
**custody** [5] - 413:5,
416:6, 419:18,
419:19, 419:20
**customary** [1] - 451:2
**cut** [5] - 467:23,
480:16, 484:21,
505:11, 519:19
**Cut** [1] - 519:11
**Cutter** [2] - 604:20,
605:7
**CV** [6] - 442:21,
442:22, 443:2,
448:7, 541:9, 558:4
**cycle** [1] - 494:5

# D

**dad** [10] - 409:11,
411:1, 413:9,
413:19, 413:20,
413:22, 413:25,
423:4, 425:19,
434:14
**daddy** [17] - 408:24,
408:25, 409:1,
409:13, 409:15,
410:6, 410:7,
410:16, 411:8,
411:9, 412:5,
422:21, 422:24,
422:25, 423:2
**damage** [3] - 460:10,
460:12, 472:7
**damages** [2] - 403:10,
403:13
**danger** [2] - 530:18,
551:2
**dangerous** [1] -
530:24
**dangled** [1] - 534:15
**Danny** [2] - 411:15,
411:16
**dark** [2] - 469:17,
509:19
**data** [1] - 558:11
**date** [2] - 526:23,
565:1
**dates** [1] - 527:1
**Daubert** [7] - 532:1,

532:2, 533:11,
535:11, 535:13,
538:2, 541:15
**daughter** [3] - 414:9,
414:10, 425:17
**Dave** [3] - 417:21,
417:22, 417:23
**Dave's** [1] - 417:21
**DAVID** [1] - 400:9
**David** [1] - 542:6
**day's** [1] - 407:22
**day-to-day** [1] - 410:9
**daylight** [1] - 578:14
**days** [5] - 410:23,
422:3, 437:16,
532:12, 579:1
**dead** [2] - 420:13,
486:24
**deadly** [22] - 444:2,
451:3, 451:7,
488:18, 489:1,
489:16, 490:17,
501:17, 502:3,
502:11, 502:23,
513:14, 552:7,
552:15, 552:20,
552:21, 553:5,
555:11, 559:19,
560:16, 560:17,
568:9
**deal** [2] - 513:16,
602:14
**dealing** [3] - 461:9,
507:13, 552:14
**dealt** [1] - 604:8
**death** [38] - 406:15,
406:16, 407:19,
410:1, 410:8,
410:20, 415:23,
416:1, 417:7, 417:8,
419:13, 419:15,
421:18, 422:15,
423:13, 423:21,
424:3, 426:7,
426:15, 426:19,
426:23, 428:3,
428:18, 428:25,
431:19, 433:18,
435:13, 435:19,
435:24, 448:4,
488:11, 488:13,
548:14, 549:1,
550:16, 551:3,
551:5, 567:19
**decades** [1] - 448:9
**deceleration** [1] -
457:6
**deception** [1] - 497:6
**decide** [3] - 443:11,
562:11, 575:22

8

decided [1] - 516:13
decision [9] - 489:14,
489:17, 489:24,
490:8, 490:22,
520:2, 563:3, 565:7,
593:8
decisions [1] - 487:11
decompress [2] -
494:6, 550:7
dedicated [2] - 445:1,
447:18
deemed [2] - 450:24,
602:23
deep [3] - 453:8,
497:21, 503:6
deescalate [1] - 448:1
defend [2] - 568:16,
568:19
Defendant [3] -
400:10, 400:21,
527:17
defendant [21] -
462:3, 462:5,
471:12, 473:14,
474:23, 476:17,
486:22, 488:12,
488:17, 489:10,
491:20, 494:18,
499:25, 501:25,
528:25, 591:5,
591:19, 592:1,
593:13, 597:17,
597:20
Defendant's [2] -
602:18, 604:9
defendant's [16] -
444:2, 451:3,
471:10, 476:8,
497:12, 499:19,
499:20, 500:3,
500:4, 500:9,
500:10, 501:17,
502:21, 513:11,
590:17, 592:4
defendants [1] - 527:2
defense [5] - 403:1,
403:8, 441:5, 441:6,
448:18
defensive [3] - 445:17,
445:25, 446:5
define [1] - 547:19
defined [1] - 547:4
definitely [2] - 589:5,
589:6
definition [1] - 474:4
definitive [1] - 448:17
degree [1] - 451:2
delay [1] - 584:8
delirium [1] - 448:15
delivered [1] - 573:13

delivery [2] - 553:17,
553:18
demeanor [2] -
555:12, 555:19
demonstrate [1] -
458:13
demonstrates [1] -
479:3
demonstration [1] -
457:15
demonstrative [1] -
479:2
DENNIS [2] - 401:12,
440:15
Dennis [11] - 439:11,
440:12, 440:25,
441:9, 444:13,
445:11, 450:8,
454:2, 464:17,
476:15, 527:17
dentist [1] - 431:21
Department [8] -
445:15, 445:21,
445:24, 446:5,
446:18, 449:10,
488:8, 554:24
department [5] -
554:25, 555:6,
558:7, 594:15,
594:17
Department's [1] -
487:25
dependent [1] - 543:5
deployed [2] - 502:8,
506:10
depo [1] - 524:14
deposed [2] - 452:5,
464:18
deposition [62] -
403:15, 429:20,
430:11, 430:16,
434:4, 435:2,
435:21, 435:23,
441:15, 442:24,
443:1, 451:20,
460:25, 462:6,
462:18, 506:13,
511:5, 515:9,
515:12, 515:20,
516:1, 516:9, 518:9,
531:17, 534:1,
534:11, 534:20,
538:2, 538:8,
538:14, 540:20,
540:22, 540:25,
546:11, 546:22,
547:1, 548:17,
564:23, 565:1,
566:1, 570:3, 570:5,
571:2, 579:14,

579:17, 579:19,
582:8, 585:4, 585:7,
585:11, 587:14,
587:17, 591:9,
591:18, 592:1,
595:18, 596:7,
597:6, 597:18,
597:21, 598:16,
598:23
depositions [1] -
587:22
depth [1] - 495:21
deputies [5] - 488:7,
491:22, 501:10,
554:7, 554:9
DEPUTY [1] - 602:9
deputy [15] - 480:24,
483:24, 484:18,
486:8, 488:9,
490:17, 490:18,
504:11, 514:2,
524:7, 524:9,
524:11, 574:19,
579:4, 595:23
Deputy [164] - 451:7,
451:17, 457:5,
461:16, 466:16,
466:17, 471:5,
472:8, 472:20,
472:21, 473:21,
474:17, 480:19,
481:3, 481:24,
482:10, 482:20,
482:21, 482:23,
484:9, 492:17,
492:18, 492:19,
496:17, 500:20,
502:7, 503:21,
505:8, 506:10,
506:12, 507:1,
507:18, 510:15,
511:14, 511:17,
511:24, 512:5,
512:7, 513:16,
513:17, 519:11,
521:12, 521:15,
521:19, 522:6,
526:5, 535:4,
546:15, 546:18,
547:18, 548:2,
548:9, 548:13,
548:23, 549:7,
549:10, 549:18,
550:11, 551:22,
553:25, 556:9,
556:12, 557:2,
566:9, 568:2, 569:3,
569:6, 570:9,
571:25, 572:7,
572:20, 573:3,

573:21, 573:24,
574:13, 574:23,
575:4, 576:24,
577:2, 578:3,
578:21, 579:9,
579:12, 579:22,
580:1, 580:5,
580:15, 580:20,
580:21, 581:1,
581:4, 581:15,
581:23, 581:25,
582:5, 582:6, 582:9,
582:10, 582:21,
582:23, 583:1,
583:2, 583:4, 583:5,
583:9, 583:10,
583:11, 583:13,
583:25, 584:4,
584:19, 585:1,
585:2, 585:4, 585:6,
585:10, 585:11,
585:18, 585:22,
585:23, 585:25,
587:5, 587:6,
587:12, 589:10,
589:17, 595:17,
595:18, 595:19,
596:6, 596:7,
596:14, 596:15,
598:6, 598:17,
598:20, 598:22,
599:2, 599:6, 599:7,
599:13, 599:15,
599:17, 601:17,
601:19, 601:22
describe [6] - 407:12,
453:4, 492:6,
576:15, 578:2,
598:21
described [39] -
452:23, 456:10,
467:17, 535:2,
535:4, 563:16,
567:15, 569:7,
569:11, 569:12,
569:18, 569:19,
570:9, 570:14,
571:12, 572:2,
572:8, 572:20,
573:16, 573:21,
574:10, 574:13,
575:19, 577:14,
578:3, 582:9,
582:21, 582:23,
583:1, 583:3,
583:10, 583:13,
584:1, 585:22,
588:22, 598:23,
599:7, 599:16
describes [2] -
576:14, 585:24

describing [3] - 535:3,
569:23, 573:2
description [6] -
471:23, 570:16,
571:20, 581:23,
586:11, 588:15
designated [2] -
454:12, 517:20
detective [1] - 446:8
determine [7] -
461:14, 491:18,
519:21, 523:5,
558:7, 566:11, 573:7
determined [1] -
583:24
determining [4] -
489:10, 497:11,
568:8, 573:8
developed [3] - 447:5,
584:9
deviation [1] - 500:14
device [1] - 405:3
diagram [17] - 455:12,
456:17, 456:18,
456:20, 457:1,
457:8, 457:10,
458:23, 464:16,
464:17, 464:20,
464:24, 467:13,
470:4, 482:1,
504:21, 504:23
diagramed [1] - 466:3
diagrams [2] - 454:18,
491:16
die [1] - 426:11
died [4] - 423:24,
427:24, 432:6,
432:14
difference [4] - 407:9,
473:14, 552:16,
580:2
differences [2] -
507:6, 551:24
different [27] - 449:22,
459:5, 459:6,
459:16, 460:5,
468:1, 473:17,
474:5, 496:1, 497:2,
497:13, 551:11,
551:12, 551:17,
551:18, 551:22,
562:1, 575:15,
576:8, 576:10,
576:12, 576:20,
576:21, 577:5, 594:6
differentiate [1] -
598:15
differently [2] -
496:25, 570:17
difficult [6] - 412:9,

422:13, 424:11, 458:16, 459:12, 459:24
**dig** [1] - 503:6
**dim** [3] - 453:23, 479:10, 479:13
**dire** [1] - 450:10
**Direct** [3] - 401:3, 401:8, 401:13
**DIRECT** [3] - 405:4, 419:7, 440:20
**direct** [5] - 557:25, 584:24, 586:7, 587:1, 587:16
**directed** [1] - 597:20
**direction** [6] - 474:5, 483:2, 497:2, 561:10, 567:8, 567:17
**directly** [13] - 454:16, 457:1, 469:11, 469:16, 480:14, 502:2, 502:10, 502:22, 506:11, 508:22, 513:13, 583:19, 590:22
**Director** [1] - 446:20
**dirt** [1] - 485:10
**disagree** [3] - 441:3, 534:18, 547:12
**discern** [2] - 479:19, 520:21
**discharge** [7] - 483:14, 483:17, 483:18, 490:8, 569:3
**discharged** [6] - 465:24, 475:5, 483:10, 483:15, 529:10, 550:20
**discharges** [1] - 486:16
**discharging** [4] - 513:25, 548:15, 549:2, 549:13
**disclosed** [1] - 461:10
**disclosing** [1] - 602:6
**disconnect** [2] - 586:5, 587:15
**discount** [1] - 498:17
**discovery** [6] - 442:10, 442:18, 451:14, 451:23, 454:6, 455:8
**discrepancies** [3] - 496:10, 496:12, 594:16
**discuss** [8] - 419:11, 454:2, 534:3, 538:7, 538:24, 539:3, 556:7, 601:10

**discussed** [15] - 402:5, 439:5, 451:11, 461:24, 462:14, 462:17, 501:15, 502:13, 513:9, 532:10, 550:21, 556:5, 556:6, 599:11, 600:16
**discussing** [5] - 439:1, 477:6, 537:7, 592:13, 600:9
**discussion** [1] - 556:16
**dismiss** [2] - 528:1, 528:9
**Dismuke** [1] - 526:13
**DISMUKE** [1] - 526:13
**disparagingly** [1] - 574:18
**disprove** [3] - 499:5, 499:20, 500:9
**disproves** [1] - 499:21
**disrespected** [1] - 575:8
**distance** [22] - 455:6, 459:12, 459:17, 460:16, 463:7, 463:8, 468:20, 469:1, 470:11, 470:21, 472:11, 474:15, 479:3, 518:5, 518:14, 518:16, 518:19, 522:7, 553:10, 553:15, 560:8
**distant** [1] - 422:6
**distinct** [2] - 458:11, 468:3
**distinction** [2] - 442:14, 492:7
**DISTRICT** [2] - 400:1, 400:2
**district** [1] - 540:4
**District** [9] - 400:13, 543:13, 543:14, 564:16, 604:21, 604:22, 605:8, 605:9
**disturbance** [20] - 457:18, 457:19, 458:6, 458:13, 468:2, 469:21, 470:8, 470:19, 470:22, 471:13, 472:1, 472:7, 486:7, 500:16, 500:17, 500:18, 501:1, 501:6, 588:10
**ditch** [6] - 469:18, 470:10, 470:11,

470:17, 474:15, 505:12
**division** [1] - 524:20
**docket** [3] - 526:19, 536:4, 536:7
**doctor** [1] - 431:21
**doctors'** [1] - 431:17
**document** [4] - 500:15, 528:15, 580:17, 583:18
**documentation** [1] - 454:17
**documented** [1] - 499:4
**documents** [2] - 451:19, 540:10
**dogs** [1] - 443:24
**dollars** [1] - 407:22
**done** [28] - 448:12, 464:21, 465:11, 465:16, 466:24, 474:5, 481:20, 481:21, 487:17, 500:24, 504:21, 504:23, 514:25, 515:6, 515:8, 528:4, 531:5, 558:5, 558:12, 558:15, 559:8, 559:12, 559:25, 560:1, 561:19, 563:10, 566:4, 594:3
**door** [7] - 414:24, 415:1, 507:9, 509:9, 529:4, 529:15, 529:20
**doors** [2] - 507:15
**doubt** [6] - 462:8, 484:9, 487:4, 487:13, 550:15, 594:8
**dovetail** [1] - 579:8
**down** [67] - 403:1, 403:9, 403:21, 407:17, 411:17, 417:21, 418:12, 422:18, 438:17, 441:21, 441:24, 442:19, 446:2, 448:8, 449:25, 458:15, 460:3, 461:2, 462:11, 463:11, 463:12, 463:16, 463:21, 464:12, 477:15, 477:21, 480:19, 484:8, 485:2, 485:3, 485:10, 485:16, 485:17, 486:3, 486:4, 486:10,

486:18, 487:7, 489:7, 491:3, 491:11, 493:25, 495:5, 502:18, 504:25, 507:15, 511:20, 513:23, 514:1, 522:1, 522:4, 522:7, 522:13, 522:16, 522:18, 522:23, 525:5, 527:13, 542:22, 550:8, 562:21, 563:9, 579:6, 585:15, 600:1, 600:4
**downloaded** [1] - 604:5
**drag** [2] - 460:11, 472:2
**dramatic** [1] - 509:1
**draw** [1] - 503:15
**drawing** [7] - 455:11, 482:7, 516:21, 569:21, 587:24, 588:15, 593:16
**drawings** [1] - 455:10
**drawn** [1] - 457:11
**drew** [1] - 480:11
**drive** [7] - 472:22, 505:3, 508:6, 513:3, 588:11, 604:3, 604:5
**driven** [2] - 485:21, 504:25
**driver** [3] - 483:7, 510:1, 510:2
**driver's** [3] - 417:10, 473:5, 576:25
**driveway** [1] - 407:1
**driving** [3] - 417:2, 509:18, 581:24
**drop** [2] - 505:15, 588:13
**drove** [4] - 460:8, 471:7, 522:4, 591:11
**due** [5] - 405:2, 485:1, 488:14, 517:7, 574:15
**DUI** [1] - 446:9
**during** [23] - 425:15, 427:1, 427:13, 427:22, 433:17, 435:11, 437:20, 455:1, 455:9, 458:2, 462:16, 469:19, 482:12, 493:6, 493:7, 500:17, 501:16, 502:8, 513:10, 561:4, 565:5, 597:21, 603:1
**Durst** [30] - 400:21, 403:21, 404:6,

424:13, 424:22, 437:3, 438:14, 439:19, 462:19, 475:16, 478:2, 514:8, 533:12, 535:21, 537:19, 537:22, 542:11, 542:22, 544:15, 544:22, 545:2, 576:4, 590:3, 592:12, 593:5, 595:11, 596:3, 597:25, 601:14, 604:1
**DURST** [87] - 403:23, 424:14, 424:16, 424:24, 430:4, 430:10, 430:16, 436:3, 436:6, 438:15, 439:20, 440:1, 440:4, 450:11, 460:18, 460:22, 478:3, 478:11, 514:9, 514:11, 514:19, 514:22, 516:6, 516:8, 526:16, 526:18, 528:14, 528:17, 533:16, 533:25, 534:6, 534:10, 534:14, 534:18, 534:24, 535:23, 536:1, 536:7, 536:12, 537:23, 537:24, 539:16, 539:22, 539:24, 541:25, 542:3, 542:6, 542:12, 543:8, 543:15, 543:18, 543:22, 544:2, 544:6, 544:11, 544:17, 544:23, 545:4, 545:11, 545:12, 545:15, 545:17, 564:19, 564:21, 565:17, 565:21, 572:15, 572:16, 576:5, 576:6, 580:11, 580:13, 581:19, 581:21, 589:23, 589:25, 590:5, 595:12, 595:15, 596:4, 596:19, 598:1, 598:3, 599:22, 601:16, 604:2, 604:10
**Durst**...................**513**
   [1] - 401:14
**Durst**.................**594**

10

[1] - 401:16
**Durst.........597** [1] - 401:18
**dust** [2] - 492:23, 492:24
**duties** [3] - 445:19, 446:8, 530:22
**duty** [1] - 530:20
**dynamic** [2] - 447:20, 447:21
**dynamics** [1] - 473:5

# E

**early** [2] - 403:7, 403:11
**earned** [1] - 407:23
**earth** [1] - 412:3
**easier** [1] - 479:12
**easy** [2] - 455:3, 516:10
**eat** [2] - 410:23, 477:1
**economic** [2] - 403:10, 403:13
**edge** [1] - 469:25
**editorial** [1] - 576:3
**educate** [1] - 516:13
**educated** [1] - 510:17
**educating** [1] - 566:1
**education** [6] - 444:24, 447:15, 447:17, 551:13, 558:3, 565:15
**effect** [8] - 409:25, 410:8, 415:2, 421:17, 421:25, 497:9, 501:5, 510:9
**effectively** [1] - 476:9
**effort** [3] - 542:24, 543:4, 543:6
**efforts** [4] - 449:19, 477:9, 537:11, 600:15
**egress** [1] - 505:11
**eight** [6] - 409:10, 464:25, 466:1, 504:22, 510:20, 514:1
**either** [17] - 426:6, 427:6, 429:5, 431:20, 431:24, 432:23, 434:17, 442:24, 452:23, 461:4, 462:21, 493:2, 497:7, 505:16, 515:12, 571:5, 602:12
**elapsed** [1] - 461:15
**electrical** [1] - 444:20
**electronic** [1] - 543:23

**electronically** [2] - 536:2, 536:9
**element** [13] - 463:9, 464:7, 465:23, 467:21, 498:18, 501:2, 503:24, 518:23, 570:16, 593:1, 593:7
**elements** [9] - 454:14, 484:16, 490:13, 490:22, 499:8, 507:25, 556:22, 557:17, 566:14
**embankment** [7] - 465:14, 588:3, 588:4, 588:6, 588:8, 588:21, 589:1
**embarrassment** [1] - 513:2
**emotional** [1] - 414:5
**emotionally** [1] - 423:16
**emphasize** [1] - 530:12
**employed** [7] - 415:22, 428:19, 428:22, 429:1, 429:5, 429:9, 449:9
**empower** [1] - 493:18
**empowers** [1] - 518:21
**enable** [1] - 477:15
**encountered** [4] - 492:2, 492:3, 494:2, 494:3
**encounters** [3] - 447:20, 447:21, 493:16
**encourage** [1] - 415:8
**end** [16] - 402:5, 407:1, 441:18, 453:2, 458:19, 465:13, 473:25, 484:22, 484:24, 486:12, 519:18, 530:6, 552:17, 557:25, 594:7, 594:8
**endangering** [1] - 493:17
**ended** [3] - 471:3, 548:1, 553:21
**enforcement** [68] - 441:6, 444:21, 445:2, 445:5, 445:14, 446:16, 446:17, 447:1, 447:8, 447:25, 449:2, 450:9, 450:25, 466:25, 487:10, 489:15,

489:18, 489:25, 490:4, 492:7, 493:14, 494:8, 494:9, 495:17, 497:13, 499:10, 514:25, 519:2, 523:13, 524:1, 524:4, 524:8, 524:16, 524:18, 525:3, 525:6, 525:24, 526:5, 530:18, 530:19, 530:23, 531:25, 550:25, 552:16, 552:17, 553:25, 554:3, 554:16, 554:20, 558:21, 558:24, 560:3, 560:7, 560:14, 561:18, 561:19, 561:22, 562:2, 562:25, 563:18, 564:3, 565:6, 569:11, 575:5, 593:20, 594:9, 594:24
**engage** [1] - 511:2
**engaged** [1] - 492:11
**engagement** [2] - 510:22, 510:24
**engine** [6] - 471:24, 471:25, 507:4, 508:17, 508:25, 509:6
**ensured** [1] - 591:23
**ensuring** [1] - 575:21
**enter** [1] - 506:1
**entered** [10] - 404:11, 440:7, 469:1, 473:12, 473:21, 504:7, 583:14, 585:17, 590:23, 592:2
**entering** [3] - 473:18, 504:8, 590:18
**Enterprise** [1] - 417:20
**entire** [3] - 447:18, 467:4, 479:23
**entirely** [1] - 498:18
**entirety** [3] - 468:9, 499:9, 566:2
**entrance** [6] - 482:5, 482:9, 485:14, 491:24, 491:25, 590:22
**entries** [2] - 527:14, 527:19
**entrusted** [1] - 594:24
**entry** [7] - 465:12,

467:9, 504:9, 504:16, 504:17, 505:4, 505:17
**entryway** [1] - 463:15
**environment** [5] - 473:6, 504:15, 506:25, 563:21, 564:4
**environments** [1] - 490:3
**equal** [1] - 562:14
**equipment** [6] - 456:19, 505:14, 507:16, 509:25, 510:5, 512:5
**erroneous** [1] - 519:23
**error** [2] - 497:5, 604:14
**especially** [7] - 408:23, 422:5, 443:5, 470:20, 485:10, 578:13, 595:1
**essentially** [6] - 453:3, 486:24, 503:17, 505:11, 565:19, 572:23
**establish** [1] - 479:22
**established** [6] - 489:9, 502:22, 513:12, 518:17, 518:21, 563:6
**estate** [5] - 400:5, 419:12, 419:24, 422:9, 542:13
**estimate** [1] - 470:12
**estimated** [1] - 453:6
**et** [2] - 543:12, 544:12
**euphemism** [1] - 446:24
**evaluate** [11] - 445:4, 454:4, 455:6, 458:9, 464:7, 470:24, 481:18, 487:12, 490:4, 517:23, 555:11
**evaluated** [7] - 468:9, 488:22, 489:4, 490:10, 496:2, 517:9, 519:24
**evaluating** [6] - 466:12, 469:8, 486:9, 489:21, 501:11, 553:4
**evaluation** [6] - 463:10, 464:13, 483:25, 498:19, 525:14, 548:7
**evasive** [1] - 505:23
**evening** [3] - 420:16,

