09:09:11

```
                   UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF WEST VIRGINIA
                           AT CLARKSBURG
                              - - -

CHRISTY J. RHOADES, in her          CIVIL ACTION NO. 1:18-CV-186
capacity as the Administratrix
and Personal Representative of
the estate of Philip Jontz
Rhoades,

                         Plaintiff,

V.

DAVID FORSYTH, in his official
and individual capacity,

                         Defendant.
                              - - -
     Proceedings had in the Jury Trial of the above-styled
action on Friday, April 9, 2021, before the Honorable Judge
Thomas S. Kleeh, District Judge, at Clarksburg, West Virginia.
                              - - -

APPEARANCES:
For the Plaintiff:            Ryan J. Umina
                             Umina Legal, PLLC
                             125 Greenbag Road
                             Morgantown, WV 26501

                             Travis Austin Prince
                             Benjamin J. Hogan
                             Bailey & Glasser, LLP - Morgantown
                             6 Canyon Rd., Suite 200
                             Morgantown, WV 26508


For the Defendant:           Tiffany R. Durst
                             Nathan A. Carroll
                             Pullin Fowler Flanagan Brown & Poe
                             PLLC - Morgantown
                             2414 Cranberry Sq.
                             Morgantown, WV 26508


     Proceedings recorded utilizing realtime translation.
Transcript produced by computer-aided transcription.
```

*Jill M. Cutter, RPR*
*500 W. Pike Street, Clarksburg, WV 26301 (304)622-8513*

608

```
1                        INDEX

2    RULE 50 MOTION

3    By Mr. Carroll............................3

4    DEFENSE WITNESS: SAMUEL FAULKNER

5    Direct examination by Ms. Durst...........21

6    Cross-examination by Mr. Umina............74

7    CLOSING ARGUMENT

8    By Mr. Umina.............................157

9    By Ms. Durst.............................184

10   VERDICT.................................226

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

|       |                                                                      |
|-------|----------------------------------------------------------------------|
| 1     | (Proceedings commenced at 9:09 a.m., in open court.)                |
| 2     | THE COURT:  Good morning, everyone.  Please be                       |
| 3     | seated.  All right.                                                  |
| 4     | So we are here on day four of trial proceedings in the              |
| 5     | matter of Rhoades v. Forsyth, 1:18-cv-186.  At the conclusion       |
| 6     | yesterday, the plaintiff rested.                                    |
| 7     | Any motions at this point?                                           |
| 8     | MR. CARROLL:  Your Honor, we would like to present a                |
| 9     | Rule 50 motion for judgement as a matter of law at this point.      |
| 10    | THE COURT:  You may proceed, sir.                                    |
| 11    | MR. CARROLL:  Thank you, Your Honor.  There are four                |
| 12    | components to our motion.  We are moving to dismiss the             |
| 13    | punitive damages, excessive force claim, intentional               |
| 14    | infliction of emotional distress, and wrongful death.  That is     |
| 15    | all the plaintiff's claims at this time.                           |
| 16    | With regards to punitive damages, Congress created the             |
| 17    | 1983 to create a cause of action including excessive force;        |
| 18    | however, Congress did not specifically create punitive             |
| 19    | damages.  That was attached by the Supreme Court through the        |
| 20    | case *Smith v. Wade*, that's 461 U.S. 30.  And under *Smith*, the  |
| 21    | case law is for punitive damages.  To be applicable, the           |
| 22    | defendant's conduct must be motivated by evil motive or            |
| 23    | intent, or involve reckless or callous indifference.               |
| 24    | In this case, the jury has not heard any testimony of any          |
| 25    | events preceding the afternoon of August 2nd, 2017.  There is      |

Timestamps (left margin):
- 09:09:11 (line 2)
- 09:09:13 (line 3)
- 09:09:17 (line 4)
- 09:09:22 (line 5)
- 09:09:31 (line 6)
- 09:09:32 (line 7)
- 09:09:34 (line 8)
- 09:09:36 (line 9)
- 09:09:39 (line 10)
- 09:09:41 (line 11)
- 09:09:42 (line 12)
- 09:09:45 (line 13)
- 09:09:47 (line 14)
- 09:09:50 (line 15)
- 09:09:53 (line 16)
- 09:09:57 (line 17)
- 09:10:01 (line 18)
- 09:10:05 (line 19)
- 09:10:10 (line 20)
- 09:10:15 (line 21)
- 09:10:20 (line 22)
- 09:10:23 (line 23)
- 09:10:26 (line 24)
- 09:10:29 (line 25)

09:10:33  1    no evidence of any motive.  There is no evidence of any

09:10:36  2    intent.  And there is nothing to suggest indifference on

09:10:39  3    behalf of the part of the defendant.  Essentially, we are

09:10:42  4    talking about a 16-second window.  That is not enough time for

09:10:46  5    any juror to reasonably infer motive, intent, or indifference.

09:10:50  6    For that reason, as a matter of law, we believe the punitive

09:10:53  7    damages claim must be dismissed.

09:10:55  8         Regarding the excessive force, we would rely on the case

09:11:00  9    law that we presented in our motion for summary judgment;

09:11:03  10   however, I would reiterate that under *Pritchard vs. Alford* the

09:11:07  11   determination of whether a reasonable person in the officer's

09:11:09  12   position would have known that his conduct would violate the

09:11:12  13   right at issue, must be made in light of any exigencies at the

09:11:18  14   time and circumstances that reasonably may have affected the

09:11:21  15   officer's perceptions.

09:11:23  16        The only objective evidence in this case to support

09:11:26  17   plaintiff's theory would be the fact that the Jeep that

09:11:29  18   Philip Rhoades was driving was running and in gear, which is

09:11:35  19   an impossibility based off of all of the testimony from the

09:11:37  20   witnesses in this trial.  From there, plaintiff relies on his

09:11:40  21   expert opinion, and his expert opinion essentially says that

09:11:43  22   the evidence at the scene is inconsistent with the defendant's

09:11:46  23   statements.  And that the timeline of the incident is

09:11:50  24   inconsistent with the, again, Deputy Forsyth's statements.

09:11:56  25   Both of those are -- point to inconsistencies, but do not

09:12:00  1    provide any objective evidence to support.  Essentially, they

09:12:02  2    say that the defendant's theory of the case is not consistent,

09:12:05  3    but it doesn't say that excessive force has objectively

09:12:09  4    occurred.  For that reason, we do not believe that a

09:12:12  5    reasonable jury could find that excessive force -- the

09:12:16  6    elements for excessive force have been met in this case.

09:12:19  7        I will also point out that plaintiff's expert has made an

09:12:22  8    opinion on the tactics and the actions of Defendant Forsyth.

09:12:26  9    To the extent that he has made that argument, and this is a

09:12:30  10   quote that I have from Mr. Roof, it was that Forsyth's

09:12:34  11   decision -- and my quote is, "It wasn't tactically sound, but

09:12:38  12   he did not know any better."  Your Honor, that is no

09:12:41  13   indication of motive, intent.  That is simply, at best, a

09:12:44  14   negligence claim.  And under excessive force, officers have

09:12:48  15   the right to make reasonable errors.

09:12:51  16       Finally, with regards to -- well, I will say the third,

09:12:54  17   intentional infliction of emotional distress, that is the

09:12:58  18   state law claim, that is the initial question of whether

09:13:01  19   intentional infliction of emotional distress, if permitted to

09:13:05  20   go to the jury, is a legal question.  And the hallmark of

09:13:07  21   intentional infliction of emotional distress is extreme or

09:13:10  22   outrageous conduct.  Again, to the extent that we have heard

09:13:13  23   that death would have essentially been instantaneous in this

09:13:17  24   case, there would not be any emotional distress.

09:13:20  25       More importantly, Your Honor, the claim for severe

09:13:27  1    emotional distress arising out of Defendant Forsyth's conduct

09:13:31  2    is a personal injury claim.  And in that sense, it is governed

09:13:35  3    by the two-year statute of limitations, which is pursuant to

09:13:37  4    West Virginia Code, Section 55-2-12(b).  However, the West

09:13:43  5    Virginia court in *Courtney v. Courtney* -- that is 190 W. VA.

09:13:48  6    126.  It is a 1993 case -- the *Courtney* decision makes clear

09:13:53  7    that a claim for emotional distress only survives the death of

09:13:56  8    a plaintiff where the alleged tortuous conduct does not result

09:14:00  9    in the death of the plaintiff.

09:14:02  10       Here what we have is a case where the alleged tortuous

09:14:06  11   conduct, the use of excessive force, is the cause of

09:14:09  12   Philip Rhoades' death; therefore, it does not survive

09:14:11  13   Philip Rhoades' death.

09:14:12  14       In the Northern District of West Virginia there is an

09:14:15  15   unpublished opinion, this is a trial court decision, that is

09:14:18  16   *Hoover vs. Trent*, and the docket number is 1:07-CV-47, and the

09:14:28  17   elective citation for that case is 2008 U.S. DIST LEXIS 58447.

09:14:39  18   And that is a Northern District of West Virginia 2008.  In the

09:14:45  19   *Hoover* decision the decedent was an inmate who passed away as

09:14:49  20   a result of hypothermia in jail.  The estate sued, alleging

09:14:54  21   wrongful death and intentional infliction of emotional

09:14:58  22   distress in that case.  In addressing which claims survived

09:15:00  23   the death of the decedent, the Court noted that West Virginia

09:15:04  24   Code 55-7-8(a) only allows for the survival of personal

09:15:08  25   injuries that do not result in death.  So I think that is

09:15:11  1   established here today, and plaintiff cannot pursue it any

09:15:13  2   further, intentional infliction of emotional -- intentional

09:15:18  3   infliction of emotional distress claims.

09:15:20  4        And lastly, the wrongful death claim, it is a derivative

09:15:24  5   claim to the extent that the prior two claims are dismissed,

09:15:26  6   the wrongful claim -- - --

09:15:27  7        THE COURT:  Any other basis defendant moves under

09:15:31  8   Rule 50 with respect to the wrongful death claim other than

09:15:34  9   derivative of the other three claims?

09:15:36  10        MR. CARROLL:  -- no, Your Honor.

09:15:37  11        THE COURT:  Understood.

09:15:38  12        MR. CARROLL:  And we would reserve the right to make

09:15:39  13   a Rule 50 motion on qualified immunity at the close of our

09:15:43  14   case in chief; however, I don't believe it's appropriate at

09:15:45  15   this time.

09:15:45  16        THE COURT:  Understood.

09:15:47  17        MR. CARROLL:  Thank you, Your Honor.

09:15:47  18        THE COURT:  Thank you, Mr. Carroll.

09:15:48  19      Counsel.

09:15:48  20        MR. UMINA:  Your Honor, under Rule 50, the facts are

09:15:54  21   viewed in a light favorable to the non-moving party.  As to

09:15:58  22   the punitive damages claim, Your Honor, as counsel points out,

09:16:03  23   requires a reckless indifference.

09:16:05  24        In this matter, Your Honor, simply a finding of liability

09:16:10  25   requires either a reckless indifference to the rights of Mr.

09:16:15   1    Rhoades, or intent.  And if that -- if we are at intent, most

09:16:21   2    certainly taking someone's life has an evil motive behind it.

09:16:25   3    So, Your Honor, as to punitive damages, the Court has been

09:16:28   4    fully briefed on the applicable case law, and prior -- and

09:16:32   5    prior pleadings in this Court.

09:16:34   6        Most certainly the jury is entitled to consider punitive

09:16:38   7    damages.  And again, the theory of the plaintiff is that the

09:16:44   8    defendant jumped out of his vehicle and knowingly and

09:16:49   9    intentionally utilized lethal force when it wasn't permitted

09:16:54   10    by his own policy or by the Constitution of the United States

09:16:56   11    of America, Your Honor.  And that callous indifference to the

09:17:01   12    policies that govern him and to the constitutional

09:17:04   13    requirements for using lethal force, most certainly rise to

09:17:10   14    the level of the plaintiff being entitled to punitive damages.

09:17:14   15        As to the excessive force claim, Your Honor, opposing

09:17:19   16    counsel pointed out a number of facts that would go to

09:17:22   17    indicate that the defendant did, in fact, utilize excessive

09:17:28   18    force.  He points out that there was a timeline that was put

09:17:33   19    into evidence in this case that would indicate that the

09:17:36   20    defendant's version of events could not have occurred in the

09:17:40   21    manner in which he claims.

09:17:41   22        Additionally, they point out that the vehicle was running

09:17:44   23    and in neutral, and as we have heard from nearly every single

09:17:48   24    person who testified other than the Rhoades' family, a vehicle

09:17:52   25    could not be running and in gear 52 minutes after the

09:17:57   1   shooting.  And there has been no evidence, not a single piece

09:18:00   2   of evidence, offered as to how the vehicle got out of neutral,

09:18:07   3   out of gear at the time of the shooting.

09:18:14   4        Your Honor, there has also been -- I was just passed a

09:18:22   5   note by my co-counsel.  I just want to add to punitive

09:18:26   6   damages.  The intent, motive, and deliberate indifference

09:18:29   7   would also be demonstrated by the coverup that we have argued

09:18:32   8   here and the fact that the defendant intentionally intended to

09:18:36   9   cover up his actions and, in fact, worked with another member

09:18:40   10  of the department, the only witness to the scene, to cover up

09:18:44   11  these actions.  That would also go to punitive damages.

09:18:46   12       Turning back to the excessive force argument, they made a

09:18:51   13  statement that the tactics used were not proper, but he didn't

09:18:57   14  know any better.  That statement wasn't made about Mr.

09:19:00   15  Forsyth.  That statement was made about Mr. Love.  We were

09:19:03   16  specifically talking about him going towards the front of the

09:19:06   17  vehicle.  So again, that had nothing to do with Mr. Forsyth.

09:19:11   18  So certainly the vehicle running and in neutral, there being

09:19:15   19  no evidence of that vehicle being taken out of gear by anyone

09:19:18   20  including the defendant, as he has testified, the timeline of

09:19:22   21  events, the fact that there was no ground disturbance on the

09:19:26   22  scene to support his claim that the tires were spinning and

09:19:30   23  the engine was revving, Your Honor, we have certainly put

09:19:33   24  forth enough evidence to show that his version of events did

09:19:35   25  not happen.  He took the life of someone sitting in a vehicle

09:19:38  1    in neutral.

09:19:39  2         As to the intentional infliction of emotional distress,

09:19:44  3    most certainly taking a .40-caliber pistol and shooting at

09:19:49  4    someone seven times is extreme and outrageous unless your life

09:19:53  5    is actually in danger, and again, the evidence here does not

09:19:53  6    suggest that it was.

09:19:54  7         As to the law cited by the defendant, none of that law

09:19:58  8    sounded like it was binding on this Court.  If the Court --

09:20:02  9              THE COURT:  How is it not.

09:20:03  10             MR. UMINA:  He cited a Northern District of West

09:20:07  11   Virginia case.  Now, if the Courtney case does, in fact, say

09:20:10  12   what it does, and it is still good law, then, Your Honor,

09:20:13  13   frankly we don't have much of an argument here.  And I will

09:20:17  14   concede that.  But in the event there is any exception to that

09:20:20  15   rule, we have certainly put forth enough evidence of

09:20:22  16   intentional infliction of emotional distress.

09:20:25  17        And as to the wrongful death claim, I'm not sure that he

09:20:29  18   actually -- I am not sure there is really an argument to

09:20:31  19   address.  He said it is derivative of the other claims.  We

09:20:34  20   made sufficient arguments to each of other claims, Your Honor.

09:20:37  21             THE COURT:  Understood.  Thank you, Mr. Umina.

09:20:38  22        Mr. Carroll.

09:20:39  23             MR. CARROLL:  Your Honor, I would only point out,

09:20:42  24   particularly in the context of punitive damages claims, that

09:20:45  25   the plaintiff has not identified, or I don't believe there is

09:20:47  1    any significant evidence that was taken of Defendant Forsyth

09:20:52  2    of anything that happened after the shooting.  So to the

09:20:54  3    extent that there was a coverup or even looking into what

09:20:57  4    happened to the Jeep and how it got into neutral, or anything

09:21:01  5    of that nature, I don't believe that is properly in the

09:21:04  6    record.

09:21:04  7        I would also point out, to the extent that an alleged

09:21:07  8    coverup would be the basis of a punitive damages claim, it

09:21:11  9    seems to me that that would be related to *Monell*.  That is

09:21:14  10   something that happened after the shooting here on the 1983

09:21:18  11   excessive force, and I don't believe that we can create a

09:21:21  12   punitive damages claim for something that occurred after the

09:21:22  13   use of force was used.  Thank you, Your Honor.

09:21:25  14       THE COURT:  Understood.  Thank you, counsel.  The

09:21:29  15   Court will deny the motion on the excessive force claim.  I

09:21:33  16   certainly believe the record that has been established during

09:21:37  17   the plaintiff's case in chief, presents a legally sufficient

09:21:40  18   evidentiary basis, which of course is our standard here.  And

09:21:44  19   as Mr. Umina appropriately points out, the Court is required

09:21:48  20   to view the evidence in the light most favorable to the

09:21:51  21   non-movement, and that includes inferences.  I do believe

09:21:55  22   there is sufficient evidence for a jury to return a verdict in

09:22:00  23   favor of the plaintiff on the excessive force claim.

09:22:03  24       Hand in hand with that with respect to punitive damages,

09:22:06  25   I spent a good bit of time yesterday diving into that issue,

09:22:11  1    anticipating this conversation this morning.  I do think

09:22:14  2    counsel has correctly identified the standard, which is evil

09:22:19  3    motive or intent, or when the situation involves reckless,

09:22:22  4    callous indifference to the federally protected rights of

09:22:26  5    others.  There is plenty of cases -- and I will get an actual

09:22:31  6    order in reflecting our rulings here this morning -- talking

09:22:34  7    about how close in hand, if you will, liability on an

09:22:39  8    excessive force claim under 1983 is with punitive damages.

09:22:42  9    Doesn't make it automatic if liability is found, but the

09:22:47  10   standard is relatively the same.  So given the Court's ruling

09:22:53  11   on the excessive force claim, the Court would likewise deny

09:22:56  12   the motion with respect to the punitive damages aspect of the

09:23:00  13   1983 claim.  Putting aside the evil motive or intent, I think

09:23:07  14   there is a legally sufficient evidentiary basis to support a

09:23:10  15   finding by the jury with respect to potentially reckless or

09:23:14  16   callous indifference behavior here, again, looking at the

09:23:18  17   evidence in the light most favorable to the non-movement,

09:23:22  18   which at this point is the plaintiff.

09:23:25  19        With respect to -- well, let's put the intentional

09:23:30  20   infliction to the side for the moment.  Given the Court's

09:23:34  21   ruling on the excessive force claim, the Court would likewise

09:23:36  22   deny the motion with respect to the wrongful death claim given

09:23:39  23   that it's derivative of 1983.

09:23:41  24        The Court will grant the motion with respect to the

09:23:43  25   intentional infliction of emotional stress claim for two

09:23:46    1    reasons.  First, I believe Mr. Carroll is correct.  It's not a

09:23:51    2    survivable claim given the death of Mr. Rhoades here.  That is

09:23:56    3    a claim that belonged to him, and that claim expired upon his

09:24:01    4    passing.  And also recognizing as an alternative basis, it's

09:24:07    5    this Court's duty as an additional matter, to determine if the

09:24:12    6    conduct involved is so atrocious, so extreme, and so

09:24:16    7    outrageous that it cannot be tolerated in society, and again,

09:24:19    8    I recognize why we are here, and that Mr. Rhoades is not with

09:24:23    9    us, and that is why we are here, but the facts and

09:24:26   10    circumstances of what led to his death are also why we are

09:24:31   11    here.  And this Court can't, as a matter of law, declare the

09:24:33   12    actions that occurred on August 2nd so atrocious and so

09:24:37   13    extreme given law enforcement's involvement and the evidence

09:24:42   14    in dispute here.

09:24:44   15        So for those two reasons, the survivability and the

09:24:47   16    initial legal threshold, the Court would grant the motion on

09:24:50   17    the intentional infliction of emotional distress claim.

09:24:54   18    Objections respectively noted with respect to the Court's

09:24:58   19    rulings.

09:24:59   20        Any other motions we need to take up at this point?

09:25:03   21            MR. CARROLL:  Nothing further, Your Honor.

09:25:04   22            THE COURT:  Mr. Umina, any motions for plaintiff?

09:25:05   23            MR. UMINA:  Not in this regard, Your Honor.  Prior to

09:25:10   24    Mr. Faulkner testifying, we would like to talk about the way

09:25:14   25    in which his opinions are phrased in terms of the Court's

09:25:18  1   rulings in this matter.

09:25:21  2       Would you like us to address that now, Your Honor?

09:25:23  3       THE COURT:  Let's put a pin in that and come back

09:25:26  4   around to it, but don't let me leave before we talk about it.

09:25:29  5       Let me ask this question at this point as we are

09:25:33  6   finalizing our charge:  First question off the top, is there

09:25:36  7   any dispute with respect to the state actor under state --

09:25:44  8   "under color" of state law element at this point?

09:25:46  9       MR. UMINA:  We stipulated to that previously.

09:25:47  10      THE COURT:  Is that accurate?

09:25:49  11      MS. DURST:  It is, Your Honor.

09:25:49  12      THE COURT:  All right.  We will make sure our charge

09:25:53  13  reflects that.

09:26:04  14      Mr. Umina, go ahead.

09:26:06  15      MR. UMINA:  Your Honor, in this case, Mr. Faulkner,

09:26:16  16  we found a number of opinions, but only two have survived

09:26:22  17  motions in limine hearings, but his first opinion, "Deputy

09:26:26  18  Forsyth did his duty and placed himself in harm's way when he

09:26:30  19  responded to a high risk pursuit of a dangerous fleeing

09:26:35  20  felon."  We take issue with the words "dangerous, fleeing

09:26:39  21  felon," and especially the word "felon."  We have no issue

09:26:43  22  with him using "high risk traffic stop."  And additionally, a

09:26:48  23  high risk traffic stop and a felony traffic stop are

09:26:52  24  synonymous terms.  So I think it would be misleading to the

09:26:56  25  jury especially in light of the Court's rulings, to refer to

09:27:00  1    it as a felony traffic stop.  We have no issue with him

09:27:03  2    calling it a high risk traffic stop.

09:27:05  3        And also, calling Mr. Rhoades himself dangerous.  You

09:27:11  4    know, again, we realize that he -- that he had information,

09:27:16  5    the defendant had information at the time that he may be

09:27:19  6    armed, but that information was not true.  So to just

09:27:23  7    inherently call him dangerous, I don't think it's proper,

09:27:26  8    especially in light of the Court's rulings.

09:27:31  9        And additionally, Deputy Forsyth's response to Mr.

09:27:35  10   Rhoades placing members of the general public at risk of death

09:27:39  11   or serious bodily harm after attempting to run over the

09:27:42  12   deputy, complying with Supreme Court guidelines.  First, it's

09:27:48  13   highly misleading that he was placing members of the general

09:27:51  14   public at risk or death, especially when you look at the

09:27:55  15   requirements under the Marion County Sheriff's Department use

09:27:58  16   of force policy.  That threat has to be imminent.  And how

09:28:02  17   imminent is defined is that it is perceived to be unavoidable.

09:28:08  18   There is --

09:28:09  19            THE COURT:  Do we have any evidence that anyone else

09:28:11  20   was anywhere in the path or near the chase?

09:28:17  21            MS. DURST:  In the initial pursuit -- yes, Your

09:28:20  22   Honor, Deputy Forsyth testified from the witness stand that

09:28:22  23   when he initially saw the Jeep on Route 250, Mr. Rhoades

09:28:27  24   swerved into oncoming traffic, almost hit a vehicle in the

09:28:31  25   oncoming lane, as Deputy Forsyth turned around to pursue him.

09:28:36  1    There was also the civilian vehicle near where they found the

09:28:39  2    access road.  If you remember, Deputy Forsyth had to wait for

09:28:43  3    that civilian vehicle to pull by.  So there is evidence of

09:28:47  4    that, Your Honor.

09:28:47  5            THE COURT:  Understood.  Go ahead, Mr. Umina.

09:28:47  6            MR. UMINA:  Again, that threat has to be imminent.

09:28:50  7    It's not somebody is down the road or he passed somebody

09:28:53  8    earlier.  There would have had to have been someone that it

09:28:57  9    appeared to the defendant that but for shooting him, there was

09:29:02  10   an unavoidable threat of serious injury or bodily harm.  No

09:29:08  11   members of the public were anywhere near there, even by their

09:29:11  12   own testimony.  There was no unavoidable threat to the public

09:29:13  13   that was perceived to be immediate.  So the characterization

09:29:20  14   of him placing members of the general public at risk of death

09:29:24  15   or serious bodily harm, that is the verbiage from the use of

09:29:28  16   force policy, but again, this is highly misleading because

09:29:32  17   that doesn't -- just stating that, doesn't get them there.  It

09:29:36  18   has to be a -- perceived to be an immediate, unavoidable

09:29:41  19   threat.  And --

09:29:45  20           THE COURT:  Tell me about the trying to run over the

09:29:48  21   deputy portion of that.

09:29:51  22           MR. UMINA:  Yes, Your Honor.  It says -- it says

09:29:54  23   after attempting to run over the deputy.  Again --

09:30:02  24           THE COURT:  Is that related to July 25th?

09:30:06  25           MR. UMINA:  I know that he most certainly -- that is

| 09:30:10 | 1 | another issue with both of these.  He mentions July 25th.  I |
| 09:30:13 | 2 | want to make sure... |
| 09:30:15 | 3 | THE COURT:  Well, we're not talking about July 25th. |
| 09:30:16 | 4 | That's why I am curious about this "running over the deputy." |
| 09:30:20 | 5 | MR. UMINA:  So right here, on page 14 of the initial |
| 09:30:26 | 6 | opinion, Deputy Love was interviewed following Deputy |
| 09:30:31 | 7 | Forsyth's interview.  "Mr. Rhoades had attempted to run over |
| 09:30:34 | 8 | Deputy Love on July 25th, 2017."  And then he goes on and on |
| 09:30:38 | 9 | there.  So really it's kind of vague, just as I am looking at |
| 09:30:45 | 10 | this here.  And maybe they can provide some clarification, but |
| 09:30:49 | 11 | I mean, they make mention of that, and again most certainly |
| 09:30:53 | 12 | that is not for consideration by the jury in this case. |
| 09:30:56 | 13 | THE COURT:  Any other issues, Mr. Umina? |
| 09:30:58 | 14 | MR. UMINA:  No, I just wanted to make sure -- and I'm |
| 09:31:02 | 15 | sure counsel has informed the expert of the evidentiary |
| 09:31:04 | 16 | rulings in the case, so no other issues in that regard. |
| 09:31:09 | 17 | THE COURT:  We're not talking about July 25th at all. |
| 09:31:12 | 18 | MS. DURST:  No, Your Honor.  Mr. Faulkner has been |
| 09:31:14 | 19 | fully advised -- |
| 09:31:15 | 20 | THE COURT:  I am sure he has.  I am sure he has. |
| 09:31:18 | 21 | MS. DURST:  He does not intend to address that at all |
| 09:31:21 | 22 | in regard to opinion number one, Your Honor.  Mr. Faulkner has |
| 09:31:22 | 23 | been advised that he is not to refer to Mr. Rhoades as a |
| 09:31:29 | 24 | dangerous, fleeing felon.  However, I would note that when |
| 09:31:32 | 25 | Mr. Rhoades failed to comply, he actually -- he actually |

09:31:42  1    engaged in felonious conduct directly in front of Deputy

09:31:46  2    Forsyth, when he witnessed the Jeep flee, and flee in reckless

09:31:52  3    disregard and almost strike an oncoming vehicle.  There is a

09:31:57  4    (indiscernible) component to it, but we do not intend at all,

09:32:00  5    Your Honor, to refer to July 25th whatsoever.

09:32:03  6            THE COURT:  Understood.

09:32:04  7            MS. DURST:  The other thing, Your Honor, with regard

09:32:06  8    to almost attempting to run over the officer, I will just note

09:32:12  9    from the questioning of Deputy Forsyth, plaintiff's counsel

09:32:16  10   did not ask Deputy Forsyth any testimony at all as to where he

09:32:21  11   believed Deputy Love was.  In fact, that is information -- let

09:32:25  12   me proffer this, Your Honor, Mr. Faulkner met with

09:32:28  13   Deputy Forsyth at the scene, which will come out in testimony,

09:32:31  14   so he has information in addition to what was heard in court.

09:32:35  15     Deputy Forsyth believed that Deputy Love was behind him

09:32:39  16   as the Jeep was coming forward.  So Deputy Forsyth did not

09:32:44  17   know where Deputy Love was, so that is also with regard to

09:32:48  18   attempting, at least the reasonable belief of attempting to

09:32:51  19   run over an officer, so we are not --

09:32:53  20           THE COURT:  They are sort of in line, and Mr. Forsyth

09:32:56  21   is at the front of the line?

09:32:58  22           MS. DURST:  Well, yeah, because he exited the

09:33:01  23   driver's side thinking he was going to have cover, cruiser

09:33:03  24   continues to move, Deputy Forsyth [sic] exits passenger's

09:33:07  25   side, starting to go around the front and, of course, the

09:33:10  1   cruiser continues to move, so Deputy Forsyth doesn't know

09:33:13  2   where Love is.  But we are not going to say that there was a

09:33:17  3   prior incident where Deputy Love was almost or attempted to be

09:33:21  4   struck by a vehicle by Mr. Rhoades.  We know the Court's

09:33:24  5   ruling, and we're not going do defy that ruling, Your Honor.

09:33:27  6            THE COURT:  Understood.  Sounds like we are on the

09:33:29  7   same the page.

09:33:30  8            MR. UMINA:  Yes, sounds like it, Your Honor.

09:33:32  9            THE COURT:  Well, anything else we need to discuss

09:33:35  10  this morning?

09:33:36  11           MS. DURST:  Your Honor, the only other thing I would

09:33:38  12  note is Deputy Forsyth was able to get his shot, so we do not

09:33:42  13  even have to worry about advising the jury that he might be

09:33:47  14  late, because he was able to get that shot earlier this

09:33:47  15  morning.

09:33:49  16           THE COURT:  All right.  Outstanding.

09:33:49  17           MR. UMINA:  Your Honor, I think we just need some

09:33:53  18  more clarification on opinion one because any consideration of

09:33:57  19  a car that may have passed prior to him entering the gas well

09:34:02  20  site, is irrelevant here.  So any argument by them regarding

09:34:06  21  members of the general public, again, under the policy, lethal

09:34:10  22  force can only be used if they are in the immediate vicinity

09:34:13  23  and if perceived to be an unavoidable threat.  So I just

09:34:16  24  wanted to get clarification --

09:34:18  25           THE COURT:  I mean, you are free to cross on that

09:34:20  1    then if he advocates that their actions were appropriate, but
09:34:24  2    yet they are in violation of policy.  Sounds like a
09:34:26  3    cross-examination question to me, Mr. Umina.
09:34:27  4                MR. UMINA:  Okay.  Your Honor.  Thank you.
09:34:29  5                THE COURT:  Anything else?
09:34:30  6                MS. DURST:  I don't believe so, Your Honor.  Thank
09:34:31  7    you.
09:34:31  8                THE COURT:  Mr. Umina.
09:34:32  9                MR. UMINA:  Nothing.
09:34:33  10               THE COURT:  All right.  Well, let's take a
09:34:35  11   five-minute personal comfort break so you guys can get
09:34:38  12   together, and then we will be ready to receive our jury.
09:34:53  13        (Break taken at this time 9:34 a.m. - 9:42 a.m.)
09:40:49  14               THE COURT:  Sir, may we have our jury, please.  Thank
09:40:52  15   you.
09:40:52  16        (The jury entered the courtroom, and the following
09:41:45  17   transpired in open court.)
09:41:45  18               THE COURT:  Good morning, ladies and gentlemen.
09:41:47  19   Everyone please be seated.  Thank you very much.
09:41:49  20        Ladies and gentlemen, again, thank you for being here
09:41:50  21   this morning.  The plaintiff has concluded their presentation
09:41:58  22   and has rested, so we are now prepared to start to hear
09:42:02  23   evidence on behalf of the defendant.
09:42:03  24        With that, Ms. Durst, Mr. Carroll, you may call your
09:42:07  25   first witness.

627

09:42:07  1        MS. DURST:  Thank you, Your Honor.  The defendant

09:42:09  2   calls Sam Faulkner.

09:42:12  3        THE COURT:  Mr. Faulkner, sir, if I could ask you to

09:42:13  4   step forward and pause before Madam Clerk so she can swear you

09:42:18  5   in, please.

09:42:39  6            SAMUEL D. FAULKNER, DEFENSE WITNESS, SWORN

09:42:39  7        THE COURT:  Thank you, Mr. Faulkner.  Sir, if you can

09:42:42  8   adjustment that microphone whenever you are comfortable.

09:42:45  9      Ms. Durst, you may proceed whenever you are ready.

09:42:47  10       MS. DURST:  Thank you, Your Honor.

09:42:49  11                    DIRECT EXAMINATION

09:42:49  12  BY MS. DURST:

09:42:51  13  Q.   Good morning, Mr. Faulkner.  Can you please identify

09:42:54  14  yourself to the jury?

09:42:55  15  A.   Samuel D. Faulkner, F-a-u-l-k-n-e-r.

09:43:01  16  Q.   Mr. Faulkner, where do you live?  Where are you from?

09:43:04  17  A.   I grew up in New Jersey, came to Ohio for college, and

09:43:08  18  then stayed there through most of my career.  And then my wife

09:43:12  19  and I have moved down to Florida, which is called God's

09:43:17  20  waiting room; so we are in Florida now.

09:43:20  21  Q.   Okay.  Can you tell the jury -- you talked about living

09:43:26  22  in Ohio throughout most of your career.  What was your career?

09:43:31  23  A.   It was a law enforcement officer, and then a law

09:43:36  24  enforcement training specialist for the Ohio Attorney

09:43:39  25  General's Office.

09:43:39   1    Q.   What do you mean by law enforcement training specialist?

09:43:42   2    A.   Most states have what is called POST training, Peace

09:43:45   3    Officers Standard Training in the governor's office.   In Ohio,

09:43:51   4    they have the Ohio Peace Officer Training Commission that is

09:43:54   5    under the Attorney General's office, and the training section

09:43:58   6    of that commission is the Ohio Peace Officer Training Academy,

09:44:01   7    where I was employed.

09:44:02   8    Q.   So what did you actually do through that program or that

09:44:06   9    agency?

09:44:07   10   A.   I did train the trainer classes.   Any trainer that would

09:44:12   11   train any police officer, security, corrections, bailiff, in

09:44:17   12   the State of Ohio, I would have trained the trainers, and then

09:44:21   13   I was sent out alone to Indiana State Police Academy, to the

09:44:28   14   Pennsylvania Police Academy, to Michigan, to West Virginia.

09:44:32   15   So I trained all the surrounding states and trained the

09:44:35   16   trainer classes.

09:44:36   17   Q.   Can you tell the jury a little bit about your involvement

09:44:38   18   then as a train the trainer through the West Virginia State

09:44:43   19   Police Academy?

09:44:44   20   A.   The first person I became acquainted with was Trooper

09:44:49   21   Sinclair, who came up to the academy and took my classes, and

09:44:53   22   then he was promoted into the governor's detail, protection

09:44:56   23   detail.   And then it was Jess Gundy, who came up to the

09:45:00   24   academy, and I trained him in all the force-related topics.

09:45:02   25   He then moved up and became the commander of the training

09:45:05  1    academy.  And then it was Trooper Petry, and I trained him in

09:45:10  2    all the force topics.  He now is in charge of the law

09:45:12  3    enforcement standards division.  So then it was Corporal

09:45:16  4    Clark, I believe.  I trained him.  And then there was a

09:45:20  5    trooper along with him, and Clark has moved on, and the

09:45:24  6    trooper is now doing the defensive tactics, subject control

09:45:26  7    training.

09:45:27  8    Q.   So when you say that you train the trainers, what are you

09:45:30  9    actually training the trainers to do?

09:45:34  10   A.   How to instruct officers in any of the force topics from

09:45:40  11   verbalization, to empty hand control, to aerosol agents, to

09:45:47  12   conductive energy devices, batons, and combative firearms.  So

09:45:51  13   anything in the force topic.

09:45:53  14   Q.   So if I am understanding correctly, you have trained the

09:45:56  15   individuals at the West Virginia State Police Academy that

09:45:59  16   provide training to the cadets that come there?

09:46:02  17   A.   The cadets and the officers.  And then I was detailed;

09:46:06  18   the Academy detailed me on the Academy's request to go down

09:46:10  19   and conduct train the trainer classes for officers kind of

09:46:15  20   throughout the state.

09:46:16  21   Q.   Okay.  So with -- leaving aside the Train the Trainer,

09:46:24  22   employment what -- tell the jury a little bit about your

09:46:27  23   employment as a law enforcement officer.

09:46:29  24   A.   I started out in 1983 in a state program of intensive

09:46:36  25   supervision of adult felons.  While I was doing that, I took

09:46:40  1   my law enforcement training classes, certification classes,

09:46:44  2   and became a commissioned officer then with the Portage County

09:46:47  3   Sheriff's Office.  With their commission, I was uniform patrol

09:46:53  4   at Robinson Memorial Hospital, that was kind of my first duty

09:46:56  5   station.  And did undercover drug work still with the

09:46:59  6   detective bureau.  They would use me to fly around the United

09:47:04  7   States to pick up felons from other prisons to bring them back

09:47:08  8   to Ohio, and warrant services.  And then I moved to the city

09:47:15  9   of Kent Police Department.

09:47:16 10   Q.   In Ohio?

09:47:17 11   A.   In Ohio.  There is Kent State University.  I was actually

09:47:21 12   given an offer of employment by Kent State University or Kent

09:47:26 13   city.  My children were all young at the time, so I went with

09:47:29 14   the city.  And was there for about eight months, and I was

09:47:35 15   doing training for officers in peace officer basic training

09:47:40 16   academies in different colleges.  And then I was called by the

09:47:44 17   Ohio Attorney General's Office and then was hired by them,

09:47:50 18   moved to London, Ohio, where I did the train the trainer

09:47:53 19   classes.

09:47:54 20   Q.   How many years all tolled were you in law enforcement?

09:47:57 21   A.   Commissioned officer for just under 30 years.

09:48:00 22   Q.   Are you retired, is that the right word?

09:48:05 23   A.   Yes, ma'am.  I just -- I kind of made a commitment to

09:48:10 24   myself that when I turned 60, I wouldn't keep on rolling

09:48:13 25   around with kids that were three times my size and one-third

09:48:16  1    of my age, so I retired from the academy at age 60.  And a

09:48:21  2    month before I was retired, I was hired by the Village of

09:48:26  3    Mechanicsburg, as their chief of police.  I gave them a

09:48:30  4    five-year commitment.  I served as their chief for a little

09:48:33  5    over five years, retired from there, and then I just happened

09:48:35  6    to be called by a Lieutenant Colonel then from the Marine

09:48:40  7    Corp.  And he said, Sam, you have heard about our Marines

09:48:42  8    hurting themselves and other people.  We are setting up a

09:48:45  9    violence prevention program for the United States Marine Corp.

09:48:48  10   Can we count on your assistance?  I could not say no, so for

09:48:52  11   the next three years, east coast, west coast, and overseas,

09:48:57  12   setting up the violence prevention for the Unites States

09:48:59  13   Marine Corp.  When that was over, I then just did some

09:49:03  14   training and consulting and expert witness work.

09:49:05  15   Q.   Okay.  And so can you tell the jury about your expert

09:49:12  16   witness work.  Obviously, you are here today as an expert

09:49:14  17   retained on behalf of Deputy Forsyth; is that right?

09:49:17  18   A.   Yes, ma'am.

09:49:17  19   Q.   Okay.  Can you tell the jury just a little bit about your

09:49:22  20   expert witness work.

09:49:25  21   A.   I started in 1990.  I was just contacted by a lawyer, and

09:49:32  22   that's the first time I did it.  And then I did a number on my

09:49:38  23   own.  I did a number for the Ohio Attorney General's Office.

09:49:42  24   If there was a critical incident, they would detail me out to

09:49:47  25   provide expert witness testimony through my employment.  And

09:49:53  1    then when I retired, I just kept on doing it on my own.  I

09:49:58  2    have probably had about 450 cases now.

09:50:01  3    Q.   Okay.  Of those 450 cases, are those civil cases like we

09:50:06  4    are here about today?

09:50:08  5    A.   The majority would be civil cases, yes, ma'am.

09:50:11  6    Q.   Okay.  Can you tell the jury, obviously, are you here

09:50:15  7    today serving as an expert witness working on behalf of the

09:50:19  8    defendant, who is a law enforcement officer, right?

09:50:21  9    A.   Yes, ma'am.

09:50:21  10   Q.   Of the approximate, whatever the number is, 450 if it's

09:50:27  11   civil cases, can you tell the jury how many of those cases

09:50:30  12   were for civil cases against law enforcement officers.

09:50:35  13   A.   None civil against, ma'am.

09:50:37  14   Q.   Why?

09:50:37  15   A.   I am a law enforcement trainer.  That was my profession.

09:50:43  16   And I am not saying they always do it right.  I have attorneys

09:50:47  17   call me frequently.  I will talk to anybody about what

09:50:51  18   training is or what standards are.  I just choose -- just

09:50:56  19   ethically, I just don't take cases, civil cases, against law

09:50:59  20   enforcement.

09:51:00  21        If they are wrong, I will tell the counselor.  I will

09:51:03  22   say, "Counselor, if you can prove that, you don't need me."

09:51:06  23   But I just choose not to take cases against law enforcement.

09:51:10  24   Q.   What about criminal cases?

09:51:11  25   A.   I have taken a number of criminal cases against law

09:51:15    1    enforcement.  Their actions were so egregious we had to get

09:51:18    2    them out of law enforcement.

09:51:20    3    Q.   Okay.  We have already established that I retained your

09:51:25    4    services here today; is that right?

09:51:27    5    A.   Yes, ma'am.

09:51:27    6    Q.   Have you and I ever worked together on any cases before

09:51:31    7    this case?

09:51:31    8    A.   This is the first case.

09:51:33    9    Q.   Okay.  And in all fairness, have you had any other cases

09:51:38   10    with any other attorneys in my law firm?

09:51:41   11    A.   Yes, ma'am, quite a few.

09:51:43   12    Q.   Okay.  But this was the first one that you ever worked

09:51:43   13    with me?

09:51:44   14    A.   Yes, ma'am.

09:51:44   15    Q.   Okay.  With regard to, like, training certifications, can

09:51:53   16    you tell the jury a little bit about what your training

09:51:56   17    certifications may be without going into too, too much detail?

09:52:02   18    A.   I have been trained in virtually every force modality in

09:52:07   19    there from empty hand -- I was a fourth-degree black belt.

09:52:12   20    And then at some time I was high speed.  Now I have a problem

09:52:15   21    getting out of my own way.  So I have that background.  And

09:52:19   22    then took all of the close quarter personal control, PPCT,

09:52:25   23    active countermeasures, took all of those training courses and

09:52:31   24    wound up training -- being a train the trainer for them and

09:52:37   25    then literally chiefs and sheriffs, they were -- they would

09:52:42  1   not accept these other training modalities.  They said, "What

09:52:48  2   are you training, Sam?"  And so I became, at least for the

09:52:52  3   State of Ohio and surrounding states, I was the certifying

09:52:58  4   entity, I will call it.

09:52:59  5   Q.   Okay.  And you were here in court yesterday for Dennis

09:53:03  6   Root's testimony?

09:53:04  7   A.   Yes, ma'am, I was.

09:53:05  8   Q.   He mentioned -- I want to make sure I get it correctly --

09:53:10  9   Force Science Institute?

09:53:11  10  A.   Yes, ma'am.

09:53:11  11  Q.   Can you tell the jury what involvement if any you have

09:53:15  12  had with Force Science Institute?

09:53:16  13  A.   I have had the same course that Mr. Root's had, which is

09:53:21  14  human factors performance.  That's what we look at.  What

09:53:25  15  is -- Dr. Lewinski, Ph.D., he brings in specialists.  It's an

09:53:31  16  intensive course, and there are a whole series of topics, so

09:53:37  17  reaction time under stress, the effect of stress on the eye,

09:53:43  18  reaction time on performance, all those different things are

09:53:47  19  discussed.

09:53:47  20  Q.   And so what Mr. Root described yesterday is the training

09:53:52  21  that he received by Force Science Institute is the same

09:53:56  22  training you received?

09:53:57  23  A.   Yes, ma'am.

09:53:57  24  Q.   Do you receive a certification through Force Science

09:53:59  25  Institute?

09:53:59  1    A.   Yes, ma'am.

09:54:00  2    Q.   Okay.  With regard to the expert witness work, have you

09:54:07  3    testified previously in any Courts in West Virginia?

09:54:11  4    A.   Oh, yes, ma'am.

09:54:12  5    Q.   Okay.  Have you had any reason to have a court, for

09:54:18  6    whatever reason, exclude your testimony?

09:54:21  7    A.   Never for qualifications.  I learned afterwards that I

09:54:26  8    can recall, in 2000, I believe that case was called *Lockman*

09:54:32  9    *vs. Perdue* (phonetic).  It was in the Southern District, and

09:54:33  10   then there was another in 2003.  I don't remember the cite on

09:54:38  11   that one, but the judge -- it was his decision that they were

09:54:43  12   empty hand control incidents, and he said the jury knows what

09:54:47  13   a punch is, and the jury knows what a wrestling match is.  We

09:54:50  14   don't need any experts.  So experts were not used in that

09:54:53  15   case.  There was a case for summary judgment in 2006, I

09:55:00  16   believe it was, where a lady had come into a town meeting and

09:55:04  17   was extracted from the meeting and arrested.  The judge said

09:55:10  18   that excessive force was not used, so I don't need an expert

09:55:16  19   to tell me about that, and so no experts were used in that.

09:55:21  20        And then there was one other where I don't remember the

09:55:25  21   fact pattern of it, but it was again for summary judgment, and

09:55:29  22   the judge ruled that -- he said, I would admit Mr. Faulkner's

09:55:34  23   affidavit, whatever, written opinion paper.  He said, "I am

09:55:37  24   not going to rely on it."  There was no excessive force, and

09:55:39  25   summary judgment was granted.  Those are the only ones I know

09:55:42   1   about.

09:55:42   2   Q.   Okay.  Have you been qualified as an expert in use of

09:55:47   3   force by courts in West Virginia?

09:55:49   4   A.   Yes, ma'am.

09:55:50   5   Q.   Is there any other aspect of your training as a law

09:55:56   6   enforcement officer or with regard to train the trainer that

09:56:00   7   we have not discussed with the jury here this morning?

09:56:05   8   A.   Well, I think one important factor is I did what was

09:56:09   9   called the combative firearms training.

09:56:13   10   Q.   What is that?

09:56:13   11   A.   It's -- you are going to do qualification where you are

09:56:17   12   shooting at a target, but in the stress of the situation, it

09:56:20   13   is very different.  And it is well-known and taught around the

09:56:25   14   nation, around the world, that there are things called sensory

09:56:29   15   distortions, you lose feeling in your hands, your pupils

09:56:32   16   dilate, you lose close vision, you lose sometimes your

09:56:36   17   hearing, memory distortions, getting things backwards.  I

09:56:40   18   would actually put officers through those situations.

09:56:45   19   Q.   Why?

09:56:46   20   A.   I always said that the street is not the place to learn

09:56:52   21   first time for anything, because that critical incident is a

09:56:56   22   life and -- an often life and death encounter.  So I would put

09:57:00   23   them in these simulated training scenarios with what we call

09:57:05   24   marking ammunition that will sting you, and I would cause

09:57:09   25   these distortions.  And once I started doing that, word got

09:57:14   1    out, and I was sent all over the country doing that kind of

09:57:17   2    training.

09:57:17   3    Q.   Okay.  So that was in addition to the train the trainer

09:57:21   4    training that you have done?

09:57:22   5    A.   Yes, ma'am.

09:57:22   6    Q.   Okay.  Anything else about the training you have either

09:57:26   7    taken or received, or training or provided in the context of

09:57:33   8    law enforcement over the past 30 -- or more than 30 years, I

09:57:37   9    guess?

09:57:38   10   A.   I don't believe so.

09:57:40   11   Q.   Okay.

09:57:42   12           MS. DURST:  Your Honor, at this time I would move to

09:57:43   13   have Mr. Faulkner qualified as an expert in the field of use

09:57:47   14   of force, specifically with regard to law enforcement.

09:57:50   15           THE COURT:  Understood.  Any voir dire or objection,

09:57:53   16   Mr. Umina?

09:57:53   17           MR. UMINA:  Just like to ask him a few questions

09:57:57   18   briefly, Your Honor.

09:57:57   19           THE COURT:  Understood.

09:57:58   20                     CROSS-EXAMINATION

09:57:58   21   BY MR. UMINA:

09:57:59   22   Q.   Mr. Faulkner, just so the jury is clear before you give

09:58:01   23   your testimony, you are not an expert on memory, are you?

09:58:03   24   A.   No, sir.

09:58:03   25   Q.   You are not an expert on how the brain reacts to stress,

09:58:07  1    are you?

09:58:07  2    A.   No, sir.

09:58:07  3    Q.   You don't consider yourself to be an expert on how the

09:58:12  4    brain tracks moving objects, correct?

09:58:15  5    A.   Correct.

09:58:15  6    Q.   Are you not a crime scene reconstructionist?

09:58:18  7    A.   Correct.

09:58:19  8    Q.   Are you not an accident reconstructionist?

09:58:21  9    A.   Correct.  I am not.

09:58:21  10   Q.   And to be clear, your time as the chief of police, that

09:58:25  11   was a 15-hour a week job, wasn't it?

09:58:28  12   A.   Absolutely not.

09:58:29  13   Q.   You received a salary of $15,000 year?

09:58:32  14   A.   I did, because --

09:58:34  15   Q.   Because it was a part time job?

09:58:36  16   A.   Absolutely not, sir.

09:58:37  17   Q.   Sir, in that command, you only had three people under

09:58:41  18   you, correct?

09:58:41  19   A.   No, sir.

09:58:42  20   Q.   Is that your testimony today?

09:58:45  21   A.   Would you like me to answer it?

09:58:48  22        THE COURT:  Is this relative to his qualifications as

09:58:50  23   an expert?

09:58:51  24        MR. UMINA:  In terms of his qualifications as chief

09:58:52  25   of police, yeah.  I believe that it is.

09:58:55   1          THE COURT:  I am not sure his qualifications as chief

09:58:58   2   of police are relevant to his expert opinion.

09:59:01   3          MR. UMINA:  No objection, Your Honor.

09:59:02   4          THE COURT:  Understood.  Any further questions?

09:59:04   5          MR. UMINA:  No, Your Honor.

09:59:05   6          THE COURT:  All right.  Any objections to the motion

09:59:07   7   to qualify --

09:59:08   8          MR. UMINA:  No, Your Honor.

09:59:09   9          THE COURT:  -- Mr. Faulkner?  Understood.  Thank you,

09:59:09  10   sir.  Without objection, then, Mr. Faulkner is deemed

09:59:12  11   qualified as an expert in the fields identified by Ms. Durst.

09:59:17  12          Ladies and gentlemen, like Mr. Root, Mr. Faulkner has

09:59:19  13   now been qualified as an expert witness by this Court.  That

09:59:24  14   means he is permitted under the rules of evidence to share

09:59:27  15   with you opinions that non-expert witnesses normally would not

09:59:30  16   be able to do.

09:59:31  17      Ms. Durst, you may proceed.

09:59:32  18          MS. DURST:  Thank you, Your Honor.

09:59:33  19   BY MS. DURST:

09:59:34  20   Q.  Mr. Faulkner, one other kind of item I had forgotten to

09:59:38  21   ask you about and I wanted to go ahead and do that.

09:59:39  22      For the time that you have spent reviewing documents in

09:59:43  23   this case, formulating opinions, those kinds of things, are

09:59:46  24   you compensated for your time?

09:59:48  25   A.  Yes, ma'am.

| | | |
|---|---|---|
| 09:59:49 | 1 | Q.    How much are you compensated for your time? |
| 09:59:52 | 2 | A.    Retainer of $2,500 used against the first ten hours of |
| 09:59:56 | 3 | review, and then it is 250 an hour for reviewing material, |
| 10:00:02 | 4 | writing papers, and whatnot.  Travel time would be $100 an |
| 10:00:05 | 5 | hour. |
| 10:00:05 | 6 | Q.    Okay.  All right.  So let's just kind of start off with |
| 10:00:09 | 7 | the jury, if you can tell the jury how you came to be involved |
| 10:00:15 | 8 | in this case? |
| 10:00:17 | 9 | A.    I received a phone call from you, and I do what I always |
| 10:00:22 | 10 | do when I am called; can you give me a thumbnail of what |
| 10:00:25 | 11 | happened, because I need to find out, first of all, is it in |
| 10:00:28 | 12 | my area of expertise, and if it is something that I am willing |
| 10:00:33 | 13 | to take.  Because if the fact pattern isn't consistent with |
| 10:00:38 | 14 | training, then I just -- right up front, it's better to be |
| 10:00:42 | 15 | honest, I tell the lawyer, I cannot give a favorable opinion |
| 10:00:45 | 16 | to this and so you probably don't want to use me. |
| 10:00:47 | 17 | Q.    And then kind of walk the jury through then, you and I |
| 10:00:52 | 18 | had a conversation.  What happens after that?  I mean, what do |
| 10:00:55 | 19 | you do in your expert witness cases?  How do you review |
| 10:00:58 | 20 | documents?  Just tell the jury a little bit about how you go |
| 10:01:02 | 21 | about that. |
| 10:01:02 | 22 | A.    I was asked to come up and make a site visit, so I drove |
| 10:01:06 | 23 | up and went to the well road.  And that was probably in 2019 I |
| 10:01:12 | 24 | believe that was. |
| 10:01:12 | 25 | Q.    Let me stop you there.  When you did the site visit, had |

10:01:17  1    you formulated any opinions at that point in time?

10:01:21  2    A.   No, ma'am.

10:01:21  3    Q.   Okay.  Who was at that site visit?

10:01:23  4    A.   You and I were, Deputy Forsyth was, and the sheriff was.

10:01:28  5    Q.   Okay.  Did you have an opportunity at that site visit to

10:01:33  6    speak with Deputy Forsyth and obtain information directly from

10:01:37  7    him that you have used in the formulation of opinions in this

10:01:41  8    case?

10:01:41  9    A.   I did, ma'am.

10:01:42  10   Q.   Can you tell the jury just a little bit about -- kind of

10:01:45  11   walk them through that site visit when you did that.

10:01:48  12   A.   Instead of like an interview and interrogation, kind of

10:01:56  13   more modern training is what is called cognitive interview,

10:02:00  14   where you go to the site, you try to put the individual as

10:02:05  15   close as they can to remembering what happened, and then just

10:02:08  16   say, in your own words tell me what happened.  And then I just

10:02:12  17   listen, and I observe.

10:02:15  18        And when he went through all the things that happened,

10:02:20  19   and then got to the point where he said, "The Jeep was coming

10:02:24  20   at me," I could see, just like in his excited utterance in the

10:02:29  21   radio transmission, the voice went up, when he simulated

10:02:34  22   drawing the firearm, head went back, he started stepping back,

10:02:37  23   the voice went high, and that just told me a lot.

10:02:40  24   Q.   You actually had the opportunity to be in court to hear

10:02:44  25   Deputy Forsyth's trial testimony, as well; is that right?

| 10:02:46 | 1 | A.   Yes, ma'am, I did. |
| 10:02:47 | 2 | Q.   Was there anything that you recall Deputy Forsyth telling |
| 10:02:51 | 3 | you when you visited the scene with him some time in 2019, |
| 10:02:56 | 4 | that was inconsistent with what he told the jury from the |
| 10:03:00 | 5 | witness stand? |
| 10:03:00 | 6 | A.   No, ma'am. |
| 10:03:01 | 7 | Q.   Okay.  So I am sorry I stopped you.  So let's continue |
| 10:03:05 | 8 | walking through the scene.  What else did you do when you |
| 10:03:07 | 9 | visited the scene? |
| 10:03:08 | 10 | A.   That was, you know, the site visit.  And then you |
| 10:03:15 | 11 | provided me with the documents.  I reviewed the documents. |
| 10:03:20 | 12 | And then always I am asked if there is anything else I would |
| 10:03:24 | 13 | need, and when I felt I had all the documents I needed, then I |
| 10:03:27 | 14 | wrote an opinion paper.  And then afterwards, there were more |
| 10:03:31 | 15 | materials that happened, and I wrote a supplemental opinion |
| 10:03:37 | 16 | paper, and that's where we are today. |
| 10:03:38 | 17 | Q.   So let's kind of -- let me just ask you if you -- did you |
| 10:03:41 | 18 | review the statements either in audio or written form or both, |
| 10:03:46 | 19 | that Deputy Forsyth and Deputy Love provided to, then |
| 10:03:51 | 20 | Sergeant, now Lieutenant Branham? |
| 10:03:53 | 21 | A.   I did. |
| 10:03:53 | 22 | Q.   Okay.  Did you review the deposition testimony of the |
| 10:04:00 | 23 | witnesses that we have heard here in the courtroom today, |
| 10:04:02 | 24 | either Corey Love by video, Deputy Forsyth, Mr. Root, |
| 10:04:08 | 25 | Lieutenant Branham; did you review all those? |

10:04:10   1   A.   Yes, ma'am, I did.

10:04:11   2   Q.   Okay.  Did you review the West Virginia State Police

10:04:16   3   investigation report that was completed by Lieutenant Branham?

10:04:20   4   A.   I did.

10:04:21   5   Q.   Did that include photographs of the scene that he had

10:04:25   6   taken?

10:04:25   7   A.   Yes, ma'am, it did.

10:04:26   8   Q.   Okay.  Did you also have an opportunity to review -- let

10:04:33   9   me back up again.  Were you in court when we had the

10:04:37   10  opportunity to play the radio traffic from August 2nd?

10:04:41   11  A.   Yes, ma'am, I was, and I had that provided.

10:04:44   12  Q.   Okay.  When it was provided to you, did you have any

10:04:48   13  difficulty in figuring out how the radio traffic was ordered

10:04:52   14  and figuring out if it was in reverse order, anything like

10:04:56   15  that, like Mr. Root testified to?

10:04:57   16  A.   No, ma'am.  It is a standard time signature on it.

10:05:00   17  Q.   Was there anything else that you can think of

10:05:03   18  specifically that you reviewed to assist you in the

10:05:07   19  formulation of the opinions that you will be giving to the

10:05:09   20  jury here this morning?

10:05:11   21  A.   I did review the force policy.

10:05:13   22  Q.   Okay.  The use of force policy?

10:05:17   23  A.   Yes, ma'am.  And then just the review of some of the text

10:05:21   24  work that I have in terms of the training I have received that

10:05:24   25  apply to this situation.

10:05:25  1    Q.   Okay.   You visit the site, get additional information,

10:05:34  2    and then take that information to formulate opinions?

10:05:38  3    A.   Yes, ma'am.

10:05:38  4    Q.   Okay.   One thing that I had forgotten to ask you about as

10:05:44  5    well when we were talking about kind of, like, your education,

10:05:48  6    experience, background, can you tell the jury a little bit

10:05:52  7    about the research studies that you have done, and I guess

10:06:00  8    what the reasoning or rationale behind doing those research

10:06:04  9    studies was, and what the culmination of the studies would

10:06:07  10   have been?

10:06:07  11   A.   Yes, ma'am.   When a critical incident happens, or there

10:06:12  12   is what we call a bright-line decision comes down from the

10:06:17  13   Supreme Court, everything in law enforcement changes.   The

10:06:20  14   shooting case of *Tennessee vs. Garner* changed the way law

10:06:23  15   enforcement firearms was training nationally.   That was

10:06:27  16   before -- I was an officer, then, but I wasn't at the academy.

10:06:31  17   I was at the academy in 1987.   So in 1989, the bright-line

10:06:37  18   case that we talk about of *Graham vs. Connor* happened.   Right

10:06:41  19   away the Ohio Attorney General's Office contacts the Peace

10:06:46  20   Officer Training Commission and says, "What are you training

10:06:50  21   officers?"   Because you have to make sure you are in line with

10:06:53  22   court guidelines.   And that's when the information came, it's

10:06:59  23   objective reasonableness, and factors in the tests that were

10:07:03  24   actually cited correctly by Mr. Root, that was correct, and it

10:07:09  25   says we must act as other reasonable officers would have acted

10:07:13   1   in a tense, rapidly evolving situation, where the exact level

10:07:17   2   of force necessary is unknown, what is that?  And I had what I

10:07:25   3   considered the luxury of training thousands of officers every

10:07:29   4   year in multiple states, and I would never tell an officer

10:07:33   5   what to do, unless I put it in context.  In other words,

10:07:37   6   anything done at the right time is right, anything done at the

10:07:39   7   wrong time is wrong.

10:07:42   8        And so I started first on my own, and I would -- the

10:07:49   9   classes that would come for officers and trainers, I would say

10:07:54   10  if an incident happened, like where a person is pulling away

10:07:57   11  from an officer, if you read any police report, it is based on

10:08:01   12  what we call kinesiology, movement of the human body.  The

10:08:05   13  person pulled away so I, the person slapped me so I, the

10:08:09   14  person tried take my gun away, so I.

10:08:11   15       So we take the movements of the human body and then I

10:08:14   16  would ask three questions, based on *Graham versus Connor*:

10:08:18   17  What move would you attempt to stop this action?  What is the

10:08:25   18  greatest amount of force anybody should use to stop that

10:08:28   19  action?  And how much of a threat?  I did, on a scale of 1 to

10:08:33   20  10 -- do you place that action at, if that makes sense to you.

10:08:38   21  And they would answer.  They would take a survey.

10:08:41   22       And back then I would do it by hand, and I would tally

10:08:44   23  it.  And people aren't clones, but I started to see it's very

10:08:48   24  close.  And so then I contacted the Ohio Attorney General and

10:08:53   25  I said -- back then it was Anthony Celebrezze -- I said, "Sir,

10:08:56   1    may I do research?"  He said, "You may do research.  We're not
10:09:00   2    going to fund it.  We're not going to give you the time to do
10:09:02   3    it.  It must be anonymous, but you are welcome to share it,"
10:09:06   4    and so I did.  I bought my first computer.  It was an Apple
10:09:10   5    2E, a used computer with a floppy disk, and I started
10:09:14   6    surveying officers.  From their responses -- well, after --
10:09:19   7    the standard is objective reasonableness.  In other words, a
10:09:23   8    bunch of cops can't get together and say, "We can do this and
10:09:26   9    we can do that."  It's what you believe are reasonable
10:09:30   10   responses.  So I started -- I put myself on the Ohio Attorney
10:09:36   11   General Speaker Bureau, and I went to Kiwanis clubs, Rotary
10:09:41   12   clubs, high school, college government classes.  I did St.
10:09:45   13   Rita's School for the Deaf.  And I would go to them and say,
10:09:48   14   ladies and gentlemen, we are going to talk about a negative
10:09:50   15   topic, the use of force by a law enforcement officer.  It is
10:09:54   16   our job to protect and serve you.  I am going to show you what
10:09:59   17   I am training the officers.  Then I am going to ask you on a
10:10:03   18   survey, "Is this acceptable or does it offend you?"
10:10:06   19        When I first started doing that, cops said, "You can't do
10:10:08   20   that."  And I said to them, "If you are sued for excessive
10:10:13   21   force, how many cops will be on your jury?  I need to know
10:10:17   22   what I train you" -- and now it's not just Ohio, they sent me
10:10:20   23   all over the country -- so now I am advising multiple states'
10:10:25   24   training divisions on what to do and when.  What if I was
10:10:29   25   wrong?  I wouldn't just mess up Ohio, I would mess up multiple

10:10:32  1    states.  So I needed to do this research, and continued, and

10:10:36  2    continue still today.

10:10:37  3    Q.   And how many -- are you able to give the jury, like, how

10:10:43  4    many -- estimates of the number of participants in these

10:10:45  5    studies?

10:10:46  6    A.   We are probably around 70,000, somewhere in there.

10:10:50  7    Q.   And who are -- I mean, who are the participants in these

10:10:55  8    studies?

10:10:56  9    A.   It would be -- it can be anybody.  People can go online

10:10:59  10   and take the survey.  When I go up and do training, I would do

10:11:04  11   the survey.  Oftentimes after critical incidents.  Like there

10:11:07  12   was a neck restraint related death in Columbus, excuse me, in

10:11:13  13   Cleveland, called the Pipkins incident, and there was almost

10:11:17  14   race riots going on at the time, so I was detailed up there

10:11:20  15   and spoke to the black community and said, "Ladies and

10:11:24  16   gentlemen, here is what I am training the officers," and I

10:11:27  17   surveyed them.  Kokomo, Indiana had their shooting incident.

10:11:31  18   Same thing, town hall meeting I did that.  So I went --

10:11:37  19   *Tennessee vs. Garner*, it occurred in Memphis, Tennessee.  The

10:11:40  20   director of the Memphis Police Department, a top 25 police

10:11:46  21   department -- 2,500 officers -- asked me to survey his

10:11:50  22   officers particularly.  Then I went down into Memphis and

10:11:55  23   trained their trainers, and then Director Rawlings got on

10:11:59  24   television, and said, "Here is what we have done.  Please come

10:12:02  25   on the website and take the survey," and provided the survey

10:12:07  1    to the newspapers, television, everybody just for

10:12:10  2    transparency.  That was in 2017.

10:12:14  3         2020 was a very -- there was great upheaval around the

10:12:19  4    nation.  All right.  And there were -- you could see

10:12:22  5    demonstrations, riots, all that kind of stuff.  Director

10:12:25  6    Rawlings called me again and said, "Would you come resurvey

10:12:29  7    the community?"  So in 2020, I resurveyed the Memphis

10:12:35  8    community, and again all that information is published to

10:12:37  9    everybody.  It's online.

10:12:38  10   Q.   When you survey the community, are you asking the same

10:12:42  11   questions to law enforcement and then asking those same

10:12:45  12   questions to civilians to find out what the law enforcement

10:12:48  13   officer thinks might be reasonable versus what the civilian

10:12:53  14   community thinks what might be reasonable?

10:12:56  15   A.   Yes, ma'am.  Again, the reaction, if a person is pulling

10:12:58  16   away way, what control measures are reasonable?  Just in your

10:13:01  17   opinion, if a person is pushing an officer; if a person is

10:13:06  18   strike, punching, or kicking an officer; the person is

10:13:09  19   attempting to take an officer's gun away; if the subject is

10:13:13  20   using a weapon against an officer, those type of questions.

10:13:16  21   Q.   And you said this research is available online?

10:13:21  22   A.   Yes, ma'am.

10:13:21  23   Q.   Mr. Root had testified yesterday that he was not able to

10:13:26  24   locate the research.  Where is the research that would be

10:13:30  25   available?

| | |
|---|---|
| 10:13:30 | 1 |

A.   Well, I took you through it last night, and it probably

took 20 seconds to get there.  You go to "Response to

Resistance."  I am the first one that comes up on all those --

because that is the -- some departments still call it use of

force.  I don't believe that's correct.  So you will see many,

many departments now around the country will call it a

response to resistance or aggression policy.  That comes from

the research and the training.

Q.   Okay.

A.   So you click on that, it asks for your email so that they

can send you any updates or anything that I have, and you are

right on the site.  And the research from Memphis is on there,

the research from Parkersburg, West Virginia, which I did the

department and the community in Parkersburg.  The book is on

there.  And it's just there.  Downloadable.  I never charge

anything.  Never have.

Q.   Okay.  And as a result of this research that you have

done, what is, I guess, the culmination of that research?

A.   It was called the action response continuum, so I made

a --

Q.   Let me stop you there, Mr. Faulkner, if I might.  Can we

use the projector?

        MS. DURST:  Your Honor, can we see if the jurors are

able to see this?

        THE COURT:  Absolutely.  Can everyone see that okay?

10:15:22   1   I am seeing all affirmative head shakes.  Okay.  I think we
10:15:25   2   are good to go.  You may proceed.  Thank you.
10:15:28   3   BY MS. DURST:
10:15:29   4   Q.   So Mr. Faulkner, I stopped you when you started to
10:15:32   5   describe the action response continuum.  Is this what you were
10:15:35   6   starting to describe to the jury?
10:15:37   7   A.   Yes, ma'am.
10:15:37   8   Q.   Okay.  Can you -- and you have a screen there in front of
10:15:41   9   you as well.  And although I don't think it worked that well
10:15:45   10  yesterday, but I think you can touch the screen if you need to
10:15:48   11  point to something.  Okay.  Our clerk is telling us that I
10:15:51   12  think it works today.  If you -- okay.  If you can explain to
10:15:58   13  the jury what this action response continuum is, what it shows
10:16:08   14  individuals, how you rely upon it, just generally if you
10:16:11   15  would, please.
10:16:13   16  A.   When I survey all the people, originally it was
10:16:18   17  open-ended questions.  All right.  I outlined to you; what
10:16:21   18  would you use; greatest amount of force anybody should use.
10:16:25   19  When I had I don't know how many thousands of that, I tried to
10:16:29   20  make a pictorial representation of the average, the mode, the
10:16:37   21  mean, the medium, the standard deviation, you know, of
10:16:39   22  people's general opinions.  I am not a graphic artist.  I
10:16:44   23  failed miserably, so I hired a professional.  This is a
10:16:50   24  pictorial representation of what officers and the citizens
10:16:52   25  that we serve said -- say are acceptable responses to assault,

651

| | |
|---|---|
| 10:16:56 | 1 |

resistance, and aggression.

10:16:59  2         It is hard to be overly scientific about a fistfight.

10:17:05  3    It's usually not a push or a punch or whatnot, so normally I

10:17:08  4    will tell officers if the subject is acting -- actions are say

10:17:13  5    in the green area, they are pulling away, the officers'

10:17:16  6    responses should be somewhere in the bluish, greenish,

10:17:21  7    yellowish area of the continuum, as a response.  The more

10:17:26  8    color codes you jump, the less people will agree with your

10:17:30  9    decision.

10:17:31  10   Q.   So when you say color codes you jump, do you mean going

10:17:35  11   down this graph from blue to red?

10:17:38  12   A.   Yes, ma'am.  For example, if a subject were not

10:17:43  13   responding to your commands, that is the blue area.

10:17:47  14   Q.   Okay.

10:17:47  15   A.   And the officer's decision is to shoot him, nobody is

10:17:53  16   going to agree with that decision.  The more color codes you

10:17:56  17   jump, the less people will agree with that decision.

10:17:59  18   Q.   Okay.  I think I see what you are saying.  So the

10:18:02  19   individual's action would be the suspect's, so to speak, that

10:18:07  20   the officer is encountering?

10:18:09  21   A.   It is always based on that.  That is why I don't -- use

10:18:12  22   of force to me is a misnomer.  You just don't use force.  If

10:18:17  23   you do use force for no reason, you are wrong.  There is an

10:18:20  24   action, and you respond to that action.  That is what this

10:18:23  25   shows.

10:18:24   1   Q.   Okay.  So, for instance, if we looked at the green on the
10:18:28   2   left, refusing to move, dead weight, pulling away from the
10:18:32   3   officer, that would be the action of the -- I am using the
10:18:36   4   term suspect, the action of the individual the police officer
10:18:39   5   is encountering, correct?
10:18:40   6   A.   Yes, ma'am.
10:18:41   7   Q.   And then the -- you would expect the officer's response,
10:18:46   8   the acceptable mode of response, would be immediately across
10:18:50   9   in the green?
10:18:51   10   A.   Yes, ma'am.  Anything in the bluish, greenish, and could
10:18:56   11   be in the yellowish area, simply on the other officer subject
10:19:02   12   factors.  In other words, when I was a hotshot martial artist,
10:19:08   13   if there was somebody 6'6 and 280, I didn't care.  Now at 70
10:19:13   14   and six surgeries -- 72 actually -- and six surgeries, you
10:19:16   15   know, if somebody is 200 pounds and 6-foot, I'm like, "Can we
10:19:20   16   just talk about this?"  Before I would try to use empty-hand
10:19:25   17   control, because I was very confident in what I did.  Now it's
10:19:28   18   going to be (indiscernible) or something like that, to try to
10:19:30   19   not get into this hand encounter.
10:19:33   20   Q.   So if -- tell me if I am understanding this action
10:19:36   21   response continuum correctly, then.  If the individual 's
10:19:40   22   action is in the yellow, pushing officer, wrestling with
10:19:44   23   officer, anything in yellow or above, based on the survey,
10:19:47   24   would be an acceptable response by the officer?
10:19:51   25   A.   Yes, ma'am.

10:19:52   1   Q.   Okay.  And so then if we look at the yellow, pushing

10:19:56   2   officer, wrestling with officer, if we move down, going into

10:20:00   3   the red, the use of deadly force, would be, in the minds of

10:20:07   4   the respondents to the survey would be less acceptable?

10:20:11   5   A.   Yes, ma'am.

10:20:11   6   Q.   Okay.  Did you -- and we will talk about your specific

10:20:16   7   opinions in this case -- but did you use the results of your

10:20:21   8   research and this action response continuum, to formulate

10:20:26   9   opinions in this case?

10:20:27   10   A.   I always do.  Yes, ma'am, I did.

10:20:28   11   Q.   Okay.  All right.  I think I have gotten you sidetracked

10:20:33   12   a little bit.  We were talking about what you had reviewed and

10:20:36   13   what you had done in this case.  So after you reviewed all the

10:20:42   14   information that we talked about, the radio traffic, the

10:20:45   15   statements, your site investigation, the depositions, what is

10:20:50   16   the next thing that you do?

10:20:51   17   A.   Then I would formulate opinions in a statement of

10:20:58   18   opinions, whatever view, statements of opinions, basis for

10:21:01   19   opinions.

10:21:01   20   Q.   And did you actually formulate two opinions in this case?

10:21:07   21   A.   I did, an original opinion.  And then there was other

10:21:11   22   information made available, and then made a supplemental.

10:21:14   23   Q.   You will be testifying here today to the jury with regard

10:21:17   24   to two particular opinions; is that right?

10:21:19   25   A.   Yes, ma'am.

*Jill M. Cutter, RPR*
*500 W. Pike Street, Clarksburg, WV 26301 (304)622-8513*

10:21:19  1   Q.   Okay.  Mr. Faulkner, opinion number one, I just want to
10:21:27  2   go ahead and start walking you through your opinions if I
10:21:30  3   might.  "Deputy Forsyth did his duty and placed himself in
10:21:33  4   harm's way when he responded to a high risk pursuit."  Is that
10:21:37  5   an opinion that you have in this case?
10:21:39  6   A.   Yes, ma'am, it is.
10:21:39  7   Q.   Okay.  And you heard Mr. Root's testimony yesterday with
10:21:46  8   regard to the fact that he didn't believe that Deputy Forsyth
10:21:52  9   and Deputy Love were involved in a pursuit because they had
10:21:56  10  lost site of Mr. Rhoades.  You heard that testimony?
10:22:00  11  A.   I did.
10:22:01  12  Q.   Can you tell the jury, do you agree or disagree with
10:22:05  13  that?
10:22:05  14  A.   I disagree.  But to me, it's a minor point.  You can call
10:22:11  15  it anything you want.  If you have been to Florida, it's very
10:22:16  16  different then West Virginia.  It's flat, and you will go for
10:22:19  17  hours and never turn a wheel.  Going from where I used to live
10:22:22  18  in Okeechobee to the airport, I would kid with my wife, there
10:22:27  19  is turn after like an hour and a half, you would have to turn
10:22:30  20  the wheel, like, two degrees, and it's like, "Oh, my God, a
10:22:34  21  curve, what do I do?"
10:22:36  22       If someone is out of sight in Florida, they are way away,
10:22:38  23  then you may have to search for them.  In West Virginia, you
10:22:40  24  go around a turn or a switchback, and they can be ten feet
10:22:43  25  away from you, and you can't see them.

Q.   Okay.  So with regard to Mr. Root's opinion that they
were not actively involved in a pursuit, they were searching
for him, does that information impact your opinion at all that
Deputy Forsyth did his duty and placed himself in harm's way
when he responded to a high risk pursuit?

A.   No, ma'am.

Q.   Okay.  Can you tell the jury why you have formulated this
opinion, and how you came to reach that opinion.

A.   Yes, ma'am.  Pursuits, I believe everybody knows, you can
see them on television, they are dangerous.  And that's why
they are highly regulated.  Like in law enforcement now, there
are two cars on the pursuit.  Everyone else takes parallel
paths.  It's not like it used to be, a Gumball Rally where you
had 37 cop cars behind somebody.  You don't do that now.  We
have a primary, a secondary unit following.  You have people
traveling on different roads to see where they could possibly
cut off.  You've got a supervisor on the line, that if they
feel it's dangerous, they tell you to terminate the pursuit.
It's just knowing that a pursuit is just naturally high risk
to everybody; the driver of the vehicle, officers following,
and the general public.

     And my point is, officer -- Deputy Forsyth, Deputy Love,
knew this was a pursuit.  They did their duty.  They went
right to that area.  They followed that vehicle.  They saw the
vehicle swerve almost hitting a car, which, again, just

10:24:23   1    increases, to me, the risk.  It tells you something about --

10:24:27   2    the driver certainly wanted to get away.  And that's all that

10:24:31   3    meant, that they were doing their duty in a high risk

10:24:34   4    situation.

10:24:35   5    Q.   You heard Mr. Root talk about Deputy Forsyth -- I'm

10:24:46   6    trying to remember the word he used -- not taking a step, or

10:24:50   7    jumping out of the way.  Do you recall that testimony from

10:24:52   8    Mr. Root yesterday?

10:24:53   9    A.   Yes, ma'am.

10:24:54   10   Q.   Do you have -- do you agree or disagree with that

10:24:57   11   statement?

10:24:57   12   A.   I disagree.

10:24:59   13   Q.   Why?

10:24:59   14   A.   If I could, I think it would be easier for the jury to

10:25:07   15   understand if I put in it order.

10:25:08   16   Q.   Okay.

10:25:09   17   A.   If that is okay?

10:25:10   18   Q.   Absolutely.

10:25:11   19   A.   From everything I reviewed, and sitting through the

10:25:14   20   testimony here, here is what I believe we know.  You are going

10:25:20   21   to decide whether I am right or not.

10:25:23   22        We know that Mr. Rhoades did not stop when he was

10:25:27   23   signaled to do so.  We know that he almost struck a vehicle.

10:25:31   24   We know that -- we heard from the radio transmission and

10:25:35   25   testimony, the deputies were informed that Mr. Rhoades may be

armed.  We heard that radio transmission.  We know that Mr. Rhoades' Jeep went down a well road, was the first to go down that road.  We know following him was Deputy Forsyth and Deputy Love's cruiser.  They were second down the road.  We know that the time and distance transmission.  In other words, at some point of traveling down that road, we know Deputy Forsyth told dispatch of his travel and location.  We know from that transmission to the shots fired transmission, that everybody heard, was approximately 16 seconds.  We know there were a number of vehicles that went down that road, well road, after the incident.  We had Deputy Love and his testimony, talking about the Mannington officer, who he knew was a relation to Wesley Wheeler.  And then the Mannington chief, so we have got two more cruisers that very possibly went down that road.  We know we had an ambulance go down that road, or a squad.  We know from the pictures taken later on there was a Jeep, and the cruiser, so those vehicles had to go out of that well road, because we learned after the fact, that was the only way in and only way out.  We know the final resting place of the Jeep.  We know the final resting place of the cruiser.  We know that Mr. Rhoades was removed from the Jeep, and somebody closed the door.  The pictures shows that. We know that the Jeep was in neutral and running.  We know that Deputy Forsyth fired seven rounds.  And he said he did that because he was afraid he wouldn't see his wife and

10:27:34  1    children again.  We know Deputy Love did not fire his service
10:27:38  2    weapon, but we know that he said, I was afraid that my partner
10:27:43  3    was going to be killed or was killed.  We know there was
10:27:48  4    damage to the front end of the Jeep from being struck by
10:27:52  5    rounds.  We know that there was seven rounds fired, and one of
10:27:58  6    the rounds impacted Mr. Rhoades, and he did die as a result of
10:28:03  7    being struck by that round.  Everything else is speculation.
10:28:08  8    Q.   And what you mean, everything else is speculation?
10:28:11  9    A.   It's unknown and cannot be known because just as in
10:28:16  10   *Graham versus Connor*, this was a dynamic, moving situation.
10:28:21  11   Q.   Okay.  With regard to the opinion that Deputy Forsyth did
10:28:26  12   his duty and placed himself in harm's way, when he responded
10:28:31  13   to the high risk pursuit of Mr. Rhoades, is there any other
10:28:35  14   information factually that you have heard in the courtroom
10:28:41  15   throughout the course of this trial that has altered that
10:28:44  16   opinion?
10:28:44  17   A.   No, ma'am.
10:28:45  18   Q.   Okay.  And why is it that you believe Deputy Forsyth
10:28:49  19   fulfilled that duty and placed himself in harm's way?
10:28:52  20   A.   We know that he did pursue.  We know from the testimony
10:28:57  21   that he perceived that Mr. Rhoades swerved in traffic almost
10:29:03  22   hitting another car, and we all heard the radio transmission
10:29:07  23   that the subject may be armed.
10:29:09  24   Q.   Is it fair to say, Mr. Faulkner, that you have some
10:29:15  25   disagreement with some other opinions that Mr. Root offered in

10:29:20  1    court yesterday?

10:29:20  2    A.   Yes, ma'am, I do.

10:29:21  3    Q.   Okay.  Are you able to talk about that after you address

10:29:26  4    your second opinion?

10:29:27  5    A.   I think probably best in that opinion if we can -- I

10:29:31  6    think just for the ease if we can start right from the entry

10:29:35  7    of the well road, and we will just try to take it step-by-step

10:29:39  8    of what happened.

10:29:39  9    Q.   Okay.  Well, let's talk about your second opinion that

10:29:44  10   Deputy Forsyth's response to Mr. Rhoades placing members of

10:29:47  11   the general public at risk of death or serious bodily harm

10:29:51  12   after attempting to run over the deputy complied with Supreme

10:29:55  13   Court guidelines -- excuse me -- and national law enforcement

10:29:58  14   operational practices; is that your opinion?

10:30:00  15   A.   Yes, ma'am.

10:30:01  16   Q.   Okay.  And did you formulate that opinion after doing all

10:30:06  17   of the things that you have told the jury that you did?

10:30:08  18   A.   Yes, ma'am, I did.

10:30:09  19   Q.   Okay.  You have had the opportunity to sit through the

10:30:14  20   trial and hear all of the testimony that the jury has heard

10:30:18  21   this week so far, right?

10:30:19  22   A.   Yes, ma'am.

10:30:19  23   Q.   Has there been anything that you have heard that has

10:30:23  24   changed that opinion?

10:30:25  25   A.   No, ma'am.

10:30:26   1    Q.    Okay.  Okay.  So let's go ahead, then, take it as we are

10:30:33   2    going down, starting down the, I guess, the access road to the

10:30:37   3    gas well site.

10:30:38   4    A.    Yes, ma'am.  We all saw the pictures.  There has been

10:30:43   5    some debate on whether it was five feet nine inches or six

10:30:51   6    feet nine inches or eight feet.  It depends on what you

10:30:54   7    measured.  Is it the difference between the trees?  But I

10:30:58   8    think everyone will stipulate the fact that the Jeep did make

10:31:01   9    it down that road, and the cruiser did make it down the road,

10:31:04  10    and the ambulance made it down the road.  So I really don't

10:31:07  11    care what the distance of the roadway is.  We know that it was

10:31:13  12    approximately, I believe they said, about 213 feet.  And then

10:31:25  13    there were some from his visit four years after the event.

10:31:31  14    Q.    Let me stop you there.  Whose visit?

10:31:33  15    A.    Mr. Root's.

10:31:34  16    Q.    Thank you.

10:31:34  17    A.    Site visit, four years after the event, the day before

10:31:38  18    trial when he measured that, he came up with a time and

10:31:42  19    distance.  That just had me moving all over my seat, because

10:31:48  20    he has had the same training I have had.  His equations were

10:31:48  21    fine.

10:31:57  22    Q.    Let me stop there.  With regard to the actual numbers

10:31:59  23    that he had in that chart, if you are traveling, you know, ten

10:32:03  24    miles an hour -- do you have any disagreement with the actual

10:32:08  25    calculations that he had in the time and distance chart?

10:32:11  1   A.   No, ma'am.  He went to the same speed and distance

10:32:15  2   calculator and computer that I did to do the same

10:32:18  3   computations.

10:32:18  4   Q.   I stopped you, so where is the disagreement?  With regard

10:32:21  5   to the application of those measurements to the facts of this

10:32:27  6   case?

10:32:27  7   A.   Yes, ma'am.  And the reason is, you don't know where the

10:32:33  8   cruiser was when that transmission was put out.

10:32:37  9   Q.   Which transmission?

10:32:37  10  A.   The transmission of when he turned down the well site,

10:32:41  11  because Deputy Forsyth had to operate that vehicle.  He

10:32:46  12  said -- the testimony was he almost went by, then he came

10:32:49  13  back, and then went down the well road.  You have to be

10:32:53  14  manipulating your vehicle to do that.  So some time down the

10:32:57  15  well road he did what he needed to do and informed dispatch of

10:33:02  16  the direction of travel.  We don't know where on the well road

10:33:05  17  that is.  You can come up with five miles an hour, ten miles

10:33:09  18  an hour, 15 miles an hour, you don't know, no one knows, the

10:33:14  19  speed of that vehicle.  And you can speculate maybe 25.  It

10:33:20  20  was a cruiser.  It's not his personal vehicle where I

10:33:27  21  guarantee I can go down that well road going 50 miles an hour.

10:33:30  22  I don't care.  It's a cruiser.  But I don't know the speed.

10:33:35  23  Nobody knows the speed.  So to put the time and distance

10:33:38  24  calculator, it's just guessing, and you might as well put up

10:33:42  25  on there, the title chart, and the celestial chart, and where

10:33:47  1    the sun is, and the pollen count.  It's a useless-meaning time

10:33:52  2    and distance calculation in there.

10:33:54  3    Q.   Mr. Root portrayed that as, what I at least took as

10:33:59  4    somewhat of a scientific calculation.  Do you believe that

10:34:03  5    there was any scientific calculation in what he did, applying

10:34:07  6    the time and distance measurements to the facts of this case?

10:34:09  7    A.   It was a scientific calculation on a total guess.

10:34:16  8    University MSU, making stuff up.  It could have been this.  It

10:34:19  9    could have been that.  Nobody knows, and everybody is

10:34:21  10   testifying here when they have been asked that final question

10:34:25  11   well, no.  Nobody knows, and can't know.

10:34:28  12   Q.   Okay.  So with regard to starting down the access road,

10:34:33  13   we know at some point as Deputy Forsyth is going down the

10:34:37  14   access road, he radios at the transmission that we saw?

10:34:40  15   A.   Yes, ma'am.

10:34:41  16   Q.   Which I can't remember the exact time.  I think it was

10:34:43  17   2:43 and 4 seconds.

10:34:46  18   A.   I don't recall, yeah.

10:34:47  19   Q.   So then as we continue to travel down that access road,

10:34:53  20   we have the, I guess, the photograph of the muddy tire track?

10:35:00  21   A.   Yes, ma'am.

10:35:00  22   Q.   Okay.  You heard Mr. Root's testimony about that, right?

10:35:06  23   A.   Yes, ma'am.

10:35:07  24   Q.   Do you place any emphasis at all on that photograph in

10:35:12  25   the formulation of your opinions in this case?

10:35:14  1    A.   None at all.

10:35:16  2    Q.   Why?

10:35:16  3    A.   We had a Jeep go there.  We had a cruiser go there.  We

10:35:22  4    had as many as two other cruisers.  I don't know whether --

10:35:26  5    nobody knows, because nobody asked did Lieutenant Branham

10:35:32  6    drive down there to see the scene and then turn around and

10:35:35  7    back out, either back out or turn around to put his cruiser

10:35:39  8    where you saw in the picture?  I don't know.  I know the

10:35:42  9    ambulance went down that access road.  And after the fact,

10:35:46  10   since that is the only way in or out, the ambulance came back

10:35:49  11   out of that road.  What are you going to infer from a muddy

10:35:53  12   tire print of what that had to do with anything?

10:35:57  13   Q.   So safe to say that that did not factor into your

10:36:00  14   analysis in this case at all?

10:36:02  15   A.   The only thing that you can say about that is there was

10:36:05  16   vehicle traffic down that well road.

10:36:08  17   Q.   So we continue -- let's continue traveling down that

10:36:11  18   access road.  So we have gotten to the access road, we have

10:36:14  19   gotten past the muddy tire print, and we come to what has been

10:36:19  20   described, at least by Mr. Root, as the opening to the bowl?

10:36:22  21   A.   Yes, ma'am.

10:36:23  22   Q.   Okay.  So can you tell the jury what information you are

10:36:30  23   able to ascertain from approaching and arriving at the opening

10:36:35  24   of the bowl?

10:36:35  25   A.   The truth is, almost none.

10:36:39   1    Q.   What do you mean?

10:36:40   2    A.   All we have -- from the videos that you saw.

10:36:45   3    Q.   You mean the photos?

10:36:46   4    A.   The photos that you saw, as you travel down the well

10:36:51   5    road, there was a period of time you could not see the Jeep.

10:36:55   6    When you saw the Jeep, finally, you were near the bowl

10:36:58   7    entrance, and the only thing you saw there was the final

10:37:02   8    resting place of the Jeep.

10:37:04   9         We have Deputy Forsyth and Deputy Love say it was

10:37:09   10   somewhere to the left as they went into the bowl.  Where?

10:37:16   11   Nobody knows.  So you don't know.  No one knows when Deputy

10:37:22   12   Forsyth and Deputy Love would have first laid eyes on that

10:37:29   13   Jeep.  The final resting place does not tell you that.

10:37:33   14   Q.   Let me ask you, Mr. Faulkner, as you would be traveling

10:37:37   15   down that road pursuing a Jeep that you believe to be in high

10:37:46   16   risk pursuit and an individual that may be armed, would you be

10:37:49   17   focusing on how fast your cruiser is traveling down the road?

10:37:53   18   A.   That would be -- would not even enter your consciousness.

10:37:59   19   Doesn't matter.

10:37:59   20   Q.   Would you be focusing on the placement of the vehicle

10:38:04   21   specifically as you entered the mouth of the bowl?

10:38:08   22   A.   You don't know where the Jeep is.  And to explain that

10:38:14   23   timing, Mr. Root did talk about human reaction time.  And that

10:38:20   24   is covered in detail, goes over very much detail in the force

10:38:27   25   science class.

| | |
|---|---|
| 10:38:28 | 1 |
| 10:38:31 | 2 |
| 10:38:32 | 3 |
| 10:38:32 | 4 |
| 10:38:34 | 5 |
| 10:38:39 | 6 |
| 10:38:44 | 7 |
| 10:38:50 | 8 |
| 10:38:56 | 9 |
| 10:39:00 | 10 |
| 10:39:03 | 11 |
| 10:39:08 | 12 |
| 10:39:14 | 13 |
| 10:39:21 | 14 |
| 10:39:25 | 15 |
| 10:39:29 | 16 |
| 10:39:34 | 17 |
| 10:39:38 | 18 |
| 10:39:42 | 19 |
| 10:39:47 | 20 |
| 10:39:51 | 21 |
| 10:39:58 | 22 |
| 10:40:03 | 23 |
| 10:40:08 | 24 |
| 10:40:11 | 25 |

Q.   Which is the certification that you have, the same that Mr. Root has?

A.   Yes, ma'am.

Q.   Okay.

A.   Now, you are traveling down the road at some speed, and just like Mr. Root said, it takes time to do anything.  So at some point that no one knows, the Jeep became visible to Deputy Forsyth, who is driving the cruiser.  If the cruiser, and again we don't know, so I am just tossing this out to you, if the cruiser was traveling ten miles an hour, in one second it was traveling 14.67 feet.  If it was 15 miles an hour in one second, it is 22 feet.  If it was 20 miles an hour, it's 29.33 feet per second, and if it's 25 miles an hour, it's 36.67 feet per second.  Time isn't calculated.  We don't know which one of those it is.  But we do know from Marc Green, Ph.D., Forensic Vision, third edition, which is a text used, referenced in Force Science Institute class.  Expected reaction time, in other words, for a driver, if I am driving and I see a stop sign up in front of me, the time expected -- reaction time I expect it to happen.  For you to get off the gas and apply the break, it is reaction time of 0.70 seconds to 0.75 seconds.  It takes time to do everything for a human being.  Unexpected reaction time, in other words, that deer jumped out in front of you, or somebody cuts you off, unexpected reaction time is 1.2 seconds to 1.35 seconds.

10:40:17   1          Now, when you apply that to a driver or a vehicle, the

10:40:21   2    American Association of State Highway and Transportation

10:40:25   3    Official, norm of 2.5 seconds break reaction time is a

10:40:30   4    reasonable guess for the time achievable from 90 percent to

10:40:35   5    95 percent of the general population.  So the general

10:40:39   6    population to see an event, in a surprise situation, get off

10:40:45   7    of the gas, on to the break, it is going to be about

10:40:49   8    2.5 seconds.  Pick any speed you want for that vehicle, and at

10:40:54   9    ten miles an hour, it's 14.6 seconds times two point -- two

10:41:00  10    and a half.  If it's 25 miles an hour, it's 36.6 seconds times

10:41:05  11    two and a half.  We are not even going to talk about the brake

10:41:09  12    coefficient, which means if you stop a car quickly, you are

10:41:14  13    still going to slide.  There is forward momentum.  No one

10:41:17  14    knows any of that stuff.  But to go on whiteboard and say I

10:41:21  15    need to stop right here and then speak to you about human

10:41:24  16    reaction time, he knew better than that.  That was part of the

10:41:28  17    training.  That was a total mischaracterization of what could

10:41:33  18    have been humanly possible in that situation.

10:41:37  19    Q.   So let's talk about, then, when Deputy Forsyth gets to

10:41:46  20    the mouth of the bowl.  As an officer approaching that, do you

10:41:54  21    know what's in there before you get into the mouth of the

10:41:56  22    bowl?

10:41:57  23    A.   It's something no one else asked.  I asked directly.

10:42:00  24    Four years after the incident, the day before trial, Mr. Root

10:42:05  25    goes in there, and then comes back and starts drawing diagrams

10:42:08  1    of a bowl.  That was the first time Deputy Forsyth ever went

10:42:14  2    down that well road, so to talk about a hill up here or cut

10:42:20  3    down there.  And then he opines how the Jeep couldn't of made

10:42:26  4    it; if you watch a television commercial you watch Jeeps going

10:42:29  5    up mountains, you see them going on stairways in China.  How

10:42:33  6    do you know what a Jeep could do?  And even if it couldn't

10:42:38  7    have made it up, how do you know where the well road goes?

10:42:42  8    Did it stop there?  Did it continue on?  Did it filter out

10:42:46  9    someplace else?  You don't know.  Deputy Forsyth didn't know.

10:42:50  10        So going on four years after the event and draw this bowl

10:42:54  11   like he should have known to stop here is contrary to any

10:42:58  12   training that Mr. Root had.

10:43:01  13   Q.   Well, because he -- you said that Mr. Root got his

10:43:06  14   discussion of *Graham versus Connor* correct.

10:43:09  15   A.   He did.

10:43:10  16   Q.   And *Graham versus Connor* says you look at it from the

10:43:13  17   perspective of the reasonable officer, not with 20/20

10:43:17  18   hindsight?

10:43:17  19   A.   Exactly.

10:43:18  20   Q.   So as we go into -- we are at the entrance to this bowl,

10:43:28  21   what information were you able to ascertain based on what

10:43:34  22   Mr. Root has described as the physical evidence?

10:43:37  23   A.   Actually very little from physical evidence, because it

10:43:42  24   is totally unreliable, other than the final resting place of

10:43:46  25   the Jeep, and the final resting place of the cruiser.  We know

10:43:50  1    that at some point in there Deputy Forsyth made it through --

10:43:56  2    what Mr. Root was trying to say -- it's called a PEDA process;

10:44:02  3    perceive, evaluate, decide and act.  The human body must go

10:44:05  4    through those stages.  In the military, when they are training

10:44:06  5    the fighter pilots, they call it the OODA -- fighter pilots

10:44:11  6    use that training -- observe, orient, decide and act.  Every

10:44:14  7    human being must go through four stages of reaction time.  So

10:44:19  8    at traveling some unknown speed, Deputy Forsyth made it

10:44:25  9    through that OODA loop, and tried to stop his cruiser and put

10:44:30  10   it in park.  He admitted he made a slip.  Mr. Root admitted he

10:44:35  11   made a slip.  I would readily admit to you I made many slips.

10:44:39  12   I stopped at a domestic, got out of the car, and my Sergeant

10:44:44  13   rolled my hand up in the window.  Stuff happens.  And

10:44:47  14   afterwards, nobody is hurt, then it's something we can laugh

10:44:50  15   at.

10:44:50  16        In here, he didn't put the cruiser in park because of

10:44:55  17   what he felt was immediate threat to his left.

10:44:59  18   Q.  With regard to Deputy Love's actions, Mr. Root had

10:45:12  19   basically talked about that it was poor practice with

10:45:17  20   Deputy Love going around the front of the cruiser.  Do you

10:45:20  21   have an opinion on that?

10:45:21  22   A.  I do.

10:45:22  23   Q.  What is that?

10:45:23  24   A.  I find that offensive.

10:45:26  25   Q.  Why?

10:45:27  1    A.   We have Deputy Forsyth bail out of the car.  We know he

10:45:33  2    is confronting a threat.  We have his partner get out of the

10:45:37  3    car.  And he said, "I thought my partner was killed or going

10:45:45  4    to be killed."  I would expect any reasonable officer to get

10:45:51  5    around any obstacle they have to, to back their partner.  And

10:45:56  6    to say that was stupid.  I find that offensive.

10:46:01  7    Q.   Okay.  So one of the questions that I asked you, and I

10:46:05  8    think you said it would kind of be easier to go down the

10:46:08  9    access road, so we are down the access road, Deputy Forsyth

10:46:10  10   has gotten out of his cruiser.  Do you have any issue with him

10:46:16  11   actually exiting the cruiser?

10:46:19  12   A.   No, ma'am, I don't.

10:46:20  13   Q.   Why not?

10:46:21  14   A.   When Mr. Root was first talking about it, where the car

10:46:27  15   should have stopped, even though it's not humanly possible

10:46:32  16   where it should have stopped, and should have stayed in the --

10:46:34  17   in the cruiser, or even into the bowl, the standard in

10:46:38  18   training, I will guarantee you around the United States, is no

10:46:43  19   one's feet hit the ground before yours.

10:46:45  20   Q.   And what you do mean by that?  Meaning the person that

10:46:48  21   you are pursuing?

10:46:49  22   A.   Exactly.  I mean, I have not been in a cruiser since 2009

10:46:56  23   probably.  Still when I put my pickup truck, when I am backing

10:47:01  24   into a space, my seatbelt is always undone.  It's just habit.

10:47:06  25   I just can't stop a vehicle with my seatbelt on.  Law

10:47:09  1    enforcement is trained to do that.  All right.  It's a term,

10:47:14  2    and I don't mean to give you an offensive term.  It's what we

10:47:19  3    use to make law enforcement aware of how severe these things

10:47:23  4    can be.

10:47:24  5         For example, if I was training you as officers, I would

10:47:28  6    not call that a door.  That is a "fatal funnel."

10:47:31  7    Q.   A fatal what?

10:47:33  8    A.   A fatal funnel.  That is term you use -- in other words,

10:47:37  9    there could be a subject hiding anywhere in this room armed.

10:47:41  10   They know how you are coming in.  You have no idea where they

10:47:45  11   are.  So if you see any cop shows, people get through doors

10:47:49  12   quickly, and then, you know, they button up through the doors

10:47:53  13   and whatnot because that is fatal, fatal funneling.

10:47:55  14   Q.   So even though we as civilians would call it a door, law

10:47:59  15   enforcement officers call it something else?

10:48:01  16   A.   Fatal funnel in training, yes, ma'am.

10:48:03  17   Q.   So with regard to a vehicle then?

10:48:04  18   A.   I call it a cruiser --

10:48:05  19   Q.   For your cruiser?

10:48:06  20   A.   When we do traffic, you know, we call vehicles and

10:48:10  21   cruisers, and whatnot, in training, if you are confronting an

10:48:15  22   armed subject, a potentially armed subject, depending on who

10:48:18  23   is doing the training, it is called a "kill box" or a "rolling

10:48:24  24   coffin."

10:48:24  25   Q.   Why?

A.   Because rounds shot into a vehicle, even if they don't
hit you, you have shards of glass, you have parts inside the
vehicle, you have potential ricochets, if your seat belt is on
you cannot get to your firearm, you have very limited evasive
motion.  So the standard is, if you are confronting a -- armed
potentially armed subject, get out of that car, and like
Deputy Forsyth tried to do, get to the rear of the car, get
behind the tires, get behind the block, because that will stop
some rounds anyway.  He tried.  Unfortunately the car kept on
going.

Q.   So with regard to Deputy Forsyth's actions actually
exiting the cruiser, when he got into the mouth of the bowl,
do you have any issue with that?

A.   Not at all.  That is exactly what officers are trained to
do, and had he not done that, that would have been contrary to
training.

Q.   Okay.  All right.  So we have kind of talked about that.
Deputy Forsyth is out of the cruiser now.  And based on his
testimony that he observed the Jeep -- let me back up.  He
testified that the Jeep almost hit the cruiser as he pulled in
initially?

A.   Yes, ma'am.

Q.   Okay.  Would that information that the cruiser -- the
Jeep almost hit the cruiser, do you still have any issue with
him exiting the vehicle?

10:50:02  1    A.   No, ma'am.  I don't.

10:50:03  2    Q.   So he exits the cruiser, and then sees the Jeep starting

10:50:11  3    to move towards him?

10:50:13  4    A.   In what he said was an aggressive manner, yes.

10:50:15  5    Q.   Okay.  So Mr. Root testified that Deputy Forsyth didn't

10:50:27  6    take -- didn't step out of the way of the Jeep.

10:50:29  7    A.   Correct.

10:50:30  8    Q.   Okay.  And I took that obviously to be a criticism of

10:50:36  9    Deputy Forsyth's action.  Do you have any such criticism of

10:50:40  10   his actions?

10:50:41  11   A.   I don't.

10:50:42  12   Q.   Why?

10:50:42  13   A.   Where are you going to go?  We have no idea how fast the

10:50:47  14   Jeep was going.  Was it humanly possible to get out of the way

10:50:50  15   of the Jeep, because all you have to do is turn the wheel to

10:50:53  16   steer the thing?  Did he have time to do that when it was

10:50:56  17   coming?  Did he know where his partner was?  Because Deputy

10:51:02  18   Forsyth thought Deputy Love was behind him, so I get out of

10:51:05  19   the way, "There you go partner.  You catch the vehicle."

10:51:09  20   Again, that to me -- the analysis there makes no sense,

10:51:14  21   because you don't know any of these factors.  But we do know

10:51:20  22   that by what Mr. Root said correctly in *Graham v. Connor*, it's

10:51:24  23   the perception of the officer in a tense and rapidly evolving

10:51:28  24   situation.  And you are going to decide whether those -- that

10:51:31  25   perception that you heard him say, "I thought I wasn't going

10:51:36  1    to go home to my wife and kids," was reasonable or not.

10:51:40  2    Q.   Based on the information that you evaluated before you

10:51:44  3    formulated your opinions, any information you evaluated after

10:51:49  4    the formulation of those opinions and before trial, and any

10:51:53  5    information that you have heard in the courtroom during trial

10:51:56  6    this week, has there been any of that information that has

10:52:00  7    caused you to believe that Deputy Forsyth's actions did not

10:52:03  8    comply with, as you said, Supreme Court Guidelines and

10:52:09  9    National Law Enforcement Operational Practices?

10:52:10  10   A.   No, ma'am; not at all.

10:52:13  11   Q.   Can you explain to the jury, then -- and maybe we kind of

10:52:16  12   walked through that a little bit with the discussion of

10:52:18  13   Mr. Root's opinions -- but can you explain specifically to the

10:52:22  14   jury how you came to formulate that opinion and why you

10:52:26  15   believe Deputy Forsyth's actions on August 2nd complied with

10:52:32  16   the Supreme Court Guidelines, which would include *Graham v.*

10:52:35  17   *Connor*, right?

10:52:35  18   A.   Yes, ma'am.

10:52:36  19   Q.   And National Law Enforcement Operational Practices?

10:52:38  20   A.   Yes, ma'am.   If there is one factor that I can speak of?

10:52:43  21   Q.   Absolutely.

10:52:44  22   A.   One other factor.   Numerous people in here have tried to

10:52:48  23   make some kind of analysis of ground disturbance.   And I don't

10:52:54  24   mind them trying to do that, but it is actually another thing

10:52:57  25   that is meaningless.

| | | |
|---|---|---|
| 10:52:59 | 1 | Q.   Why is it meaningless? |
| 10:53:01 | 2 | A.   Which vehicle disturbed the ground and when?  Again, the |
| 10:53:05 | 3 | only thing you have to go by is a final resting place of the |
| 10:53:10 | 4 | Jeep and the final resting place of the cruiser.  So did the |
| 10:53:13 | 5 | Jeep make that mark?  And they are trying to talk about, kind |
| 10:53:17 | 6 | of see a line here.  I don't care whether you see a line or |
| 10:53:20 | 7 | not.  Who made the line?  At what point did that line get |
| 10:53:23 | 8 | made?  If you have an ambulance -- and I am pretty sure that |
| 10:53:26 | 9 | the responding officers and the ambulance did not back down |
| 10:53:32 | 10 | that access road.  I don't know, but I think that's a |
| 10:53:36 | 11 | reasonable assumption, and you can -- if you think that is |
| 10:53:39 | 12 | reasonable, that's up to you.  Which means if I have got a |
| 10:53:42 | 13 | couple of cruisers, maybe the state police, I don't know, and |
| 10:53:47 | 14 | an ambulance, it meant in a 33 by 45, whatever Mr. Root made |
| 10:53:53 | 15 | some kind of measurement, they had to turn around to get out |
| 10:53:56 | 16 | of there.  They had to avoid what we saw in the pictures, that |
| 10:54:01 | 17 | there was some piping in there, the two different -- had to |
| 10:54:04 | 18 | avoid that when they backed out.  How are you going to know |
| 10:54:08 | 19 | who made what lines, and when the disturbance was made?  So |
| 10:54:13 | 20 | that also.  I don't see any point to put weight on that.  I |
| 10:54:21 | 21 | think it's contrary to the training that we have had. |
| 10:54:22 | 22 | Q.   Okay.  You wanted to discuss the actions.  Then what I |
| 10:54:27 | 23 | had asked you was what information or how did you come to the |
| 10:54:33 | 24 | conclusion that Deputy Forsyth's actions on August 2, of 2017, |
| 10:54:40 | 25 | complied with the Supreme Court guidelines in the National Law |

10:54:43   1   Enforcement Operational Standards?

10:54:45   2   A.   I relied on the deposition and trial testimony of the

10:54:53   3   actions of the Jeep, and Mr. Rhoades driving during the

10:54:57   4   pursuit.  I relied on the radio transmission.  I relied --

10:55:05   5   Mr. Root was critical of me relying on the statements and

10:55:12   6   trial testimony and deposition testimony, of the officers, yet

10:55:16   7   that's what *Graham vs. Connor* tells us to do, to rely on.  I

10:55:22   8   didn't find anything inconsistent with the scene that was

10:55:25   9   there of what -- the minor things that could be developed from

10:55:29   10  that scene.  And Lieutenant Branham, who -- the state police

10:55:34   11  they do more than a couple accidents.  He knows how to analyze

10:55:39   12  an accident scene like that.  Again, there was nothing to

10:55:42   13  analyze with all of the traffic down there, and the unknown

10:55:46   14  movements, so that is what I relied on when I made my

10:55:51   15  opinions.

10:55:52   16  Q.   And was there anything that you heard during any of the

10:55:56   17  testimony, whether from Deputy Forsyth, any of the other

10:55:59   18  witnesses, or Mr. Root yesterday, that changed that opinion?

10:56:03   19  A.   No, ma'am.

10:56:04   20  Q.   Let me ask this:  Your opinion talks about compliance

10:56:08   21  with Supreme Court guidelines and National Law Enforcement

10:56:11   22  Operational Practices.  Mr. Root framed his opinion in the

10:56:17   23  form of that he believed Deputy Forsyth's use of force was

10:56:21   24  objectively unreasonable.  Do you disagree with that

10:56:27   25  statement?

| | | |
|---|---|---|
| 10:56:28 | 1 | A.   I disagree with his statement, that it was objectively |
| 10:56:31 | 2 | unreasonable, and I disagree with the way he stated it. |
| 10:56:35 | 3 | Q.   Why? |
| 10:56:36 | 4 | A.   I have been in so many cases and just like there are |
| 10:56:39 | 5 | certain things we can talk about and certain things we can't. |
| 10:56:41 | 6 | I have been told repeatedly that is for you to decide.  That |
| 10:56:45 | 7 | is what objective reasonableness is.  It's not for me to |
| 10:56:49 | 8 | decide.  I can tell you what training is.  I can tell you what |
| 10:56:52 | 9 | operational practice is, but you are going to decide what is |
| 10:56:55 | 10 | objectively reasonable or not.  I would not make that |
| 10:56:58 | 11 | statement. |
| 10:56:58 | 12 | Q.   Let me ask you this:  Mr. Root had also testified with |
| 10:57:07 | 13 | regard to Deputy Forsyth and Deputy Love exchanging copies of |
| 10:57:16 | 14 | their written statements, you know, after they gave their |
| 10:57:19 | 15 | statement on August 4 of 2017.  Do you recall that testimony? |
| 10:57:23 | 16 | A.   I do. |
| 10:57:24 | 17 | Q.   Do you have any issue with Deputy Forsyth and Deputy Love |
| 10:57:28 | 18 | exchanging statements after the fact? |
| 10:57:31 | 19 | A.   None at all. |
| 10:57:32 | 20 | Q.   Why not? |
| 10:57:33 | 21 | A.   The operation procedure that was done is exactly what |
| 10:57:40 | 22 | International Association of Chiefs of Police advise. |
| 10:57:45 | 23 | Separate the individuals.  Take the firearms for evidence. |
| 10:57:50 | 24 | Oftentimes it's even all of their clothing, sometimes.  And |
| 10:57:54 | 25 | then you separate them.  You get them medically evaluated. |

| | |
|---|---|
| 10:57:58 | 1 |
| 10:58:02 | 2 |
| 10:58:06 | 3 |
| 10:58:09 | 4 |
| 10:58:12 | 5 |
| 10:58:16 | 6 |
| 10:58:20 | 7 |
| 10:58:26 | 8 |
| 10:58:32 | 9 |
| 10:58:37 | 10 |
| 10:58:42 | 11 |
| 10:58:45 | 12 |
| 10:58:50 | 13 |
| 10:58:53 | 14 |
| 10:58:57 | 15 |
| 10:59:00 | 16 |
| 10:59:03 | 17 |
| 10:59:07 | 18 |
| 10:59:11 | 19 |
| 10:59:17 | 20 |
| 10:59:21 | 21 |
| 10:59:24 | 22 |
| 10:59:27 | 23 |
| 10:59:28 | 24 |
| 10:59:33 | 25 |

And part of it is a blood draw, and someone is going to allege that there was some intoxicating substance in their body.  So it's all preemptive stuff that has happened from different court cases.  So we are advised -- you know, officers are advised to do certain things.  You separate them.  You don't have them talk to each other until statements are given.  After that, I have no problem if there is a video.  Review the video.  You should.  Because you can only testify -- again, part of force training -- an officer will testify to what they saw, and you can only remember what you saw.  So in other words, if I see a vehicle coming at me and I am getting out of my driver's side, I can see in my peripheral vision the door handle.  So I can keep an eye on this vehicle.  If I am on the other side, the passenger's side, I have got to turn my head. I have got to turn my body to get out of the vehicle.  Try doing that while you are looking over your shoulder.  I've then got to maneuver around the door frame.  I've got to maneuver, "Oh, my God, the vehicle is moving."  I have to maneuver around that, while all that attention is over here. If the statements are identical, I am more concerned about that, if that makes sense to you.  You can only testify to what you saw.  And that is what I believe happened in this situation.

Q.   Do you agree with Mr. Root's testimony that an individual such as Deputy Forsyth and Deputy Love being involved in a

| | |
|---|---|
| 10:59:39 | 1 |
| 10:59:43 | 2 |
| 10:59:46 | 3 |
| 10:59:47 | 4 |
| 10:59:48 | 5 |
| 10:59:53 | 6 |
| 10:59:57 | 7 |
| 11:00:00 | 8 |
| 11:00:03 | 9 |
| 11:00:07 | 10 |
| 11:00:08 | 11 |
| 11:00:12 | 12 |
| 11:00:17 | 13 |
| 11:00:20 | 14 |
| 11:00:20 | 15 |
| 11:00:29 | 16 |
| 11:00:34 | 17 |
| 11:00:39 | 18 |
| 11:00:43 | 19 |
| 11:00:46 | 20 |
| 11:00:48 | 21 |
| 11:00:53 | 22 |
| 11:00:56 | 23 |
| 11:01:01 | 24 |
| 11:01:03 | 25 |

stress-inducing event like a shooting can affect an individual's ability to recall or even remember some events forever?

A.   Absolutely.

Q.   You also heard Mr. Root's testimony with regard to the timing, aside from Deputy Forsyth and Deputy Love exchanging the statements, but the timing of when they gave the statements.  Do you agree with that testimony that there was no issue with them not giving a statement to Lieutenant Branham the day of the incident?

A.   I have no disagreement with that at all.  They did say it correctly.  He cited the literature in terms of Force Science; talks about sleep cycles and memory.  That was correctly cited.

Q.   Okay.  There was some discussion as well with regard Lieutenant Branham's investigation.  From your evaluation of this incident, was there anything you believe that Lieutenant Branham could have done to get a more definitive or more definitive information with regard to the positions of the vehicles before the shooting occurred?

A.   No, ma'am.  Only thing you have is the reference point, the final resting place of the Jeep, and the final resting place of the cruiser.  That is the only thing you got.

         MS. DURST:  Your Honor, may I have one moment, please?

11:01:03    1           THE COURT:  You may.

11:01:17    2    BY MS. DURST:

11:01:17    3    Q.   Mr. Faulkner, I just wanted to clarify, when you were

11:01:21    4    talking about the radio transmission with regard to Deputy

11:01:24    5    Forsyth, saying that he was starting down the access road, do

11:01:28    6    you recall the actual transmission being that he thought that

11:01:30    7    Mr. Rhoades had cut off a trail, that it wasn't with regard to

11:01:35    8    the access road initially?

11:01:36    9    A.   The well road, that is what I interpreted that as.

11:01:39   10    Q.   Okay.  Okay.  Mr. Faulkner, the opinions that you have

11:01:51   11    given to the jury here this morning, do you hold all those

11:01:55   12    opinions to a reasonable degree of certainty in your field of

11:01:59   13    expertise and specifically with regard to the use of force?

11:02:02   14    A.   Yes, ma'am, I do.

11:02:03   15    Q.   Is there anything that you have heard in the course of

11:02:07   16    your testimony -- or excuse me -- in the course of observing

11:02:11   17    the testimony here during the trial, that has altered or

11:02:15   18    changed those opinions in any manner whatsoever?

11:02:19   19    A.   No, ma'am.

11:02:19   20    Q.   Okay.  And do you believe that Deputy Forsyth's actions

11:02:24   21    on August 2, of 2017, were consistent with the Supreme Court

11:02:31   22    guidelines and the National Law Enforcement Operational

11:02:34   23    Policies?

11:02:35   24    A.   Yes, ma'am, I do.

11:02:37   25           MS. DURST:  Your Honor, at this point I don't have

680

11:02:38    1    any further questions for Mr. Faulkner.

11:02:41    2         THE COURT:  Thank you very much, Ms. Durst.

11:02:44    3      Mr. Umina, I was going to give the jury their morning

11:02:45    4    break before you begin your cross if that's --

11:02:50    5         MR. UMINA:  Fine.

11:02:51    6         THE COURT:  Ladies and gentlemen, we have reached a

11:02:52    7    good point to take our morning break.  We will do that now and

11:02:55    8    give you 15 minutes to stretch, and you can otherwise catch

11:02:59    9    your breath.  We will see you back here, let's say at 11:20,

11:03:03   10    since it's almost five after at this point.

11:03:06   11      My instructions, again, remain the same.  Please don't

11:03:08   12    talk about the case amongst yourselves, no independent

11:03:12   13    investigation yourselves, please.  We will see you in

11:03:16   14    15 minutes.  Thank you.

11:03:17   15         (Jury left the courtroom, and the following transpired in

11:03:19   16    open court.)

11:03:22   17         THE COURT:  Thank you all.  Please be seated.  I was

11:03:36   18    just going to give Mr. Faulkner the usual instruction.

11:03:40   19      Mr. Faulkner, we are going to cover for your counsel, but

11:03:44   20    -- no one can talk to you, sir, so I don't want you to think

11:03:47   21    that anyone is being rude.  You are a man without a country

11:03:52   22    until we resume, but we will take a 15-minute break at which

11:03:56   23    point, I will ask you to resume the witness stand.

11:03:58   24      Thank you all very much.  We will stand in recess.

11:28:19   25         (Recess taken at this time 11:03 - 11:28.)

681

| | |
|---|---|
| 11:28:19 | 1 |

THE COURT:  I have a hard copy of the charge; when we go to talk about it, we will have a hard copy with line numbers on it to keep us a little more together as to where we are.  I am sure Ms. Mannan told you the substantive instructions start on page 10 through 19, as my general charge, but always willing to take comments and suggestions on how to improve the Court's general charge.

Mr. Umina, how long do you think you will be with Mr. Faulkner.

MR. UMINA:  Thirty minutes.

THE COURT:  What we might do, and again whatever we do we will play it by ear, is when we dismiss the jury for lunch we will give you guys a few minutes and we will do our charge conference then and go from there.  We will try to do that anyway.  Anything else we need to talk about before we have the jury come back in, Mr. Umina?

MR. UMINA:  No.

THE COURT:  Ms. Durst.

MS. DURST:  I don't believe so, Your Honor.  Thank you.

THE COURT:  Outstanding.

Sir, may we have our jury then, please.

(Jury entered the courtroom, and the following transpired in open court.)

THE COURT:  Mr. Faulkner, I will remind you, you

| | |
|---|---|
| 11:30:20 | 1 |
| 11:30:20 | 2 |
| 11:30:23 | 3 |
| 11:30:24 | 4 |
| 11:30:24 | 5 |
| 11:30:26 | 6 |
| 11:30:29 | 7 |
| 11:30:31 | 8 |
| 11:30:32 | 9 |
| 11:30:39 | 10 |
| 11:30:47 | 11 |
| 11:30:50 | 12 |
| 11:30:52 | 13 |
| 11:30:57 | 14 |
| 11:31:00 | 15 |
| 11:31:02 | 16 |
| 11:31:10 | 17 |
| 11:31:13 | 18 |
| 11:31:17 | 19 |
| 11:31:25 | 20 |
| 11:31:29 | 21 |
| 11:31:32 | 22 |
| 11:31:37 | 23 |
| 11:31:37 | 24 |
| 11:31:43 | 25 |

remain under oath.

Mr. Umina, you may proceed when you are ready.

MR. UMINA:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. UMINA:

Q.   Good morning, Mr. Faulkner.  My name is Ryan Umina.  I believe we met down at your deposition in Florida?

A.   Yes, sir.

Q.   First question, Mr. Faulkner, you acknowledge that there is at least a possibility that the defendant is lying about what happened here?

A.   I wouldn't know.

Q.   You wouldn't know.  Well, if you wouldn't know, how can you say what he did was objectively reasonable?

A.   Based on what I reviewed.

Q.   We'll get into that.  Mr. Faulkner, you lied under oath during the pendency of this case, didn't you?

A.   No, sir.

Q.   I am glad you said that.  We asked you down in Florida during your sworn deposition -- Mr. Prince, what line were we at?

MR. PRINCE:  Page 20, line 5 through 10.

BY MR. UMINA:

Q.   We asked you about working at the Port Columbus airport as an officer back in 2000, right?  That's when you started

11:31:48  1    there?

11:31:49  2    A.   I believe.

11:31:51  3    Q.   I will show you your CV in a moment.  You said that was

11:31:55  4    voluntary.  I asked you if that was a voluntary position, and

11:31:58  5    you said, "Yes, it was not paid."  It was after 9-11 that you

11:32:04  6    went there to assist.  That's what you said, isn't it?

11:32:07  7    A.   Yes, sir.

11:32:08  8    Q.   Sir, you started that job in the year 2000, didn't you?

11:32:14  9    A.   If that's what is on the resume, it's wrong because I

11:32:18  10   started after 9-11; that's why I went there.

11:32:21  11   Q.   Sir, you never corrected your resume, did you?

11:32:24  12   A.   No, but I didn't know it was incorrect.

11:32:26  13   Q.   You can acknowledge that 9-11 happened in 2001?

11:32:35  14   A.   I do recall, yes.

11:32:36  15   Q.   So it was impossible, right?  It was impossible?  You

11:32:40  16   lied here, didn't you?

11:32:42  17   A.   I think that is a ridiculous statement, but go ahead.

11:32:46  18   Q.   That's funny because you gave testimony in another case

11:32:49  19   about this very topic, Mr. Faulkner.  You gave testimony in a

11:32:53  20   case out of the Southern District of Ohio, *Melissa Stanford*

11:32:58  21   *vs. Jacob Lincoln* (phonetic).  Do you remember that case?

11:33:00  22   A.   Yes.

11:33:01  23   Q.   Let's look at what you said then.  Let me read you

11:33:07  24   something they asked you.  This is in response to a question

11:33:10  25   that was asked on the application for employment at the Port

684

11:33:14   1    Columbus International Airport.  The question says, "Briefly
11:33:18   2    describe why you would like to be a law enforcement officer at
11:33:23   3    the Port Columbus airport," and the response that is provided
11:33:26   4    there, I am assuming in your hand is as follows:  "This would
11:33:30   5    once again give me a chance to do some uniform patrol work.
11:33:34   6    It would give me some firsthand contact with the public, which
11:33:39   7    would be make me better instructor at OPOTA.  It would allow
11:33:41   8    me to practice some of the communication tactics that I
11:33:44   9    instruct.  It would also allow me to better serve the officers
11:33:49   10   I defend as a use of force expert by showing I am current and
11:33:56   11   active in the profession.  Lastly, it would give me a chance
11:34:01   12   to work with the general public, which I would enjoy."

11:34:06   13

11:34:07   14   A.    Nowhere in there do you say a word about 9-11, do you.
11:34:10   15   A.    No.
11:34:10   16   Q.    On your application for this job.  Is that a yes?
11:34:15   17   A.    I said no.  It's not in there.
11:34:19   18   Q.    And you actually wrote that it would allow you to better
11:34:25   19   serve officers, like the defendant, that you defend as a use
11:34:32   20   of force expert, because you weren't active in the profession,
11:34:37   21   were you?
11:34:37   22   A.    I was not doing road patrol at the time, no, sir.
11:34:41   23   Q.    Okay.  You lied just now, didn't you, Mr. Faulkner?
11:34:45   24   A.    No, sir.
11:34:46   25   Q.    Okay.  So you provided your CV that you provided in a

11:34:53  1   number of cases.  All of them have said the year 2000.  You

11:34:57  2   filled out an employment application supposedly on the heels

11:35:00  3   of 9-11 in which you don't mention 9-11 at all, but rather

11:35:06  4   mention that you want to do what you are doing right now,

11:35:08  5   being compensated at $250 an hour, and you still are going to

11:35:13  6   look this jury in the eyes and tell us that you didn't lie to

11:35:16  7   us during that deposition?

11:35:18  8   A.   Absolutely.

11:35:21  9          MR. UMINA:  Wow.

11:35:22  10         MS. DURST:  Your Honor, can we refrain from the

11:35:23  11  comments.

11:35:24  12         THE COURT:  Enough.

11:35:24  13         MR. UMINA:  Yes, Your Honor.

11:35:24  14  BY MR. UMINA:

11:35:25  15  Q.   Your opinion is for sale, isn't it, Mr. Faulkner?

11:35:28  16  A.   Absolutely not.

11:35:31  17  Q.   Okay.  So you have been retained in over 450

11:35:35  18  police-related cases, 90 to 95 percent, and you have already

11:35:39  19  told the jury today the number of cases where you testified

11:35:45  20  that the use of force was not objectively reasonable, out of

11:35:50  21  even 400 of those cases, is zero?

11:35:54  22  A.   Correct, sir.  If it was unreasonable, I wouldn't have

11:35:57  23  taken the case.

11:35:58  24  Q.   And you don't think that, let's say one out of 400 cases,

11:36:02  25  .25 percent chance you were wrong?

11:36:03  1    A.   No, sir.

11:36:03  2    Q.   You were right every time, huh?

11:36:05  3    A.   I wouldn't take the case if I didn't believe in it.

11:36:09  4    Q.   Zero for 450?

11:36:11  5    A.   Yes, sir.

11:36:12  6    Q.   And the law firm representing the defendant, two years

11:36:22  7    ago, you had been retained by them 50 to 70 times?

11:36:28  8    A.   That was my best guess.

11:36:30  9    Q.   So -- and you have taken more cases with them since this,

11:36:34  10   haven't you?

11:36:34  11   A.   I am sure I have.

11:36:35  12   Q.   So they have paid you hundreds of thousands, if not over

11:36:38  13   a million dollars, to testify and to state that the officer

11:36:44  14   they are defending did not act objectively reasonable?

11:36:48  15   A.   The way you are putting it is offensive.  They paid me

11:36:52  16   for my time.  My time is compensated, yes, sir.

11:36:55  17   Q.   And you have earned hundreds of thousands of dollars from

11:36:58  18   their firm?

11:36:59  19   A.   Yes.

11:37:00  20   Q.   And you will continue to earn money from their firm,

11:37:01  21   won't you?

11:37:01  22   A.   If I take cases, yes, sir.

11:37:02  23   Q.   And again, so out of 400 you have worked for them 50 to

11:37:07  24   70 times.  So I mean we are talking about more than ten

11:37:10  25   percent if not close to 20 percent, of all of the work that

11:37:15   1    you get as an expert witness is for this law firm, isn't it?

11:37:21   2    A.   Yes, sir.

11:37:26   3    Q.   As you have already said, you don't take cases against

11:37:30   4    law enforcement officers, do you?

11:37:32   5    A.   I explained it, yes, sir.

11:37:35   6    Q.   Would you agree with me that would indicate that your

11:37:38   7    opinion is biased?

11:37:40   8    A.   Not at all.

11:37:41   9    Q.   You realize Mr. Root, he has taken a number of cases on

11:37:47   10   either side, and he has defended all sorts of people, and he

11:37:51   11   also stood up and said when police officers do things wrong.

11:37:56   12   Are you aware of that?

11:37:57   13   A.   I don't know what his cases were, sir.

11:38:00   14   Q.   Let's talk about physical evidence, cold hard facts that

11:38:09   15   are unchangeable, and subjective evidence.  I'd like to talk

11:38:13   16   with you about our questioning previously there.

11:38:18   17        So we asked you, "You would consider physical evidence to

11:38:22   18   be more reliable than subjective recollections of

11:38:26   19   individuals?"  Your answer to start with was, "It could be."

11:38:32   20   And that -- is a yes?

11:38:33   21   A.   Yes.

11:38:34   22   Q.   And you know that the physical evidence in this case is

11:38:38   23   bad for the defendant, don't you?

11:38:40   24   A.   No, sir.

11:38:41   25   Q.   That's your opinion?

11:38:43   1    A.   Yes, sir.

11:38:44   2    Q.   Okay.  And then you tried to wiggle out of this.  We

11:38:49   3    asked, "Well, why wouldn't it be?"  And you said, "It depends

11:38:53   4    on the physical evidence."  Again, trying to make it so that

11:39:01   5    subjective evidence, like from individuals, is more reliable

11:39:05   6    than cold hard facts.  That's what you said, isn't it?

11:39:08   7    A.   I have already stated to the jury what cold hard facts

11:39:13   8    are and what is just speculation.

11:39:16   9    Q.   Okay.  Like for instance, the Jeep being in neutral, that

11:39:21   10   is a cold, hard fact in this case, isn't it?

11:39:23   11   A.   It is.

11:39:23   12   Q.   And any explanation for how that Jeep got into neutral is

11:39:28   13   merely speculation, isn't it?

11:39:29   14   A.   Yes, sir.

11:39:30   15   Q.   Other than it would have had to have been in neutral when

11:39:33   16   the defendant shot and killed Philip Rhoades, anything else is

11:39:38   17   speculation, isn't it?

11:39:38   18   A.   I disagree with that completely, sir.

11:39:40   19   Q.   Sir, you just said anything as to how the Jeep got in

11:39:43   20   neutral is speculation, and then you just disagreed with me

11:39:46   21   that anything other than the Jeep being in neutral is not

11:39:51   22   speculation, do you realize that?

11:39:52   23   A.   No, sir.  You didn't ask that question.

11:39:54   24   Q.   Okay.  You would agree with me that any explanation other

11:40:02   25   than the Jeep already being in neutral when the defendant shot

11:40:06  1    and killed him, is mere speculation, correct?

11:40:11  2    A.   Yes.

11:40:12  3    Q.   Thank you.  And then when we asked you, "You would agree

11:40:17  4    that physical evidence is what it is.  You can see it, measure

11:40:22  5    it, take pictures of it.  There is no question in that regard;

11:40:27  6    is that correct?"  And here you still wouldn't give us a yes.

11:40:31  7    You said, "Well, let's do it this way:  If there were seven

11:40:36  8    casings found and the officer said, I don't know, I think I

11:40:38  9    shot five times, the casings will tell the number of times it

11:40:43  10   was shot."

11:40:46  11        You realize that is a contradictory statement by you in

11:40:48  12   and of itself.  You are actually agreeing there as you are

11:40:52  13   trying to disagree that physical evidence is more reliable

11:40:56  14   than subjective evidence?

11:40:58  15   A.   I don't see it that way.

11:41:00  16   Q.   Okay.  But the officer said, you know, I was moving here

11:41:02  17   and casings don't do anything in terms of disproving or

11:41:06  18   proving where the officer was or wasn't at the time.  You

11:41:09  19   know, he pulled that trigger per the specific casings.  And

11:41:14  20   then we said, It could be or could not be, I mean --

11:41:18  21        MS. DURST:  Your Honor, may I object to this

11:41:20  22   particular line of questions.  May we approach?

11:41:23  23        THE COURT:  What is the question?

11:41:26  24        MS. DURST:  I think he trying is trying to impeach

11:41:28  25   Mr. Faulkner's testimony.  He hasn't asked a question to

11:41:30   1    Mr. Faulkner and got an answer to begin with.

11:41:34   2              THE COURT:  Lack of foundation.  Make that objection.

11:41:37   3              MR. UMINA:  Your Honor --

11:41:38   4              THE COURT:  Hold on.  Understood.  Object if

11:41:40   5    necessary.  Mr. Umina, ask your question, sir.

11:41:44   6              MR. UMINA:  Thank you, Your Honor.

11:41:46   7    BY MR. UMINA:

11:41:47   8    Q.   Then we say, "It could be or couldn't be.  I mean, if he

11:41:50   9    says I was here and he found casings from him 50 yards away,

11:41:53   10   it would probably disprove that he actually stood in the area

11:41:58   11   where he believed him to be.  Then the physical evidence would

11:42:03   12   say, wait a minute, it may not tell you exactly where you are,

11:42:05   13   but we know you are not where you are stating you are at,

11:42:09   14   correct?"  And even to that question you said, "That could

11:42:13   15   be."  And, Mr. Faulkner, you tried to give an answer, some

11:42:18   16   sort of speculation, even in that hypothetical to discount the

11:42:23   17   value of physical evidence, didn't you?

11:42:25   18   A.   No, sir.

11:42:25   19   Q.   Sir, you said, "That could be, or again, it could be due

11:42:32   20   to foot traffic, something was kicked or carried away, you

11:42:35   21   know.  There is all kinds of possibilities."  That is what you

11:42:38   22   said, isn't it?

11:42:38   23   A.   May I explain?

11:42:40   24   Q.   Sure.

11:42:40   25   A.   Thank you.  We are talking about casings.  And in the

11:42:45  1   same training course that Mr. Root had -- it used to be where

11:42:51  2   a normal gun, the casings go out in a certain direction all

11:42:57  3   right, and that was used in cases like this, that is, well a

11:43:00  4   person must have been standing so many feet away.  My research

11:43:05  5   done by Force Science with multiple police departments and

11:43:09  6   thousands of rounds shot, found that in a standard shooting

11:43:13  7   position, when you pull the trigger, the casings may hit at

11:43:17  8   180 degrees area.  And if there is any movement or changing of

11:43:24  9   the shooting posture, or position of the hand, it may be as

11:43:29  10  much as 360 degrees.  That's what I was referring to.  On top

11:43:34  11  of that, I did say correctly, and I will say it here too, if

11:43:38  12  you can say, well, they found a shell casing, it says nothing

11:43:43  13  because you don't know the ejection pattern of the gun, you

11:43:47  14  don't know where the officer was standing, you don't know the

11:43:50  15  position he held the firearm in, you know there was multiple

11:43:53  16  traffic in there after that, you -- and it was found a couple

11:43:56  17  days afterwards that, in that case, that casing has no

11:44:01  18  evidentiary value based on law enforcement training.

11:44:04  19  Q.   Sir, we can see right here that's not what you said in

11:44:07  20  your deposition, correct?  You said, "Or again, it could be

11:44:11  21  due to foot traffic, something was kicked or carried or, you

11:44:14  22  know, there is all kinds of possibilities there."

11:44:16  23  A.   Is that not what I just said?

11:44:18  24  Q.   You just gave a three-minute explanation on the direction

11:44:22  25  of shell changes being ejected from a gun.  You did not state

11:44:26  1    all the things you just said to the jury, anything like that

11:44:28  2    to us, did you?  Your words are right here on the screen, sir.

11:44:32  3    A.   I know that.  You didn't ask any more questions.  I

11:44:37  4    answered your question.  If you wanted a full explanation, you

11:44:39  5    could have asked for it, sir.

11:44:40  6    Q.   Okay.  But you do agree as a matter of principle,

11:44:46  7    physical evidence is more reliable than subjective evidence,

11:44:51  8    isn't it?

11:44:52  9    A.   Correctly related physical evidence is.

11:44:56  10   Q.   And it's more reliable than recollections as a general

11:44:59  11   rule, isn't it?

11:45:00  12   A.   It may be.

11:45:03  13   Q.   You said here, "I would say so."

11:45:05  14   A.   It may be.

11:45:06  15   Q.   You would agree those are two different answers?

11:45:09  16   A.   I will agree, because after it was presented in here, as

11:45:12  17   I said and will continue to say, what you are saying is

11:45:15  18   physical evidence I disagree with.

11:45:17  19   Q.   Let's talk about the use of force policies for a moment.

11:45:26  20   You would agree that the defendant was prohibited from using

11:45:35  21   deadly force to stop an individual on mere suspicion of a

11:45:39  22   crime or simply because the individual runs away?

11:45:42  23   A.   Yes, sir.

11:45:42  24   Q.   You would agree that was prohibited, right?

11:45:46  25   A.   Yes, sir.

693

11:45:48  1    Q.   You said that you relied on trial testimony today,

11:45:51  2    correct?

11:45:52  3    A.   Yes, sir.

11:45:53  4    Q.   You were here when Lieutenant JP Branham testified,

11:45:58  5    correct?

11:45:59  6    A.   I was.

11:46:00  7    Q.   And you heard him state three times that Corey Love lied

11:46:09  8    under oath, didn't you?

11:46:15  9    A.   In what context?  I don't recall.

11:46:18  10   Q.   I walked up to the overhead.  I showed Lieutenant Branham

11:46:22  11   what he wrote.  And then I showed him portions of Corey Love's

11:46:26  12   sworn deposition testimony, and I said, "Did you provide false

11:46:31  13   information here or did he lie?"  And he very quickly informed

11:46:36  14   us on three occasions that Corey Love lied.

11:46:39  15   A.   I would like to see what you are talking about.

11:46:42  16   Q.   Sir, you were at the trial?

11:46:44  17   A.   I was.  And I would like to see what you are talking

11:46:47  18   about.

11:46:48  19   Q.   Sir, you just testified that you are basing your opinion

11:46:53  20   on what you saw at trial, and you don't recall the testimony

11:46:57  21   at trial?

11:46:59  22   A.   Sir, with all due respect, since you won't show it to me,

11:47:03  23   it makes me very suspicious.  I would like to see what you are

11:47:03  24   talking about.

11:47:06  25   Q.   Sir, I don't have the transcript of the trial available.

11:47:09    1    We are still in the trial.

11:47:10    2    A.   I'm sorry.  I don't recall what you are talking about.

11:47:11    3    Q.   Well, doesn't that call into question you relying on any

11:47:15    4    of the other evidence presented here?

11:47:16    5    A.   Sir, you can call into question anything you would like.

11:47:19    6    Q.   Sir, your testimony is that you don't recall the

11:47:24    7    testimony of the investigating state trooper as it relates to

11:47:29    8    the only other witness to this shooting during this trial --

11:47:32    9    that's your testimony?

11:47:33   10    A.   I do not recall every word that was said.  I would like

11:47:35   11    to see what you are referring to.

11:47:37   12    Q.   I just explained to you -- I mean, I thought that would

11:47:40   13    jog your memory, when I walked up to the overhead.  I put

11:47:43   14    statements side-by-side as a little bit of to do.  You don't

11:47:46   15    recall that?

11:47:46   16    A.   I don't, and if you are not prepared to do it, I am not

11:47:49   17    going to answer something I don't know if what you are saying

11:47:52   18    is correct or accurate.

11:47:53   19    Q.   So again, your testimony was just that you relied on the

11:47:56   20    evidence that you heard at trial, but you don't remember the

11:47:58   21    evidence heard at trial?

11:48:00   22    A.   I didn't say that.  It's clear on record what I said.

11:48:06   23    Q.   Okay.  You agree that the Jeep had left no distinctly

11:48:14   24    visible evidence that it's tires had been spinning, correct?

11:48:19   25    A.   I don't know.

11:48:21  1   Q.   These are your words, sir.  I wrote this from something

11:48:29  2   you read in this case.  So you disagree with this now?  That

11:48:32  3   quote, that is a direct quote from something that you

11:48:36  4   authorized in this case.

11:48:38  5   A.   And I agree with it.  There was a scratch up on the

11:48:41  6   ground; I don't know what left it.  I don't know if it was the

11:48:45  7   Jeep or some other vehicle when they were there before

11:48:50  8   turning.  I don't know.  There was ground disturbance.  My

11:48:52  9   point that I made to the jury, I have no idea what to assign

11:48:56  10  that ground disturbance to.

11:48:57  11  Q.   Sir, you wrote in this case, "The Jeep had left no

11:49:04  12  distinctly visual evidence that its tires had been spinning."

11:49:09  13  A.   And I agree with that.

11:49:11  14  Q.   I want to show you two photos here.  You see this area

11:49:17  15  right here, sir?

11:49:18  16  A.   Yes.

11:49:19  17  Q.   Right here behind the Jeep's tire.  Okay.  Do you see how

11:49:23  18  the grass not only to the tire and the bumper are actually --

11:49:28  19  I mean, right on the wheel -- pressed up against it and fully

11:49:33  20  up into the well?

11:49:35  21  A.   Yes.

11:49:35  22  Q.   You would agree with me that if a car was driving

11:49:38  23  straight and had just driven over this grass, that it would no

11:49:44  24  longer be standing straight up into the well there?  You would

11:49:48  25  agree with that, wouldn't you?

11:49:49  1    A.   It's possible.  But if you look at the line of travel

11:49:52  2    that is here, it seems like it is to the right of what you are

11:49:58  3    talking about in the grass, and if the car -- if the Jeep was

11:50:01  4    stopping, it had to be slowing to have been stopped there and

11:50:04  5    the wheel turned up, it might have stood the grass up.  I

11:50:07  6    don't know.

11:50:07  7    Q.   Sir, you reviewed all the evidence in this case?

11:50:09  8    A.   Yes.

11:50:09  9    Q.   You know that the defendant had stated repeatedly that

11:50:13  10   the Jeep did not stop, veer, or slow down?

11:50:18  11   A.   When it was coming at him, yes.

11:50:20  12   Q.   Okay.  This is it's final resting place, sir.  These

11:50:24  13   marks are not aligned with the Jeep's tires.  This is the

11:50:28  14   vegetation behind it.  And all of this, okay, all of this, if

11:50:33  15   he went straight at the defendant, all of this vegetation

11:50:40  16   would be disturbed, wouldn't it?

11:50:43  17   A.   This is the final resting place of the vehicle.  You do

11:50:47  18   not know, and I have heard this from everybody's testimony,

11:50:51  19   Mr. Root said the same thing.  You don't know where the

11:50:53  20   officer was standing.  You don't know where the Jeep was when

11:50:57  21   shots were fired.  You don't know which round is the one that

11:51:00  22   actually hit Mr. Rhoades.  You don't know any of that.  And

11:51:02  23   then you are trying to make stuff up on this line or that

11:51:06  24   line.  It has no meaning.

11:51:07  25   Q.   Sir, it was the defendant who stated that the Jeep

11:51:11  1    traveled straight at him and did not veer.  Are you aware of

11:51:14  2    that as someone who reviewed the evidence in this case?

11:51:16  3    A.   That is why he shot.

11:51:19  4    Q.   And, sir, let's think about this.  If the vehicle is

11:51:24  5    accelerating straight and not veering, it would have to travel

11:51:28  6    straight at him.  So how is the Jeep in this direction --

11:51:35  7    let's just back it up.  This is where it would have to be,

11:51:39  8    right?  You would agree with that?  If this vehicle just

11:51:42  9    traveled straight at the defendant, then this is what would be

11:51:47  10   directly behind the Jeep in the moments before.

11:51:52  11   A.   If you want to make a hypothetical on where the deputy

11:51:55  12   was, and you want me to say based on that hypothetical, you

11:52:00  13   don't know where the deputy was standing.

11:52:01  14   Q.   Sir, I don't understand how this is a hypothetical if

11:52:04  15   this is the final resting place of the Jeep.  That is the

11:52:07  16   front of the car.  That is the back of the car, and the

11:52:08  17   defendant says that it traveled straight.  This is not a

11:52:12  18   hypothetical.

11:52:13  19   A.   It is, sir.

11:52:15  20   Q.   Your testimony is that the Jeep, traveling in a straight

11:52:21  21   line as the defendant testified, is a hypothetical?

11:52:28  22   A.   I am saying what you are trying to make -- you are making

11:52:31  23   a theory, which is fine.  You are making an argument, which is

11:52:35  24   fine.  I am saying you cannot scientifically say where the

11:52:37  25   deputy was and when that Jeep stopped.  You don't where it

11:52:42   1   rolled to.  We have got the wheel, as you can see there,

11:52:45   2   slightly toward the right.  Was it that way all the time?  I

11:52:49   3   don't know.  You don't know.  No one knows.

11:52:50   4   Q.   Sir, I am not giving you a hypothetical.  I am asking you

11:52:54   5   a question based upon the defendant's account of what occurred

11:52:59   6   at the moment force was used.  And I am asking you questions

11:53:03   7   about that.  Can you at least acknowledge that?

11:53:05   8   A.   No, sir, because you are not asking me that.  I am very

11:53:08   9   clear on saying Deputy Forsyth said he shot when the Jeep was

11:53:14  10   coming right at him.  And then you are bringing that --

11:53:18  11   interjecting that with final resting place.  That is not

11:53:21  12   correct.

11:53:22  13   Q.   Coming right at him and not veering would indicate a

11:53:28  14   straight direction of travel.  Right here is the opening where

11:53:32  15   he says he jumped out at.  He would have -- the defendant

11:53:36  16   claims he was aggressively accelerating straight at him.  What

11:53:40  17   I am asking you to do is consider, let's pull the Jeep

11:53:43  18   straight back, okay, straight back, and consider this.  You

11:53:48  19   are telling me that is a hypothetical?

11:53:49  20   A.   Yes, sir.  That's your argument.  That's all it is.

11:53:51  21   Q.   Okay.  Mr. Faulkner, were you here when this picture was

11:53:55  22   introduced at trial?

11:53:56  23   A.   Yes.

11:53:57  24   Q.   Do you recall the defendant attempting to introduce this

11:54:05  25   photo as evidence of wheel spinning?

11:54:09   1   A.   It just -- I am not sure it said wheel spinning.  I

11:54:14   2   thought it was a ground disturbance.  I believe that's what

11:54:17   3   was said, a ground disturbance.  I don't know what from.

11:54:23   4   Q.   Do you recall Lieutenant Branham then, when I questioned

11:54:29   5   him about this photo further, acknowledging that it would have

11:54:34   6   been impossible for this to be evidence of tires spinning,

11:54:39   7   because the Jeep would have had to have been faced in a

11:54:42   8   completely perpendicular direction to the direction that it

11:54:46   9   allegedly traveled?

11:54:47   10   A.   Yes, sir.

11:54:47   11   Q.   Okay.  So you and I can both acknowledge this is

11:54:51   12   impossible that this photo is evidence of tires spinning?

11:54:55   13   A.   At what point?  We have -- we have Deputy Forsyth saying

11:55:01   14   the Jeep pulled up and almost hit me, then pulled back and

11:55:05   15   made a three-point, which I don't know what that means.  When

11:55:08   16   I pull in a parking space, and I'm over the line, and I

11:55:11   17   straighten the car?  I don't know what a three-point turn is

11:55:14   18   in here.  Again, you are trying to say that means it is going

11:55:17   19   in the opposite direction.  I don't know where that came from.

11:55:21   20   I don't know what caused that ground disturbance.  I don't

11:55:25   21   know.  You don't know.  No one knows.

11:55:27   22   Q.   Sir, I am specifically focused on the moment in time and

11:55:32   23   the allegations of the actions of the Jeep that the defendant

11:55:36   24   is claiming as justification for utilizing deadly force in

11:55:41   25   this manner, just to clear up any discrepancy questions I am

11:55:44  1    asking you.

11:55:45  2        So what I am specifically concerned with is -- his claim

11:55:48  3    is that the tires started spinning, the engine started

11:55:54  4    revving, he claims it came at him and it did not veer, stop,

11:56:00  5    or slow down and then he claims that by shooting the driver,

11:56:04  6    the vehicle suddenly stopped in its tracks.  Just so you

11:56:09  7    understand, that's right where I am going to ask you all the

11:56:12  8    questions about.  And again, do you recall that the defendant

11:56:17  9    attempted to offer this photo into evidence as evidence of the

11:56:22  10   tires spinning in the exact moment I just described to you?

11:56:25  11   A.   I don't know.  It's ground disturbance.  I don't know

11:56:28  12   when it was.

11:56:29  13   Q.   Do you recall the defendant here at trial introducing

11:56:34  14   this photograph as evidence of the tires spinning just before

11:56:39  15   the moment the defendant shot and killed Mr. Rhoades?

11:56:41  16   A.   I don't believe anybody could say when it was with any

11:56:45  17   kind of accuracy.

11:56:46  18   Q.   And you -- that wasn't my question.  I am again asking

11:56:50  19   you about the testimony and evidence here at trial.  And my

11:56:56  20   question to you is:  Do you recall the defendant attempting to

11:57:01  21   introduce this photo during Lieutenant Branham's testimony as

11:57:06  22   evidence of tires spinning in the moment before the defendant

11:57:10  23   killed Mr. Rhoades?

11:57:12  24   A.   I don't recall that specifically.

11:57:13  25   Q.   So that is another piece of critical evidence in this

11:57:16  1    case that you don't recall that was heard at trial, correct?

11:57:20  2    A.   Yes, and I would have disregarded it, because it's not

11:57:24  3    scientifically based.

11:57:26  4    Q.   Do you recall Lieutenant Branham testifying that this

11:57:30  5    could not have been evidence of tires spinning?

11:57:36  6    A.   I don't know how anybody could make that statement.

11:57:41  7    Q.   You visited the site, correct?

11:57:43  8    A.   I did.

11:57:43  9    Q.   Okay.  You recall there is a ditch right here?

11:57:48  10   A.   Yes, sir.

11:57:48  11   Q.   Sir, do you not remember that entire line of questioning

11:57:51  12   that I had with Lieutenant Branham at this trial?

11:57:54  13   A.   I do, and I thought it was -- I'm sorry.  I thought it

11:57:58  14   was off base.  I thought it was you're presenting a theory

11:58:02  15   with no scientific basis behind it.

11:58:05  16   Q.   Are you saying Lieutenant Branham was wrong also when he

11:58:07  17   testified that these could not have been the marks?

11:58:10  18   A.   Specifically what marks?

11:58:12  19   Q.   Right here in this photo that I am pointing at.

11:58:15  20   A.   Marks -- that's ground disturbance in relation to what?

11:58:19  21   Q.   Sir, I just explained to you for probably 30 seconds

11:58:23  22   about the moment in time that I am focused on and the actions

11:58:26  23   of the Jeep.  Do you recall that question?

11:58:27  24   A.   I do.  And I said then, and will repeat, I don't know how

11:58:31  25   anyone could make any kind of definitive statement in terms of

11:58:35   1   analysis of what that is.

11:58:36   2   Q.   Because that's physical evidence that disproves the

11:58:39   3   defendant's theory, correct?

11:58:40   4   A.   I don't think it does.

11:58:41   5   Q.   You have already agreed that if the defendant violated

11:58:45   6   the Marion County Sheriff's Department's use of force policy,

11:58:48   7   he acted objectively unreasonably, correct?

11:58:52   8   A.   That would have been contrary to training and practice.

11:58:54   9   Q.   Sir, that was not my question.  I am asking you, you have

11:58:57   10   already agreed under oath in this case, that if the defendant

11:58:59   11   violated the Marion County Sheriff's Department's use of force

11:59:02   12   policy, he acted objectively unreasonable, correct?

11:59:06   13   A.   No, sir.  I explained before why I don't use that term.

11:59:09   14   I use the term "contrary to training and practice."  They will

11:59:13   15   decide if it is objectively unreasonable.  Unreasonable.

11:59:17   16   That's the jury's decision.

11:59:19   17   Q.   Sir, didn't you just offer your expert opinion that the

11:59:22   18   defendant did not act objectively unreasonably -- that he

11:59:27   19   acted objectively unreasonably, didn't you just offer that as

11:59:29   20   your expert opinion in this case?

11:59:31   21   A.   He acted in line with the policies and training, and in

11:59:36   22   line with *Graham vs. Connor*.  That's what I said.  They will

11:59:40   23   make the objective reasonable analysis.  That is what

11:59:43   24   objective reasonableness, it's what the jury thinks.

11:59:51   25   Q.   Sir, you have already agreed in this case as well that

11:59:54   1   the Jeep was not moving towards the defendant when he opened

11:59:57   2   fire and shot Philip Rhoades on August 2, 2017; that this

12:00:02   3   shooting was objectively unreasonable, correct?  You have

12:00:06   4   already agreed to that in this case?

12:00:07   5   A.   If the Jeep was not moving, yes.  If the Jeep was

12:00:11   6   stationary, that would be contrary to policy and training.

12:00:19   7   Q.   A few more questions for you, Mr. Faulkner.  You just

12:00:29   8   testified, okay, you said things that we know.  You said we

12:00:35   9   know he almost struck a vehicle, Mr. Rhoades, when he was

12:00:38  10   driving, correct?  That's what you testified to?

12:00:41  11   A.   Yes, sir.

12:00:42  12   Q.   You have reviewed the radio transmissions in this case?

12:00:44  13   A.   Yes, sir.

12:00:45  14   Q.   You acknowledge there is not a single radio transmission

12:00:48  15   indicating that Mr. Rhoades did that, correct?

12:00:50  16   A.   Yes, sir.

12:00:50  17   Q.   You also -- you were at trial and heard the defendant

12:01:06  18   testify that he was waiting for a car to pass before he went

12:01:09  19   down the road?

12:01:10  20   A.   Yes, sir.

12:01:11  21   Q.   Okay.  And you also agree there was no radio traffic

12:01:15  22   about that, correct?

12:01:15  23   A.   Yes, sir.

12:01:16  24   Q.   And you also heard him testify that he radioed and had to

12:01:21  25   let the girl go past, didn't you?

| | | |
|---|---|---|
| 12:01:24 | 1 | A.   Yes, sir. |
| 12:01:24 | 2 | Q.   We -- you said, "We don't know what vehicles went down |
| 12:01:32 | 3 | that road," sir.  That was your testimony? |
| 12:01:35 | 4 | A.   Yes, sir. |
| 12:01:36 | 5 | Q.   You acknowledge that when photos were taken of the scene |
| 12:01:40 | 6 | 40 minutes later, there were no vehicles there? |
| 12:01:43 | 7 | A.   There was a Jeep and a cruiser.  That was all. |
| 12:01:46 | 8 | Q.   That was all.  And typically after a shooting, a police |
| 12:01:50 | 9 | agency would secure that scene, correct? |
| 12:01:53 | 10 | A.   Well, no, because what you are going to do is officers |
| 12:01:59 | 11 | are going to respond to make sure everybody is okay in that |
| 12:02:02 | 12 | and an ambulance is going to be in there, and ambulance -- |
| 12:02:05 | 13 | human life always takes precedence over evidence.  And if you |
| 12:02:10 | 14 | have ever seen the way a fire department comes in, the squad |
| 12:02:13 | 15 | comes in, they may mess up the crime scene.  You don't stop |
| 12:02:18 | 16 | that because they have got to treat the people, and then they |
| 12:02:21 | 17 | have got to get out of there, and they may mess it up there. |
| 12:02:26 | 18 | Q.   Sir, you would agree with me that Deputy Love didn't |
| 12:02:32 | 19 | actually know what was happening in the seconds just prior to |
| 12:02:37 | 20 | the shooting, after the defendant jumped out of the car, and |
| 12:02:43 | 21 | while he was shooting, correct? |
| 12:02:44 | 22 | A.   I will agree, yes. |
| 12:02:45 | 23 | Q.   Because Deputy Love didn't actually see the defendant |
| 12:02:51 | 24 | pulling the trigger, did he? |
| 12:02:52 | 25 | A.   No, sir. |

| | | |
|---|---|---|
| 12:02:53 | 1 | Q.   He was running around the vehicle, right? |
| 12:02:58 | 2 | A.   Yes, sir. |
| 12:02:59 | 3 | Q.   And that vehicle, his vehicle, was moving, correct? |
| 12:03:02 | 4 | A.   Yes, sir. |
| 12:03:03 | 5 | Q.   And as he is looking back, he says he sees the back of |
| 12:03:09 | 6 | the Jeep disappear, right?  In his testimony, Mr. Love, he |
| 12:03:14 | 7 | says when is walking alongside the cruiser, he sees the back |
| 12:03:21 | 8 | of the Jeep disappear.  That's what he said, right? |
| 12:03:23 | 9 | A.   I don't remember "disappear."  I remember he said the |
| 12:03:25 | 10 | back of the Jeep was moving.  I don't remember "disappear." |
| 12:03:30 | 11 | Q.   It could have disappeared to him as the back of the Jeep |
| 12:03:32 | 12 | was moving because he is walking by a moving car, so that Jeep |
| 12:03:35 | 13 | sitting still, he is walking by a moving car, and now the top |
| 12:03:38 | 14 | is disappearing behind him? |
| 12:03:42 | 15 | A.   That's not what he said. |
| 12:03:44 | 16 | Q.   I know that's not what he said, but that could have |
| 12:03:47 | 17 | happened, couldn't it? |
| 12:03:47 | 18 | A.   That's an argument and a theory you can put forth. |
| 12:03:51 | 19 | Q.   You said you don't care what the distance of the roadway |
| 12:03:57 | 20 | is? |
| 12:04:00 | 21 | A.   In terms of what happened, not really.  I mean, for the |
| 12:04:07 | 22 | sketch afterwards, yes, you need to mark those things.  But |
| 12:04:11 | 23 | the reason I say I don't care is we know it's approximately |
| 12:04:14 | 24 | 213 feet, but you don't know the speed of travel, you don't |
| 12:04:21 | 25 | know the location when radio transmissions were made.  That's |

12:04:25  1  why objective findings or any kind of scientific analysis when

12:04:30  2  you are starting off with total unknowns.

12:04:33  3  Q.  Sir, they are not total unknowns.  You would acknowledge

12:04:36  4  that radio traffic starting and stopping at a definitive time,

12:04:40  5  using a mathematical calculation, are both not unknowns,

12:04:43  6  correct?

12:04:44  7  A.  The only known there is approximately 16 seconds.

12:04:48  8  Q.  And you would agree with that 16-second timeline is very

12:04:52  9  bad for the defendant, isn't it?

12:04:53  10  A.  I don't think so at all.

12:04:54  11  Q.  Because you don't believe any objective evidence is bad,

12:04:57  12  do you?

12:04:58  13  A.  I don't know how to answer that, sir.

12:05:00  14  Q.  The only thing you are relying on in this case is

12:05:02  15  objective evidence, isn't it?

12:05:04  16  A.  That's wrong.

12:05:04  17  Q.  Sir, you just sat here and discounted physical objective

12:05:09  18  evidence for at least 30 minutes during your testimony.

12:05:11  19  A.  Because the fact is, sir, it is not physical objective

12:05:15  20  evidence.  It is not.

12:05:19  21  Q.  You mean the unchangeable facts of the scene are not

12:05:23  22  physical evidence?  That's your testimony today?

12:05:27  23  A.  My testimony is the only thing known is the final resting

12:05:33  24  place of the Jeep --

12:05:34  25  Q.  Sir --

12:05:35  1    A.    -- the final resting place of cruiser, and a reference

12:05:39  2    point.

12:05:39  3    Q.    Sir, you took issue with this time distance calculation,

12:05:46  4    right?  You said that you were offended?

12:05:50  5    A.    It was a misuse of his training.

12:05:52  6    Q.    Sir, you made those same calculations and discussed time

12:05:57  7    distance calculations with us during your deposition, didn't

12:06:00  8    you?

12:06:00  9    A.    To show how it is a complete unknown.  I said repeatedly

12:06:05  10   in there, I don't know because this is a "could have".  That

12:06:08  11   is all -- that is all everything is, is an argument.  It could

12:06:11  12   have been is a theory.  Nobody knows.

12:06:14  13   Q.    Sir, you take surveys and do studies as part of something

12:06:20  14   that you do, right?

12:06:20  15   A.    Yes, sir.

12:06:21  16   Q.    There is a bunch of unknown variables, but what you want

12:06:24  17   to do when you are attempting to discern information is figure

12:06:29  18   out what those variables might be, and then attempt to see

12:06:34  19   what the scenarios could be based on those variables, correct?

12:06:38  20   A.    Yes, we do look at officer subject factors, special

12:06:42  21   circumstances in the survey, yes, sir.

12:06:43  22   Q.    I'm saying as a general rule of analyzing information, if

12:06:47  23   there are variables, you can get a range of possibilities,

12:06:53  24   right, and limit it based on what variables could have

12:06:57  25   occurred or were likely to have occurred, for instance, like

| | | |
|---|---|---|
| 12:07:00 | 1 | the speed of the vehicle? |
| 12:07:07 | 2 | A.   Speed of the vehicle is unknown.  Scientific evidence is |
| 12:07:12 | 3 | the length of the road and final rest place.  That's all you |
| 12:07:14 | 4 | have. |
| 12:07:14 | 5 | Q.   Okay.  So you talked about the Jeep.  The Jeep could have |
| 12:07:25 | 6 | gone anywhere, right?  The Jeep could have gone anywhere.  It |
| 12:07:29 | 7 | could have climbed a mountain, right?  That's what you said, |
| 12:07:32 | 8 | the Jeep could have climbed a mountain? |
| 12:07:33 | 9 | A.   It could. |
| 12:07:35 | 10 | Q.   Are you saying that if Mr. Rhoades would have attempted |
| 12:07:37 | 11 | to climb the mountain in that Jeep, the defendant would have |
| 12:07:40 | 12 | been justified in shooting him and killing him? |
| 12:07:44 | 13 | A.   Absolutely not. |
| 12:07:45 | 14 | Q.   Thank you.  So we were talking about witness statements. |
| 12:07:51 | 15 | You said the right thing to do is to separate them and not let |
| 12:07:56 | 16 | them talk to anybody, correct? |
| 12:07:57 | 17 | A.   Yes, sir.  Other than you -- in training we tell them, |
| 12:08:04 | 18 | you need to give the immediate information.  In other words, |
| 12:08:08 | 19 | the suspect has fled, was in a green car heading this |
| 12:08:12 | 20 | direction, but that's all.  Other than that, we don't go into |
| 12:08:16 | 21 | any detail because of what we have talked about in terms of |
| 12:08:20 | 22 | emotional distress. |
| 12:08:21 | 23 | Q.   Do you recall Sergeant Branham testifying that both |
| 12:08:24 | 24 | Corey Love and the defendant informed him that they wanted to |
| 12:08:27 | 25 | give their interviews together? |

| 12:08:29 | 1 | A.   I believe at the same time, yeah. |
| 12:08:31 | 2 | Q.   No.  He had an individual conversation with both |
| 12:08:35 | 3 | Corey Love and the defendant, and he actually noted in his |
| 12:08:38 | 4 | report that they both informed him that they wanted to be |
| 12:08:42 | 5 | interviewed together.  Do you recall that testimony? |
| 12:08:44 | 6 | A.   Yes, and if they wanted to, that's fine.  I would not |
| 12:08:47 | 7 | allow it.  I would have separated them. |
| 12:08:49 | 8 | Q.   And Lieutenant Branham correctly did. |
| 12:08:51 | 9 | A.   He did.  He did. |
| 12:08:54 | 10 | Q.   Do you recall that Corey Love had lied about that, and |
| 12:08:57 | 11 | that is one of the things that Lieutenant Branham stated, that |
| 12:09:00 | 12 | Corey Love lied about under oath? |
| 12:09:02 | 13 | A.   What are you referring to? |
| 12:09:04 | 14 | Q.   Lieutenant Branham's testimony here at trial, sir. |
| 12:09:08 | 15 | A.   Again, what are you talking about? |
| 12:09:12 | 16 | Q.   I will move on.  I will move on.  You agree that the |
| 12:09:21 | 17 | bullets fired by the defendant did not stop the Jeep, correct? |
| 12:09:26 | 18 | A.   Bullets will not stop a vehicle, but it can disrupt the |
| 12:09:32 | 19 | driving pattern of the operator. |
| 12:09:36 | 20 | Q.   So again, that's correct, right?  Bullets don't stop |
| 12:09:40 | 21 | moving vehicles? |
| 12:09:40 | 22 | A.   They don't. |
| 12:09:42 | 23 | Q.   And you agree that if the defendant testified the Jeep |
| 12:09:46 | 24 | was coming at him in an aggressive manner, that is the basis |
| 12:09:50 | 25 | for your opinion for his use of deadly force being justified |

12:09:55  1   allegedly, correct?

12:09:56  2   A.   Yes.

12:09:56  3   Q.   That was it?

12:09:57  4   A.   Yes, sir.

12:09:58  5   Q.   How do you do that, yet you have no explanation from how

12:10:05  6   this -- for how this aggressively moving Jeep magically

12:10:10  7   stopped?

12:10:11  8   A.   I don't think it magically stopped at all.  It was in

12:10:14  9   neutral, it rolled a little bit, and stopped.  That's not

12:10:15  10  magic.  That's normal operation of a vehicle.

12:10:22  11  Q.   And as you said, the only reasonable explanation is that

12:10:26  12  it was in neutral right?

12:10:29  13  A.   Final resting place had to be in neutral.

12:10:35  14  Q.   You mentioned the term -- let me back up real quick.  Two

12:10:43  15  more questions for you.  Okay?

12:10:45  16       All of the things that the defendant claims that he did

12:10:52  17  in this short window of time was travel down a 212-foot road,

12:10:57  18  see the Jeep coming towards him where he would have had to

12:11:01  19  brake, see the Jeep coming towards him, the Jeep backs up, he

12:11:04  20  has to exit his cruiser, the defendant watches him attempt to

12:11:09  21  do a three-point turn, the defendant gives commands, the

12:11:14  22  defendant continues to give verbal commands, the Jeep revs its

12:11:18  23  engine, the defendant continues to give verbal commands, the

12:11:21  24  Jeep begins aggressively accelerating towards him, Defendant

12:11:27  25  Forsyth then fires seven rounds.  He begins to do a tac

12:11:30   1    reload.  He decides against doing a tac reload, and then he

12:11:35   2    reports shots fired.  Sir, is it your testimony that that

12:11:38   3    16-second timeline is not very bad for the defendant?

12:11:41   4    A.   Yes, sir, it is not.

12:11:42   5    Q.   Okay.  You mentioned a "kill box."  Correct?

12:11:46   6    A.   Yes, sir.  That's what we refer to it as.

12:11:49   7    Q.   You would agree with me that the only person facing an

12:11:56   8    armed individual who remained in their car on that day, was

12:12:00   9    Philip Rhoades, wasn't it?

12:12:02   10   A.   That remained in their car, yes, sir.

12:12:04   11   Q.   Philip Rhoades was not armed, was he?  That is the

12:12:07   12   testimony.  Philip Rhoades was not armed.

12:12:11   13   A.   That is not the testimony at all.  He was driving a 4,400

12:12:16   14   pound vehicle.

12:12:17   15   Q.   You would agree with me based on your definition of a

12:12:20   16   kill box, that Philip Rhoades was the only person in the kill

12:12:23   17   box that day?

12:12:24   18   A.   At the time it was fired, yes sir.

12:12:25   19   Q.   The defendant killed him, didn't he?

12:12:28   20   A.   The defendant fired to save his life, yes, sir.

12:12:30   21   Q.   Sir, the defendant killed him, didn't he?

12:12:33   22   A.   That was the ultimate result; yes, sir, it was.

12:12:37   23   Q.   Thank you.

12:12:38   24   A.   Yes, sir.

12:12:41   25            THE COURT:  Any further questions, Mr. Umina?

12:12:42   1            MR. UMINA:  No, Your Honor.

12:12:44   2            THE COURT:  All right.  Ms. Durst, any redirect?

12:12:47   3            MS. DURST:  Very, very briefly, Your Honor.

12:12:49   4            THE COURT:  You may proceed.

12:12:49   5                        REDIRECT EXAMINATION

12:12:49   6   BY MS. DURST:

12:12:59   7   Q.   Mr. Faulkner, Mr. Umina just spent, oh, about 45 minutes

12:13:04   8   with you, asking you a number of questions here today,

12:13:15   9   correct?

12:13:15  10   A.   Yes, ma'am.

12:13:15  11   Q.   Have any of the questions that he has asked you, have

12:13:19  12   they altered the opinions that you provided to the jury in

12:13:21  13   your direct testimony here today?

12:13:24  14   A.   No, ma'am, not at all.

12:13:25  15   Q.   Do you still believe based on the information that you

12:13:28  16   reviewed in this case, that Deputy Forsyth's actions on

12:13:34  17   August 2, 2017, complied with the Supreme Court guidelines and

12:13:36  18   the National Law Enforcement Operational Practices?

12:13:38  19   A.   I do, ma'am.

12:13:39  20   Q.   I just wanted to ask you this Port of Columbus, Port

12:13:43  21   Authority, did you lie about your job?

12:13:46  22   A.   No.  I went there after 9-11 just to stand at the

12:13:51  23   concourse, because they were working around the clock, and I

12:13:53  24   did that for a number of years just to help out.

12:13:55  25   Q.   Well, let me ask you this:  If Mr. Umina showed you some

12:13:59   1   deposition testimony from a *Stanford vs. Laconne* (phonetic)

12:14:03   2   case, and you testified about wanting to get some experience

12:14:09   3   to use to defend law enforcement officers, do you agree with

12:14:15   4   that?

12:14:15   5   A.   Yes.  You want to keep active on the road; yes, ma'am, I

12:14:19   6   did that.  And then after the airport, I went to Mechanicsburg

12:14:24   7   as a road officer, promoted to lieutenant and chief.  If you

12:14:27   8   want to stay in the profession, sure.

12:14:29   9   Q.   And the opinions that you have provided on direct

12:14:33   10  examination and as well as just confirming that your opinions

12:14:36   11  still are the same, even in light of Mr. Umina's

12:14:40   12  cross-examination of you, do you still hold all those opinions

12:14:43   13  to a reasonable degree of certainty in your field of expertise

12:14:46   14  as determined by the Court?

12:14:48   15  A.   Yes, ma'am, I do.

12:14:49   16             MS. DURST:  One moment, Your Honor.

12:14:50   17             THE COURT:  Certainly.

12:14:54   18             MS. DURST:  Your Honor, I don't have any further

12:14:56   19  questions for Mr. Faulkner.  Thank you.

12:14:57   20             THE COURT:  Thank you.

12:14:58   21     Mr. Umina, anything further of Mr. Faulkner?

12:15:01   22             MR. UMINA:  No, Your Honor.

12:15:02   23             THE COURT:  May he be excused?

12:15:03   24             MS. DURST:  He may, Your Honor.

12:15:04   25             THE COURT:  Thank you.  You may step down.

| | |
|---|---|
| 12:15:06 | 1 |
| 12:15:08 | 2 |
| 12:15:19 | 3 |
| 12:15:24 | 4 |
| 12:15:27 | 5 |
| 12:15:31 | 6 |
| 12:15:35 | 7 |
| 12:15:39 | 8 |
| 12:15:45 | 9 |

1    THE WITNESS:  Thank you, sir.

2    THE COURT:  All right.  Ladies and gentlemen, we have

3 reached a good spot in our day to take our lunch break, so we

4 are going to do that now.  We are going to give you an extra

5 few minutes today.  There are a few things counsel and the

6 Court have to discuss before we are ready for you to resume

7 here in the courtroom, so if you could be back at 1:30, we

8 should be ready for you by then.  But we will take our lunch

9 break now, and be ready to go back in here at 1:30.

10    Please continue to refrain from discussing the case with

11 anyone, including your fellow jurors, or anyone else.  And

12 also please continue to refrain from any independent

13 investigation efforts not only about this case or any issues

14 discussed in this case.

15    With that said, have a pleasant lunch, and we will see

16 you at 1:30.  Thank you all very much.

17    (Jury excused, and the following transpired in open

18 court.)

19    THE COURT:  Any further witnesses you anticipate

20 calling, Ms. Durst?

21    MS. DURST:  No.  Defense will rest.

22    THE COURT:  Any rebuttal from the plaintiff?

23    MR. UMINA:  No, Your Honor.

24    THE COURT:  Okay.  With that then, we will give you

25 guys a break so you can catch your breath, and I will say grab

12:16:51  1   something to eat, but why don't we get back together at 1:00,

12:16:56  2   and we will go through the Court's proposed charge.  You guys

12:17:00  3   have working copies.  We will have a copy waiting for you at

12:17:06  4   1:00 with line numbers for you to reference.  Again, please

12:17:09  5   take a look at the entire thing.  Substantive instructions

12:17:13  6   with respect to this case are on pages ten through 19, but of

12:17:17  7   course, we can discuss any aspects of it.

12:17:20  8         Usually how I do this, I don't anticipate altering at

12:17:24  9   this point.  I will go through each of the parties' proposed

12:17:27  10  instructions and let you know which made the cut, which

12:17:30  11  didn't.  And then we can take up any objections, concerns, and

12:17:34  12  the like going forward from there.  But hopefully that gives

12:17:37  13  you enough time to grab a protein bar and take a look at the

12:17:41  14  instructions.  We will reconvene at 1:00 to do that.  Okay.

12:17:44  15  Thank you all very much.

12:17:46  16        (Recess taken at this time 12:17 - 1:02.)

01:02:38  17        THE COURT:  We're back on the record then.  We are

01:02:41  18  convened for our charge conference.  Did everyone have a

01:02:45  19  chance to read the Court's proposed charge?

01:02:49  20        MR. CARROLL:  We have, Your Honor.  I would also note

01:02:52  21  that the defendant will renew the Rule 50 motion with regards

01:02:53  22  to qualified immunity --

01:02:57  23        THE COURT:  We will come back around to that.  Let's

01:02:58  24  do our charge conference.  And thank you for the reminder,

01:03:03  25  Mr. Carroll.

01:03:07  1        For the record, I will go through one by one everyone's

01:03:11  2    proposed instructions.  Then we can take up any concerns you

01:03:15  3    have about the version that you have been provided.  Starting

01:03:26  4    with the plaintiff's amended proposed instructions that were

01:03:31  5    filed back on February 25, '21, document 165.  I don't believe

01:03:38  6    we used instruction number one, mainly because it's really a

01:03:43  7    statement of -- I don't want to say it's a statement of fact,

01:03:47  8    but we have not incorporated plaintiff's number one.  We did

01:03:51  9    incorporate elements of plaintiff's proposed instruction

01:03:52  10   number two as modified as the parties already saw, the

01:03:57  11   substantive sections of the Court's proposed charge, and we

01:04:02  12   will make a copy of the current form of the proposed charge

01:04:06  13   and verdict form exhibits to the record as well.

01:04:13  14       The Court did not -- or rejected plaintiff's proposed

01:04:17  15   number three given the parties' stipulation with respect to

01:04:21  16   the question of color of state law.  Plaintiff's proposed

01:04:25  17   number four portions of it were adopted, so I would say

01:04:28  18   plaintiff's four was used as modified.  Same with respect to

01:04:33  19   number five, instruction on damages.

01:04:38  20       With respect to six, that was incorporated in a modified

01:04:45  21   version.  Again, dealing not only nominal damages.  The same

01:04:49  22   with plaintiff's seven, another proposed instruction with

01:04:52  23   respect to damages.  Portions of that were incorporated as the

01:04:56  24   parties can see, so I would say that was used as modified.

01:05:03  25       With respect to defendant's proposed instructions, which

were filed on January 14 of 2020, at docket 101.  Defendant

proposed one was rejected for the same reasons plaintiff's

one.  It's a summary of what this case is about.  I think the

Court has covered that.  Two was rejected and refused.  Again,

it's an instruction "under color" of state law, which is

unnecessary at this point.

Defendant's three, portions of it were incorporated, as I

am sure the parties saw, so that one is modified.

Number four, same.  Portions of it were incorporated in

part, so it has been incorporated as modified.  Instructions

five, six -- five and six from defendant have not been

incorporated, and will not be used.

With respect to qualified immunity, we will come back

around to the Rule 50 motion on that question.  That's a

question for the Court, not for jury resolution.  So five --

defendant's five and six were not incorporated.

Defendant's seven has been incorporated, that is a

question of instruction as well as the crime of fleeing from

law enforcement.

Eight gets back to qualified immunity.  That was also not

incorporated.  Again, that is a question for the Court and not

the jury.  Defendant's nine is not incorporated, dismissed at

summary judgment stage.  Ten, not incorporated.  Again,

immunity is largely a question for the Court to decide, and

given the intentional affliction of emotional distress claim

01:07:01  1   has been dismissed at this point, the state immunity issue is

01:07:08  2   not relevant.  Defendant's 11 has been incorporated in part in

01:07:16  3   the Court's proposed charge.  Defendant's 12 has not been;

01:07:18  4   it's the intentional infliction claim, again, the Court has

01:07:21  5   dismissed.

01:07:22  6         Defendant's 13 has been incorporated in part, as it deals

01:07:27  7   with damages.

01:07:28  8         Same with 14; it's a damages instruction, which is --

01:07:31  9   parts of it have been incorporated in the Court's proposed

01:07:36  10  charge.  Same applies to defendant's 15; parts have been

01:07:38  11  adopted -- used and adopted.

01:07:41  12        16 has been incorporated, defendant's 16, with respect to

01:07:46  13  the conscientious pain and suffering claim.

01:07:52  14        Defendant's proposed instruction 17 is rejected.  The

01:07:55  15  Court will instruct the jury on punitive damages obviously,

01:07:59  16  but given the lack of any remaining state law claims, West

01:08:03  17  Virginia Code 5729 is not applicable to any remaining damages

01:08:09  18  consideration here.  So defendant 17 is not given.  Will not

01:08:14  19  be given.

01:08:15  20        18, however, portions of it similar to plaintiff's mirror

01:08:21  21  version, if you will, have been incorporated in the Court's

01:08:25  22  charge.

01:08:26  23        I believe that covers everyone's proposed instructions.

01:08:29  24  Are there any other instructions that were tendered to the

01:08:33  25  Court that the Court didn't address at this point.

01:08:35   1              Mr. Umina.

01:08:37   2                   MR. UMINA:  Nothing from us, Your Honor.

01:08:39   3                   THE COURT:  Mr. Carroll.

01:08:40   4                   MR. CARROLL:  There were no instructions that were

01:08:42   5       tendered on behalf of the defendant that have not been

01:08:45   6       addressed.

01:08:46   7                   THE COURT:  With that, then, let's take a look at the

01:08:49   8       version the parties have, and everyone should have a line

01:08:51   9       numbered edition.

01:08:54  10           Mr. Umina, anything you want to address with respect to

01:08:57  11       the proposed instructions and the Court's use of those or with

01:09:02  12       respect to the charges currently constituted?

01:09:06  13                   MR. UMINA:  Your Honor, Mr. Hogan will speak to that.

01:09:09  14                   THE COURT:  I'm sorry, Mr. Hogan, sir.

01:09:10  15                   MR. HOGAN:  My only concern after looking over these

01:09:17  16       is on page 13.  First, both are on page 13 as luck would have

01:09:24  17       it, first is on line three that if the plaintiff would

01:09:29  18       establish the claim of losses of Philip Rhoades, I would

01:09:31  19       suggest just for consistency purposes, to be consistent with

01:09:36  20       lines seven and eight on that same page, that it said that we

01:09:40  21       add, "And your verdict should be for the plaintiff, Christy

01:09:45  22       Rhoades," just as it is for Defendant Forsyth below.

01:09:48  23                   THE COURT:  So after, "by Philip Rhoades" on line

01:09:51  24       three your proposal would be to add, "And your verdict should

01:09:54  25       be for the plaintiff, Christy Rhoades?"

01:09:58  1          MR. HOGAN:  Correct.

01:09:59  2          THE COURT:  Any objection to that, Mr. Carroll?

01:10:02  3          MR. CARROLL:  No, Your Honor.

01:10:03  4          THE COURT:  We will do that.  Thank you for that

01:10:05  5     consistency catch, Mr. Hogan.

01:10:07  6          SPEAKER:  And then, Your Honor, the second thing that

01:10:10  7     we would have some concern on is the fleeing from police

01:10:15  8     officer instruction.  First, the assessment of the officer's

01:10:21  9     use of force is, of course, assessed at the time the incident

01:10:25  10    occurred, and things that led up to it, just like the July

01:10:29  11    25th incident, for example, don't have any bearing on that.

01:10:32  12    What it made me think of is the comparative fault instruction

01:10:38  13    that was on the verdict form submitted by the defendant.  And

01:10:41  14    there is no support on the law.  I've done some fairly

01:10:44  15    extensive research on that for comparative law instruction in

01:10:47  16    a 1983 Constitution depravation case.  And this made me think

01:10:53  17    of that.  Nor has there been any evidence submitted or

01:10:55  18    presented that Philip Rhoades actually intentionally fled or

01:11:00  19    attempted to flee at the time of the incident.  The only thing

01:11:01  20    that they proffered is that he tried to run him over with the

01:11:05  21    Jeep.  And so, I would suggest that we strike the entire

01:11:11  22    fleeing from the police officer instruction because the

01:11:13  23    totality of the circumstances is already covered by the

01:11:16  24    Court's prior instructions leading up to that.

01:11:18  25          THE COURT:  Understood.  Thank you, sir.

01:11:24  1       Mr. Carroll, with respect to fleeing from a police

01:11:27  2   officer, which I believe is defendant's proposed

01:11:28  3   instruction --

01:11:40  4             MR. CARROLL:  I believe it's number seven, Your

01:11:41  5   Honor.

01:11:41  6             THE COURT:  It the last one I looked at, which I

01:11:44  7   believe is largely defendant's proposed number seven, which in

01:11:47  8   this version is on page 13, lines nine through 19.

01:11:53  9             MR. CARROLL:  Yes, Your Honor.  I do believe that the

01:11:55  10  evidence that has come out through trial includes that

01:11:59  11  Deputy Forsyth was responding to a vehicle pursuit.  He did

01:12:01  12  identify the black Jeep driven by Philip Rhoades.  He did

01:12:06  13  attempt to make a traffic stop, by putting his lights on, and

01:12:10  14  Philip Rhoades did not stop.  And certainly all those

01:12:13  15  inferences could be drawn by a reasonable jury in this case.

01:12:16  16  I think it would be inconsistent with what is in the record

01:12:20  17  and the function of the pursuit that it was going on, to not

01:12:23  18  include an instruction such as this.  And that also includes

01:12:26  19  the fact that part of the determination of the reasonableness

01:12:29  20  of Deputy Forsyth's actions is the severity of the crime at

01:12:35  21  issue.  I mean, here if the plaintiff was committing a crime

01:12:37  22  or the facts could support that he was committing a crime,

01:12:40  23  that is something that should be considered by the jury, and

01:12:42  24  that is a matter of law that the jury should be instructed on.

01:12:45  25            THE COURT:  Anything further on that Mr. Hogan, sir?

01:12:48  1        MR. HOGAN:  Yes, Your Honor, just one quick thing.

01:12:50  2    *Tennessee vs. Garner* is the seminal case as it has been in

01:12:54  3    this specific case, right?

01:12:56  4        THE COURT:  We heard about that earlier this morning.

01:12:59  5        MR. HOGAN:  Right, and fleeing from an officer is, of

01:13:02  6    course, not grounds to deploy deadly force, and this

01:13:04  7    instruction suggests that it might be.  And pursuing an

01:13:09  8    officer -- I mean, pursuing a defendant in a car chase is

01:13:14  9    under no circumstances grounds to deploy deadly force, and I

01:13:19  10   think that this invites a suggestion that it might be.

01:13:21  11       THE COURT:  Understood.  I will overrule the

01:13:25  12   objection, although I am going to revise this portion of the

01:13:30  13   Court's charge, in particular at line 17, after the comma

01:13:35  14   following Philip Rhoades to read -- so that entire sentence

01:13:39  15   will read, "You may consider the conduct of the decedent,

01:13:42  16   Philip Rhoades, as part of the totality of the circumstances

01:13:46  17   when determining whether the use of deadly force by the

01:13:49  18   defendant, David Forsyth, was reasonable."  I think it's an

01:13:52  19   accurate statement of the law.  There is evidence,

01:13:56  20   particularly radio traffic, indicating at least law

01:13:59  21   enforcement believed that Mr. Rhoades was fleeing, and there

01:14:03  22   has to be some explanation as to how these folks end up where

01:14:07  23   they end up.  But I think it's an appropriate part of the

01:14:11  24   calculus of the totality of the circumstances.

01:14:14  25       I understand your point, Mr. Hogan, with respect to

| | |
|---|---|
| 01:14:17 | 1 |
| 01:14:21 | 2 |
| 01:14:24 | 3 |
| 01:14:29 | 4 |
| 01:14:33 | 5 |
| 01:14:38 | 6 |
| 01:14:45 | 7 |
| 01:14:48 | 8 |
| 01:14:50 | 9 |
| 01:14:51 | 10 |
| 01:14:52 | 11 |
| 01:14:53 | 12 |
| 01:14:55 | 13 |
| 01:14:59 | 14 |
| 01:15:02 | 15 |
| 01:15:05 | 16 |
| 01:15:08 | 17 |
| 01:15:10 | 18 |
| 01:15:14 | 19 |
| 01:15:18 | 20 |
| 01:15:22 | 21 |
| 01:15:27 | 22 |
| 01:15:31 | 23 |
| 01:15:34 | 24 |
| 01:15:38 | 25 |

concerns of creating almost an equivalency with comparative fault analysis.  That's why we are going to add, again, at the end of line 17, after Mr. Rhoades' name, "As part of the totality of the circumstances in determining whether the use of deadly force by David Forsyth was reasonable."  But understood.  Objection overruled, noted.  But you have that modification based on your objection.  Anything else from the plaintiff's perspective?

MR. HOGAN:  Nothing further from us.

THE COURT:  Thank you.

Mr. Carroll, sir.

MR. CARROLL:  Thank you, Your Honor.  Initially we would certainly object to the exclusion of any or the failure to include instructions on qualified immunity.  And I understand the Court has -- would prefer to address that in the Rule 50 motion that I will be making.

THE COURT:  We are going to talk about qualified immunity at Rule 50 stage, but separate and apart from that with respect to the defendant's request to instruct the jury on qualified immunity, again, I did extensive research on that yesterday, last night, and this morning, that there are very, very limited circumstances where courts have submitted the question of qualified immunity to a jury.  And I don't think any of those exist here.  That is a question of law to be decided by the Court.  It is also quite clear that it's a

01:15:43   1   question that enables, as was done here upon denial of

01:15:48   2   qualified immunity, an interlocutory appeal further

01:15:53   3   highlighting the fact that it's a question of law that needs

01:15:55   4   determined before a jury is impaneled and has to consider the

01:16:00   5   factual disputes in the case.

01:16:01   6       I understand.  I think that is a question more

01:16:03   7   appropriate for the Court, as opposed to the jury.  My

01:16:06   8   efforts, research-wise anyway, to find a set of circumstances

01:16:13   9   where a jury should be asked to make determinations with

01:16:16  10   respect to qualified immunity are very, very, limited, and I

01:16:22  11   don't -- certainly didn't find anything to indicate in this

01:16:25  12   case that that was appropriate.  On those particular

01:16:27  13   instructions, sir, objection noted.

01:16:29  14           MR. CARROLL:  Thank you, Your Honor.  Just one

01:16:30  15   moment, Your Honor.

01:16:31  16           THE COURT:  Sure.

01:16:40  17           MR. CARROLL:  Thank you, Your Honor.  The next issue

01:16:43  18   that I would like to address is with regards to nominal

01:16:47  19   damages.  That is on page 16, and I am specifically looking at

01:16:52  20   line ten.  This is the Court's instruction, Your Honor.

01:16:58  21           THE COURT:  Okay.  Go ahead.

01:16:59  22           MR. CARROLL:  In that provision, I will just read

01:17:04  23   from the beginning at eight, "If you return a verdict for the

01:17:06  24   estate of Philip Jontz Rhoades, but the estate of Philip Jontz

01:17:12  25   Rhoades failed to prove the compensatory damage, then you must

01:17:14    1    award nominal damages."  And Your Honor, it seems from the

01:17:17    2    case law from the Fourth Circuit, particularly *Ganey vs.*

01:17:21    3    *Edwards*, it would be inappropriate to instruct the jury that

01:17:24    4    they must award nominal damages, and whether they award a

01:17:28    5    dollar or less, that remains within the sound discretion of

01:17:31    6    the jury.  I think that is evidence in the case law I don't

01:17:33    7    see any reason that the Court would stray from that, do you?

01:17:36    8            THE COURT:  I understand your argument.  You need to

01:17:37    9    update your research, *Farrar v. Hobby*, 506 US 103, while that

01:17:46   10    case doesn't expressly overrule Ganey, subsequent Fourth

01:17:50   11    Circuit cases have.  The jury, if they do not award any

01:17:54   12    compensatory damages, if there is a finding that a

01:17:57   13    constitutional right has been infringed upon, they are

01:17:59   14    required to award nominal damages, so for that reason that

01:18:04   15    objection is overruled.

01:18:06   16            MR. CARROLL:  And to that extent that is my mistake.

01:18:09   17    I apologize for taking the Court's time on that.

01:18:12   18         The next issue I would like to address would be in the

01:18:15   19    punitive damages portion, and that would be the same case

01:18:16   20    page, lines 22 and 23.  And particularly I would like to

01:18:20   21    direct the Court's attention to the "motivated by evil" motive

01:18:24   22    or intent provision.  We did make a motion earlier to exclude

01:18:28   23    punitive damages, and I may have misunderstood the Court at

01:18:31   24    that time, but I understood that the Court denied that motion

01:18:34   25    based off of reckless or callous indifference that could be

01:18:39  1   inferred from the record.  To the extent that the Court would

01:18:41  2   agree that there is no evidence of evil motive or intent, I do

01:18:44  3   not think that the jury should be instructed on evil motive or

01:18:49  4   intent.

01:18:49  5          THE COURT:  Understood.  Objection overruled.  I do

01:18:50  6   believe that is a correct statement of the law.  Those are the

01:18:53  7   different buckets, if you will, different buckets of evidence

01:18:57  8   or categories of evidence, I should say, that would support a

01:19:00  9   finding and award of punitive damages in an excessive force

01:19:06  10  case.  I am not overly convinced, but I think there is

01:19:10  11  certainly evidence in the record from which a jury can infer a

01:19:16  12  different basis than perhaps reckless or callous indifference.

01:19:20  13  For that reason, objection overruled.

01:19:23  14     Again, I do believe it is an accurate statement of the

01:19:25  15  law that is not -- does not present a risk of jury confusion

01:19:30  16  at this point.

01:19:31  17         MR. CARROLL:  Understood, Your Honor.  And I should

01:19:33  18  also add that it's that same motivated by evil motive or

01:19:38  19  intent that is presented on page 17, lines 9 and 10, I would

01:19:41  20  incorporate my objection to those lines as well.

01:19:44  21         THE COURT:  Understood.  So incorporated.  Same

01:19:46  22  ruling.

01:19:47  23         MR. CARROLL:  One further issue I would like to

01:19:49  24  address is instruction -- this one is in the punitive damages

01:19:53  25  section.  I am referring to page 17 at line eight.  I do

01:19:58   1    understand the Court's rulings from earlier, that now that

01:20:00   2    intentional emotional distress claim has been dismissed, the

01:20:04   3    West Virginia statute for punitive damages does not apply.  It

01:20:08   4    seems to me, from my review of the law, that to the extent

01:20:11   5    that punitive damages was created by the case law, that the

01:20:13   6    substantive mechanism for punitive damages needs to be

01:20:17   7    borrowed from the state law and to that end, I believe that

01:20:20   8    punitive damages, even in this case, which is 1983 arising in

01:20:23   9    West Virginia, I think it would still be clear and convincing

01:20:26   10   evidence which is the standard in West Virginia.

01:20:28   11          THE COURT:  Okay.  Understood.  Thank you, Mr.

01:20:31   12   Carroll.

01:20:31   13      Mr. Hogan.

01:20:34   14          MR. HOGAN:  Your Honor, I think that given the

01:20:37   15   genesis of the punitive damages possibility is a 1983 case, I

01:20:44   16   don't know why we would draw from state law the clear and

01:20:49   17   convincing standard.  I have admittedly, though, not done

01:20:54   18   extensive research in the past 45 minutes on this issue, but I

01:21:00   19   don't know that that would be our objection to -- that would

01:21:07   20   be our response to that objection.

01:21:07   21          THE COURT:  I understand.

01:21:10   22      Mr. Carroll.

01:21:10   23          MR. CARROLL:  I would like to add, in all candor to

01:21:13   24   the Court, I think it is a true statement that it is not

01:21:15   25   extensively litigated, the standard of law for punitive

01:21:18  1    damages in the 1983 claim.  But in context such as the statute

01:21:23  2    of limitations which necessarily bars from state law, I

01:21:24  3    believe that would be the bulk of the issue from the federal

01:21:27  4    perspective.  That's all I wanted to add, Your Honor.

01:21:29  5         THE COURT:  Well, I read that statue.  It's 55-7-29,

01:21:37  6    correct?

01:21:39  7         MS. DURST:  Yes, Your Honor.

01:22:02  8         THE COURT:  I understand the argument, Mr. Carroll.

01:22:04  9    I think I am inclined to agree with Mr. Hogan.  We are talking

01:22:08  10   about a federal statutory cause of action as opposed to the

01:22:14  11   extent there could possibly -- to the extent that you are

01:22:16  12   talking about a federal common law cause of action, my very

01:22:21  13   poor legislative drafting skills don't make any distinction

01:22:29  14   between civil actions in federal court, state court, or the

01:22:34  15   like.  I have, in all candor, concerns of the state

01:22:38  16   legislature telling us how damages can be considered, or

01:22:43  17   should be treated, in federal court, particularly under

01:22:47  18   federal statutes, and then what happens even within the Fourth

01:22:50  19   Circuit if there is a similar 1983 case within the

01:22:53  20   commonwealth of Virginia, in such that you are stuck with

01:22:57  21   differing evidentiary standards and factors are punitive.  We

01:23:05  22   are not going to apply again my legislative handwork at

01:23:12  23   55-7-29 here.  If we had an intentional infliction claim, I

01:23:15  24   think we would have a more complicated conversation right now

01:23:19  25   because obviously 55-7-29 would apply to that, so we would

729

01:23:24  1    have two lines of thinking on punitives.  But I understand the

01:23:29  2    objection.  It's overruled at this point.

01:23:31  3          Anything further on the charge, Mr. Carroll - --

01:23:34  4          MR. CARROLL:  Nothing further on the charge, Your

01:23:35  5    Honor.

01:23:35  6          THE COURT:  -- okay.  Anything else from anybody with

01:23:38  7    respect to the Court's proposed charge?

01:23:40  8          MR. HOGAN:  Nothing from the plaintiffs, Your Honor.

01:23:41  9          THE COURT:  Mr. Carroll.

01:23:41  10          MR. CARROLL:  With regards to the charge?

01:23:41  11          THE COURT:  Yes.

01:23:44  12          MR. CARROLL:  Nothing, Your Honor.

01:23:45  13          THE COURT:  Okay.  All right.  We will revise it as

01:23:48  14    indicated.  So that the counsel knows, our charge is not very

01:23:55  15    lengthy, so hopefully we don't run into court technology

01:24:00  16    issues.  My usual course of action is everybody will have a

01:24:03  17    hard copy of the charge without the line numbers, including

01:24:06  18    the jurors, so they can read along as the Court instructs

01:24:10  19    them.  Again, the charge here is not over lengthy, but some

01:24:18  20    folks process things better reading as opposed to listening,

01:24:21  21    so I would like to give folks the option.  We will make

01:24:24  22    revisions as noted and hit "control P" and start printing.

01:24:30  23    That may take a few moments.

01:24:32  24          Let's talk about our verdict form.  Mr. Hogan, Mr.

01:24:35  25    Carroll, you still have responsibility for that verdict form.

01:24:38  1   Any issues we need to take up from the plaintiff's

01:24:40  2   perspective?

01:24:41  3              MR. HOGAN:  Nothing from the plaintiffs, Your Honor.

01:24:43  4              THE COURT:  Understood.

01:24:43  5         Mr. Carroll, anything on the verdict form?

01:24:46  6              MR. CARROLL:  A few things to address.  Again, I

01:24:48  7   would like to place an objection on the record to not

01:24:51  8   including the defendant's proposed qualified immunity

01:24:54  9   provision.  We think that is something the jury should be

01:24:56  10  considering and believe it to be error not to do so.

01:24:58  11             THE COURT:  Understood.

01:24:59  12             MR. CARROLL:  Next issue I would like to address is

01:25:01  13  on page 2 at line seven regarding a line item for damages.

01:25:05  14             THE COURT:  Sure.

01:25:06  15             MR. CARROLL:  And that line item would be pain and

01:25:08  16  suffering of Philip's Jontz Rhoades.  I believe that the

01:25:12  17  testimony in this case from the medical examiner that death

01:25:17  18  would have been essentially instantaneous, resulting in no

01:25:17  19  pain and suffering from the decedent in this case, which means

01:25:20  20  there would be nothing for the jury to consider.

01:25:22  21             THE COURT:  Understood.

01:25:23  22         Mr. Hogan.

01:25:25  23             MR. HOGAN:  Your Honor, the medical examiner

01:25:26  24  explained that -- what he said was that the time of death does

01:25:30  25  not necessarily mean that that is written in stone, but the

01:25:35  1   time of death is almost a half hour after the shooting

01:25:39  2   occurred.  And even if one couldn't move one's lower

01:25:44  3   appendages, I can't imagine a greater amount of mental

01:25:49  4   anguish, and pain, and suffering laying in a field bleeding

01:25:53  5   out and knowing that it is the end of my life.  So I think

01:25:56  6   that -- I think that is appropriate to keep there.  And I

01:25:59  7   think that there is plenty of evidence for the jury to

01:26:01  8   consider.

01:26:02  9          THE COURT:  Understood.

01:26:03  10       Mr. Carroll.

01:26:03  11          MR. CARROLL:  First of all, Your Honor, I believe

01:26:06  12   plaintiffs just referred to mental anguish in that argument.

01:26:09  13       And that language is a separate line item, which is sort

01:26:11  14   of proving my point that we are duplicating damages here, but

01:26:14  15   I would also point out that I think that counsel is confusing

01:26:17  16   the time of death with the doctor's testimony on proposed --

01:26:23  17   not proposed -- pronounced death.  So actual death occurs

01:26:31  18   being pronounced dead.  The vital functions would have stopped

01:26:37  19   at the same time paralysis or inability to move --

01:26:41  20          THE COURT:  Understood and I did take a look at the

01:26:42  21   medical examiner's testimony anticipating this issue.  I think

01:26:46  22   there were kernels in there for everyone to use in Dr.

01:26:50  23   Savasman's testimony.  There was testimony that there was a

01:26:53  24   chance at least that Mr. Rhoades was not immediately paralyzed

01:26:58  25   despite the partial severance of his spinal cord.  I don't

01:27:03  1    think I would agree with Mr. Hogan's characterization that

01:27:07  2    there is a lot of evidence, but there is sufficient evidence

01:27:10  3    to submit that question to the jury.  The jury will be

01:27:14  4    instructed on it, and it should also be included here.  So

01:27:18  5    objection overruled on that for those reasons.

01:27:21  6         I will also note your objection with respect to the

01:27:25  7    requirement that the jury award nominal damages if they do not

01:27:29  8    award compensatory damages.

01:27:31  9         Anything further on the verdict form?

01:27:34  10           MR. CARROLL:  Yes.  I would like to make the record

01:27:35  11   here, Your Honor, the same arguments I made with regards to

01:27:38  12   the instructions.  I appreciate the nominal damages issue that

01:27:42  13   you identified, but I also identify in terms of the next

01:27:46  14   paragraph down at line 22, "Preponderance of the evidence

01:27:49  15   standard;" that, again, I believe should be clear and

01:27:52  16   convincing evidence based on the punitive damages.  And the

01:27:56  17   evil motive or intent, again, I believe that should be removed

01:27:59  18   as well.

01:28:00  19           THE COURT:  Understood.  With the same reasons the

01:28:01  20   Court articulated with respect to defendant's objections in

01:28:04  21   the instructions, we will leave that question on the verdict

01:28:09  22   form as it is.

01:28:10  23        Any other concerns or issues on the verdict form, Mr.

01:28:12  24   Carroll?

01:28:12  25           MR. CARROLL:  Nothing further, Your Honor.

01:28:13   1        THE COURT:  Yes, Mr. Umina.

01:28:14   2        MR. UMINA:  Your Honor, we have made the decision,

01:28:18   3    the "loss of services to society, protection, care, and

01:28:21   4    assistance of Philip Rhoades," we would like to remove that

01:28:25   5    from the verdict form.  We will not seek those damages, and we

01:28:28   6    would ask that defense counsel expressly not make my arguments

01:28:31   7    in this regard.

01:28:32   8      As it relates to family, we are solely going to be

01:28:34   9    arguing sorrow, mental anguish, and solace.  We are not

01:28:38  10    arguing those damages.

01:28:39  11        THE COURT:  Any objection to removing that line from

01:28:42  12    the verdict form?

01:28:43  13        MS. DURST:  I don't have an objection to removing

01:28:44  14    that line from the verdict form, Your Honor.  But I'm not

01:28:48  15    exactly sure what evidence they are asking that I not address

01:28:51  16    in my, you know, my closing argument based on the testimony

01:28:54  17    that the jury heard.

01:28:55  18        THE COURT:  I mean the evidence is in.  You can argue

01:28:58  19    on the evidence however you like.  No objection striking lines

01:29:01  20    eight and nine on page 2 of the verdict form?

01:29:13  21        MS. DURST:  No, Your Honor.

01:29:14  22        THE COURT:  We will remove that.

01:29:16  23        MR. UMINA:  Your Honor, what my concern is, you know,

01:29:20  24    they are going to stand up and argue he didn't, you know,

01:29:22  25    things about doctors appointments and all of these other sorts

01:29:26  1   of things.  If those items aren't being sought, I am not sure

01:29:30  2   how they can get up and make arguments about him not taking

01:29:34  3   the kids to the doctors or anything like that.  It would be --

01:29:37  4   I mean, it's nothing that the jury is going to consider.  It

01:29:42  5   would be irrelevant at that point.

01:29:43  6        THE COURT:  The evidence is in, Mr. Umina.  And

01:29:45  7   frankly, I think those pieces of evidence that we heard about

01:29:48  8   could arguably be considered relevant to the amount of sorrow,

01:29:53  9   mental anguish, and solace that we are talking about --

01:29:56  10        MR. UMINA:  We would --

01:29:56  11        THE COURT:  -- relationship and I think that is a

01:29:58  12   relevant consideration.

01:29:58  13        MR. UMINA:  Well, then we would withdraw our removal

01:30:01  14   of that from the verdict, Your Honor.

01:30:04  15        THE COURT:  So you would like to keep "loss of

01:30:04  16   services to society, protection, care and assistance of Philip

01:30:11  17   Jontz Rhoades" on the verdict form?

01:30:12  18        MR. UMINA:  Yes, Your Honor.  I apologize.

01:30:14  19        THE COURT:  All right.  Any objection to that

01:30:15  20   remaining on the verdict form?

01:30:17  21        MS. DURST:  No, Your Honor.

01:30:18  22        THE COURT:  All right.  So we will leave lines 8 and

01:30:21  23   9 on page 2 of the Court's proposed verdict form.  Anything

01:30:35  24   else with regard to the verdict form, Mr. Umina?

01:30:35  25        MR. UMINA:  Nothing further.

| | |
|---|---|
| 01:30:36 | 1 |
| 01:30:36 | 2 |
| 01:30:37 | 3 |
| 01:30:45 | 4 |
| 01:30:47 | 5 |
| 01:30:50 | 6 |
| 01:30:54 | 7 |
| 01:31:01 | 8 |
| 01:31:03 | 9 |
| 01:31:08 | 10 |
| 01:31:11 | 11 |
| 01:31:16 | 12 |
| 01:31:19 | 13 |
| 01:31:21 | 14 |
| 01:31:27 | 15 |
| 01:31:32 | 16 |
| 01:31:33 | 17 |
| 01:31:34 | 18 |
| 01:31:37 | 19 |
| 01:31:41 | 20 |
| 01:31:45 | 21 |
| 01:31:45 | 22 |
| 01:31:48 | 23 |
| 01:31:50 | 24 |
| 01:31:54 | 25 |

THE COURT:  Mr. Carroll, Ms. Durst?

MR. CARROLL:  No, Your Honor.

THE COURT:  We will make the Court's copies exhibits.
We are right on schedule.

Here will be my plan.  We will have the jury come back
in.  I will advise them the defendant has rested, and they
have now heard all of the evidence.  And then as -- maybe what
we will do is we will wait to make copies before we do that,
so that we can then proceed immediately to instructions.  We
will take a break after instructions so that you guys can get
your thoughts together, get set up for closings, and then we
will have the jury back in for closings.

How long would counsel like for closing?

MR. UMINA:  We anticipate approximately 40 minutes on
closing, and approximately 10 to 15 on rebuttal.

THE COURT:  Understood.

Ms. Durst.

MS. DURST:  Your Honor, I always underestimate
myself.  I would probably indicate between 30 and 45 minutes.
I don't want to tell the Court 30, and then I know I am going
40 minutes.

THE COURT:  There won't be a hard stop unless you go
crazy.  Neither of those requested time frames offend me, so
we will go from there.  Okay.

Anything else we need to take up at this point?

01:31:57  1          MR. CARROLL:  Defendant would like to make a Rule 50

01:32:00  2  --

01:32:00  3          THE COURT:  That's correct, Mr. Carroll.  Go right

01:32:02  4  ahead.

01:32:03  5          MR. CARROLL:  Now that the defendant has rested its

01:32:05  6  case, Your Honor, we are making a Rule 50 motion for judgment

01:32:07  7  as a matter of law under qualified immunity.  A deputy's

01:32:10  8  actions are shielded so long as his actions do not contravene

01:32:15  9  a fairly established right of which a reasonable officer would

01:32:17  10  have known that * comes from law agree versus tow bell.  This

01:32:22  11  is especially true in the context of street level police work,

01:32:24  12  which is what we are dealing with here.  That was established

01:32:26  13  in *Rolling versus Perry* (phonetic).  An officer should be

01:32:29  14  permitted to act without judicial second guessing, if they are

01:32:33  15  involved in an intense and highly fluid situation.  That is

01:32:36  16  *Swanson vs. Powers* (phonetic).

01:32:37  17      The facts that the jury heard in this case, we have a

01:32:41  18  tense, evolving situation.  I don't think that there is any

01:32:43  19  dispute to that.  That this occurred during a high risk

01:32:47  20  traffic stop.  Only 16 seconds for the defendant to reasonably

01:32:50  21  react to the situation.  The deputy heard that Philip Rhoades

01:32:57  22  was armed over the radio, may be armed over the radio, excuse

01:33:01  23  me.  At the time that the shooting occurred, we heard the

01:33:06  24  testimony that Deputy Forsyth believed that the Jeep was

01:33:10  25  coming at him.  He had fear for himself.  He had fear for his

01:33:13  1    partner.  He did not know where he was, and believed he could

01:33:15  2    have been behind him.  And we also know that another driver

01:33:18  3    was on the road nearby in the seconds or minute leading up to

01:33:24  4    this incident.

01:33:24  5         There is no argument that a vehicle can be used as a

01:33:26  6    weapon, and indeed this Court, I'm sure, is very familiar with

01:33:29  7    the (indiscernible) question in this case after discussing it

01:33:32  8    several times.

01:33:32  9         We have plaintiff's expert opinions, and we talked about

01:33:36  10   those earlier, but the plaintiff's expert relies on the

01:33:38  11   alleged physical evidence being inconsistent with the

01:33:40  12   defendant's statement, and that the timeline that their expert

01:33:45  13   created is inconsistent with the defendant's statement.

01:33:48  14        The court has now heard testimony from defendant's

01:33:51  15   expert, which specifically finds that Deputy Forsyth actions

01:33:54  16   were consistent within training or policies or consistent with

01:33:59  17   best police practices.  Based on all the evidence the jury has

01:34:02  18   heard, a reasonable juror would have to conclude that the

01:34:05  19   actions of Deputy Forsyth were reasonable, and he is

01:34:07  20   therefore, shielded by qualified immunity.

01:34:11  21        THE COURT:  Thank you very much.  The Court will deny

01:34:12  22   the motion, similar to our discussion at the summary judgment

01:34:18  23   stage.  I think there are factual disputes in this case that

01:34:22  24   precluded this Court from granting summary judgment on

01:34:26  25   qualified immunity grounds.  And I am even more convinced of

01:34:30  1    that after listening to the testimony over the last three

01:34:34  2    days.  In particular experts -- two experts' varying opinions,

01:34:38  3    I still I believe under the Rule 50 standard that there is

01:34:44  4    legally sufficient evidence should those factual disputes be

01:34:48  5    resolved in favor of the plaintiff that would render the

01:34:53  6    application of qualified immunity here inappropriate and not

01:35:00  7    proper based on the record.  I do think, based on all the

01:35:03  8    cases that you noted, Mr. Carroll, I think the right that we

01:35:07  9    are talking about is clearly established, but the question

01:35:11  10   here again centers around factual dispute with respect to the

01:35:16  11   other prong of the qualified immunity analysis.  So for that

01:35:21  12   reason that motion will be denied at this point.  Objection

01:35:24  13   noted.    Anything further we need to take up at this point,

01:35:27  14   Mr. Carroll?

01:35:28  15          MR. CARROLL:  Nothing further, Your Honor.

01:35:29  16          THE COURT:  Mr. Umina.

01:35:30  17          MR. UMINA:  Nothing from us, Your Honor.

01:35:31  18          THE COURT:  Okay.  We will hit "control P", so we

01:35:36  19   might be a couple minutes tardy, but we will get to work and

01:35:40  20   use all the printers we have at our disposal in our post

01:35:44  21   office here, and we will bring the jury in as soon as that is

01:35:49  22   ready.  Everybody can be at ease for a few moments.  We will

01:35:52  23   give you a heads up when we are ready to go.

01:35:55  24      We stand in recess until then.  Thank you.

01:54:14  25      (Recess taken at this time 1:35 - 1:54.)

01:54:14    1          THE COURT:  Mr. Umina, anything else we need to take

01:54:19    2   up at this point, sir?

01:54:19    3          MR. UMINA:  No, Your Honor.

01:54:19    4          THE COURT:  Ms. Durst, Mr. Carroll.

01:54:20    5          MS. DURST:  I don't believe so, Your Honor.  Were we

01:54:21    6   going to get a copy of the verdict forms too?

01:54:23    7          THE COURT:  Sure.

01:54:24    8          MS. DURST:  I didn't know, Your Honor.  I thought I

01:54:25    9   understood that, but I wasn't sure.

01:54:40   10       (Jury returned to the courtroom, and the following

01:54:48   11   transpired in open court.)

01:55:37   12          THE COURT:  Thank you, ladies and gentlemen.  Please

01:55:38   13   be seated.

01:55:39   14       Ladies and gentlemen, the defendant has rested, and you

01:55:43   15   have now heard all of the evidence in this case.  So -- well,

01:55:47   16   first let me say my apologies for being a few minutes behind

01:55:51   17   schedule, but we wanted to be ready to dive right into the

01:55:55   18   next phase of our trial once we brought you back into the

01:55:56   19   courtroom, given that both parties have rested and you have

01:55:59   20   heard all of the evidence.

01:56:00   21       So from a planning perspective, since you know we are now

01:56:03   22   ready to review the instructions of law, that I promised you

01:56:07   23   were forthcoming at the beginning of our jury selection

01:56:10   24   process back on Tuesday.  After we do that, we are going to

01:56:14   25   take a break, and then you will hear closing arguments from

01:56:17   1    counsel.  And after that, the case will be yours to begin your

01:56:22   2    deliberations.

01:56:23   3        Each of you should have a copy of the jury instructions

01:56:26   4    on your chair, so that, if you are like me and you can follow

01:56:31   5    along better reading as opposed to listening, you can follow

01:56:35   6    along.  We are now going to go through these together.  It

01:56:39   7    appears that everyone has a copy.  Outstanding.

01:56:41   8        Now that you have heard all of the evidence in this case,

01:56:43   9    ladies and gentlemen, it is my duty to instruct you as to the

01:56:47   10   law applicable to this civil action.  It is your duty as

01:56:51   11   jurors to follow the law as stated in this final charge and to

01:56:55   12   apply these rules of law to the facts as you find them from

01:56:58   13   the evidence in this case.

01:57:01   14       You must not single out one instruction alone as stating

01:57:04   15   the law, but must consider the instructions as a whole.  Each

01:57:09   16   of you may take your copy of these instructions with you into

01:57:11   17   the jury room.

01:57:12   18       First, you must determine from the evidence what the

01:57:15   19   facts of this case are.  And second, you must apply the rules

01:57:18   20   of law that I will give to you to those facts in order to

01:57:23   21   determine whether defendant David Forsyth deprived the

01:57:27   22   decedent, Philip Rhoades, a federal constitutional right while

01:57:31   23   acting "under color" of state law.

01:57:33   24       You should not concern yourself with the wisdom of any

01:57:36   25   rule of law stated by the Court.  Your sworn duty as jurors is

01:57:40   1   to base your verdict only on the law in this final charge

01:57:43   2   without regard to your personal opinion as to what the law

01:57:47   3   should be.  It is also part of your sworn duty to base your

01:57:51   4   verdict only on the evidence that has been admitted in this

01:57:51   5   case.

01:57:56   6       Our jury system depends on the willingness of each

01:57:59   7   individual juror to seek the truth from the evidence presented

01:58:01   8   at trial, and to arrive at a verdict by applying the rules of

01:58:06   9   law as provided in these instructions.

01:58:08   10       I have no right to tell you what facts have been

01:58:11   11   established by the evidence that you have heard in this case.

01:58:14   12   In turn, you have no right as jurors to make decisions as to

01:58:17   13   what the law is that applies to this trial.

01:58:21   14       You must perform your duty without any bias or prejudice

01:58:24   15   as to either party.  Our system of law does not permit jurors

01:58:28   16   to be governed by sympathy, prejudice, or public opinion.  The

01:58:32   17   parties and the public expect that you will carefully and

01:58:36   18   impartially consider all of the evidence in this case, follow

01:58:39   19   the law as stated in this final charge, and then reach a just

01:58:43   20   verdict regardless of the consequences.

01:58:46   21       You must decide this case as a civil action between

01:58:49   22   persons of equal standing and worth in the community.  All

01:58:54   23   persons stand equal before the law, and are to be dealt with

01:58:57   24   as equals in a court of justice.

01:58:59   25       The burden is on the plaintiff in a civil action to prove

01:59:02  1    every essential element of her claims by a preponderance of

01:59:06  2    the evidence.  If the evidence should fail to establish any

01:59:11  3    essential element on a particular claim by a preponderance of

01:59:14  4    the evidence, or if the evidence is evenly balanced, then the

01:59:18  5    plaintiff has failed to establish her burden of proof, and you

01:59:21  6    should find for the defendant on that claim.

01:59:24  7        The phrase preponderance of the evidence has a simple

01:59:27  8    meaning.  It has to do with the weight of the evidence.  For

01:59:30  9    example, in an ordinary lawsuit, the plaintiff brings forth

01:59:33  10   evidence to support their side, and the defendant then brings

01:59:36  11   forth evidence to support its side.  Each juror then weighs

01:59:40  12   the evidence in his or her mind.  If the plaintiff's evidence

01:59:44  13   is more persuasive and outweighs the defendant's evidence,

01:59:48  14   then we have a condition where the preponderance or weight is

01:59:52  15   on the plaintiff's side, and you should find for the

01:59:54  16   plaintiff.

01:59:54  17       However, if the plaintiff's evidence is not more

01:59:58  18   persuasive and does not outweigh the defendant's evidence, or

02:00:01  19   if the evidence is evenly balanced in the minds of the jury,

02:00:05  20   then there is a preponderance of the evidence favoring the

02:00:07  21   defendant.

02:00:09  22       In determining preponderance, the test is not which side

02:00:12  23   brings the greater number of witnesses, or presents the

02:00:16  24   greater quantity of evidence, but which side presents the more

02:00:20  25   persuasive evidence when all evidence has been heard.  You are

02:00:23  1    to judge the quality of the evidence.  Quality may or may not

02:00:27  2    be consistent with quantity.

02:00:32  3        As I mentioned at the start of this trial, there are,

02:00:34  4    generally speaking, two types of evidence from which you, the

02:00:36  5    jury, may properly find the truth as to the facts of this

02:00:41  6    case.  One is direct evidence, such as testimony of an

02:00:44  7    eyewitness.  The other is indirect or circumstantial evidence,

02:00:48  8    proof of a chain of circumstances pointing to the existence or

02:00:52  9    non-existence of certain facts.  As a general rule, the law

02:00:57  10   makes no distinction between direct and circumstantial

02:01:00  11   evidence, but simply requires that the jury find the facts in

02:01:02  12   accordance with the preponderance of all of the evidence in

02:01:05  13   the case, both direct and circumstantial.

02:01:10  14       Statements and arguments of attorneys are not evidence in

02:01:13  15   the case.  While counsel may, during closing argument, state

02:01:17  16   his or her opinion as to what the amount of the verdict should

02:01:20  17   be, you are instructed that any dollar figures mentioned by

02:01:23  18   counsel do not constitute evidence, but merely represent

02:01:27  19   argument which you as the jury may disregard in your

02:01:30  20   deliberations.  Likewise, objections to questions are not

02:01:34  21   evidence.  Lawyers have an obligation to their clients to make

02:01:37  22   an objection when they believe evidence being offered is

02:01:39  23   improper under the rules of evidence.  You should not be

02:01:43  24   influenced by the objection or by the Court's ruling on it.

02:01:47  25   If the objection is sustained, ignore the question.  If it is

02:01:50  1    overruled, treat the answer like any other.  If you are

02:01:53  2    instructed some evidence is received only for a limited

02:01:57  3    purpose, you must follow that instruction.

02:02:00  4         The evidence in this case consists of the sworn testimony

02:02:03  5    of the witnesses, regardless of who may have called them, all

02:02:08  6    exhibits received in evidence, regardless of who may have

02:02:11  7    produced them, and all facts that have been stipulated to by

02:02:14  8    the parties.  Any evidence to which I had sustained an

02:02:18  9    objection during the course of the trial, and any evidence

02:02:22  10   that I ordered stricken from the record, must be entirely

02:02:25  11   disregarded by you in your deliberations.  In addition,

02:02:29  12   anything that you may have seen or heard outside the courtroom

02:02:32  13   is not evidence and must be entirely disregarded by you.  You

02:02:38  14   are to consider only the evidence in the case.  But in your

02:02:41  15   consideration of that evidence, you are not limited to the

02:02:43  16   mere statements of the witnesses.  In other words, you are not

02:02:47  17   limited solely to what you have seen and heard the witnesses

02:02:52  18   testify.  Are you permitted to draw from the facts that you

02:02:54  19   find have been proven such reasonable inferences as you

02:02:58  20   justify in light of your experience.

02:03:01  21        An inference is a deduction or conclusion that reason and

02:03:05  22   common sense lead the jury to draw from the facts that have

02:03:07  23   been established and the evidence in this case.

02:03:12  24        You as jurors are the sole judges of the credibility of

02:03:15  25   the witnesses and the weight their testimony deserves.  You

02:03:19   1    are not required to accept testimony even though the testimony

02:03:22   2    is uncontradicted and the witness is not impeached.  You

02:03:27   3    should carefully consider each witness's intelligence, motive,

02:03:31   4    state of mind, demeanor, and manner while on the witness

02:03:35   5    stand.  Consider also any relation each witness may bear to

02:03:40   6    other either side of the case, the manner in which each

02:03:43   7    witness might be affected by the verdict, and the extent to

02:03:46   8    which, if at all, each witness is either supported or

02:03:49   9    contradicted by other evidence in the case.

02:03:54  10        Inconsistencies or discrepancies in the testimony of a

02:03:57  11    witness, or between the testimony of different witnesses, may

02:04:01  12    or may not cause the jury to discredit such testimony.  Two or

02:04:05  13    more persons witnessing an incident or transaction may see or

02:04:09  14    hear it differently.  An innocent misrecollection or failure

02:04:13  15    of recollection is not an uncommon experience.  In weighing

02:04:17  16    the effect of a discrepancy, always consider whether it

02:04:20  17    pertains to a matter of importance or an unimportant detail,

02:04:23  18    and whether the discrepancy results from the innocent error or

02:04:27  19    intentional falsehood.

02:04:30  20        In addition, the testimony of a witness may be

02:04:32  21    discredited or impeached by showing that he or she previously

02:04:36  22    made statements which are inconsistent with his or her present

02:04:39  23    testimony.  As a general rule, earlier contradictory

02:04:44  24    statements are admissible only to impeach the credibility of

02:04:48  25    the witness and not to establish the truth of those

statements.  If a witness is shown to have knowingly testified falsely concerning any material matter, or conducted himself or herself in a manner that indicated a propensity to lie, or involved some element of deceit or untruthfulness.  You have the right to distrust the testimony of that witness and other particulars, and you may reject all of the testimony of that witness or give it such credibility as you may think it deserves.

In this connection, the weight of the evidence is not necessarily determined by the number of witnesses testifying. Rather, you should consider all of the facts and circumstances in evidence to determine which of the witnesses are worthy of greater credence or believability.

You have heard from two -- you have heard expert witness in this case, from Dennis Root and Samuel Faulkner.  As I mentioned, an expert witness is allowed to express his or her opinion on those matters about which he or she has special knowledge and training.  Expert testimony is presented to you on the theory that someone who is experienced in the field can assist you in understanding the evidence, or in reaching an independent decision on the facts.

In weighing the expert's testimony you may consider the expert's qualifications, his or her opinions, his or her reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding

whether or not to believe a witness's testimony.  You may give the expert testimony whatever weight, if any, you find it deserves in light of all the evidence in this case.  You should not, however, accept these witnesses' testimony merely because they are experts, nor should you substitute it for your own reason, judgment, and common sense.

The determination of the facts in this case rests solely with you.  A witness, whether or not a party, may be discredited or impeached by contradictory evidence or by evidence that at other times the witness may have made statements that are inconsistent with the witness's testimony.  If you believe a witness has been impeached, or if a witness has been shown to have knowingly testified falsely concerning any material matter, you have a right to distrust such witness's testimony and all other particulars and you may reject all the testimony of that witness or give it such credibility as you think it deserves.

I know some of you have taken notes during the course of this trial.  Notes are only an aid to memory, and should not be given preference over your independent recollection of the facts.  A juror who did not take notes should rely on his or her independent recollection of the proceedings and should not be influenced by the notes of other jurors.  If any reference by the Court or by counsel to matters of evidence does not coincide with your own recollection, your recollection should

control during your deliberations.

Pertinent to this case, federal law provides that the plaintiff, Christy J. Rhoades, in her capacity as administratrix and personal representative of the estate of Philip Jontz Rhoades, may recover damages if Defendant David Forsyth, acting "under color" of law, deprived Philip Jontz Rhoades of a right guaranteed by the Constitution.  The right at stake here is the right to be free from the use of excessive force.

The parties had agreed that defendant David Forsyth acted "under color" of law.  The only issue for you, therefore, is the issue of excessive force.

In the instant case the plaintiff claims that Philip Rhoades was subjected to excessive force by the Defendant, David Forsyth, when Defendant Forsyth shot Philip Rhoades.  To determine whether the defendant, David Forsyth's, acts caused Philip Rhoades to suffer the loss of a constitutional right, you must determine whether the amount of force used in attempting to affect the arrest was that which an objective reasonable officer would have employed in effecting the arrest under similar circumstances.

The estate of Philip Jontz Rhoades must prove both of the following elements by preponderance of the evidence.  First, that Defendant David Forsyth acted "under color" of state law and second, while acting "under color" of state law.

02:09:18  1   Defendant David Forsyth deprived Philip Rhoades of a federal

02:09:24  2   constitutional right.  Again, the first element has been

02:09:26  3   stipulated to and does not require your attention.  The second

02:09:30  4   element of the estate of Philip Jontz Rhoades' claim is that

02:09:34  5   Defendant David Forsyth deprived him of federal constitutional

02:09:38  6   right.  In the instant case, plaintiff claims that Philip

02:09:43  7   Rhoades was subjected to excessive force by the Defendant,

02:09:47  8   David Forsyth, when the Defendant, David Forsyth, used deadly

02:09:50  9   force against Philip Rhoades.

02:09:53  10      To determine whether the Defendant, David Forsyth's, acts

02:09:56  11  caused Philip Rhoades to suffer the loss of a constitutional

02:10:00  12  right, you must determine whether the amount of force used in

02:10:03  13  attempting to effect the arrest was that which a reasonable

02:10:06  14  officer would have employed in effecting the arrest under

02:10:09  15  similar circumstances.  Whether or not the force used was

02:10:13  16  excessive is an issue for you to decide on the basis of that

02:10:17  17  degree of force that a reasonable and prudent law enforcement

02:10:20  18  officer would have applied under the same circumstances

02:10:24  19  disclosed in this case.

02:10:27  20      The test of reasonableness require careful attention to

02:10:30  21  the facts and circumstances, including but not limited to

02:10:34  22  whether Philip Rhoades posed an immediate threat to the safety

02:10:37  23  of the officer or others, whether Philip Rhoades was actively

02:10:41  24  resisting the arrest, and the severity of the injury to

02:10:45  25  Philip Rhoades.

| | |
|---|---|
| 02:10:48 | 1 |

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with 20/20 vision of hindsight.  With respect to a claim of excessive force, the standard of reasonableness at that moment applies.  The reasonableness inquiry is an objective one.  The question is whether an officer's actions are objectively reasonable in light of all the facts and circumstances confronting Defendant Forsyth without regard to Defendant Forsyth's underlying intent or motivation.  Evil intentions will not make a constitutional violation out of an objectively reasonable use of force, and good intentions will not make an unreasonable use of force proper.

An officer may not use deadly force to prevent a suspect from escaping; unless deadly force is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses an immediate, significant threat of death or serious physical injury to the officer or others.

Also, the officer must give the suspect a warning before using deadly force if it is feasible under the circumstances to give such a warning.  Thus, the estate of Philip Jontz Rhoades must prove by a preponderance of the evidence that Defendant David Forsyth did not reasonably believe that Philip Rhoades posed an immediate, significant threat of serious physical injury to Defendant David Forsyth or others at the

02:12:22  1    time of utilizing deadly force.

02:12:27  2         If you find that the amount of force used was greater

02:12:30  3    than a reasonable person would have employed, the plaintiff

02:12:34  4    will have established a claim of loss of a federal right by

02:12:38  5    Philip Rhoades, and your verdict should be for the estate of

02:12:41  6    Philip Rhoades.  If after considering all the evidence you

02:12:44  7    should find the amount of force used was not greater than a

02:12:47  8    reasonable person would have employed, the plaintiff will have

02:12:50  9    failed to establish the claim of a loss of a federal right of

02:12:53  10   Philip Rhoades, and your verdict should be for the Defendant,

02:12:58  11   David Forsyth.

02:12:58  12        There has been evidence presented in this case that the

02:13:01  13   decedent, Philip Rhoades, intentionally fled or attempted to

02:13:05  14   flee from law enforcement officers at the time of the

02:13:08  15   shooting.  You are instructed that in West Virginia it is a

02:13:11  16   crime for any person to flee or attempt to flee in a vehicle

02:13:14  17   from law enforcement after officers have given a clear visual

02:13:17  18   or audible signal directing the person to stop.  You may

02:13:21  19   consider the conduct of the decedent, Philip Rhoades, as part

02:13:25  20   of the totality of the circumstances when determining whether

02:13:27  21   the use of deadly force by the Defendant, David Forsyth, was

02:13:31  22   reasonable.

02:13:33  23        The estate of Philip Jontz Rhoades has brought a cause of

02:13:36  24   action or a lawsuit against Defendant Forsyth under West

02:13:39  25   Virginia wrongful death statute.  In order to prove an action

02:13:43  1    of wrongful death, there must be the death of a person, and

02:13:46  2    the death must be caused by such wrongful act, neglect, or

02:13:50  3    default as would, if death had not ensued, had entitled the

02:13:54  4    injured party to maintain such action to recover damages for

02:13:57  5    such wrongful death.  Therefore, to find in favor of the

02:14:02  6    estate of Philip Jontz Rhoades on this claim, the estate of

02:14:05  7    Philip Jontz Rhoades must prove that the death of Philip

02:14:06  8    Rhoades was caused by a wrongful act, neglect, or default on

02:14:10  9    the part of the Defendant, David Forsyth, as would if death

02:14:13  10   had not ensued, had entitled Philip Rhoades to maintain such

02:14:18  11   action to recover damages from the defendant.

02:14:22  12        If you find Defendant David Forsyth liable, then you must

02:14:26  13   consider the issue of compensatory or "general damages."  You

02:14:31  14   must award the estate of Philip Jontz Rhoades an amount that

02:14:34  15   will fairly compensate it for any injury actually sustained as

02:14:38  16   a result of Defendant David Forsyth's conduct which in this

02:14:41  17   case resulted in death.

02:14:42  18        The estate of Philip Jontz Rhoades has also brought a

02:14:47  19   claim for the suffering of Philip Jontz Rhoades prior to

02:14:50  20   death.  In determining the damages which the estate of Philip

02:14:53  21   Jontz Rhoades is entitled to recover in this case, you should

02:14:56  22   award such sum of money as will fully compensate the estate of

02:15:00  23   Philip Jontz Rhoades for the injuries and losses sustained as

02:15:04  24   a proximate result of the death of Philip Rhoades.

02:15:07  25        Additionally, in determining damages, if any, for pain

and suffering on the part of Philip Jontz Rhoades, the estate
of Philip Rhoades has the burden of proving the conscientious
pain and suffering prior to death.  Where death is
instantaneous or where there is no evidence that
Philip Rhoades consciously perceived pain and suffering, no
damages from pain and suffer are allowed.  The type of damages
at issue here is termed general damages.  There is not a
precise monetary or money calculation that can be used to
determine general damages or compensatory damages.  General or
compensatory damages are not restricted to actual loss of
money.  They cover both mental and physical aspects of injury,
tangible and intangible.  They are an attempt to restore the
plaintiff, that is to make it whole or where it was
immediately prior to the death of Philip Rhoades.

The estate of Philip Jontz Rhoades claims the following
items of damages:  Physical harm to Philip Rhoades during and
after the events at issue including ill health, physical pain,
disability, disfigurement, discomfort, or death.  In assessing
such harm you should consider the nature and extent of the
injury, and whether the injury is temporary or permanent.  In
this case, Philip Rhoades suffered death.

Mental harm and emotional distress suffered by
Philip Rhoades including fear, humiliation and mental anguish
from the time of being subjected to excessive force by a
government actor until his death, and lastly, sorrow, mental

anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices and advice of Philip Rhoades' family members, including his two sons, mother, father, brothers and lawful spouse.  If you return a verdict for the estate of Philip Jontz Rhoades, but the estate of Philip Jontz Rhoades has failed to prove compensatory or general damages, then you just award nominal damages.

A person whose federal rights were violated is entitled to the recognition of that violation even if he or she suffered no actual injury.  Nominal damages are designed to acknowledge the depravation of a federal right even when no actual injury occurred.  However, if you find actual injury, you must award compensatory damages, as I instructed you, rather than nominal damages.

You are further instructed that plaintiff has made a claim for punitive damages against defendant.  Punitive damages in civil rights actions are available where the defendant's conduct is shown to be motivated by evil motive or intent, or when it involve reckless or callous indifference to the federally protected rights of others.  The focus in awarding punitive damages to the plaintiff is on the character of the defendant's conduct, including whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards.

Punitive damages are designed to be a deterrent.

02:18:18  1    However, because punitive damages are designed to punish

02:18:23  2    egregious conduct, you are instructed that before you return a

02:18:27  3    verdict for punitive damages, plaintiffs must prove by a

02:18:29  4    preponderance of the evidence that Defendant David Forsyth was

02:18:32  5    motivated by an evil motive or intent, or Defendant David

02:18:36  6    Forsyth's conduct involved reckless or callous indifference to

02:18:41  7    the federally protected rights of Philip Jontz Rhoades.

02:18:45  8         As a general proposition, the purposes of punitive

02:18:48  9    damages are; one, to punish a wrongdoer for conduct that has

02:18:52  10   harmed another party; and two, to discourage the wrongdoer and

02:18:57  11   others from acting the same way in the future.  Therefore,

02:18:59  12   punitive damages are damages that are awarded to punish and

02:19:04  13   deter wrongdoers.  Punitive damages are in addition to damages

02:19:07  14   you award to compensate the party for injuries or losses.

02:19:12  15   Therefore, if you find from the evidence that the defendant;

02:19:14  16   committed a wrongful act, with actual malice toward Philip

02:19:19  17   Rhoades or acted with a conscientious, reckless, or outrageous

02:19:21  18   indifference to the health, safety, and welfare of others,

02:19:26  19   then you may award plaintiff punitive damages in an amount you

02:19:28  20   believe is sufficient to punish the defendant and to serve as

02:19:35  21   an example to prevent defendant and others from acting in a

02:19:45  22   similar way in the future.

02:19:47  23        Remember, you are not required to award punitive damages,

02:19:51  24   and any punitive damages that are awarded must be in addition

02:19:54  25   to damages which are necessary to compensate plaintiff for the

02:19:57  1    losses incurred from the death of Philip Rhoades, or any

02:20:01  2    nominal damages you may award.

02:20:04  3         There is no fixed formula to determine the amount of

02:20:06  4    punitive damages.  If you decide to award punitive damages,

02:20:09  5    you should consider the following factors in determining the

02:20:12  6    amount of punitive damages; one, punitive damages should bear

02:20:18  7    a reasonable relationship to the harm that is likely to occur

02:20:21  8    from the defendant's conduct, as well as bear any reasonable

02:20:25  9    relationship to the harm that actually has occurred.  In

02:20:28  10   assessing punitive damages, the jury should also consider the

02:20:33  11   reprehensibility, offensiveness, or repugnancy of defendant's

02:20:36  12   conduct in this case, and whether and or how often defendant

02:20:39  13   engaged in similar conduct in the past, whether the defendant

02:20:43  14   has been adequately punished through other means, and whether

02:20:46  15   defendant attempted to conceal or cover up their actions or

02:20:50  16   the harm caused by them.

02:20:53  17        The proportional relationship between the compensatory

02:20:57  18   damages awarded and the punitive damages awarded must be

02:21:00  19   reasonable, although there is no fixed formula by which to

02:21:04  20   guide you.

02:21:04  21        You may consider any or all of these factors and give

02:21:09  22   them such weight as you consider appropriate in this case,

02:21:11  23   should you find that punitive damages are appropriate.  If you

02:21:15  24   find punitive damages to be appropriate, your award of

02:21:19  25   punitive damages must not be based passion or prejudice, but

02:21:23  1   rather, should be based upon all the evidence in this case,

02:21:25  2   and your desire to arrive at a reasonable amount which you

02:21:29  3   feel will adequately punish defendant's conduct in this case.

02:21:35  4        The fact that I have instructed you on the law of damages

02:21:39  5   does not imply or suggest that the Court believes that any

02:21:42  6   damages should be awarded.  Whether or not such damages are

02:21:45  7   due is for you, the jury, to decide.  Instructions as to the

02:21:50  8   measure of damages are only given for your guidance in the

02:21:53  9   event that you should find in favor of the plaintiff from a

02:21:57  10  preponderance of the evidence in this case.

02:21:59  11       The fact that the plaintiff may have suffered damages

02:22:02  12  does not automatically create a presumption of liability on

02:22:06  13  the part of the Defendant, David Forsyth, and does not

02:22:09  14  necessarily give the plaintiff a right to recover from

02:22:13  15  Defendant David Forsyth.  It is the burden of plaintiff to

02:22:16  16  prove by a preponderance of the evidence each item of damages

02:22:19  17  claimed.  If plaintiff's proof should fall to establish an

02:22:25  18  essential element of any of the damages by a preponderance of

02:22:28  19  the evidence, the plaintiff cannot recover on that particular

02:22:29  20  claim for damages.

02:22:32  21       You are not permitted to award damages based on sympathy,

02:22:37  22  speculation, or guesswork.  Damages which are purely

02:22:42  23  speculative cannot be recovered, but it is the uncertainty as

02:22:45  24  to the fact of damages and not as to the amount of damages

02:22:49  25  that is to be considered.  Where it is certain that the

02:22:55  1    damages resulted from Defendant David Forsyth's actions, the

02:22:56  2    mere uncertainty as to the amount does not justify the jury

02:23:00  3    refusing recovery.

02:23:01  4        The plaintiff is not required to prove his or her damages

02:23:06  5    with mathematical exactitude or precision because it is not

02:23:11  6    always possible or even probable that a party can prove the

02:23:15  7    exact amount of his or her damages.  When determining the

02:23:17  8    amount of damages, you are not to be concerned where the money

02:23:21  9    comes from to pay for a damage award or what will happen to

02:23:24  10   the money once it is awarded.

02:23:29  11       Your verdict in this case must represent the considered

02:23:32  12   judgment of each juror.  In order to return a verdict it is

02:23:36  13   necessary that each juror agree thereto.  Your verdict must be

02:23:40  14   unanimous.  It is your duty as jurors to consult with one

02:23:46  15   another, and to deliberate with a view to reaching an

02:23:49  16   agreement if can you do so without violence to your individual

02:23:53  17   judgment.  You must decide the case for yourself, but only

02:23:55  18   after an impartial consideration of the evidence in the case

02:24:00  19   with your fellow jurors.

02:24:00  20       In the course of your deliberation, do not hesitate to

02:24:00  21   examine your own view, and change your opinion if convinced it

02:24:08  22   is erroneous, but do not surrender your honest conviction as

02:24:12  23   to the weight or effect of evidence, solely because of the

02:24:15  24   opinion of your fellow jurors, or for the mere purpose of

02:24:18  25   returning a verdict.

02:24:21   1          Remember at all times that you are not partisans.  You

02:24:24   2     are judges; judges of the facts of this case.  Your sole

02:24:27   3     interest in serving as jurors in this case is to seek the

02:24:31   4     truth from the evidence in this case.

02:24:35   5          Upon retiring to the jury room, you will need to select

02:24:40   6     one of your members to serve as your foreperson.  The

02:24:42   7     foreperson will preside over your deliberations and will be

02:24:44   8     your spokesperson in court.  In addition to your copy of

02:24:53   9     instructions that we have been reviewing, a verdict form has

02:24:56   10    also been prepared for your convenience, and a copy of this

02:25:02   11    verdict form will be provided to you to take back into the

02:25:04   12    jury room, but I do want to review that with you now.

02:25:08   13         There are a series of questions, with instructions after

02:25:13   14    some of the questions:  One, do you find that the plaintiff

02:25:20   15    has proven by a preponderance of the evidence that the force

02:25:24   16    used by Defendant David Forsyth toward Philip Jontz Rhoades on

02:25:28   17    August 2, 2017, was excessive and objectively reasonable?  Yes

02:25:32   18    or no.

02:25:33   19         If your answer to question one is "yes," please proceed

02:25:37   20    to question 1A.  If your answer is question one is "no," then

02:25:41   21    skip the remaining questions, sign and date the verdict form,

02:25:46   22    and inform the COURT security officer that you have completed

02:25:48   23    your deliberations.

02:25:50   24         Question 1A, if you find the plaintiff has proven general

02:25:54   25    damages by a preponderance of the evidence, please specify the

02:25:58    1    amounts, if any, of the following damages.  There are then
02:26:01    2    three categories of general damages listed for your
02:26:05    3    consideration.  Those are "sorrow, mental anguish, and
02:26:10    4    solace;" "pain and suffering of Philip Jontz Rhoades;" and
02:26:13    5    lastly, "loss of services, society, protection, care and
02:26:17    6    assistance of Philip Jontz Rhoades."  Underneath those three
02:26:23    7    lines is a line for a total amount.
02:26:25    8        If you award any general damages you may skip question 1B
02:26:31    9    and proceed to question two.  Question 1B asks or states if
02:26:37   10    you do not award any general damages to plaintiff, you must
02:26:41   11    award nominal damages.  Please specify the amount of nominal
02:26:45   12    damages that you award.  Then there is a line for nominal
02:26:49   13    damages.
02:26:50   14        Question two:  Do you find the plaintiff has proven by a
02:26:53   15    preponderance of the evidence that the Defendant, David
02:26:56   16    Forsyth, was motivated by an evil motive or intent, or
02:27:01   17    Defendant David Forsyth conduct involved reckless or callous
02:27:04   18    indifference to the federally protected rights of Philip Jontz
02:27:06   19    Rhoades?  Yes or no.
02:27:12   20        If your answer to question two is "no," then skip
02:27:15   21    question 2A, sign and date the verdict form, and inform the
02:27:19   22    court security officer that you have completed your
02:27:22   23    deliberations.  If your answer to question two is "yes,"
02:27:24   24    please list an amount of punitive damages in response to
02:27:29   25    question 2A.

02:27:29  1       Question 2A asks, if your answer to question two is

02:27:36  2   "yes," specify the amount of punitive damages below.  And

02:27:39  3   there is a line provided there for punitive damages.

02:27:42  4       Lastly, there is a line for the date, which is today,

02:27:48  5   April 9, 2021 and a line for your jury foreperson to sign.

02:27:54  6       You will take this verdict form to the jury room and when

02:27:57  7   you have reached a unanimous agreement as to your verdict, you

02:28:01  8   will have your foreperson complete this form by answering the

02:28:06  9   question or questions under the written instructions on the

02:28:08  10  verdict form and then completing the form, stating the verdict

02:28:11  11  upon which you unanimously agreed.  Your foreperson will then

02:28:17  12  sign and date the form, and the jury will return with your

02:28:19  13  verdict to the courtroom.

02:28:21  14      If you should desire to communicate with the Court at any

02:28:24  15  time, please write down your message or question, and pass the

02:28:28  16  note to the court security officer who will bring it to my

02:28:33  17  attention.  We will then respond as promptly as possible in

02:28:35  18  writing.  I caution you, however, with regard to any message

02:28:38  19  or question you might send, that you should not tell me how

02:28:43  20  you stand numerically or otherwise, on the issue or any aspect

02:28:47  21  of your deliberations.

02:28:51  22      Ladies and gentlemen, we have completed our jury

02:28:55  23  instructions.  At this point, we are going to take a brief,

02:28:58  24  five-minutes break and excuse you to your jury room so that

02:29:05  25  counsel can set up for closing arguments.  After that break,

02:29:05  1    we will return.  Plaintiff will have the opportunity to

02:29:09  2    present their closing argument first.  The defendant will have

02:29:11  3    an opportunity after that.  And finally, the plaintiff will

02:29:14  4    have a brief period of time for rebuttal.  After those closing

02:29:17  5    arguments, we will excuse you finally to your jury room to

02:29:20  6    begin your deliberations.

02:29:22  7        So odds are this is the last time you will hear me say

02:29:25  8    this:  Please continue to refrain from discussing this case

02:29:28  9    with anyone including any of your fellow jurors, or in small

02:29:31  10   groups of fellow jurors, or anyone else.  Also, please

02:29:34  11   continue to refrain from any independent investigation with

02:29:37  12   respect to this case or any of the issues raised in connection

02:29:40  13   with this case.

02:29:42  14       With that, we will ask you to step aside for five minutes

02:29:45  15   while we set up.  We will be back for closing arguments here

02:29:48  16   in five.  Thank you.

02:29:50  17       (Jury excused, and the following transpired in open

          18   court.)

          19          THE COURT:  You may all be seated.  Anything we need

          20   to discuss before closings, Mr. Umina?

          21          MR. UMINA:  No, Your Honor.

          22          THE COURT:  Ms. Durst.

          23          MS. DURST:  No, Your Honor.

02:30:16  24          THE COURT:  You are all free to rearrange the

02:30:17  25   courtroom however you believe most appropriate.  We will give

02:30:19   1   you five to do that, and then we will come back and get

02:30:21   2   started.  Thank you all.

02:31:13   3        (Break taken at this time 2:30 p.m. -  2:39 p.m.)

02:39:15   4            THE COURT:  Do we have everyone we need?  Okay.

02:39:19   5   Ready to go?

02:39:22   6            MR. UMINA:  Yes, Your Honor.

02:39:22   7            MS. DURST:  Yes, Your Honor.

02:39:24   8            THE COURT:  May we have our jury then.  Thank you.

02:39:24   9        (Jury returned to the courtroom, and the following

02:40:51  10   transpired in open court.)

02:40:51  11            THE COURT:  Thank you all.  Please be seated.

02:40:53  12        Mr. Umina, if you are ready to go, you may proceed, sir.

02:40:57  13            MR. UMINA:  May it please the Court, counsel.

02:42:13  14        Ladies and gentlemen, the Jeep was not in gear.  Philip

02:42:26  15   should still be here.  Basic rules of policing, ladies and

02:42:34  16   gentlemen.  Police officers must never violate the

02:42:42  17   Constitution of the United States of America.  I know the

02:42:48  18   defendant told that you there were exceptions when he was on

02:42:51  19   the witness stand.  But as you will see in your jury

02:42:55  20   instructions, as everyone knows, the Constitution of the

02:42:59  21   United States is infallible.  It has been long before we were

02:43:06  22   a country of over 300 million citizens.  Our founding fathers

02:43:13  23   had the foresight and the knowledge to know that human beings

02:43:18  24   are imperfect, and if we create a system of government, we

02:43:25  25   must be protected from that government.  No one is ever

02:43:30   1    permitted to violate a citizen's constitutional rights,

02:43:36   2    especially not a police officer.  And along those lines,

02:43:43   3    police officers may never violate their own department's

02:43:48   4    policies.  No government actor can violate a policy causing

02:43:52   5    death of a citizen.  And when they do, they are liable for the

02:44:00   6    harm that they have caused.  They are liable for the life that

02:44:07   7    they have taken.

02:44:12   8        Now, Mr. Prince told you at the beginning of this case

02:44:19   9    this is how far we have to get, the 51-yard line.  Another way

02:44:26  10    of saying that, okay, if I were to come over here, take this

02:44:32  11    book right here that Mr. Prince has, open it exactly in half,

02:44:37  12    if you flip one page in our favor based on the weight of the

02:44:41  13    evidence, we prevail.  You must find for the plaintiff.

02:44:47  14        The standard here is not beyond a reasonable doubt.  It's

02:44:52  15    merely what's more likely than not, based on the evidence

02:44:57  16    presented to you here in this courtroom.  Evidence that the

02:45:07  17    Jeep was moving.  None.  They haven't put up a single piece of

02:45:16  18    evidence to prove that that Jeep wasn't in neutral.  You have

02:45:24  19    the self serving statement of the defendant.  You have

02:45:28  20    Corey Love, who neither saw the shooting, didn't see the

02:45:34  21    vehicle, the front end of it; he didn't see anything.  He was

02:45:40  22    trying to get around his own moving vehicle.  That's it.

02:45:43  23    That's what they are hoping you rely on, the defendant's

02:45:46  24    statement.

02:45:50  25        Let's talk about the evidence that indicates that the

02:45:54  1    Jeep was not moving, not rapidly and aggressively accelerating

02:46:02  2    and causing him to fear for his life and thus utilizing deadly

02:46:07  3    force and taking a man's life, shooting him in the face.  The

02:46:11  4    Jeep wasn't in gear.  You heard every single person who took

02:46:18  5    that witness stand testify about this, tell you a standard

02:46:24  6    transmission vehicle cannot be running 52 minutes after the

02:46:32  7    dead driver is pulled out with no one to push on the gas or

02:46:39  8    the clutch.  It's simply not how a manual transmission

02:46:43  9    operates.  A manual transmission must be in neutral, even the

02:46:49  10   defendant told you that, to be running with nobody in it.

02:46:53  11   Otherwise, the engine stalls out.

02:46:59  12        Vehicles in neutral do not accelerate.  The defendant's

02:47:04  13   version of events is that the vehicle revved its engine and

02:47:11  14   began aggressively accelerating -- I guess we take that to be

02:47:15  15   rapidly -- towards him.  He said it went straight at him, did

02:47:20  16   not veer, stop, or slow down.  He said that thing was coming

02:47:25  17   straight at him.  Vehicles in neutral don't do that.

02:47:33  18        You heard even Mr. Faulkner testify, bullets do not stop

02:47:41  19   moving vehicles.  And in this case, you have seen the pictures

02:47:44  20   and we are going to look at more of these pictures.  Where

02:47:49  21   could the Jeep possibly have been coming from?  And then on a

02:47:54  22   dime, in what, the length of one car after he goes from tire

02:47:59  23   spinning, rapidly accelerating, shooting a driver, it just

02:48:04  24   magically stops right there in its tracks.

02:48:08  25        The judge instructed you, we are relying on good old

02:48:16    1   fashion common sense.  And common sense tells us that vehicles

02:48:20    2   don't just magically stop when you shoot the driver if they

02:48:24    3   are rapidly accelerating.  Killing the driver does not stop a

02:48:33    4   moving vehicle.

02:48:38    5        Everyone at the scene has testified, no one ever touched

02:48:44    6   the gear shift after the killing.  No one touched it.  No one

02:48:49    7   could have possibly taken the vehicle out of gear and put it

02:48:54    8   into neutral.  And further, if the Jeep would have still been

02:48:58    9   in gear as Philip was laying there dead, it would have kept

02:49:04   10   going.  It wouldn't have stopped.

02:49:12   11        The defendant testified the Jeep was still running.  He

02:49:17   12   testified it had to be in neutral to still be running.  You

02:49:26   13   heard from the state medical examiner, deputy chief.  He sat

02:49:32   14   right there and told you with the injury that Philip sustained

02:49:36   15   to his spinal cord, to his C1, instantaneously, he can't move

02:49:44   16   from the neck down.  There is no question he couldn't have

02:49:47   17   done anything.  His spinal cord had just been severed by the

02:49:53   18   defendant's bullet.  He couldn't have done anything to take

02:49:59   19   that vehicle from here in first gear, to here in neutral.

02:50:09   20        The timeline of events.  I was not surprised by Mr.

02:50:22   21   Faulkner's testimony.  He has been retained by the defendant's

02:50:26   22   counsel's law firm 50 to 70 times.  He works for them

02:50:32   23   constantly.  He is always going to tell you what they want you

02:50:39   24   to believe.  Every single time.  And, in fact, every single

02:50:45   25   case he has ever worked on, he has had the exact same opinion

02:50:51  1   400-plus times.  Folks, he wants you to ignore time, distance,

02:51:07  2   and the events as the defendant stated.  I mean, he even told

02:51:13  3   me the defendant's version of events was a hypothesis when I

02:51:17  4   showed him hard, physical evidence to indicate his story

02:51:24  5   doesn't add up.  It just -- it just doesn't connect in the

02:51:29  6   mind.  It's like if you go and put the puzzle together at the

02:51:33  7   scene and take his statements and try to make the physical

02:51:37  8   evidence fit, everything inside of us tells us it doesn't.  It

02:51:41  9   doesn't fit his story.  And the time line of events, why do

02:51:48  10  you think they were so concerned with it?  Because it's very

02:51:52  11  bad for them.  It's very, very bad for them.

02:51:57  12       You saw that road.  We are going to take a look at that

02:52:01  13  road again.  You can't whip down that road at 50-mile an hour,

02:52:05  14  and based on the defendant's version of events when he told

02:52:08  15  you someone is driving by, let's sit on that for a second.  I

02:52:13  16  don't know if any of you are familiar with that area.  I take

02:52:15  17  it that you are not, but you are talking about a gravel road

02:52:19  18  in a very rural area, very rural.  Its a gravel road.  So it

02:52:26  19  just so happens at the moment he is driving by, that another

02:52:30  20  car is passing.  Highly unlikely, but let's assume that it

02:52:36  21  was.  He had to stop, wait, turn around, and then come from a

02:52:42  22  stop, and then start accelerating up the road, that 213 feet.

02:52:49  23  The time has started, folks.  It doesn't add up.

02:52:59  24       There is no physical evidence of ground disturbance.  You

02:53:03  25  can see on those pictures of the roadway leading up to the

02:53:09   1    scene, how soft the ground was.  I don't think anyone disputes

02:53:13   2    that.  Okay.  You can see how soft the ground was that day.

02:53:17   3    You can see how wet the ground was.  And just either way, if

02:53:24   4    this Jeep is spinning its tires to the point where it starts

02:53:30   5    rapidly accelerating, there is going to be evidence of that.

02:53:35   6    And they even tried to trick you with a picture.  They tried

02:53:39   7    to trick you.  They tried to insult your intelligence by

02:53:46   8    putting in a photo that could possibly be something like a

02:53:53   9    tire spinning, and they put that in evidence hoping that you

02:53:56   10   would latch on to it, that you would buy it.  And then that

02:54:00   11   same witness, Lieutenant Branham -- I mean, we have to commend

02:54:04   12   him.  He really came in here and tried to tell you the truth

02:54:08   13   the best that he could.  And I have so much sympathy for him,

02:54:12   14   for being fed this story by the defendant and then not knowing

02:54:17   15   how a manual transmission works, and he was hoodwinked.  He

02:54:23   16   bought that story.  But Lieutenant Branham confirmed,

02:54:30   17   confirmed the photo that they tried to feed you during this

02:54:34   18   trial to show that the tires were spinning couldn't have been

02:54:38   19   caused by the Jeep.  They were actually and completely the

02:54:42   20   wrong direction.  Lieutenant Branham also told you three

02:54:50   21   times, three times, Corey Love is lying.  In his sworn

02:54:59   22   deposition about this case, Corey Love lied.  And it was stuff

02:55:08   23   he didn't even need to lie to you about.  The gunshot residue

02:55:12   24   test, I mean, he could have just said, I never shot him.  I

02:55:14   25   washed my hands.  I didn't shoot the guy.  But he lied.

02:55:18   1   Because from the moment this happened, he towed the company
02:55:24   2   line.  You heard it.  His dad is Forsyth's boss.  Now, he
02:55:28   3   wanted to classify it as a higher ranking member of the police
02:55:34   4   department, but that's his boss.  Okay.  Corey Love's dad is
02:55:38   5   the defendant's boss.  And when they took that young man, 25
02:55:45   6   at the time, and told him what to say and told him to tow the
02:55:51   7   company line, he did it.  And then he sat there and lied under
02:55:56   8   oath.  And, you know, two of the most important things that he
02:56:03   9   lied about, two of the most -- I mean, absolutely significant
02:56:07   10  things that he lied about; one, he says he didn't talk to the
02:56:12   11  defendant before this.  He didn't try to plan to gave their
02:56:16   12  statements together.  You saw it in black and white.  Love
02:56:23   13  told Lieutenant Branham he wants to come in and give his
02:56:27   14  statement with the defendant.  Similarly, and he also said, --
02:56:34   15  No, he was just called, the defendant set up the time, and
02:56:39   16  then he was called and told when to come in.  Branham talked
02:56:43   17  to Love first, so that was another lie.  And then the
02:56:50   18  defendant also told Lieutenant Branham he wanted to give his
02:56:56   19  statement with Love.
02:56:59   20      Now, our expert, Mr. Root, he will tell you -- he told
02:57:04   21  you -- he looked you straight in the face -- "I don't have an
02:57:07   22  issue with them waiting.  I have an issue with them talking
02:57:12   23  before and wanting to give their statements together."  Why
02:57:15   24  would someone lie about it, if they weren't covering something
02:57:19   25  up?  This is what a coverup looks like, ladies and gentlemen.

02:57:24   1   You are seeing it.  You are in federal court right now.  This

02:57:27   2   is what a coverup by the government looks like.  They control

02:57:30   3   all of the documents, all of the evidence, everything.  And

02:57:36   4   but for catching them in their lies, this entire case would

02:57:42   5   have been filed away somewhere, rubber stamped.  That would

02:57:47   6   have been the end of it.  The defendant would have gotten away

02:57:50   7   with it.

02:57:53   8       This photo -- Mr. Faulkner, I mean, he wouldn't even give

02:58:01   9   up the stuff that he was -- he wouldn't give up anything.

02:58:06   10   Mr. Root sat up here, and he would agree.  He would agree many

02:58:12   11   of her points had nothing to do with this case whatsoever.  It

02:58:16   12   was designed as another thing to distract you in hopes that

02:58:19   13   you don't understand that the only issue in this case is

02:58:24   14   whether or not the Jeep was moving.  If the Jeep was not in

02:58:30   15   gear, Philip should still be here.  Okay.  It is

02:58:34   16   unquestionable; both experts told you; everyone told you.  If

02:58:39   17   that Jeep wasn't doing what he said it was, then this was

02:58:44   18   objectively unreasonable, then the defendant violated Philip's

02:58:49   19   constitutional rights when he took his life at the dead end of

02:58:54   20   a dirt road at a gas well site all alone on August 2, 2017.

02:59:02   21       Folks, common sense.  You see where this grass is?  You

02:59:07   22   see how it's standing straight up?  Philip Rhoades made a

02:59:11   23   three-point turn that day, but it was before the defendant

02:59:14   24   ever got there.  Folks, you saw how this road comes up.  He is

02:59:20   25   hidden here.  Okay.  He ran.  He made a mistake.  We do not

deny that at all, but Philip Rhoades isn't on trial.  The
defendant took that from him when he acted as judge, jury, and
executioner.  Just like that, two kids fatherless, a father
without a son, a brother without his brother who he has grown
up with since a child.  Just like that.

These -- anything over here, that is not in line with the
Jeep's wheels, folks.  The defendant said he hopped out of the
vehicle here.  This Jeep came straight at him.  Jeeps don't
move side-to-side.  They don't just jump.  Look at that grass
right there.  If someone just backed up or even drove over it
forward, especially rapidly accelerating, but I mean, how does
it go from rapidly accelerating right here to stopped right
here?  Even if it rolled, you wouldn't have grass up in the
wheel wells.  You wouldn't have this vegetation pressed
against the bumper.  He did.  He got out to this road.  He
made a three-point turn, and he tucked himself right back in
here.  He wasn't running at this moment.  He was hiding.
Again, 28 years old.  He did something -- you know, he made a
mistake.  He ran from law enforcement.  But folks, it's a lot
more common than you think.  In many instances, it's a
misdemeanor.  In many instances, fleeing is a misdemeanor
crime.  A lot -- has anyone seen Dukes of Hazard?  People run
out in the country sometimes.  He wasn't in the middle of
Clarksburg, or Fairmont, or Buckhannon, or even Kingwood.  He
was way out in the country.  I mean, this is off of a gravel

| | |
|---|---|
| 03:01:31 | 1 |
| 03:01:35 | 2 |
| 03:01:45 | 3 |
| 03:01:51 | 4 |
| 03:01:57 | 5 |
| 03:02:02 | 6 |
| 03:02:07 | 7 |
| 03:02:13 | 8 |
| 03:02:18 | 9 |
| 03:02:25 | 10 |
| 03:02:35 | 11 |
| 03:02:40 | 12 |
| 03:02:44 | 13 |
| 03:02:53 | 14 |
| 03:02:57 | 15 |
| 03:03:02 | 16 |
| 03:03:06 | 17 |
| 03:03:12 | 18 |
| 03:03:17 | 19 |
| 03:03:22 | 20 |
| 03:03:24 | 21 |
| 03:03:28 | 22 |
| 03:03:32 | 23 |
| 03:03:35 | 24 |
| 03:03:39 | 25 |

road at a gas well site.  He is at a gas well site, if that tells you anything.  This photo, this vegetation, there is no way that Jeep did what the defendant said it was doing.  Let's look here.  Again, you have -- this is a ditch line, folks. This is a ditch line.  Look at that grass.  Look at this grass up here.  Look how far it's pressed against the bumper.  Look at all the grass back here.  No way.  And where is he coming from?  This is a bowl, folks.  How does that thing go from spinning tires, rapidly accelerating, and by the time he gets off seven shots, dead in his tracks, stops, standing straight up.  There is no way.

The defendant's expert wants you to ignore your common sense.  He wants you to ignore the physical, unchangeable, hard evidence in this case, because that's what he did when he formed his opinion.  He took his statement, ignored any inconsistencies from Love, and came in and did what he was paid to do, just like he did 50 to 70 other times for the defendant's counsel's law firm.  They are 10 to 20 percent of his entire income, folks.  10 to 20 percent of his entire income.  Do you think he is going to give an answer that they don't want?  So much so that he just walked into court, straight faced, looked at you all during a federal trial and told you that physical evidence doesn't matter.  He insulted your intelligence, ladies and gentlemen.  Each and every one of you know that.  The first thing you would look at at the

| | |
|---|---|
| 03:03:44 | 1 |
| 03:03:48 | 2 |
| 03:04:00 | 3 |
| 03:04:03 | 4 |
| 03:04:09 | 5 |
| 03:04:11 | 6 |
| 03:04:16 | 7 |
| 03:04:20 | 8 |
| 03:04:24 | 9 |
| 03:04:28 | 10 |
| 03:04:34 | 11 |
| 03:04:38 | 12 |
| 03:04:45 | 13 |
| 03:04:51 | 14 |
| 03:04:56 | 15 |
| 03:05:01 | 16 |
| 03:05:05 | 17 |
| 03:05:13 | 18 |
| 03:05:18 | 19 |
| 03:05:31 | 20 |
| 03:05:35 | 21 |
| 03:05:40 | 22 |
| 03:05:49 | 23 |
| 03:05:55 | 24 |
| 03:06:06 | 25 |

scene of a shooting or anything else, is for physical
evidence.  The Jeep was in neutral, folks.  First gear is up
here, okay.  Anyone ever seen a manual transmission?  This
is -- I will tell you this is demonstrative.  This is not the
gear shift from the vehicle.  I am showing you this so you see
the manual transmission, okay.  First gear, up here, okay.
They are going to throw anything at the wall, any reason that
they can to try to get you to believe some other way that that
thing got into neutral; falling on it, after the defendant
shot him in the face.  Ladies and gentlemen, falling is a
forward motion, that would push this forward.  It would keep
it in gear.  It would continue to advance.  Getting into
neutral is a back motion, so he just happened to fall just --
I mean, it doesn't make sense.  You are sitting in the car,
get shot in the right cheek, you are going to fall back.  You
are not going to magically take a bullet to the right side of
your face and then happen to hit the gear shifter this way.
That is speculation, total speculation, that they are hoping
that you grasp on to.  And look at the size here, okay.  This
is a bowl.  Those pictures that you just saw in the back, this
type, this hillside, this is a ditch line.  He had nowhere to
be accelerating from in this story.  Nowhere.

     Look at this grass behind the Jeep.  Does that look like
it just got ran over?  Folks, he turned around.  He couldn't
have -- that Jeep couldn't have been back any further than

| | | |
|---|---|---|
| 03:06:10 | 1 | right here.  If he kicks that thing into gear, slams on the |
| 03:06:20 | 2 | gas, and starts moving forward, that thing -- it's going to |
| 03:06:24 | 3 | keep going.  This is the -- okay.  This is another |
| 03:06:35 | 4 | demonstrative exhibit.  Additionally, let's clear something |
| 03:06:39 | 5 | up, okay.  Let's clear something up right here.  Mr. Faulkner |
| 03:06:46 | 6 | wanted to state that Dennis Root went out there a few days ago |
| 03:06:51 | 7 | and drew this.  That is not where he got this information. |
| 03:06:54 | 8 | This information came from a former state trooper who acted as |
| 03:07:00 | 9 | a private investigator in the days and weeks following the |
| 03:07:05 | 10 | shooting, okay.  He went out days after the shooting and made |
| 03:07:12 | 11 | this drawing.  This wasn't something done yesterday.  This |
| 03:07:16 | 12 | drawing was done nearly four years ago.  And this, both |
| 03:07:22 | 13 | experts had when looking at the scene, okay.  So again, that |
| 03:07:28 | 14 | testimony by Mr. Faulkner, that was completely untrue.  This |
| 03:07:34 | 15 | was done by a state trooper days after this happened when he |
| 03:07:39 | 16 | went out to look at the scene, and that's when the drawing was |
| 03:07:42 | 17 | done. |
| 03:07:51 | 18 | They tried to trick you, here at trial.  We are in a |
| 03:07:57 | 19 | federal courthouse.  The defendant is on trial for depriving |
| 03:08:02 | 20 | someone's constitutional rights and taking his life, and they |
| 03:08:07 | 21 | tried to trick you with this photo.  If you recall, Sergeant |
| 03:08:13 | 22 | Branham was on the witness stand, okay; first witness that you |
| 03:08:17 | 23 | all heard from.  First witness that you all heard from, |
| 03:08:20 | 24 | Sergeant Branham.  They took this photo, put it into evidence, |
| 03:08:26 | 25 | made a comment about me not putting it into evidence, okay, |

03:08:30   1   because they are trying to support their theory of tires

03:08:34   2   spinning, if you recall that.  And then when we talked to

03:08:38   3   Sergeant Branham about it, and we talked about the scene, he

03:08:41   4   acknowledged the vehicle would have had to have been

03:08:45   5   perpendicular to where it is sitting to make marks like this.

03:08:50   6   This is a trick.  They tried to fool you in the middle of a

03:08:56   7   federal trial, because they know all of the other physical

03:08:59   8   evidence in this case does not support their theory.

03:09:08   9        Let's look at it side-by-side, evidence that the Jeep was

03:09:12  10   moving, hard evidence.  None.  Evidence the Jeep was not

03:09:19  11   moving.  Folks, that's all we have seen here.  The Jeep was in

03:09:32  12   neutral.  The defendant told you that the vehicle had to be in

03:09:35  13   neutral to be running, and it was running.  Sam Faulkner told

03:09:41  14   you the vehicle had to be in neutral to be running, Dennis

03:09:45  15   Root told you, Lieutenant Branham told you he didn't know how

03:09:49  16   that type of vehicle worked, but he has since learned that it

03:09:55  17   could not have been in gear and it had to be in neutral, and

03:09:59  18   Corey Love told you the same thing.  That vehicle was running.

03:10:07  19        State medical examiner.  Philip was shot in the right

03:10:17  20   cheek, okay.  Instantly not able to move his legs.  Instantly

03:10:22  21   not able to move his arms.  Instantly not able to move his

03:10:27  22   body below his neck.  He is not able to shift the car into

03:10:37  23   neutral, ladies and gentlemen.  Again, that is total

03:10:42  24   speculation because they are trying to come up with anything

03:10:48  25   that they can to convince you that the defendant didn't hop

03:10:54  1    out of his car without putting it in park and attempt to stop

03:10:59  2    someone who had fled with bullets, which is expressly

03:11:07  3    prohibited by the Constitution of the United States of

03:11:10  4    America.

03:11:11  5         Now, this is very important, okay.  The direction of the

03:11:19  6    wound path with respect to this anatomic position, okay, right

03:11:24  7    to left, downward, front to back, okay.  He was shot here.

03:11:32  8    And we're not going to put anyone through seeing that photo of

03:11:36  9    the entry wound, okay.  He was shot right here.  The bullet

03:11:41  10   got lodged in his C1 down here okay.  So it had a downward

03:11:46  11   angle to it.  The defendant is standing in the front of the

03:11:50  12   vehicle, all right.  They want to tell you the story that he

03:11:55  13   is reaching into the floorboard and doing all of these things,

03:11:59  14   but the entry wound, and the trajectory, and where the bullet

03:12:02  15   got lodged, indicate that he was faced this way.  He is

03:12:12  16   cowering, ducking cover.  And when you look at how the body

03:12:16  17   is, I mean, standard anatomical position, your C1 is here,

03:12:21  18   cheek is here.  For that bullet to go through his cheek and

03:12:27  19   hit his spinal cord, he has to be faced this way, ducking the

03:12:33  20   defendant's fire.  He can't be faced this way.  He can't be

03:12:37  21   faced this way.  If he is faced this way, he gets shot in this

03:12:42  22   side.  If he reaching down here, he gets shot on left side.

03:12:46  23   If he is standing up or ducking down to cover, he gets shot in

03:12:51  24   the face.  So he either, one, was ducking cover, or two,

03:12:55  25   trying to exit the vehicle.  That's the only explanation for

03:13:03  1    this.  He was standing right in front of the Jeep.  He got

03:13:07  2    shot right here.  The bullet hits him in the spinal cord.  You

03:13:12  3    don't get shot in the face and the bullet end up in your

03:13:16  4    spinal court unless your head is down.  Right to left,

03:13:21  5    slightly front to back, downward.  He was attempting to exit

03:13:26  6    the vehicle or he was taking cover from the defendant's

03:13:31  7    bullet.  What we know he wasn't doing, he wasn't faced this

03:13:38  8    way; wasn't faced this way; he was faced towards the door.  So

03:13:48  9    all this, he is reaching into the floor board, he is doing

03:13:53  10   this and that, no.  That bullet is all the way back here.  And

03:14:04  11   when it hit him in the C1, he couldn't do anything.  Couldn't

03:14:11  12   do anything.  And again, he is sitting like this.  How does he

03:14:21  13   magically knock the gear shift out?  He doesn't.

03:14:25  14        Again, ladies and gentlemen, the preponderance of the

03:14:35  15   evidence, what is more likely than not, okay.  They can throw

03:14:41  16   out all of these theories that they have no evidence for

03:14:45  17   whatsoever, okay.  None.  Not a single piece of evidence.

03:14:49  18   They don't have a single piece of evidence to support any of

03:14:54  19   these speculative theories that they have.  But when we look

03:14:58  20   at the objective facts, the physical evidence, which their own

03:15:02  21   expert tried to discount, it is clearly, clearly weighed

03:15:12  22   heavily, heavily in favor of the fact that the defendant

03:15:18  23   violated Philip's constitutional rights when he shot him in

03:15:25  24   the face.

03:15:29  25        The Jeep was not in gear, ladies and gentlemen.  Philip

should still be here.  Basic rules of policing that we have talked about.  Constitution of the United States of America, Fourth Amendment, the government cannot take a man's life without it being clearly established that he had that right. In fact, the law is set up to show what the defendant can't do, and he has a duty to know that law.  And in his policies, in the Marion County use of force policy, it makes all of this very, very clear.  Deputies of the Marion County Sheriff's Departments are permitted to use lethal force when the deputies reasonably believe that it is necessary to protect themselves or others from what they believe to be an imminent threat of serious bodily injury or death, okay.  Seriously bodily injury or death.

Madam Clerk, may I see Defendant's Exhibit 1?

Imminent threat, it's defined in their policy, That threat which is about to happen, immediate, and perceived to be unavoidable.  Perceived to be unavoidable.  That's what an imminent threat is, okay.  Thank you.

Now, they may want you to latch onto this, oh, they saw someone else down the road, or whatever, okay.  Doesn't matter.  Imminent threat.  Perceived to be unavoidable.  That means the threat that they are responding to is right now. It's going to happen unless they utilize deadly force.  That is the only time they are permitted to use deadly force.  And this -- these laws, what they do is they make them to be

03:18:30   1   aligned with constitutional requirements.  That's why when you
03:18:35   2   look at the prohibitions, and folks you are going to have that
03:18:39   3   with you.  It's going to go back there, and you are going to
03:18:42   4   be able to look at this.  You are going to be able to look
03:18:44   5   right at this policy.  Prohibitions, A deputy shall not
03:18:49   6   discharge a firearm under the following circumstances -- this
03:18:53   7   is *Tennessee v Garner*, right here -- to stop an individual on
03:18:58   8   the mere suspicion of a crime because the individual runs
03:19:01   9   away.  Moving vehicle absent exigent circumstances.  See,
03:19:10  10   that's why he has to claim even if the vehicle was moving, but
03:19:14  11   we know it wasn't, that he said exigent circumstances.  That
03:19:17  12   is why he used to buzz word up there.  But folks, that Jeep
03:19:21  13   wasn't moving.  To stop an individual on mere suspicion of a
03:19:30  14   crime, simply because the individual runs away.  It is
03:19:33  15   prohibited.  That is where Dukes of Hazard has it wrong.  You
03:19:38  16   can't shoot at them for running.  That is what *Tennessee v*
03:19:40  17   *Garner* was all about.  So you can't say, "Oh, well, I mean, he
03:19:46  18   just ran.  It's okay that he shot him.  That's all right."
03:19:51  19   No.  It is expressly prohibited under the use of force policy
03:19:58  20   and under the Constitution of the United States of America and
03:20:00  21   the law of the United States Supreme Court.  That's what
03:20:04  22   *Tennessee vs. Garner* stands for.  You can't shoot someone
03:20:07  23   because they had run.
03:20:10  24       Again, he made a mistake.  He is out in the country.  He
03:20:15  25   didn't stop when they tried to pull him over.  He got away, he

03:20:19   1   thought.  He is hiding at the gas well site and within seconds

03:20:26   2   he is dead.  Seconds of visual location of him.  The defendant

03:20:30   3   jumped out of his vehicle, doesn't even put it into park,

03:20:33   4   steps in front of it, fires seven shots.  He broke the most

03:20:40   5   basic rules of policing, and the most cardinal rules of the

03:20:45   6   United States of America contained in the Constitution.  They

03:20:52   7   are going to try everything that they can to take attention

03:20:57   8   off of that.  But do not forget Philip Rhoades is not on

03:21:02   9   trial.  The defendant is expressly not allowed to shoot him

03:21:07   10  because he ran, and if he did, then he is liable.  That is

03:21:14   11  where this story comes from, folks.  He has to claim the Jeep

03:21:18   12  is trying to run him over.  He knows he is not allowed to do

03:21:21   13  it.  It's in black and white.  That is Supreme Court law.

03:21:24   14  That is what governs him, and it is written in his own policy.

03:21:32   15      Folks, we had to get to here, okay.  All you are looking

03:21:38   16  at is, is it more likely than not that the Jeep was rapidly

03:21:42   17  accelerating and the defendant's bullets magically stopped it

03:21:45   18  and then somehow it got into neutral.  Or is it more likely

03:21:50   19  than not that he pulled in the gas well site, got so excited

03:21:56   20  that he found the guy that just ran, that he jumped out of the

03:21:56   21  car without putting it into park, stood up and killed him.

03:22:00   22  Killed him for fleeing, in violation of his policy.

03:22:04   23      Folks, we just had to get to the 50-yard line.  The Jeep

03:22:09   24  was in neutral.  No one has one sliver of evidence, not one

03:22:16   25  single piece of evidence, and you are not supposed to

03:22:20   1   speculate, folks.  You are supposed to take the evidence

03:22:23   2   presented at trial, and then decide based on the evidence

03:22:29   3   presented.  Nothing else.  The Jeep was still running 52

03:22:40   4   minutes after there was no one in it.  There is no ground

03:22:47   5   disturbance to support his theory or his story about tires

03:22:55   6   spinning and engine revving and all of that.  Corey didn't say

03:23:00   7   anything about tires spinning.  But the photographs show you

03:23:04   8   everything that you need to show.  Look at them closely.

03:23:13   9        The false testimony that you heard.  Ladies and

03:23:17  10   gentlemen, I don't know how you can trust a single word that

03:23:23  11   Corey Love said in his deposition that would support the

03:23:28  12   defendant's theory.  I don't know how you can trust a single

03:23:31  13   word of that.  When he was caught in three straight-faced lies

03:23:38  14   under oath.  Three lies, in black and white.  How can you

03:23:46  15   trust a single word that he says?

03:23:48  16        And then Mr. Faulkner, he sat here and lied to your face.

03:23:52  17   He has submitted that CV in countless cases.  He filled out

03:23:59  18   application for that very job.  It didn't say one place on his

03:24:05  19   reason for wanting to go there being 9-11, okay.  If he would

03:24:10  20   have gone and applied for that job in response to 9-11, of

03:24:16  21   course he would have put that on his application.  It's

03:24:19  22   because he was caught in a lie, and you could see it, I mean,

03:24:23  23   you judge the witness credibility.  That man has testified

03:24:27  24   hundreds of times, but you could see it; he was caught in a

03:24:30  25   lie.  Right here, right in front of you.  And to say that you

03:24:34    1    took a job in response to one of the darkest days in our

03:24:39    2    nation's history and most of our memory in recent years, and

03:24:43    3    to try and taunt that, when it's a flat out lie, that man has

03:24:52    4    no credibility.  In addition to what we have already talked

03:24:56    5    about, about all of his testimony.

03:24:57    6         And the timeline, ladies and gentlemen, the timeline is

03:25:02    7    very bad for the defendants.  Very, very, very, bad for the

03:25:06    8    defendant.  That's why they got so upset when we used very

03:25:10    9    simple math based upon their testimony and the radio

03:25:14   10    transmissions here at trial.  And then so what did they do?

03:25:17   11    They leave, they get their expert prepared.  You saw how mad

03:25:22   12    everyone was that he was using math to show that the defendant

03:25:26   13    couldn't be telling the truth.  Because it's very, very, very

03:25:31   14    bad for their case.

03:25:42   15         Ladies and gentlemen, if you were to return a verdict in

03:25:55   16    favor of the defendant because you are worried about his

03:26:02   17    career, or him, or his status in the community, or the

03:26:09   18    financial burden that an award to compensate for the death of

03:26:18   19    a 28 year old father of two, might cause him, your verdict

03:26:24   20    would be for the wrong reasons.

03:26:28   21         The only reason that you may find for the defendant in

03:26:35   22    this case is if he did nothing wrong.  And, ladies and

03:26:41   23    gentlemen, everything that we have seen here shows you that he

03:26:47   24    did something very wrong.  He violated the Constitution of the

03:26:52   25    United States of America.  He violated Supreme Court precedent

03:27:00  1    that was contained within his own policies.  He broke the

03:27:06  2    rules of policing.

03:27:08  3         Your job, ladies and gentlemen, is not forgiveness.  Your

03:27:18  4    function here is judgment.  Only God can forgive.  Your

03:27:28  5    function here is judgment.

03:27:34  6         Let's look at the verdict form for a moment.  We are

03:27:41  7    switching technology over, so it will just be a moment.  But

03:27:47  8    when you fill out this verdict form, here's exactly what you

03:27:50  9    have to do, okay.  You have to judge the defendant.  That's

03:27:58  10   what he is here for.  He is on trial today.  So when you fill

03:28:34  11   out this verdict form, okay, do you find that the plaintiff

03:28:41  12   has proven by a preponderance of the evidence what's more

03:28:46  13   likely than not, that the force used by Defendant David

03:28:53  14   Forsyth toward Philip Jontz Rhoades on August 2, 2017, was

03:28:58  15   excessive and objectively unreasonable.  The Jeep wasn't in

03:29:09  16   gear, ladies and gentlemen.  The Jeep wasn't moving.  And

03:29:15  17   that's the only question you have to answer.  Everyone told

03:29:20  18   you, if the Jeep wasn't moving, then this was objectively

03:29:25  19   unreasonable, by his own policies.

03:29:38  20        Mr. Prince told you that the hardest decision that you

03:29:44  21   will have to make in this section is damages, okay.  I am not

03:29:54  22   going to tell you what to put here, okay.  This is for you to

03:30:02  23   decide.  "Sorrow, mental anguish, and solace," okay.  What is

03:30:11  24   a life worth to everyone who lost that person?  And we will

03:30:17  25   talk a bit more about that in a moment.  "Pain and suffering

03:30:22  1    of Philip Jontz Rhoades," okay.  The last thing that he

03:30:29  2    experienced in his life was either attempting to exit his

03:30:38  3    vehicle, complying with the defendant if he gave commands, or

03:30:45  4    simply ducking fire.  And the very last moment of his life was

03:30:50  5    a bullet going into his face and in violation of the

03:30:56  6    Constitution of the United States of America.  "Loss of

03:31:04  7    services to society, protection, care and assistance of

03:31:08  8    Philip Rhoades."

03:31:10  9         Talk a little bit more about that.  At that point you

03:31:19  10   skip nominal damages.  Do you find that he was motivated by

03:31:26  11   evil intent or that his conduct involved a reckless or callous

03:31:32  12   indifference to the federally protected rights of

03:31:35  13   Philip Rhoades?  Yes.  A reckless or callous indifference.  He

03:31:42  14   knew what he was allowed to do and what he was not allowed to

03:31:46  15   do.  It was in his policy.  And by taking someone's life for

03:31:54  16   fleeing, that is a reckless indifference to the constitutional

03:32:00  17   rights of Philip Rhoades.  *Tennessee v Garner*.  You can't

03:32:05  18   shoot him just because he had run.  And again, this is a

03:32:16  19   question that you will have to answer.  Punitive damages are

03:32:20  20   for two purposes; one, to punish the defendant.  He has not

03:32:39  21   been punished for this.  And the Court told you and instructed

03:32:44  22   you if there was an effort to conceal or cover up his actions,

03:32:50  23   that is to be considered, ladies and gentlemen.  And without

03:32:54  24   question, what you have seen, and what has brought everyone

03:32:58  25   here is a coverup.  There is no question about it.  This was a

03:33:05  1   coverup.  He shot and killed the man in a vehicle in neutral

03:33:12  2   and knew what he did was wrong, and he tried to cover it up.

03:33:19  3       Now, let's talk about the defendant's questions, okay.

03:33:23  4   Why would the defendant ask Rick and Christy a single question

03:33:33  5   if they didn't do anything wrong?  Okay.  Because what you

03:33:37  6   have to understand, you first have to decide liability,

03:33:43  7   meaning did he do something wrong?  And then you look at this

03:33:49  8   part, damages, the testimony that you heard from Rick and

03:33:55  9   Christy, okay, that only related to damages.  What was the

03:34:02  10  loss suffered by his children?  How has this affected them?

03:34:09  11  What kind of effect has it had on Rick, his father?  What kind

03:34:12  12  of effect has it had on the family?  All of those questions

03:34:17  13  only have to do with damages.  So if the defendant knew he

03:34:24  14  didn't do anything wrong and truly believed that, why would

03:34:31  15  they sit up here and try and make Rick or Philip or anyone in

03:34:40  16  his family try to degrade their family, try to belittle them,

03:34:46  17  pry into every little detail in their life.  It's a desperate

03:34:50  18  attempt to try to save money, okay.  They are trying to

03:34:57  19  devalue someone's life, based on where they live, separated

03:35:08  20  from their children's mother.  Now, I will tell you, a word

03:35:13  21  that got thrown around a lot, almost like in a negative way,

03:35:17  22  which really affected some of us over here, defendant's

03:35:23  23  counsel kept using the word "trailer," like it was a bad word.

03:35:27  24  She really emphasized that word.  "Trailer, trailer."

03:35:32  25       Folks, myself, Mr. Hogan, Mr. Prince, we all spent some

03:35:43   1    or all of our childhoods living in a trailer.  Mr. Hogan here,

03:35:51   2    he was born in a trailer.  And as I stand here today, each of

03:35:57   3    the three of us, are ranked in the top two and a half percent

03:36:02   4    of attorneys in the state of West Virginia.

03:36:04   5            MS. DURST:  Your Honor, objection.

03:36:04   6            THE COURT:  Sustained.  Move on, Mr. Umina.

03:36:08   7            MR. UMINA:  The next questions that they asked, you

03:36:12   8    they asked about them being separated, okay.  So is the life

03:36:17   9    of a child whose parents are separated, okay, the life of

03:36:24   10   their father, their father's life is worth less now?  For

03:36:29   11   every single kid who is out there who is not in a nuclear

03:36:34   12   family, if their parent dies, is their parent's life worth

03:36:40   13   less now?

03:36:40   14           Now, I was trying to -- I have been thinking about it

03:36:47   15   for many years actually.  I have been looking into this case

03:36:52   16   since shortly after it happened because -- once we realized

03:36:59   17   and got into the lawsuit, I thought for a lot of years, how do

03:37:05   18   I talk to you about the loss of a father to a child?  Okay.

03:37:12   19   And I am going to tell you a story.  A story about my own

03:37:17   20   life.  That is my dad --

03:37:24   21           MS. DURST:  Your Honor, objection.

03:37:26   22           MR. UMINA:  Your Honor, I am allowed to tell a story.

03:37:27   23           THE COURT:  Based on the evidence in the case, Mr.

03:37:29   24   Umina.

03:37:29   25           MR. UMINA:  This is demonstrative, Your Honor.

| | |
|---|---|
| 03:37:32 | 1 |
| 03:37:34 | 2 |
| 03:37:40 | 3 |
| 03:37:46 | 4 |
| 03:37:54 | 5 |
| 03:37:57 | 6 |
| 03:38:01 | 7 |
| 03:38:04 | 8 |
| 03:38:09 | 9 |
| 03:38:13 | 10 |
| 03:38:18 | 11 |
| 03:38:24 | 12 |
| 03:38:28 | 13 |
| 03:38:33 | 14 |
| 03:38:38 | 15 |
| 03:38:42 | 16 |
| 03:38:43 | 17 |
| 03:38:45 | 18 |
| 03:38:49 | 19 |
| 03:38:50 | 20 |
| 03:38:52 | 21 |
| 03:38:55 | 22 |
| 03:38:58 | 23 |
| 03:39:02 | 24 |
| 03:39:14 | 25 |

THE COURT.  Overruled.  Get to the point.

MR. UMINA:  So this is my dad, okay.  This is me.
And this is the first fish I ever caught, okay.  Now, I
remember this day very well.  So I am -- my parents were
divorced.  I am down at my dad's.  At the time he is living
with one of his buddies from the Army down on the shores of
Alabama.  Me and my little brother were there, and we were
fishing off of a little dock, and I remember I was so excited,
you know.  I saw the pole hit.  I started yelling for my dad,
"Daddy, daddy," I was probably only about five years old,
okay.  He comes over, and we reel this fish in, and I was so
excited.  I kept telling him, "I caught dinner, I caught
dinner, daddy."  I was so excited.  And we go to the store,
grab a few things, go home.  I vividly remember seeing the
fish frying in the pan.  And before that, we had gone out in
the yard and --

MS. DURST:  Your Honor, objection.  I don't know what
this story is about, and how his father relates to the
evidence in this case.

MR. UMINA:  Your Honor, if I may.

THE COURT:  Wrap it up.  Overruled.  Get to the
point.  Second time.  Last warning.

MR. UMINA:  The point I am getting to, okay, ladies
and gentlemen, is these memories, okay.  Your Honor, I would
really like to finish this example.

03:39:18  1          THE COURT:  It's not based on the evidence, sir, so

03:39:20  2     it's not subject to proper closing argument.  Let's move on.

03:39:24  3          MR. UMINA:  Okay.  Folks, what they took from those

03:39:29  4     two little boys at the age of seven and nine, were their

03:39:35  5     memories, okay, memories of a father.  They will never, ever,

03:39:44  6     ever be able to create those.  For the rest of their lives,

03:39:53  7     every single time they would want to pick up the phone and

03:39:59  8     call their daddy, ask for advice, or just to be a father, at

03:40:08  9     the ages of seven and nine, that was taken away from them.

03:40:14  10         And Rick Rhoades, it's every parent's worse nightmare and

03:40:23  11     greatest fear to lose a child.  Anyone with kids knows that.

03:40:31  12     You would give your life for your child.  But Rick Rhoades had

03:40:38  13     to bury his son.

03:40:45  14         Did his son make a mistake?  He did, okay.  But he

03:40:52  15     doesn't deserve to die.  And the law specifically prohibited

03:40:56  16     the defendant from taking his life.

03:41:02  17         Ladies and gentlemen, I couldn't begin to tell you how to

03:41:07  18     value that, but because of the mistake that a 28 year old

03:41:12  19     made, on one day in August of 2017, his life isn't worth

03:41:20  20     nothing.  His life isn't meaningless.  He was 28 years old.

03:41:25  21     He made a mistake.  And the defendant violated the

03:41:30  22     Constitution of the United States of America and his own

03:41:33  23     policies when he took Philip's life.

03:41:39  24         You know, I saw this quote yesterday, yesterday, and it

03:41:46  25     just seemed so poignant for what brings us all here today.

03:41:53  1   This happened in 2017, okay.  After the investigation, the

03:42:00  2   case was filed in 2018; it has taken nearly four years to get

03:42:09  3   here to this moment in front of each and every one of you to

03:42:16  4   tell you this story.

03:42:22  5        Ladies and gentlemen, the Jeep was not in gear, okay.

03:42:31  6   The Jeep was not in gear.  Philip should still be here.

03:42:41  7        Thank you.

03:42:46  8            THE COURT:  Thank you, Mr. Umina.

03:42:47  9        It strikes me, ladies and gentlemen, that we should

03:42:50  10  probably take a ten-minute personal comfort break at this

03:42:55  11  point, so we will do that, which makes me go back on my word

03:42:59  12  that this would be the last time you heard me say this.

03:43:01  13  Please continue at this point to refrain from discussing the

03:43:05  14  case with anyone including amongst yourselves or in small

03:43:07  15  groups and anyone outside the jury.  Also, please continue to

03:43:10  16  refrain from any personal investigation efforts or independent

03:43:13  17  investigation efforts about this case or any issues related to

03:43:16  18  this case.  But with that said, we will take a ten minute

03:43:19  19  break, and we will resume for defendant's closing argument.

03:43:22  20  Thank you very much.

03:43:22  21        (Jury left the courtroom, and the following transpired in

03:43:45  22  open court.)

03:43:45  23            THE COURT:  Thank you all.  We will see you in few

03:43:47  24  moments.  Thank you.

03:43:47  25        (Break taken at this time 3:45 p.m. - 3:53 p.m.)

03:43:47  1        (The Jury entered the courtroom, and the following

03:53:32  2    transpired in open court.)

03:53:32  3        THE COURT:  Thank you very much, ladies and

03:53:33  4    gentlemen.  Please be seated everyone.

03:53:34  5        Ms. Durst.

03:53:35  6        MS. DURST:  Thank you, Your Honor.

03:53:51  7        May it please the Court, counsel.

03:53:53  8        Ladies and gentlemen of the jury, I want to thank you

03:53:57  9    again for serving here this week.  I know it's probably lasted

03:54:04  10   a little bit longer than we initially anticipated at the

03:54:07  11   beginning, but without jurors like you the plaintiff can't

03:54:12  12   file suit.  My client can't have someone decide, you know,

03:54:17  13   whether his actions make him responsible for the plaintiff's

03:54:21  14   claim in this case so for that, I thank you.  Thanks for the

03:54:25  15   attentiveness that you have shown.  I will tell you I have

03:54:29  16   been in trials where I have seen jurors nod off, and that

03:54:33  17   always makes the attorney who is presenting the case worry.

03:54:36  18   So again, I appreciate that.

03:54:38  19        I also want to reiterate that I do have the pleasure and

03:54:42  20   the honor of representing Defendant David Forsyth in this

03:54:46  21   case.  Regardless of the accusations that have been leveled

03:54:51  22   against him in this case, I welcome the opportunity to

03:54:57  23   represent him.

03:55:02  24        As the Court has instructed you, this case is supposed to

03:55:06  25   be decided on the evidence that you have heard in the

03:55:09  1    courtroom here today, well, throughout the week.  But I feel

03:55:14  2    compelled, ladies and gentlemen, to respond to a comment that

03:55:17  3    was made in plaintiff's counsel's closing argument with regard

03:55:21  4    to any references to a trailer, implying that I somehow look

03:55:28  5    down upon or think poorly or badly of someone who lives in a

03:55:35  6    trailer.  Rest assured, I do not.  And that is very offensive

03:55:40  7    to me because I too, grew up in a trailer.  So to the extent,

03:55:45  8    ladies and gentlemen, that there was some kind of implication

03:55:48  9    of questions that I asked during the course of this trial that

03:55:53  10   could somehow be cast negatively upon my client, I wanted to

03:55:59  11   make sure that I clarified that at this point in time.

03:56:05  12         Can we turn the monitor on, Madam Clerk?

03:56:29  13         This case, ladies and gentlemen, is a case about a

03:56:34  14   situation where David Forsyth had to make a split-second

03:56:41  15   decision to take action to protect himself, and what he

03:56:46  16   thought was potentially protecting Deputy Corey Love, because

03:56:50  17   he didn't know where Corey Love was at the time.

03:56:53  18         This is testimony from Dennis Root's deposition, and I

03:56:57  19   asked him this very same question on the witness stand, so you

03:57:00  20   heard his answer.  He would train any officer that he is

03:57:05  21   providing training for that hesitation will get you killed.

03:57:11  22         So what are we talking about, ladies and gentlemen?  You

03:57:14  23   have heard time and distance computations; you have heard 16

03:57:21  24   seconds; you have heard the radio traffic in this case.  What

03:57:25  25   I want to do is to remind you of a couple of the time -- or a

03:57:30  1    couple of entries from the radio traffic, and you are going to

03:57:35  2    have those to take back with you.  If you recall, we walked

03:57:38  3    Deputy Forsyth through what was occurring over the radio.

03:57:42  4    Let's go ahead and play the first, please.  And this, ladies

03:57:47  5    and gentlemen, is at 2:43:04 or 1443:04.

03:57:47  6         (Playing audio in open court.)

03:57:47  7         MS. DURST:  Let's play that one more time, Mr.

03:58:02  8    Carroll.

03:58:02  9         (Playing audio in open court.)

03:58:10  10   Q.   Let me stop here for one second.  This is at 2:43:04,

03:58:17  11   which is kind of the start of the 16 seconds that Mr. Root

03:58:21  12   spent hours telling you about.  He wants to take this entry

03:58:26  13   and tell you that at that point in time Deputy David Forsyth

03:58:32  14   was at the mouth of that bowl and that's -- or at the

03:58:36  15   beginning of the access road, and that's where the 16 seconds

03:58:39  16   starts.

03:58:40  17        What Mr. Faulkner has tried to convey to you here today

03:58:44  18   is that there is no way to know exactly where Deputy Forsyth

03:58:49  19   was on the access road, or where he was when he made that

03:58:55  20   transmission.  That's what Mr. Faulkner has tried to tell you,

03:58:59  21   is we know the transmission was made.  We know the time that

03:59:05  22   it was made.  We don't know the precise location of

03:59:10  23   Deputy Forsyth 's cruiser when the transmission was made.  But

03:59:14  24   Mr. Root wants to take that transmission, and say that is the

03:59:18  25   start of the 16 seconds, and then he had to travel down that

| | | |
|---|---|---|
| 03:59:22 | 1 | access road 212 feet.  We have no idea.  Deputy Forsyth |
| 03:59:28 | 2 | couldn't tell you exactly.  And you heard Mr. Faulkner, when I |
| 03:59:33 | 3 | asked him the question, a gentleman, by the way who has |
| 03:59:37 | 4 | 30 years in law enforcement who trains the trainers. |
| 03:59:41 | 5 | Deputy Forsyth attended the state police academy.  Mr. |
| 03:59:45 | 6 | Forsyth -- or Mr. Faulkner trains those people that train our |
| 03:59:49 | 7 | cadets at the West Virginia State Police Academy.  And what he |
| 03:59:53 | 8 | told you was if you are a police officer traveling down that |
| 03:59:57 | 9 | road in a high risk pursuit, you are not going to be looking |
| 04:00:05 | 10 | at your speedometer.  How fast am I going?  Am I going too |
| 04:00:09 | 11 | fast?  You are not going to be looking at exactly where a |
| 04:00:13 | 12 | vehicle is to give a precise measurement the day of or a |
| 04:00:20 | 13 | couple days after a stress-inducing event like a shooting |
| 04:00:25 | 14 | situation where he had no choice but to take the life of |
| 04:00:30 | 15 | another person to protect himself. |
| 04:00:32 | 16 | So we have this entry at 2:43:04 that we know at a |
| 04:00:38 | 17 | minimum Deputy Forsyth was in that area, because he said he |
| 04:00:43 | 18 | thought Mr. Rhoades' Jeep had cut down an access road. |
| 04:00:51 | 19 | (Playing audio in open court.) |
| 04:00:54 | 20 | I think one thing you can also tell, ladies and |
| 04:00:56 | 21 | gentlemen, you have the radio traffic. |
| 04:00:58 | 22 | Let's play that again, please. |
| 04:00:51 | 23 | (Playing audio in open court.) |
| 04:01:03 | 24 | When you listen to the other recordings where |
| 04:01:06 | 25 | Deputy Forsyth is reporting what is happening, listen to the |

|         |    |
|---------|----|
| 04:01:11 | 1 |
| 04:01:18 | 2 |
| 04:01:23 | 3 |
| 04:01:28 | 4 |
| 04:01:34 | 5 |
| 04:01:38 | 6 |
| 04:01:44 | 7 |
| 04:01:50 | 8 |
| 04:01:54 | 9 |
| 04:01:58 | 10 |
| 04:02:02 | 11 |
| 04:02:06 | 12 |
| 04:02:09 | 13 |
| 04:02:13 | 14 |
| 04:02:18 | 15 |
| 04:02:23 | 16 |
| 04:02:28 | 17 |
| 04:02:32 | 18 |
| 04:02:37 | 19 |
| 04:02:42 | 20 |
| 04:02:45 | 21 |
| 04:02:47 | 22 |
| 04:02:52 | 23 |
| 04:02:55 | 24 |
| 04:02:59 | 25 |

1  change in his voice.  Clearly that is, as has been conceded by
2  Mr. Root, as described by Mr. Faulkner, as testified to by
3  Deputy Forsyth, that is a stress-inducing, rapid evolving
4  event that a police officer is facing with, I think
5  Mr. Faulkner said a 4,400 pound vehicle coming at you, and at
6  that point in time remember what Deputy Forsyth heard over the
7  radio was Mr. Rhoades may be armed.  We don't look at this
8  case -- and the Judge gave you the instructions, and Mr. Root
9  even conceded -- you don't look at this case in hindsight.  We
10 don't Monday morning quarterback a police officer.  But that
11 is exactly what Dennis Root has tried do in this courtroom.
12 He went in and said, "Well, there was a ditch on this side,
13 and a steep embankment here, and a hill down" --
14 Deputy Forsyth did not know any of that information when he
15 pulled into that gas well site, but Mr. Root is trying to
16 Monday morning quarterback what actions Deputy Forsyth took,
17 even though he paid lip service and repeatedly said, "Well, I
18 look at it in the light most favorable to the police officer."
19 What a load of crap.  There is absolutely no way he looked at
20 this fact, the facts of this case, in the light most favorable
21 to the police officer.
22    So we know -- and what did Mr. Faulkner tell you -- we
23 know certain things.  We know the timing of the transmissions.
24 We know generally even the area where Mr. -- Deputy Forsyth
25 would have been at the time he said, "Marion, shots fired,

shots fired," and that's how his voice was.  He would have been in that area where the Jeep and the cruiser would have been.  We don't even know exactly where he would have been positioned when he made that transmission, but we know 16 seconds elapsed between when he said, "Cut up the trail" and when he said "Shots were fired."  It's easy for me to stand here and say, well, 16 seconds.

        As the Judge kind of described to you when he was reading the jury charge -- I followed along because I do better like visually if I can put something in context -- I tried to figure out how can I convey to you to understand how short a period of time 16 seconds would have been for Deputy Forsyth to take the actions that he did, facing a Jeep coming at him with a suspect at that time he believed to be armed.  So how can I show you what you can do or what little can be done in that 16 seconds?  And you bounce ideas off.  Mr. Carroll and I, we tried to figure that out.  Here is what I have been able to figure out.  I tried saying the Pledge of Allegiance. That's a little bit short of 16 seconds.  Let me tell you what I have figured out, and I have a timer here on my own, ladies and gentlemen, that I am going to set for 16 seconds, and if you -- I am not going to sing the alphabet for you, because I can't sing, but saying the alphabet is 16 seconds, and that is the amount of time that Deputy Forsyth had to make this decision.  I am getting ready to start the timer.  A, B, C, D,

04:04:57  1  E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V, W, X, Y,

04:05:09  2  and Z.  16 seconds, ladies and gentlemen.  That is what -- the

04:05:17  3  amount of time that Deputy Forsyth had from time -- at

04:05:20  4  whatever point in time he was going down that access road to

04:05:25  5  make a decision to protect himself.  16 seconds.

04:05:35  6      This is also from Mr. Root's testimony.  This is an

04:05:39  7  excerpt taken from his deposition, but I know he said it on

04:05:44  8  the witness stand because I asked him the same question:

04:05:46  9  "Would you agree with me that when dealing with a suspect

04:05:49  10  armed with a deadly weapon, fractions of a second can make the

04:05:53  11  difference between going home at the end of police officer's

04:05:56  12  shift, and having a law enforcement officer's funeral?"

04:06:02  13      "A hundred percent."

04:06:04  14      Flip to the next slide, please.  I asked Mr. Root also:

04:06:08  15  "Would you agree with me also in terms of a deadly weapon,

04:06:13  16  that a vehicle can be a deadly weapon?"  And his answer was

04:06:17  17  "Yes."  And we know a vehicle can be a deadly weapon, ladies

04:06:21  18  and gentlemen.  We heard in the news just over the last week

04:06:23  19  or so that a Capitol police officer was killed in D.C. with a

04:06:27  20  vehicle by a suspect, so we know it is possible.

04:06:30  21          MR. UMINA:  Objection, Your Honor.  Move to strike

04:06:31  22  that.

04:06:32  23          THE COURT:  Sustained.  Stay within the confines of

04:06:36  24  this case, Ms. Durst.

04:06:37  25          MS. DURST:  Mr. Root testified that police officers

04:06:39  1    are killed quite frequently by vehicles driven by suspects

04:06:44  2    trying to flee.  So we know -- and that is one of the facts

04:06:48  3    that Mr. Faulkner told you we know, without a doubt, that

04:06:53  4    Philip Rhoades was in the Jeep.

04:06:57  5         Okay.  So let's talk about this case.  Mr. Root tried to

04:07:02  6    focus on what he claimed to be inconsistencies, and that was a

04:07:07  7    large focus of the opening statement that was done by

04:07:12  8    plaintiff's counsel in this case as well.  All these

04:07:15  9    inconsistencies and the things that they were going to show

04:07:18  10   you.

04:07:20  11        Okay.  In the opening statement, and I have written this

04:07:23  12   quote down, they didn't call him Deputy Forsyth, they said the

04:07:29  13   defendant's mind was made up when he drove down that road.

04:07:32  14   That was in the opening statement what evidence was presented

04:07:37  15   to you by the plaintiff in this case that, Deputy David

04:07:43  16   Forsyth made his mind made up when he drove down that road?

04:07:47  17   Absolutely zero.  The actual evidence in this case

04:07:52  18   David Forsyth testified he had no professional or personal

04:07:57  19   dealing with Philip Rhoades at any point in time.  Before

04:08:01  20   August 2 of 2017.  So there was a representation made in

04:08:05  21   opening statements that Deputy Forsyth's mind was made up when

04:08:10  22   he drove down that road.  No evidence supported by the

04:08:15  23   plaintiff's case at all.

04:08:20  24        Another statement made by plaintiff's counsel in opening

04:08:23  25   statement directed specifically toward Deputy Forsyth, "If he

04:08:28  1    thought the killing was justified, why not just tell

04:08:31  2    Lieutenant Branham what happened the day of the incident?"

04:08:35  3    That was raised by plaintiff's counsel, and there was a big

04:08:37  4    focus on that in the opening statement.

04:08:44  5        Mr. Root's testimony, please.

04:08:46  6        And the reason I want to show you this testimony, ladies

04:08:48  7    and gentlemen, is because this is the same testimony that I

04:08:51  8    went over with Mr. Root in this case.

04:08:53  9            MR. UMINA:  Your Honor, I object to her taking public

04:08:56  10   deposition testimony at this time in the trial.

04:09:01  11           MS. DURST:  Your Honor, this is same questions that I

04:09:03  12   asked Mr. Root in the examination.

04:09:06  13           THE COURT:  Overruled, but we need to focus on the

04:09:09  14   evidence in the case, not on discovery materials, please.

04:09:12  15           MS. DURST:  In Mr. Root's trial testimony, which is

04:09:15  16   consistent with his deposition testimony, he testified that he

04:09:19  17   had no issue with the timing of the statements.  He also told

04:09:23  18   you that an individual like Deputy Forsyth or Deputy Love in a

04:09:30  19   high stress-inducing event could have, he said, suffered

04:09:36  20   physiological or psychological effects, that they could forget

04:09:41  21   things for a period of time, and he even told you that they

04:09:46  22   could forget things forever.  Why do I bring that up?  Because

04:09:52  23   we are also going to talk about these alleged inconsistencies

04:09:56  24   with regard to Deputy Love and Deputy Forsyth, but in the

04:10:00  25   opening statement -- let's go back to the other slide.

04:10:04  1        In the opening statement they said, "If Deputy Forsyth

04:10:09  2   thought that the shooting was justified, why not talk to

04:10:12  3   Trooper Branham at that point in time?"  Their own expert

04:10:16  4   concedes he should not have done that.  There is nothing wrong

04:10:19  5   with the timing of when they gave the statements.  He even

04:10:21  6   said they should have gone with an attorney.  So there is

04:10:24  7   absolutely nothing wrong with the timing of when they gave the

04:10:27  8   statements, despite the fact that it was raised in opening

04:10:30  9   statement that there must be something -- if he thought it was

04:10:33  10   justified, why not talk about it at that point in time.

04:10:39  11        In the opening statement it was mentioned that

04:10:42  12   Deputy Forsyth and Deputy Love colluded in their statements to

04:10:46  13   Lieutenant Branham.  That was also raised by plaintiff's

04:10:49  14   counsel in the opening statement.  Well, the evidence

04:10:52  15   presented, Mr. Root spent hours and hours telling you why he

04:10:57  16   thought that there were inconsistencies.  So they colluded,

04:11:04  17   but their statements are inconsistent.  That in and of itself,

04:11:08  18   ladies and gentlemen, is an inconsistency right there.  If you

04:11:11  19   have two police officers who are going to collude and get

04:11:14  20   their statements straight, well, that is not at all what

04:11:19  21   Mr. Root says the statements say.  He says that there are

04:11:22  22   always internal inconsistencies between the statements.

04:11:26  23        So again, there is a focus on supposed inconsistencies in

04:11:32  24   the statements to Lieutenant Branham.  But Mr. Root says,

04:11:37  25   "Well, they colluded."  Now apparently, we are hearing in

04:11:40  1    closing argument today that there was this big conspiracy,
04:11:45  2    there was collusion.  Apparently, the state police must have
04:11:48  3    been colluding with Deputy Forsyth as well.
04:11:53  4         Let's talk about Lieutenant Branham.  Lieutenant Branham
04:12:00  5    came in and testified, that consistent with his investigation
04:12:04  6    the Jeep was running and in gear.  So the plaintiffs have
04:12:09  7    latched ahold of that and said it had to have been in neutral
04:12:13  8    when Deputy Forsyth fired his weapon.  There is no evidence of
04:12:17  9    that.  That is pure speculation.  They have introduced no
04:12:22  10   evidence that the Jeep was actually in neutral at the time
04:12:25  11   that it was fired.  I think everyone concedes, with the
04:12:31  12   exception of Lieutenant Branham not understanding how a manual
04:12:33  13   transmission works.  He conceded that the Jeep was running,
04:12:38  14   and as he has now learned, it had to have been in neutral at
04:12:42  15   the time he arrived.
04:12:44  16        Now, so plaintiff likes Lieutenant Branham for that.
04:12:51  17   That -- okay, the Jeep was running, so it was running; it had
04:12:55  18   to be in neutral.  We like that part of it, but all the other
04:12:59  19   parts of Lieutenant Branham's testimony, we try to discount or
04:13:03  20   ignore.
04:13:06  21        Lieutenant Branham was called in plaintiff's case in
04:13:08  22   chief.  He was their witness.  They want you to believe him
04:13:11  23   when he says the Jeep was running, but they ignore his other
04:13:15  24   testimony.  What other testimony?  He testified that he, even
04:13:20  25   though he has a recollection of, you know, arranging the

04:13:24  1   statements, who he called, and taking the statements, he asked

04:13:31  2   each, Deputy Forsyth and Deputy Love, questions.  He testified

04:13:35  3   under oath on the witness stand that he didn't believe that

04:13:38  4   there were any inconsistencies in their testimony -- or in

04:13:41  5   their statements.

04:13:42  6       He also testified that even though they came in with a

04:13:46  7   prepared statement, that he had the opportunity to ask them

04:13:49  8   questions.  There were no questions they refused to answer,

04:13:53  9   whatsoever.  And that if he had felt that there was additional

04:13:58  10  information that he needed, he would have asked and followed

04:14:03  11  up.  He then also testified that based on his investigation,

04:14:10  12  which included going to the scene, the photographs that he

04:14:13  13  took, the statements that he took, listening to the 911 radio

04:14:17  14  traffic, again, that you will hear, or can you take back to

04:14:20  15  the jury room with you at a minimum, that he did not find any

04:14:26  16  evidence in his investigation to contradict Deputy Forsyth's

04:14:32  17  description of the events that occurred.  And what does that

04:14:36  18  mean?  He didn't find any evidence that the Jeep was not

04:14:39  19  moving at Deputy Forsyth at the time he discharged his weapon

04:14:43  20  on August 2nd of 2017.

04:14:45  21      And if you remember, I asked deputy -- or excuse me,

04:14:49  22  Lieutenant Branham about how he went about preparing his

04:14:52  23  report, who he submitted it to.  He testified that he had to

04:14:55  24  prepare it.  It then gets submitted to the district commander.

04:14:59  25  And then if the district commander thinks there is additional

04:15:02  1    information, then he will ask that the lieutenant add

04:15:05  2    additional information.  There could be a supplemental report.

04:15:09  3    Even after, you know, being deposed in this case in 2019, and

04:15:13  4    having questions asked of him by plaintiff's counsel in this

04:15:17  5    case, Lieutenant Branham testified that there has been no

04:15:21  6    revision to his investigation into this incident, and that the

04:15:29  7    information that he had still supported his finding that there

04:15:33  8    was no evidence to contradict Deputy Forsyth's and Deputy

04:15:37  9    Loves' description of what happened at that gas well site.

04:15:45  10          There was some mention in closing argument by opposing

04:15:49  11   counsel that -- they showed you the picture of the gear shift,

04:15:53  12   and said, "Well, if he fell forward, the gear shift would have

04:15:57  13   had to have been pushed forward."  We don't know what gear the

04:16:02  14   Jeep was in.  That is pure, again, speculation.  As Mr.

04:16:09  15   Faulkner said, he would not speculate.

04:16:13  16          Another point that was made, and I want to touch upon it

04:16:17  17   at this point in time, with regard to the Jeep.  They

04:16:20  18   indicated -- Mr. Umina showed you what he described to be the

04:16:26  19   trajectory, and said, well, he had to be ducking this way for

04:16:28  20   cover.  I want you to remember, Dr. Savasman was on the

04:16:32  21   witness stand, the deputy medical examiner.  My co-counsel,

04:16:37  22   Mr. Carroll, asked him questions if he would be able to tell

04:16:39  23   what the path of -- or trajectory of the bullet was.  The only

04:16:44  24   medical person that we heard could not tell you.

04:16:47  25          Mr. Root is not an expert in the path of trajectory of a

04:16:51    1    bullet.  There has been no evidence in this case to show you

04:16:54    2    how the path of that bullet traveled.  What Deputy Forsyth

04:16:58    3    told you, he did not tell you that Mr. Rhoades was looking

04:17:04    4    straight ahead, or he did not tell you that he was leaning

04:17:06    5    down at the time he discharged his weapon.  What he said was,

04:17:10    6    I saw him leaning down what looked like toward the console or

04:17:15    7    the floorboard and he popped back up.

04:17:19    8        Again, there is no person that has testified in this

04:17:25    9    courtroom that can you tell you how Mr. Rhoades was looking,

04:17:30   10    and how he was positioned at the time the bullet struck him.

04:17:36   11    Again, what Mr. Faulkner has said is a lot of this is

04:17:41   12    speculation because of things that we don't know.  What we do

04:17:45   13    know is that -- I think he said repeatedly throughout his

04:17:51   14    testimony, we know the final resting position of the Jeep.  We

04:17:54   15    know the final resting position of the cruiser, and we know

04:17:57   16    like the point of the access road, but even that, that depends

04:18:03   17    on where you start the measurement.  So again, it's been

04:18:09   18    speculative on the part of the plaintiff in this case.  We

04:18:16   19    also talked about -- again, Mr. Faulkner, and nobody can tell

04:18:22   20    you how the Jeep ended in neutral.  I can't tell you.  I wish

04:18:30   21    I could.  Can't tell you how it specifically ended up in

04:18:34   22    neutral, but we know -- and Deputy Forsyth testified he has

04:18:39   23    had a stick shift, learned to drive on manual a transmission,

04:18:43   24    and a manual transmission can be kicked out of gear without it

04:18:48   25    being pushed in.  It is very, very, very hard to get it in

04:18:51  1   gear without the clutch pushed in.  You can do it, but you

04:18:55  2   have to have the RPMs just right, but to have a manual

04:19:00  3   transmission kicked out of gear, you don't have to have the

04:19:03  4   clutch depressed.  What Deputy Forsyth described for you is

04:19:06  5   when he got to the Jeep, Mr. Rhoades was slumped over the

04:19:10  6   console, slumped over where the gear shift was.  Can I tell

04:19:15  7   you that that is exactly how the gear shift ended up out of

04:19:21  8   gear, in neutral?  Wish I could.  Could he have been in the

04:19:26  9   process of shifting gears?  We know Deputy Forsyth has

04:19:31  10  described hearing the engine rev, and I think he even said at

04:19:34  11  one point he got on the gas.  We don't know if he was in the

04:19:36  12  middle of shifting gears and driving toward Deputy Forsyth at

04:19:41  13  the time that he was struck with the bullet.  We just don't

04:19:45  14  know.  And that's what Mr. Faulkner repeatedly said.  There

04:19:48  15  are only some finite things that we know in this case, a lot

04:19:53  16  of it is unknown.  But Mr. Root wants to come in and tell you

04:19:57  17  that all these things are known and it's scientific fact, and

04:20:02  18  it just isn't, ladies and gentlemen.

04:20:08  19       With regard to the Jeep moving, it also came up on the

04:20:12  20  PowerPoint that plaintiff's counsel had, is that the medical

04:20:16  21  examiner testified that Mr. Rhoades was paralyzed

04:20:21  22  instantaneously.  They tried to get him to say that, but if

04:20:25  23  you recall, Dr. Savasman wouldn't say that.  He said, it is

04:20:29  24  very, very likely, but he wouldn't say that it was absolute.

04:20:34  25  What he said, and if you remember he made some kind of

04:20:37   1    comment, you can shoot in the sky and maybe hit a bird.  He

04:20:41   2    made a comment like.  That he could not say with absolute

04:20:47   3    100 percent certainty that Mr. Rhoades would have been

04:20:49   4    immediately paralyzed when he was struck with the bullet.

04:20:53   5    They want you to take Dr. Savasman's testimony and say that he

04:20:57   6    was paralyzed instantaneously, and couldn't move his arms or

04:21:03   7    legs.

04:21:05   8        There is kind of like another point to that, then.  Okay.

04:21:08   9    Dr. Savasman also said I believe that when he would have --

04:21:13   10   the bullet would have lacerated his spine, his body organs

04:21:18   11   would have shut down.  Think about that.  Can't have it both

04:21:22   12   ways.  If he is paralyzed he can't move, and his vital organs

04:21:30   13   shut down, he can't move the Jeep.  But then talking about the

04:21:34   14   pain and suffering that they are trying to claim that he

04:21:38   15   experienced, you can't have it both ways, ladies and

04:21:40   16   gentlemen.  And Dr. Savasman said he can't tell you with

04:21:45   17   100 percent certainty that he was paralyzed instantaneously.

04:21:50   18   It is very, very likely, but we don't have the burden to prove

04:21:54   19   that he was.  That is part of the theory of their case that he

04:21:57   20   was paralyzed instantaneously and therefore couldn't shift the

04:22:02   21   gear.  He wouldn't have had to have been -- he wouldn't have

04:22:05   22   had to shift the gear if he was slumped over and knocked the

04:22:10   23   Jeep out of gear in the first place.

04:22:16   24       Let's talk about the rest of the story then.  We have

04:22:18   25   talked a little bit about Lieutenant Branham.  We have touched

04:22:22   1     upon the inconsistencies.  There are no inconsistencies in

04:22:30   2     this case, ladies and gentlemen, between Deputy Forsyth's and

04:22:34   3     Deputy Love's statements.  Why do I say that?  Well, Mr. Root

04:22:39   4     conceded that people witnessing the same event can have a

04:22:45   5     different recollection.  Could be in part because of their

04:22:50   6     positions of what they were seeing, where they were situated

04:22:54   7     at a specific point in time.

04:22:56   8         We know in this case that Deputy Forsyth would have been

04:22:59   9     exiting his cruiser on the driver's side, so he would have had

04:23:03   10    a view of what was happening there.  We also know that he was

04:23:06   11    trying to get to the rear of the cruiser, which unfortunately

04:23:09   12    didn't happen because the cruiser was not in gear and

04:23:13   13    continued to move forward.

04:23:14   14        We know Deputy Love would have been exiting the cruiser

04:23:18   15    on the passenger's side.  He would have had a different view

04:23:21   16    and a different vantage point.  You have seen the pictures of

04:23:25   17    the cruiser.  It's an SUV, so it would impair someone's

04:23:29   18    ability to see over the top of the cruiser.  So it's going to

04:23:33   19    affect what Deputy Love sees versus what Deputy Forsyth was

04:23:37   20    seeing at the time.  No inconsistencies.

04:23:42   21        I talked with Mr. Root about who located the access road.

04:23:46   22    He tried to say that there was an inconsistency between their

04:23:50   23    statements because Deputy Love said he is the one that located

04:23:54   24    the access road, but then he said Deputy Forsyth said he is

04:23:58   25    the one that did.  If you remember, I had him pull out

04:24:02   1   Deputy Forsyth's statement.  Deputy Forsyth never said he

04:24:06   2   located the access road.  He said there was an access road to

04:24:09   3   the right or whatever.  He never said he located the access

04:24:13   4   road.  Mr. Root was interpreting that to mean Deputy Forsyth

04:24:18   5   said he located the access road, and then he wants to use that

04:24:22   6   interpretation to support some claim that there is an

04:24:25   7   inconsistency between their statements.  There isn't.

04:24:31   8        There is no evidence to contradict Deputy Forsyth's and

04:24:37   9   Deputy Loves' description of the event.  And again, Trooper

04:24:42  10   Branham indicated that if he had seen any such

04:24:45  11   inconsistencies, he would have noted that in the report that

04:24:49  12   he prepared.  He did not note any inconsistencies.

04:24:53  13        And we talked about the photos of the ground disturbance.

04:24:56  14   Now, I want to touch on those for a second.  I wasn't trying

04:25:01  15   to trick you.  There are photos.  There was an argument in

04:25:05  16   this case that there are no photos showing any ground

04:25:08  17   disturbance.  Clearly there are.  I think what Mr. Faulkner

04:25:14  18   told you is, we can't say.  Could the Jeep have caused it?

04:25:19  19   Maybe.  Could one of the other vehicles in there caused that?

04:25:23  20   Maybe.  Don't know.  And that's what he kept saying.  We don't

04:25:27  21   know.  But to argue that there is no evidence of any ground

04:25:33  22   disturbance in those photographs is just completely contrary

04:25:37  23   to the photographs, including the photographs that we

04:25:39  24   introduced that were not introduced to you by the plaintiffs

04:25:42  25   in this case.

04:25:46  1       So then let's talk about Corey Love.  They told you in

04:25:50  2  the opening statement that they would show Corey Love lied.

04:25:54  3  Well, a lot of lies is about Trooper Branham contacting him

04:25:59  4  about giving a statement.  Corey Love testified, and you saw

04:26:04  5  his deposition played here by way of video.  He testified in

04:26:10  6  September of 2019, "Not that I can remember, no."  He didn't

04:26:15  7  say "No."

04:26:17  8       Not that I can remember.  How many times do we all answer

04:26:20  9  a question like that; not that I recall, not that I remember?

04:26:24  10  You are not saying with 100 percent certainty that that

04:26:28  11  absolutely did not happen.

04:26:32  12       Does it really matter, ladies and gentlemen?  They gave

04:26:35  13  their statements separately.  Whether you believe the

04:26:40  14  plaintiff's version that they tried to collude.  They gave

04:26:43  15  statements separately, answered direct requests proposed to

04:26:49  16  them by then a sergeant with the West Virginia State Police

04:26:53  17  who said, "If I had any additional questions I could have

04:26:56  18  asked them."  And he found no inconsistencies with the

04:26:59  19  statements.

04:27:01  20       Corey Love, he was asked whether he washed his hand or

04:27:04  21  not after the incident.  Has there been any dispute presented

04:27:12  22  to you in this case that Corey Love discharged the weapon?

04:27:15  23  That is the purpose of the gunshot residue test, is whether he

04:27:19  24  washed his hands or not.  There has been no question, no

04:27:21  25  dispute in this case, that it was Deputy Forsyth who

discharged his weapon.  Focusing on something like that, ladies and gentlemen, is red herring.  Corey Love, whether he remembered or not, again, this deposition where he testified that was played to you, was taken two years after the fact at a time when he was no longer with the sheriff's department. He was in Georgia.  He was down there.  He had gone down there and I think he was working at the YMCA at the time.  No reason to make something up about whether he washed his hands or he didn't wash his hands.  Yeah, it might make sense in this case if there was an issue in this case as to who actually fired the weapon.  There is no question about that in this case at all.

     Something else, if you recall I went over this with Mr. Root in his deposition, that there was this supposed inconsistency that Deputy Forsyth -- or excuse me -- Deputy Love never described any movement of the Jeep at all, period, until Deputy Forsyth exited the cruiser.  And if you remember, I had to get Mr. Root to pull the transcript out finally, because what Deputy Love described, he said, "As soon as we pulled in, the Jeep started -- it started coming out."  There is no inconsistency with regard to his testimony.  He never said the Jeep was stopped, like they represented, like Mr. Root represented.  He said, as soon we pulled in, it, or the Jeep, started coming out.

     I went over it with Mr. Root then, that part of the

810

04:29:08   1   reason he believed there was a conflict between Deputy -- I
04:29:14   2   think I have it actually right here -- that he thought there
04:29:16   3   was a conflict between Deputy Love's and Defendant Forsyth's
04:29:21   4   statement is that Deputy Love had not described the Jeep as
04:29:23   5   moving at any point in time.  On the witness stand, I finally
04:29:28   6   got him to concede that Deputy Love described the Jeep's
04:29:31   7   location as being about 10 to 15 feet off the left side, and
04:29:36   8   "As soon as we pulled in, he started coming out."  He read
04:29:39   9   that from the statement, finally after going back and forth
04:29:43  10   with him over that, he finally conceded that.
04:29:47  11       So despite Mr. Root's opinion that Deputy Love had not
04:29:51  12   described the Jeep moving at any point in time before
04:29:55  13   Deputy Forsyth exited the cruiser, Deputy Love actually did
04:29:59  14   tell, then sergeant, now Lieutenant Branham, that as soon as
04:30:04  15   they pulled into the site, that Jeep started coming out.
04:30:10  16       Differences in statements does not equal inconsistencies.
04:30:14  17   And again, I went through all these questions with Mr. Root.
04:30:17  18   A conflict in how a person describes an event, versus how
04:30:22  19   another person described that same event, can depend upon the
04:30:26  20   position --
04:30:26  21       MR. UMINA:  Your Honor, I am going to object.  We
04:30:27  22   don't know if this -- specifically how these questions were
04:30:31  23   asked and answered during the trial.
04:30:32  24       THE COURT:  It's up to the jury to recall that.
04:30:34  25    You may proceed.

04:30:35  1          MR. UMINA:  Absolutely, Judge.

04:30:37  2          MS. DURST:  Mr. Root testified that in a conflict and

04:30:40  3    how a person describes an event versus how another person

04:30:44  4    describes that same event, as we just talked about, can depend

04:30:48  5    upon the position of each person in relation to the event that

04:30:52  6    he or she is witnessing.

04:30:53  7          So if you have one person standing in one location and

04:30:57  8    another person standing in a separate location, what each

04:31:00  9    person sees could be different.  It could also depend upon the

04:31:03  10   memory of each person, and that following, as we talked about,

04:31:06  11   a high stress event, like a shooting, it is not uncommon for a

04:31:11  12   person not to remember certain things occurring at all.

04:31:20  13         Corey Love testified in trial by way of video.  He was

04:31:25  14   asked with regard to what he was feeling, what he saw.  He

04:31:33  15   candidly admitted he did not see Deputy Forsyth fire his

04:31:38  16   weapon.  He is going to make something up to help

04:31:45  17   Deputy Forsyth?  He would make something up to say I saw him?

04:31:51  18   He said, I didn't see him fire his weapon.  What he saw was,

04:31:56  19   he said, from the middle to the back of the Jeep moving

04:32:00  20   forward.  That is what he was able to see from his

04:32:03  21   perspective, and that's what he described to you.  And what he

04:32:07  22   described was that he thought Dave, Deputy Forsyth, was going

04:32:13  23   to die.  That's what he was seeing from the perspective that

04:32:17  24   he had with a Jeep from the middle to the back moving forward

04:32:22  25   in what he believed was Deputy Forsyth's direction.

04:32:29   1        Let's talk about Deputy Forsyth.  They told you in the
04:32:32   2   opening statement that they would show that Deputy Forsyth
04:32:36   3   lied.  And they talked about the lies in regard to the
04:32:42   4   circumstances of his statement that he gave to Lieutenant
04:32:45   5   Branham.  They had Deputy Forsyth on the stand, and they never
04:32:51   6   asked him a single question about anything that occurred after
04:32:54   7   the shooting.  Not one.  Not if he asked Lieutenant Branham to
04:33:02   8   give a statement with Corey Love.  Didn't ask anything about
04:33:09   9   how his written statement came about.  Never asked any of
04:33:12   10  those questions at all of Deputy Forsyth on that witness
04:33:16   11  stand.  They wanted to rely on deposition testimony to
04:33:20   12  establish that he lied somehow.  They spent quite a bit of
04:33:26   13  time cross-examining him on that witness stand and never asked
04:33:29   14  a single question about anything that occurred.  They didn't
04:33:33   15  ask about if he is the one that took Mr. Rhoades out of the
04:33:36   16  Jeep or took Mr. Rhoades out of Jeep.  They didn't ask any of
04:33:41   17  those questions.
04:33:42   18       They also put the use of force policy up there.  Not a
04:33:47   19  single question asked of Deputy Forsyth with regard to the use
04:33:50   20  of force policy at all.  Not one question.
04:33:55   21       So another thing with regard to Deputy Forsyth, in the
04:34:00   22  opening statement by plaintiff's counsel, there was a
04:34:03   23  statement made -- or it may have been in questioning of
04:34:06   24  Deputy Forsyth -- that he saw this Jeep go by and he just
04:34:13   25  pulled out and started following it.  Ladies and gentlemen, we

04:34:17  1   know, that is something we do know, that did not happen.  It

04:34:23  2   was over the radio, that the Marion County Sheriff's

04:34:26  3   Department was in pursuit of what was believed to be a black

04:34:29  4   in color, soft top, Jeep Wrangler with an individual who was

04:34:34  5   believed to be armed.  And then Deputy Forsyth was traveling

04:34:37  6   on Route 250 near North Marion in that area, and sees a Jeep

04:34:43  7   matching that description.  If you remember, he radios.  He

04:34:47  8   asks, I think it's Deputy Mundell, if he passed a Jeep.

04:34:52  9   Deputy Mundell said, "Negative".  Deputy Forsyth apparently

04:34:55  10  didn't hear him, asked him again, and you can hear in the

04:35:00  11  radio traffic, "I said negative."  So Deputy Forsyth knew the

04:35:04  12  Jeep had not gone in that direction.  He sees this black Jeep,

04:35:10  13  starts to participate in the pursuit that was already active

04:35:16  14  by the Marion County Sheriff's Department.  He didn't just see

04:35:18  15  a Jeep driving by and then decide to follow it.  There was

04:35:23  16  radio traffic that indicated that there was already a pursuit

04:35:25  17  in progress, and he, as Mr. Faulkner testified to, he did his

04:35:32  18  duty and assisted in that pursuit.

04:35:38  19       As the Judge has said, you have to decide this case based

04:35:45  20  on the objective reasonableness of Deputy Forsyth's actions on

04:35:49  21  August 2nd, not with hindsight in what was learned after the

04:35:55  22  fact.  It is, what was known at that time, was

04:35:58  23  Deputy Forsyth's actions reasonable or not?  So you have to

04:36:12  24  walk in his foot path, ladies and gentlemen, okay.  Let's walk

04:36:17  25  down -- let's go down that path.  You know that you are

04:36:21  1   pursuing a Jeep that has an individual who may be armed.  You

04:36:28  2   pull into -- you go down this access road that -- we have seen

04:36:33  3   the photographs.  You pull into what has been described as the

04:36:37  4   mouth of the bowl.  You pull into the opening to that gas well

04:36:41  5   site.  You see a Jeep.  Immediately, as you start to pull in,

04:36:47  6   the Jeep starts to come out and almost hit your cruiser.  You

04:36:54  7   then see the Jeep start to do a three-point turn.  You get of

04:37:01  8   your cruiser.  Give audible commands.  "Get out of the

04:37:07  9   vehicle, stop the vehicle, show me your hands; stop the

04:37:10  10  vehicle, show me your hands."  The individual in the Jeep,

04:37:15  11  that we know is Mr. Rhoades, doesn't comply.  You continue to

04:37:20  12  give those commands; "stop the vehicle, show me your hands."

04:37:27  13  He does not comply.  "Stop the vehicle, show me your hands."

04:37:35  14  And all the while you thought you would have cover from your

04:37:40  15  cruiser, didn't get in park, so it continues to move, so you

04:37:44  16  are now in this open area exposed.  You have given the suspect

04:37:50  17  commands, "Stop the vehicle, show me your hands."  Bam!  The

04:37:57  18  Jeep comes at you.  Now I ask you:  In that circumstance,

04:38:04  19  would you have fired your weapon?  That is what you have to

04:38:07  20  decide.

04:38:07  21       You have to put yourself in Deputy Forsyth's foot path

04:38:11  22  and make a decision as to whether his conduct was objectively

04:38:16  23  reasonable on August 2nd in light of all that information.

04:38:26  24       So I don't even know where to begin with Mr. Root.  He is

04:38:33  25  a law enforcement officer who says he has 27 years of

04:38:37  1     experience and apparently didn't know how to figure out how

04:38:43  2     the radio traffic worked; it was in reverse order, and I had

04:38:46  3     to figure it out, and it was all chopped up.  That's exactly

04:38:51  4     the way that he listened to it, ladies and gentlemen.  That's

04:38:54  5     the way it was provided in the course of this case.  To say

04:38:58  6     that he didn't know that information until he heard it here

04:39:03  7     with Deputy Forsyth from the witness stand is completely and

04:39:07  8     utterly ridiculous.

04:39:12  9         He also said that, well, we know that Mr. Rhoades wasn't

04:39:17  10    going to take that Jeep up the embankment.  Really?  How in

04:39:23  11    the world could he sit there with a straight face and say that

04:39:26  12    he knew that Mr. Rhoades wasn't going to take that Jeep up the

04:39:30  13    embankment?  No one knows.  But to sit here and tell you

04:39:35  14    that -- so the reason he is saying that is that, well, the

04:39:40  15    exit where the -- back out to the access road, that is the

04:39:44  16    only way out.  We don't know that.  We have no idea of knowing

04:39:51  17    that, and again, that is what Mr. Faulkner was trying to tell

04:39:54  18    you, that he is not going to speculate about some of these

04:39:58  19    things that Mr. Root speculated about.

04:40:02  20        The photograph of the tire print.  Remember, I went over

04:40:05  21    that with him?  It's the one I think you have in evidence.  He

04:40:10  22    said, well, it shows a clearly defined tire pattern.  It

04:40:16  23    couldn't have been going that fast, so couldn't have been made

04:40:20  24    by the cruiser.  Well, we know that the ambulance went in

04:40:25  25    there because we know that by the time Lieutenant Branham

816

04:40:28  1    arrived, Mr. Rhoades had already been taken from the scene.

04:40:34  2    The ambulance is going to take all their supplies, carry them

04:40:37  3    down that access road?  Ambulance went in there.  We have no

04:40:41  4    idea -- again, what Mr. Faulkner was trying to impart to

04:40:45  5    you -- you have no idea how many vehicles had driven down that

04:40:49  6    road by the time Lieutenant Branham actually had the

04:40:52  7    opportunity to take that photograph.

04:40:55  8         Now, he also repeatedly used the phrase, arena of

04:41:03  9    performance.  Well, I have to tell you, ladies and gentlemen,

04:41:04  10   I spent almost six hours with him taking his deposition, that

04:41:08  11   was almost 280 pages and not once, not once did he describe

04:41:14  12   the arena of performance, and not once did he mention the time

04:41:18  13   and distance calculations that he tried to tell you yesterday.

04:41:24  14   Not once.  And he had all the information, other than doing

04:41:27  15   the site investigation, that he said didn't change his

04:41:31  16   opinions.  I will leave Mr. Root at that.  There is much, much

04:41:39  17   more that could I say, but I will leave it at that.

04:41:43  18        And then we have Mr. Faulkner that you heard from today.

04:41:48  19   Mr. Faulkner has, as I kind of eluded to and mentioned, he

04:41:53  20   trains the trainers.  So the individuals at the various state

04:41:59  21   police academies, whatever they are called in various states,

04:42:02  22   he trains those individuals to train the officers that are

04:42:05  23   going through getting certified.  We have the research project

04:42:12  24   that he has done, and he explained to you why and how that

04:42:17  25   research project came about.  And based on that information he

04:42:24  1  reviewed -- they want to say he didn't review all the

04:42:29  2  evidence.  Yeah, he did.  He absolutely reviewed all the

04:42:31  3  evidence.  He is just unwilling to do what Mr. Root is

04:42:34  4  apparently willing to do, is speculate with regard to evidence

04:42:39  5  that is not objective.  You can call it objective evidence.

04:42:44  6  You can put a term on anything.  Doesn't mean it's objective

04:42:50  7  evidence, whatsoever.

04:42:51  8      Mr. Faulkner, he wouldn't even tell you that -- he

04:42:56  9  wouldn't use the phrase that Mr. Root used, objectively

04:42:59  10  reasonable.  That's for you to decide.  And that's what Mr.

04:43:02  11  Faulkner told you.  What he told you was, based on his years

04:43:06  12  of experience, the research studies that he has done, all of

04:43:10  13  the training that he had done, the Force Science Institute

04:43:14  14  which is the same one that Mr. Root wanted to repeatedly

04:43:19  15  mention, based on all of that and the facts that Deputy

04:43:20  16  Forsyth was confronted with on August 2nd of 2017, that

04:43:27  17  Deputy Forsyth's actions complied with the Supreme Court

04:43:31  18  guidelines and National Law Enforcement Operational Practices.

04:43:35  19  And you will have -- the Judge has read you the law with

04:43:39  20  regard to the objective reasonableness.  You will have all of

04:43:43  21  that.  But we don't look at this as Mr. Root tries to do --

04:43:47  22  even though he says he doesn't -- we don't look at this in

04:43:52  23  hindsight.  We don't get to Monday morning quarterback

04:43:56  24  Deputy Forsyth.  That's not the way it works.  We have to look

04:43:59  25  at the information he had available to him as he was in that

04:44:05  1    entrance to that gas well site, not that there is a ditch down

04:44:10  2    over the hill and there is an embankment.  He has never been

04:44:12  3    in the area before.  So that is new information to him.  He

04:44:17  4    has got a Jeep who fled, almost hitting an oncoming car in the

04:44:23  5    opposing lane of traffic with a suspect believed to be armed,

04:44:27  6    and then the Jeep is coming at him.  That is the information

04:44:32  7    that you have to use to judge whether Deputy Forsyth's conduct

04:44:38  8    was objectively reasonable.

04:44:40  9          And, ladies and gentlemen, I am not going to take the

04:44:48  10   time to switch to the projector.  You will have the verdict

04:44:51  11   form.  Mr. Umina showed it to you.  The very first question:

04:44:55  12   Do you find the plaintiff has proven by a preponderance of the

04:44:58  13   evidence the force used by Defendant David Forsyth toward

04:45:01  14   Philip Jontz Rhoades on August 2nd was excessive and

04:45:05  15   objectively unreasonable?  There is a couple key components to

04:45:09  16   that.  If the plaintiff has proven.  We don't have to prove to

04:45:16  17   you that it was not objectively reasonable.  They have the

04:45:22  18   burden to prove that.

04:45:24  19         We don't have to prove to you that it was objectively

04:45:27  20   reasonable.  They have the burden of proving that.  And,

04:45:29  21   ladies and gentlemen, I submit based on the evidence that you

04:45:32  22   have heard over now the past technically these days, because

04:45:36  23   we didn't hear any evidence or witnesses on the first day,

04:45:39  24   that that answer is no.  They have not met their burden to

04:45:46  25   prove by a preponderance of the evidence that Deputy Forsyth's

04:45:50   1   actions on August 2nd were anything other than objectively

04:45:55   2   reasonable.  If that -- if you answer the question "no," you

04:46:00   3   are done.

04:46:01   4        As the Judge advised you, and the instructions are on

04:46:04   5   there, you complete the verdict form, sign it, and date it,

04:46:07   6   and you are done.

04:46:12   7        So the last part of this I have to address is the comment

04:46:20   8   that was made in closing argument by opposing counsel, which

04:46:24   9   was, well, if Defendant Forsyth thinks that he didn't do

04:46:26   10  anything wrong, why do they ask a single question of Christy

04:46:31   11  Rhoades or Rick Rhoades?

04:46:32   12       Ladies and gentlemen, I wouldn't be doing my job to

04:46:36   13  represent Deputy Forsyth, nor would Mr. Carroll be doing his

04:46:41   14  job if we didn't ask those questions.  Do I believe the

04:46:46   15  evidence supports the answer that I just told you on that

04:46:50   16  verdict form?  100 percent.  Unfortunately, I am not in that

04:46:56   17  jury box.  And I don't get to decide it.  You do.

04:47:02   18       You might think, "She is out of her mind.  She is crazy.

04:47:06   19  We don't believe a word she says."  Then I have to address

04:47:12   20  damages then.  If I didn't address potential damages in this

04:47:16   21  case, I would be doing a complete and total disservice to my

04:47:21   22  client who I owe an obligation to represent.  So let's talk

04:47:25   23  about, and this is never -- this is never an easy topic.  It's

04:47:29   24  not fun at all.  I don't relish the opportunity to address

04:47:34   25  these issues, but I have to.

04:47:36  1      There was a statement made in opening statement that
04:47:40  2  there would be no more birthday parties, no more T ball.
04:47:46  3  There were a number of questions asked of Ms. Rhoades on the
04:47:49  4  witness stand, ladies and gentlemen, with regard to the
04:47:52  5  interaction that the sons of Philip Rhoades had with their
04:47:59  6  father in the years leading up to his death.  Although Ms.
04:48:05  7  Rhoades didn't want to answer those questions, I understand
04:48:07  8  why, but those questions go to the damages that are being
04:48:13  9  sought in this case.
04:48:15 10      We know that the boys lived with their mother from about
04:48:24 11  2013 until 2014.  And that they would stay at their
04:48:29 12  grandfather's house or her sister's, and that's where they
04:48:33 13  would see their father.  We know Mr. Rhoades did not go to
04:48:37 14  parent teacher conferences, he didn't go to medical
04:48:40 15  appointments, he didn't go to any urgent care appointments, he
04:48:45 16  didn't provide any financial support for the boys.  That is
04:48:50 17  the reality of the evidence in this case.  So that is
04:48:59 18  something -- I can't tell you how you take that into
04:49:03 19  consideration.  But I submit to you, ladies and gentlemen,
04:49:06 20  it's relevant to the claim in this case that -- you know, I
04:49:12 21  think it was made in opening or closing argument, that they
04:49:17 22  would never be able to call their dad, or their dad wouldn't
04:49:21 23  be able to call them.  In the year leading up to his death,
04:49:24 24  Mr. Rhoades didn't call the boys.  I specifically asked that
04:49:28 25  question.  He didn't call them.  These are the facts, ladies

04:49:33  1     and gentlemen.

04:49:34  2         We also -- there was closing argument about the memories.

04:49:38  3     Well, I think if I recall correctly, Ms. Rhoades testified at

04:49:47  4     the age her youngest son Philip was, that he didn't really

04:49:48  5     have a lot of memories of his father, and at that point in

04:49:52  6     time she admitted that he was spending more time with her then

04:50:01  7     significant other Todd Stevens, than he was with his father.

04:50:04  8         So those are the facts, ladies and gentlemen.  I didn't

04:50:09  9     make them up.  That is the evidence that you have to consider

04:50:12  10    if you get to that point of the verdict form.  I don't believe

04:50:19  11    that the evidence supports that in this case, that you even

04:50:24  12    get past the first question.  But whether it's fun or not, I

04:50:29  13    have to bring that evidence to your attention.  You heard it.

04:50:33  14    It's there.  You do with it what you want.

04:50:39  15        Again, I would not be doing my job in representing my

04:50:43  16    client if I also didn't lastly address the issue with regard

04:50:47  17    to punitive damages.  The Judge has given you again the

04:50:51  18    instructions, and you will have the verdict form.  You can

04:50:57  19    only award punitive damages if you find that Defendant Forsyth

04:51:00  20    was motivated by evil motive or intent.  That has not been

04:51:05  21    established here, despite the fact that the claim was made in

04:51:09  22    opening statement that he drove down that road with his mind

04:51:12  23    made up.  There is no evidence.  In fact, we know that he

04:51:15  24    hadn't even had any dealings with Philip Rhoades at any point

04:51:18  25    in time before August 2nd.  So the rest of it, then, is

04:51:22   1   Defendant Forsyth's conduct involved reckless or callous

04:51:24   2   indifference to the federally protected rights of Mr. Rhoades.

04:51:29   3   Again, for the reasons that I have articulated to you, ladies

04:51:33   4   and gentlemen, as to why we do not believe that there was any

04:51:37   5   excessive force used by Deputy Forsyth in this case, it's the

04:51:43   6   same reason that there should be no punitive damages assessed

04:51:48   7   against Deputy Forsyth.  He was doing his job.  He was

04:51:52   8   pursuing a suspect, as part of a pursuit with the Marion

04:51:57   9   County Sheriff's Department, and he did his job.

04:52:01  10       Whether his conduct was objectively reasonable is for you

04:52:10  11   to judge.  I would simply ask that you do as the Court has

04:52:16  12   instructed you and not look at this with 20/20 hindsight,

04:52:21  13   don't Monday morning quarterback him.  Look at this based on

04:52:26  14   the information and the evidence that was available to

04:52:30  15   Deputy Forsyth when he was facing that Jeep driving at him,

04:52:36  16   and the action that he took in response to that threat.

04:52:41  17       I thank you for your time.

04:52:47  18            THE COURT:  Thank you, Mr. Durst.

04:52:49  19       Mr. Prince, will you handle rebuttal, sir?

04:52:52  20            MR. PRINCE:  I am not, Your Honor.

04:52:55  21            THE COURT:  Mr. Umina, you have ten minutes.

04:52:58  22            MR. UMINA:  Yes, Your Honor.

04:53:12  23       May it please the Court, counsel.

04:53:16  24       Now, what I found really interesting about that closing,

04:53:20  25   they didn't show you a single piece of evidence.  They didn't

04:53:27  1    show you a single piece of physical evidence.  And they spent

04:53:34  2    a majority of the beginning of the time trying to attack the

04:53:38  3    timeline that they established.  Folks that tells you

04:53:43  4    everything you need to know about this case.  They just stood

04:53:47  5    up in closing argument and didn't you show you a single piece

04:53:52  6    of evidence.  They are trying to confuse you.  They are trying

04:53:59  7    to talk about this, that, and anything else that has

04:54:03  8    absolutely nothing to do with the singular fact to decide

04:54:08  9    regarding liability in this case, was the Jeep in gear

04:54:11  10   aggressively advancing towards David Forsyth or was it in

04:54:17  11   neutral?  Did he shoot someone in complete violation of his

04:54:19  12   own policy and *Tennessee v Garner*?  That is the issue here.

04:54:24  13   And when you go back to that jury room, every single thing

04:54:29  14   that doesn't relate to the issue of was the Jeep moving or was

04:54:33  15   the Jeep not moving, it doesn't matter.  It doesn't remotely

04:54:40  16   matter.  And they just stood up here in the summation of this

04:54:43  17   trial and didn't show you a single piece of evidence.  What

04:54:49  18   does that tell you?  The evidence is terrible for them.

04:54:57  19        You know, that photo, I already told you, you were all

04:55:04  20   here, you were all here and watched them try to take this

04:55:11  21   photo and use it as evidence of tires spinning.  You watched

04:55:17  22   them do it.  And then they just got up here and tried to give

04:55:21  23   you an excuse.  And you want to know the very first time the

04:55:23  24   word perpendicular ever came out of the defendant's mouth

04:55:28  25   since this case was filed?  After I got Sergeant Branham to

04:55:33   1   admit that the Jeep would have had to be perpendicular to make

04:55:33   2   those lines.  The first time out of his mouth in nearly four

04:55:39   3   years.

04:55:43   4        You know, he said something.  He said he shot that deer

04:55:46   5   in the head, or shot the deer five times, because it had

04:55:52   6   broken legs, and he didn't want it to run away.  A deer with

04:56:01   7   broken legs trying to run away, sounds a lot like a Jeep in

04:56:06   8   neutral trying to run somebody over.  It's not possible.

04:56:11   9        The dear has broken legs.  How is it going to run away?

04:56:17  10   The Jeep was in neutral.  How was it ever a threat to him?

04:56:24  11   But he shot that deer at close range not once, not twice, not

04:56:33  12   three times, not four times, but five times.  He is trigger

04:56:42  13   happy.  Who shoots a deer to put it down at close range five

04:56:48  14   times, and then walks into court and says, I didn't want him

04:56:52  15   to run away, his legs were broken?  How does a deer with

04:56:56  16   broken legs run away?  And then hours later he pulls up and

04:57:00  17   somebody fled, seven shots.  Kills a man.  We know that

04:57:05  18   40-caliber -- only takes one bullet to put a man down.  A deer

04:57:10  19   with broken legs, only takes one bullet.  He shot that thing

04:57:16  20   five times.  What does that tell you about him and his gun?

04:57:25  21        They didn't show you any evidence in their summation,

04:57:30  22   folks, in their closing argument.  That grass that is backed

04:57:36  23   up right against that bumper.  There is not one tire mark

04:57:41  24   aligned with these tires.  He says the Jeep tires were

04:57:46  25   spinning, heavy on the gas, rapidly accelerating.  He fired

04:57:51   1    until the threat stopped.  Where is the evidence?

04:57:59   2        Again, they tried to prove their case with this picture.

04:58:05   3    False.  Lieutenant Branham told you, that's not what they are

04:58:12   4    trying to tell you.  The evidence isn't there folks.  Why are

04:58:18   5    they so worried about the timeline?  Why is it the first thing

04:58:21   6    the expert led off with?  It is very, very bad for them.  Cold

04:58:30   7    hard objective facts.

04:58:32   8        Listen, I know this is tough.  I know it is tough to say

04:58:38   9    to yourself this police officer did something very, very, very

04:58:45  10    wrong.  He killed someone in violation of the Constitution.

04:58:51  11    We don't want to believe that about our police officers.  Good

04:58:58  12    cops and bad cops wear the same badge, ladies and gentlemen,

04:59:06  13    for every hard working, honest, good police officer out there.

04:59:14  14    And that's majority of them, okay.  That is the majority of

04:59:18  15    police officers out there.  They are honest, hard working guys

04:59:22  16    and women, and they do -- they have a dangerous job.  And it

04:59:29  17    does present a lot of situations that do threaten their life,

04:59:34  18    but for the defendant to get up here and try to hide behind

04:59:38  19    completely unrelated cases, completely unrelated incidents,

04:59:47  20    that didn't even involve him, that is not what you are here to

04:59:52  21    consider.

04:59:54  22        And for all of those good police officers out there, and

04:59:57  23    for all of those police officers who have lost something, that

05:00:06  24    is why you have to identify the bad ones, the ones who violate

05:00:13  25    their policies, and then try and cover it up.  One bad apple

05:00:19  1    does spoil the whole bunch, because now he does this, now

05:00:26  2    Corey Love has got to get in line with it.

05:00:30  3          And let's think about Corey Love and what happened for

05:00:34  4    just as moment, okay.  Have you ever been sitting at a traffic

05:00:38  5    light, and you are stopped, and there is a car next to you.

05:00:42  6    And the car next to you starts going, and you start feeling

05:00:46  7    like you are moving backwards?  Anybody ever experience that?

05:00:49  8    Corey Love doesn't know he is jumping out of a moving vehicle

05:00:52  9    or he wouldn't have run to the front of it.  Nobody would run

05:00:55  10   to the front of a car that they think is moving forward.  So

05:01:00  11   if Corey Love really did think he saw the back of that Jeep

05:01:01  12   moving, it is because he jumped out of a moving car, didn't

05:01:04  13   realize it was moving.  He is looking back.  He thinks this is

05:01:07  14   stationary.  So the Jeep looks like it is moving.  But that is

05:01:11  15   not what is happening.  This car is moving.  Let's give Corey

05:01:15  16   the benefit of the doubt, and all he hears are shots.  And he

05:01:20  17   said, "I don't know what happened.  I think Dave was going to

05:01:24  18   die or Dave died" or whatever, right?  But he is basing that

05:01:26  19   off of he jumps out of a moving car that he thinks is

05:01:30  20   stationary.  It's moving.  The Jeep is stationary, but the --

05:01:33  21   all he can see is the back.  The back disappeared because this

05:01:36  22   car is moving.  And then, "He tried to run me over.  He tried

05:01:43  23   to run me over," that's what Dave says.  No, Dave hopped out

05:01:46  24   of that car, the defendant, and he put seven rounds into it in

05:01:54  25   the blink of an eye.  No body camera to show it.  No dash cam

05:02:02  1   to the show it.  No evidence.  Isolated gas well site at the

05:02:06  2   dead end of a dirt road and there was nobody there to see it.

05:02:10  3   When he jumped out of that car without even putting it into

05:02:15  4   park, he was (indiscernible) out that day.  He was on high

05:02:18  5   alert.  Sees the vehicle jumps out.  Seven rounds.  Kills

05:02:24  6   Philip Rhoades.  The timeline doesn't give him enough time to

05:02:28  7   do all of the things he said he did.  There is just no way.

05:02:32  8   There is just no way.

05:02:34  9        And for every hard working police officer out there,

05:02:41  10  serving with pride, honor, and courage, protect them.  Don't

05:02:46  11  allow this kind of behavior to go on.  Send a message; we will

05:02:52  12  not tolerate this in policing.  You cannot kill someone and

05:02:56  13  attempt to cover it up because you violated a policy.

05:03:01  14       He could have just said, "I messed up.  I messed this one

05:03:05  15  up."  But he denies it, and denies it, and denies it.  But

05:03:10  16  devil is in the details.  And at his trial for doing this,

05:03:17  17  they didn't give you one piece of evidence to look at to

05:03:22  18  support their theory, not a single one.

05:03:26  19            THE COURT:  One minute, Mr. Umina.

05:03:28  20            MR. UMINA:  Ladies and gentlemen, justice dies in

05:03:36  21  darkness.  He thought that he could give this story.  Corey

05:03:45  22  didn't see anything.  He is running around a moving vehicle.

05:03:49  23  He hears gunshots, okay.  His dad worked for the department

05:03:53  24  for 20 some years.  Defendant tells him this story.  Corey

05:03:59  25  didn't even have time to get to the front of the vehicle.

05:04:02  1    That's how fast the shooting started when they jumped out.

05:04:05  2    Seconds.  I mean seconds.  How long does it take for an

05:04:10  3    Explorer to go 30 feet?  This happened in seconds.  He

05:04:13  4    couldn't have done all the things that he said that he did,

05:04:16  5    ladies and gentlemen.  And he thought they would rubber stamp

05:04:19  6    this, put it in a drawer, and no one would ever know because

05:04:22  7    justice dies in darkness.  Be the light, ladies and gentlemen.

05:04:29  8    You be the light.  Thank you.

05:04:35  9              THE COURT:  Thank you, counsel.

05:04:38  10         Ladies and gentlemen of the jury, it's now time to retire

05:04:40  11   to your jury room to begin your deliberations.  As we

05:04:44  12   mentioned again, your first order of business will be to

05:04:48  13   select a jury foreperson.  You can proceed from there.  If you

05:04:51  14   give us just a brief moment, the verdict form, as well as all

05:04:56  15   the exhibits will be brought back to you.  At this point, my

05:04:59  16   warning no longer applies.  You may finally begin your

05:05:03  17   deliberations and discuss the case with one another.

05:05:04  18         We will excuse you at this time to do so.  Thank you very

05:05:07  19   much.

05:05:07  20         (Jury excused to begin deliberations, and the following

05:05:07  21   transpired in open court.)

05:05:31  22              THE COURT:  Thank you, counsel.

05:05:32  23         Madam Clerk, you have everything, correct?

05:05:35  24         Counsel, we're going to impose on you to make a quick

05:05:54  25   look at the stack of exhibits to make sure everything is

05:05:56  1    there.

05:07:59  2             Is counsel satisfied all exhibits are present?

05:08:02  3             MR. UMINA:  Yes.

05:08:02  4             MS. DURST:  Yes.

05:08:03  5             THE COURT:  Madam Clerk has taken those back.  There

05:08:08  6    are conference rooms available to you.  I don't think anybody

05:08:10  7    has a local office.  If you do leave the building just leave a

05:08:19  8    cell phone number so we can get ahold of you immediately here

05:08:22  9    in the courtroom.  Otherwise, we will be in "wait and see"

05:08:25  10   mode.

05:08:25  11         (Recess taken at this time 5:08 p.m.- 7:50 p.m.)

07:50:30  12            THE COURT:  Good evening, everyone.  We have our

07:50:32  13   first jury question contrary to our instructions.  The note

07:50:35  14   from the jury, which is signed by the foreperson, I believe,

07:50:39  15   it is Michael Dawson, "Currently split seven to one.  No signs

07:50:46  16   of agreement on the way.  Please advise."

07:50:50  17       To be candid, I have never had one like this.  So does

07:50:55  18   anyone have any thoughts as to how we should advise back at

07:50:59  19   this point?  I am happy to talk first while you guys think.

07:51:05  20       It feels premature for an Allen charge at this point,

07:51:09  21   considering it's the first note we have received.  They have

07:51:15  22   been deliberating less than three hours, so again, it feels

07:51:20  23   early for a declaration of hopelessly deadlocked.

07:51:27  24       One option is to have them come in and encourage them to

07:51:31  25   continue their discussions and continue deliberations.

07:51:35   1    Another option is excuse them for the evening, ask them to
07:51:40   2    come back Monday morning, but again I am open to any thoughts
07:51:44   3    anybody has.
07:51:45   4         MR. UMINA:  We would prefer they continue to
07:51:48   5    deliberate.
07:51:48   6         THE COURT:  Sure.  But at some point we are going
07:51:51   7    to -- feels as if we are going to butt our heads against the
07:51:55   8    wall.
07:51:56   9         MR. CARROLL:  Your Honor, I think we are in
07:51:57   10   agreement.  We would like to further have them deliberate.
07:52:00   11        THE COURT:  Understood.  Okay.  Well, I think -- does
07:52:18   12   anyone have any objection to an Allen charge at this point?
07:52:23   13   Which really is just a fancy word for "Please keep working and
07:52:27   14   give it some thought and talk to one another."
07:52:31   15        MR. UMINA:  We have no objection to an Allen charge,
07:52:33   16   Your Honor.
07:52:34   17        MS. DURST:  Your Honor, while it's the first note and
07:52:36   18   typically you see it a little bit later, we don't have any
07:52:39   19   objection given the time and the fact that they do have almost
07:52:42   20   three hours in deliberation in, so we have no objection to an
07:52:45   21   Allen charge.
07:52:46   22        THE COURT:  Well, let me ask this, and I will make a
07:52:51   23   copy of this so you guys can look at it.  My Allen charge, if
07:52:55   24   you will, does include, of course, that's probably what makes
07:52:59   25   it an Allen charge, you know, the threat of potential mistrial

07:53:03   1   if they don't reach a verdict.  Are we prepared to drop that

07:53:07   2   hammer, or do we just use the warm and fuzzy portions of an

07:53:12   3   Allen charge; "Please keep an open mind and keep talking?"

07:53:17   4       In all candor, I am inclined at this point to do the

07:53:20   5   latter and avoid any mention of possible consequences if they

07:53:27   6   remained deadlocked, to be honest with you.

07:53:29   7           MS. DURST:  At least from the defense's perspective,

07:53:31   8   we would propose in agreement with the Court, at least give

07:53:34   9   them the warm and fuzzy, see if we can make any further

07:53:38   10  progress with them.  And then if we get another note, and they

07:53:42   11  are still deadlocked, then maybe give them additional

07:53:46   12  language.

07:53:46   13          THE COURT:  Right.  Any thoughts?

07:53:48   14          MR. UMINA:  We are in agreement Your Honor.

07:53:49   15          THE COURT:  Okay.  Well, I want to make sure guys

07:53:56   16  know what we are talking about.  Let me make a copy of what we

07:53:59   17  will do, and then I will show you what we would basically

07:54:08   18  scratch out.

07:54:31   19          COURT SECURITY OFFICER:  Your Honor, they have

07:54:32   20  reached a verdict.

07:54:34   21          THE COURT:  All right.  I guess that mutes our

07:54:39   22  conversation at this point.  I will ask Madam Clerk to file

07:54:46   23  that note under seal at this point.  Okay.

07:54:54   24      Is everyone here, let me ask that initial question, that

07:54:57   25  needs to be here?

07:55:02    1              MS. DURST:  I believe so, Your Honor.  Thank you.

07:55:03    2              THE COURT:  All right.  So you guys know how I

07:55:10    3    handled this, we will have the jury come back in.  I will ask

07:55:13    4    the foreperson if they have reached a verdict.  I will ask

07:55:15    5    them if it is unanimous.  I will ask them to give me the

07:55:17    6    verdict.  I will review it for form.  I will read the verdict.

07:55:22    7    I don't put lawyers in the position to request that the jurors

07:55:27    8    be polled.  I do that sua sponte in every case to insure a

07:55:32    9    unanimous verdict.  And I believe that's it.

07:55:38   10         Anything else we need to discuss before we have the jury

07:55:41   11    come back in?

07:55:42   12              MR. UMINA:  Nothing from us, Your Honor.

07:55:43   13              MS. DURST:  No, thank you.

07:55:44   14              THE COURT:  While we are all here, if we could have

07:55:46   15    our jury, please.

07:56:39   16         (Jury returned to the courtroom, and the following

07:56:39   17    transpired in open court.)

07:56:41   18              THE COURT:  Everyone may be seated.

07:56:44   19         Ladies and gentlemen of the jury, it's my understanding

07:56:46   20    after receiving the first note, that subsequent to that, you

07:56:50   21    have reached a verdict.  If I could ask initially who was

07:56:55   22    serving as the foreperson?  Thank you, Mr. Dawson.

07:56:59   23         Has the jury unanimously agreed upon a verdict?

07:57:04   24              JURY FOREPERSON:  We have.

07:57:05   25              THE COURT:  If I could ask you to hand that verdict

07:57:07  1   to our court security person who will give it to me, please.

07:57:12  2   Thank you.

07:57:12  3       Ladies and gentlemen of the jury, so that you are aware

07:57:20  4   of how this typically works, I will inspect the verdict form

07:57:25  5   here in a moment to make sure it's appropriate from a form

07:57:28  6   standpoint, which really isn't a big deal given the questions

07:57:31  7   posed in this case.  After that, I will ask each of you

07:57:38  8   individually -- or actually, I will ask Madam Clerk to do

07:57:42  9   that -- individually if the verdict published is your verdict

07:57:45  10  to insure that it is a unanimous verdict; so again, just so

07:57:50  11  you know how that works.  All right.

07:57:58  12      I will ask each of you to pay attention as I do publish

07:58:01  13  the verdict, so that when Madam Clerk polls you, you do

07:58:05  14  understand or know what the verdict as read here, and you can

07:58:09  15  confirm whether or not it is unanimous.

07:58:14  16      Jury verdict form returned in the matter of Rhoades v.

07:58:18  17  Forsyth, civil action number 1:18-cv-186.  "Question one:  Do

07:58:25  18  you find the plaintiff has proven by a preponderance of the

07:58:27  19  evidence that the force used by Defendant Forsyth toward

07:58:30  20  Philip Jontz Rhoades on August 2nd, 2017 was excessive and

07:58:36  21  objectively unreasonable?"  The jury has answered "No."  And

07:58:39  22  the verdict form is signed April 9, 2021, today's date and

07:58:45  23  signed by Michael Dawson.

07:58:47  24      Madam Clerk, if I could ask you to poll the jurors,

07:58:50  25  please, ma'am.

07:58:51  1          THE CLERK:  I will call you by your number.  Just

07:58:53  2  answer "Yes or No."

07:58:54  3      Juror number one, is this your verdict?

4              JUROR NO. 1:  Yes.

5              THE CLERK:  Juror number two, is this your verdict?

6              JUROR NO. 2:  Yes.

7              THE CLERK:  Juror number three, is this your verdict?

8              JUROR NO. 3:  Yes.

9              THE CLERK:  Juror number four, is this your verdict?

10             JUROR NO. 4:  Yes.

11             THE CLERK:  Juror number five, is this your verdict?

12             JUROR NO. 5:  Yes.

13             THE CLERK:  Juror number six, is this your verdict?

14             JUROR NO. 6:  Yes.

15             THE CLERK:  Juror number seven, is this your verdict?

16             JUROR NO. 7:  Yes.

17             THE CLERK:  Juror number eight, is this your verdict?

07:59:18  18             JUROR NO. 8:  Yes.

07:59:19  19         THE COURT:  Finding the verdict to be unanimous, the

07:59:22  20  Court will ask Madam Clerk to file the verdict form.

07:59:29  21      Ladies and gentlemen of the jury, I cannot thank you

07:59:32  22  enough for your time and your service during this trial,

07:59:35  23  particularly working into the evening on a Friday.  I speak on

07:59:39  24  behalf of everyone who was involved in this trial that we

07:59:41  25  certainly appreciate your willingness to serve and all of the

07:59:45  1    hard work that you put in.

07:59:47  2         This has ended and will conclude your jury service here,

07:59:50  3    so I am pleased to welcome you to depart the courtroom.

07:59:54  4    Report back to your jury room.  I recognize the late hour.  If

07:59:58  5    you have five minutes, I would appreciate if you could hang

08:00:01  6    there for a second so I can chat with you for a moment.  If

08:00:04  7    you don't, please feel free to go.  Either way, we thank you

08:00:08  8    very much for your service, and you are free to go.  Thank

08:00:08  9    you.

08:00:29  10        (Jury excused, and the following transpired in open

08:00:30  11   court.)

08:00:31  12        THE COURT:  Everyone thank you.  Please be seated.

08:00:35  13   It won't happen today, but the Court will enter the

08:00:37  14   appropriate judgment order, along with the verdict.  Given the

08:00:41  15   late hour on a Friday, I won't ask folks when they anticipate

08:00:45  16   or desire to file post trial motions.  The Court will enter

08:00:49  17   the order on Monday, asking to advise when you want the

08:00:51  18   deadline set down the road.

08:00:55  19        Anything else we need to take up at this point?

08:00:58  20        MR. UMINA:  No.  Thank you, Your Honor.

08:00:59  21        THE COURT:  Ms. Durst.

08:01:00  22        MS. DURST:  No, Your Honor.  Thank you.

08:01:02  23        THE COURT:  We shall stand adjourned.  Thank you all

08:01:03  24   very much.

          25        (Trial in this matter was concluded at this time 8:01

1    p.m.)

2                    C E R T I F I C A T E

3        I, Jill M. Cutter, Registered Professional Reporter and

4    Official Reporter for the United States District Court for the

5    Northern District of West Virginia, so hereby certify that the

6    foregoing is a correct transcript to the best of my ability of

7    the proceedings in the above-styled action on April 9, 2021,

8    as reported by me in stenotypy.

9        I certify that the transcript fees and format comply with

10   those prescribed by the Court and Judicial conference of the

11   United States.

12                Given under by hand this day, April 26, 2021.

13

14                    /s/ Jill M. Cutter, RPR

15                     Official Reporter, United States
                       US District Court for the Northern
16                     US District of West Virginia

17

18

19

20

21

22

23

24

25

1

## $

**$100** [1] - 640:4
**$15,000** [1] - 638:13
**$2,500** [1] - 640:2
**$250** [1] - 685:5

## '

**'21** [1] - 716:5

## /

**/s** [1] - 836:14

## 0

**0.70** [1] - 665:21
**0.75** [1] - 665:22

## 1

**1** [3] - 645:19, 778:14, 834:4
**1.2** [1] - 665:25
**1.35** [1] - 665:25
**10** [8] - 645:20, 681:5, 682:22, 726:19, 735:15, 772:18, 772:19, 810:7
**100** [4] - 805:3, 805:17, 808:10, 819:16
**101** [1] - 717:1
**103** [1] - 725:9
**11** [1] - 718:2
**11:03** [1] - 680:25
**11:20** [1] - 680:9
**11:28** [1] - 680:25
**12** [1] - 718:3
**125** [1] - 607:16
**126** [1] - 612:6
**12:17** [1] - 715:16
**13** [4] - 718:6, 719:16, 721:8
**14** [3] - 623:5, 717:1, 718:8
**14.6** [1] - 666:9
**14.67** [1] - 665:11
**1443:04** [1] - 792:5
**15** [7] - 661:18, 665:11, 680:8, 680:14, 718:10, 735:15, 810:7
**15-hour** [1] - 638:11
**15-minute** [1] - 680:22
**16** [19] - 657:9, 706:7, 718:12, 724:19, 736:20, 791:23, 792:11, 792:15,

792:25, 795:4, 795:7, 795:12, 795:16, 795:19, 795:21, 795:23, 796:2, 796:5
**16-second** [3] - 610:4, 706:8, 711:3
**165** [1] - 716:5
**17** [6] - 718:14, 718:18, 722:13, 723:3, 726:19, 726:25
**18** [1] - 718:20
**180** [1] - 691:8
**19** [3] - 681:5, 715:6, 721:8
**190** [1] - 612:5
**1983** [11] - 609:17, 617:10, 618:8, 618:13, 618:23, 629:24, 720:16, 727:8, 727:15, 728:1, 728:19
**1987** [1] - 644:17
**1989** [1] - 644:17
**1990** [1] - 631:21
**1993** [1] - 612:6
**1:00** [3] - 715:1, 715:4, 715:14
**1:02** [1] - 715:16
**1:07-CV-47** [1] - 612:16
**1:18-CV-186** [1] - 607:4
**1:18-cv-186** [2] - 609:5, 833:17
**1:30** [3] - 714:7, 714:9, 714:16
**1:35** [1] - 738:25
**1:54** [1] - 738:25
**1A** [2] - 759:20, 759:24
**1B** [2] - 760:8, 760:9

## 2

**2** [12] - 674:24, 679:21, 703:2, 712:17, 730:13, 733:20, 734:23, 759:17, 770:20, 783:14, 797:20, 834:6
**2,500** [1] - 647:21
**2.5** [2] - 666:3, 666:8
**20** [7] - 649:2, 665:12, 682:22, 686:25, 772:18, 772:19, 827:24
**20/20** [3] - 667:17, 750:3, 822:12
**200** [2] - 607:19,

652:15
**2000** [4] - 635:8, 682:25, 683:8, 685:1
**2001** [1] - 683:13
**2003** [1] - 635:10
**2006** [1] - 635:15
**2008** [2] - 612:17, 612:18
**2009** [1] - 669:22
**2013** [1] - 820:11
**2014** [1] - 820:11
**2017** [17] - 609:25, 623:8, 648:2, 674:24, 676:15, 679:21, 703:2, 712:17, 759:17, 770:20, 783:14, 788:19, 789:1, 797:20, 801:20, 817:16, 833:20
**2018** [1] - 789:2
**2019** [3] - 640:23, 642:3, 802:3, 808:6
**2020** [3] - 648:3, 648:7, 717:1
**2021** [5] - 607:12, 761:5, 833:22, 836:7, 836:12
**212** [1] - 793:1
**212-foot** [1] - 710:17
**213** [3] - 660:12, 705:24, 767:22
**22** [3] - 665:12, 725:20, 732:14
**23** [1] - 725:20
**2414** [1] - 607:23
**25** [7] - 647:20, 661:19, 665:13, 666:10, 685:25, 716:5, 769:5
**250** [3] - 621:23, 640:3, 813:6
**25th** [7] - 622:24, 623:1, 623:3, 623:8, 623:17, 624:5, 720:11
**26** [1] - 836:12
**26501** [1] - 607:16
**26508** [2] - 607:19, 607:23
**27** [1] - 814:25
**28** [4] - 771:18, 782:19, 788:18, 788:20
**280** [2] - 652:13, 816:11
**29.33** [1] - 665:13
**2:30** [1] - 763:3
**2:39** [1] - 763:3
**2:43** [1] - 662:17

**2:43:04** [3] - 792:5, 792:10, 793:16
**2A** [3] - 760:21, 760:25, 761:1
**2E** [1] - 646:5
**2nd** [12] - 609:25, 619:12, 643:10, 673:15, 801:20, 813:21, 814:23, 817:16, 818:14, 819:1, 821:25, 833:20

## 3

**3** [1] - 834:8
**30** [10] - 609:20, 630:21, 637:8, 701:21, 706:18, 735:19, 735:20, 793:4, 828:3
**300** [1] - 763:22
**33** [1] - 674:14
**36.6** [1] - 666:10
**36.67** [1] - 665:14
**360** [1] - 691:10
**37** [1] - 655:14
**3:45** [1] - 789:25
**3:53** [1] - 789:25

## 4

**4** [3] - 662:17, 676:15, 834:10
**4,400** [2] - 711:13, 794:5
**40** [3] - 704:6, 735:14, 735:21
**40-caliber** [2] - 616:3, 824:18
**400** [3] - 685:21, 685:24, 686:23
**400-plus** [1] - 767:1
**45** [4] - 674:14, 712:7, 727:18, 735:19
**450** [5] - 632:2, 632:3, 632:10, 685:17, 686:4
**461** [1] - 609:20

## 5

**5** [2] - 682:22, 834:12
**50** [18] - 608:2, 609:9, 613:8, 613:13, 613:20, 661:21, 686:7, 686:23, 690:9, 715:21, 717:14, 723:16, 723:18, 736:1,

736:6, 738:3, 766:22, 772:17
**50-mile** [1] - 767:13
**50-yard** [1] - 780:23
**506** [1] - 725:9
**51-yard** [1] - 764:9
**52** [3] - 614:25, 765:6, 781:3
**55-2-12(b)** [1] - 612:4
**55-7-29** [3] - 728:5, 728:23, 728:25
**55-7-8(a** [1] - 612:24
**5729** [1] - 718:17
**58447** [1] - 612:17
**5:08** [1] - 829:11

## 6

**6** [2] - 607:19, 834:14
**6'6** [1] - 652:13
**6-foot** [1] - 652:15
**60** [2] - 630:24, 631:1

## 7

**7** [1] - 834:16
**70** [5] - 652:13, 686:7, 686:24, 766:22, 772:17
**70,000** [1] - 647:6
**72** [1] - 652:14
**7:50** [1] - 829:11

## 8

**8** [2] - 734:22, 834:18
**8:01** [1] - 835:25

## 9

**9** [6] - 607:12, 726:19, 734:23, 761:5, 833:22, 836:7
**9-11** [9] - 683:5, 683:10, 683:13, 684:14, 685:3, 712:22, 781:19, 781:20
**90** [2] - 666:4, 685:18
**911** [1] - 801:13
**95** [2] - 666:5, 685:18
**9:09** [1] - 609:1
**9:34** [1] - 626:13
**9:42** [1] - 626:13

## A

**a.m** [3] - 609:1, 626:13
**ability** [3] - 678:2, 806:18, 836:6

**able** [21] - 625:12, 625:14, 639:16, 647:3, 648:23, 649:24, 659:3, 663:23, 667:21, 775:20, 775:21, 775:22, 779:4, 788:6, 795:17, 802:22, 811:20, 820:22, 820:23
**above-styled** [2] - 607:12, 836:7
**absent** [1] - 779:9
**absolute** [2] - 804:24, 805:2
**absolutely** [17] - 638:12, 638:16, 649:25, 656:18, 673:21, 678:4, 685:8, 685:16, 708:13, 769:9, 794:19, 797:17, 799:7, 808:11, 811:1, 817:2, 823:8
**academies** [2] - 630:16, 816:21
**Academy** [7] - 628:6, 628:13, 628:14, 628:19, 629:15, 629:18, 793:7
**academy** [7] - 628:21, 628:24, 629:1, 631:1, 644:16, 644:17, 793:5
**Academy's** [1] - 629:18
**accelerate** [1] - 765:12
**accelerating** [15] - 697:5, 698:16, 710:24, 765:1, 765:14, 765:23, 766:3, 767:22, 768:5, 771:11, 771:12, 772:9, 773:22, 780:17, 824:25
**accept** [3] - 634:1, 745:1, 747:4
**acceptable** [5] - 646:18, 650:25, 652:8, 652:24, 653:4
**access** [28] - 622:2, 660:2, 662:12, 662:14, 662:19, 663:9, 663:18, 669:9, 674:10, 679:5, 679:8, 792:15, 792:19, 793:1, 793:18, 796:4, 803:16,

806:21, 806:24, 807:2, 807:3, 807:5, 814:2, 815:15, 816:3
**accident** [2] - 638:8, 675:12
**accidents** [1] - 675:11
**accordance** [1] - 743:12
**account** [1] - 698:5
**accuracy** [1] - 700:17
**accurate** [4] - 620:10, 694:18, 722:19, 726:14
**accusations** [1] - 790:21
**achievable** [1] - 666:4
**acknowledge** [8] - 682:9, 683:13, 698:7, 699:11, 703:14, 704:5, 706:3, 754:11
**acknowledged** [1] - 775:4
**acknowledging** [1] - 699:5
**acquainted** [1] - 628:20
**act** [9] - 644:25, 668:3, 668:6, 686:14, 702:18, 736:14, 752:2, 752:8, 755:16
**acted** [10] - 644:25, 702:7, 702:12, 702:19, 702:21, 748:10, 748:24, 755:17, 771:2, 774:8
**acting** [6] - 651:4, 740:23, 748:6, 748:25, 755:11, 755:21
**ACTION** [1] - 607:4
**action** [31] - 607:12, 609:17, 645:17, 645:19, 645:20, 649:19, 650:5, 650:13, 651:19, 651:24, 652:3, 652:4, 652:20, 652:22, 653:8, 672:9, 728:10, 728:12, 729:16, 740:10, 741:21, 741:25, 751:24, 751:25, 752:4, 752:11, 791:15, 822:16, 833:17, 836:7
**actions** [37] - 611:8, 615:9, 615:11, 619:12, 626:1,

633:1, 651:4, 668:18, 671:11, 672:10, 673:7, 673:15, 674:22, 674:24, 675:3, 679:20, 699:23, 701:22, 712:16, 721:20, 728:14, 736:8, 737:15, 737:19, 750:7, 754:17, 756:15, 758:1, 784:22, 790:13, 794:16, 795:13, 813:20, 813:23, 817:17, 819:1
**active** [5] - 633:23, 684:11, 684:20, 713:5, 813:13
**actively** [2] - 655:2, 749:23
**actor** [3] - 620:7, 753:25, 764:4
**acts** [2] - 748:16, 749:10
**actual** [11] - 618:5, 660:22, 660:24, 679:6, 731:17, 753:10, 754:10, 754:12, 755:16, 797:17
**add** [10] - 615:5, 719:21, 719:24, 723:2, 726:18, 727:23, 728:4, 767:5, 767:23, 802:1
**addition** [8] - 624:14, 637:3, 744:11, 745:20, 755:13, 755:24, 759:8, 782:4
**additional** [7] - 619:5, 644:1, 801:9, 801:25, 802:2, 808:17, 831:11
**additionally** [5] - 614:22, 620:22, 621:9, 752:25, 774:4
**address** [18] - 616:19, 620:2, 623:21, 659:3, 718:25, 719:10, 723:15, 724:18, 725:18, 726:24, 730:6, 730:12, 733:15, 819:7, 819:19, 819:20, 819:24, 821:16
**addressed** [1] - 719:6
**addressing** [1] - 612:22

**adequately** [2] - 756:14, 757:3
**adjourned** [1] - 835:23
**adjustment** [1] - 627:8
**Administratrix** [1] - 607:4
**administratrix** [1] - 748:4
**admissible** [1] - 745:24
**admit** [3] - 635:22, 668:11, 824:1
**admitted** [5] - 668:10, 741:4, 811:15, 821:6
**admittedly** [1] - 727:17
**adopted** [3] - 716:17, 718:11
**adult** [1] - 629:25
**advance** [1] - 773:12
**advancing** [1] - 823:10
**advice** [2] - 754:2, 788:8
**advise** [5] - 676:22, 735:6, 829:16, 829:18, 835:17
**advised** [5] - 623:19, 623:23, 677:4, 677:5, 819:4
**advising** [2] - 625:13, 646:23
**advocates** [1] - 626:1
**aerosol** [1] - 629:11
**affect** [3] - 678:1, 748:19, 806:19
**affected** [4] - 610:15, 745:7, 785:10, 785:22
**affidavit** [1] - 635:23
**affliction** [1] - 717:25
**afraid** [2] - 657:25, 658:2
**afternoon** [1] - 609:25
**afterwards** [5] - 635:7, 642:14, 668:14, 691:17, 705:22
**age** [4] - 631:1, 788:4, 821:4
**agency** [2] - 628:9, 704:9
**agents** [1] - 629:11
**ages** [1] - 788:9
**aggression** [2] - 649:7, 651:1
**aggressive** [2] - 672:4, 709:24
**aggressively** [6] - 698:16, 710:6, 710:24, 765:1,

765:14, 823:10
**ago** [3] - 686:7, 774:6, 774:12
**agree** [39] - 651:8, 651:16, 651:17, 654:12, 656:10, 677:24, 678:8, 687:6, 688:24, 689:3, 692:6, 692:15, 692:16, 692:20, 692:24, 694:23, 695:5, 695:13, 695:22, 695:25, 697:8, 703:21, 704:18, 704:22, 706:8, 709:16, 709:23, 711:7, 711:15, 713:3, 726:2, 728:9, 732:1, 736:10, 758:13, 770:10, 796:9, 796:15
**agreed** [7] - 702:5, 702:10, 702:25, 703:4, 748:10, 761:11, 832:23
**agreeing** [1] - 689:12
**agreement** [6] - 758:16, 761:7, 829:16, 830:10, 831:8, 831:14
**ahead** [10] - 620:14, 622:5, 639:21, 654:2, 660:1, 683:17, 724:21, 736:4, 792:4, 803:4
**ahold** [2] - 800:7, 829:8
**aid** [1] - 747:19
**aided** [1] - 607:25
**airport** [4] - 654:18, 682:24, 684:3, 713:6
**Airport** [1] - 684:1
**Alabama** [1] - 787:7
**alert** [1] - 827:5
**Alford** [1] - 610:10
**aligned** [3] - 696:13, 779:1, 824:24
**allegations** [1] - 699:23
**allege** [1] - 677:1
**alleged** [5] - 612:8, 612:10, 617:7, 737:11, 798:23
**allegedly** [2] - 699:9, 710:1
**Allegiance** [1] - 795:18
**alleging** [1] - 612:20
**Allen** [7] - 829:20,

830:12, 830:15,
830:21, 830:23,
830:25, 831:3
**allow** [5] - 684:7,
684:9, 684:18,
709:7, 827:11
**allowed** [7] - 746:16,
753:6, 780:9,
780:12, 784:14,
786:22
**allows** [1] - 612:24
**almost** [23] - 621:24,
624:3, 624:8, 625:3,
647:13, 655:25,
656:23, 658:21,
661:12, 663:25,
671:20, 671:24,
680:10, 699:14,
703:9, 723:1, 731:1,
785:21, 814:6,
816:10, 816:11,
818:4, 830:19
**alone** [3] - 628:13,
740:14, 770:20
**alongside** [1] - 705:7
**alphabet** [2] - 795:22,
795:23
**altered** [3] - 658:15,
679:17, 712:12
**altering** [1] - 715:8
**alternative** [1] - 619:4
**ambulance** [12] -
657:15, 660:10,
663:9, 663:10,
674:8, 674:9,
674:14, 704:12,
815:24, 816:2, 816:3
**amended** [1] - 716:4
**Amendment** [1] -
778:3
**America** [9] - 614:11,
763:17, 776:4,
778:2, 779:20,
780:6, 782:25,
784:6, 788:22
**American** [1] - 666:2
**ammunition** [1] -
636:24
**amount** [24] - 645:18,
650:18, 731:3,
734:8, 743:16,
748:18, 749:12,
751:2, 751:7,
752:14, 755:19,
756:3, 756:6, 757:2,
757:24, 758:2,
758:7, 758:8, 760:7,
760:11, 760:24,
761:2, 795:24, 796:3
**amounts** [1] - 760:1

**analysis** [8] - 663:14,
672:20, 673:23,
702:1, 702:23,
706:1, 723:2, 738:11
**analyze** [2] - 675:11,
675:13
**analyzing** [1] - 707:22
**anatomic** [1] - 776:6
**anatomical** [1] -
776:17
**angle** [1] - 776:11
**anguish** [8] - 731:4,
731:12, 733:9,
734:9, 753:23,
754:1, 760:3, 783:23
**anonymous** [1] -
646:3
**answer** [25] - 638:21,
645:21, 687:19,
690:1, 690:15,
694:17, 706:13,
744:1, 759:19,
759:20, 760:20,
760:23, 761:1,
772:20, 783:17,
784:19, 791:20,
796:16, 801:8,
808:8, 818:24,
819:2, 819:15,
820:7, 834:2
**answered** [4] - 692:4,
808:15, 810:23,
833:21
**answering** [1] - 761:8
**answers** [1] - 692:15
**Anthony** [1] - 645:25
**anticipate** [4] -
714:19, 715:8,
735:14, 835:15
**anticipated** [1] -
790:10
**anticipating** [2] -
618:1, 731:21
**anyway** [3] - 671:9,
681:15, 724:8
**apart** [1] - 723:18
**apologies** [1] - 739:16
**apologize** [2] -
725:17, 734:18
**appeal** [1] - 724:2
**APPEARANCES** [1] -
607:14
**appeared** [1] - 622:9
**appendages** [1] -
731:3
**Apple** [1] - 646:4
**apple** [1] - 825:25
**applicable** [4] -
609:21, 614:4,
718:17, 740:10

**application** [7] -
661:5, 683:25,
684:16, 685:2,
738:6, 781:18,
781:21
**applied** [2] - 749:18,
781:20
**applies** [4] - 718:10,
741:13, 750:5,
828:16
**apply** [9] - 643:25,
665:21, 666:1,
727:3, 728:22,
728:25, 740:12,
740:19, 746:25
**applying** [2] - 662:5,
741:8
**appointments** [3] -
733:25, 820:15
**appreciate** [4] -
732:12, 790:18,
834:25, 835:5
**approach** [1] - 689:22
**approaching** [2] -
663:23, 666:20
**appropriate** [12] -
613:14, 626:1,
722:23, 724:7,
724:12, 731:6,
756:22, 756:23,
756:24, 762:25,
833:5, 835:14
**appropriately** [1] -
617:19
**approximate** [1] -
632:10
**April** [5] - 607:12,
761:5, 833:22,
836:7, 836:12
**area** [17] - 640:12,
651:5, 651:7,
651:13, 652:11,
655:24, 690:10,
691:8, 695:14,
767:16, 767:18,
793:17, 794:24,
795:2, 813:6,
814:16, 818:3
**arena** [2] - 816:8,
816:12
**arguably** [1] - 734:8
**argue** [3] - 733:18,
733:24, 807:21
**argued** [1] - 615:7
**arguing** [2] - 733:9,
733:10
**ARGUMENT** [1] -
608:7
**argument** [28] - 611:9,
615:12, 616:13,

616:18, 625:20,
697:23, 698:20,
705:18, 707:11,
725:8, 728:8,
731:12, 733:16,
737:5, 743:15,
743:19, 762:2,
788:2, 789:19,
791:3, 800:1,
802:10, 807:15,
819:8, 820:21,
821:2, 823:5, 824:22
**arguments** [9] -
616:20, 732:11,
733:6, 734:2,
739:25, 743:14,
761:25, 762:5,
762:15
**arising** [2] - 612:1,
727:8
**armed** [20] - 621:6,
657:1, 658:23,
664:16, 670:9,
670:22, 671:5,
671:6, 711:8,
711:11, 711:12,
736:22, 794:7,
795:14, 796:10,
813:5, 814:1, 818:5
**arms** [2] - 775:21,
805:6
**Army** [1] - 787:6
**arranging** [1] - 800:25
**arrest** [5] - 748:19,
748:20, 749:13,
749:14, 749:24
**arrested** [1] - 635:17
**arrive** [2] - 741:8,
757:2
**arrived** [2] - 800:15,
816:1
**arriving** [1] - 663:23
**articulated** [2] -
732:20, 822:3
**artist** [2] - 650:22,
652:12
**ascertain** [2] - 663:23,
667:21
**aside** [4] - 618:13,
629:21, 678:6,
762:14
**aspect** [3] - 618:12,
636:5, 761:20
**aspects** [2] - 715:7,
753:11
**assault** [1] - 650:25
**assessed** [2] - 720:9,
822:6
**assessing** [2] -
753:18, 756:10

**assessment** [1] -
720:8
**assign** [1] - 695:9
**assist** [3] - 643:18,
683:6, 746:20
**assistance** [5] -
631:10, 733:4,
734:16, 760:6, 784:7
**assisted** [1] - 813:18
**Association** [2] -
666:2, 676:22
**assume** [1] - 767:20
**assuming** [1] - 684:4
**assumption** [1] -
674:11
**assured** [1] - 791:6
**AT** [1] - 607:2
**atrocious** [2] - 619:6,
619:12
**attached** [1] - 609:19
**attack** [1] - 823:2
**attempt** [9] - 645:17,
707:18, 710:20,
721:13, 751:16,
753:12, 776:1,
785:18, 827:13
**attempted** [7] - 623:7,
625:3, 700:9,
708:10, 720:19,
751:13, 756:15
**attempting** [14] -
621:11, 622:23,
624:8, 624:18,
648:19, 659:12,
698:24, 700:20,
707:17, 748:19,
749:13, 777:5, 784:2
**attended** [1] - 793:5
**attention** [8] - 677:19,
725:21, 749:3,
749:20, 761:17,
780:7, 821:13,
833:12
**attentiveness** [1] -
790:15
**Attorney** [7] - 627:24,
628:5, 630:17,
631:23, 644:19,
645:24, 646:10
**attorney** [2] - 790:17,
799:6
**attorneys** [4] - 632:16,
633:10, 743:14,
786:4
**audible** [2] - 751:18,
814:8
**audio** [5] - 642:18,
792:6, 792:9,
793:19, 793:23
**August** [22] - 609:25,

4

619:12, 643:10,
673:15, 674:24,
676:15, 679:21,
703:2, 712:17,
759:17, 770:20,
783:14, 788:19,
797:20, 801:20,
813:21, 814:23,
817:16, 818:14,
819:1, 821:25,
823:20
**Austin** [1] - 607:17
**Authority** [1] - 712:21
**authorized** [1] - 695:4
**automatic** [1] - 618:9
**automatically** [1] -
757:12
**available** [8] - 648:21,
648:25, 653:22,
693:25, 754:17,
817:25, 822:14,
829:6
**average** [1] - 650:20
**avoid** [3] - 674:16,
674:18, 831:5
**award** [26] - 725:1,
725:4, 725:11,
725:14, 726:9,
732:7, 732:8,
752:14, 752:22,
754:7, 754:13,
755:14, 755:19,
755:23, 756:2,
756:4, 756:24,
757:21, 758:9,
760:8, 760:10,
760:11, 760:12,
782:18, 821:19
**awarded** [6] - 755:12,
755:24, 756:18,
757:6, 758:10
**awarding** [1] - 754:21
**awards** [1] - 754:24
**aware** [4] - 670:3,
687:12, 697:1, 833:3

## B

**backed** [3] - 674:18,
771:10, 824:22
**background** [2] -
633:21, 644:6
**backing** [1] - 669:23
**backs** [1] - 710:19
**backwards** [2] -
636:17, 826:7
**bad** [14] - 687:23,
706:9, 706:11,
711:3, 767:11,
782:7, 782:14,

785:23, 825:6,
825:12, 825:24,
825:25
**badge** [1] - 825:12
**badly** [1] - 791:5
**bail** [1] - 669:1
**Bailey** [1] - 607:18
**bailiff** [1] - 628:11
**balanced** [2] - 742:4,
742:19
**ball** [1] - 820:2
**Bam** [1] - 814:17
**bar** [1] - 715:13
**bars** [1] - 728:2
**base** [3] - 701:14,
741:1, 741:3
**based** [42] - 610:19,
645:11, 645:16,
651:21, 652:23,
667:21, 671:18,
673:2, 682:15,
691:18, 697:12,
698:5, 701:3,
707:19, 707:24,
711:15, 712:15,
723:7, 725:25,
732:16, 733:16,
737:17, 738:7,
756:25, 757:1,
757:21, 764:12,
764:15, 767:14,
781:2, 782:9,
785:19, 786:23,
788:1, 801:11,
813:19, 816:25,
817:11, 817:15,
818:21, 822:13
**basic** [4] - 630:15,
763:15, 778:1, 780:5
**basing** [2] - 693:19,
826:18
**basis** [10] - 613:7,
617:8, 617:18,
618:14, 619:4,
653:18, 701:15,
709:24, 726:12,
749:16
**batons** [1] - 629:12
**bear** [3] - 745:5,
756:6, 756:8
**bearing** [1] - 720:11
**became** [5] - 628:20,
628:25, 630:2,
634:2, 665:7
**began** [1] - 765:14
**begin** [9] - 680:4,
690:1, 740:1, 762:6,
788:17, 814:24,
828:11, 828:16,
828:20

beginning [6] -
724:23, 739:23,
764:8, 790:11,
792:15, 823:2
**begins** [2] - 710:24,
710:25
**behalf** [6] - 610:3,
626:23, 631:17,
632:7, 719:5, 834:24
**behavior** [2] - 618:16,
827:11
**behind** [16] - 614:2,
624:15, 644:8,
655:14, 671:8,
672:18, 695:17,
696:14, 697:10,
701:15, 705:14,
737:2, 739:16,
773:23, 825:18
**beings** [1] - 763:23
**belief** [1] - 624:18
**believability** [1] -
746:13
**believes** [1] - 757:5
**belittle** [1] - 785:16
**bell** [1] - 736:10
**belonged** [1] - 619:3
**below** [3] - 719:22,
761:2, 775:22
**belt** [2] - 633:19, 671:3
**benefit** [1] - 826:16
**Benjamin** [1] - 607:18
**best** [6] - 611:13,
659:5, 686:8,
737:17, 768:13,
836:6
**better** [10] - 611:12,
615:14, 640:14,
666:16, 684:7,
684:9, 684:18,
729:20, 740:5, 795:9
**between** [15] - 660:7,
728:14, 735:19,
741:21, 743:10,
745:11, 756:17,
795:5, 796:11,
799:22, 806:2,
806:22, 807:7,
810:1, 810:3
**beyond** [1] - 764:14
**bias** [1] - 741:14
**biased** [1] - 687:7
**big** [3] - 798:3, 800:1,
833:6
**binding** [1] - 616:8
**bird** [1] - 805:1
**birthday** [1] - 820:2
**bit** [19] - 617:25,
628:17, 629:22,
631:19, 633:16,

640:20, 641:10,
644:6, 653:12,
673:12, 694:14,
710:9, 783:25,
784:9, 790:10,
795:19, 805:25,
812:12, 830:18
**black** [8] - 633:19,
647:15, 721:12,
769:12, 780:13,
781:14, 813:3,
813:12
**bleeding** [1] - 731:4
**blink** [1] - 826:25
**block** [1] - 671:8
**blood** [1] - 677:1
**blue** [2] - 651:11,
651:13
**bluish** [2] - 651:6,
652:10
**board** [1] - 777:9
**bodily** [6] - 621:11,
622:10, 622:15,
659:11, 778:12,
778:13
**body** [9] - 645:12,
645:15, 668:3,
677:2, 677:15,
775:22, 776:16,
805:10, 826:25
**book** [2] - 649:14,
764:11
**born** [1] - 786:2
**borrowed** [1] - 727:7
**boss** [3] - 769:2,
769:4, 769:5
**bought** [2] - 646:4,
768:16
**bounce** [1] - 795:16
**bowl** [16] - 663:20,
663:24, 664:6,
664:10, 664:21,
666:20, 666:22,
667:1, 667:10,
667:20, 669:17,
671:12, 772:8,
773:20, 792:14,
814:4
**box** [5] - 670:23,
711:5, 711:16,
711:17, 819:17
**boys** [4] - 788:4,
820:10, 820:16,
820:24
**brain** [2] - 637:25,
638:4
**brake** [2] - 666:11,
710:19
**Branham** [47] -
642:20, 642:25,

643:3, 663:5,
675:10, 678:10,
678:18, 693:4,
693:10, 699:4,
701:4, 701:12,
701:16, 708:23,
709:8, 709:11,
768:11, 768:16,
768:20, 769:13,
769:16, 769:18,
774:22, 774:24,
775:3, 775:15,
798:2, 799:3,
799:13, 799:24,
800:4, 800:12,
800:16, 800:21,
801:22, 802:5,
805:25, 807:10,
808:3, 810:14,
812:5, 812:7,
815:25, 816:6,
823:25, 825:3
**Branham's** [4] -
678:16, 700:21,
709:14, 800:19
**break** [17] - 626:11,
626:13, 665:21,
666:3, 666:7, 680:4,
680:7, 680:22,
714:3, 714:9,
714:25, 735:10,
739:25, 761:24,
761:25, 789:10,
789:19
**Break** [2] - 763:3,
789:25
**breath** [2] - 680:9,
714:25
**brief** [3] - 761:23,
762:4, 828:14
**briefed** [1] - 614:4
**Briefly** [1] - 684:1
**briefly** [2] - 637:18,
712:3
**bright** [2] - 644:12,
644:17
**bright-line** [2] -
644:12, 644:17
**bring** [5] - 630:7,
738:21, 761:16,
798:22, 821:13
**bringing** [1] - 698:10
**brings** [5] - 634:15,
742:9, 742:10,
742:23, 788:25
**broke** [2] - 780:4,
783:1
**broken** [6] - 824:6,
824:7, 824:9,
824:15, 824:16,

5

824:19
**brother** [3] - 771:4, 787:7
**brothers** [1] - 754:4
**brought** [5] - 739:18, 751:23, 752:18, 784:24, 828:15
**Brown** [1] - 607:22
**buckets** [2] - 726:7
**Buckhannon** [1] - 771:24
**buddies** [1] - 787:6
**building** [1] - 829:7
**bulk** [1] - 728:3
**bullet** [19] - 766:18, 773:16, 776:9, 776:14, 776:18, 777:2, 777:3, 777:7, 777:10, 784:5, 802:23, 803:1, 803:2, 803:10, 804:13, 805:4, 805:10, 824:18, 824:19
**bullets** [6] - 709:17, 709:18, 709:20, 765:18, 776:2, 780:17
**bumper** [4] - 695:18, 771:15, 772:6, 824:23
**bunch** [2] - 646:8, 707:16, 826:1
**burden** [9] - 741:25, 742:5, 753:2, 757:15, 782:18, 805:18, 818:18, 818:20, 818:24
**bureau** [1] - 630:6
**Bureau** [1] - 646:11
**bury** [1] - 788:13
**business** [1] - 828:12
**butt** [1] - 830:7
**button** [1] - 670:12
**buy** [1] - 768:10
**buzz** [1] - 779:12
**BY** [10] - 627:12, 637:21, 639:19, 650:3, 679:2, 682:5, 682:23, 685:14, 690:7, 712:6

**C**

**C1** [4] - 766:15, 776:10, 776:17, 777:11
**cadets** [3] - 629:16, 629:17, 793:7
**calculated** [1] -

665:14
**calculation** [7] - 662:2, 662:4, 662:5, 662:7, 706:5, 707:3, 753:8
**calculations** [4] - 660:25, 707:6, 707:7, 816:13
**calculator** [2] - 661:2, 661:24
**calculus** [1] - 722:24
**callous** [12] - 609:23, 614:11, 618:4, 618:16, 725:25, 726:12, 754:19, 755:6, 760:17, 784:11, 784:13, 822:1
**cam** [1] - 826:25
**camera** [1] - 826:25
**candid** [1] - 829:17
**candidly** [1] - 811:15
**candor** [3] - 727:23, 728:15, 831:4
**cannot** [12] - 613:1, 619:7, 640:15, 658:9, 671:4, 697:24, 757:19, 757:23, 765:6, 778:3, 827:12, 834:21
**Canyon** [1] - 607:19
**capacity** [3] - 607:4, 607:9, 748:3
**Capitol** [1] - 796:19
**car** [40] - 625:19, 655:25, 658:22, 666:12, 668:12, 669:1, 669:3, 669:14, 671:6, 671:7, 671:9, 695:22, 696:3, 697:16, 699:17, 703:18, 704:20, 705:12, 705:13, 708:19, 711:8, 711:10, 722:8, 765:22, 767:20, 773:14, 775:22, 767:1, 780:21, 818:4, 826:5, 826:6, 826:10, 826:12, 826:15, 826:19, 826:22, 826:24, 827:3
**cardinal** [1] - 780:5
**care** [11] - 652:13, 660:11, 661:22, 674:6, 705:19, 705:23, 733:3,

734:16, 760:5, 784:7, 820:15
**career** [4] - 627:18, 627:22, 782:17
**careful** [1] - 749:20
**carefully** [2] - 741:17, 745:3
**carried** [2] - 690:20, 691:21
**Carroll** [28] - 607:21, 613:18, 616:22, 619:1, 626:24, 715:25, 719:3, 720:2, 721:1, 723:11, 727:12, 727:22, 728:8, 729:3, 729:9, 729:25, 730:5, 731:10, 732:24, 735:1, 736:3, 738:8, 738:14, 739:4, 792:8, 795:16, 802:22, 819:13
**CARROLL** [34] - 609:8, 609:11, 613:10, 613:12, 613:17, 616:23, 619:21, 715:20, 719:4, 720:3, 721:4, 721:9, 723:12, 724:14, 724:17, 724:22, 725:16, 726:17, 726:23, 727:23, 729:4, 729:10, 729:12, 730:6, 730:12, 730:15, 731:11, 732:10, 732:25, 735:2, 736:1, 736:5, 738:15, 830:9
**Carroll......................
......3** [1] - 608:3
**carry** [1] - 816:2
**cars** [2] - 655:12, 655:14
**case** [200] - 609:20, 609:21, 609:24, 610:8, 610:16, 611:2, 611:6, 611:24, 612:6, 612:10, 612:17, 612:22, 613:14, 614:4, 614:19, 616:11, 617:17, 620:15, 623:12, 623:16, 633:7, 633:8, 635:8, 635:15, 639:23, 640:8, 641:8, 644:14, 644:18,

653:7, 653:9, 653:13, 653:20, 654:5, 661:6, 662:6, 662:25, 663:14, 680:12, 682:17, 683:18, 683:20, 683:21, 685:23, 686:3, 687:22, 688:10, 691:17, 695:2, 695:4, 695:11, 696:7, 697:2, 701:1, 702:10, 702:20, 702:25, 703:4, 703:12, 706:14, 712:16, 713:2, 714:10, 714:13, 714:14, 715:6, 717:3, 720:16, 721:15, 722:2, 722:3, 724:5, 724:12, 725:2, 725:6, 725:10, 725:19, 726:10, 727:5, 727:8, 727:15, 728:19, 730:17, 730:19, 736:6, 736:17, 737:7, 737:23, 739:15, 740:1, 740:8, 740:13, 740:19, 741:5, 741:11, 741:18, 741:21, 743:6, 743:13, 743:15, 744:4, 744:14, 744:23, 745:6, 745:9, 746:15, 747:3, 747:7, 748:2, 748:13, 749:6, 749:19, 751:12, 752:17, 752:21, 753:21, 756:12, 756:22, 757:1, 757:3, 757:10, 758:11, 758:17, 758:18, 759:2, 759:3, 759:4, 762:8, 762:12, 762:13, 764:8, 765:19, 766:25, 768:22, 770:4, 770:11, 770:13, 772:14, 775:8, 782:14, 782:22, 786:15, 786:23, 787:19, 789:2, 789:14, 789:17, 789:18, 790:14, 790:17, 790:21, 790:22, 790:24, 791:13,

791:24, 794:8, 794:9, 794:20, 796:24, 797:5, 797:8, 797:15, 797:17, 797:23, 798:8, 798:14, 800:21, 802:3, 802:5, 803:1, 803:18, 804:15, 805:19, 806:2, 806:8, 807:16, 807:25, 808:22, 808:25, 809:9, 809:10, 809:11, 813:19, 815:5, 819:21, 820:9, 820:17, 820:20, 821:11, 822:5, 823:4, 823:9, 823:25, 825:2, 828:17, 832:8, 833:7
**cases** [33] - 618:5, 632:2, 632:3, 632:5, 632:11, 632:12, 632:19, 632:23, 632:24, 632:25, 633:6, 633:9, 640:19, 676:4, 677:4, 685:1, 685:18, 685:19, 685:21, 685:24, 686:9, 686:22, 687:3, 687:9, 687:13, 691:3, 725:11, 738:8, 781:17, 825:19
**casing** [2] - 691:12, 691:17
**casings** [8] - 689:8, 689:9, 689:17, 689:19, 690:9, 690:25, 691:2, 691:7
**cast** [1] - 791:10
**catch** [4] - 672:19, 680:8, 714:25, 720:5
**catching** [1] - 770:4
**categories** [2] - 726:8, 760:2
**caught** [6] - 781:13, 781:22, 781:24, 787:3, 787:12
**caused** [11] - 673:7, 699:20, 748:16, 749:11, 752:2, 752:8, 756:16, 764:6, 768:19, 807:18, 807:19
**causing** [2] - 764:4, 765:2
**caution** [1] - 761:18

Celebrezze [1] - 645:25
celestial [1] - 661:25
cell [1] - 829:8
centers [1] - 738:10
certain [8] - 676:5, 677:5, 691:2, 743:9, 757:25, 794:23, 811:12
certainly [17] - 614:2, 614:6, 614:13, 615:18, 615:23, 616:3, 616:15, 617:16, 622:25, 623:11, 656:2, 713:17, 721:14, 723:13, 724:11, 726:11, 834:25
certainty [5] - 679:12, 713:13, 805:3, 805:17, 808:10
certification [3] - 630:1, 634:24, 665:1
certifications [2] - 633:15, 633:17
certified [1] - 816:23
certify [2] - 836:5, 836:9
certifying [1] - 634:3
chain [1] - 743:8
chair [1] - 740:4
chance [5] - 684:5, 684:11, 685:25, 715:19, 731:24
change [3] - 758:21, 794:1, 816:15
changed [4] - 644:14, 659:24, 675:18, 679:18
changes [2] - 644:13, 691:25
changing [1] - 691:8
character [1] - 754:21
characterization [2] - 622:13, 732:1
charge [36] - 620:6, 620:12, 629:2, 649:15, 681:1, 681:6, 681:7, 681:14, 715:2, 715:18, 715:19, 715:24, 716:11, 716:12, 718:3, 718:10, 718:22, 722:13, 729:3, 729:4, 729:7, 729:10, 729:14, 729:17, 729:19, 740:11, 741:1, 741:19, 795:9,

829:20, 830:12, 830:15, 830:21, 830:23, 830:25, 831:3
charges [1] - 719:12
chart [4] - 660:23, 660:25, 661:25
chase [2] - 621:20, 722:8
chat [1] - 835:6
cheek [4] - 773:15, 775:20, 776:18
chief [11] - 613:14, 617:17, 631:3, 631:4, 638:10, 638:24, 639:1, 657:14, 713:7, 766:13, 800:22
Chiefs [1] - 676:22
chiefs [1] - 633:25
child [5] - 771:5, 786:9, 786:18, 788:11, 788:12
childhoods [1] - 786:1
children [3] - 630:13, 658:1, 785:10
children's [1] - 785:20
China [1] - 667:5
choice [1] - 793:14
choose [2] - 632:18, 632:23
chopped [1] - 815:3
Christy [6] - 719:21, 719:25, 748:3, 785:4, 785:9, 819:10
CHRISTY [1] - 607:4
Circuit [3] - 725:2, 725:11, 728:19
circumstance [1] - 814:18
circumstances [23] - 610:14, 619:10, 707:21, 720:23, 722:9, 722:16, 722:24, 723:4, 723:22, 724:8, 743:8, 746:11, 748:21, 749:15, 749:18, 749:21, 750:8, 750:20, 751:20, 779:6, 779:9, 779:11, 812:4
circumstantial [3] - 743:7, 743:10, 743:13
citation [1] - 612:17
cite [1] - 635:10
cited [5] - 616:7, 616:10, 644:24, 678:12, 678:14

citizen [1] - 764:5
citizen's [1] - 764:1
citizens [2] - 650:24, 763:22
city [3] - 630:8, 630:13, 630:14
CIVIL [1] - 607:4
civil [12] - 632:3, 632:5, 632:11, 632:12, 632:13, 632:19, 728:14, 740:10, 741:21, 741:25, 754:17, 833:17
civilian [3] - 622:1, 622:3, 648:13
civilians [2] - 648:12, 670:14
claim [54] - 609:13, 610:7, 611:14, 611:18, 611:25, 612:2, 612:7, 613:4, 613:5, 613:6, 613:8, 613:22, 614:15, 615:22, 616:17, 617:8, 617:12, 617:15, 617:23, 618:8, 618:11, 618:13, 618:21, 618:22, 618:25, 619:2, 619:3, 619:17, 700:2, 717:25, 718:4, 718:13, 719:18, 727:2, 728:1, 728:23, 742:3, 742:6, 749:4, 750:4, 751:4, 751:9, 752:6, 752:19, 754:16, 757:20, 779:10, 780:11, 790:14, 805:14, 807:6, 820:20, 821:21
claimed [2] - 757:17, 797:6
claiming [1] - 699:24
claims [18] - 609:15, 612:22, 613:3, 613:5, 613:9, 614:21, 616:19, 616:20, 616:24, 698:16, 700:4, 700:5, 710:16, 718:16, 742:1, 748:13, 749:6, 753:15
clarification [3] - 623:10, 625:18, 625:24
clarified [1] - 791:11

clarify [1] - 679:3
Clark [2] - 629:4, 629:5
CLARKSBURG [1] - 607:2
Clarksburg [2] - 607:13, 771:24
class [2] - 664:25, 665:17
classes [9] - 628:10, 628:16, 628:21, 629:19, 630:1, 630:19, 645:9, 646:12
classify [1] - 769:3
clear [14] - 612:6, 637:22, 638:10, 694:22, 698:9, 699:25, 723:25, 727:9, 727:16, 732:15, 751:17, 774:4, 774:5, 778:8
clearly [7] - 738:9, 777:21, 778:4, 794:1, 807:17, 815:22
CLERK [8] - 834:1, 834:5, 834:7, 834:9, 834:11, 834:13, 834:15, 834:17
clerk [1] - 650:11
Clerk [10] - 627:4, 778:14, 791:12, 828:23, 829:5, 831:22, 833:8, 833:13, 833:24, 834:20
Cleveland [1] - 647:13
click [1] - 649:10
client [4] - 790:12, 791:10, 819:22, 821:16
clients [1] - 743:21
climb [1] - 708:11
climbed [2] - 708:7, 708:8
clock [1] - 712:23
clones [1] - 645:23
close [9] - 613:13, 618:7, 633:22, 636:16, 641:15, 645:24, 686:25, 824:11, 824:13
closed [1] - 657:22
closely [1] - 781:8
CLOSING [1] - 608:7
closing [20] - 733:16, 735:13, 735:15, 739:25, 743:15, 761:25, 762:2,

762:4, 762:15, 788:2, 789:19, 791:3, 800:1, 802:10, 819:8, 820:21, 821:2, 822:24, 823:5, 824:22
closings [3] - 735:11, 735:12, 762:20
clothing [1] - 676:24
clubs [2] - 646:11, 646:12
clutch [3] - 765:8, 804:1, 804:4
co [2] - 615:5, 802:21
co-counsel [2] - 615:5, 802:21
coast [2] - 631:11
Code [3] - 612:4, 612:24, 718:17
codes [5] - 651:8, 651:10, 651:16
coefficient [1] - 666:12
coffin [1] - 670:24
cognitive [1] - 641:13
coincide [1] - 747:25
cold [5] - 687:14, 688:6, 688:7, 688:10, 825:6
college [2] - 627:17, 646:12
colleges [1] - 630:16
collude [2] - 799:19, 808:14
colluded [3] - 799:12, 799:16, 799:25
colluding [1] - 800:3
collusion [1] - 800:2
Colonel [1] - 631:6
color [12] - 620:8, 651:8, 651:10, 651:16, 716:16, 717:5, 740:23, 748:6, 748:11, 748:24, 748:25, 813:4
Columbus [5] - 647:12, 682:24, 684:1, 684:3, 712:20
combative [2] - 629:12, 636:9
comfort [3] - 626:11, 754:2, 789:10
comfortable [1] - 627:8
coming [22] - 624:16, 641:19, 670:10, 672:17, 677:11, 696:11, 698:10,

7

698:13, 709:24,
710:18, 710:19,
736:25, 765:16,
765:21, 772:7,
794:5, 795:13,
809:20, 809:24,
810:8, 810:15, 818:6
**comma** [1] - 722:13
**command** [1] - 638:17
**commander** [3] -
628:25, 801:24,
801:25
**commands** [8] -
651:13, 710:21,
710:22, 710:23,
784:3, 814:8,
814:12, 814:17
**commenced** [1] -
609:1
**commend** [1] - 768:11
**comment** [5] - 774:25,
791:2, 805:1, 805:2,
819:7
**comments** [2] - 681:6,
685:11
**commercial** [1] -
667:4
**Commission** [2] -
628:4, 644:20
**commission** [2] -
628:6, 630:3
**commissioned** [2] -
630:2, 630:21
**commitment** [2] -
630:23, 631:4
**committed** [1] -
755:16
**committing** [2] -
721:21, 721:22
**common** [8] - 728:12,
744:22, 747:6,
766:1, 770:21,
771:20, 772:12
**commonwealth** [1] -
728:20
**communicate** [1] -
761:14
**communication** [1] -
684:8
**community** [8] -
647:15, 648:7,
648:8, 648:10,
648:14, 649:14,
741:22, 782:17
**companionship** [1] -
754:1
**company** [2] - 769:1,
769:7
**comparative** [3] -
720:12, 720:15,

723:1
**compelled** [1] - 791:2
**compensate** [5] -
752:15, 752:22,
755:14, 755:25,
782:18
**compensated** [4] -
639:24, 640:1,
685:5, 686:16
**compensatory** [10] -
724:25, 725:12,
732:8, 752:13,
753:9, 753:10,
754:6, 754:13,
754:24, 756:17
**complete** [5] - 707:9,
761:8, 819:5,
819:21, 823:11
**completed** [4] - 643:3,
759:22, 760:22,
761:22
**completely** [8] -
688:18, 699:8,
768:19, 774:14,
807:22, 815:7,
825:19
**completing** [1] -
761:10
**compliance** [1] -
675:20
**complicated** [1] -
728:24
**complied** [5] - 659:12,
673:15, 674:25,
712:17, 817:17
**comply** [5] - 623:25,
673:8, 814:11,
814:13, 836:9
**complying** [2] -
621:12, 784:3
**component** [1] - 624:4
**components** [2] -
609:12, 818:15
**computations** [2] -
661:3, 791:23
**computer** [4] - 607:25,
646:4, 646:5, 661:2
**computer-aided** [1] -
607:25
**conceal** [2] - 756:15,
784:22
**concede** [2] - 616:14,
810:6
**conceded** [5] - 794:1,
794:9, 800:13,
806:4, 810:10
**concedes** [2] - 799:4,
800:11
**concern** [4] - 719:15,
720:7, 733:23,

740:24
**concerned** [4] -
677:20, 700:2,
758:8, 767:10
**concerning** [2] -
746:2, 747:13
**concerns** [5] - 715:11,
716:2, 723:1,
728:15, 732:23
**conclude** [2] - 737:18,
835:2
**concluded** [2] -
626:21, 835:25
**conclusion** [3] -
609:5, 674:24,
744:21
**concourse** [1] -
712:23
**condition** [1] - 742:14
**conduct** [27] - 609:22,
610:12, 611:22,
612:1, 612:8,
612:11, 619:6,
624:1, 629:19,
722:15, 751:19,
752:16, 754:18,
754:22, 755:2,
755:6, 755:9, 756:8,
756:12, 756:13,
757:3, 760:17,
784:11, 814:22,
818:7, 822:1, 822:10
**conducted** [1] - 746:2
**conductive** [1] -
629:12
**conference** [5] -
681:14, 715:18,
715:24, 829:6,
836:10
**conferences** [1] -
820:14
**confident** [1] - 652:17
**confines** [1] - 796:23
**confirm** [1] - 833:15
**confirmed** [2] -
768:16, 768:17
**confirming** [1] -
713:10
**conflict** [4] - 810:1,
810:3, 810:18, 811:2
**confronted** [1] -
817:16
**confronting** [4] -
669:2, 670:21,
671:5, 750:8
**confuse** [1] - 823:6
**confusing** [1] - 731:15
**confusion** [1] - 726:15
**Congress** [2] -
609:16, 609:18

**connect** [1] - 767:5
**connection** [2] -
746:9, 762:12
**connor** [1] - 702:22
**Connor** [8] - 644:18,
645:16, 658:10,
667:14, 667:16,
672:22, 673:17,
675:7
**conscientious** [3] -
718:13, 753:2,
755:17
**consciously** [1] -
753:5
**consciousness** [1] -
664:18
**consequences** [2] -
741:20, 831:5
**consider** [27] - 614:6,
638:3, 687:17,
698:17, 698:18,
722:15, 724:4,
730:20, 731:8,
734:4, 740:15,
741:18, 744:14,
745:3, 745:5,
745:16, 746:11,
746:22, 751:19,
752:13, 753:19,
756:5, 756:10,
756:21, 756:22,
821:9, 825:21
**consideration** [8] -
623:12, 625:18,
718:18, 734:12,
744:15, 758:18,
760:3, 820:19
**considerations** [1] -
746:25
**considered** [7] -
645:3, 721:23,
728:16, 734:8,
757:25, 758:11,
784:23
**considering** [3] -
730:10, 751:6,
829:21
**consistency** [2] -
719:19, 720:5
**consistent** [9] - 611:2,
640:13, 679:21,
719:19, 737:16,
743:2, 798:16, 800:5
**consists** [1] - 744:4
**console** [2] - 803:6,
804:6
**conspiracy** [1] - 800:1
**constantly** [1] -
766:23
**constitute** [1] - 743:18

**constituted** [1] -
719:12
**Constitution** [13] -
614:10, 720:16,
748:7, 763:17,
763:20, 776:3,
778:2, 779:20,
780:6, 782:24,
784:6, 788:22,
825:10
**constitutional** [14] -
614:12, 725:13,
740:22, 748:17,
749:2, 749:5,
749:11, 750:10,
764:1, 770:19,
774:20, 777:23,
779:1, 784:16
**consult** [1] - 758:14
**consulting** [1] -
631:14
**contact** [1] - 684:6
**contacted** [2] -
631:21, 645:24
**contacting** [1] - 808:3
**contacts** [1] - 644:19
**contained** [2] - 780:6,
783:1
**context** [7] - 616:24,
637:7, 645:5, 693:9,
728:1, 736:11,
795:10
**continue** [19] - 642:7,
647:2, 662:19,
663:17, 667:8,
686:20, 692:17,
714:10, 714:12,
762:8, 762:11,
773:12, 789:13,
789:15, 814:11,
829:25, 830:4
**continued** [2] - 647:1,
806:13
**continues** [5] -
624:24, 625:1,
710:22, 710:23,
814:15
**continuum** [6] -
649:19, 650:5,
650:13, 651:7,
652:21, 653:8
**contradict** [3] -
801:16, 802:8, 807:8
**contradicted** [1] -
745:9
**contradictory** [3] -
689:11, 745:23,
747:9
**contrary** [8] - 667:11,
671:15, 674:21,

702:8, 702:14,
703:6, 807:22,
829:13
**contravene** [1] - 736:8
**control** [10] - 629:6,
629:11, 633:22,
635:12, 648:16,
652:17, 729:22,
738:18, 748:1, 770:2
**convened** [1] - 715:18
**convenience** [1] -
759:10
**conversation** [5] -
618:1, 640:18,
709:2, 728:24,
831:22
**convey** [2] - 792:17,
795:11
**conviction** [1] -
758:22
**convince** [1] - 775:25
**convinced** [3] -
726:10, 737:25,
758:21
**convincing** [3] -
727:9, 727:17,
732:16
**cop** [2] - 655:14,
670:11
**copies** [4] - 676:13,
715:3, 735:3, 735:8
**cops** [5] - 646:8,
646:19, 646:21,
825:12
**copy** [13] - 681:1,
681:2, 715:3,
716:12, 729:17,
739:6, 740:3, 740:7,
740:16, 759:8,
759:10, 830:23,
831:16
**cord** [5] - 731:25,
766:15, 766:17,
776:19, 777:2
**Corey** [32] - 642:24,
693:7, 693:11,
693:14, 708:24,
709:3, 709:10,
709:12, 764:20,
768:21, 768:22,
769:4, 775:18,
781:6, 781:11,
791:16, 791:17,
808:1, 808:2, 808:4,
808:20, 808:22,
809:2, 811:13,
812:8, 826:2, 826:3,
826:8, 826:11,
826:15, 827:21,
827:24

**Corp** [3] - 631:7,
631:9, 631:13
**Corporal** [1] - 629:3
**correct** [47] - 619:1,
638:4, 638:5, 638:7,
638:9, 638:18,
644:24, 649:5,
652:5, 667:14,
672:7, 685:22,
689:1, 689:6,
690:14, 691:20,
693:2, 693:5,
694:18, 694:24,
698:12, 701:1,
701:7, 702:3, 702:7,
702:12, 703:3,
703:10, 703:15,
703:22, 704:9,
704:21, 705:3,
706:6, 707:19,
708:16, 709:17,
709:20, 710:1,
711:5, 712:9, 720:1,
726:6, 728:6, 736:3,
828:23, 836:6
**corrected** [1] - 683:11
**corrections** [1] -
628:11
**correctly** [12] - 618:2,
629:14, 634:8,
644:24, 652:21,
672:22, 678:12,
678:13, 691:11,
692:9, 709:8, 821:3
**counsel** [37] - 613:19,
613:22, 614:16,
615:5, 617:14,
618:2, 623:15,
624:9, 680:19,
714:5, 729:14,
731:15, 733:6,
735:13, 740:1,
743:15, 743:18,
747:24, 761:25,
763:13, 785:23,
790:7, 797:8,
797:24, 798:3,
799:14, 802:4,
802:11, 802:21,
804:20, 812:22,
819:8, 822:23,
828:9, 828:22,
828:24, 829:2
**counsel's** [3] - 766:22,
772:18, 791:3
**counselor** [1] - 632:21
**Counselor** [1] -
632:22
**count** [2] - 631:10,
662:1

**countermeasures** [1]
- 633:23
**countless** [1] - 781:17
**country** [8] - 637:1,
646:23, 649:6,
680:21, 763:22,
771:23, 771:25,
779:24
**County** [9] - 621:15,
630:2, 702:6,
702:11, 778:7,
778:8, 813:2,
813:14, 822:9
**couple** [8] - 674:13,
675:11, 691:16,
738:19, 791:25,
792:1, 793:13,
818:15
**courage** [1] - 827:10
**course** [19] - 617:18,
624:25, 634:13,
634:16, 658:15,
679:15, 679:16,
691:1, 715:7, 720:9,
722:6, 729:16,
744:9, 747:18,
758:20, 781:21,
791:9, 815:5, 830:24
**courses** [1] - 633:23
**COURT** [163] - 607:1,
609:2, 609:10,
613:7, 613:11,
613:16, 613:18,
616:9, 616:21,
617:14, 619:22,
620:3, 620:10,
620:12, 621:19,
622:5, 622:20,
622:24, 623:3,
623:13, 623:17,
623:20, 624:6,
624:20, 625:6,
625:9, 625:16,
625:25, 626:5,
626:8, 626:10,
626:14, 626:18,
627:3, 627:7,
637:15, 637:19,
638:22, 639:1,
639:4, 639:6, 639:9,
649:25, 679:1,
680:2, 680:6,
680:17, 681:1,
681:11, 681:18,
681:21, 681:25,
685:12, 689:23,
690:2, 690:4,
711:25, 712:2,
712:4, 713:17,
713:20, 713:23,

713:25, 714:2,
714:19, 714:22,
714:24, 715:17,
715:23, 719:3,
719:7, 719:14,
719:23, 720:2,
720:4, 720:25,
721:6, 721:25,
722:4, 722:11,
723:10, 723:17,
724:16, 724:21,
725:8, 726:5,
726:21, 727:11,
727:21, 728:5,
728:8, 729:6, 729:9,
729:11, 729:13,
730:4, 730:11,
730:14, 730:21,
731:9, 731:20,
732:19, 733:1,
733:11, 733:18,
733:22, 734:6,
734:11, 734:15,
734:19, 734:22,
735:1, 735:3,
735:16, 735:22,
736:3, 737:21,
738:16, 738:18,
739:1, 739:4, 739:7,
739:12, 759:22,
762:19, 762:22,
762:24, 763:4,
763:8, 763:11,
786:6, 786:23,
787:1, 787:21,
788:1, 789:8,
789:23, 790:3,
796:23, 798:13,
810:24, 822:18,
822:21, 827:19,
828:9, 828:22,
829:5, 829:12,
830:6, 830:11,
830:22, 831:13,
831:15, 831:19,
831:21, 832:2,
832:14, 832:18,
832:25, 834:19,
835:12, 835:21,
835:23
**Court** [69] - 609:19,
612:23, 614:3,
614:5, 616:8,
617:15, 617:19,
618:11, 618:21,
618:24, 619:11,
619:16, 621:12,
639:13, 644:13,
659:13, 673:8,
673:16, 674:25,
675:21, 679:21,

712:17, 713:14,
714:6, 716:14,
717:4, 717:15,
717:21, 717:24,
718:4, 718:15,
718:25, 723:15,
723:25, 724:7,
725:7, 725:23,
725:24, 726:1,
727:24, 729:18,
732:20, 735:20,
737:6, 737:21,
737:24, 740:25,
747:24, 757:5,
761:14, 763:13,
779:21, 780:13,
782:25, 784:21,
790:7, 790:24,
817:17, 822:11,
822:23, 831:8,
834:20, 835:13,
835:16, 836:4,
836:10, 836:15
**court** [41] - 609:1,
612:5, 612:15,
624:14, 626:17,
634:5, 635:5,
641:24, 643:9,
644:22, 659:1,
677:4, 680:16,
681:24, 714:18,
728:14, 728:17,
729:15, 737:14,
739:11, 741:24,
759:8, 760:22,
761:16, 762:18,
763:10, 770:1,
772:21, 777:4,
789:22, 790:2,
792:6, 792:9,
793:19, 793:23,
824:14, 828:21,
832:17, 833:1,
835:11
**Court's** [26] - 618:10,
618:20, 619:5,
619:18, 619:25,
620:25, 621:8,
625:4, 681:7, 715:2,
715:19, 716:11,
718:3, 718:9,
718:21, 719:11,
720:24, 722:13,
724:20, 725:17,
725:21, 727:1,
729:7, 734:23,
735:3, 743:24
**courthouse** [1] -
774:19
**Courtney** [4] - 612:5,
612:6, 616:11

**courtroom** [22] - 626:16, 642:23, 658:14, 673:5, 680:15, 681:23, 714:7, 739:10, 739:19, 744:12, 761:13, 762:25, 763:9, 764:16, 789:21, 790:1, 791:1, 794:11, 803:9, 829:9, 832:16, 835:3
**Courts** [1] - 635:3
**courts** [2] - 636:3, 723:22
**cover** [16] - 615:9, 615:10, 624:23, 680:19, 753:11, 756:15, 776:16, 776:23, 776:24, 777:6, 784:22, 785:2, 802:20, 814:14, 825:25, 827:13
**covered** [3] - 664:24, 717:4, 720:23
**covering** [1] - 769:24
**covers** [1] - 718:23
**coverup** [7] - 615:7, 617:3, 617:8, 769:25, 770:2, 784:25, 785:1
**cowering** [1] - 776:16
**Cranberry** [1] - 607:23
**crap** [1] - 794:19
**crazy** [2] - 735:23, 819:18
**create** [6] - 609:17, 609:18, 617:11, 757:12, 763:24, 788:6
**created** [3] - 609:16, 727:5, 737:13
**creating** [1] - 723:1
**credence** [1] - 746:13
**credibility** [6] - 744:24, 745:24, 746:7, 747:17, 781:23, 782:4
**crime** [11] - 638:6, 692:22, 704:15, 717:18, 721:20, 721:21, 721:22, 751:16, 771:22, 779:8, 779:14
**criminal** [2] - 632:24, 632:25
**critical** [6] - 631:24, 636:21, 644:11, 647:11, 675:5,

700:25
**criticism** [2] - 672:8, 672:9
**CROSS** [2] - 637:20, 682:4
**cross** [5] - 625:25, 626:3, 680:4, 713:12, 812:13
**Cross** [1] - 608:6
**CROSS-EXAMINATION** [2] - 637:20, 682:4
**Cross-examination** [1] - 608:6
**cross-examination** [2] - 626:3, 713:12
**cross-examining** [1] - 812:13
**cruiser** [52] - 624:23, 625:1, 657:4, 657:17, 657:21, 660:9, 661:8, 661:20, 661:22, 663:3, 663:7, 664:17, 665:8, 665:10, 667:25, 668:9, 668:16, 668:20, 669:10, 669:11, 669:17, 669:22, 670:18, 670:19, 671:12, 671:18, 671:20, 671:23, 671:24, 672:2, 674:4, 678:23, 704:7, 705:7, 707:1, 710:20, 792:23, 795:2, 803:15, 806:9, 806:11, 806:12, 806:14, 806:17, 806:18, 809:17, 810:13, 814:6, 814:8, 814:15, 815:24
**cruisers** [4] - 657:14, 663:4, 670:21, 674:13
**culmination** [2] - 644:9, 649:18
**curious** [1] - 623:4
**current** [2] - 684:10, 716:12
**curve** [1] - 654:21
**cut** [5] - 655:17, 667:2, 679:7, 715:10, 793:18
**Cut** [1] - 795:5
**cuts** [1] - 665:24
**Cutter** [2] - 836:3, 836:14

**CV** [3] - 683:3, 684:25, 781:17
**cycles** [1] - 678:13

## D

**D.C** [1] - 796:19
**dad** [8] - 769:2, 769:4, 786:20, 787:2, 787:9, 820:22, 827:23
**dad's** [1] - 787:5
**Daddy** [1] - 787:10
**daddy** [3] - 787:10, 787:13, 788:8
**damage** [3] - 658:4, 724:25, 758:9
**damages** [131] - 609:13, 609:16, 609:19, 609:21, 610:7, 613:22, 614:3, 614:7, 614:14, 615:6, 615:11, 616:24, 617:8, 617:12, 617:24, 618:8, 618:12, 716:19, 716:21, 716:23, 718:7, 718:8, 718:15, 718:17, 724:19, 725:1, 725:4, 725:12, 725:14, 725:19, 725:23, 726:9, 726:24, 727:3, 727:5, 727:6, 727:8, 727:15, 728:1, 728:16, 730:13, 731:14, 732:7, 732:8, 732:12, 732:16, 733:5, 733:10, 748:5, 752:4, 752:11, 752:13, 752:20, 752:25, 753:6, 753:7, 753:9, 753:10, 753:16, 754:7, 754:10, 754:13, 754:14, 754:16, 754:17, 754:21, 754:25, 755:1, 755:3, 755:9, 755:12, 755:13, 755:19, 755:23, 755:24, 755:25, 756:2, 756:4, 756:6, 756:10, 756:18, 756:23, 756:24, 756:25, 757:4, 757:6, 757:8,

757:11, 757:16, 757:18, 757:20, 757:21, 757:22, 757:24, 758:1, 758:4, 758:7, 758:8, 759:25, 760:1, 760:2, 760:8, 760:10, 760:11, 760:12, 760:13, 760:24, 761:2, 761:3, 783:21, 784:10, 784:19, 785:8, 785:9, 785:13, 819:20, 820:8, 821:17, 821:19, 822:6
**danger** [1] - 616:5
**dangerous** [8] - 620:19, 620:20, 621:3, 621:7, 623:24, 655:10, 655:18, 825:16
**darkest** [1] - 782:1
**darkness** [2] - 827:21, 828:7
**dash** [1] - 826:25
**date** [6] - 759:21, 760:21, 761:4, 761:12, 819:5, 833:22
**Dave** [5] - 811:22, 826:17, 826:18, 826:23
**DAVID** [1] - 607:9
**David** [36] - 722:18, 723:5, 740:21, 748:5, 748:10, 748:15, 748:16, 748:24, 749:1, 749:5, 749:8, 749:10, 750:23, 750:25, 751:11, 751:21, 752:9, 752:12, 752:16, 755:4, 755:5, 757:13, 757:15, 758:1, 759:16, 760:15, 760:17, 783:13, 790:20, 791:14, 792:13, 797:15, 797:18, 818:13, 823:10
**Dawson** [3] - 829:15, 832:22, 833:23
**days** [9] - 691:17, 738:2, 774:6, 774:9, 774:10, 774:15, 782:1, 793:13, 818:22
**dead** [8] - 652:2,

731:18, 765:7, 766:9, 770:19, 772:10, 780:2, 827:2
**deadline** [1] - 835:18
**deadlocked** [3] - 829:23, 831:6, 831:11
**deadly** [4] - 716:21, 736:12, 796:9, 797:19
**dealings** [1] - 821:24
**deals** [1] - 718:6
**dealt** [1] - 741:23
**dear** [1] - 824:9
**death** [52] - 609:14, 611:23, 612:7, 612:9, 612:12, 612:13, 612:21, 612:23, 612:25, 613:4, 613:8, 616:17, 618:22, 619:2, 619:10, 621:10, 621:14, 622:14, 636:22, 647:12, 659:11, 730:17, 730:24, 731:1, 731:16, 731:17, 750:17, 751:25, 752:1, 752:2, 752:3, 752:5, 752:7, 752:9, 752:17, 752:20, 752:24, 753:3, 753:14, 753:18, 753:21, 753:25, 756:1, 764:5, 778:12, 778:13, 782:18, 820:6, 820:23
**debate** [1] - 660:5
**decedent** [7] - 612:19, 612:23, 722:15, 730:19, 740:22, 751:13, 751:19
**deceit** [1] - 746:4
**decide** [24] - 656:21, 668:3, 668:6,

672:24, 676:6,
676:8, 676:9,
702:15, 717:24,
741:21, 749:16,
756:4, 757:7,
758:17, 781:2,
783:23, 785:6,
790:12, 813:15,
813:19, 814:20,
817:10, 819:17,
823:8
**decided** [2] - 723:25,
790:25
**decides** [1] - 711:1
**deciding** [1] - 746:25
**decision** [18] - 611:11,
612:6, 612:15,
612:19, 635:11,
644:12, 651:9,
651:15, 651:16,
651:17, 702:16,
733:2, 746:21,
783:20, 791:15,
795:25, 796:5,
814:22
**decisions** [1] - 741:12
**declaration** [1] -
829:23
**declare** [1] - 619:11
**deduction** [1] - 744:21
**deemed** [1] - 639:10
**deer** [8] - 665:23,
824:4, 824:5, 824:6,
824:11, 824:13,
824:15, 824:18
**default** [2] - 752:3,
752:8
**defend** [3] - 684:10,
684:19, 713:3
**defendant** [123] -
610:3, 613:7, 614:8,
614:17, 615:8,
615:20, 616:7,
621:5, 622:9,
626:23, 627:1,
632:8, 682:10,
684:19, 686:6,
687:23, 688:16,
688:25, 692:20,
696:9, 696:15,
696:25, 697:9,
697:17, 697:21,
698:15, 698:24,
699:23, 700:8,
700:13, 700:15,
700:20, 700:22,
702:5, 702:10,
702:18, 703:1,
703:17, 704:20,
704:23, 706:9,

708:11, 708:24,
709:3, 709:17,
709:23, 710:16,
710:20, 710:21,
710:22, 710:23,
711:3, 711:19,
711:20, 711:21,
715:21, 717:1,
717:11, 718:18,
719:5, 720:13,
722:8, 722:18,
735:6, 736:1, 736:5,
736:20, 739:14,
740:21, 742:6,
742:10, 742:21,
748:10, 748:16,
749:1, 752:11,
754:16, 755:15,
755:20, 755:21,
756:12, 756:13,
756:15, 762:2,
763:18, 764:19,
765:10, 766:11,
767:2, 768:14,
769:11, 769:14,
769:15, 769:18,
770:6, 770:18,
770:23, 771:2,
771:7, 772:3, 773:9,
774:19, 775:12,
775:25, 776:11,
777:22, 778:5,
780:2, 780:9, 782:8,
782:12, 782:16,
782:21, 783:9,
784:3, 784:20,
785:4, 785:13,
788:16, 788:21,
825:18, 826:24,
827:24
**Defendant** [41] -
607:10, 607:21,
611:8, 612:1, 617:1,
710:24, 719:22,
748:5, 748:14,
748:15, 748:24,
749:5, 749:7, 749:8,
749:10, 750:8,
750:9, 750:23,
750:25, 751:10,
751:21, 751:24,
752:9, 752:12,
752:16, 755:4,
755:5, 757:13,
757:15, 758:1,
759:16, 760:15,
760:17, 783:13,
790:20, 810:3,
818:13, 819:9,
821:19, 822:1,
833:19

**defendant's** [48] -
609:22, 610:22,
611:2, 614:20,
698:5, 702:3,
716:25, 717:7,
717:16, 717:17,
718:2, 718:6,
718:10, 718:12,
718:14, 721:2,
721:7, 723:19,
730:8, 732:20,
737:12, 737:13,
737:14, 742:13,
742:18, 754:18,
754:22, 756:8,
756:11, 757:3,
764:23, 765:12,
766:18, 766:21,
767:3, 767:14,
769:5, 772:12,
772:18, 776:20,
777:6, 780:17,
781:12, 785:3,
785:22, 789:19,
797:13, 823:24
**Defendant's** [3] -
717:22, 718:3,
778:14
**defendants** [1] - 782:7
**defended** [1] - 687:10
**defending** [1] - 686:14
**defense** [2] - 714:21,
733:6
**DEFENSE** [2] - 608:4,
627:6
**defense's** [1] - 831:7
**defensive** [1] - 629:6
**defined** [3] - 621:17,
778:15, 815:22
**definition** [1] - 711:15
**definitive** [4] - 678:18,
678:19, 701:25,
706:4
**defy** [1] - 625:5
**degrade** [1] - 785:16
**degree** [4] - 633:19,
679:12, 713:13,
749:17
**degrees** [3] - 654:20,
691:8, 691:10
**deliberate** [4] - 615:6,
758:15, 830:5,
830:10
**deliberating** [1] -
829:22
**deliberation** [2] -
758:20, 830:20
**deliberations** [13] -
740:2, 743:20,
744:11, 748:1,

759:7, 759:23,
760:23, 761:21,
762:6, 828:11,
828:17, 828:20,
829:25
**demeanor** [1] - 745:4
**demonstrated** [1] -
615:7
**demonstrations** [1] -
648:5
**demonstrative** [3] -
773:4, 774:4, 786:25
**denial** [1] - 724:1
**denied** [2] - 725:24,
738:12
**denies** [3] - 827:15
**Dennis** [6] - 634:5,
746:15, 774:6,
775:14, 791:18,
794:11
**deny** [5] - 617:15,
618:11, 618:22,
737:21, 771:1
**depart** [1] - 835:3
**department** [7] -
615:10, 647:21,
649:14, 704:14,
769:4, 809:5, 827:23
**Department** [6] -
621:15, 630:9,
647:20, 813:3,
813:14, 822:9
**department's** [1] -
764:3
**Department's** [2] -
702:6, 702:11
**Departments** [1] -
778:9
**departments** [3] -
649:4, 649:6, 691:5
**deploy** [2] - 722:6,
722:9
**deposed** [1] - 802:3
**deposition** [21] -
642:22, 675:2,
675:6, 682:7,
682:20, 685:7,
691:20, 693:12,
707:7, 713:1,
768:22, 781:11,
791:18, 796:7,
798:10, 798:16,
808:5, 809:3,
809:14, 812:11,
816:10
**depositions** [1] -
653:15
**depravation** [2] -
720:16, 754:11
**depressed** [1] - 804:4

**deprived** [4] - 740:21,
748:6, 749:1, 749:5
**depriving** [1] - 774:19
**deputies** [3] - 656:25,
778:8, 778:10
**deputy** [14] - 621:12,
622:21, 622:23,
623:4, 659:12,
697:11, 697:13,
697:25, 736:21,
766:13, 779:5,
801:21, 802:21,
813:9
**Deputy** [188] - 610:24,
620:17, 621:9,
621:22, 621:25,
622:2, 623:6, 623:8,
624:1, 624:9,
624:10, 624:11,
624:13, 624:15,
624:16, 624:17,
624:24, 625:1,
625:3, 625:12,
631:17, 641:4,
641:6, 641:25,
642:2, 642:19,
642:24, 654:3,
654:8, 654:9, 655:4,
655:22, 656:5,
657:3, 657:4, 657:7,
657:11, 657:24,
658:1, 658:11,
658:18, 659:10,
661:11, 662:13,
664:9, 664:11,
664:12, 665:8,
666:19, 667:1,
667:9, 668:1, 668:8,
668:18, 668:20,
669:1, 669:9, 671:7,
671:11, 671:18,
672:5, 672:9,
672:17, 672:18,
673:7, 673:15,
674:24, 675:17,
675:23, 676:13,
676:17, 677:25,
678:6, 679:4,
679:20, 698:9,
699:13, 704:18,
704:23, 712:16,
721:11, 721:20,
736:24, 737:15,
737:19, 791:16,
792:3, 792:13,
792:18, 792:23,
793:1, 793:5,
793:17, 793:25,
794:3, 794:6,
794:14, 794:16,

794:24, 795:12, 795:24, 796:3, 797:12, 797:15, 797:21, 797:25, 798:18, 798:24, 799:1, 799:12, 800:3, 800:8, 801:2, 801:16, 801:19, 802:8, 803:2, 803:22, 804:4, 804:9, 804:12, 806:2, 806:3, 806:8, 806:14, 806:19, 806:23, 806:24, 807:1, 807:4, 807:8, 807:9, 808:25, 809:15, 809:17, 809:19, 810:1, 810:3, 810:4, 810:6, 810:11, 810:13, 811:15, 811:17, 811:22, 811:25, 812:1, 812:2, 812:5, 812:10, 812:19, 812:21, 812:24, 813:5, 813:8, 813:9, 813:11, 813:20, 813:23, 814:21, 815:7, 817:15, 817:17, 817:24, 818:7, 818:25, 819:13, 822:5, 822:7, 822:15

**deputy's** [1] - 736:7

**derivative** [4] - 613:4, 613:9, 616:19, 618:23

**describe** [4] - 650:5, 650:6, 684:2, 816:11

**described** [18] - 634:20, 663:20, 667:22, 700:10, 794:2, 795:8, 802:18, 804:4, 804:10, 809:16, 809:19, 810:4, 810:6, 810:12, 810:19, 811:21, 811:22, 814:3

**describes** [3] - 810:18, 811:3, 811:4

**description** [4] - 801:17, 802:9, 807:9, 813:7

**deserve** [1] - 788:15

**deserves** [4] - 744:25, 746:8, 747:3, 747:17

**designed** [4] - 754:10, 754:25, 755:1, 770:12

**desire** [3] - 757:2, 761:14, 835:16

**desperate** [1] - 785:17

**despite** [4] - 731:25, 799:8, 810:11, 821:21

**detail** [9] - 628:22, 628:23, 631:24, 633:17, 664:24, 708:21, 745:17, 785:17

**detailed** [3] - 629:17, 629:18, 647:14

**details** [1] - 827:16

**detective** [1] - 630:6

**deter** [1] - 755:13

**determination** [3] - 610:11, 721:19, 747:7

**determinations** [1] - 724:9

**determine** [10] - 619:5, 740:18, 740:21, 746:12, 748:16, 748:18, 749:10, 749:12, 753:9, 756:3

**determined** [3] - 713:14, 724:4, 746:10

**determining** [8] - 722:17, 723:4, 742:22, 751:20, 752:20, 752:25, 756:5, 758:7

**deterrence** [1] - 754:23

**deterrent** [1] - 754:25

**devalue** [1] - 785:19

**developed** [1] - 675:9

**deviation** [1] - 650:21

**devices** [1] - 629:12

**devil** [1] - 827:16

**diagrams** [1] - 666:25

**die** [4] - 658:6, 788:15, 811:23, 826:18

**died** [1] - 826:18

**dies** [3] - 786:12, 827:20, 828:7

**difference** [2] - 660:7, 796:11

**differences** [1] - 810:16

**different** [16] - 630:16, 634:18, 636:13, 654:16, 655:16, 674:17, 677:3, 692:15, 726:7, 726:12, 745:11, 806:5, 806:15,

806:16, 811:9

**differently** [1] - 745:14

**differing** [1] - 728:21

**difficulty** [1] - 643:13

**dilate** [1] - 636:16

**dime** [1] - 765:22

**dinner** [2] - 787:12, 787:13

**dire** [1] - 637:15

**Direct** [1] - 608:5

**direct** [8] - 695:3, 712:13, 713:9, 725:21, 743:6, 743:10, 743:13, 808:15

**DIRECT** [1] - 627:11

**directed** [1] - 797:25

**directing** [1] - 751:18

**direction** [13] - 661:16, 691:2, 691:24, 697:6, 698:14, 699:8, 699:19, 708:20, 768:20, 776:5, 811:25, 813:12

**directly** [4] - 624:1, 641:6, 666:23, 697:10

**director** [2] - 647:20, 648:5

**Director** [1] - 647:23

**dirt** [2] - 770:20, 827:2

**disability** [1] - 753:18

**disagree** [11] - 654:12, 654:14, 656:10, 656:12, 675:24, 676:1, 676:2, 688:18, 689:13, 692:18, 695:2

**disagreed** [1] - 688:20

**disagreement** [4] - 658:25, 660:24, 661:4, 678:11

**disappear** [4] - 705:6, 705:8, 705:9, 705:10

**disappeared** [2] - 705:11, 826:21

**disappearing** [1] - 705:14

**discern** [1] - 707:17

**discharge** [1] - 779:6

**discharged** [4] - 801:19, 803:5, 808:22, 809:1

**disclosed** [1] - 749:19

**discomfort** [1] - 753:18

**discount** [3] - 690:16, 777:21, 800:19

**discounted** [1] -

706:17

**discourage** [1] - 755:10

**discovery** [1] - 798:14

**discredit** [1] - 745:12

**discredited** [2] - 745:21, 747:9

**discrepancies** [1] - 745:10

**discrepancy** [3] - 699:25, 745:16, 745:18

**discretion** [1] - 725:5

**discuss** [7] - 625:9, 674:22, 714:6, 715:7, 762:20, 828:17, 832:10

**discussed** [4] - 634:19, 636:7, 707:6, 714:14

**discussing** [4] - 714:10, 737:7, 762:8, 789:13

**discussion** [4] - 667:14, 673:12, 678:15, 737:22

**discussions** [1] - 829:25

**disfigurement** [1] - 753:18

**disk** [1] - 646:5

**dismiss** [2] - 609:12, 681:12

**dismissed** [6] - 610:7, 613:5, 717:22, 718:1, 718:5, 727:2

**dispatch** [2] - 657:7, 661:15

**disposal** [1] - 738:20

**disprove** [1] - 690:10

**disproves** [1] - 702:2

**disproving** [1] - 689:17

**dispute** [6] - 619:14, 620:7, 736:19, 738:10, 808:21, 808:25

**disputes** [4] - 724:5, 737:23, 738:4, 768:1

**disregard** [2] - 624:3, 743:19

**disregarded** [3] - 701:2, 744:11, 744:13

**disrupt** [1] - 709:18

**disservice** [1] - 819:21

**DIST** [1] - 612:17

**distance** [14] - 657:5, 660:11, 660:19, 660:25, 661:1,

661:23, 662:2, 662:6, 705:19, 707:3, 707:7, 767:1, 791:23, 816:13

**distinction** [2] - 728:13, 743:10

**distinctly** [2] - 694:23, 695:12

**distortions** [3] - 636:15, 636:17, 636:25

**distract** [1] - 770:12

**distress** [6] - 609:14, 611:17, 611:19, 611:21, 611:24, 612:1, 612:7, 612:22, 613:3, 616:2, 616:16, 619:17, 708:22, 717:25, 727:2, 753:22

**DISTRICT** [2] - 607:1, 607:2

**district** [2] - 801:24, 801:25

**District** [10] - 607:13, 612:14, 612:18, 616:10, 635:9, 683:20, 836:4, 836:5, 836:15, 836:16

**distrust** [2] - 746:5, 747:14

**disturbance** [15] - 615:21, 673:23, 674:19, 695:8, 695:10, 699:2, 699:3, 699:20, 700:11, 701:20, 767:24, 781:5, 807:13, 807:17, 807:22

**disturbed** [2] - 674:2, 696:16

**ditch** [6] - 701:9, 772:4, 772:5, 773:21, 794:12, 818:1

**dive** [1] - 739:17

**diving** [1] - 617:25

**division** [1] - 629:3

**divisions** [1] - 646:24

**divorced** [1] - 787:5

**dock** [1] - 787:8

**docket** [2] - 612:16, 717:1

**doctor's** [1] - 731:16

**doctors** [2] - 733:25, 734:3

**document** [1] - 716:5

**documents** [6] - 639:22, 640:20, 642:11, 642:13, 770:3
**dollar** [2] - 725:5, 743:17
**dollars** [2] - 686:13, 686:17
**domestic** [1] - 668:12
**done** [29] - 637:4, 644:7, 646:6, 647:24, 649:18, 653:13, 671:15, 676:21, 678:18, 691:5, 720:14, 724:1, 727:17, 766:17, 766:18, 774:11, 774:12, 774:15, 774:17, 795:15, 797:7, 799:4, 816:24, 817:12, 817:13, 819:3, 819:6, 828:4
**door** [6] - 657:22, 670:6, 670:14, 677:12, 677:17, 777:8
**doors** [2] - 670:11, 670:12
**doubt** [3] - 764:14, 797:3, 826:16
**down** [87] - 622:7, 627:19, 629:18, 644:12, 647:22, 651:11, 653:2, 657:2, 657:3, 657:4, 657:6, 657:10, 657:15, 660:2, 660:9, 660:10, 661:10, 661:13, 661:14, 661:21, 662:12, 662:13, 662:19, 663:6, 663:9, 663:16, 663:17, 664:4, 664:15, 664:17, 665:5, 667:2, 667:3, 669:8, 669:9, 674:9, 675:13, 679:5, 682:7, 682:19, 696:10, 700:5, 703:19, 704:2, 710:17, 713:25, 732:14, 761:15, 765:16, 766:16, 767:13, 776:10, 776:22, 776:23, 777:4, 778:20, 787:5, 787:6, 791:5, 792:25, 793:8,

793:18, 794:13, 796:4, 797:12, 797:13, 797:16, 797:22, 803:5, 803:6, 805:11, 805:13, 809:6, 813:25, 814:2, 816:3, 816:5, 818:1, 821:22, 824:13, 824:18, 835:18
**downloadable** [1] - 649:15
**downward** [3] - 776:7, 776:10, 777:5
**Dr** [7] - 634:15, 731:22, 802:20, 804:23, 805:5, 805:9, 805:16
**drafting** [1] - 728:13
**draw** [5] - 667:10, 677:1, 727:16, 744:18, 744:22
**drawer** [1] - 828:6
**drawing** [5] - 641:22, 666:25, 774:11, 774:12, 774:16
**drawn** [1] - 721:15
**drew** [1] - 774:7
**drive** [2] - 663:6, 803:23
**driven** [4] - 695:23, 721:12, 797:1, 816:5
**driver** [10] - 655:20, 656:2, 665:18, 666:1, 700:5, 737:2, 765:7, 765:23, 766:2, 766:3
**driver's** [3] - 624:23, 677:12, 806:9
**driving** [13] - 610:18, 665:8, 665:18, 675:3, 695:22, 703:10, 709:19, 711:13, 767:15, 767:19, 804:12, 813:15, 822:15
**drop** [1] - 831:1
**drove** [6] - 640:22, 771:10, 797:13, 797:16, 797:22, 821:22
**drug** [1] - 630:5
**ducking** [6] - 776:16, 776:19, 776:23, 776:24, 784:4, 802:19
**due** [4] - 690:19, 691:21, 693:22, 757:7
**Dukes** [2] - 771:22,

779:15
**duplicating** [1] - 731:14
**during** [23] - 617:16, 673:5, 675:3, 675:16, 679:17, 682:17, 682:20, 685:7, 694:8, 700:21, 706:18, 707:7, 736:19, 743:15, 744:9, 747:18, 748:1, 753:16, 768:17, 772:22, 791:9, 810:23, 834:22
**Durst** [17] - 607:21, 626:24, 627:9, 639:11, 639:17, 680:2, 681:18, 712:2, 714:20, 735:1, 735:17, 739:4, 762:22, 790:5, 796:24, 822:18, 835:21
**DURST** [53] - 620:11, 621:21, 623:18, 623:21, 624:7, 624:22, 625:11, 626:6, 627:1, 627:10, 627:12, 637:12, 639:18, 639:19, 649:23, 650:3, 678:24, 679:2, 679:25, 681:19, 685:10, 689:21, 689:24, 712:3, 712:6, 713:16, 713:18, 713:24, 714:21, 728:7, 733:13, 733:21, 734:21, 735:18, 739:5, 739:8, 762:23, 763:7, 786:5, 786:21, 787:17, 790:6, 792:7, 796:25, 798:11, 798:15, 811:2, 829:4, 830:17, 831:7, 832:1, 832:13, 835:22
**Durst..........................
......184** [1] - 608:9
**Durst............21** [1] - 608:5
**duty** [17] - 619:5, 620:18, 630:4, 654:3, 655:4, 655:23, 656:3, 658:12, 658:19,

740:9, 740:10, 740:25, 741:3, 741:14, 758:14, 778:6, 813:18
**dynamic** [1] - 658:10

## E

**ear** [1] - 681:12
**early** [1] - 829:23
**earn** [1] - 686:20
**earned** [1] - 686:17
**ease** [2] - 659:6, 738:22
**easier** [2] - 656:14, 669:8
**east** [1] - 631:11
**easy** [2] - 795:6, 819:23
**eat** [1] - 715:1
**edition** [2] - 665:16, 719:9
**education** [1] - 644:5
**Edwards** [1] - 725:3
**effect** [6] - 634:17, 745:16, 749:13, 758:23, 785:11, 785:12
**effecting** [2] - 748:20, 749:14
**effects** [1] - 798:20
**effort** [1] - 784:22
**efforts** [4] - 714:13, 724:8, 789:16, 789:17
**egregious** [2] - 633:1, 755:2
**eight** [8] - 630:14, 660:6, 717:20, 719:20, 724:23, 726:25, 733:20, 834:17
**either** [13] - 613:25, 637:6, 642:18, 642:24, 663:7, 687:10, 741:15, 745:6, 745:8, 768:3, 776:24, 784:2, 835:7
**ejected** [1] - 691:25
**ejection** [1] - 691:13
**elapsed** [1] - 795:5
**elective** [1] - 612:17
**element** [7] - 620:8, 742:1, 742:3, 746:4, 749:2, 749:4, 757:18
**elements** [3] - 611:6, 716:9, 748:23
**eluded** [1] - 816:19
**email** [1] - 649:10
**embankment** [4] -

794:13, 815:10, 815:13, 818:2
**emotional** [18] - 609:14, 611:17, 611:19, 611:21, 611:24, 612:1, 612:7, 612:21, 612:2, 613:3, 616:2, 616:16, 618:25, 619:17, 708:22, 717:25, 727:2, 753:22
**emphasis** [1] - 662:24
**emphasized** [1] - 785:24
**employed** [5] - 628:7, 748:20, 749:14, 751:3, 751:8
**employment** [6] - 629:22, 629:23, 630:12, 631:25, 683:25, 685:2
**empty** [4] - 629:11, 633:19, 635:12, 652:16
**empty-hand** [1] - 652:16
**enables** [1] - 724:1
**encounter** [2] - 636:22, 652:19
**encountering** [2] - 651:20, 652:5
**encourage** [1] - 829:24
**end** [12] - 658:4, 722:22, 722:23, 723:3, 727:7, 731:5, 764:21, 770:6, 770:19, 777:3, 796:11, 827:2
**ended** [5] - 650:17, 803:20, 803:21, 804:7, 835:2
**energy** [1] - 629:12
**Enforcement** [7] - 673:9, 673:19, 675:1, 675:21, 679:22, 712:18, 817:18
**enforcement** [40] - 627:23, 627:24, 628:1, 629:3, 629:23, 630:1, 630:20, 632:8, 632:12, 632:15, 632:20, 632:23, 633:1, 633:2, 636:6, 637:8, 637:14, 644:13, 644:15, 646:15, 648:11,

648:12, 655:11, 659:13, 670:1, 670:3, 670:15, 684:2, 687:4, 691:18, 713:3, 717:19, 722:21, 749:17, 751:14, 751:17, 771:19, 793:4, 796:12, 814:25

**enforcement's** [1] - 619:13

**engaged** [2] - 624:1, 756:13

**engine** [7] - 615:23, 700:3, 710:23, 765:11, 765:13, 781:6, 804:10

**enjoy** [1] - 684:12

**ensued** [2] - 752:3, 752:10

**enter** [3] - 664:18, 835:13, 835:16

**entered** [4] - 626:16, 664:21, 681:23, 790:1

**entering** [1] - 625:19

**entire** [7] - 701:11, 715:5, 720:21, 722:14, 770:4, 772:19

**entirely** [2] - 744:10, 744:13

**entitled** [6] - 614:6, 614:14, 752:3, 752:10, 752:21, 754:8

**entity** [1] - 634:4

**entrance** [3] - 664:7, 667:20, 818:1

**entries** [1] - 792:1

**entry** [5] - 659:6, 776:9, 776:14, 792:12, 793:16

**equal** [3] - 741:22, 741:23, 810:16

**equals** [1] - 741:24

**equations** [1] - 660:20

**equivalency** [1] - 723:1

**erroneous** [1] - 758:22

**error** [2] - 730:10, 745:18

**errors** [1] - 611:15

**escape** [1] - 750:16

**escaping** [1] - 750:15

**especially** [7] - 620:21, 620:25, 621:8, 621:14, 736:11, 764:2,

771:11

**essential** [3] - 742:1, 742:3, 757:18

**essentially** [5] - 610:3, 610:21, 611:1, 611:23, 730:18

**establish** [7] - 719:18, 742:2, 742:5, 745:25, 751:9, 757:17, 812:12

**established** [12] - 613:1, 617:16, 633:3, 736:9, 736:12, 738:9, 741:11, 744:23, 751:4, 778:4, 821:21, 823:3

**estate** [20] - 607:5, 612:20, 724:24, 748:4, 748:22, 749:4, 750:21, 751:5, 751:23, 752:6, 752:14, 752:18, 752:20, 752:22, 753:1, 753:15, 754:5

**estimates** [1] - 647:4

**ethically** [1] - 632:19

**evaluate** [1] - 668:3

**evaluated** [3] - 673:2, 673:3, 676:25

**evaluation** [1] - 678:16

**evasive** [1] - 671:4

**evening** [3] - 829:12, 830:1, 834:23

**evenly** [2] - 742:4, 742:19

**event** [18] - 616:14, 660:13, 660:17, 666:6, 667:10, 678:1, 757:9, 793:13, 794:4, 798:19, 806:4, 807:9, 810:18, 810:19, 811:3, 811:4, 811:5, 811:11

**events** [13] - 609:25, 614:20, 615:21, 615:24, 678:2, 753:17, 765:13, 766:20, 767:2, 767:3, 767:9, 767:14, 801:17

**evidence** [235] - 610:1, 610:16, 610:22, 611:1, 614:19, 615:1, 615:2, 615:19, 615:24, 616:5, 616:15,

617:1, 617:20, 617:22, 618:17, 619:13, 621:19, 622:3, 626:23, 639:14, 667:22, 667:23, 676:23, 687:14, 687:15, 687:17, 687:22, 688:4, 688:5, 689:4, 689:13, 689:14, 690:11, 690:17, 692:7, 692:9, 692:18, 694:4, 694:20, 694:21, 694:24, 695:12, 696:7, 697:2, 698:25, 699:6, 699:12, 700:9, 700:14, 700:19, 700:22, 700:25, 701:5, 702:2, 704:13, 706:11, 706:15, 706:18, 706:20, 706:22, 708:2, 720:17, 721:10, 722:19, 725:6, 726:2, 726:7, 726:8, 726:11, 727:10, 731:7, 732:2, 732:14, 732:16, 733:15, 733:18, 733:19, 734:6, 734:7, 735:7, 737:11, 737:17, 738:4, 739:15, 739:20, 740:8, 740:13, 740:18, 741:4, 741:7, 741:11, 741:18, 742:2, 742:4, 742:7, 742:8, 742:10, 742:11, 742:12, 742:13, 742:17, 742:18, 742:19, 742:20, 742:24, 742:25, 743:1, 743:4, 743:6, 743:7, 743:11, 743:12, 743:14, 743:18, 743:21, 743:22, 743:23, 744:2, 744:4, 744:6, 744:8, 744:9, 744:13, 744:14, 744:15, 744:23, 745:9, 746:9, 746:12, 746:20, 747:3, 747:9, 747:10, 747:24, 748:23, 750:22, 751:6, 751:12, 753:4,

755:4, 755:15, 757:1, 757:10, 757:16, 757:19, 758:18, 758:23, 759:4, 759:15, 759:25, 760:15, 764:13, 764:15, 764:16, 764:18, 764:25, 767:4, 767:8, 767:24, 768:5, 768:9, 770:3, 772:14, 772:23, 773:2, 774:24, 774:25, 775:8, 775:9, 775:10, 777:15, 777:16, 777:17, 777:18, 777:20, 780:24, 780:25, 781:1, 781:2, 783:12, 786:23, 787:19, 788:1, 790:25, 797:14, 797:17, 797:22, 798:14, 799:14, 800:8, 800:10, 801:16, 801:18, 802:8, 803:1, 807:8, 807:21, 815:21, 817:2, 817:3, 817:4, 817:5, 817:7, 818:13, 818:21, 818:23, 818:25, 819:15, 820:17, 821:9, 821:11, 821:13, 821:23, 822:14, 822:25, 823:1, 823:6, 823:17, 823:18, 823:21, 824:21, 825:1, 825:4, 827:1, 827:17, 833:19

**evidentiary** [5] - 617:18, 618:14, 623:15, 691:18, 728:21

**evil** [15] - 609:22, 614:2, 618:2, 618:13, 725:21, 726:2, 726:3, 726:18, 732:17, 750:10, 754:18, 755:5, 760:16, 784:11, 821:20

**evolving** [4] - 645:1, 672:23, 736:18, 794:3

**exact** [5] - 645:1, 662:16, 700:10, 758:7, 766:25

**exactitude** [1] - 758:5

**exactly** [15] - 667:19, 669:22, 671:14, 676:21, 690:12, 733:15, 764:11, 783:8, 792:18, 793:2, 793:11, 794:11, 795:3, 804:7, 815:3

**EXAMINATION** [4] - 627:11, 637:20, 682:4, 712:5

**examination** [6] - 608:5, 608:6, 626:3, 713:10, 713:12, 798:12

**examine** [1] - 758:21

**examiner** [5] - 730:17, 730:23, 766:13, 775:19, 802:21, 804:21

**examiner's** [1] - 731:21

**examining** [1] - 812:13

**example** [6] - 651:12, 670:5, 720:11, 742:9, 755:21, 787:25

**exception** [2] - 616:14, 800:12

**exceptions** [1] - 763:18

**excerpt** [1] - 796:7

**excessive** [33] - 609:13, 609:17, 610:8, 611:3, 611:5, 611:6, 611:14, 612:11, 614:15, 614:17, 615:12, 617:11, 617:15, 617:23, 618:8, 618:11, 618:21, 635:18, 635:24, 646:20, 726:9, 748:9, 748:12, 748:14, 749:7, 749:16, 750:4, 753:24, 759:17, 783:15, 818:14, 822:5, 833:20

**exchanging** [3] - 676:13, 676:18, 678:6

**excited** [5] - 641:20, 780:19, 787:8, 787:12, 787:13

**exclude** [2] - 635:6, 725:22

**exclusion** [1] - 723:13

**excuse** [1] - 647:12, 659:13, 679:16, 736:22, 761:24, 762:5, 801:21, 809:15, 823:23, 828:18, 830:1
**excused** [5] - 713:23, 714:17, 762:17, 828:20, 835:10
**executioner** [1] - 771:3
**Exhibit** [1] - 778:14
**exhibit** [1] - 774:4
**exhibits** [6] - 716:13, 735:3, 744:6, 828:15, 828:25, 829:2
**exigencies** [1] - 610:14
**exigent** [2] - 779:9, 779:11
**exist** [1] - 723:24
**existence** [2] - 743:8, 743:9
**exit** [5] - 710:20, 776:25, 777:5, 784:2, 815:15
**exited** [3] - 624:22, 809:17, 810:13
**exiting** [5] - 669:11, 671:12, 671:25, 806:9, 806:14
**exits** [2] - 624:24, 672:2
**expect** [4] - 652:7, 665:20, 669:4, 741:17
**expected** [2] - 665:17, 665:19
**experience** [7] - 644:6, 713:2, 744:20, 745:15, 815:1, 817:12, 826:7
**experienced** [3] - 746:19, 784:2, 805:15
**expert** [43] - 610:21, 611:7, 623:15, 631:14, 631:15, 631:16, 631:20, 631:25, 632:7, 635:2, 635:18, 636:2, 637:13, 637:23, 637:25, 638:3, 638:23, 639:2, 639:11, 639:13, 639:15, 640:19, 684:10, 684:20, 687:1, 702:17, 702:20,

737:9, 737:10, 737:12, 737:15, 746:14, 746:16, 746:18, 747:2, 769:20, 772:12, 777:21, 782:11, 799:3, 802:25, 825:6
**expert's** [2] - 746:22, 746:23
**expertise** [3] - 640:12, 679:13, 713:13
**experts** [7] - 635:14, 635:19, 738:2, 747:5, 770:16, 774:13
**experts'** [1] - 738:2
**expired** [1] - 619:3
**explain** [5] - 650:12, 664:22, 673:11, 673:13, 690:23
**explained** [6] - 687:5, 694:12, 701:21, 702:13, 730:24, 816:24
**explanation** [8] - 688:12, 688:24, 691:24, 692:4, 710:5, 710:11, 722:22, 776:25
**Explorer** [1] - 828:3
**exposed** [1] - 814:16
**express** [1] - 746:16
**expressly** [5] - 725:10, 733:6, 776:2, 779:19, 780:9
**extensive** [3] - 720:15, 723:20, 727:18
**extensively** [1] - 727:25
**extent** [13] - 611:9, 611:22, 613:5, 617:3, 617:7, 725:16, 726:1, 727:4, 728:11, 745:7, 753:19, 791:7
**extra** [1] - 714:4
**extracted** [1] - 635:17
**extreme** [4] - 611:21, 616:4, 619:6, 619:13
**eye** [3] - 634:17, 677:13, 826:25
**eyes** [2] - 664:12, 685:6
**eyewitness** [1] - 743:7

**F**

**F-a-u-l-k-n-e-r** [1] - 627:15
**face** [10] - 765:3,

769:21, 773:10, 773:17, 776:24, 777:3, 777:24, 781:16, 784:5, 815:11
**faced** [11] - 699:7, 772:22, 776:15, 776:19, 776:20, 776:21, 777:7, 777:8, 781:13
**facing** [4] - 711:7, 794:4, 795:13, 822:15
**fact** [34] - 610:17, 614:17, 615:8, 615:9, 615:21, 616:11, 624:11, 635:21, 640:13, 654:8, 657:18, 660:8, 663:9, 676:18, 688:10, 706:19, 716:7, 721:19, 724:3, 757:4, 757:11, 757:24, 766:24, 777:22, 778:5, 794:20, 799:8, 804:17, 809:4, 813:22, 821:21, 821:23, 823:8, 830:19
**factor** [4] - 636:8, 663:13, 673:20, 673:22
**factors** [8] - 634:14, 644:23, 652:12, 672:21, 707:20, 728:21, 756:5, 756:21
**facts** [35] - 613:20, 614:16, 619:9, 661:5, 662:6, 687:14, 688:6, 688:7, 706:21, 721:22, 736:17, 740:12, 740:19, 740:20, 741:10, 743:5, 743:9, 743:11, 744:7, 744:18, 744:22, 746:11, 746:21, 747:7, 747:21, 749:21, 750:8, 759:2, 777:20, 794:20, 797:2, 817:15, 820:25, 821:8, 825:7
**factual** [4] - 724:5, 737:23, 738:4, 738:10

**factually** [1] - 658:14
**fail** [1] - 742:2
**failed** [6] - 623:25, 650:23, 724:25, 742:5, 751:9, 754:6
**failure** [2] - 723:13, 745:14
**fair** [1] - 658:24
**fairly** [3] - 720:14, 736:9, 752:15
**Fairmont** [1] - 771:24
**fairness** [1] - 633:9
**fall** [3] - 757:17, 773:13, 773:15
**falling** [2] - 773:9, 773:10
**false** [3] - 693:12, 781:9, 825:3
**falsehood** [1] - 745:19
**falsely** [2] - 746:2, 747:13
**familiar** [2] - 737:6, 767:16
**family** [7] - 614:24, 733:8, 754:3, 785:12, 785:16, 786:12
**fancy** [1] - 830:13
**far** [3] - 659:21, 764:9, 772:6
**Farrar** [1] - 725:9
**fashion** [1] - 766:1
**fast** [6] - 664:17, 672:13, 793:10, 793:11, 815:23, 828:1
**fatal** [6] - 670:6, 670:7, 670:8, 670:13, 670:16
**father** [13] - 754:4, 771:3, 782:19, 785:11, 786:10, 786:18, 787:18, 788:5, 788:8, 820:6, 820:13, 821:5, 821:7
**father's** [1] - 786:10
**fatherless** [1] - 771:3
**fathers** [1] - 763:22
**Faulkner** [69] - 619:24, 620:15, 623:18, 623:22, 624:12, 627:2, 627:3, 627:7, 627:13, 627:15, 627:16, 637:13, 637:22, 639:9, 639:10, 639:12, 639:20, 649:21, 650:4, 654:1, 658:24, 664:14, 679:3, 679:10,

680:1, 680:18, 680:19, 681:9, 681:25, 682:6, 682:9, 682:16, 683:19, 684:23, 685:15, 690:1, 690:15, 698:21, 703:7, 712:7, 713:19, 713:21, 746:15, 765:18, 770:8, 774:5, 774:14, 775:13, 781:16, 792:17, 792:20, 793:2, 793:6, 794:2, 794:5, 794:22, 797:3, 802:15, 803:11, 803:19, 804:14, 807:17, 813:17, 815:17, 816:4, 816:18, 816:19, 817:8, 817:11
**FAULKNER** [2] - 608:4, 627:6
**Faulkner's** [3] - 635:22, 689:25, 766:21
**fault** [2] - 720:12, 723:2
**favor** [7] - 617:23, 738:5, 752:5, 757:9, 764:12, 777:22, 782:16
**favorable** [6] - 613:21, 617:20, 618:17, 640:15, 794:18, 794:20
**favoring** [1] - 742:20
**fear** [5] - 736:25, 753:23, 765:2, 788:11
**feasible** [1] - 750:20
**February** [1] - 716:5
**fed** [1] - 768:14
**federal** [18] - 728:3, 728:10, 728:12, 728:14, 728:17, 728:18, 740:22, 748:2, 749:1, 749:5, 751:4, 751:9, 754:8, 754:11, 770:1, 772:22, 774:19, 775:7
**federally** [6] - 618:4, 754:20, 755:7, 760:18, 784:12, 822:2
**feed** [1] - 768:17
**fees** [1] - 836:9
**feet** [16] - 654:24,

660:5, 660:6,
660:12, 665:11,
665:12, 665:13,
665:14, 669:19,
691:4, 705:24,
767:22, 793:1,
810:7, 828:3
**fell** [1] - 802:12
**fellow** [5] - 714:11,
758:19, 758:24,
762:9, 762:10
**felon** [4] - 620:20,
620:21, 623:24
**felonious** [1] - 624:1
**felons** [2] - 629:25,
630:7
**felony** [2] - 620:23,
621:1
**felt** [3] - 642:13,
668:17, 801:9
**few** [13] - 633:11,
637:17, 681:13,
703:7, 714:5,
729:23, 730:6,
738:22, 739:16,
774:6, 787:14,
789:23
**field** [5] - 637:13,
679:12, 713:13,
731:4, 746:19
**fields** [1] - 639:11
**fighter** [2] - 668:5
**figure** [6] - 707:17,
795:11, 795:17,
795:18, 815:1, 815:3
**figured** [1] - 795:20
**figures** [2] - 743:17
**figuring** [2] - 643:13,
643:14
**file** [4] - 790:12,
831:22, 834:20,
835:16
**filed** [5] - 716:5, 717:1,
770:5, 789:2, 823:25
**fill** [2] - 783:8, 783:10
**filled** [2] - 685:2,
781:17
**filter** [1] - 667:8
**final** [24] - 657:19,
657:20, 662:10,
664:7, 664:13,
667:24, 667:25,
674:3, 674:4,
678:22, 696:12,
696:17, 697:15,
698:11, 706:23,
707:1, 708:3,
710:13, 740:11,
741:1, 741:19,
803:14, 803:15

**finalizing** [1] - 620:6
**finally** [9] - 611:16,
664:6, 762:3, 762:5,
809:18, 810:5,
810:9, 810:10,
828:16
**financial** [2] - 782:18,
820:16
**findings** [1] - 706:1
**fine** [5] - 660:21,
680:5, 697:23,
697:24, 709:6
**finish** [1] - 787:25
**finite** [1] - 804:15
**fire** [7] - 658:1, 703:2,
704:14, 776:20,
784:4, 811:15,
811:18
**firearm** [4] - 641:22,
671:4, 691:15, 779:6
**firearms** [4] - 629:12,
636:9, 644:15,
676:23
**fired** [16] - 657:8,
657:24, 658:5,
696:21, 709:17,
711:2, 711:18,
711:20, 794:25,
795:1, 795:6, 800:8,
800:11, 809:10,
814:19, 824:25
**fires** [2] - 710:25,
780:4
**firm** [7] - 633:10,
686:6, 686:18,
686:20, 687:1,
766:22, 772:18
**first** [54] - 619:1,
620:6, 620:17,
621:12, 626:25,
628:20, 630:4,
631:22, 633:8,
633:12, 636:21,
640:2, 640:11,
645:8, 646:4,
646:19, 649:3,
657:2, 664:12,
667:1, 669:14,
682:9, 719:16,
719:17, 720:8,
731:11, 739:16,
740:18, 748:23,
749:2, 762:2,
766:19, 769:17,
772:25, 773:2,
773:6, 774:22,
774:23, 785:6,
787:3, 792:4,
805:23, 818:11,
818:23, 821:12,

823:23, 824:2,
825:5, 828:12,
829:13, 829:19,
829:21, 830:17,
832:20
**firsthand** [1] - 684:6
**fish** [3] - 787:3,
787:11, 787:15
**fishing** [1] - 787:8
**fistfight** [1] - 651:2
**fit** [2] - 767:8, 767:9
**five** [23] - 626:11,
631:4, 631:5, 660:5,
661:17, 680:10,
689:9, 716:19,
717:11, 717:15,
717:16, 761:24,
762:14, 762:16,
763:1, 787:10,
824:5, 824:12,
824:13, 824:20,
834:11, 835:5
**five-minute** [1] -
626:11
**five-minutes** [1] -
761:24
**five-year** [1] - 631:4
**fixed** [2] - 756:3,
756:19
**Flanagan** [1] - 607:22
**flat** [2] - 654:16, 782:3
**fled** [6] - 708:19,
720:18, 751:13,
776:2, 818:4, 824:17
**flee** [7] - 624:2,
720:19, 751:14,
751:16, 797:2
**fleeing** [12] - 620:19,
620:20, 623:24,
717:18, 720:7,
720:22, 721:1,
722:5, 722:21,
771:21, 780:22,
784:16
**flip** [2] - 764:12,
796:14
**floor** [1] - 777:9
**floorboard** [2] -
776:13, 803:7
**floppy** [1] - 646:5
**Florida** [6] - 627:19,
627:20, 654:15,
654:22, 682:7,
682:19
**fluid** [1] - 736:15
**fly** [1] - 630:6
**focus** [6] - 754:20,
797:6, 797:7, 798:4,
798:13, 799:23
**focused** [2] - 699:22,

701:22
**focusing** [3] - 664:17,
664:20, 809:1
**folks** [27] - 722:22,
729:20, 729:21,
767:1, 767:23,
770:21, 770:24,
771:7, 771:19,
772:4, 772:8,
772:19, 773:2,
773:24, 775:11,
779:2, 779:12,
780:11, 780:15,
780:23, 781:1,
785:25, 788:3,
823:3, 824:22,
825:4, 835:15
**follow** [6] - 740:4,
740:5, 740:11,
741:18, 744:3,
813:15
**followed** [3] - 655:24,
795:9, 801:10
**following** [25] - 623:6,
626:16, 655:15,
655:20, 657:3,
680:15, 681:23,
714:17, 722:14,
739:10, 748:23,
753:15, 756:5,
760:1, 762:17,
763:9, 774:9, 779:6,
789:21, 790:1,
811:10, 812:25,
828:20, 832:16,
835:10
**follows** [1] - 684:4
**fool** [1] - 775:6
**foot** [4] - 690:20,
691:21, 813:24,
814:21
**Force** [8] - 634:9,
634:12, 634:21,
634:24, 665:17,
678:12, 691:5,
817:13
**force** [98] - 609:13,
609:17, 610:8,
611:3, 611:5, 611:6,
611:14, 612:11,
614:9, 614:13,
614:15, 614:18,
615:12, 617:11,
617:13, 617:15,
617:23, 618:8,
618:11, 618:21,
621:16, 622:16,
625:22, 628:24,
629:2, 629:10,
629:13, 633:18,

635:18, 635:24,
636:3, 637:14,
643:21, 643:22,
645:2, 645:18,
646:15, 646:21,
649:5, 650:18,
651:22, 651:23,
653:3, 664:24,
675:23, 677:9,
679:13, 684:10,
684:20, 685:20,
692:19, 692:21,
698:6, 699:24,
702:6, 702:11,
709:25, 720:9,
722:6, 722:9,
722:17, 723:5,
726:9, 748:9,
748:12, 748:14,
748:18, 748:7,
749:9, 749:12,
749:15, 749:17,
750:1, 750:4,
750:11, 750:12,
750:14, 750:15,
750:20, 751:1,
751:2, 751:7,
751:21, 753:24,
759:15, 765:3,
778:7, 778:9,
778:23, 778:24,
779:19, 783:13,
812:18, 812:20,
818:13, 822:5,
833:19
**force-related** [1] -
628:24
**foregoing** [1] - 836:6
**Forensic** [1] - 665:16
**FOREPERSON** [1] -
832:24
**foreperson** [9] -
759:6, 759:7, 761:5,
761:8, 761:11,
828:13, 829:14,
832:4, 832:22
**foresight** [1] - 763:23
**forever** [2] - 678:3,
798:22
**forget** [3] - 780:8,
798:20, 798:22
**forgive** [1] - 783:4
**forgiveness** [1] -
783:3
**forgotten** [2] - 639:20,
644:4
**form** [43] - 642:18,
675:23, 716:12,
716:13, 720:13,
729:24, 729:25,

730:5, 732:9,
732:22, 732:23,
733:5, 733:12,
733:14, 733:20,
734:17, 734:20,
734:23, 734:24,
759:9, 759:11,
759:21, 760:21,
761:6, 761:8,
761:10, 761:12,
783:6, 783:8,
783:11, 818:11,
819:5, 819:16,
821:10, 821:18,
828:14, 832:6,
833:4, 833:5,
833:16, 833:22,
834:20
**format** [1] - 836:9
**formed** [1] - 772:15
**former** [1] - 774:8
**forms** [1] - 739:6
**formula** [2] - 756:3,
756:19
**formulate** [6] - 644:2,
653:8, 653:17,
653:20, 659:16,
673:14
**formulated** [3] -
641:1, 655:7, 673:3
**formulating** [1] -
639:23
**formulation** [4] -
641:7, 643:19,
662:25, 673:4
**FORSYTH** [1] - 607:9
**Forsyth** [163] - 609:5,
611:8, 615:15,
615:17, 617:1,
620:18, 621:22,
621:25, 622:2,
624:2, 624:9,
624:10, 624:13,
624:15, 624:16,
624:20, 624:24,
625:1, 625:12,
631:17, 641:4,
641:6, 642:2,
642:19, 642:24,
654:3, 654:8, 655:4,
655:22, 656:5,
657:3, 657:7,
657:24, 658:11,
658:18, 661:11,
662:13, 664:9,
664:12, 665:8,
666:19, 667:1,
667:9, 668:1, 668:8,
669:1, 669:9, 671:7,
671:18, 672:5,

672:18, 675:17,
676:13, 676:17,
677:25, 678:6,
679:5, 698:9,
699:13, 710:25,
719:22, 721:11,
722:18, 723:5,
736:24, 737:15,
737:19, 740:21,
748:6, 748:10,
748:15, 748:24,
749:1, 749:5, 749:8,
750:8, 750:23,
750:25, 751:11,
751:21, 751:24,
752:9, 752:12,
755:4, 757:13,
757:15, 759:16,
760:16, 760:17,
783:14, 790:20,
791:14, 792:3,
792:13, 792:18,
792:23, 793:1,
793:5, 793:6,
793:17, 793:25,
794:3, 794:6,
794:14, 794:16,
794:24, 795:12,
795:24, 796:3,
797:12, 797:16,
797:18, 797:25,
798:18, 798:24,
799:1, 799:12,
800:3, 800:8, 801:2,
801:19, 803:2,
803:22, 804:4,
804:9, 804:12,
806:8, 806:19,
806:24, 807:1,
807:4, 808:25,
809:15, 809:17,
810:13, 811:15,
811:17, 811:22,
812:1, 812:2, 812:5,
812:10, 812:19,
812:21, 812:24,
813:5, 813:9,
813:11, 815:7,
817:16, 817:24,
818:13, 819:9,
819:13, 821:19,
822:5, 822:7,
822:15, 823:10,
833:17, 833:19
**Forsyth's** [38] -
610:24, 611:10,
612:1, 621:9, 623:7,
641:25, 659:10,
671:11, 672:9,
673:7, 673:15,
674:24, 675:23,

679:20, 712:16,
721:20, 748:16,
749:10, 750:9,
752:16, 755:6,
758:1, 769:2,
797:21, 801:16,
802:8, 806:2, 807:1,
807:8, 810:3,
811:25, 813:20,
813:23, 814:21,
817:17, 818:7,
818:25, 822:1
**forth** [6] - 615:24,
616:15, 705:18,
742:9, 742:11, 810:9
**forthcoming** [1] -
739:23
**forward** [14] - 624:16,
627:4, 666:13,
715:12, 771:11,
773:11, 774:2,
802:12, 802:13,
806:13, 811:20,
811:24, 826:10
**foundation** [1] - 690:2
**founding** [1] - 763:22
**four** [15] - 609:4,
609:11, 660:13,
660:17, 666:24,
667:10, 668:7,
716:17, 716:18,
717:9, 774:12,
789:2, 824:2,
824:12, 834:9
**Fourth** [4] - 725:2,
725:10, 728:18,
778:3
**fourth** [1] - 633:19
**fourth-degree** [1] -
633:19
**Fowler** [1] - 607:22
**fractions** [1] - 796:10
**frame** [1] - 677:17
**framed** [1] - 675:22
**frames** [1] - 735:23
**frankly** [2] - 616:13,
734:7
**free** [5] - 625:25,
748:8, 762:24,
835:7, 835:8
**frequently** [2] -
632:17, 797:1
**Friday** [3] - 607:12,
834:23, 835:15
**front** [22] - 615:16,
624:1, 624:21,
624:25, 640:14,
650:8, 658:4,
665:19, 665:24,
668:20, 697:16,

764:21, 776:7,
776:11, 777:1,
777:5, 780:4,
781:25, 789:3,
826:9, 826:10,
827:25
**frying** [1] - 787:15
**fulfilled** [1] - 658:19
**full** [1] - 692:4
**fully** [4] - 614:4,
623:19, 695:19,
752:22
**fun** [2] - 819:24,
821:12
**function** [3] - 721:17,
783:4, 783:5
**functions** [1] - 731:18
**fund** [1] - 646:2
**funeral** [1] - 796:12
**funnel** [3] - 670:6,
670:8, 670:16
**funneling** [1] - 670:13
**funny** [1] - 683:18
**future** [2] - 755:11,
755:22
**fuzzy** [2] - 831:2,
831:9

## G

**Ganey** [2] - 725:2,
725:10
**Garner** [8] - 644:14,
647:19, 722:2,
779:7, 779:17,
779:22, 784:17,
823:12
**gas** [18] - 625:19,
660:3, 665:21,
666:7, 765:7,
770:20, 772:1,
774:2, 780:1,
780:19, 794:15,
802:9, 804:11,
814:4, 818:1,
824:25, 827:1
**gear** [38] - 610:18,
614:25, 615:3,
615:19, 763:14,
765:4, 766:6, 766:7,
766:9, 766:19,
770:15, 773:2,
773:5, 773:6,
773:12, 773:17,
774:1, 775:17,
777:13, 777:25,
783:16, 789:5,
789:6, 800:6,
802:11, 802:12,
802:13, 803:24,

804:1, 804:3, 804:6,
804:7, 804:8,
805:21, 805:22,
805:23, 806:12,
823:9
**gears** [2] - 804:9,
804:12
**general** [26] - 621:10,
621:13, 622:14,
625:21, 650:22,
655:21, 659:11,
666:5, 681:5, 681:7,
684:12, 692:10,
707:22, 743:9,
745:23, 752:13,
753:7, 753:9, 754:7,
755:8, 759:24,
760:2, 760:8, 760:10
**General** [2] - 645:24,
646:11
**General's** [5] - 627:25,
628:5, 630:17,
631:23, 644:19
**generally** [3] - 650:14,
743:4, 794:24
**genesis** [1] - 727:15
**gentleman** [1] - 793:3
**gentlemen** [68] -
626:18, 626:20,
639:12, 646:14,
647:16, 680:6,
714:2, 739:12,
739:14, 740:9,
761:22, 763:14,
763:16, 769:25,
772:24, 773:10,
775:23, 777:14,
777:25, 781:10,
782:6, 782:15,
782:23, 783:3,
783:16, 784:23,
787:24, 788:17,
789:5, 789:9, 790:4,
790:8, 791:2, 791:8,
791:13, 791:22,
792:5, 793:21,
795:21, 796:2,
796:18, 798:7,
799:18, 804:18,
805:16, 806:2,
808:12, 809:2,
812:25, 813:24,
815:4, 816:9, 818:9,
818:21, 819:12,
820:4, 820:19,
821:1, 821:8, 822:4,
825:12, 827:20,
828:5, 828:7,
828:10, 832:19,
833:3, 834:21

**Georgia** [1] - 809:6
**girl** [1] - 703:25
**Given** [1] - 836:12
**given** [23] - 618:10, 618:20, 618:22, 619:2, 619:13, 630:12, 677:6, 679:11, 716:15, 717:25, 718:16, 718:18, 718:19, 727:14, 739:19, 747:20, 751:17, 757:8, 814:16, 821:17, 830:19, 833:6, 835:14
**glad** [1] - 682:19
**glass** [1] - 671:2
**Glasser** [1] - 607:18
**God** [3] - 654:20, 677:18, 783:4
**God's** [1] - 627:19
**govern** [1] - 614:12
**governed** [2] - 612:2, 741:16
**government** [7] - 646:12, 753:25, 763:24, 763:25, 764:4, 770:2, 778:3
**governor's** [2] - 628:3, 628:22
**governs** [1] - 780:14
**grab** [3] - 714:25, 715:13, 787:14
**Graham** [9] - 644:18, 645:16, 658:10, 667:14, 667:16, 672:22, 673:16, 675:7, 702:22
**grandfather's** [1] - 820:12
**grant** [2] - 618:24, 619:16
**granted** [1] - 635:25
**granting** [1] - 737:24
**graph** [1] - 651:11
**graphic** [1] - 650:22
**grasp** [1] - 773:19
**grass** [12] - 695:18, 695:23, 696:3, 696:5, 770:21, 771:9, 771:13, 772:5, 772:7, 773:23, 824:22
**gravel** [3] - 767:17, 767:18, 771:25
**great** [1] - 648:3
**greater** [6] - 731:3, 742:23, 742:24, 746:13, 751:2, 751:7
**greatest** [3] - 645:18,

650:18, 788:11
**Green** [1] - 665:15
**green** [4] - 651:5, 652:1, 652:9, 708:19
**Greenbag** [1] - 607:16
**greenish** [2] - 651:6, 652:10
**grew** [2] - 627:17, 791:7
**ground** [20] - 615:21, 669:19, 673:23, 674:2, 695:6, 695:8, 695:10, 699:2, 699:3, 699:20, 700:11, 701:20, 767:24, 768:1, 768:2, 768:3, 781:4, 807:13, 807:16, 807:21
**grounds** [3] - 722:6, 722:9, 737:25
**groups** [2] - 762:10, 789:15
**grown** [1] - 771:4
**guarantee** [2] - 661:21, 669:18
**guaranteed** [1] - 748:7
**guess** [10] - 637:9, 644:7, 649:18, 660:2, 662:7, 662:20, 666:4, 686:8, 765:14, 831:21
**guessing** [2] - 661:24, 736:14
**guesswork** [1] - 757:22
**guidance** [2] - 754:2, 757:8
**guide** [1] - 756:20
**guidelines** [8] - 621:12, 644:22, 659:13, 674:25, 675:21, 679:22, 712:17, 817:18
**Guidelines** [2] - 673:8, 673:16
**Gumball** [1] - 655:13
**gun** [6] - 645:14, 648:19, 691:2, 691:13, 691:25, 824:20
**Gundy** [1] - 628:23
**gunshot** [2] - 768:23, 808:23
**gunshots** [1] - 827:23
**guy** [2] - 768:25, 780:20
**guys** [10] - 626:11, 681:13, 714:25,

715:2, 735:10, 825:15, 829:19, 830:23, 831:15, 832:2

---

# H

**habit** [1] - 669:24
**half** [6] - 654:19, 666:10, 666:11, 731:1, 764:11, 786:3
**hall** [1] - 647:18
**hallmark** [1] - 611:20
**hammer** [1] - 831:2
**hand** [15] - 617:24, 618:7, 629:11, 633:19, 635:12, 645:22, 652:16, 652:19, 668:13, 684:4, 691:9, 808:20, 832:25, 836:12
**handle** [2] - 677:13, 822:19
**handled** [1] - 832:3
**hands** [10] - 636:15, 768:25, 808:24, 809:8, 809:9, 814:9, 814:10, 814:12, 814:13, 814:17
**handwork** [1] - 728:22
**hang** [1] - 835:5
**happy** [2] - 824:13, 829:19
**hard** [18] - 651:2, 681:1, 681:2, 687:14, 688:6, 688:7, 688:10, 729:17, 735:22, 767:4, 772:14, 775:10, 803:25, 825:7, 825:13, 825:15, 827:9, 835:1
**hardest** [1] - 783:20
**harm** [11] - 621:11, 622:10, 622:15, 659:11, 753:16, 753:19, 753:22, 756:7, 756:9, 756:16, 764:6
**harm's** [5] - 620:18, 654:4, 655:4, 658:12, 658:19
**harmed** [1] - 755:10
**have"** [1] - 707:10
**Hazard** [2] - 771:22, 779:15
**head** [6] - 641:22, 650:1, 677:14, 777:4, 824:5

**heading** [1] - 708:19
**heads** [2] - 738:23, 830:7
**health** [2] - 753:17, 755:18
**hear** [10] - 626:22, 641:24, 659:20, 739:25, 745:14, 762:7, 801:14, 813:10, 818:23
**heard** [69] - 609:24, 611:22, 614:23, 624:14, 631:7, 642:23, 654:7, 654:10, 656:5, 656:24, 657:1, 657:9, 658:14, 658:22, 659:20, 659:23, 662:22, 672:25, 673:5, 675:16, 678:5, 679:15, 693:7, 694:20, 694:21, 696:18, 701:1, 703:17, 703:24, 722:4, 733:17, 734:7, 735:7, 736:17, 736:21, 736:23, 737:14, 737:18, 739:15, 739:20, 740:8, 741:11, 742:25, 744:12, 744:17, 746:14, 765:4, 765:18, 766:13, 769:2, 774:23, 781:9, 785:8, 789:12, 790:25, 791:20, 791:23, 791:24, 793:2, 794:6, 796:18, 802:24, 815:6, 816:18, 818:22, 821:13
**hearing** [3] - 636:17, 799:25, 804:10
**hearings** [1] - 620:17
**hears** [2] - 826:16, 827:23
**heavily** [2] - 777:22
**heavy** [1] - 824:25
**heels** [1] - 685:2
**held** [1] - 691:15
**help** [2] - 712:24, 811:16
**hereby** [1] - 836:5
**herring** [1] - 809:2
**herself** [1] - 746:3
**hesitate** [1] - 758:20
**hesitation** [1] - 791:21

**hidden** [1] - 770:25
**hide** [1] - 825:18
**hiding** [2] - 670:9, 771:17, 780:1
**high** [18] - 620:19, 620:22, 620:23, 621:2, 633:20, 641:23, 646:12, 654:4, 655:5, 655:19, 656:3, 658:13, 664:15, 736:19, 793:9, 798:19, 811:11, 827:4
**higher** [1] - 769:3
**highlighting** [1] - 724:3
**highly** [5] - 621:13, 622:16, 655:11, 736:15, 767:20
**Highway** [1] - 666:2
**hill** [3] - 667:2, 794:13, 818:2
**hillside** [1] - 773:21
**himself** [12] - 620:18, 621:3, 654:3, 655:4, 658:12, 658:19, 736:25, 746:2, 771:16, 791:15, 793:15, 796:5
**hindsight** [6] - 667:18, 750:3, 794:9, 813:21, 817:23, 822:12
**hired** [3] - 630:17, 631:2, 650:23
**history** [1] - 782:2
**hit** [16] - 621:24, 669:19, 671:2, 671:20, 671:24, 691:7, 696:22, 699:14, 729:22, 738:18, 773:17, 776:19, 777:11, 787:9, 805:1, 814:6
**hits** [1] - 777:2
**hitting** [3] - 655:25, 658:22, 818:4
**Hobby** [1] - 725:9
**HOGAN** [1] - 719:15, 720:1, 722:1, 722:5, 723:9, 727:14, 729:8, 730:3, 730:23
**Hogan** [12] - 607:18, 719:13, 719:14, 720:5, 721:25, 722:25, 727:13, 728:9, 729:24, 730:22, 785:25, 786:1

18

**Hogan's** [1] - 732:1
**hold** [3] - 679:11, 690:4, 713:12
**home** [3] - 673:1, 787:14, 796:11
**honest** [5] - 640:15, 758:22, 825:13, 825:15, 831:6
**honor** [2] - 790:20, 827:10
**Honor** [130] - 609:8, 609:11, 611:12, 611:25, 613:10, 613:17, 613:20, 613:22, 613:24, 614:3, 614:11, 614:15, 615:4, 615:23, 616:12, 616:20, 616:23, 617:13, 619:21, 619:23, 620:2, 620:11, 620:15, 621:22, 622:4, 622:22, 623:18, 623:22, 624:5, 624:7, 624:12, 625:5, 625:8, 625:11, 625:17, 626:4, 626:6, 627:1, 627:10, 637:12, 637:18, 639:3, 639:5, 639:8, 639:18, 649:23, 678:24, 679:25, 681:19, 682:3, 685:10, 685:13, 689:21, 690:3, 690:6, 712:1, 712:3, 713:16, 713:18, 713:22, 713:24, 714:23, 715:20, 719:2, 719:13, 720:3, 720:6, 721:5, 721:9, 722:1, 723:12, 724:14, 724:15, 724:17, 724:20, 725:1, 726:17, 727:14, 728:4, 728:7, 729:5, 729:8, 729:12, 730:3, 730:23, 731:11, 732:11, 732:25, 733:2, 733:14, 733:21, 733:23, 734:14, 734:18, 734:21, 735:2, 735:18, 736:6, 738:15, 738:17, 739:3, 739:5, 739:8,

762:21, 762:23, 763:6, 763:7, 786:5, 786:21, 786:22, 786:25, 787:17, 787:20, 787:24, 790:6, 796:21, 798:9, 798:11, 810:21, 822:20, 822:22, 830:9, 830:16, 830:17, 831:14, 831:19, 832:1, 832:12, 835:20, 835:22
**Honorable** [1] - 607:12
**hoodwinked** [1] - 768:15
**Hoover** [2] - 612:16, 612:19
**hop** [1] - 775:25
**hopefully** [2] - 715:12, 729:15
**hopelessly** [1] - 829:23
**hopes** [1] - 770:12
**hoping** [3] - 764:23, 768:9, 773:18
**hopped** [2] - 771:7, 826:23
**Hospital** [1] - 630:4
**hotshot** [1] - 652:12
**hour** [19] - 640:3, 640:5, 654:19, 660:24, 661:17, 661:18, 661:21, 665:10, 665:11, 665:12, 665:13, 666:9, 666:10, 685:5, 731:1, 767:13, 835:4, 835:15
**hours** [9] - 640:2, 654:17, 792:12, 799:15, 816:10, 824:16, 829:22, 830:20
**house** [1] - 820:12
**human** [10] - 634:14, 645:12, 645:15, 664:23, 665:22, 666:15, 668:3, 668:7, 704:13, 763:23
**humanly** [3] - 666:18, 669:15, 672:14
**humiliation** [1] - 753:23
**hundred** [1] - 796:13
**hundreds** [3] - 686:12, 686:17, 781:24

**hurt** [1] - 668:14
**hurting** [1] - 631:8
**hypothermia** [1] - 612:20
**hypothesis** [1] - 767:3
**hypothetical** [8] - 690:16, 697:11, 697:12, 697:14, 697:18, 697:21, 698:4, 698:19

**I**

**idea** [7] - 670:10, 672:13, 695:9, 793:1, 815:16, 816:4, 816:5
**ideas** [1] - 795:16
**identical** [1] - 677:20
**identified** [4] - 616:25, 618:2, 639:11, 732:13
**identify** [4] - 627:13, 721:12, 732:13, 825:24
**ignore** [6] - 743:25, 767:1, 772:12, 772:13, 800:20, 800:23
**ignored** [1] - 772:15
**ill** [1] - 753:17
**imagine** [1] - 731:3
**immediate** [9] - 622:13, 622:18, 625:22, 668:17, 708:18, 749:22, 750:17, 750:24, 778:16
**immediately** [7] - 652:8, 731:24, 735:9, 753:14, 805:4, 814:5, 829:8
**imminent** [7] - 621:16, 621:17, 622:6, 778:11, 778:15, 778:18, 778:21
**immunity** [18] - 613:13, 715:22, 717:13, 717:20, 717:24, 718:1, 723:14, 723:18, 723:20, 723:23, 724:2, 724:10, 730:8, 736:7, 737:20, 737:25, 738:6, 738:11
**impact** [1] - 655:3
**impacted** [1] - 658:6
**impair** [1] - 806:17
**impaneled** [1] - 724:4

**impart** [1] - 816:4
**impartial** [1] - 758:18
**impartially** [1] - 741:18
**impeach** [2] - 689:24, 745:24
**impeached** [4] - 745:2, 745:21, 747:9, 747:12
**imperfect** [1] - 763:24
**implication** [1] - 791:8
**imply** [1] - 757:5
**implying** [1] - 791:4
**importance** [1] - 745:17
**important** [3] - 636:8, 769:8, 776:5
**importantly** [1] - 611:25
**impose** [1] - 828:24
**impossibility** [1] - 610:19
**impossible** [4] - 683:15, 699:6, 699:12
**improper** [1] - 743:23
**improve** [1] - 681:7
**inability** [1] - 731:19
**inappropriate** [2] - 725:3, 738:6
**inches** [2] - 660:5, 660:6
**incident** [20] - 610:23, 625:3, 631:24, 636:21, 644:11, 645:10, 647:13, 647:17, 657:11, 666:24, 678:10, 678:17, 720:9, 720:11, 720:19, 737:4, 745:13, 798:2, 802:6, 808:21
**incidents** [3] - 635:12, 647:11, 825:19
**inclined** [2] - 728:9, 831:4
**include** [6] - 643:5, 673:16, 721:18, 723:14, 754:1, 830:24
**included** [2] - 732:4, 801:12
**includes** [3] - 617:21, 721:10, 721:18
**including** [13] - 609:17, 615:20, 714:11, 729:17, 730:8, 749:21, 753:17, 753:23, 754:3, 754:22,

762:9, 789:14, 807:23
**income** [2] - 772:19, 772:20
**inconsistencies** [17] - 610:25, 745:10, 772:16, 797:6, 797:9, 798:23, 799:16, 799:22, 799:23, 801:4, 806:1, 806:20, 807:11, 807:12, 808:18, 810:16
**inconsistency** [5] - 799:18, 806:22, 807:7, 809:15, 809:21
**inconsistent** [10] - 610:22, 610:24, 642:4, 675:8, 721:16, 737:11, 737:13, 745:22, 747:11, 799:17
**incorporate** [2] - 716:9, 726:20
**incorporated** [18] - 716:8, 716:20, 716:23, 717:7, 717:9, 717:10, 717:12, 717:16, 717:17, 717:21, 717:22, 717:23, 718:2, 718:6, 718:9, 718:12, 718:21, 726:21
**incorrect** [1] - 683:12
**increases** [1] - 656:1
**incurred** [1] - 756:1
**indeed** [1] - 737:6
**independent** [7] - 680:12, 714:12, 746:21, 747:20, 747:22, 762:11, 789:16
**INDEX** [1] - 608:1
**Indiana** [2] - 628:13, 647:17
**indicate** [8] - 614:17, 614:19, 687:6, 698:13, 724:11, 735:19, 767:4, 776:15
**indicated** [5] - 729:14, 746:3, 802:18, 807:10, 813:16
**indicates** [1] - 764:25
**indicating** [2] - 703:15, 722:20
**indication** [1] - 611:13
**indifference** [19] -

609:23, 610:2, 610:5, 613:23, 613:25, 614:11, 615:6, 618:4, 618:16, 725:25, 726:12, 754:19, 755:6, 755:18, 760:18, 784:12, 784:13, 784:16, 822:2
**indirect** [1] - 743:7
**indiscernible** [4] - 624:4, 652:18, 737:7, 827:4
**individual** [20] - 607:9, 641:14, 652:4, 652:21, 664:16, 677:24, 692:21, 692:22, 709:2, 711:8, 741:7, 758:16, 779:7, 779:8, 779:13, 779:14, 798:18, 813:4, 814:1, 814:10
**individual's** [2] - 651:19, 678:2
**individually** [2] - 833:8, 833:9
**individuals** [7] - 629:15, 650:14, 676:23, 687:19, 688:5, 816:20, 816:22
**inducing** [4] - 678:1, 793:13, 794:3, 798:19
**infallible** [1] - 763:21
**infer** [3] - 610:5, 663:11, 726:11
**inference** [1] - 744:21
**inferences** [3] - 617:21, 721:15, 744:19
**inferred** [1] - 726:1
**infliction** [14] - 609:14, 611:17, 611:19, 611:21, 612:21, 613:2, 613:3, 616:2, 616:16, 618:20, 618:25, 619:17, 718:4, 728:23
**influenced** [2] - 743:24, 747:23
**inform** [2] - 759:22, 760:21
**information** [43] - 621:4, 621:5, 621:6, 624:11, 624:14, 641:6, 644:1, 644:2,

644:22, 648:8, 653:14, 653:22, 655:3, 658:14, 663:22, 667:21, 671:23, 673:2, 673:3, 673:5, 673:6, 674:23, 678:19, 693:13, 707:17, 707:22, 708:18, 712:15, 774:7, 774:8, 794:14, 801:10, 802:1, 802:2, 802:7, 814:23, 815:6, 816:14, 816:25, 817:25, 818:3, 818:6, 822:14
**informed** [6] - 623:15, 656:25, 661:15, 693:13, 708:24, 709:4
**infringed** [1] - 725:13
**inherently** [1] - 621:7
**initial** [5] - 611:18, 619:16, 621:21, 623:5, 831:24
**injured** [1] - 752:4
**injuries** [3] - 612:25, 752:23, 755:14
**injury** [15] - 612:2, 622:10, 749:24, 750:18, 750:25, 752:15, 753:11, 753:20, 754:10, 754:12, 766:14, 778:12, 778:13
**inmate** [1] - 612:19
**innocent** [2] - 745:14, 745:18
**inquiry** [1] - 750:6
**inside** [2] - 671:2, 767:8
**inspect** [1] - 833:4
**instance** [3] - 652:1, 688:9, 707:25
**instances** [2] - 771:20, 771:21
**instant** [2] - 748:13, 749:6
**instantaneous** [3] - 611:23, 730:18, 753:4
**instantaneously** [5] - 766:15, 804:22, 805:6, 805:17, 805:20
**instantly** [3] - 775:20, 775:21
**instead** [1] - 641:12
**Institute** [6] - 634:9,

634:12, 634:21, 634:25, 665:17, 817:13
**instruct** [6] - 629:10, 684:9, 718:15, 723:19, 725:3, 740:9
**instructed** [14] - 721:24, 726:3, 732:4, 743:17, 744:2, 751:15, 754:13, 754:15, 755:2, 757:4, 765:25, 784:21, 790:24, 822:12
**instruction** [20] - 680:18, 716:6, 716:9, 716:19, 716:22, 717:5, 717:18, 718:8, 718:14, 720:8, 720:12, 720:15, 720:22, 721:3, 721:18, 722:7, 724:20, 726:24, 740:14, 744:3
**instructions** [35] - 680:11, 681:5, 715:5, 715:10, 715:14, 716:2, 716:4, 716:25, 717:10, 718:23, 718:24, 719:4, 719:11, 720:24, 723:14, 724:13, 732:12, 732:21, 735:9, 735:10, 739:22, 740:3, 740:15, 740:16, 741:9, 757:7, 759:9, 759:13, 761:9, 761:23, 763:20, 794:8, 819:4, 821:18, 829:13
**instructor** [1] - 684:7
**instructs** [1] - 729:18
**insult** [1] - 768:7
**insulted** [1] - 772:23
**insure** [2] - 832:8, 833:10
**intangible** [1] - 753:12
**intelligence** [3] - 745:3, 768:7, 772:24
**intend** [2] - 623:21, 624:4
**intended** [1] - 615:8
**intense** [1] - 736:15
**intensive** [2] - 629:24, 634:16
**intent** [20] - 609:23, 610:2, 610:5,

611:13, 614:1, 615:6, 618:3, 618:13, 725:22, 726:2, 726:4, 726:19, 732:17, 750:9, 754:19, 755:5, 760:16, 784:11, 821:20
**intentional** [17] - 609:13, 611:17, 611:19, 611:21, 612:21, 613:2, 616:2, 616:16, 618:19, 618:25, 619:17, 717:25, 718:4, 727:2, 728:23, 745:19
**intentionally** [4] - 614:9, 615:8, 720:18, 751:13
**intentions** [2] - 750:10, 750:12
**interaction** [1] - 820:5
**interest** [1] - 759:3
**interesting** [1] - 822:24
**interjecting** [1] - 698:11
**interlocutory** [1] - 724:2
**internal** [1] - 799:22
**International** [2] - 676:22, 684:1
**interpretation** [1] - 807:6
**interpreted** [1] - 679:9
**interpreting** [1] - 807:4
**interrogation** [1] - 641:12
**interview** [3] - 623:7, 641:12, 641:13
**interviewed** [2] - 623:6, 709:5
**interviews** [1] - 708:25
**intoxicating** [1] - 677:2
**introduce** [2] - 698:24, 700:21
**introduced** [4] - 698:22, 800:9, 807:24
**introducing** [1] - 700:13
**investigating** [1] - 694:7
**investigation** [14] - 643:3, 653:15, 678:16, 680:13, 714:13, 762:11,

789:1, 789:16, 789:17, 800:5, 801:11, 801:16, 802:6, 816:15
**investigator** [1] - 774:9
**invites** [1] - 722:10
**involve** [3] - 609:23, 754:19, 825:20
**involved** [12] - 619:6, 640:7, 654:9, 655:2, 677:25, 736:15, 746:4, 755:6, 760:17, 784:11, 822:1, 834:24
**involvement** [3] - 619:13, 628:17, 634:11
**involves** [1] - 618:3
**irrelevant** [2] - 625:20, 734:5
**isolated** [1] - 827:1
**issue** [37] - 610:13, 617:25, 620:20, 620:21, 621:1, 623:1, 669:10, 671:13, 671:24, 676:17, 678:9, 707:3, 718:1, 721:21, 724:17, 725:18, 726:23, 727:18, 728:3, 730:12, 731:21, 732:12, 748:11, 748:12, 749:16, 752:13, 753:7, 753:17, 761:20, 769:22, 770:13, 798:17, 809:10, 821:16, 823:12, 823:14
**issues** [9] - 623:13, 623:16, 714:13, 729:16, 730:1, 732:23, 762:12, 789:17, 819:25
**item** [5] - 639:20, 730:13, 730:15, 731:13, 757:16
**items** [2] - 734:1, 753:16
**itself** [2] - 689:12, 799:17

**J**

**Jacob** [1] - 683:21
**jail** [1] - 612:20
**January** [1] - 717:1
**Jeep** [175] - 610:17,

617:4, 621:23, 624:2, 624:16, 641:19, 657:2, 657:17, 657:20, 657:22, 657:23, 658:4, 660:8, 663:3, 664:5, 664:6, 664:8, 664:13, 664:15, 664:22, 665:7, 667:3, 667:6, 667:25, 671:19, 671:20, 671:24, 672:2, 672:6, 672:14, 672:15, 674:4, 674:5, 675:3, 678:22, 688:9, 688:12, 688:19, 688:21, 688:25, 694:23, 695:7, 695:11, 696:3, 696:10, 696:20, 696:25, 697:6, 697:10, 697:15, 697:20, 697:25, 698:9, 698:17, 699:7, 699:14, 699:23, 701:23, 703:1, 703:5, 704:7, 705:6, 705:8, 705:10, 705:11, 705:12, 706:24, 708:5, 708:6, 708:8, 708:11, 709:17, 709:23, 710:6, 710:18, 710:19, 710:22, 710:24, 720:21, 721:12, 736:24, 763:14, 764:17, 764:18, 765:1, 765:4, 765:21, 766:8, 766:11, 768:4, 768:19, 770:14, 770:17, 771:8, 772:3, 773:2, 773:23, 773:25, 775:9, 775:10, 775:11, 777:1, 777:25, 779:12, 780:11, 780:16, 780:23, 781:3, 783:15, 783:16, 783:18, 789:5, 789:6, 793:18, 795:2, 795:13, 797:4, 800:6, 800:10, 800:13, 800:17, 800:23, 801:18, 802:14, 802:17, 803:14, 803:20, 804:5,

804:19, 805:13, 805:23, 807:18, 809:16, 809:20, 809:22, 809:24, 810:4, 810:12, 810:15, 811:19, 811:24, 812:16, 812:24, 813:4, 813:6, 813:8, 813:12, 813:15, 814:1, 814:5, 814:6, 814:7, 814:10, 814:18, 815:10, 815:12, 818:4, 818:6, 822:15, 823:9, 823:14, 823:15, 824:1, 824:7, 824:10, 824:24, 826:11, 826:14, 826:20
**Jeep's** [4] - 695:17, 696:13, 771:7, 810:6
**Jeeps** [2] - 667:4, 771:8
**Jersey** [1] - 627:17
**Jess** [1] - 628:23
**Jill** [2] - 836:3, 836:14
**job** [16] - 638:11, 638:15, 646:16, 683:8, 684:16, 712:21, 781:18, 781:20, 782:1, 783:3, 819:12, 819:14, 821:15, 822:7, 822:9, 825:16
**jog** [1] - 694:13
**Jontz** [31] - 607:5, 724:24, 730:16, 734:17, 748:5, 748:6, 748:22, 749:4, 750:21, 751:23, 752:6, 752:7, 752:14, 752:18, 752:19, 752:21, 752:23, 753:1, 753:15, 754:5, 754:6, 755:7, 759:16, 760:4, 760:6, 760:18, 783:14, 784:1, 818:14, 833:20
**JP** [1] - 693:4
**judge** [10] - 635:11, 635:17, 635:22, 743:1, 765:25, 771:2, 781:23, 783:9, 818:7, 822:11
**Judge** [9] - 607:12, 607:13, 794:8, 795:8, 811:1,

813:19, 817:19, 819:4, 821:17
**judged** [1] - 750:2
**judgement** [1] - 609:9
**judges** [3] - 744:24, 759:2
**judgment** [14] - 610:9, 635:15, 635:21, 635:25, 717:23, 736:6, 737:22, 737:24, 747:6, 758:12, 758:17, 783:4, 783:5, 835:14
**judicial** [1] - 736:14
**Judicial** [1] - 836:10
**July** [7] - 622:24, 623:1, 623:3, 623:8, 623:17, 624:5, 720:10
**jump** [4] - 651:8, 651:10, 651:17, 771:9
**jumped** [9] - 614:8, 665:24, 698:15, 704:20, 780:3, 780:20, 826:12, 827:3, 828:1
**jumping** [2] - 656:7, 826:8
**jumps** [2] - 826:19, 827:5
**JUROR** [8] - 834:4, 834:6, 834:8, 834:10, 834:12, 834:14, 834:16, 834:18
**juror** [10] - 610:5, 737:18, 741:7, 742:11, 747:21, 758:12, 758:13, 834:3, 834:5, 834:9
**Juror** [5] - 834:7, 834:11, 834:13, 834:15, 834:17
**jurors** [19] - 649:23, 714:11, 729:18, 740:11, 740:25, 741:12, 741:15, 744:24, 747:23, 758:14, 758:19, 758:24, 759:3, 762:9, 762:10, 790:11, 790:16, 832:7, 833:24
**Jury** [6] - 607:12, 681:23, 763:9, 789:21, 790:1, 790:8
**jury** [142] - 609:24, 611:5, 611:20,

614:6, 617:22, 618:15, 620:25, 623:12, 625:13, 626:12, 626:14, 626:16, 627:14, 627:21, 628:17, 629:22, 631:15, 631:19, 632:6, 632:11, 633:16, 634:11, 635:12, 635:13, 636:7, 637:22, 640:7, 640:17, 640:20, 641:10, 642:4, 643:20, 644:6, 646:21, 647:3, 650:6, 650:13, 653:23, 654:12, 655:7, 656:14, 659:17, 659:20, 663:22, 673:11, 673:14, 679:11, 680:3, 680:15, 681:12, 681:16, 681:22, 685:6, 685:19, 688:7, 692:1, 695:9, 702:24, 712:12, 714:17, 717:15, 717:22, 718:15, 721:15, 721:23, 721:24, 723:19, 723:23, 724:4, 724:7, 724:9, 725:3, 725:6, 725:11, 726:3, 726:11, 726:15, 730:9, 730:20, 731:7, 732:3, 732:7, 733:17, 734:4, 735:5, 735:12, 736:17, 737:17, 738:21, 739:10, 739:23, 740:3, 740:17, 741:6, 742:19, 743:5, 743:11, 743:19, 744:22, 745:12, 756:10, 757:7, 758:2, 759:5, 759:12, 761:5, 761:6, 761:12, 761:22, 761:24, 762:5, 762:17, 763:8, 763:19, 771:2, 789:15, 790:8, 795:9, 801:15, 810:24, 819:17, 823:13, 828:10, 828:11, 828:13, 829:13,

829:14, 832:3, 832:10, 832:15, 832:16, 832:19, 832:23, 833:3, 833:16, 833:21, 834:21, 835:2, 835:4, 835:10
**JURY** [1] - 832:24
**jury's** [1] - 702:16
**justice** [3] - 741:24, 827:20, 828:7
**justification** [1] - 699:24
**justified** [5] - 708:12, 709:25, 798:1, 799:2, 799:10
**justify** [2] - 744:20, 758:2

## K

**keep** [11] - 630:24, 677:13, 681:3, 713:5, 731:6, 734:15, 773:11, 774:3, 830:13, 831:3
**Kent** [4] - 630:9, 630:11, 630:12
**kept** [6] - 632:1, 671:9, 766:9, 785:23, 787:12, 807:20
**kernels** [1] - 731:22
**key** [1] - 818:15
**kicked** [4] - 690:20, 691:21, 803:24, 804:3
**kicking** [1] - 648:18
**kicks** [1] - 774:1
**kid** [2] - 654:18, 786:11
**kids** [5] - 630:25, 673:1, 734:3, 771:3, 788:11
**kill** [5] - 670:23, 711:5, 711:16, 827:12
**killed** [17] - 658:3, 669:3, 669:4, 688:16, 689:1, 700:15, 700:23, 711:19, 711:21, 780:21, 780:22, 785:1, 791:21, 796:19, 797:1, 825:10
**killing** [4] - 708:12, 766:3, 766:6, 798:1
**kills** [2] - 824:17, 827:5
**kind** [31] - 623:9, 629:19, 630:4,

630:23, 637:1, 639:20, 640:6, 640:17, 641:10, 641:12, 642:17, 644:5, 648:5, 669:8, 671:17, 673:11, 673:23, 674:5, 674:15, 700:17, 701:25, 706:1, 785:11, 791:8, 792:11, 795:8, 804:25, 805:8, 816:19, 827:11

**kindly** [1] - 754:2

**kinds** [3] - 639:23, 690:21, 691:22

**kinesiology** [1] - 645:12

**Kingwood** [1] - 771:24

**Kiwanis** [1] - 646:11

**Kleeh** [1] - 607:13

**knock** [1] - 777:13

**knocked** [1] - 805:22

**knowing** [4] - 655:19, 731:5, 768:14, 815:16

**knowingly** [3] - 614:8, 746:1, 747:13

**knowledge** [2] - 746:18, 763:23

**known** [9] - 610:12, 636:13, 658:9, 667:11, 706:7, 706:23, 736:10, 804:17, 813:22

**knows** [21] - 635:12, 635:13, 655:9, 661:18, 661:23, 662:9, 662:11, 663:5, 664:11, 665:7, 666:14, 675:11, 698:3, 699:21, 707:12, 729:14, 763:20, 780:12, 788:11, 815:13

**Kokomo** [1] - 647:17

---

**L**

---

**lacerated** [1] - 805:10

**lack** [2] - 690:2, 718:16

**Laconne** [1] - 713:1

**ladies** [66] - 626:18, 626:20, 639:12, 646:14, 714:2, 739:12, 739:14, 740:9, 761:22, 763:14, 763:15,

769:25, 772:24, 773:10, 775:23, 777:14, 777:25, 781:9, 782:6, 782:15, 782:22, 783:3, 783:16, 784:23, 787:23, 788:17, 789:5, 789:9, 790:3, 790:8, 791:2, 791:8, 791:13, 791:22, 792:4, 793:20, 795:20, 796:2, 796:17, 798:6, 799:18, 804:18, 805:15, 806:2, 808:12, 809:2, 812:25, 813:24, 815:4, 816:9, 818:9, 818:21, 819:12, 820:4, 820:19, 820:25, 821:8, 822:3, 825:12, 827:20, 828:5, 828:7, 828:10, 832:19, 833:3, 834:21

**Ladies** [2] - 647:15, 680:6

**lady** [1] - 635:16

**laid** [1] - 664:12

**lane** [2] - 621:25, 818:5

**language** [2] - 731:13, 831:12

**large** [1] - 797:7

**largely** [2] - 717:24, 721:7

**last** [11] - 649:1, 721:6, 723:21, 738:1, 762:7, 784:1, 784:4, 787:22, 789:12, 796:18, 819:7

**lasted** [1] - 790:9

**lastly** [6] - 613:4, 684:11, 753:25, 760:5, 761:4, 821:16

**latch** [2] - 768:10, 778:19

**latched** [1] - 800:7

**late** [3] - 625:14, 835:4, 835:15

**latter** [1] - 831:5

**laugh** [1] - 668:14

**law** [107] - 609:9, 609:21, 610:6, 610:9, 611:18, 614:4, 616:7, 616:12, 619:11,

619:13, 620:8, 627:23, 628:1, 629:2, 629:23, 630:1, 630:20, 632:8, 632:12, 632:15, 632:19, 632:23, 632:25, 633:2, 633:10, 636:5, 637:8, 637:14, 644:13, 644:14, 646:15, 648:11, 648:12, 655:11, 659:13, 669:25, 670:3, 670:14, 684:2, 686:6, 687:1, 687:4, 691:18, 713:3, 716:16, 717:5, 717:19, 718:16, 720:14, 720:15, 721:24, 722:19, 722:20, 723:24, 724:3, 725:2, 725:6, 726:6, 726:15, 727:4, 727:5, 727:7, 727:16, 727:25, 728:2, 728:12, 736:7, 736:10, 739:22, 740:10, 740:11, 740:12, 740:15, 740:20, 740:23, 740:25, 741:1, 741:2, 741:9, 741:13, 741:15, 741:19, 741:23, 743:9, 748:2, 748:6, 748:11, 748:24, 748:25, 749:17, 751:14, 751:17, 757:4, 766:22, 771:19, 772:18, 778:5, 778:6, 779:21, 780:13, 788:15, 793:4, 796:12, 814:25, 817:19

**Law** [7] - 673:9, 673:19, 674:25, 675:21, 679:22, 712:18, 817:18

**lawful** [1] - 754:4

**laws** [1] - 778:25

**lawsuit** [3] - 742:9, 751:24, 786:17

**lawyer** [2] - 631:21, 640:15

**lawyers** [2] - 743:21, 832:7

**laying** [2] - 731:4, 766:9

**lead** [1] - 744:22

**leading** [5] - 720:24, 737:3, 767:25, 820:6, 820:23

**leaning** [2] - 803:4, 803:6

**learn** [1] - 636:20

**learned** [6] - 635:7, 657:18, 775:16, 800:14, 803:23, 813:21

**least** [11] - 624:18, 634:2, 662:3, 663:20, 682:10, 698:7, 706:18, 722:20, 731:24, 831:7, 831:8

**leave** [8] - 620:4, 732:21, 734:22, 782:11, 816:16, 816:17, 829:7

**leaving** [1] - 629:21

**led** [3] - 619:10, 720:10, 825:6

**left** [12] - 652:2, 664:10, 668:17, 680:15, 694:23, 695:6, 695:11, 776:7, 776:22, 777:4, 789:21, 810:7

**legal** [2] - 611:20, 619:16

**Legal** [1] - 607:15

**legally** [3] - 617:17, 618:14, 738:4

**legislative** [2] - 728:13, 728:22

**legislature** [1] - 728:16

**legs** [8] - 775:20, 805:7, 824:6, 824:7, 824:9, 824:15, 824:16, 824:19

**length** [2] - 708:3, 765:22

**lengthy** [2] - 729:15, 729:19

**less** [7] - 651:8, 651:17, 653:4, 725:5, 786:10, 786:13, 829:22

**lethal** [4] - 614:9, 614:13, 625:21, 778:9

**level** [3] - 614:14, 645:1, 736:11

**leveled** [1] - 790:21

**Lewinski** [1] - 634:15

**LEXIS** [1] - 612:17

**liability** [6] - 613:24,

618:7, 618:9, 757:12, 785:6, 823:9

**liable** [4] - 752:12, 764:5, 764:6, 780:10

**lie** [10] - 685:6, 693:13, 712:21, 746:3, 768:23, 769:17, 769:24, 781:22, 781:25, 782:3

**lied** [16] - 682:16, 683:16, 684:23, 693:7, 693:14, 709:10, 709:12, 768:22, 768:25, 769:7, 769:9, 769:10, 781:16, 808:2, 812:3, 812:12

**lies** [5] - 670:4, 781:13, 781:14, 808:3, 812:3

**lieutenant** [2] - 713:7, 802:1

**Lieutenant** [43] - 631:6, 642:20, 642:25, 643:3, 663:5, 675:10, 678:9, 678:16, 678:17, 693:4, 693:10, 699:4, 700:21, 701:4, 701:12, 701:16, 709:8, 709:11, 709:14, 768:11, 768:16, 768:20, 769:13, 769:18, 775:15, 798:2, 799:13, 799:24, 800:4, 800:12, 800:16, 800:19, 800:21, 801:22, 802:5, 805:25, 810:14, 812:4, 812:7, 815:25, 816:6, 825:3

**life** [32] - 614:2, 615:25, 616:4, 636:22, 704:13, 711:20, 731:5, 764:6, 765:2, 765:3, 770:19, 774:20, 778:3, 783:24, 784:2, 784:4, 784:15, 785:17, 785:19, 786:8, 786:9, 786:10, 786:12, 786:20, 788:12, 788:16, 788:19, 788:20, 788:23, 793:14, 825:17

**light** [16] - 610:13,
613:21, 617:20,
618:17, 620:25,
621:8, 713:11,
744:20, 747:3,
750:7, 794:18,
794:20, 814:23,
826:5, 828:7, 828:8
**lights** [1] - 721:13
**likely** [9] - 707:25,
756:7, 764:15,
777:15, 780:16,
780:18, 783:13,
804:24, 805:18
**likewise** [3] - 618:11,
618:21, 743:20
**limine** [1] - 620:17
**limit** [1] - 707:24
**limitations** [2] - 612:3,
728:2
**limited** [7] - 671:4,
723:22, 724:10,
744:2, 744:15,
744:17, 749:21
**Lincoln** [1] - 683:21
**line** [53] - 624:20,
624:21, 644:12,
644:17, 644:21,
655:17, 674:6,
674:7, 681:2,
682:20, 682:22,
689:22, 696:1,
696:23, 696:24,
697:21, 699:16,
701:11, 702:21,
702:22, 715:4,
719:8, 719:17,
719:23, 722:13,
723:3, 724:20,
726:25, 729:17,
730:13, 730:15,
731:13, 732:14,
733:11, 733:14,
760:7, 760:12,
761:3, 761:4, 761:5,
764:9, 767:9, 769:2,
769:7, 771:6, 772:4,
772:5, 773:21,
780:23, 826:2
**lines** [12] - 674:19,
719:20, 721:8,
725:20, 726:19,
726:20, 729:1,
733:19, 734:22,
760:7, 764:2, 824:2
**lip** [1] - 794:17
**list** [1] - 760:24
**listed** [1] - 760:2
**listen** [4] - 641:17,
793:24, 793:25,

825:8
**listened** [1] - 815:4
**listening** [4] - 729:20,
738:1, 740:5, 801:13
**literally** [1] - 633:25
**literature** [1] - 678:12
**litigated** [1] - 727:25
**live** [3] - 627:16,
654:17, 785:19
**lived** [1] - 820:10
**lives** [2] - 788:6, 791:5
**living** [3] - 627:21,
786:1, 787:5
**LLP** [1] - 607:18
**load** [1] - 794:19
**local** [1] - 829:7
**locate** [1] - 648:24
**located** [5] - 806:21,
806:23, 807:2,
807:3, 807:5
**location** [7] - 657:7,
705:25, 780:2,
792:22, 810:7,
811:7, 811:8
**Lockman** [1] - 635:8
**lodged** [2] - 776:10,
776:15
**London** [1] - 630:18
**look** [46] - 621:14,
634:14, 653:11,
667:16, 683:23,
685:6, 696:1,
707:20, 715:5,
715:13, 719:7,
731:20, 765:20,
767:12, 771:9,
772:4, 772:5, 772:6,
772:25, 773:19,
773:23, 774:16,
775:9, 776:16,
777:19, 779:2,
779:4, 781:8, 783:6,
785:7, 791:4, 794:7,
794:9, 794:18,
817:21, 817:22,
817:24, 822:12,
822:13, 827:17,
828:25, 830:23
**looked** [6] - 652:1,
721:6, 769:21,
772:22, 794:19,
803:6
**looking** [15] - 617:3,
618:16, 623:9,
677:16, 705:5,
719:15, 724:19,
774:13, 780:15,
786:15, 793:9,
793:11, 803:3,
803:9, 826:13

**looks** [3] - 769:25,
770:2, 826:14
**loop** [1] - 668:9
**lose** [4] - 636:15,
636:16, 788:11
**loss** [11] - 733:3,
734:15, 748:17,
749:11, 751:4,
751:9, 753:10,
760:5, 784:6,
785:10, 786:18
**losses** [4] - 719:18,
752:23, 755:14,
756:1
**lost** [3] - 654:10,
783:24, 825:23
**love** [3] - 615:15,
705:6, 769:12
**Love** [64] - 623:6,
623:8, 624:11,
624:15, 624:17,
625:2, 625:3,
642:19, 642:24,
654:9, 655:22,
657:11, 658:1,
664:9, 664:12,
668:20, 672:18,
676:13, 676:17,
677:25, 678:6,
693:7, 693:14,
704:18, 704:23,
708:24, 709:3,
709:10, 709:12,
764:20, 768:21,
768:22, 769:17,
769:19, 772:16,
775:18, 781:11,
791:16, 791:17,
798:18, 798:24,
799:12, 801:2,
806:14, 806:19,
806:23, 808:1,
808:2, 808:4,
808:20, 808:22,
809:2, 809:16,
809:19, 810:4,
810:6, 810:11,
810:13, 811:13,
812:8, 826:2, 826:3,
826:8, 826:11
**Love's** [6] - 657:4,
668:18, 693:11,
769:4, 806:3, 810:3
**Loves'** [2] - 802:9,
807:9
**lower** [1] - 731:2
**luck** [1] - 719:16
**lunch** [4] - 681:13,
714:3, 714:8, 714:15
**luxury** [1] - 645:3

**lying** [2] - 682:10,
768:21

## M

**ma'am** [73] - 630:23,
631:18, 632:5,
632:9, 632:13,
633:5, 633:11,
633:14, 634:7,
634:10, 634:23,
635:1, 635:4, 636:4,
637:5, 639:25,
641:2, 641:9, 642:1,
642:6, 643:1, 643:7,
643:11, 643:16,
643:23, 644:3,
644:11, 648:15,
648:22, 650:7,
651:12, 652:6,
652:10, 652:25,
653:5, 653:10,
653:25, 654:6,
655:6, 655:9, 656:9,
658:17, 659:2,
659:15, 659:18,
659:22, 659:25,
660:4, 661:1, 661:7,
662:15, 662:21,
662:23, 663:21,
665:3, 669:12,
670:16, 671:22,
672:1, 673:10,
673:18, 673:20,
675:19, 678:21,
679:14, 679:19,
679:24, 712:10,
712:14, 712:19,
713:5, 713:15,
833:25
**mad** [1] - 782:11
**Madam** [10] - 627:4,
778:14, 791:12,
828:23, 829:5,
831:22, 833:8,
833:13, 833:24,
834:20
**magic** [1] - 710:10
**magically** [7] - 710:6,
710:8, 765:24,
766:2, 773:16,
777:13, 780:17
**maintain** [2] - 752:4,
752:10
**majority** [4] - 632:5,
823:2, 825:14
**malice** [1] - 755:16
**man** [7] - 680:21,
769:5, 781:23,
782:3, 785:1,

824:17, 824:18
**man's** [2] - 765:3,
778:3
**maneuver** [3] -
677:17, 677:18,
677:19
**manipulating** [1] -
661:14
**Mannan** [1] - 681:4
**manner** [8] - 614:21,
672:4, 679:18,
699:25, 709:24,
745:4, 745:6, 746:3
**Mannington** [2] -
657:12, 657:13
**manual** [9] - 765:8,
765:9, 768:15,
773:3, 773:6,
800:12, 803:23,
803:24, 804:2
**Marc** [1] - 665:15
**Marine** [3] - 631:6,
631:9, 631:13
**Marines** [1] - 631:7
**Marion** [10] - 621:15,
702:6, 702:11,
778:7, 778:8,
794:25, 813:2,
813:6, 813:14, 822:8
**mark** [3] - 674:5,
705:22, 824:23
**marking** [1] - 636:24
**marks** [5] - 696:13,
701:17, 701:18,
701:20, 775:5
**martial** [1] - 652:12
**match** [1] - 635:13
**matching** [1] - 813:7
**material** [3] - 640:3,
746:2, 747:14
**materials** [2] - 642:15,
798:14
**math** [2] - 782:9,
782:12
**mathematical** [2] -
706:5, 758:5
**matter** [21] - 609:5,
609:9, 610:6,
613:24, 619:5,
619:11, 620:1,
664:19, 692:6,
721:24, 736:7,
745:17, 746:2,
747:14, 772:23,
778:21, 808:12,
823:15, 823:16,
833:16, 835:25
**matters** [2] - 746:17,
747:24
**mean** [40] - 623:11,

625:25, 628:1, 640:18, 647:7, 650:21, 651:10, 658:8, 664:1, 664:3, 669:20, 669:22, 670:2, 686:24, 689:20, 690:8, 694:12, 695:19, 705:21, 706:21, 721:21, 722:8, 730:25, 733:18, 734:4, 767:2, 768:11, 768:24, 769:9, 770:8, 771:11, 771:25, 773:14, 776:17, 779:17, 781:22, 801:18, 807:4, 817:6, 828:2

**meaning** [5] - 662:1, 669:20, 696:24, 742:8, 785:7

**meaningless** [3] - 673:25, 674:1, 788:20

**means** [8] - 639:14, 666:12, 674:12, 699:15, 699:18, 730:19, 756:14, 778:22

**meant** [2] - 656:3, 674:14

**measure** [2] - 689:4, 757:8

**measured** [2] - 660:7, 660:18

**measurement** [3] - 674:15, 793:12, 803:17

**measurements** [2] - 661:5, 662:6

**measures** [1] - 648:16

**Mechanicsburg** [2] - 631:3, 713:6

**mechanism** [1] - 727:6

**medical** [9] - 730:17, 730:23, 731:21, 766:13, 775:19, 802:21, 802:24, 804:20, 820:14

**medically** [1] - 676:25

**medium** [1] - 650:21

**meeting** [3] - 635:16, 635:17, 647:18

**Melissa** [1] - 683:20

**member** [2] - 615:9, 769:3

**members** [8] - 621:10, 621:13, 622:11,

622:14, 625:21, 659:10, 754:3, 759:6

**Memorial** [1] - 630:4

**memories** [5] - 787:24, 788:5, 821:2, 821:5

**memory** [7] - 636:17, 637:23, 678:13, 694:13, 747:19, 782:2, 811:10

**Memphis** [5] - 647:19, 647:20, 647:22, 648:7, 649:12

**mental** [10] - 731:3, 731:12, 733:9, 734:9, 753:11, 753:22, 753:23, 753:25, 760:3, 783:23

**mention** [7] - 623:11, 685:3, 685:4, 802:10, 816:12, 817:15, 831:5

**mentioned** [9] - 634:8, 710:14, 711:5, 743:3, 743:17, 746:16, 799:11, 816:19, 828:12

**mentions** [1] - 623:1

**mere** [7] - 689:1, 692:21, 744:16, 758:2, 758:24, 779:8, 779:13

**merely** [4] - 688:13, 743:18, 747:4, 764:15

**mess** [4] - 646:25, 704:15, 704:17

**message** [3] - 761:15, 761:18, 827:11

**messed** [1] - 827:14

**met** [4] - 611:6, 624:12, 682:7, 818:24

**Michael** [2] - 829:15, 833:23

**Michigan** [1] - 628:14

**microphone** [1] - 627:8

**middle** [5] - 771:23, 775:6, 804:12, 811:19, 811:24

**might** [17] - 625:13, 648:13, 648:14, 649:21, 654:3, 661:24, 681:11, 696:5, 707:18, 722:7, 722:10, 738:19, 745:7, 761:19, 782:19,

809:9, 819:18

**miles** [11] - 660:24, 661:17, 661:18, 661:21, 665:10, 665:11, 665:12, 665:13, 666:9, 666:10

**military** [1] - 668:4

**million** [2] - 686:13, 763:22

**mind** [10] - 673:24, 742:12, 745:4, 767:6, 797:13, 797:16, 797:21, 819:18, 821:22, 831:3

**minds** [2] - 653:3, 742:19

**minimum** [2] - 793:17, 801:15

**minor** [2] - 654:14, 675:9

**minute** [7] - 626:11, 690:12, 691:24, 737:3, 789:10, 789:18, 827:19

**minutes** [21] - 614:25, 680:8, 680:14, 681:10, 681:13, 704:6, 706:18, 712:7, 714:5, 727:18, 735:14, 735:19, 735:21, 738:19, 739:16, 761:24, 762:14, 765:6, 781:4, 822:21, 835:5

**mirror** [1] - 718:20

**mischaracterization** [1] - 666:17

**misdemeanor** [2] - 771:21

**miserably** [1] - 650:23

**misleading** [3] - 620:24, 621:13, 622:16

**misnomer** [1] - 651:22

**misrecollection** [1] - 745:14

**mistake** [7] - 725:16, 770:25, 771:19, 779:24, 788:14, 788:18, 788:21

**mistrial** [1] - 830:25

**misunderstood** [1] - 725:23

**misuse** [1] - 707:5

**modalities** [1] - 634:1

**modality** [1] - 633:18

**mode** [3] - 650:20,

652:8, 829:10

**modern** [1] - 641:13

**modification** [1] - 723:7

**modified** [6] - 716:10, 716:18, 716:20, 716:24, 717:8, 717:10

**moment** [25] - 618:20, 678:24, 683:3, 692:19, 698:6, 699:22, 700:10, 700:15, 700:22, 701:22, 713:16, 724:15, 750:5, 767:19, 769:1, 771:17, 783:6, 783:7, 783:25, 784:4, 789:3, 826:4, 828:14, 833:5, 835:6

**moments** [4] - 697:10, 729:23, 738:22, 789:24

**momentum** [1] - 666:13

**Monday** [6] - 794:10, 794:16, 817:23, 822:13, 830:2, 835:17

**Monell** [1] - 617:9

**monetary** [1] - 753:8

**money** [7] - 686:20, 752:22, 753:8, 753:11, 758:8, 758:10, 785:18

**monitor** [1] - 791:12

**month** [1] - 631:2

**months** [1] - 630:14

**Morgantown** [5] - 607:16, 607:18, 607:19, 607:22, 607:23

**morning** [21] - 609:2, 618:1, 618:6, 625:10, 625:15, 626:18, 626:21, 627:13, 636:7, 643:20, 679:11, 680:3, 680:7, 682:6, 722:4, 723:21, 794:10, 794:16, 817:23, 822:13, 830:2

**most** [19] - 614:1, 614:6, 614:13, 616:3, 617:20, 618:17, 622:25, 623:11, 627:18, 627:22, 628:2, 762:25, 769:8,

769:9, 780:4, 780:5, 782:2, 794:18, 794:20

**mother** [3] - 754:3, 785:20, 820:10

**motion** [21] - 609:9, 609:12, 610:9, 613:13, 617:15, 618:12, 618:22, 618:24, 619:16, 639:6, 671:5, 715:21, 717:14, 723:16, 725:22, 725:24, 736:6, 737:22, 738:12, 773:11, 773:13

**MOTION** [1] - 608:2

**motions** [5] - 609:7, 619:20, 619:22, 620:17, 835:16

**motivated** [8] - 609:22, 725:21, 726:18, 754:18, 755:5, 760:16, 784:10, 821:20

**motivation** [1] - 750:10

**motive** [18] - 609:22, 610:1, 610:5, 611:13, 614:2, 615:6, 618:3, 618:13, 725:21, 726:2, 726:3, 726:18, 732:17, 745:3, 754:18, 755:5, 760:16, 821:20

**mountain** [3] - 708:7, 708:8, 708:11

**mountains** [1] - 667:5

**mouth** [8] - 664:21, 666:20, 666:21, 671:12, 792:14, 814:4, 823:24, 824:2

**move** [24] - 624:24, 625:1, 637:12, 645:17, 652:2, 653:2, 672:3, 709:16, 731:2, 731:19, 766:15, 771:9, 775:20, 775:21, 786:6, 788:2, 796:21, 805:6, 805:12, 805:13, 806:13, 814:15

**moved** [5] - 627:19, 628:25, 629:5, 630:8, 630:18

**movement** [5] -

617:21, 618:17,
645:12, 691:8,
809:16
**movements** [2] -
645:15, 675:14
**moves** [1] - 613:7
**moving** [50] - 609:12,
613:21, 638:4,
658:10, 660:19,
677:18, 689:16,
703:1, 703:5, 705:3,
705:10, 705:12,
705:13, 709:21,
710:6, 764:17,
764:22, 765:1,
765:19, 766:4,
770:14, 774:2,
775:10, 775:11,
779:9, 779:10,
779:13, 783:16,
783:18, 801:19,
804:19, 810:5,
810:12, 811:19,
811:24, 823:14,
823:15, 826:7,
826:8, 826:10,
826:12, 826:13,
826:14, 826:15,
826:19, 826:20,
826:22, 827:22
**MR** [113] - 609:8,
609:11, 613:10,
613:12, 613:17,
613:20, 616:10,
616:23, 619:21,
619:23, 620:9,
620:15, 622:6,
622:22, 622:25,
623:5, 623:14,
625:8, 625:17,
626:4, 626:9,
637:17, 637:21,
638:24, 639:3,
639:5, 639:8, 680:5,
681:10, 681:17,
682:3, 682:5,
682:22, 682:23,
685:9, 685:13,
685:14, 690:3,
690:6, 690:7, 712:1,
713:22, 714:23,
715:20, 719:2,
719:4, 719:13,
719:15, 720:1,
720:3, 721:4, 721:9,
722:1, 722:5, 723:9,
723:12, 724:14,
724:17, 724:22,
725:16, 726:17,
726:23, 727:14,
727:23, 729:4,

729:8, 729:10,
729:12, 730:3,
730:6, 730:12,
730:15, 730:23,
731:11, 732:10,
732:25, 733:2,
733:23, 734:10,
734:13, 734:18,
734:25, 735:2,
735:14, 736:1,
736:5, 738:15,
738:17, 739:3,
762:21, 763:6,
763:13, 786:7,
786:22, 786:25,
787:2, 787:20,
787:23, 788:3,
796:21, 798:9,
810:21, 811:1,
822:20, 822:22,
827:20, 829:3,
830:4, 830:9,
830:15, 831:14,
832:12, 835:20
**MS** [53] - 620:11,
621:21, 623:18,
623:21, 624:7,
624:22, 625:11,
626:6, 627:1,
627:10, 627:12,
637:12, 639:18,
639:19, 649:23,
650:3, 678:24,
679:2, 679:25,
681:19, 685:10,
689:21, 689:24,
712:3, 712:6,
713:16, 713:18,
713:24, 714:21,
728:7, 733:13,
733:21, 734:21,
735:18, 739:5,
739:8, 762:23,
763:7, 786:5,
786:21, 787:17,
790:6, 792:7,
796:25, 798:11,
798:15, 811:2,
829:4, 830:17,
831:7, 832:1,
832:13, 835:22
**MSU** [1] - 662:8
**muddy** [3] - 662:20,
663:11, 663:19
**multiple** [5] - 645:4,
646:23, 646:25,
691:5, 691:15
**Mundell** [2] - 813:8,
813:9
**must** [45] - 609:22,

610:7, 610:13,
644:25, 646:3,
668:3, 668:7, 691:4,
724:25, 725:4,
740:14, 740:15,
740:18, 740:19,
741:14, 741:21,
744:3, 744:10,
744:13, 748:18,
748:22, 749:12,
750:1, 750:19,
750:22, 752:1,
752:2, 752:7,
752:12, 752:14,
754:13, 755:3,
755:24, 756:18,
756:25, 758:11,
758:13, 758:17,
760:10, 763:16,
763:25, 764:13,
765:9, 799:9, 800:2
**mutes** [1] - 831:21

# N

**name** [2] - 682:6,
723:3
**Nathan** [1] - 607:21
**nation** [2] - 636:14,
648:4
**nation's** [1] - 782:2
**national** [1] - 659:13
**National** [7] - 673:9,
673:19, 674:25,
675:21, 679:22,
712:18, 817:18
**nationally** [1] - 644:15
**naturally** [1] - 655:19
**nature** [2] - 617:5,
753:19
**near** [5] - 621:20,
622:1, 622:11,
664:6, 813:6
**nearby** [1] - 737:3
**nearly** [4] - 614:23,
774:12, 789:2, 824:2
**necessarily** [4] -
728:2, 730:25,
746:10, 757:14
**necessary** [6] - 645:2,
690:5, 750:15,
755:25, 758:13,
778:10
**neck** [3] - 647:12,
766:16, 775:22
**need** [28] - 619:20,
625:9, 625:17,
632:22, 635:14,
635:18, 640:11,
642:13, 646:21,

650:10, 666:15,
681:15, 705:22,
708:18, 725:8,
730:1, 735:25,
738:13, 739:1,
759:5, 762:19,
763:4, 768:23,
781:8, 798:13,
823:4, 832:10,
835:19
**needed** [4] - 642:13,
647:1, 661:15,
801:10
**needs** [3] - 724:3,
727:6, 831:25
**negative** [3] - 646:14,
785:21, 813:11
**Negative"** [1] - 813:9
**negatively** [1] - 791:10
**neglect** [2] - 752:2,
752:8
**negligence** [1] -
611:14
**neutral** [43] - 614:23,
615:2, 615:18,
616:1, 617:4,
657:23, 688:9,
688:12, 688:15,
688:20, 688:21,
688:25, 710:9,
710:12, 710:13,
764:18, 765:9,
765:12, 765:17,
766:8, 766:12,
766:19, 773:2,
773:9, 773:13,
775:12, 775:13,
775:14, 775:17,
775:23, 780:18,
780:24, 785:1,
800:7, 800:10,
800:14, 800:18,
803:20, 803:22,
804:8, 823:11,
824:8, 824:10
**Never** [1] - 635:7
**never** [21] - 645:4,
649:15, 649:16,
654:17, 683:11,
763:16, 764:3,
768:24, 788:5,
807:1, 807:3,
809:16, 809:21,
812:5, 812:9,
812:13, 818:2,
819:23, 820:22,
829:17
**new** [1] - 818:3
**New** [1] - 627:17
**news** [1] - 796:18

**newspapers** [1] -
648:1
**next** [11] - 631:11,
653:16, 724:17,
725:18, 730:12,
732:13, 739:18,
786:7, 796:14,
826:5, 826:6
**night** [2] - 649:1,
723:21
**nightmare** [1] - 788:10
**nine** [7] - 660:5, 660:6,
717:22, 721:8,
733:20, 788:4, 788:9
**NO** [9] - 607:4, 834:4,
834:6, 834:8,
834:10, 834:12,
834:14, 834:16,
834:18
**nobody** [13] - 651:15,
661:23, 662:9,
662:11, 663:5,
664:11, 668:14,
707:12, 765:10,
803:19, 826:9, 827:2
**nominal** [15] - 716:21,
724:18, 725:1,
725:4, 725:14,
732:7, 732:12,
754:7, 754:10,
754:14, 756:2,
760:11, 760:12,
784:10
**non** [5] - 613:21,
617:21, 618:17,
639:15, 743:9
**non-existence** [1] -
743:9
**non-expert** [1] -
639:15
**non-movement** [2] -
617:21, 618:17
**non-moving** [1] -
613:21
**none** [4] - 616:7,
632:13, 663:1,
663:25, 676:19,
764:17, 775:10,
777:17
**norm** [1] - 666:3
**normal** [2] - 691:2,
710:10
**normally** [2] - 639:15,
651:3
**North** [1] - 813:6
**Northern** [5] - 612:14,
612:18, 616:10,
836:5, 836:15
**NORTHERN** [1] -
607:2

**note** [14] - 615:5, 623:24, 624:8, 625:12, 715:20, 732:6, 761:16, 807:12, 829:13, 829:21, 830:17, 831:10, 831:23, 832:20
**noted** [9] - 612:23, 619:18, 709:3, 723:6, 724:13, 729:22, 738:8, 738:13, 807:11
**notes** [4] - 747:18, 747:19, 747:21, 747:23
**nothing** [26] - 610:2, 615:17, 619:21, 626:9, 675:12, 691:12, 719:2, 723:9, 729:4, 729:8, 729:12, 730:3, 730:20, 732:25, 734:4, 734:25, 738:15, 738:17, 770:11, 781:3, 782:22, 788:20, 799:4, 799:7, 823:8, 832:12
**nowhere** [3] - 684:14, 773:21, 773:22
**nuclear** [1] - 786:11
**number** [40] - 612:16, 614:16, 620:16, 623:22, 631:22, 631:23, 632:10, 632:25, 647:4, 654:1, 657:10, 685:1, 685:19, 687:9, 689:9, 712:8, 712:24, 716:6, 716:8, 716:10, 716:15, 716:17, 716:19, 717:9, 721:4, 721:7, 742:23, 746:10, 820:3, 829:8, 833:17, 834:1, 834:3, 834:5, 834:7, 834:9, 834:11, 834:13, 834:15, 834:17
**numbered** [1] - 719:9
**numbers** [4] - 660:22, 681:3, 715:4, 729:17
**numerically** [1] - 761:20
**numerous** [1] - 673:22

# O

**oath** [8] - 682:1, 682:16, 693:8, 702:10, 709:12, 769:8, 781:14, 801:3
**object** [5] - 689:21, 690:4, 723:13, 798:9, 810:21
**objection** [36] - 637:15, 639:3, 639:10, 690:2, 720:2, 722:12, 723:6, 723:7, 724:13, 725:15, 726:5, 726:13, 726:20, 727:19, 727:20, 729:2, 730:7, 732:5, 732:6, 733:11, 733:13, 733:19, 734:19, 738:12, 743:22, 743:24, 743:25, 744:9, 786:5, 786:21, 787:17, 796:21, 830:12, 830:15, 830:19, 830:20
**objections** [5] - 619:18, 639:6, 715:11, 732:20, 743:20
**objective** [21] - 610:16, 611:1, 644:23, 646:7, 676:7, 702:23, 702:24, 706:1, 706:11, 706:15, 706:17, 706:19, 748:19, 750:6, 777:20, 813:20, 817:5, 817:6, 817:20, 825:7
**objectively** [28] - 611:3, 675:24, 676:1, 676:10, 682:14, 685:20, 686:14, 702:7, 702:12, 702:15, 702:18, 702:19, 703:3, 750:7, 750:11, 759:17, 770:18, 783:15, 783:18, 814:22, 817:9, 818:8, 818:15, 818:17, 818:19, 819:1, 822:10, 833:21
**objects** [1] - 638:4
**obligation** [2] -

743:21, 819:22
**observe** [2] - 641:17, 668:6
**observed** [1] - 671:19
**observing** [1] - 679:16
**obstacle** [1] - 669:5
**obtain** [1] - 641:6
**obviously** [5] - 631:16, 632:6, 672:8, 718:15, 728:25
**occasions** [1] - 693:14
**occur** [1] - 756:7
**occurred** [18] - 611:4, 614:20, 617:12, 619:12, 647:19, 678:20, 698:5, 707:25, 720:10, 731:2, 736:19, 736:23, 754:12, 756:9, 801:17, 812:6, 812:14
**occurring** [2] - 792:3, 811:12
**occurs** [1] - 731:17
**odds** [1] - 762:7
**OF** [1] - 607:2
**offend** [2] - 646:18, 735:23
**offended** [1] - 707:4
**offensive** [5] - 668:24, 669:6, 670:2, 686:15, 791:6
**offensiveness** [1] - 756:11
**offer** [4] - 630:12, 700:9, 702:17, 702:19
**offered** [3] - 615:2, 658:25, 743:22
**Office** [5] - 627:25, 630:3, 630:17, 631:23, 644:19
**office** [4] - 628:3, 628:5, 738:21, 829:7
**OFFICER** [1] - 831:19
**Officer** [3] - 628:4, 628:6, 644:20
**officer** [75] - 624:8, 624:19, 627:23, 628:11, 629:23, 630:2, 630:15, 630:21, 632:8, 636:6, 644:16, 645:4, 645:11, 646:15, 648:13, 648:17, 648:18, 648:20, 651:20, 652:3, 652:4,

652:11, 652:22, 652:23, 652:24, 653:2, 655:22, 657:12, 666:20, 667:17, 669:4, 672:23, 677:9, 682:25, 684:2, 686:13, 689:8, 689:16, 689:18, 691:14, 696:20, 707:20, 713:7, 720:8, 720:22, 721:2, 722:5, 722:8, 736:9, 736:13, 748:20, 749:14, 749:18, 749:23, 750:2, 750:14, 750:16, 750:18, 750:19, 759:22, 760:22, 761:16, 764:2, 791:20, 793:8, 794:4, 794:10, 794:18, 794:21, 796:19, 814:25, 825:9, 825:13, 827:9
**officer's** [9] - 610:12, 610:15, 648:19, 651:15, 652:7, 720:8, 750:7, 796:11, 796:12
**officers** [42] - 611:14, 629:10, 629:17, 629:19, 630:15, 632:12, 636:18, 644:21, 644:25, 645:3, 645:9, 646:6, 646:17, 647:16, 647:21, 647:22, 650:24, 651:4, 655:20, 670:5, 670:15, 671:14, 674:9, 675:6, 677:4, 684:9, 684:19, 687:4, 687:11, 704:10, 713:3, 751:14, 751:17, 763:16, 764:3, 796:25, 799:19, 816:22, 825:11, 825:15, 825:22, 825:23
**Officers** [1] - 628:3
**officers'** [1] - 651:5
**offices** [1] - 754:2
**Official** [3] - 666:3, 836:4, 836:15
**official** [1] - 607:9
**often** [2] - 636:22, 756:12

**oftentimes** [2] - 647:11, 676:24
**Ohio** [20] - 627:17, 627:22, 627:24, 628:3, 628:4, 628:6, 628:12, 630:8, 630:10, 630:11, 630:17, 630:18, 631:23, 634:3, 644:19, 645:24, 646:10, 646:22, 646:25, 683:20
**Okeechobee** [1] - 654:18
**old** [6] - 765:25, 771:18, 782:19, 787:10, 788:18, 788:20
**once** [10] - 636:25, 684:5, 739:18, 758:10, 786:16, 816:11, 816:12, 816:14, 824:11
**oncoming** [4] - 621:24, 621:25, 624:3, 818:4
**one** [106] - 623:22, 625:18, 630:25, 633:12, 635:11, 635:20, 636:8, 639:20, 644:4, 649:3, 654:1, 658:5, 661:18, 664:11, 665:7, 665:10, 665:12, 665:15, 666:13, 666:23, 669:7, 673:20, 673:22, 678:24, 680:20, 685:24, 696:21, 698:3, 699:21, 709:11, 713:16, 716:1, 716:6, 716:8, 717:2, 717:3, 717:8, 721:6, 722:1, 724:14, 726:23, 726:24, 731:2, 740:14, 743:6, 750:6, 755:9, 756:6, 758:14, 759:6, 759:14, 759:19, 759:20, 763:25, 764:12, 765:7, 765:22, 766:5, 766:6, 769:10, 772:24, 776:24, 780:24, 781:4, 781:18, 782:1, 784:20, 787:6, 788:19, 789:3, 792:7,

operator [1] - 709:19
opines [1] - 667:3
opinion [50] - 610:21, 611:8, 612:15, 620:17, 623:6, 623:22, 625:18, 635:23, 639:2, 640:15, 642:14, 642:15, 648:17, 653:21, 654:1, 654:5, 655:1, 655:3, 655:8, 658:11, 658:16, 659:4, 659:5, 659:9, 659:14, 659:16, 659:24, 668:21, 673:14, 675:18, 675:20, 675:22, 685:15, 687:7, 687:25, 693:19, 702:17, 702:20, 709:25, 741:2, 741:16, 743:16, 746:17, 758:21, 758:24, 766:25, 772:15, 810:11
opinions [35] - 619:25, 620:16, 639:15, 639:23, 641:1, 641:7, 643:19, 644:2, 650:22, 653:7, 653:9, 653:17, 653:18, 653:19, 653:20, 653:24, 654:2, 658:25, 662:25, 673:3, 673:4, 673:13, 675:15, 679:10, 679:12, 679:18, 712:12, 713:9, 713:10, 713:12, 737:9, 738:2, 746:23, 816:16
OPOTA [1] - 684:7
opportunity [11] - 641:5, 641:24, 643:8, 643:10, 659:19, 762:1, 762:3, 790:22, 801:7, 816:7, 819:24
opposed [4] - 724:7, 728:10, 729:20, 740:5
opposing [4] - 614:15, 802:10, 818:5, 819:8
opposite [1] - 699:19
option [3] - 729:21, 829:24, 830:1
order [10] - 618:6,

792:10, 793:20, 797:2, 804:11, 806:23, 806:25, 807:19, 811:7, 812:7, 812:15, 812:20, 815:13, 815:21, 817:14, 824:18, 824:19, 824:23, 825:25, 827:14, 827:17, 827:18, 827:19, 828:6, 828:17, 829:15, 829:17, 829:24, 830:14, 833:17, 834:3
one's [2] - 669:19, 731:2
one-third [1] - 630:25
ones [3] - 635:25, 825:24
online [3] - 647:9, 648:9, 648:21
OODA [2] - 668:5, 668:9
open [22] - 609:1, 626:17, 650:17, 680:16, 681:24, 714:17, 739:11, 762:17, 763:10, 764:11, 789:22, 790:2, 792:6, 792:9, 793:19, 793:23, 814:16, 828:21, 830:2, 831:3, 832:17, 835:10
open-ended [1] - 650:17
opened [1] - 703:1
opening [21] - 663:20, 663:23, 698:14, 797:7, 797:11, 797:14, 797:21, 797:24, 798:4, 798:25, 799:1, 799:8, 799:11, 799:14, 808:2, 812:2, 812:22, 814:4, 820:1, 820:21, 821:22
operate [1] - 661:11
operates [1] - 765:9
operation [2] - 676:21, 710:10
Operational [7] - 673:9, 673:19, 675:1, 675:22, 679:22, 712:18, 817:18
operational [2] - 659:14, 676:9

643:14, 656:15, 740:20, 751:25, 758:12, 815:2, 828:12, 835:14, 835:17
ordered [2] - 643:13, 744:10
ordinarily [1] - 746:25
ordinary [1] - 742:9
organs [2] - 805:10, 805:12
orient [1] - 668:6
original [1] - 653:21
originally [1] - 650:16
otherwise [4] - 680:8, 761:20, 765:11, 829:9
outlined [1] - 650:17
outrageous [4] - 611:22, 616:4, 619:7, 755:17
outside [2] - 744:12, 789:15
Outstanding [1] - 625:16
outstanding [2] - 681:21, 740:7
outweigh [1] - 742:18
outweighs [1] - 742:13
overhead [2] - 693:10, 694:13
overly [2] - 651:2, 726:10
overrule [2] - 722:11, 725:10
overruled [10] - 723:6, 725:15, 726:5, 726:13, 729:2, 732:5, 744:1, 787:1, 787:21, 798:13
overseas [1] - 631:11
owe [1] - 819:22
own [21] - 614:10, 622:12, 631:23, 632:1, 633:21, 641:16, 645:8, 747:6, 747:25, 758:21, 764:3, 764:22, 777:20, 780:14, 783:1, 783:19, 786:19, 788:22, 795:20, 799:3, 823:12

**P**

p.m [7] - 763:3, 789:25, 829:11, 836:1

page [16] - 623:5, 625:7, 681:5, 682:22, 719:16, 719:20, 721:8, 724:19, 725:20, 726:19, 726:25, 730:13, 733:20, 734:23, 764:12
pages [2] - 715:6, 816:11
paid [5] - 683:5, 686:12, 686:15, 772:17, 794:17
pain [12] - 718:13, 730:15, 730:19, 731:4, 752:25, 753:3, 753:5, 753:6, 753:17, 760:4, 783:25, 805:14
pan [1] - 787:15
paper [3] - 635:23, 642:14, 642:16
papers [1] - 640:4
paragraph [1] - 732:14
parallel [1] - 655:12
paralysis [1] - 731:19
paralyzed [7] - 731:24, 804:21, 805:4, 805:6, 805:12, 805:17, 805:20
parent [2] - 786:12, 820:14
parent's [2] - 786:12, 788:10
parents [2] - 786:9, 787:4
park [7] - 668:10, 668:16, 776:1, 780:3, 780:21, 814:15, 827:4
Parkersburg [2] - 649:13, 649:14
parking [1] - 699:16
part [26] - 610:3, 638:15, 666:16, 677:1, 677:9, 707:13, 717:10, 718:2, 718:6, 721:19, 722:16, 722:23, 723:3, 741:3, 751:19, 752:9, 753:1, 757:13, 785:8, 800:18, 803:18, 805:19, 806:5, 809:25, 819:7, 822:8
partial [1] - 731:25
participants [2] - 647:4, 647:7
participate [1] -

813:13
particular [8] - 653:24, 689:22, 722:13, 724:12, 738:2, 742:3, 750:1, 757:19
particularly [7] - 616:24, 647:22, 722:20, 725:2, 725:20, 728:17, 834:23
particulars [2] - 746:6, 747:15
parties [7] - 716:10, 716:24, 717:8, 719:8, 739:19, 741:17, 744:8, 748:10, 820:2
parties' [2] - 715:9, 716:15
partisans [1] - 759:1
partner [7] - 658:2, 669:2, 669:3, 669:5, 672:17, 672:19, 737:1
parts [4] - 671:2, 718:9, 718:10, 800:19
party [7] - 613:21, 741:15, 747:8, 752:4, 755:10, 755:14, 758:6
pass [2] - 703:18, 761:15
passed [5] - 612:19, 615:4, 622:7, 625:19, 813:8
passenger's [3] - 624:24, 677:14, 806:15
passing [2] - 619:4, 767:20
passion [1] - 756:25
past [7] - 637:8, 663:19, 703:25, 727:18, 756:13, 818:22, 821:12
path [8] - 621:20, 776:6, 802:23, 802:25, 803:2, 813:24, 813:25, 814:21
paths [1] - 655:13
patrol [3] - 630:3, 684:5, 684:22
pattern [5] - 635:21, 640:13, 691:13, 709:19, 815:22
pause [1] - 627:4
pay [2] - 758:9, 833:12
Peace [4] - 628:2,

628:4, 628:6, 644:19
**peace** [1] - 630:15
**PEDA** [1] - 668:2
**pendency** [1] - 682:17
**Pennsylvania** [1] -
628:14
**people** [15] - 631:8,
638:17, 645:23,
647:9, 650:16,
651:8, 651:17,
655:15, 670:11,
673:22, 687:10,
704:16, 771:22,
793:6, 806:4
**people's** [1] - 650:22
**per** [3] - 665:13,
665:14, 689:19
**perceive** [1] - 668:3
**perceived** [9] -
621:17, 622:13,
622:18, 625:23,
658:21, 753:5,
778:16, 778:17,
778:21
**percent** [14] - 666:4,
666:5, 685:18,
685:25, 686:25,
772:18, 772:19,
786:3, 796:13,
805:3, 805:17,
808:10, 819:16
**perception** [2] -
672:23, 672:25
**perceptions** [1] -
610:15
**Perdue** [1] - 635:9
**perform** [1] - 741:14
**performance** [4] -
634:14, 634:18,
816:9, 816:12
**perhaps** [1] - 726:12
**period** [5] - 664:5,
762:4, 795:12,
798:21, 809:16
**peripheral** [1] - 677:12
**permanent** [1] -
753:20
**permit** [1] - 741:15
**permitted** [9] - 611:19,
614:9, 639:14,
736:14, 744:18,
757:21, 764:1,
778:9, 778:24
**perpendicular** [4] -
699:8, 775:5,
823:24, 824:1
**Perry** [1] - 736:13
**person** [37] - 610:11,
614:24, 628:20,
645:10, 645:13,

645:14, 648:15,
648:17, 648:18,
669:20, 691:4,
711:7, 711:16,
751:3, 751:8,
751:16, 751:18,
752:1, 754:8, 765:4,
783:24, 793:15,
802:24, 803:8,
810:18, 810:19,
811:3, 811:5, 811:7,
811:8, 811:9,
811:10, 811:12,
833:1
**Personal** [1] - 607:5
**personal** [10] - 612:2,
612:24, 626:11,
633:22, 661:20,
741:2, 748:4,
789:10, 789:16,
797:18
**persons** [3] - 741:22,
741:23, 745:13
**perspective** [9] -
667:17, 723:8,
728:4, 730:2,
739:21, 750:2,
811:21, 811:23,
831:7
**persuasive** [1] -
742:13, 742:18,
742:25
**pertains** [1] - 745:17
**pertinent** [1] - 748:2
**Petry** [1] - 629:1
**Ph.D** [2] - 634:15,
665:16
**phase** [1] - 739:18
**Philip** [97] - 607:5,
610:18, 612:12,
612:13, 688:16,
703:2, 711:9,
711:11, 711:12,
711:16, 719:18,
719:23, 720:18,
721:12, 721:14,
722:14, 722:16,
724:24, 733:4,
734:16, 736:21,
740:22, 748:5,
748:6, 748:13,
748:15, 748:17,
748:22, 749:1,
749:4, 749:6, 749:9,
749:11, 749:22,
749:23, 749:25,
750:21, 750:23,
751:5, 751:6,
751:10, 751:13,
751:19, 751:23,

752:6, 752:7,
752:10, 752:14,
752:18, 752:19,
752:20, 752:23,
752:24, 753:1,
753:2, 753:5,
753:14, 753:15,
753:16, 753:21,
753:23, 754:2,
754:5, 754:6, 755:7,
755:16, 756:1,
759:16, 760:4,
760:6, 760:18,
763:14, 766:9,
766:14, 770:15,
770:22, 771:1,
775:19, 777:25,
780:8, 783:14,
784:1, 784:8,
784:13, 784:17,
785:15, 789:6,
797:4, 797:19,
818:14, 820:5,
821:4, 821:24,
827:6, 833:20
**Philip's** [4] - 730:16,
770:18, 777:23,
788:23
**phone** [3] - 640:9,
788:7, 829:8
**phonetic** [2] - 610:11,
713:1
**phonetic)** [4] - 635:9,
683:21, 736:13,
736:16
**photo** [15] - 698:25,
699:5, 699:12,
700:9, 700:21,
701:19, 768:8,
768:17, 770:8,
772:2, 774:21,
774:24, 776:8,
823:19, 823:21
**photograph** [5] -
662:20, 662:24,
700:14, 815:20,
816:7
**photographs** [7] -
643:5, 781:7,
801:12, 807:22,
807:23, 814:3
**photos** [7] - 664:3,
664:4, 695:14,
704:5, 807:13,
807:15, 807:16
**phrase** [3] - 742:7,
816:8, 817:9
**phrased** [1] - 619:25
**physical** [32] - 667:22,
667:23, 687:14,

687:17, 687:22,
688:4, 689:4,
689:13, 690:11,
690:17, 692:7,
692:9, 692:18,
702:2, 706:17,
706:19, 706:22,
737:11, 750:18,
750:25, 753:11,
753:16, 753:17,
767:4, 767:7,
767:24, 772:13,
772:23, 773:1,
775:7, 777:20, 823:1
**physiological** [1] -
798:20
**pick** [3] - 630:7, 666:8,
788:7
**pickup** [1] - 669:23
**pictorial** [2] - 650:20,
650:24
**picture** [5] - 663:8,
698:21, 768:6,
802:11, 825:2
**pictures** [10] - 657:16,
657:22, 660:4,
674:16, 689:5,
765:19, 765:20,
767:25, 773:20,
806:16
**piece** [11] - 615:1,
700:25, 764:17,
777:17, 777:18,
780:25, 822:25,
823:1, 823:5,
823:17, 827:17
**pieces** [1] - 734:7
**pilots** [2] - 668:5
**pin** [1] - 620:3
**piping** [1] - 674:17
**Pipkins** [1] - 647:13
**pistol** [1] - 616:3
**place** [24] - 636:20,
645:20, 657:20,
662:24, 664:8,
664:13, 667:24,
667:25, 674:3,
674:4, 678:22,
678:23, 696:12,
696:17, 697:15,
698:11, 706:24,
707:1, 708:3,
710:13, 730:7,
781:18, 805:23
**placed** [5] - 620:18,
654:3, 655:4,
658:12, 658:19
**placement** [1] -
664:20
**placing** [4] - 621:10,

621:13, 622:14,
659:10
**Plaintiff** [2] - 607:7,
607:15
**plaintiff** [53] - 609:6,
610:20, 612:8,
612:9, 613:1, 614:7,
614:14, 616:25,
617:23, 618:18,
619:22, 626:21,
714:22, 719:17,
719:21, 719:25,
721:21, 738:5,
741:25, 742:5,
742:9, 742:16,
748:3, 748:13,
749:6, 751:3, 751:8,
753:13, 754:15,
754:21, 755:19,
755:25, 757:9,
757:11, 757:14,
757:15, 757:19,
758:4, 759:14,
759:24, 760:10,
760:14, 762:1,
762:3, 764:13,
783:11, 790:11,
797:15, 800:16,
803:18, 818:12,
818:16, 833:18
**plaintiff's** [34] -
609:15, 610:17,
611:7, 617:17,
624:9, 716:4, 716:8,
716:9, 716:14,
716:16, 716:18,
716:22, 717:2,
718:20, 723:8,
730:1, 737:9,
737:10, 742:12,
742:15, 742:17,
757:17, 790:13,
791:3, 797:8,
797:23, 797:24,
798:3, 799:13,
800:21, 802:4,
804:20, 808:14,
812:22
**plaintiffs** [6] - 729:8,
730:3, 731:12,
755:3, 800:6, 807:24
**plan** [2] - 735:5,
769:11
**planning** [1] - 739:21
**play** [5] - 643:10,
681:12, 792:4,
792:7, 793:22
**played** [2] - 808:5,
809:4
**playing** [3] - 792:6,

793:19, 793:23
**Playing** [1] - 792:9
**pleadings** [5] - 614:5
**pleasant** [1] - 714:15
**pleased** [1] - 835:3
**pleasure** [1] - 790:19
**Pledge** [1] - 795:18
**plenty** [2] - 618:5, 731:7
**PLLC** [2] - 607:15, 607:22
**Poe** [1] - 607:22
**poignant** [1] - 788:25
**point** [87] - 609:7, 609:9, 610:25, 611:7, 614:22, 616:23, 617:7, 618:18, 619:20, 620:5, 620:8, 641:1, 641:19, 650:11, 654:14, 655:22, 657:6, 662:13, 665:7, 666:9, 668:1, 674:7, 674:20, 678:21, 679:25, 680:7, 680:10, 680:23, 695:9, 699:13, 699:15, 699:17, 707:2, 710:21, 715:9, 717:6, 718:1, 718:25, 722:25, 726:16, 729:2, 731:14, 731:15, 734:5, 735:25, 738:12, 738:13, 739:2, 761:23, 768:4, 770:23, 771:16, 784:9, 787:1, 787:22, 787:23, 789:11, 789:13, 791:11, 792:13, 794:6, 796:4, 797:19, 799:3, 799:10, 802:16, 802:17, 803:16, 804:11, 805:8, 806:7, 806:16, 810:5, 810:12, 814:7, 821:5, 821:10, 821:24, 828:15, 829:19, 829:20, 830:6, 830:12, 831:4, 831:22, 831:23, 835:19
**pointed** [1] - 614:16
**pointing** [2] - 701:19, 743:8
**points** [4] - 613:22,

614:18, 617:19, 770:11
**pole** [1] - 787:9
**police** [42] - 628:11, 631:3, 638:10, 638:25, 639:2, 645:11, 647:20, 652:4, 674:13, 675:10, 685:18, 687:11, 691:5, 704:8, 720:7, 720:22, 721:1, 736:11, 737:17, 763:16, 764:2, 764:3, 769:3, 793:5, 793:8, 794:4, 794:10, 794:18, 794:21, 796:11, 796:19, 796:25, 799:19, 800:2, 816:21, 825:9, 825:11, 825:13, 825:15, 825:22, 825:23, 827:9
**Police** [10] - 628:13, 628:14, 628:19, 629:15, 630:9, 643:2, 647:20, 676:22, 793:7, 808:16
**police-related** [1] - 685:18
**policies** [10] - 614:12, 692:19, 702:21, 737:16, 764:4, 778:6, 783:1, 783:19, 788:23, 825:25
**Policies** [1] - 679:23
**policing** [5] - 763:15, 778:1, 780:5, 783:2, 827:12
**policy** [23] - 614:10, 621:16, 622:16, 625:21, 626:2, 643:21, 643:22, 649:7, 702:6, 702:12, 703:6, 764:4, 778:7, 778:15, 779:5, 779:19, 780:14, 780:22, 784:15, 812:18, 812:20, 823:12, 827:13
**poll** [1] - 833:24
**polled** [1] - 832:8
**pollen** [1] - 662:1
**polls** [1] - 833:13
**poor** [2] - 668:19, 728:13

**poorly** [1] - 791:5
**popped** [1] - 803:7
**population** [2] - 666:5, 666:6
**Port** [5] - 682:24, 683:25, 684:3, 712:20
**Portage** [1] - 630:2
**portion** [3] - 622:21, 722:12, 725:19
**portions** [7] - 693:11, 716:17, 716:23, 717:7, 717:9, 718:20, 831:2
**portrayed** [1] - 662:3
**posed** [3] - 749:22, 750:24, 833:7
**poses** [1] - 750:17
**position** [12] - 610:12, 683:4, 691:7, 691:9, 691:15, 776:6, 776:17, 803:14, 803:15, 810:20, 811:5, 832:7
**positioned** [2] - 795:4, 803:10
**positions** [2] - 678:19, 806:6
**possibilities** [3] - 690:21, 691:22, 707:23
**possibility** [2] - 682:10, 727:15
**possible** [9] - 666:18, 669:15, 672:14, 696:1, 758:6, 761:17, 796:20, 824:8, 831:5
**possibly** [6] - 655:16, 657:14, 728:11, 765:21, 766:7, 768:8
**post** [2] - 738:20, 835:16
**POST** [1] - 628:2
**posture** [1] - 691:9
**potential** [3] - 671:3, 819:20, 830:25
**potentially** [4] - 618:15, 670:22, 671:6, 791:16
**pound** [2] - 711:14, 794:5
**pounds** [1] - 652:15
**PowerPoint** [1] - 804:20
**Powers** [1] - 736:16
**PPCT** [1] - 633:22
**practice** [5] - 668:19, 676:9, 684:8, 702:8, 702:14

**practices** [2] - 659:14, 737:17
**Practices** [5] - 673:9, 673:19, 675:22, 712:18, 817:18
**precedence** [1] - 704:13
**precedent** [1] - 782:25
**preceding** [1] - 609:25
**precise** [3] - 753:8, 792:22, 793:12
**precision** [1] - 758:5
**precluded** [1] - 737:24
**preemptive** [1] - 677:3
**prefer** [2] - 723:15, 830:4
**preference** [1] - 747:20
**prejudice** [3] - 741:14, 741:16, 756:25
**premature** [1] - 829:20
**prepare** [1] - 801:24
**prepared** [7] - 626:22, 694:16, 759:10, 782:11, 801:7, 807:12, 831:1
**preparing** [1] - 801:22
**Preponderance** [1] - 732:14
**preponderance** [21] - 742:1, 742:3, 742:7, 742:14, 742:20, 742:22, 743:12, 748:23, 750:22, 755:4, 757:10, 757:16, 757:18, 759:15, 759:25, 760:15, 777:14, 783:12, 818:12, 818:25, 833:18
**prescribed** [1] - 836:10
**present** [6] - 609:8, 726:15, 745:22, 762:2, 825:17, 829:2
**presentation** [1] - 626:21
**presented** [14] - 610:9, 692:16, 694:4, 720:18, 726:19, 741:7, 746:18, 751:12, 764:16, 781:2, 781:3, 797:14, 799:15, 808:21
**presenting** [2] - 701:14, 790:17
**presents** [3] - 617:17, 742:23, 742:24
**preside** [1] - 759:7

**pressed** [3] - 695:19, 771:14, 772:6
**presumption** [1] - 757:12
**pretty** [1] - 674:8
**prevail** [1] - 764:13
**prevent** [3] - 750:14, 750:15, 755:21
**prevention** [2] - 631:9, 631:12
**previously** [4] - 620:9, 635:3, 687:16, 745:21
**pride** [1] - 827:10
**primary** [1] - 655:15
**Prince** [7] - 607:17, 682:20, 764:8, 764:11, 783:20, 785:25, 822:19
**PRINCE** [2] - 682:22, 822:20
**principle** [1] - 692:6
**print** [3] - 663:12, 663:19, 815:20
**printers** [1] - 738:20
**printing** [1] - 729:22
**prisons** [1] - 630:7
**Pritchard** [1] - 610:10
**private** [1] - 774:9
**probable** [2] - 750:16, 758:6
**problem** [2] - 633:20, 677:7
**procedure** [1] - 676:21
**proceed** [12] - 609:10, 627:9, 639:17, 650:2, 682:2, 712:4, 735:9, 759:19, 760:9, 763:12, 810:25, 828:13
**proceedings** [3] - 609:4, 747:22, 836:7
**Proceedings** [3] - 607:12, 607:25, 609:1
**process** [4] - 668:2, 729:20, 739:24, 804:9
**produced** [2] - 607:25, 744:7
**profession** [4] - 632:15, 684:11, 684:20, 713:8
**Professional** [1] - 836:3
**professional** [2] - 650:23, 797:18
**proffer** [1] - 624:12
**proffered** [1] - 720:20
**program** [3] - 628:8,

629:24, 631:9
**progress** [2] - 813:17, 831:10
**prohibited** [6] - 692:20, 692:24, 776:3, 779:15, 779:19, 788:15
**prohibitions** [2] - 779:2, 779:5
**project** [2] - 816:23, 816:25
**projector** [2] - 649:22, 818:10
**promised** [1] - 739:22
**promoted** [2] - 628:22, 713:7
**promptly** [1] - 761:17
**prong** [1] - 738:11
**pronounced** [2] - 731:17, 731:18
**proof** [3] - 742:5, 743:8, 757:17
**propensity** [1] - 746:3
**proper** [5] - 615:13, 621:7, 738:7, 750:13, 788:2
**properly** [2] - 617:5, 743:5
**proportional** [1] - 756:17
**proposal** [1] - 719:24
**propose** [1] - 831:8
**proposed** [26] - 715:2, 715:9, 715:19, 716:2, 716:4, 716:9, 716:11, 716:12, 716:14, 716:16, 716:22, 716:25, 717:2, 718:3, 718:9, 718:14, 718:23, 719:11, 721:2, 721:7, 729:7, 730:8, 731:16, 731:17, 734:23, 808:15
**proposition** [1] - 755:8
**protect** [6] - 646:16, 778:10, 791:15, 793:15, 796:5, 827:10
**protected** [7] - 618:4, 754:20, 755:7, 760:18, 763:25, 784:12, 822:2
**protecting** [1] - 791:16
**protection** [5] - 628:22, 733:3, 734:16, 760:5, 784:7
**protein** [1] - 715:13

**prove** [19] - 632:22, 724:25, 741:25, 748:22, 750:22, 751:25, 752:7, 754:6, 755:3, 757:16, 758:4, 758:6, 764:18, 805:18, 818:16, 818:18, 818:19, 818:25, 825:2
**proven** [8] - 744:19, 759:15, 759:24, 760:14, 783:12, 818:12, 818:16, 833:18
**provide** [6] - 611:1, 623:10, 629:16, 631:25, 693:12, 820:16
**provided** [17] - 637:7, 642:11, 642:19, 643:11, 643:12, 647:25, 684:3, 684:25, 712:12, 713:9, 716:3, 741:9, 754:24, 759:11, 761:3, 815:5
**provides** [1] - 748:2
**providing** [1] - 791:21
**proving** [4] - 689:18, 731:14, 753:2, 818:20
**provision** [3] - 724:22, 725:22, 730:9
**proximate** [1] - 752:24
**prudent** [1] - 749:17
**pry** [1] - 785:17
**psychological** [1] - 798:20
**public** [13] - 621:10, 621:14, 622:11, 622:12, 622:14, 625:21, 655:21, 659:11, 684:6, 684:12, 741:16, 741:17, 798:9
**publish** [1] - 833:12
**published** [2] - 648:8, 833:9
**pull** [11] - 622:3, 691:7, 698:17, 699:16, 779:25, 806:25, 809:18, 814:2, 814:3, 814:4, 814:5
**pulled** [13] - 645:13, 671:20, 689:19, 699:14, 765:7, 780:19, 794:15, 809:20, 809:23,

810:8, 810:15, 812:25
**Pullin** [1] - 607:22
**pulling** [5] - 645:10, 648:15, 651:5, 652:2, 704:24
**pulls** [1] - 824:16
**punch** [2] - 635:13, 651:3
**punching** [1] - 648:18
**punish** [6] - 755:1, 755:9, 755:12, 755:20, 757:3, 784:20
**punished** [2] - 756:14, 784:21
**punishment** [1] - 754:23
**punitive** [58] - 609:13, 609:16, 609:18, 609:21, 610:6, 613:22, 614:3, 614:6, 614:14, 615:5, 615:11, 616:24, 617:8, 617:12, 617:24, 618:8, 618:12, 718:15, 725:19, 725:23, 726:9, 726:24, 727:3, 727:5, 727:6, 727:8, 727:15, 727:25, 728:21, 732:16, 754:16, 754:21, 754:25, 755:1, 755:3, 755:8, 755:12, 755:13, 755:19, 755:23, 755:24, 756:4, 756:6, 756:10, 756:18, 756:23, 756:24, 756:25, 760:24, 761:2, 761:3, 784:19, 821:17, 821:19, 822:6
**punitives** [1] - 729:1
**pupils** [1] - 636:15
**pure** [2] - 800:9, 802:14
**purely** [1] - 757:22
**purpose** [3] - 744:3, 758:24, 808:23
**purposes** [3] - 719:19, 755:8, 784:20
**pursuant** [1] - 612:3
**pursue** [3] - 613:1, 621:25, 658:20
**pursuing** [6] - 664:15, 669:21, 722:7,

722:8, 814:1, 822:8
**pursuit** [21] - 620:19, 621:21, 654:4, 654:9, 655:2, 655:5, 655:12, 655:18, 655:19, 655:23, 658:13, 664:16, 675:4, 721:11, 721:17, 793:9, 813:3, 813:13, 813:16, 813:18, 822:8
**pursuits** [1] - 655:9
**push** [3] - 651:3, 765:7, 773:11
**pushed** [3] - 802:13, 803:25, 804:1
**pushing** [3] - 648:17, 652:22, 653:1
**put** [40] - 614:18, 615:23, 616:15, 618:19, 620:3, 636:18, 636:22, 641:14, 645:5, 646:10, 656:15, 661:8, 661:23, 661:24, 663:7, 668:9, 668:16, 669:23, 674:20, 694:13, 705:18, 764:17, 766:7, 767:6, 768:9, 774:24, 776:8, 780:3, 781:21, 783:22, 795:10, 812:18, 814:21, 817:6, 824:13, 824:18, 826:24, 828:6, 832:7, 835:1
**putting** [8] - 618:13, 686:15, 721:13, 768:8, 774:25, 776:1, 780:21, 827:3
**puzzle** [1] - 767:6

**Q**

**qualification** [1] - 636:11
**qualifications** [5] - 635:7, 638:22, 638:24, 639:1, 746:23
**qualified** [20] - 613:13, 636:2, 637:13, 639:11, 639:13, 715:22, 717:13, 717:20, 723:14, 723:17, 723:20, 723:23, 724:2,

722:8, 814:1, 822:8
**pursuit** [21] - 620:19, 621:21, 654:4, 654:9, 655:2, 655:5, 655:12, 655:18, 655:19, 655:23, 658:13, 664:16, 675:4, 721:11, 721:17, 793:9, 813:3, 813:13, 813:16, 813:18, 822:8
**pursuits** [1] - 655:9
**push** [3] - 651:3, 765:7, 773:11
**pushed** [3] - 802:13, 803:25, 804:1
**pushing** [3] - 648:17, 652:22, 653:1
**put** [40] - 614:18, 615:23, 616:15, 618:19, 620:3, 636:18, 636:22, 641:14, 645:5, 646:10, 656:15, 661:8, 661:23, 661:24, 663:7, 668:9, 668:16, 669:23, 674:20, 694:13, 705:18, 764:17, 766:7, 767:6, 768:9, 774:24, 776:8, 780:3, 781:21, 783:22, 795:10, 812:18, 814:21, 817:6, 824:13, 824:18, 826:24, 828:6, 832:7, 835:1
**putting** [8] - 618:13, 686:15, 721:13, 768:8, 774:25, 776:1, 780:21, 827:3
**puzzle** [1] - 767:6

724:10, 730:8, 736:7, 737:20, 737:25, 738:6, 738:11
**qualify** [1] - 639:7
**quality** [2] - 743:1
**quantity** [2] - 742:24, 743:2
**quarter** [1] - 633:22
**quarterback** [4] - 794:10, 794:16, 817:23, 822:13
**questioned** [1] - 699:4
**questioning** [4] - 624:9, 687:16, 701:11, 812:23
**questions** [45] - 637:17, 639:4, 645:16, 648:11, 648:12, 648:20, 650:17, 669:7, 680:1, 689:22, 692:3, 698:6, 699:25, 700:8, 703:7, 710:15, 711:25, 712:8, 712:11, 713:19, 743:20, 759:13, 759:14, 759:21, 761:9, 785:3, 785:12, 786:7, 791:9, 798:11, 801:2, 801:8, 802:4, 802:22, 808:17, 810:17, 810:22, 812:10, 812:17, 819:14, 820:3, 820:7, 820:8, 833:6
**quick** [3] - 710:14, 722:1, 828:24
**quickly** [3] - 666:12, 670:12, 693:13
**quite** [4] - 633:11, 723:25, 797:1, 812:12
**quote** [6] - 611:10, 611:11, 695:3, 788:24, 797:12

**R**

**race** [1] - 647:14
**radio** [28] - 641:21, 643:10, 643:13, 653:14, 656:24, 657:1, 658:22, 675:4, 679:4, 703:12, 703:14, 703:21, 705:25, 706:4, 722:20,

736:22, 782:9,
791:24, 792:1,
792:3, 793:21,
794:7, 801:13,
813:2, 813:11,
813:16, 815:2
**radioed** [1] - 703:24
**radios** [2] - 662:14,
813:7
**raised** [4] - 762:12,
798:3, 799:8, 799:13
**Rally** [1] - 655:13
**ran** [6] - 770:25,
771:19, 773:24,
779:18, 780:10,
780:20
**range** [3] - 707:23,
824:11, 824:13
**ranked** [1] - 786:3
**ranking** [1] - 769:3
**rapid** [1] - 794:3
**rapidly** [12] - 645:1,
672:23, 765:1,
765:15, 765:23,
766:3, 768:5,
771:11, 771:12,
772:9, 780:16,
824:25
**rather** [5] - 685:3,
746:11, 750:3,
754:14, 757:1
**rationale** [1] - 644:8
**Rawlings** [2] - 647:23,
648:6
**Rd** [1] - 607:19
**reach** [3] - 655:8,
741:19, 831:1
**reached** [6] - 680:6,
714:3, 761:7,
831:20, 832:4,
832:21
**reaching** [5] - 746:20,
758:15, 776:13,
776:22, 777:9
**react** [1] - 736:21
**reaction** [12] - 634:17,
634:18, 648:15,
664:23, 665:18,
665:20, 665:21,
665:23, 665:25,
666:3, 666:16, 668:7
**reacts** [1] - 637:25
**read** [13] - 645:11,
683:23, 695:2,
715:19, 722:14,
722:15, 724:22,
728:5, 729:18,
810:8, 817:19,
832:6, 833:14
**readily** [1] - 668:11

**reading** [3] - 729:20,
740:5, 795:8
**ready** [13] - 626:12,
627:9, 682:2, 714:6,
714:8, 714:9,
738:22, 738:23,
739:17, 739:22,
763:5, 763:12,
795:25
**real** [1] - 710:14
**reality** [1] - 820:17
**realize** [5] - 621:4,
687:9, 688:22,
689:11, 826:13
**realized** [1] - 786:16
**really** [16] - 616:18,
623:9, 660:10,
705:21, 716:6,
768:12, 785:22,
785:24, 787:25,
808:12, 815:10,
821:4, 822:24,
826:11, 830:13,
833:6
**realtime** [1] - 607:25
**rear** [2] - 671:7,
806:11
**rearrange** [1] - 762:24
**reason** [21] - 610:6,
611:4, 635:5, 635:6,
651:23, 661:7,
705:23, 725:7,
725:14, 726:13,
738:12, 744:21,
747:6, 773:7,
781:19, 782:21,
798:6, 809:7, 810:1,
815:14, 822:6
**reasonable** [53] -
610:11, 611:5,
611:15, 624:18,
644:25, 646:9,
648:13, 648:14,
648:16, 666:4,
667:17, 669:4,
673:1, 674:11,
674:12, 676:10,
679:12, 682:14,
685:20, 686:14,
702:23, 710:11,
713:13, 721:15,
722:18, 723:5,
736:9, 737:18,
737:19, 744:19,
748:20, 749:13,
749:17, 750:2,
750:7, 750:11,
751:3, 751:8,
751:22, 756:7,
756:8, 756:19,

757:2, 759:17,
764:14, 813:23,
814:23, 817:10,
818:8, 818:17,
818:20, 819:2,
822:10
**reasonableness** [11] -
644:23, 646:7,
676:7, 702:24,
721:19, 749:20,
750:1, 750:5,
813:20, 817:20
**reasonably** [5] -
610:5, 610:14,
736:20, 750:23,
778:10
**reasoning** [1] - 644:8
**reasons** [8] - 619:1,
619:15, 717:2,
732:5, 732:19,
746:24, 782:20,
822:3
**rebuttal** [4] - 714:22,
735:15, 762:4,
822:19
**receive** [2] - 626:12,
634:24
**received** [9] - 634:21,
634:22, 637:7,
638:13, 640:9,
643:24, 744:2,
744:6, 829:21
**receiving** [1] - 832:20
**recent** [1] - 782:2
**recess** [2] - 680:24,
738:24
**Recess** [4] - 680:25,
715:16, 738:25,
829:11
**reckless** [16] - 609:23,
613:23, 613:25,
618:3, 618:15,
624:2, 725:25,
726:12, 754:19,
755:6, 755:17,
760:17, 784:11,
784:13, 784:16,
822:1
**recognition** [1] -
754:9
**recognize** [2] - 619:8,
835:4
**recognizing** [1] -
619:4
**recollection** [7] -
745:15, 747:20,
747:22, 747:25,
800:25, 806:5
**recollections** [2] -
687:18, 692:10

**reconstructionist** [2] -
638:6, 638:8
**reconvene** [1] -
715:14
**record** [13] - 617:6,
617:16, 694:22,
715:17, 716:1,
716:13, 721:16,
726:1, 726:11,
730:7, 732:10,
738:7, 744:10
**recorded** [1] - 607:25
**recordings** [1] -
793:24
**recover** [6] - 748:5,
752:4, 752:11,
752:21, 757:14,
757:19
**recovered** [1] - 757:23
**recovery** [1] - 758:3
**red** [3] - 651:11,
653:3, 809:2
**redirect** [1] - 712:2
**REDIRECT** [1] - 712:5
**reel** [1] - 787:11
**refer** [4] - 620:25,
623:23, 624:5, 711:6
**reference** [4] - 678:21,
707:1, 715:4, 747:23
**referenced** [1] -
665:17
**references** [1] - 791:4
**referred** [1] - 731:12
**referring** [4] - 691:10,
694:11, 709:13,
726:25
**reflecting** [1] - 618:6
**reflects** [1] - 620:13
**refrain** [7] - 685:10,
714:10, 714:12,
762:8, 762:11,
789:13, 789:16
**refused** [2] - 717:4,
801:8
**refusing** [2] - 652:2,
758:3
**regard** [45] - 619:23,
623:16, 623:22,
624:7, 624:17,
633:15, 635:2,
636:6, 637:14,
653:23, 654:8,
655:1, 658:11,
660:22, 661:4,
662:12, 668:18,
670:17, 671:11,
676:13, 678:5,
678:15, 678:19,
679:4, 679:7,
679:13, 689:5,

733:7, 734:24,
741:2, 750:9,
761:18, 791:3,
798:24, 802:17,
804:19, 809:21,
811:14, 812:3,
812:19, 812:21,
817:4, 817:20,
820:4, 821:16
**regarding** [4] - 610:8,
625:20, 730:13,
823:9
**regardless** [4] -
741:20, 744:5,
744:6, 790:21
**regards** [6] - 609:16,
611:16, 715:21,
724:18, 729:10,
732:11
**Registered** [1] - 836:3
**regulated** [1] - 655:11
**reiterate** [2] - 610:10,
790:19
**reject** [2] - 746:6,
747:16
**rejected** [4] - 716:14,
717:2, 717:4, 718:14
**relate** [1] - 823:14
**related** [8] - 617:3,
622:24, 628:24,
647:12, 685:18,
692:9, 785:9, 789:17
**relates** [3] - 694:7,
733:8, 787:18
**relation** [4] - 657:13,
701:20, 745:5, 811:5
**relationship** [4] -
734:11, 756:7,
756:9, 756:17
**relative** [1] - 638:22
**relatively** [1] - 618:10
**relevant** [5] - 639:2,
718:2, 734:8,
734:12, 820:20
**reliable** [1] - 687:18,
688:5, 689:13,
692:7, 692:10
**relied** [6] - 675:2,
675:4, 675:14,
693:1, 694:19
**relies** [2] - 610:20,
737:10
**relish** [1] - 819:24
**reload** [2] - 711:1
**rely** [7] - 610:8,
635:24, 650:14,
675:7, 747:21,
764:23, 812:11
**relying** [4] - 675:5,
694:3, 706:14,

765:25
**remain** [2] - 680:11, 682:1
**remained** [3] - 711:8, 711:10, 831:6
**remaining** [4] - 718:16, 718:17, 734:20, 759:21
**remains** [1] - 725:5
**remember** [30] - 622:2, 635:10, 635:20, 656:6, 662:16, 677:10, 678:2, 683:21, 694:20, 701:11, 705:9, 705:10, 755:23, 759:1, 787:4, 787:8, 787:14, 794:6, 801:21, 802:20, 804:25, 806:25, 808:6, 808:8, 808:9, 809:17, 811:12, 813:7, 815:20
**remembered** [1] - 809:3
**remembering** [1] - 641:15
**remind** [2] - 681:25, 791:25
**reminder** [1] - 715:24
**remotely** [1] - 823:15
**removal** [1] - 734:13
**remove** [2] - 733:4, 733:22
**removed** [2] - 657:21, 732:17
**removing** [2] - 733:11, 733:13
**render** [1] - 738:5
**renew** [1] - 715:21
**repeat** [1] - 701:24
**repeatedly** [8] - 676:6, 696:9, 707:9, 794:17, 803:13, 804:14, 816:8, 817:14
**report** [7] - 643:3, 645:11, 709:4, 801:23, 802:2, 807:11, 835:4
**reported** [1] - 836:8
**Reporter** [3] - 836:3, 836:4, 836:15
**reporting** [1] - 793:25
**reports** [1] - 711:2
**reprehensibility** [1] - 756:11
**represent** [5] - 743:18, 758:11, 790:23,

819:13, 819:22
**representation** [3] - 650:20, 650:24, 797:20
**representative** [1] - 748:4
**Representative** [1] - 607:5
**represented** [2] - 809:22, 809:23
**representing** [3] - 686:6, 790:20, 821:15
**repugnancy** [1] - 756:11
**request** [3] - 629:18, 723:19, 832:7
**requested** [1] - 735:23
**requests** [1] - 808:15
**require** [2] - 749:3, 749:20
**required** [5] - 617:19, 725:14, 745:1, 755:23, 758:4
**requirement** [1] - 732:7
**requirements** [3] - 614:13, 621:15, 779:1
**requires** [3] - 613:23, 613:25, 743:11
**research** [23] - 644:7, 644:8, 646:1, 647:1, 648:21, 648:24, 649:8, 649:12, 649:13, 649:17, 649:18, 653:8, 691:4, 720:15, 723:20, 724:8, 725:9, 727:18, 816:23, 816:25, 817:12
**research-wise** [1] - 724:8
**reserve** [1] - 613:12
**residue** [2] - 768:23, 808:23
**Resistance** [1] - 649:3
**resistance** [2] - 649:7, 651:1
**resisting** [1] - 749:24
**resolution** [1] - 717:15
**resolved** [1] - 738:5
**respect** [31] - 613:8, 617:24, 618:12, 618:15, 618:19, 618:22, 618:24, 619:18, 620:7, 693:22, 715:6, 716:15, 716:18,

716:20, 716:23, 716:25, 717:13, 718:12, 719:10, 719:12, 721:1, 722:25, 723:19, 724:10, 729:7, 732:6, 732:20, 738:10, 750:4, 762:12, 776:6
**respectively** [1] - 619:18
**respond** [4] - 651:24, 704:11, 761:17, 791:2
**responded** [4] - 620:19, 654:4, 655:5, 658:12
**respondents** [1] - 653:4
**responding** [4] - 651:13, 674:9, 721:11, 778:22
**response** [19] - 621:9, 649:7, 649:19, 650:5, 650:13, 651:7, 652:7, 652:8, 652:21, 652:24, 653:8, 659:10, 683:24, 684:3, 727:20, 760:24, 781:20, 782:1, 822:16
**Response** [1] - 649:2
**responses** [4] - 646:6, 646:10, 650:25, 651:6
**responsibility** [1] - 729:25
**responsible** [1] - 790:13
**rest** [6] - 708:3, 714:21, 788:6, 791:6, 805:24, 821:25
**rested** [6] - 609:6, 626:22, 735:6, 736:5, 739:14, 739:19
**resting** [19] - 657:20, 664:8, 664:13, 667:24, 667:25, 674:3, 674:4, 678:22, 696:12, 696:17, 697:15, 698:11, 706:23, 707:1, 710:13, 803:14, 803:15
**restore** [1] - 753:12
**restraint** [1] - 647:12
**restricted** [1] - 753:10

**rests** [1] - 747:7
**result** [8] - 612:8, 612:20, 612:25, 649:17, 658:6, 711:22, 752:16, 752:24
**resulted** [2] - 752:17, 758:1
**resulting** [1] - 730:18
**results** [2] - 653:7, 745:18
**resume** [6] - 680:22, 680:23, 683:9, 683:11, 714:6, 789:19
**resurvey** [1] - 648:6
**resurveyed** [1] - 648:7
**retained** [5] - 631:17, 633:3, 685:17, 686:7, 766:21
**retainer** [1] - 640:2
**retire** [1] - 828:10
**retired** [5] - 630:22, 631:1, 631:2, 631:5, 632:1
**retiring** [1] - 759:5
**return** [8] - 617:22, 724:23, 754:4, 755:2, 758:12, 761:12, 762:1, 782:15
**returned** [4] - 739:10, 763:9, 832:16, 833:16
**returning** [1] - 758:25
**rev** [1] - 804:10
**reverse** [2] - 643:14, 815:2
**review** [15] - 640:3, 640:19, 642:18, 642:22, 642:25, 643:2, 643:8, 643:21, 643:23, 677:7, 727:4, 739:22, 759:12, 817:1, 832:6
**reviewed** [12] - 642:11, 643:18, 653:12, 653:13, 656:19, 682:15, 696:7, 697:2, 703:12, 712:16, 817:1, 817:2
**reviewing** [3] - 639:22, 640:3, 759:9
**revise** [2] - 722:12, 729:13
**revision** [1] - 802:6
**revisions** [1] - 729:22
**revs** [1] - 710:22

**revved** [1] - 765:13
**revving** [3] - 615:23, 700:4, 781:6
**RHOADES** [1] - 607:4
**Rhoades** [140] - 607:6, 609:5, 610:18, 614:1, 619:2, 619:8, 621:3, 621:10, 621:23, 623:7, 623:23, 623:25, 625:4, 654:10, 656:22, 656:25, 657:21, 658:6, 658:13, 658:21, 659:10, 675:3, 679:7, 688:16, 696:22, 700:15, 700:23, 703:2, 703:9, 703:15, 708:10, 711:9, 711:11, 711:12, 711:16, 719:18, 719:22, 719:23, 719:25, 720:18, 721:12, 721:14, 722:14, 722:16, 722:21, 724:24, 724:25, 730:16, 731:24, 733:4, 734:17, 736:21, 740:22, 748:3, 748:5, 748:7, 748:14, 748:15, 748:17, 748:22, 749:1, 749:7, 749:9, 749:11, 749:22, 749:23, 749:25, 750:22, 750:24, 751:5, 751:6, 751:10, 751:13, 751:19, 751:23, 752:6, 752:7, 752:8, 752:10, 752:14, 752:18, 752:19, 752:21, 752:23, 752:24, 753:1, 753:2, 753:5, 753:14, 753:15, 753:16, 753:21, 753:23, 754:5, 754:6, 755:7, 755:17, 756:1, 759:16, 760:4, 760:6, 760:19, 770:22, 771:1, 780:8, 783:14, 784:1, 784:8, 784:13, 784:17, 788:10, 788:12, 794:7, 797:4, 797:19, 803:3,

803:9, 804:5,
804:21, 805:3,
812:15, 812:16,
814:11, 815:9,
815:12, 816:1,
818:14, 819:11,
820:3, 820:5, 820:7,
820:13, 820:24,
821:3, 821:24,
822:2, 827:6,
833:16, 833:20
**Rhoades'** [8] - 612:12,
612:13, 614:24,
657:2, 723:3, 749:4,
754:3, 793:18
**Rick** [7] - 785:4,
785:8, 785:11,
785:15, 788:10,
788:12, 819:11
**ricochets** [1] - 671:3
**ridiculous** [2] -
683:17, 815:8
**rights** [14] - 613:25,
618:4, 754:8,
754:17, 754:20,
755:7, 760:18,
764:1, 770:19,
774:20, 777:23,
784:12, 784:17,
822:2
**riots** [2] - 647:14,
648:5
**rise** [1] - 614:13
**risk** [18] - 620:19,
620:22, 620:23,
621:2, 621:10,
621:14, 622:14,
654:4, 655:5,
655:19, 656:1,
656:3, 658:13,
659:11, 664:16,
726:15, 736:19,
793:9
**Rita's** [1] - 646:13
**road** [83] - 622:2,
622:7, 640:23,
657:2, 657:3, 657:4,
657:6, 657:10,
657:11, 657:15,
657:16, 657:18,
659:7, 660:2, 660:9,
660:10, 661:13,
661:15, 661:16,
661:21, 662:12,
662:14, 662:19,
663:9, 663:11,
663:16, 663:18,
664:5, 664:15,
664:17, 665:5,
667:2, 667:7, 669:9,

674:10, 679:5,
679:8, 679:9,
684:22, 703:19,
704:3, 708:3,
710:17, 713:5,
717:5, 737:3,
767:12, 767:13,
767:17, 767:18,
767:22, 770:20,
770:24, 771:15,
772:1, 778:20,
792:15, 792:19,
793:1, 793:9,
793:18, 796:4,
797:13, 797:16,
797:22, 803:16,
806:21, 806:24,
807:2, 807:4, 807:5,
814:2, 815:15,
816:3, 816:6,
821:22, 827:2,
835:18
**Road** [1] - 607:16
**roads** [1] - 655:16
**roadway** [3] - 660:11,
705:19, 767:25
**Robinson** [1] - 630:4
**rolled** [4] - 668:13,
698:1, 710:9, 771:13
**rolling** [2] - 630:24,
670:23
**Rolling** [1] - 736:13
**roof** [1] - 611:10
**room** [12] - 627:20,
670:9, 740:17,
759:5, 759:12,
761:6, 761:24,
762:5, 801:15,
823:13, 828:11,
835:4
**rooms** [1] - 829:6
**root** [2] - 662:3,
674:14
**Root** [67] - 634:20,
639:12, 642:24,
643:15, 644:24,
648:23, 656:5,
656:8, 658:25,
663:20, 664:23,
665:2, 665:6,
666:24, 667:12,
667:13, 667:22,
668:2, 668:10,
668:18, 669:14,
672:5, 672:22,
675:5, 675:18,
675:22, 676:12,
687:9, 691:1,
696:19, 746:15,
769:20, 770:10,

774:6, 775:15,
792:11, 792:24,
794:2, 794:8,
794:11, 794:15,
796:14, 796:25,
797:5, 798:8,
798:12, 799:15,
799:21, 799:24,
802:25, 804:16,
806:3, 806:21,
807:4, 809:14,
809:18, 809:23,
809:25, 810:17,
811:2, 814:24,
815:19, 816:16,
817:3, 817:9,
817:14, 817:21
**root's** [2] - 798:5,
798:15
**Root's** [12] - 634:6,
634:13, 654:7,
655:1, 660:15,
662:22, 673:13,
677:24, 678:5,
791:18, 796:6,
810:11
**Rotary** [1] - 646:11
**round** [2] - 658:7,
696:21
**rounds** [10] - 657:24,
658:5, 658:6, 671:1,
671:9, 691:6,
710:25, 826:24,
827:5
**Route** [2] - 621:23,
813:6
**RPMs** [1] - 804:2
**RPR** [1] - 836:14
**rubber** [2] - 770:5,
828:5
**rude** [1] - 680:21
**rule** [6] - 616:15,
692:11, 707:22,
740:25, 743:9,
745:23
**RULE** [1] - 608:2
**Rule** [11] - 609:9,
613:8, 613:13,
613:20, 715:21,
717:14, 723:16,
723:18, 736:1,
736:6, 738:3
**ruled** [1] - 635:22
**rules** [10] - 639:14,
740:12, 740:19,
741:8, 743:23,
763:15, 778:1,
780:5, 783:2
**ruling** [6] - 618:10,
618:21, 625:5,

726:22, 743:24
**rulings** [7] - 618:6,
619:19, 620:1,
620:25, 621:8,
623:16, 727:1
**run** [23] - 621:11,
622:20, 622:23,
623:7, 624:8,
624:19, 659:12,
720:20, 729:15,
771:22, 779:23,
780:12, 784:18,
824:6, 824:7, 824:8,
824:9, 824:15,
824:16, 826:9,
826:22, 826:23
**running** [24] - 610:18,
614:22, 614:25,
615:18, 623:4,
657:23, 705:1,
765:6, 765:10,
766:11, 766:12,
771:17, 775:13,
775:14, 775:18,
779:16, 781:3,
800:6, 800:13,
800:17, 800:23,
827:22
**runs** [3] - 692:22,
779:8, 779:14
**rural** [2] - 767:18
**Ryan** [2] - 607:15,
682:6

## S

**safe** [1] - 663:13
**safety** [2] - 749:22,
755:18
**salary** [1] - 638:13
**sale** [1] - 685:15
**Sam** [4] - 627:2,
631:7, 634:2, 775:13
**SAMUEL** [2] - 608:4,
627:6
**Samuel** [2] - 627:15,
746:15
**sat** [5] - 706:17,
766:13, 769:7,
770:10, 781:16
**satisfied** [1] - 829:2
**Savasman** [4] -
802:20, 804:23,
805:9, 805:16
**Savasman's** [2] -
731:23, 805:5
**save** [2] - 711:20,
785:18
**saw** [32] - 621:23,
655:24, 660:4,

662:14, 663:8,
664:2, 664:4, 664:6,
664:7, 674:16,
677:10, 677:22,
693:20, 716:10,
717:8, 764:20,
767:12, 769:12,
770:24, 773:20,
778:19, 782:11,
787:9, 788:24,
803:6, 808:4,
811:14, 811:17,
811:18, 812:24,
826:11
**scale** [1] - 645:19
**scenarios** [2] -
636:23, 707:19
**scene** [27] - 610:22,
615:10, 615:22,
624:13, 638:6,
642:3, 642:8, 642:9,
643:5, 663:6, 675:8,
675:10, 675:12,
704:5, 704:9,
704:15, 706:21,
750:3, 766:5, 767:7,
768:1, 773:1,
774:13, 774:16,
775:3, 801:12, 816:1
**schedule** [2] - 735:4,
739:17
**school** [1] - 646:12
**School** [1] - 646:13
**science** [1] - 664:25
**Science** [8] - 634:9,
634:12, 634:21,
634:24, 665:17,
678:12, 691:5,
817:13
**scientific** [8] - 651:2,
662:4, 662:5, 662:7,
701:15, 706:1,
708:2, 804:17
**scientifically** [2] -
697:24, 701:3
**scratch** [2] - 695:5,
831:18
**screen** [3] - 650:8,
650:10, 692:2
**seal** [1] - 831:23
**search** [1] - 654:23
**searching** [1] - 655:2
**seat** [2] - 660:19,
671:3
**seatbelt** [2] - 669:24,
669:25
**seated** [9] - 609:3,
626:19, 680:17,
739:13, 762:19,
763:11, 790:4,

832:18, 835:12
**second** [19] - 657:4, 659:4, 659:9, 665:10, 665:12, 665:13, 665:14, 720:6, 736:14, 740:19, 748:25, 749:3, 767:15, 787:22, 791:14, 792:10, 796:10, 807:14, 835:6
**secondary** [1] - 655:15
**seconds** [34] - 649:2, 657:9, 662:17, 665:21, 665:22, 665:25, 666:3, 666:8, 666:9, 666:10, 701:21, 704:19, 706:7, 736:20, 737:3, 780:1, 780:2, 791:24, 792:11, 792:15, 792:25, 795:5, 795:7, 795:12, 795:16, 795:19, 795:21, 795:23, 796:2, 796:5, 828:2, 828:3
**Section** [1] - 612:4
**section** [3] - 628:5, 726:25, 783:21
**sections** [1] - 716:11
**secure** [1] - 704:9
**security** [5] - 628:11, 759:22, 760:22, 761:16, 833:1
**SECURITY** [1] - 831:19
**see** [71] - 641:20, 645:23, 648:4, 649:5, 649:23, 649:24, 649:25, 651:18, 654:25, 655:10, 655:16, 657:25, 663:6, 664:5, 665:19, 666:6, 667:5, 670:11, 674:6, 674:20, 677:11, 677:12, 680:9, 680:13, 689:4, 689:15, 691:19, 693:15, 693:17, 693:23, 694:11, 695:14, 695:17, 698:1, 704:23, 707:18, 710:18, 710:19, 714:15, 716:24, 725:7,

745:13, 763:19, 764:20, 764:21, 767:25, 768:2, 768:3, 770:21, 770:22, 773:5, 778:14, 779:9, 781:22, 781:24, 789:23, 806:18, 811:15, 811:18, 811:20, 813:14, 814:5, 814:7, 820:13, 826:21, 827:2, 827:22, 829:9, 830:18, 831:9
**seeing** [7] - 650:1, 770:1, 776:8, 787:14, 806:6, 806:20, 811:23
**seek** [3] - 733:5, 741:7, 759:3
**sees** [8] - 672:2, 705:5, 705:7, 806:19, 811:9, 813:6, 813:12, 827:5
**select** [2] - 759:5, 828:13
**selection** [1] - 739:23
**self** [1] - 764:19
**seminal** [1] - 722:2
**send** [3] - 649:11, 761:19, 827:11
**sense** [12] - 612:2, 645:20, 672:20, 677:21, 744:22, 747:6, 766:1, 770:21, 772:13, 773:14, 809:9
**sensory** [1] - 636:14
**sent** [3] - 628:13, 637:1, 646:22
**sentence** [1] - 722:14
**separate** [7] - 676:23, 676:25, 677:5, 708:15, 723:18, 731:13, 811:8
**separated** [4] - 709:7, 785:19, 786:8, 786:9
**separately** [2] - 808:13, 808:15
**September** [1] - 808:6
**Sergeant** [7] - 642:20, 668:12, 708:23, 774:21, 774:24, 775:3, 823:25
**sergeant** [2] - 808:16, 810:14
**series** [2] - 634:16, 759:13
**serious** [7] - 621:11, 622:10, 622:15,

659:11, 750:18, 750:24, 778:12
**seriously** [1] - 778:12
**serve** [7] - 646:16, 650:25, 684:9, 684:19, 755:20, 759:6, 834:25
**served** [1] - 631:4
**service** [5] - 658:1, 794:17, 834:22, 835:2, 835:8
**services** [6] - 630:8, 633:4, 733:3, 734:16, 760:5, 784:7
**serving** [6] - 632:7, 759:3, 764:19, 790:9, 827:10, 832:22
**set** [8] - 724:8, 735:11, 761:25, 762:15, 769:15, 778:5, 795:21, 835:18
**setting** [2] - 631:8, 631:12
**seven** [20] - 616:4, 657:24, 658:5, 689:7, 710:25, 716:22, 717:17, 719:20, 721:4, 721:7, 730:13, 772:10, 780:4, 788:4, 788:9, 824:17, 826:24, 827:5, 829:15, 834:15
**several** [1] - 737:8
**severance** [1] - 731:25
**severe** [2] - 611:25, 670:3
**severed** [1] - 766:17
**severity** [2] - 721:20, 749:24
**shakes** [1] - 650:1
**shall** [2] - 779:5, 835:23
**shards** [1] - 671:2
**share** [2] - 639:14, 646:3
**shell** [2] - 691:12, 691:25
**sheriff** [1] - 641:4
**sheriff's** [1] - 809:5
**Sheriff's** [8] - 621:15, 630:3, 702:6, 702:11, 778:8, 813:2, 813:14, 822:9
**sheriffs** [1] - 633:25
**shielded** [2] - 736:8, 737:20
**shift** [12] - 766:6,

773:5, 775:22, 777:13, 796:12, 802:11, 802:12, 803:23, 804:6, 804:7, 805:20, 805:22
**shifter** [1] - 773:17
**shifting** [2] - 804:9, 804:12
**shoot** [9] - 651:15, 766:2, 768:25, 779:16, 779:22, 780:9, 784:18, 805:1, 823:11
**shooting** [34] - 615:1, 615:3, 616:3, 617:2, 617:10, 622:9, 636:12, 644:14, 647:17, 678:1, 678:20, 691:6, 691:9, 694:8, 700:5, 703:3, 704:8, 704:20, 704:21, 708:12, 731:1, 736:23, 751:15, 764:20, 765:3, 765:23, 773:1, 774:10, 793:13, 799:2, 811:11, 812:7, 828:1
**shoots** [1] - 824:13
**shores** [1] - 787:6
**short** [3] - 710:17, 795:11, 795:19
**shortly** [1] - 786:16
**shot** [31] - 625:12, 625:14, 671:1, 688:16, 688:25, 689:9, 689:10, 691:6, 697:3, 698:9, 700:15, 703:2, 748:15, 768:24, 773:10, 773:15, 775:19, 776:7, 776:9, 776:22, 776:23, 777:2, 777:3, 777:23, 779:18, 785:1, 824:4, 824:5, 824:11, 824:19
**Shots** [1] - 795:6
**shots** [9] - 657:8, 696:21, 711:2, 772:10, 780:4, 794:25, 795:1, 824:17, 826:16
**shoulder** [1] - 677:16
**show** [30] - 615:24, 646:16, 683:3, 693:22, 695:14,

707:9, 768:18, 778:5, 781:7, 781:8, 782:12, 795:15, 797:9, 798:6, 803:1, 808:2, 812:2, 814:9, 814:10, 814:12, 814:13, 814:17, 822:25, 823:1, 823:5, 823:17, 824:21, 826:25, 827:1, 831:17
**showed** [7] - 693:10, 693:11, 712:25, 767:4, 802:11, 802:18, 818:11
**showing** [4] - 684:10, 745:21, 773:5, 807:16
**shown** [4] - 746:1, 747:13, 754:18, 790:15
**shows** [6] - 650:13, 651:25, 657:22, 670:11, 782:23, 815:22
**shut** [2] - 805:11, 805:13
**sic** [1] - 624:24
**side** [26] - 618:20, 624:23, 624:25, 677:12, 677:14, 687:10, 694:14, 742:10, 742:11, 742:15, 742:22, 742:24, 745:6, 771:9, 773:16, 775:9, 776:22, 794:12, 806:9, 806:15, 810:7
**side-by-side** [2] - 694:14, 775:9
**side-to-side** [1] - 771:9
**sidetracked** [1] - 653:11
**sight** [1] - 654:22
**sign** [6] - 665:19, 759:21, 760:21, 761:5, 761:12, 819:5
**signal** [1] - 751:18
**signaled** [1] - 656:23
**signature** [1] - 643:16
**signed** [3] - 829:14, 833:22, 833:23
**significant** [5] - 617:1, 750:17, 750:24, 769:9, 821:7
**signs** [1] - 829:15
**similar** [7] - 718:20, 728:19, 737:22,

748:21, 749:15,
755:22, 756:13
**similarly** [1] - 769:14
**simple** [2] - 742:7,
782:9
**simply** [9] - 611:13,
613:24, 652:11,
692:22, 743:11,
765:8, 779:14,
784:4, 822:11
**simulated** [2] -
636:23, 641:21
**Sinclair** [1] - 628:21
**sing** [2] - 795:22,
795:23
**single** [27] - 614:23,
615:1, 703:14,
740:14, 764:17,
765:4, 766:24,
777:17, 777:18,
780:25, 781:10,
781:12, 781:15,
785:4, 786:11,
788:7, 812:6,
812:14, 812:19,
819:10, 822:25,
823:1, 823:5,
823:13, 823:17,
827:18
**singular** [1] - 823:8
**sister's** [1] - 820:12
**sit** [5] - 659:19,
767:15, 785:15,
815:11, 815:13
**site** [28] - 625:20,
640:22, 640:25,
641:3, 641:5,
641:11, 641:14,
642:10, 644:1,
649:12, 653:15,
654:10, 660:3,
660:17, 661:10,
701:7, 770:20,
772:1, 780:1,
780:19, 794:15,
802:9, 810:15,
814:5, 816:15,
818:1, 827:1
**sitting** [7] - 615:25,
656:19, 705:13,
773:14, 775:5,
777:12, 826:4
**situated** [1] - 806:6
**situation** [15] - 618:3,
636:12, 643:25,
645:1, 656:4,
658:10, 666:6,
666:18, 672:24,
677:23, 736:15,
736:18, 736:21,

791:14, 793:14
**situations** [2] -
636:18, 825:17
**six** [9] - 652:14, 660:5,
716:20, 717:11,
717:16, 816:10,
834:13
**size** [2] - 630:25,
773:19
**sketch** [1] - 705:22
**skills** [1] - 728:13
**skip** [4] - 759:21,
760:8, 760:20,
784:10
**sky** [1] - 805:1
**slams** [1] - 774:1
**slapped** [1] - 645:13
**sleep** [1] - 678:13
**slide** [3] - 666:13,
796:14, 798:25
**slightly** [2] - 698:2,
777:5
**slip** [2] - 668:10,
668:11
**slips** [1] - 668:11
**sliver** [1] - 780:24
**slow** [3] - 696:10,
700:5, 765:16
**slowing** [1] - 696:4
**slumped** [3] - 804:5,
804:6, 805:22
**small** [2] - 762:9,
789:14
**Smith** [2] - 609:20
**society** [6] - 619:7,
733:3, 734:16,
754:1, 760:5, 784:7
**soft** [3] - 768:1, 768:2,
813:4
**solace** [5] - 733:9,
734:9, 754:1, 760:4,
783:23
**sole** [2] - 744:24,
759:2
**solely** [4] - 733:8,
744:17, 747:7,
758:23
**someone** [18] -
615:25, 616:4,
622:8, 654:22,
677:1, 697:2,
746:19, 767:15,
769:24, 771:10,
776:2, 778:20,
779:22, 790:12,
791:5, 823:11,
825:10, 827:12
**someplace** [1] - 667:9
**sometimes** [3] -
636:16, 676:24,

771:23
**somewhat** [1] - 662:4
**somewhere** [4] -
647:6, 651:6,
664:10, 770:5
**son** [4] - 771:4,
788:13, 788:14,
821:4
**sons** [2] - 754:3, 820:5
**soon** [5] - 738:21,
809:19, 809:23,
810:8, 810:14
**sorrow** [4] - 733:9,
734:8, 753:25, 760:3
**Sorrow** [1] - 783:23
**sorry** [4] - 642:7,
694:2, 701:13,
719:14
**sort** [4] - 624:20,
690:16, 731:13,
754:23
**sorts** [2] - 687:10,
733:25
**sought** [2] - 734:1,
820:9
**sound** [2] - 611:11,
725:5
**sounded** [1] - 616:8
**sounds** [4] - 625:6,
625:8, 626:2, 824:7
**Southern** [2] - 635:9,
683:20
**space** [2] - 669:24,
699:16
**SPEAKER** [1] - 720:6
**Speaker** [1] - 646:11
**speaking** [1] - 743:4
**special** [2] - 707:20,
746:17
**specialist** [2] - 627:24,
628:1
**specialists** [1] -
634:15
**specific** [4] - 653:6,
689:19, 722:3, 806:7
**specifically** [18] -
609:18, 615:16,
637:14, 643:18,
664:21, 673:13,
679:13, 699:22,
700:2, 700:24,
701:18, 724:19,
737:15, 788:15,
797:25, 803:21,
810:22, 820:24
**specify** [3] - 759:25,
760:11, 761:2
**speculate** [5] -
661:19, 781:1,
802:15, 815:18,

817:4
**speculated** [1] -
815:19
**speculation** [16] -
658:7, 658:8, 688:8,
688:13, 688:17,
688:20, 688:22,
689:1, 690:16,
757:22, 773:18,
775:24, 800:9,
802:14, 803:12
**speculative** [3] -
757:23, 777:19,
803:18
**speed** [11] - 633:20,
661:1, 661:19,
661:22, 661:23,
665:5, 666:8, 668:8,
705:24, 708:1, 708:2
**speedometer** [1] -
793:10
**spending** [1] - 821:6
**spent** [9] - 617:25,
639:22, 712:7,
785:25, 792:12,
799:15, 812:12,
816:10, 823:1
**spinal** [6] - 731:25,
766:15, 766:17,
776:19, 777:2, 777:4
**spine** [1] - 805:10
**spinning** [22] -
615:22, 694:24,
695:12, 698:25,
699:1, 699:6,
699:12, 700:3,
700:10, 700:14,
700:22, 701:5,
765:23, 768:4,
768:9, 768:18,
772:9, 775:2, 781:6,
781:7, 823:21,
824:25
**split** [2] - 791:14,
829:15
**split-second** [1] -
791:14
**spoil** [1] - 826:1
**spokesperson** [1] -
759:8
**sponte** [1] - 832:8
**spot** [1] - 714:3
**spouse** [1] - 754:4
**Sq** [1] - 607:23
**squad** [2] - 657:16,
704:14
**St** [1] - 646:12
**stack** [1] - 828:25
**stage** [3] - 717:23,
723:18, 737:23

**stages** [2] - 668:4,
668:7
**stairways** [1] - 667:5
**stake** [1] - 748:8
**stalls** [1] - 765:11
**stamp** [1] - 828:5
**stamped** [1] - 770:5
**stand** [26] - 621:22,
642:5, 680:23,
680:24, 712:22,
733:24, 738:24,
741:23, 745:5,
761:20, 763:19,
765:5, 774:22,
786:2, 791:19,
795:6, 796:8, 801:3,
802:21, 810:5,
812:5, 812:11,
812:13, 815:7,
820:4, 835:23
**standard** [18] -
617:18, 618:2,
618:10, 643:16,
646:7, 650:21,
669:17, 671:5,
691:6, 727:10,
727:17, 727:25,
732:15, 738:3,
750:4, 764:14,
765:5, 776:17
**Standard** [1] - 628:3
**standards** [3] - 629:3,
632:18, 728:21
**Standards** [1] - 675:1
**standing** [13] - 691:4,
691:14, 695:24,
696:20, 697:13,
741:22, 770:22,
772:10, 776:11,
776:23, 777:1,
811:7, 811:8
**standpoint** [1] - 833:6
**stands** [1] - 779:22
**Stanford** [2] - 683:20,
713:1
**start** [16] - 626:22,
640:6, 654:2, 659:6,
681:5, 687:19,
729:22, 743:3,
767:22, 792:11,
792:25, 795:25,
803:17, 814:5,
814:7, 826:6
**started** [25] - 629:24,
631:21, 636:25,
641:22, 645:8,
645:23, 646:5,
646:10, 646:19,
650:4, 682:25,
683:8, 683:10,

700:3, 763:2,
767:23, 787:9,
809:20, 809:24,
810:8, 810:15,
812:25, 828:1
**starting** [9] - 624:25,
650:6, 660:2,
662:12, 672:2,
679:5, 706:2, 706:4,
716:3
**starts** [7] - 666:25,
768:4, 774:2,
792:16, 813:13,
814:6, 826:6
**State** [11] - 628:12,
628:13, 628:18,
629:15, 630:11,
630:12, 634:3,
643:2, 666:2, 793:7,
808:16
**state** [35] - 611:18,
620:7, 620:8,
629:20, 629:24,
674:13, 675:10,
686:13, 691:25,
693:7, 694:7,
716:16, 717:5,
718:1, 718:16,
727:7, 727:16,
728:2, 728:14,
728:15, 740:23,
743:15, 745:4,
748:24, 748:25,
766:13, 774:6,
774:8, 774:15,
775:19, 786:4,
793:5, 800:2, 816:20
**statement** [53] -
615:13, 615:14,
615:15, 653:17,
656:11, 675:25,
676:1, 676:11,
676:15, 678:9,
683:17, 689:11,
701:6, 701:25,
716:7, 722:19,
726:6, 726:14,
727:24, 737:12,
737:13, 764:19,
764:24, 769:14,
769:19, 772:15,
797:7, 797:11,
797:14, 797:24,
797:25, 798:4,
798:25, 799:1,
799:9, 799:11,
799:14, 801:7,
807:1, 808:2, 808:4,
810:4, 810:9, 812:2,
812:4, 812:8, 812:9,

812:22, 812:23,
820:1, 821:22
**statements** [44] -
610:23, 610:24,
642:18, 653:15,
653:18, 675:5,
676:14, 676:18,
677:6, 677:20,
678:7, 678:8,
694:14, 708:14,
743:14, 744:16,
745:22, 745:24,
746:1, 747:11,
767:7, 769:12,
769:23, 797:21,
798:17, 799:5,
799:8, 799:12,
799:17, 799:20,
799:21, 799:22,
799:24, 801:1,
801:5, 801:13,
806:3, 806:23,
807:7, 808:13,
808:15, 808:19,
810:16
**states** [7] - 628:2,
628:15, 634:3,
645:4, 647:1, 760:9,
816:21
**STATES** [1] - 607:1
**States** [18] - 614:10,
630:7, 631:9,
631:12, 669:18,
763:17, 763:21,
776:3, 778:2,
779:20, 779:21,
780:6, 782:25,
784:6, 788:22,
836:4, 836:11,
836:15
**states'** [1] - 646:23
**stating** [4] - 622:17,
690:13, 740:14,
761:10
**station** [1] - 630:5
**stationary** [4] - 703:6,
826:14, 826:20
**statue** [1] - 728:5
**status** [1] - 782:17
**statute** [4] - 612:3,
727:3, 728:1, 751:25
**statutes** [1] - 728:18
**statutory** [1] - 728:10
**stay** [3] - 713:8,
796:23, 820:11
**stayed** [2] - 627:18,
669:16
**steep** [1] - 794:13
**steer** [1] - 672:16
**stenotypy** [1] - 836:8

**step** [7] - 627:4, 656:6,
659:7, 672:6,
713:25, 762:14
**step-by-step** [1] -
659:7
**stepping** [1] - 641:22
**steps** [1] - 780:4
**Stevens** [1] - 821:7
**stick** [1] - 803:23
**still** [27] - 616:12,
630:5, 647:2, 649:4,
666:13, 669:23,
671:24, 685:5,
689:6, 694:1,
705:13, 712:15,
713:11, 713:12,
727:9, 729:25,
738:3, 763:15,
766:8, 766:11,
766:12, 770:15,
778:1, 781:3, 789:6,
802:7, 831:11
**sting** [1] - 636:24
**stipulate** [1] - 660:8
**stipulated** [3] - 620:9,
744:7, 749:3
**stipulation** [1] -
716:15
**stone** [1] - 730:25
**stood** [6] - 687:11,
690:10, 696:5,
780:21, 823:4,
823:16
**Stop** [1] - 814:17
**stop** [47] - 620:22,
620:23, 621:1,
621:2, 640:25,
645:17, 645:18,
649:21, 656:22,
660:14, 660:22,
665:19, 666:12,
666:15, 667:8,
667:11, 668:9,
669:25, 671:8,
692:21, 696:10,
700:4, 704:15,
709:17, 709:18,
709:20, 721:13,
721:14, 735:22,
736:20, 751:18,
765:16, 765:18,
766:2, 766:3,
767:21, 767:22,
776:1, 779:7,
779:13, 779:25,
792:10, 814:9,
814:12, 814:13
**stopped** [19] - 642:7,
650:4, 661:4,
668:12, 669:15,

669:16, 696:4,
697:25, 700:6,
710:7, 710:8, 710:9,
731:18, 766:10,
771:12, 780:17,
809:22, 825:1, 826:5
**stopping** [2] - 696:4,
706:4
**stops** [2] - 765:24,
772:10
**store** [1] - 787:13
**story** [16] - 767:4,
767:9, 768:14,
768:16, 773:22,
776:12, 780:11,
781:5, 786:19,
786:22, 787:18,
789:4, 805:24,
827:21, 827:24
**straight** [24] - 695:23,
695:24, 696:15,
697:1, 697:5, 697:6,
697:9, 697:17,
697:20, 698:14,
698:16, 698:18,
765:15, 765:17,
769:21, 770:22,
771:8, 772:10,
772:22, 781:13,
799:20, 803:4,
815:11
**straight-faced** [1] -
781:13
**straighten** [1] - 699:17
**stray** [1] - 725:7
**street** [2] - 636:20,
736:11
**stress** [10] - 618:25,
634:17, 636:12,
637:25, 678:1,
793:13, 794:3,
798:19, 811:11
**stress-inducing** [4] -
678:1, 793:13,
794:3, 798:19
**stretch** [1] - 680:8
**stricken** [1] - 744:10
**strike** [4] - 624:3,
648:18, 720:21,
796:21
**strikes** [1] - 789:9
**striking** [1] - 733:19
**struck** [8] - 625:4,
656:23, 658:4,
658:7, 703:9,
803:10, 804:13,
805:4
**stuck** [1] - 728:20
**studies** [7] - 644:7,
644:9, 647:5, 647:8,

707:13, 817:12
**stuff** [8] - 648:5,
662:8, 666:14,
668:13, 677:3,
696:23, 768:22,
770:9
**stupid** [1] - 669:6
**styled** [2] - 607:12,
836:7
**sua** [1] - 832:8
**subject** [12] - 629:6,
648:19, 651:4,
651:12, 652:11,
658:23, 670:9,
670:22, 671:6,
707:20, 788:2
**subjected** [3] -
748:14, 749:7,
753:24
**subjective** [5] -
687:15, 687:18,
688:5, 689:14, 692:7
**submit** [3] - 732:3,
818:21, 820:19
**submitted** [6] -
720:13, 720:17,
723:22, 781:17,
801:23, 801:24
**subsequent** [2] -
725:10, 832:20
**substance** [1] - 677:2
**substantive** [4] -
681:4, 715:5,
716:11, 727:6
**substitute** [1] - 747:5
**suddenly** [1] - 700:6
**sued** [2] - 612:20,
646:20
**suffer** [3] - 748:17,
749:11, 753:6
**suffered** [6] - 753:21,
753:22, 754:10,
757:11, 785:10,
798:19
**suffering** [11] -
718:13, 730:16,
730:19, 731:4,
752:19, 753:1,
753:3, 753:5, 760:4,
783:25, 805:14
**sufficient** [7] - 616:20,
617:17, 617:22,
618:14, 732:2,
738:4, 755:20
**suggest** [5] - 610:2,
616:6, 719:19,
720:21, 757:5
**suggestion** [1] -
722:10
**suggestions** [1] -

681:6
**suggests** [1] - 722:7
**suit** [1] - 790:12
**Suite** [1] - 607:19
**sum** [1] - 752:22
**summary** [8] - 610:9,
635:15, 635:21,
635:25, 717:3,
717:23, 737:22,
737:24
**summation** [2] -
823:16, 824:21
**sun** [1] - 662:1
**supervision** [1] -
629:25
**supervisor** [1] -
655:17
**supplemental** [3] -
642:15, 653:22,
802:2
**supplies** [1] - 816:2
**support** [17] - 610:16,
611:1, 615:22,
618:14, 720:14,
721:22, 726:8,
742:10, 742:11,
775:1, 775:8,
777:18, 781:5,
781:11, 807:6,
820:16, 827:18
**supported** [3] - 745:8,
797:22, 802:7
**supports** [2] - 819:15,
821:11
**supposed** [5] -
780:25, 781:1,
790:24, 799:23,
809:14
**supposedly** [1] -
685:2
**Supreme** [14] -
609:19, 621:12,
644:13, 659:12,
673:8, 673:16,
674:25, 675:21,
679:21, 712:17,
779:21, 780:13,
782:25, 817:17
**sure..** [1] - 623:2
**surgeries** [2] - 652:14
**surprise** [1] - 666:6
**surprised** [1] - 766:20
**surrender** [1] - 758:22
**surrounding** [2] -
628:15, 634:3
**survey** [12] - 645:21,
646:18, 647:10,
647:11, 647:21,
647:25, 648:10,
650:16, 652:23,

653:4, 707:21
**surveyed** [1] - 647:17
**surveying** [1] - 646:6
**surveys** [1] - 707:13
**survivability** [1] -
619:15
**survivable** [1] - 619:2
**survival** [1] - 612:24
**survive** [1] - 612:12
**survived** [2] - 612:22,
620:16
**survives** [1] - 612:7
**suspect** [11] - 652:4,
708:19, 750:14,
750:17, 750:19,
795:14, 796:9,
796:20, 814:16,
818:5, 822:8
**suspect's** [1] - 651:19
**suspects** [1] - 797:1
**suspicion** [3] -
692:21, 779:8,
779:13
**suspicious** [1] -
693:23
**sustained** [7] -
743:25, 744:8,
752:15, 752:23,
766:14, 786:6,
796:23
**SUV** [1] - 806:17
**Swanson** [1] - 736:16
**swear** [1] - 627:4
**swerve** [1] - 655:25
**swerved** [2] - 621:24,
658:21
**switch** [1] - 818:10
**switchback** [1] -
654:24
**switching** [1] - 783:7
**sworn** [6] - 682:20,
693:12, 740:25,
741:3, 744:4, 768:21
**SWORN** [1] - 627:6
**sympathy** [3] -
741:16, 757:21,
768:13
**synonymous** [1] -
620:24
**system** [3] - 741:6,
741:15, 763:24

---

**T**

**tac** [2] - 710:25, 711:1
**tactically** [1] - 611:11
**tactics** [4] - 611:8,
615:13, 629:6, 684:8
**talks** [2] - 675:20,
678:13

**tally** [1] - 645:22
**tangible** [1] - 753:12
**tardy** [1] - 738:19
**target** [1] - 636:12
**taught** [1] - 636:13
**taunt** [1] - 782:3
**teacher** [1] - 820:14
**technically** [1] -
818:22
**technology** [2] -
729:15, 783:7
**television** [4] -
647:24, 648:1,
655:10, 667:4
**temporary** [1] - 753:20
**ten** [13] - 640:2,
654:24, 660:23,
661:17, 665:10,
666:9, 686:24,
715:6, 717:23,
724:20, 789:10,
789:18, 822:21
**ten-minute** [1] -
789:10
**tendered** [2] - 718:24,
719:5
**Tennessee** [9] -
644:14, 647:19,
722:2, 779:7,
779:16, 779:22,
784:17, 823:12
**tense** [3] - 645:1,
672:23, 736:18
**term** [8] - 652:4,
670:1, 670:2, 670:8,
702:13, 702:14,
710:14, 817:6
**termed** [1] - 753:7
**terminate** [1] - 655:18
**terms** [11] - 619:25,
620:24, 638:24,
643:24, 678:12,
689:17, 701:25,
705:21, 708:21,
732:13, 796:15
**terrible** [1] - 823:18
**test** [4] - 742:22,
749:20, 768:24,
808:23
**testified** [45] - 614:24,
615:20, 621:22,
635:3, 643:15,
648:23, 671:20,
672:5, 676:12,
685:19, 693:4,
693:19, 697:21,
701:17, 703:8,
703:10, 709:23,
713:2, 746:1,
747:13, 766:5,

766:11, 766:12,
781:23, 794:2,
796:25, 797:18,
798:16, 800:5,
800:24, 801:2,
801:6, 801:11,
801:23, 802:5,
803:8, 803:22,
804:21, 808:4,
808:5, 809:3, 811:2,
811:13, 813:17,
821:3
**testify** [9] - 677:8,
677:9, 677:21,
686:13, 703:18,
703:24, 744:18,
765:5, 765:18
**testifying** [7] - 619:24,
653:23, 662:10,
701:4, 708:23,
746:10, 746:24
**testimony** [110] -
609:24, 610:19,
622:12, 624:10,
624:13, 631:25,
634:6, 635:6,
637:23, 638:20,
641:25, 642:22,
654:7, 654:10,
656:7, 656:20,
656:25, 657:12,
658:20, 659:20,
661:12, 662:22,
671:19, 675:2,
675:6, 675:17,
676:15, 677:24,
678:5, 678:8,
679:16, 679:17,
683:18, 683:19,
689:25, 693:1,
693:12, 693:20,
694:6, 694:7, 694:9,
694:19, 696:18,
697:20, 700:19,
700:21, 704:3,
705:6, 706:18,
706:22, 706:23,
709:5, 709:14,
711:2, 711:12,
711:13, 712:13,
713:1, 730:17,
731:16, 731:21,
731:23, 733:16,
736:24, 737:14,
738:1, 743:6, 744:4,
744:25, 745:1,
745:10, 745:11,
745:12, 745:20,
745:23, 746:5,
746:6, 746:18,
746:22, 747:1,

747:2, 747:4,
747:11, 747:15,
747:16, 766:21,
774:14, 781:9,
782:5, 782:9, 785:8,
791:18, 796:6,
798:5, 798:6, 798:7,
798:10, 798:15,
798:16, 800:19,
800:24, 801:4,
803:14, 805:5,
809:21, 812:11
**tests** [1] - 644:23
**text** [2] - 643:23,
665:16
**THE** [169] - 609:2,
609:10, 613:7,
613:11, 613:16,
613:18, 616:9,
616:21, 617:14,
619:22, 620:3,
620:10, 620:12,
621:19, 622:5,
622:20, 622:24,
623:3, 623:13,
623:17, 623:20,
624:6, 624:20,
625:6, 625:9,
625:16, 625:25,
626:5, 626:8,
626:10, 626:14,
626:18, 627:3,
627:7, 637:15,
637:19, 638:22,
639:1, 639:4, 639:6,
639:9, 649:25,
679:1, 680:2, 680:6,
680:17, 681:1,
681:11, 681:18,
681:21, 681:25,
685:12, 689:23,
690:2, 690:4,
711:25, 712:2,
712:4, 713:17,
713:20, 713:23,
713:25, 714:1,
714:2, 714:19,
714:22, 714:24,
715:17, 715:23,
719:3, 719:7,
719:14, 719:23,
720:2, 720:4,
720:25, 721:6,
721:25, 722:4,
722:11, 723:10,
723:17, 724:16,
724:21, 725:8,
726:5, 726:21,
727:11, 727:21,
728:5, 728:8, 729:6,
729:9, 729:11,

729:13, 730:4, 730:11, 730:14, 730:21, 731:9, 731:20, 732:19, 733:1, 733:11, 733:18, 733:22, 734:6, 734:11, 734:15, 734:19, 734:22, 735:1, 735:3, 735:16, 735:22, 736:3, 737:21, 738:16, 738:18, 739:1, 739:4, 739:7, 739:12, 762:19, 762:22, 762:24, 763:4, 763:8, 763:11, 786:6, 786:23, 787:1, 787:21, 788:1, 789:8, 789:23, 790:3, 796:23, 798:13, 810:24, 822:18, 822:21, 827:19, 828:9, 828:22, 829:5, 829:12, 830:6, 830:11, 830:22, 831:13, 831:15, 831:21, 832:2, 832:14, 832:18, 832:25, 834:1, 834:5, 834:7, 834:9, 834:11, 834:13, 834:15, 834:17, 834:19, 835:12, 835:21, 835:23

**themselves** [2] - 631:8, 778:11

**theories** [2] - 777:16, 777:19

**theory** [15] - 610:17, 611:2, 614:7, 697:23, 701:14, 702:3, 705:18, 707:12, 746:19, 775:1, 775:8, 781:5, 781:12, 805:19, 827:18

**therefore** [7] - 612:12, 737:20, 748:11, 752:5, 755:11, 755:15, 805:20

**thereto** [1] - 758:13

**thinking** [3] - 624:23, 729:1, 786:14

**thinks** [7] - 648:13, 648:14, 702:24, 801:25, 819:9, 826:13, 826:19

**third** [3] - 611:16, 630:25, 665:16

**thirty** [1] - 681:10

**Thomas** [1] - 607:13

**thoughts** [4] - 735:11, 829:18, 830:2, 831:13

**thousands** [5] - 645:3, 650:19, 686:12, 686:17, 691:6

**threat** [22] - 621:16, 622:6, 622:10, 622:12, 622:19, 625:23, 645:19, 668:17, 669:2, 749:22, 750:17, 750:24, 778:12, 778:15, 778:16, 778:18, 778:21, 778:22, 822:16, 824:10, 825:1, 830:25

**threaten** [1] - 825:17

**three** [30] - 613:9, 630:25, 631:11, 638:17, 645:16, 691:24, 693:7, 693:14, 699:15, 699:17, 710:21, 716:15, 717:7, 719:17, 719:24, 738:1, 760:2, 760:6, 768:20, 768:21, 770:23, 771:16, 781:13, 781:14, 786:3, 814:7, 824:12, 829:22, 830:20, 834:7

**three-minute** [1] - 691:24

**threshold** [1] - 619:16

**throughout** [5] - 627:22, 629:20, 658:15, 791:1, 803:13

**throw** [2] - 773:7, 777:15

**thrown** [1] - 785:21

**thumbnail** [1] - 640:10

**Tiffany** [1] - 607:21

**timeline** [12] - 610:23, 614:18, 615:20, 706:8, 711:3, 737:12, 766:20, 782:6, 823:3, 825:5, 827:6

**timer** [2] - 795:20, 795:25

**timing** [7] - 664:23, 678:6, 678:7, 794:23, 798:17, 799:5, 799:7

**tire** [10] - 662:20, 663:12, 663:19, 695:17, 695:18, 765:22, 768:9, 815:20, 815:22, 824:23

**tires** [21] - 615:22, 671:8, 694:24, 695:12, 696:13, 699:6, 699:12, 700:3, 700:10, 700:14, 700:22, 701:5, 768:4, 768:18, 772:9, 775:1, 781:5, 781:7, 823:21, 824:24

**title** [1] - 661:25

**today** [26] - 613:1, 631:16, 632:4, 632:7, 633:4, 638:20, 642:16, 642:23, 647:2, 650:12, 653:23, 685:19, 693:1, 706:22, 712:8, 712:13, 714:5, 761:4, 783:10, 786:2, 788:25, 791:1, 792:17, 800:1, 816:18, 835:13

**today's** [1] - 833:22

**Todd** [1] - 821:7

**together** [12] - 626:12, 633:6, 646:8, 681:3, 708:25, 709:5, 715:1, 735:11, 740:6, 767:6, 769:12, 769:23

**tolerate** [1] - 827:12

**tolerated** [1] - 619:7

**tolled** [1] - 630:20

**took** [25] - 615:25, 628:21, 629:25, 633:22, 633:23, 649:1, 649:2, 662:3, 672:8, 707:3, 765:4, 769:5, 770:19, 771:2, 772:15, 774:24, 782:1, 788:3, 788:23, 794:16, 801:13, 812:15, 812:16, 822:16

**top** [7] - 620:6, 647:20, 691:10, 705:13, 786:3, 806:18, 813:4

**topic** [4] - 629:13, 646:15, 683:19, 819:23

**topics** [4] - 628:24, 629:2, 629:10, 634:16

**tortuous** [2] - 612:8, 612:10

**tossing** [1] - 665:9

**total** [8] - 662:7, 666:17, 706:2, 706:3, 760:7, 773:18, 775:23, 819:21

**totality** [5] - 720:23, 722:16, 722:24, 723:4, 751:20

**totally** [1] - 667:24

**touch** [3] - 650:10, 802:16, 807:14

**touched** [2] - 766:5, 766:6, 805:25

**tough** [2] - 825:8

**tow** [2] - 736:10, 769:6

**toward** [9] - 698:2, 755:16, 759:16, 783:14, 797:25, 803:6, 804:12, 818:13, 833:19

**towards** [9] - 615:16, 672:3, 703:1, 710:18, 710:19, 710:24, 765:15, 777:8, 823:10

**towed** [1] - 769:1

**town** [2] - 635:16, 647:18

**track** [1] - 662:20

**tracks** [4] - 638:4, 700:6, 765:24, 772:10

**traffic** [30] - 620:22, 620:23, 621:1, 621:2, 621:24, 643:10, 643:13, 653:14, 658:21, 663:16, 670:20, 675:13, 690:20, 691:16, 691:21, 703:21, 706:4, 721:13, 722:20, 736:20, 791:24, 792:1, 793:21, 801:14, 813:11, 813:16, 815:2, 818:5, 826:4

**trail** [2] - 679:7, 795:5

**trailer** [8] - 785:23, 785:24, 786:1, 786:2, 791:4, 791:6,

791:7

**Train** [1] - 629:21

**train** [13] - 628:10, 628:11, 628:18, 629:8, 629:19, 630:18, 633:24, 636:6, 637:3, 646:22, 791:20, 793:6, 816:22

**trained** [11] - 628:12, 628:15, 628:24, 629:1, 629:4, 629:14, 633:18, 647:23, 670:1, 671:14

**Trainer** [1] - 629:21

**trainer** [10] - 628:10, 628:16, 628:18, 629:19, 630:18, 632:15, 633:24, 636:6, 637:3

**trainers** [7] - 628:12, 629:8, 629:9, 645:9, 647:23, 793:4, 816:20

**training** [65] - 627:24, 628:1, 628:2, 628:5, 628:25, 629:7, 629:9, 629:16, 630:1, 630:15, 631:14, 632:18, 633:15, 633:16, 633:23, 633:24, 634:1, 634:2, 634:20, 634:22, 636:5, 636:9, 636:23, 637:2, 637:4, 637:6, 637:7, 640:14, 641:13, 643:24, 644:15, 644:20, 645:3, 646:17, 646:24, 647:10, 647:16, 649:8, 660:20, 666:17, 667:12, 668:4, 668:6, 669:18, 670:5, 670:16, 670:21, 670:23, 671:16, 674:21, 676:8, 677:9, 691:1, 691:18, 702:8, 702:14, 702:21, 703:6, 707:5, 708:17, 737:16, 746:18, 791:21, 817:13

**Training** [4] - 628:3, 628:4, 628:6, 644:20

**trains** [4] - 793:4,

793:6, 816:20, 816:22
**trajectory** [4] - 776:14, 802:19, 802:23, 802:25
**transaction** [1] - 745:13
**transcript** [4] - 693:25, 809:18, 836:6, 836:9
**Transcript** [1] - 607:25
**transcription** [1] - 607:25
**translation** [1] - 607:25
**transmission** [30] - 641:21, 656:24, 657:1, 657:5, 657:8, 658:22, 661:8, 661:9, 661:10, 662:14, 675:4, 679:4, 679:6, 703:14, 765:6, 765:8, 765:9, 768:15, 773:3, 773:6, 792:20, 792:21, 792:23, 792:24, 795:4, 800:13, 803:23, 803:24, 804:3
**transmissions** [4] - 703:12, 705:25, 782:10, 794:23
**transparency** [1] - 648:2
**transpired** [12] - 626:17, 680:15, 681:23, 714:17, 739:11, 762:17, 763:10, 789:21, 790:2, 828:21, 832:17, 835:10
**Transportation** [1] - 666:2
**travel** [11] - 640:4, 657:7, 661:16, 662:19, 664:4, 696:1, 697:5, 698:14, 705:24, 710:17, 792:25
**traveled** [5] - 697:1, 697:9, 697:17, 699:9, 803:2
**traveling** [13] - 655:16, 657:6, 660:23, 663:17, 664:14, 664:17, 665:5, 665:10, 665:11, 668:8, 697:20, 793:8, 813:5
**Travis** [1] - 607:17

**treat** [2] - 704:16, 744:1
**treated** [1] - 728:17
**trees** [1] - 660:7
**Trent** [1] - 612:16
**trial** [56] - 609:4, 610:20, 612:15, 641:25, 658:15, 659:20, 660:18, 666:24, 673:4, 673:5, 675:2, 675:6, 679:17, 693:1, 693:16, 693:20, 693:21, 693:25, 694:1, 694:8, 694:20, 694:21, 698:22, 700:13, 700:19, 701:1, 701:12, 703:17, 709:14, 721:10, 739:18, 741:8, 741:13, 743:3, 744:9, 747:19, 768:18, 771:1, 772:22, 774:18, 774:19, 775:7, 780:9, 781:2, 782:10, 783:10, 791:9, 798:10, 798:15, 810:23, 811:13, 823:17, 827:16, 834:22, 834:24, 835:16
**Trial** [2] - 607:12, 835:25
**trials** [1] - 790:16
**trick** [6] - 768:6, 768:7, 774:18, 774:21, 775:6, 807:15
**tried** [35] - 645:14, 650:19, 668:9, 671:7, 671:9, 673:22, 688:2, 690:15, 720:20, 768:6, 768:7, 768:12, 768:17, 774:18, 774:21, 775:6, 777:21, 779:25, 785:2, 792:17, 792:20, 794:11, 795:10, 795:17, 795:18, 797:5, 804:22, 806:22, 808:14, 816:13, 823:22, 825:2, 826:22
**tries** [1] - 817:21
**trigger** [4] - 689:19, 691:7, 704:24,

824:12
**Trooper** [5] - 628:20, 629:1, 799:3, 807:9, 808:3
**trooper** [5] - 629:5, 629:6, 694:7, 774:8, 774:15
**truck** [1] - 669:23
**true** [3] - 621:6, 727:24, 736:11
**truly** [1] - 785:14
**trust** [3] - 781:10, 781:12, 781:15
**truth** [7] - 663:25, 741:7, 743:5, 745:25, 759:4, 768:12, 782:13
**try** [19] - 641:14, 652:16, 652:18, 659:7, 677:15, 681:14, 767:7, 769:11, 773:8, 780:7, 782:3, 785:15, 785:16, 785:18, 800:19, 823:20, 825:18, 825:25
**trying** [32] - 622:20, 656:6, 668:2, 673:24, 674:5, 688:4, 689:13, 689:24, 696:23, 697:22, 699:18, 764:22, 775:1, 775:24, 776:25, 780:12, 785:18, 786:14, 794:15, 797:2, 805:14, 806:11, 807:14, 815:17, 816:4, 823:2, 823:6, 824:7, 824:8, 825:4
**tucked** [1] - 771:16
**Tuesday** [1] - 739:24
**turn** [18] - 654:17, 654:19, 654:24, 663:6, 663:7, 672:15, 674:15, 677:14, 677:15, 699:17, 710:21, 741:12, 767:21, 770:23, 771:16, 791:12, 814:7
**turned** [5] - 621:25, 630:24, 661:10, 696:5, 773:24
**turning** [2] - 615:12, 695:8
**twice** [1] - 824:11
**two** [44] - 612:3,

613:5, 618:25, 619:15, 620:16, 653:20, 653:24, 654:20, 655:12, 657:14, 663:4, 666:9, 666:11, 674:17, 686:6, 692:15, 695:14, 710:14, 716:10, 717:4, 729:1, 738:2, 743:4, 745:12, 746:14, 754:3, 755:10, 760:9, 760:14, 760:20, 760:23, 761:1, 769:8, 769:9, 771:3, 776:24, 782:19, 784:20, 786:3, 788:4, 799:19, 809:4, 834:5
**two-year** [1] - 612:3
**type** [4] - 648:20, 753:6, 773:21, 775:16
**types** [1] - 743:4
**typically** [3] - 704:8, 830:18, 833:4

## U

**U.S** [2] - 609:20, 612:17
**ultimate** [1] - 711:22
**Umina** [37] - 607:15, 607:15, 616:21, 617:19, 619:22, 620:14, 622:5, 623:13, 626:3, 626:8, 637:16, 680:3, 681:8, 681:16, 682:2, 682:6, 690:5, 711:25, 712:7, 712:25, 713:21, 719:1, 719:10, 733:1, 734:6, 734:24, 738:16, 739:1, 762:20, 763:12, 786:6, 786:24, 789:8, 802:18, 818:11, 822:21, 827:19
**UMINA** [68] - 613:20, 616:10, 619:23, 620:9, 620:15, 622:6, 622:22, 622:25, 623:5, 623:14, 625:8, 625:17, 626:4, 626:9, 637:17, 637:21, 638:24,

639:3, 639:5, 639:8, 680:5, 681:10, 681:17, 682:3, 682:5, 682:23, 685:9, 685:13, 685:14, 690:3, 690:6, 690:7, 712:1, 713:22, 714:23, 719:2, 719:13, 733:2, 733:23, 734:10, 734:13, 734:18, 734:25, 735:14, 738:17, 739:3, 762:21, 763:6, 763:13, 786:7, 786:22, 786:25, 787:2, 787:20, 787:23, 788:3, 796:21, 798:9, 810:21, 811:1, 822:22, 827:20, 829:3, 830:4, 830:15, 831:14, 832:12, 835:20
**Umina's** [1] - 713:11
**Umina.........................
......157** [1] - 608:8
**Umina.............74** [1] - 608:6
**unanimous** [7] - 758:14, 761:7, 832:5, 832:9, 833:10, 833:15, 834:19
**unanimously** [2] - 761:11, 832:23
**unavoidable** [8] - 621:17, 622:10, 622:12, 622:18, 625:23, 778:17, 778:21
**uncertainty** [2] - 757:23, 758:2
**unchangeable** [3] - 687:15, 706:21, 772:13
**uncommon** [2] - 745:15, 811:11
**uncontradicted** [1] - 745:2
**under** [45] - 609:20, 610:10, 611:14, 613:7, 613:20, 618:8, 620:7, 620:8, 621:15, 625:21, 628:5, 630:21, 634:17, 638:17, 639:14, 682:1, 682:16, 693:8,

702:10, 709:12,
717:5, 722:9,
728:17, 736:7,
738:3, 740:23,
743:23, 748:6,
748:11, 748:21,
748:24, 748:25,
749:14, 749:18,
750:20, 751:24,
761:9, 769:7, 779:6,
779:19, 779:20,
781:14, 801:3,
831:23, 836:12
**undercover** [1] - 630:5
**underestimate** [1] -
735:18
**underlying** [1] - 750:9
**underneath** [1] -
760:6
**Understood** [3] -
622:5, 726:5, 730:4
**understood** [26] -
613:11, 613:16,
616:21, 617:14,
624:6, 625:6,
637:15, 637:19,
639:4, 639:9, 690:4,
720:25, 722:11,
723:6, 725:24,
726:17, 726:21,
727:11, 730:11,
730:21, 731:9,
731:20, 732:19,
735:16, 739:9,
830:11
**undone** [1] - 669:24
**unexpected** [2] -
665:23, 665:25
**unfortunately** [3] -
671:9, 806:11,
819:16
**uniform** [2] - 630:3,
684:5
**unimportant** [1] -
745:17
**unit** [1] - 655:15
**United** [17] - 614:10,
630:6, 631:9,
669:18, 763:17,
763:21, 776:3,
778:2, 779:20,
779:21, 780:6,
782:25, 784:6,
788:22, 836:4,
836:11, 836:15
**UNITED** [1] - 607:1
**Unites** [1] - 631:12
**University** [2] -
630:11, 630:12
**university** [1] - 662:8

**unknown** [8] - 645:2,
658:9, 668:8,
675:13, 707:9,
707:16, 708:2,
804:16
**unknowns** [3] - 706:2,
706:3, 706:5
**unless** [6] - 616:4,
645:5, 735:22,
750:15, 777:4,
778:23
**unlikely** [1] - 767:20
**unnecessary** [1] -
717:6
**unpublished** [1] -
612:15
**unquestionable** [1] -
770:16
**unreasonable** [13] -
675:24, 676:2,
685:22, 702:12,
702:15, 703:3,
750:12, 770:18,
783:15, 783:19,
818:15, 833:21
**unreasonably** [3] -
702:7, 702:18,
702:19
**unrelated** [2] - 825:19
**unreliable** [1] - 667:24
**untrue** [1] - 774:14
**untruthfulness** [1] -
746:4
**unwilling** [1] - 817:3
**up** [134] - 615:9,
615:10, 619:20,
627:17, 628:21,
628:23, 628:25,
630:7, 631:8,
631:12, 633:24,
640:14, 640:22,
640:23, 641:21,
643:9, 646:25,
647:10, 647:14,
649:3, 660:18,
661:17, 661:24,
662:8, 665:19,
667:2, 667:5, 667:7,
668:13, 670:12,
671:19, 674:12,
687:11, 693:10,
694:13, 695:5,
695:19, 695:20,
695:24, 696:5,
696:23, 697:7,
699:14, 699:25,
704:15, 704:17,
710:14, 710:19,
715:11, 716:2,
720:10, 720:24,

722:22, 722:23,
730:1, 733:24,
734:2, 735:11,
735:25, 737:3,
738:13, 738:23,
739:2, 756:15,
761:25, 762:15,
764:17, 767:5,
767:22, 767:23,
767:25, 769:15,
769:25, 770:9,
770:10, 770:22,
770:24, 771:5,
771:10, 771:13,
772:6, 772:11,
773:2, 773:6, 774:5,
775:24, 776:23,
777:3, 778:5,
779:12, 780:21,
784:22, 785:2,
785:15, 787:21,
788:7, 791:7, 795:5,
797:13, 797:16,
797:21, 798:22,
801:11, 803:7,
803:21, 804:7,
804:19, 809:8,
810:24, 811:16,
811:17, 812:18,
815:3, 815:10,
815:12, 820:6,
820:23, 821:9,
821:23, 823:5,
823:16, 823:22,
824:16, 824:23,
825:18, 825:25,
827:13, 827:14,
827:15, 835:19
**update** [1] - 725:9
**updates** [1] - 649:11
**upheaval** [1] - 648:3
**upset** [1] - 782:8
**urgent** [1] - 820:15
**US** [1] - 725:9
**useless** [1] - 662:1
**useless-meaning** [1] -
662:1
**usual** [2] - 680:18,
729:16
**utilize** [2] - 614:17,
778:23
**utilized** [1] - 614:9
**utilizing** [4] - 607:25,
699:24, 751:1, 765:2
**utterance** [1] - 641:20
**utterly** [1] - 815:8

---
## V
---

**VA** [1] - 612:5

**vague** [1] - 623:9
**value** [3] - 690:17,
691:18, 788:18
**vantage** [1] - 806:16
**variables** [5] - 707:16,
707:18, 707:19,
707:23, 707:24
**various** [2] - 816:20,
816:21
**varying** [1] - 738:2
**veer** [4] - 696:10,
697:1, 700:4, 765:16
**veering** [2] - 697:5,
698:13
**vegetation** [4] -
696:14, 696:15,
771:14, 772:2
**vehicle** [90] - 614:8,
614:22, 614:24,
615:2, 615:17,
615:18, 615:19,
615:25, 621:24,
622:1, 622:3, 624:3,
625:4, 655:20,
655:24, 655:25,
656:23, 661:11,
661:14, 661:19,
661:20, 663:16,
664:20, 666:1,
666:8, 669:25,
670:17, 671:1,
671:3, 671:25,
672:19, 674:2,
677:11, 677:13,
677:15, 677:18,
695:7, 696:17,
697:4, 697:8, 700:6,
703:9, 705:1, 705:3,
708:1, 708:2,
709:18, 710:10,
711:14, 721:11,
737:5, 751:16,
764:21, 764:22,
765:6, 765:13,
766:4, 766:7,
766:19, 771:8,
773:5, 775:4,
775:12, 775:14,
775:16, 775:18,
776:12, 776:25,
777:6, 779:9,
779:10, 780:3,
784:3, 785:1,
793:12, 794:5,
796:16, 796:17,
796:20, 814:9,
814:10, 814:12,
814:13, 814:17,
826:8, 827:5,
827:22, 827:25

**vehicles** [14] - 657:10,
657:17, 670:20,
678:20, 704:2,
704:6, 709:21,
765:12, 765:17,
765:19, 766:1,
797:1, 807:19, 816:5
**verbal** [2] - 710:22,
710:23
**verbalization** [1] -
629:11
**verbiage** [1] - 622:15
**verdict** [84] - 617:22,
716:13, 719:21,
719:24, 720:13,
724:23, 729:24,
729:25, 730:5,
732:9, 732:21,
732:23, 733:5,
733:12, 733:14,
733:20, 734:14,
734:17, 734:20,
734:23, 734:24,
739:6, 741:1, 741:4,
741:8, 741:20,
743:16, 745:7,
751:5, 751:10,
754:4, 755:3,
758:11, 758:12,
758:13, 758:25,
759:9, 759:11,
759:21, 760:21,
761:6, 761:7,
761:10, 761:13,
782:15, 782:19,
783:6, 783:8,
783:11, 818:10,
819:5, 819:16,
821:10, 821:18,
828:14, 831:1,
831:20, 832:4,
832:6, 832:9,
832:21, 832:23,
832:25, 833:4,
833:9, 833:10,
833:13, 833:14,
833:16, 833:22,
834:3, 834:5, 834:7,
834:9, 834:11,
834:13, 834:15,
834:17, 834:19,
834:20, 835:14
**VERDICT...................
................226** [1] -
608:10
**version** [11] - 614:20,
615:24, 716:3,
716:21, 718:21,
719:8, 721:8,
765:13, 767:3,

767:14, 808:14
**versus** [10] - 645:16, 648:13, 658:10, 667:14, 667:16, 736:10, 736:13, 806:19, 810:18, 811:3
**vicinity** [1] - 625:22
**video** [5] - 642:24, 677:7, 677:8, 808:5, 811:13
**videos** [1] - 664:2
**view** [6] - 617:20, 653:18, 758:15, 758:21, 806:10, 806:15
**viewed** [1] - 613:21
**Village** [1] - 631:2
**violate** [6] - 610:13, 763:16, 764:1, 764:3, 764:4, 825:24
**violated** [9] - 702:5, 702:11, 754:8, 770:18, 777:23, 782:24, 782:25, 788:21, 827:13
**violation** [7] - 626:2, 750:11, 754:9, 780:22, 784:5, 823:11, 825:10
**violence** [3] - 631:9, 631:12, 758:16
**VIRGINIA** [1] - 607:2
**Virginia** [28] - 607:13, 612:4, 612:5, 612:14, 612:18, 612:23, 616:11, 628:14, 628:18, 629:15, 635:3, 636:3, 643:2, 649:13, 654:16, 654:23, 718:17, 727:3, 727:9, 727:10, 728:20, 751:15, 751:25, 786:4, 793:7, 808:16, 836:5, 836:16
**virtually** [1] - 633:18
**visible** [2] - 665:7, 694:24
**vision** [3] - 636:16, 677:12, 750:3
**Vision** [1] - 665:16
**visit** [10] - 640:22, 640:25, 641:3, 641:5, 641:11, 642:10, 644:1, 660:13, 660:14, 660:17

**visited** [3] - 642:3, 642:9, 701:7
**visual** [3] - 695:12, 751:17, 780:2
**visually** [1] - 795:10
**vital** [2] - 731:18, 805:12
**vividly** [1] - 787:14
**voice** [4] - 641:21, 641:23, 794:1, 795:1
**voir** [1] - 637:15
**voluntary** [2] - 683:4
**vs** [14] - 610:10, 612:16, 635:9, 644:14, 644:18, 647:19, 675:7, 683:21, 702:22, 713:1, 722:2, 725:2, 736:16, 779:22

## W

**Wade** [1] - 609:20
**wait** [5] - 622:2, 690:12, 735:8, 767:21, 829:9
**waiting** [4] - 627:20, 703:18, 715:3, 769:22
**walk** [4] - 640:17, 641:11, 813:24
**walked** [5] - 673:12, 693:10, 694:13, 772:21, 792:2
**walking** [5] - 642:8, 654:2, 705:7, 705:12, 705:13
**walks** [1] - 824:14
**wall** [2] - 773:7, 830:8
**wants** [8] - 767:1, 769:13, 772:12, 772:13, 792:12, 792:24, 804:16, 807:5
**warm** [2] - 831:2, 831:9
**warning** [4] - 750:19, 750:21, 787:22, 828:16
**warrant** [1] - 630:8
**wash** [1] - 809:9
**washed** [4] - 768:25, 808:20, 808:24, 809:8
**watch** [1] - 667:4
**watched** [2] - 823:20, 823:21
**watches** [1] - 710:20
**ways** [2] - 805:12, 805:15

**weapon** [16] - 648:20, 658:2, 737:6, 796:10, 796:15, 796:16, 796:17, 800:8, 801:19, 803:5, 808:22, 809:1, 809:11, 811:16, 811:18, 814:19
**wear** [1] - 825:12
**website** [1] - 647:25
**week** [6] - 638:11, 659:21, 673:6, 790:9, 791:1, 796:18
**weeks** [1] - 774:9
**weighed** [1] - 777:21
**weighing** [2] - 745:15, 746:22
**weighs** [1] - 742:11
**weight** [10] - 652:2, 674:20, 742:8, 742:14, 744:25, 746:9, 747:2, 756:22, 758:23, 764:12
**welcome** [3] - 646:3, 790:22, 835:3
**welfare** [1] - 755:18
**well-known** [1] - 636:13
**wells** [1] - 771:14
**Wesley** [1] - 657:13
**west** [1] - 631:11
**WEST** [1] - 607:2
**West** [27] - 607:13, 612:4, 612:14, 612:18, 612:23, 616:10, 628:14, 628:18, 629:15, 635:3, 636:3, 643:2, 649:13, 654:16, 654:23, 718:16, 727:3, 727:10, 751:15, 751:24, 786:4, 793:7, 808:16, 836:5, 836:16
**wet** [1] - 768:3
**whatnot** [4] - 640:4, 651:3, 670:13, 670:21
**whatsoever** [6] - 624:5, 679:18, 770:11, 777:17, 801:9, 817:7
**wheel** [9] - 654:17, 654:20, 672:15, 695:19, 696:5, 698:1, 698:25, 699:1, 771:14

**Wheeler** [1] - 657:13
**wheels** [1] - 771:7
**whip** [1] - 767:13
**white** [3] - 769:12, 780:13, 781:14
**whiteboard** [1] - 666:14
**whole** [4] - 634:16, 740:15, 753:13, 826:1
**wife** [4] - 627:18, 654:18, 657:25, 673:1
**wiggle** [1] - 688:2
**willing** [3] - 640:12, 681:6, 817:4
**willingness** [2] - 741:6, 834:25
**window** [3] - 610:4, 668:13, 710:17
**wisdom** [1] - 740:24
**wise** [1] - 724:8
**wish** [2] - 803:20, 804:8
**withdraw** [1] - 734:13
**WITNESS** [3] - 608:4, 627:6, 714:1
**witness** [51] - 615:10, 621:22, 626:25, 631:14, 631:16, 631:20, 631:25, 632:7, 635:2, 639:13, 640:19, 642:5, 680:23, 687:1, 694:8, 708:14, 745:2, 745:4, 745:5, 745:7, 745:8, 745:11, 745:20, 745:25, 746:1, 746:5, 746:7, 746:14, 746:16, 747:8, 747:10, 747:12, 747:16, 763:19, 765:5, 768:11, 774:22, 774:23, 781:23, 791:19, 796:8, 800:22, 801:3, 802:21, 810:5, 812:10, 812:13, 815:7, 820:4
**witness's** [4] - 745:3, 747:1, 747:11, 747:15
**witnessed** [1] - 624:2
**witnesses** [14] - 610:20, 639:15, 642:23, 675:18, 714:19, 742:23, 744:5, 744:16,

744:17, 744:25, 745:11, 746:10, 746:12, 818:23
**witnesses'** [1] - 747:4
**witnessing** [3] - 745:13, 806:4, 811:6
**women** [1] - 825:16
**word** [18] - 620:21, 630:22, 636:25, 656:6, 684:14, 694:10, 779:12, 781:10, 781:13, 781:15, 785:20, 785:23, 785:24, 789:11, 819:19, 823:24, 830:13
**words** [14] - 620:20, 641:16, 645:5, 646:7, 652:12, 657:5, 665:18, 665:23, 670:8, 677:11, 692:2, 695:1, 708:18, 744:16
**works** [7] - 650:12, 766:22, 768:15, 800:13, 817:24, 833:4, 833:11
**world** [2] - 636:14, 815:11
**worried** [2] - 782:16, 825:5
**worry** [2] - 625:13, 790:17
**worse** [1] - 788:10
**worth** [5] - 741:22, 783:24, 786:10, 786:12, 788:19
**worthy** [1] - 746:12
**wound** [4] - 633:24, 776:6, 776:9, 776:14
**wow** [1] - 685:9
**Wrangler** [1] - 813:4
**wrap** [1] - 787:21
**wrestling** [3] - 635:13, 652:22, 653:2
**write** [1] - 761:15
**writing** [2] - 640:4, 761:18
**written** [8] - 635:23, 642:18, 676:14, 730:25, 761:9, 780:14, 797:11, 812:9
**wrongdoer** [2] - 755:9, 755:10
**wrongdoers** [1] - 755:13
**wrongful** [13] - 609:14, 612:21,

613:4, 613:6, 613:8, 616:17, 618:22, 751:25, 752:1, 752:2, 752:5, 752:8, 755:16

**wrote** [6] - 642:14, 642:15, 684:18, 693:11, 695:1, 695:11

**WV** [3] - 607:16, 607:19, 607:23

## Y

**yard** [1] - 787:16

**yards** [1] - 690:9

**year** [9] - 612:3, 631:4, 638:13, 645:4, 683:8, 685:1, 782:19, 788:18, 820:23

**years** [26] - 630:20, 630:21, 631:5, 631:11, 637:8, 660:13, 660:17, 666:24, 667:10, 686:6, 712:24, 771:18, 774:12, 782:2, 786:15, 786:17, 787:10, 788:20, 789:2, 793:4, 809:4, 814:25, 817:11, 820:6, 824:3, 827:24

**yelling** [1] - 787:9

**yellow** [3] - 652:22, 652:23, 653:1

**yellowish** [2] - 651:7, 652:11

**yesterday** [15] - 609:6, 617:25, 634:5, 634:20, 648:23, 650:10, 654:7, 656:8, 659:1, 675:18, 723:21, 774:11, 788:24, 816:13

**YMCA** [1] - 809:7

**young** [2] - 630:13, 769:5

**youngest** [1] - 821:4

**yourself** [6] - 627:14, 638:3, 740:24, 758:17, 814:21, 825:9

**yourselves** [3] - 680:12, 680:13, 789:14

## Z

**zero** [3] - 685:21, 686:4, 797:17