600:20, 604:16
**event** [72] - 452:15, 452:16, 452:18, 452:21, 452:22, 452:24, 454:10, 454:16, 454:19, 454:21, 454:25, 455:1, 455:4, 460:14, 460:17, 462:10, 463:6, 464:10, 464:22, 466:9, 466:13, 466:15, 466:21, 467:2, 472:14, 479:23, 480:6, 480:11, 480:15, 481:9, 481:12, 481:18, 484:22, 486:21, 487:12, 487:22, 488:19, 490:15, 490:16, 491:5, 493:19, 493:20, 494:2, 494:8, 495:4, 495:6, 496:3, 496:7, 497:14, 518:18, 548:21, 550:19, 552:3, 556:24, 558:22, 568:24, 569:10, 569:18, 569:23, 570:13, 572:7, 572:19, 575:18, 576:8, 576:11, 576:12, 576:14, 576:15, 577:13, 577:22, 581:23, 593:5
**events** [25] - 445:4, 446:13, 448:1, 448:6, 448:23, 461:13, 490:1, 490:15, 493:16, 499:19, 499:20, 499:23, 499:24, 500:3, 535:1, 557:1, 559:13, 571:25, 572:1, 573:1, 573:14, 573:20, 591:23, 594:9, 595:1
**eventually** [3] - 490:24, 512:4, 512:5
**everyday** [1] - 454:23
**evidence** [61] - 450:19, 458:19, 459:6, 460:6, 464:1, 465:18, 467:3, 469:6, 471:9, 471:13, 472:15, 474:20, 474:22, 475:1, 475:3, 475:8,

476:11, 476:13,
476:15, 479:17,
479:20, 481:17,
488:16, 488:21,
491:8, 491:9,
491:18, 497:18,
498:6, 498:8,
498:14, 498:15,
498:22, 499:14,
499:17, 499:18,
499:19, 499:21,
499:22, 500:2,
500:8, 501:12,
557:18, 571:8,
572:22, 573:18,
574:1, 574:3, 574:9,
574:21, 593:19,
593:23, 594:12,
594:18, 594:23,
595:25, 596:1,
603:18
**evidences** [1] - 522:6
**evident** [1] - 470:8
**evolutions** [1] - 498:9
**evolving** [1] - 531:1
**exact** [5] - 465:7,
485:3, 576:11,
587:21, 588:7
**exactly** [8] - 413:13,
420:10, 473:11,
480:18, 487:2,
519:11, 547:25,
586:19
**EXAMINATION** [12] -
405:4, 415:9, 417:2,
419:7, 424:15,
436:10, 440:20,
514:10, 590:13,
595:14, 597:2, 598:2
**examination** [10] -
457:25, 466:24,
500:20, 500:22,
500:24, 525:15,
584:24, 586:7,
587:1, 589:4
**Examination** [12] -
401:3, 401:4, 401:5,
401:8, 401:9,
401:10, 401:13,
401:14, 401:15,
401:16, 401:17,
401:18
**examined** [1] - 491:7
**example** [15] - 443:21,
452:21, 454:17,
460:8, 465:20,
472:20, 495:23,
496:15, 507:9,
508:13, 509:17,
535:9, 563:25,

568:11, 588:11
**examples** [1] - 469:20
**excellent** [1] - 408:11
**except** [1] - 412:18
**exceptionally** [1] -
469:5
**exchange** [6] -
591:21, 595:19,
596:8, 597:9,
597:17, 597:20
**exchanging** [1] -
597:5
**excited** [2] - 409:14,
448:15
**exclude** [8] - 531:13,
532:4, 532:21,
533:3, 533:19,
534:21, 538:3, 540:3
**excluded** [7] - 461:6,
532:23, 533:5,
533:7, 533:20,
535:6, 553:14
**excluding** [1] - 594:1
**excuse** [11] - 455:12,
455:16, 474:2,
480:24, 485:5,
485:15, 536:17,
536:23, 537:5,
537:6, 600:7
**excused** [2] - 418:7,
439:7
**execute** [1] - 501:25
**exhibit** [2] - 479:3,
604:14
**Exhibit** [1] - 602:18
**exigent** [3] - 489:2,
489:3
**exist** [1] - 579:9
**existed** [1] - 580:20
**exists** [2] - 582:5,
589:11
**exit** [7] - 473:24,
482:11, 505:17,
509:4, 509:8,
588:16, 588:20
**exited** [13] - 477:13,
482:10, 511:24,
511:25, 512:6,
513:4, 537:16,
577:2, 582:11,
583:2, 583:11,
584:5, 600:21
**exiting** [3] - 513:17,
576:24, 577:6
**expect** [9] - 411:5,
413:10, 468:23,
561:24, 562:25,
563:17, 565:6,
578:13, 602:11
**experience** [15] -

406:12, 412:14,
451:10, 479:20,
483:12, 502:12,
519:2, 520:24,
551:13, 551:19,
551:24, 558:3,
558:23, 559:25,
560:4
**experienced** [2] -
472:23, 568:15
**experiences** [2] -
455:1, 559:14
**experiencing** [2] -
414:7, 580:1
**expert** [36] - 439:11,
441:7, 441:20,
442:2, 442:23,
444:15, 447:13,
447:14, 448:22,
450:8, 450:14,
450:17, 450:25,
460:23, 460:24,
461:1, 461:4, 464:7,
477:20, 481:18,
500:1, 515:1, 531:6,
531:23, 532:13,
545:13, 545:18,
545:22, 545:25,
546:2, 546:5,
554:25, 555:22,
568:11
**expert's** [1] - 500:4
**expertise** [1] - 462:22
**experts** [1] - 441:24
**explain** [11] - 403:18,
406:10, 410:20,
411:3, 448:25,
452:13, 502:20,
503:15, 575:23,
593:3
**explained** [3] -
461:20, 520:24,
566:20
**explaining** [4] -
506:22, 510:15,
556:21, 593:9
**explanation** [1] -
550:5
**explanations** [1] -
500:13
**Explorer** [1] - 460:1
**exposing** [1] - 510:9
**expounding** [1] -
549:15
**expressed** [1] -
452:11
**expression** [1] -
568:18
**extent** [1] - 559:15
**extra** [1] - 485:23

**extraction** [1] - 506:24
**extraordinary** [1] -
588:8
**extremely** [1] - 535:14

## F

**face** [5] - 447:2, 447:3,
496:22
**face-to-face** [2] -
447:2, 447:3
**Facebook** [1] - 420:11
**facing** [9] - 473:24,
474:8, 548:21,
551:22, 551:23,
552:2, 552:6,
589:19, 589:20
**fact** [22] - 426:2,
426:17, 431:6,
452:9, 493:3,
494:20, 499:3,
505:7, 506:7, 522:2,
532:19, 538:21,
547:12, 550:2,
550:10, 553:19,
557:12, 557:24,
568:17, 573:23,
577:21, 589:10
**factor** [1] - 568:8
**factors** [6] - 553:3,
553:7, 555:10,
555:18, 555:25,
560:6
**facts** [19] - 442:3,
442:9, 442:11,
442:13, 442:18,
443:6, 488:15,
489:22, 490:9,
490:11, 530:10,
530:16, 549:3,
549:5, 549:8,
569:13, 574:20,
574:24, 594:7
**failed** [1] - 513:12
**failing** [1] - 560:13
**failure** [1] - 556:18
**fair** [20] - 416:5, 416:8,
416:14, 435:23,
515:2, 525:21,
525:24, 550:8,
552:1, 554:8, 555:1,
556:3, 567:14,
567:17, 573:22,
578:23, 578:25,
581:16, 581:17,
583:19
**fairly** [1] - 566:15
**faith** [1] - 517:4
**falls** [1] - 489:13
**family** [9] - 412:1,

413:17, 414:7,
420:8, 422:1,
423:20, 436:25,
529:20, 600:12
**far** [13] - 407:7,
417:24, 421:10,
439:5, 465:3, 473:1,
474:21, 513:22,
539:22, 559:10,
571:4, 573:8, 586:20
**fast** [5] - 472:22,
496:11, 512:3,
522:24, 563:13
**faster** [6] - 460:11,
463:21, 468:1,
563:13, 564:9, 580:9
**fastest** [5] - 486:10,
513:22, 522:16,
522:19
**father** [16] - 408:8,
408:22, 410:21,
411:4, 420:12,
420:16, 421:7,
427:7, 427:10,
434:16, 434:20,
434:21, 434:23,
435:15, 437:5,
437:17
**father's** [1] - 423:13
**father-in-law** [4] -
420:12, 420:16,
434:20, 434:21
**Faulkner** [8] - 462:15,
462:17, 557:21,
557:24, 558:5,
560:1, 601:18,
601:20
**Faulkner's** [6] -
462:14, 500:19,
558:2, 601:24,
603:6, 603:10
**fault** [3] - 435:16,
495:24, 564:8
**favorite** [1] - 421:21
**favorites** [1] - 421:19
**fear** [23] - 490:24,
491:1, 548:25,
549:3, 549:4, 549:6,
549:7, 549:8, 551:8,
551:10, 551:11,
551:16, 568:7,
568:15, 568:18,
568:19, 568:21,
580:1, 592:14,
593:1, 593:3, 593:10
**fears** [1] - 592:18
**feast** [1] - 411:16
**fed** [2] - 427:18, 431:7
**federal** [2] - 536:3,
540:4

12

**fees** [2] - 441:11, 605:1
**feet** [34] - 417:25, 453:7, 453:8, 459:15, 460:1, 463:11, 464:25, 465:11, 465:12, 465:15, 468:20, 468:21, 468:23, 468:24, 470:14, 471:6, 472:25, 473:13, 473:19, 482:6, 485:8, 487:7, 497:20, 497:21, 504:11, 504:22, 504:24, 512:4, 518:6, 582:24, 584:20, 599:9
**fellow** [5] - 439:2, 477:7, 537:8, 600:10, 600:11
**felony** [1] - 527:9
**felt** [1] - 556:20
**female** [2] - 562:5, 562:6
**few** [10] - 408:3, 412:21, 416:11, 423:5, 439:17, 449:3, 455:15, 499:25, 512:4, 537:20
**field** [12] - 441:17, 442:2, 445:20, 449:12, 450:25, 451:2, 452:17, 452:18, 461:6, 493:3, 508:2, 546:2
**fields** [1] - 450:16
**fifth** [1] - 461:22
**fight** [2] - 510:19
**figure** [8] - 470:13, 517:2, 517:3, 519:5, 519:7, 562:7, 586:16, 586:24
**figured** [4] - 424:1, 512:23, 519:10, 525:6
**file** [6] - 526:23, 528:9, 535:16, 540:9, 540:11, 541:18
**filed** [23] - 526:12, 527:10, 527:24, 527:25, 528:3, 528:6, 528:8, 534:13, 535:19, 535:20, 535:24, 536:2, 536:9, 536:11, 536:12, 538:17, 540:3, 540:17, 541:5,

542:17, 542:24, 543:17, 543:19
**filing** [1] - 543:23
**fill** [1] - 410:14
**final** [1] - 511:16
**finalize** [2] - 517:15, 517:17
**finally** [2] - 407:2, 438:21
**financial** [2] - 428:3, 428:15
**financially** [5] - 429:8, 429:13, 430:22, 431:1, 431:3
**findings** [1] - 480:2
**fine** [5] - 439:15, 498:21, 602:5, 602:9, 604:7
**finger** [1] - 455:21
**fingers** [1] - 455:23
**finish** [1] - 572:13
**finished** [3] - 603:8, 603:10, 603:18
**finishing** [1] - 449:12
**finite** [1] - 577:18
**fire** [2] - 507:7, 566:11
**firearm** [7] - 465:25, 483:11, 483:17, 483:18, 486:16, 490:8, 506:8, 548:15, 549:2
**firearms** [4] - 553:14, 561:20, 561:22, 563:6
**fired** [11] - 481:2, 481:4, 483:23, 484:13, 484:22, 513:18, 519:12, 529:13, 530:1, 548:9, 562:23
**firing** [1] - 560:21
**first** [33] - 411:7, 417:13, 421:2, 444:8, 454:3, 455:10, 455:11, 456:5, 456:25, 459:14, 459:22, 467:5, 468:18, 475:17, 491:12, 492:20, 493:10, 493:21, 508:12, 508:13, 508:18, 512:15, 514:14, 514:17, 514:23, 527:13, 562:23, 575:7, 591:1, 601:9, 602:13, 603:3, 603:9
**firsthand** [2] - 466:14, 548:6
**fit** [1] - 460:3

**fits** [1] - 443:12
**five** [7] - 409:9, 412:19, 463:15, 485:7, 537:5, 544:24, 544:25
**fixed** [3] - 417:23, 465:6, 465:18
**Flanagan** [1] - 400:22
**flash** [2] - 604:3, 604:4
**flee** [1] - 552:25
**fleeing** [3] - 491:19, 492:1, 586:8
**flip** [1] - 433:7
**floors** [3] - 414:1, 414:3
**Florida** [7] - 406:5, 415:17, 415:19, 437:22, 443:19, 444:11, 445:8, 445:16, 526:12, 533:1, 535:22, 540:3, 540:4, 542:7, 542:8, 543:13, 543:14, 553:24, 554:8, 564:17, 573:15, 575:5
**flower** [1] - 467:11
**flowers** [1] - 411:23
**fluid** [1] - 552:3
**focus** [2] - 497:8, 500:12
**focused** [5] - 498:16, 500:11, 501:9, 563:23, 566:22
**focusing** [1] - 493:22
**foliage** [2] - 469:17, 470:10
**folks** [1] - 603:16
**follow** [5] - 436:8, 492:23, 495:22, 509:20, 560:13
**follow-up** [2] - 436:8, 495:22
**followed** [2] - 480:15, 482:24
**following** [23] - 404:11, 415:5, 435:18, 439:7, 440:7, 445:22, 463:1, 478:13, 481:24, 483:18, 492:12, 493:16, 493:20, 494:24, 495:4, 495:8, 536:25, 537:17, 537:25, 545:7, 577:13, 584:8, 600:22
**food** [3] - 411:17, 429:18

**foot** [1] - 465:5
**football** [1] - 452:17
**force** [96] - 437:15, 441:5, 441:6, 441:7, 443:5, 444:2, 444:14, 444:17, 445:1, 445:2, 445:3, 445:4, 445:9, 446:10, 446:11, 446:13, 446:14, 447:7, 447:9, 447:15, 447:19, 447:20, 448:6, 448:12, 448:21, 448:23, 450:9, 450:25, 451:3, 451:7, 452:21, 454:5, 454:21, 454:25, 455:1, 455:13, 460:17, 460:23, 462:10, 466:9, 466:13, 474:23, 476:18, 480:15, 481:9, 486:21, 487:12, 487:25, 488:1, 488:6, 488:8, 488:19, 489:1, 489:12, 489:15, 489:16, 489:18, 489:19, 489:25, 490:4, 490:14, 490:18, 495:25, 496:3, 496:5, 497:11, 499:8, 499:13, 501:17, 501:19, 502:3, 502:11, 502:23, 513:14, 532:14, 534:25, 548:8, 549:3, 551:4, 551:8, 552:8, 553:5, 555:4, 555:12, 556:1, 556:21, 558:8, 558:22, 558:25, 559:13, 559:16, 559:19, 566:24, 568:9, 589:12, 589:17
**Force** [2] - 445:1, 448:17
**forced** [2] - 449:4, 490:1
**Ford** [1] - 460:1
**foregoing** [1] - 604:23
**foremost** [1] - 575:7
**forever** [1] - 577:19
**forget** [2] - 578:18, 588:22
**forgot** [1] - 578:22

**form** [8] - 426:22, 467:4, 473:5, 533:11, 535:17, 548:22, 574:24, 603:20
**format** [1] - 605:1
**formed** [2] - 501:9, 574:5
**former** [1] - 593:17
**forming** [15] - 451:11, 451:13, 455:7, 463:10, 464:8, 466:13, 488:2, 491:11, 498:16, 499:16, 501:14, 502:13, 502:15, 513:8, 519:25
**formula** [1] - 462:23
**formulate** [1] - 546:25
**formulated** [1] - 546:10
**FORSYTH** [2] - 400:9, 602:9
**Forsyth** [89] - 402:4, 451:7, 451:17, 457:5, 461:16, 462:7, 466:16, 472:8, 472:21, 480:19, 481:3, 481:24, 482:10, 482:23, 484:10, 492:18, 496:17, 500:20, 502:7, 503:21, 506:10, 507:1, 507:18, 510:15, 511:17, 511:24, 512:7, 517:7, 519:11, 519:24, 521:12, 522:6, 526:5, 535:4, 546:15, 546:18, 547:18, 548:2, 548:13, 549:7, 549:10, 549:18, 550:11, 551:22, 556:9, 557:2, 566:9, 568:2, 569:6, 570:9, 572:7, 572:20, 573:3, 573:21, 573:24, 574:13, 574:23, 575:4, 576:24, 577:2, 578:3, 579:12, 580:1, 580:15, 580:20, 581:25, 582:5, 582:10, 583:2, 583:4, 583:9, 583:11, 584:4, 585:10, 585:18, 585:22, 587:5,

13

587:12, 589:10,
590:16, 595:17,
595:19, 595:23,
596:7, 601:17,
601:22, 602:5, 603:4
**Forsyth's** [19] -
472:20, 473:21,
480:11, 482:20,
548:9, 548:23,
556:12, 569:4,
579:9, 579:22,
580:5, 581:4,
581:23, 585:1,
589:17, 596:15,
598:22, 599:13,
599:17
**forthcoming** [1] -
601:11
**forward** [34] - 404:21,
404:23, 412:22,
418:24, 443:14,
469:13, 469:14,
471:2, 471:7,
471:20, 472:23,
473:22, 473:25,
474:2, 474:8,
474:16, 474:19,
475:9, 476:14,
482:14, 482:18,
482:19, 483:10,
496:16, 496:18,
498:3, 504:19,
505:19, 505:21,
509:2, 512:1, 512:2,
583:4, 603:14
**fought** [1] - 407:15
**founded** [5] - 548:16,
548:19, 548:23,
549:11, 549:13
**four** [8] - 409:20,
410:16, 449:11,
449:14, 496:6,
532:12, 558:13,
588:11
**four-wheel** [1] -
588:11
**Fourth** [1] - 489:20
**Fowler** [1] - 400:22
**fractions** [1] - 552:15
**frame** [3] - 461:19,
461:20, 549:25
**Frank** [1] - 542:14
**fraud** [1] - 527:10
**free** [3] - 440:2, 442:1,
477:21
**frequently** [1] - 530:19
**fresh** [1] - 510:23
**friction** [2] - 460:11,
472:3
**Friday** [1] - 408:4

**friend** [2] - 417:14,
438:4
**friends** [2] - 411:13,
414:9
**front** [31] - 423:18,
433:6, 455:17,
462:15, 462:25,
470:24, 473:25,
504:1, 504:2,
506:12, 507:19,
507:21, 507:23,
508:19, 508:22,
510:11, 512:9,
512:13, 512:22,
529:15, 529:20,
531:18, 563:15,
564:22, 565:25,
566:17, 567:24,
570:3, 598:13,
599:6, 601:3
**full** [6] - 411:12, 415:2,
446:17, 483:13,
487:10, 494:5,
506:18, 582:18,
582:20
**full-effect** [1] - 415:2
**full-time** [1] - 446:17
**fully** [2] - 510:25,
543:20
**fully-loaded** [1] -
510:25
**funeral** [8] - 411:11,
411:12, 411:15,
420:22, 421:3,
421:10, 421:17,
552:18
**fur** [1] - 443:23
**furniture** [1] - 414:2
**FURTHER** [2] - 597:2,
598:2
**future** [1] - 525:5

## G

**Gabriella** [2] - 425:17,
425:21
**gap** [1] - 449:2
**gas** [43] - 410:14,
453:2, 453:3,
456:19, 463:15,
464:13, 465:17,
468:18, 469:2,
473:10, 473:12,
473:16, 473:18,
473:21, 482:5,
485:14, 487:9,
491:22, 491:25,
492:3, 503:16,
504:3, 504:7, 504:9,
504:16, 505:17,

506:1, 506:4,
508:22, 508:24,
509:19, 512:5,
521:23, 521:24,
574:14, 579:16,
588:1, 588:21,
590:22, 591:6, 592:2
**Gasbarrini** [6] -
543:11, 544:12,
564:15, 564:24,
571:19, 571:20
**GASBARRINI** [1] -
543:12
**gear** [3] - 472:18,
508:6, 593:11
**gears** [2] - 493:6,
501:3
**general** [2] - 468:17,
553:16
**generalization** [1] -
503:25
**generalized** [1] -
586:20
**generalizing** [2] -
562:7, 587:9
**generally** [2] - 492:12,
562:6
**generate** [1] - 510:1
**gentleman** [1] -
568:12
**gentlemen** [9] -
404:13, 425:5,
440:9, 450:15,
453:22, 476:25,
479:12, 545:8, 600:5
**George** [1] - 568:12
**get-together** [1] -
411:15
**giant** [1] - 498:23
**given** [23] - 420:19,
442:17, 446:12,
462:3, 463:24,
486:8, 493:3,
498:11, 517:4,
519:17, 530:7,
556:24, 557:22,
562:10, 563:14,
567:6, 567:16,
569:13, 572:24,
574:5, 574:20,
589:2, 594:6
**Given** [1] - 605:5
**glad** [1] - 438:21
**Glasser** [1] - 400:18
**gliding** [1] - 471:19
**goal** [5] - 537:4,
563:12, 564:6,
564:9, 566:6
**God** [1] - 443:21
**good-bye** [3] - 420:25,

423:1, 423:2
**goodness** [1] - 540:6
**grab** [1] - 477:1
**grade** [2] - 461:22
**Graham** [8] - 489:13,
489:14, 489:17,
489:22, 489:24,
490:22, 589:15,
593:2
**grand** [1] - 555:3
**grandfather** [1] -
437:19
**grandfather's** [5] -
432:21, 434:22,
435:4, 435:9, 437:4
**grandsons** [1] -
410:17
**granted** [2] - 450:12,
454:24
**graph** [1] - 462:15
**graphic** [1] - 471:23
**grassy** [1] - 472:5
**gravel** [1] - 492:23
**great** [15] - 404:2,
413:20, 438:21,
453:20, 455:22,
472:20, 475:13,
495:21, 532:11,
548:14, 548:25,
551:2, 551:4, 564:5,
604:7
**greater** [2] - 553:12,
553:15
**greatly** [1] - 571:23
**Greenbag** [1] - 400:16
**grew** [1] - 407:25
**grocery** [1] - 595:2
**ground** [31] - 456:15,
457:17, 457:19,
458:6, 458:13,
466:3, 468:2, 469:4,
469:20, 470:8,
470:18, 470:21,
470:22, 471:13,
472:1, 472:4, 472:6,
472:7, 472:23,
474:11, 485:23,
486:6, 500:16,
500:17, 500:18,
501:1, 501:6, 569:1,
588:10
**groups** [4] - 449:23,
477:8, 537:9, 600:11
**grow** [4] - 406:12,
408:13, 408:15,
412:14
**growing** [3] - 407:12,
408:8, 412:13
**guess** [13] - 427:12,
433:24, 441:19,

457:13, 504:16,
539:7, 542:19,
561:5, 579:1, 582:6,
587:20, 589:16,
604:10
**guessing** [1] - 484:15
**guide** [1] - 448:18
**guiding** [1] - 489:18
**gun** [7] - 444:22,
447:23, 483:1,
510:19, 554:13,
568:22
**gunfire** [1] - 490:20
**guns** [2] - 408:25,
409:1
**guy** [2] - 408:5, 417:21
**guys** [1] - 544:24

## H

**half** [9] - 415:3, 427:8,
441:13, 460:1,
470:16, 483:17,
508:22, 513:25,
514:1
**half-window** [1] -
514:1
**Hamrick** [4] - 417:14,
417:15, 417:16,
417:18
**hand** [12] - 405:20,
430:7, 444:18,
447:23, 465:22,
468:12, 468:19,
503:12, 539:12,
540:15, 605:5
**hand-in-hand** [1] -
539:12
**handed** [6] - 409:2,
430:11, 503:11,
516:9, 526:19,
580:14
**handgun** [3] - 444:21,
444:22, 447:23
**handing** [1] - 479:2
**handled** [1] - 528:5
**handles** [1] - 528:12
**hands** [3] - 556:10,
556:19, 557:4
**happy** [1] - 443:18
**hard** [8] - 407:23,
411:10, 412:7,
421:16, 422:5,
423:7, 487:11,
499:18
**hardest** [1] - 422:2
**hardwood** [3] - 414:1,
414:3
**harm** [2] - 551:3,
551:4

**hate** [1] - 411:2
**head** [2] - 479:4, 547:5
**headaches** [1] - 463:13
**heads** [2] - 495:7, 602:14
**headsets** [1] - 405:16
**health** [1] - 602:7
**hear** [17] - 402:19, 404:25, 405:1, 405:14, 405:20, 405:21, 406:2, 408:20, 415:11, 417:4, 439:16, 440:18, 462:5, 499:10, 503:21, 508:11, 517:20
**heard** [24] - 414:22, 417:23, 420:1, 428:21, 429:3, 434:6, 453:1, 453:15, 456:13, 457:18, 458:2, 458:4, 458:21, 459:15, 475:6, 479:21, 488:16, 501:16, 503:23, 513:10, 542:22, 568:2, 571:7, 579:4
**hearing** [13] - 405:3, 414:20, 460:20, 474:20, 479:17, 487:16, 517:8, 533:14, 536:5, 541:15, 542:25, 543:20
**hearing-assist** [1] - 405:3
**heavy** [2] - 505:3, 507:4
**heck** [1] - 487:6
**hedge** [1] - 468:11
**held** [1] - 543:20
**helium** [1] - 410:14
**help** [8] - 413:18, 413:22, 429:8, 429:13, 431:1, 443:11, 465:23, 507:16
**helped** [2] - 408:2, 428:6, 429:18
**helping** [3] - 430:21, 430:24, 431:3
**hen** [1] - 406:15
**hereby** [2] - 602:23, 604:22
**hero** [1] - 408:24
**herself** [1] - 552:8
**hesitation** [1] - 567:3
**hide** [1] - 421:21

**hides** [2] - 507:6, 507:8
**hiding** [2] - 492:4, 492:5
**high** [10] - 403:6, 403:11, 493:16, 507:11, 507:12, 508:12, 508:14, 510:15, 577:13
**highest** [2] - 524:8, 524:10
**highlights** [1] - 445:13
**hill** [1] - 410:18
**himself** [3] - 568:16, 568:19, 593:17
**hindsight** [3] - 490:5, 490:10, 589:20
**hired** [2] - 408:4, 451:25
**hisself** [3] - 413:21, 413:24, 414:2
**history** [2] - 414:22, 445:11
**hit** [6] - 411:7, 445:13, 474:14, 485:21, 507:22, 512:24
**hitting** [1] - 591:3
**Hogan** [1] - 440:18
**hold** [9] - 413:14, 445:8, 451:1, 452:10, 455:18, 502:7, 533:12, 545:22, 572:13
**holster** [1] - 562:21, 563:10
**holsters** [1] - 563:6
**home** [15] - 411:12, 417:17, 417:19, 420:22, 421:3, 422:17, 422:21, 425:18, 425:19, 433:13, 435:10, 437:15, 529:15, 552:17, 600:12
**honest** [6] - 448:7, 456:16, 548:17, 548:19, 548:23, 549:11
**honestly** [4] - 421:22, 455:19, 574:17, 594:13
**honesty** [2] - 443:4, 541:22
**honor** [1] - 445:3
**Honor** [91] - 402:9, 402:20, 402:24, 404:5, 404:8, 414:18, 414:21, 415:4, 416:20, 418:6, 418:8,

418:10, 418:23, 424:14, 424:23, 430:4, 436:3, 438:12, 439:11, 439:20, 439:25, 440:1, 440:4, 450:7, 450:11, 455:16, 460:18, 460:22, 461:11, 476:1, 476:20, 476:23, 478:1, 478:3, 478:19, 478:23, 503:2, 511:22, 514:9, 514:19, 516:6, 526:16, 528:14, 533:16, 534:1, 534:19, 535:7, 535:22, 536:2, 536:7, 537:23, 539:17, 542:12, 543:8, 543:13, 543:15, 543:18, 543:22, 544:4, 544:11, 544:18, 544:21, 544:23, 545:4, 545:11, 545:15, 564:19, 565:17, 572:15, 576:5, 580:11, 581:19, 589:23, 589:25, 590:5, 595:9, 595:13, 595:24, 596:20, 596:22, 598:1, 599:23, 599:25, 600:25, 601:6, 601:16, 601:21, 602:9, 602:22, 603:19, 604:2
**Honorable** [1] - 400:12
**hootin'** [1] - 406:15
**hope** [3] - 443:24, 503:3, 508:1
**hopefully** [2] - 448:1, 449:1
**horrific** [1] - 490:8
**hospital** [2] - 494:22, 549:17
**hour** [18] - 441:13, 463:15, 463:17, 475:24, 477:18, 485:8, 485:9, 485:12, 485:15, 485:16, 486:3, 486:11, 486:18, 486:24, 513:24, 522:16, 522:18
**hours** [3] - 409:21,

493:25, 517:12
**house** [21] - 408:2, 409:17, 409:21, 409:23, 411:6, 411:15, 413:5, 414:1, 414:4, 416:18, 417:24, 432:21, 433:2, 434:18, 434:19, 434:22, 435:4, 435:9, 437:4, 529:19
**houses** [1] - 427:9
**hug** [1] - 422:23
**huge** [1] - 510:6
**human** [2] - 497:5, 593:8
**humans** [1] - 562:4
**hundred** [1] - 417:25
**hundreds** [4] - 496:1, 496:4, 515:1, 530:19
**husband** [1] - 425:25

**I**

**idea** [6] - 474:6, 512:9, 512:13, 591:19, 595:19, 596:8
**ideal** [1] - 564:2
**ideally** [2] - 563:1, 563:20
**identification** [1] - 558:22
**identified** [8] - 458:18, 459:20, 465:11, 481:16, 504:22, 532:15, 581:12, 581:13
**identifies** [1] - 508:4
**identify** [3] - 420:18, 452:20, 469:23
**identifying** [5] - 454:8, 468:5, 469:20, 581:8, 581:12
**ignore** [1] - 457:14
**ignored** [3] - 456:16, 456:24
**ignores** [1] - 567:7
**ignoring** [1] - 567:16
**image** [6] - 464:16, 468:17, 469:10, 469:18, 470:23, 470:24
**images** [4] - 458:7, 469:19, 472:13, 503:17
**imagine** [2] - 423:11, 590:10
**immediate** [1] - 506:15
**immediately** [7] -

482:10, 482:11, 493:20, 506:14, 506:16, 527:1, 584:7
**imminent** [4] - 488:11, 488:13, 548:14, 560:7
**impact** [7] - 444:19, 445:18, 448:15, 519:24, 519:25, 577:16, 577:18
**impacts** [1] - 486:20
**impeachment** [4] - 534:15, 542:25, 543:4, 543:5
**implementing** [1] - 446:14
**implied** [1] - 471:17
**implies** [1] - 471:18
**important** [32] - 443:3, 443:6, 454:3, 454:20, 455:14, 456:23, 457:9, 457:20, 458:15, 459:8, 459:16, 459:18, 460:13, 463:9, 463:23, 465:6, 465:22, 466:7, 467:15, 467:21, 467:25, 469:5, 470:23, 473:23, 486:1, 490:13, 492:7, 499:11, 504:6, 513:20, 548:8, 560:24
**impose** [1] - 502:24
**impossibility** [1] - 521:23
**impression** [2] - 484:6, 567:25
**impressions** [1] - 468:3
**improper** [1] - 587:22
**improperly** [1] - 484:17
**in-between** [1] - 421:5
**in-depth** [1] - 495:21
**in-person** [1] - 447:11
**inaccurate** [1] - 525:1
**inaudible** [1] - 536:21
**inches** [1] - 459:16
**incident** [3] - 497:11, 548:1, 569:5
**incidents** [1] - 432:2
**incline** [2] - 505:13, 589:4
**include** [6] - 444:21, 456:18, 466:3, 484:14, 523:15, 560:21

**included** [10] - 451:14, 454:9, 456:13, 457:23, 465:25, 480:13, 483:23, 484:3, 484:4, 569:1
**includes** [3] - 453:9, 537:8, 600:10
**including** [4] - 439:1, 477:7, 479:18, 541:10
**inconsistencies** [4] - 496:22, 496:23, 497:3, 497:9
**inconsistent** [2] - 462:3, 496:20
**incorrectly** [1] - 486:9
**increments** [4] - 441:13, 519:6, 520:10, 520:13
**independent** [6] - 439:3, 452:1, 477:9, 537:10, 551:19, 600:15
**INDEX** [1] - 401:1
**index** [1] - 516:10
**indicate** [2] - 474:22, 585:2
**indicated** [18] - 457:17, 461:18, 504:8, 504:11, 506:15, 511:14, 511:16, 520:19, 521:19, 522:1, 522:13, 543:2, 558:15, 579:11, 585:6, 585:10, 585:20, 587:7
**indicates** [3] - 504:2, 522:20, 550:14
**indication** [1] - 504:18
**indiscernible** [3] - 421:13, 512:18, 518:2
**individual** [31] - 400:9, 441:6, 442:12, 443:7, 455:3, 461:18, 491:15, 493:15, 493:24, 506:7, 550:14, 550:24, 551:1, 551:20, 552:2, 552:11, 553:21, 558:21, 561:25, 562:1, 562:6, 567:5, 567:6, 567:7, 568:6, 577:9, 578:16, 587:10, 593:2
**individuals** [10] - 454:15, 466:23, 554:4, 561:13,

561:17, 561:20, 561:23, 571:7, 576:21, 577:11
**individuals'** [1] - 593:4
**induced** [1] - 578:21
**inducing** [3] - 577:13, 577:22, 578:17
**inference** [1] - 536:21
**influence** [2] - 495:12, 559:2
**influenced** [1] - 559:15
**information** [81] - 442:11, 442:17, 451:13, 451:14, 451:23, 451:24, 454:5, 457:22, 459:8, 459:10, 460:13, 461:5, 463:5, 465:9, 466:22, 466:23, 467:1, 472:13, 480:13, 482:1, 484:25, 485:18, 487:23, 491:7, 491:17, 495:11, 496:2, 497:17, 498:13, 498:20, 499:1, 499:5, 499:6, 499:15, 499:21, 501:10, 501:15, 502:15, 503:21, 503:22, 506:5, 513:9, 513:20, 516:20, 516:22, 516:23, 517:14, 517:24, 518:8, 518:19, 519:23, 520:1, 520:3, 520:4, 520:6, 529:22, 530:5, 535:15, 536:1, 536:8, 539:19, 542:23, 543:18, 548:3, 549:5, 551:14, 552:5, 556:25, 557:11, 559:7, 559:22, 568:24, 569:14, 572:22, 573:11, 575:9, 584:12, 586:18, 594:1, 595:1, 602:7
**initial** [2] - 482:9, 506:11
**initiates** [1] - 547:6
**injury** [6] - 448:4, 488:11, 488:13, 548:14, 549:1, 567:19

**inquiry** [1] - 595:12
**inseparable** [1] - 406:20
**inside** [5] - 411:6, 486:15, 511:4, 554:18, 582:24
**Institute** [1] - 445:1
**instruction** [2] - 448:14
**instructions** [4] - 438:25, 477:5, 591:25, 600:8
**instructor** [9] - 444:16, 444:24, 445:8, 445:17, 445:18, 446:1, 446:6, 447:21, 448:16
**instructors** [1] - 448:16
**insult** [1] - 461:23
**intends** [2] - 403:9, 567:19
**intent** [2] - 434:23, 435:8
**intention** [2] - 403:24, 568:2
**interact** [2] - 448:1, 506:8
**Interceptor** [1] - 460:1
**interchangeably** [1] - 587:17
**interesting** [1] - 514:4
**interestingly** [1] - 495:19
**interior** [1] - 480:13
**interject** [2] - 475:21, 571:6
**intermediate** [1] - 444:18
**Internal** [1] - 446:20
**International** [1] - 449:24
**interpersonal** [1] - 447:25
**interpret** [3] - 539:8, 562:10, 562:17
**interpretation** [2] - 457:8, 593:5
**interpreted** [1] - 457:2
**intersecting** [1] - 482:2
**interview** [6] - 579:22, 583:17, 586:5, 594:17, 598:6, 598:10
**interviewed** [2] - 448:22, 594:15
**interviews** [3] - 451:15, 451:16,

575:14
**introduce** [2] - 405:6, 440:24
**introduced** [1] - 602:25
**invade** [1] - 573:8
**invest** [1] - 441:14
**investigated** [5] - 485:4, 489:4, 496:1, 496:3, 499:4
**investigating** [4] - 448:5, 495:14, 497:4, 499:13
**investigation** [16] - 420:5, 439:4, 448:3, 451:18, 452:1, 454:19, 455:14, 463:5, 466:24, 477:9, 496:5, 520:3, 530:15, 537:10, 600:15
**investigations** [8] - 447:7, 447:9, 448:3, 448:5, 495:25, 520:25, 532:13, 594:25
**investigator** [9] - 450:6, 451:25, 464:21, 465:1, 465:10, 497:7, 504:21, 516:21, 593:17
**investigator's** [2] - 464:16, 594:1
**investigators** [1] - 447:7
**invite** [1] - 502:18
**involve** [1] - 592:18
**involved** [14] - 451:24, 454:16, 455:4, 467:2, 481:15, 490:16, 491:3, 491:5, 497:15, 510:19, 530:24, 543:7, 550:15, 559:13
**involvement** [1] - 528:6
**involving** [1] - 445:4
**irrelevant** [1] - 403:12
**isolated** [2] - 595:1, 595:3
**issue** [15] - 404:1, 489:20, 493:8, 493:11, 493:12, 493:13, 494:16, 494:17, 495:18, 514:20, 536:19, 536:20, 543:5, 579:25, 601:21

**issues** [8] - 405:2, 439:4, 439:15, 462:2, 477:10, 537:11, 571:4, 600:16
**itself** [7] - 452:2, 463:23, 464:14, 564:1, 571:18, 578:25, 603:15

---

## J

**jail** [5] - 409:11, 414:24, 415:3, 415:4, 417:13
**January** [2] - 527:14, 527:19
**Jason** [1] - 542:7
**Jeannette** [1] - 419:10
**Jeep** [85] - 457:11, 468:10, 468:13, 468:19, 468:22, 469:16, 469:17, 470:1, 470:2, 470:9, 470:11, 470:14, 470:15, 470:16, 470:24, 470:25, 471:1, 471:2, 471:4, 471:6, 471:7, 471:11, 472:5, 474:8, 474:22, 476:16, 482:13, 483:2, 483:9, 484:12, 488:14, 488:24, 492:3, 492:19, 492:21, 496:16, 503:19, 504:1, 504:8, 506:12, 508:23, 549:12, 566:10, 566:16, 566:25, 574:22, 578:2, 580:1, 581:24, 582:1, 582:9, 583:1, 583:3, 583:10, 583:13, 584:1, 585:5, 585:6, 585:17, 586:1, 586:14, 587:2, 588:4, 588:6, 588:24, 588:25, 589:3, 589:5, 590:18, 591:10, 591:11, 591:16, 592:7, 593:11, 593:12, 597:13, 597:15, 598:22, 598:23, 599:16
**Jeep's** [4] - 470:14, 582:21, 582:23, 599:8

**Jill** [2] - 604:20, 605:7
**job** [6] - 408:3, 446:8, 447:1, 497:13, 530:22, 573:6
**jobs** [1] - 446:22
**Joetown** [1] - 425:9
**John** [4] - 417:13, 417:15, 417:18
**Johnny** [3] - 526:13, 526:14, 542:14
**Jontz** [35] - 400:5, 406:5, 406:8, 407:2, 407:4, 407:7, 409:12, 411:7, 412:3, 412:17, 412:22, 413:5, 413:7, 413:18, 413:25, 414:1, 414:10, 417:17, 417:19, 417:20, 420:11, 420:23, 421:20, 422:2, 422:11, 423:7, 423:18, 426:16, 426:25, 428:5, 434:20, 436:19, 438:5
**Jontz's** [8] - 406:11, 410:18, 412:24, 417:24, 421:4, 421:9, 436:15, 437:20
**Josh** [4] - 529:3, 529:8, 529:18, 530:1
**Judge** [4] - 400:12, 400:13, 436:8, 456:1
**judge** [2] - 532:15
**judged** [1] - 589:17
**judgments** [1] - 490:1
**Judicial** [1] - 605:2
**judo** [1] - 447:24
**July** [1] - 435:23
**jump** [2] - 508:15, 513:4
**jumped** [1] - 422:21
**jumping** [1] - 508:10
**Jupiter** [2] - 445:24, 446:4
**jurors** [8] - 439:2, 440:5, 440:7, 477:7, 537:8, 600:10, 600:11, 601:11
**jury** [94] - 402:21, 403:20, 404:7, 404:9, 404:11, 405:7, 406:3, 406:10, 406:11, 408:21, 409:6, 409:25, 410:20, 411:3, 412:11,

413:13, 413:15, 414:20, 419:9, 420:4, 421:17, 422:14, 439:24, 440:24, 443:16, 444:12, 445:10, 446:21, 450:15, 452:13, 453:11, 453:22, 460:20, 464:4, 473:8, 477:13, 478:9, 478:12, 478:13, 479:6, 479:25, 480:2, 497:23, 502:20, 503:8, 516:14, 516:21, 518:15, 519:1, 519:4, 519:7, 520:9, 520:12, 522:5, 527:24, 533:14, 535:15, 535:16, 536:17, 536:19, 536:23, 536:24, 537:9, 537:16, 537:21, 545:5, 545:6, 546:8, 548:18, 550:22, 551:8, 555:3, 555:23, 556:17, 565:25, 566:1, 566:20, 573:8, 575:22, 579:13, 592:20, 600:5, 600:21, 601:4, 601:5, 601:25, 602:3, 602:7, 602:11, 602:12, 603:3, 603:8, 603:10, 603:13
**Jury** [2] - 400:12, 439:7
**jury's** [3] - 408:19, 575:23, 576:3
**justice** [1] - 558:7
**justified** [6] - 530:3, 548:15, 549:1, 549:12, 556:21, 556:23
**justifies** [2] - 549:3, 551:8
**juvenile** [2] - 524:16, 524:21

**K**

**Kaleb** [16] - 406:20, 406:24, 407:4, 407:7, 407:9, 409:12, 410:23, 410:25, 411:24, 412:17, 413:5,

413:7, 421:25, 422:2, 436:19, 436:20
**Karen** [1] - 526:20
**keep** [7] - 455:23, 479:4, 480:20, 495:8, 495:9, 567:17, 575:9
**keeps** [1] - 567:8
**key** [5] - 458:11, 490:22, 499:8, 503:23, 508:12
**kids** [8] - 407:13, 412:23, 421:20, 423:20, 429:12, 429:15, 432:1, 443:24
**killed** [18] - 410:7, 411:21, 412:4, 412:6, 420:6, 421:7, 421:8, 444:3, 451:4, 508:3, 529:1, 529:2, 529:3, 529:8, 529:16, 530:1, 530:20, 567:3
**kind** [20] - 402:25, 408:1, 408:7, 409:18, 411:17, 422:7, 460:5, 475:6, 480:20, 486:6, 495:9, 505:5, 532:18, 540:24, 550:8, 553:14, 560:18, 561:2, 579:8, 588:2
**kinds** [2] - 427:18, 431:11
**KK** [3] - 422:4, 436:20, 438:2
**Kleeh** [1] - 400:13
**knife** [1] - 554:12
**knowing** [9] - 412:12, 412:13, 462:13, 512:16, 522:2, 522:4, 534:20, 538:16, 601:1
**knowledge** [8] - 441:16, 451:10, 466:14, 479:19, 502:12, 510:16, 538:16, 543:1
**known** [2] - 490:7, 506:5
**knows** [2] - 414:12, 535:12

**L**

**lack** [2] - 481:23, 560:11

**ladies** [7] - 404:13, 440:9, 450:15, 476:25, 479:12, 545:8, 600:5
**Ladies** [1] - 453:22
**lady** [1] - 509:18
**Land** [1] - 563:6
**language** [1] - 540:24
**lapel** [1] - 503:10
**large** [1] - 479:12
**laser** [1] - 456:8
**last** [11] - 409:11, 412:3, 412:5, 414:24, 415:19, 416:11, 433:17, 440:25, 447:3, 522:8, 538:13
**lasted** [1] - 516:1
**laugh** [1] - 406:19
**law** [75] - 402:10, 419:25, 420:3, 420:12, 420:16, 434:20, 434:21, 441:5, 444:21, 445:2, 445:4, 445:14, 446:17, 446:25, 447:7, 447:25, 449:2, 450:9, 450:25, 466:25, 487:10, 489:9, 489:15, 489:18, 489:25, 490:4, 492:7, 493:14, 494:8, 494:9, 495:17, 497:13, 499:10, 514:25, 519:2, 523:13, 524:1, 524:4, 524:8, 524:15, 524:18, 525:3, 525:6, 525:24, 526:5, 530:18, 530:19, 530:23, 531:24, 550:25, 552:16, 552:17, 553:24, 554:3, 554:16, 554:20, 558:21, 558:24, 560:3, 560:7, 560:13, 561:18, 561:19, 561:22, 562:1, 562:25, 563:17, 564:2, 565:6, 569:11, 575:5, 593:19, 594:9, 594:24
**lawfully** [1] - 419:16
**lawsuit** [6] - 420:5, 422:9, 526:4,

527:11, 527:24, 528:10
**lawsuits** [1] - 528:12
**lawyers** [2] - 535:16, 536:16
**lazy** [1] - 408:12
**lead** [5] - 445:17, 445:25, 446:5, 457:10, 496:5
**leading** [3] - 417:12, 427:1, 453:2
**learn** [1] - 409:9
**learned** [1] - 407:23, 479:19, 538:15, 552:10, 565:12
**least** [8] - 423:1, 470:16, 471:21, 494:5, 531:23, 570:1, 570:17, 579:13
**leave** [8] - 413:9, 413:10, 477:21, 485:24, 493:24, 500:12, 537:2, 589:7
**leaves** [4] - 423:17, 508:8, 510:13, 571:12
**leaving** [4] - 403:11, 423:25, 426:10, 530:5
**led** [5] - 490:24, 491:11, 499:16, 529:15, 530:6
**left** [49] - 403:7, 409:2, 411:18, 413:4, 426:2, 426:5, 463:4, 465:25, 467:3, 467:10, 468:12, 468:19, 468:23, 472:21, 473:13, 473:19, 480:23, 491:23, 491:25, 504:9, 505:18, 506:2, 508:6, 513:2, 521:12, 521:15, 522:9, 522:21, 522:22, 524:4, 524:5, 525:23, 538:12, 582:24, 584:20, 584:25, 585:14, 586:9, 587:3, 587:8, 587:11, 588:2, 588:22, 590:22, 591:15, 592:7, 597:14, 599:9, 603:17
**left-hand** [2] - 468:12, 468:19
**left-handed** [1] - 409:2

**Legal** [1] - 400:15
**legal** [1] - 443:12
**legally** [3] - 425:1, 425:4, 425:22
**legs** [1] - 537:13
**LeMaster** [5] - 528:21, 528:24, 529:8, 529:20, 529:25
**LeMaster's** [2] - 529:4, 531:10
**LeMasters'** [1] - 553:20
**length** [8] - 459:17, 459:19, 459:20, 463:14, 485:17, 506:18, 518:10, 532:11
**lengths** [2] - 472:9, 472:10
**less** [8] - 444:19, 460:10, 463:21, 486:20, 504:24, 563:1, 563:10, 563:20
**lethal** [6] - 444:19, 474:23, 487:25, 488:6, 488:8, 489:11
**lethals** [1] - 561:21
**letter** [1] - 449:10
**letters** [2] - 449:7, 458:16
**letting** [1] - 475:23
**level** [5] - 448:14, 450:5, 462:22, 558:8
**Levi** [15] - 408:23, 409:4, 409:8, 409:11, 409:12, 410:3, 410:10, 421:6, 421:9, 422:17, 422:21, 423:8, 423:12, 425:12, 427:7
**Levi's** [1] - 410:3
**liar** [1] - 573:3
**license** [1] - 417:10
**lieutenant** [2] - 467:13, 468:4
**Lieutenant** [31] - 455:13, 458:5, 458:17, 458:21, 459:20, 463:8, 468:16, 470:5, 475:14, 475:18, 476:9, 481:25, 482:7, 485:19, 487:14, 494:25, 495:23, 495:24, 496:9, 503:18, 504:23, 505:7, 516:22, 520:18,

521:3, 521:11, 522:9, 546:25, 547:12, 580:15, 581:5
**life** [23] - 406:11, 410:9, 473:4, 491:1, 493:17, 494:7, 519:25, 520:25, 528:3, 549:5, 549:7, 550:7, 550:13, 550:16, 551:19, 551:24, 559:13, 559:25, 560:2, 560:3, 568:7, 568:21, 580:1
**life-changing** [1] - 494:7
**life-threatening** [1] - 550:13
**light** [3] - 455:16, 491:7, 589:16
**lighting** [1] - 504:14
**lights** [5] - 453:24, 476:4, 479:10, 479:13, 507:16
**likely** [1] - 494:7
**limine** [3] - 534:20, 534:23, 540:2
**limit** [2] - 532:4, 532:21
**limited** [1] - 555:2
**limits** [1] - 469:8
**line** [26] - 430:14, 433:7, 434:5, 458:8, 459:2, 468:11, 469:13, 469:14, 469:18, 469:25, 470:1, 470:2, 470:6, 470:10, 470:11, 470:17, 470:19, 474:15, 491:10, 498:4, 499:23, 530:20, 531:21, 535:8, 543:3, 570:7
**linear** [4] - 457:2, 458:7, 458:12, 469:25
**lines** [7] - 430:16, 433:8, 435:3, 457:16, 458:12, 538:8, 565:3
**list** [6] - 448:10, 451:23, 525:16, 525:17, 525:22, 531:23
**listed** [4] - 442:22, 480:7, 527:3, 528:4
**lit** [3] - 504:15, 509:20, 509:21
**literally** [4] - 410:22,

452:9, 459:6, 508:19
**live** [12] - 405:8, 411:14, 413:2, 417:10, 427:7, 427:10, 436:25, 438:2, 438:4, 443:22, 443:23, 460:9
**lived** [4] - 415:19, 427:8, 429:16, 438:5
**lives** [3] - 410:10, 434:19, 434:20
**living** [7] - 405:10, 415:17, 425:8, 425:12, 425:24, 429:8, 434:10
**LLC** [1] - 542:14
**LLP** [1] - 400:18
**loaded** [2] - 510:25
**local** [2] - 448:24, 449:1
**locate** [1] - 493:4
**located** [11] - 418:1, 468:22, 579:15, 580:2, 580:21, 580:22, 581:1, 581:5, 581:14, 581:15, 582:2
**location** [14] - 457:12, 458:19, 459:10, 465:7, 469:23, 481:8, 482:9, 499:1, 509:15, 576:19, 576:20, 582:21, 582:24, 599:8
**locations** [1] - 466:4
**locked** [1] - 566:2
**lone** [1] - 466:2
**look** [57] - 407:1, 430:12, 434:4, 435:2, 454:9, 454:24, 456:25, 457:10, 458:9, 459:22, 460:16, 463:11, 463:23, 465:2, 465:25, 466:9, 466:18, 467:25, 469:3, 469:16, 469:22, 469:24, 470:1, 470:13, 470:14, 470:15, 470:24, 474:25, 482:19, 485:18, 486:1, 497:7, 497:18, 503:17, 504:6, 518:13, 519:6, 521:24, 527:13, 532:8, 532:18, 547:20, 555:10,

564:22, 565:3, 566:22, 566:23, 571:12, 572:25, 581:25, 582:15, 584:6, 584:7, 598:7, 598:9, 598:15, 598:16
**looked** [4] - 410:5, 468:9, 488:22, 517:22
**looking** [29] - 412:22, 466:11, 467:5, 483:16, 493:1, 497:1, 498:3, 498:7, 498:8, 498:25, 499:8, 499:22, 503:13, 506:3, 520:2, 520:3, 520:25, 539:7, 563:24, 563:25, 578:8, 578:9, 578:12, 583:18, 586:14, 594:13, 599:5
**loose** [1] - 410:19
**lose** [2] - 408:5, 421:22
**losing** [1] - 414:13
**loss** [1] - 413:15
**lost** [10] - 414:9, 414:10, 492:9, 492:19, 546:17, 546:21, 547:15, 581:11, 586:12
**loud** [3] - 510:1, 510:7, 514:19
**loudly** [1] - 510:1
**love** [5] - 410:16, 422:24, 422:25, 424:9, 426:16
**Love** [61] - 451:17, 462:3, 466:17, 471:5, 473:11, 473:18, 474:17, 481:25, 482:21, 490:19, 492:18, 492:20, 494:18, 505:8, 506:12, 511:14, 511:24, 512:5, 512:10, 513:16, 513:17, 521:15, 521:19, 546:15, 546:18, 548:2, 549:18, 550:11, 573:24, 578:1, 578:21, 579:12, 580:21, 581:1, 581:15, 582:6, 582:9, 582:21, 582:23,

583:1, 583:5, 583:10, 583:13, 583:25, 585:2, 585:4, 585:11, 585:23, 585:25, 587:6, 591:20, 595:17, 595:18, 596:6, 596:14, 597:5, 597:12, 598:20, 599:7, 599:15, 601:19
**Love's** [18] - 462:6, 473:9, 473:15, 504:11, 506:15, 556:9, 556:12, 579:9, 583:9, 584:19, 585:6, 589:10, 591:14, 591:18, 598:6, 598:17, 599:2, 599:7
**loved** [7] - 406:18, 407:14, 408:10, 408:24, 409:1, 409:14, 413:19
**lower** [2] - 441:18, 459:14
**luckily** [1] - 504:13
**lucky** [1] - 513:3
**lunch** [4] - 475:24, 476:2, 477:2, 477:18
**lunchtime** [1] - 439:14
**lying** [13] - 422:22, 496:24, 569:23, 572:5, 573:17, 574:13, 575:1, 575:6, 575:13, 594:6, 594:20, 594:21

## M

**ma'am** [23] - 424:17, 425:3, 428:5, 428:17, 433:2, 438:17, 460:21, 519:16, 528:11, 541:7, 545:3, 549:23, 571:23, 574:15, 575:3, 583:23, 584:23, 586:18, 595:11, 598:13, 599:14, 599:18, 599:21
**madam** [1] - 418:13
**Madam** [7] - 404:23, 418:20, 418:25, 440:14, 457:15, 479:14, 503:8
**magazine** [3] - 510:20, 510:23, 510:24

**maintain** [1] - 449:22
**major** [2] - 448:23, 524:20
**male** [2] - 562:5, 562:6
**mall** [1] - 595:2
**man** [7] - 529:1, 529:2, 529:3, 530:9, 530:12, 575:3, 575:25
**maneuvering** [1] - 504:20
**manner** [19] - 471:15, 471:16, 471:25, 476:17, 481:19, 483:10, 494:17, 506:8, 532:4, 532:22, 539:10, 539:13, 541:12, 559:2, 560:19, 567:15, 573:2, 575:19, 581:25
**Mannington** [1] - 521:17
**manuals** [1] - 448:14
**Marion** [4] - 420:14, 425:9, 487:24, 488:7
**mark** [8] - 455:21, 458:23, 485:25, 486:11, 522:9, 522:13, 522:20
**marked** [2] - 458:21, 458:22
**markings** [1] - 459:7
**marks** [16] - 457:2, 457:3, 457:4, 457:7, 457:9, 457:10, 458:5, 460:5, 468:5, 485:20, 510:15, 520:16, 520:18, 520:22, 520:25, 522:5
**married** [11] - 408:13, 408:16, 408:17, 419:16, 419:21, 425:1, 425:4, 425:22, 436:14, 436:16, 438:3
**martial** [1] - 450:4
**Martin** [13] - 446:7, 524:15, 526:13, 527:6, 529:4, 529:8, 529:9, 529:18, 529:19, 530:1, 554:23, 568:13, 568:22
**mask** [2] - 419:5, 503:7
**match** [5] - 467:2, 497:4, 497:5, 498:4, 498:13

**matching** [2] - 470:20, 470:21
**material** [1] - 559:21
**materials** [2] - 441:14, 588:21
**math** [6] - 461:13, 461:15, 461:22, 462:24, 463:13
**mathematic** [1] - 461:9
**mathematical** [1] - 462:23
**matter** [24] - 402:4, 403:11, 407:3, 452:5, 452:9, 459:16, 464:19, 466:16, 488:3, 488:25, 489:12, 490:14, 491:1, 505:7, 509:13, 513:8, 535:17, 538:21, 540:14, 543:10, 543:17, 582:2, 593:13
**matters** [3] - 495:17, 573:12, 592:17
**maximum** [2] - 472:10, 497:20
**mean** [29] - 407:14, 408:24, 411:17, 413:23, 423:9, 423:10, 423:16, 434:25, 437:10, 441:25, 443:4, 461:21, 471:16, 485:4, 495:7, 496:23, 497:3, 497:19, 512:23, 521:24, 535:14, 535:15, 539:16, 550:18, 581:12, 589:12, 593:23, 594:18
**meaning** [2] - 470:25, 483:14
**means** [8] - 450:18, 488:20, 492:11, 506:2, 510:17, 520:20, 575:17, 575:18
**meant** [2] - 431:5, 459:24
**measure** [2] - 465:18, 497:21
**measured** [3] - 463:8, 465:4, 470:12
**measurement** [4] - 459:4, 464:25, 487:14, 518:5
**measurements** [3] -

**458:18, 459:12, 465:21
**measuring** [2] - 465:7, 465:8
**mechanism** [2] - 508:7, 509:12
**media** [1] - 448:24
**medical** [4] - 431:10, 431:15, 432:9, 481:7
**medically** [1] - 493:21
**meet** [8] - 407:3, 420:22, 502:9, 502:22, 513:12, 550:21, 559:17, 571:8
**meeting** [2] - 435:20, 495:1
**member** [1] - 450:2
**members** [3] - 414:7, 495:13, 600:12
**membership** [1] - 449:23
**memorandum** [1] - 543:24
**memorial** [4] - 411:6, 411:8, 421:4, 421:9
**memorialize** [1] - 423:21
**memory** [6] - 448:11, 571:3, 577:10, 577:16, 577:18, 578:16
**men** [1] - 449:14
**mention** [5] - 423:4, 452:3, 470:6, 597:13, 602:16
**mentioned** [10] - 409:5, 450:16, 458:10, 462:21, 493:6, 493:7, 518:14, 520:15, 579:14
**mentions** [1] - 462:1
**merely** [2] - 500:10, 549:4
**message** [1] - 520:6
**messages** [1] - 410:15
**messed** [2] - 407:5, 495:7
**met** [6] - 420:20, 421:2, 436:18, 500:20, 500:21, 502:1
**mic** [2] - 476:3, 503:10
**Micah** [1] - 528:21
**Michael** [1] - 543:11
**Michata** [1] - 526:7
**microphone** [4] - 415:8, 419:4, 440:17, 502:25

**middle** [5] - 456:6, 504:14, 529:5, 529:14, 540:3
**midmorning** [1] - 438:23
**midstream** [1] - 477:16
**might** [10] - 432:2, 442:6, 458:6, 466:8, 484:14, 538:7, 538:24, 539:4, 551:22, 564:8
**mile** [2] - 486:11, 492:20
**miles** [13] - 463:15, 463:17, 485:8, 485:9, 485:12, 485:15, 485:16, 486:3, 486:18, 486:24, 513:24, 522:15, 522:18
**military** [1] - 561:21
**mind** [11] - 404:20, 404:22, 410:4, 440:13, 464:2, 475:23, 483:19, 503:1, 548:9, 561:1, 565:11
**mine** [1] - 573:6
**minimal** [1] - 507:9
**minor** [1] - 529:7
**minute** [7] - 405:18, 421:1, 456:18, 544:3, 557:21, 582:17, 582:18
**minutes** [9] - 438:24, 439:6, 439:17, 439:21, 521:7, 537:3, 537:14, 544:24, 590:11
**mischaracterizing** [1] - 595:25
**misinformation** [1] - 498:11
**misinforming** [1] - 586:23
**mislead** [1] - 582:19
**misleading** [1] - 535:14
**miss** [4] - 410:16, 412:12, 602:2, 602:12
**missed** [1] - 602:17
**missing** [1] - 519:22
**mistake** [1] - 512:19
**misunderstood** [1] - 578:20
**mix** [1] - 568:1
**modified** [1] - 474:3
**mom** [2] - 422:20,

**429:18
**moment** [19] - 406:2, 415:13, 420:6, 458:14, 459:18, 476:18, 490:7, 492:1, 492:2, 492:3, 492:14, 550:24, 551:1, 570:21, 570:22, 580:4, 589:23, 590:7, 594:3
**moments** [1] - 499:25
**mommy** [3] - 422:19, 422:22, 422:24
**Monday** [1] - 589:20
**money** [1] - 407:22
**monitor** [1] - 455:19
**month** [1] - 512:15
**months** [1] - 417:12
**moot** [2] - 553:15, 568:23
**Morgantown** [6] - 400:16, 400:18, 400:19, 400:22, 400:23, 417:14
**morning** [19] - 402:2, 404:14, 417:15, 424:17, 424:18, 438:19, 440:16, 440:22, 440:23, 453:13, 515:16, 589:20, 600:19, 601:9, 602:15, 603:9, 604:14, 604:15, 604:17
**most** [11] - 416:18, 421:19, 441:24, 441:25, 448:3, 454:3, 462:9, 473:2, 494:6, 569:14, 602:7
**mother** [4] - 413:4, 431:21, 433:3
**motion** [38] - 450:12, 473:6, 527:21, 528:1, 528:3, 528:6, 528:8, 528:9, 531:13, 532:1, 532:2, 532:21, 533:2, 533:11, 533:24, 534:12, 534:22, 535:13, 535:20, 535:24, 536:2, 536:3, 536:9, 536:10, 536:12, 536:14, 538:2, 540:2, 540:17, 541:5, 541:20, 542:16, 542:23, 543:1, 543:2, 543:17, 543:23
**motions** [14] - 533:17,

533:19, 533:22, 534:20, 535:11, 535:17, 535:18, 538:2, 543:20, 544:9, 601:8, 601:10, 601:13, 603:2
**motor** [1] - 578:13
**motorcycles** [1] - 409:19
**Mountain** [2] - 443:18, 443:20
**Mountains** [1] - 443:23
**mouth** [3] - 510:6, 525:8, 557:8
**move** [14] - 426:12, 440:2, 443:14, 450:7, 463:9, 463:11, 463:24, 467:7, 468:15, 486:14, 503:15, 510:22, 511:5, 511:10
**moved** [8] - 414:2, 426:5, 443:20, 468:16, 483:1, 496:16, 496:18, 511:4
**movement** [23] - 471:11, 485:22, 487:5, 498:1, 522:14, 522:20, 562:14, 562:17, 562:18, 562:20, 562:22, 566:21, 578:10, 578:14, 582:7, 583:1, 583:3, 597:19, 597:21, 598:21, 598:23, 599:16
**movements** [2] - 522:21, 566:17
**moving** [48] - 457:6, 460:7, 471:19, 471:20, 471:21, 471:22, 472:17, 472:22, 472:24, 472:25, 473:4, 475:2, 475:4, 476:14, 482:13, 482:18, 482:19, 482:23, 483:10, 485:7, 486:13, 486:18, 488:24, 489:1, 498:2, 506:16, 511:3, 511:25, 512:10, 512:13, 512:21, 512:24, 513:1,

557:13, 561:7, 561:9, 567:8, 574:22, 581:24, 582:1, 582:10, 583:10, 583:13, 592:2, 592:6, 597:13, 603:13
**MR** [72] - 402:9, 402:15, 402:20, 402:24, 403:5, 404:2, 404:5, 404:8, 404:18, 405:5, 414:18, 414:21, 415:3, 415:10, 416:20, 416:24, 417:3, 418:6, 418:8, 418:10, 418:17, 418:22, 419:8, 436:8, 436:11, 438:12, 439:11, 439:13, 439:17, 439:25, 440:12, 440:21, 450:7, 450:23, 454:1, 461:11, 462:1, 462:13, 463:3, 475:25, 476:5, 476:7, 476:20, 476:23, 478:1, 478:10, 478:19, 478:23, 479:1, 479:16, 489:7, 503:2, 511:11, 511:13, 512:8, 514:6, 535:7, 535:22, 544:21, 590:10, 590:14, 595:9, 595:24, 596:22, 597:3, 597:24, 599:25, 600:25, 601:6, 602:22, 603:19, 603:25
**MS** [88] - 403:23, 424:14, 424:16, 424:24, 430:4, 430:10, 430:16, 430:18, 436:3, 436:6, 438:15, 439:20, 440:1, 440:4, 450:11, 460:18, 460:22, 478:3, 478:11, 514:9, 514:11, 514:19, 514:22, 516:6, 516:8, 526:16, 526:18, 528:14, 528:17, 533:16, 533:25, 534:6, 534:10, 534:14, 534:18,

534:24, 535:23, 536:1, 536:7, 536:12, 537:23, 537:24, 539:16, 539:22, 539:24, 541:25, 542:3, 542:6, 542:12, 543:8, 543:15, 543:18, 543:22, 544:2, 544:6, 544:11, 544:17, 544:23, 545:4, 545:11, 545:12, 545:15, 545:17, 564:19, 564:21, 565:17, 565:21, 572:15, 572:16, 576:5, 576:6, 580:11, 580:13, 581:19, 581:21, 589:23, 589:25, 590:5, 595:12, 595:15, 596:4, 596:19, 598:1, 598:3, 599:22, 601:16, 604:2, 604:10
**mud** [7] - 468:5, 485:11, 485:20, 485:21, 520:16, 520:18
**muddied** [1] - 584:15
**multiple** [6] - 436:23, 462:3, 498:1, 498:2, 572:24, 585:18
**multitude** [1] - 493:17
**Muncie** [1] - 554:1
**must** [3] - 466:17, 527:10, 578:20

---

# N

**name** [14] - 405:8, 419:9, 425:6, 433:23, 440:25, 527:5, 527:8, 529:17, 542:9, 542:11, 544:10, 554:6, 554:9
**named** [3] - 417:21, 446:19, 527:7
**names** [1] - 482:4
**nanny** [2] - 406:16
**narrative** [2] - 456:10, 457:16
**Nathan** [1] - 400:21
**national** [2] - 448:23, 450:5
**National** [1] - 450:1
**national-level** [1] -

450:5
**natural** [1] - 497:5
**near** [1] - 557:25
**nearest** [1] - 463:19
**necessarily** [3] - 434:25, 570:16, 589:14
**necessary** [3] - 402:18, 488:9, 545:16
**need** [27] - 402:22, 421:1, 432:2, 439:15, 439:19, 439:23, 443:12, 453:23, 461:2, 464:15, 474:6, 474:9, 477:24, 478:8, 484:16, 497:3, 539:13, 539:21, 544:19, 550:7, 550:20, 561:2, 563:8, 601:4, 601:12, 603:23, 604:3
**needed** [3] - 429:19, 457:22, 566:11
**needs** [8] - 411:3, 442:14, 483:24, 484:18, 489:4, 496:2, 552:7, 563:10
**negate** [1] - 473:5
**negative** [10] - 474:24, 474:25, 475:9, 475:11, 476:9, 476:12, 495:8, 556:23, 601:25
**negatively** [3] - 486:20, 519:24, 519:25
**negativity** [1] - 496:9
**negotiate** [1] - 474:15
**neighbors** [1] - 411:13
**neutral** [2] - 474:22, 488:22
**neutralize** [1] - 560:18
**neutralizing** [1] - 560:21
**never** [46] - 410:6, 413:9, 417:23, 420:1, 422:4, 426:5, 426:13, 426:25, 428:10, 428:13, 428:14, 428:15, 431:17, 431:22, 431:24, 432:15, 432:20, 432:22, 458:10, 470:12, 484:10, 485:4, 495:24, 517:17, 519:9, 522:1,

450:5
**natural** [1] - 497:5
523:12, 523:15, 523:23, 523:24, 523:25, 525:9, 525:11, 525:22, 527:7, 527:11, 528:3, 528:6, 557:6, 557:8, 558:10, 558:16, 581:14, 583:5
**new** [1] - 457:22
**news** [2] - 448:24
**next** [15] - 402:18, 404:17, 418:15, 418:17, 418:21, 439:10, 440:11, 459:11, 459:21, 477:18, 479:5, 480:22, 482:22, 525:18, 576:4
**nice** [2] - 402:13, 406:23
**night** [4] - 416:17, 434:21, 529:5, 529:14
**nine** [3] - 410:7, 421:8, 509:15
**NO** [1] - 400:4
**Noble** [7] - 543:11, 564:15, 564:23, 571:19, 573:5, 575:14, 594:14
**NOBLE** [1] - 543:11
**noble** [2] - 544:11, 571:21
**nobody** [1] - 499:1
**non** [3] - 404:1, 561:21, 575:20
**non-issue** [1] - 404:1
**non-lethals** [1] - 561:21
**non-offensive** [1] - 575:20
**none** [6] - 476:19, 547:24, 547:25, 548:4, 548:5, 550:17
**nonexistent** [1] - 604:13
**nonexpert** [1] - 450:19
**nootin'** [2] - 406:16
**normal** [1] - 454:22
**normally** [2] - 509:24, 519:17
**NORTHERN** [1] - 400:2
**Northern** [2] - 604:22, 605:8
**note** [3] - 413:4, 556:8, 604:2
**noted** [2] - 544:15, 583:25

**nothing** [21] - 404:5, 404:8, 418:6, 420:15, 420:19, 420:20, 439:20, 478:1, 492:5, 494:14, 505:24, 506:6, 532:16, 532:17, 544:21, 549:17, 549:24, 550:11, 580:4, 599:25, 604:16
**notice** [9] - 456:6, 456:17, 458:4, 459:1, 459:11, 464:22, 470:9, 527:17, 527:25
**notified** [1] - 521:8
**number** [9] - 430:14, 444:16, 459:21, 462:1, 463:19, 527:2, 531:6, 534:24, 553:2
**Number** [1] - 602:18
**numbered** [1] - 433:8
**numbers** [3] - 463:18, 463:19, 465:21

## O

**o'clock** [1] - 466:1
**O-r-r** [1] - 569:17
**oath** [10] - 429:21, 430:1, 431:2, 433:15, 478:21, 514:17, 514:23, 515:13, 533:18, 534:7
**object** [6] - 506:19, 507:4, 509:7, 535:7, 595:24
**objection** [13] - 402:6, 450:10, 450:11, 450:13, 462:19, 462:25, 542:20, 542:21, 544:15, 602:19, 602:22, 602:25
**objective** [7] - 498:15, 498:25, 499:17, 499:18, 500:2, 500:8, 574:8
**objectively** [24] - 444:3, 451:4, 451:8, 488:19, 491:13, 497:11, 501:18, 501:19, 530:8, 530:10, 530:14, 534:25, 548:11, 549:9, 551:3, 557:12, 569:4,

572:19, 573:22, 574:7, 589:12, 592:21, 592:25, 593:14
**obligated** [1] - 538:19
**obligation** [2] - 420:14, 497:17
**obscured** [1] - 492:5
**observation** [1] - 490:6
**observations** [5] - 483:3, 483:7, 486:15, 501:13, 513:7
**observed** [1] - 482:13
**obstruct** [1] - 508:20
**obstruction** [2] - 510:4, 588:12
**obstructions** [1] - 453:9
**obtain** [2] - 454:14, 590:5
**obtained** [1] - 461:12
**obvious** [1] - 463:22
**obviously** [10] - 447:2, 462:21, 462:24, 468:2, 468:10, 472:22, 558:2, 601:23, 602:1, 603:11
**OC** [2] - 444:19, 448:16
**occupant** [2] - 483:4, 483:7
**occur** [2] - 510:24, 563:1
**occurred** [7] - 462:4, 486:21, 573:15, 573:20, 576:15, 578:22, 581:23
**occurring** [3] - 574:13, 577:23, 578:19
**OF** [1] - 400:2
**offender** [2] - 524:16, 524:21
**offensive** [1] - 575:20
**offer** [2] - 532:16, 532:17
**offered** [1] - 428:14
**Office** [3] - 446:7, 524:15, 527:6
**office** [4] - 435:20, 527:11, 528:5, 528:12
**officer** [49] - 444:9, 444:10, 445:8, 445:20, 449:6, 454:25, 455:1, 465:24, 487:13,

490:7, 490:18, 493:23, 494:9, 502:1, 502:9, 502:22, 507:3, 508:1, 512:16, 513:12, 521:18, 530:23, 535:2, 535:23, 548:12, 548:20, 551:1, 552:16, 553:7, 553:10, 553:12, 555:19, 560:7, 560:9, 560:16, 562:2, 562:5, 563:8, 563:18, 564:8, 565:6, 567:2, 569:11, 574:19, 589:18, 592:21, 592:25, 594:5, 594:9
**Officer** [2] - 480:11, 571:20
**officer's** [2] - 552:18, 560:14
**officers** [37] - 448:21, 449:15, 450:9, 467:17, 487:10, 490:15, 490:23, 492:8, 493:8, 500:14, 512:14, 524:1, 530:18, 530:19, 530:23, 550:15, 552:24, 553:25, 554:3, 554:16, 554:21, 558:21, 558:25, 559:13, 559:18, 561:18, 562:25, 563:2, 572:4, 573:4, 573:15, 573:16, 575:5, 592:18, 593:3, 593:20, 595:6
**Official** [2] - 604:21, 605:8
**official** [2] - 400:9, 602:20
**officially** [1] - 602:16
**often** [5] - 409:23, 421:23, 437:11, 499:10, 535:17
**old** [10] - 409:9, 409:10, 410:7, 412:17, 413:21, 413:22, 414:4, 421:6, 436:18, 456:4
**oldest** [1] - 408:23
**omitted** [1] - 597:19
**once** [10] - 446:18, 449:15, 482:8, 484:3, 509:2, 522:17, 525:6,

526:6, 577:8, 603:17
**one** [115] - 403:14, 407:4, 407:19, 407:20, 408:3, 408:23, 409:19, 410:2, 410:4, 412:21, 414:9, 423:22, 423:25, 426:9, 427:14, 427:22, 427:24, 431:6, 431:14, 432:8, 446:10, 449:8, 453:5, 454:3, 455:10, 455:18, 456:25, 457:20, 458:14, 459:14, 464:16, 464:20, 466:11, 467:15, 467:22, 469:11, 470:3, 470:4, 477:18, 485:6, 485:10, 490:13, 490:21, 491:16, 494:5, 495:10, 496:20, 498:11, 501:2, 501:4, 503:11, 503:12, 505:6, 511:2, 515:15, 517:25, 518:17, 519:19, 520:15, 521:3, 522:8, 527:14, 528:20, 531:15, 531:16, 531:21, 532:10, 532:11, 532:20, 533:4, 533:6, 534:5, 534:24, 537:25, 541:22, 543:8, 544:3, 546:14, 546:24, 549:5, 551:8, 553:7, 555:10, 557:15, 557:16, 558:17, 560:23, 562:21, 563:9, 566:7, 569:17, 570:12, 572:6, 572:10, 572:17, 573:25, 576:1, 576:19, 578:5, 578:9, 578:12, 579:11, 582:17, 585:20, 585:21, 592:12, 593:24, 594:3, 595:12, 601:15, 601:21, 602:16
**ones** [3] - 409:20, 449:9, 466:18
**online** [8] - 447:5, 447:6, 447:8,

447:12, 541:9, 558:13, 559:6, 559:19
**open** [24] - 402:1, 404:12, 415:6, 439:7, 440:8, 443:4, 444:18, 447:23, 463:2, 468:12, 478:14, 506:2, 507:9, 507:15, 508:8, 510:12, 510:14, 511:8, 529:20, 537:1, 537:17, 545:7, 567:24, 600:22
**opened** [2] - 414:24, 414:25
**opening** [7] - 468:12, 468:18, 508:21, 579:1, 591:15, 592:6, 597:14
**operator** [1] - 507:24
**opinion** [41] - 441:21, 442:13, 442:15, 442:17, 442:19, 442:25, 443:1, 443:15, 444:1, 444:6, 444:7, 451:1, 451:6, 451:7, 451:9, 451:13, 452:5, 462:7, 462:24, 463:10, 464:8, 464:18, 466:7, 466:13, 467:4, 467:15, 475:19, 481:13, 484:17, 487:18, 487:23, 488:2, 488:15, 488:18, 491:12, 497:10, 498:16, 500:4, 500:6, 500:11, 501:14, 501:16, 501:23, 501:24, 502:5, 502:6, 502:7, 502:13, 502:16, 513:8, 513:11, 518:2, 520:1, 520:7, 520:20, 530:6, 534:25, 546:10, 556:22, 557:11, 568:15, 568:23, 569:2, 569:3, 569:5, 569:9, 569:22, 570:8, 570:12, 571:19, 571:24, 572:9, 572:18, 572:21, 574:6, 574:22, 574:24, 592:9, 594:6

**opinions** [26] - 450:19, 450:20, 451:11, 452:8, 452:10, 455:7, 499:16, 501:9, 517:16, 517:17, 517:25, 542:17, 544:9, 546:25, 555:8, 556:8, 556:16, 557:18, 557:22, 569:17, 570:13, 572:6, 574:5, 575:11, 584:14, 594:7
**opportunity** [17] - 408:15, 408:20, 445:16, 446:15, 452:4, 454:11, 466:21, 479:23, 481:15, 487:9, 494:6, 495:15, 500:3, 517:20, 559:17, 565:15, 571:12
**opposing** [1] - 533:9
**opposition** [1] - 543:2
**option** [1] - 555:23
**options** [1] - 560:23
**oral** [1] - 525:14
**oranges** [1] - 568:1
**order** [8] - 415:2, 517:1, 517:15, 517:22, 518:16, 519:7, 519:20, 519:21
**orders** [1] - 560:14
**organization** [1] - 450:4
**organizations** [1] - 449:20
**original** [3] - 529:12, 529:13, 584:7
**originally** [4] - 443:19, 447:2, 506:14, 587:12
**Orlando** [2] - 542:7, 542:8
**Orr** [9] - 569:16, 569:21, 570:12, 570:19, 570:23, 570:25, 571:14, 571:16, 571:17
**otherwise** [2] - 474:14, 555:23
**outcome** [2] - 558:11, 559:3
**outdoor** [1] - 563:21
**outlets** [1] - 448:24
**outset** [1] - 419:11
**outside** [12] - 414:20, 460:20, 467:9, 477:17, 497:14, 533:14, 536:24, 537:9, 537:20, 538:16, 577:8, 603:12
**over-brush** [1] - 460:4
**overall** [4] - 480:6, 480:11, 584:14, 601:15
**overgrowth** [2] - 485:11, 589:2
**overnight** [1] - 416:9
**overruled** [2] - 462:25, 596:2
**oversimplifying** [1] - 566:13
**own** [9] - 407:21, 408:10, 435:15, 448:17, 449:13, 477:18, 512:11, 559:9

---

**P**

**p.m** [11] - 477:13, 478:7, 480:7, 516:2, 537:16, 545:1, 545:6, 600:21, 604:18
**PA** [2] - 509:25, 510:9
**pace** [2] - 473:3, 512:3
**page** [22] - 430:14, 430:16, 433:7, 434:5, 435:3, 527:13, 531:19, 531:21, 532:8, 532:18, 538:8, 564:22, 565:3, 570:5, 570:10, 581:7, 581:9, 582:15, 585:7, 599:2, 599:7, 599:10
**pages** [3] - 516:2, 516:11, 517:13
**paid** [4] - 407:21, 429:15, 441:9, 554:25
**pair** [1] - 436:16
**pairing** [1] - 470:5
**Palm** [1] - 446:18
**papers** [1] - 420:23
**paragraph** [3] - 582:18, 582:19, 582:20
**paraphrasing** [1] - 501:5
**pardon** [2] - 408:14, 412:8
**parent** [2] - 432:15, 432:17
**parents** [2] - 411:5, 413:19
**park** [1] - 512:2
**parked** [9] - 491:23, 504:8, 584:25, 585:14, 585:19, 586:9, 587:2, 587:12, 591:11
**Parked** [1] - 590:18
**Parker** [3] - 402:6, 402:11, 402:13
**Parrish** [2] - 482:3, 482:4
**part** [23] - 446:17, 449:19, 461:4, 466:12, 480:15, 494:15, 507:1, 530:22, 538:12, 538:18, 538:22, 540:8, 550:5, 550:9, 554:14, 561:3, 579:11, 580:19, 583:8, 601:19, 602:24, 604:12
**part-time** [1] - 446:17
**partially** [1] - 510:25
**partially-loaded** [1] - 510:25
**participate** [2] - 490:20, 525:13
**participated** [2] - 452:23, 558:13
**participation** [2] - 449:18, 543:1
**particular** [8] - 466:16, 467:16, 490:14, 540:13, 551:14, 558:8, 571:18, 573:12
**particularly** [1] - 477:19
**parties** [6] - 451:21, 466:14, 472:13, 543:6, 569:19, 570:14
**partly** [1] - 515:16
**partner** [1] - 512:18
**pass** [2] - 476:3, 492:21
**passed** [1] - 468:5
**passenger** [4] - 470:25, 483:20, 484:12, 577:3
**passing** [1] - 427:2
**passionate** [1] - 491:4
**past** [2] - 414:22, 565:16
**path** [5] - 459:5, 491:11, 522:7, 522:13, 545:23
**pathologist** [1] - 575:16
**patience** [2] - 404:15, 600:18
**patrol** [18] - 445:19, 446:9, 468:11, 503:20, 504:2, 504:19, 504:24, 505:19, 506:4, 507:3, 512:1, 512:2, 512:4, 513:2, 522:22, 524:23, 578:7, 583:5
**Paul** [3] - 542:6, 542:7
**pause** [5] - 418:25, 482:12, 482:13, 484:4, 486:13
**paused** [2] - 484:5, 484:7
**pausing** [2] - 404:23, 440:14
**pay** [1] - 429:16
**paycheck** [1] - 408:4
**pending** [2] - 402:6, 430:9
**people** [28] - 406:19, 408:3, 411:12, 421:19, 448:1, 452:23, 454:18, 455:2, 467:2, 481:15, 493:17, 494:7, 495:4, 495:6, 495:14, 499:6, 552:24, 558:23, 561:15, 570:16, 571:2, 571:6, 575:12, 575:21, 576:10, 595:3
**people's** [2] - 554:6, 592:13
**pepper** [1] - 444:20
**per** [3] - 407:22, 441:13, 483:15
**perceive** [4] - 563:2, 563:18, 565:6, 566:10
**perceived** [2] - 466:19, 589:9
**perceiving** [1] - 582:1
**percent** [2] - 500:11, 500:12
**perception** [15] - 487:22, 548:8, 548:11, 548:13, 548:16, 548:17, 548:19, 548:22, 548:23, 548:24, 549:11, 549:14, 565:12, 576:8, 602:1
**perfectly** [1] - 485:24
**performance** [19] - 452:13, 452:14, 452:15, 452:17, 452:21, 452:25, 453:1, 453:9, 454:9, 466:4, 466:18, 466:20, 468:7, 469:8, 481:14, 497:20, 498:4, 515:17, 516:12
**performed** [1] - 454:19
**peril** [1] - 548:14
**period** [7] - 427:13, 427:22, 454:12, 494:4, 564:7, 566:18, 577:19
**periods** [1] - 454:24
**Perkins** [1] - 542:7
**permission** [1] - 600:11
**permitted** [3] - 450:18, 450:20, 488:8
**perpendicular** [1] - 458:7
**Perry** [1] - 554:4
**person** [28] - 441:21, 441:22, 442:20, 443:12, 447:11, 454:21, 493:20, 494:8, 495:10, 495:11, 501:3, 508:12, 508:13, 508:18, 509:14, 532:16, 550:25, 552:6, 560:17, 567:9, 567:18, 567:25, 576:14, 576:15, 576:19, 576:20, 577:22, 578:18
**person's** [4] - 576:16, 577:14, 577:16, 577:18
**Personal** [1] - 400:5
**personal** [2] - 542:13, 602:6
**personally** [2] - 494:2, 558:12
**personnel** [3] - 491:2, 491:5, 497:15
**perspective** [7] - 402:23, 488:22, 496:24, 496:25, 565:14, 577:6, 589:18
**Philip** [40] - 400:5, 403:5, 406:7, 406:8, 407:10, 407:25,

408:7, 409:3, 409:6,
409:17, 410:2,
411:7, 412:13,
413:10, 415:22,
415:25, 416:6,
416:8, 416:10,
416:14, 416:15,
417:6, 417:7,
419:13, 420:19,
421:6, 421:8,
422:18, 423:6,
424:8, 425:12,
425:22, 427:6,
429:4, 432:3, 432:8,
432:22, 435:14,
444:3, 451:4
**Philip's** [8] - 408:21,
409:25, 410:21,
419:24, 421:11,
422:15, 423:21,
437:18
**phone** [4] - 426:25,
432:23, 433:3, 442:1
**phonetic** [6] - 526:7,
528:22, 553:25,
554:1, 554:4, 554:5
**photograph** [10] -
467:25, 468:9,
469:3, 469:14,
470:21, 474:12,
520:16, 521:2,
521:12, 522:10
**photographs** [10] -
451:21, 454:18,
456:14, 458:11,
458:12, 464:3,
472:24, 485:19,
491:16, 602:19
**photos** [6] - 453:5,
453:16, 471:10,
473:8, 473:9, 473:11
**physical** [26] - 464:1,
467:3, 469:5,
471:13, 472:14,
475:3, 481:17,
488:21, 491:8,
491:9, 497:18,
498:6, 498:8,
498:13, 498:15,
498:22, 499:18,
499:22, 500:2,
500:8, 501:11,
557:18, 571:8,
573:25, 574:3,
574:21
**physically** [1] - 490:19
**physiological** [3] -
493:18, 493:21,
577:15
**pick** [5] - 509:14,

509:15, 525:17,
557:15
**picked** [3] - 407:4,
586:20
**picture** [6] - 464:1,
464:11, 467:4,
467:6, 468:4, 499:15
**pictures** [8] - 456:18,
464:5, 465:15,
466:5, 467:5,
470:13, 471:8, 506:1
**piece** [8] - 466:11,
469:5, 491:16,
513:20, 518:17,
559:6, 593:18,
593:23
**pieces** [3] - 467:22,
519:20, 519:22
**pipe** [10] - 456:14,
456:22, 466:2,
469:4, 470:1,
474:11, 474:14,
474:15, 504:4,
588:21
**piping** [2] - 465:17,
504:3
**place** [27] - 408:25,
425:9, 445:6,
452:16, 452:19,
452:22, 454:10,
454:12, 458:24,
463:6, 464:9,
466:20, 466:22,
479:23, 481:5,
481:10, 486:20,
487:6, 489:5, 498:5,
513:18, 522:3,
538:15, 548:9,
566:14, 571:21,
578:8
**placed** [3] - 530:18,
539:1, 559:18
**placement** [3] - 458:8,
469:10, 475:4
**places** [1] - 551:2
**placing** [1] - 524:21
**plaintiff** [10] - 404:18,
418:22, 440:12,
527:2, 531:12,
531:24, 541:25,
601:11, 602:17,
603:5
**Plaintiff** [2] - 400:7,
400:15
**plaintiff's** [7] - 402:22,
543:25, 544:3,
544:6, 601:17,
602:24, 603:1
**PLAINTIFF'S** [3] -
404:19, 419:2,

440:15
**plan** [1] - 402:4
**planning** [4] - 590:8,
600:23, 603:7,
603:13
**play** [5] - 408:25,
409:8, 409:9,
409:12, 409:13
**played** [3] - 406:21,
406:23, 520:12
**playing** [4] - 409:5,
409:6, 409:15, 410:4
**pleasant** [2] - 600:20,
604:16
**plenty** [1] - 520:3
**PLLC** [2] - 400:15,
400:22
**plumbing** [1] - 465:17
**plural** [1] - 585:16
**plus** [1] - 488:25
**Poe** [1] - 400:22
**point** [71] - 404:16,
405:16, 426:6,
426:14, 427:5,
427:10, 427:23,
432:3, 434:11,
435:13, 435:25,
439:19, 455:15,
456:11, 457:17,
458:11, 458:17,
461:8, 462:25,
465:8, 465:12,
467:9, 467:11,
467:14, 469:16,
474:3, 474:4, 474:6,
474:9, 475:22,
476:19, 476:25,
477:4, 477:25,
485:13, 493:25,
496:19, 497:8,
498:2, 504:9,
504:18, 504:24,
505:4, 505:10,
505:17, 517:10,
519:11, 529:21,
530:2, 537:13,
539:5, 544:20,
546:10, 553:15,
568:23, 578:2,
578:22, 582:10,
582:20, 583:11,
586:25, 588:16,
588:19, 588:20,
589:25, 591:3,
592:1, 600:7, 603:23
**pointed** [4] - 458:5,
471:1, 581:3, 593:5
**pointer** [1] - 469:22
**pointing** [2] - 474:1,
483:1

**points** [3] - 465:6,
465:18, 505:11
**Police** [16] - 445:15,
445:20, 445:24,
446:5, 446:18,
449:9, 449:24,
451:18, 460:1,
523:16, 523:21,
523:23, 547:4,
547:13, 547:19,
547:23
**police** [28] - 420:13,
444:9, 445:7, 449:6,
509:11, 512:16,
521:17, 523:19,
547:8, 552:23,
553:10, 560:16,
562:5, 570:24,
570:25, 573:4,
589:18, 592:18,
593:22, 593:25,
594:12, 594:15,
594:16, 594:18,
594:19, 595:20
**policing** [1] - 449:19
**policy** [8] - 487:25,
488:2, 488:5, 488:7,
488:17, 488:20,
488:25, 554:20
**polite** [1] - 569:14
**politely** [1] - 571:10
**politically** [2] - 525:8,
575:20
**poor** [4] - 501:25,
502:8, 502:21,
513:12
**poorly** [1] - 504:15
**porch** [3] - 413:19,
413:20, 413:21
**portion** [1] - 464:9
**pose** [1] - 559:2
**posed** [1] - 480:23
**posing** [1] - 480:25
**position** [19] - 465:23,
466:1, 468:17,
468:25, 503:19,
503:20, 505:23,
506:18, 507:14,
509:22, 510:3,
510:21, 510:23,
525:19, 553:7,
555:19, 575:16,
576:16, 578:12
**positioned** [1] - 509:5
**positions** [5] - 452:10,
524:24, 524:25,
559:18, 575:15
**possibility** [3] -
472:11, 481:20,
555:22

**possible** [11] - 462:8,
468:15, 486:25,
487:13, 522:19,
533:23, 563:14,
566:7, 571:22,
578:22, 578:24
**possibly** [1] - 448:10
**post** [1] - 494:21
**potential** [4] - 469:20,
507:17, 507:18,
551:21
**potentially** [4] - 483:5,
486:6, 507:13,
510:12
**Powell** [6] - 433:23,
433:25, 434:10,
434:11, 434:12,
434:13
**PowerPoint** [3] -
455:25, 456:3, 456:4
**preceded** [1] - 480:15
**preface** [1] - 495:23
**preferred** [1] - 564:9
**premise** [2] - 442:9,
443:10
**preparation** [1] -
555:7
**prepare** [3] - 406:25,
453:11, 479:24
**prepared** [6] - 411:16,
444:1, 479:6,
501:23, 516:23,
583:20
**prescribed** [1] - 605:2
**presence** [6] - 402:18,
536:19, 536:24,
537:20, 601:5,
603:13
**present** [9] - 429:24,
442:4, 453:10,
454:7, 456:19,
511:7, 584:12,
595:7, 602:8
**presentation** [1] -
562:7
**presented** [29] -
442:9, 442:12,
443:6, 455:8,
456:21, 462:15,
466:10, 471:24,
479:17, 480:4,
480:9, 488:23,
490:11, 491:8,
491:15, 498:20,
500:13, 503:18,
517:21, 518:25,
552:12, 563:8,
563:14, 563:15,
563:17, 566:15,
568:25, 569:13,

574:3
**presents** [1] - 564:1
**pressed** [1] - 469:13
**presumably** [1] -
492:24
**presume** [2] - 484:13,
539:10
**pretty** [8] - 441:16,
441:19, 483:16,
485:9, 497:22,
532:17, 548:19,
594:11
**prevent** [1] - 505:24
**previously** [1] -
528:18
**primarily** [3] - 441:4,
445:18, 447:11
**primary** [2] - 416:5,
496:7
**Prince** [4] - 400:17,
489:7, 502:24, 511:9
**PRINCE** [2] - 503:2,
511:11
**principle** [1] - 566:15
**prison** [1] - 527:10
**private** [4] - 494:12,
550:25, 561:19,
561:22
**probability** [1] -
481:19
**problem** [9] - 457:13,
458:25, 491:10,
494:23, 495:2,
498:25, 550:16,
551:25, 602:6
**problems** [1] - 463:25
**procedure** [1] - 554:20
**proceed** [14] - 404:16,
415:7, 419:6,
424:19, 440:19,
450:22, 453:25,
476:6, 478:22,
537:22, 545:12,
545:10, 590:12,
603:5
**proceedings** [1] -
604:24
**Proceedings** [4] -
400:12, 400:25,
402:1, 604:18
**process** [4] - 441:25,
491:19, 525:14,
586:8
**produced** [1] - 400:25
**profession** [2] - 441:2,
441:4
**Professional** [1] -
604:20
**professional** [8] -
442:23, 447:7,

449:20, 449:23,
450:6, 451:24,
464:21, 520:2
**proficient** [2] - 483:13,
563:9
**program** [3] - 447:10,
447:22, 448:5
**programming** [1] -
449:1
**programs** [3] - 447:5,
447:10, 448:14
**progress** [1] - 463:20
**progresses** [1] -
541:11
**prohibits** [1] - 488:25
**promise** [2] - 420:18,
420:24, 423:1
**promote** [1] - 525:18
**promoted** [3] -
524:19, 525:9,
525:11
**promotion** [3] - 525:1,
525:10, 525:13
**promotions** [1] -
525:23
**prompted** [1] - 542:20
**proper** [4] - 510:8,
510:11, 517:22,
573:12
**property** [6] - 418:1,
436:23, 437:1,
437:5, 437:17, 438:7
**proposed** [1] - 603:8
**protect** [3] - 488:10,
507:16, 552:8
**protection** [4] - 507:7,
509:23, 510:4, 511:7
**proud** [1] - 450:1
**prove** [8] - 474:25,
475:11, 476:9,
476:12, 500:9,
542:25, 594:19,
594:20
**provide** [13] - 441:7,
442:19, 447:6,
453:15, 455:5,
457:5, 495:16,
523:13, 523:20,
523:25, 524:1,
539:12, 548:3
**provided** [40] -
415:13, 428:10,
428:14, 441:21,
442:10, 451:14,
451:22, 451:23,
451:24, 461:4,
463:5, 466:22,
467:1, 480:5,
482:10, 484:25,
485:19, 499:6,

499:15, 501:10,
503:22, 517:1,
519:20, 519:23,
523:15, 556:17,
557:3, 558:19,
561:13, 561:16,
569:14, 570:15,
571:20, 571:25,
572:22, 573:11,
573:24, 585:18,
593:16, 604:11
**provides** [2] - 509:22,
577:9
**providing** [8] - 428:3,
445:2, 452:4,
464:18, 466:19,
509:7, 567:2, 588:14
**province** [1] - 573:8
**proving** [1] - 475:9
**proximity** [1] - 560:8
**psychological** [2] -
493:18, 577:15
**published** [6] -
448:19, 520:4,
559:10, 559:11,
559:21, 559:24
**pull** [3] - 510:20,
540:9, 540:23
**pulled** [15] - 414:1,
473:10, 473:16,
504:15, 504:17,
505:18, 582:25,
583:14, 584:1,
584:21, 590:21,
591:1, 591:6, 599:9,
599:19
**Pullin** [1] - 400:22
**pulling** [3] - 509:2,
541:17, 591:2
**pulls** [1] - 509:21
**purposes** [2] - 590:8,
603:7
**pursue** [2] - 444:25,
493:1
**pursued** [2] - 492:16,
586:12
**pursuing** [3] - 492:8,
493:2, 547:20
**pursuit** [10] - 492:11,
492:13, 546:16,
546:22, 547:4,
547:6, 547:9,
547:14, 547:16,
586:22
**put** [21] - 411:23,
413:24, 414:1,
414:2, 422:18,
423:23, 443:1,
453:13, 458:24,
459:6, 466:25,

487:13, 500:12,
505:19, 506:18,
508:25, 510:23,
511:5, 541:1,
562:21, 567:9
**puts** [2] - 474:4,
504:24, 593:2
**putting** [1] - 529:7
**puzzle** [1] - 467:22

## Q

**qualifications** [3] -
444:7, 542:17, 544:9
**qualified** [6] - 450:8,
450:14, 450:16,
460:22, 461:6,
598:25
**quarter** [3] - 483:15,
492:20, 589:21
**questioned** [4] -
543:10, 585:9,
601:17, 601:19
**questioning** [1] -
535:8
**questions** [31] -
403:24, 414:15,
416:21, 416:24,
418:3, 424:25,
429:21, 436:4,
438:12, 443:9,
471:8, 475:15,
476:1, 495:21,
495:22, 496:9,
514:6, 533:22,
534:19, 536:18,
536:24, 537:20,
537:25, 558:14,
590:1, 595:9, 596:1,
599:22, 601:3
**quick** [1] - 483:16
**quickly** [7] - 460:7,
467:7, 471:22,
520:21, 563:14,
566:7, 598:8
**quit** [4] - 403:15,
405:18, 417:20,
417:22
**quite** [4] - 515:16,
515:23, 523:9,
530:18
**quote** [5] - 414:23,
457:3, 538:6,
585:14, 590:18
**quotes** [1] - 599:8

## R

**radio** [38] - 451:22,
461:12, 461:15,

479:18, 480:5,
480:9, 480:14,
480:22, 481:1,
481:3, 481:6, 481:9,
481:24, 483:22,
484:5, 484:10,
484:21, 486:17,
487:3, 487:6,
487:17, 503:23,
506:5, 507:23,
516:21, 516:25,
517:5, 517:15,
517:19, 517:21,
518:20, 518:25,
519:5, 519:7,
519:10, 519:16,
519:18, 604:3
**raise** [1] - 405:20
**raised** [2] - 477:11,
537:12
**raises** [1] - 408:5
**raising** [3] - 405:23,
406:10, 406:12
**ran** [1] - 504:4
**range** [3] - 562:22,
563:9, 564:4
**rank** [4] - 524:4,
524:8, 524:10,
525:18
**rapid** [4] - 471:14,
472:15, 473:3
**rapidly** [3] - 467:8,
490:2, 531:1
**rather** [1] - 448:7
**Rd** [1] - 400:19
**re** [1] - 596:21
**re-redirect** [1] -
596:21
**reach** [1] - 534:16
**reached** [2] - 495:1,
541:15
**reaches** [1] - 541:14
**reaching** [2] - 420:8,
568:22
**react** [2] - 563:3,
563:9, 563:19,
564:3, 565:7, 566:10
**reaction** [10] - 560:25,
562:3, 562:6, 562:8,
562:9, 562:14,
562:19, 565:13,
566:14, 566:20
**read** [4] - 495:20,
496:13, 517:10,
583:19
**reads** [1] - 459:14
**ready** [16] - 404:16,
415:7, 418:16,
419:5, 419:6,
427:17, 431:7,

439:12, 440:5,
440:19, 477:3,
478:17, 525:4,
537:22, 545:2,
545:10
**real** [10] - 403:16,
409:2, 410:2, 422:6,
495:22, 559:13,
559:25, 560:1,
560:3, 564:3
**realistically** [1] -
437:11
**realize** [4] - 423:3,
455:17, 541:12,
604:13
**realized** [3] - 508:5,
512:1, 513:5
**really** [28] - 406:22,
412:19, 422:3,
422:5, 423:8,
426:25, 434:2,
434:25, 442:14,
454:21, 455:14,
458:15, 459:16,
463:22, 468:8,
470:23, 471:20,
474:8, 490:13,
495:10, 498:23,
505:3, 517:15,
518:24, 542:18,
553:15, 584:10,
588:15
**realm** [3] - 462:20,
462:22, 497:24
**realtime** [2] - 400:25,
481:19
**rear** [8] - 470:20,
482:23, 486:14,
508:5, 508:6, 511:6,
511:7, 568:3
**reason** [18] - 420:20,
444:23, 457:9,
457:21, 459:25,
485:6, 493:15,
500:14, 508:6,
510:15, 541:8,
541:11, 572:10,
572:11, 575:6,
575:13, 582:8, 583:8
**reasonable** [26] -
444:4, 451:1, 451:4,
451:8, 488:19,
491:13, 497:12,
501:18, 501:20,
530:8, 530:10,
530:14, 548:11,
549:4, 549:9, 551:3,
551:10, 551:11,
552:6, 557:12,
569:4, 574:7,

589:13, 589:18,
592:21, 592:25
**reasonably** [1] - 488:9
**reasons** [4] - 457:20,
461:5, 489:21,
572:17
**rebuilding** [1] - 407:6
**recalling** [1] - 580:25
**receive** [2] - 555:6,
603:9
**received** [8] - 429:17,
429:18, 449:6,
449:7, 449:10,
453:16, 455:11,
591:25
**receiving** [1] - 592:4
**recently** [5] - 438:3,
448:3, 448:19,
457:18, 472:6
**recess** [4] - 439:22,
478:5, 478:7, 545:1
**recognizes** [2] -
560:16, 560:17
**recognizing** [2] -
560:24, 561:4
**recollection** [5] -
532:20, 533:3,
570:2, 570:19, 571:1
**recommendation** [1] -
449:8
**recommended** [2] -
494:4, 550:2
**reconsideration** [2] -
501:14, 513:9
**reconstruction** [5] -
460:24, 461:1,
462:20, 546:3, 546:5
**reconstructionist** [4] -
460:25, 523:2,
523:4, 523:6
**reconvene** [2] -
476:21, 477:3
**reconvened** [1] -
402:3
**record** [9] - 403:25,
405:2, 495:20,
500:21, 507:2,
543:9, 544:15,
602:20, 604:12
**recorded** [3] - 400:25,
451:16, 590:25
**recording** [1] - 594:17
**recordings** [2] -
451:16, 480:9
**recreate** [1] - 458:25
**Recross** [2] - 401:16,
401:18
**recross** [1] - 595:11
**RECROSS** [2] -
595:14, 598:2

**Recross-
Examination** [2] -
401:16, 401:18
**RECROSS-
EXAMINATION** [2] -
595:14, 598:2
**red** [1] - 457:14
**redirect** [5] - 401:5,
401:10, 564:1,
590:9, 596:21
**REDIRECT** [4] - 417:2,
436:10, 590:13,
597:2
**Redirect** [2] - 401:15,
401:17
**refer** [2] - 538:8,
579:21
**reference** [8] - 458:17,
465:6, 465:18,
467:14, 497:25,
516:11, 539:5, 585:8
**referenced** [3] -
456:10, 456:11,
581:7
**references** [1] -
558:18
**referred** [2] - 442:7,
447:24
**referring** [4] - 430:15,
533:4, 585:13,
587:23
**refers** [1] - 599:6
**reflects** [1] - 559:21
**refrain** [9] - 438:25,
439:3, 477:6, 477:9,
537:7, 537:10,
576:2, 600:9, 600:14
**refresh** [1] - 570:1
**regard** [16] - 408:1,
420:8, 463:25,
470:22, 475:12,
480:3, 501:14,
538:2, 539:17,
539:20, 547:3,
557:21, 561:24,
568:25, 570:2,
586:11
**regarding** [7] -
475:15, 480:23,
487:25, 488:16,
494:17, 551:14,
571:21
**Registered** [1] -
604:20
**regret** [1] - 426:11
**regrets** [2] - 423:25,
426:10
**regular** [1] - 555:5
**regularly** [2] - 411:22,
431:25

**rehash** [1] - 550:22
**reinforced** [1] - 487:21
**relate** [1] - 445:9
**related** [7] - 443:5,
444:17, 445:2,
446:10, 446:14,
448:23, 455:11
**relates** [3] - 444:14,
448:6, 460:17
**relating** [3] - 448:20,
488:5, 584:14
**relation** [1] - 503:21
**relationship** [8] -
407:12, 408:22,
425:5, 425:15,
433:19, 433:20,
433:22, 435:12
**relationships** [1] -
424:6
**relative** [5] - 455:2,
456:23, 468:21,
499:6, 576:16
**relatively** [1] - 589:6
**relatives** [2] - 411:13
**release** [1] - 423:22
**relevant** [1] - 573:10
**reliable** [1] - 459:9
**relied** [1] - 429:7
**reload** [4] - 483:19,
510:17, 510:18,
511:1
**reloads** [1] - 510:17
**rely** [5] - 429:13,
489:6, 489:9,
502:15, 520:5
**relying** [2] - 431:1,
492:21
**remain** [3] - 438:25,
477:5, 600:8
**remains** [2] - 415:2,
508:8
**remember** [23] -
421:12, 429:20,
474:11, 483:3,
506:1, 507:1,
513:21, 520:17,
540:4, 542:9,
547:22, 554:7,
554:17, 569:16,
569:24, 570:23,
571:3, 571:6,
577:23, 579:17,
579:19, 591:18,
595:21
**remembered** [3] -
532:9, 595:18, 597:7
**remembering** [1] -
601:2
**remembers** [1] - 423:6
**remodel** [1] - 408:2

**remote** [1] - 417:10
**remove** [2] - 419:5,
510:23
**render** [2] - 442:24,
444:6
**rendered** [1] - 442:17
**Renmei** [1] - 450:4
**rent** [1] - 429:15
**reorganized** [1] -
524:21
**repeat** [2] - 407:8,
529:17
**rephrase** [4] - 428:24,
529:12, 579:4, 596:5
**report** [30] - 451:18,
457:17, 461:4,
500:11, 500:15,
500:19, 500:24,
500:25, 501:6,
501:8, 516:23,
558:2, 558:18,
559:4, 576:21,
579:14, 579:18,
582:13, 582:15,
583:19, 583:23,
583:25, 584:13,
584:22, 586:3,
586:23, 586:25,
598:4, 599:5, 599:6
**reported** [1] - 604:25
**REPORTER** [1] -
446:2
**Reporter** [3] - 604:20,
604:21, 605:8
**Reporter's** [1] - 503:9
**reports** [2] - 461:24,
461:25
**represent** [1] - 473:11
**representative** [4] -
456:12, 494:10,
542:13, 550:4
**Representative** [1] -
400:5
**requesting** [1] - 481:7
**require** [2] - 459:2,
530:14
**required** [3] - 419:24,
520:6, 528:13
**requires** [1] - 530:23
**research** [4] - 558:5,
558:6, 559:9, 559:12
**residence** [1] - 416:9
**resident** [1] - 450:2
**resistance** [1] -
472:23
**respect** [8] - 462:22,
537:11, 542:16,
553:3, 561:13,
574:15, 575:3,
603:13

respectfully [3] - 428:5, 534:18, 574:15
respond [2] - 564:3, 564:7
responding [1] - 466:25
response [13] - 475:8, 536:5, 542:25, 543:19, 560:25, 561:25, 562:8, 562:12, 562:15, 562:24, 563:19, 566:21, 586:10
responses [2] - 535:24, 577:16
responsibilities [1] - 446:23
responsibility [4] - 490:23, 491:6, 593:2, 593:9
responsible [3] - 427:15, 427:24, 446:12
rest [5] - 413:16, 422:1, 494:5, 525:11, 601:4
rested [3] - 601:12, 602:17, 603:5
result [3] - 423:13, 551:4, 559:3
resulted [1] - 533:4
resume [2] - 438:24, 537:4
resuming [1] - 511:9
retain [1] - 443:13
retained [13] - 441:22, 441:23, 442:8, 442:12, 442:20, 528:25, 531:11, 531:23, 531:24, 541:10, 541:23, 541:25, 544:2
retainer [1] - 441:12
retake [1] - 478:20
retired [8] - 405:9, 441:3, 443:20, 446:7, 524:11, 524:12, 524:20, 526:1
retirement [2] - 446:22, 446:24
retiring [1] - 446:16
retrieve [1] - 436:4
return [2] - 467:23, 477:23
returned [2] - 478:13, 545:6
revealed [1] - 493:23
reverse [2] - 519:20,

519:21
reversed [1] - 517:1
review [22] - 444:6, 445:4, 451:13, 454:4, 456:16, 457:21, 458:9, 460:13, 464:17, 470:23, 471:9, 473:8, 473:16, 473:17, 474:20, 476:15, 488:2, 491:18, 497:10, 500:4, 555:2, 574:6
reviewed [8] - 451:20, 451:21, 459:8, 462:18, 468:8, 490:9, 496:2, 546:24
reviewing [8] - 441:14, 446:13, 455:2, 456:23, 467:15, 467:16, 467:21, 469:7
revving [2] - 471:24, 471:25
RHOADES [5] - 400:4, 401:2, 404:19, 419:2, 430:18
Rhoades [82] - 400:6, 402:4, 402:7, 402:19, 403:5, 404:18, 404:20, 404:22, 404:25, 405:6, 405:8, 414:23, 415:11, 415:13, 415:22, 415:25, 416:5, 416:10, 416:23, 418:5, 418:7, 418:11, 418:17, 418:18, 418:22, 418:24, 419:10, 421:18, 424:25, 425:1, 425:5, 425:22, 425:24, 426:2, 426:5, 426:10, 426:12, 426:17, 426:18, 427:24, 428:3, 429:3, 429:4, 429:20, 430:7, 430:8, 430:11, 430:19, 431:17, 432:5, 432:6, 432:11, 432:14, 432:22, 433:7, 433:9, 433:19, 433:22, 434:4, 434:10, 434:13, 435:11, 435:17, 438:17, 444:3,

451:4, 480:12, 491:19, 521:21, 546:16, 548:1, 556:9, 557:3, 557:4, 557:6, 569:6, 588:5, 588:16, 588:25, 595:5
Rhoades' [15] - 416:6, 416:8, 416:14, 416:15, 428:18, 434:18, 434:19, 435:13, 435:18, 435:24, 436:22, 548:25, 556:18, 578:2
Rhoades's [4] - 403:15, 403:23, 427:1, 489:11
RHOADS [1] - 401:7
Rick [29] - 404:18, 405:8, 405:9, 405:22, 405:23, 406:3, 406:9, 408:19, 410:20, 411:20, 412:11, 413:13, 413:14, 414:5, 414:14, 417:4, 417:24, 418:3, 420:17, 420:20, 421:16, 421:18, 421:20, 421:23, 429:3, 434:17, 434:19, 436:22, 438:2
RICK [2] - 401:2, 404:19
Ridge [1] - 443:23
riding [1] - 409:22
right-hand [1] - 465:22
rights [1] - 489:11
ring [1] - 569:20
rise [2] - 490:24, 593:3
risk [8] - 507:11, 507:12, 508:12, 508:14, 510:10, 524:17, 553:17
Riviera [4] - 445:15, 445:16, 445:20, 449:9
road [74] - 403:1, 403:9, 403:21, 449:19, 453:2, 458:19, 459:18, 459:19, 459:20, 460:16, 462:11, 463:6, 463:14, 463:16, 463:22, 463:23, 464:12, 464:24, 464:25,

465:4, 465:13, 467:10, 467:18, 467:19, 467:20, 468:22, 471:1, 473:24, 474:1, 480:17, 482:2, 482:3, 484:8, 485:2, 485:4, 485:10, 485:17, 486:3, 486:13, 486:18, 487:4, 487:5, 487:7, 487:14, 492:22, 492:23, 503:17, 504:22, 505:1, 505:9, 513:23, 518:6, 518:10, 522:1, 522:17, 522:18, 524:23, 525:2, 525:7, 542:22, 579:6, 579:16, 580:3, 580:21, 580:22, 581:1, 581:6, 581:8, 581:11, 581:13, 581:15, 582:2, 588:15
Road [1] - 400:16
road's [1] - 463:7
roads [1] - 406:25
roadway [5] - 460:3, 465:2, 486:25, 518:19, 522:23
robbery [1] - 449:12
roll [1] - 497:8
roofer [1] - 408:11
room [7] - 410:24, 413:7, 423:17, 497:22, 537:9, 575:7, 594:17
ROOT [3] - 401:12, 440:15, 440:25
Root [73] - 439:11, 439:12, 439:16, 440:12, 440:13, 440:16, 440:22, 440:25, 441:2, 441:20, 443:3, 443:25, 444:8, 449:5, 449:21, 450:8, 450:13, 450:15, 450:24, 452:12, 453:11, 460:22, 463:4, 476:8, 476:21, 477:15, 479:2, 479:5, 479:17, 488:7, 493:7, 498:16, 501:13, 501:22, 502:5, 503:4, 511:9,

511:14, 511:20, 513:7, 514:5, 514:12, 519:1, 520:15, 523:9, 526:19, 527:13, 527:17, 530:17, 537:19, 537:25, 539:25, 541:23, 543:10, 544:2, 545:13, 547:24, 553:24, 560:5, 564:22, 571:14, 572:13, 576:1, 576:7, 580:14, 581:22, 589:8, 590:1, 590:15, 594:3, 597:4, 597:22, 600:1
root [5] - 443:15, 451:9, 595:8, 595:16, 598:4
Root's [3] - 478:18, 537:4, 543:1
roughly [2] - 453:4, 453:6
round [6] - 483:15, 560:21, 562:21, 563:9, 575:15
rounded [2] - 463:12, 463:19
rounds [4] - 475:4, 510:20, 514:1, 529:10
RP [2] - 458:17, 459:1
RP1 [1] - 466:1
RPR [1] - 605:7
rude [1] - 477:19
ruled [1] - 489:25
rules [1] - 450:18
ruling [4] - 402:6, 543:9, 544:14, 544:17
rulings [1] - 414:22
Run [2] - 482:3, 482:5
run [10] - 405:15, 407:1, 407:2, 439:14, 471:18, 489:3, 512:9, 512:13, 512:22, 536:16
running [2] - 447:6, 529:19
runs [1] - 505:12
rural [1] - 595:3
Ryan [3] - 400:15, 420:20, 421:2

**S**

S.W.A.T [2] - 506:23,

507:2
**sacrifice** [1] - 508:17
**sadly** [3] - 525:7, 530:21, 559:18
**Safari** [1] - 563:6
**safe** [4] - 434:12, 435:17, 476:10, 509:18
**safety** [11] - 502:1, 502:9, 502:22, 507:5, 508:7, 508:17, 509:12, 510:21, 510:23, 513:12
**sale** [1] - 442:15
**sanctions** [1] - 446:16
**sanitize** [1] - 418:13
**sat** [1] - 422:18
**save** [1] - 463:12
**saw** [16] - 408:7, 426:21, 433:10, 458:7, 464:1, 471:4, 485:11, 504:21, 505:25, 548:20, 559:6, 578:9, 590:17, 591:15, 592:7, 597:14
**scale** [1] - 503:25
**scanning** [1] - 506:3
**scared** [5] - 406:15, 406:16, 406:17, 407:19, 423:18
**scene** [46] - 411:20, 451:21, 452:1, 452:4, 452:7, 454:18, 456:20, 457:25, 458:20, 458:25, 461:1, 464:22, 465:19, 466:23, 467:3, 469:6, 475:3, 475:15, 481:17, 488:21, 491:8, 497:18, 498:14, 499:2, 499:4, 499:18, 499:22, 500:20, 500:21, 500:22, 500:24, 501:12, 516:16, 521:3, 521:21, 521:25, 546:2, 546:8, 546:12, 548:5, 557:18, 574:1, 574:9, 589:4, 589:19
**scheduled** [2] - 432:1, 601:22
**school** [12] - 403:6, 403:7, 403:11, 403:15, 406:24,

427:17, 431:8, 432:16, 432:18, 437:13, 447:11, 456:4
**schools** [2] - 447:18, 448:9
**science** [4] - 445:1, 445:3, 447:20, 462:24
**Science** [1] - 445:1
**screaming** [1] - 422:23
**screen** [6] - 453:23, 455:20, 467:11, 469:23, 469:24, 479:13
**searching** [7] - 492:9, 492:15, 493:2, 493:5, 546:20, 547:21, 586:21
**seat** [1] - 473:5
**seated** [9] - 439:9, 440:10, 440:17, 477:14, 478:16, 537:18, 545:9, 578:7, 578:11
**second** [21] - 402:24, 418:16, 425:20, 455:18, 483:15, 483:16, 490:1, 496:5, 501:23, 502:6, 513:25, 533:12, 552:15, 562:8, 562:16, 562:20, 566:7, 576:1, 576:20, 590:25
**secondary** [1] - 496:6
**secondly** [1] - 575:9
**seconds** [34] - 463:16, 463:18, 463:20, 480:8, 480:10, 481:6, 481:12, 481:22, 481:23, 484:9, 484:20, 484:22, 485:1, 485:8, 485:13, 485:16, 485:17, 486:12, 486:19, 487:8, 487:11, 513:18, 513:24, 514:2, 563:1, 563:10, 563:11, 563:20, 565:5, 566:2, 566:12, 566:19, 566:25
**section** [1] - 488:5
**sections** [1] - 485:12
**security** [1] - 507:5
**see** [91] - 402:2, 407:1,

410:6, 421:23, 430:19, 433:7, 433:8, 434:5, 438:21, 439:6, 439:21, 443:24, 453:5, 453:23, 456:7, 456:8, 456:17, 456:25, 458:16, 459:12, 459:18, 463:18, 463:20, 464:5, 465:3, 465:14, 465:21, 466:2, 467:1, 467:10, 468:2, 468:4, 468:10, 468:11, 468:13, 468:18, 468:24, 469:11, 469:12, 469:14, 472:12, 477:11, 478:5, 479:12, 479:14, 485:11, 496:25, 497:18, 498:24, 505:10, 506:3, 509:2, 510:2, 517:20, 520:19, 526:21, 526:23, 527:1, 527:15, 527:18, 527:20, 537:14, 544:25, 550:10, 552:6, 559:5, 561:1, 562:9, 562:16, 562:17, 562:18, 563:2, 563:8, 563:18, 564:3, 564:24, 565:6, 566:9, 566:25, 567:18, 570:21, 576:21, 578:10, 578:14, 582:21, 600:18, 603:11, 603:16, 604:16
**seeing** [4] - 483:4, 577:6, 578:2, 578:15
**seeking** [1] - 442:2
**segment** [1] - 575:11
**segments** [1] - 517:1
**selected** [2] - 525:20, 525:22
**self** [3] - 441:5, 441:6, 448:18
**self-defense** [3] - 441:5, 441:6, 448:18
**send** [1] - 421:3
**sense** [1] - 572:1
**sent** [2] - 481:7, 542:6
**sentences** [1] - 501:4
**separate** [2] - 416:3, 591:5

**separated** [16] - 416:1, 416:10, 416:16, 419:13, 424:4, 426:13, 426:14, 427:6, 427:11, 427:13, 427:23, 431:18, 431:22, 432:6, 437:8, 495:9
**separating** [1] - 448:18
**September** [3] - 515:21, 516:10, 518:9
**sequence** [2] - 468:14, 556:25
**Sergeant** [10] - 455:12, 547:3, 549:19, 579:22, 580:6, 585:25, 586:2, 586:4, 587:19, 596:9
**sergeant** [8] - 524:10, 524:13, 524:19, 524:24, 526:2, 546:25, 549:19
**serious** [4] - 448:4, 488:11, 488:13, 567:19
**serve** [3] - 419:24, 450:16, 523:20
**served** [6] - 445:20, 445:25, 446:5, 531:6, 539:8, 555:4
**service** [11] - 404:16, 421:9, 421:11, 443:13, 538:13, 538:14, 538:18, 539:2, 539:18, 541:1, 542:4
**set** [6] - 411:6, 411:8, 411:22, 439:17, 504:3, 510:8
**Seth** [5] - 412:19, 412:24, 413:1, 413:6, 437:21
**seven** [5] - 421:9, 481:6, 483:11, 485:17, 565:12
**Seventh** [1] - 564:16
**several** [1] - 517:12
**shady** [1] - 406:22
**share** [5] - 450:19, 450:20, 480:2, 573:11, 585:7
**shared** [1] - 586:18
**sharing** [2] - 575:10, 575:11
**sharp** [1] - 467:17
**Shawn** [1] - 543:11
**sheet** [1] - 526:19

**sheriff** [6] - 524:7, 524:9, 524:11, 525:4, 525:16, 525:23
**Sheriff's** [8] - 446:7, 450:1, 450:3, 487:24, 488:8, 524:15, 527:6, 554:24
**sheriff's** [5] - 527:11, 528:5, 528:11, 554:25, 555:6
**shield** [1] - 508:7
**shift** [2] - 445:19, 552:17
**shifting** [2] - 493:6, 501:3
**shock** [1] - 410:22
**shoes** [1] - 526:10
**shoot** [6] - 409:1, 460:25, 562:19, 563:4, 565:8, 566:25
**shooter** [2] - 447:22
**shooting** [40] - 452:4, 452:7, 471:3, 475:2, 481:4, 483:16, 488:24, 491:12, 499:3, 499:7, 504:13, 508:16, 510:21, 514:3, 521:8, 529:16, 530:7, 530:9, 546:2, 549:20, 554:21, 557:11, 561:14, 561:15, 561:22, 571:21, 572:18, 573:22, 574:7, 575:15, 575:16, 577:14, 577:23, 578:17, 593:14, 593:22, 593:25, 594:14, 594:19
**shoots** [1] - 409:3
**Shores** [1] - 446:18
**short** [2] - 405:25, 445:24
**shortened** [1] - 445:12
**shortest** [1] - 575:12
**shortly** [1] - 453:5
**shot** [20] - 408:25, 409:1, 409:3, 420:11, 444:3, 451:3, 470:18, 511:2, 529:1, 529:2, 529:3, 529:8, 529:16, 529:21, 530:1, 553:21, 554:4, 554:9, 568:12, 574:23
**shotgun** [1] - 444:22

**shots** [7] - 481:2, 481:4, 483:23, 484:13, 484:22, 513:17, 529:13
**Shots** [1] - 519:12
**Show** [1] - 556:10
**show** [17] - 448:25, 449:3, 453:5, 458:10, 458:14, 460:6, 464:3, 468:4, 472:24, 488:5, 507:11, 517:13, 556:19, 557:3, 581:4, 585:5, 594:20
**showed** [9] - 485:6, 495:19, 506:1, 519:6, 520:16, 573:18, 575:14, 575:16, 594:15
**showing** [4] - 469:10, 470:18, 522:19, 588:1
**shown** [2] - 474:12, 493:15
**shows** [7] - 458:11, 464:24, 474:25, 500:21, 503:19, 575:14
**shy** [1] - 472:25
**side** [20] - 433:8, 460:5, 465:25, 468:13, 468:19, 469:3, 469:12, 470:1, 470:19, 470:25, 492:6, 504:9, 504:12, 505:15, 505:18, 576:25, 577:3, 584:20, 588:13, 599:9
**sight** [6] - 546:17, 546:21, 547:7, 547:15, 581:11, 586:12
**sign** [2] - 420:22, 443:13
**significant** [2] - 510:10, 568:7
**similar** [7] - 429:21, 468:24, 535:1, 535:3, 559:8, 565:4, 589:19
**similarly** [1] - 594:11
**simple** [5] - 441:25, 461:13, 461:15, 563:22, 589:10
**simply** [1] - 571:14
**simultaneously** [1] - 483:6
**single** [3] - 464:15,

593:18, 593:23
**singular** [2] - 578:24, 578:25
**sister** [6] - 434:19, 434:21, 435:1, 436:12, 437:18, 438:2
**sister's** [1] - 434:17
**sisters** [1] - 436:16
**sit** [3] - 410:24, 432:25, 541:19
**site** [37] - 452:3, 453:2, 453:3, 463:15, 464:13, 465:17, 468:18, 469:2, 473:10, 473:12, 473:16, 473:19, 473:22, 482:5, 485:14, 487:9, 491:22, 492:1, 492:4, 492:19, 503:16, 504:3, 504:7, 504:10, 504:16, 505:18, 506:2, 506:4, 508:22, 508:24, 521:23, 521:24, 574:14, 579:16, 590:22, 591:6, 592:2
**sitting** [6] - 448:11, 468:22, 471:6, 473:20, 491:22, 492:3
**situation** [11] - 508:12, 533:9, 550:7, 550:13, 550:16, 551:2, 552:2, 553:20, 561:6, 578:17, 578:21
**situations** [10] - 490:3, 494:7, 530:13, 530:24, 531:1, 577:21
**six** [8] - 421:8, 421:20, 438:5, 460:1, 486:11, 504:24, 540:21, 555:23
**sixth** [1] - 461:22
**size** [3] - 497:19, 521:24, 578:13
**skip** [1] - 402:12
**sleep** [2] - 410:23, 494:5
**sleepovers** [2] - 438:8, 438:10
**slide** [3] - 464:15, 485:6, 485:21
**slow** [1] - 446:2, 449:25, 461:2,

472:9, 473:1, 491:3, 495:5, 511:20, 522:13, 522:20, 522:21
**slower** [1] - 460:9
**slowly** [2] - 460:7, 471:19
**small** [5] - 409:20, 469:24, 474:11, 537:9, 600:10
**smaller** [1] - 477:8
**smudge** [3] - 456:7, 456:9, 456:22
**soft** [1] - 472:5
**solely** [2] - 501:9, 556:12
**solid** [2] - 498:12, 509:7
**solidify** [1] - 498:23
**someone** [6] - 489:2, 493:22, 538:17, 550:6, 553:20, 567:14
**sometime** [2] - 443:24, 524:20
**sometimes** [2] - 429:16, 495:7
**somewhat** [1] - 570:11
**somewhere** [3] - 416:4, 467:10, 467:12
**son** [14] - 405:23, 406:5, 406:11, 408:13, 408:15, 409:7, 411:4, 411:20, 412:18, 420:17, 423:4, 432:2, 432:8, 435:14
**sons** [10] - 408:22, 408:23, 412:12, 412:15, 412:18, 413:16, 415:14, 415:20, 428:8, 434:16
**sons'** [1] - 421:5
**soon** [10] - 419:3, 422:17, 440:16, 582:25, 583:13, 583:14, 584:1, 584:21, 599:9, 599:19
**sorry** [29] - 422:4, 424:21, 435:5, 436:21, 438:22, 446:2, 446:4, 449:25, 453:21, 457:24, 464:10, 481:11, 491:3, 495:5, 496:11,

504:17, 507:7, 511:18, 514:19, 519:16, 543:7, 544:11, 545:14, 562:13, 569:25, 572:12, 574:19, 586:5, 586:24
**sought** [2] - 435:18, 448:22
**sound** [3] - 507:25, 512:20, 516:2
**sounds** [2] - 404:1, 546:23
**source** [3] - 498:12, 594:2, 594:25
**Southern** [1] - 543:12
**southern** [1] - 543:14
**speaker** [1] - 510:1
**speaking** [1] - 496:11
**special** [1] - 506:24
**specialist** [3] - 446:11, 555:4, 559:16
**specific** [3] - 403:14, 556:2, 561:18
**specifically** [10] - 403:6, 474:17, 488:25, 489:16, 496:16, 497:12, 534:1, 538:1, 538:5, 583:25
**specifics** [1] - 470:15
**speed** [9] - 460:4, 463:12, 463:24, 468:1, 471:18, 472:17, 473:1, 485:3, 523:5
**speeds** [1] - 463:25
**spelled** [1] - 440:25
**spend** [2] - 437:7, 497:3
**spent** [11] - 409:21, 416:17, 427:8, 435:14, 437:4, 465:20, 515:16, 515:23, 517:12, 555:7, 592:12
**spinning** [4] - 471:11, 472:1, 472:6, 472:15
**split** [3] - 480:23, 487:11, 490:1
**split-second** [1] - 490:1
**spoken** [1] - 426:18
**sporting** [1] - 452:16
**spot** [2] - 459:7, 600:6
**spray** [1] - 444:20
**spun** [2] - 471:24, 471:25
**Sq** [1] - 400:23
**squeeze** [1] - 505:2

**staff** [1] - 554:24
**stage** [1] - 568:24
**stamps** [1] - 429:18
**stand** [10] - 418:14, 477:22, 478:5, 478:20, 502:18, 503:14, 510:14, 511:10, 515:12, 574:16
**standard** [3] - 441:16, 563:6, 592:24
**standards** [7] - 502:1, 502:9, 502:22, 513:13, 547:8, 547:13, 547:22
**standing** [8] - 438:24, 454:23, 477:5, 508:8, 566:17, 567:24, 576:19, 576:20
**staples** [1] - 432:3
**start** [9] - 405:22, 407:5, 420:6, 506:3, 508:16, 562:18, 601:24, 602:3, 602:8
**started** [23] - 403:7, 406:24, 410:5, 411:9, 417:20, 422:19, 422:22, 423:22, 445:14, 477:3, 481:22, 481:23, 504:20, 513:6, 523:8, 582:25, 583:14, 584:1, 584:21, 586:23, 599:10, 599:20
**starts** [1] - 570:7
**state** [10] - 419:9, 420:13, 444:1, 450:5, 458:21, 501:24, 523:19, 547:7, 593:17, 595:20
**State** [10] - 444:11, 451:17, 523:16, 523:21, 523:23, 528:21, 547:4, 547:13, 547:19, 547:23
**state-level** [1] - 450:5
**statement** [73] - 416:14, 471:5, 471:6, 471:14, 472:8, 473:10, 473:21, 474:10, 476:10, 480:18, 491:15, 493:14, 493:22, 494:10, 494:13, 494:23,

495:16, 496:21,
504:11, 506:11,
506:13, 507:20,
508:9, 549:19,
551:7, 576:22,
577:10, 580:5,
580:15, 581:4,
581:14, 584:6,
584:7, 584:10,
584:11, 584:20,
585:6, 585:21,
585:25, 586:2,
586:13, 586:15,
586:16, 587:4,
587:9, 587:10,
587:16, 587:17,
589:11, 590:25,
591:7, 591:14,
591:20, 592:4,
594:16, 595:20,
596:13, 596:14,
596:15, 597:16,
597:19, 598:12,
598:16, 598:17,
598:21, 598:22,
599:2, 599:12,
599:13, 599:14,
599:15, 599:17
**statements** [91] -
451:15, 451:20,
454:6, 454:15,
457:5, 458:2, 462:4,
466:14, 466:17,
470:7, 471:5,
473:18, 481:16,
482:10, 488:21,
491:9, 491:23,
491:24, 492:17,
493:9, 493:13,
494:18, 495:20,
496:13, 497:10,
498:3, 498:7, 498:9,
498:17, 498:24,
500:13, 504:7,
506:15, 511:16,
516:22, 549:16,
549:25, 550:6,
550:12, 556:13,
557:10, 557:15,
557:20, 571:8,
572:23, 572:24,
572:25, 573:1,
573:24, 574:4,
574:8, 574:16,
574:21, 576:11,
578:6, 579:1, 579:4,
579:10, 580:23,
583:9, 584:8,
584:25, 585:14,
585:16, 585:18,
585:20, 586:8,

587:2, 587:5, 587:6,
587:7, 587:8,
587:10, 587:18,
587:21, 589:10,
590:15, 591:9,
591:21, 592:10,
595:16, 595:20,
596:8, 596:9,
596:11, 597:5,
597:10, 597:17,
597:20
**STATES** [1] - 400:1
**States** [5] - 489:14,
564:16, 604:21,
605:3, 605:8
**stating** [1] - 486:22
**station** [1] - 509:19
**stay** [8] - 416:9,
416:15, 416:17,
417:18, 434:16,
434:17, 435:8, 438:7
**stayed** [4] - 416:18,
433:3, 434:20, 435:1
**staying** [5] - 411:19,
434:23, 437:3, 509:3
**stays** [1] - 422:6
**steep** [5] - 505:15,
588:3, 588:8,
588:21, 589:3
**steeper** [1] - 505:13
**stenotypy** [1] - 604:25
**step** [8] - 418:12,
418:24, 438:17,
477:15, 477:21,
502:18, 600:1, 600:3
**stepping** [2] - 404:21,
404:22
**steps** [1] - 434:20
**Stevens** [11] - 425:6,
425:8, 425:13,
425:16, 425:21,
429:7, 429:9,
433:20, 435:12,
435:15
**stick** [1] - 455:25
**sticking** [4] - 456:14,
466:2, 469:4, 474:11
**still** [28] - 402:8,
405:9, 419:16,
419:21, 421:23,
423:4, 424:9, 425:1,
425:4, 425:19,
425:21, 425:22,
433:6, 445:8,
468:13, 477:16,
479:6, 501:19,
509:4, 515:16,
522:3, 547:8,
547:14, 554:24,
561:7, 563:17,

598:4, 604:3
**stood** [2] - 413:7,
511:8
**Stop** [2] - 556:19,
557:3
**stop** [22] - 424:8,
424:10, 434:2,
447:4, 472:24,
473:1, 473:4, 473:7,
486:24, 501:25,
502:8, 502:21,
503:13, 506:22,
507:12, 508:14,
509:13, 509:17,
509:24, 512:4,
512:12, 600:6
**stopgapped** [1] -
482:16
**stopped** [23] - 425:24,
472:24, 472:25,
486:22, 491:25,
511:4, 557:13,
584:25, 585:3,
585:5, 585:6,
585:15, 585:17,
585:23, 585:24,
586:1, 586:4, 586:9,
586:13, 586:14,
586:17, 587:3,
587:11
**stopping** [5] - 457:7,
486:5, 508:14,
509:14, 509:18
**stops** [3] - 472:18,
483:22, 510:21
**store** [1] - 595:2
**stories** [2] - 495:15,
496:20
**story** [3] - 500:9,
500:10, 594:8
**straight** [4] - 459:2,
471:2, 474:13,
495:15
**straightforward** [1] -
485:22
**Straley** [1] - 593:17
**strengthened** [2] -
487:21, 520:8
**strengthens** [1] -
452:10
**stress** [8] - 454:25,
493:16, 577:13,
577:22, 578:17,
578:21
**stress-induced** [1] -
578:21
**stress-inducing** [3] -
577:13, 577:22,
578:17
**stretch** [2] - 537:2,

537:13
**strikes** [2] - 505:22,
600:5
**striking** [5] - 473:22,
473:25, 505:20,
591:12, 598:25
**strings** [1] - 410:15
**stripe** [1] - 524:13
**stripes** [3] - 524:25,
525:3, 526:1
**strong** [1] - 449:11
**struck** [4] - 504:19,
549:12, 552:24,
583:5
**Stuart** [1] - 406:5
**studies** [11] - 493:15,
493:23, 558:6,
558:15, 558:16,
559:3, 559:5, 559:9,
559:10, 559:11,
559:12
**study** [6] - 558:10,
558:11, 558:19,
558:20, 559:19,
559:25
**stuff** [7] - 413:25,
420:23, 423:11,
423:23, 453:15,
466:8, 575:3
**stuttering** [1] - 486:7
**styled** [2] - 400:12,
604:24
**Suarez** [1] - 542:1
**subject** [10] - 403:11,
531:13, 532:1,
532:21, 533:2,
533:17, 533:19,
536:3, 536:13,
592:17
**subjective** [5] -
592:14, 592:24,
593:1, 593:4, 593:7
**subjects** [3] - 507:13,
558:6
**successful** [2] -
553:18, 564:5
**sudden** [1] - 410:5
**suddenly** [3] - 486:5,
504:19, 564:1
**sued** [2] - 526:6, 527:6
**suing** [1] - 531:24
**suit** [1] - 526:14
**Suite** [1] - 400:19
**summaries** [1] -
480:20
**summer** [3] - 412:21,
437:15, 437:20
**summertime** [1] -
437:14
**supervisor** [2] -

446:15, 525:23
**supplemental** [1] -
461:24
**support** [16] - 428:3,
428:15, 471:12,
472:1, 472:15,
476:16, 487:23,
488:23, 498:6,
498:22, 499:5,
499:19, 499:23,
500:2, 549:6, 549:8
**supported** [3] -
471:10, 506:12,
536:22
**supporting** [2] -
543:24, 572:22
**supportive** [2] -
471:14, 521:1
**supports** [2] - 475:1,
572:18
**supposed** [3] -
498:12, 566:19,
601:2
**Supreme** [2] - 489:14,
489:17
**surface** [3] - 472:2,
485:23, 486:4
**surprises** [1] - 422:7
**survey** [1] - 558:13
**survive** [1] - 493:19
**survived** [1] - 595:5
**suspect** [8] - 535:2,
552:15, 555:12,
555:14, 555:20,
560:11, 560:13,
578:8
**suspects** [5] - 449:12,
554:9, 554:12,
554:15, 554:21
**sustained** [2] -
542:21, 544:16
**Swaronski** [1] -
553:25
**swear** [3] - 404:23,
418:25, 440:14
**sweet** [1] - 423:9
**SWORN** [3] - 404:19,
419:2, 440:15
**sworn** [3] - 433:14,
515:3, 540:25
**system** [2] - 448:2,
510:9
**systems** [1] - 449:1

**T**

**table** [1] - 502:25
**tac** [1] - 483:19
**tactical** [12] - 444:21,
444:22, 447:23,

505:23, 506:18,
506:24, 508:7,
510:13, 510:16,
510:17, 511:1
**tactically** [2] - 512:9,
512:19
**tactician** [1] - 512:12
**tactics** [24] - 444:18,
445:17, 445:25,
446:5, 447:23,
501:24, 502:2,
502:7, 502:21,
504:7, 506:7,
506:10, 506:23,
507:25, 508:10,
508:19, 509:10,
510:4, 510:8,
510:11, 511:5,
511:8, 513:11,
561:21
**tactics-wise** [1] -
506:7
**takedown** [1] - 507:12
**talents** [2] - 408:7,
412:13
**talks** [1] - 559:4
**tall** [2] - 469:17,
470:10
**tank** [1] - 588:1
**taped** [1] - 604:24
**target** [6] - 563:5,
563:7, 563:16,
565:6, 565:7
**targets** [3] - 561:14,
561:15, 563:7
**tasks** [1] - 481:16
**taught** [7] - 409:8,
412:17, 412:18,
412:21, 447:22,
523:23
**teach** [1] - 412:15
**teacher** [2] - 432:15,
432:17
**teaching** [1] - 444:17
**team** [2] - 495:13,
507:2
**technical** [1] - 405:2
**technique** [1] - 562:11
**technology** [1] -
455:22
**tedious** [1] - 466:8
**television** [2] -
448:20, 448:25
**temperature** [1] -
438:20
**ten** [11] - 421:9,
463:17, 477:2,
485:9, 485:12,
485:16, 486:12,
486:19, 513:25,

537:3, 599:8
**ten-second** [1] -
513:25
**tend** [1] - 402:9
**Tennessee** [5] -
443:19, 443:20,
450:2, 450:3, 460:9
**tense** [2] - 490:2,
530:24
**term** [8] - 452:12,
452:20, 481:23,
492:11, 516:13,
587:16, 587:17,
604:11
**terminate** [1] - 473:4
**terms** [5] - 402:24,
420:8, 447:15,
552:20, 553:16
**terrible** [1] - 504:5
**tested** [1] - 524:19
**testified** [40] - 424:25,
426:9, 442:24,
460:24, 482:11,
483:9, 483:18,
484:3, 496:4,
496:10, 496:12,
514:14, 514:17,
514:23, 515:8,
515:13, 516:15,
518:4, 528:18,
529:24, 532:13,
533:17, 533:18,
534:7, 536:13,
547:13, 557:21,
564:11, 564:12,
564:13, 564:15,
568:5, 571:17,
572:17, 573:14,
573:17, 584:24,
587:16, 592:22,
596:6
**testify** [8] - 418:16,
429:3, 447:14,
500:1, 533:10,
534:14, 568:2,
579:18
**testifying** [7] - 441:14,
503:4, 515:12,
526:4, 532:11,
538:5, 595:18
**testimony** [103] -
402:7, 414:23,
415:13, 431:2,
431:4, 433:1,
433:14, 434:4,
435:2, 443:2, 453:1,
453:14, 455:9,
456:13, 457:18,
457:22, 458:3,
458:4, 459:15,

462:6, 462:14,
462:16, 467:19,
469:20, 470:6,
474:21, 475:6,
475:15, 475:18,
477:17, 478:18,
479:18, 479:20,
480:4, 482:8,
482:19, 482:20,
483:9, 487:16,
492:17, 494:24,
500:18, 507:20,
511:6, 515:18,
517:8, 517:20,
519:4, 519:8, 520:9,
520:23, 521:6,
521:10, 523:10,
528:2, 530:2,
531:13, 532:4,
532:22, 533:3,
533:19, 533:25,
534:7, 534:21,
537:5, 539:1, 539:4,
539:16, 539:17,
540:1, 540:7,
540:25, 541:4,
541:13, 543:3,
546:9, 547:1,
547:11, 547:17,
556:9, 556:17,
557:2, 557:5,
557:25, 569:3,
573:19, 580:25,
582:4, 584:5, 584:8,
585:9, 585:13,
585:22, 586:6,
587:1, 587:19,
590:17, 591:10,
591:18, 597:6,
601:24, 603:6,
603:11
**testing** [1] - 525:14
**text** [2] - 426:23,
426:25
**THE** [160] - 402:2,
402:12, 402:17,
402:21, 403:4,
403:21, 404:1,
404:3, 404:6, 404:9,
404:13, 404:20,
405:15, 414:16,
414:19, 414:25,
415:7, 416:22,
417:1, 418:4, 418:7,
418:9, 418:11,
418:18, 418:20,
418:24, 419:3,
424:12, 424:22,
430:5, 430:8,
430:14, 436:5,
436:7, 436:9,

438:13, 438:17,
439:9, 439:12,
439:15, 439:18,
439:21, 439:23,
440:2, 440:5, 440:9,
440:13, 440:16,
450:10, 450:12,
453:22, 455:18,
455:22, 455:23,
455:25, 456:1,
456:3, 460:19,
460:21, 461:8,
461:23, 462:11,
462:19, 475:21,
476:3, 476:6,
476:22, 476:24,
477:14, 478:2,
478:4, 478:8,
478:12, 478:15,
478:20, 478:25,
479:10, 502:24,
503:3, 503:6, 503:8,
503:11, 511:9,
511:12, 511:20,
511:22, 514:7,
514:21, 516:7,
526:17, 528:16,
533:12, 533:15,
533:23, 534:4,
534:9, 534:12,
534:15, 534:22,
535:20, 535:24,
536:4, 536:10,
536:16, 537:2,
537:18, 539:21,
541:23, 542:2,
542:5, 542:9,
542:11, 542:15,
542:18, 542:19,
543:14, 543:16,
543:19, 543:25,
544:5, 544:8,
544:13, 544:14,
544:19, 544:22,
544:24, 545:2,
545:5, 545:8,
545:16, 564:20,
565:18, 565:19,
572:13, 576:1,
580:12, 581:20,
589:24, 590:2,
590:7, 590:12,
595:10, 596:1,
596:21, 597:1,
597:25, 599:24,
600:1, 600:2, 600:3,
600:23, 601:1,
601:8, 602:5,
602:10, 602:23,
603:21, 604:1,
604:7, 604:13

**theirs** [1] - 507:14
**themselves** [8] -
488:10, 490:3,
490:16, 508:1,
574:16, 584:12,
589:11, 594:10
**theory** [2] - 542:5,
542:6
**therefore** [1] - 573:21
**They've** [1] - 538:6
**they've** [2] - 442:23,
538:23
**thinking** [2] - 497:22,
498:19
**third** [6] - 543:6,
562:7, 562:16,
562:19, 582:18,
582:20
**Thomas** [1] - 400:13
**thoroughly** [1] -
461:20
**thoughts** [1] - 592:24
**threat** [52] - 471:21,
488:11, 488:13,
507:17, 507:18,
551:14, 551:22,
551:23, 552:3,
552:6, 553:4, 553:8,
553:10, 553:12,
553:13, 553:17,
553:19, 555:11,
555:19, 558:9,
560:7, 560:8,
560:16, 560:17,
560:18, 560:21,
560:22, 560:24,
560:25, 561:1,
561:4, 561:6, 561:9,
561:25, 562:10,
562:16, 562:19,
563:2, 563:3, 563:4,
563:8, 563:14,
563:15, 563:17,
563:18, 563:19,
564:1, 564:7, 566:15
**threatening** [3] -
472:17, 550:7,
550:13
**threats** [2] - 529:5,
559:1
**three** [19] - 402:3,
408:4, 411:22,
443:23, 448:9,
448:13, 472:10,
474:3, 474:4, 474:6,
474:9, 496:19,
537:3, 537:5,
575:14, 578:2,
578:22, 591:3
**three-point** [9] -

474:3, 474:4, 474:6, 474:9, 496:19, 578:2, 578:22, 591:3
**throughout** [2] - 449:7, 525:10
**thrown** [1] - 509:16
**Thursday** [1] - 400:12
**tie** [1] - 410:14
**Tiffany** [1] - 400:21
**Timann** [1] - 526:21
**TIMANN** [1] - 526:21
**timeline** [28] - 461:13, 479:6, 479:22, 480:5, 480:8, 481:18, 482:22, 483:17, 483:24, 484:19, 499:17, 513:22, 517:5, 517:9, 517:11, 517:19, 517:21, 517:23, 518:1, 518:17, 518:18, 518:20, 518:24, 519:16, 522:15, 550:21, 571:25
**timelines** [1] - 513:16
**timing** [4] - 460:16, 550:5, 550:17, 561:24
**tire** [15] - 464:2, 468:3, 470:25, 472:3, 472:4, 472:6, 485:24, 520:16, 520:18, 520:19, 520:22, 520:25, 522:5, 522:13, 522:20
**tires** [8] - 470:2, 470:20, 471:10, 471:24, 471:25, 472:1, 472:15
**title** [2] - 446:12, 569:24
**today** [15] - 402:25, 429:22, 430:1, 431:3, 432:25, 479:24, 501:15, 501:23, 513:10, 531:6, 541:19, 547:11, 570:20, 571:1, 600:18
**Todd** [10] - 425:6, 425:21, 429:7, 430:21, 430:24, 431:1, 431:3, 433:20, 435:12, 435:15
**Todd's** [1] - 430:24
**together** [11] - 406:21, 407:16, 409:18,

411:15, 424:1, 425:24, 453:14, 466:25, 495:2, 515:24, 517:12
**toll** [1] - 414:5
**tomorrow** [11] - 600:19, 601:9, 601:15, 601:23, 602:8, 602:14, 603:2, 603:14, 603:17, 604:6, 604:14
**ton** [1] - 448:8
**took** [32] - 413:4, 415:14, 427:17, 430:24, 431:7, 431:14, 431:21, 432:8, 435:21, 445:5, 446:19, 449:14, 458:18, 461:17, 461:19, 463:6, 465:21, 468:4, 489:5, 490:25, 499:7, 506:10, 513:18, 518:8, 521:3, 522:10, 548:9, 556:18, 558:12, 571:21, 581:7, 581:12
**top** [4] - 456:6, 526:23, 531:21, 547:5
**topic** [1] - 402:25
**topics** [6] - 441:5, 444:17, 445:9, 446:8, 446:11, 448:12
**TORRES** [1] - 542:13
**Torres** [5] - 540:5, 541:5, 542:12, 543:7, 571:24
**total** [7] - 444:10, 444:16, 452:22, 453:8, 481:11, 496:5
**totality** [14] - 445:5, 466:10, 491:14, 499:10, 499:13, 530:7, 548:21, 556:24, 565:14, 568:17, 573:23, 574:3, 574:5, 575:10
**totally** [1] - 403:12
**touches** [1] - 455:20
**touching** [1] - 460:10
**tough** [2] - 421:6, 479:4
**toward** [13] - 471:1, 471:15, 471:17, 471:19, 471:24,

473:24, 474:1, 486:16, 496:17, 511:3, 529:20, 554:16, 561:9
**towards** [5] - 423:10, 457:6, 563:7, 591:12, 593:12
**track** [1] - 529:16
**traffic** [30] - 445:19, 446:9, 451:22, 461:12, 480:6, 480:14, 481:9, 501:25, 502:8, 502:21, 503:13, 503:23, 506:6, 507:12, 507:23, 509:13, 513:11, 516:21, 516:25, 517:5, 517:15, 517:19, 517:21, 518:21, 518:25, 519:5, 519:7, 519:10, 519:16, 604:4
**tragic** [1] - 494:2
**trail** [4] - 480:17, 492:23, 492:24, 519:12
**trailer** [5] - 410:18, 416:15, 429:16, 434:17, 438:4
**train** [1] - 567:2
**trained** [1] - 510:16
**trainer** [1] - 523:20
**trainers** [2] - 446:10, 446:14
**training** [49] - 441:4, 445:2, 445:20, 446:14, 446:19, 447:2, 447:3, 447:5, 447:6, 447:10, 447:19, 448:3, 448:8, 448:10, 449:13, 451:10, 479:20, 483:12, 495:25, 502:12, 506:23, 506:24, 508:2, 509:10, 509:11, 523:9, 523:13, 523:16, 523:20, 523:25, 524:1, 524:16, 524:22, 551:13, 558:23, 558:24, 561:12, 561:13, 561:16, 561:18, 561:19, 561:20, 561:22, 564:6, 565:15, 567:3
**Training** [1] - 446:20

**trajectory** [3] - 545:14, 545:18, 575:15
**transcribed** [1] - 598:16
**Transcript** [1] - 400:25
**transcript** [19] - 430:12, 433:6, 436:4, 516:1, 517:13, 518:13, 531:18, 532:9, 564:23, 583:17, 590:5, 598:6, 598:10, 598:12, 598:17, 599:6, 599:7, 604:23, 605:1
**transcription** [2] - 400:25, 580:14
**transcripts** [1] - 451:15
**transfer** [1] - 460:5
**transition** [3] - 464:10, 475:13, 584:9
**transitioning** [2] - 482:25, 483:20
**transitions** [2] - 508:4, 571:8
**translation** [1] - 400:25
**transmission** [11] - 479:18, 480:6, 480:9, 480:21, 480:22, 481:7, 481:9, 481:24, 487:3, 487:6, 487:17
**transmissions** [5] - 461:16, 481:1, 519:17, 519:18, 519:19
**transpired** [10] - 404:11, 415:5, 439:7, 440:8, 463:1, 478:14, 537:1, 537:17, 545:7, 600:22
**transportation** [1] - 417:9
**trapped** [1] - 508:15
**travel** [4] - 481:25, 485:1, 522:9, 522:17
**traveled** [4] - 463:13, 463:14, 521:25, 522:6
**traveling** [5] - 485:9, 485:12, 485:15, 520:21, 522:24
**Travis** [4] - 400:17, 542:8, 542:9, 542:10
**Trayvon** [2] - 568:13, 568:22
**tread** [4] - 468:5,

485:20, 485:25, 520:19
**treatment** [1] - 481:7
**tree** [2] - 406:22, 441:1
**treeman** [1] - 554:4
**trees** [1] - 589:2
**tremble** [1] - 409:14
**tremendous** [2] - 451:22, 530:14
**trial** [25] - 402:3, 441:15, 442:24, 443:2, 455:9, 462:4, 474:21, 479:17, 479:21, 487:16, 493:6, 493:8, 500:23, 501:16, 513:10, 514:14, 515:12, 516:18, 528:18, 528:19, 529:25, 546:9, 568:12, 585:13, 602:3
**Trial** [1] - 400:12
**triangle** [1] - 504:1
**tried** [9] - 419:25, 422:20, 422:23, 453:13, 466:3, 507:19, 507:22, 523:11, 588:8
**tries** [1] - 508:5
**trigger** [1] - 510:20
**trigonometry** [1] - 461:21
**trooper** [1] - 593:18
**trouble** [2] - 418:13, 419:4
**truck** [2] - 417:21, 417:23
**true** [28] - 426:17, 429:11, 496:14, 496:22, 520:14, 526:2, 526:3, 530:11, 532:22, 546:12, 546:17, 548:15, 549:25, 550:1, 550:18, 554:13, 558:3, 559:23, 560:2, 572:20, 576:12, 576:13, 576:22, 577:3, 577:4, 577:16, 578:6, 595:23
**truly** [1] - 459:19
**truth** [5] - 490:11, 515:4, 574:25, 575:17, 594:5
**truthfully** [3] - 515:13, 533:22, 564:13
**try** [17] - 403:17,

405:17, 449:22, 455:5, 459:13, 467:6, 467:7, 467:11, 469:23, 481:19, 484:1, 503:11, 509:14, 509:15, 557:17, 573:7

**trying** [30] - 410:3, 446:4, 448:7, 455:16, 461:19, 473:3, 480:20, 487:3, 489:3, 491:3, 492:15, 493:4, 494:25, 495:18, 498:2, 505:8, 509:17, 512:15, 517:2, 523:22, 529:14, 552:24, 563:22, 570:21, 570:22, 575:23, 586:16, 586:22, 586:24, 598:15

**turn** [23] - 407:21, 422:11, 441:24, 442:11, 442:19, 453:20, 455:16, 474:3, 474:4, 474:6, 474:9, 476:4, 479:8, 486:23, 487:24, 492:18, 501:22, 508:23, 578:2, 578:22, 591:3

**turned** [7] - 421:8, 421:9, 441:21, 471:3, 484:5, 492:25, 529:9

**turning** [3] - 503:1, 563:7, 563:16

**turns** [4] - 496:19, 498:2, 529:11, 563:7

**TV** [3] - 416:19, 449:1, 449:3

**two** [60] - 407:11, 408:17, 410:22, 415:3, 416:15, 419:15, 419:19, 419:21, 421:3, 424:4, 424:6, 425:12, 426:13, 427:5, 427:11, 428:8, 435:24, 438:2, 438:4, 443:19, 458:11, 458:16, 458:23, 459:11, 462:21, 469:19, 470:4, 472:9, 479:14, 495:14, 496:6, 496:13, 496:20,

497:9, 498:10, 499:6, 507:6, 534:5, 553:24, 554:4, 554:9, 563:1, 563:10, 563:11, 563:20, 565:5, 566:2, 566:11, 566:19, 566:25, 570:7, 572:21, 573:4, 576:10, 579:1, 591:5, 591:9, 601:15

**type** [7] - 439:3, 441:5, 442:2, 465:14, 466:8, 486:4, 498:19

**types** [3] - 468:2, 571:9, 594:9

## U

**U-turn** [1] - 492:18

**ultimate** [2] - 564:6, 566:6

**ultimately** [2] - 420:5, 603:11

**umina** [1] - 603:24

**Umina** [48] - 400:15, 400:15, 404:4, 404:17, 405:17, 414:16, 416:23, 418:7, 418:15, 418:21, 419:6, 424:12, 425:1, 433:18, 436:7, 438:13, 439:10, 440:11, 440:19, 450:13, 450:22, 453:25, 457:23, 457:25, 475:21, 476:6, 476:22, 476:24, 477:24, 478:17, 478:22, 524:7, 518:1, 523:8, 544:20, 546:14, 557:24, 584:24, 585:9, 590:4, 590:8, 595:10, 595:16, 596:6, 598:20, 599:24, 600:24, 602:21

**UMINA** [63] - 402:9, 402:15, 402:20, 402:24, 403:5, 404:2, 404:5, 404:18, 405:5, 414:15, 416:24, 417:3, 418:8, 418:17, 418:22, 419:8, 436:8, 436:11, 438:12, 439:11, 439:13,

439:17, 439:25, 440:12, 440:21, 450:7, 450:23, 454:1, 461:11, 462:1, 462:13, 463:3, 475:25, 476:5, 476:7, 476:20, 476:23, 478:1, 478:10, 478:19, 478:23, 479:1, 479:16, 489:7, 511:13, 512:8, 514:6, 535:7, 535:22, 544:21, 590:10, 590:14, 595:9, 595:24, 596:22, 597:3, 597:24, 599:25, 600:25, 601:6, 602:22, 603:19, 603:25

**Umina's** [1] - 542:20

**Umina........404** [1] - 401:3

**Umina.................418** [1] - 401:8

**Umina.................439** [1] - 401:13

**Umina...............416** [1] - 401:5

**Umina................435** [1] - 401:10

**Umina................589** [1] - 401:15

**Umina........596** [1] - 401:17

**unarmed** [4] - 529:1, 529:2, 530:9, 530:12

**unaware** [1] - 430:6

**uncertain** [1] - 490:2

**uncle** [2] - 420:23, 437:18

**uncommon** [4] - 571:5, 571:9, 577:21, 578:18

**under** [21] - 406:22, 406:24, 429:21, 430:1, 431:2, 433:15, 450:18, 478:21, 489:13, 514:17, 514:23, 515:13, 524:15, 524:18, 527:1, 530:3, 533:18, 534:7, 535:15, 566:25, 605:5

**undergo** [1] - 577:15

**underneath** [1] - 524:22

**understood** [8] -

404:1, 476:3, 542:19, 544:17, 548:21, 566:16, 566:17, 590:12

**unfold** [1] - 481:12

**unfolded** [7] - 484:23, 569:19, 570:14, 571:5, 571:11, 573:1, 575:18

**unfolding** [1] - 490:2

**unfortunately** [2] - 472:11, 595:4

**union** [1] - 494:10, 550:4

**unit** [3] - 445:19, 446:9, 446:16

**United** [5] - 489:14, 564:16, 604:21, 605:3, 605:8

**UNITED** [1] - 400:1

**unless** [4] - 474:14, 505:2, 508:23, 538:17

**unlike** [1] - 490:14

**unquote** [1] - 457:3

**unreasonable** [5] - 502:3, 513:13, 572:19, 573:22, 593:14

**unusual** [1] - 552:23

**up** [138] - 402:16, 402:22, 403:10, 404:3, 406:13, 407:4, 407:5, 407:13, 407:25, 408:8, 408:13, 408:15, 410:5, 410:14, 410:17, 411:6, 411:8, 411:14, 411:22, 412:13, 412:14, 413:24, 414:2, 417:12, 422:21, 423:23, 426:6, 426:14, 426:23, 427:1, 427:8, 427:14, 427:23, 428:2, 428:16, 431:18, 432:14, 433:17, 435:13, 435:25, 436:8, 439:16, 439:17, 439:19, 439:23, 440:14, 447:6, 454:23, 455:21, 457:13, 457:18, 459:1, 459:21, 461:21, 465:22, 466:2, 467:2, 467:12, 468:12,

469:4, 469:13, 469:22, 470:2, 470:15, 470:19, 471:2, 471:3, 471:4, 471:7, 472:17, 474:2, 474:13, 474:18, 475:23, 476:4, 477:24, 478:8, 480:20, 484:8, 491:10, 493:25, 495:7, 495:19, 495:22, 496:16, 496:17, 497:4, 497:5, 498:2, 498:4, 498:13, 499:23, 500:22, 504:15, 504:17, 504:20, 505:1, 505:25, 507:9, 508:9, 509:2, 509:3, 510:8, 511:19, 516:16, 520:10, 520:13, 525:2, 525:7, 527:8, 537:25, 544:20, 548:1, 553:21, 566:21, 575:9, 578:11, 582:13, 584:16, 587:24, 588:4, 588:6, 588:8, 588:25, 593:14, 594:4, 598:4, 598:6, 601:8, 602:14, 603:2, 603:23

**upper** [1] - 465:22

**urgent** [1] - 432:2

**usual** [2] - 475:24, 600:12

**utilize** [7] - 451:10, 453:18, 502:12, 506:21, 508:16, 508:20, 509:25

**utilized** [2] - 474:23, 489:11

**utilizing** [2] - 400:25, 509:12

**utterance** [1] - 415:1

## V

**vaccine** [4] - 601:23, 602:2, 602:4, 603:4

**validated** [1] - 402:13

**validity** [1] - 558:20

**value** [1] - 496:22

**variable** [3] - 472:8, 489:19, 518:23

**variables** [3] - 491:11, 556:4, 556:5

**variety** [5] - 441:5,

443:9, 446:8,
535:17, 587:6
**veer** [1] - 472:9
**vegetation** [1] - 505:3
**vehicle** [164] - 449:14,
457:1, 457:6, 457:7,
458:8, 458:20,
458:22, 458:23,
458:24, 460:2,
460:4, 460:5, 460:6,
460:10, 460:11,
463:24, 467:23,
468:1, 468:2, 468:5,
468:11, 468:21,
468:23, 469:1,
469:10, 469:12,
471:15, 471:19,
472:9, 472:17,
472:18, 472:20,
472:21, 473:1,
473:2, 473:4, 473:6,
473:12, 473:15,
473:19, 473:22,
473:23, 473:25,
474:1, 474:2,
474:12, 474:16,
474:18, 475:1,
475:3, 475:4, 475:8,
476:13, 480:16,
482:8, 482:11,
482:12, 482:18,
482:23, 482:24,
483:4, 483:8,
483:21, 484:4,
484:7, 484:11,
485:7, 486:2,
486:13, 486:16,
487:5, 489:1, 492:8,
492:9, 492:13,
492:14, 492:15,
492:16, 492:24,
504:2, 504:18,
504:25, 505:1,
505:8, 505:10,
505:18, 505:21,
505:23, 506:4,
506:7, 506:9,
506:17, 506:18,
506:22, 506:24,
506:25, 507:4,
507:19, 507:21,
507:23, 508:4,
508:8, 508:14,
508:16, 508:19,
508:20, 509:4,
509:5, 509:8,
509:12, 509:17,
509:22, 510:3,
510:8, 510:12,
510:13, 511:2,
511:4, 511:6, 511:7,

511:17, 511:18,
511:24, 511:25,
512:6, 512:10,
512:13, 512:21,
513:17, 513:23,
520:20, 522:8,
522:24, 547:7,
547:20, 547:21,
552:21, 554:10,
554:16, 556:19,
557:3, 557:13,
557:14, 567:11,
567:24, 578:9,
578:10, 578:13,
578:14, 581:11,
582:7, 583:4,
583:11, 586:12,
587:7, 587:11,
591:12, 592:2,
592:5, 599:1
**vehicles** [4] - 459:9,
507:14, 522:3,
552:24
**vehicles'** [1] - 498:1
**verbal** [4] - 447:24,
482:24, 482:25,
486:14
**verdict** [1] - 603:19
**verified** [1] - 489:5
**verify** [2] - 509:23,
535:8
**verifying** [1] - 535:12
**versa** [1] - 596:15
**version** [8] - 445:12,
499:19, 499:20,
499:23, 500:3,
591:1, 591:2, 591:23
**versions** [2] - 499:24,
591:5
**versus** [3] - 510:25,
576:15, 581:15
**vice** [1] - 596:15
**vice-versa** [1] - 596:15
**video** [2] - 448:5,
575:14
**videos** [2] - 454:6
**view** [2] - 506:2, 509:3
**violated** [2] - 488:17,
489:10
**violation** [1] - 488:20
**violations** [1] - 554:20
**VIRGINIA** [1] - 400:2
**Virginia** [24] - 400:13,
405:8, 417:11,
451:17, 516:16,
523:12, 523:16,
523:20, 523:23,
523:24, 524:1,
528:19, 528:21,
532:10, 532:12,

532:14, 533:4,
546:9, 547:4,
547:13, 547:19,
547:23, 604:22,
605:9
**visit** [3] - 409:23,
452:4, 452:7
**visited** [2] - 411:20,
516:15
**visits** [3] - 411:25,
431:11, 432:2
**visual** [12] - 453:11,
453:18, 454:2,
479:24, 492:9,
492:10, 492:13,
492:14, 493:3,
497:24, 547:7,
547:15
**visually** [2] - 469:12,
470:12
**voice** [1] - 503:6,
510:6, 514:20
**voir** [1] - 450:10
**vs** [12] - 402:4, 528:21,
540:5, 541:5,
542:14, 543:11,
544:11, 564:15,
564:23, 571:19,
571:24, 589:15

## W

**W-a-r-o-n-i-c-k-i** [1] -
544:7
**w-as** [1] - 419:23
**wait** [4] - 420:2, 430:8,
494:8, 567:18
**waited** [1] - 421:3
**waiting** [5] - 493:11,
493:12, 493:13,
549:24, 550:11
**walk** [3] - 555:18,
555:20, 555:22
**walking** [1] - 454:23
**wall** [1] - 497:23
**Wallace's** [1] - 411:15
**wampus** [1] - 406:17
**wants** [1] - 509:19
**Waronicki** [2] - 544:6,
544:10
**wasted** [1] - 575:22
**watch** [2] - 416:19,
486:13
**watched** [1] - 507:11
**watching** [1] - 406:12
**watermark** [1] - 541:9
**ways** [1] - 571:13
**weapon** [28] - 444:18,
476:17, 483:14,
510:25, 529:9,

529:22, 530:2,
548:10, 549:13,
550:19, 552:3,
552:15, 552:20,
552:21, 553:16,
553:22, 554:16,
560:22, 562:11,
562:21, 567:6,
567:8, 567:16,
567:21, 567:22,
567:23, 569:4
**weapons** [7] - 444:19,
444:20, 445:18,
448:2, 448:15, 449:1
**weekend** [1] - 437:12
**weeks** [3] - 412:21,
416:11, 421:3
**weight** [1] - 535:18
**welfare** [1] - 429:17
**well-founded** [5] -
548:16, 548:19,
548:23, 549:11,
549:13
**well-lit** [1] - 509:21
**WEST** [1] - 400:2
**West** [24] - 400:13,
405:8, 417:10,
451:17, 516:16,
523:12, 523:16,
523:20, 523:23,
523:24, 523:25,
528:18, 528:21,
532:10, 532:11,
532:14, 533:4,
546:9, 547:4,
547:13, 547:18,
547:23, 604:22,
605:9
**wet** [1] - 472:6
**whatsoever** [1] -
408:12
**wheel** [5] - 471:1,
471:3, 508:23,
508:24, 588:11
**wheelers** [1] - 409:20
**wheelhouse** [1] -
442:6
**wheels** [3] - 458:22,
458:24
**whereabouts** [1] -
492:10
**whereas** [1] - 450:19
**whiteboard** [4] -
502:19, 503:4,
511:10, 587:25
**whole** [5] - 407:6,
436:25, 463:19,
489:16, 509:15
**wide** [7] - 453:7,
460:2, 464:25,

465:12, 497:20,
505:24
**width** [4] - 459:25,
464:24, 465:11,
504:22
**wife** [8] - 411:16,
416:1, 425:25,
441:3, 443:20,
443:23, 446:22,
446:25
**Williams** [3] - 542:8,
542:9, 542:10
**willing** [2] - 505:2,
575:24
**window** [10] - 454:11,
466:21, 479:22,
481:14, 487:8,
513:21, 513:25,
514:1
**wise** [2] - 445:7, 506:7
**wish** [1] - 586:18
**witness** [40] - 402:18,
402:25, 404:17,
415:1, 416:21,
418:13, 418:15,
418:17, 418:21,
439:10, 439:11,
440:11, 441:8,
441:20, 442:23,
447:14, 448:23,
450:8, 450:14,
450:17, 477:20,
477:22, 478:20,
478:23, 490:19,
500:1, 502:18,
511:10, 515:1,
515:11, 533:5,
533:21, 554:25,
573:7, 576:11,
590:9, 590:15,
595:5, 601:16,
601:20
**WITNESS** [17] - 401:2,
401:7, 401:12,
404:19, 419:2,
440:15, 455:22,
455:25, 456:3,
503:6, 503:11,
511:22, 542:9,
542:18, 544:13,
565:19, 600:2
**witnessed** [3] -
452:23, 589:4,
591:10
**witnesses** [12] -
450:20, 454:15,
467:2, 472:14,
490:15, 490:21,
495:8, 496:23,
497:14, 595:4,

595:6, 600:24
**witnessing** [1] - 576:17
**woman** [1] - 433:22
**wooded** [1] - 505:3
**word** [5] - 497:16, 548:24, 549:10, 549:13, 587:12
**words** [7] - 422:20, 454:11, 465:13, 518:20, 539:15, 562:4, 588:7
**worker** [1] - 408:6
**workers** [1] - 407:24
**works** [2] - 455:24, 547:18
**world** [2] - 564:2, 564:4
**write** [2] - 410:15, 586:4
**writing** [2] - 448:12, 480:19
**written** [12] - 448:13, 451:15, 452:5, 464:18, 495:20, 525:15, 572:24, 591:20, 592:4, 597:9, 599:17
**wrote** [2] - 572:9, 585:15
**WV** [3] - 400:16, 400:19, 400:23
**Wyatt** [1] - 405:8

## Y

**yard** [3] - 406:22, 409:21, 409:22
**yards** [1] - 509:15
**year** [9] - 410:11, 410:13, 411:23, 426:18, 447:3, 530:20, 538:13, 540:15, 540:16
**year's** [2] - 426:23, 427:1
**years** [25] - 405:23, 406:4, 407:11, 409:9, 409:10, 410:7, 413:21, 414:4, 415:3, 431:10, 435:24, 443:19, 444:10, 519:2, 524:8, 526:5, 531:7, 540:6, 540:21, 555:24, 558:7, 565:12, 565:16, 569:10
**yelling** [1] - 511:18
**yesterday** [17] - 402:5,

405:24, 406:4, 410:11, 422:5, 458:13, 459:15, 461:12, 469:19, 475:18, 476:8, 480:5, 487:16, 496:10, 496:12, 519:8, 520:12
**yesterday's** [2] - 500:17, 517:8
**young** [7] - 409:8, 410:3, 425:17, 490:18, 512:15, 524:17
**younger** [3] - 403:3, 403:6, 409:4
**youngest** [5] - 410:2, 412:18, 412:24, 413:1, 437:20
**yourself** [5] - 405:6, 414:6, 440:24, 510:10, 545:22
**yourselves** [2] - 439:1, 477:7
**youths** [1] - 524:17

## Z

**zero** [1] - 494:15
**Zimmerman** [2] - 568:12, 568:16
**Zimmerman's** [1] - 568:22